# EXHIBIT R



April 25, 2016

Jonathan N. Rosen

Via Email:

Ms. Cathy Yu, Senior Counsel
U.S. Senate Special Committee on Aging
The Honorable Claire McCaskill, Ranking Member
G31 Dirksen Senate Office Building
Washington, D.C. 20510-6050, 2

Re: **Philidor's Responses to Interrogatories**

Dear Ms. Yu:

    Philidor genuinely appreciates the opportunity to cooperate with your request, which counsel received last Saturday afternoon. We also appreciate your time in last Friday's telephone call.

    Consistent with Philidor's intention to cooperate, Philidor is volunteering the enclosed information for your review. Today's disclosure involves a detailed summary of responsive data. The cover email to this letter contains a link for accessing the exhibits.

    Although the content is extensive, we respectfully reserve the ability to supplement our voluntary responses as may become necessary.

    Please do not hesitate to contact us if we can provide you with any further assistance.

Best,

Jonathan N. Rosen

JNR:pmd
cc: Harry Sporidis
     Mary Clare Bonaccorsci

polsinelli.com

Atlanta   Boston   Chicago   Dallas   Denver   Houston   Kansas City   Los Angeles   Nashville   New York   Phoenix
St. Louis   San Francisco   Washington, D.C.   Wilmington
Polsinelli PC, Polsinelli LLP in California



## PHLIDOR'S VOLUNTARY INTERROGATORY RESPONSES TO THE UNITED STATES SENATE SPECIAL COMMITTEE ON AGING

1. For the period of January 1, 2010 through the present, please state whether Philidor filled prescriptions for Syprine or Cuprimine.

    a. If the answer to the preceding question is "yes" for either drug, please state separately for each drug the number of prescriptions filled by year from 2010 through 2015, and 2016 to date.

    Philidor did not fill prescriptions for Syprine or Curprimine. The vast majority of drugs dispensed pursuant to Valeant's Patient Assistance Program ("Valeant's Program") included dermatological and topical acne drugs.

2. **Did OncoSource ever fill prescriptions for Syprine or Cuprimine**

    Philidor had no business relationship with OncoSource and does not know whether OncoSource filled prescriptions for Syprine and Cuprimine.

3. **Please describe the terms of the relationship between Valeant and Philidor when it was initiated, including the terms that addressed how Philidor was paid for the services it provided Valeant.**

    From September 2013 to January 2016, Philidor administered a copay card for Valeant's Program.

    Patients received prescribed medications at a low cost to them. Medicare and Medicaid were not billed under Valeant's Program.

    The Valeant Program was managed by Opus Health. Opus Health created unique BIN PCNs on patient assistance cards. Valeant paid a subsidy to Philidor to cover the difference between a patient's maximum copay of $35 and the amount paid by that patient's insurance. Any subsidy paid by Valeant to Philidor represented an offset to the cost of the medication charged by Valeant to Philidor.

    Where the patient had commercial insurance, Philidor processed the Valeant copay card as the patient's secondary insurance. Patients that did not have commercial insurance could elect a self-pay option which enabled the patient to pay a flat fee for access to the Valeant prescribed drugs under Valeant's Program. The flat fee was exclusively defined by the manufacturer. In those circumstances, the Valeant copay card was processed as the patient's primary insurance.

    Pursuant to Master Service and Pharmacy Dispensing Agreement, Philidor was paid a flat and predetermined transactional and other support fee for its role. *See* Master Services Agreement at Exhibit B. Philidor's profit was not variable based on dispensing outcomes.

1



In administering Valeant's Program, Philidor always complied with the requirements of the physician's order. As a result, Philidor's dispensing behavior was agnostic to its contractual relationships and simply mirrored the independent judgment of the prescribing physician.

Philidor's role in administering Valeant's Program was consistent with industry practice. For example, Rx Crossroads provides a materially similar service for Anacor Pharmaceuticals' toe nail fungus drug, Kerydin. Rx Crossroads, which is owned by CVS Caremark, has enjoyed uninterrupted reimbursement from PBMs and payors. Further, Walgreens is now administering the same Valeant Program.

*See* Master Service and Pharmacy Dispensing Agreement at AGING 2-35.

*See* Distribution Services Agreement at AGING 36-43.

4. **Did the terms of the relationship change over time?**

Yes.

a. **If so, how did the terms of the relationship change?**

The terms of the relationship changed over time and were memorialized in the following agreements:

*See* Purchase Option Agreement at AGING 44-140. ("Option Agreement")

*See* First Amendment to Master Pharmacy and Dispensing Agreement ("First Amendment Agreement") at AGING 141-157.

