EXHIBIT T

EXECUTION VERSION

PURCHASE OPTION AGREEMENT

Dated as of December 15, 2014

among

**KGA FULFILLMENT SERVICES, INC.,**

**EACH OF THE MEMBERS SET FORTH ON SCHEDULE A**

**and**

**PHILIDOR RX SERVICES, LLC**

Confidential Treatment Requested by Philidor

## Table of Contents

|  |  | Page |
|---|---|---|
| ARTICLE I . DEFINITIONS; CERTAIN RULES OF CONSTRUCTION | | 1 |
| 1.1 | Definitions. | 1 |
| | | |
| ARTICLE II . PURCHASE OPTION AND ACQUISITION | | 15 |
| 2.1 | Purchase Option to Acquire Company Equity Interests. | 15 |
| 2.2 | Purchase Option Consideration. | 15 |
| 2.3 | The Purchase Option Closing. | 16 |
| 2.4 | Conditions to Payment of Purchase Option Consideration. | 16 |
| 2.5 | Milestone Payments. | 17 |
| 2.6 | The Closing. | 20 |
| 2.7 | Closing Deliveries. | 20 |
| 2.8 | Tax Treatment of the Transaction and Allocation of Purchase Option Consideration and Other Consideration. | 21 |
| 2.9 | Commercially Reasonable Efforts for Purchase Option Closing. | 22 |
| | | |
| ARTICLE III . REPRESENTATIONS AND WARRANTIES REGARDING THE COMPANY | | 22 |
| 3.1 | Organization; Predecessors; Subsidiaries. | 22 |
| 3.2 | Power and Authorization for Transactions Contemplated Hereunder | 23 |
| 3.3 | Authorization of Governmental Authorities. | 23 |
| 3.4 | Noncontravention. | 23 |
| 3.5 | Capitalization of the Company. | 24 |
| 3.6 | Financial Statements. | 24 |
| 3.7 | Absence of Certain Developments. | 25 |
| 3.8 | Debt. | 27 |
| 3.9 | Assets. | 27 |
| 3.10 | Accounts Receivable. | 27 |
| 3.11 | Real Property. | 27 |
| 3.12 | Legal Compliance. | 28 |
| 3.13 | Tax Matters. | 31 |
| 3.14 | Employee Benefit Plans. | 32 |
| 3.15 | Environmental Matters. | 34 |
| 3.16 | Contracts. | 35 |
| 3.17 | Affiliate Transactions. | 37 |
| 3.18 | Employees. | 37 |
| 3.19 | Litigation; Governmental Orders. | 38 |
| 3.20 | Insurance. | 38 |
| 3.21 | No Brokers. | 39 |
| 3.22 | Customers and Suppliers. | 39 |
| 3.23 | Intellectual Property. | 39 |

Confidential Treatment Requested by Philidor   AGING-000045

ARTICLE IV . REPRESENTATIONS AND WARRANTIES ABOUT THE
    MEMBERS.................................................................................41

    4.1    Organization ...................................................................41
    4.2    Power and Authorization...............................................41
    4.3    Authorization of Governmental Authorities..................41
    4.4    Noncontravention. .........................................................41
    4.5    Title. .............................................................................42
    4.6    No Brokers. ....................................................................42
    4.7    Litigation. ......................................................................42
    4.8    Disclaimer of Other Representations and Warranties. ...42

ARTICLE V . REPRESENTATIONS AND WARRANTIES OF THE BUYER .........43

    5.1    Organization. .................................................................43
    5.2    Power and Authorization...............................................43
    5.3    Authorization of Governmental Authorities..................43
    5.4    Noncontravention. .........................................................43
    5.5    No Brokers. ....................................................................44
    5.6    Litigation. ......................................................................44
    5.7    Sufficient Funds. ...........................................................44

ARTICLE VI . COVENANTS ..................................................................44

    6.1    Commercially Reasonable Efforts for Closing. .............44
    6.2    Operation of Business. ..................................................44
    6.3    Notices and Consents; Regulatory Filings. ...................47
    6.4    Buyer's Access to Premises; Information; Financial Statements................49
    6.5    Notice of Developments.................................................50
    6.6    Exclusivity.....................................................................50
    6.7    Expenses. .......................................................................51
    6.8    Confidentiality...............................................................51
    6.9    Publicity.........................................................................52
    6.10   Employee Matters. .........................................................52
    6.11   Operation of the Company After the Closing Date .......54
    6.12   Further Assurances.........................................................54
    6.13   Irrevocable Power of Attorney; Pledge of Equity Interests; Vote of
        Members .......................................................................54
    6.14   Establishment of JSC.....................................................56

ARTICLE VII . CONDITIONS TO THE BUYER'S OBLIGATIONS AT THE
    CLOSING................................................................................58

    7.1    Purchase Option Exercise..............................................58
    7.2    Performance...................................................................58
    7.3    Antitrust.........................................................................58
    7.4    Evidence of Transfer; Member Approval. .....................58

Confidential Treatment Requested by Philidor        AGING-000046

7.5      Resignations. ................................................................................58

ARTICLE VIII . CONDITIONS TO THE MEMBERS' OBLIGATIONS AT
          THE CLOSING .........................................................................59

8.1      Antitrust. ...................................................................................59
8.2      Payment Obligations. .................................................................59

ARTICLE IX . TERMINATION ........................................................................59

9.1      Termination of Agreement. .........................................................59
9.2      Effect of Termination. ................................................................60
9.3      Return of Documentation. ...........................................................60

ARTICLE X . INDEMNIFICATION ...................................................................60

10.1     Indemnification by the Members. ................................................60
10.2     Indemnity by the Buyer. .............................................................62
10.3     Time Limit for Certain Claims. ....................................................63
10.4     Indemnification Procedures. ........................................................63
10.5     No Circular Recovery. ................................................................65
10.6     Reduction by Insurance Proceeds and Net Tax Benefits. ................65
10.7     Set-Off Rights; Exclusive Remedy. ..............................................66

ARTICLE XI . TAX MATTERS ........................................................................66

11.1     Tax Returns. ..............................................................................66
11.2     Pre-Closing Taxes. .....................................................................67
11.3     Straddle Period. .........................................................................67
11.4     Tax Sharing Agreements. ............................................................68
11.5     Transfer Taxes. ..........................................................................68
11.6     Cooperation on Tax Matters. .......................................................68
11.7     Amendments of Tax Returns. .......................................................68
11.8     Tax Proceedings. ........................................................................68
11.9     Tax Items of the Company and the Business. .................................69
11.10    Pennsylvania Tax Credit. ............................................................69
11.11    Withholding. ..............................................................................70

ARTICLE XII . MISCELLANEOUS ...................................................................70

12.1     Notices. .....................................................................................70
12.2     Succession and Assignment; No Third-Party Beneficiary. ...............71
12.3     Amendments and Waivers. ..........................................................72
12.4     Entire Agreement. ......................................................................72
12.5     Listed Documents, etc. ...............................................................72
12.6     Counterparts. .............................................................................72
12.7     Severability. ..............................................................................72

-iii-

                                          AGING-000047

12.8    Headings. ...................................................................................... 72
12.9    Governing Law. ............................................................................. 73
12.10   Jurisdiction; Venue; Service of Process. ...................................... 73
12.11   Specific Performance. ................................................................... 73
12.12   Delivery by Facsimile or Other Electronic Transmission. ........... 74
12.13   Appointment of Members' Representative. .................................. 74

**Schedules**

Schedule A            Acquisition Schedule
Schedule B            Disclosure Schedule
Schedule C            Time-Based Milestone Payment Allocation Schedule.
Schedule D            Net Sales Milestone Payment Allocation Schedule
Schedule 1.1-1        Buyer's Knowledge
Schedule 1.1-2        Permitted Transaction Bonuses
Schedule 1.1-3        Company's Knowledge
Schedule 2.8          Allocation Schedule
Schedule 5.4          Noncontravention
Schedule 6.2(b)       Permitted Actions Prior to Closing
Schedule 6.2(b)(xiv)  Selected States

**Exhibits**

Exhibit A             Form of Non-Competition Agreement

Confidential Treatment Requested by Philidor                                    AGING-000048

## PURCHASE OPTION AGREEMENT

This Purchase Option Agreement dated as of December 15, 2014 (as amended or otherwise modified, the "Agreement") is among (i) KGA Fulfillment Services, Inc., a Delaware corporation (the "Buyer"), (ii) each of the Persons listed as a "Member" on the Acquisition Schedule (each a "Member" and together the "Members"), and (iii) Philidor Rx Services, LLC, a Delaware limited liability company (the "Company").

WHEREAS, the Members collectively own the Company Equity Interests; and

WHEREAS, upon the exercise of the Purchase Option (as hereafter defined) by Buyer, the Members desire to sell the Company Equity Interests to the Buyer, and the Buyer desires to purchase all of the Company Equity Interests from the Members.

NOW, THEREFORE, in consideration of the premises and mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Buyer and each Member hereby agree as follows:

## ARTICLE I.  DEFINITIONS; CERTAIN RULES OF CONSTRUCTION

1.1   Definitions.  As used herein, the following terms have the following meanings:

"1933 Act" means the Securities Act of 1933, as amended.

"2013 Financials" has the meaning set forth in Section 3.6(a)(i).

"Acquisition Schedule" means the Acquisition Schedule attached hereto as Schedule A.

"Action" means any litigation, assessment, arbitration, investigation, hearing, grievance, or similar proceeding against, by or before any Governmental Authority.

"ADRs" has the meaning set forth in Section 3.12(d).

"Affiliate" means, with respect to any specified Person at any time, each Person directly or indirectly controlling, controlled by or under direct or indirect common control with such specified Person at such time.  For purposes of this definition, "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the Preamble.

"Allocation Schedule" has the meaning set forth in Section 2.8(a).

                     AGING-000049

"Allocable Portion" means with respect to a Member's portion of a particular amount, including any Losses, that portion of such particular amount as is equal to (i) the total amount of such particular amount (e.g., the total amount of Losses) multiplied by (ii) a fraction, (A) the numerator of which is the sum, as of the time of calculation, of (i) the portion of the Initial Purchase Option Consideration paid to such Member on the Purchase Option Closing Date and (ii) the portion of all Milestone Payments for which the associated Milestone Events have been achieved as of the calculation date that such Member has been paid, or would be paid in accordance with the Time-Based Milestone Payment Allocation Schedule and/or Net Sales Milestone Payment Allocation Schedule, as applicable, assuming such portion of such Milestone Payments were paid in full to such Member as of such calculation date without any set-off pursuant to Section 2.5(e), after deducting such amounts paid to any designee(s) of such Member, and (B) the denominator of which is the sum of (i) the Initial Purchase Option Consideration and (ii) the total amount of all Milestone Payments for which the associated Milestone Events have been achieved as of the calculation date that have been paid to all Members entitled to receive them, or would be paid assuming such Milestone Payments were paid in full as of such calculation date, without any set-off pursuant to Section 2.5(e), after deducting such amounts paid to any and all the designee(s) of any and all of such Members.

"Approval" means any authorization, approval, consent, ratification, or any extension, modification, amendment or waiver of any of the foregoing.

"Assets" has the meaning set forth in Section 3.9

"Basket" has the meaning set forth in Section 10.1(b)(i).

"Business" means the Company's and its Subsidiaries' business of full-service pharmaceutical fulfillment and distribution operations and any other business of the Company or its Subsidiaries as of the date of this Agreement.

"Business Day" means any weekday other than a weekday on which banks in New York, New York are authorized or required to be closed.

"Buyer" has the meaning set forth in the Preamble.

"Buyer Employee Plans" has the meaning set forth in Section 6.10(b).

"Buyer Fundamental Representations" has the meaning set forth in Section 10.2(b)(ii).

"Buyer Indemnified Person" has the meaning set forth in Section 10.1(a).

"Buyer's Knowledge," and all permutations thereof, means the actual knowledge, after reasonable investigation, of those persons set forth on the attached Schedule 1.1-1.

"Buyer Requested Employee" has the meaning set forth in Section 6.10(a).

2

"Calendar Quarter" means each of the three (3) consecutive months ending on March 31, June 30, September 30 and December 31.

"Cap" has the meaning set forth in Section 10.1(b)(i).

"Closing" has the meaning set forth in Section 2.6.

"Closing Date" has the meaning set forth in Section 2.6.

"Code" means the U.S. Internal Revenue Code of 1986, as amended or supplemented from time to time.

"Collateral" has the meaning set forth in Section 6.13(b).

"Company" has the meaning set forth in the Preamble; provided, however, that unless the context expressly indicates otherwise, for purposes of Article III and Article VI, the term "Company" shall include all Subsidiaries of the Company.

"Company 401(k) Plan" has the meaning set forth in Section 6.10(c).

"Company Debt" means any Debt of the Company or of any of its Subsidiaries.

"Company Equity Interests" means all of the issued and outstanding Equity Interests of the Company.

"Company Equity Interests Acquisition" means the acquisition of the Company Equity Interests by Buyer pursuant to the exercise of the Purchase Option.

"Company Plan" has the meaning set forth in Section 3.14(a).

"Company IT" means all Software and information technology systems currently distributed, used or maintained by the Company or its Subsidiaries.

"Company Transaction Bonuses" shall mean, the amount of all bonuses, severance payments and other amounts paid or payable by the Company or its Subsidiaries to employees of the Company or its Subsidiaries as a result of the Purchase Option Closing, including any amounts payable under any retention agreements, severance agreements, employment agreements or similar agreements or arrangements, and any applicable Taxes related to such payments that the Company or its Subsidiaries may be subject to; provided, however, that the term Company Transaction Bonuses shall not include those bonus amounts described in Schedule 1.1-2 or severance payments made to an employee as a result of any "double trigger" severance right, the right to which payment arises after the Purchase Option Closing Date (provided such severance obligation was in effect prior to the date of this Agreement and disclosed to Buyer prior to the date of this Agreement or is entered into after the date of this Agreement with the consent of Buyer) as a result of the Company's termination of such employee's employment after the Purchase Option Closing Date or as a result of the employee's termination of his or her employment with the Company for "good reason" (as

3

AGING-000051

defined in the applicable agreement relating to such severance obligation but excluding any payment arising by virtue of a "good reason" termination right that is triggered as a result of the Purchase Option Closing or the transactions contemplated by this Agreement).

"Company's Knowledge", and all permutations thereof, means the actual knowledge, after reasonable investigation, of those individuals set forth on the attached Schedule 1.1-3.

"Compensation" means, with respect to any Person, all salaries, compensation, remuneration, bonuses or benefits (including issuances or grants of Equity Interests), made directly or indirectly by the Company or its Subsidiaries to such Person or Affiliates of such Person.

"Confidentiality Agreement" means the Confidentiality Agreement dated as of October 26, 2014 between Buyer's Affiliate, Valeant Pharmaceuticals International, Inc., and the Company.

"Contractual Obligation" means, with respect to any Person, any contract, agreement, deed, mortgage, lease or license, whether written or oral, which is Enforceable against such Person or any material Assets of such Person.

"Current Liability Policies" has the meaning set forth Section 3.20.

"Debt" means, with respect to any Person at any date, without duplication: (i) all obligations for borrowed money or in respect of loans or advances, (ii) all obligations evidenced by bonds, debentures, notes, interest rate swap agreements or other similar instruments or debt securities, (iii) all obligations in respect of letters of credit and bankers' acceptances issued for the account of such Person, (iv) all obligations arising from cash/book overdrafts or negative cash balances, (v) all obligations arising from deferred compensation arrangements, employee bonuses (whether accrued or not), (vi) all obligations of such Person secured by an Encumbrance, (vii) all accrued but unpaid franchise, income and excise taxes, (viii) all capital lease obligations determined in accordance with GAAP (excluding any portion that is classified as interest), (ix) notes and accounts payable to any Affiliates of such Person (and in the case of the Company or any of its Subsidiaries, to any of the Members) or any officers or employees of such Person, (x) all Guarantees of such Person in connection with any of the foregoing, and (xi) all accrued interest, prepayment premiums or penalties related to any of the foregoing.

"Disclosed Contract" has the meaning set forth in Section 3.16(b).

"Employee Plan" means any plan, program, agreement, policy or arrangement, whether or not reduced to writing, and whether covering a single individual or a group of individuals, that is (a) a welfare plan within the meaning of Section 3(1) of ERISA, (b) a pension benefit plan within the meaning of Section 3(2) of ERISA, (c) a stock bonus, stock purchase, stock option, restricted stock, stock appreciation right, profit sharing or similar equity-based plan or agreement, or (d) any other deferred-compensation, retirement, severance, retention, change-in-control, leave, vacation, welfare-benefit, bonus, incentive or fringe-benefit plan, program,

4

                                   AGING-000052

agreement or arrangement maintained for the benefit of any officers, directors, employees or consultants of the Business.

"Encumbrance" means any lien, license to a third party, option, pledge, security interest, mortgage, right of way, easement, encroachment, right of first offer or first refusal, buy/sell agreement and any other material restriction or covenant with respect to, or material condition governing the use, voting (in the case of any security or equity interest), transfer, receipt of income or exercise of any other material attribute of ownership.

"Enforceable" means, with respect to any Contractual Obligation, that such Contractual Obligation is a legal, valid and binding obligation of such Person enforceable by or against such Person in accordance with its terms, except to the extent that enforcement of the rights and remedies created thereby is subject to bankruptcy, insolvency and other similar laws of general application affecting the rights and remedies of creditors and general principles of equity.

"Environmental Laws" means any Legal Requirement relating to (a) releases or threatened releases of Hazardous Substances, (b) pollution or protection of the environment, (c) the manufacture, handling, transport, use, treatment, storage, or disposal of Hazardous Substances or (d) human health and safety, including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601 et seq., the Hazardous Materials Transportation Act, 49 U.S.C. 5101 et seq., the Resource Conservation and Recovery Act, 42 U.S.C. 6901 et seq., the Clean Water Act, 33 U.S.C. 1251 et seq., the Clean Air Act, 42 U.S.C. 7401 et seq., the Toxic Substances Control Act, 15 U.S.C. 2601 et seq., and the Oil Pollution Act of 1990, 33 U.S.C. 2701 et seq., and the regulations promulgated pursuant thereto, and all analogous state and local statutes and laws.

"Equity Interests" means (a) any capital stock, share, partnership or membership interest, unit of participation or other similar interest (however designated) in any Person and (b) any option, warrant, purchase right, conversion right, exchange right or other Contractual Obligation to acquire any such interest or otherwise share in the equity, profit earnings, losses or gains of such Person (including stock appreciation, phantom stock, profit participation or other similar rights).

"ERISA" means the federal Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means each business or entity which is a member of a "controlled group of corporations," under "common control" or an "affiliated service group" with the Company or its Subsidiaries within the meaning of Sections 414(b), (c) or (m) of the Code, or required to be aggregated with the Company under Section 414(o) of the Code, or is under "common control" with the Company or its Subsidiaries within the meaning of Section 4001(a)(14) of ERISA.

5

Confidential Treatment Requested by Philidor            AGING-000053

"Existing Services Agreement" means the Distribution and Services Agreement dated as of the date hereof between the Company and Buyer's Affiliate, Valeant Pharmaceuticals North America LLC.

"Financials" has the meaning set forth in Section 3.6(a)(ii).

"GAAP" means generally accepted accounting principles in the United States, applied consistently, as in effect from time to time.

"General Survival Period" has the meaning set forth in Section 10.3(c).

"Government Programs" has the meaning set forth in Section 3.12(d).

"Governmental Authority" means any United States federal, foreign, state, provincial or local government, or political subdivision thereof, or any authority, agency or commission entitled to exercise any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power, any court or tribunal (or any department, bureau or division thereof), or any arbitrator or arbitral body, and includes any contractor acting on behalf of a Governmental Authority.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, ruling, determination or award entered by or with any Governmental Authority.

"Guarantee" means, with respect to any Person, (a) any guarantee of the payment or performance of, or any contingent obligation in respect of, any Debt or other Liability of any other Person or (b) any other arrangement whereby credit is extended to any obligor (other than such Person) on the basis of any promise or undertaking of such Person (i) to pay the Debt or other Liability of such obligor, (ii) to purchase any obligation owed by such obligor, (iii) to purchase or lease assets under circumstances that are designed to enable such obligor to discharge one or more of its obligations, or (iv) to maintain the capital, working capital, solvency or general financial condition of such obligor.

"Hazardous Substance" means any substance included in the definition of such term in the Comprehensive Environmental Response, Compensation, and Liability Act, commonly known as "Superfund," or listed, regulated or defined under any other Environmental Law, and including petroleum (or any fraction thereof), any asbestos or asbestos containing materials, mold, polychlorinated biphenyls and radioactive materials.

"Health Care Legal Requirement" means any Legal Requirement relating to health care regulatory matters, including, without limitation (i) 42 U.S.C. §§ 1320a-7, 7a and 7b, which are commonly referred to as the "Federal Fraud Statutes," (ii) 42 U.S.C. § 1395nn, which is commonly referred to as the "Stark Law," (iii) 31 U.S.C. §§ 3729-3733, which is commonly referred to as the "Federal False Claims Act," (iv) the Occupational Safety and Health Act ("OSHA") and all regulations promulgated under such legislation, (v) the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 321 et seq., and all regulations promulgated thereunder, (vi) applicable laws of the United States Drug Enforcement Administration ("DEA") and all

6

regulations promulgated thereunder, (vii) applicable state anti-kickback, fee-splitting and patient brokering laws, (viii) Information Privacy and Security Laws, (ix) federal and state laws governing the licensure and operation of pharmacies and the professional conduct of pharmacists, and (x) the Public Health Service Act, 42 U.S.C. § 201 et seq. and all regulations promulgated thereunder.

"HIPAA" has the meaning set forth in Section 3.12(e).

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Inception" means, with respect to the Company, January 2, 2013 and with respect to any of the Company's Subsidiaries, the date on which such Subsidiary was first formed and organized as a legal entity.

"Indemnification Claim" means a claim that may be made or suit instituted seeking indemnification pursuant to Section 10.1 or 10.2, as the case may be.

"Indemnification Notice" has the meaning set forth in Section 10.4.

"Indemnified Party" means, with respect to any Indemnification Claim, the Buyer Indemnified Person or Member Indemnified Person asserting such claim under Section 10.1 or 10.2, as the case may be.

"Indemnifying Party" means, with respect to any Indemnification Claim, the Buyer or the Member, as the case may be, against whom such claim is asserted.

"Information Privacy and Security Laws" shall mean all applicable Legal Requirements concerning the privacy and/or security of Personal Information, including, where applicable, HIPAA, state data breach notification laws, state social security number protection laws, the Federal Trade Commission Act, the Gramm Leach Bliley Act, the Fair Credit Reporting Act, the Fair and Accurate Credit Transaction Act, and state consumer protection laws.

"Initial Purchase Option Consideration Amount" has the meaning set forth in Section 2.2(a).

"Initial Purchase Option Consideration Amount Statement" has the meaning set forth in Section 2.2(b).

"Intellectual Property" means patents, trademarks and other similar designations of source or origin, together with the goodwill symbolized thereby, trade names, corporate names, service marks, trade dress rights, internet domain names, copyrights (including Software, compilations, databases, moral rights and rights of attribution and integrity), information technology systems, trade secrets and all other confidential information, know-how, inventions, proprietary processes and procedures, formulae, models, and business methods, and registrations and applications for registration of any of the foregoing.

7

"Interim Financials" has the meaning set forth in Section 3.6(a)(ii).

"IRS" means the United States Internal Revenue Service or any successor thereto.

"JSC" has the meaning set forth in Section 6.14(a).

"Labor Troubles" has the meaning set forth in Section 3.18(a).

"Leased Real Property" has the meaning set forth in Section 3.11(b).

"Legal Requirement" means any federal, state or local law, statute, ordinance, common law ruling or regulation, or any Governmental Order, or any license, franchise, permit or similar right granted under any of the foregoing, or any similar provision having the force or effect of law, including without limitation any Health Care Legal Requirement or related or similar statutes pertaining to any Government Programs or the regulations or requirements promulgated pursuant to any of such statutes.

"Liability" means, with respect to any Person, any liability or obligation of such Person whether known or unknown, whether asserted or unasserted, whether determined, determinable or otherwise, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due.

"Liability Policies" has the meaning set forth in Section 3.20.

"Licenses" has the meaning set forth in Section 3.7(v).

"Losses" has the meaning set forth in Section 10.1(a).

"Material Adverse Effect" means with respect to any Person, any circumstance, change in or effect on such Person that (a) has a material adverse effect on, or results in a material adverse change in, the business (including, with respect to the Company, the Business), assets, properties, Liabilities, condition (financial or otherwise) or results of operations of such Person, or (b) prevents or materially delays or impairs the ability of such Person to consummate the transactions contemplated by this Agreement; provided, however, Material Adverse Effect will not be deemed to result from or arise out of (i) any act or threat of terrorism or war, any armed hostilities or terrorist activities, any threat or escalation of armed hostilities or terrorist activities or any governmental or other response or reaction to any of the foregoing, (ii) with respect to the Company, the taking of any action by the Buyer or any action taken by the Company and approved or consented to by the Buyer in writing, (iii) any change in the general economic conditions in the United States including such conditions related to the Business which does not affect such Person disproportionately in any material respect as compared to such Person's competitors; (iv) the announcement or disclosure of the transactions contemplated by this Agreement in accordance with the terms hereof; or (v) any changes in Legal Requirements that occur after the date of this Agreement and do not affect such Person disproportionately in any material respect as compared to such Person's competitors.  References in this Agreement to dollar amount thresholds will not be deemed to be evidence of materiality or of a Material

8

Adverse Effect.

