EXHIBIT W

EXECUTION VERSION

## TERMINATION AGREEMENT

This TERMINATION AGREEMENT, dated as of January 22, 2016 (this "Termination Agreement") and effective as of November 1, 2015 (the "Effective Date"), by and among Valeant Pharmaceuticals International, Inc., a British Columbia corporation ("VPII"), Valeant Pharmaceuticals North America LLC, a Delaware limited liability company ("VPNA") and wholly-owned subsidiary of VPII; KGA Fulfillment Services, Inc., a Delaware corporation ("KGA" and, together with VPNA, VPII and each of its and their respective Affiliates, the "Valeant Parties") and wholly-owned subsidiary of VPII; Philidor Rx Services, LLC, a Delaware limited liability company ("Philidor" and, together with the Members (as defined below), the "Philidor Parties"); End Game, LP, a Pennsylvania limited partnership ("End Game"); the Andrew J. Davenport Irrevocable Trust (the "Davenport Trust"); Matthew S. Davenport; and Andrew J. Davenport ("Davenport") (collectively, the "Parties" and each, a "Party"). Capitalized terms used herein shall have the meanings assigned to such terms in Section 5.1.

## RECITALS

WHEREAS, KGA, Philidor, End Game, the Davenport Trust and Matthew S. Davenport are parties to that certain Purchase Option Agreement, dated as of December 15, 2014 (the "Option Agreement"), by and among KGA, Philidor and the members listed on Schedule A thereto (the "Members"), pursuant to which, among other things, KGA acquired an option to purchase all of the issued and outstanding equity interests of Philidor (the "Equity Interests");

WHEREAS, pursuant to the Option Agreement, VPII gave that certain Parent Guarantee, dated as of December 15, 2014 (the "VPII Guarantee"), in favor of the Members, pursuant to which, among other things, VPII guaranteed the payment obligations of KGA under the Option Agreement;

WHEREAS, End Game, the Davenport Trust and Matthew S. Davenport (collectively, the "Terminating Members") together hold 61.5% of the Equity Interests, thus constituting "Requisite Members" under the Option Agreement;

WHEREAS, VPNA and Philidor are parties to that certain Distribution and Services Agreement, dated as of December 15, 2014 (the "Distribution Agreement"), pursuant to which, among other things, Philidor agreed to distribute certain identified products of VPNA ("Products");

WHEREAS, VPII and Philidor are parties to that certain Confidentiality Agreement, dated as of October 26, 2014 (the "Confidentiality Agreement"), pursuant to which, among other things, VPII and Philidor agreed to keep confidential certain information;

WHEREAS, VPNA and Davenport are parties to that certain Consulting Agreement, dated as of December 18, 2014 (the "Consulting Agreement"), pursuant to which, among other things, VPNA retained Davenport to provide certain consulting services;

WHEREAS, KGA and Philidor are parties to (i) that certain Noncompetition Agreement, dated as of December 15, 2014 (the "Active Members' Noncompetition

LA_LAN01:287031.12

Confidential Treatment Requested by Philidor                                                    AGING-000194

Agreement"), by and among KGA, Philidor, Matthew S. Davenport, David S. Wing, Fabien Forrester-Charles, Edward John Carne VIII, End Game, David Frank Ostrow, Michael Paul Ostrow, the Davenport Trust, James Fleming, Gregory W. Blaszczynski and Gina Milner (collectively, the "Active Members") and (ii) that certain Noncompetition Agreement, dated as of December 15, 2014 (the "Passive Members' Noncompetition Agreement" and, together with the Active Members' Noncompetition Agreement, the "Noncompetition Agreements"), by and among KGA, Philidor, Timothy Schuler, Pamela Schuler, David Cowen, Elizabeth Kardos, Four Beads, LLC, Jeffrey Gotteman, Francis Jennings and Nicholas Spuhler (the "Passive Members");

WHEREAS, the Parties have entered into that certain binding Summary of Terms for Termination Agreement, effective as of November 1, 2015 (the "Term Sheet"), pursuant to which the Parties terminated the Option Agreement, the VPII Guarantee, the Distribution Agreement, the Confidentiality Agreement, the Consulting Agreement, the Noncompetition Agreements and any and all other agreements between a Valeant Party, on the one hand, and Philidor or any of its Affiliates, on the other hand (all such agreements, the "Terminated Agreements"), and provided binding mutual releases of claims as set forth in the Term Sheet, all as of 12:00 midnight Eastern Time on November 1, 2015 and agreed to certain transitional services from the Effective Date until January 30, 2016 in order to assure the continuation of care for patients in compliance with all relevant Laws;

WHEREAS, the Term Sheet requires the Parties to enter into definitive agreements with respect to the matters set forth in the Term Sheet to further evidence the agreements set forth in the Term Sheet and therefore, the Parties are entering into this Termination Agreement and the mutual release agreements (the "Mutual Release Agreements") in the forms attached hereto as Exhibit A and Exhibit B.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## TERMINATION AND WAIVER

1.1     Termination of the Terminated Agreements.   Each of the Terminated Agreements is hereby terminated in all respects as of November 1, 2015 at 12:00 midnight Eastern Time (the "Termination Date") and any notice periods set forth in any such Terminated Agreement are hereby waived.  From and after the Termination Date, no party to any Terminated Agreement has or shall have any further rights, duties, liabilities or obligations of any nature whatsoever with respect to, in connection with or arising under any such Terminated Agreement, including those provisions of each Terminated Agreement which by their terms would otherwise survive termination of such Terminated Agreement.

1.2     Waiver of Milestone Payment.   For the avoidance of doubt, notwithstanding Section 2.5 of the Option Agreement, the Terminating Members constituting the Requisite Members hereby expressly waive and agree to forego the $25 million Net Sales

LA_LAN01:287031.12

Confidential Treatment Requested by Philidor                                                          AGING-000195

Milestone Payment due and payable in connection with the achievement of the Tranche 1 Milestone Event which occurred prior to the Termination Date.

## ARTICLE II
## TRANSITIONAL PROVISIONS

2.1     Windup of Philidor's Business.  In order to minimize any interruptions in patient care, Philidor agrees to cease all activities, including terminating all relationships with its Network Pharmacies, in compliance with Law, as soon as practicable after the Termination Date and in accordance with the provisions of this Article II.  Notwithstanding the foregoing, Philidor shall conduct (i) all activities required to perform its obligations set forth under Sections 2.3 and 2.4, (ii) any other activities required to be undertaken by Philidor pursuant to this Termination Agreement, including pursuant to Sections 2.2 and 2.5, and (iii) all other activities required in connection with the winding up or cessation of all of its business activities, including with respect to the retention and destruction of protected health information in accordance with applicable Law, including HIPAA (such transitional and continuing activities, the "Windup").

2.2     Expenses of Windup.

(a)     General.  Philidor agrees that it shall be solely responsible for any costs, expenses and liabilities incurred in connection with the Windup, including (i) all costs incurred by Philidor in complying with the provisions set forth under Section 2.5, (ii) all costs incurred by Philidor in connection with its operations, including the operations of its Network Pharmacies, during the cessation of its activities, the termination of all relationships with its Network Pharmacies and the transition of its and the Network Pharmacies' services to other parties, including in connection with its provision of services pursuant to Section 2.4, (iii) all costs and expenses incurred in connection with the termination of Philidor's lease obligations for real or personal property and (iv) all severance or similar obligations or liabilities paid in connection with Philidor's termination of its employees, including all liabilities and obligations under the Worker Adjustment Retraining Notification Act of 1988, as amended, or similar Laws (collectively, "Windup Expenses").  Windup Expenses shall be limited to commercially reasonable expenses to carry out the Windup, and Philidor shall not make any distribution or other payments to any Affiliate of Philidor (other than payments for salary, severance and retention to employees of Philidor consistent with the salary for such employees immediately prior to the Termination Date and severance payments pursuant to and in accordance with Section 2.2(b)).

