# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

In re VALEANT PHARMACEUTICALS
INTERNATIONAL, INC. SECURITIES
LITIGATION

_____

This Document Relates To:

ALL ACTIONS.

Master File No. 3:15-cv-7658-
MAS-LHG

**ORAL ARGUMENT
REQUESTED**

## BANK OFFERING DEFENDANTS'
## BRIEF IN SUPPORT OF MOTION TO DISMISS
## THE CONSOLIDATED COMPLAINT

Mark A. Berman, Esq.
Robin D. Fineman, Esq.
**HARTMANN DOHERTY ROSA
BERMAN & BULBULIA, LLC**
65 Route 4 East
River Edge, NJ 07661
Telephone: (201) 441-9056

Richard A. Rosen, Esq. (*pro hac
vice*)
**PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000

*Attorneys for the Bank Offering
Defendants*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................1

FACTUAL BACKGROUND ......................................................................2

    The Note Offerings..............................................................................3

    The Secondary Offering of Common Stock...........................................5

ARGUMENT ...........................................................................................7

I.   The Securities Act Does Not Apply to the Note Offerings .............................7

II.  Even If the Securities Act Applied to the Note Offerings, TIAA-CREF Has Not Adequately Alleged That It Purchased Notes From an Identified Bank Offering Defendant, and Counts III Through VI Should Therefore Be Dismissed for Lack of Standing....................................................................16

III. The Section 11 and 12(a)(2) Claims Arising Out of the Stock Offering Fail Because the Complaint Does Not Adequately Allege That City of Tucson Has Standing to Sue, and Counts VII and VIII Should Therefore Be Dismissed ................................................................................................18

    A.   The Complaint Fails To Adequately Allege That City of Tucson Has Standing to Sue Under Section 11...........................................................18

    B.   The Complaint Fails to Adequately Allege That City of Tucson Has Standing to Sue Under Section 12(a)(2)..................................................23

CONCLUSION ......................................................................................25

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AAL High Yield Bond Fund* v. *Ruttenberg*,
   No. Civ. A. 00-C-1404-S, 2001 WL 34372980 (N.D. Ala. Sept. 30,
   2001) ....................................................................................................11

*In re Adams Golf, Inc. Sec. Litig.*,
   176 F. Supp. 2d 216 (D. Del. 2001), *rev'd in part on other
   grounds*, 381 F.3d 267 (3d Cir. 2004) ................................................16

*Am. High-Income Trust* v. *AlliedSignal*,
   329 F. Supp. 2d 534 (S.D.N.Y. 2004) ..........................................10, 11

*Ballay* v. *Legg Mason Wood Walker, Inc.*,
   925 F.2d 682 (3d Cir. 1991) ................................................................22

*Beaver Cnty. Employees' Ret. Fund* v. *Tile Shop Holdings, Inc.*,
   94 F. Supp. 3d 1035 (D. Minn. 2015)..................................................21

*Bell Atl. Corp.* v. *Twombly*,
   550 U.S. 544 (2007)..............................................................................20

*In re Century Aluminum Co. Sec. Litig.*,
   729 F.3d 1104 (9th Cir. 2013) ..................................................20, 21, 22

*In re Constar Int'l Inc. Sec. Litig.*,
   No. 03 Civ. 5020, 2008 WL 614551 (E.D. Pa. Mar. 4, 2008)......16, 18

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
   310 F. Supp. 2d 819 (S.D. Tex. 2004)..................................................11

*In re EveryWare Global, Inc. Sec. Litig.*,
   No. 2:14-CV-01838, 2016 WL 1242689 (S.D. Ohio Mar. 30, 2016) ...............21

*Finkelman* v. *NFL*,
   810 F.3d 187 (3d Cir. 2016) ................................................................22

*In re Fisker Auto. Holdings, Inc. S'holder Litig.*,
   Civ. No. 13-2100, 2015 WL 6039690 (D. Del. Oct. 15, 2015)....13, 14

*Gibbons* v. *Malone*,
    703 F.3d 595 (2d Cir. 2012) ...............................................................21

*Gotham Holdings, LP* v. *Health Grades, Inc.*,
    534 F. Supp. 2d 442 (S.D.N.Y. 2008) .................................................10

*Gustafson* v. *Alloyd Co.*,
    513 U.S. 561 (1995)..........................................................................7, 8

*In re Hayes Lemmerz Int'l, Inc. Equity Sec. Litig.*,
    271 F. Supp. 2d 1007 (E.D. Mich. 2003) ...........................................10

*In re Ikon Office Solutions, Inc. Sec. Litig.*,
    194 F.R.D. 166 (E.D. Pa. 2000)..........................................................23

*Johnson* v. *CBD Energy, Ltd.*,
    No. H-15-1668, 2016 U.S. Dist. LEXIS 87174 (S.D. Tex. Jul. 6,
    2016) ...............................................................................................20, 22

*Lewis* v. *Fresne*,
    252 F.3d 352 (5th Cir. 2001) ................................................................7

*Luminent Mortg. Capital, Inc.* v. *Merrill Lynch & Co.*,
    652 F. Supp. 2d 576 (E.D. Pa. 2009)...................................................23

*In re Measurement Specialties, Inc. Sec. Litig.*,
    No. 02 Civ. 1071, 2003 U.S. Dist. LEXIS 27904 (D.N.J. Sept. 29,
    2003) ...............................................................................................18, 22

