## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re VALEANT PHARMACEUTICALS INTERNATIONAL, INC. SECURITIES LITIGATION | ) ) ) ) | **Master File No. 3:15-cv-07658 (MAS) (LHG)** |
| This Document Relates To: | ) ) ) | |
| ALL ACTIONS. | ) ) ) | **(ORAL ARGUMENT REQUESTED)** **Motion Day:  January 3, 2017** |

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

---

Richard Hernandez
McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey  07102
Telephone:  (973) 848-8615
Facsimile:  (973) 297-6615

Robert J. Giuffra, Jr. (Admitted *Pro Hac Vice*)
Brian T. Frawley
Andrew J. Finn (Admitted *Pro Hac Vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000

Michael H. Steinberg (Admitted *Pro Hac Vice*)
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, California  90067
Telephone:  (310) 712-6670

*Attorneys for Valeant Pharmaceuticals International, Inc., J. Michael Pearson, Robert L. Rosiello,*
*Ari S. Kellen, Ronald H. Farmer, Colleen Goggins, Robert A. Ingram, Anders Lönner, Theo*
*Melas-Kyriazi, Robert N. Power, Norma Provencio, Katherine B. Stevenson and Jeffrey W. Ubben*
*Katherine B. Stevenson and Jeffrey W. Ubben*

## TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ........................................................................................1

THE ALLEGATIONS OF THE COMPLAINT ..................................................................9

    A.    Valeant's Non-Traditional Business Strategy and Rapid Growth ...........................9

    B.    Beginning in January 2013, Valeant Enters into a Distribution
           Agreement with Philidor and Discloses Efforts To Develop a New
           Alternative Fulfillment Distribution Channel for Certain of Its Drugs ................10

           1.    Valeant's Contractual Relationship with and
                 Accounting for Philidor Prior to December 2014.....................................11

           2.    Valeant's Disclosures Concerning the AF Program
                 and Philidor Prior to December 2014 .......................................................12

    C.    Valeant Disclosed Routinely the Contribution of Price Increases
           to the Company's Revenue Growth........................................................................15

    D.    Valeant's Business Model and Practices Are Scrutinized by
           Investors and Competitors, Including During a Contentious 2014
           Proxy Fight ...........................................................................................................16

    E.    In December 2014, Valeant Purchases an Option To Acquire
           Philidor and Consolidates Philidor's Financials as the AF
           Program Grows .....................................................................................................17

    F.    From July 2013 to March 2015, Valeant Makes Several Private
           Debt and Common Stock Offerings, Fully Disclosing the Risks
           of the Company's Business Model ........................................................................18

    G.    The Perfect Storm Begins: In April 2015, *The Wall Street
           Journal* Reports on Drug Price Increases by Valeant
           and Other Pharmaceutical Companies ..................................................................19

    H.    The Scrutiny Begins:  In Late September 2015, the Government
           and Press Question Drug Pricing and Focus on Valeant ......................................20

    I.    On October 19, 2015, Valeant Announces Third Quarter Earnings
           and Provides Details on Philidor in Response to a Report on a
           Lawsuit with a Philidor-Related Pharmacy .........................................................21

    J.    On October 21, 2015, Short-Seller Citron Research Publishes a
           Report Making Baseless Allegations Comparing Valeant to Enron,
           and Plaintiffs Reflexively File Putative Securities Class Action
           Complaints Against the Company ........................................................................23

# TABLE OF CONTENTS
*(continued)*

*Page*

K.    On October 26, 2015, Valeant Discloses Philidor's Limited Contribution to Revenues and Initiates a Voluntary Review of the Company's Relationship with Philidor ........................................... 23

L.    On October 30, 2015, Valeant Ends Its Relationship with Philidor ..................... 24

M.   In February 2016, Valeant Announces Preliminary Results of Its Internal Board Review and and Delays Issuance of Its 2015 Form 10-K ........................................................................................... 25

N.    In March 2016, Valeant Announces Results for the Fourth Quarter of 2015, Reduces 2016 Guidance and Further Delays Issuance of Its Form 10-K ....................................................................... 26

O.    In March 2016, Valeant Announces Its Final Restatement Related to Philidor ............................................................................................... 26

P.    Valeant Announces Management Succession and the Internal Board Review Ends Without Finding Any Fraud ....................... 27

Q.    The Complaint's Alleged Misstatements or Omissions ......................... 29

R.    The Alleged "Corrective" Disclosures ................................................. 30

ARGUMENT ......................................................................................................... 31

I.    PLAINTIFFS' EXCHANGE ACT CLAIMS FAIL BECAUSE THE COMPLAINT DOES NOT PLEAD FACTS GIVING RISE TO A COGENT AND COMPELLING INFERENCE THAT DEFENDANTS ACTED WITH SCIENTER ................................................................ 31

A.    Plaintiffs Plead No Cognizable Motive to Defraud .............................. 31

B.    Plaintiffs Fail to Plead that Any Defendant Made the Challenged Misstatements or Omissions Intentionally or with Extreme Recklessness ........... 34

1.    Alleged "Admissions" in Valeant's Voluntary Restatement of Philidor-Related Revenues ......................................................... 34

2.    Purported "Admission" About Mr. Pearson's April 29, 2015 Statement on Price and Volume Growth ..................... 36

3.    Purported "Admissions" During Congressional Testimony ..................... 37

4.    Philidor's Alleged "Deceptive" Practices Directed at Third-Party Payors ............................................................... 38

5.    The Individual Defendants' General Management Role and Diligence Regarding Philidor .................................... 39

6.    Valeant's Decision Not To Claw Back Compensation from Pearson and Schiller, or Pursue Remedies Against Philidor ........................................................................ 44

# TABLE OF CONTENTS
*(continued)*

*Page*

       7.     Executive Departures Between April 2015 and May 2016 ......................44

C.    Taken Together, the More Compelling Inference from Plaintiffs'
Allegations Is that Defendants Did *Not* Engage in Securities Fraud ....................45

**II.    PLAINTIFFS DO NOT PLEAD ANY ACTIONABLE
MISSTATEMENTS OR OMISSIONS AS A MATTER OF LAW ...........................47**

A.    Valeant's Restatement Was Immaterial and Did Not Render
Prior Statements About Valeant's Internal Controls Actionable ..........................48

B.    Prior to October 2015, Valeant Had No Duty
to Disclose Further Information About Its Relationship with Philidor ................51

C.    Mr. Pearson's April 29, 2015 Statement Concerning Price
and Volume Growth Was Neither False Nor Misleading......................................55

D.    Plaintiffs Fail To Plead Any Actionable Omissions
Regarding the Company's Pricing Practices........................................................56

E.    Valeant's Statements About General Corporate Strengths
Are Inactionable "Puffery" ................................................................................57

F.    The PSLRA Safe Harbor and "Bespeaks Caution" Doctrines
Protect All Forward-Looking and Opinion Statements .........................................58

G.    Plaintiffs Fail To Allege that the Director Defendants or Messrs.
Rosiello or Ingram or Dr. Kellen Made Any Misstatements ................................60

**III.    PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION FOR EACH
ALLEGED "CORRECTIVE" DISCLOSURE AS A MATTER OF LAW ..............61**

**IV.    PLAINTIFFS FAIL TO PLEAD ANY CLAIM UNDER
THE SECURITIES ACT .............................................................................63**

A.    Valeant's Debt Offerings Are Exempt from Section 12(a)(2)
Claims Under Rule 144A.....................................................................................63

B.    Plaintiffs Fail to Plead Any Actionable Misstatements .........................................63

**CONCLUSION** ........................................................................................................65

# TABLE OF AUTHORITIES

*Page(s)*

## Cases

*Acito* v. *IMCERA Group, Inc.*,
  47 F.3d 47 (2d Cir. 1995) ........................................................................................32

*In re Adams Golf, Inc. Sec. Litig.*,
  381 F.3d 267 (3d Cir. 2004) ...................................................................................63

*In re Advanta Corp. Sec. Litig.*,
  180 F.3d 525 (3d Cir. 1999) .............................................................................57, 64

*In re Aetna Sec. Litig.*,
  617 F.3d 272 (3d Cir. 2010) .............................................................................58, 59

*Benak ex rel. Alliance Premier Growth Fund* v. *Alliance Capital Mgmt. L.P.*,
  435 F.3d 396 (3d Cir. 2006) .....................................................................................9

*Am. Bus. Fin. Servs., Inc. Sec. Litig.*,
  2007 WL 81937 (E.D. Pa. Jan. 9, 2007) ................................................................57

*In re Amarin Corp. PLC Sec. Litig.*,
  2016 WL 1644623 (D.N.J. Apr. 26, 2016) .............................................................58

*In re Anadigics, Inc., Sec. Litig.*,
  2011 WL 4594845 (D.N.J. Sept. 30, 2011) ......................................................52, 55

*Bartesch* v. *Cook*,
  941 F. Supp. 2d 501 (D. Del. 2013) ........................................................................65

*In re Bristol-Myers Squibb Sec. Litig.*,
  312 F. Supp. 2d 549 (S.D.N.Y. 2004) ....................................................................35

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997) ...........................................................................32, 60

*Cal. Pub. Emps.' Ret. Sys.* v. *Chubb Corp.*,
  2002 WL 33934282 (D.N.J. June 26, 2002) ...........................................................34

*Cal. Pub. Emps.' Ret. Sys.* v. *Chubb Corp.*,
  394 F.3d 126 (3d Cir. 2004) .............................................................................38, 63

*Carpenters Pension Trust Fund of St. Louis* v. *Barclays*,
  750 F.3d 227 (2d Cir. 2014) ....................................................................................51

# TABLE OF AUTHORITIES
*(continued)*

*Page(s)*

*Castlerock Mgmt. Ltd.* v. *Ultralife Batteries, Inc.*,
  114 F. Supp. 2d 316 (D.N.J. 2000) ........................................................65

*City of Brockton Ret. Sys.* v. *Avon Prods., Inc.*,
  2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014).......................................46

*City of Edinburgh Council* v. *Pfizer, Inc.*,
  754 F.3d 158 (3d Cir. 2014)...................................................................51

*City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*,
  752 F.3d 173 (2d Cir. 2014)...................................................................53

*City of Roseville Emps.' Ret. Sys.* v. *Horizon Lines, Inc.*,
  442 F. App'x 672 (3d Cir. 2011) .............................................40, 42, 43

*City of Roseville Emps.' Ret. Sys.* v. *Horizon Lines, Inc.*,
  713 F. Supp. 2d 378 (D. Del. 2010).......................................................43

*In re Donald J. Trump Casino Sec. Litig.*,
  7 F.3d 357 (3d Cir. 1993) .......................................................................48

*ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009).......................................................39, 49, 50

*In re Elan Corp. Sec. Litig.*,
  543 F. Supp. 2d 187 (S.D.N.Y. 2008).....................................................40

*Galati* v. *Commerce Bancorp, Inc.*,
  2005 WL 3797764 (D.N.J. Nov. 7, 2005) .........................................54, 65

*Glassman* v. *Computervision Corp.*,
  90 F.3d 617 (1st Cir. 1996).....................................................................52

*Greenstone* v. *Cambex Corp.*,
  975 F.2d 22 (1st Cir. 1992).....................................................................47

*GSC Partners CDO Fund* v. *Washington*,
  368 F.3d 228 (3d Cir. 2004)....................................................................33

*Guerra* v. *Teradyne Inc.*,
  2004 WL 1467065 (D. Mass. Jan. 16, 2004)..........................................57

*In re Hertz Global Holdings, Inc. Sec. Litig.*,
  2015 WL 4469143 (D.N.J. July 22, 2015).................................38, 47, 59

## TABLE OF AUTHORITIES
*(continued)*

*Page(s)*

*Hutchison* v. *Deutsche Bank Sec. Inc.*,
    647 F.3d 479 (2d Cir. 2011) .................................................49

*Inst'l Investors Grp.* v. *Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009) ..............................................4, 31, 32, 37

*In re Intelligroup Sec. Litig.*,
    527 F. Supp. 2d 262 (D.N.J. 2007) ...........................................45

*In re Interpool, Inc. Sec. Litig.*,
    2005 WL 2000237 (D.N.J. Aug. 17, 2005) ...................................45

*Ironworkers Local 580-Joint Funds* v. *Linn Energy, LLC*,
    29 F. Supp. 3d 400 (S.D.N.Y. 2014) ........................................36

*Israeli* v. *Team Telecom Int'l, Ltd.*,
    2006 WL 2883237 (D.N.J. Oct. 10, 2006) ...................................60

*Kalnit* v. *Eichler*,
    264 F.3d 131 (2d Cir. 2001) .................................................39

*Key Equity Investors, Inc.* v. *Sel-Lab Mktg. Inc.*,
    246 F. App'x 780 (3d Cir. 2007) .............................................57

*Klein* v. *Gen. Nutrition Cos., Inc.*,
    186 F.3d 338 (3d Cir. 1999) .................................................57, 59

*Litwin* v. *Blackstone Grp., L.P.*,
    634 F.3d 706 (2d Cir. 2011) .................................................50

*Livingston* v. *Cablevision Sys. Corp.*,
    966 F. Supp. 2d 208 (E.D.N.Y. 2013) .......................................13

*Lovallo* v. *Pacira Pharms., Inc.*,
    2015 WL 7300492 (D.N.J. Nov. 18, 2015) ..................................51

*In re Lululemon Sec. Litig.*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014) ........................................31

*Makor Issues & Rights, Ltd.* v. *Tellabs, Inc.*,
    513 F.3d 702 (7th Cir. 2008) ................................................40

*McGowan Inv'rs LP* v. *Frucher*,
    481 F. Supp. 2d 405 (E.D. Pa. 2007) ........................................33

**TABLE OF AUTHORITIES**
*(continued)*

*Page(s)*

*Merrill Lynch, Pierce, Fenner & Smith Inc.* v. *Dabit*,
    547 U.S. 71 (2006)..................................................................................................31

*Metzler Inv. GMBH* v. *Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ...............................................................................39

*Monk* v. *Johnson & Johnson*,
    2011 WL 6339824 (D.N.J. Dec. 19, 2011).................................................34, 41, 44

*In re NAHC, Inc. Sec. Litig.*,
    306 F.3d 1314 (3d Cir. 2002)....................................................................................9

*Nat'l Junior Baseball League* v. *PharmaNet Dev. Grp.*,
    720 F. Supp. 2d 517 (D.N.J. 2010) .......................................................4, 40, 61, 62

*In re NUI Sec. Litig.*,
    314 F. Supp. 2d 388 (D.N.J. 2004) .........................................................................33

*OFI Asset Mgmt.* v. *Cooper Tire & Rubber*,
    --- F.3d ---, 2016 WL 4434404 (3d Cir. Aug. 22, 2016) ............................... *passim*

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010)....................................................................................62

*Oran* v. *Stafford*,
    226 F.3d 275 (3d Cir. 2000).........................................................................7, 47, 48

*In re Par Pharm. Sec. Litig.*,
    2008 WL 2559362 (D.N.J. June 24, 2008) .............................................................41

*Pathfinder Mgmt., Inc.* v. *Mayne Pharma, Inc.*,
    2009 WL 4250061 (D.N.J. Nov. 25, 2009) .............................................................41

*In re Ply Gem Holdings, Inc. Sec. Litig.*,
    135 F. Supp. 3d 145, 150 (S.D.N.Y. 2015)..............................................................50

*Police Ret. Sys. of St. Louis* v. *Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) ................................................................................56

*Rahman* v. *Kid Brands, Inc.*,
    2012 WL 762311 (D.N.J. Mar. 8, 2012).....................................................42, 51, 53

*In re Rent-Way Sec. Lit.*,
    209 F. Supp. 2d 493 (W.D. Pa. 2002)......................................................................33

**TABLE OF AUTHORITIES**
(*continued*)

*Page(s)*

*Rescue Mission of El Paso, Inc.* v. *K-Sea Transp. Partners L.P.*,
　　2013 WL 3087078 (D.N.J. June 14, 2013) ................................................................54

*In re Rockefeller Ctr. Props., Inc. Sec. Litig.*,
　　311 F.3d 198 (3d Cir. 2002) ....................................................................................47

*In re Royal Dutch/Shell Transport Sec. Litig.*,
　　380 F. Supp. 2d 509 (D.N.J. 2005) ........................................................................60

*In re Salix Pharm., Ltd.*,
　　2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ..........................................................44

*Se. Pa. Transp. Auth.* v. *Orrstown Fin. Servs., Inc.*,
　　2015 WL 3833849 (M.D. Pa. June 22, 2015) .............................................51, 60, 63

*Silverstein* v. *Globus Medical, Inc.*,
　　2016 WL 4478826 (E.D. Pa. Aug. 25, 2016) ......................................................53, 59

*Strougo* v. *Barclays PLC*,
　　105 F. Supp. 3d 330 (S.D.N.Y. 2015) ................................................................58, 62

*In re Suprema Specialties, Inc. Sec. Litig.*,
　　438 F.3d 256 (3d Cir. 2006) ..........................................................................5, 34, 65

*In re Synchronoss Sec. Litig.*,
　　705 F. Supp. 2d 367 (D.N.J. 2010) .................................................................32, 46, 59

*Teamsters Loc. 445 Freight Div. Pension Fund* v. *Dynex Capital, Inc.*,
　　531 F.3d 190 (2d Cir. 2008) ....................................................................................34

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
　　551 U.S. 308 (2007) ......................................................................................6, 7, 31, 45

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
　　2014 WL 7176187 (S.D.N.Y. Dec. 16, 2014) ........................................................47

*United States* v. *Smith*,
　　155 F.3d 1051 (9th Cir. 1998) ................................................................................50

*In re Westinghouse Sec. Litig.*,
　　90 F.3d 696 (3d Cir. 1996) ....................................................................................49

*Wilson* v. *Bernstock*,
　　195 F. Supp. 2d 619 (D.N.J. 2002) ........................................................................32

**TABLE OF AUTHORITIES**
(*continued*)

*Page(s)*

*Winer Family Trust* v. *Queen*,
   2004 WL 2203709 (E.D. Pa. Sept. 27, 2004) ...........................................................56

*Winer Family Trust* v. *Queen*,
   503 F.3d 319 (3d Cir. 2007)........................................................51, 54, 55, 60

*WM High Yield Fund* v. *O'Hanlon*,
   964 F. Supp. 2d 368 (E.D. Pa. 2013) ...................................................53

*Woodward* v. *Raymond James Fin., Inc.*,
   732 F. Supp. 2d 425 (S.D.N.Y. 2010)..................................................48

**Statutes**

Private Securities Litigation Reform Act, 15 U.S.C. § 78u–4............................................ *passim*

**Rules**

Item 101(c)(1)(vii) of Regulation S-K,
   17 C.F.R. § 229.101(c)(1)(vii) ...........................................................11

SEC Staff Accounting Bulletin (SAB) No. 99,
   64 Fed. Reg. 45,150, 45,151 (Aug. 19, 1999).................................................49, 50

SEC Rule 144A, 17 C.F.R. § 230.144A ...........................................................8, 19, 63

## PRELIMINARY STATEMENT

Congress enacted the Private Securities Litigation Reform Act of 1995 (the "PSLRA") to weed out "stock drop" lawsuits like this one—premised on business setbacks and accounting errors—on a motion to dismiss.   From 2008 to 2015, Defendant Valeant Pharmaceuticals International, Inc.'s ("Valeant" or the "Company") business strategy—fully disclosed to investors—differed from many of its peers.  Rather than spending heavily to develop the next blockbuster drug, Valeant acquired existing and sometimes undervalued drugs from other companies.  From 2008 to 2014, Valeant's revenues grew dramatically (from $757 million to more than $8.2 billion annually), and its stock price rose more than fifteenfold (from $9.45 at the end of 2008 to $143.11 at the end of 2014).   Throughout this period, Valeant repeatedly warned investors that the Company might not be able to set its drug prices freely or manage its rapid growth.  *See infra* at 10 to 16.