*See* Distribution and Services Agreement at AGING 158-193. Compare Distribution Services Agreement at 2.7 ("Pharmacy shall purchase Product hereunder at a purchase price that is equal to WAC in effect at the time of such order") with Distribution and Services Agreement at 2.6 ("Philidor shall purchase product hereunder at a purchase price that is equal to the WAC in effect at the time of such order less a 4% discount").

*See* Termination Agreement at AGING 194-226.

5. **Please provide copies of all contractual agreements between Philidor and Valeant, including any fee schedules associated with any such agreements.**

*See* Agreements referred to above at AGING 2-226.

*See* Confidentiality Agreement between Philidor and Valeant at AGING 227-231.

*See* Statement of Work between Philidor and Opus Health at AGING 232-237.

6. **Describe Philidor's role in handling Valeant's Patient Assistance Program.**



*See* response to Interrogatory No. 3.

7.  **Did Philidor fill prescriptions of Valeant products for patients who were not part of a patient assistance program?**

Yes.

Philidor routinely dispensed prescribed medications which were not a part of Valeant's Program. Philidor regularly purchased about 600 non-Valeant Program drugs from a wholesaler each week. These purchases included Valeant and non-Valeant manufactured drugs, including, but not limited to, Valeant drugs which were branded under the name of a manufacturer which Valeant had acquired. Valeant manufactured over 6,000 products and only a small number of its overall portfolio of manufactured drugs were involved in Valeant's Program that was administered by Philidor.

Moreover, Philidor dispensed prescribed medications for Valeant pharmaceuticals outside of Valeant's Program for a commercially-insured patient with a co-payment of less than $35.

8.  **Please list the Valeant products for which Philidor filled prescriptions.**

Valeant's Program drugs included: Acanya, Addyi, Atralin, Aurstat, Elidel, Hylatopic, Locoid, Luzu, Migranal, Minocin, Retin-A Micro, Tretinoin Gel Microsphere, Xerese, Ziana, Zovirax, Zyclara, Aldara, Bensal, BenzaClin, Carac, Clarifoam, Clingdagel, Efudex, Ertaczo, Fluocinonide, Loprox Shampoo, Noritate, Vanos, Aplenzin, Dihydroergotamine, Jublia, Onexton, Solodyn, Targretin, Wellbutrin XL, Alrex, Bepreve, Besivance, Istalol, Lacrisert, Lotemax, Prolensa, Timoptic Ocudose, Zirgan, Zylet, Biafine, Elastiderm décolletage, Nu-Derm Blender, Nu-Derm Clear, Nu-Derm Sunfader, Obagi C Rx Clarifying Serum, C-Therapy Night Cream, Renova, Tretinoin Cream, Tretinoin Gel.

9.  **Please list all of the pharmacy companies that were selling Valeant's dermatology products between January 2015 - October 2015.**

Neither Philidor nor its affiliate pharmacies were engaged in marketing and selling Valeant products. Consistent with the terms of Philidor's contractual agreements with Valeant, Philidor dispensed prescribed Valeant medications based on a valid physician's order.

Philidor was contractually involved with the following network pharmacies which dispensed Valeant pharmaceuticals, among others:

Cambria Pharmacy

West Wilshire Pharmacy

R&O Pharmacy



        Safe Rx Pharmacy

        Orbit Pharmacy

        D&A Pharmacy

        Prescription Shoppe

        Heritage Compounding Pharmacy

        Parkwest Pharmacy

**10.  Did Valeant play a role in Philidor's operations at any time?**

Yes.

    **a.  If so, what role did Valeant play and when?**

Philidor relied on a small number of former Medicis employees to help Philidor avoid the chronic fulfillment issues and related customer dissatisfaction which had plagued OncoSource. Before working on site at Philidor, these same employees had previously worked on site at OncoSource, where they developed significant expertise in identifying and remediating operational challenges which inhere in an alternative fulfillment business model.

At Philidor, these former Medicis employees worked at Philidor's direction and were only delegated authority by Philidor on support service issues, including leveraging the experience that the former Medicis employees had gained at Oncosource. Pharmacy operations were always and exclusively administered by the Pharmacist in Charge. The participation of the former Medicis employees was limited to support services to ensure patient and medical professional satisfaction.

Subsequent to the Option Agreement that was entered into in December 2014 between Philidor and Valeant, Valeant's internal auditors, Deloitte & Touche ("Deloitte") evaluated and played a role in Philidor's operations. Deloitte oversaw the implementation of certain policies, procedures and internal controls to bring Philidor into compliance with Sarbanes-Oxley ("SOX"). Deloitte and Valeant's external auditor PricewaterhouseCoopers ("PwC") then evaluated those process and procedures pursuant to normal audit protocols. Prior to the Option, Philidor was a privately held company, which was, therefore, not subject to the SOX mandates for publically-held companies.