"Member" and "Members" shall have the respective meanings set forth in the Preamble.

"Member Indemnified Person" has the meaning set forth in Section 10.2(a).

"Member Party Fundamental Representation" means each of the representations and warranties set forth in Sections 3.1 (Organization; Predecessors; Subsidiaries), 3.2 (Power and Authorization), 3.5 (Capitalization of the Company), 3.21 (No Brokers), 4.1 (Organization), 4.2 (Power and Authorization), 4.5 (Title) or 4.6 (No Brokers).

"Member's Knowledge" and all permutations thereof, means:

(i)     with respect to Members that are individuals, the actual knowledge of such Member, after reasonable investigation; and

(ii) with respect to Members that are not individuals, the actual knowledge, after reasonable investigation, of the directors and executive officers (executive vice presidents and above) or equivalent management of such Member.

"Members' Representative" has the meaning set forth in Section 12.13.

"Milestone Event" means each of the Time-Based Milestone Event, the Tranche 1 Milestone Event, the Tranche 2 Milestone Event, the Tranche 3 Milestone Event and the Tranche 4 Milestone Event.

"Milestone Payment Date" means each of the Tranche 1 Milestone Payment Date, the Tranche 2 Milestone Payment Date, the Tranche 3 Milestone Payment Date and the Tranche 4 Milestone Payment Date.

"Milestone Payments" has the meaning set forth in Section 2.5(a).

"Net Sales" means, for a particular period, the gross amount invoiced by the Company or any of its Affiliates or distributors for sale of any Valeant Products, which amount is recognized as gross revenue in accordance with GAAP for such period, less the following deductions actually taken or accrued by Buyer or its Affiliates in accordance with GAAP (except for the items in (b) and (e) below that are classified as operating expenses for GAAP purposes): (a) trade, cash and quantity discounts and allowances, including credit memos and other adjustments such as group purchasing organization fees, inventory management fees and distributor performance agreement fees, costs of coupons and vouchers; (b) freight, shipping, insurance and other transportation expenses; (c) sales tax, value-added tax, excise taxes, tariffs and duties, and other taxes directly related to the sale, all to the extent that such items are included in the gross invoice price and specified on the invoice (but not including taxes assessed against the income derived from such sale); (d) amounts repaid or credited by reason of rejections, defects, withdrawals, recalls or returns or retroactive price reductions, chargebacks,

9

Confidential Treatment Requested by Philidor                                    AGING-000057

rebates or commissions; (e) bad debt write off attributable directly to the sale of the Valeant Product; (f) compulsory payments and rebates directly related to sale of the Valeant Product paid to any governmental authority (or agent thereof) pursuant to governmental regulations by reason of any national or local health insurance or similar program; (g) customary rebates and chargebacks; and (h) such other customary deductions allowed by GAAP. All such discounts, allowances, expenses, taxes, credits, rebates, chargebacks and other deductions shall be fairly and equitably allocated to the Valeant Product and other products or services of Buyer or its respective Affiliates or distributors, such that the Valeant Products do not bear a disproportionate portion of such deductions. The transfer of Valeant Products among the Buyer, the Company and their respective Affiliates or distributors will not be deemed a sale, except in the case of an Affiliate of or distributor for the Company whose primary business is wholesale distribution of pharmaceutical products, in which case the per unit sales price of Valeant Product sold to such Affiliate or distributor shall be deemed to be the average sales price per unit of the Valeant Product sold by the Company and its Affiliates and distributors to Third Parties in arm's length transactions during the calendar quarter in which the sale took place.

"Net Sales Milestone Payment" has the meaning set forth in Section 2.5(c).

"Net Sales Milestone Payment Allocation Schedule" means the Net Sales Milestone Payment Schedule attached hereto as Schedule D.

"Net Sales Milestone Payment Allocation" means with respect to a Member, such Member's percentage allocation of any Net Sales Milestone Payment as set forth on the Net Sales Milestone Payment Allocation Schedule.

"Non-Competition Agreements" means each of the Non-Competition Agreements between each of the Members and certain Affiliates of such Members, on the one hand, and the Company and the Buyer, on the other hand, in the form attached hereto as Exhibit A.

"Other Services Agreement" has the meaning set forth in Section 6.2(b)(vi).

"Operating Agreement" means the Operating Agreement of the Company, dated as of January 15, 2013, as supplemented or amended.

"Option End Date" means the date that is the fifth (5th) anniversary of the Purchase Option Closing Date, unless extended in the sole discretion of the Buyer by prior written notice to the Members' Representative at least five (5) days prior to the end of the current Option Period, in which case the Option End Date shall mean the date that is the tenth (10th) anniversary of the Purchase Option Closing Date.

"Option Exercise Date" has the meaning set forth in Section 2.1.

"Option Period" has the meaning set forth in Section 2.1.

"Ordinary Course of Business" means an action taken by any Person in the ordinary course of such Person's business which is consistent with the past customs and practices

10

AGING-000058

of such Person.

"Organizational Documents" means, with respect to any Person (other than an individual), the certificate or articles of incorporation or organization, certificate of limited partnership and any joint venture, limited liability company, operating, voting or partnership agreement, by-laws, or similar documents, instruments or agreements relating to the organization or governance of such Person, in each case, as amended or supplemented.

"Owned Real Property" has the meaning set forth in Section 3.11(a).

"Payment Obligations" has the meaning set forth in the definition of VPII Guarantee."

"Payor Claims" has the meaning set forth in Section 3.12(d).

"PBGC" has the meaning set forth in Section 3.14(b).

"Percentage Interest" means a Member's percentage Equity Interest in the Company, as set forth on the Acquisition Schedule.

"Periodic Financial Statements" has the meaning set forth in Section 6.4(b)(v).

"Permits" means, with respect to any Person, any Approval, bond, certificate of authority, certificate of need, accreditation, qualification, provider number, license, franchise, permit, order, registration, variance, consent, approval, right, privilege, certificate or other similar authorization issued by, or otherwise granted by, any Governmental Authority or any other Person to which or by which such Person is subject or bound or to which or by which any property, business, operation or right of such Person is subject or bound.

"Permitted Distribution" has the meaning set forth in Section 6.2(b)(iii).

"Permitted Encumbrance" means (a) statutory liens for Taxes, special assessments or other governmental charges not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings and for which reserves have been established in accordance with GAAP, (b) mechanics', materialmens', carriers' and similar statutory liens arising or incurred in the Ordinary Course of Business which liens relate to obligations not due and payable as of the Closing Date and which are not material, and (c) covenants, conditions, restrictions, easements, encumbrances and other similar matters of record that do not materially impair the current occupancy or use of the Leased Real Property in the operation of the Business.

"Person" means any individual or corporation, association, partnership, limited liability company, joint venture, joint stock or other company, business trust, trust, organization, Governmental Authority or other entity of any kind.

Confidential Treatment Requested by Philidor                                        AGING-000059

"Personal Information" means the information pertaining to an individual that is regulated or protected by one or more of the Information Privacy and Security Laws.

"Plan Termination Date" has the meaning set forth in Section 6.10(c).

"Post-Equity Purchase Milestone Payment" means a Milestone Payment that is due and payable after the Closing Date.

"Pre-Equity Purchase Milestone Payment" means a Milestone Payment that is due and payable on or prior to the Closing Date.

"Purchase Option" has the meaning set forth in Section 2.1.

"Purchase Option Closing" means the consummation of the purchase and sale of the Purchase Option from the Members to the Buyer pursuant to ARTICLE II.

"Purchase Option Closing Date" means the date on which the Purchase Option Closing takes place pursuant to ARTICLE II.

"Purchase Option Consideration" has the meaning set forth in Section 2.2(a).

"Purchase Option Exercise Notice" has the meaning set forth in Section 2.1.

"Real Property Leases" has the meaning set forth in Section 3.11(b).

"Requisite Members" means Members holding a majority of the Percentage Interests.

"Representative" means, with respect to any Person, any director, officer, employee, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants, and financial advisors.

"Security Risk Assessment" has the meaning set forth in Section 6.2(a)(viii).

"Selected Company Transaction Expenses" means all Transaction Expenses which are incurred or owed by the Company and/or its Subsidiaries prior to the Purchase Option Closing Date.

"Software" means all computer programs (including all source code and object code), whether in human-readable or machine-readable form, and all documentation related to any of the foregoing.

"Straddle Period" has the meaning set forth in Section 11.2.

"Strategic Plan" has the meaning set forth in Section 6.14(e).

"Subsidiary" means, with respect to any Person, any corporation, partnership,

12

joint venture, limited liability company, trust or other legal entity of which such Person (either alone or through or together with any other Subsidiary) owns, directly or indirectly, at least a majority of the stock or other equity interests in such entity, or of which such Person is a general partner, manager or managing member.

"Successor Buyer" has the meaning set forth in Section 12.2.

"Tax" or "Taxes" means (a) any and all federal, state, local, provincial, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar, including FICA), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind imposed or collected by a Governmental Authority, whether direct or indirect and whether imposed by way of a withholding or a deduction for or on an account of tax, or any charge of any kind in the nature of taxes whatsoever, including any interest, penalty, or addition thereto, whether disputed or not and (b) any Liability for the payment of any amounts of the type described in clause (a) of this definition as a result of being a member of an affiliated, consolidated, combined or unitary group for any period, as a result of any tax sharing or tax allocation agreement, arrangement or understanding, or as a result of being liable for another Person's taxes as a transferee or successor, by contract or otherwise.

"Tax Proceeding" has the meaning set forth in Section 11.6.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Termination Date" has the meaning set forth in Section 9.1.

"Third Party" means a Person other than Buyer, the Company or their respective Affiliates.

"Third Party Claim" has the meaning set forth in Section 10.4(a).

"Third Party Payors" means any third party payors who finance or reimburse the cost of health products or services provided by the Company and the Subsidiaries, such as Blue Cross and/or Blue Shield plans, State government insurers, private insurers, employer self-funded benefit plans and any other person or any entities that maintains Third Party Payor programs.

"Third Party Products" means the proprietary products of Persons other than Buyer or its Affiliates (but, for greater certainty, shall not include any "Products" as defined under the Existing Services Agreement at such time).

"Tier 1 Covenant" means any of the covenants or agreements set forth in Sections 6.1, 6.2(a)(v), 6.2(b)(vi)(B), 6.2(b)(xiv), 6.3(a), 6.4(a), and 6.14.

13

"<u>Tier 2 Covenant</u>" means any of the covenants or agreements set forth in Sections 6.2(a)(i)-(iv), 6.2(a)(vi)-(viii), 6.2(b)(i), 6.2(b)(vi)(A), 6.2(b)(viii), 6.2(b)(xii), 6.2(b)(xiii), 6.2(b)(xv), 6.4(b), 6.4(c), 6.5, 6.10, and 6.12.

"<u>Time-Based Milestone Event</u>" means January 15, 2015.

"<u>Time-Based Milestone Payment</u>" has the meaning set forth in Section 2.5(b).

"<u>Time-Based Milestone Payment Allocation Schedule</u>" means the Time-Based Milestone Payment Allocation Schedule attached hereto as <u>Schedule C</u>.

"<u>Tranche 1 Milestone Event</u>" has the meaning set forth in Section 2.5(c)(i).

"<u>Tranche 1 Milestone Payment Date</u>" has the meaning set forth in Section 2.5(c)(i).

"<u>Tranche 2 Milestone Event</u>" has the meaning set forth in Section 2.5(c)(ii).

"<u>Tranche 2 Milestone Payment Date</u>" has the meaning set forth in Section 2.5(c)(ii).

"<u>Tranche 3 Milestone Event</u>" has the meaning set forth in Section 2.5(c)(iii).

"<u>Tranche 3 Milestone Payment Date</u>" has the meaning set forth in Section 2.5(c)(iii).

"<u>Tranche 4 Milestone Event</u>" has the meaning set forth in Section 2.5(c)(iv).

"<u>Tranche 4 Milestone Payment Date</u>" has the meaning set forth in Section 2.5(c)(iv).

"<u>Transaction Expenses</u>" means the costs and expenses (including legal, accounting, consulting, advisory and brokerage and any other professional service costs or expenses) incurred in connection with the transactions contemplated hereunder.

"<u>Transfer Taxes</u>" has the meaning set forth in Section 11.5.

"<u>Transfer Obligation</u>" has the meaning set forth in Section 6.13(b).

"<u>Treasury Regulations</u>" means the regulations promulgated under the Code.

"<u>UCC</u>" has the meaning set forth in Section 6.13(b).

"<u>Valeant Products</u>" means those products which satisfy both of the following criteria: (i) are distributed by the Buyer or its Affiliates or in which the Buyer or its Affiliates holds the right to distribute or sell such product, and (ii) (x) are dispensed by the Company or its Subsidiaries or for which the Company or the Subsidiaries provides other services pursuant to (or

14

AGING-000062

substantially similar to those set out in) the Existing Services Agreement or (y) following the Closing, if applicable, are dispensed by Buyer or its Affiliates through the same dispensary channels used by the Company for the dispensing of such products immediately prior to the Closing; provided, however, that, following the Closing, Third Party Products that are dispensed or distributed by the Company or its Subsidiaries shall not be considered "Valeant Products."

"VPII" means Valeant Pharmaceuticals International, Inc.

"VPII Guarantee" means an irrevocable and unconditional guarantee by VPII to the Members of the prompt performance, observance and discharge by the Buyer of all payment obligations under the Agreement (such obligations being collectively, the "Payment Obligations"), providing that if the Buyer shall fail to perform, observe or discharge any such Payment Obligations, VPII shall forthwith perform, observe and discharge each such Payment Obligation and shall pay any and all damages that would be payable by the Buyer arising out of such failure.

"WARN Act" has the meaning set forth in Section 3.7(xii).

Except as otherwise explicitly specified to the contrary, (a) references to a Section, Article, Exhibit or Schedule means a Section or Article of, or Schedule or Exhibit to this Agreement, unless another agreement is specified, (b) the word "including" will be construed as "including without limitation," (c) references to a particular statute or regulation include all rules and regulations thereunder and any predecessor or successor statute, rules or regulation, in each case as amended or otherwise modified from time to time, (d) words in the singular or plural form include the plural and singular form, respectively, and (e) references to a particular Person include such Person's successors and assigns to the extent not prohibited by this Agreement.

## ARTICLE II.  PURCHASE OPTION AND ACQUISITION

2.1    Purchase Option to Acquire Company Equity Interests.   Each Member hereby grants to the Buyer an irrevocable, exclusive option (the "Purchase Option"), but not the obligation, exercisable at any time after the Purchase Option Closing Date and on or prior to the Option End Date (such period of time, the "Option Period") to acquire all of such Member's Equity Interests in the Company (whether now held or acquired in the future) free and clear of any and all Encumbrances.  The Buyer shall exercise the Purchase Option, if at all, by giving written notice (the "Purchase Option Exercise Notice") to the Members' Representative of the exercise of the Purchase Option on or prior to the last day of the Option Period (the date such notice is delivered, the "Option Exercise Date").

2.2    Purchase Option Consideration.

(a)    Subject to the satisfaction (or waiver by the Buyer, unless prohibited by applicable Legal Requirement) of the conditions set forth in Section 2.4, as full consideration for the purchase and sale of the Purchase Option, the Buyer shall pay to the Members as described in Sections 2.2(c) and 2.5) the portion of the Purchase Option Consideration described in Sections 2.2(c) and 2.5, to be allocated among the Members as described in Sections 2.2(c) and 2.5.  The

15

Confidential Treatment Requested by Philidor                                          AGING-000063

"Purchase Option Consideration" will be (i) $100 million, minus (ii) the sum of (A) the aggregate amount of all Company Debt outstanding as of the Purchase Option Closing Date, (B) the aggregate amount of all Selected Company Transaction Expenses (whether paid or payable before, at or after the Purchase Option Closing) and (C) the aggregate amount of all Company Transaction Bonuses (whether paid or payable before, at or after the Purchase Option Closing), plus (iii) when and if due and payable in accordance with Section 2.5, an amount of cash equal to the applicable Pre-Equity Purchase Milestone Payment payable solely to the Members set forth in Section 2.5 with respect to such Milestone Payment.  The amount of consideration payable for the Purchase Option giving effect to clauses (i) and (ii) only of the immediately preceding sentence (and accordingly, excluding any potential Milestone Payment(s)) is referred to herein as the "Initial Purchase Option Consideration Amount."

(b)     At the Purchase Option Closing, the Company shall deliver to the Buyer a statement of the Initial Purchase Option Consideration Amount (the "Initial Purchase Option Consideration Amount Statement") prepared in good faith (including a statement of (i) the aggregate amount of Company Debt outstanding as of the Purchase Option Closing Date, (ii) the aggregate amount of all Selected Company Transaction Expenses and (iii) the aggregate amount of all Company Transaction Bonuses).

(c)     At the Purchase Option Closing, the Buyer agrees to pay to each Member an amount equal to: (1) the Initial Purchase Option Consideration Amount multiplied by (2) such Member's Percentage Interest as set forth on the Acquisition Schedule.  In addition, at the Purchase Option Closing, the Buyer shall cause VPII to deliver to the Members the VPII Guarantee.

2.3   The Purchase Option Closing.  The Purchase Option Closing will take place at the offices of Hogan Lovells US LLP, 875 Third Avenue, New York, NY 10022, on the date of this Agreement following the satisfaction (or waiver, by the appropriate party) of the conditions set forth in Section 2.4 (other than conditions to be satisfied at the Purchase Option Closing, but subject to the waiver or fulfillment of those conditions) or at such other place and on such other date as the Buyer and the Requisite Members may agree in writing.

2.4   Conditions to Payment of Purchase Option Consideration. The obligation of Buyer to pay the Purchase Option Consideration for the Purchase Option at the Purchase Option Closing is subject to the satisfaction of each of the following conditions on or prior to the Purchase Option Closing Date (it being understood that any one or more of the following conditions may be waived by the written agreement of the Buyer, unless prohibited by applicable Legal Requirement):

(a)     Performance. The Company and each Member will have performed and complied in all material respects, with all agreements, obligations and covenants contained in this Agreement that are required to be performed or complied with by them at or prior to the Purchase Option Closing.

(b)     Absence of Litigation.  No Action is pending or threatened in writing which may result in a Governmental Order (nor is there any Governmental Order in effect)

16

Confidential Treatment Requested by Philidor                                                      AGING-000064

which would: (i) limit or otherwise adversely affect the right of the Buyer to acquire the Purchase Option, prevent the exercise of the Purchase Option or the consummation of the Company Equity Interests Acquisition, result in the Purchase Option being rescinded or compel the Buyer or any of its Affiliates to dispose of the Purchase Option; (ii) if the Buyer were to elect to exercise the Purchase Option and consummate the Company Equity Interests Acquisition, (A) result in the Company Equity Interests Acquisition being rescinded following consummation, (B) limit or otherwise adversely affect the right of the Buyer to own the Company Equity Interests (including the right to vote the Company Equity Interests) or to control the Company, (C) materially and adversely affect the right of the Buyer to operate all or any material portion of the Business or Assets of the Company, or (D) compel the Buyer or any of its Affiliates to dispose of the Company Equity Interests or all or any material portion of the Business or Assets; or (iii) compel the Buyer or any of its Affiliates to dispose of all or any material portion of the business or assets of the Buyer or any of its Affiliates.

(c)     No Material Adverse Effect.  There will have occurred no events nor will there exist circumstances which singly or in the aggregate have resulted in a Material Adverse Effect on the Company or any of its Subsidiaries.

(d)     Compliance Certificate.  The Members will have delivered to the Buyer a certificate signed by the chief executive officer (or similar position) of the Company and by each Member to the effect that each of the conditions specified above in Sections 2.4(a), 2.4(b), 2.4(c), 2.4(e), 2.4(f) and 2.4(g) have been satisfied as to the Company or Member, as applicable.

(e)     Initial Purchase Option Consideration Amount Statement.  The Buyer shall have received from the Company the Initial Purchase Option Consideration Amount Statement in accordance with Section 2.2(b).

(f)     Non-Competition Agreement.  The Non-Competition Agreements will have been executed and delivered to the Buyer by each of the Members and certain of their Affiliates contemplated to be parties thereto and the Company.

(g)     FIRPTA Certificate.  The Buyer shall have received from each Member written certification of the non-foreign status of such Member in compliance with Treasury Regulation section 1.1445-2(b)(2) and in form reasonably satisfactory to the Buyer.

(h)     Lucena and Isolani Agreements. The Company shall have entered into a Purchase Option Agreement with each of Lucena Holdings, LLC and Isolani, LLC, each in a form satisfactory to Buyer, respecting, among other things, the option of the Company to acquire the Equity Interests of Lucena Holdings, LLC and Isolani, LLC, respectively, and Buyer shall have received a copy of such executed agreement.

2.5   Milestone Payments.

(a)     Milestone Payments Generally. Following the Purchase Option Closing and for so long as this Agreement has not been terminated pursuant to Article IX, (i) as additional consideration for the Purchase Option, in the case of a Pre-Equity Purchase Milestone

17

Payment and (ii) as additional consideration for the Company Equity Interests, in the case of a Post-Equity Purchase Milestone Payment, the Members shall be entitled to receive contingent payments (collectively, the "Milestone Payments"), as described below in this Section 2.5, when and if required to be made in accordance with the provisions of this Section 2.5, and subject to the limitations on such Milestone Payments set forth in this Section 2.5 and in Article X. The Milestone Payments shall consist of (i) a single Time-Based Milestone Payment, and (ii) up to four (4) Net Sales Milestone Payments, none of which Milestone Payments shall bear interest. Each such Milestone Payment shall be payable only once.

(b)     Time-Based Milestone Payment.  Buyer shall make a one-time Milestone Payment equal to thirty-three million United States Dollars (US$33,000,000) on January 15, 2015 (the "Time-Based Milestone Payment") payable to the Members allocated amongst all Members in accordance with the second sentence of Section 2.5(d), which Time-Based Milestone Payment shall not be subject to any set-off rights of Buyer pursuant to Section 2.5(e) and Article X.

(c)     Net Sales Milestone Payment.  Subject to the set-off rights of Buyer pursuant to Section 2.5(e) and Article X and the other provisions of this Section 2.5, Buyer shall make up to a total of four (4) Milestone Payments to the Members in each case, which the Members agree shall be allocated amongst all Members in accordance with the third sentence of Section 2.5(d) (each a "Net Sales Milestone Payment"):

(i)     Buyer shall make a one-time Milestone Payment equal to twenty-five million United States Dollars (US$25,000,000) upon the first achievement of Net Sales of at least five hundred twenty-four million, sixty-two thousand, seven hundred and fifty United States Dollars (US$524,062,750) in any four (4) consecutive Calendar Quarters (the "Tranche 1 Milestone Event"), such Milestone Payment to be made on the later of (A) sixty (60) days after the end of such four (4) consecutive Calendar Quarter period, and (B) ten (10) Business Days after the end of the General Survival Period (the date on which such earned Milestone Payment is due to be paid, the "Tranche 1 Milestone Payment Date"); provided, however, that the amount that is the subject of an Indemnification Claim that has been brought in accordance with the procedures and the applicable time limitations set out in Article X, shall be withheld from such payment, and such withheld amount, net of the amount finally determined to be payable to Buyer, if any, shall be paid upon the resolution of such Indemnification Claim in accordance with the terms herein;

(ii)     Buyer shall make a one-time Milestone Payment equal to twenty-five million United States Dollars (US$25,000,000) upon the first achievement of Net Sales of at least one billion, thirty-seven million, five hundred and fifty-one thousand, seven hundred and nineteen United States Dollars (US$1,037,551,719) in any four (4) consecutive Calendar Quarters (the "Tranche 2 Milestone Event"), such Milestone Payment to be made on the later of (A) sixty (60) days after the end of such four (4) consecutive Calendar Quarter period, and (B) ten (10) Business Days after the end of the General Survival Period (the date on which such earned Milestone Payment is due to be paid, the "Tranche 2 Milestone Payment Date"); provided, however, that the amount that is the subject of an Indemnification Claim that has been

18

brought in accordance with the procedures and the applicable time limitations set out in Article X, shall be withheld from such payment, and such withheld amount, net of the amount finally determined to be payable to Buyer, if any, shall be paid upon the resolution of such Indemnification Claim in accordance with the terms herein;

(iii)     Buyer shall make a one-time Milestone Payment equal to twenty-five million United States Dollars (US$25,000,000) upon the first achievement of Net Sales of at least one billion, seven hundred and fifty-two million, nine hundred and eighty-one thousand, six hundred and eighteen United States Dollars (US$1,752,981,618) in any four (4) consecutive Calendar Quarters (the "Tranche 3 Milestone Event"), such Milestone Payment to be made by the later of (A) sixty (60) days after the end of such four (4) consecutive Calendar Quarter period, and (B) ten (10) Business Days after the end of the General Survival Period (the date on which such earned Milestone Payment is due to be paid, the "Tranche 3 Milestone Payment Date"); provided, however, that the amount that is the subject of an Indemnification Claim that has been brought in accordance with the procedures and the applicable time limitations set out in Article X, shall be withheld from such payment, and such withheld amount, net of the amount finally determined to be payable to Buyer, if any, shall be paid upon the resolution of such Indemnification Claim in accordance with the terms herein; and

(iv)     Buyer shall make a one-time Milestone Payment equal to twenty-five million United States Dollars (US$25,000,000) if, during the period commencing on January 1, 2018, Net Sales of at least three billion, five hundred million United States Dollars (US$3,500,000,000) is achieved in any four (4) consecutive Calendar Quarters (the "Tranche 4 Milestone Event"), such Milestone Payment to be made sixty (60) days after the end of such four (4) consecutive Calendar Quarter period (the date on which such earned Milestone Payment is due to be paid, the "Tranche 4 Milestone Payment Date"); provided, however, that the amount that is the subject of an Indemnification Claim that has been brought in accordance with the procedures and the applicable time limitations set out in Article X, shall be withheld from such payment, and such withheld amount, net of the amount finally determined to be payable to Buyer, if any, shall be paid upon the resolution of such Indemnification Claim in accordance with the terms herein;

provided that, if the level of Net Sales relating to a Net Sales Milestone Payment described in clauses (i), (ii) or (iii) of this Section 2.5(c) has not been achieved in any four (4) consecutive Calendar Quarters by December 31, 2017, then Buyer shall have no obligation to pay such Net Sales Milestone Payment and this Section 2.5(c) shall terminate with respect to such unpaid Net Sales Milestone Payments.