(b)     Severance.  Philidor shall make severance payments to its employees in amounts that are intended to ensure that its employees are sufficiently motivated to provide the services set forth under Section 2.4 and comply with Philidor's obligations under this Termination Agreement for the full period during which such employees remain employed, which severance payments shall be calculated equitably based on the length of each employee's respective tenure at Philidor; provided, that such severance amount with respect to each terminated employee shall average approximately an amount equal to 90 days' of such terminated employee's current wages.  Each terminated employee shall be entitled to severance benefits commencing upon the date of such employee's termination.  In addition, Philidor may pay retention payments to its employees, in the case of each such employee in a commercially

Confidential Treatment Requested by Philidor                                                    AGING-000196

reasonable amount intended to ensure that such employee is available to provide the services set forth in Section 2.4 and not to exceed an amount equal to 90 days' of each such employee's current wages.  Notwithstanding anything herein to the contrary, Philidor shall not pay any severance, retention, termination or similar payments to its Chief Executive Officer or to any other officer or employee of Philidor that is, or as of the date of the Option Agreement was, a Member or received, directly or indirectly, any portion of the Purchase Option Consideration or any Milestone Payments.  Except for severance and retention payments made pursuant to and in accordance with this Section 2.2(b), Philidor shall not increase the salary, benefits or other compensation of, or pay any bonuses, retention payments, termination payments or similar payments to, any of its employees

        (c)      <u>Philidor Retained Cash</u>.

        (i)      VPNA shall be entitled to, and Philidor shall pay to VPNA, in accordance with this Section 2.2(c), all funds held by or received by Philidor in connection with the sale of pharmacy products by Philidor and its Network Pharmacies (including, for the avoidance of doubt, all funds to which Philidor is entitled from Contract Pharmacies), in excess of the Retained Cash Amount (such excess funds, the "<u>Excess Funds</u>").  VPNA and the other Valeant Parties shall not be entitled to receive any funds other than the Excess Funds from Philidor.

        (ii)      Philidor shall deposit all Excess Funds into a separate bank account to be established by VPNA, the details of which shall be provided to Philidor (the "<u>Bank Account</u>").  Philidor shall deposit in the Bank Account on a daily basis, and in any event no later than two Business Days after receipt thereof, and retain therein, all Excess Funds as it receives them.  VPNA shall be entitled to withdraw funds from the Bank Account at any time.  Subject to Philidor's compliance with its obligations under Section 2.3(b), Philidor and its Network Pharmacies shall have no obligation to pay any accounts payable due to VPNA.

        (iii)      Philidor shall use all commercially reasonable efforts to collect all of its accounts receivable, including from each Third-Party Payor that has publicly announced that it is suspending payments to Philidor.  In furtherance of the foregoing, Philidor shall not agree to any reductions in any payments owed to it from third parties (including by agreeing to write off any accounts receivable) without the consent of VPNA .

        (iv)      Immediately prior to the liquidation or other sale of Philidor following the completion of all activities constituting the Windup, Philidor shall, or shall cause, the excess, if any, of (x) the Retained Cash Amount over (y) the Windup Expenses to be contributed to a charity or foundation of Philidor's election (such election to be made in consultation with an appropriate Valeant Party) for the benefit of patients.

        (v)      Philidor shall provide to the Valeant Parties (x) on a weekly basis, a report detailing (A) the collection of accounts receivable from third parties (which report shall identify all such collections and the applicable third party) and (B) all prescriptions filled by Philidor pursuant to Section 2.4, and (y) access, at reasonable times and upon reasonable notice, to all officers and personnel of Philidor and to all premises, properties,

LA_LAN01:287031.12

Confidential Treatment Requested by Philidor

AGING-000197

books, records (including financial and tax records), contracts, financial and operating data and information and documents pertaining to Philidor and its business as such Valeant Party or its auditors may reasonably request and upon reasonable notice in order for (A) the Valeant Parties to comply with their tax and financial reporting obligations (including with respect to any quarterly report on Form 10-Q or any annual report on Form 10-K) and (B) VPII's independent auditor to perform and complete its audit for calendar year 2015 in accordance with GAAP. In connection with the foregoing, Philidor shall deliver to the Valeant Parties as soon as practicable, but in any event by November 16, 2015, an unaudited income statement and statement of cash flows for the period from January 1, 2015 through October 31, 2015, and an unaudited balance sheet and statement of the Members' equity as of October 31, 2015, all prepared in accordance with GAAP (except that such financial statements may (I) be subject to normal year-end audit adjustments and (II) not contain all notes thereto that may be required in accordance with GAAP).

(d)     Third Party Monitor.  Philidor and the Valeant Parties hereby agree to (i) appoint a third-party monitor (the "Monitor") mutually agreed upon by VPNA and Philidor and (ii) enter into an agreement with the Monitor pursuant to which the Monitor shall be engaged, on behalf of, and at the expense of, the Valeant Parties, to (A) confirm the amount of Philidor Cash-on-Hand and (B) conduct an audit on a monthly basis (beginning with November 2015) of the Windup Expenses to confirm that the Windup Expenses incurred by Philidor (and the calculation of such Windup Expenses) comply with this Termination Agreement.  In connection therewith, Philidor agrees to provide the Monitor with access, at reasonable times and upon reasonable notice, to all officers and personnel of Philidor and to all premises, properties, books, records (including financial and tax records), contracts, financial and operating data and information and documents pertaining to Philidor and its business as the Monitor may reasonably request in order to complete the tasks set forth in the foregoing sentence.

2.3     Cessation of Pharmacy Services.

(a)     Cessation.  Notwithstanding anything to the contrary contained herein, (i) other than as provided in Section 2.4(a), Philidor shall not fill or refill, directly or indirectly, any prescriptions following November 8, 2015, (ii) Philidor shall not make any insurance claims with respect to any Products after November 1, 2015 and (iii) except as provided herein, Philidor shall cease to perform any Services (as defined in the Distribution Agreement) after November 1, 2015.

(b)     Return of Valeant Inventory.  Subject to reasonable advance notice (which in no case shall be less than one Business Day), in accordance with reasonable instructions from an appropriate Valeant Party, Philidor shall, and shall cause its Network Pharmacies to, return any inventory of Products to such Valeant Party on such date as directed by such Valeant Party, at such Valeant Party's cost (with respect to shipping and transportation), and in compliance with all Laws; provided, that Contract Pharmacies shall be entitled to receive a credit from such Valeant Party for the price paid by such Contract Pharmacy for such Product.

(c)     Disposal of Other Inventory.  Philidor shall return for credit, transfer or otherwise dispose of all prescription pharmaceutical products (other than Products) in its

-5-

Confidential Treatment Requested by Philidor                                              AGING-000198

possession by November 30, 2015, consistent with the cessation of all of Philidor's business activities and in compliance with all applicable Laws.

    2.4    <u>Provision of Interim Services</u>.

    (a)    <u>Transitional Filling of Prescriptions and Refills</u>.