*In re Merrill Lynch Auction Rate Sec. Litig.*,
    No. 09 MD 2030 Civ. 124, 2012 WL 1994707 (S.D.N.Y. June 4,
    2012), *aff'd sub nom. Iconix Brand Grp.* v. *Merrill Lynch, Pierce,
    Fenner & Smith Inc.*, 505 F. App'x 14 (2d Cir. 2012) ...........................9

*Morrison* v. *Nat'l Australia Bank Ltd.*,
    561 U.S. 247 (2010)............................................................................15

*NL Indus.* v. *Old Bridge Twp.*,
    No. 13-3493, 2014 U.S. Dist. LEXIS 90317 (D.N.J. June 30, 2014)
    (Shipp, J.) .............................................................................................3

*Polanco* v. *Omnicell, Inc.*,
    988 F. Supp. 2d 451 (D.N.J. 2013)..................................................16, 24

*In re Prestige Brands Holding, Inc.*,
No. 05 CV. 06924, 2006 WL 2147719 (S.D.N.Y. July 10, 2006) ....................23

*In re Refco, Inc. Sec. Litig.*,
503 F. Supp. 2d 611 (S.D.N.Y. 2007) ...............................................10, 11, 12, 13

*Swift* v. *Pandey*,
No. 13-650, 2013 U.S. Dist. LEXIS 162029 (D.N.J. Nov. 13,
2013) ...........................................................................................................4

*United States* v. *Georgia*,
777 F.3d 125 (3d Cir. 2015) ..............................................................15

*Winer Family Trust* v. *Queen*,
503 F.3d 319 (3d Cir. 2007) ..............................................................15

*In re WorldCom, Inc. Sec. Litig.*,
294 F. Supp. 2d 431 (S.D.N.Y. 2003), *vacated and remanded on
other grounds*, 496 F.3d 245 (2d Cir. 2007)......................................10

*Yung* v. *Lee*,
432 F.3d 142 (2d Cir. 2005) .............................................................7

## Statutes and Regulations

S.E.C. Rule 144A (17 C.F.R. § 230.144A)......................................................*passim*

Section 11 of the Securities Act of 1933 (15 U.S.C. § 77k) ..........................*passim*

Section 12(a)(2) of the Securities Act of 1933 (15 U.S.C. § 77*l*(a)(2)) ..........*passim*

## Other Authorities

53 Fed. Reg. 44,016 (Nov. 1, 1988)...........................................................9

55 Fed. Reg. 17,933 (Apr. 30, 1990) .........................................................9

Securities Act Release No. 33-5186, 1971 WL 126057 (Sept. 10,
1971) .............................................................................................8

The Bank Offering Defendants[1] respectfully submit this Brief in Support of their Motion to Dismiss the Consolidated Complaint (the "Complaint"), which underscores the limited nature of the claims against them and the Complaint's fatal deficiencies requiring dismissal of those claims.

## PRELIMINARY STATEMENT

As to the Bank Offering Defendants, the Complaint asserts claims under the Securities Act of 1933 arising out of several securities offerings by Valeant Pharmaceuticals International, Inc. ("Valeant").

Four of these offerings were private placements of senior notes (the "Note Offerings"), offered for sale solely to sophisticated investors pursuant to S.E.C. Rule 144A. These private placements (for which certain of the Bank Offering Defendants served as Initial Purchasers) were not sold by means of a prospectus. Because the Securities Act simply does not apply to such offerings, the single

---

[1] The Bank Offering Defendants are Barclays Capital, Inc.; BMO Capital Markets Corp.; CIBC World Markets Corp.; Citigroup Global Markets Inc.; DBS Bank Ltd.; Deutsche Bank Securities Inc.; DNB Markets Inc.; Goldman, Sachs & Co.; HSBC Securities (USA) Inc.; J.P. Morgan Securities LLC; Merrill Lynch, Pierce, Fenner & Smith Incorporated; Mitsubishi UFJ Securities (USA), Inc. (which, as of July 1, 2016, changed its legal name to MUFG Securities America Inc.); Morgan Stanley & Co. LLC; RBC Capital Markets LLC; SMBC Nikko Securities America, Inc.; SunTrust Robinson Humphrey, Inc.; and TD Securities (USA) LLC.

claim asserted against the Bank Offering Defendants with respect to these offerings should be dismissed.

The Complaint also asserts claims against those Bank Offering Defendants that served as underwriters of Valeant's March 2015 secondary offering of common stock.  At the time of that offering, there were already 335 million shares of common stock outstanding.  Plaintiff City of Tucson fails to allege—as it must—that it purchased shares in or traceable to the secondary offering, as opposed to any of the hundreds of millions of outstanding shares of the identical security.  Indeed, City of Tucson's own certification filed with the Court establishes that it did *not* acquire shares in the offering.  Accordingly, the claim arising out of the secondary offering must be dismissed for lack of standing.

The Bank Offering Defendants also incorporate by reference all arguments related to the Securities Act claims that Valeant makes in its brief in support of its motion to dismiss.