Beginning in January 2013, Valeant disclosed its development of a new "alternative fulfillment" ("AF") distribution channel through which specialty pharmacies filled certain dermatological prescriptions directly for patients.   From 2013 to September 2015, Valeant repeatedly disclosed efforts to improve its AF program and to make this program grow, but warned of potential risks, including that:  (i) the AF program had "bugs"; (ii) the Company might not be able to control revenues obtained from distributors or third-party payors; and (iii)  non-compliance with regulations governing sales practices could adversely impact results. The Company also disclosed its business decision not to provide confidential details about its AF program or identify distributors by name, including Philidor Rx Services, LLC ("Philidor"), which entered into a distribution agreement with Valeant in January 2013.  Initially, Philidor's sales were nominal and began to increase significantly only during 2015 (peaking at about 7% of revenues in the third quarter of 2015 right before Valeant disclosed its relationship with Philidor to investors).

This action arises out of events beginning in the fall of 2015, when Valeant faced a perfect storm of negative publicity involving small portions of its multi-billion-dollar business. First, beginning in September 2015, following news reports about dramatic price increases of certain specialty drugs, including two recently acquired Valeant drugs, Congress and other government regulators pursued investigations into drug-pricing practices by Valeant and other drug makers.  Second, in October 2015, just as Valeant's sales through Philidor had begun to grow, the press reported on alleged improper and "deceptive" sales practices by Philidor employees to obtain reimbursement from third-party insurers and other prescription payors. Seizing on the news, activist "short-seller" Citron Research ("Citron") targeted Valeant, branding the Company "the pharmaceutical Enron" and accusing it of "creat[ing] an entire network of *phantom* captive pharmacies" like Philidor in order to book "*phantom* sales or stuff the channel and *avoid scrutiny from the auditors*."  On the day when Citron made its allegations, Valeant's stock dropped more than 19%, which benefited Citron's short position.  Within six weeks, Valeant's stock price fell more than 60% (from $242.14 on September 18 to $93.77 on October 30), and plaintiffs here filed multiple securities actions alleging that Valeant and its senior executives defrauded investors.

In response, Valeant's Board formed an Ad Hoc Committee that began a voluntary internal review of the Company's relationship with Philidor, including its accounting practices.  Ultimately, this internal Board review, conducted by independent Board members and their independent advisors, resulted in a restatement of $57.5 million in revenue for 2014 (less than 1% of Valeant's $8.2 billion) and smaller related adjustments in 2015, based largely on the *timing* of revenue recognition for certain shipments to Philidor in the fourth quarter of 2014. This review did not conclude that there was any accounting fraud, and Plaintiffs do not contend that Citron's accusations of "phantom sales" and "channel stuffing" were even remotely true.

In their 282-page Consolidated Complaint (the "Complaint"), Lead Plaintiff TIAA and plaintiff City of Tucson (together, "Plaintiffs") have sued Valeant, its former CEO, J. Michael Pearson, five members of Mr. Pearson's management team,[1] and nine current or former Valeant Directors[2] (the "Individual Defendants," and together with Valeant, the "Valeant Defendants"). In addition, Plaintiffs have sued 17 separate financial institutions that purchased, underwrote or marketed Valeant debt or common stock offerings from 2013 to 2015,[3] and Valeant's independent auditor, PricewaterhouseCoopers LLP ("PwC").

In their Complaint, Plaintiffs allege that for more than three years (from January 4, 2013 through March 15, 2016, the putative "Class Period"), Defendants carried out an "unsustainable" and "wrongful course of business . . . us[ing] a network of secretly controlled pharmacies, deceptive pricing and reimbursement practices, and fictitious accounting to misrepresent Valeant's business operations and financial performance." (*See* Compl. ¶¶ 3, 12.) Plaintiffs assert claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), seeking from the Valeant Defendants recovery of their alleged losses trading Valeant securities based on a stock drop of over 85% between September 28, 2015 and June 7, 2016. Plaintiffs also assert claims under Sections 11, 12(a)(2) and 15 of the Securities

---

[1] In addition to Mr. Pearson, the other "Management Defendants" are former CFOs Howard B. Schiller and Robert L. Rosiello, former Vice President and Company Group Chairman Deborah Jorn, current Executive Vice President and Company Group Chairman Dr. Ari S. Kellen and former Corporate Controller Tanya Carro. (*See* Compl. ¶¶ 36-41.)

[2] The "Director Defendants" are current Board members Robert A. Ingram and Robert N. Power and former Board members Ronald H. Farmer, Colleen Goggins, Anders Lönner, Theo Melas-Kyriazi, Norma Provencio, Katherine B. Stevenson and Jeffrey W. Ubben. (*See* Compl. ¶¶ 42-51.)

[3] The "Bank Offering Defendants" are Deutsche Bank Securities Inc.; HSBC Securities (USA) Inc.; Mitsubishi UFJ Securities (USA), Inc.; DNB Markets Inc.; Barclays Capital Inc.; Morgan Stanley & Co. LLC; RBC Capital Markets; SunTrust Robinson Humphrey, Inc.; Goldman Sachs; J.P. Morgan Securities LLC; Merrill Lynch, Pierce, Fenner & Smith Inc.; CIBC World Markets Inc.; Citigroup Global Markets Inc.; DBS Bank Ltd.; TD Securities (USA) LLC; BMO Capital Markets Corp.; and SMBC Nikko Securities America, Inc. (Compl. ¶¶ 564, 566.)

Act of 1933 (the "Securities Act") against Valeant, Messrs. Pearson and Schiller, the Bank

Offering Defendants and PwC, alleging losses from purchases of Valeant's debt and stock in a

series of securities offerings made from July 2013 to March 2015.

Notwithstanding its prolix allegations, the Complaint does not state a claim as a

matter of law.  The PSLRA's heightened pleading standards, 15 U.S.C. § 78u–4(b)(1)-(2), and

Federal Rule of Civil Procedure 9(b) require Plaintiffs to "state with particularity facts giving

rise to a *strong inference* that [each] [D]efendant acted with" fraudulent intent and "specify each

statement alleged to have been misleading[] [and] the reason or reasons why the statement is

misleading."  To meet their high statutory burden, Plaintiffs must allege far more than a stock

price decline following adverse business news, alleged misconduct by third parties, accounting

errors, restatements or deteriorating financial results.  *See* cases cited *infra* at 35 to 43 & 48 to

55.  Because Plaintiffs fail to meet the PSLRA's and Rule 9(b)'s heightened pleading

requirements, the Complaint should be dismissed with prejudice.

> **1.      Plaintiffs Do Not Allege Scienter with the Required Particularity To Plead Fraud Claims Under the Exchange Act.**  In their Complaint, Plaintiffs do not plead that

any Individual Defendant had a cognizable motive to defraud investors for a personal, concrete

benefit, such as to profit from insider trading.  Plaintiffs' conclusory allegations—that certain

Individual Defendants had motive to commit fraud to (i) keep their jobs, (ii) increase

compensation or (iii) inflate Valeant's stock price in order to make corporate acquisitions

cheaper—are precisely the types of motives "generally possessed by most corporate directors

and officers" that are insufficient, as a matter of law, to plead the scienter in this Circuit.  *Inst'l*

*Investors Grp.* v. *Avaya, Inc.*, 564 F.3d 242, 278 (3d Cir. 2009).

Because Plaintiffs do not plead a legally sufficient motive for the Individual

Defendants to have engaged in fraud, their "circumstantial allegations must be *even greater*" to

plead a *strong inference* of scienter.  *Nat'l Junior Baseball League* v. *PharmaNet Dev. Grp.*, 720

F. Supp. 2d 517, 553 (D.N.J. 2010) (Wolfson, J.) (emphasis added).  Specifically, Plaintiffs must plead that one of the Individual Defendants made misstatements intentionally or with extreme recklessness—*i.e.*, "an *extreme departure from the standards of ordinary care . . .* which presents a danger of misleading buyers or sellers that is either *known* to the defendant or is so obvious that the actor *must have been aware of it*," *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276 (3d Cir. 2006) (emphasis added).  Tellingly, even after Congress made numerous Valeant internal documents public, the Complaint does not cite even one internal Valeant document or confidential witness suggesting any Individual Defendant made material misstatements knowingly or with extreme recklessness.  Instead, the Complaint strings together a number of circumstances that, taken together or separately, do not create a plausible—let alone the required *strong*—inference  that the Valeant Defendants, knowingly or with extreme recklessness, engaged in three-plus years of securities fraud.

First, Plaintiffs cannot rely on Valeant's voluntary restatement of less than 1% of its revenues from its distribution relationship with Philidor to support the required strong inference of securities fraud.  Plaintiffs do not allege facts showing that accounting fraud prompted this restatement, and the limited accounting errors that led to the restatement involved nuanced questions on the timing of revenues around the time that Valeant purchased its option to acquire Philidor.  The restatement had no impact on the Company's net cash flows and actually *increased* its net income in 2015.  In fact, Valeant's stock price increased more than 7% after release of the final restatement.  Courts routinely decline to infer any fraudulent intent from such accounting errors.  *See* cases cited *infra* at 34 to 36.

Second, Plaintiffs' allegations concerning *Philidor's* supposedly "deceptive" practices toward some of its customers and their insurers do not give rise to an inference of intent by any *Valeant Defendant* to defraud Valeant *investors*.  The Complaint pleads no particularized facts connecting any Individual Defendant to any alleged Philidor misconduct.  And Plaintiffs

cannot plead scienter with particularity by conclusorily speculating that an Individual Defendant must have known about Philidor's alleged misconduct because the pharmacy was supposedly part of Valeant's "core operations," when Philidor was merely one of Valeant's many distribution channels, and an insubstantial source of Valeant's revenues prior to the third quarter of 2015.  *See* cases cited *infra* at 38 to 43.

Third, no Valeant Defendant has admitted to engaging in fraud.  The internal Board review found that the Company's Audit and Risk Committee and auditors received incorrect information about certain Philidor sales, and that Valeant's "performance based environment" and Valeant's then-CFO and Controller may have contributed to accounting errors that led to Valeant's restatement.  Other than Valeant's small restatement of revenues, the only alleged affirmative misstatement in the entire Complaint, Mr. Pearson's vague and unscripted comment describing price and volume growth during an April 29, 2015 investor call, does not support the required strong inference that he acted knowingly or with extreme recklessness. Moreover, certain after-the-fact statements by the Individual Defendants to Congress in February and April 2016 about past "mistakes," including being "too aggressive" on pricing, do not support a strong inference that any Valeant Defendant made any historical misstatement to investors knowingly or with extreme recklessness.

Fourth, courts in this Circuit have repeatedly rejected as bases for inferring fraudulent intent Plaintiffs' other conclusory allegations about the Individual Defendants' general role in managing the Company or monitoring a distributor, the replacement of Valeant's management and the Company's decisions not to claw back certain executive compensation or to sue Philidor.  *See* cases cited *infra* at 38 to 45.

Thus, accepting Plaintiffs' well-pled allegations as true, Plaintiffs have not established an "inference of scienter *at least as likely* as [the] plausible opposing inference" of non-fraudulent intent, as they must to survive this motion to dismiss.  *Tellabs, Inc.* v. *Makor*

*Issues & Rights, Ltd.*, 551 U.S. 308, 328 (2007).   Rather, the "opposing inference of nonfraudulent intent" here—that the Valeant Defendants did not anticipate the political and regulatory backlash in 2015 from a limited number of drug-pricing decisions and did not know about Philidor's allegedly "deceptive" sales practices—is far more compelling than Plaintiffs' speculative allegations of securities fraud.  *See id.* at 314.

> **2.      *Plaintiffs Fail To Allege Any Defendant Made Actionable Misstatements or Omissions as a Matter of Law.***   Beyond failing to plead a strong inference of scienter, the Complaint does not plead with the required particularity that any Valeant Defendant made a materially false or misleading statement during the putative Class Period.  Valeant's limited restatement was not material because its impact on the Company's revenues (less than 1%) was well below the 5% impact threshold that the Securities and Exchange Commission ("SEC") and courts look to in determining materiality, and the accounting errors that led to the restatement occurred during a limited time period in the fourth quarter of 2014 around the time that Valeant entered into an option to purchase Philidor.  Valeant's restatement simply would not have "significantly altered the total mix of information available to [Valeant's] investors" prior to the revelations of Philidor's alleged misconduct in October 2015.  *Oran* v. *Stafford*, 226 F.3d 275, 284 (3d Cir. 2000) (internal quotation marks omitted).

Moreover, Plaintiffs cannot plead securities fraud based on the timing of Valeant's disclosures of its relationship with Philidor.   Plaintiffs allege no affirmative misstatement about Philidor, but rather that Valeant did not disclose enough detail about its relationship with Philidor until October 2015.  In fact, Valeant repeatedly disclosed its plans to develop an AF distribution program, *starting in January 2013*, including the risks associated with that program, such as that distributors might not comply with regulatory requirements.  And, in any event, public companies generally do not have a duty to disclose by name their

distributors, and Valeant did so after Philidor sales reached about 7% of revenues during the third quarter of 2015.

Defendants were not required to anticipate the maelstrom following either the political scrutiny of drug pricing that began in the fall of 2015 or Philidor's collapse. Plaintiffs have failed to plead particularized facts to show that any statement about Valeant's financial results or business practices was materially false. The remaining statements that Plaintiffs allege amount to "puffery" or protected forward-looking or opinion statements that courts in this Circuit routinely reject as a basis for securities fraud. And Plaintiffs cannot avoid dismissal of their claims against the Individual Defendants by imputing statements to all of them through so-called "group pleading" when most of them made few, if any, statements to shareholders; such group pleading does not meet the particularity requirements of the PSLRA or Rule 9(b).

**3.  *Plaintiffs Fail To Plead Loss Causation.*** The Complaint does not plead adequately the required "causal link" between each of 24 alleged "corrective" disclosures from September 28, 2015 to June 7, 2016, and some previously undisclosed wrongdoing by Defendants. In fact, Plaintiffs rely on disclosures, made after October 30, 2015, that simply repeated previously disclosed information about government inquiries, Philidor or Valeant's financial results. Notably, the original complaints in this action all claimed the Company's alleged misstatements were "revealed" by the time those complaints were filed in October 2015.

**4.  *Valeant's Debt and Common Stock Offerings Do Not Give Rise to Securities Act Liability.*** Plaintiffs' Securities Act claims fail for at least two reasons: *First*, each of the challenged debt offerings was a private placement made under Rule 144A, 17 C.F.R. § 230.144A, and thereby exempt from the registration requirements of the Securities Act. *Second*, Plaintiffs have not alleged actionable material misstatements or omissions in connection with any securities offering for the same reasons they have not done so for their Exchange Act claims.

## THE ALLEGATIONS OF THE COMPLAINT[4]

### A.  Valeant's Non-Traditional Business Strategy and Rapid Growth

Headquartered in Quebec, Valeant is a specialty pharmaceutical and medical device company offering more than 1,800 "branded and generic pharmaceuticals, over-the-counter products, and medical devices" in 100 countries with around 20,000 employees.  (*See* Compl. ¶¶ 2, 422; Ex. 1 (VRX 10-K FY 2015) at 1-9.)[5]  Valeant's stock trades on the New York Stock Exchange under the ticker symbol "VRX."  (Compl. ¶ 35.)

From 2008 to 2015, then-CEO J. Michael Pearson and his executive team led Valeant through a period of substantial growth based on a non-traditional business strategy fully disclosed to investors.  (*See* Compl. ¶¶ 7-11.)  Unlike drug companies that "grow by developing new medications . . . spend[ing] approximately 15%-20% of revenues on research and development ("R&D") . . . [and] charg[ing] high prices for the newly developed drugs" (if any) (Compl. ¶ 7), Valeant spent "approximately 3% of revenue" on internal R&D expenses (Compl. ¶ 8), and "more than $30 billion" for existing drug portfolios and companies through "more than 100 acquisitions" (Compl. ¶ 9), including undervalued or mispriced drugs the Company believed could be sold more profitably (Compl. ¶ 192(b)-(c)).

---

[4]    Under the PSLRA, the Court "must consider the [C]omplaint in its entirety, as well as other sources that courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the [C]omplaint by reference, and matters of which a court may take judicial notice."  *OFI Asset Mgmt.* v. *Cooper Tire & Rubber*, --- F.3d ---, 2016 WL 4434404, at *5 (3d Cir. Aug. 22, 2016).  The Court may consider "(1) documents relied upon in the Complaint ([including] Company['s] . . . press releases); (2) documents filed with the SEC . . . ; [] (3) stock price data compiled by [a reliable financial] news service," *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002); and (4) published news reports that "serve only to indicate what was in the public realm at the time," so long as "[t]heir publication is 'not subject to reasonable dispute.'" *Benak ex rel. Alliance Premier Growth Fund* v. *Alliance Capital Mgmt. L.P.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006) (quoting Fed. R. Evid. 201(b)(2)).

[5]    Unless otherwise specified, all exhibits cited are contained in the September 13, 2016 Declaration of Robert J. Giuffra, Jr.

Valeant's non-traditional business strategy succeeded.  From 2012 to 2015 alone, the Company's revenues nearly tripled from $3.5 billion to more than $10 billion, while its assets nearly tripled from approximately $18 billion to $49 billion.  (Ex. 1 (VRX 10-K FY 2015) at 39.) Valeant's stock price also rose dramatically, from approximately $48 on January 6, 2012 to over $262 by August 5, 2015.  (Ex. 2 (Stock Price Chart).)   At the same time, Valeant warned investors each quarter that because the Company had "grown at a very rapid pace" its "inability to properly manage or support this growth could have a material adverse effect on our business, financial condition and results of operations and could cause the market value of our common stock to decline."  (Ex. 3 (VRX 10-K FY 2013) at 10; *see also* Ex. 4 (VRX 10-K FY 2014) at 10.)

    **B.**    **Beginning in January 2013, Valeant Enters into a Distribution Agreement with Philidor and Discloses Efforts To Develop a New Alternative Fulfillment Distribution Channel for Certain of Its Drugs.**

Valeant also attempted to develop a new distribution channel using an alternative fulfillment ("AF") program begun by Medicis Pharmaceutical Corporation ("Medicis") (Compl. ¶ 84), a publicly traded drug company that Valeant acquired in December 2012 (Compl. ¶ 9).  As Medicis disclosed to investors in 2012 (prior to Valeant's acquisition), the AF program sought to "transfer unprofitable prescriptions from the traditional wholesale and retail chain drugstore channel" to specialty pharmacies working directly with doctors, patients and insurance payors and thus "improve the profitability of the brands."  (Ex. 5 (Medicis 10-Q 3Q 2012) at 40; Compl. ¶ 85.)  One of the specialty pharmacies Valeant used was Philidor, which was owned by a former Medicis consultant and "formed a network of specialty pharmacies in order to distribute" prescription drugs in the United States.  (Compl. ¶¶ 88-90, 104.)