**11.  Did Valeant employees ever work at Philidor and/or on behalf of Philidor while employed at Valeant?**

As noted above in response to Interrogatory 10, and as also noted below in response to Interrogatory No. 12 below, the former Medicis employees worked on-site at Philidor to help Philidor avoid the chronic support service problems that had been experienced by

4



OncoSource. The former Medicis employees were Gary Tanner, Dean Griffin, Alison Pritchett and Bijal Patel.

After the Option Agreement, Fabien Forrester-Charles became a Valeant employee who worked onsite at Philidor.

**12.    Who did Philidor communicate with at Valeant?**

In the ordinary course of Philidor's day-to-day business, Philidor communicated with the following:

- Valeant's accounting department and supply chain regarding Philidor's purchase of product from Valeant;
- Valeant's accounting department regarding financial reconciliation for amounts paid and owed between the parties;
- Valeant's IT, Valeant's sales department, the former Medicis employees, and Fabien Forrester-Charles;
- Post-option, a joint steering committee comprised of Philidor and Valeant representatives; made semi-annual reports and ongoing reports to Valeant's senior management;
- Valeant's internal auditor (Deloitte) to satisfy any and all information requested;
- Valeant's external auditor (PwC) to satisfy any and all information requested; and
- At the time when Valeant expressed interest in acquiring Philidor, at first as an outright acquisition and later through an Option Agreement, Philidor and/or its legal counsel, Duane Morris, communicated with Valeant's senior management team, compliance officer and general counsel, as well as its outside legal counsel, Hogan Lovells.

**a.    Is Philidor aware of any instance in which a Valeant employee communicated with Philidor under false identities?**

Because the former Medicis employees had access to confidential and Protected Health Information ("PHI"), it was important to Philidor to keep that information confidential and HIPAA compliant.

Philidor identified a compliance risk arising from the potential conveyance of confidential information to a non-Philidor server. This compliance risk arose from an auto-population feature in Philidor's email server. This auto-population issue has been widely reported in the press. *See "Nightmare on Email Street: Lilly Leaks Confidential Settlement Info to NY Times"* at AGING 238-239.

To remediate this risk, Philidor assigned an email address to the former Medicis employees, who had been using a Valeant email address in their past communications with Philidor. Because these individuals' true identities were widely known throughout Philidor, the former Medicis employees were assigned email names associated with prominent movie characters, musicians or actors. *See* Email Communication at AGING 240 (email from Philidor



employee to Brian Wilson). Some humor was used in assigning these email names as the email names were known to be just that -- email names (e.g., Peter Parker, Brian Wilson.)

This procedure successfully protected a patient's right to confidentiality of their PHI. Moreover, this procedure is common and has been reported in the press as a means to protect unintended disclosures arising from auto population features. *See* "*While US Attorney General, Eric Holder, Used Kareem Abdul Jabbar's Birth Name as His Official Email Address,*" at AGING 241-248.

13. **Did Philidor ever receive or conduct any communications with Valeant investors?**

Yes.

Aside from attorney communications relating to pending derivative shareholder lawsuits, Philidor received contact, in the fall of 2015, from the following Valeant investors: Sequoia Fund, Brave Warrior Advisors, Goldman Sachs and Pacific Investment Management Company. Each attempted to contact Philidor's executives, employees, former employees, and/or outside investors. In response, cease and desist letters were sent. Philidor is not aware of any additional contact arising from these overtures.

In July 2015, Philidor was invited to attend a Valeant management meeting. Among many others, this meeting was attended by members of Valeant's board members, which included Value Act, a Valeant investor. Philidor did not have direct communications with Value Act at this meeting or otherwise.

14. **Why did Valeant pay Philidor $100 million for the option to buy the company at any time?**

While Philidor cannot speculate about Valeant's actual intentions, Philidor concluded that Valeant's conduct was consistent with a business risk mitigation strategy to prevent Philidor from diverting its limited resources to non-Valeant potential business opportunities.

   a. **Why did Valeant never purchase Philidor?**

Philidor had no role in Valeant's decision-making regarding the non-exercise of its option and cannot speculate about Valeant's intentions. However, Philidor concluded that Valeant's conduct was consistent with a concern about the economic impacts of any PBM response if Valeant had purchased Philidor.

   b. **Did Valeant and Philidor ever undertake any steps for Valeant to purchase Philidor?**

Yes. Between approximately August through November 2014, a purchase was discussed between Valeant and Philidor. Each party was represented by counsel. Valeant engaged Hogan Lovells; Philidor engaged Duane Morris.

6



**15. Did Valeant have the right to access Philidor's books, records, and facilities at any time in their relationship?**

Valeant did not have an unfettered right to access Philidor's books, records and facilities at any time.