(d)     Payment and Allocation of Milestone Payments. Buyer shall pay the Milestone Payment in accordance with the terms of this Section 2.5, including with respect to the date on which such Milestone Payment is due.  In addition, upon the Time-Based Milestone Payment becoming payable pursuant to Section 2.5(b), Buyer shall pay, or, if the Closing has occurred, cause the Company to pay, to each Member a portion of the Time-Based Milestone Payment equal to (1) the total amount of the Time-Based Milestone Payment multiplied by (2) such Member's Time-Based Milestone Payment Allocation as set forth on the Time-Based

19

Milestone Payment Allocation Schedule.  In the case of each Net Sales Milestone Payment, subject to the set-off rights of Buyer pursuant to Section 2.5(e) and Article X, upon such Milestone Payment becoming payable pursuant to Section 2.5(c), the Buyer shall pay, or, if the Closing has occurred, cause the Company to pay, by wire transfer of immediately available funds, to each Member  a portion of such Net Sales Milestone Payment equal to (1) the total amount of such Net Sales Milestone Payment multiplied by (2) such Member's Net Sales Milestone Payment Allocation as set forth on the Net Sales Milestone Payment Allocation Schedule.

(e)      Unilateral Right of Set-Off.  Subject to the express limitations and procedures set forth in Article X including the Cap (if applicable), the obligation of Buyer to make any Milestone Payment (other than the Time-Based Milestone Payment) shall be qualified by the right of Buyer to reduce the amount of any one or more Milestone Payments (other than the Time-Based Milestone Payment) by the amount of any Losses for which any Buyer Indemnified Person is entitled to indemnification pursuant to Article X; provided, that the right of Buyer to reduce any such Milestone Payment pursuant to this Section 2.5(e) is subject to the limitations, notice requirements and procedures set forth in Article X, including the Cap (if applicable).  In the event that the Members' Representative objects to a claim pursuant to Article X, and it is later finally determined that the Buyer Indemnified Person is not entitled to indemnification pursuant to Article X with respect to any portion of such Losses, then, following such determination, Buyer shall thereafter pay to the Members, promptly after such determination and without interest, the amount of the prior reduction attributable to such Losses for which the Buyer Indemnified Person is not entitled to indemnification in the form of an additional Milestone Payment that has not been otherwise paid in accordance with the terms of this Agreement.  Subject to Section 10.7, Buyer and the Company shall have no right to set-off or reduce the amount of any Milestone Payment otherwise required to be paid pursuant to this Section 2.5 except as is expressly set forth in this Section 2.5(e).

2.6      The Closing.  In the event the Buyer exercises the Purchase Option in accordance with the terms of this Agreement, the closing of the Company Equity Interests Acquisition (the "Closing") will take place at the offices of Hogan Lovells US LLP, 875 Third Avenue, New York, NY 10022, on the first Business Day following the satisfaction (or waiver, by the appropriate party) of the conditions set forth in Articles VII and VIII (other than conditions to be satisfied at the Closing, but subject to the waiver or fulfillment of those conditions) or at such other place and on such other date as the Buyer and the Requisite Members may agree in writing.  The day on which the Closing takes place is the "Closing Date".  At the Closing, each Member agrees to transfer to the Buyer the Equity Interests of the Company owned of record or beneficially by such Member (both now held and acquired in the future), free and clear of any and all Encumbrances.

2.7      Closing Deliveries.

(a)      Buyer Deliveries.  At the Closing, the Buyer will deliver or cause to be delivered:

(i)      to the Members the various certificates, instruments and

20

documents referred to in Article VIII.

(b)   <u>Member Deliveries</u>.  At the Closing, the Members will deliver or cause to be delivered to the Buyer:

(i)   assignments duly transferring the Company Equity Interests to the Buyer free and clear of all Encumbrances or such other evidence of transfer as is reasonably satisfactory to the Buyer; and

(ii)   the various certificates, instruments and documents referred to in Article VII.

2.8   <u>Tax Treatment of the Transaction and Allocation of Purchase Option Consideration and Other Consideration</u>.

(a)   The parties recognize that for federal income tax purposes and to the extent permitted under applicable state or local tax law, (i) the Purchase Option Closing pursuant to this Agreement shall be treated as resulting in a sale of the Company Equity Interests by the Members and a purchase by the Buyer of the assets of the Company occurring on the Purchase Option Closing Date, (ii) any income, gain, loss, deduction, credit or other tax item realized or derived from assets of the Company or the Business ("<u>Tax Items</u>") after the Purchase Option Closing shall be treated as the Tax Items of the Buyer and (iii) the Milestone Payments shall be treated as payments (except for any imputed interest) eligible for installment reporting under Section 453 of the Code (the "<u>Intended Tax Treatment</u>").  As promptly as practicable following the Purchase Option Closing Date, the Buyer shall deliver to the Members a written allocation of the consideration (within the meaning of Section 1060 of the Code) paid by the Buyer (the "<u>Allocation Schedule</u>") prepared in accordance with Section 1060 of the Code and the regulations thereunder in accordance with Schedule 2.8.  If the Purchase Option Consideration or the consideration for the Company Equity Interests is adjusted pursuant to the provisions of this Article II or an indemnification payment is made pursuant to the provisions of this Agreement, then the Buyer shall adjust the Allocation Schedule to reflect such adjustment or payment in accordance with the nature of each such adjustment or payment and in a manner consistent with Section 1060 and the regulations thereunder and shall deliver the Allocation Schedule as so revised to the Members.  The allocations made on the Allocation Schedule and any adjustments to the Allocation Schedule shall be final unless the Members' Representative objects in writing within 30 days of the delivery of the Allocation Schedule or the notification of any adjustment(s) to the Allocation Schedule.  In the event of an objection, the Buyer and the Members' Representative shall work cooperatively to finalize an Allocation Schedule that is mutually agreeable to such parties.

(b)   The Members and the Buyer and their respective Affiliates and the Company shall report, act and file all Tax Returns (including, but not limited to, IRS Form 8594 and the Tax Returns prepared under Section 11.1 of this Agreement) in all respects and for all purposes consistent with the Intended Tax Treatment and with the Allocation Schedule as finally determined or agreed upon in accordance with this Section 2.8.  Neither the Buyer nor the Members shall take any position in any Tax matter (whether in audit, Tax Returns, or otherwise

21

                                                   AGING-000069

with any Governmental Authority) that is inconsistent with such allocation or the Intended Tax Treatment unless required to do so by applicable Legal Requirement.

2.9   <u>Commercially Reasonable Efforts for Purchase Option Closing</u>.   The Members and the Buyer will, and will cause their respective Representatives to, use commercially reasonable efforts to take all of the actions necessary to consummate the Purchase Option Closing including delivering all the various certificates, documents and instruments described in Section 2.4, as the case may be.

## ARTICLE III.  REPRESENTATIONS AND WARRANTIES REGARDING THE COMPANY

In order to induce the Buyer to enter into and perform this Agreement and to consummate the transactions contemplated hereunder, the Company and the Members, jointly and severally, hereby make the following representations and warranties to the Buyer as of the date hereof (and in the case of the Member Party Fundamental Representations contained in this Article III, also as of the Closing Date), subject to the disclosures contained in <u>Schedule B</u> attached to this Agreement (the "<u>Disclosure Schedule</u>"), which Disclosure Schedule shall contain references to the representations and warranties to which the disclosures contained therein relate.

3.1   <u>Organization; Predecessors; Subsidiaries</u>.

(a)   The Company is (i) a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Delaware and (ii) duly qualified to do business in good standing in each jurisdiction in which it owns or leases real property and in each other jurisdiction in which the character of the Company's properties or the nature of the Company's activities require it to be so qualified.  The Company has full power and authority to own, lease and operate its properties and Assets and to carry on the Business as it is now being conducted.

(b)   <u>Section 3.1(b) of the Disclosure Schedule</u> sets forth a true and complete list of all of the Company's direct and indirect Subsidiaries, together with the jurisdiction of incorporation or organization of each Subsidiary and the percentage of each Subsidiary's outstanding capital stock or other equity or similar interest owned by the Company or another direct or indirect Subsidiary of the Company.

(c)   Each Subsidiary of the Company is an entity, duly incorporated or duly organized, validly existing and in good standing under the laws of its respective jurisdiction of incorporation or organization as set forth in <u>Section 3.1(b) of the Disclosure Schedule</u> and has full corporate power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted.  Each Subsidiary is duly qualified to do business and in good standing in each jurisdiction in which it owns or leases real property and in each other jurisdiction in which the character of its properties or the nature of its activities require it to be so qualified, except where the lack of such qualification would not have a Material Adverse Effect on the Company.

22

(d)      True, accurate and complete copies of the Organizational Documents of the Company and each of its Subsidiaries have been provided by the Members to the Buyer.

3.2      <u>Power and Authorization for Transactions Contemplated Hereunder</u>.   The execution, delivery and performance by the Company of this Agreement and each Non-Competition Agreement to which it is (or will be) a party and the consummation of the transactions contemplated hereunder are within the power and authority of the Company and have been duly authorized by all necessary action on the part of the Company.   This Agreement and each Non-Competition Agreement to which the Company is (or will be) a party (a) has been (or, in the case of Non-Competition Agreements to be entered into at or prior to the Purchase Option Closing, will be) duly executed and delivered by the Company and (b) is (or, in the case of Non-Competition Agreements to be entered into at or prior to the Purchase Option Closing, will be) a legal, valid and binding obligation of the Company, Enforceable against the Company in accordance with its terms.

3.3      <u>Authorization of Governmental Authorities</u>.  Except as disclosed in <u>Section 3.3 of the Disclosure Schedule</u>, no action by (including any authorization, consent, exemption or Approval), or in respect of, or filing with, any Governmental Authority is required for, or in connection with, the valid and lawful (a) authorization, execution, delivery and performance by the Company of this Agreement and each Non-Competition Agreement to which it is (or will be) a party or (b) consummation of the transactions contemplated hereunder by the Company.

3.4      <u>Noncontravention</u>.  Except as disclosed in <u>Section 3.4 of the Disclosure Schedule</u>, neither the execution, delivery and performance by the Company of this Agreement or any Non-Competition Agreement to which it is (or will be) a party nor the consummation of the transactions contemplated hereunder will, directly or indirectly (with or without notice or lapse of time):

(i)      assuming the taking of any action by (including any authorization, consent, exemption or Approval), or in respect of, or any filing with, any Governmental Authority, in each case, as disclosed in <u>Section 3.3 of the Disclosure Schedule</u>, violate any material Legal Requirement applicable to the Company, give any Governmental Authority the right to challenge the transactions contemplated hereunder or give any Governmental Authority the right to revoke, withdraw, suspend, cancel, terminate or modify any Permit;

(ii)      result in a breach, violation or default under any Contractual Obligation of the Company (including any Disclosed Contract), except in the case where such breach, violation or default would not result in a Material Adverse Effect on the Company;

(iii)      require any action by (including any authorization, consent, exemption or Approval) or in respect of (including notice to), any Person under any material Contractual Obligation of the Company (including any Disclosed Contract);

(iv)      result in the creation or imposition of an Encumbrance upon, or the forfeiture of, any Asset of the Company; or

23

(v)    result in a breach, violation or default under the Organizational Documents of the Company or any resolution adopted by the Board of Directors, managers or members of the Company.

3.5    Capitalization of the Company.

(a)    Outstanding Equity Interests.    Section 3.5(a) of the Disclosure Schedule sets forth for the Company the names of the record holders of the Company Equity Interests and the percentage of Company Equity Interests owned by each such record holder as of the date of this Agreement.    The Equity Interests of the Company set forth on Section 3.5(a) of the Disclosure Schedule constitute all of the issued and outstanding Equity Interests of the Company. As of the Purchase Option Closing (and immediately prior to the Closing, if the Purchase Option is exercised by the Buyer in accordance with this Agreement), the Company Equity Interests shall be owned solely and exclusively by the Members in accordance with the Allocation Schedule and there shall be no other Equity Interests of the Company issued and outstanding. The Company has not had any capital deficiency pursuant to any statutory capital requirement. The Members have delivered to the Buyer true, accurate and complete copies of the organizational and operating documents which set forth the Company Equity Interests. There are no options, warrants, convertible securities or other rights, or agreements, arrangements or commitments relating to the Equity Interests of the Company or obligating the Company to issue or sell any Equity Interests in the Company.

(b)    Encumbrances, etc.    Except as set forth in Section 3.5(b) of the Disclosure Schedule, (i) there are no preemptive rights, right of first refusal or other similar rights in respect of the Company Equity Interests, (ii) except as imposed by applicable securities laws or as set forth in the Company's Organizational Documents, there are no Encumbrances on the ownership, transfer or voting of any Equity Interests in the Company, or otherwise affecting the rights of any holder of the Equity Interests in the Company, (iii) except for the transactions contemplated hereunder, there is no Contractual Obligation or provision in the Organizational Documents of the Company which obligates it to purchase, redeem or otherwise acquire, or make any payment (including any dividend or distribution) in respect of, any Equity Interests in the Company, (iv) the Company does not own any Equity Interests in, and is not a party to any Contractual Obligation to purchase any Equity Interests in, any Person other than the Company and its Subsidiaries, and there is no Contractual Obligation of the Company which obligates it to provide funds to, or make any investment (in the form of a loan, capital contribution or otherwise) in, any Person, (v) there are no existing rights with respect to registration under the 1933 Act of any Equity Interests in the Company, and (vi) there are no securities convertible into or exchangeable for Equity Interests in the Company.

3.6    Financial Statements.

(a)    Financial Statements.    Attached to Section 3.6(a) of the Disclosure Schedule are the following financial statements:

(i)    the reviewed annual balance sheet of the Company as of December 31, 2013 and the related reviewed annual statement of income, cash flow and changes in

24

members' equity of the Company for the fiscal year then ended, accompanied by the report of the Company's independent accountants and notes thereto (collectively, the "2013 Financials"); and

   (ii) the interim financial statements for the nine (9) month period ended September 30, 2014 (the "Interim Financials,"  and together with the 2013 Financials and the Interim Financials for the Company, collectively the "Financials").

   (b) Compliance with GAAP, etc.  Except as disclosed in Section 3.6(b) of the Disclosure Schedule, the Financials (including any notes thereto) (i) were prepared in accordance with the books and records of the Company, (ii) have been prepared in accordance with GAAP, (iii) present the financial condition and results of operations of the Company and its Subsidiaries on a stand-alone basis, net of any intercompany transactions, and (iv) fairly present, in all material respects, the financial condition of the Company as at the respective dates thereof and the results of operations of the Company and changes in financial condition for the respective periods covered thereby (except for the absence of footnotes and other presentation items in the case of the Interim Financials).

   (c) Absence of Undisclosed Liabilities.  Except as set forth in Section 3.6(c) of the Disclosure Schedule, the Company has no Liabilities, other than (i) Liabilities reflected on or reserved against in the Financials; (ii) Liabilities incurred in the Ordinary Course of Business since the date of the latest Interim Financials set forth in Section 3.6(a) of the Disclosure Schedule and in amounts and of a type consistent with recent historical experience; (iii) Liabilities under this Agreement and with respect to the transactions contemplated hereunder, including Transaction Expenses, and (iv) Liabilities, the monetary value of which with respect to any individual matter (or group or series of related matters) does not exceed $25,000.

   3.7 Absence of Certain Developments.  Since December 31, 2013, the Business has been conducted in the Ordinary Course of Business and, except for the matters disclosed on Section 3.7 of the Disclosure Schedule or permitted to occur prior to Purchase Option Closing that are set forth on Schedule 6.2(b):

   (i) the Company has not (A) amended its Organizational Documents, (B) amended any term of its outstanding Equity Interests or other securities, or (C) issued, sold, granted, or otherwise disposed of, its Equity Interests or other securities, or (D) formed any Subsidiary or acquired, sold or disposed of any Subsidiaries (or Persons that would have been Subsidiaries but for such sale or disposition) or any securities therein or any substantial portion of the assets or property thereof;

   (ii) the Company has not (A) become liable in respect of any Guarantee, (B) incurred, assumed or otherwise become liable in respect of any Debt, or (C) cancel, waive, release or assign any Debt owed to it;

   (iii) the Company has not (A) made any declaration, setting aside or payment of any dividend or other distribution with respect to, or any repurchase, redemption or other acquisition of, any Equity Interests or (B) entered into, or performed, any transaction with, or for

25

the benefit of the Members or any Affiliate of the Members (other than payments made to officers, directors and employees in the Ordinary Course of Business);

(iv)     the Company has not sold, assigned, transferred, leased or licensed any of its material tangible assets, except as reflected in the Financials, or canceled any material debts or claims;

(v)     the Company has not sold, assigned, transferred, leased, licensed or otherwise encumbered any rights the Company may have in any Intellectual Property (the "Licenses"), or any other material intangible assets, or disclosed any material proprietary confidential information to any Person (other than to the Buyer and its Affiliates and the Members (and their Representatives)), other than in the Ordinary Course of Business in circumstances in which the Company has imposed reasonable confidentiality restrictions;

(vi)     the Company has not  instituted or permitted any material change in the conduct of the Business, or any material change in its method of purchase, sale, lease, management, marketing, promotion or operation;

(vii)     the Company has not (A) terminated any of the relationships of the Business between the Company, on the one hand, and any material dealer, franchisee, distributor, licensee, licensor, customer or supplier of the Company, on the other hand, or modified any of such relationships in a manner which is materially less favorable to the Business, or (B) been threatened or notified of any intention (orally or in writing) by any such material dealer, franchisee, distributor, licensee, licensor, customer or supplier to effect any such termination or modification (and, to the Company's Knowledge, no facts exist which would form the basis for any such termination or modification);

(viii)     the Company has not made any material change in its methods of accounting or accounting principles or practices (including with respect to reserves);

(ix)     except as reflected in the Financials, the Company has not made, changed or revoked any material Tax election, changed, in any material respect, any method of accounting for Tax purposes, changed its fiscal year, settled or compromised any Action in respect of material Taxes, entered into any Contractual Obligation in respect of material Taxes with any Governmental Authority, or amended any Tax Return that would result in any material increase in the liability for Taxes of the Buyer, its Affiliates or the Company not indemnified by the Members hereunder;

(x)     the Company has not terminated or closed any material facility, business or operation;

(xi)     the Company has not adopted any Employee Plan or, except in accordance with terms thereof as in effect on April 1, 2014, increased any benefits under any Employee Plan, except for increases with respect to specific individuals (other than its officers and directors) in the Ordinary Course of Business;

26

                                                                   AGING-000074

(xii)   the Company has not implemented any layoff of employees that could implicate the Worker Adjustment and Retraining Notification Act of 1988, as amended (the "<u>WARN Act</u>"), or any similar foreign, state or local law, regulation or ordinance;

(xiii)   the Company has not entered into any agreement or arrangement prohibiting or restricting it from freely engaging in the Business or otherwise restricting the conduct of the Business in any state in which it currently operates;

(xiv)   no material Permit necessary for or used in the conduct of the Business has been terminated, withdrawn, suspended or allowed to lapse;

(xv)   the Company has not agreed, whether orally or in writing, to do any of the foregoing; and

(xvi)   no event or circumstance has occurred with respect to the Company which has had, or is reasonably likely to have, a Material Adverse Effect on the Company.

3.8   <u>Debt</u>.  The Company has no Liability for Debt as of the date of this Agreement except as set forth in <u>Section 3.8 of the Disclosure Schedule</u>.

3.9   <u>Assets</u>.  The Company has sole and exclusive good and marketable title to, or, in the case of property held under a lease or other Contractual Obligation, a sole and exclusive leasehold interest (or contractual right) in, or right to use, all of its properties, rights and assets, whether real or personal and whether tangible or intangible, including all assets reflected in the Interim Financials and all of the assets used in the Business of the Company (except for those assets set forth in <u>Section 3.9 of the Disclosure Schedule</u>, which sets forth the material assets sold or otherwise disposed of outside the Ordinary Course of Business since the date of the Interim Financials) (collectively, the "<u>Assets</u>").   Except as disclosed in <u>Section 3.9 of the Disclosure Schedule</u>, none of the Assets are subject to any Encumbrance other than Permitted Encumbrances.   Except as set forth in <u>Section 3.9 of the Disclosure Schedule</u>, the Assets comprise all of the assets and services required for the conduct of the Business as it is currently conducted and/or proposed to be conducted.

3.10   <u>Accounts Receivable</u>.  All accounts and notes receivable reflected on the Interim Financials and all accounts and notes receivable arising subsequent to the Interim Financials and on or prior to the Purchase Option Closing Date, have arisen or will arise in the Ordinary Course of Business out of bona fide sales and deliveries of goods, performance of services or other business transactions, and, to the Company's Knowledge, represent or will represent legal, valid, binding and enforceable obligations to the Company.

3.11   <u>Real Property</u>.

(a)   <u>Owned Real Property</u>.  <u>Section 3.11(a) of the Disclosure Schedule</u> lists all parcels of real property owned by the Company (the "<u>Owned Real Property</u>"), showing the record title holder, legal address and legal description of each such parcel of Owned Real Property.

27

(b)      Section 3.11(b) of the Disclosure Schedule describes each leasehold interest in real property leased, subleased by, licensed or with respect to which a right to use or occupy has been granted to or by the Company (the "Leased Real Property"), and identifies each Contractual Obligation under which such property is leased (the "Real Property Leases").

(c)      Except as described on Section 3.11(c) of the Disclosure Schedule, there are no subleases, licenses, concessions, occupancy agreements or other Contractual Obligations granting to any other Person the right of use or occupancy of any of the Owned Real Property or the Leased Real Property and there is no Person (other than a Company) in possession of the Owned Real Property or the Leased Real Property.  The Members have delivered to the Buyer true, correct and complete copies of the Real Property Leases with respect to the Company, including all amendments, modifications, notices or memoranda of lease thereto and all estoppel certificates or subordinations, non-disturbance and attornment agreements, if any, related thereto. To the Company's Knowledge, there is no default or event which with notice or passage of time of both would be a default under any Real Property Lease.  The Company has paid all amounts currently due and owing under any Real Property Lease.

3.12   Legal Compliance.

(a)      Compliance.   Except for breaches, violation or defaults disclosed in Section 3.12(a) of the Disclosure Schedule, the Company is not in breach or violation of, or default under, and has not been in breach or violation of, or default under any Legal Requirement in any material respect (including under any Government Program).   The Company's past and present collection, use, analysis, disclosure, retention, storage, security and dissemination of Personal Information comply with, and have not violated, (i) all (or any) applicable Legal Requirements, including Information Privacy and Security Laws, (ii) to the Company's Knowledge, business associate agreements to which the Company is a party, (iii) all (or any) Person's right of publicity, and (iv) each of the Company's privacy policies.   To the extent required by applicable Legal Requirements, the Company has posted, in accordance with Information Privacy and Security Laws, a privacy policy governing its use of Personal Information on its website and has complied in all material respects with such privacy policy.