    (i)    *Pre-November 9, 2015 Activities*.  Through and including November 8, 2015, Philidor shall fill without charge to patients (A) all prescriptions received by Philidor for Designated Valeant Products and (B) all refill prescriptions due to be processed and shipped through November 8, 2015.

    (ii)    *Subsequent Activities*.

    (A)    *Auto-Refills*.  Philidor shall (or shall cause the Network Pharmacies to), until the earlier of (x) the completion of the Transition with respect to auto-refill prescriptions or (y) the expiration of the Transition Period, fill all auto-refill prescriptions for Designated Valeant Products outstanding at Philidor (or the Network Pharmacies) (A) without charge to the applicable patient if the previous prescription for such auto-refill was filled without charge to the patient and (B) at a cost to the patient of $35.00 in all other cases.

    (B)    *Non-Auto Refills*.  If a patient who has not opted into Philidor's auto-refill program contacts Philidor and requests that Philidor (or a Network Pharmacy) refill a prescription for Designated Valeant Products outstanding at Philidor (or the Network Pharmacy), Philidor shall (or shall cause the Network Pharmacies to), until the earlier of (x) the completion of the Transition with respect to non-auto-refill prescriptions or (y) the expiration of the Transition Period, fill such refill (A) without charge to the applicable patient if the previous prescription for such refill was filled without charge to the patient and (B) at a cost to the patient of $35.00 in all other cases.

    (iii)    *Cash-Pay Option*.  Through and including January 30, 2016 (or such earlier date as the Valeant Parties in their sole discretion on a state-by-state and product-by-product basis shall notify Philidor in accordance with Section 5.5 (any such notice, a "<u>Cash-Pay Change Notice</u>")), Philidor shall administer a co-pay assistance program pursuant to which new prescriptions for Designated Valeant Products will be available to patients (without insurance coverage) or patients with insurance coverage (covered or uncovered) other than through a Government-Sponsored Healthcare Program for an out-of-pocket cost of $35.00 (the "<u>Cash-Pay Option</u>").  Any Cash-Pay Change Notice delivered by a Valeant Party shall include, as applicable, the name of the new administrator of the Cash-Pay Option, the applicable state and/or Designated Valeant Product and any other instructions that Philidor shall give to patients who had been participating in or otherwise inquire about the Cash-Pay Option.

    (iv)    *Commercial Coverage Only*.  Except as explicitly provided in Section 2.4(a)(iii) with respect to patients without insurance coverage, for the avoidance of doubt, the services described in this Section 2.4(a) shall only apply to patients with

Confidential Treatment Requested by Philidor

prescriptions having insurance coverage (covered or uncovered) other than through a Government-Sponsored Healthcare Program and Philidor shall not offer any refill services or Cash-Pay Option to any patient with insurance coverage through a Government-Sponsored Healthcare Program.

(b)     <u>Patient-Requested Prescription Transfers</u>.  If during the Transition Period a patient requests that Philidor transfer such patient's prescription to another pharmacy, Philidor shall (i) transfer such prescription in accordance with such patient's request and all applicable Laws, (ii) contact such patient to confirm that such prescription has been successfully transferred and (iii) take all commercially reasonable actions necessary to ensure that such prescription is successfully transferred pursuant to this Section 2.4(b).  Until a requested transfer is completed, Philidor shall continue to provide such patient's refills as provided in Section 2.4(a)(ii) until directed otherwise by a Valeant Party or until the Transition, if sooner, but in no event after the Transition Period.

(c)     <u>Patient Records and Transition</u>.  During the Transition Period Philidor shall use its commercially reasonable efforts to arrange to transition and subsequently to transition (the "<u>Transition</u>") all patient records, including all refill prescriptions (the "<u>Records</u>") to an alternative pharmacy (the "<u>Alternative Pharmacy</u>") selected by the Valeant Parties, subject to each patient's freedom to use the pharmacy of their respective choice.  Philidor shall ensure that the Alternative Pharmacy can identify auto-refill prescriptions in the Records.

(i)     *Purchase of Records*.  If requested by the Valeant Parties or required by applicable Law, Philidor shall enter into a purchase and sale agreement with the Alternative Pharmacy pursuant to which such Alternative Pharmacy would acquire from Philidor the Records for nominal consideration.

(ii)     *Patient Contact*.  Prior to the Transition, (A) Philidor customer service representatives shall inform patients who contact Philidor directly that Philidor will continue to fill all refill prescriptions as described herein and (B) if requested by the Valeant Parties and permitted or required by applicable Law, Philidor shall deliver to patients whose records are subject to the Transition a notice informing them of the Transition and the identity of the Alternative Pharmacy and their rights under applicable Law (a "<u>Transition Notice</u>").  If Philidor sends a Transition Notice pursuant to Section 2.4(c)(ii)(B), the Valeant Parties shall have the right to review and approve the form and content of such Transition Notice and Philidor shall only send Transition Notices that comply with the approved form.  Following the Transition and until the end of the Transition Period, Philidor customer service representatives shall inform patients who contact Philidor directly of the Transition and that Philidor will not fill any refill prescriptions after such Transition.  As and where required by applicable Law, the Valeant Parties shall cause the Alternative Pharmacy to deliver to each patient whose records are subject to the Transition a Transition Notice.

(iii)     *Identification of Alternative Pharmacy*.  The Valeant Parties shall identify the Alternative Pharmacy to Philidor in writing.

LA_LAN01:287031.12

Confidential Treatment Requested by Philidor

AGING-000200

(iv)   *Notice to Network Pharmacies*.  No later than one Business Day following the Transition, Philidor shall provide the Network Pharmacies with notice of the Transition and, in such notice, shall encourage the Network Pharmacies to deliver notices to their patients explaining the Transition and providing the contact information for the Alternative Pharmacy.

(d)   <u>Transitional Supply of Products</u>.

(i)   *Supply of Products*.  Philidor shall use its and its Network Pharmacies' current inventory of Designated Valeant Products in complying with its obligations under Section 2.4(a).  If Philidor concludes that such inventory of Designated Valeant Products is insufficient to meet its obligations hereunder, Philidor shall submit to VPNA a product order using VPNA's purchase order form in advance of the requested delivery date for the amount of additional Designated Valeant Products that it anticipates will be necessary to meet its obligations hereunder, together with appropriate supporting documentation justifying its conclusion, to VPNA; <u>provided</u>, that in no event shall Philidor submit a product order for an amount of Designated Valeant Products in excess of the amount of Designated Valeant Products shipped by Philidor and its Network Pharmacies pursuant to Section 2.4(a) during the two-week period immediately preceding the delivery of such product order.  VPNA shall evaluate the product order and supporting documentation and may, in its sole discretion, accept the product order or modify the product order.  Once accepted, if and as modified by VPNA, VPNA shall use commercially reasonable efforts to ship all product orders in full without cost to Philidor.

(ii)   *Title and Risk of Loss*.  Designated Valeant Product ordered by Philidor pursuant to Section 2.4(d)(i) shall be held by Philidor on a consignment basis and title and risk of loss shall pass to Philidor at the time of shipment to the Consumer.

(iii)   *Damaged Product*.  If Designated Valeant Product ordered pursuant to Section 2.4(d)(i) is damaged, VPNA shall replace the Designated Valeant Product and Philidor shall return such Designated Valeant Product to VPNA.