## FACTUAL BACKGROUND

The facts underlying this litigation are set forth at length in Valeant's brief in support of its motion to dismiss, and the Bank Offering Defendants do not reprise them here except as necessary to provide context for their motion:

**The Note Offerings**

Plaintiff TIAA-CREF—the only named plaintiff asserting claims related to the Note Offerings—makes four separate claims under Section 12(a)(2) of the Securities Act of 1933, one relating to each of four Note Offerings conducted in July 2013, December 2013, January 2015, and March 2015.  (Compl. ¶ 556.)  Each of the Note Offerings was a private placement conducted pursuant to S.E.C. Rule 144A.  The offering memorandum for each of the Note Offerings contained prominently placed, boldfaced language specifically stating that the notes would *not* be registered with the S.E.C. and would *not* be offered to the general public:

> **The notes have not been and will not be registered under the Securities Act of 1933, as amended (the "Securities Act") and are being offered and sold in the United States only to persons reasonably believed to be qualified institutional buyers in reliance on Rule 144A under the Securities Act and to certain non-U.S. persons in transactions outside the United States in reliance on Regulation S under the Securities Act. Prospective purchasers that are qualified institutional buyers are hereby notified that the seller of the notes may be relying on the exemption from the provisions of Section 5 of the Securities Act provided by Rule 144A.  The notes have not been and will not be qualified for sale to the public by prospectus under applicable laws in Canada and, accordingly, any offer and sale of the notes in the United States, Canada, or any other jurisdiction will be made on a basis which is**

> exempt from the prospectus requirements of such securities laws. . . .[2]

Each offering memorandum also stated in four other places—the Summary, Risk Factors, Transfer Restrictions, and Plan of Distribution sections—that the notes had not been and would not be registered under the Securities Act and that no prospectus would be issued in connection with their sale.[3]  Each memorandum also stated three more times that the notes would be offered and sold only to "qualified institutional buyers" ("QIBs") under Rule 144A  or to non-U.S. purchasers under Regulation S.[4]  Indeed, the Transfer Restrictions section of each memorandum

---

[2]  (Rosen Decl. Ex. 1 (July 2013 Memorandum) at cover page; Ex. 2 (December 2013 Memorandum) at cover page; Ex. 3 (January 2015 Memorandum) at cover page; and Ex. 4 (March 2015 Memorandum) at cover page 2 (boldface in original).)  The Court may appropriately consider documents that are relied upon in, or integral to, the complaint, as well as documents available in the public record and facts that may be judicially noticed.  *NL Indus.* v. *Old Bridge Twp.*, No. 13-3493, 2014 U.S. Dist. LEXIS 90317, at \*6–7 n.2 (D.N.J. June 30, 2014) (Shipp, J.).  Courts may consider a company's S.E.C. filings on a motion to dismiss.  *See, e.g.*, *Swift* v. *Pandey*, No. 13-650, 2013 U.S. Dist. LEXIS 162029, at \*13 n.4 (D.N.J. Nov. 13, 2013).

[3]  (Rosen Decl. Exs. 1 (July 2013 Memorandum) at 16, 29-30, 117, 120-21; 2 (December 2013 Memorandum) at 8, 21, 84, 87-89; 3 (January 2015 Memorandum) at 9, 21, 85, 88-90; and 4 (March 2015 Memorandum) at 20, 35, 153, 157-59.)

[4]  (Rosen Decl. Exs. 1 (July 2013 Memorandum) at ii, 117, 120; 2 (December 2013 Memorandum) at ii, 84, 87; 3 (January 2015 Memorandum) at iii, 85, 88; and 4 (March 2015 Memorandum) at ii, 153, 157.)

provided that "[e]ach purchaser or transferee of notes will be deemed to have represented and agreed," among other things, (i) that it is a QIB or a non-U.S. purchaser, (ii) that "[i]t acknowledges that the notes have not been registered under the Securities Act," and (iii) that it understood that each note would bear a legend providing that the security was not registered.[5]  In addition, each offering memorandum indicated that "[t]here is no public trading market for the notes" and that Valeant "do[es] not intend to apply for a listing of the notes on any national securities exchange."[6]

### The Secondary Offering of Common Stock

Plaintiff City of Tucson asserts claims under Sections 11 and 12(a)(2) arising out of the Stock Offering of 7.3 million Valeant common shares in March 2015 at a price of $199 per share.  (*See, e.g.*, Compl. ¶ 671.)  The Stock Offering was effected on March 27, 2015.[7]  City of Tucson alleges in conclusory terms that

---

[5] (Rosen Decl. Exs. 1 (July 2013 Memorandum) at 117-18; 2 (December 2013 Memorandum) at 84-85; 3 (January 2015 Memorandum) at 85-86; and 4 (March 2015 Memorandum) at 153-54.)

[6] (Rosen Decl. Exs. 1 (July 2013 Memorandum) at 16; 2 (December 2013 Memorandum) at 9; 3 (January 2015 Memorandum) at 9; and 4 (March 2015 Memorandum) at 20.)

[7] *See* Valeant Pharm. Int'l, Current Report (Form 8-K) (March 27, 2015) ("On March 27, 2015, Valeant Pharmaceuticals International, Inc. will complete the sale of 7,286,432 shares of its common stock, no par value"); Valeant Pharm. Int'l, Quarterly Report (Form 10-Q) (Apr. 30, 2015) at 41 ("On March 27, 2015,

it "purchased Valeant stock *in* the March 2015 Stock Offering . . . traceable to the registration statement and by means of the prospectus . . . ." (Compl. ¶ 557 (emphasis added).)

However, City of Tucson's Certification, which is attached to the Complaint, makes clear that the only Valeant shares City of Tucson acquired on March 27, 2015 were purchased for $198.24 and $198.46 per share—not the offering price of $199.00.[8]  And on March 27, 2015, the *335 million*[9] Valeant shares *already in circulation* in the market traded between $196.56 and $200.31, a range that encompasses the prices at which City of Tucson purportedly bought shares on that date.[10]  City of Tucson's own sworn Certification thus does not support the claim that it bought Valeant shares "in" the March 27, 2015 Stock Offering, but rather

_____

we issued 7,286,432 of our common shares, no par value, at a price of $199.00 per common share, under a registered offering in the United States in connection with the Salix Acquisition."); *see also id.* at 20 ("On March 27, 2015, the Company completed … a registered offering in the United States of 7,286,432 of its common shares, no par value, at a price of $199.00 per common share, for aggregate gross proceeds of approximately $1.45 billion.").