1.      **Valeant's Contractual Relationship with and Accounting for Philidor Prior to December 2014**

In January 2013, Valeant entered into a Master Service and Pharmacy Dispensing Agreement ("Dispensing Agreement") with Philidor to fill prescriptions for a limited set of Valeant drugs, to "adjudicat[e] . . . all insured pharmacy claims," including reprocessing of initially rejected claims, and to "proactively follow-up with customer[s] for covered Product refills." (Compl. ¶¶ 89-90 (quoting Dispensing Agreement); Ex. 6 (Dispensing Agreement) at Ex. A, pp. 19-20.) Philidor expressly represented and warranted that it would maintain "all federal and state pharmacy and other licenses or approvals" and perform all services "in accordance with all applicable Laws and in accordance with applicable industry standards." (Ex. 6 ¶ 4.2.5.)

Prior to December 2014, Valeant treated Philidor like any other wholesale customer in its various sales channels: Valeant recognized revenue only when its products were delivered (and title passed) to Philidor. (Compl. ¶ 316.) This revenue recognition policy was disclosed in Valeant's financial statements (*e.g.*, Ex. 3 (VRX 10-K FY 2013) at F-14), and Plaintiffs have not alleged that it was inconsistent with any applicable accounting principles. Philidor was not separately identified in Valeant's financial statements because its sales were less than 10% of Valeant's total revenue, the SEC's materiality threshold for separately identifying customers, which Valeant disclosed. (*E.g.*, Ex. 3 (VRX 10-K FY 2013) at 7.)[6] Prior to mid-December 2014, Philidor's sales were "less than 1% of [Valeant's] total consolidated net revenue for 2014." (Ex. 1 (VRX 10-K FY 2015) at 44.)

---

[6]      Under SEC rules, a company should disclose the "name of any customer and its relationship, if any," if sales to that customer are "equal to 10 percent or more of the [Company's] consolidated revenues and the loss of such customer would have a material adverse effect on the [Company] taken as a whole." Item 101(c)(1)(vii) of Regulation S-K, 17 C.F.R. § 229.101(c)(1)(vii).

Although the Complaint alleges that Philidor was created "with the assistance of Valeant employees" (Compl. ¶ 54), that a "joint steering committee" was formed after December 2014 (Compl. ¶ 100), that two non-Defendant Valeant employees used email "aliases" when working with Philidor (Compl. ¶¶ 12, 95), and that several Valeant employees became Philidor employees in 2015 (Compl. ¶¶ 95-96), there is no allegation Valeant owned Philidor or that Philidor ceased to maintain its own corporate form, employees and operations.[7]  And Plaintiffs do not allege facts suggesting any Individual Defendant had day-to-day control over Philidor.

2.     **Valeant's Disclosures Concerning the AF Program and Philidor Prior to December 2014**

Far from "concealing" its AF program (Compl. ¶ 14), Valeant regularly disclosed its efforts to develop it, as well as known risks from the program.  Financial analysts reporting on Valeant observed that "[p]hysicians had mixed opinions regarding alternate fulfillment channels," and that "VRX uses Philidor to process the order."  (Ex. 7 (Guggenheim Report, Sept. 19, 2014).)  As statements and documents quoted selectively in the Complaint demonstrate, beginning *in January 2013* Valeant fully disclosed to investors development of the AF program.[8]

*Goals of the AF Program*:  On January 4, 2013, then-CEO Mr. Pearson explained how the program could allow the "average price internally to go up" for sales by eliminating traditional distributor and retailer costs and obtaining higher reimbursement rates from pharmacy-led efforts "to actually try to get [insurance] claim[s] adjudicated" with payors. (Compl. ¶ 133(d)-(e).)  Pearson noted that "*if it all works out*," the AF program "hopefully can

---

[7]     Valeant's agreements with Philidor also gave Valeant a limited "right to inspect and audit Philidor to verify compliance with the agreement 'and to assess and evaluate the operation of the program'" (Compl. ¶ 89), but Plaintiffs do not allege Valeant uncovered any improper or illegal conduct by Philidor.

[8]     For the Court's convenience, Valeant's disclosures prior to October 2015 concerning the AF program, and risks of the Company's business model, are provided in Appendix A.

be used to start generating truly profitable scripts through a different channel." (*See* Compl. ¶ 133(d) (emphasis added).)[9]

  ***Efforts to Improve the Program***:   On June 11, 2013, then-CFO Mr. Schiller explained that "generation two and generation three" of the AF program were under development, focusing on "more judicious use of co-pay cards," a form of patient assistance that reduces out-of-pocket cost, "and making sure when . . . a patient is covered, you get reimbursed for it." (Compl. ¶ 138.)[10]   In January 2014, however, Mr. Pearson warned that the AF program had "rolled out a little bit too quickly and there were lots of bugs in it," and that the Company was working on a "next generation." (Compl. ¶ 147.)

  ***Product Volumes in the AF Channel***:   Recognizing that the AF program could become "a competitive advantage," Valeant generally declined to "give specifics" about product sales through AF channels. (Compl. ¶¶ 133(b), 169; *see also* Compl. ¶¶ 134(b), 207.)  Beginning in October 2014, however, in response to analysts' requests, Valeant gave volume estimates for the anti-fungal drug Jublia flowing through "specialty pharmacy Philidor" and the AF channel.[11]

---

[9] Stock analysts began reporting on the program around the same time. On January 4, 2013, Jefferies Equity Research reported that AF volumes for one drug, Solydyn, "signal[ed] increasing focus on AF as a novel channel for wringing more revenue from this and other products with sub-optimal insurance coverage." (Ex. 8 (Jefferies Report, Jan. 4, 2013).)  In April 2013, Susquehanna Financial Group reported that Valeant's "ability to execute Medicis' alternate fulfillment program" was a "[k]ey downside risk[]." (Ex. 9 (Susquehanna Report, Apr. 16, 2013).)  This Court may consider analyst reports "not for the truth of their content, but as corroboration" that information about the AF program was available in the marketplace. *See Livingston* v. *Cablevision Sys. Corp.*, 966 F. Supp. 2d 208, 217 n.3 (E.D.N.Y. 2013).

[10] The Complaint's reference to federal statutory restrictions on "waiv[ing] or eliminat[ing] patient copays . . . if government payors, such as Medicaid," are involved (Compl. ¶ 12; *see also* Compl. ¶¶ 70, 436) is beside the point, because, as Plaintiffs acknowledge, the Philidor AF channel was "for commercially insured and cash-paying claims only" and prescriptions paid by "government insurance [were] not eligible for our co-pay subsidy programs" (Compl. ¶ 206).

[11] On an October 20, 2014 conference call, Mr. Pearson estimated that "about 40% of [Jublia] volumes [are] going through specialty pharma and 60% [are] going through traditional pharmacies." (Ex. 10 (Oct. 20, 2014 Call Transcript) at 14.)  The Complaint selectively quotes

*(footnote continued . . .)*

-13-

***Disclosed Risks from Distributors Like Philidor***:  Valeant warned investors in each of its quarterly Form 10-Qs and annual Form 10-Ks that the Company's performance could be impacted by "declines in the pricing and sales volume of certain of our products that are distributed or marketed by third parties, over which we have no or limited control" and that its "ability to secure and maintain third party . . . marketing or distribution arrangements" could adversely affect its business.[12]

***Disclosed Risks from Reimbursement by Third-Party Payors***:  Valeant also stressed in its quarterly and annual filings that "the availability and extent to which our products are reimbursed by . . . third party payors, as well as the impact of obtaining or maintaining such reimbursement on the price of our products" could impact the Company's expectations.[13]

***Disclosed Risks of Improper Sales Practices***:  Valeant further disclosed to investors that "significant sanctions" against the Company could result if Valeant, its partners or service providers failed to comply with "the extensive regulation" governing "marketing,

---

(. . . *continued footnote*)

statements made on that call (*see* Compl. ¶ 175), but omits the disclosures about specialty pharmacies.

[12]     Ex. 11 (VRX 10-Q 2Q 2013) at iii-iv; Ex. 12 (VRX 10-Q 3Q 2013) at iii-iv; Ex. 3 (VRX 10-K FY 2013) at iii-iv; Ex. 13 (VRX 10-Q 1Q 2014) at iii-iv; Ex. 14 (VRX 10-Q 2Q 2014) at iii-iv; Ex. 15 (VRX 10-Q 3Q 2014) at iii-iv; Ex. 4 (VRX 10-K FY 2014) at iii-iv; Ex. 16 (VRX 10-Q 1Q 2015) at iii-iv; Ex. 17 (VRX 10-Q 2Q 2015) at iii-iv.  The annual reports also warned that Valeant had "entered into distribution agreements with other companies to distribute certain of our products at supply prices based on net sales" and that "[d]eclines in the pricing and/or volume, over which we have no or limited control, of such products, and therefore the amounts paid to us, could have a material adverse effect on our business . . . and could cause the market value of our common stock to decline."  (Ex. 3, at 19; Ex. 4, at 19.)

[13]     Ex. 11, at iii; Ex. 12, at iii; Ex. 3, at iv; Ex. 13, at iii; Ex. 14, at iv; Ex. 15, at iv; Ex. 4, at iv; Ex. 16, at iv; Ex. 17, at iv.

promotional and pricing practices, as well as the manner in which sales forces interact with purchasers, prescribers and patients."[14]

### C. Valeant Disclosed Routinely the Contribution of Price Increases to the Company's Revenue Growth.

Plaintiffs assert repeatedly that Valeant "concealed from investors" that its revenue "growth was dependent upon dramatic prices increases," and the risks associated with the Company's growth and drug pricing.  (*E.g.* Compl. ¶ 12.)  In fact, Valeant disclosed these facts and risks in great detail.

*Contribution of Pricing to Revenue Growth*:  Valeant regularly disclosed to investors the primary factors that contributed to the Company's financial results, including changes in pricing and volume, as well as revenues and costs from acquired businesses and products.  For example, Valeant's 2013 Form 10-K disclosed that revenue growth "[i]n the Developed Markets. . . *was driven primarily by price*, while volume was the main driver of growth in the Emerging Markets."  (Ex. 3, at 35 (emphasis added).)  For every quarter between April 2013 and June 2015, Valeant disclosed that price increases contributed more to revenue growth than volume in Developed Markets,[15] which accounted for at least 74% of total revenues (Ex. 1 (10-K FY 2015) at 47).

On top of this, the Company provided comparative growth from acquisitions and "organic growth" from existing assets.  (*See*, *e.g.*, Ex. 4 (VRX 10-K FY 2014) at 34.)  Beginning in 2014, Valeant also disclosed quarterly revenue figures for each of its top 20 products,

---

[14]      Ex. 3, at 17; Ex. 4, at 16; *see also* Ex. 4, at iv (warning business could be impacted by discovery of a "failure to comply with . . . [the] extensive regulation of our marketing, promotional and pricing practices," among other things); Ex. 11, at iv (same); Ex. 12, at iv (same); Ex. 3, at iv (same); Ex. 13, at iv (same); Ex. 14, at iv (same); Ex. 15, at iv (same); Ex. 4, at iv (same); Ex. 16, at iv (same); Ex. 17, at iv (same).

[15]      Ex. 11, at 42; Ex. 12, at 53; Ex. 3, at 35; Ex. 13, at 38; Ex. 14, at 44-45; Ex. 15, at 47; Ex. 4, at 34; Ex. 16, at 34; Ex. 17, at 39.

including primary drivers of each product's growth. (*See*, *e.g.*, Ex. 18 (July 31, 2014 Valeant Presentation) at 8-10 (price primary driver of eight of top 20 selling drugs).)[16]

        ***Risks of Future Price Controls*:**  Valeant also warned in its quarterly and annual filings that its future prospects were subject to "the impact of price control restrictions on our products, including the risk of mandated price reductions," and "the inclusion of our products on formularies or our ability to achieve favorable formulary status."[17]  Valeant further warned that "[l]egislative or regulatory reform of the healthcare system may affect our ability to sell our products profitably . . . and could cause the market value of our common stock to decline."[18]  Likewise, Valeant cautioned that "the impacts of the Patient Protection and Affordable Care Act (as amended) and other legislative and regulatory healthcare reforms in the countries in which we operate" may adversely affect its business.[19]

      **D.**     **Valeant's Business Model and Practices Are Scrutinized by Investors and Competitors, Including During a Contentious 2014 Proxy Fight.**

        As Valeant grew rapidly from 2013 to 2015, Valeant faced detractors.  The most intense public scrutiny came in April 2014 when "Valeant engaged in a hostile takeover attempt of drug manufacturer Allergan," which Allergan publicly resisted, pointing to many of the risks that Plaintiffs here contend were "concealed" until September and October 2015.  (Compl. ¶ 15.) In presentations filed with the SEC in May and October 2014, Allergan raised concerns about "Valeant's low organic sales growth (driven mostly by price increases)[,] [s]ustainability of

---

[16]    *See also* Ex. 19 (Oct. 20, 2014 Valeant Presentation) at 9-11 (same for seven of top 20 drugs).  Moreover, independent data sources like IMS Health track drug pricing and sales in retail pharmacy channels, including pricing and volume.  (Compl. ¶¶ 66, 93.)

[17]    Ex. 11, at iii; Ex. 12 at iii; Ex. 3, at iv; Ex. 13, at iii; Ex. 14, at iv; Ex. 15, at iv; Ex. 4, at iv; Ex. 16, at iv; Ex. 17, at iv.

[18]    Ex. 3, at 21; Ex. 4, at 20.

[19]    Ex. 11, at iv; Ex. 12, at iv; Ex. 3, at iv; Ex. 13, at iv; Ex. 14, at iv; Ex. 15, at iv; Ex. 4, at iv; Ex. 16, at iv; Ex. 17, at iv.

acquisitions strategy[, and] [l]ow R&D investment and the impact on future growth" (Ex. 20 (May 27, 2014 Allergan Presentation) at 3)[20]—the very risks Plaintiffs here claim were unknown to investors (*e.g.*, Compl. ¶ 202).  Allergan also criticized Valeant's reliance on price increases for sales growth, and pronounced that Valeant's drug pricing was "unsustainable."  (Ex. 20 at 7.) Valeant responded by pointing out that the Company had "constraints, just like other pharma companies . . . , in terms of pricing," and "that most of [its] top products were 'growing by volume, not just price'" (Compl. ¶ 15), which Plaintiffs have not alleged was inaccurate.

E.     **In December 2014, Valeant Purchases an Option To Acquire Philidor and Consolidates Philidor's Financials as the AF Program Grows.**

Although Philidor's net revenue to mid-December 2014 "represented less than 1% of [Valeant's] total consolidated net revenue for 2014" (Ex. 1 (VRX 10-K FY 2015) at 44), by late 2014 the AF program showed promise, and Valeant sought to expand it using Philidor's network of pharmacies (*see* Compl. ¶¶ 168-69, 173, 175).  On December 15, 2014, Valeant paid $100 million for a 10-year option to acquire Philidor.  (Compl. ¶ 99.)   Under the option agreement, Philidor remained an independent company, but "Valeant ha[d] the right (but not the obligation) to appoint" certain Philidor officers and employees "as reasonably requested." (Compl. ¶ 253.)   Plaintiffs allege that Messrs. Pearson and Schiller and Valeant's Board "engaged in due diligence, which included multiple site visits" to Philidor's main office prior to signing the option agreement (Compl. ¶ 405), but allege no facts suggesting they learned of any purported improper Philidor sales practices.

Because the option agreement granted Valeant additional rights with respect to Philidor, the Company determined that Philidor qualified for accounting purposes as a "variable interest entity" ("VIE") for which Valeant had become "primary beneficiary."  (Compl. ¶ 327.)

---

[20]     *See also* Ex. 21 (Oct. 20, 2014 Allergan Presentation) at 14 ("We Believe Price is a Large Driver of Growth"); *id.* at 23 (citing price increases for 20 Valeant products).

Thus, under FASB's Accounting Standards Codification ("ASC") Topic 810, beginning in mid-December 2014 Valeant properly consolidated Philidor's financial statements with its own and recognized Philidor sales when Philidor dispensed products to patients rather than when the product was delivered to Philidor.  (Compl. ¶ 316.)  Plaintiffs do not contend that Valeant's consolidation of Philidor's financial statements after 2014 was improper.  Recognizing its Philidor option agreement, in February 2015 Valeant disclosed its consolidation of financials for several VIEs, "which [were] not material individually or in the aggregate."  (Compl. ¶ 184(e).)

Over the ensuing months, Valeant's sales through Philidor began to grow, peaking at around 7% of net revenues in the third quarter of 2015 (and approximately 6% of revenues over the first three quarters combined).  (Compl. ¶ 215(a).)  In April and July 2015, Valeant disclosed volumes of Jublia and other dermatology products sold through specialty pharmacies (Ex. 22 (Apr. 29, 2015 Call Transcript) at 15, 23), and stated that "the adoption through multiple specialty pharmacies continues," such that "[f]or derm[atology] overall, it varies by product, but it's around 40%" (Compl. ¶ 196).[21]

F.      **From July 2013 to March 2015, Valeant Makes Several Private Debt and Common Stock Offerings, Fully Disclosing the Risks of the Company's Business Model.**

On July 12 and December 2, 2013 and January 30 and March 13, 2015, Valeant completed four private placements of senior notes totaling over $13.6 billion (the "Debt Offerings").  (Compl. ¶¶ 574-76, 595-98, 618-20, 644-46.)  As the Offering Memorandum for each of those placements made clear, only Qualified Institutional Buyers (or "QIBs") like TIAA, as well as non-U.S. purchasers, could participate in the offerings, which were exempt under SEC

---

[21]      Analysts continued to note Philidor sales.  (Ex. 23 (Cantor Fitzgerald Report, Apr. 30, 2015) ("Approximately 50% of Jublia prescriptions are now running through the Philidor specialty pharmacy").)

Rule 144A from the registration requirements of the Securities Act.[22]  In addition, Valeant raised $1.45 billion through a March 16, 2015 public offering of 7.3 million shares of Valeant stock priced at $199 per share (the "Stock Offering").  (Compl. ¶ 671.)  The Offering Memoranda for the Debt Offerings and the Prospectus for the Stock Offering clearly identified the same risks of Valeant's business that the Company regularly disclosed in its periodic SEC filings.[23]

G.     **The Perfect Storm Begins: In April 2015, *The Wall Street Journal* Reports on Drug Price Increases by Valeant and Other Pharmaceutical Companies.**

In the spring of 2015, the press began to focus on drug pricing by pharmaceutical companies, which incited a firestorm of scrutiny over drug pricing.  On April 26, 2015, *The Wall Street Journal* reported that "[m]ore pharmaceutical companies are buying drugs that they see as undervalued, then raising the prices," and that "companies [are] regularly upping the prices of their own older medicines and launching new treatments at once unheard of sums, driving up the cost of drugs."  (Ex. 25 (Jonathan D. Rockoff, *Firms Buy Rival Drugs, Then Raise Their Prices*, WALL ST. J., Apr. 27, 2015 (print ed.)).)  The article highlighted price increases for just two Valeant heart drugs, Isuprel and Nitropress (neither of which is alleged to have flowed through Philidor), that Valeant had purchased earlier that year from another drug maker, Marathon Pharmaceuticals.  (*Id.*)  Later, in mid August, *the Wall Street Journal* reported that Senator Bernie Sanders and Representative Elijah Cummings had sent a letter to Valeant demanding information about pricing for Isuprel and Nitropress, based on the April 26 article.  (Ex. 26

---

[22]     The Rule 144A exemption for each of the Debt Offering materials is set forth in the Bank Offering Defendants' motion to dismiss.