Discrete contractual provisions enabled Valeant to have delimited access to specific types of information for a contractually arranged fee. *See* Dispensing Agreement and Distribution Agreement. These disclosures and their corresponding payment terms were consistent with the ordinary course of business.

During the due diligence attendant to the execution of the Option Agreement, Philidor entered into a Confidentiality Agreement with Valeant. Pursuant to this agreement, Philidor elected to provide information to Valeant and its outside legal counsel concerning the proposed transaction.

Post-option, Philidor fully complied with its disclosure obligations under the Option Agreement. *See* Option Agreement.

Additional post-option disclosures included responses to requests of Valeant's outside and inside auditors who treated Philidor and Philidor's affiliated pharmacies as Valeant-consolidated entities. These requests were governed by standard internal audit procedures and involved monthly trial balance disclosures, participation in Valeant's Management and Analysis Reporting System ("MARS") reports, quarterly audits and end of the year audits. These requests also included reviews of Philidor's internal control process and procedures for compliance by Valeant's internal auditor.

Additional post-option disclosures involved monthly financial reporting from Philidor to Valeant of Philidor's and affiliates trial balances and sales reports.

    **a. If so, did Valeant ever undertake an internal review or audit of these files?**

Yes. See above.

    **(i) If so, when did Valeant do so?**

Philidor made monthly data disclosures from February 2014 through January 2016.

Philidor made due diligence disclosures from September 2014 through November 2014.

Philidor provided requested information in PwC's end of the year audit for FY 2014.

Philidor provided requested information to Valeant in connection with Valeant's internal review of Philidor financials for post-option activity in FY 2014.

Philidor provided requested information in PwC's quarterly audits of Valeant for 1Q15-4Q15.



Philidor provided requested information in PwC's annual audit of Valeant for FY2015

Philidor provided requested information to Valeant for its MARS reports for March, 2015, June 2015, September 2015, and October 2015.

Philidor provided requested information in Deloitte's review of Philidor's SOX compliance in April 2015, July 2015, and November - December 2015.

In August 2015, Philidor made a disclosure to Valeant in support of a milestone payment under the Option Agreement.

Post-option, Philidor made monthly financial disclosures to Valeant from December 2014 – December 2015.

16. **Did Valeant ever instruct or encourage Philidor to alter doctors' prescriptions?**

No.

Valeant did not ever instruct or encourage Philidor to alter a doctor's prescription. At all times, Philidor's policy and practice were to dispense the drug prescribed and supported by the patient's treating physician. The vast majority of patients who came to Philidor did so in order to obtain the benefit of Valeant's Program. Moreover, approximately 95% of those drugs that were covered by this program did not have a generic alternative. For the less than 5% of drugs for which there was a generic, most of those generic drugs were manufactured by and sold to Philidor by Valeant. Valeant did not instruct or encourage Philidor to alter a doctor's prescription through product switching or otherwise.

17. **Please describe the function of Philidor's network of affiliate pharmacies.**

Consistent with industry practice, Philidor supported a network of pharmacies in compliance with state pharmacy law. Philidor used a database which was generally shared by the network pharmacies in support this objective. Philidor used the database to transfer prescriptions to legal entities with the required state license. Philidor also used its network to match legal entities with the payor relationship that corresponded with the patient's insurance. Where multiple network pharmacies could adjudicate the same claim, Philidor transferred the prescription within the network for operational reasons, including proximity to the patient's delivery site, and to avoid aggregate payor reimbursement thresholds that would have otherwise triggered anticompetitive backlash from PBMs. Philidor did not transfer any prescription to maximize reimbursement rates, which were unknown to Philidor at the time of the transfer and not material to Philidor's fee-based business model.

18. **Please describe Philidor's relationship with R&O Pharmacy.**

R&O was a network pharmacy within Philidor's central processing network with their full awareness and participation.

8



    a.    When was the relationship between Philidor and R&O Pharmacy established?

This relationship was established on December 1, 2014.

**19.** Did Philidor instruct its employees at Philidor or instruct any of its affiliate pharmacies to try different pharmacy codes from around the country to improve the chances of a reimbursement?

No. *See* Response to Interrogatory No. 17.

**20.** When did Valeant sever ties with Philidor?

Valeant advised Philidor of its intention to terminate on October 29, 2015. A binding term sheet was signed by Philidor on November 1, 2015. The termination agreement was executed in January 22, 2016.

    a.    Why did it do so?

Philidor has no knowledge of Valeant's internal decision making regarding the origination and exercise of the termination agreement. Philidor was surprised and disappointed at Valeant's decision to terminate in the wake of false allegations made in the media and later affiliate with Walgreens for the same service which Philidor had provided under Valeant's Program.