(b)      Payments and Financial Relationships.   Neither the Company nor any of its directors, officers, employees, or to the Company's Knowledge, agents of the Company, have directly or indirectly, overtly or covertly, in violation of any Legal Requirement in connection with the Business (i) made, or agreed to make, any contribution, gift, bribe, rebate, payoff, influence payment, kickback or other payment or transfer of value to any Person (including, in the case of an individual, any family members of such Person and in the case of an entity, any Affiliates of such entity), regardless of form, whether in money, property or services or other remuneration, including (A) to obtain favorable treatment in securing business, (B) to pay for favorable treatment for business secured, or (C) to obtain special concessions or pay for special concessions already obtained for or in respect of the Company, or (ii) established or maintained any fund or asset that has not been recorded in the books and records of the Company. To the Company's Knowledge, no licensed health care professional or family member of such a health care professional (x) has an interest in the Business either directly or indirectly through debt,

28

equity or otherwise, or (y) shall receive or share in, directly or indirectly, any of the proceeds of the transactions contemplated hereunder.

(c)     Permits.  The Company has been duly granted all material Permits under all Legal Requirements necessary for the conduct of the Business.  To the Company's Knowledge, each employee of the Company has all Permits required for the performance of his or her duties for the Company.  None of the Company or any of its directors, officers, members, managers, employees or, to the Company's Knowledge, agents has been a party to or subject to any proceeding seeking to revoke, suspend or otherwise limit any material Permit of the Company or such Person.  Section 3.12(c) of the Disclosure Schedule sets forth a list of all material Permits.  Except as disclosed on Section 3.12(c) of the Disclosure Schedule, (i) such Permits are valid and in full force and effect, (ii) the Company is not in material breach or violation of, or default under, any such Permit, and (iii) such Permits will continue to be valid and in full force and effect on substantially identical terms following the consummation of the transactions contemplated hereunder.  The Company has not received any notice from any Governmental Authority that any of its properties, facilities, equipment, operations or business procedures or practices fails to comply in any material respect with any applicable Legal Requirement or material Permit.  The Company is not in breach or violation of, and there is no pending, or to the Company's Knowledge, threatened, Action or Governmental Order with respect to, any of the Permits listed in Section 3.12(c) of the Disclosure Schedule.  The Company has not received any written notice of any Action pending or recommended by any federal or state Governmental Authority, having jurisdiction over the Permits listed in Section 3.12(c) of the Disclosure Schedule, to revoke, withdraw or suspend any Permit.  No event has occurred that, with or without notice or the passage of time, would constitute a breach or violation of, or would constitute grounds for an Action or Governmental Order with respect to, any of the Permits listed in Section 3.12(c) of the Disclosure Schedule.  There has been no decision by the Members or the Company not to renew any Permit relating to the Business (other than in the Ordinary Course of Business with respect to Permits other than pharmacy licenses) or not to renew any pharmacy license relating to the Business.

(d)     Payor Participation.  The Company does not participate in any federal health care programs as defined in 42 U.S.C. § 1320a-7b(f) ("Government Programs").  All Company material agreements with Third Party Payors were entered into in the Ordinary Course of Business.  The Company is in compliance in all material respects with all respective agreements with, and the applicable policies and procedures of, Third Party Payors, and except as disclosed in Section 3.12(d) of the Disclosure Schedule, the Company has timely filed all claims and reports required to be filed prior to the date hereof with respect to Third Party Payors ("Payor Claims").     All Payor Claims that have been filed are complete, accurate and in compliance with applicable Legal Requirements in all material respects.  Section 3.12(d) of the Disclosure Schedule sets forth a correct and complete list of all additional document requests ("ADRs") made by Third Party Payors to which the Company has not responded and all denials of claims currently being appealed by the Company that are not in the Ordinary Course of Business.  The Company has paid or caused to be paid all known and undisputed refunds, overpayments, discounts or adjustments that have become due pursuant to Payor Claims.  Other than any refund, overpayment, discount or adjustment that occurs in the Ordinary Course of

29

Business, the Company has not claimed or received reimbursements from Government Programs or Third Party Payors in excess of the amounts permitted by applicable Legal Requirements, and has no Liability under any Government Program or to any Third Party Payor.  Except as disclosed in <u>Section 3.12(d) of the Disclosure Schedule</u>, there are no pending, concluded since Inception or, to the Company's Knowledge, threatened investigations, audits or other Actions, relating to the Company's participation in any Government Program or its submission of claims to Third Party Payors that are not in the Ordinary Course of Business (excluding from the definition of Ordinary Course of Business for such purpose any onsite audits).  The Company is not subject to, nor has the Company been subject to since Inception, any pre-payment utilization review or other utilization review. Except as disclosed in <u>Section 3.12(d) of the Disclosure Schedule</u>, the Company is not subject to, nor since Inception has the Company been subject to, any recoupment, refund or set-off in excess of $25,000 by any Third Party Payor.

(e)    <u>HIPAA</u>.  The Company is not in violation of the applicable requirements of the standards for Privacy or Security of Individually Identifiable Health Information, which were promulgated pursuant to the Health Insurance Portability and Accountability Act of 1996 ("<u>HIPAA</u>") and the implementing regulations thereunder.

(f)    <u>Health Care Matters</u>.  With respect to the Business:

(i)    <u>Section 3.12(f) of the Disclosure Schedule</u> lists all financial relationships (whether or not memorialized in writing), including any joint venture, partnership, co-ownership or other arrangement involving any ownership or investment interest, that the Company has had since its formation, with any individual known by the Members or the Company to be a physician or any other potential referral source or an immediate family member of any such person in connection with the Business.  All Contracts and joint ventures with potential referral sources comply in all material respects with material Health Care Legal Requirements.  For purposes of this Section 3.12(f), the term "financial relationship" has the meaning set forth in 42 U.S.C. § 1395nn and the regulations promulgated thereunder.

(ii)    Except as set forth in <u>Section 3.12(f) of the Disclosure Schedule</u>, neither the Company nor its director, officer, employee or, to the Company's Knowledge, agent of the Company:

(A)    has been convicted of or charged with any violation of any Legal Requirements related to any Government Program;

(B)    has been convicted of, charged with, or investigated for any violation of Legal Requirements related to fraud, theft, embezzlement, breach of fiduciary responsibility, financial misconduct, obstruction of an investigation, or controlled substances;

(C)    has received any material written communication from a Governmental Authority, vendee or other Person that alleges that the Company is not in material compliance with any Health Care Legal Requirement, including state pharmacy licensing requirements; or

30

(D)     has been subpoenaed or charged or, to the Company's Knowledge, investigated in connection with any possible material violation of any Health Care Legal Requirement, other than any audits, surveys or investigations in the ordinary course of business.

(iii)     The Company has been and currently is operating in compliance with all applicable Health Care Legal Requirements and each of the Company's standard operating policies and procedures relating to compliance with Health Care Legal Requirements, and, to the Company's knowledge, no officer, director, employee or agent of the Company or any Company Subsidiary has engaged in any act on behalf of the Company that violates any Health Care Legal Requirement or any of the Company's standard operating policies and procedures relating to compliance with Health Care Legal Requirements in any material respect.

(iv)     There have not been and currently are no actions, audits or recoupment by or before any Governmental Authority alleging a material violation of Health Care Legal Requirements by the Company and any of its employees, officers, directors, and managers of each.

3.13   Tax Matters.

(a)     The Company has duly filed (or obtained extensions with respect to) all income, franchise and other material Tax Returns required to be filed on or before the Purchase Option Closing with respect to all applicable Taxes.  No penalties or other charges are or will become due with respect to any such Tax Returns as the result of the late filing thereof.  All of the Tax Returns are true, correct and complete in all material respects.  The Company has paid all Taxes due on or prior to the Purchase Option Closing Date whether or not shown on any Tax Return and whether or not a Tax Return was required.  The amounts set up as reserves for Taxes on the latest Interim Financials set forth in Section 3.6(a) of the Disclosure Schedule are sufficient for the payment of all unpaid Taxes as of the date thereof, whether or not such Taxes are disputed or are yet due and payable, for or with respect to such period, and for which the Company may be liable in its own right or as a transferee of the assets of, or successor to, any corporation, limited liability company, person, association, partnership, joint venture or other entity.  The Company has withheld and paid all Taxes required to have been withheld and paid on or prior to the Purchase Option Closing Date in connection with amounts paid or owing to any employee, independent contractor, creditor, member or other third party.

(b)     The Company, either individually or in its own right or as a transferee, does not have any liability for Taxes payable for or with respect to any periods prior to and up to the Purchase Option Closing in excess of the amounts actually paid prior to the Purchase Option Closing or reserved for in the latest Interim Financials set forth in Section 3.6(a) of the Disclosure Schedule.

(c)     The Company has not consented to any waivers or extensions of any statute of limitations with respect to the collection or assessment of any Taxes against the Company.  There is no agreement, waiver or consent providing for an extension of time with respect to the assessment or collection of any Taxes against the Company and no power of

31

attorney granted by the Company with respect to any tax matters is currently in force that would have a continuing effect after the Purchase Option Closing.  No written claim has ever been made by any taxing authority in any jurisdiction in which the Company does not file Tax Returns that the Company is or may be subject to taxation by that jurisdiction.

(d)     The Company has furnished or otherwise made available to the Buyer true and correct copies of all income and franchise Tax Returns and any other Tax Returns requested in writing by Buyer and all written communications relating to any such Tax Returns or to any deficiency or claim proposed and/or asserted, irrespective of the outcome of such matter, but only to the extent such items relate to tax years (i) which are subject to an audit, investigation, examination or other proceeding, or (ii) with respect to which the statute of limitations has not expired.

(e)     The Company has not been a party to any agreement relating to the sharing, allocation or payment of, or indemnity for, Taxes, other than any agreements that were entered into in the Ordinary Course of Business and were not related principally to Taxes (e.g., leases).

(f)     The Company is an eligible entity as defined in Treasury Regulation Section 301.7701-3(a) and has not filed an election to be taxed as a corporation for federal, state or local income tax purposes.

(g)     The Company has not made any payments to any employee or other service provider, nor is it a party to a contract, agreement or arrangement entered into prior to the Purchase Option Closing with any employee or other service provider, to make payments, individually or considered collectively with any other events, agreements, plans, arrangements or other contracts, that will, or could reasonably be expected to, be characterized as a "parachute payment" within the meaning of Section 280G(b)(1) of the Code or that could give rise to excise taxes payable pursuant to Section 4999 of the Code that would result from the closing of the transactions contemplated under this Agreement.

3.14    Employee Benefit Plans.

(a)     Section 3.14(a) of the Disclosure Schedule lists all Employee Plans as to which the Company sponsors, maintains, contributes or is obligated to contribute, or under which the Company has or may have any Liability (each, a "Company Plan").  With respect to each Company Plan of the Company, the Members have delivered to the Buyer true, accurate and complete copies of each of the following (i) if the plan has been reduced to writing, the plan document together with all amendments thereto, (ii) if the plan has not been reduced to writing, a written summary of all material plan terms, (iii) if applicable, copies of any trust agreements, custodial agreements, insurance policies, administrative agreements and similar agreements, and investment management or investment advisory agreements, (iv) copies of any summary plan descriptions, employee handbooks or similar employee communications, (v) in the case of any plan that is intended to be qualified under Code Section 401(a), a copy of the most recent determination letter or opinion letter, as applicable, from the IRS  and a copy of any pending request for such determination, (vi) in the case of any funding arrangement intended to qualify as

32

a VEBA under Code Section 501(c)(9), a copy of the IRS letter determining that it so qualifies, (vii) in the case of any plan for which Forms 5500 are required to be filed, a copy of the two most recently filed Forms 5500, (or any Forms 5500 filed if the plan has been in existence less than two years) with all required schedules attached,  (viii) in the case of any plan subject to Title IV of ERISA, the most recent actuarial report, and (ix) if applicable, the results of the most recent year's discrimination testing on the Company's 401(k) plan.  Each Company Plan has been maintained and administered in material compliance with its terms and with applicable Legal Requirements, including ERISA and the Code to the extent applicable thereto.  There are no governmental audits or investigations pending or, to the Company's Knowledge, threatened in connection with any Company Plan.

(b)     Except as set forth in <u>Section 3.14(b) of the Disclosure Schedule</u>, neither the Company nor any other Person that would be considered an ERISA Affiliate has ever maintained or contributed to a plan subject to Title IV of ERISA or Code Section 412, including any "multiemployer plan" as defined in Section 4001(a)(8) of ERISA.  Neither the Company nor any Person that would be considered an ERISA Affiliate has ever maintained or contributed to any "multiple employer plan," as described in Code Section 413(c) or Sections 4063 or 4064 of ERISA, or any "multiple employer welfare arrangement" as defined in Section 3(40)(A) of ERISA.

(c)     With respect to each Company Plan that is subject to Title IV of ERISA or Code Section 412:

(i)     there does not exist any accumulated funding deficiency within the meaning of Section 412 of the Code or Section 302 of ERISA;

(ii)     no reportable event within the meaning of Section 4043(c) of ERISA for which the 30-day notice requirement has not been waived has occurred;

(iii)     all premiums to the Pension Benefit Guaranty Corporation (the "<u>PBGC</u>") have been timely paid in full;

(iv)     no liability (other than for premiums to the PBGC) under Title IV of ERISA has been or is expected to be incurred by the Company or any Subsidiary; or

(v)     the PBGC has not instituted proceedings to terminate any such Company Plan.

(d)     Each of the Company Plans intended to be qualified under Section 401(a) of the Code (i) satisfies in form the requirements of such Section, except to the extent amendments are not required by law to be made until a date after the Purchase Option Closing Date, (ii) has either received a favorable determination letter or opinion letter, as applicable, from the IRS regarding such qualified status, which covers all amendments to the Company Plans for which the determination letter process is open, and all amendments upon which such favorable letter was made contingent have been timely executed, or the remedial amendment period has not expired for requesting a favorable determination letter or opinion letter, as

33

applicable, from the IRS regarding such qualified status, and (iii) has not been operated or amended in a way that could materially adversely affect its qualified status.  Each Company Plan that is both a qualified defined contribution plan and intended to be an "ERISA Section 404(c) Plan" within the meaning of the applicable Department of Labor relations, has been materially operated consistent with such intent.

(e)     Each Company Plan which is a group health plan (within the meaning of section 5000(b)(1) of the Code) complies in all material respects with and has been maintained and operated in all material respects in accordance with each of the requirements of section 4980B of the Code and Part 6 of Subtitle B of Title I of ERISA.

(f)     All required contributions to, and premium payments on account of, each Company Plan with respect to the Company have been made on a timely basis.

(g)     Except as required under Section 601 *et seq*. of ERISA or Section 4980B of the Code, no Company Plan provides health benefits or life or disability insurance coverage following retirement or other termination of employment.

(h)     No Company Plan fiduciary nor any Company Plan has engaged in any transaction in violation of Section 406 of ERISA or any "prohibited transaction" (as defined in section 4975(c)(1) of the Code).   No material action, claim or proceeding is pending or, to the Company's Knowledge, threatened with respect to any Company Plan (other than claims for benefits in the ordinary course) and, to the Company's Knowledge, no fact or event exists that would give rise to any such action, claim or proceeding.

(i)     All individuals performing services or who have performed services for the Company and are or were treated by the Company as independent contractors have been appropriately classified as such under all applicable Legal Requirements, and no such individuals participate or have the right to participate in any Company Plan with respect to the Company, even if reclassified as an employee of the Company.

(j)     Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby, either alone or in combination with another event (whether contingent or otherwise) will (i) entitle any employee, director or consultant of the Company to any payment, (ii) increase the amount of compensation or benefits due to any such employee or director, or (iii) accelerate the vesting, funding or time of payment of any compensation, equity award or other benefit.

3.15  Environmental Matters.  Except as set forth in Section 3.15 of the Disclosure Schedule, (a) the Company is, and has been, in compliance, with all applicable Environmental Laws; (b) there has been no spill, discharge, leak, emission, migration or other release or threatened release of any Hazardous Substance by the Company nor, to the  Company's Knowledge, by any predecessors in interest, at, on, under or from any Owned Real Property or Leased Real Property or any property currently or formerly operated, leased or owned by the Company; and (c) the Company is not, and has not been since Inception, subject to any order, complaint, claim, injunction, investigation, judgment, decree, ruling, assessment, notice of

34

violation, information request, or demand with respect to any matter under any Environmental Law.

3.16 <u>Contracts</u>.

(a) <u>Contracts</u>. Except as disclosed in <u>Section 3.16(a) of the Disclosure Schedule</u>, the Company is not bound by or a party to:

(i) any Contractual Obligation (or group of related Contractual Obligations) for the purchase or sale of inventory, accounts receivable, supplies, goods, products, equipment or other personal property, or for the furnishing or receipt of services, in each case, the performance of which will extend over a period of more than six months from the date of the Contractual Obligation or which contemplates annual payments to or by the Company in excess of $50,000, which is not terminable by the Company on 45 days' or less notice without penalty;

(ii) (A) any capital lease or (B) any other lease or other Contractual Obligation relating to equipment used in the Business providing for annual rental payments in excess of $50,000, under which any such equipment is held or used by the Company;

(iii) any material Contractual Obligation, other than Real Property Leases or leases relating to the equipment used in the Business, relating to the lease, license, or sublicense of any Licenses;

(iv) since December 31, 2013, any Contractual Obligation (pending or executed) relating to the acquisition or disposition of (A) any business of the Company (whether by merger, consolidation or other business combination, sale of securities, sale of assets or otherwise), (B) any material asset other than in the Ordinary Course of Business, or (C) a series or group of related transactions or events of the type specified in clauses (A) and (B) above;

(v) any Contractual Obligation concerning or consisting of a partnership, limited liability company or joint venture agreement with another Person;

(vi) any Contractual Obligation (or group of related Contractual Obligations) (A) under which the Company has created, incurred, assumed or guaranteed any Debt or (B) under which the Company has permitted any Asset to become Encumbered, except by Permitted Encumbrances;

(vii) any Contractual Obligation subjecting the Company to non-competition or other similar material restrictions on its ability to conduct the Business anywhere in the world or pursuant to which the Company has the benefit of material non-competition, confidentiality or other similar restrictions by another Person (other than standard Contractual Obligations entered into by employees or independent contractors of the Company in the Ordinary Course of Business);

(viii) any profit sharing, stock option, stock purchase, stock appreciation, defined compensation, severance or other plan or arrangement for the benefit of a Company's

35

                                                 AGING-000083

current or former directors, officers, and employees;

(ix)   any Contractual Obligation contemplating annual payments in excess of $100,000 per year providing for the employment or in excess of $50,000 providing for consultancy with an individual on a full-time, part-time, consulting or other basis or otherwise providing Compensation or other benefits to any officer, director, employee or consultant (other than an Employee Plan);

(x)   except as may be entered into in the Ordinary Course of Business, any material agency, dealer, distributor, sales representative, marketing or other similar agreement;

(xi)   any other Contractual Obligation (or group of related Contractual Obligations) the performance of which involves consideration in excess of $150,000 over the life of such Contractual Obligation;

(xii)   any Contractual Obligation with any vendor that provides services relating to billing, coding and/or reimbursement;

(xiii)   except as may be entered into in the Ordinary Course of Business, any warranty Contractual Obligations with respect to products sold or indemnity agreements with any supplier or customer to the Business under which the Company  is obligated to indemnify such supplier or customer against product liability claims; and

(xiv)   any other Contractual Obligation that is material to the Business, taken as a whole whether or not entered into in the Ordinary Course of Business.

With respect to the Company, the Members have delivered to the Buyer true, accurate and complete copies in all material respects of each written Contractual Obligation (including copies of all material amendments or modifications thereto) listed in Section 3.16(a) of the Disclosure Schedule, in each case, as amended or otherwise modified and in effect.

(b)   Enforceability, etc.  Each Contractual Obligation required to be disclosed in Sections 3.11(b) (Real Property Leases), 3.16(a) (Contracts), or 3.20 (Insurance) of the Disclosure Schedule (each, a "Disclosed Contract") is Enforceable against the Company  (and, to the Company's Knowledge, against each other party thereto; provided, however, that no representation or warranty is given with respect to the enforceability of any noncompetition, nonsolicitation, confidentiality or other similar agreements) and is in full force and effect, and, subject to obtaining any consents disclosed in Section 3.4 of the Disclosure Schedule.

(c)   Breach, etc.  The Company is not, and, to the Company's Knowledge, no other party to any Disclosed Contract is in, material breach or violation of, or material default under, or has repudiated any provision of, any Disclosed Contract and the Company has not given or received written notice to or from any Person relating to any such breach, violation or default that has not been cured.  The Company has not terminated or cancelled any Disclosed Contract other than in the Ordinary Course of Business and no counterparty to any Disclosed

36

                                                   AGING-000084

Contract has cancelled or terminated, or given written notice of its intention to cancel or terminate any Disclosed Contract or, to the Company's Knowledge, threatened to cancel or terminate any Disclosed Contract.

3.17 <u>Affiliate Transactions</u>.   Except as set forth in <u>Section 3.17 of the Disclosure Schedule</u>, none of (i) the Company's managers, officers, directors, members, shareholders or Affiliates , (ii) to the  Company's Knowledge, any individual related by blood, marriage or adoption to any such individual listed in clause (i),  or (iii) any entity in which any such Person or individual listed in clause (i) owns any controlling beneficial interest, is a party or has been a party since Inception to any Contractual Obligation, commitment or transaction with the Company, or has any interest in any material property used by the Company.  <u>Section 3.17 of the Disclosure Schedule</u> lists all intercompany transactions between or among the Company, the Members and their respective Affiliates entered into since Inception other than transactions conducted in the Ordinary Course of Business.

3.18 <u>Employees</u>.

(a)     <u>Section 3.18(a) of the Disclosure Schedule</u> lists the employees of the Company with annual compensation in excess of $100,000, including such employee's position, status as a full- or part-time employee, current salary, current target bonus and any bonus amount paid from January 1, 2013 to the date of this Agreement, tenure and any Equity Interests in the Company or its Subsidiaries held by such employee.  Except as disclosed in <u>Section 3.18(a) of the Disclosure Schedule</u>, there are no work slowdowns, lockouts, stoppages, picketing or strikes ("<u>Labor Troubles</u>") pending, or to the Company's Knowledge, threatened between the Company and its employees, and there have been no such Labor Troubles since December 31, 2013.  Except as disclosed in <u>Section 3.18(a) of the Disclosure Schedule</u>, to the Company's Knowledge, no employee of the Company is represented by a labor union and the Company is not a party to, or otherwise subject to, any collective bargaining agreement or other labor union contract.  Since December 31, 2013, no officer's or other key employee's employment with the Company has been terminated for any reason nor has any such officer or employee notified the Company in writing of his or her intention to resign or retire.  To the Company's Knowledge, no officer or other key employee of the Company, is bound by any Contractual Obligation that would prohibit or impair his or her ability to be employed by the Company, or the Buyer, or to perform his or her duties pursuant to employment with either of them.  Except as set forth in <u>Section 3.18(a) of the Disclosure Schedule</u>, the Company is not liable for any payment to any trust or other fund or to any governmental or administrative authority with respect to unemployment compensation benefits, social security, or other benefits for employees or former employees of the Company other than in the Ordinary Course of Business.  <u>Section 3.18(a) of the Disclosure Schedule</u> lists all consultants currently hired by the Company whose annual or one-time compensation is in excess of $50,000, their rate of pay, the date when they began their assignment with the Company, and the estimated completion date of their services.

(b)     With respect to this transaction, any notice required under any law or collective bargaining agreement has been given, and all bargaining obligations with any employee representative have been, or prior to the Closing will be, satisfied.  Since Inception, the

37

                                                         AGING-000085

Company has not implemented any plant closing or mass layoff of employees as those terms are defined in the WARN Act, or any similar foreign, state or local law, regulation or ordinance, and no such action will be implemented without advance notification to the Buyer.

(c)     The Company and each of its Subsidiaries is currently in material compliance with all Legal Requirements relating to employment, including those related to wages, hours and the payment and withholding of Taxes and other sums as required by the appropriate Governmental Authority and has withheld and paid to the appropriate Governmental Authority all amounts required to be withheld from employees and is not liable for any arrears of any material wages, Taxes (other than Taxes not yet due and payable), penalties or other sums for failing to comply with any of the foregoing. There are no labor grievances pending or, to the Company's Knowledge, threatened between the Company or any of its Subsidiaries, on the one hand, and any of their respective employees or former employees, on the other hand.