(iv)   *Adverse Drug Experience*.  During the Transition Period, if Philidor is notified by any third party of an Adverse Drug Experience concerning any Product, Philidor shall report information concerning such Adverse Drug Experience directly to VPNA within 24 hours of notification thereof using VPNA's customer service number at (877) 361-2719 and shall immediately provide such third party such number.  Without limiting the foregoing, Philidor shall promptly (A) notify VPNA of any customer complaints concerning the Designated Valeant Products and (B) forward to VPNA copies of any written communication received or prepared by, from or to (as applicable) any Governmental Entity regarding any Adverse Drug Experiences or complaints from any third party, in each case, relating to a Designated Valeant Product, including any Governmental Entity.

(e)   <u>Staffing</u>.  Philidor shall use commercially reasonable efforts to employ sufficient staff throughout the Transition Period to enable Philidor to orderly and timely complete the Transition and to perform the services associated with the Windup.  All such staff

LA_LAN01:287031.12

Confidential Treatment Requested by Philidor   AGING-000201

shall be trained with respect to the transition services to be provided and carefully scripted with all communications as contemplated hereby. Philidor shall provide the Valeant Parties with information as to the number of employees performing the functions required hereunder by function area and provide weekly updates with regard to any change in the level of service.

(f)    <u>Call Center</u>.    Philidor shall use commercially reasonable efforts to maintain a call center throughout the Transition Period that is sufficiently staffed to enable it to (i) provide any patient outreach services required pursuant to this Section 2.4 and (ii) provide appropriate services for physicians and patients by addressing inquiries related to the transition of services from Philidor consistent with instructions provided by the Valeant Parties. Philidor shall periodically update the Valeant Parties on the number of calls being made per day and the number of patients reached, as well as information regarding any inquiries to which Philidor has not responded.

(g)    <u>Updates</u>.    Philidor shall keep records, and shall update the Valeant Parties on a weekly basis (including by participating in weekly telephone calls if requested by the Valeant Parties), with respect to the number of prescriptions transferred to local pharmacies and to specialty pharmacies in connection with the provision of interim services under this Section 2.4. All such weekly updates shall be directed to the individuals identified in Section 2.4(h).

(h)    <u>Valeant Party Contact</u>.    All questions regarding Philidor's obligations hereunder shall be directed to Tanya Carro ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮) or Deb Jorn ▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

2.5    <u>Cooperation</u>.

(a)    <u>Access</u>.

(i)    The Philidor Parties shall (A) consistent with their legal obligations, cooperate with any Governmental Entity and comply with or respond to any subpoena or other Legal Proceeding initiated by any Governmental Entity and (B) transfer electronic copies of all Information, to a third party vendor selected by VPII (and reasonably acceptable to Philidor) (the "<u>Vendor</u>") who shall electronically host the Information and provide the Valeant Parties, including the Committee and their respective Representatives, with access, at all times, to the Information. Philidor shall enter into a contract with the Vendor that complies with the requirements for a business associate contract set forth in 45 C.F.R. §§ 164.314(a) and 164.504(e) and that instructs the Vendor, with any commercially reasonable support, approval or cooperation from the Philidor Parties (A) to electronically host the Information, (B) to provide any Valeant Party and/or the Committee with access to such portions of the Information as such Valeant Party may request, provided that an individual's name, postal address (including city, county or full zip code), email address, URL, IP address, telephone number, fax number, social security number, driver's license number, vehicle identification number, date of birth, other dates related directly to the individual, medical record numbers, health plan beneficiary numbers, any other unique identifying numbers, device identifiers and serial numbers, full face photographs or any other personal identifiers (the "<u>Identifiers</u>") shall first be removed and (C) in the event that a Valeant Party requests access to

-9-

LA_LAN01:287031.12

Information containing one or more of the Identifiers, to cooperate in good faith with the Valeant Party to provide as much of the requested Information as possible while meeting the de-identification specifications set forth in 45 C.F.R. § 164.514(b)(1). The Philidor Parties shall use commercially reasonable efforts to provide the Valeant Parties with access to Information as promptly as reasonably practicable.

   (ii)  The Valeant Parties and the Committee may use the Information only with respect to any inquiries or investigations of any Governmental Entity, the Committee's review or similar matters or other Legal Proceedings relating to the Valeant Parties' business relationship with Philidor and its Network Pharmacies (the "Purpose").

   (iii)  Additionally, at reasonable times and upon reasonable notice, Philidor shall use good faith efforts to provide the Valeant Parties, the Committee and their respective Representatives reasonable access to the officers and personnel of Philidor. The Parties shall, and shall cause their Representatives to, comply with all Laws applicable to the Information.

   (b)  Philidor Confidential Information. Each of the Valeant Parties and the Committee shall retain in confidence and refrain from disclosing to any third party (other than their and their Affiliates' respective Representatives) any and all Confidential Information, except for disclosures of Confidential Information in connection with the Purpose. In the event that any Valeant Party, the Committee, or any member of the Committee (a "Receiving Party") is requested or required (by oral questions, interrogatories, requests for information or documents in legal proceedings, subpoena, investigative demand or other similar process or other requirement of Law) to disclose any Confidential Information for a reason other than the Purpose, the Receiving Party shall, to the extent permitted by Law, provide Philidor with prompt notice of any such request or requirement so that Philidor may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Termination Agreement. Except to the extent required by Law, in connection with any Legal Proceeding initiated by a Governmental Entity or in connection with the Purpose, none of the Valeant Parties, the Committee or any member of the Committee shall make any public disclosure regarding Philidor, its members, operations or business practices; provided, that the foregoing shall not apply to any such public disclosures that (i) relate to the conduct of any of the Valeant Parties or their employees or actions being taken by the Valeant Parties or (ii) are based on information that (A) does not constitute Confidential Information or (B) is described in subclauses (i) through (v) of the following sentence. The foregoing restrictions shall not apply to Confidential Information that (i) is or becomes public knowledge through no fault of the Receiving Party or its Representatives, (ii) is lawfully made available to a Receiving Party by an independent third party who, to the knowledge of the Receiving Party, did not receive such information directly or indirectly from Philidor, (iii) is already in the Receiving Party's possession at the time of initial receipt from Philidor, and such possession can be properly demonstrated by the Receiving Party's records prior to receipt of the Confidential Information from Philidor, (iv) is independently developed or known by the Receiving Party or its Representatives without the use of or reliance upon the Confidential Information (or information derived therefrom) or (v) is developed by a Valeant Party in connection with or through any Legal Proceeding and for which a court has denied confidential treatment. Nothing herein shall be intended to restrict the ability of the Valeant Parties to make any disclosures required under applicable securities Laws or to

LA_LAN01:287031.12

Confidential Treatment Requested by Philidor

AGING-000203

securities exchanges or regulators or to defend themselves or prosecute any of their positions in any Legal Proceedings to the extent such Legal Proceeding relates to or arises out of the Valeant Parties' business relationship with Philidor and its Network Pharmacies.