[8] (Rosen Decl. Ex. 5 (Certification of City of Tucson) at 2.)

[9] *See* Valeant Pharm. Int'l, Annual Report (Form 10-K) at Cover (Feb. 25, 2015) ("The number of outstanding shares of the registrant's common stock as of February 18, 2015 was 336,202,718.").

[10]  (Rosen Decl. Ex. 6 (Bloomberg Report of Valeant stock trading on March 27, 2015).)

indicates that it purchased from the far larger pool of Valeant shares already circulating in the secondary market.

## ARGUMENT

## I.    The Securities Act Does Not Apply to the Note Offerings

Counts III through VI of the Complaint allege violations of Section 12(a)(2) of the Securities Act premised on purportedly defective disclosures in the offering documents for the Note Offerings.  (*See* Compl. ¶¶ 572–668.)  Each of these Counts fails to state a claim as a matter of law because the Securities Act does not apply to private placements of securities conducted pursuant to S.E.C. Rule 144A, such as the Note Offerings here.  *See Yung* v. *Lee,* 432 F.3d 142, 148-50 (2d Cir. 2005) (dismissing Section 12(a)(2) claim because it related to private transactions for which defendants were not obligated to distribute a prospectus); *Lewis* v. *Fresne,* 252 F.3d 352, 357 (5th Cir. 2001) ("Section 12 of the 1933 Act does not apply to private transactions.").

Section 12(a)(2) imposes liability on "[a]ny person" who "offers or sells a security . . . by means of a prospectus . . . which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading . . . ."  15 U.S.C. § 77*l*(a)(2).  Interpreting Section 12(a)(2), the

Supreme Court has explained that "the liability imposed by § 12[(a)](2) cannot attach unless there is an obligation to distribute the prospectus in the first place." *Gustafson* v. *Alloyd Co.*, 513 U.S. 561, 571 (1995).  The Court in *Gustafson* squarely held that "the term 'prospectus' [as used in the statute] relates to *public offerings* by issuers and their controlling shareholders."  *Id.* at 576 (emphasis added).  The Court thus ruled that Section 12(a)(2), by its terms, cannot impose liability for misstatements in marketing materials for *non-public* offerings where a prospectus is *not* required.  *Id.* at 576–78 (emphasis added).

Offerings made pursuant to S.E.C. Rule 144A—like the Note Offerings here—are by definition "deemed not to have been offered to the public" and are therefore exempt from the registration and prospectus requirements of the Securities Act.  17 C.F.R. § 230.144A(c).  First adopted by the S.E.C. in 1972, Rule 144 exempted certain types of securities issuances from the Act's standard disclosure requirements.  In so doing, the S.E.C. balanced, on the one hand, the goal of "full and fair disclosure" through the process of registering publicly-offered securities with, on the other, the recognition that there existed "certain types of securities and securities transactions where there was no practical need for registration or where the benefits of registration were too remote."  Securities Act Release No. 33-5186, 1971 WL 126057, at *2 (Sept. 10, 1971).

Consistent with this balancing, in 1990, the S.E.C. adopted Rule 144A, expanding the exemption from the Securities Act's disclosure and prospectus requirements to include sales of securities that are, *inter alia*, marketed only to large "qualified institutional buyers" ("QIBs").[11]  55 Fed. Reg. 17,933 (Apr. 30, 1990).  The rationale for this expansion was that sophisticated QIBs did not need the full panoply of protections afforded retail investors.

Indeed, as the S.E.C. explained in proposing the exemption for securities marketed only to QIBs, "[t]he key to the analysis of proposed Rule 144A is that certain institutions can fend for themselves and that, therefore, offers and sales to such institutions do not involve a public offering" triggering disclosure requirements under the Act.  53 Fed. Reg. 44,016, 44,026 (Nov. 1, 1988); *see also id.* at 44,027 ("[T]he proposed Rule gives full effect to the concept that these large institutional investors are fully able to fend for themselves.").  The balance of competing policy considerations struck by the S.E.C. in adopting Rule 144A thus excludes offerings marketed only to QIBs from the disclosure and prospectus obligations under the Securities Act.

---

[11] Today, Rule 144A defines "qualified institutional buyers" to be any of a number of types of entities (*e.g.*, insurance companies, investment companies) that own and invest at least $100 million of securities.  17 C.F.R. § 230.144A(a)(1).

Rule 144A offerings cannot, as a matter of law, give rise to liability under the Act.  *See, e.g.*, *In re Merrill Lynch Auction Rate Sec. Litig.,* No. 09 MD 2030, 10 Civ. 124, 2012 WL 1994707, at *5, 7 (S.D.N.Y. June 4, 2012) (holding that "Section 12 claims based on Rule 144A offerings of unregistered securities in private placements are subject to dismissal" and dismissing Section 12 claim premised on Rule 144A offering "with prejudice as a matter of law"), *aff'd sub nom. Iconix Brand Grp.* v. *Merrill Lynch, Pierce, Fenner & Smith Inc.*, 505 F. App'x 14 (2d Cir. 2012); *Gotham Holdings, LP* v. *Health Grades, Inc.*, 534 F. Supp. 2d 442, 445 (S.D.N.Y. 2008) (dismissing Section 12(a)(2) claim where, as here, the issuer was under no obligation to issue a prospectus for the transactions at issue); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 625–26 (S.D.N.Y. 2007) ("[E]xemption from registration and non-public status are necessary consequences of compliance with the conditions of Rule 144A.  If the Rule 144A bonds were exempt from registration because they complied with Rule 144A, they were non-public by definition."); *Am. High-Income Trust* v. *AlliedSignal*, 329 F. Supp. 2d 534, 543 (S.D.N.Y. 2004) ("[O]fferings under Rule 144A are by definition non-public, and offering memoranda distributed in connection with such offerings cannot give rise to Section 12(a)(2) liability."); *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 431, 454–56 (S.D.N.Y. 2003), *vacated and remanded on other grounds*, 496 F.3d 245 (2d Cir. 2007); *In re Hayes Lemmerz Int'l, Inc. Equity Sec.*