[23]     (*See*, *e.g.*, Ex. 24 (Mar. 16, 2015 Prospectus Supplement) at S-vii-x.)  Moreover, the Debt Offering Memoranda and Stock Offering Prospectus incorporated by reference Valeant's prior SEC filings.  (Compl. ¶¶ 578 n.85, 600 n.86, 622 n.87, 648 n.88, 675.)

(Jonathan D. Rockoff, *Bernie Sanders, Elijah Cummings Question Valeant on Heart-Drug Price Increases*, WALL ST. J. ONLINE, Aug. 14, 2015).)[24]

### H.    The Scrutiny Begins:  In Late September 2015, the Government and Press Question Drug Pricing and Focus on Valeant.

By late September 2015, press and political scrutiny on drug price increases reached a fever pitch, initially fueled by widespread reports about a 5,000% overnight price increase on a decades-old HIV/cancer treatment by Turing Pharmaceuticals.  In a September 20, 2015 report on Turing, *The New York Times* noted that "Turing's price increase is not an isolated example," and that "there is also growing concern about huge price increases on older drugs" by other pharmaceutical companies (including Valeant), which "resulted from a business strategy of buying old neglected drugs and turning them into high-priced 'specialty drugs.'"  (Ex. 27 (Andrew Pollack, *Drug Goes from $13.50 a Tablet to $750, Overnight*, N.Y. TIMES, Sept. 20, 2015).)[25]  The next day, on Monday, September 21, 2015, presidential candidate Hillary Clinton tweeted about Turing's "price gouging," precipitating a pharmaceutical stock sell-off.  (*See* Ex. 28 (Anna Edney & Melissa Mittelman, *Valeant, Turing Targets of Probes in Both Houses of Congress*, BLOOMBERG, Nov. 4, 2015).)  Valeant's stock dropped 5.4% the same day (from $242.14 to $229.00) and over 17% for the week (from $242.14 to $199.47).  (Ex. 2.)

Just one week after Secretary Clinton's "tweet," on September 28, 2015, members of Congress publicized a letter requesting that Congress subpoena Valeant for documents related to "massive price increases" for Isuprel and Nitropress.  (Compl. ¶ 232.)  Despite the limited focus on two Valeant drugs, numerous news outlets reported that Valeant was "in [the]

---

[24]    Plaintiffs' suggestion that congressional requests for information were not "revealed" until September 28, 2015 is wrong (Compl. ¶ 233); as this article demonstrates, the press immediately covered them.

[25]    The article specifically referenced the August 2015 Cummings/Sanders letter.

crosshairs of [the] U.S. Congress" for its pricing practices (Compl. ¶ 235), and Valeant's stock price declined another 16.5% that day (from $199.47 to $166.50 at close) (Ex. 2).

Throughout October, legislators and the press continued to focus on pricing practices in the pharmaceutical industry, which sparked government inquiries.  On October 4, 2015, *The New York Times* reported that "Valeant's habit of buying up existing drugs and raising prices aggressively, rather than trying to develop new drugs, has also drawn the ire of lawmakers and helped stoke public outrage."  (Compl. ¶ 236; *see also* Ex. 29 (Andrew Pollack & Sabrina Tavernise, *Valeant's Drug Price Strategy Enriches It, but Infuriates Patients and Lawmakers*, N.Y. TIMES, Oct. 4, 2015).)  On October 14, 2015, Valeant voluntarily reported that it had recently received subpoenas from two U.S. Attorney's Offices for materials primarily relating to Valeant's patient assistance, "distribution of the company's products, information provided to the Centers for Medicare and Medicaid Services, and pricing decisions."  (Compl. ¶ 237.)

Overall, from September 21 to October 16, 2015, Valeant's stock price declined by 27.8%, from an intraday high of $245.82 on September 21 to close at $177.56 on October 16. (Ex. 2.)  But Valeant was not alone in this period.  Amid the industry-wide scrutiny on drug pricing, the NYSE Arca's pharmaceutical industry index fell around 20% from September 17 to 29.  (Ex. 30 (Index Value Chart).)

I.    **On October 19, 2015, Valeant Announces Third Quarter Earnings and Provides Details on Philidor in Response to a Report on a Lawsuit with a Philidor-Related Pharmacy.**

Beginning in the second half of October 2015, media attention turned to Valeant's AF program and its relationship with Philidor.  On October 19, 2015, the Southern Investigative Reporting Foundation ("SIRF"), a non-profit group whose "sole focus is to perform deep-dive reporting on business organizations" by "min[ing] corporations' legal and financial documents" (SIRF, About Us, http://sirf-online.org/about-us/), released a report on its website about Valeant's relationship with Philidor and a lawsuit involving a Philidor-related pharmacy called

R&O Pharmacy ("R&O") that sold certain Valeant drugs.  (Ex. 31 (Roddy Boyd, *The King's Gambit: Valeant's Big Secret*, SIRF, Oct. 19, 2015).)  The report described R&O's relationship with Philidor and highlighted R&O's accusation that "Valeant and R&O were being jointly defrauded by someone, or Valeant was defrauding R&O."  (*Id.*)  The report claimed that Philidor had "conceal[ed] its ownership" structure, and that California regulators had rejected Philidor's pharmacy application in 2014 based on a "false statement of facts."  (*See id.*)  The report further speculated that the previously disclosed U.S. Attorneys' Office subpoenas Valeant received might be related to Philidor.  (*See id.*)

Before the market opened on October 19, 2015, Valeant announced earnings for the third quarter of 2015 and disclosed additional details about the Company's use of specialty pharmacies and its relationship with Philidor.  (Compl. ¶¶ 239-40.)  Valeant confirmed, among other things, that it had "a contractual relationship with Philidor and late last year we purchased an option to acquire Philidor," and that the Company consolidated Philidor's financials so that "[i]nventory held at Philidor remains on Valeant's books."  (Ex. 32 (Oct. 19, 2015 Presentation) at 34-35.)[26]  Valeant also responded by noting that the R&O lawsuit involved collections on unpaid invoices (*see* Ex. 33 (VRX 10-Q 1Q 2016) at 39) and reiterated that the Company "intend[ed] to cooperate with the investigations" of Congress and the U.S. Attorneys' Offices.[27] (Ex. 32, at 41.)  Valeant's stock price declined more than 17% over the next two days.  (Compl. ¶ 383.)

---

[26]     The Company also gave a detailed breakdown in volume and price growth for the first nine months of 2015, which showed both prices and volume had increased by 8%.  (Ex. 32 at 21; *see also* Compl. ¶ 242.)  Mr. Pearson also stated that Valeant would "mak[e] pricing a smaller part of [its] growth," would "pursue far fewer, if any, transactions that are focused on mispriced products," and that "internal R&D will become more of an area of focus."  (Compl. ¶¶ 240-41.)

[27]     Valeant produced more than 75,000 pages of documents to Congress (Compl. ¶ 421), some of which have been made public, and two Valeant executives testified at congressional hearings.  (Compl. ¶¶ 422, 429.)

**J.    On October 21, 2015, Short-Seller Citron Research Publishes a Report Making Baseless Allegations Comparing Valeant to Enron, and Plaintiffs Reflexively File Putative Securities Class Action Complaints Against the Company.**

Two days after Valeant announced its earnings, on October 21, 2015, Citron—a short-seller with a financial interest in seeing Valeant's stock drop—issued a wildly speculative eight-page report calling Valeant "the pharmaceutical Enron." (Compl. ¶ 247.) Citron accused the Company of "hav[ing] created an entire network of phantom captive pharmacies" through Philidor in order to book "*phantom sales* or *stuff the channel*, and avoid scrutiny from the auditors," and claimed to have found "the smoking gun" in the fact that R&O was in the Philidor network. (Ex. 34 (Citron Report) at 3, 5 (emphasis added); *see also* Compl. ¶¶ 246-47.) With no more support than R&O's lawsuit, the SIRF report and speculation, Citron announced that it "*believes the whole thing is a fraud* to create invoices to deceive the auditors and book revenues." (Ex. 34, at 3 (emphasis added).) Trading on enormous volume, Valeant's stock dropped more than 40% that day, closing over 19% below the open. (*See* Compl. ¶ 247.)

Within a day of Citron's report comparing Valeant to Enron, the first of four securities fraud putative class actions were filed in this Court,[28] each one alleging that many of the same supposed Valeant misstatements that Plaintiffs now contend were not "revealed" until June 2016 had been disclosed by October 21, 2015. (*See*, *e.g.*, *Potter* Compl. ¶¶ 62-65.)

**K.    On October 26, 2015, Valeant Discloses Philidor's Limited Contribution to Revenues and Initiates a Voluntary Review of the Company's Relationship with Philidor.**

As media reports on Philidor continued, on October 26, 2015, Valeant filed its Form 10-Q for the third quarter of 2015 and announced a voluntary internal review of the

---

[28]    The four actions are:  *Potter* v. *Valeant Pharms. Int'l Inc.* ("*Potter*"), No. 15-cv-7658 (filed Oct. 22, 2015); *Chen* v. *Valeant Pharms. Int'l, Inc.*, No. 15-cv-7679 (filed Oct. 23, 2015); *Yang* v. *Valeant Pharms. Int'l, Inc.*, No. 15-cv-7746 (filed Oct. 27, 2015); and *Fein* v. *Valeant Pharms. Int'l Inc.*, No. 15-cv-7809 (filed Oct. 30, 2015).

Company's relationship with Philidor.  (Ex. 35 (VRX 10-Q 3Q 2015) at 38.)  In its Form 10-Q

and an accompanying presentation, Valeant disclosed Philidor's limited contribution to net

revenue for the first three quarters of 2015 (about 6%) and the third quarter of 2015 (about 7%)

(*id.* at 42), as well as Philidor's contribution to Valeant's non-GAAP earnings (EBITA) for the

third quarter of 2015 (approximately 7%) (Ex. 36 (Oct. 26, 2015 Presentation) at 10).  Valeant

also noted that Philidor's total assets were less than 1% of the Company's consolidated assets at

the end of the third quarter.  (Ex. 35, at 13.)  Valeant also provided further details about its

relationship with, and accounting practices for, Philidor.  (*See* Compl. ¶ 215.)

Valeant announced that "its Audit and Risk Committee and the full Board of

Directors . . . have confirmed the appropriateness of the Company's related revenue recognition

and accounting treatment" of Philidor, but that, "[i]n light of the recent allegations made

regarding Philidor . . . the Board of Directors decided to establish an ad hoc committee of the

board to review allegations related to the Company's business relationship with Philidor and

related matters."  (Ex. 35, at 38.)  The Ad Hoc Board Committee hired independent advisors to

assist in its review, including Kirkland & Ellis LLP.  (*See* Ex. 37 (VRX 8-K (Mar. 21, 2016)).)

During Valeant's October 26 earnings call, Mr. Pearson warned that "it is hard to predict how

and whether recent events will impact the business in the short term," and that Valeant was

"develop[ing] contingency plans if we choose not to continue with Philidor."  (Ex. 38 (Oct. 26,

2015 Call Transcript) at 14, 17.)  That day, Valeant stock ended more than 5% below the

previous close.

## L.     On October 30, 2015, Valeant Ends Its Relationship with Philidor.

Several days later, on October 28, 2015, Bloomberg reported on alleged

misconduct by Philidor employees in filling and obtaining reimbursement for prescriptions,

quoting "an internal Philidor training manual" that "instructed employees to submit claims under

different pharmacy identification numbers if an insurer rejected Philidor's request for

reimbursement." (Compl. ¶ 258.) The next day, Bloomberg, citing former employees and an internal document, reported further that "[w]orkers at . . . Philidor . . . were given written instructions to change codes on prescriptions in some cases so it would appear that physicians required or patients desired Valeant's brand-name drugs – not less expensive generic versions." (Compl. ¶ 259.) These articles are not alleged to have cited any evidence that any Individual Defendant was aware of or involved in these alleged practices.

That same day, the country's three largest pharmacy benefit managers ("PBMs") responsible for paying a large portion of insured prescriptions (Express Scripts, CVS Caremark and OptumRx) announced that they would no longer work with Philidor. (Compl. ¶¶ 20, 260-61.) The next day, on October 30, 2015, Valeant announced that it too would sever all ties with Philidor (Compl. ¶ 493), and would "develop a plan to ensure patients' access to drugs" and "to the extent that managed care plans will no longer reimburse prescriptions in process, Valeant will fill them at the company's expense" (Ex. 39 (Valeant, Press Release (Oct. 30, 2015))). Thereafter, Valeant continued to update investors on the short-term impact on dermatology product revenues from the loss of Philidor.[29]

## M. In February 2016, Valeant Announces Preliminary Results of Its Internal Board Review and Delays Issuance of Its 2015 Form 10-K.

On February 22, 2016, Valeant disclosed that the Ad Hoc Board Committee had preliminarily determined that "certain sales to Philidor during 2014, prior to Valeant's entry into an option to acquire Philidor, . . . should have been recognized when product was dispensed to patients rather than on delivery to Philidor." (Compl. ¶ 289.) This timing issue affected approximately $58 million of revenue previously recognized in the second half of 2014 (0.7% of

---

[29]    On November 10, 2015, Valeant confirmed that "more than half" of dermatology prescriptions continued to flow through traditional retail pharmacies. (Ex. 40 (Nov. 10, 2015 Call Transcript) at 7; *see also* Compl. ¶¶ 267-71.)

the more than $8.2 billion in reported gross revenue for 2014), and a limited reduction of "approximately $0.10" in 2014 earnings per share was mostly offset by an "approximately $0.09" increase in 2015 earnings per share.  (Compl. ¶ 289; Ex. 41 (Valeant, Press Release (Feb. 22, 2016)).)  The Company further announced that it "expect[ed] to delay filing its 2015 10-K pending completion of the review of related accounting matters by the Ad Hoc Committee." (Ex. 41.)

N.     **In March 2016, Valeant Announces Results for the Fourth Quarter of 2015, Reduces 2016 Guidance and Further Delays Issuance of Its Form 10-K.**

On March 15, 2016, Valeant reported earnings for the fourth quarter of 2015 and reduced its 2016 guidance.  (Compl. ¶¶ 22, 294, 519; *see also* Ex. 42 (Valeant, Press Release (Mar. 15, 2016)).)  The Company also announced that it would continue to delay filing of its Form 10-K for the full-year 2015 pending completion of the internal Board review (Ex. 42), and warned that this delayed filing could trigger a technical but curable default on its credit agreements and bond indentures covering $30 billion of Valeant debt (Ex. 43 (Mar. 15, 2016 Call Transcript) at 7).  The same day, credit rating agency Moody's downgraded Valeant's credit rating (Compl. ¶ 520), and Valeant's stock dropped more than 50% (from $69.04 on March 14 to $33.51 on March 15) (Ex. 2).

O.     **In March 2016, Valeant Announces Its Final Restatement Related to Philidor.**

On March 21, 2016, Valeant issued its restatement of the Company's audited financial statements for 2014, and unaudited financial statements from the fourth quarter of 2014 through the third quarter of 2015.  (Compl. ¶ 302.)  The Company reaffirmed its accounting treatment of Philidor, though the internal Board review found that certain revenues were recognized prematurely because (a) certain sales were made in contemplation of the option agreement, and/or (b) "collectability was not reasonably assured at the time that the revenue was originally recognized."  (Ex. 37 (VRX 8-K (Mar. 21, 2016)), Item 4.02.)  Overall, these errors

had a limited impact on revenues, profits and assets for 2014 and 2015, and actually had the effect of increasing net income in the first quarter of 2015 by 32%:

| Financial Metric Impacted | Original Amount (FY 2014) | Restated Amount (FY 2014) | Change | Original Amount (Q1 2015) | Restated Amount (Q1 2015) | Change |
|---|---|---|---|---|---|---|
| **Revenues** | $8.264 billion | $8.206 billion | -0.7% | $2.191 billion | $2.170 billion | -0.9% |
| **Total Assets** | $26.327 billion | $26.305 billion | -0.09% | $38.525 billion | $38.555 billion | +0.08% |
| **Net Income** | $913.5 million | $880.7 million | -3.6% | $74.5 million | $98.5 million | +32% |

(Ex. 1 (VRX 10-K FY 2015) at F-13-15, F-99-100.)[30]

The Company also reported that unspecified "improper conduct of the company's former Chief Financial Officer and former Corporate Controller, which resulted in the provision of incorrect information to the [Audit] Committee and the company's auditors, contributed to the misstatement of results," as well as the "tone at the top of the organization and the performance-based environment at the Company, where challenging targets were set and achieving those targets was a key performance expectation."  (Ex. 37, Item 4.02; Compl. ¶¶ 305, 380.)  The internal Board review did not identify any accounting fraud.  (*See* Ex. 37).)  That day, Valeant's stock price increased 7.41% (from $26.98 to $28.98).  (Ex. 2.)

### P.     Valeant Announces Management Succession and the Internal Board Review Ends Without Finding Any Fraud.

On the same day Valeant announced its restatement, March 21, 2016, Valeant announced that it had "initiated a search for a new chief executive officer," and that Ms. Stevenson had "resigned from the Board to create a vacancy to permit" a major Valeant investor,

---

[30]     The restatement adjustments to the reported figures for fiscal year 2014 were:  (a) $57.5 million decrease in revenues; (b) $22.6 million decrease in total assets; and (c) $32.8 million decrease in net income.  (Ex. 1, at F-13-14.)  The restatement adjustments to the reported figures for the first quarter of 2015 were:   (a) $20.8 million decrease in revenues; (b) $30 million *increase* in total assets; and (c) $24 million *increase* in net income.  (*Id.* at F-99-100.)

Pershing Square, to appoint a Board member.  (Ex. 37, at Ex. 99.1; Compl. ¶¶ 36, 49, 444.)  The Company did not accuse Mr. Pearson or Ms. Stevenson of any wrongdoing.[31]  The next month, on April 5, 2016, the Company announced that the Ad Hoc Board Committee had completed its review and had "not identified any additional items that would require restatements beyond those required by matters previously disclosed."  (Ex. 45 (Valeant, Press Release (Apr. 5, 2016)).)  On April 5, Valeant's stock price jumped over 10% (from $26.11 to $28.73).  (Ex. 2.)  Later that month, on April 29, 2016, Valeant filed its 2015 Form 10-K, curing the potential technical default on its debt.  (Compl. ¶ 308.)  The Company also announced that seven of its Board members would not be standing for re-election, including Messrs. Pearson and Schiller.  (Compl. ¶ 446.)

On June 7, 2016, Valeant announced earnings for the first quarter of 2016, disclosing that a decline in revenue had been "exacerbated by the loss of refills following the shutdown at the end of January of" Philidor and that the Company's new fulfillment program with Walgreens had not been as profitable as anticipated.  (Compl. ¶ 524.)

In total, from September 28, 2015 through June 7, 2016, Valeant's stock dropped 85.2% from $166.50 to $24.64.  (Ex. 2.)  Valeant's executives holding stock compensation saw the value of their stock drop significantly, including Mr. Pearson, whose stock position dropped by well-over $1 billion value.[32]

---

[31]     The Company also announced that Ms. Carro, its Controller, had been placed on administrative leave, and she was later replaced.  (Compl. ¶¶ 41, 444.)  "On or about March 2, 2016," Ms. Jorn left the Company "for personal reasons."  (*See* Compl. ¶ 443; Ex. 44 (Valeant, Press Release (Mar. 3, 2016)).)