3.19   Litigation; Governmental Orders.

(a)     Litigation.   Except as disclosed on Section 3.19(a) of the Disclosure Schedule, there is no (and since Inception, there has not been any) Action to which the Company is a party (either as plaintiff or defendant) and, to the Company's knowledge, there is no Action threatened against the Company. To the Company's Knowledge, no event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.  Except as disclosed on Section 3.19(a) of the Disclosure Schedule, there is no Action pending or, to the Company's Knowledge, threatened, which (x) in any manner challenges or seeks the rescission of, or seeks to prevent, enjoin, alter or materially delay the consummation of, or otherwise relates to, this Agreement and the transactions contemplated hereunder, (y) involves any Equity Interests of the Company or may result in any change in the current equity ownership of the Company, or (z) is against a Member or an officer, director or key employee of the Company involving the Business of the Company. To the Company's Knowledge, no event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action. To the Company's Knowledge, there is no Action against any current or former director or employee of the Company with respect to which the Company has or is reasonably likely to have an indemnification obligation. Except as disclosed on Section 3.19(a) of the Disclosure Schedule, there is no Action which the Company presently intends to initiate.  Except as described on Section 3.19(a) of the Disclosure Schedule, the Company is not subject to any arbitration proceedings under collective bargaining agreements.

(b)     Governmental Orders.   Except as disclosed on Section 3.19(b) of the Disclosure Schedule, no material Governmental Order has been issued or is threatened which is applicable to the Company or its Assets or the Business.

3.20   Insurance.   Section 3.20 of the Disclosure Schedule sets forth (x) a description of insurance policies maintained by the Company, including policies by which the Company, or any of its Assets, employees, officers or directors or the Business has been insured since December 31, 2013 (the "Liability Policies") and, with respect to such Liability Policies under which the Company, or any of its Assets, employees, officers or directors or the Business is currently

38

insured (the "Current Liability Policies"), their respective expiration dates and (y) a list of all pending claims under such Liability Policies in excess of $25,000 and a list of all historic claims under such Liability Policies since January 1, 2013. The description includes for each Liability Policy the type of policy, policy number and name of insurer. The Members have made available to the Buyer true, accurate and materially complete copies of all Liability Policies, in each case, as amended or otherwise modified and in effect with respect to the Company. The Company is not in default, in any material respect, with respect to its obligations under any insurance policy maintained by it and the Company has not been denied insurance coverage or been subject to any gaps in insurance coverage since Inception. Except as disclosed in Section 3.20 of the Disclosure Schedule, since December 31, 2013, no insurer (a) has denied or disputed (or otherwise reserved its rights with respect to) the coverage of any claim pending under any Liability Policy or (b) has threatened to cancel any Liability Policy with respect to the Company. Except as set forth in Section 3.20 of the Disclosure Schedule, the Company does not have any self-insurance or co-insurance programs, and the reserves set forth on the books of the Company as of the Purchase Option Closing will be adequate and have been prepared in accordance with GAAP to cover all liabilities with respect to any such self-insurance or co-insurance programs. All Liability Policies are issued by an insurer that, to the Company's Knowledge, is reputable, are in full force and effect and enforceable in accordance with their terms and, to the Company's Knowledge, provide coverage customary for entities engaged in similar lines of business.

3.21   No Brokers.  Except as provided on Section 3.21 of the Disclosure Schedule, the Company has no Liability of any kind to, or is subject to any claim of, any broker, finder or agent in connection with the transactions contemplated hereunder.

3.22   Customers and Suppliers.  Section 3.22 of the Disclosure Schedule sets forth (a) a list of the top 25 institutional customers of the Company (by volume of sales to such customers), if any (excluding individual natural persons), (b) a list of the top 15 suppliers of the Company (by volume of purchases from such suppliers), and (c) a list of the top 15 payors of the Company (by volume of sales from such payors), for the fiscal year ended December 31, 2013 and for the 9-month period ended September 30, 2014. The Company has not received any notice from any customer or payor of the Company listed in Section 3.22 of the Disclosure Schedule to the effect that, and the Company has no Knowledge that, any such customer or payor will stop, materially decrease the rate of, or materially change the terms (whether related to payment, price or otherwise) with respect to, buying materials, products or services from the Company (whether as a result of the consummation of the transactions contemplated hereby or otherwise). The Company has not received any notice from any supplier listed in Section 3.22 of the Disclosure Schedule, as required to be disclosed hereunder, to the effect that, and the Company has no Knowledge that, any such supplier will stop, materially decrease the rate of, or materially change the terms (whether related to payment, price or otherwise) with respect to, supplying materials, products or services to the Company (whether as a result of the consummation of the transactions contemplated hereby or otherwise).

3.23   Intellectual Property.

(a)   Section 3.23(a) of the Disclosure Schedule sets forth a true and complete

39

list of all registered or material Intellectual Property, other than non-material non exclusively in-licensed Intellectual Property and commercially available Software, used in the Company's conduct of the Business, separated by (i) Intellectual Property that is owned by the Company, and (ii) Licenses, whether written or other, setting forth the details of the License.

(b)     Except as set forth in Section 3.23(b) of the Disclosure Schedule, the Company owns or has valid licenses to use (which licenses are set forth in Section 3.23(a) of the Disclosure Schedule) all material Intellectual Property used in the Company's conduct of the Business, free and clear of all Encumbrances.  To the Company's Knowledge, the Company's conduct of the Business has not infringed, misappropriated or otherwise unlawfully used and does not infringe, misappropriate or otherwise unlawfully use the Intellectual Property of any Person. To the Company's Knowledge, there are no facts or circumstances that would render any of the Company Intellectual Property invalid or unenforceable and each item of the Company's registered Intellectual Property is valid and subsisting. To the Company's Knowledge, no Person has infringed or misappropriated or is infringing or misappropriating any of the Company's Intellectual Property, including any employee or former employee of Company.

(c)     Except as set forth in Section 3.23(c) of the Disclosure Schedule, the Company does not pay or receive any royalty to or from anyone with respect to Intellectual Property, nor has the Company licensed anyone to use any of the Intellectual Property owned by the Company and used in the Company's conduct of the Business.

(d)     Except as set forth in Section 3.23(d) of the Disclosure Schedule, all rights of the Company in and to the material Intellectual Property used in the Company's conduct of the Business will be unaffected by the transactions contemplated by this Agreement.

(e)     Except as set forth in Section 3.23(e) of the Disclosure Schedule, neither the Company nor any of the Members has given nor received any written notice of any pending conflict with, or infringement of the rights of others with respect to any Intellectual Property owned by the Company or used in the Company's conduct of the Business.

(f)     To the Company's Knowledge, all trade secrets, confidential information or know-how owned by or purported to be owned by the Company and used in the Company's conduct of the Business have been maintained in accordance with protection procedures customarily used by comparable companies in the same industry as the Company to protect rights of like importance.  All Company employees or consultants who have contributed to or participated in the conception or development of any Intellectual Property owned by or purported to be owned by the Company or used in the Company's conduct of the Business (including any Company IT) have executed and delivered to the Company and, to the Company's Knowledge, are in material compliance with, an agreement assigning all proprietary rights to the Company and restricting such Person's rights to use or disclose such proprietary information and to the Company's Knowledge, no current or former employee, consultant or contractor or any other Person (except for the owners of non-exclusively in-licensed Intellectual Property), has any right, claim or interest to any such Intellectual Property, including the Company IT.

(g)     The Company IT does not contain any open source or freeware and no

40

Software distributed by or licensed from the Company is governed, in whole or in part, by the terms of the GNU General Public License or any other license requiring the Company to disclose source code to, or requiring the licensing of, any of Software.

## ARTICLE IV.  REPRESENTATIONS AND WARRANTIES ABOUT THE MEMBERS

Each Member hereby represents and warrants to the Buyer as of the date hereof (and in the case of the Member Party Fundamental Representations contained in this Article IV, also as of the Closing Date), subject to the disclosures contained in the Disclosure Schedule, which Disclosure Schedule shall contain specific references to the representations and warranties to which the disclosures contained therein relate, that, with respect to such Member:

4.1    <u>Organization</u>. If such Member is not a natural person, that such Member is duly organized, validly existing and in good standing under the laws of its state of incorporation or formation.

4.2    <u>Power and Authorization</u>.   The execution, delivery and performance by such Member of this Agreement and by such Member of each Non-Competition Agreement to which it is (or will be) a party and the consummation of the transactions contemplated hereunder and thereunder are within the power and authority of such Member and, if applicable, have been prior to the Purchase Option Closing, duly authorized by all necessary action on the part of such Member.  This Agreement and each Non-Competition Agreement to which such Member is (or will be) a party (i) has been (or, in the case of Non-Competition Agreements to be entered into at or prior to the Purchase Option Closing, will be) duly executed and delivered by such Member and (ii) is (or in the case of Non-Competition Agreements to be entered into at or prior to the Purchase Option Closing, will be) a legal, valid and binding obligation of such Member, Enforceable against such Member in accordance with its terms.

4.3    <u>Authorization of Governmental Authorities</u>.  Except as disclosed in <u>Section 4.3 of the Disclosure Schedule</u> and any filings/consents required under the HSR Act, no action by (including any authorization, consent or approval), or in respect of, or filing with, any Governmental Authority is required for, or in connection with, the valid and lawful (a) authorization, execution, delivery and performance by such Member of this Agreement and by such Member of each Non-Competition Agreement to which it is (or will be) a party or (b) the consummation of the transactions contemplated hereunder by such Member.

4.4    <u>Noncontravention</u>.  Except as disclosed in <u>Section 4.4 of the Disclosure Schedule</u>, neither the execution, delivery and performance by such Member of this Agreement or any Non-Competition Agreement to which such Member is (or will be) a party nor the consummation of the transactions contemplated hereunder will:

(i)      assuming the taking of any action by (including any authorization, consent or approval) or in respect of, or any filing with, any Governmental Authority, in each case, as disclosed on <u>Section 4.4 of the Disclosure Schedule</u>, violate any provision of any Legal Requirement applicable to such Member;

41

Confidential Treatment Requested by Philidor                                                      AGING-000089

(ii)    result in a material breach, violation or default under any Contractual Obligation of such Member; or

(iii)    require any action by (including any authorization, consent or approval) or in respect of (including notice to), any Person under any Contractual Obligation of such Member.

4.5    <u>Title</u>.  Such Member is (and, if the Purchase Option is exercised by the Buyer in accordance with this Agreement, at the Closing, the Member shall be the record and beneficial owner of the Equity Interests of the Company set forth opposite such Member's name in <u>Section 3.5(a) of the Disclosure Schedule</u>, and such Member has (and, if the Purchase Option is exercised by the Buyer in accordance with this Agreement, at the Closing, the Member shall have good and marketable title to such Equity Interests of the Company, free and clear of all Encumbrances.  Such Member has (and, if the Purchase Option is exercised by the Buyer in accordance with this Agreement, at the Closing, the Member shall have) full right, power and authority to transfer and deliver to the Buyer valid title to the Equity Interests of the Company set forth opposite such Member's name in <u>Section 3.5(a) of the Disclosure Schedule</u> (other than restrictions under the 1933 Act and state securities laws), free and clear of all Encumbrances. Such Member possesses (and, if the Purchase Option is exercised by the Buyer in accordance with this Agreement, at the Closing, the Member shall possess) all ownership, transfer, voting and other rights with respect to the Equity Interests of the Company set forth opposite such Member's name in <u>Section 3.5(a) of the Disclosure Schedule</u>, free and clear of all Encumbrances. Except pursuant to this Agreement, there is no Contractual Obligation pursuant to which such Member has granted any option, warrant or other right to any Person to acquire the Equity Interests of the Company set forth opposite such Member's name in <u>Section 3.5(a) of the Disclosure Schedule</u> or any other Equity Interests in the Company.

4.6    <u>No Brokers</u>.  Except as disclosed in <u>Section 4.6 of the Disclosure Schedule</u>, such Member has no Liability of any kind to any broker, finder or agent or any other Person in connection with the transactions contemplated hereunder other than those which will be borne by the Members.

4.7    <u>Litigation</u>.   There are no Actions pending or, to such Member's Knowledge, threatened against such Member nor any outstanding judgments, orders, writs, injunctions or decrees of any Governmental Authority against such Member that seeks to prohibit or materially and adversely restrict or delay the consummation of the transactions contemplated hereunder or which could reasonably be expected to have a Material Adverse Effect on such Member.

4.8    <u>Disclaimer of Other Representations and Warranties</u>.  Except as expressly set forth in Articles III and IV and as otherwise set forth in this Agreement, Members make no representation and warranty, express or implied, at law or in equity, in respect of the Company, its Subsidiaries or any of their respective Assets, liabilities or operations, and any such other representations or warranties are hereby expressly disclaimed; <u>provided</u> that the foregoing disclaimer does not constitute a waiver or disclaimer by Buyer or its successors or permitted assigns of any element, requirement or condition that may be necessary under applicable Legal Requirements for Buyer or any of its successors or permitted assigns to make a claim based on conduct constituting fraud, fraud in the inducement, intentional misrepresentation or violation of

42

law as permitted pursuant to Section 10.7.

## ARTICLE V.  REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Members as of the date hereof (and in the case of the Buyer Fundamental Representations contained in this Article V, also as of the Closing Date) that:

5.1   <u>Organization</u>.  The Buyer is duly organized, validly existing and in good standing under the laws of the State of Delaware with the requisite corporate power and authority to enter into and perform this Agreement and the transactions contemplated hereunder.

5.2   <u>Power and Authorization</u>.  The execution, delivery and performance by the Buyer of this Agreement and each Non-Competition Agreement to which it is (or will be) a party and the consummation of the transactions contemplated hereunder are within the power and authority of the Buyer and have been duly authorized by all necessary action on the part of the Buyer. This Agreement and each Non-Competition Agreement to which the Buyer is (or will be) a party (a) has been (or, in the case of Non-Competition Agreements to be entered into at or prior to the Purchase Option Closing, will be) duly executed and delivered by the Buyer and (b) is (or in the case of Non-Competition Agreements to be entered into at or prior to the Purchase Option Closing, will be) a legal, valid and binding obligation of the Buyer, Enforceable against the Buyer in accordance with its terms.

5.3   <u>Authorization of Governmental Authorities</u>.  Except for any filings/consents required under the HSR Act, no action by (including any authorization, consent or approval), or in respect of, or filing with, any Governmental Authority is required for, or in connection with, the valid and lawful (a) authorization, execution, delivery and performance by the Buyer of this Agreement and each Non-Competition Agreement to which it is (or will be) a party or (b) the consummation of the transactions contemplated hereunder by the Buyer.

5.4   <u>Noncontravention</u>.  Neither the execution, delivery nor performance by the Buyer of this Agreement or any Non-Competition Agreement to which it is (or will be) a party nor the consummation of the transactions contemplated hereunder will:

(i)   assuming the taking of any action by (including any authorization, consent or approval) or in respect of, or any filing with, any Governmental Authority, in each case, as disclosed on <u>Schedule 5.4</u>, violate any provision of any Legal Requirement applicable to the Buyer;

(ii)   result in a material breach, violation, or default under any Contractual Obligation of the Buyer;

(iii)   require any action by (including any authorization, consent or approval) or in respect of (including notice to), any Person under any Contractual Obligation; or

(iv)   result in a breach, violation, or default under the Buyer's Organizational

43

Documents.

5.5   <u>No Brokers</u>.  The Buyer has no Liability of any kind to any broker, finder or agent or any other Person in connection with the transactions contemplated hereunder other than those which will be borne by the Buyer.

5.6   <u>Litigation</u>.   There are no Actions pending or, to the Buyer's Knowledge, threatened against the Buyer nor any outstanding judgments, orders, writs, injunctions or decrees of any Governmental Authority against the Buyer that seeks to prohibit or materially and adversely restrict or delay the consummation of the transactions contemplated hereunder or which would reasonably be expected to have a Material Adverse Effect on the Buyer.

5.7   <u>Sufficient Funds</u>.  The Buyer has available, and on the Purchase Option Closing Date and the Closing Date will have available, in cash, all funds necessary to consummate all of the Buyer's obligations under this Agreement that are required to be consummated at Purchase Option Closing or the Closing.

### ARTICLE VI.  COVENANTS

6.1   <u>Commercially Reasonable Efforts for Closing</u>.  If Buyer exercises the Purchase Option, the Members and the Buyer will, and will cause their respective Representatives to, use commercially reasonable efforts to take all of the actions necessary (including as necessary and appropriate, in obtaining all governmental and third party consents, approvals, licenses, change of ownership applications, billing numbers, provider applications and other permits) to consummate the Company Equity Interests Acquisition including delivering all the various certificates, documents and instruments described in Section 2.7 and Article VII or VIII, as the case may be.

6.2   <u>Operation of Business</u>.

(a)   <u>Conduct of Business</u>.  From the date of this Agreement until the Closing Date, the Company will and the Members will cause the Company to:

(i)   except as otherwise set forth on <u>Schedule 6.2(b)</u>, conduct the Business only in the Ordinary Course of Business and in accordance with the Strategic Plan;

(ii)   maintain insurance reasonably comparable to that in effect on the date hereof;

(iii)   maintain its books, accounts and records in accordance with past custom and practice as used in the preparation of the Interim Financials and provide accruals for Taxes, obsolete inventory, bonuses, vacation and other items in accordance with past practice;

(iv)   except as otherwise directed by the Buyer, use reasonable efforts to encourage each of the officers of the Company to continue their employment with the Company both before and after the Closing;

44

(v)      comply in all material respects with all Legal Requirements and Contractual Obligations applicable to the Company' operations and business;

(vi)     pay all Taxes due and file all Tax Returns on a timely basis in a manner consistent with the Intended Tax Treatment and subject to Section 11.1(b);

(vii) promptly following the date hereof, perform a HIPAA security rule risk assessment as required by 45 C.F.R. §164.308(a)(1)(ii)(A), including an assessment as required by 45 C.F.R. §164.306(d)(3), taking into account the factors set forth in 45 C.F.R. §164.306(a), (b), and (c) and create and maintain documentation in accordance with 45 C.F.R. §164.316 (the "Security Risk Assessment"), and address and remediate all threats and deficiencies identified in the Security Risk Assessment in accordance with HIPAA; and

(viii) use all reasonable efforts to defend any Action to which the Company is or becomes a party and shall keep the Buyer regularly updated with respect to the status of such Action.

(b)      Buyer's Consent.  Without limiting the generality of Section 6.2, without the written consent of the Buyer, except as set forth in Schedule 6.2(b), the Company will not, and the Members will cause the Company not to:

(i)      take or omit to take any action which would reasonably be anticipated to have a Material Adverse Effect on the Company;

(ii)     make any redemption, repurchase or other acquisition or transfer of, or permit or record any transfer of, the Equity Interests of the Company (whether by operation of law or otherwise) or grant any new Equity Interests of the Company or incur, create or assume (or permit any Member to incur, create or assume) any Encumbrances (whether by operation of law or otherwise) upon any Equity Interests of the Company;

(iii)    make any distributions to the Members or any other Person, other than the distributions of earnings, in an amount not to exceed $5,620,000.00 in the aggregate, to certain Members and employees (such permitted $5,620,000 distribution, being referred to as the "Permitted Distribution");

(iv)     make any material capital expenditures relating to the Business and, for greater certainty, any individual capital expenditure over $50,000 or series of related capital expenditures, in the aggregate, over $100,000 shall be deemed to be material capital expenditures for the purposes of this Section;

(v)      waive, release, assign, commence, discharge, settle or compromise any Action, including, but not limited to, Actions involving Third Party Payors or Governmental Authorities;

(vi)     (A) except for Contractual Obligations with Third Party Payors or Other Services Agreements (for which clause (B) of this Section 6.2(b)(vi) shall instead apply),

45

subject to the approval of the JSC (if applicable), enter into any new material Contractual Obligation (or other relationship respecting the Business) or terminate, modify, amend or waive, or exercise any right under, any material Contractual Obligation (or other relationship respecting the Business) to which the Company is a party, except new Contractual Obligations, terminations, modifications, amendments, waivers or exercises made in the Ordinary Course of Business and which would not, either individually or in the aggregate, have a Material Adverse Effect on the Company; or (B) subject to the approval of the JSC (if applicable), enter into any new material Contractual Obligation (or other relationship respecting the Business) with any Third Party Payor or with new or existing customers to which the Company provides the same or similar services as that provided to Buyer or its Affiliates under the Existing Services Agreement (an "Other Services Agreement") or terminate, modify, amend or waive, or exercise any right under, any Other Services Agreement or under any material Contractual Obligation (or other relationship respecting the Business) to which the Company is a party with any Third Party Payor;

(vii)    mortgage, lease, sell, transfer, license, permit to lapse or otherwise dispose of or incur, create or assume any Encumbrances upon any material Intellectual Property of the Company, any material Asset of the Company or any other Asset of the Company necessary for the operation of the Business, other than in the Ordinary Course of Business;

(viii)    abandon, lapse, allow to lapse or fail to maintain any material Intellectual Property or any other Intellectual Property necessary for or used in the operation of the Business, in each case that is owned by the Company or in which the Company has rights, or disclose any material proprietary confidential information to any Person other than in the Ordinary course in circumstances in which the Company has imposed reasonable confidentiality restrictions;

(ix)    forgive, cancel, waive, release or compromise any material Debt or claim of the Company;

(x)    incur, assume or otherwise become liable under any Debt or become liable in respect of any Guarantee;

(xi)    amend its Organizational Documents or any term of its outstanding Equity Interests or other securities, or issue, sell, grant or otherwise dispose of its Equity Interests or other securities, or form any Subsidiary;

(xii)    institute or permit any material change in the conduct of the Business, subject to approval of the JSC;

(xiii)    (A) close any material site or facility (other than (1) as a result of the termination or non-renewal of a lease by the landlord or (2) as approved by the JSC), or (B) abandon or terminate any line of business of the Company except as required by any Legal Requirements;

(xiv)    terminate, withdraw, suspend or allow to lapse (A) any state pharmacy license in any of the states set out on Schedule 6.2(b)(xiv) except for immaterial lapses

46

of such licenses in the Ordinary Course of Business that do not adversely affect the Company's Assets or the Company, or (B) any Permit necessary for or used in the conduct of the Business, except in the case of this clause (B), such Permits the termination, withdrawal, suspension or lapse of which would not individually or in the aggregate have a Material Adverse Effect on the Company;

(xv)    terminate the employment of the Buyer Requested Employees, except as permitted by the terms of this Agreement;

(xvi)    other than as contemplated in connection with the transactions contemplated hereunder or to satisfy Legal Requirements, (A) increase the compensation, bonus awards or benefits payable to its officers or employees, other than in the Ordinary Course of Business and consistent with normal compensation practices of industries substantially similar to the Business, in all cases subject to the amounts set forth in the Company's annual budget and to the limits set out in Schedule 6.2(b)(xvi) and provided that the Permitted Distributions shall not be considered in determining what is in the Ordinary Course of Business for this purpose; (B) grant to any officer, employee or independent contractor of the Company any new employment, retention, severance, equity, change of control or termination pay awards; (C) grant any increase in, accelerate the vesting or payment of, or otherwise alter or amend, any right to receive any severance, change of control, retention or termination pay or benefits; or (D) establish, adopt, enter into or amend any collective bargaining (or similar), bonus, profit sharing, thrift, compensation, stock option, restricted stock, stock unit, dividend equivalent, pension, retirement, deferred compensation, employment, loan, retention, consulting, indemnification, termination, severance or other similar plan, agreement, trust, fund, policy or arrangement (including any Employee Plan) with any officer, employee or independent contractor; provided, however, that nothing shall prohibit the Company from hiring new employees in the Ordinary Course of Business so long as the Company does not take any of the actions prohibited by this Section in so doing;

(xvii)   modify, amend or terminate, or waive any right of the Company (or any obligation of the Members) under the Non-Competition Agreements; or

(xviii)  agree or commit to do any of the foregoing,

provided, however, that nothing contained herein shall give to the Buyer, directly or indirectly, the right to control or direct the operations of the Business prior to the Closing Date.

6.3    Notices and Consents; Regulatory Filings.

(a)    The Company.  If the Buyer exercises the Purchase Option, the Company shall, and the Members shall use commercially reasonable efforts to cause the Company to, give all notices to, make all filings with and use commercially reasonable efforts to obtain all authorizations, consents, modifications, waivers or approvals from, any Governmental Authority or other Person (including as set forth in Sections 3.3 or 3.4 of the Disclosure Schedule and as required under the HSR Act) as may be necessary to consummate the Company Equity Interests Acquisition or as may be necessary for the operation of the Business following the Closing or as

47

otherwise reasonably requested by the Buyer (including, but not limited to, in connection with any pharmacy licenses or Third Party Payor contracts and the transfer thereof); provided further that in no event shall such actions by such party or its Affiliates include the sale, divesture or disposition of its or its Affiliates assets, properties or businesses or of the assets, properties or businesses to be acquired by the Buyer pursuant to the Company Equity Interests Acquisition.