       (c)    <u>Valeant Confidential Information</u>.  Philidor shall, and shall cause its Affiliates and Representatives to, retain in confidence and refrain from disclosing to any third party (other than their and their Affiliates' respective Representatives) any confidential or proprietary information involving or relating to the Valeant Parties ("<u>Valeant Confidential Information</u>").  In the event that any Philidor Party is requested or required (by oral questions, interrogatories, requests for information or documents in legal proceedings, subpoena, investigative demand or other similar process or other requirement of Law) to disclose any Valeant Confidential Information, such Philidor Party shall, to the extent permitted by Law, provide VPII with prompt notice of any such request or requirement so that VPII may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Termination Agreement.  Except to the extent required by Law or in connection with any Legal Proceeding initiated by a Governmental Entity, no Philidor Party shall make any public disclosure regarding the Valeant Parties, their operations or their business practices; <u>provided</u>, that the foregoing shall not apply to any such public disclosures that (i) relate to the conduct of any of the Philidor Parties or their employees or actions being taken by the Philidor Parties or (ii) are based on information that (A) does not constitute Confidential Information or (B) is described in subclauses (i) through (v) of the following sentence.  The foregoing restrictions shall not apply to Valeant Confidential Information that (i) is or becomes public knowledge through no fault of a Philidor Party or its Representatives, (ii) is lawfully made available to a Philidor Party by an independent third party who, to the knowledge of the Philidor Party, did not receive such information directly or indirectly from a Valeant Party, (iii) is already in the Philidor Party's possession at the time of initial receipt from a Valeant Party, and such possession can be properly demonstrated by the Philidor Party's records prior to receipt of the Valeant Confidential Information from a Valeant Party, (iv) is independently developed or known by the Philidor Party or its Representatives without the use of or reliance upon the Valeant Confidential Information (or information derived therefrom) or (v) is developed by a Philidor Party in connection with or through any Legal Proceeding and for which a court has denied confidential treatment.  Nothing herein shall be intended to restrict the ability of the Philidor Parties to regulators or to defend themselves or prosecute any of their positions in any Legal Proceedings to the extent such Legal Proceeding relates to or arises out of the Philidor Parties' business relationship with the Valeant Parties.

       2.6    <u>Publicity</u>.  Nothing herein shall prohibit either a Valeant Party or a Philidor Party from making truthful statements to the extent required by applicable Law, or otherwise permitted hereunder, in connection with any Legal Proceeding or in response to any question, inquiry or request, including in response to legal process or a government investigation or inquiry.

       2.7    <u>Confidentiality</u>.  The Parties shall not disclose any of the terms of this Termination Agreement to any Person other than such Party's officers, directors, members, accountants, advisors and attorneys without the prior written consent of the other Parties. Notwithstanding the foregoing, any Party may make any disclosure necessary to respond to any Legal Proceeding initiated by a Governmental Entity, or as required by applicable Law, and VPII

LA_LAN01:287031.12

Confidential Treatment Requested by Philidor          AGING-000204

may issue a press release with respect to, or otherwise publicly disclosing, the general terms of the termination of the Parties' relationship and the details with respect to the services to be provided during the Transition Period.

## ARTICLE III
## REPRESENTATIONS, WARRANTIES AND COVENANTS

3.1     <u>Representations, Warranties and Certain Covenants of the Philidor Parties</u>. Each of Philidor and each of the Terminating Members on behalf of the Members represents, warrants and covenants that:

(a)     <u>Authority</u>.  The execution, delivery and performance by such Philidor Party of this Termination Agreement, the consummation of the transactions contemplated hereby and the performance of its obligations hereunder are within the power and authority of such Philidor Party and have been duly authorized by all necessary action on the part of such Philidor Party.  This Termination Agreement (i) has been duly executed and delivered by such Philidor Party and (ii) is a legal, valid and binding obligation of such Philidor Party, enforceable against such Philidor Party in accordance with its terms.

(b)     <u>Non-Contravention</u>.  Neither the execution, delivery and performance by such Philidor Party of this Termination Agreement, the consummation of the transactions contemplated hereby nor the performance of its obligations hereunder will, directly or indirectly (with or without notice or lapse of time):

(i)     violate any Law applicable to such Philidor Party, give any Governmental Entity the right to challenge the transactions contemplated hereby or give any Governmental Entity the right to revoke, withdraw, suspend, cancel, terminate or modify any Permit required by such Philidor Party to fulfill its obligations under this Termination Agreement;

(ii)     result in a breach, violation or default under any contractual obligation of such Philidor Party;

(iii)     require any action by (including any authorization, consent, exemption or Approval) or in respect of (including notice to), any Person under any contractual obligation of such Philidor Party; or

(iv)     result in a breach, violation or default under the organizational documents, if any, of such Philidor Party.

(c)     <u>Compliance with Law</u>.  All of the services, obligations and activities provided hereunder to be performed by any Philidor Party shall be performed in accordance with all applicable Law and, without limiting the foregoing, in a competent, courteous, timely and professional manner.

LA_LAN01:287031.12

Confidential Treatment Requested by Philidor                                                      AGING-000205

(d)      Permits.  Philidor now has and shall use commercially reasonable efforts to maintain in full force during the Transition Period all Permits required by Philidor to fulfill its obligations under this Termination Agreement.

(e)      Handling of Products.  Philidor shall at all times handle, maintain, store, transport and otherwise manage and distribute the Designated Valeant Products in accordance with their applicable handling and storage requirements, including as set forth in the applicable Designated Valeant Product specifications, and in accordance with industry codes of conduct and applicable Law.  Philidor shall ensure that Designated Valeant Product sold and distributed by it includes all information and material as received by Philidor from a Valeant Party, including packaging, labeling, information sheets and product instructions, and shall not alter, remove or tamper with any such information and material.

(f)      Change in Regulatory Status.  Philidor shall advise the Valeant Parties promptly of any (i) change in status with the FDA, pharmacy licensing boards and other pertinent Governmental Entities and any Third-Party Payors, (ii) registration number assigned to Philidor by the DEA or (iii) any denial, revocation, termination or suspension of registration by the DEA, pharmacy licensing board or similar Governmental Entities that may govern Philidor's ability to legally do business.  Philidor shall notify the Valeant Parties within two Business Days of any suspension, revocation, termination, condition, limitation, qualification or other restriction on any Permit that would impede Philidor in the performance of its obligations hereunder.  Evidence of such Permits shall be submitted to the Valeant parties upon reasonable written request.

3.2      Representations, Warranties and Certain Covenants of the Valeant Parties.  Each of VPII, KGA and VPNA represents, warrants and covenants that:

(a)      Authorization.  The execution, delivery and performance by such Valeant Party of this Termination Agreement, the consummation of the transactions contemplated hereby and the performance of its obligations hereunder are within the power and authority of such Valeant Party and have been duly authorized by all necessary action on the part of such Valeant Party.  This Termination Agreement (i) has been duly executed and delivered by such Valeant Party and (ii) is a legal, valid and binding obligation of such Valeant Party, enforceable against such Valeant Party in accordance with its terms.

(b)      Non-Contravention.  Neither the execution, delivery and performance by such Valeant Party of this Termination Agreement, the consummation of the transactions contemplated hereby nor  the performance of its obligations hereunder will, directly or indirectly (with or without notice or lapse of time):

(i)      violate any Law applicable to such Valeant Party, give any Governmental Entity the right to challenge the transactions contemplated hereby or give any Governmental Entity the right to revoke, withdraw, suspend, cancel, terminate or modify any Permit required by such Valeant Party to fulfill its obligations under this Termination Agreement;

LA_LAN01:287031.12

Confidential Treatment Requested by Philidor                                          AGING-000206

(ii)     result in a breach, violation or default under any contractual obligation of such Valeant Party;

(iii)     require any action by (including any authorization, consent, exemption or Approval) or in respect of (including notice to), any Person under any contractual obligation of such Valeant Party; or

(iv)     result in a breach, violation or default under the organizational documents of such Valeant Party.