*Litig.*, 271 F. Supp. 2d 1007, 1028–29 (E.D. Mich. 2003) ("[S]ince Rule 144A

expressly provides that offerings to QIBs are private, and *Gustafson* limits §

12(a)(2) liability to public offerings, there can be no § 12(a)(2) liability.").[12]  The

same conclusion should follow here.

Other than a single conclusory characterization in a sub-heading on page

218, the Complaint does not contain any allegations that support the conclusion

that the Note Offerings were not truly private placements.  Rather, the Complaint

alleges only that the Note Offerings were "some of the largest corporate offerings

---

[12] Although an overwhelming majority of courts have held that dismissal of
Securities Act claims is appropriate on a motion to dismiss, two district courts
outside of this Circuit have held—on the specific pleadings before them—that the
question of whether the offering in that case was "public" was a factual inquiry
that could not be decided on a motion to dismiss.  *See In re Enron Corp. Sec.,
Derivative & ERISA Litig.*, 310 F. Supp. 2d 819, 864–66 (S.D. Tex. 2004); *AAL
High Yield Bond Fund* v. *Ruttenberg*, No. Civ. A. 00-C-1404-S, 2001 WL
34372980, at *7 (N.D. Ala. Sept. 30, 2001).  In neither case was a Rule 144A
offering ultimately held to be a public offering for purposes of the Securities Act.
Quite to the contrary, in *In re Enron Corp. Securities, Derivative & ERISA
Litigation*  the court reversed course and *granted* defendant Deutsche Bank's
motion to dismiss the Section 12(a)(2) claims in a subsequent opinion and
*followed* the cases that have held a Rule 144A offerings cannot give rise to
Section 12(a)(2) liability.  *See* 761 F. Supp. 2d 504, 531–33 (S.D. Tex. 2011)
(citing, *inter alia*, *WorldCom* and *AlliedSignal*).  In subsequent cases, courts have
refused to follow these two outlier decisions.  *See In re Refco*, 503 F. Supp. 2d at
626 ("[C]ourts in the Southern District of New York have repeatedly declined to
follow [*Enron*'s] reasoning."); *AlliedSignal*, 329 F. Supp. 2d at 543 ("The Court
declines to follow the *AAL High Yield Bond Fund* court's reasoning.").

by a drug company in the last five years" (Compl. ¶ 569) and that the offering memoranda accompanying them supposedly included "information required in connection with the sale of registered securities" (*Id.* ¶ 571). But neither of these allegations removes the Note Offerings from the scope of the exemption provided by Rule 144A. There is no size limit to offerings that can be conducted under Rule 144A, and courts have specifically rejected the allegation that a private offering becomes "public" simply because its marketing materials contain information similar to what may be found in a prospectus.[13]

Significantly, the Complaint does not contend that the Note Offerings failed to comply with the requirements of Rule 144A. There is no allegation, for example, that notes were marketed or sold to investors other than QIBs. Of equal import, named plaintiff TIAA-CREF itself is a QIB, and has represented as much in writing.[14] Against this background, the one-sentence, entirely conclusory allegation that the Rule 144A Note Offerings should be deemed to be "public"

---

[13] *See, e.g.*, *In re Refco*, 503 F. Supp. 2d at 625 ("Plaintiffs rely heavily on the fact that the Rule 144A Offering Memorandum included the same information that would later be included in the Bond Registration Statement, but the test is whether there was any requirement that that information be included in the Offering Memorandum.").

[14] (Rosen Decl. Ex. 7 (TIAA-CREF Certificates of Rule 144A Qualified Institutional Buyer and Section 3(c)(7) Qualified Purchaser)).

because they were "marketed . . . and sold to a large cross-section of American investors" and because the subsequent decline in the notes' value has "adversely impacted the retirement savings of tens of millions of Americans" (Compl. ¶ 570) has no legal significance.

First, not a single investor that does not qualify as a QIB is identified; nor are any facts alleged that suggest that the Note Offerings were marketed or sold in violation of Rule 144A.  The phrase "a large cross-section of American investors" is sufficiently elastic and meaningless to describe accurately sales made only to QIBs, and similar allegations have been rejected as the basis for Securities Act liability.  *See In re Refco*, 503 F. Supp. 2d at 626 (rejecting plaintiffs' allegation that "the Rule 144A Bonds were offered to a subset of the investing public" as "disingenuous," and commenting that "any private transaction involves 'a subset of the investing public'—every investor is a 'subset' of the investing public just as every citizen is a subset of the general public").