[32]     According to the Complaint, Mr. Pearson received restricted stock that vested in five years and only if shareholders received a set return on their investment over that time.  (*See* Compl. ¶ 466.)  As of March 2014, Mr. Pearson beneficially owned around 3% of Valeant's stock (both vested and unvested).  (*See* Compl. ¶ 462; Ex. 46, at 32.)  The $174.83 drop in Valeant's stock price during the putative Class Period caused the implied value his shares to drop by $1.5 billion.

### Q.   The Complaint's Alleged Misstatements or Omissions

In their Complaint, Plaintiffs contend that Valeant made numerous misstatements in the Company's financial statements, SEC filings, press releases and presentations during earnings and investor calls (typically by Messrs. Pearson or Schiller), about Philidor and the Company's business practices during the putative Class Period, which fall into five categories:

### 1.   *Valeant's Relationship with Philidor and Philidor's Alleged "Deceptive Practices"*:  Plaintiffs allege that Valeant failed to identify and sufficiently disclose details of Valeant's business relationship with Philidor prior to October 2015, including that Valeant employees worked with Philidor and that Valeant was Philidor's primary customer.  (*E.g.*, Compl. ¶¶ 139(a), 148(a); *see also* Compl. ¶ 165(k).)   Plaintiffs further allege that Valeant should have disclosed Philidor's allegedly "deceptive" sales practices directed at third-party payors.  (*E.g.*, Compl. ¶¶ 139(c), 181(b).)

### 2.   *Valeant's Financial Accounting for Philidor*:   Plaintiffs allege that Valeant's financial statements for 2014 and the first three quarters of 2015 were false due to the subsequent restatement.  (*E.g.*, Compl. ¶¶ 181(j); 202(p), 228(i).)

### 3.   *Valeant's Internal Controls, Compliance, Training and "Ethics"*:  Plaintiffs allege that statements about Valeant's internal controls, compliance and training, and the Company's overall "ethical" behavior, were false or misleading because "Valeant lacked internal controls, compliance, and training programs which resulted in an 'improper tone at the top.'"  (*E.g.*, Compl. ¶¶ 139(g), 181(h).)  Plaintiffs also allege that the periodic certifications of the accuracy of Valeant's SEC filings, signed by Pearson, Schiller and Rosiello and required by the Sarbanes-Oxley Act of 2002 ("SOX"), were false.  (Compl. ¶ 228(n).)

### 4.   *Valeant's Dependence on Increasing Prices of Acquired Drugs and Patient Assistance*:  Plaintiffs allege that Valeant failed to disclose that its "growth and ability to service its debt were substantially dependent on acquiring companies and drug portfolios in

which it could engage in price gouging," and "using patient assistance and PR strategies to minimize patient complaints," rather than organic growth of its drug products through sales volume increases. (*E.g.*, Compl. ¶¶ 139(c), 148(e), 181(b), 190(f).)

       *5.*    *Valeant's Business Risks***:**  Plaintiffs also allege that Valeant failed to disclose that its "business risks had materially increased as a result of" its allegedly "deceptive" and "concealed" business practices (consisting of pricing practices, patient assistance and the alleged "deceptive" sales practices at Philidor), including risks of regulatory sanctions and reputational harm (*e.g.*, Compl. ¶¶ 139(d), 165(e)), and that Valeant's continued business success was "dependent on [its] ability to continue" those practices (*e.g.*, Compl. ¶¶ 148(d), 165(f)).

    **R.**    **The Alleged "Corrective" Disclosures**

       Even though the first set of securities complaints in this action alleged that many of the same misstatements were corrected ***by October 2015***, the Consolidated Complaint now contends that the "truth" about those purported misstatements was revealed in 24 disclosures over eight months, beginning with media reports about government inquiries into drug pricing on ***September 28, 2015*** and continuing through ***June 7, 2016*** (after the putative Class Period) when Valeant announced results for the first quarter of 2016. (Compl. ¶ 526.) Over this time period, Valeant's stock dropped by 87.6% (from $199.47 to $24.64). (Ex. 2.) Excluding corrections in the stock during this time period, Plaintiffs' total alleged stock drop amounts to $281 per share, more than the highest price the stock traded during the putative Class Period. The Complaint also alleges that Valeant's senior note prices declined, from par to between 75 to 90 cents on the dollar. (Compl. ¶¶ 590, 613, 639, 666.)

**ARGUMENT**

I.      **PLAINTIFFS' EXCHANGE ACT CLAIMS FAIL BECAUSE THE COMPLAINT DOES NOT PLEAD FACTS GIVING RISE TO A COGENT AND COMPELLING INFERENCE THAT DEFENDANTS ACTED WITH SCIENTER.**

The PSLRA "insists that securities fraud complaints . . . 'state with particularity facts giving rise to a *strong* inference that the defendant acted with'" scienter. *Merrill Lynch, Pierce, Fenner & Smith Inc.* v. *Dabit*, 547 U.S. 71, 81-82 (2006) (quoting 15 U.S.C. §§ 78u–4(b)(1)-(2) (emphasis added)).  In this Circuit, "[t]h[e] scienter standard requires plaintiffs to allege facts giving rise to a '*strong inference*' of 'either reckless or conscious behavior'" by a defendant when making misstatements to investors.  *Inst'l Investors Grp.* v. *Avaya*, 564 F.3d 242, 267 (3d Cir. 2009) (citation omitted and emphasis added).  For an inference of scienter to be "strong," it "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling . . . [and] at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-24 (2007).  Thus, in reviewing the Complaint, this Court "must consider plausible, nonculpable explanations for the defendant's conduct." *Id.*

Here, Plaintiffs have not pled with particularity that any Individual Defendant made false or misleading statements knowingly or with extreme recklessness.  Rather, the more compelling inference from circumstances alleged in the Complaint is that congressional inquiries, Philidor's collapse and a short-seller—not securities fraud—drove down Valeant's stock price.

A.      **Plaintiffs Plead No Cognizable Motive to Defraud.**

Allegations of "motive or opportunity" to defraud investors may support a strong inference of scienter only where a complaint includes particularized facts of "a concrete and personal benefit to the individual defendants resulting from" the alleged fraud, *Avaya*, 564 F.3d at 278, such as "unusual" or "suspicious" trading in Company stock, *In re Lululemon Sec. Litig.*,

-31-

14 F. Supp. 3d 553, 584-86 (S.D.N.Y. 2014); *see also In re Synchronoss Sec. Litig.*, 705 F. Supp. 2d 367, 410 (D.N.J. 2010) (Brown, Jr., C.J.) (no scienter inferred from profitable stock sales because "it is natural for any trader of securities, including insiders, to try to sell their shares at maximum profit").[33]   "Motives that are generally possessed by most corporate directors and officers do not suffice." *Avaya*, 564 F.3d at 278 (citation omitted).  The Complaint here makes no allegation that any Individual Defendant used accounting errors or the alleged Philidor sales practices, or made any other alleged misstatement, to benefit himself or herself in any "concrete and personal" way, such as through insider trading, which seriously "undermines [P]laintiffs' claim[s]" of fraud. *Acito* v. *IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995).

Lacking any true concrete, personal benefit, the Complaint relies upon conclusory motive allegations, all of which have been routinely rejected by courts in this Circuit as grounds for inferring fraudulent intent.  *First*, Plaintiffs' allegations that Mr. "Pearson and other Valeant executives" (Compl. ¶ 464) tried to inflate Valeant's stock price in order to keep their jobs and to increase their compensation (*see* Compl. ¶ 459) "is the type of generalized motive that can be imputed to the top executives of almost any publicly-owned, for-profit corporation," and therefore supplies no inference of scienter.  *Wilson* v. *Bernstock*, 195 F. Supp. 2d 619, 634 (D.N.J. 2002) (Irenas, J.) (dismissing securities fraud claims for failure to plead scienter based on

---

[33]    Plaintiffs allege that about two months before leaving Valeant's Board on August 25, 2015, one Defendant, Mr. "Ubben, through [hedge fund investor] ValueAct, sold 4.2 million shares of Valeant stock" (Compl. ¶ 442), but do not and cannot plead any unusual or suspicious circumstances sufficient to support a strong inference of scienter.  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1424 (3d Cir. 1997) ("[P]laintiffs must allege that the trades were made at times and in quantities that were suspicious enough to support the necessary strong inference of scienter.") (citation omitted).  Furthermore, Plaintiffs' attempt to insinuate (but not actually plead facts to show) that there was a suspicious connection between ValueAct's stock sale and Mr. Ubben's departure is belied by the Complaint's allegation that "[t]here has been at least one high-ranking ValueAct individual on Valeant's board since 2007."  (Compl. ¶ 55 n.9.)

purported "motive to artificially inflate a company's stock price in order to increase performance-based executive compensation").[34]

      *Second*, Plaintiffs' conclusory allegation that "Individual Defendants were motivated to conceal . . . negative facts . . . in order to artificially inflate Valeant's stock price to more cheaply acquire other companies and further its acquisition strategy" (Compl. ¶ 470) fares no better, as courts have rejected repeatedly this purported motivation as being indicative of fraud.[35]  This is because, as the Third Circuit has held, "[i]n every corporate transaction, the corporation and its officers have a desire to complete the transaction, and officers will usually reap financial benefits from a successful transaction.  Such allegations alone cannot give rise to a 'strong inference' of fraudulent intent."  *GSC Partners CDO Fund* v. *Washington*, 368 F.3d 228, 237 (3d Cir. 2004) (allegations that executives motivated to inflate stock price to finance acquisition through issuance of debt securities insufficient to plead scienter).

---

[34]     In any event, other than a handful of allegations about Messrs. Pearson and Schiller, the Complaint does not specify what "Valeant's highest ranking executives" received as compensation.  (Compl. ¶¶ 460-67.)  Moreover, the restricted stock compensation Plaintiffs allege Mr. Pearson received did not vest for five years, and then only if the stock achieved sustained growth, which created a significant disincentive to try to artificially inflate Valeant's stock price in the short-term through fraud or otherwise.  (Compl. ¶¶ 459, 466.)  *See also McGowan Inv'rs LP* v. *Frucher*, 481 F. Supp. 2d 405, 417 (E.D. Pa. 2007), *aff'd sub nom.*, *McGowan Inv'rs LP* v. *Meyer*, 392 F. App'x 39 (3d Cir. 2010) ("If motive and opportunity could be established simply by pleading that corporate boards and executives want increased compensation and have access to the means to increase their compensation, then every single corporate manager or board member in the United States would have the requisite scienter.").

[35]     *See, e.g.*, *In re Rent-Way Sec. Lit.*, 209 F. Supp. 2d 493, 515 (W.D. Pa. 2002) (allegation CEO engaged in accounting fraud "to increase [company's] stock price . . . in part, to fund the company's ongoing acquisition program . . . does not identify a particularized, concrete benefit that could have been realized by [the CEO] himself as a result of the false statements and is accordingly insufficient as a matter of law"); *In re NUI Sec. Litig.*, 314 F. Supp. 2d 388, 414 (D.N.J. 2004) (Cooper, J.) (allegation "that Kean and Abramovic wanted to inflate NUI's share price and ensure the Norcom acquisition was successful" insufficient to plead scienter).

**B.**     **Plaintiffs Fail to Plead that Any Defendant Made the Challenged Misstatements or Omissions Intentionally or with Extreme Recklessness.**

Because Plaintiffs fail to plead any cognizable motive, "the strength of the circumstantial allegations must be *even greater*" to establish a strong inference that "someone whose intent could be imputed to the corporation," *Teamsters Loc. 445 Freight Div. Pension Fund* v. *Dynex Capital, Inc.*, 531 F.3d 190, 194-95 (2d Cir. 2008) (emphasis added), made alleged misstatements intentionally or with extreme recklessness, *Monk* v. *Johnson & Johnson*, 2011 WL 6339824, at *8 (D.N.J. Dec. 19, 2011) (Wolfson, J.) (citation omitted).   The "recklessness" required is "not merely simple, even inexcusable negligence, but an *extreme departure* from the standard of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276 (3d Cir. 2006) (emphasis added).  "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Cal. Pub. Emps.' Ret. Sys.* v. *Chubb Corp.*, 2002 WL 33934282, at *23 (D.N.J. June 26, 2002) (Brown, J.) (citation omitted).

Notably, despite a massive and very public congressional investigation, the Complaint does not cite a single internal Valeant document or confidential witness demonstrating that any Individual Defendant was aware of, or involved in, any purported "deceptive practices" by Philidor or accounting fraud.   Instead, Plaintiffs offer a host of speculative and conclusory allegations, none of which—taken together or individually—pleads with the required particularity that any Individual Defendant acted intentionally or with extreme recklessness.

**1.**     **Alleged "Admissions" in Valeant's Voluntary Restatement of Philidor-Related Revenues**

Valeant's voluntary restatement of certain Philidor-related revenues does not support the required strong inference of fraud.  (Compl. ¶¶ 417-19.)

*First*, the internal Board review did not conclude that any Individual Defendant engaged in accounting fraud.  Rather, the Ad Hoc Board Committee reported only that unspecified "improper conduct" by Mr. Schiller and Ms. Carro "resulted in the provision of incorrect information to the [Audit] Committee and the [C]ompany's auditors," and that the Company's "performance-based environment" may have contributed to small accounting errors, not any effort to inflate artificially Valeant's stock price.  (Compl. ¶¶ 44, 417, 419, 444.)

*Second*, the accounting errors that led to the restatement do not support a strong inference of fraud.  Valeant determined that the Company recognized too early a limited amount of revenue in the fourth quarter of 2014 (less than $58 million of $8.2 billion in total revenues), around the time Valeant purchased an option to acquire Philidor and changed its accounting treatment to consolidate Philidor's financial statements.  The restatement actually resulted in an *increase* in net income in the following quarter, and had no impact on the Company's net cash flows (Ex. 1 (VRX 10-K FY 2015) at F-15, -101), which would make no sense if someone intended to mislead investors.  And Plaintiffs have not alleged facts substantiating Citron's wild accusations that Valeant was engaging in widespread "stuff[ing of] the channel" by building up inventory at Philidor and improperly recognizing that inventory as revenue, or making "phantom sales."  (Ex.  Courts recognize that "a [r]estatement of financial results or 'allegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim.'"  *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 565 (S.D.N.Y. 2004) (no scienter based on restatement caused by revenue recognition errors and allegations of channel stuffing); *Nat'l Junior Baseball League* v. *PharmaNet Dev. Grp.*, 720 F. Supp. 2d 517, 557 (D.N.J. 2010) (Wolfson, J.) ("[C]ourts have

uniformly held that allegations of scienter based on GAAP violations do not create the requisite strong inference of scienter unless plaintiffs' complaint alleges 'more.'").[36]

### 2. Purported "Admission" About Mr. Pearson's April 29, 2015 Statement on Price and Volume Growth

Plaintiffs mischaracterize a February 3, 2016 Valeant statement, which in no way "admitted that [Mr.] Pearson's April 29, 2015 statement . . . was false" (Compl. ¶ 418), or creates any inference of scienter.  Valeant's February 3 disclosure referenced an unscripted statement Mr. Pearson made during a Q&A session of an earnings call, following a discussion of Valeant's Top 20 products, that "[i]n terms of price volume, actually, volume was greater than price in terms of our growth" for the first quarter of 2015.  (Ex. 22 (Apr. 29, 2015 Call Transcript) at 14.) The next day, on April 30, 2015, Valeant filed its Form 10-Q, disclosing (like previous quarters) that "growth in the Developed Markets was driven primarily by price, as significant volume increases in dermatology and eye health were offset by volume declines for certain neurology & other/generic products and for the Japan market."  (Ex. 16 (VRX 10-Q 1Q 2015) at 34.)  In response to a congressional report highlighting Mr. Pearson's statement, on February 3, 2016, Valeant clarified that the question posed to Mr. Pearson could have been misinterpreted:  "To the extent that Mr. Pearson was asked a question about total revenue growth his response would not have been accurate; it would accurately reflect price/volume mix for Top 20 product revenue growth for the period."  (Ex. 47 (Valeant, *Statement Regarding the Relative Impact of Price and Volume on Growth* (Feb. 3, 2016)).)

---

[36]    Nor does Plaintiffs' allegation about Valeant's use of "non-GAAP measures" in its financial statements support any scienter inference.  (Compl. ¶ 419 n.76.)  As Plaintiffs' allegations note (Compl. ¶ 311), Valeant provided both non-GAAP and comparable GAAP measurements, and Plaintiffs have not alleged a violation of applicable SEC regulations.  *See Ironworkers Local 580-Joint Funds* v. *Linn Energy, LLC*, 29 F. Supp. 3d 400, 431 (S.D.N.Y. 2014) (dismissing securities fraud claims based on allegedly misleading use of non-GAAP measures where plaintiff failed to plead actual violation of any SEC disclosure requirement).

In any event, any ambiguity in Mr. Pearson's unscripted statement suggests nothing more than imprecise language, and "'omissions and ambiguities count against inferring scienter' under the PSLRA's particularity requirements." *Avaya*, 564 F.3d at 263 (quoting *Tellabs*, 551 U.S. at 326).  As the Third Circuit held last month, Plaintiffs' "post hoc scouring of countless pages of documents for a stray and inartfully phrased comment that can be argued to be technically false seems like just the sort of litigation maneuver the PSLRA was meant to eliminate." *OFI Asset Mgmt.*, 2016 WL 4434404, *13.

### 3. Purported "Admissions" During Congressional Testimony

Plaintiffs' allegations about testimony and statements provided by Messrs. Pearson and Schiller and Valeant investor and Board member William Ackman to the House Oversight and/or Senate Aging Committees in February and April of 2016 do not create any inference of fraud.  (Compl. ¶¶ 420-38.)  *First*, Mr. Schiller's statement in hindsight that Valeant had "made a lot of mistakes" (Compl. ¶ 424), and Mr. Pearson's statement that he and the Company were "too aggressive in pursuing price increases on certain drugs" (Compl. ¶ 420), reflect nothing more than hindsight regrets.  The Complaint fails to allege facts suggesting any Individual Defendant knew at the time the Company's pricing decisions were made that those decisions would months or years later inspire controversy or adversely impact the Company.[37] Moreover, Valeant had for years disclosed to investors the risk of future mandated price restrictions (*supra* p. 16), and the risk of "negative publicity or reputational harm to our products and business."  (*E.g.*, Ex. 3 (VRX 10-K FY 2013) at iv; Ex. 4 (VRX 10-K FY 2014) at iv.)  As the Third Circuit has made clear, "fraud cannot be inferred merely because '[a]t one time the

---

[37]   Mr. Ackman's January 2015 email to Mr. Pearson about a "politically connected" individual discussing a price increase for one Valeant drug (Compl. ¶ 81) did not foreshadow the national media attention that began with the April 2015 *Wall Street Journal* article or the congressional investigations that followed (*see supra* pp. 19-21).

firm bathes itself in a favorable light' but 'later the firm discloses that things are less than rosy.'"
*Cal. Pub. Emps.' Ret. Sys.* v. *Chubb Corp.*, 394 F.3d 126, 158 (3d Cir. 2004).  And "allegations that merely suggest corporate mismanagement are insufficient to establish even recklessness." *In re Hertz Global Holdings, Inc. Sec. Litig.*, 2015 WL 4469143, at *17 (D.N.J. July 22, 2015) (Arleo, J.) (no scienter from accounting errors).