(b)    Members.  If the Buyer exercises the Purchase Option, each Member shall give all notices to, make all filings with and use its commercially reasonable efforts to obtain all authorizations, consents or approvals from, any Governmental Authority or other Person (including as set forth in Sections 4.3 or 4.4 of the Disclosure Schedule and applicable to such Member and as required under the HSR Act) as may be necessary to consummate the Company Equity Interests Acquisition or as otherwise reasonably requested by the Buyer; provided that in no event shall such actions by such party or its Affiliates include the sale, divesture or disposition of its or its Affiliates assets, properties or businesses or of the assets, properties or businesses to be acquired by the Buyer pursuant hereto.  If the Buyer exercises the Purchase Option, upon the Buyer's specific request, each Member shall, and will cause each of its Affiliates to, complete and file in a timely manner all applications and notices related to a change in ownership or transfer of the Assets that are required by any Governmental Authority or third party payor to be filed by such Member or its Affiliates (including, if requested by the Buyer or the Members, as appropriate, entering into a collaboration or other appropriate agreement with the Buyer for either or both of the State of Illinois and the State of Kansas, so as to permit the Buyer to rely on the Company's existing pharmacy license in the State of Illinois and the State of Kansas, respectively, pending the approval of the Buyer's application for a replacement pharmacy license for the Company in the State of Illinois and the State of Kansas, respectively). Each Member, as applicable, shall promptly provide to the Buyer a copy of all such documents upon submission.

(c)    Buyer.  If the Buyer exercises the Purchase Option, the Buyer will give all notices to, make all filings with and use its commercially reasonable efforts to obtain all authorizations, consents or approvals from, any Governmental Authority or other Person (including as set forth in Schedule 5.4 and as required under the HSR Act) or as otherwise reasonably requested by the Members; provided that in no event shall such actions by the Buyer or its Affiliates include, or shall the Buyer or its Affiliates be required to agree to take or become subject to, any of the following actions or restrictions: (i) the sale, divesture or disposition of the Buyer's or its Affiliates' assets, properties or businesses or of the assets, properties or businesses to be acquired by the Buyer pursuant hereto, (ii) any limitations on (A) the right of the Buyer effectively to control or operate its business (including the Business and the Company) or assets (including the Assets), or (B) the right of the Buyer to exercise full rights of ownership of its business (including the Business and the Company) or assets (including the Assets), or (iii) any steps to avoid or eliminate any impediment that may be asserted under any law governing competition, monopolies or restrictive trade practices.

(d)    All filing fees payable to any Governmental Authority pursuant to the HSR Act in connection with the transactions contemplated hereby shall be paid by the Buyer.

48

                                    AGING-000096

6.4   Buyer's Access to Premises; Information; Financial Statements.

(a)   Access. From the date of this Agreement until the Closing Date, the Company will permit the Buyer, and its Representatives, to have reasonable access (at reasonable times and upon reasonable notice and subject to reasonable confidentiality procedures and processes) to all officers and personnel of the Company and to all premises, properties, books, records (including  financials and Tax records), contracts, financial and operating data and information and documents pertaining to the Company or the Business (and shall furnish copies of such documentation and information) as the Buyer may reasonably request, including for financial reporting purposes (including with respect to any quarterly report on Form 10-Q or any annual report on Form 10-K)  and tax and accounting matters; provided, however, that the Company shall be entitled to encrypt confidential customer and practice names, data and information for proprietary purposes with numbers being inserted for names to protect the Company in the event Closing does not occur. In addition to the foregoing, the Company agrees to provide reasonable assistance to the Buyer (and its Representatives), on request, in connection with any required financial or tax reporting in connection with this transaction or the Business, including by preparing audited or unaudited financial statements of the Business, including as further described in Section 6.4(b).

(b)   Delivery of Financial Statements.  From the date of this Agreement until the Closing Date, the Company shall deliver to the Buyer:

(i)   as soon as practicable, but in any event within 30 days after the end of each fiscal year of the Company (A) a balance sheet as of the end of such year, (B) statements of income and of cash flows for such year, and (C) a statement of members' equity as of the end of such year, all such financial statements audited and certified by independent public accountants of nationally recognized standing selected by the Company;

(ii)   as soon as practicable, but in any event within 15 days after the end of each of the first three (3) quarters of each fiscal year of the Company, unaudited statements of income and cash flows for such fiscal quarter, and an unaudited balance sheet and a statement of members' equity as of the end of such fiscal quarter, all prepared in accordance with GAAP (except that such financial statements may (i) be subject to normal year-end audit adjustments; and (ii) not contain all notes thereto that may be required in accordance with GAAP);

(iii)   as soon as practicable, but in any event within 15 days of the end of each month, an unaudited income statement and statement of cash flows for such month, and an unaudited balance sheet and statement of members' equity as of the end of such month, all prepared in accordance with GAAP (except that such financial statements may (i) be subject to normal year-end audit adjustments and (ii) not contain all notes thereto that may be required in accordance with GAAP);

(iv)   as soon as practicable, but in any event thirty (30) days before the end of each fiscal year, a budget and business plan for the next fiscal year prepared on a monthly basis, including balance sheets, income statements, and statements of cash flow for such months

49

and, promptly after prepared, any other budgets or revised budgets prepared by the Company; and

(v)  with respect to the financial statements called for in this Section 6.4(b) (the "<u>Periodic Financial Statements</u>"), an instrument executed by the chief financial officer (or similar position) and chief executive officer (or similar position) of the Company certifying that such financial statements were prepared in accordance with GAAP consistently applied with prior practice for earlier periods (except as otherwise set forth in Section 6.4(b)(ii) and Section 6.4(b)(iii) and fairly present the financial condition of the Company and its results of operation for the periods specified therein.

(c)  <u>Requirements of Periodic Financial Statements</u>. The Periodic Financial Statements (including any notes thereto) (i) shall be prepared in accordance with the books and records of the Company, (ii) shall be prepared in accordance with GAAP(except that that the unaudited interim financial statements specified in Section 6.4(b) above may (x) be subject to normal year-end audit adjustments and (y) not contain all notes thereto that may be required in accordance with GAAP), (iii) shall present the financial condition and results of operations of the Company and its Subsidiaries on a stand-alone basis, net of any intercompany transactions, and (iv) shall fairly present, in all material respects, the financial condition of the Company as at the respective dates thereof and the results of operations of the Company and changes in financial condition for the respective periods covered thereby.

6.5  <u>Notice of Developments</u>.  From the date of this Agreement until the Closing Date, the Members will give the Buyer prompt written notice upon becoming aware of any material development affecting the Assets, Liabilities, Business, financial condition, operations or prospects of the Company, any event or circumstance that could reasonably be expected to result in a breach of, or inaccuracy in, any of the Company's or Members' representations and warranties, any material breach of any covenant or obligation of the Company or the Members hereunder, or any event or circumstance that would make the timely satisfaction of any of the conditions to Closing set out herein impossible or unlikely. For greater certainty, the Members will give the Buyer prompt written notice upon becoming aware of any pending or threatened Action against the Company.

6.6  <u>Exclusivity</u>.  From the date of this Agreement until the earlier of Closing or the date this Agreement is terminated pursuant to Article IX hereof, the Members will not (and each of the Members shall cause its Affiliates not to) directly or indirectly: (a) solicit, initiate, or encourage the submission of any proposal or offer from any Person relating to, or enter into or consummate any transaction relating to, the acquisition of any Equity Interests in the Company or any merger, recapitalization, share exchange, sale of substantial assets or any similar transaction or alternative to the transactions contemplated hereunder or (b) participate in any discussions or negotiations regarding, furnish any information with respect to, assist or participate in, or facilitate in any other manner any effort or attempt by any Person to do or seek any of the foregoing.  The Members and the Company will notify the Buyer immediately if any Person makes any proposal, offer, inquiry or contact with respect to any of the foregoing (whether solicited or unsolicited) and provide the Buyer with the relevant details thereto.

50

6.7   Expenses.   Except as otherwise set forth in Sections 6.3(d) and 11.5, (i) the Members shall bear the Transaction Expenses of the Members, (ii) the Buyer shall bear the Transaction Expenses of the Buyer, (iii) the Company shall bear the Transaction Expenses of the Company except that Selected Company Transaction Expenses shall be treated in accordance with Section 2.2(a) and Article X.

6.8   Confidentiality. Each of the parties shall hold, and shall cause its Representatives to hold, in confidence all documents and information furnished to it by or on behalf of the other party in connection with the transactions contemplated hereby.  If for any reason this Agreement is terminated prior to the Closing Date, the Confidentiality Agreement shall nonetheless continue in full force and effect in accordance with their terms and the Buyer shall return all documents (or copies of documents) pertaining to the Members or the Company to the Company or the Members, as applicable, within thirty (30) days of such termination.   The parties each acknowledge that certain information provided to them by the other parties hereto in connection with the transactions contemplated hereby is subject to the terms of the Confidentiality Agreement, the terms of which are incorporated herein by reference, and binding upon all of the parties hereto. If the transactions contemplated hereby are not consummated, the parties shall continue to be bound by the provisions of the Confidentiality Agreement in accordance with the terms thereof.   Effective as of the Closing, the Confidentiality Agreement shall terminate. Whether or not the transactions contemplated hereby are consummated, each of the parties shall return and keep confidential all information and materials regarding any other party to this Agreement, to the extent such information and materials were originally disclosed by such party and were reasonably designated by such party (whether before or after the date of this Agreement) as confidential (except to the extent (i) disclosure of such information is required by law, (ii) the information was previously known to the receiving party from a source that was not subject to a duty of confidentiality to the disclosing party, or (iii) the information becomes publicly known, (except through the actions or inactions of the receiving party)).  Each Member acknowledges that the success of the Company after Closing depends upon the continued preservation of the confidentiality of certain information possessed by the Members as of the date of this Agreement, that the preservation of the confidentiality of such information by the Members is an essential premise of the bargain between the Members and the Buyer, and that the Buyer would be unwilling to enter into this Agreement in the absence of this Section 6.8.  The Buyer acknowledges that the success of the Company prior to Closing and, to the extent Closing fails to occur, following the termination of this Agreement, depends upon the Buyer's preservation of the confidentiality of the information disclosed to the Buyer hereunder, and that the Members would be unwilling to enter into this Agreement in the absence of this Section 6.8. Accordingly, each party hereby agrees that neither it, nor any of its Representatives shall, and that each party shall cause its Affiliates not to, at any time on or after the date of this Agreement, directly or indirectly, without the prior written consent of the disclosing parties, disclose or use, any confidential or proprietary information involving or relating to the Business or the Company; provided, however, that the information subject to the foregoing provisions of this sentence will not include any information generally available to, or known by, the public (other than as a result of disclosure in violation hereof); and provided further, that the provisions of this Section 6.8 will not prohibit any disclosure (a) required by any applicable Legal Requirement so long as reasonable prior notice is given of such disclosure and a reasonable opportunity is afforded to

51

contest the same, (b) made in connection with the enforcement of any right or remedy relating to this Agreement or the transactions contemplated hereunder, (c) by the Buyer of confidential or proprietary information of the Business or the Company after Closing, or (d) by the Members or the Company to the extent required to operate the Business in the Ordinary Course of Business prior to Closing or to comply with the conditions to Closing set forth in Article VII.  Each party agrees that it will be responsible for any breach or violation of the provisions of this Section 6.8 by any of its Representatives.

6.9   <u>Publicity</u>.  Prior to Closing, no public announcement or disclosure will be made by any party with respect to the subject matter of this Agreement or the transactions contemplated hereunder without the prior written consent of the Buyer and the Requisite Members and thereafter only by the Buyer after consultation with the Requisite Members; <u>provided</u>, <u>however</u>, that the provisions of this Section 6.9 will not prohibit (a) any disclosure required by any applicable Legal Requirements (in which case the disclosing party will provide the other parties with the opportunity to review in advance the disclosure) or (b) any disclosure made in connection with the enforcement of any right or remedy relating to this Agreement or the transactions contemplated hereunder.

6.10   <u>Employee Matters</u>.

(a)   During the period between the Purchase Option Closing Date and the Closing Date, the Buyer shall have the right, but not the obligation, to appoint an advisor to the chief executive officer of the Company (who provides advice, guidance and assistance on, among other things, matters relating to the Existing Services Agreement, including the programs and products of Buyer and its Affiliates for which the Company provides services under the Existing Agreement), a head compliance officer of the Company (or such position that is the functional equivalent of a head compliance officer), an in-house lawyer, a head information technology officer (or such position that is the functional equivalent of a head information technology officer) and such other position as reasonably requested by Buyer (in each case, a "<u>Buyer Requested Employee</u>" and, collectively, the "<u>Buyer Requested Employees</u>").  At the election of the Buyer, such Buyer Requested Employees may require the Company to either (i) hire and employ employees, identified and selected by Buyer, to serve in such roles, and/or (ii) permit employees employed by the Buyer or its Affiliates in such functions to provide applicable services to the Business. In the case of a Buyer Requested Employee hired by the Company, the Company shall consult with the Buyer in determining an appropriate salary, bonus and other benefits for such Buyer Requested Employee. In the case of a Buyer Requested Employee employed by the Buyer or one of its Affiliates, if the parties deem it necessary or desirable, the Company and the Buyer shall negotiate, in good faith and acting reasonably, a services agreement for such employees and such Buyer Requested Employee shall be permitted to work at the facilities of the Company with access to the records and documents relating to the Business, subject to the terms herein. The Buyer Requested Employees shall report on a regular basis to the JSC (as defined in Section 6.14(a)). The Company shall not terminate such Buyer Requested Employees (or the services of such Buyer Requested Employees) without the prior written consent of the Buyer.

52

(b)     To the extent that, following the Closing, the Buyer determines that Company employees will participate in one or more retirement, health and welfare benefit plans, programs or arrangements sponsored or maintained by the Buyer (the "Buyer Employee Plans") in lieu of one or more Company Plans, the Buyer shall give each Company employee service credit for such Company employee's employment with the Company for purposes of eligibility to participate, vesting credit and entitlement to benefits under each applicable Buyer Employee Plan (and with respect to any Buyer Employee Plan that is a welfare benefit plan, the Buyer shall honor and otherwise compensate accounts paid under a corresponding welfare benefit plan during the same period for purposes of applying deductibles, co-payments and out-of-pocket maximums as though such amounts had been paid in accordance with the terms and conditions of the applicable Buyer Employee Plan and as if such service had been performed with the Buyer) except to the extent that similarly situated employees of Buyer (or its Affiliates) do not receive credit for prior service.  Until the first anniversary of the Closing Date, any Buyer Employee Plan provided to Company employees in lieu of one or more Company Plans, shall not be materially less favorable, in the aggregate, to such Company employees than the Company Plans in which such employees participated immediately prior to the Closing.

(c)     If requested in writing by the Buyer at least ten (10) Business Days prior to the anticipated Closing, to the extent permitted by applicable Legal Requirements, the Company shall take or cause to be taken all actions necessary or appropriate to terminate, effective no later than the day immediately preceding the Closing (the "Plan Termination Date") (unless a Legal Requirement prevents termination on the day preceding the Closing in which case termination shall occur as practicable following the Closing), any Company Plan that contains a cash or deferred arrangement intended to qualify under Section 401(k) of the Code (a "Company 401(k) Plan"). If the Company is required to terminate any Company 401(k) Plan, then the Company shall provide to the Buyer prior to the Plan Termination Date written evidence of the adoption by the Company's governing board of resolutions authorizing the termination of such Company 401(k) Plan . The Company also shall take such other actions in furtherance of terminating such Company 401(k) Plan as the Buyer may reasonably request.

(d)     If requested in writing by the Buyer at least five (5) Business Days prior to the anticipated Closing, the Company shall take (or cause to be taken) all actions necessary, including the provision of notice to all insurance carriers and third party administrators (provided that the Buyer has submitted such written request to the Company prior to the date notice is required by such insurance carrier or third party administrator), to terminate such Company benefit plans as requested by the Buyer with respect to accrual of additional benefits (but excluding the Company 401(k) Plan, for which Section 6.10(c) shall instead apply).

(e)     Notwithstanding any provision herein, no term of this Agreement shall be deemed to create any contract with any Company employee, or to give any Company employee the right to be retained in the employment of the Buyer, the Company or any related employer, or to interfere with the Buyer or the Company's right to terminate employment of any Company employee at any time.  Nothing in this Agreement shall diminish the Buyer or the Company's rights to change or terminate its policies regarding salaries, benefits and other employment matters at any time or from time to time.   The representations, warranties, covenants and

Confidential Treatment Requested by Philidor                                                       AGING-000101

agreements contained herein are for the sole benefit of the parties hereto, and the Company's employees are not intended to be and shall not be construed as beneficiaries hereof.

6.11    Operation of the Company After the Closing Date.  The Buyer acknowledges that a substantial inducement to the Members to enter into this Agreement are the Milestone Payments.  Accordingly, the Buyer agrees that, following the Closing, the Buyer will act in good faith and in a commercially reasonable manner with respect to the management of the Business of the Company in relation to the possible Post-Equity Milestone Payments and will not intentionally take any actions the purpose of which is to avoid the payment of such Milestone Payments.  Notwithstanding anything to the contrary contained herein, the Buyer reserves the right, at any time, (i) to voluntarily wind down, dissolve, shut down, liquidate, or file for bankruptcy with respect to the Company or with respect to all or any part of Business if the Buyer deems, in good faith, such winding down, dissolution, shut down, liquidation, or bankruptcy filing to be a commercially reasonable action under the applicable circumstances, and (ii) to cease to offer all or any portion of any products or services if the Buyer deems, in good faith, such cessation to be a commercially reasonable action under the applicable circumstances.

6.12    Further Assurances.  From and after the Purchase Option Closing Date, upon the request of any of the Members or the Buyer, each of the parties hereto will do, execute, acknowledge and deliver all such further acts, assurances, deeds, assignments, transfers, conveyances and other instruments and papers as may be commercially reasonable to carry out the transactions contemplated hereunder.  No Member will take any action that is designed or intended to have the effect of discouraging any lessor, licensor, supplier, distributor or customer of the Company or other Person with whom the Company has a relationship from maintaining the same relationship with the Company after the Closing as it maintained prior to the Closing. Each Member will refer all customer inquiries relating to the Business to the Buyer, or the Company, as appropriate, from and after the Closing.

6.13    Irrevocable Power of Attorney; Pledge of Equity Interests; Vote of Members.

(a)      Each Member (for itself and its successors and permitted assigns) hereby appoints the Buyer to be such Member's attorney-in-fact authorizing the Buyer, if the Buyer elects to exercise the Purchase Option in accordance with the terms of this Agreement, to transfer the Collateral to the Buyer pursuant to the terms of the Closing and this Section 6.13 and to execute and complete, on behalf of such Member (or its successors and permitted assigns), such other documents as are determined by the Buyer to be necessary or desirable to give effect to such transfer.  The power of attorney granted hereby and all authority conferred hereby is coupled with an interest and therefore shall be irrevocable and shall not be terminated by any act of such Member or by operation of law, whether by the death, disability, incapacity, dissolution, termination or liquidation of such Member or by the occurrence of any other event or events (including, without limitation the termination of any trust or estate for which the Member is acting as a fiduciary or fiduciaries), and if, after the execution hereof, such Member shall die or become disabled or incapacitated, or is dissolved, termination or liquidated, or if any other such event or events shall occur before the completion of the transfer of the Company Equity Interests

54

(including the Collateral) to the Buyer pursuant to the Closing, the Buyer shall nevertheless be authorized and directed to complete such transfer as if such death, disability, incapacity, dissolution, termination or liquidation or other event or events had not occurred and regardless of notice thereof.  It is understood that the Buyer does not assume any responsibility or liability to any person by virtue of the power of attorney granted hereby.  Each Member agrees to indemnify the Buyer for and to hold the Buyer harmless against any loss, claim, damage or liability incurred by it arising out of or in connection with acting as the attorney-in-fact under the power of attorney created by such Member hereby, as well as the cost and expense of investigating and defending against any such loss, claim, damage or liability except to the extent such loss, claim, damage or liability is due to the gross negligence or bad faith of the Buyer.

(b)      Each Member (for itself and its successors and permitted assigns) for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each Member, hereby grants, pledges and transfers to the Buyer a security interest in, and collaterally assigns to the Buyer, all right, title and interest of such Member in and to all of the Equity Interests of the Company now or hereafter owned of record or beneficially by such Member (including the Equity Interests of the Company set forth opposite such Member's name in Section 3.5(a) of the Disclosure Schedule) (the "Collateral") as collateral security (i) for the performance of such Member's obligation to transfer such Equity Interests to the Buyer at the Closing if the Buyer elects to exercise the Purchase Option in accordance with the terms of this Agreement and (ii) for the payment of any Indemnification Claim to which the Buyer now or hereafter may be entitled pursuant to Article X of this Agreement as a result of (x) any failure by the Company or the Members to perform or comply with any covenant or agreement of the Company or the Members set forth in Section 6.2(b)(ii) or Section 2.6, (y) if the Buyer elects to exercise the Purchase Option in accordance with the terms of this Agreement, such Member's failure to deliver all of the Collateral to the Buyer at the Closing free and clear of any and all Encumbrances, or (z) any breach of any representation or warranty made by the Member in Section 4.5 (the Member's obligations set forth in clauses (i) and (ii) being referred to as the "Transfer Obligations").  Each Member hereby irrevocably authorizes the Buyer to file a UCC-1 financing statement under the Uniform Commercial Code ("UCC") in any applicable jurisdiction naming such Member as "debtor," the Buyer as "secured party" and describing the Collateral.  In the event that the Member should fail to perform any of such Member's Transfer Obligations, the Buyer shall have the right to exercise all rights of a secured party under the UCC as in effect in the State of New York or any other applicable jurisdiction and under other applicable Legal Requirements.

(c)      Each Member, by the Member's execution and delivery of this Agreement, irrevocably consents to each of the transactions contemplated by this Agreement and acknowledges and agrees that such irrevocable consent constitutes the written consent of such Member to each of the transactions contemplated by this Agreement for the purpose of Section 11.1 of the Operating Agreement.

55

6.14  Establishment of JSC.

(a)      Establishment of JSC. Within thirty (30) days after the Purchase Option Closing Date, the Company and the Buyer shall form a joint steering committee (the "JSC"), the purposes of which is to exchange, assess and discuss the following matters related to this Agreement and the Business:

(i)      matters relating to the compliance of the Company with applicable Legal Requirements, the provisions of the Company's material Contractual Obligations (including Contractual Obligations with Third Party Payors), and the Company's internal policies, manuals and processes (including the establishment of new policies and processes and the amendment of existing policies and processes);

(ii)      the Strategic Plan (as defined in Section 6.14(e)) and the execution of such Strategic Plan, together with the monitoring of the progress and results of such Strategic Plan; and

(iii)      any other matters relating to the operation of the Business of the Company  that may properly be brought to a meeting of the JSC.

(b)      Constitution of JSC. The JSC shall be comprised of an equal number (initially at least two (2)) representatives of each of the Buyer and the Company. Each of the Buyer and the Company may replace its representatives on the JSC at any time upon written notice to the other party.

(c)      Meetings of the JSC. The JSC shall meet at such frequency and at such time and place as agreed to by the members of the JSC or upon the reasonable request of either the Buyer or the Company, provided, however that the JSC shall meet at least once every calendar quarter. Meetings of the JSC may take place either in person or by telephonic or video conference. Minutes from the meetings shall be kept. Each of the Buyer and the Company shall bear its own costs, including costs for travelling and lodging for its personnel serving on the JSC or attending meetings of the JSC. Not later than two (2) weeks prior to any meeting of the JSC, each of the Company and the Buyer shall submit any proposed agenda items for the meeting to the JSC members.

(d)      Voting of the JSC. Each matter that comes before the JSC for consideration and/or approval must be approved by a majority of the members of the JSC in attendance at such meeting.  Each member of the JSC shall have one vote. In the event of a tie, (A) the Buyer will make the final determination regarding all matters with respect to (i) the Strategic Plan (including the execution of such Strategic Plan), and (ii) the compliance of the Company with applicable Legal Requirements, Contractual Obligations (including agreements with Third Party Payors) and the Company's internal policies and manuals, and (B) the Company will make the final determination with respect to all other matters, including the day-to-day operation of the Business, subject to the terms of this Agreement and the Existing Agreement.

56

(e)  Strategic Plan. On an annual basis, the Company shall submit to the JSC, for its review, comment and approval, a detailed operating plan, the annual budget (which shall include details respecting any compensation increases and bonus awards) and the plan relating to the proposed strategy of the Business and the Company (collectively, the "Strategic Plan"). The JSC shall review the Strategic Plan and has the right to provide comments, input or revisions to such Strategic Plan. The Strategic Plan must be approved by the JSC. The JSC shall oversee and supervise the implementation and execution of such Strategic Plan and, in this respect, the Company shall provide the JSC with regular updates relating to the implementation of the Strategic Plan, including the progress and results of such Strategic Plan.