(c)     <u>Compliance with Law</u>.  All obligations and activities provided hereunder to be performed by any Valeant Party shall be performed in accordance with all applicable Law and, without limiting the foregoing, in a competent, courteous, timely and professional manner.

(d)     <u>Product Quality</u>.  As of the date of shipment to Philidor, any Designated Valeant Product shipped to Philidor pursuant to Section 2.4(d) shall (i) be free from defect in design, material and workmanship, (ii) be fit for the ordinary purpose for which such Product is made and (iii) not infringe upon the patents or trademarks of any third party.

## ARTICLE IV
## INDEMNIFICATION

4.1     <u>Indemnification by the Valeant Parties</u>.  VPII, VPNA and KGA shall, each severally with regard to its obligations, indemnify, defend and hold harmless the Philidor Parties (the "<u>Philidor Indemnified Persons</u>"), from, against and in respect of any and all claims, demands, causes of action, losses, judgments, damages, costs and expenses (including reasonable attorneys' fees) (collectively, "<u>Losses</u>") that the Philidor Indemnified Persons, or any of them, may suffer as a result of any breach by any Valeant Party of any of its representations, warranties, covenants or agreements contained in this Termination Agreement.

4.2     <u>Indemnification by Philidor</u>.  Philidor shall indemnify, defend and hold harmless the Valeant Parties (the "<u>Valeant Indemnified Persons</u>") from, against and in respect of any and all Losses that the Valeant Indemnified Persons, or any of them, may suffer as a result of any breach by any Philidor Party of any of its representations, warranties, covenants or agreements contained in this Termination Agreement.

4.3     <u>Notice of Claim; Cooperation</u>.  If any Philidor Indemnified Person or Valeant Indemnified Person (each, an "<u>Indemnified Person</u>") has suffered or incurred any Loss for which an indemnification claim may be asserted pursuant to this Article 4 or any third party notifies an Indemnified Person with respect to any matter which may give rise to an indemnification claim under this Article 4, then the Indemnified Person shall promptly give written notice of the claim to the Indemnifying Person; <u>provided</u>, that no delay on the part of the Indemnified Person shall relieve the Indemnifying Person of any obligation under this Article 4, except to the extent that such delay actually and materially prejudices the Indemnifying Person. The Indemnified Person shall cooperate with the Indemnifying Person, at the Indemnifying Party's expense, in its defense of any claim for which indemnification is sought hereunder.

-14-

Confidential Treatment Requested by Philidor

# ARTICLE V
# GENERAL PROVISIONS

5.1     <u>Definitions</u>.  The following terms have the respective meanings given to them below:

"<u>Active Members</u>" shall have the meaning set forth in the Recitals.

"<u>Active Members' Noncompetition Agreement</u>" shall have the meaning set forth in the Recitals.

"<u>Adverse Drug Experience</u>" shall have the meaning set forth in 21 C.F.R. § 314.80 and/or 21 C.F.R. § 600.80, as applicable, or any replacements thereto.

"<u>Affiliate</u>" means, with respect to an entity, any other entity controlling, controlled by or under common control with such entity and, with respect to Philidor only, its employees and the Members; <u>provided</u>, <u>however</u>, that for the purposes of this Termination Agreement (i) none of Philidor or any of its affiliated pharmacies or its members, officers or employees shall be deemed to be an Affiliate of VPII or any of its subsidiaries and (ii) no Valeant Party shall be deemed to be an Affiliate of Philidor or any of its affiliated pharmacies or its members, officers or employees.  For purposes of this definition, the term "control," including the correlative terms "controlling," "controlled by" and "under common control with," means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of an entity, whether through ownership of voting securities, by contract or otherwise.

"<u>Alternative Pharmacy</u>" shall have the meaning set forth in Section 2.4(c).

"<u>Approval</u>" means any authorization, approval, consent, ratification, or any extension, modification, amendment or waiver of any of the foregoing.

"<u>Bank Account</u>" shall have the meaning set forth in Section 2.2(c)(ii).

"<u>Business Day</u>" means a day (i) other than Saturday or Sunday and (ii) on which commercial banks are open for business in New York City or Pennsylvania.

"<u>Cash-Pay Change Notice</u>" shall have the meaning set forth in Section 2.4(a)(iii).

"<u>Cash-Pay Option</u>" shall have the meaning set forth in Section 2.4(a)(iii).

"<u>Committee</u>" means the ad hoc committee of the board of directors of VPII established to review allegations related to the Valeant Parties' business relationship with Philidor.

"<u>Confidential Information</u>" means all Information, together with all copies, summaries, notes, analyses and or studies thereof or pertaining thereto, or derived therefrom, whether written, oral, visual, or otherwise, or recorded in electronic or other format and on whatever media.

LA_LAN01:287031.12

Confidential Treatment Requested by Philidor                    AGING-000208

"Confidentiality Agreement" shall have the meaning set forth in the Recitals.

"Consulting Agreement" shall have the meaning set forth in the Recitals.

"Consumer" means an individual to whom Philidor dispenses, directly or indirectly, one or more Designated Valeant Products.

"Contract Pharmacies" means those pharmacies with which Philidor or an Affiliate of Philidor has a contractual relationship as of the Termination Date regarding the processing of prescriptions, dispensing of medications or provision of administrative services.

"Davenport" shall have the meaning set forth in the Preamble.

"Davenport Trust" shall have the meaning set forth in the Preamble.

"DEA" means the United States Drug Enforcement Administration.

"Designated Valeant Product" means all promoted dermatology products of a Valeant Party, Aplenzin® and Wellbutrin XL®.

"Distribution Agreement" shall have the meaning set forth in the Recitals.

"Effective Date" shall have the meaning set forth in the Preamble.

"End Game" shall have the meaning set forth in the Preamble.

"Equity Interests" shall have the meaning set forth in the Recitals.

"Excess Funds" shall have the meaning set forth in Section 2.2(c)(i).

"FDA" means the United States Food and Drug Administration.

"GAAP" means United States generally accepted accounting principles, applied consistently, as in effect from time to time.

"Governmental Entity" means any domestic or foreign governmental or regulatory authority, agency, commission, body, court or other legislative, executive or judicial governmental entity.

"Government-Sponsored Healthcare Program" means any plan or program providing healthcare benefits, whether directly through insurance or otherwise, that is funded directly, in whole or part, by a Governmental Entity, whether pursuant to one or more contracts with the applicable Governmental Entity or otherwise, including Medicare, Medicaid, TRICARE and the Program of All-Inclusive Care for the Elderly.

"HIPAA" means the Health Insurance Portability and Accountability Act of 1996, as the same may be amended, supplemented or otherwise modified from time to time.

"Identifiers" shall have the meaning set forth in Section 2.5(a)(i).

LA_LAN01:287031.12

Confidential Treatment Requested by Philidor                                    AGING-000209

"Indemnified Person" shall have the meaning set forth in Section 4.3.

"Indemnifying Person" means, with respect to any indemnification claim brought pursuant to Section 4.1, VPII, VPNA and KGA, and with respect any indemnification claim brought pursuant to Section 4.2, Philidor.

"Information" means all data, emails, documents, records (including financial and tax records), contracts, operating data and other records, which is not privileged from disclosure, in whatever form, related to Philidor's operations, including the operations of its Network Pharmacies.

"KGA" shall have the meaning set forth in the Preamble.