As for the suggestion that a decline in the value of the notes has adversely affected "tens of millions of Americans" (Compl. ¶ 570), the fact that sophisticated QIBs like TIAA-CREF invest their clients' money in the instruments they purchase in private offerings cannot convert a Rule 144A offering into a public offering. *See In re Fisker Auto. Holdings, Inc. S'holder Litig.*, Civ. No. 13-2100, 2015 WL

6039690, at *12 (D. Del. Oct. 15, 2015) (holding that offerings were private, not public—even though the "accredited investor" venture capital firms that purchased in the offerings had raised money from hundreds of private investors—because "the investment information was provided to the venture capital firms, not to the private investors").  Stripping Rule 144A offerings of their essential private character merely because ultimate beneficial owners of QIB purchasers may not themselves qualify as QIBs would completely undermine the purpose and effectiveness of Rule 144A and would radically expand the scope of potential liability under the Securities Act in a way that neither Congress nor the S.E.C. has intended or endorsed.  Such a rule would mean that no issuer could use Rule 144A to sell a private placement to an institutional investor that manages client funds. This would call into question the viability of Rule 144A, which last year alone was used by American companies to issue $540.97 billion worth of private placements.[15]  Moreover, TIAA-CREF's unprecedented suggestion that the Court should pierce ***TIAA-CREF's own*** separate corporate identity is completely inconsistent with fundamental corporate law principles.

---

[15] (Rosen Decl. Ex. 8 (Thomson Reuters, 2015 US Private Placement Review) at 4).

Under such circumstances, the Court should follow the letter of S.E.C. rules, as well as the approach of the vast majority of courts to have considered the question, and conclude, as a matter of law, that Section 12(a)(2) does not apply to Rule 144A offerings and dismiss Counts III through VI with prejudice. *See, e.g.*, *In re Fisker*, 2015 WL 6039690, at *12 (concluding, as a matter of law on a motion to dismiss, that an offering was non-public and dismissing Section 12(a)(2) claims where the offering memorandum stated that the securities "have not been registered under the Securities Act" and the issuer "solicited only 'qualified investors.'").[16]

---

[16] For the purposes of this motion, the Bank Offering Defendants construe paragraph 729 of the Complaint—in which Plaintiffs purport to bring claims only on behalf of a class that purchased Valeant stock and notes "in the United States"—as an attempt by Plaintiffs to comply with *Morrison* v. *National Australia Bank Ltd.*, 561 U.S. 247 (2010). Under *Morrison*, the Securities Act applies only to (i) transactions on U.S. securities exchanges and (ii) "domestic transactions in other securities." *Id.* at 267; *see also United States* v. *Georgia*, 777 F.3d 125, 135 (3d Cir. 2015) ("'[A] securities transaction is domestic when the parties incur irrevocable liability to carry out the transaction within the United States or when title is passed within the United States.'" (quoting *Absolute Activist Value Master Fund Ltd.* v. *Ficeto*, 677 F.3d 60, 69 (2d Cir. 2012))). Should this case reach the class certification stage, a class containing members not satisfying *Morrison* cannot be certified.

**II.     Even If the Securities Act Applied to the Note Offerings, TIAA-CREF Has Not Adequately Alleged That It Purchased Notes From an Identified Bank Offering Defendant, and Counts III Through VI Should Therefore Be Dismissed for Lack of Standing**

The Securities Act does not apply to the Note Offerings at issue here, but even if it did, the Court still should dismiss Counts III through VI for lack of standing.  In a putative securities class action such as this, a named plaintiff must have standing to support the court's jurisdiction.  *See Winer Family Trust* v. *Queen*, 503 F.3d 319, 325–26 (3d Cir. 2007) (citing *Fallick* v. *Nationwide Mut. Ins. Co.*, 162 F.3d 410, 423 (6th Cir. 1998)  ("A potential class representative must demonstrate individual standing vis-a-vis [sic] the defendant; he cannot acquire such standing merely by virtue of bringing a class action.")) (additional citation omitted).  Further, at least one named plaintiff must have standing to sue *each* of the defendants identified in the complaint.  *Polanco* v. *Omnicell, Inc.*, 988 F. Supp. 2d 451, 464 (D.N.J. 2013) ("plaintiff may not maintain an action on behalf of a class against a specific defendant if the plaintiff is unable to assert an individual cause of action against that defendant" (quotation marks and citation omitted)).

To obtain standing under Section 12(a)(2), a plaintiff must have purchased *directly* from an underwriter or initial purchaser.  *See In re Adams Golf, Inc. Sec. Litig.*, 176 F. Supp. 2d 216, 223 (D. Del. 2001) (noting that the "statutory language of § 12(a)(2) requires privity by limiting seller's liability 'to the person purchasing

such security *from him*' (quoting 15 U.S.C. § 77*l*(a))), *rev'd in part on other*

*grounds*, 381 F.3d 267 (3d Cir. 2004); *In re Constar Int'l Inc. Sec. Litig.*, No. 03

Civ. 5020, 2008 WL 614551, at *2 (E.D. Pa. Mar. 4, 2008) (noting Section

12(a)(2)'s "privity requirement").

Lead Plaintiff TIAA-CREF alone claims to have purchased in the Note

Offerings, but the Complaint offers only the same boilerplate allegation for each

Section 12(a)(2) claim:

> Lead Plaintiff and other members of the Class purchased
> Valeant senior notes in the [particular] Debt Offering from
> the Bank Offering Defendants named in this Count and did
> so by means of the [particular] Debt Offering Prospectus.