   *Second*, Mr. Ackman's statements to the Senate that he "was unaware of . . . the 'horrible' and 'wrong' price increases" regarding three drugs (not alleged to have been sold through Philidor), and that there "were things [he] did not understand about the business" (Compl. ¶ 456), suggest that Mr. Ackman was not aware of Philidor's alleged misconduct or the public policy implications of Valeant's strategy, not that anyone at Valeant intentionally or recklessly misled Mr. Ackman or any other investor.  In fact, Mr. Ackman did not testify that he was misled by anyone at Valeant, and, as Plaintiffs themselves allege, Mr. Ackman was aware of one drug's price increase and sent an email to Mr. Pearson about it prior to September 2015. (Compl. ¶ 81.)  *See In re Hertz*, 2015 WL 4469143, at *19 (conduct of "Private Equity Group" investor in defendant company "irrelevant to scienter").

### 4.  Philidor's Alleged "Deceptive" Practices Directed at Third-Party Payors

   Plaintiffs' allegations about *Philidor*-employee efforts to deceive "PBMs, physicians, and payors by designing and concealing improper practices to boost sales and sale prices of Valeant" and/or violate Philidor's contracts with PBMs (Compl. ¶ 386; *see also* Compl. ¶¶ 116, 118), do not support any inference that any *Valeant* executive made misstatements to investors intentionally or with extreme recklessness.  Again, Plaintiffs have failed to plead facts creating a strong inference that any Individual Defendant knew about the alleged "deceptive" Philidor sales practices and their implications, if any, for Valeant's financial condition prior to public news reports in October 2015 and Philidor's later collapse.  (*See supra* pp. 12, 24-25.)

And even if true, these allegations do not suggest that Philidor's purported conduct was directed at *Valeant investors*.[38]

### 5. The Individual Defendants' General Management Role and Diligence Regarding Philidor

Plaintiffs' allegations regarding the corporate roles of Messrs. Pearson or Schiller or Dr. Kellen, or any other Individual Defendant, in managing Valeant or engaging in diligence regarding Philidor cannot plead scienter. (Compl. ¶¶ 387, 401, 409) These allegations amount to mere speculation that the Individual Defendants could have or should have known about Philidor's alleged "deceptive" sales practices, which is insufficient to plead scienter.

*First*, the Complaint's allegations that Mr. Pearson generally "had his fingers in everything" and "micromanaged things he deemed important" (Compl. ¶ 389), or that Messrs. Schiller and Pearson "religiously track[ed] each deal on a quarterly basis" (Compl. ¶ 395), establish nothing more than "corporate management's general awareness of the day-to-day workings of the company's business." Such allegations "do[] not establish scienter . . . absent some additional allegation of specific information conveyed to management and *related to the fraud*."[39] *Metzler Inv. GMBH* v. *Corinthian Colls., Inc.*, 540 F.3d 1049, 1068 (9th Cir. 2008)

---

[38]     Courts have dismissed securities claims for lack of scienter where, as here, the alleged improper conduct was directed at commercial counterparties, not shareholders. *See Kalnit* v. *Eichler*, 264 F.3d 131, 141 (2d Cir. 2001) ("[I]ntent to defraud Comcast cannot be conflated with an intent to defraud [defendant's] shareholders."); *ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 203 (2d Cir. 2009) ("Even if the [allegations] could give rise to an inference of intent to defraud Enron's shareholders . . . such an intent would not necessarily relate to JPMC's shareholders.").

[39]     Plaintiffs allege that non-party former Valeant employee Gary Tanner was "Valeant's liaison to Philidor" (Compl. ¶ 96), and reported to non-party Laizer Kornwasser, who in turn reported to Mr. Pearson (Compl. ¶ 402), but there are no allegations whatsoever that any of these individuals knew or conveyed anything about alleged "deceptive" Philidor sales practices.

(emphasis added).[40]  This is particularly true here, where Philidor distributed a small, primarily dermatology-focused segment of Valeant's 1,800 different products and made only a nominal contribution to Valeant's billions of dollars in revenue prior to 2015.  Further, because it cannot be "automatically assumed that a corporate officer is familiar with certain facts just because these facts are important to the company's business," *PharmaNet*, 720 F. Supp. 2d at 556, neither Valeant's acquisition of an option to purchase Philidor in December 2014 nor Philidor's subsequent growth by the third quarter of 2015 to just under 7% of net revenues suggest the Individual Defendants knew about any allegedly improper sales practices.

        *Second*, Plaintiffs' allegations that Valeant "effectively controlled Philidor from its inception" through its limited inspection, audit and appointment rights (Compl. ¶ 406),[41] or that Messrs. "Pearson [and] Schiller[] and senior management signed the Philidor agreements" (Compl. ¶ 403), or that Messrs. "Pearson [and] Schiller[] and Valeant's Board of Directors engaged in due diligence" of Philidor (Compl. ¶ 405), in no way support any inference of scienter.  *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 219-20 (S.D.N.Y. 2008) (pharmaceutical company's "agreement to 'closely monitor'" drug trial insufficient to infer

---

[40]       To the extent that Plaintiffs seek to plead corporate scienter against Valeant pursuant to the so-called "core operations" doctrine without sufficiently pleading an Individual Defendant's scienter, the Complaint's allegations concerning Philidor and Valeant's business practices fall well-short of the "extraordinary" circumstances where an alleged misstatement is "so dramatic" that a court could infer it "would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false."  *City of Roseville Emps.' Ret. Sys.* v. *Horizon Lines, Inc.*, 442 F. App'x 672, 676 (3d Cir. 2011) (affirming dismissal of securities fraud claims based on admitted long-running price-fixing scheme for failure to plead scienter) (citation omitted); *Makor Issues & Rights, Ltd.* v. *Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) (hypothesizing such a dramatic announcement if "General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero").

[41]       Plaintiffs' reliance on a March 9, 2015 email exchange between Mr. Pearson and Dr. Kellen, which referenced a possible meeting of District Managers "to go over practices in each district where Philidor is working well" (Compl. ¶ 407), does not contain any indication that Philidor's practices were improper, or that anyone said or knew so.

defendants had knowledge of adverse information when making statements).   Rather, these allegations suggest nothing more than an ongoing, arms'-length contractual business relationship between Valeant and Philidor.   And Plaintiffs have not alleged any reason why Valeant Defendants could not have relied on Philidor's representations and warranties that it would provide all services "in accordance with all applicable Laws and . . . applicable industry standards."[42]  *See Monk*, 2011 WL 6339824, at *13 ("Fraud cannot be inferred simply because the parent corporation might have been more curious or concerned about the activity at its subsidiary, and courts should not presume recklessness or intentional misconduct from a parent corporation's reliance on it[s] subsidiary's internal controls." (internal citations omitted)); *Pathfinder Mgmt., Inc.* v. *Mayne Pharma, Inc.*, 2009 WL 4250061, at *9 (D.N.J. Nov. 25, 2009) (Martini, J.) ("knowledge and actions of a subsidiary . . . cannot be imputed to the parent company").[43]

*Third*, Plaintiffs have failed to plead "[w]ith regard to the SOX certifications . . . that any of the Individual Defendants 'had clear reasons to doubt the validity of financials being certified but kept turning their blind eye to all 'red flags.'"  *In re Par Pharm. Sec. Litig.*, 2008 WL 2559362, at *13 (D.N.J. June 24, 2008) (Sheridan, J.).  Nor could Plaintiffs plead such facts here, where the accounting errors with respect to Philidor involved relatively small amounts (less than 1% of revenues) and occurred during a short period of time (around the

---

[42]   Plaintiffs do not allege that any of Valeant's agreements with Philidor authorized the pharmacy to engage in "deceptive" sales practices that Plaintiffs allege occurred here, or that any of their terms were otherwise improper or illegal.  (Compl. ¶¶ 89-90, 116.)

[43]   Plaintiffs' allegation about Philidor's efforts "to cover up its wrongdoing" by "compell[ing] its employees to sign" confidentiality agreements is likewise irrelevant to scienter because the Complaint does not contain any factual allegation that any Individual Defendant was aware of or involved in those agreements.  And contrary to Plaintiffs' allegation of fraud, the existence of confidentiality agreements is entirely consistent with Mr. Pearson's observation that details about the AF program were "a competitive advantage."  (*See supra* p. 13.)

time that Valeant changed its accounting treatment of Philidor in December 2014). Plaintiffs nowhere attempt to explain to what extent Philidor's alleged sales practices were actually improper or how they impacted Valeant at the time of any SEC filing of purported misstatement.

Viewed together, Plaintiffs' allegations here are indistinguishable from allegations that Judge Linares held insufficient to plead scienter in *Rahman* v. *Kid Brands, Inc.*, 2012 WL 762311, at \*23 (D.N.J. Mar. 8, 2012). There, plaintiffs alleged that a manufacturer and its executives had defrauded investors by artificially inflating earnings (and the company's stock price) when the company's affiliate and a third party evaded U.S. import duties on certain of the company's products. *Id.* at \*1-2. After learning of the potential misconduct, the company's board initiated its own internal review, as Valeant's Board did here. *Id.* at \*3. Like Plaintiffs here, the *Rahman* plaintiffs argued that the company's executives should have known and disclosed the customs violations, because they "had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, [are] presumed to have had the power to control or influence the particular transactions." *Id.* at \*23.[44] Judge Linares rejected those allegations, ruling that "given the investigations initiated by the Board and the lack of any confidential witness, document or other factual source indicating that [the individual defendants], or anyone at the Company, knew about the customs violations earlier than their public disclosure, the most 'plausible inference flowing from these facts is a non-culpable inference.'" *Id*. Here, like in *Rahman*, Plaintiffs' failure to allege even a single witness, document or specific fact suggesting any Individual Defendant knew about alleged "deceptive" sales practices at Philidor prior to their disclosure in October 2015 is fatal to their claims.

---

[44]     Unlike the Complaint here, the *Rahman* plaintiffs' complaint contained statements from a former employee witness alleging that several employees were aware of the company's improper customs practices. *Id.* at \*14-15.

Likewise, in *City of Roseville Employees Retirement System* v. *Horizon Lines, Inc.*, the court rejected claims similar to those asserted by Plaintiffs here.  There, plaintiffs alleged that an ocean freight shipping company and its executives had engaged in securities fraud by failing to disclose that sales growth from one of its shipping routes resulted from illegal price fixing by one of the company's largest subsidiaries, rather than legitimate sales practices.  713 F. Supp. 2d 378, 397 (D. Del. 2010), *aff'd*, 442 F. App'x 672 (3d Cir. 2011).  Notably, the court rejected as insufficient to plead scienter the *Horizon Lines* plaintiffs' far more specific assertions that company executives knew or should have known about the price-fixing scheme because, among other things, the subsidiary's employees had "direct communications with senior executives," the subsidiary constituted "a significant portion of Horizon's business," and executives "had significant experience working" in the industry.[45]  *Id.*  In so ruling, the court explained that "[m]ere allegations that a defendant 'should have known' of fraud because of his supervisory role within a company or because his subordinates were aware of it, are insufficient," *id.* at 399, and thus held that plaintiffs' allegations only "suggested *possible* ways in which . . . defendants could have discovered" the improper conduct but did not establish actual awareness or recklessness.  *Id.* at 401 (emphasis added).  Plaintiffs' far less robust allegations here concerning Valeant's purported control of Philidor or Individual Defendants' general involvement in managing the Company similarly fail to establish any inference that any Individual Defendant was aware of or extremely reckless in not discovering Philidor's allegedly "deceptive" sales practices prior to October 2015.[46]

---

[45]    The *Horizon* plaintiffs also alleged, as Plaintiffs do here, that the timing of the CFO's resignation was "extremely suspicious," *id.* at 398, which the court also rejected as being indicative of fraudulent intent.

[46]    The timing of Valeant's decision to cease business with Philidor in late October 2015 in no way suggests that the Individual Defendants "were fully aware of Philidor's deceptive practices" prior to October 2015, as Plaintiffs contend.  (Compl. ¶ 409.)  Instead, Valeant's

(*footnote continued . . .*)

6.      **Valeant's Decision Not To Claw Back Compensation from Pearson and Schiller, or Pursue Remedies Against Philidor**

Plaintiffs' allegation that Valeant has not attempted to claw back executive compensation from Messrs. Pearson and Schiller, or "pursue remedies" against Philidor (Compl. ¶ 413), assumes the conclusions both that there was wrongdoing and that Valeant must have condoned it because it failed to pursue these "remedies."   The PSLRA, however, requires Plaintiffs to plead facts supporting such conclusions with particularity, which the Complaint does no do.  *Monk*, 2011 WL 6339824, at *8.   Without more, the only plausible inference from Valeant's decision not to claw back compensation from any Individual Defendant is that the Company had no basis to do so.[47]   *Cf. In re Salix Pharm., Ltd.*, 2016 WL 1629341, at *15 (S.D.N.Y. Apr. 22, 2016) ("The Board's decision to exercise the clawback against the Individual Defendants . . . weighs in favor of a strong inference of scienter.").   And Plaintiffs' utter speculation about why Valeant has not sued Philidor—a company that has ceased doing business and is subject to government investigations (Compl. ¶ 267)—does not substitute for a lack of particularized facts required to plead scienter.

7.      **Executive Departures Between April 2015 and May 2016**

Finally, Plaintiffs' allegations that nine of the Individual Defendants and three other Valeant employees left the Company over a one-year period between April 2015 and May 2016 (Compl. ¶¶ 439-47) does not support the requisite strong inference of scienter.  As an initial matter, Plaintiffs have not alleged any fact sufficient to connect the departures of any Individual

---

(. . . *continued footnote*)
decision to terminate its relationship with Philidor came after media reports of Philidor's misconduct and after three of the largest PBMs announced they would stop filling Philidor prescriptions.  (Compl. ¶¶ 261-62.)

[47]      Contrary to Plaintiffs' conclusory assertions (Compl. ¶ 410), Mr. Ingram's statement on October 26, 2015 that the Board "fully supported the [C]ompany's specialty pharmacy strategy" does not demonstrate that any Individual Defendant was "conscious" of Philidor's alleged misconduct or the accounting errors that occurred.  (Compl. ¶¶ 216(c), 410.)

Defendant to a fraud on investors,[48] and "the Third Circuit, and other courts have found resignations of key officers to be insufficient to show that they acted with the requisite scienter to commit the alleged fraud." *In re Interpool, Inc. Sec. Litig.*, 2005 WL 2000237, at *17 (D.N.J. Aug. 17, 2005) (Chesler, J.) (citation omitted). In any event, Plaintiffs' allegation that Mr. Schiller "was asked to resign from the board," and Ms. "Carro was replaced" (Compl. ¶ 444) does not create any inference that either Mr. Schiller or Ms. Carro was aware of any supposed misstatement or omission that allegedly defrauded investors. Nor do Plaintiffs allege any "extraordinary corporate punishment measure" like "denial of severance payment" that courts in this Circuit require to allow an inference of scienter from executive departures. *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 347 (D.N.J. 2007) (Brown, C.J.) (resignation relevant only if it "takes place within a couple of months of the announcement of the errors committed and is accompanied by an extraordinary corporate punishment measure, *e.g.*, denial of severance payment").

      **C.**    **Taken Together, the More Compelling Inference from Plaintiffs' Allegations Is that Defendants Did *Not* Engage in Securities Fraud.**

Taken together, the Complaint's allegations suggest that Valeant's stock price decline resulted from an increasingly negative business landscape and regulatory climate—*i.e.*, (i) government policymakers' unprecedented focus on drug pricing, a risk that any drug company faces and Valeant disclosed; (ii) Valeant's loss of a fledgling distribution channel after Philidor lost its key payors and accusations arose of misconduct previously unknown to Valeant management; and (iii) allegations from short-seller Citron seeking to profit from a drop in Valeant's stock price. These allegations do not suggest fraud. *See Tellabs*, 551 U.S. at 328.

---

[48]    Plaintiffs allege that Individual Defendants Pearson, Schiller, Ubben, Farmer, Melas-Kyriazi, Jorn, Carro, Provencio and Goggins left the Company. (Compl. ¶¶ 440-46.)

*First*, as shown above (*supra* pp. 32-33), Valeant's management had no motive to defraud investors, and they remained significant shareholders throughout the putative Class Period.  As of March 2014, Valeant's board and senior management owned over 9.4% of issued and outstanding common stock—and weathered the same enormous decline in value as Valeant's public shareholders.  (Ex. 46, at 32.)  Mr. Pearson's stock holdings alone would have lost more than $1 billion in implied value as a result of Valeant's stock drop.  (*See supra* p. 28 n.32.)

*Second*, shortly after media reports of potentially improper business practices by Philidor, Valeant's Board voluntarily initiated an internal review of the Company's relationship with Philidor, ended its relationship with Philidor and corrected the limited accounting errors identified.  These actions support an inference that no Individual Defendant engaged in accounting or securities fraud.  *City of Brockton Ret. Sys.* v. *Avon Prods., Inc.*, 2014 WL 4832321, at *23 (S.D.N.Y. Sept. 29, 2014) (voluntary investigation supports non-fraudulent inference).

*Third*, the nature and size of the accounting errors that led to Valeant's restatement of certain Philidor revenues do not suggest a concerted effort to defraud anyone. Instead, Valeant's restatement resulted from revenue-recognition timing errors associated with Valeant's December 2014 option agreement with Philidor, and impacted less than 1% of Valeant's total revenue for 2014 and less than 3% total revenue for the fourth quarter of 2014. *In re Synchronoss*, 705 F. Supp. 2d at 410 (ruling that a 3% difference between quarterly revenue projection and actuals "cannot be read as evidencing scienter," especially considering that the yearly revenue projections were materially correct).  Those errors involved a limited portion of Valeant's dermatology business, did not impact net cash flows, and had the effect of

*understating* net income in 2015, a result that would make no sense if the goal of the alleged fraud was to make the Company look more profitable than it was.[49]

      *Finally*, Valeant's growth-by-acquisition business model, its pricing strategies and its use of the AF program, even if viewed as "aggressive" or a "mistake" in hindsight, were disclosed to investors. "[T]he complaint makes clear that [defendants] publicized its . . . practice[s] with a candor that seems inconsistent with knowledge of illegality." *Greenstone* v. *Cambex Corp.*, 975 F.2d 22, 26 (1st Cir. 1992).  In any event, "aggressive" and even "mistaken" strategies are in no way indicative of securities fraud.  *In re Hertz*, 2015 WL 4469143, at *17 (allegations of "corporate mismanagement are insufficient to establish even recklessness").

*     *     *     *

      Because the Complaint fails to allege facts supporting any strong inference of scienter of the Valeant Defendants, Plaintiffs' Section 10(b) claims should be dismissed.

## II.    PLAINTIFFS DO NOT PLEAD ANY ACTIONABLE MISSTATEMENTS OR OMISSIONS AS A MATTER OF LAW.

      Under the PSLRA and Rule 9(b), Plaintiffs also must plead with particularity that Defendants "made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading."  *Oran* v. *Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) (citation omitted).  Plaintiffs therefore must, at minimum, "set forth the details of allegedly fraudulent statements or omissions, including who was involved, where the events took place, when the events took place, and why any statements were misleading."  *In re Rockefeller Ctr.*

---

[49]    PwC also signed off each year on the accuracy of the Company's financial statements and the effectiveness of the Company's internal controls, and there is no allegation that PwC even questioned or disapproved of Valeant's accounting practices or controls with respect to Philidor prior to October 2015.  *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2014 WL 7176187, at *6 (S.D.N.Y. Dec. 16, 2014) (rejecting scienter where "Complaint does not allege that Turquoise Hill's auditors disapproved of SouthGobi's accounting practices or found any lack of internal controls prior to the restatement").

*Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002). None of Plaintiffs' alleged misstatements or omissions satisfies this pleading standard.[50]

> A. **Valeant's Restatement Was Immaterial and Did Not Render Prior Statements About Valeant's Internal Controls Actionable.**

A misstatement is material only "if there is a substantial likelihood that a reasonable investor would consider it important in deciding how to act," *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 369 (3d Cir. 1993), and it "*significantly alter[s]* the total mix of information available," *Oran*, 226 F.3d at 284 (emphasis added). The accounting errors identified in Valeant's restatement were immaterial as a matter of law, and do not make prior certifications or statements about the effectiveness of Valeant's controls during the restated period (from the fourth quarter of 2014 through the third quarter of 2015) actionable.

*First*, Valeant's restatement was not material quantitatively because it impacted a mere 0.7% of Valeant's total revenue for fiscal year 2014, and only 1% of revenues for the first quarter of 2015. (*See supra* pp. 26-27.) The change in net income was almost a wash, with a decrease of $33 million in 2014 (3.6% of previously recorded total net income) and an *increase*

---

[50]    Spanning 734 paragraphs over 282 pages, the Complaint's prolixity obscures the non-existent bases for the asserted claims and violates Rule 8(a)(2)'s requirement that the Complaint contain "a short and plain statement showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *see also Woodward* v. *Raymond James Fin., Inc.*, 732 F. Supp. 2d 425, 428 & n.2 (S.D.N.Y. 2010) ("extreme length" of mere 112-page complaint "is an independent ground for dismissal"). Plaintiffs do not specify why each alleged misstatement was false or misleading, but rather group alleged misstatements by time period and assert wholesale a group of statements was false or misleading based on an undifferentiated list of not inconsistent "true facts." (*See* Compl. ¶¶ 139, 148, 165, 181, 190, 202, 228.) This "presents an extraordinary challenge for application of the highly particularized pleading standard demanded by the PSLRA," and this Court may "rightly demand[] that [Plaintiffs] make [their] contentions more clear" and identify the basis for their claim of falsity and scienter for each statement. *OFI Asset Mgmt.* v. *Cooper Tire & Rubber*, 2016 WL 4434404, at *6 (3d Cir. Aug. 22, 2016).

    To aid the Court, Appendix B attached hereto endeavors to catalogue the Complaint's alleged misstatements and identifies the grounds for which each should be dismissed.

of $24 million in first quarter 2015 (32.4% of previously recorded total net income).  And the Company's assets were impacted by less than 0.1%.  (*See supra* p. 24; Ex. 35, at 13.)

Even if the restatement had negatively impacted Valeant's stock price, the Third Circuit has held such insignificant accounting errors to be immaterial as a matter of law.  In *In re Westinghouse Securities Litigation*, plaintiffs brought securities fraud claims against Westinghouse based on an alleged overstatement of assets in the company's financial statements that "amounted to merely 0.54% of Westinghouse's net income . . . for [the] quarter."  90 F.3d 696, 713-15 (3d Cir. 1996).  The court held that this misstatement was not material because "there is not a substantial likelihood that this information would have assumed actual significance in the deliberations of a reasonable investor."  *Id.* at 715.  Other courts have similarly held that financial misstatements are not material where, as here, the impact on the restated item is less than 5%, which is consistent with SEC guidance.  *See*, *e.g.*, *ECA, Local 134 IBEW Joint Pension Trust of Chi.* v. *JP Morgan Chase Co.*, 553 F.3d 187, 204 (2d Cir. 2009) (accounting treatment for 0.3% of total assets quantitatively immaterial).  Indeed, the SEC itself has opined that a restatement that results in less than a 5% change is *per se* quantitatively insignificant.  SEC Staff Accounting Bulletin (SAB) No. 99, 64 Fed. Reg. 45,150, 45,151 (Aug. 19, 1999) (misstatement quantitatively immaterial where impact on restated item less than 5%).[51]

---

[51] Plaintiffs cannot rely on Valeant's stock price movement around the time the Company announced its restatement to plead materiality because, as the SEC Staff and courts have recognized, a stock drop alone is "too blunt an instrument to be depended on in considering" materiality.  SAB No. 99, 64 Fed. Reg. at 45,152.  Further, Valeant's restatement coincided with decreased earnings expectations, which investors would have found much more important.  *See Hutchison* v. *Deutsche Bank Sec. Inc.*, 647 F.3d 479, 490 (2d Cir. 2011) (no materiality despite 32% stock drop because disclosure was "loaded with news . . . any item of which could have caused [the] stock price to drop").

*Second*, Valeant's restatement is also qualitatively immaterial, *see* SAB No. 99, 64 Fed. Reg. at 45,152,[52] because it involved limited accounting errors that "were not a significant aspect of . . . [the] operations" or profitability of Valeant.  *ECA, Local 134*, 553 F.2d at 198.  The errors that led to Valeant's restatement centered on when revenue resulting from sales through Philidor was recorded during the short time in December 2014 around the time Valeant changed its accounting treatment for Philidor.  Specifically, Valeant modified its accounting treatment by consolidating Philidor's financials and began recognizing revenues only when prescriptions were dispensed to patients, but did not back out certain revenue that had been recognized as a sale to Philidor before the consolidation but not yet dispensed to patients.  (Ex. 1 (VRX 10-K FY 2015) at F-10.)  The restatement did not identify any improper accounting policy, and was limited to a small and nascent sales channel—Philidor.  Further, the accounting errors had no impact on Valeant's net cash flow because they did not impact the amount of revenue actually earned, just when and how those revenues were recorded (*see* Ex. 1, at F-15, F-101), and as courts have recognized, "investors are concerned, perhaps above all else, with the future cash flows of the companies in which they invest." *United States* v. *Smith*, 155 F.3d 1051, 1064 n.20 (9th Cir. 1998).

*Third*, Valeant's finding in March 2016 "that one or more material weaknesses exist in the company's internal control over financial reporting" (Compl. ¶¶ 304, 342) does not render materially false or misleading Valeant's prior statements that it believed its "disclosure controls and procedures were effective." (*See*, *e.g.*, Compl. ¶ 135.)  Not only were the accounting errors to which those "weaknesses" contributed neither material to Valeant's business nor

---

[52]     Numerous courts have looked to SAB No. 99 in assessing quantitative and qualitative materiality of financial statements, because it "provides relevant guidance regarding the proper assessment of materiality."  *Litwin* v. *Blackstone Grp., L.P.*, 634 F.3d 706, 717 (2d Cir. 2011); *accord In re Ply Gem Holdings, Inc. Sec. Litig.*, 135 F. Supp. 3d 145, 150 (S.D.N.Y. 2015).

pervasive, as described above, *cf. Rahman*, 2012 WL 762311, at *13 (allowing claims based on statements of controls where accounting errors "pervasive" in three out of four subsidiaries), Plaintiffs also fail to allege, as they must, facts suggesting any Individual Defendant "*knew* the internal controls were ineffective a[t] the time of" making statements of belief about the Company's internal controls.  *Se. Pa. Transp. Auth.* v. *Orrstown Fin. Servs., Inc.*, 2015 WL 3833849, at *46 (M.D. Pa. June 22, 2015).  As the Third Circuit held, a claim that later internal control weaknesses rendered prior internal control certifications false "is without sufficient factual support to be actionable."  *OFI Asset Mgmt.*, 2016 WL 4434404, at *11.[53]

Because Plaintiffs fail to allege any materially false or misleading information in Valeant's financial statements, their claims based on Valeant's restatement should be dismissed.

**B.      Prior to October 2015, Valeant Had No Duty to Disclose Further Information About Its Relationship with Philidor.**

To be actionable, an omission must be material.  *Lovallo* v. *Pacira Pharms., Inc.*, 2015 WL 7300492, at *9 (D.N.J. Nov. 18, 2015) (Walls, J.) (dismissing claims based on alleged marketing of drug for non-approved uses).  Even then, "[t]he securities laws do not require a defendant provide the public with all material information" and "[t]o impose liability for non-disclosure, a defendant must be under a duty to disclose the omitted information . . . . [which] arises only when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete, or misleading prior disclosure."  *Winer Family Trust* v. *Queen*, 503 F.3d 319, 329 (3d Cir. 2007).  "Silence, absent a duty to disclose, is not misleading under Rule 10b–5."  *City of Edinburgh Council* v. *Pfizer, Inc.*, 754 F.3d 158, 174 (3d Cir. 2014) (citation omitted).  Here,

---

[53]      *See also Se. Pa. Transp. Auth.*, 2015 WL 3833849, at *46 (rejecting claims based on "admission" by company after a restatement that it "did not maintain effective internal control" over reporting, holding such "allegations are improperly based on hindsight, and therefore are inactionable"); *Carpenters Pension Trust Fund of St. Louis* v. *Barclays*, 750 F.3d 227, 236 (2d Cir. 2014) (dismissing "minimum control statements" because "statements do not mention" the specific area that contained alleged weaknesses).

Plaintiffs fail to plead facts demonstrating that any Valeant Defendant had a duty to identify or provide more detailed information about Philidor prior to October 2015.

   *First*, the Complaint fails to allege facts indicating that Philidor was material to Valeant's business *prior to October 2015*, when Valeant specifically disclosed its relationship with Philidor.  As Valeant repeatedly disclosed beginning in January 2013, the AF program (of which Philidor was a part) remained an uncertain work-in-progress as the Company attempted to fix "bugs" and develop a "next generation."  (*E.g.*, Compl. ¶ 147.)  Moreover, the impact of Philidor on Valeant's total net revenue for 2014 was less than 1% prior to Valeant's purchase of an option to acquire Philidor in mid-December.  (Ex. 1 at 44; Compl. ¶ 215(a).)  And even after Valeant purchased the option and sales through Philidor increased in 2015, Philidor sales were approximately 6% of net revenue for the first nine months of 2015, and peaked at 7% of revenues only in the third quarter of 2015.  Courts have recognized not every part of a company's business is material, particularly those parts generating less than 10% of revenue like Philidor.[54]  *See Glassman* v. *Computervision Corp.*, 90 F.3d 617, 633 n.26 (1st Cir. 1996) (omission of 3% to 9% of actual revenue immaterial as a matter of law).

   *Second*, Plaintiffs fail to allege that Valeant had a duty to disclose more information about Philidor than it did based on Philidor's allegedly "deceptive" sales practices, because Plaintiffs do not plead facts demonstrating that any Defendant knew of those practices prior to their public disclosure in October 2015.  *See In re Anadigics, Inc., Sec. Litig.*, 2011 WL 4594845, at *2, *20 (D.N.J. Sept. 30, 2011) (Cooper, J.) (defendants' statements "touting the

---

[54]  In an attempt to make Philidor's proportion of Valeant's revenues seem more significant, the Complaint cites a Wells Fargo analyst report speculating that Philidor's unwinding may have caused a 36.6% reduction of earnings per share guidance in the fourth quarter of 2015 after Valeant ceased doing business with Philidor. (*See* Compl. ¶¶ 283-86.)  However, Valeant's reduced guidance and decrease in revenues in late 2015 is not alleged to have been caused solely by the loss of Philidor and, in any event, says nothing about Philidor's importance to Valeant's financial condition when the supposed misstatements were made.

growth in demand from its wireless customers" not misleading where plaintiffs failed to allege facts that defendants were aware of increased customer returns and cancelled orders), *aff'd*, 484 F. App'x 742 (3d Cir. 2012).[55]  Even if someone at Valeant had been aware of Philidor's alleged misconduct prior to October 2015—which the Complaint does not plead with the requisite particularity—Plaintiffs still fail to allege (a) how any misconduct impacting some unspecified subset of Philidor's sales (which peaked at approximately 7% of Valeant revenues in the third quarter of 2015) was material to Valeant, or (b) why a delay of a matter of months in disclosing that information (to October 2015) caused any Valeant statement to be materially false or misleading.   *See Rahman*, 2012 WL 762311, at *10 ("[A]bsent a statutory or regulatory requirement to disclose within a short, designated period of time said information, the Court does not find the two-month delay of disclosure misleading."); *see also Silverstein* v. *Globus Medical, Inc.*, 2016 WL 4478826, at *9 (E.D. Pa. Aug. 25, 2016) (three-month delay in disclosing termination of contract with major distributor not actionable where plaintiffs failed to plead facts suggesting any duty to disclose earlier).

> *Third*, even if Philidor had been material to Valeant's business at some point prior to October 2015, Plaintiffs have not alleged facts giving rise to any duty to disclose more information than Valeant had about the AF program and Philidor.   Plaintiffs' conclusory allegation that GAAP required Valeant to identify Philidor by name prior to October 2015 is wholly unsupported.  (*See* Compl. ¶¶ 323-30.)  To the contrary, Valeant's practice *not* to identify wholesalers or customers that accounted for less than 10% of total revenues—an express materiality threshold that Philidor never reached—is entirely consistent with GAAP and SEC

---

[55]      *See also WM High Yield Fund* v. *O'Hanlon*, 964 F. Supp. 2d 368, 392 (E.D. Pa. 2013) (no duty to disclose deceptive practices to inflate financial results where plaintiffs did not establish defendant director knew about alleged misconduct); *City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) ("companies do not have a duty to disclose uncharged, unadjudicated wrongdoing").

rules, and, in any event, was fully disclosed to Valeant's shareholders.  (Ex. 3 (VRX 10-K FY 2013) at F-98; Ex. 1 (VRX 10-K FY 2015) at 7-8.)  Further, Valeant repeatedly disclosed its AF program development, and Valeant's use of Philidor was known to investors who cared to look.  *See Rescue Mission of El Paso, Inc.* v. *K-Sea Transp. Partners L.P.*, 2013 WL 3087078, at *16 (D.N.J. June 14, 2013) (Walls, J.) ("Defendants were under no duty to provide more dire specifics while disclosing their true, generally positive, fiscal year 2009 results.").

> To make up for this deficit, Plaintiffs offer only speculation for their allegation that Valeant Defendants should have disclosed that the Company's "business risks had materially increased as a result of the concealed practices" at Philidor in order to avoid making statements about Valeant's financial condition misleading (Compl. ¶ 190(d).)  But courts do not require a company to disclose every risk arising from its business practices.  Here, Valeant repeatedly disclosed *known* risks concerning Philidor and any other distributor, including uncertainties relating to the AF program's success, that the Company's financial condition could be materially impacted by non-compliance of "marketing, promotional and pricing practices" with regulations (Ex. 3 (VRX 10-K FY 2013) at 17), that the Company did not fully control its distributors' sales, and that the loss of distribution channels could be detrimental to Valeant (*id.* at 19).[56]

> In *Winer Family Trust* v. *Queen*, the Third Circuit rejected claims similar to Plaintiffs' here that were based on an alleged failure to identify specific business counterparties. 503 F.3d 319 (3d Cir. 2007).  Like Plaintiffs allege here with respect to Philidor, the *Winer* plaintiffs alleged that the defendant company engaged in securities fraud by failing to disclose

---

[56]    Courts in this Circuit have rejected securities claims based on alleged omissions of risks of allegedly improper business practices even where, unlike here, plaintiffs alleged executives were aware of those practices.  *See, e.g., Galati* v. *Commerce Bancorp, Inc.*, 2005 WL 3797764, at *5-6 (D.N.J. Nov. 7, 2005) (Kugler, J.) (alleged omission of "attendant risks that [bid rigging known to executives] creat[ed] for the future prospects of the Company" not actionable because "risks inherent in . . . unsustainable illegal practices were too speculative to be material"), *aff'd*, 220 F. App'x 97 (3d Cir. 2007).

the identity of a commercial counterparty that had renovated a company facility but had a strained business relationship with the defendant. *Id.* at 327-29. As Plaintiffs also allege here with respect to Philidor, the *Winer* plaintiffs alleged that failing to disclose the counterparty's identity made the defendant company's other statements about purchasing and renovating the facility false or misleading. *Id.* The Third Circuit rejected those allegations, holding there was no duty to disclose the identity of the counterparty because "[t]he securities laws do not require a defendant 'provide the public with all material information.'" *Id.* at 329 (citation omitted).

Because Plaintiffs have failed to allege that any Defendant had a duty to disclose additional material information about Philidor prior to October 2015, all of Plaintiffs' claims predicated on alleged Philidor-related statements or omissions must be dismissed.

### C. Mr. Pearson's April 29, 2015 Statement Concerning Price and Volume Growth Was Neither False Nor Misleading.

To try to claim that "Defendants misrepresented volume growth in its statements to investors" (Compl. ¶ 12), Plaintiffs concoct an alleged material misstatement from Mr. Pearson's April 29, 2015 oral comment that "volume was greater than price in terms of our growth" for the first quarter of 2015 (Compl. ¶ 16). But, as demonstrated above (*supra* pp. 36-37), Plaintiffs ignore the context of Mr. Pearson's comment, which was made in response to an ambiguous question following accurate disclosures about volume and pricing of Valeant's top 20 products, and just before Valeant filed its definitive 10-Q that indisputably disclosed accurate information on price and volume growth. Under these circumstances, no reasonable investor would view any ambiguity in Mr. Pearson's statement as significant in the "total mix" of information. *See In re Anadigics*, 2011 WL 4594845, at *28 (alleged false statement during earnings call not actionable where complaint "disregard[ed] the context of the rest of the earnings call"). And the Complaint does not cite any market participant, or contemporaneous news or analyst report interpreting Mr. Pearson's statement as Plaintiffs do in hindsight.

**D.      Plaintiffs Fail To Plead Any Actionable Omissions Regarding the Company's Pricing Practices.**

Plaintiffs also cannot establish that Valeant Defendants had any duty to disclose details of "price increases which were far beyond industry norms" or the use of "patient assistance and PR strategies to minimize patient complaints" about those price increases. (Compl. ¶ 139(c).)   As set forth above (*supra* pp. 15-16), Valeant regularly disclosed the contribution that pricing had on its revenues,[57] which Plaintiffs do not claim was inaccurate, and Valeant's pricing practices were publicly scrutinized well before September 2015 when Valeant's stock price began to decline.  *See Winer Family Trust* v. *Queen*, 2004 WL 2203709, at *13 (E.D. Pa. Sept. 27, 2004) (no misstatement where "the allegedly undisclosed facts were otherwise transmitted to the market in a timely manner.").

Moreover, Valeant had no duty to disclose more about its pricing and sales practices than it did.  In *Police Retirement System of St. Louis* v. *Intuitive Surgical, Inc.*, plaintiffs alleged that defendants' statements about increased revenue were misleading because "revenue [had] increased due to price increases . . . rather than higher system placement rates." 759 F.3d 1051, 1057 (9th Cir. 2014).  The Ninth Circuit rejected plaintiffs' claim because, as here, the alleged statements made were "factually accurate," and ruled that "[t]he securities laws do not demand" "a more fulsome report."  *Id.* at 1061.  Here too, Plaintiffs do not challenge the factual accuracy of Valeant's statements about its drug pricing, and the Complaint's conclusory allegations of "price gouging" do not establish that Valeant was required to disclose more about

---

[57]      Valeant also disclosed that the Company's financial prospects could be adversely affected by the "impact of price control restrictions on our products, including the risk of mandated price reductions" (*e.g.*, Ex. 3 (VRX 10-K FY 2013) at iv), which is precisely the risk that began to materialize from congressional scrutiny in 2015.