(f)  Compliance Matters.  At each regularly scheduled quarterly meeting of the JSC, the Company shall present to the JSC a summary and status update of the Company's compliance with applicable Legal Requirements, Contractual Obligations (including in its agreements with Third Party Payors) and its own internal policies, manuals and processes, together with any compliance matters or issues that have arisen subsequent to the last quarterly meeting of the JSC. The JSC shall have the right to propose recommendations to the Company with respect to such compliance matters, including with respect to the rectification of any non-compliance, and the Company shall use all reasonable efforts to implement such recommendations as soon as practicable.  In particular, the JSC shall have the right to review and comment on the Company's internal compliance policies, manuals and processes and the Company shall use all reasonable efforts to incorporate the comments of the JSC on such policies, manuals and processes. The JSC shall also have the right to propose the implementation of new policies and processes and the Company shall use all reasonable efforts to establish and implement such new policies and processes. The JSC shall also have the right to review, prior to their submission, all applications of the Company for licenses and permits (including state pharmacy licenses) and all applications of the Company to Third Party Payors and to comment on such applications and the Company shall use all reasonable efforts to incorporate the comments of the JSC on such applications. The JSC shall also have the right to review the existing licenses and permits and agreements with Third Party Payors to ensure that the Company continues to comply with such licenses, permits and agreements and, to the extent that the JSC determines that the Company is not in compliance, in all material respects, with such licenses, permits and agreements, then the Company shall take all reasonable actions to rectify such non-compliance, which may include updating or re-submitting any licenses or applications.

(g)  Successor CEO. In the event that the then current Chief Executive Officer of the Company ceases to hold his or her office, whether as a result of voluntary termination, termination by the sole manager or board of managers of the Company, death or otherwise, the Company shall identify and select a candidate or candidates to be appointed the successor to the office of the Chief Executive Officer of the Company.  Prior to appointment, each member of the JSC shall have the power to veto any candidate selected by the Company if they determine that such candidate lacks sufficient qualification for such position, would not sufficiently serve the best interests of the Company in carrying out the duties of such position, or is otherwise not reasonably suited for such position.  In the event the JSC vetoes the candidate identified or selected by the Company, the Company shall identify and select a candidate or additional candidates until a candidate is not vetoed by the JSC as set forth in this Section 6.14(g),

57

following which the Company shall appoint such candidate as the successor to the Chief Executive Officer of the Company.

(h)     General Powers of the JSC. The JSC shall only have the powers as is specifically granted to it in this Section 6.14, and such powers shall be subject to the terms and conditions set forth herein. Each of the Buyer and the Company shall retain the rights, powers and discretion over the matters allocated to such party herein, and no such rights, powers or discretion shall be delegated to or vested in the JSC.

## ARTICLE VII.  CONDITIONS TO THE BUYER'S OBLIGATIONS AT THE CLOSING

The obligations of the Buyer to consummate the Closing is subject to the fulfillment of each of the following conditions (unless waived by the Buyer in accordance with Section 12.3):

7.1   Purchase Option Exercise.  The Buyer, in its sole and absolute discretion, shall have delivered the Purchase Option Exercise Notice to the Members' Representative on or prior to the last day of the Option Period.

7.2   Performance. The Company and each Member will have performed and complied in all material respects, with all agreements, obligations and covenants contained in this Agreement that are required to be performed or complied with by them at or prior to the Closing.

7.3   Antitrust. The waiting period (and any extensions thereof) applicable to the transactions contemplated by this Agreement under the HSR Act shall have been terminated or shall have expired.

7.4   Evidence of Transfer; Member Approval.  The Members will have delivered to the Buyer evidence, in a form reasonably satisfactory to the Buyer, of (i) the Members' transfer of the Company Equity Interests to the Buyer and (ii) the receipt of all approvals of the Members necessary under the Company's Organizational Documents and applicable Legal Requirements to constitute the Buyer as the sole member of the Company following the Closing, and to vest in the Buyer after the Closing, full power to prospectively (and retrospectively (but only for the time period commencing on the Purchase Option Closing Date and thereafter), solely (i) to the extent it would not have an adverse financial effect on the Members or (ii) to cure any matter that would constitute a breach of any representation, warrant, covenant or agreement of the Company or the Members set out herein) amend the Operating Agreement as the Buyer may determine in its sole discretion.

7.5   Resignations.  The Company shall have received a resignation from each member of the governing board or managers and each officer of the Company who is not going to serve as a governing board member, manager or officer, as the case may be, of the Company immediately following the purchase of the Company Equity Interests by the Buyer, in form and substance reasonably satisfactory to the Buyer, and each such resignation shall be in full force and effect as of the time on the Closing Date.

58

## ARTICLE VIII.  CONDITIONS TO THE MEMBERS' OBLIGATIONS AT THE CLOSING

The obligations of the Members to consummate the Closing is subject to the fulfillment of each of the following conditions (unless waived by the Requisite Members in accordance with Section 12.3):

8.1    <u>Antitrust</u>.   The waiting period (and any extensions thereof) applicable to the Company Equity Interests Acquisition under the HSR Act shall have been terminated or shall have expired.

8.2    <u>Payment Obligations</u>.  The Buyer shall have paid any Pre-Equity Purchase Milestone Payment then due and payable pursuant to Section 2.5 (subject to any right of set-off with respect to such Milestone Payment pursuant to Section 2.5).

## ARTICLE IX.  TERMINATION

9.1    <u>Termination of Agreement.</u>   This Agreement may be terminated (the date on which the Agreement is terminated, the "<u>Termination Date</u>"):

(a)    at any time after the Purchase Option Closing and before the Closing, by mutual written consent of the Buyer and the Requisite Members;

(b)    at any time prior to the Closing, by either the Buyer or the Requisite Members if a final nonappealable Governmental Order permanently enjoining, restraining or otherwise prohibiting the Company Equity Interests Acquisition has been issued by a Governmental Authority of competent jurisdiction;

(c)    at any time after the Purchase Option Closing and prior to the Closing, (i) by the Buyer in the Buyer's sole discretion or (ii) by the Requisite Members if neither the Buyer nor VPII shall have paid (or caused the Company to pay) any Pre-Equity Purchase Milestone Payment then due and payable pursuant to Section 2.5 (subject to any right of set-off with respect to such Milestone Payment pursuant to Section 2.5), which failure to pay such Milestone Payment (subject to any right of set-off with respect to such Milestone Payment pursuant to Section 2.5) has not been cured on or before the date that is fifteen (15) days after the Requisite Members notify the Buyer of such failure; or

(d)    at any time prior to the Closing, by either the Company or the Requisite Members if either (i) the Buyer shall have failed to deliver the Purchase Option Exercise Notice to the Members' Representative on or prior to the last day of the Option Period or (ii) the Buyer shall have delivered the Purchase Option Exercise Notice to the Members Representative on or prior to the last day of the Option Period and the Company Equity Interests Acquisition shall not have been consummated by the two (year) anniversary of the Option Exercise Date; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement under clause (ii) of this Section 9.1(d) shall not be available to the Requisite Members if the Members' or the Company's (or any combination thereof's) action or failure to act has been a principal cause of or resulted in the

Confidential Treatment Requested by Philidor                                        AGING-000107

failure of the item specified in clause (ii) to have been achieved by the deadline therefor specified in clause (ii).

9.2   <u>Effect of Termination</u>.  In the event of the termination of this Agreement pursuant to Section 9.1, this Agreement shall forthwith terminate and have no further force and effect, except that (a) Section 6.7 (Expenses), 6.8 (Confidentiality), 6.9 (Publicity), 12.9 (Governing Law) and 12.10 (Jurisdiction; Venue; Service of Process) shall survive, (b) nothing in Section 9.1 or this Section 9.2 shall be deemed to release any party from any Liability for any breach by such party of the terms and provisions of this Agreement or to impair the right of any party to compel specific performance by another party of its obligations under this Agreement (provided that, upon termination of this Agreement, the Buyer and VPII shall have no further Liability to pay (or otherwise have any obligation to specifically perform) any Milestone Payment with respect to any Milestone Event that has not been achieved prior to the Termination Date (but shall continue to have Liability to pay any Milestone Payment with respect to any Milestone Event that is achieved on the Termination Date), regardless of whether such Milestone Event is subsequently achieved after the Termination Date), and (c) if there is a breach by one party of such party's obligations under Section 6.6 (Exclusivity) then in addition to Liability for any other losses, the breaching party shall be responsible for paying or reimbursing the non-breaching party for its reasonable out of pocket expenses, including but not limited to the fees and expenses of its advisors.

9.3   <u>Return of Documentation</u>.  Following termination of this Agreement, the Buyer shall return or destroy (and provide proof of such destruction of) all agreements, documents, contracts, instruments, books, records, materials and other information (in any format) regarding the Company provided to the Buyer or its Representatives in connection with the transactions contemplated hereunder other than as reasonably necessary to enforce its rights under this Agreement.  The confidentiality provisions of this Agreement shall remain in full force and effect following any termination of this Agreement.

## ARTICLE X.  INDEMNIFICATION

10.1   <u>Indemnification by the Members</u>.

(a)   <u>Indemnification</u>.  Subject to the limitations set forth in this Article X, following the Purchase Option Closing, each Member will indemnify and hold harmless the Buyer, including the Representatives and Affiliates of the Buyer (each, a "<u>Buyer Indemnified Person</u>"), from, against and in respect of any and all claims, losses, damages (other than exemplary or punitive damages), diminution in value (including loss of the economic value of the Purchase Option), bonds, dues, assessments, fines, penalties, Taxes, fees, costs (including reasonable costs of investigation, defense and enforcement of this Agreement), expenses (including remediation costs) or amounts paid in settlement (in each case, including reasonable attorneys' and experts' fees and expenses), whether or not involving a Third Party Claim (collectively, "<u>Losses</u>"), in an amount not to exceed such Member's Allocable Portion of such Loss incurred or suffered by the Buyer Indemnified Persons or any of them as a result of, arising out of or directly or indirectly relating to:

60

(i)     any breach of any representation or warranty made by the Company or the Members or any of them in this Agreement (including Articles III and IV) or in any Schedule delivered pursuant to this Agreement;

(ii)     any Company Debt outstanding as of the Purchase Option Closing Date or Selected Company Transaction Expenses or Company Transaction Bonuses to the extent not reflected as a reduction to the Initial Purchase Option Consideration Amount pursuant to Section 2.2;

(iii)     any Taxes described in Section 11.1(a) or 11.2; or

(iv)     any failure by the Company (prior to the Closing) or the Members (prior to, at or after the Closing) to perform or comply with any covenant or agreement of the Company or the Members in or pursuant to this Agreement or any Schedule delivered pursuant to this Agreement.

(b)    <u>Monetary Limitations</u>.

(i)     Except as set forth in Section 10.1(b)(ii), the Members will have no obligation to indemnify the Buyer Indemnified Persons (A) pursuant to Sections 10.1(a)(i) unless and until the aggregate amount of all such Losses incurred or suffered by the Buyer Indemnified Persons exceeds $400,000 (the "<u>Basket</u>") (at which point the Members will be obligated to indemnify the Buyer Indemnified Persons from and against further Losses), and (B) for any Indemnification Claim in respect of the breach of or failure to perform or comply with a Tier 2 Covenant unless and until the aggregate amount of all such Losses incurred or suffered by the Buyer Indemnified Persons exceeds the Basket (at which point the Members will be obligated to indemnify the Buyer Indemnified Persons from and against further Losses).  The Members' aggregate liability in respect of claims for indemnification pursuant to Section 10.1(a)(i) (x) in respect of Member Party Fundamental Representations will not exceed the sum of (1) the Initial Purchase Option Consideration Amount, (2) the amount of any Milestone Payments actually paid and (3) the amount of any Milestone Payments obligated to be paid pursuant to Section 2.5, because the associated Milestone Event has been achieved, but not yet paid (for clarity, in determining whether a Net Sales Milestone Payment is "obligated to be paid" for purposes of this Section 10(b)(i) only, the fact that the Buyer has or may have an Indemnification Claim for which the Buyer may seek a remedy of set-off against such Net Sales Milestone Payment shall be disregarded in determining whether such Net Sales Milestone Payment is "obligated to be paid"), and (y) in respect of any breach of any representation or warranty that is not a Member Party Fundamental Representation will not exceed $25,400,000 (the "<u>Cap</u>").  The Members' aggregate liability in respect of claims for indemnification pursuant to Section 10.1(a)(iv) (x) in respect of any failure by the Company (prior to the Closing) or the Members (prior to, at or after the Closing) to perform or comply with any Tier 1 Covenant will not exceed the sum of (1) the Initial Purchase Option Consideration Amount, (2) the amount of any Milestone Payments actually paid and (3) the amount of any Milestone Payments obligated to be paid pursuant to Section 2.5, because the associated Milestone Event has been achieved, but not yet paid (for clarity, in determining whether a Net Sales Milestone Payment is "obligated to be paid" for purposes of this Section 10(b)(i) only, the fact that the Buyer has or may have an

61

    

Indemnification Claim for which the Buyer may seek a remedy of set-off against such Net Sales Milestone Payment shall be disregarded in determining whether such Net Sales Milestone Payment is "obligated to be paid"), and (y) in respect of any failure by the Company (prior to the Closing) or the Members (prior to, at or after the Closing) to perform or comply with any Tier 2 Covenant will not exceed the Cap; <u>provided</u> <u>however</u> that to the extent that the failure by the Company or the Members to perform or comply with such Tier 1 Covenants or Tier 2 Covenants has resulted from the willful act or omission of the Company or the Members, then the limitations to the Members' aggregate liability in respect of claims for indemnification pursuant to Section 10.1(a)(iv) set out in this sentence shall not apply.  Notwithstanding anything to the contrary herein, no Indemnification Claim may be asserted by a Buyer Indemnified Person against the Members with respect to a breach of or failure to perform or comply with a Tier 2 Covenant unless an Indemnification Notice with respect to such Indemnification Claim is provided to the Indemnifying Party at any time prior to the date that is the later of (A) the three year anniversary of the Purchase Option Closing and (B) the termination of Andrew Davenport's employment by the Company.

(ii)    Notwithstanding Section 10.1(b)(i), the Basket shall not apply to claims for indemnification pursuant to Section 10.1(a)(i) in respect of breaches of the Member Party Fundamental Representations.

10.2    <u>Indemnity by the Buyer</u>.

(a)    <u>Indemnification</u>.  Subject to the limitations set forth in this Article X, following the Purchase Option Closing, the Buyer will indemnify and hold harmless each Member and each Member's respective Affiliates and Representatives (each, a "<u>Member Indemnified Person</u>"), from, against and in respect of any and all Losses incurred or suffered by the Member Indemnified Persons or any of them as a result of, arising out of or relating to, directly or indirectly:

(i)    any breach of any representation or warranty made by the Buyer in this Agreement or in any Schedule delivered pursuant to this Agreement; or

(ii)    any failure to perform or comply with any covenant or agreement of the Buyer in or pursuant to this Agreement or any Schedule delivered pursuant to this Agreement.

(b)    <u>Monetary Limitations</u>.

(i)    The Buyer will have no obligation to indemnify the Member Indemnified Persons pursuant to Section 10.2(a)(i) in respect of Losses arising from the breach of, or inaccuracy in, any representation or warranty described therein unless and until the aggregate amount of all such Losses incurred or suffered by the Member Indemnified Persons exceeds the Basket (at which point the Buyer will indemnify the Member Indemnified Persons from and against further Losses).  The Buyer's aggregate liability in respect of claims for indemnification pursuant to Section 10.2(a)(i) will not exceed the Cap.

62

Confidential Treatment Requested by Philidor                                    AGING-000110

(ii)     Notwithstanding Section 10.2(b)(i), the foregoing limitations will not apply to claims for indemnification pursuant to Section 10.2(a)(i) in respect of breaches of representations and warranties set forth in Sections 5.1 (Organization), 5.2 (Power and Authorization) or 5.5 (No Brokers) (the "Buyer Fundamental Representations").

10.3   Time Limit for Certain Claims.   No claim may be made or suit instituted seeking indemnification pursuant to Section 10.1(a)(i) or 10.2(a)(i) for any breach of any representation or warranty unless an Indemnification Notice is provided to the Indemnifying Party:

(a)     at any time and indefinitely, in the case of any breach of the representations and warranties set forth in Sections 3.1 (Organization), 3.2 (Power and Authorization), 3.5 (Capitalization), 3.21 (No Brokers), 4.1 (Organization), 4.2 (Power and Authorization), 4.5 (Title), 4.6 (No Brokers), 5.1 (Organization), 5.2 (Power and Authorization) or 5.5 (No Brokers);

(b)     at any time prior to the thirtieth day after the expiration of any applicable statute of limitations (taking into account any tolling periods and other extensions), in the case of any breach of the representations and warranties set forth in Sections 3.12 (Legal Compliance), 3.13 (Tax Matters), 3.13 (Employee Benefit Plans), or 3.15 (Environmental Matters); and

(c)     at any time prior to the date that is fifteen (15) months after the Purchase Option Closing (such fifteen (15) month period, the "General Survival Period"), in the case of any breach of any other representation and warranty in this Agreement.

10.4   Indemnification Procedures.

(a)     Notice of Claim.   If any Indemnified Party has suffered or incurred any Loss for which an Indemnification Claim may be asserted pursuant to this Article X or any third party notifies an Indemnified Party with respect to any matter (a "Third Party Claim") which may give rise to an Indemnified Claim against an Indemnifying Party under this Article X, then the Indemnified Party will promptly give written notice to the Indemnifying Party describing the basis for such Indemnification Claim in reasonable detail in light of the circumstances then known to the Indemnified Party (the "Indemnification Notice"); provided, however, that no delay on the part of the Indemnified Party in notifying the Indemnifying Party will relieve the Indemnifying Party from any obligation under this Article X, (i) except to the extent such delay actually and materially prejudices the Indemnifying Party and (ii) subject to the applicable time limitations on bringing an Indemnification Claim set forth in Section 10.3.

(b)     Assumption of Defense of Third Party Claim.   In the event an Indemnified Party delivers to the Indemnifying Party an Indemnification Notice with respect to a Third Party Claim, the Indemnifying Party will be entitled to participate in the defense of such Third Party Claim that is the subject of an Indemnification Notice.   In addition, the Indemnifying Party will have the right to defend the Indemnified Party against and control the Third Party Claim with counsel of its choice reasonably satisfactory to the Indemnified Party so long as (i) the Indemnifying Party gives written notice to the Indemnified Party within fifteen days after the Indemnified Party has given notice of the Third Party Claim that the Indemnifying Party will

63

indemnify the Indemnified Party from and against the entirety of any and all Losses the Indemnified Party may suffer resulting from, arising out of, relating to, in the nature of, or caused by the Third Party Claim, (ii) the Indemnifying Party provides the Indemnified Party with evidence reasonably acceptable to the Indemnified Party that the Indemnifying Party will have adequate financial resources to defend against the Third Party Claim and fulfill its indemnification obligations hereunder, (iii) the Third Party Claim involves only money damages and does not seek an injunction or other equitable relief against the Indemnified Party, (iv) the Indemnified Party has not been advised by counsel that an actual or potential conflict exists between the Indemnified Party and the Indemnifying Party in connection with the defense of the Third Party Claim, (v) the Third Party Claim does not relate to or otherwise arise in connection with any criminal or regulatory enforcement Action, (vi) settlement of, an adverse judgment with respect to or the Indemnifying Party's conduct of the defense of the Third Party Claim is not, in the good faith judgment of the Indemnified Party, likely to be adverse to the Indemnified Party's reputation or continuing business interests (including its relationships with current or potential customers, suppliers or other parties material to the conduct of its business), and (vii) the Indemnifying Party conducts the defense of the Third Party Claim actively and diligently.  The Indemnified Party may retain separate co-counsel at its sole cost and expense and participate in the defense of the Third Party Claim; provided, however, that the Indemnifying Party will pay the reasonable fees and expenses of separate co-counsel retained by the Indemnified Party that are incurred prior to Indemnifying Party's assumption of control of the defense of the Third Party Claim.

(c)    Limitations on Indemnifying Party.  The Indemnifying Party will not consent to the entry of any judgment or enter into any compromise or settlement with respect to the Third Party Claim without the prior written consent of the Indemnified Party (which consent shall not be unreasonably withheld, delayed or conditioned) unless such judgment, compromise or settlement (i) provides for the payment by the Indemnifying Party of money as sole relief for the claimant, (ii) results in the full and general release of the Buyer Indemnified Persons or Member Indemnified Persons, as applicable, from all liabilities arising or relating to, or in connection with, the Third Party Claim, and (iii) involves no finding or admission of any violation of Legal Requirements or the rights of any Person and no effect on any other claims that may be made against the Indemnified Party.

(d)    Indemnified Party's Control.  If (x) the Indemnifying Party does not deliver the notice contemplated by clause (i) or the evidence contemplated by clause (ii) of Section 10.4(b) within fifteen days after the Indemnified Party has given notice of the Third Party Claim, (y) otherwise does not have the right to defend the Indemnified Party against and control the Third Party Claim pursuant to Section 10.4(b), or (z) otherwise at any time fails to conduct the defense of the Third Party Claim actively and diligently, the Indemnified Party may defend, and may consent to the entry of any judgment or enter into any compromise or settlement with respect to, the Third Party Claim in any manner it may deem appropriate (and the Indemnified Party need not consult with, or obtain any consent from, the Indemnifying Party in connection therewith).  If such notice and evidence is given on a timely basis and the Indemnifying Party conducts the defense of the Third Party Claim actively and diligently but any of the other conditions in Section 10.4(b) is or becomes unsatisfied, the Indemnified Party may

64

defend, and may consent to the entry of any judgment or enter into any compromise or settlement with respect to, the Third Party Claim; provided, however, that the Indemnifying Party will not be bound by the entry of any such judgment consented to, or any such compromise or settlement effected, without its prior written consent (which consent will not be unreasonably withheld or delayed). In the event that the Indemnified Party conducts the defense of the Third Party Claim pursuant to this Section 10.4(d), the Indemnifying Party will (a) advance the Indemnified Party promptly and periodically for the reasonable costs of defending against the Third Party Claim (including reasonable attorneys' fees and expenses) and (b) remain responsible for any and all other Losses that the Indemnified Party may incur or suffer resulting from, arising out of, relating to, in the nature of or caused by the Third Party Claim to the fullest extent provided in this Section 10.4(d).

(e)     Consent to Jurisdiction Regarding Third Party Claim. The Buyer and each Member, each in its capacity as an Indemnifying Party, hereby consents to the non-exclusive jurisdiction of any court in which any Third Party Claim may be brought against any Indemnified Party for purposes of any claim which such Indemnified Party may have against such Indemnifying Party pursuant to this Agreement in connection with such Third Party Claim, and in furtherance thereof, the provisions of Section 12.10(b) are incorporated herein by reference, mutatis mutandis, to the extent not inconsistent with this Section 10.4(e).

(f)     Conflict. Notwithstanding anything to the contrary, this Section 10.4 shall not apply to the indemnification procedures for handling a Third Party Claim relating to Taxes, and instead Section 11.9 shall apply to the indemnification procedures for handling Third Party Claims relating to Taxes.

10.5   No Circular Recovery. Each Member hereby agrees that it will not make any claim for indemnification hereunder against the Buyer or the Company by reason of the fact that such Member was an Affiliate, controlling person, director, employee or Representative of the Company or was serving as such for another Person at the request of the Buyer or the Company (whether such claim is for Losses of any kind or otherwise and whether such claim is pursuant to any statute, Organizational Document, Contractual Obligation or otherwise) with respect to any claim brought by a the Buyer Indemnified Person against any Member relating to this Agreement or any of the transactions contemplated hereunder. With respect to any claim brought by the Buyer Indemnified Person against any Member relating to this Agreement and any of the transactions contemplated hereunder, each Member expressly waives any right of subrogation, contribution, advancement, indemnification or other claim against the Company with respect to any amounts owed by such Member pursuant to this Article X.

10.6   Reduction by Insurance Proceeds and Net Tax Benefits.

(a)     The amount payable by an Indemnifying Party to an Indemnified Party pursuant to this Article X with respect to any and all Losses the Indemnified Party may suffer shall be reduced by the amount of any insurance proceeds actually received by the Indemnified Party with respect to such Losses (net of any amounts payable by the Indemnified Party with respect thereto); provided, however, that nothing contained in this Section 10.6 shall constitute or

65

operate as a waiver of, or otherwise limit, any rights of such Indemnified Party's insurance providers to make a subrogation claim against the Indemnifying Party.

(b)     The amount payable by an Indemnifying Party to an Indemnified Party pursuant to this Article X with respect to any and all Losses the Indemnified Party may suffer shall be (A) decreased by any Tax Benefit actually realized by reduction in Taxes actually payable by the Indemnified Party (or any of its Affiliates) directly resulting from such Losses, and (B) increased by any Tax cost actually incurred as an increase in Taxes payable by the Indemnified Party (or any of its Affiliates) as a result of the receipt or accrual of the indemnification payment so that the amount received by the Indemnified Party (or any of its Affiliates) is the amount which it would have received had the Tax cost not been incurred.  For purposes hereof, "Tax Benefit" shall mean any refund of Taxes paid or credit against or reduction in the amount of Taxes which otherwise would have been paid (calculated on a "with and without" basis).

10.7  Set-Off Rights; Exclusive Remedy.

(a)     Any Indemnification Claim by the Buyer Indemnified Parties against the Members pursuant to Section 10.1 shall be satisfied at the discretion of Buyer either (i) as a set-off pursuant to Section 2.5(e) from any Milestone Payment (other than the Time-Based Milestone Payment), (ii) from the Members directly in accordance with the Members' Allocable Portion of such Indemnification Claim, or (iii) in any combination of clauses (i) and (ii).