"Law" means all applicable federal, state, foreign, local, municipal or other laws, statutes, constitutions, legislation, principles of common law, resolutions, ordinances, codes, edicts, decrees, rules, directives, licenses, permits, regulations, rulings or requirements issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Entity.

"Legal Proceeding" means any governmental claim, counterclaim, proceeding, suit, hearing, litigation, investigation or inquiry, in each case whether civil, criminal, administrative or judicial, or any appeal therefrom.

"Losses" shall have the meaning set forth in Section 4.1.

"Medicaid" means, collectively, any state-operated means-tested program under Title XIX of the Social Security Act of 1965 that provides federal grants to states for medical assistance based on specific eligibility criteria and any statutes succeeding thereto, and all Laws pertaining to such programs, in each case as the same may be amended, supplemented or otherwise modified from time to time.

"Medicare" means, collectively, the health insurance program for the aged and disabled established by Title XVIII of the Social Security Act of 1965 and any statutes succeeding thereto, and all Laws pertaining to such program, in each case as the same may be amended, supplemented or otherwise modified from time to time.

"Members" shall have the meaning set forth in the Recitals.

"Milestone Payment" shall have the meaning set forth in the Option Agreement.

"Monitor" shall have the meaning set forth in Section 2.2(d).

"Mutual Release Agreements" shall have the meaning set forth in the Recitals.

"Net Sales Milestone Payment" shall have the meaning set forth in the Option Agreement.

LA_LAN01:287031.12

Confidential Treatment Requested by Philidor

AGING-000210

"<u>Network Pharmacies</u>" means (i) all specialty pharmacies owned by Philidor or that are Affiliates of Philidor or which Philidor or any of its Affiliates has a contractual right to acquire, and (ii) all Contract Pharmacies, including R&O Pharmacy, Inc., Isolani, LLC, Brighton Way Pharmacy, Inc. d/b/a West Wilshire Pharmacy, Lucena, LLC, RAAS Pharmacy, Inc., MRM Holdings, LLC, Safe Rx Raas Pharmacy, Prescription Shop Pharmacy, D&A Pharmacy and Orbit Pharmacy.

"<u>Noncompetition Agreements</u>" shall have the meaning set forth in the Recitals.

"<u>Option Agreement</u>" shall have the meaning set forth in the Recitals.

"<u>Party</u>" and "<u>Parties</u>" shall have the meaning set forth in the Preamble.

"<u>Passive Members</u>" shall have the meaning set forth in the Recitals.

"<u>Passive Members' Noncompetition Agreement</u>" shall have the meaning set forth in the Recitals.

"<u>Permits</u>" means, with respect to any Person, any Approval, bond, certificate of authority, certificate of need, accreditation, qualification, provider number, license, franchise, permit, order, registration, variance, consent, approval, right, privilege, certificate or other similar authorization issued by, or otherwise granted by, any Governmental Entity or any other Person to which or by which such Person is subject or bound or to which or by which any property, business, operation or right of such Person is subject or bound, including pharmacy licenses issued by state boards of pharmacy.

"<u>Person</u>" means any individual or corporation, association, partnership, limited liability company, joint venture, joint stock or other company, business trust, trust, organization, Governmental Entity or other entity of any kind.

"<u>Philidor</u>" shall have the meaning set forth in the Preamble.

"<u>Philidor Cash-on-Hand</u>" means the greater of (i) $35,547,282.95 or (ii) the amount of Philidor's aggregate cash or cash equivalents (including bank account balances and deposits received but not yet recorded and marketable securities), as determined in accordance with GAAP, less the amount of Philidor's trade accounts payable (not including the amount of any accounts payable to VPNA), each as of October 31, 2015, as the Monitor may determine in accordance with its auditing of Philidor pursuant to Section 2.2(d).

"<u>Philidor Indemnified Persons</u>" shall have the meaning set forth in Section 4.1.

"<u>Philidor Parties</u>" shall have the meaning set forth in the Preamble.

"<u>Products</u>" shall have the meaning set forth in the Recitals.

"<u>Purchase Option Consideration</u>" shall have the meaning set forth in the Option Agreement.

-18-

Confidential Treatment Requested by Philidor                    AGING-000211

"Purpose" shall have the meaning set forth in Section 2.5(a)(ii).

"Receiving Party" shall have the meaning set forth in Section 2.5(b).

"Records" shall have the meaning set forth in Section 2.4(c).

"Representatives" means, with respect to a Party, such Party's directors, officers, employees, representatives, agents, legal and financial advisors and auditors.

"Requisite Members" shall have the meaning set forth in the Option Agreement.

"Retained Cash Amount"



"Terminated Agreements" shall have the meaning set forth in the Recitals.

"Terminating Members" shall have the meaning set forth in the Recitals.

"Termination Agreement" shall have the meaning set forth in the Preamble.

"Termination Date" shall have the meaning set forth in Section 1.1.

"Term Sheet" shall have the meaning set forth in the Recitals.

"Third-Party Payor" means any entity responsible for the payment of health care claims for services provided to covered persons or enrollees, including Medicare, Medicaid, TRICARE or any other Governmental Entity or quasi-public agency, private commercial insurance companies, self-insured plans and any managed care plans and organizations such as health maintenance organizations and preferred provider organizations.

"Tranche 1 Milestone Event" shall have the meaning set forth in the Option Agreement.

"Transition" shall have the meaning set forth in Section 2.4(c).

"Transition Notice" shall have the meaning set forth in Section 2.4(c)(i).

"Transition Period" means the period from November 1, 2015 through and including January 30, 2016.

"TRICARE" means the program of medical benefits covering former and active members of the U.S. uniformed services and certain of their dependents administered pursuant to 10 United States Code Section 1071 et seq., Sections 1320a-7 and 1320a-7a of Title 42 of the

-19-

Confidential Treatment Requested by Philidor

United States Code and any statutes succeeding thereto, and all Laws pertaining to such program, in each case as the same may be amended, supplemented or otherwise modified from time to time.

"Valeant Confidential Information" shall have the meaning set forth in Section 2.5(c).

"Valeant Indemnified Persons" shall have the meaning set forth in Section 4.2.

"Valeant Parties" shall have the meaning set forth in the Preamble.

"Vendor" shall have the meaning set forth in Section 2.5(a)(i).

"VPII" shall have the meaning set forth in the Preamble.

"VPII Guarantee" shall have the meaning set forth in the Recitals.

"VPNA" shall have the meaning set forth in the Preamble.

"Windup" shall have the meaning set forth in Section 2.1.

"Windup Expenses" shall have the meaning set forth in Section 2.2(a).

5.2     Amendment.  This Termination Agreement may not be amended except by an instrument in writing signed by all of the Parties.

5.3     Waiver.  No waiver of any provision of this Termination Agreement shall be valid unless set forth in an instrument in writing signed by the Party or Parties to be bound thereby.   No waiver or failure to insist on strict compliance with any provision of this Termination Agreement shall operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

5.4     Fees and Expenses.  All expenses incurred by the Parties shall be borne solely and entirely by the Party which has incurred the same.

5.5     Notices.  Any notices or other communications required or permitted under, or otherwise given in connection with, this Termination Agreement shall be in writing and shall be deemed to have been duly given (i) when delivered or sent if delivered in person or sent by facsimile transmission (provided confirmation of facsimile transmission is obtained), (ii) on the third Business Day after dispatch by registered or certified mail, (iii) on the next Business Day if transmitted by national overnight courier or (iv) on the date delivered if sent by email (provided confirmation of email receipt is obtained), in each case as follows:

LA_LAN01:287031.12

Confidential Treatment Requested by Philidor                                    AGING-000213

If to a Valeant Party, addressed to it at:

    c/o Valeant Pharmaceuticals International, Inc.