(Compl. ¶¶ 579, 601, 623, 649.)  Significantly, this non-specific allegation fails to

identify which—if any—of the Bank Offering Defendants sold notes to TIAA-

CREF.  Each of the Note Offerings had at least **ten** initial purchasers (*see id.*

¶ 567), but the Complaint does nothing to identify which of them TIAA-CREF

may have standing to sue.  **Seven** of the Bank Offering Defendants were initial

purchasers of all of the Note Offerings (*see id.* ¶ 567), and any one of them could

have sold TIAA-CREF **all** of the notes it claims to have acquired.  TIAA-CREF

could have purchased all of its Notes from **one** of the Bank Offering Defendants—

meaning that TIAA-CREF lacks standing as to all but one of the **seventeen** Bank

Offering Defendants.  Under such circumstances, the Complaint has failed

adequately to plead that TIAA-CREF has standing to assert its Section 12(a)(2) claims against *any* particular Bank Offering Defendant, and, for this independent reason, the Court should dismiss Counts III through VI.

**III.    The Section 11 and 12(a)(2) Claims Arising Out of the Stock Offering Fail Because the Complaint Does Not Adequately Allege That City of Tucson Has Standing to Sue, and Counts VII and VIII Should Therefore Be Dismissed**

The Complaint's Section 11 and 12(a)(2) claims concerning the Stock Offering are asserted only by City of Tucson.  Section 11 requires a plaintiff to have purchased securities in or "traceable to an offering that was covered by the allegedly false registration statement."  *In re Constar Int'l Inc. Sec. Litig.*, No. 03 Civ. 5020, 2008 WL 614551, at *2 (E.D. Pa. Mar. 4, 2008) (quotation marks and citation omitted).  Section 12(a)(2) confers standing only on those who purchased shares "directly in the public offering" and does not permit tracing at all.  *In re Measurement Specialties, Inc. Sec. Litig.*, No. 02 Civ. 1071, 2003 U.S. Dist. LEXIS 27904, at *26 (D.N.J. Sept. 29, 2003).  Here, the Complaint does not adequately allege that City of Tucson purchased shares directly in the Stock Offering *or* that it purchased shares traceable to the Stock Offering.  Therefore, the Court should dismiss Counts VII and VIII for lack of standing.

A.    <u>The Complaint Fails To Adequately Allege That City of Tucson Has Standing to Sue Under Section 11</u>

The Complaint does not plausibly plead that City of Tucson purchased shares in or traceable to the Stock Offering.  Thus, it has failed to adequately allege that City of Tucson has standing under Section 11.

City of Tucson alleges that it "purchased Valeant stock *in* the March 2015 Stock Offering . . . traceable to the registration statement and by means of the prospectus" (Compl. ¶ 557 (emphasis added)) and purports to bring suit "on behalf of itself and the other members of the Class who purchased Valeant common stock *in* the March 2015 Stock Offering"  (*Id.* ¶¶ 670, 714 (emphasis added)).  Yet the allegation that City of Tucson purchased "in" the Stock Offering is belied by City of Tucson's own sworn Certification attached to the Complaint.  The Stock Offering was completed on March 27, 2015, and the approximately 7.3 million shares offered at a price of $199.00 were issued on that date.[17]  In its sworn Certification, however, City of Tucson attests that the only purchases of Valeant

---

[17] *See* Valeant Pharm. Int'l, Current Report (Form 8-K) (March 27, 2015) ("On March 27, 2015, Valeant Pharmaceuticals International, Inc. will complete the sale of 7,286,432 shares of its common stock, no par value[.]"); Valeant Pharm. Int'l, Quarterly Report (Form 10-Q) (Apr. 30, 2015) at 41 ("On March 27, 2015, we issued 7,286,432 of our common shares, no par value, at a price of $199.00 per common share, under a registered offering in the United States in connection with the Salix Acquisition."); *see also id.* at 20 ("On March 27, 2015, the Company completed . . . a registered offering in the United States of 7,286,432 of its common shares, no par value, at a price of $199.00 per common share, for aggregate gross proceeds of approximately $1.45 billion.")

stock it made on March 27, 2015 consisted of 300 shares at prices of $198.24 and $198.46 and not, as would be expected if the purchases were made in the offering, at the $199.00 offering price.[18]

On March 27, 2015, the ***335 million*** Valeant common shares already in the market prior to the Stock Offering changed hands at prices between $200.31 and $196.56.[19]  It is thus obvious that City of Tucson could readily have acquired 300 shares at $198.24 and $198.46 on March 27, 2015 by buying some of the stock already trading in the market prior to the Stock Offering.  This "obvious alternative explanation" for the provenance of the 300 shares purchased on the date of the Stock Offering—combined with the complete lack of further factual allegations supporting the notion that City of Tucson did purchase shares "in" the offering— fatally undermines the plausibility of any allegation that City of Tucson purchased shares "in" the offering.  *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 567 (2007).

With the allegation that City of Tucson purchased "in" the Stock Offering contradicted by City of Tucson's own Certification, the Complaint's remaining allegations fail to plausibly plead that City of Tucson purchased shares "traceable

_____

[18] (Rosen Decl. Ex. 5 (Certification of City of Tucson) at 2.)

[19] (Rosen Decl. Ex. 6 (Bloomberg Report of Valeant stock trading on March 27, 2015).)

to" the Stock Offering.  Indeed, the only remaining allegation that pertains to traceability is the bare assertion that City of Tucson purchased shares "traceable" to the registration statement underpinning the Stock Offering.  (Compl. ¶ 557.) Courts have found that mere conclusory allegations of traceability such as this do not suffice to plead standing under Section 11.  *See In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013); *Johnson* v. *CBD Energy, Ltd.*, No. H-15-1668, 2016 U.S. Dist. LEXIS 87174, at *20 (S.D. Tex. Jul. 6, 2016); *In re EveryWare Global, Inc. Sec. Litig.*, No. 2:14-CV-01838, 2016 WL 1242689, at *18–20 (S.D. Ohio Mar. 30, 2016); *Beaver Cnty. Employees' Ret. Fund* v. *Tile Shop Holdings, Inc.*, 94 F. Supp. 3d 1035, 1056–58 (D. Minn. 2015).