-56-

its pricing than it did.  *See Klein* v. *Gen. Nutrition Cos., Inc.*, 186 F.3d 338, 343 (3d Cir. 1999)

("Federal securities laws do not require a company to state the obvious.").[58]

### E.    Valeant's Statements About General Corporate Strengths Are Inactionable "Puffery."

"[V]ague and general statements of optimism 'constitute no more than puffery

and are understood by reasonable investors as such,'" and therefore cannot form the basis of a

federal securities claim.  *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999)

(citation omitted).  The Complaint here is replete with quintessential puffery statements.

*First*, Valeant's alleged misstatements about its general corporate strength,

including the "sustainability of [Valeant's] business model" (Compl. ¶ 133(a)), the Company's

"innovative new marketing approaches" (Compl. ¶ 175), the "cost advantages" of Valeant's

products (Compl. ¶ 184(c)), and "outperformance in our U.S. businesses" (Compl. ¶ 194), are

mere puffery expressing corporate optimism.  *Key Equity Investors, Inc.* v. *Sel-Lab Mktg. Inc.*,

246 F. App'x 780, 785-86 (3d Cir. 2007) (statements that business was "slated to begin to

generate strong revenue and earnings growth" not actionable).  In *American Business Financial*

*Services, Inc. Securities Litigation*, the court dismissed as puffery similar statements about a

company's "demonstrated strengths," "strong credit culture" and "quality performance loans,"

because there "is not a substantial likelihood that the above statement would have been viewed

by a reasonable investor as significantly altering the total mix of available information."  2007

WL 81937, at *8 (E.D. Pa. Jan. 9, 2007).

---

[58]      *See also Guerra* v. *Teradyne Inc.*, 2004 WL 1467065, at *11 (D. Mass. Jan. 16, 2004) (no
duty to disclose company's use of "significant price discounts and extended payment terms to
customers . . . to boost their orders," because "[s]uch allegations do not establish any more than
[defendant] did 'what every company does—lower its prices in order to sustain demand as
technology evolves'"  (internal quotation marks omitted).)

*Second*, alleged misstatements about the Company's ethics and compliance, including Valeant's "extremely high ethical bar" (Compl. ¶ 140), or that "compliance is obviously very, very important for us" (Compl. ¶ 142), are not actionable.  In *Strougo* v. *Barclays PLC*, the court dismissed claims based on Barclays' statements, like those Plaintiffs allege here, about "clear risk management objectives" and the company's "pledge[] to increase transparency and conduct our business in the right way" on the grounds that they were "too general to be actionable."  105 F. Supp. 3d 330, 343-44 (S.D.N.Y.  2015).

**F.     The PSLRA Safe Harbor and "Bespeaks Caution" Doctrines Protect All Forward-Looking and Opinion Statements.**

Nor can Plaintiffs maintain this action based on any alleged forward-looking statements, including opinion statements regarding Valeant's future prospects for particular product lines or sources of future growth.[59]  The PSLRA's safe harbor, which protects "forward-looking" statements,[60] has "two distinct entrances":   a statement is protected if (1) it is accompanied by "meaningful cautionary statements";[61] *or* (2) "the plaintiff fails to show the statement was made with actual knowledge of its falsehood."  *OFI Asset Mgmt*, 2016 WL 4434404, *11 (citation omitted).  All of the Valeant Defendants' forward-looking and opinion statements are protected under the PSLRA's safe harbor.

---

[59]     *E.g.*, Compl. ¶ 168 ("[A]fter only three weeks of being available, last week's script demand for Jublia exceeded over 1,300 scripts. ***This trend is expected to accelerate***."); Compl. ¶ 205(c) ("With our strong product portfolio and growth prospects, ***we feel very confident in our future outlook*** and we are reaffirming our $7.5 billion EBITDA floor for 2016.").

[60]     Forward-looking statements are construed broadly to include "projections of future performance, plans and objectives for future operations, and assumptions underlying statements about future financial, economic or operational performance," *In re Aetna Sec. Litig.*, 617 F.3d 272, 278-79 (3d Cir. 2010) (citation omitted).

[61]     In addition, the Third Circuit's "bespeaks caution" doctrine holds that "cautionary language, if sufficient, renders the alleged [forward-looking] omissions or misrepresentations immaterial as a matter of law."  *In re Amarin Corp. PLC Sec. Litig.*, 2016 WL 1644623, at *8 (D.N.J. Apr. 26, 2016) (Wolfson, J.) (quoting *In re Donald J. Trump*, 7 F.3d at 371).

*First*, for all of the reasons stated *supra* at pages 37 to 43, Plaintiffs have not alleged facts establishing that the Valeant Defendants had any actual knowledge of falsity of any fact underlying their forward-looking statements.  *See In re Hertz*, 2015 WL 4469143, at *14-16 (citation omitted).   In *Hertz*, plaintiffs alleged, like Plaintiffs here, that a company and its executives were aware of and failed to incorporate into its reaffirmed guidance a weakness in one particular segment of its business (the market for used cars); the court held that *Hertz* plaintiffs failed to allege sufficient facts showing the guidance was "baseless," because, as with Valeant's complex business projections, "many other bases may have existed."   2015 WL 4469143, at *15; *see also Silverstein*, 2016 WL 4478826, at *5 (guidance not actionable where plaintiffs failed to 'plead[] factual allegations, not hypotheticals, sufficient to reasonably allow the inference[] that the forecasts were made with either:  (1) inadequate consideration of the available data; or[] (2) the use of unsound forecasting methodology'") (quoting *In re Burlington Coat*, 114 F.3d at 1429).

*Second*, the Valeant Defendants' forward-looking statements were accompanied by "meaningful cautionary statements" warning investors about the risks inherent in the various aspects of its business plan, some of which materialized beginning in the fall of 2015.  (*See supra* pp. 10, 14-16 (outlining detailed warnings about risks from, among other things, price restrictions and Company's rapid growth));[62] *see also Klein*, 186 F.3d at 344 (no omission about loss of sales due to new store openings where "prospectus adequately cautioned investors that GNC's expansion plans might not be achieved and . . . expansion might not be profitable").[63]

---

[62]     Contrary to Plaintiffs' cursory allegation, Valeant's disclosures of risk factors were not "boilerplate" (Compl. ¶¶ 535-37), but rather "contained extensive discussions of multiple risks, comparable to pages and pages." *In re Synchronoss*, 705 F. Supp. 2d at 413.

[63]     Many of the alleged forward-looking statements also are inactionable because they are mere "statements of subjective analysis or extrapolations, such as opinions, motives and intentions, or general statements of optimism."  *Aetna*, 617 F.3d at 283 (citation omitted); *see*

(*footnote continued . . .*)

**G.**     **Plaintiffs Fail To Allege that the Director Defendants or Messrs. Rosiello or Ingram or Dr. Kellen Made Any Misstatements.**

Plaintiffs have gratuitously named as Defendants Messrs. Rosiello and Ingram and Dr. Kellen, as well as the Director Defendants, without specifying with any particularity why their statements were materially false or misleading.   Courts in this District have consistently held that "in order to be liable [under Section 10(b)], a person must actually make the material misstatement or omission, which must be attributed to him or her when disseminated."   *In re Royal Dutch/Shell Transport Sec. Litig.*, 380 F. Supp. 2d 509, 559 (D.N.J. 2005) (Bissell, C.J.). Moreover, Rule 9(b) and the PSLRA require that Plaintiffs specify "who was involved, where the events took place, when the events took place, and why any statements were misleading." *Israeli* v. *Team Telecom Int'l, Ltd.*, 2006 WL 2883237, at *4-5 (D.N.J. Oct. 10, 2006) (Sheridan, J.) (citation omitted).   Thus, Plaintiffs cannot rely on "group pleading" allegations against the "Management Defendants" or "Director Defendants" (Compl. ¶¶ 51-52) because the "PSLRA requires plaintiffs to specify the role of each defendant, demonstrating each defendant's involvement in misstatements and omissions."   *Winer*, 503 F.3d at 335-36.

Here,  Plaintiffs seek to hold Director Defendants Mses. Goggins, Provencio and Stevenson and Messrs. Farmer, Lönner, Melas-Kyriazi, Power and Ubben liable based solely on their signing of "[t]he 2014 10-K" (Compl. ¶ 184), but the Complaint fails to allege with specificity any material misstatement contained therein.   And with respect to the alleged statements by Messrs. Rosiello and Ingram and Dr. Kellen, Plaintiffs  "ha[ve] not pled facts supporting a reasonable inference as to the material falsity of the statement[s]."   *Se. Pa. Transp.*

---

(. . . *continued footnote*)
*also In re Burlington Coat*, 114 F.3d at 1427-28 (dismissing as immaterial statement that company "believe[d] [it could] continue to grow net earnings at a faster rate than sales").  (*E.g.*, Compl. ¶ 138 ("[W]e've got generation two and generation three, which ***I'm hoping sort of turn it into a pure defense***, into more of an offensive tool to allow us to grow profits.").

*Auth.*, 2015 WL 3833849, at *46.  Beyond merely signing the Company's SEC filings and standard SOX certifications as CFO from July 2015 to June 2016, and providing accurate historic financial information, accounting treatment of Philidor and guidance not challenged by Plaintiffs (on October 26, 2015, December 16, 2015 and March 16, 2016), Mr. Rosiello is not alleged to have made any statements to investors.  (*See*, *e.g.*, Compl. ¶¶ 198, 201, 211, 220, 227, 299.)  Likewise, Dr. Kellen is alleged to have made a single statement during a conference call on July 23, 2015 about specialty pharmacy sales of Jublia (Compl. ¶ 196), but that statement is not alleged to be inaccurate.  Lastly, Plaintiffs also fail to allege how Mr. Ingram's October 26, 2015 statements that Valeant's Board "fully supported the company's specialty pharmacy strategy" and that the Audit Committee had "confirmed the appropriateness" of Valeant's accounting treatment of Philidor (Compl. ¶¶ 216(c), 219) were materially false or misleading.[64]

Accordingly, all claims against the Director Defendants and Messrs. Rosiello and Ingram and Dr. Kellen must be dismissed.

## III.  PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION FOR EACH ALLEGED "CORRECTIVE" DISCLOSURE AS A MATTER OF LAW.

Under settled law, Plaintiffs cannot inflate their purported losses here by relying on 24 separate drops in Valeant's stock price over an eight-month period, from September 28, 2015 to June 7, 2016, without alleging a "causal link between [each] disclosure of alleged fraud and the economic harm ultimately suffered by the plaintiff."  *PharmaNet*, 720 F. Supp. 2d at 558-59.  Plaintiffs cannot do so here.

*First*, Plaintiffs fail to connect their purported losses arising from four stock drops between September 28 and October 15, 2015 to a disclosure of any previously undisclosed wrongdoing.  (Compl. ¶¶ 475-81.)  Although news reports published on September 28 and 29

---

[64]      Appendix B identifies the speaker to which the Complaint's alleged misstatments are attributed (if any).

and October 5 each described government scrutiny of Valeant's drug-pricing practices with respect to Nitropress and Isuprel, these reports did not disclose anything new or "correct" any prior misstatement or omission.  Five months earlier, on April 26, 2015, *The Wall Street Journal* reported on Valeant's pricing of the same two drugs, and on September 20, 2015, *The New York Times* also reported on price increases by Valeant and other drug makers.  (*See supra* pp. 19-20.)

    *Second*, any supposed omission concerning Philidor was fully disclosed by October 30, 2015, when Valeant terminated its relationship with the pharmacy network (*supra* pp. 24-25), as the previous complaints filed in this Court all alleged (*see*, *e.g.*, *Potter* Compl. ¶¶ 62-65).  Except for Valeant's subsequent announcement on February 22, 2016 concerning the restatement (*supra* pp. 25-26), the remaining alleged disclosures after October 30, 2015 involved negative current financial news and continued reporting of previously disclosed facts, not a correction of alleged misstatements or omissions.  *See In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010) ("A negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions.").

    Like Plaintiffs here, plaintiffs in *PharmaNet* attempted to plead loss causation by "point[ing] to the fact that the price of [the company's] stock declined each time Defendants revealed that an aspect of the [alleged] fraud had adversely impacted PharmaNet's financial status."  720 F. Supp. 2d at 560.  The court rejected these allegations, holding that "continued negative financial news" did not establish loss causation where "none of the announcements . . . mention any alleged fraudulent practices."  *Id.* at 560-61.  Because none of the disclosures subsequent to October 2015 in any way "corrected" any prior supposedly material misstatement, Plaintiffs have failed to plead loss causation.  *Strougo*, 105 F. Supp. 3d at 352 (no loss causation from stock drop following article, released days after regulatory complaint, that "d[id] not reveal any new truth about the alleged fraud").

IV.    **PLAINTIFFS FAIL TO PLEAD ANY CLAIM UNDER THE SECURITIES ACT.**

A.    **Valeant's Debt Offerings Are Exempt from Section 12(a)(2) Claims Under Rule 144A.**

For the reasons set forth in the Bank Offering Defendants' motion to dismiss, which the moving Valeant Defendants incorporate by reference herein (Dkt. # 164), Valeant's Debt Offerings are not actionable under the Securities Act because they were made pursuant to private placements under the Rule 144A exemption from Securities Act's registration requirements.[65]

B.    **Plaintiffs Fail to Plead Any Actionable Misstatements.[66]**

As with their purported Exchange Act claims, in order to plead a claim under Sections 11 and 12 of the Securities Act, Plaintiffs must allege particularized facts showing that a "materially false or misleading statement[]" was made in the relevant offering documents.  *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 273 (3d Cir. 2004).   The statements Plaintiffs challenge with respect to their Securities Act claims are merely a subset of those alleged in support of their Exchange Act claims (*compare* Compl. ¶¶ 678-80 *with* Compl. ¶¶ 157(a), 166, 171, 184(a), 187), and are not actionable for the same reasons.  *See Se. Pa. Transp. Auth.*, 2015 WL 3833849, at *32 (dismissing claims against individual defendants where court found no material false or misleading statement under Section 10(b)).

Plaintiffs challenge only a handful of statements made in connection with the only offering subject to the Securities Act—Valeant's March 2015 Stock Offering—none of which is

---

[65]     The moving Valeant Defendants also incorporate by reference all of the remaining arguments made in the Bank Offering Defendants' motion to dismiss.

[66]     Notwithstanding the Complaint's attempt to "disclaim any allegations of fraud, scienter, or recklessness in connection with" (Compl. ¶ 551) the Securities Act claims, all of Plaintiffs' claims against the Valeant Defendants are "grounded in allegations of fraud" and therefore the heightened pleading requirements of Rule 9(b) apply.  *See Cal. Pub. Emps.' Ret. Sys.* v. *Chubb Corp.*, 394 F.3d 126, 163 (3d Cir. 2004).

actionable.[67]  *First*, statements in the Stock Offering Prospectus that Valeant's "low-risk research and development ('R&D') model" allowed it to "improve both the growth rate and profitability" (Compl. ¶ 678(a)), or that Valeant's "dermatology segment and other segments" had "high-growth" or "sustainable organic growth" (Compl. ¶ 678(b)), are nothing more than "general statements of optimism" that courts recognize as inactionable puffery.  *Advanta*, 180 F.3d at 538; (*see also supra* pp. 57-58).  Moreover, like Valeant's prior quarterly and annual SEC filings, Valeant's Stock Offering Prospectus specifically warned of the risks of Valeant's business, including "the challenges and difficulties associated with managing [its] rapid growth," the extent to which third-party payors reimburse Valeant for its products and "the impact of price control restrictions on our products."  (Ex. 24 (Stock Offering Prospectus) at S-vii-x; *see also id.* at S-23-36.)

> *Second*, Plaintiffs fail to allege how Valeant's warning that its business was subject to "declines in the pricing and sales volume of certain of our products . . . that are distributed by third parties over which we have no or limited control" (*see* Compl. ¶¶ 678(c); Ex. 24, at S-ix) or its disclosure of "recent acquisitions" as of March 2015 (Compl. ¶ 679) was materially false or misleading for not disclosing more about Philidor.  Valeant never exercised its option to acquire Philidor and, as set forth above (*supra* pp. 51-55), the Company had no duty to disclose more about Philidor than it did prior to October 2015.

> *Third*, Plaintiffs have not pled facts suggesting Valeant's 2014 financial results contained in the Stock Offering Prospectus (Compl. ¶ 678(d)), or Valeant's "Internal Controls Statement and SOX Certifications" contained in SEC filings and incorporated by reference in the Stock Offering Prospectus (Compl. ¶ 680), were materially false or misleading.  As described

---

[67]    Appendix B identifies each challenged statement allegedly made in connection with Valeant's securities offerings, and the reasons those statements are not actionable.

above (*supra* pp. 48-51), Valeant's restatement was not material and Plaintiffs do not allege facts suggesting Messrs. Pearson or Schiller did not honestly believe their certifications when made. Moreover, "accurate[] earnings statements themselves do not create liability" under the federal securities laws. *Galati*, 2005 WL 3797764, at *7.

Because Plaintiffs do not allege any materially false or misleading statement made in connection with the Stock Offering, or the Debt Offerings for which they make virtually identical allegations, their Securities Act claims fail as a matter of law.[68]

## CONCLUSION

For all of the foregoing reasons, the moving Valeant Defendants respectfully request that the Court grant their Motion to Dismiss and dismiss all of Plaintiffs' claims with prejudice.

---

[68] Plaintiffs also allege control person liability against Valeant and Messrs. Pearson, Schiller and Rosiello under Section 20(a) of the Exchange Act (Compl. ¶¶ 544-50) and against Valeant and Messrs. Pearson and Schiller under Section 15 of the Securities Act (Compl. ¶¶ 723-28). To sustain these claims, Plaintiffs first "must prove . . . a primary violation of the securities laws." *In re Suprema*, 438 F.3d at 284. Because there is no primary liability under either Section 10(b) of the Exchange Act or Sections 11 or 12(a)(2) of the Securities Act, Plaintiffs' control person claims also fail as a matter of law. *Bartesch* v. *Cook*, 941 F. Supp. 2d 501, 513 (D. Del. 2013) ("Plaintiffs' Section 20(a) claim must also be dismissed because the Amended Complaint fails to allege a primary Section 10(b) violation."); *Castlerock Mgmt. Ltd.* v. *Ultralife Batteries, Inc.*, 114 F. Supp. 2d 316, 325 (D.N.J. 2000) (Hochberg, J.) (because "Plaintiffs failed to allege . . . liability under Sections 11 or 12 of the Securities Act, Plaintiffs' claim under Section 15 must fail").

/s/  *Richard Hernandez*
Richard Hernandez
McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey  07102
Telephone:  (973) 848-8615
Facsimile:  (973) 297-6615

Robert J. Giuffra, Jr. (Admitted *Pro Hac Vice*)
Brian T. Frawley
Andrew J. Finn (Admitted *Pro Hac Vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004

Michael H. Steinberg (Admitted *Pro Hac Vice*)
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, California  90067

*Attorneys for Valeant Pharmaceuticals International, Inc., J. Michael Pearson,*
*Robert L. Rosiello, Ari S. Kellen, Ronald H. Farmer, Colleen Goggins, Robert A. Ingram,*
*Anders Lönner, Theo Melas-Kyriazi, Robert N. Power, Norma Provencio, Katherine B.*
*Stevenson and Jeffrey W. Ubben*

September 13, 2016