(b)     Except for remedies that cannot be waived as a matter of law or as provided in Section 6.13(a), Section 6.13(b) and Section 12.11, if the Purchase Option Closing occurs, indemnification pursuant to this Article X (including set-off from the Milestone Payments pursuant to Section 2.5(e) or recovery directly from the Members as set forth in Section 10.7(a)) will be the exclusive remedy for any breach of this Agreement (including any representation, warranty, covenant and agreement contained in this Agreement), or in any Schedule, instrument or certificate delivered pursuant to this Agreement, other than in respect of claims based on conduct constituting fraud, fraud in the inducement, intentional misrepresentation or violation of law.

**ARTICLE XI.  TAX MATTERS**

11.1  Tax Returns.

(a)     The Members' Representative shall prepare and timely file all Tax Returns of the Company due on or before the Purchase Option Closing Date (taking into account applicable extensions) that have not yet been filed and all income Tax Returns required to be filed by the Company for taxable periods ending on or before the Purchase Option Closing Date, and the Members shall pay all Tax liabilities shown by such Tax Returns to be due.  Except as otherwise required by Legal Requirements, such Tax Returns shall be prepared in a manner and on a basis consistent with Tax Returns for prior Tax periods.  The Company shall provide a copy of each such Tax Return to the Buyer at least ten (10) days prior to the date on which such Tax Return is to be filed and shall consider in good faith all reasonable comments made by the Buyer

Confidential Treatment Requested by Philidor                                        AGING-000114

with respect to such Tax Return.

(b)     The Buyer shall file or cause to be filed all Tax Returns of or relating to the Company that are not described in Section 11.1(a) and, except as set forth in Section 11.2, the Company shall pay all Tax liabilities shown by such Tax Returns to be due.  Except as otherwise required by Legal Requirements, such Tax Returns shall, to the extent that any such Tax Returns include any period (or portion thereof) ending on or before the Purchase Option Closing Date, be prepared in a manner and on a basis consistent with Tax Returns for prior Tax periods.  The Buyer shall provide a copy of each such Tax Return that includes any period (or portion thereof) ending on or before the Purchase Option Closing Date or with respect to which Members would have an indemnification obligation to Buyer under this Agreement to the Members Representative at least ten (10) days prior to the date on which such Tax Return is to be filed and shall consider in good faith all reasonable comments made by the Members Representative with respect to such Tax Return.

11.2  Pre-Closing Taxes.  The Members will pay (a) all Taxes of the Company for all Tax periods ending before or on the Purchase Option Closing Date, (b) any and all Taxes of any person imposed on the Company as a transferee or successor, (by contract, or otherwise) which transferee or successor status existed or arose prior to the Purchase Option Closing Date and (c) all Taxes of the Company for any taxable period that begins before but ends after the Purchase Option Closing Date (a "Straddle Period") to the extent allocable (pursuant to Section 11.3) to the portion of the Straddle Period through the end of the Purchase Option Closing Date.  For the avoidance of doubt, any withholding Tax for which the Company is liable with respect to a payment made by the Company on or before the Purchase Option Closing shall be considered the responsibility of Members pursuant to the preceding sentence.  Also for the avoidance of doubt, but subject to the provisions of Section 11.5, any Taxes imposed on or with respect to the transactions contemplated by this Agreement shall be the responsibility of Members, provided, however, that the Members shall not be responsible for any Taxes of the Company or Taxes imposed with respect to the Tax Items allocable to or arising in any period (or portions thereof) beginning after the Purchase Option Closing Date.  Subject to procedures of Section 11.8, the Members shall reimburse the Buyer or the Company for any Taxes of the Company paid by the Buyer or the Company, as the case may be, which are the responsibility of the Members pursuant to Section 11.2, promptly following delivery to the Members of written notice of payment of such Taxes by the Buyer or the Company.

11.3  Straddle Period.  In the case of any Straddle Period, the amount of any Taxes of the Company allocable to the portion of the Straddle Period through and including the Purchase Option Closing Date will be determined: (i) in the case of any Tax that is based upon or measured by net income, gain, sales, payroll, purchases or expenditures, by means of an interim closing of the books as of the close of business on the Purchase Option Closing Date (and for such purpose, the taxable period of any partnership or other pass-through entity in which the Company holds a beneficial interest will be deemed to terminate at such time); and (ii) in the case of any other Tax, by allocating such Tax equally to each day of the Straddle Period so that the portion of the Tax for the Straddle Period that is allocated to the portion of the Straddle Period ending on the Purchase Option Closing Date is based on the ratio between the number of

Confidential Treatment Requested by Philidor                    AGING-000115

days in such portion to the total number of days in the Straddle Period.  Notwithstanding the foregoing, any Tax resulting from transactions occurring on the Purchase Option Closing Date after the Purchase Option Closing that are not in the Ordinary Course of Business of the Company and that are not contemplated by this Agreement shall not be attributable to the pre-Purchase Option Closing portion of the Straddle Period and the Members shall have no liability therefor; provided that, for the avoidance of doubt, the Buyer and the Members shall be liable for Transfer Taxes in the manner provided in Section 11.5.

11.4  Tax Sharing Agreements.  All Tax sharing agreements or similar agreements and all powers of attorney with respect to or involving either Company will be terminated prior to the Purchase Option Closing Date and, after the Purchase Option Closing, the Company will not be bound thereby or have any Liability thereunder.

11.5  Transfer Taxes.  The Buyer, on the one hand, and the Members, on the other hand, shall each be responsible for, and shall pay, one-half of all transfer, documentary, sales, use, stamp, real property transfer, registration and other similar Taxes and any conveyance fees or recording charges incurred in connection with the transactions contemplated hereunder (the "Transfer Taxes").  The Buyer and the Members further agree, upon request, to use their reasonable commercially reasonable efforts to obtain any certificate or other document from any Governmental Authority or any other person as may be necessary to mitigate, reduce or eliminate any Transfer Tax that could be imposed with respect to the transactions contemplated hereunder.  For the avoidance of doubt, no Tax measured by or imposed with respect to income or gain shall be regarded as a Transfer Tax for purposes of this Section 11.5.

11.6  Cooperation on Tax Matters.  The Buyer, the Company, and the Members shall cooperate fully, as and to the extent reasonably requested by the other party, in connection with the filing of Tax Returns and any audit, litigation or other proceeding (each a "Tax Proceeding") with respect to Taxes.  Such cooperation shall include using commercially reasonable efforts to retain and (upon the other party's request) the provision of records and information which are reasonably relevant to any such Tax Return or Tax Proceeding and making employees available on a mutually convenient basis to assist with such Tax Return or Tax Proceeding and provide additional information and explanation of any information related to such Tax Return or Tax Proceeding.  The party requesting such cooperation will pay the reasonable out-of-pocket expenses of the other party.

11.7  Amendments of Tax Returns.  Except as otherwise required under applicable Legal Requirements, in connection with a Tax Proceeding or as otherwise required or permitted pursuant to this Agreement, none of the Buyer, the Company, any of its Subsidiaries or any of their respective Affiliates shall amend any Tax Return of the Company for a taxable period ending on or before the Purchase Option Closing Date.

11.8  Tax Proceedings.

(a)  After the Purchase Option Closing, the Buyer shall promptly notify in writing the Members, upon receipt by the Buyer or any of its Affiliates (including the Company after the Closing) of notice of any Tax Proceeding or Third Party Claim (i) with respect to a

68

AGING-000116

taxable period of the Company ending on or before the Purchase Option Closing Date or a Straddle Period of the Company or (ii) with respect to Taxes, which if pursued successfully would reasonably be expected to serve as a basis for an Indemnification Claim under Section 10.1 (a "Tax Claim"); provided, however, that the failure to give such notice will not affect the Buyer's right to indemnification under Section 10.1, except to extent that the Members are actually prejudiced by such failure and (ii) subject to the applicable time limitations on bringing an Indemnification Claim set forth in Section 10.3.

(b)　　In the case of a Tax Proceeding that relates to a taxable period ending on or before the Purchase Option Closing Date or would reasonably be expected to serve as a basis for a Tax Claim (other than with respect to a Straddle Period or a taxable period of the Company beginning after the Purchase Option Closing Date), the Members shall have the right, at their expense, to control the conduct of the Tax Proceeding; provided, however, that the Buyer may, at its expense, participate in, but not control, any such Tax Proceeding and the Members shall keep the Buyer fully and timely informed with respect to the commencement, status and nature of any such Tax Proceeding.  In the case of a Tax Proceeding that relates to a Straddle Period or a taxable period of the Company beginning after the Purchase Option Closing Date, the Buyer shall have the right, at its expense, to control the Tax Proceeding; provided, however, that with respect to a Straddle Period the Members may also, at their expense, participate in, but not control, any such Tax Proceeding and the Buyer shall keep the Members fully and timely informed with respect to the commencement, status and nature of any such Tax Proceeding.

(c)　　Notwithstanding anything to the contrary in this Section 11.8, neither the Buyer nor the Members shall, and no party shall cause the Company to, enter into any compromise or agree to settle any Tax Proceeding that relates to a taxable period ending on or before the Closing Date or Straddle Period or would reasonably be expected to serve as a basis for a Tax Claim without the prior written consent of the other party (which consent shall not be unreasonably withheld, conditioned or delayed).

11.9　Tax Items of the Company and the Business.  Notwithstanding anything to the contrary hereunder, Buyer and the Company shall be responsible for the payment of any Taxes due and owing with respect to Tax Items arising in or allocable to any period (or portion thereof) beginning after the Purchase Option Closing Date.  At Buyer's direction, the Company shall loan to the Buyer the amount of such Taxes that are paid or to be paid by the Buyer to the appropriate Governmental Authority.

11.10　Pennsylvania Tax Credit.  If, after the Purchase Option Closing Date, the Company receives a Tax credit in respect of the Pennsylvania Jobs Tax Credit that is attributable or allocable to (i) a taxable period (or portion thereof in the case of a Straddle Period) of the Company that ends on or before the Purchase Option Closing Date, or (ii) is received or paid pursuant to an agreement entered into between the Company and the State of Pennsylvania prior to the Purchase Option Closing Date with respect to such tax credit,  the Company shall promptly pay to the Members the amount of such Tax credit, together with any interest thereon, but net of any Taxes imposed on the Company upon the receipt of such Tax credit.  The Buyer

69

AGING-000117

and the Members Representative will reasonably cooperate with the Company in promptly obtaining such credit, including through the filing of amended Tax Returns or refund claim.

11.11   Withholding.  In the event any payments made pursuant to this Agreement become subject to withholding Taxes under the laws or regulations of any jurisdiction, the party making such payment shall deduct and withhold the amount of such Taxes for the account of the payee and remit the withheld amounts to the appropriate Governmental Authority to the extent required by applicable laws or regulations and such amounts payable to the payee shall be reduced by the amount of Taxes deducted and withheld.  Any such withholding taxes required under applicable laws or regulations to be paid or withheld shall be an expense of, and borne solely by, the payee.

## ARTICLE XII.  MISCELLANEOUS

12.1 Notices.   All notices, requests, demands, claims and other communications required or permitted to be delivered, given or otherwise provided under this Agreement must be in writing and must be delivered, given or otherwise provided:

(i)       by hand (in which case, it will be effective upon delivery);

(ii)      by facsimile (in which case, it will be effective upon receipt of confirmation of good transmission); or

(iii)     by overnight delivery by a nationally recognized courier service through which delivery notification may be obtained (in which case, it will be effective on the Business Day after being deposited with such courier service);

in each case, to the address (or facsimile number) listed below:

If to the Buyer, to:

KGA Fulfillment Services, Inc.
400 Somerset Corporate Blvd.
Bridgewater, NJ 08807
Attention: President
Facsimile #: ███████████

70

<u>With a copy to:</u>

Valeant Pharmaceuticals International, Inc.
400 Somerset Corporate Blvd.
Bridgewater, NJ 08807
Attention: General Counsel
Facsimile #: ████████████

<u>If to the Members, to:</u>

Philidor Rx Services, LLC
400 Horsham Road
Suite 109
Horsham, PA 19044
Attention:
Facsimile #: ████████████

<u>With a copy to:</u>
Duane Morris LLP
30 South 17th Street
Philadelphia, PA  19103
Attention: David C. Toner
Facsimile #: ████████████

Each of the parties to this Agreement may specify a different address or facsimile number by giving notice in accordance with this Section to each of the other parties hereto.

12.2  <u>Succession and Assignment; No Third-Party Beneficiary.</u>   Subject to the immediately following sentence, this Agreement will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, each of which such successors and permitted assigns will be deemed to be a party hereto for all purposes hereof.  No party may assign, delegate or otherwise transfer either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other parties; <u>provided</u>, <u>however</u>, that the Buyer may (a) assign any or all of its rights and interests hereunder to one or more of its Affiliates, to any of its lenders as collateral security, or in connection with a sale of substantially all assets of the Buyer and (b) designate one or more of its Affiliates to perform its obligations hereunder, in each case, so long as the Buyer is not relieved of any Liability hereunder, including the obligation to pay the Milestone Payments as contemplated hereunder.  The foregoing notwithstanding, in the event Buyer sells all or substantially all of the Company's assets or transfers voting control of the Company to another Person (the "<u>Successor</u> <u>Buyer</u>"), the Members shall first seek from the Successor Buyer the performance or satisfaction of any Liabilities hereunder (including obligations to pay the Milestone Payments) before seeking that Buyer perform or satisfy any such Liabilities.  This Agreement is for the sole benefit of the parties and their permitted successors and assignees and nothing herein expressed or implied will give or be construed to give any Person, other than the parties and their permitted

71

successors and assignees and any Indemnified Party under Article X, any legal or equitable rights hereunder.

12.3   <u>Amendments and Waivers</u>.   No amendment or waiver of any provision of this Agreement will be valid and binding unless it is in writing and signed, in the case of an amendment, by the Buyer and the Requisite Members or in the case of a waiver, by the party against whom the waiver is to be effective.   No waiver by any party of any breach or violation or, default under any representation, warranty or covenant hereunder, whether intentional or not, will be deemed to extend to any prior or subsequent breach, violation, default of any such representation, warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.   No delay or omission on the part of any party in exercising any right, power or remedy under this Agreement will operate as a waiver thereof.

12.4   <u>Entire Agreement</u>.   This Agreement, together with the other Non-Competition Agreements, the Confidentiality Agreement and any documents, instruments and certificates explicitly referred to herein, constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes any and all prior discussions, negotiations, proposals, undertakings, understandings and agreements whether written or oral, with respect thereto.

12.5   <u>Listed Documents, etc</u>.   The furnishing or availability for review of any document will not be construed to modify, qualify or disclose an exception to any representation or warranty of any party made herein or in connection herewith, other than documents that are expressly referred to in the Disclosure Schedule under any section number of this Agreement (which express references shall be construed as an exception solely (i) to such representations or warranties in the Agreement to which they are expressly referred in the Disclosure Schedule by section number of this Agreement and (ii) with respect to such other representations and warranties in this Agreement for which such disclosure is sufficiently specific so that it is readily apparent on the face of such disclosure that such disclosure relates to such other representation or warranty in the Agreement).

12.6   <u>Counterparts</u>.   This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute but one and the same instrument.   This Agreement will become effective when duly executed by each party hereto.

12.7   <u>Severability</u>.    Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction will not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.   In the event that any provision hereof would, under applicable law, be invalid or unenforceable in any respect, each party hereto intends that such provision will be construed by modifying or limiting it so as to be valid and enforceable to the maximum extent compatible with, and possible under, applicable law.

12.8   <u>Headings</u>.    The headings contained in this Agreement are for convenience purposes only and will not in any way affect the meaning or interpretation hereof.

72

12.9  <u>Governing Law</u>.  This Agreement, the rights of the parties and all Actions arising in whole or in part under or in connection herewith, will be governed by and construed in accordance with the domestic substantive laws of the State of New York, without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any other jurisdiction.

12.10  <u>Jurisdiction; Venue; Service of Process</u>.

(a)  <u>Jurisdiction</u>.  Subject to Section 10.4(e), each party to this Agreement, by its execution hereof, (i) hereby irrevocably submits to the exclusive jurisdiction of the state courts of the State of New York or the United States District Court located in the Southern District of the State of New York for the purpose of any Action between the parties arising in whole or in part under or in connection with this Agreement, (ii) hereby waives to the extent not prohibited by applicable law, and agrees not to assert, by way of motion, as a defense or otherwise, in any such Action, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that any such Action brought in one of the above-named courts should be dismissed on grounds of *forum non conveniens*, should be transferred or removed to any court other than one of the above-named courts, or should be stayed by reason of the pendency of some other proceeding in any other court other than one of the above-named courts, or that this Agreement or the subject matter hereof may not be enforced in or by such court, and (iii) hereby agrees not to commence any such Action other than before one of the above-named courts.  Notwithstanding the previous sentence a party may commence any Action in a court other than the above-named courts solely for the purpose of enforcing an order or judgment issued by one of the above-named courts.

(b)  <u>Venue</u>.  Each party agrees that for any Action between the parties arising in whole or in part under or in connection with this Agreement, such party may bring Actions only in the State of New York.  Each party further waives any claim and will not assert that venue should properly lie in any other location within the selected jurisdiction.

(c)  <u>Service of Process</u>.  Each party hereby (i) consents to service of process in any Action between the parties arising in whole or in part under or in connection with this Agreement in any manner permitted by New York law, (ii) agrees that service of process made in accordance with clause (i) or made by registered or certified mail, return receipt requested, at its address specified pursuant to Section 12.1, will constitute good and valid service of process in any such Action, and (iii) waives and agrees not to assert (by way of motion, as a defense, or otherwise) in any such Action any claim that service of process made in accordance with clauses (i) or (ii) does not constitute good and valid service of process.

12.11  <u>Specific Performance</u>.  Each of the parties acknowledges and agrees that the other parties would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached or violated. Accordingly, each of the parties agrees that, without posting bond or other undertaking, the other parties will be entitled to an injunction or injunctions to prevent breaches or violations of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in any Action instituted in any court of the United States or any state thereof

73

having jurisdiction over the parties and the matter in addition to any other remedy to which it may be entitled, at law or in equity. Each party further agrees that, in the event of any action for specific performance in respect of such breach or violation, it will not assert that the defense that a remedy at law would be adequate.

12.12   Delivery by Facsimile or Other Electronic Transmission. This Agreement and any Non-Competition Agreement, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or other electronic transmission, shall be treated in all manner and respects as an original contract and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. At the request of any party hereto or to any such contract, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such contract shall raise the use of a facsimile machine or electronic transmission to deliver a signature or the fact that any signature or contract was transmitted or communicated through the use of facsimile machine or other electronic transmission as a defense to the formation of a contract and each such party forever waives any such defense.

12.13   Appointment of Members' Representative. Each Member hereby appoints David Cowen (the "Members' Representative") as the Members' exclusive representative, agent and attorney-in-fact for the Members, with full power of substitution, to make all decisions and determinations and to act and execute, deliver and receive all documents, instruments and consents on behalf of the Members at any time, in connection with, and that may be necessary or appropriate to accomplish the intent and implement the provisions of Section 2.1, Section 2.5, Section 2.6 and Article X, and to facilitate the consummation of the transactions contemplated thereby. By executing this Agreement, the Members' Representative accepts such appointment, authority and power, and agrees that it will inform and consult with the Members prior to taking any action pursuant to such appointment. Without limiting the generality of the foregoing, the Members' Representative shall have the power and authority to take all actions under Section 2.1, Section 2.5, Section 2.6 and Article X that are to be taken by the Members' Representative, including but not limited to, any of the following actions on behalf of the Members with respect to Section 2.1, Section 2.5, Section 2.6, and Article X: (i) to give and receive notices, communications and consents; (ii) to waive any provision of Section 2.5, Section 2.6 or Article X; (iii) to assert any claim or institute any Action; (iv) to investigate, defend, contest or litigate any Action initiated by any Person against the Members' Representative; (v) to receive process on behalf of any or all of the Members in any such Action; (vi) to negotiate, enter into settlements and compromises of, resolve and comply with orders of courts and awards of arbitrators or other third party intermediaries with respect to any disputes arising under Section 2.5, Section 2.6 or Article X; (vii) to agree to any offsets or other additions or subtractions of amounts to be paid under Section 2.5 or Article X; and (viii) to make, execute, acknowledge and deliver all such other agreements, orders, receipts, endorsements, notices, requests, instructions, certificates, letters and other writings, and, in general, to do any and all things and to take any and all action that the Members' Representative, in its sole and absolute discretion, may consider necessary or proper or convenient in connection with or to carry out the activities described in this Section 12.13 and the transactions contemplated hereby.

[Signature Page Follows.]

74

IN WITNESS WHEREOF, each of the undersigned has executed this Agreement as an agreement under seal as of the date first above written.

**BUYER:**

**KGA FULFILLMENT SERVICES, INC.**

By: _____
    Name:
    Title:

Confidential Treatment Requested by Philidor         AGING-000123

IN WITNESS WHEREOF, each of the undersigned has executed this Agreement as an agreement under seal as of the date first above written.

**COMPANY:**

**PHILIDOR RX SERVICES, LLC**

By: _____
    Name:
    Title:

Confidential Treatment Requested by Philidor

IN WITNESS WHEREOF, each of the undersigned has executed this Agreement as an agreement under seal as of the date first above written.

**<u>MEMBERS</u>:**

MATTHEW S. DAVENPORT


_____


DAVID S. WING


_____


FABIEN FORRESTER-CHARLES


_____


EDWARD JOHN CARNE VIII


_____


END GAME LP


By: _____
    Name:
    Title:


DAVID FRANK OSTROW, RPH


_____

AGING-000125

IN WITNESS WHEREOF, each of the undersigned has executed this Agreement as an agreement under seal as of the date first above written.

**MEMBERS:**

MICHAEL PAUL OSTROW

_____

ANDREW J. DAVENPORT
IRREVOCABLE TRUST

By: _____
   Name:
   Title:

JAMES FLEMING

_____

GREGORY W. BLASZCZYNSKI

_____

TIMOTHY & PAMELA SCHULER

_____

DAVID COWEN

_____

                                   AGING-000126

IN WITNESS WHEREOF, each of the undersigned has executed this Agreement as an agreement under seal as of the date first above written.

**<u>MEMBERS</u>:**

ELIZABETH KARDOS

_____

FOUR BEADS, LLC

By: _____
    Name:
    Title:

JEFFREY GOTTESMAN

_____

FRANCIS JENNINGS

_____

GINA MILNER

_____

NICHOLAS SPUHLER

_____

Confidential Treatment Requested by Philidor

## Schedule A

## Acquisition Schedule

| Member | Percentage Interest |
|---|---|
| Matthew S. Davenport | 24 |
| David S. Wing | 5.5 |
| Fabien Forrester-Charles | 3.4 |
| Edward John Carne VIII | 3.4 |
| End Game, LP | 31.5 |
| David Frank Ostrow, RPH | 2.2 |
| Michael Paul Ostrow | 2.2 |
| Andrew J. Davenport Irrevocable Trust | 6.0 |
| James Fleming | 2.0 |
| Gregory W. Blaszczynski | 3.4 |
| Timothy & Pamela Schuler | 6.8 |
| David Cowen | 1.35 |
| Elizabeth Kardos | 1.35 |
| Four Beads, LLC | 2.3 |
| Jeffrey Gottesman | 1.0 |
| Francis Jennings | 3.0 |
| Gina Milner | 0.50 |
| Nicholas Spuhler | 0.10 |
| **Total** | **100.00%** |

Confidential Treatment Requested by Philidor

AGING-000128

**Schedule B**

**Disclosure Schedule**

See attached.

Confidential Treatment Requested by Philidor                                      AGING-000129

**Schedule C**

**Time-Based Milestone Payment Allocation Schedule**

**[Attached]**

Confidential Treatment Requested by Philidor

**Schedule D**

**Net Sales Milestone Payment Allocation Schedule**

**[Attached]**

AGING-000131

**Schedule 1.1-1**

**Buyer's Knowledge**

Andrew Davis, Vice President, Corporate Development

Tanya Carro, Senior Vice President and Corporate Controller

Jerry Janeczko, Vice President, Information Technology

Gary Tanner, Executive Director, Access and Analytics

**Schedule 1.1-2**

**Permitted Transaction Bonuses**

Bonuses to employees that are included in (and not in addition to) the Permitted Distribution.

Confidential Treatment Requested by Philidor

**Schedule 1.1-3**

**Company's Knowledge**

Andrew Davenport
Matthew Davenport
Fabien Forrester-Charles, Chief Information Officer
John Carne, Chief of Staff
Jamie Fleming, Controller
Sherri Leon, Pharmacy
Alison Pritchett, Strategic Customer Relations
Dean Griffin, Business Analysis & Strategic Planning
Peg Neily, Human Resources
Brett Winters, Operations Management & Analytics
Eric Rice, Senior Director Call Center Operations
Jessica McMenamin, Staff/Training
Brad Greenfield, AZ Operations

Confidential Treatment Requested by Philidor