    ████████████████████████
    █████████████████
    Tel:  (███████████
    Fax:  █████████
    Attention:  General Counsel
    Email:  robert.chaionn███████████

with a copy to (for information purposes only):

    Sullivan & Cromwell LLP

    ███████████████████████████
    ████████████████████
    Tel:  (███████████
    Fax:  ██████████
    Attention:  Alison S. Ressler, Esq.
    Email:  █████████████

If to a Philidor Party, addressed to it or him at:

    c/o Philidor Rx Services, LLC

    ███████████████████████
    ███████████████████████
    Tel:  (███████████
    Fax:  █████████
    Attention:  Chief Executive Officer
    Email:  adavenport██████████████

with a copy to (for information purposes only):

    Duane Morris LLP

    ████████████████
    ███████████████████████
    Tel:  █████████
    Fax:  █████████
    Attention:  David C. Toner, Esq.
    Email:  toner████████████

     5.6    <u>Headings</u>.  The headings contained in this Termination Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Termination Agreement.

     5.7    <u>Severability</u>.  If any term or other provision (or part thereof) of this Termination Agreement is invalid, illegal or incapable of being enforced by any rule of law or

LA_LAN01:287031.12

Confidential Treatment Requested by Philidor

public policy, all other conditions and provisions (or parts thereof) of this Termination Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision (or part thereof) is invalid, illegal or incapable of being enforced, the Parties shall modify this Termination Agreement, including restructuring the transactions contemplated hereby, so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

5.8     Entire Agreement.  This Termination Agreement and the Mutual Release Agreements constitute the entire agreement of the Parties and supersede all prior agreements and undertakings, both written and oral, among the Parties, or any of them, with respect to the subject matter of this Termination Agreement, including the Term Sheet.

5.9     Assignment.  This Termination Agreement shall not be assigned by any Party by operation of law or otherwise without the prior written consent of the other Parties.

5.10    No Third-Party Beneficiaries.  Nothing in this Termination Agreement, express or implied, is intended to or shall confer upon any Person (other than the Parties) any right, benefit or remedy of any nature whatsoever under or by reason of this Termination Agreement.

5.11    Mutual Drafting; Interpretation.   Each Party has participated in the drafting of this Termination Agreement, which each Party acknowledges is the result of extensive negotiations between the Parties.  If an ambiguity or question of intent or interpretation arises, this Termination Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision.  As used in this Termination Agreement, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, but rather shall be deemed to be followed by the words "without limitation." Except as otherwise indicated, all references in this Termination Agreement to "Articles," "Sections" or "Exhibits" are intended to refer to Articles, Sections or Exhibits of this Termination Agreement.  All references in this Termination Agreement to "$" are intended to refer to U.S. dollars.  Unless otherwise specifically provided for herein, the term "or" shall not be deemed to be exclusive.  The terms "hereof," "herein," "hereto," "hereunder" and derivative or similar words refer to this entire Termination Agreement.

5.12    Governing Law; Consent to Jurisdiction; Waiver of Trial by Jury.

(a)     This Termination Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to laws that may be applicable under conflicts of laws principles (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

(b)     In connection with any controversy arising out of or related to this Termination Agreement, the Parties hereby irrevocably consent to the jurisdiction of the United

-22-

Confidential Treatment Requested by Philidor                                          AGING-000215

States District Court for the Southern District of New York, if a basis for federal court jurisdiction is present, and otherwise, in the state courts of the State of New York located in the Borough of Manhattan. Each of the Parties irrevocably consents to service of process out of the aforementioned courts and waives any objection which it may now or hereafter have to the laying of venue of any action or proceeding arising out of or in connection with this Termination Agreement brought in the aforementioned courts and hereby further irrevocably waives and agrees not to plead or claim in such courts that any such action or proceeding brought in such courts has been bought in an inconvenient forum.

(c)     EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS TERMINATION AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS TERMINATION AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE EITHER OF SUCH WAIVERS, (II) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVERS, (III) IT MAKES SUCH WAIVERS VOLUNTARILY AND (IV) IT HAS BEEN INDUCED TO ENTER INTO THIS TERMINATION AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 5.12(c).

5.13     Counterparts.  This Termination Agreement may be executed in one or more counterparts, and by the different Parties in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Termination Agreement by facsimile transmission or by e-mail of a .pdf attachment shall be effective as delivery of a manually executed counterpart of this Termination Agreement.

5.14     Specific Performance.  The Parties agree that irreparable damage would occur in the event that any of the provisions of this Termination Agreement were not performed in accordance with their specific terms or were otherwise breached or threatened to be breached. It is accordingly agreed that the Parties shall be entitled (without proof of actual damages or otherwise or posting or securing any bond) to an injunction or injunctions to prevent breaches of this Termination Agreement and to enforce specifically the terms and provisions of this Termination Agreement, these being in addition to any other remedy to which they are entitled at law or in equity.  The Parties further agree not to assert that a remedy of specific performance is unenforceable, invalid, contrary to law or inequitable for any reason, nor to assert that a remedy of monetary damages would provide adequate remedy.  Each of the Parties acknowledges and agrees that the right to specific performance and the other relief contemplated herein is an integral part of the transactions contemplated by this Termination Agreement and without such right, none of the Parties would have entered into this Termination Agreement.

-23-

Confidential Treatment Requested by Philidor                                                     AGING-000216

5.15    Further Assurances.  From time to time after the date hereof, at the request of another Party, without further consideration and at the expense of the Party so requesting, each of the Parties shall execute and deliver to such requesting Party, such additional instruments or documents, and shall take or cause to be taken such other action, as such requesting Party may reasonably request in order to consummate more effectively the transactions contemplated hereby, accomplish the purposes hereof or assure to any other Party the benefits hereof.

*[Signature Page Follows]*

LA_LAN01:287031.12

Confidential Treatment Requested by Philidor                AGING-000217

IN WITNESS WHEREOF, the Parties have caused this Termination Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**VALEANT PHARMACEUTICALS INTERNATIONAL, INC.**

By: _____

    Name:   Howard Schiller

    Title:   Interim CEO

**VALEANT PHARMACEUTICALS NORTH AMERICA LLC**

By: _____

    Name:   Howard Schiller

    Title:   Interim CEO

**KGA FULFILLMENT SERVICES, INC.**

By: _____

    Name:   Robert Rosiello

    Title:   EVP, CFO

[Signature Page to Termination Agreement]

Confidential Treatment Requested by Philidor

IN WITNESS WHEREOF, the Parties have caused this Termination Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**PHILIDOR RX SERVICES, LLC**

By: _____
    Name:  Andrew J. Davenport
    Title:   Chief Executive Officer

**END GAME, LP**

By: _____
    Name:  Andrew J. Davenport
    Title:   General Partner

**THE ANDREW J. DAVENPORT**
**   IRREVOCABLE TRUST**

By: _____
    Name:  Matthew S. Davenport
    Title:   Trustee

**MATTHEW S. DAVENPORT**

_____

**ANDREW J. DAVENPORT**

_____

[Signature Page to Termination Agreement]

Confidential Treatment Requested by Philidor