Such unadorned allegations of traceability are especially weak where, as here, "a company has issued shares in multiple offerings under more than one registration statement . . . [and thus] a greater level of factual specificity will be needed before a court can reasonably infer that shares purchased in the aftermarket are traceable to a particular offering."  *In re Century Aluminum*, 729 F.3d at 1107. To understand why this is so, consider that the Stock Offering's issuance of 7.3 million common shares occurred against the backdrop of 335 million shares already in the market and therefore only increased the number of outstanding Valeant shares by approximately 2%.  Because of the "fungible nature of shares of

stock," the odds of any one of the 300 shares bought on March 27, 2015 having been a share issued in the Stock Offering is ***less than one in a million***.  *Gibbons* v. *Malone*, 703 F.3d 595, 601 (2d Cir. 2012) (quotation marks and citation omitted). The odds are equally stacked against any of City of Tucson's subsequent aftermarket purchases of Valeant common stock.

Because the Complaint alleges *no* additional facts regarding the connection between City of Tucson's aftermarket purchases and the Stock Offering, the Court cannot reasonably infer that any of those aftermarket purchases included shares traceable to the Stock Offering.  *See In re Century Aluminum*, 729 F.3d at 1107.  In short, City of Tucson's allegations "do not tend to exclude the possibility that [its] shares came from the pool of previously issued shares."  *Id.* at 1108.  Under these circumstances, City of Tucson has failed to "affirmatively and plausibly suggest that it has standing to sue." *Finkelman* v. *NFL*, 810 F.3d 187, 194 (3d Cir. 2016) (quotation marks and citation omitted).  Therefore, the Court should dismiss the Section 11 claim against the Bank Offering Defendants.  *See In re Century Aluminum*, 729 F.3d at 1109; *Johnson*, 2016 U.S. Dist. LEXIS 87174, at *20 (dismissing Section 11 claims and concluding that a plaintiff "cannot rely on the boilerplate language included in the amended complaint to plausibly allege

traceability" where there was "aftermarket intermingling" of shares from various offerings).

B.    The Complaint Fails to Adequately Allege That City of Tucson Has Standing to Sue Under Section 12(a)(2)

In the Section 12(a)(2) context, tracing is not permissible; to have standing, a plaintiff must have purchased "directly in the public offering." *In re Measurement Specialties*, 2003 U.S. Dist. LEXIS 27904, at *26; *see also Ballay* v. *Legg Mason Wood Walker, Inc.*, 925 F.2d 682, 689 (3d Cir. 1991) (holding that Section 12(a)(2) "should not be expanded to aftermarket trading"); *Luminent Mortg. Capital, Inc.* v. *Merrill Lynch & Co.*, 652 F. Supp. 2d 576, 596 (E.D. Pa. 2009) (noting that Section 12(a)(2) does not apply to secondary market transactions); *In re Prestige Brands Holding, Inc.*, No. 05 CV. 06924, 2006 WL 2147719, at *9 (S.D.N.Y. July 10, 2006) (dismissing Section 12(a)(2) claim brought by plaintiffs who alleged "merely that they bought shares 'traceable to' or 'in connection with' an [initial public offering]," since the statute "provides for a claim only in favor of those who purchase stock directly in an initial public offering"); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 182 (E.D. Pa. 2000) ("[Section 12(a)(2)] does not apply to secondary market transactions.").

As discussed in the prior section, City of Tucson has not plausibly pleaded that it purchased its shares in the Stock Offering.  Accordingly, the Complaint fails

to adequately allege that City of Tucson has standing to sue under Section 12(a)(2).

For this reason, the Court should dismiss Count VIII.[20]

---

[20] Even if City of Tucson had adequately pleaded that it did, in fact, acquire at least some shares directly in the Stock Offering, the Section 12(a)(2) claim would still merit dismissal for lack of standing due to City of Tucson's failure to identify which of the **ten** Stock Offering underwriters it might have standing to sue.  City of Tucson could have purchased all 300 shares from one underwriter, in which case it would lack standing as to the other nine. (And indeed, it is not plausible that a large institutional buyer such as City of Tucson would have split a purchase of 300 Valeant common shares among ten banks.)  The Complaint thus fails to adequately plead that City of Tucson has standing to assert its Section 12(a)(2) claim arising out of the Stock Offering against ***any*** particular Bank Offering Defendant.  *See Polanco*, 988 F. Supp. 2d at 464 ("plaintiff may not maintain an action on behalf of a class against a specific defendant if the plaintiff is unable to assert an individual cause of action against that defendant").  For this independent reason, Count VIII should be dismissed.

## CONCLUSION

For the foregoing reasons, the Bank Offering Defendants respectfully submit that the Court should dismiss Counts III through VIII of the Complaint as a matter of law.

Respectfully submitted,

Mark A. Berman, Esq.
Robin D. Fineman, Esq.
**HARTMANN DOHERTY ROSA
BERMAN & BULBULIA, LLC**
65 Route 4 East
River Edge, NJ 07661
(201) 441-9056

– and –

Richard A. Rosen, Esq. (*pro hac vice*)
**PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3305

*Attorneys for the Bank Offering
Defendants*

Dated: September 13, 2016

25