# Exhibit 18

# Second Quarter 2014 Financial Results Conference Call

**July 31, 2014**

# Q2 2014 Top 20 Global Brands (1/3)
($ in M)

- **Top 20 products YTD revenue of $1.2B, representing 31% of total revenue**

- **Top 20 products grew 22% Q2 year over year and 14% YTD**

- **>45% of Q2 growth from volume for top 20 products, excluding declining products**

# Q2 2014 Top 20 Global Brands (2/3)
($ in M)

| | Product [a] | Q2 2014 Revenue | Primary Growth Driver | Q2 2014 YTD Revenue |
|---|---|---|---|---|
| 1) | Ocuvite®/PreserVision® | $65 | Volume | $125 |
| 2) | Wellbutrin® | $64 | Price | $124 |
| 3) | Xenazine® US | $54 | Price + Volume | $104 |
| 4) | ReNu Multiplus® | $49 | Flat | $104 |
| 5) | Lotemax® Franchise | $45 | Volume | $71 |
| 6) | Solodyn® | $43 | Declined | $95 |
| 7) | Arestin® | $30 | Price | $45 |
| 8) | Targretin® Capsules | $29 | Price + Volume | $44 |
| 9) | BioTrue® Solution | $27 | Volume | $51 |
| 10) | Artelac™ | $27 | Volume | $51 |

(a) **Excludes products held for sale (e.g., facial injectables)**

# Q2 2014 Top 20 Global Brands (3/3)
($ in M)

| | Product[a] | Q2 2014 Revenue | Primary Growth Driver | Q2 2014 YTD Revenue |
|---|---|---|---|---|
| 11) | CeraVe® | $26 | Price + Volume | $48 |
| 12) | Elidel® | $25 | Price | $51 |
| 13) | Thermage® Tips | $21 | Volume | $30 |
| 14) | Boston Solutions | $20 | Flat | $39 |
| 15) | Zovirax Franchise | $19 | Declined | $59 |
| 16) | Syprine® | $18 | Price | $37 |
| 17) | Acanya® | $18 | Price | $35 |
| 18) | Duromine® | $15 | Flat | $28 |
| 19) | Excimer | $15 | Volume | $25 |
| 20) | Prolensa® | $13 | Volume | $30 |

(a)  Excludes products held for sale (e.g., facial injectables)

10

# Exhibit 19

# Third Quarter 2014 Financial Results Conference Call

**October 20, 2014**

VALEANT
Pharmaceuticals International, Inc.



# Q3 2014 Top 20 Global Brands (1/3)

- **Top 20 products YTD revenue of $1.8B, representing 31% of total revenue**

- **Top 20 products grew 32% Q3 2014 over Q3 2013 and 16% YTD**

  - ☐ All 20 products grew in Q3 2014 over Q3 2013

- **~50% of Q3 growth from volume for top 20 products**

- **Top 20 products demonstrate diversification**

  - ☐ Largest product contributed ~3.5% of Q3 2014 revenue

  - ☐ Top 10 products contributed 22% of Q3 2014 revenue

  - ☐ Mix of products includes Rx, OTC and devices (solutions)

- **Jublia® was 28th largest product in Q3 2014, anticipated to be in top 20 products in Q4**

# Q3 2014 Top 20 Global Brands (2/3)
($ in M)

| | Product | Q3 2014 Revenue | Primary Growth Driver | 2014 YTD Revenue |
|---|---|---|---|---|
| 1) | Wellbutrin® | $72 | Volume | $195 |
| 2) | Ocuvite®/PreserVision® | $62 | Volume | $188 |
| 3) | Xenazine® US | $56 | Volume | $160 |
| 4) | Solodyn® | $54 | Volume | $148 |
| 5) | Targretin® Capsules | $44 | Price + Volume | $88 |
| 6) | ReNu Multiplus® | $41 | Volume | $145 |
| 7) | Lotemax® Franchise | $35 | Price | $106 |
| 8) | Arestin® | $30 | Price | $75 |
| 9) | Retin-A® Franchise | $30 | Volume | $68 |
| 10) | BioTrue® Solution | $26 | Volume | $77 |

# Q3 2014 Top 20 Global Brands (3/3)
($ in M)

| | Product | Q3 2014 Revenue | Primary Growth Driver | 2014 YTD Revenue |
|---|---|---|---|---|
| 11) | Artelac$^{TM}$ | $25 | Volume | $76 |
| 12) | Zovirax® Franchise | $23 | Price | $82 |
| 13) | Elidel® | $22 | Price + Volume | $72 |
| 14) | CeraVe® | $21 | Volume | $68 |
| 15) | Syprine® | $20 | Price | $57 |
| 16) | Boston Solutions | $20 | Price | $59 |
| 17) | Cardizem® CD AG | $18 | Volume | $26 |
| 18) | Ziana® | $17 | Volume | $45 |
| 19) | Duromine® | $17 | Volume | $45 |
| 20) | Prolensa® | $16 | Volume | $46 |
| 28) | Jublia | $12 | Volume | $15 |

11

# Exhibit 20

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 8-K

---

**CURRENT REPORT**

**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**May 27, 2014**
**Date of Report (Date of Earliest Event Reported)**

---

# ALLERGAN, INC.
**(Exact Name of Registrant as Specified in its Charter)**

| | | |
|---|---|---|
| **Delaware** | **1-10269** | **95-1622442** |
| **(State of Incorporation)** | **(Commission File Number)** | **(IRS Employer Identification Number)** |

**2525 Dupont Drive**
**Irvine, California 92612**
**(Address of Principal Executive Offices) (Zip Code)**

**(714) 246-4500**
**(Registrant's Telephone Number, Including Area Code)**

**N/A**
**(Former Name or Former Address, if Changed Since Last Report)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Exhibit 99.2



# Introduction

- As Allergan's Board of Directors stated on May 12, 2014, the Valeant/Pershing Square unsolicited proposal of April 22, 2014 substantially undervalues Allergan - *regardless* of the consideration mix
- Over the course of the past several weeks since the Valeant/Pershing Square proposal, we have met with many of our stockholders and stock analysts
- During those conversations, many stockholders and stock analysts expressed serious concerns about the sustainability of Valeant's business model. Some of the key themes included:
    - Valeant's low organic sales growth (driven mostly by price increases)
    - Sustainability of acquisitions strategy
    - Low R&D investment and the impact on future growth
    - Market share erosion due to lack of sales and marketing infrastructure and investment
    - Lack of transparency in financial reporting and sustainability of tax structure
- Given that the Valeant unsolicited proposal includes a substantial amount of Valeant stock in exchange for acquiring Allergan, this is a serious concern for Allergan stockholders
- In order to respond to concerns expressed by some of our stockholders, Allergan engaged two independent, third party consultants and forensic accountants to conduct an initial review of Valeant based on publicly available information
    - Alvarez & Marsal and FTI Consulting have reviewed this analysis and confirmed key components presented herein



ALLERGAN
Our pursuit. Life's potential.®

3

# How Has The Prescription Ophthalmology Business of Bausch & Lomb Performed In The U.S. Post Acquisition?

"This morning we reported Valeant's fourth quarter results for 2013, which were driven by strong sales growth and profitability across all our regions, including <u>continued outperformance from Bausch & Lomb</u>, since the August 5 close."

**Michael Pearson, CEO, 02/27/14**

**IMS Data Suggests That Most Of Bausch & Lomb's Growth Is Attributable To What We Believe Are Unsustainable Price Increases**

ALLERGAN
Our pursuit. Life's potential.®

Source: Analysis based upon IMS FIRST Q4 2013 vs. Q4 2012. Total U.S. Bausch & Lomb sales represents Eye Care
Note: Individual products listed denote products that were launched after 2012.
Note: Permission to use quotes was neither sought nor received.
Note: Reviewed by independent consultants and forensic accountants.



# Exhibit 21

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

———————————

# FORM 8-K

———————————

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d)**
**of the Securities Exchange Act of 1934**

**October 17, 2014**
**Date of Report (Date of Earliest Event Reported)**

———————————

# ALLERGAN, INC.
**(Exact Name of Registrant as Specified in its Charter)**

———————————

| **Delaware** | **1-10269** | **95-1622442** |
|:---:|:---:|:---:|
| **(State of Incorporation)** | **(Commission File Number)** | **(IRS Employer Identification Number)** |

**2525 Dupont Drive**
**Irvine, California 92612**
**(Address of Principal Executive Offices) (Zip Code)**

**(714) 246-4500**
**(Registrant's Telephone Number, Including Area Code)**

**N/A**
**(Former Name or Former Address, if Changed Since Last Report)**

———————————

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☒   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))



# We Believe Price is a Large Driver of Growth for Select Valeant U.S. Pharmaceutical Businesses

### Our Analysis of Bausch & Lomb U.S. Rx In-Market Pharmaceutical Growth

| Q2'14 YTD | Volume Growth | Price Growth | Total Growth [1] |
|---|---|---|---|
| Total U.S. B&L | 3% | 8% | 11% |
| Branded U.S. B&L | (3%) | 12% | 9% |
| Generic U.S. B&L | 11% | 3% | 14% |

### Our Analysis of Valeant U.S. Rx In-Market Skin Care Growth

| Q2'14 YTD | Volume Growth | Price Growth | Total Growth [1] |
|---|---|---|---|
| Total U.S. | (43%) | 24% | (19%) |
| Branded U.S. | (50%) | 26% | (24%) |
| Generic U.S. | 93% | (5%) | 88% |

### Sustainability of large price increases?



ALLERGAN
Our pursuit. Life's potential.®

Source: Analysis based upon US IMS NPA Combined Retail Acquisition Dollars. Excludes sales through alternative fulfillment channels not captured by IMS.
[1] Represents acquisition $ growth

14

# Valeant has Taken Substantial Price Increases Over the Past Year

| Product | Price Increases Oct'13 to Oct'14 |
|---|---|
| Timolol Maleate Ophthalmic Gel Forming Solution 0.25 % | 146% |
| Targretin | 142% |
| Syprine Oral Capsule 250 MG | 88% |
| Wellbutrin XL Oral Tablet Extended Release 24 Hour 150 MG | 72% |
| Arestin Dental Miscellaneous 1 MG | 55% |
| Zovirax | 33% |
| Elidel External Cream 1 % | 26% |
| Istalol Ophthalmic Solution 0.5 % | 25% |
| Lotemax | 24% |
| Zirgan Ophthalmic Gel 0.15 % | 17% |
| Alrex Ophthalmic Suspension 0.2 % | 17% |
| Bepreve Ophthalmic Solution 1.5 % | 16% |
| Zylet Ophthalmic Suspension 0.5-0.3 % | 14% |
| Besivance Ophthalmic Suspension 0.6 % | 14% |
| Xenazine Oral Tablet 12.5 MG | 14% |
| Prolensa Ophthalmic Solution 0.07 % | 13% |
| Solodyn Oral Tablet Extended Release 24 Hour 105 MG | 9% |
| Lacrisert Ophthalmic Insert 5 MG | 9% |
| Acanya External Gel 1.2-2.5 % | 9% |
| Timoptic | 6% |



Source: Wolters Kluwer Price Rx® Pro
All products are registered trademarks of Valeant

23

# Exhibit 22

THOMSON REUTERS STREETEVENTS

# EDITED TRANSCRIPT

VRX.TO - Q1 2015 Valeant Pharmaceuticals International Inc Earnings Call

EVENT DATE/TIME: APRIL 29, 2015 / 12:00PM GMT

**OVERVIEW:**

Co. reported 1Q15 revenues of $2.2b and cash EPS of $2.36. Expects 2015 revenues to be $10.4-10.6b and cash EPS to be $10.90-11.20. Co. also expects 2Q15 revenues to be $2.45-2.55b and cash EPS to be $2.40-2.50.

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



APRIL 29, 2015 / 12:00PM, VRX.TO - Q1 2015 Valeant Pharmaceuticals International Inc Earnings Call

## CORPORATE PARTICIPANTS

**Laurie Little** *Valeant Pharmaceuticals International Inc - Head of IR*

**J. Michael Pearson** *Valeant Pharmaceuticals International Inc - Chairman & CEO*

**Howard Schiller** *Valeant Pharmaceuticals International Inc - CFO*

**Ari Kellen** *Valeant Pharmaceuticals International Inc - Company Group Chairman*

## CONFERENCE CALL PARTICIPANTS

**Chris Schott** *JPMorgan - Analyst*

**Corey Davis** *Canaccord Genuity - Analyst*

**Annabel Samimy** *Stifel Nicolaus - Analyst*

**Louise Chen** *Guggenheim Securities LLC - Analyst*

**Gary Nachman** *Goldman Sachs - Analyst*

**Marc Goodman** *UBS - Analyst*

**Alex Affray** *BMO Capital Markets - Analyst*

**Douglas Tsao** *Barclays Capital - Analyst*

**David Amsellem** *Piper Jaffray & Co. - Analyst*

**Andrew Finkelstein** *Susquehanna Financial Group - Analyst*

**David Risinger** *Morgan Stanley - Analyst*

**Greg Fraser** *BofA Merrill Lynch - Analyst*

**Douglas Miehm** *RBC Capital Markets - Analyst*

**Umer Raffat** *Evercore ISI - Analyst*

## PRESENTATION

**Operator**

Good morning. My name is Stephanie and I will be your conference operator today. At this time I'd like to welcome everyone to the Valeant Pharmaceuticals first-quarter earnings conference call.

(Operator Instructions)

Thank you. Ms. Laurie Little, Head of Investor Relations, you may begin your conference.

---

**Laurie Little** - *Valeant Pharmaceuticals International Inc - Head of IR*

Thanks, Stephanie.

Good morning, everyone, and welcome to Valeant's investor first-quarter 2015, conference call. Today we will be discussing our financial results and presenting on the call are J. Michael Pearson, Chairman and Chief Executive Officer; and Howard Schiller, Chief Financial Officer. Dr. Ari Kellen, Company group Chairman, will also be available for questions after our prepared remarks. In addition to a live webcast, a copy of today's slide presentation can be found on our website under the Investor Relations Section.

2

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us



©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

APRIL 29, 2015 / 12:00PM, VRX.TO - Q1 2015 Valeant Pharmaceuticals International Inc Earnings Call

Before we begin, our presentation today contains forward looking information. We would ask that you take a moment to read the forward-looking statement legend at the beginning of our presentation, as it contains important information.

In addition, this presentation contains non-GAAP financial measures. For more information about non-GAAP financial measures, please refer to slide number 1. Non-GAAP reconciliations can be found in the press release issued earlier today and posted on our website.

Finally, the financial guidance in this presentation is effective only as of today. It is our policy to update our firm guidance only through broadly disseminated public disclosure.

And with that, I will turn the call over to Mike.

---

**J. Michael Pearson** - *Valeant Pharmaceuticals International Inc - Chairman & CEO*

Thank you, Laurie. Good morning, everyone, and thank you for joining us. Today we announced very strong financial results from the first quarter of 2015.

We plan to discuss four topics on today's call. First, we'll review our strong first-quarter financial results. Second, provide you with the highlights of our first-quarter business performance. Next, we'll update you on the progress with the integrations of both Dendreon and Salix. And finally, we'll discuss our financial performance and update our 2015 guidance.

This morning we reported Valeant's first-quarter results for 2015, which were driven by strong sales growth and profitability across all our regions, once again demonstrating the strength of our diversified and decentralized business model. Before we begin discussing the details of our performance, I wanted to provide the highlights of this quarter.

The results announced today exceeded the Q1 guidance that we provided on our last call, despite losing $140 million in top-line revenue and $0.12 in cash EPS to FX headwinds. We had very strong same-store organic growth of greater than 15%, driven by the strong performance from most of our business units around the world.

The Dendreon and Salix integrations are largely complete. With Salix, we will exceed $530 million in synergies and exceed the $500 million run rate by the end of Q2. With Dendreon, we expect to achieve greater than $130 million in synergies and to achieve 90% of this run rate by the end of the year.

Based on our strong base business of performance, and the contributions from sales from Dendreon, we are raising our 2015 cash EPS guidance to $10.90 to $11.20. Finally, we are reconfirming that we expect 20%-plus cash EPS accretion from the Salix acquisition in 2016. And we remain confident in our ability to comfortably seed $7.5 billion in EBITDA in 2016.

Looking at our quarter, our total revenue was $2.2 billion, an increase of 16% over the prior year, largely driven by the exceptionally strong growth in many of our US businesses, which more than offset the negative headwinds from FX in our ex-US markets. Adjusting for FX in the divestiture of our aesthetics business to Galderma last year, revenue grew 27% in Q1 2014.

Cash EPS was $2.36, an increase of 34% over prior year. This includes the negative impacts of the $140 million in revenue and $0.12. Adjusted for FX and the aesthetic divestment, cash EPS grew 50% Q1 2015 over Q1 2014.

Additionally, the acquisition-related financing that was completed prior to the quarter end had an impact on our Q1 result. We included the negative $0.01 impact from the share issuance while we excluded the $0.02 impact from the debt financing that settled prior to quarter end.

Turning to organic growth, our overall same-store total Company organic growth was 15% for the quarter. While almost all of our businesses delivered strong organic growth, I would like to highlight contact lenses, dermatology, Obagi, ophthalmology Rx, Asia, the Middle East and North

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



APRIL 29, 2015 / 12:00PM, VRX.TO - Q1 2015 Valeant Pharmaceuticals International Inc Earnings Call

**J. Michael Pearson** - *Valeant Pharmaceuticals International Inc - Chairman & CEO*

In terms of the 80% gross margins, a couple things are going on. One, is under our ownership, Salix's gross margins will increase significantly. And that's because we will not be doing the discounting that they were doing to the wholesalers, which obviously affects their gross margin. Under our hands they'll be in the low 80%s. That's before we actually negotiate better rates with wholesalers, et cetera.

And then a lot of our launch brands in the dermatology area have very high gross margins. And those will continue to grow disproportionately.

And our contact lenses, once we get to a commercial line and we get the Ultra up, the yields will continue to improve. The yields are continuing to improve on BioTrue Daily. So we have a lot of things going on in manufacturing that continue to -- and they're doing a great job in terms of improving the cost basis.

---

**Louise Chen** - *Guggenheim Securities LLC - Analyst*

And then quickly on the $7.5 billion, are you including anything for pipeline? I know you have a lot of potentially new product approvals next year.

---

**J. Michael Pearson** - *Valeant Pharmaceuticals International Inc - Chairman & CEO*

No. We assume nothing. That's why we feel very comfortable in terms of the $7.5 billion, because there's a lot of things that will happen. Howard just made a note, there's one product that we do have built in, Luminesse, which we know will get approved.

---

**Howard Schiller** - *Valeant Pharmaceuticals International Inc - CFO*

The eye whitening product.

---

**J. Michael Pearson** - *Valeant Pharmaceuticals International Inc - Chairman & CEO*

But it's small.

---

**Howard Schiller** - *Valeant Pharmaceuticals International Inc - CFO*

And that was consistent -- again, we had highlighted that over the summer and the fall, as the only pipeline product that we included.

---

**Operator**

Gary Nachman, Goldman Sachs.

---

**Gary Nachman** - *Goldman Sachs - Analyst*

Howard, my best wishes to you as well, as you move on. Mike, a couple more on Xifaxan for IBS. If approved, a little more on the initial marketing plans in terms of increasing the sales force and how aggressive you'll be with DTCs and Jublia as a comp?

And then if you could quantify a little bit how much was price versus volume that contributed to growth in 1Q? And what do you factor in your full-year guidance price versus volume?

---

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



APRIL 29, 2015 / 12:00PM, VRX.TO - Q1 2015 Valeant Pharmaceuticals International Inc Earnings Call

**J. Michael Pearson** - *Valeant Pharmaceuticals International Inc - Chairman & CEO*

Sure. In terms of our marketing plan for Xifaxan, yes, we will be taking the Jublia approach to Xifaxan, but maybe turbo-charged a little bit. There's huge, huge unmet need here. And people that are, just like onychomycosis, people that have the medical condition and just are not getting any treatment, because treatments are not that good out there today.

It's also like onychomycosis, it's pretty simple to self diagnose. It's a much more serious condition than onychomycosis. So we think that going directly to the patients to make them aware that there is now a treatment for this, and an excellent treatment for this, will really drive demand. So you'll probably see a bit of a turbo-charged Jublia approach to this product.

In terms of price volume, actually volume was greater than price in terms of our growth. Outside the United States it's all volume. In fact, we had negative price outside the US with FX. And in the US it's shifting more to volume than price, and we expect that to continue with our launch brands. A lot of our prices for most of our products are negotiated with managed care. And there's only a limited amount of price that we can take.

And then if you look at our consumer business, very little. Walmart doesn't like price increases. If you look at our contact lens business, we're not discounting contact lenses. But we are keeping the prices the same. I think there is some noise in the market that there's discounting going on. We're not discounting, but that's all volume growth. And similarly in the cataract surgery market, again, we're just holding our prices. So it's primarily volume, and we expect that to continue.

---

**Gary Nachman** - *Goldman Sachs - Analyst*

Okay. And then just a follow-up on Xifaxan with the sales force. If you could comment. You said you're going to have more of a specialized sales force?

---

**J. Michael Pearson** - *Valeant Pharmaceuticals International Inc - Chairman & CEO*

No, right now, Salix had three sleeves of specialty sales force aimed to the GI community. In terms of primary care, we're not going to build out a huge primary care sales force. We don't think that's efficient.

What we will do, just like we have done in dermatology, we will, for high-writing primary care, in the GI space, we will include them as part of our call plan. But we're not going to have -- we don't see the need to have a large primary care sales force. When we've done the analysis, it appears that the return on investment is much higher in terms of things like DTC than a primary care sales force.

---

**Gary Nachman** - *Goldman Sachs - Analyst*

Okay, thank you.

---

**Operator**

Marc Goodman, UBS.

---

**Marc Goodman** - *UBS - Analyst*

So first, on the Salix products, I'm not sure if you mentioned it, but if you could tell us where are inventory levels now? We know where you're going to take them, but I was curious now.

---

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## APRIL 29, 2015 / 12:00PM, VRX.TO - Q1 2015 Valeant Pharmaceuticals International Inc Earnings Call

Jublia, in the past you've mentioned that IMS is not really capturing all the sales. Can you give us a sense of how much you think IMS is capturing versus how much in the channels that are not being captured? Just to give us that breakdown like you've done before.

And then on Salix R&D, I was curious what pipeline assets, now that you own the assets, you own the Company, which assets are you going to move forward and which ones have you decided to stop?

And then can you, on contact lenses for the ONEday product, where is that around the world right now? You talked about that. I was curious, what countries has it been launched in? Thanks.

**J. Michael Pearson** - *Valeant Pharmaceuticals International Inc - Chairman & CEO*

A lot of questions. Start with Jublia, I don't know what the IMS numbers are, because -- but in terms of our scripts per week are about 25,000 at this point with Jublia. Continuing to grow. So it sounds like you know IMS, so you can do the arithmetic there.

Salix R&D, actually most of the programs we're going to continue. And probably next quarter we will update our R&D slide for that. So we're still finalizing discussions, but most of the programs we are going to be continuing.

BioTrue Daily, we just launched -- we were just in China last week. So we just are launching it in China, Japan and in Asia. So it's not really in Asia, it's really not in a lot of the emerging markets, it's more in the developed -- it's mostly in, at this point I'd say US, Canada and Europe -- or Western Europe. And so there's still a lot geographies to go.

**Howard Schiller** - *Valeant Pharmaceuticals International Inc - CFO*

The inventories, as I mentioned in the prepared remarks, Marc, the inventory levels at close were in the four to five month range. And that includes both the traditional, the big three wholesalers as well as some of the other wholesalers that Salix was dealing with.

**Marc Goodman** - *UBS - Analyst*

Thanks.

**Operator**

Alex [Affray], BMO Capital Markets.

**Alex Affray** - *BMO Capital Markets - Analyst*

Howard, congratulations on a strong track record with Valeant. You sounded very committed to the Company last year and we were under the impression that you were staying on for another two years. If you don't mind us asking, what changed since mid last year?

And then on the Salix synergies, can you give us more clarity on where the synergies are coming from? Particularly given that you just said you're keeping much of the R&D projects. And I think you said you're increasing the sales force. So where are the synergies coming from? Thank you.

**Howard Schiller** - *Valeant Pharmaceuticals International Inc - CFO*

I can't tell you there was any one moment. This has been a process. Lots of discussions with Mike and a lot of soul-searching as I mentioned, and conclusion that I recently drew that at this point in my life, it was an interest in doing some things on my own. As I mentioned, most likely in a

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.


THOMSON REUTERS

APRIL 29, 2015 / 12:00PM, VRX.TO - Q1 2015 Valeant Pharmaceuticals International Inc Earnings Call

**J. Michael Pearson** - *Valeant Pharmaceuticals International Inc - Chairman & CEO*

And Provenge has been approved in Europe. But the pricing so far that we've been able to get in Europe does not make it something that we probably want to do by ourselves. So we'll probably look for a partner in Western Europe to see if someone else wants to take the product.

And right now our we are focusing our efforts on the US. First the focus was to make it profitable, which we have. The second priority is to grow it, which hopefully we can report back in another quarter or two that we are starting to grow it. And I think staying very focused in the US and making it a growing profitable product is our short-term mission in terms of Provenge.

---

**Ari Kellen** - *Valeant Pharmaceuticals International Inc - Company Group Chairman*

And more on Ultra. We're going to launch the Multi Focal at the end of this year. We'll already be validating and producing Toric sometime in Q4. So again, well on track for release of commercial product early Q1 and maybe earlier.

---

**Douglas Miehm** - *RBC Capital Markets - Analyst*

And each of those lines can do $150 million?

---

**Ari Kellen** - *Valeant Pharmaceuticals International Inc - Company Group Chairman*

That's a rough estimate. Obviously as we release Ultra and Toric and Multi Focal, the ASPs will rise. So $150 million is a reasonable estimate per line.

---

**Douglas Miehm** - *RBC Capital Markets - Analyst*

Great, thank you.

---

**Operator**

Umer Raffat, Evercore ISI.

---

**Umer Raffat** - *Evercore ISI - Analyst*

A couple for Howard and one for Mike. Howard, best of luck to you. There's a lot of shareholder interest in this, so I'm compelled to ask a bit more. Wanted to understand the timing of news. We understand that right around your three-year anniversary date, you had another 3-year equity award. Wanted to understand timing there.

And then separately, what's the EBITDA expectation for 2015? Not 2016, but EBITDA expectation for 2015? And what was that number for 2014?

And then Mike, my last question. Jublia is up 87% quarter on quarter on TRx. I think the sales were up about 20%-ish. Wanted to understand trends there. Thank you very much.

---

**Howard Schiller** - *Valeant Pharmaceuticals International Inc - CFO*

So again, in terms of the timing, this was a decision that, while we've been having discussions for a period of time, the decision was just made. So up until the decision was made, it was business as usual. So I wouldn't draw any connection between those two.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.


THOMSON REUTERS

**APRIL 29, 2015 / 12:00PM, VRX.TO - Q1 2015 Valeant Pharmaceuticals International Inc Earnings Call**

In terms of the EBITDA for 2014, that you can get from our public filings. I don't have that in front of me. For 2015, the easiest -- we are giving you the guidance. We've told you what the interest expense -- we are paying 5.1% on our interest expense for the rest of the year. And we've given you our tax, you should assume tax rate stays roughly the same.

So the only missing piece is stock-based comp and depreciation. Depreciation is running a little over $50 million a quarter, so that's $200-plus million. And stock-based comp is a little over $100 million. So I think you can pretty easily, from our updated guidance you can get there very, very easily.

---

**J. Michael Pearson** - *Valeant Pharmaceuticals International Inc - Chairman & CEO*

In terms of Jublia, in our prepared remarks I think we mentioned that the difference between the growth in scripts and the growth in revenues, is basically what's out there in the channel in inventory. When you launch a product, there's a fair amount of inventory that's put in. Every pharmacy, the wholesalers, so you only see that on launch brand that early on there's a lot of sales that are just filling up the channel. Those have all been reduced.

And our sales especially into specialty pharmacies, we have our inventory levels very, very low. Well below two weeks. I think going forward what you'll see is, which is the important thing, is the growth in script trends. And the growth in Jublia revenues will match dollar to dollar from Q2 going forward.

---

**Umer Raffat** - *Evercore ISI - Analyst*

Thank you very much.

---

**J. Michael Pearson** - *Valeant Pharmaceuticals International Inc - Chairman & CEO*

Okay, thank you, everyone. And we'll talk to you next quarter.

---

**Operator**

This concludes today's conference call. You may now disconnect.

---

**DISCLAIMER**

Thomson Reuters reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON REUTERS OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

©2015, Thomson Reuters. All Rights Reserved.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



**THOMSON REUTERS**

# Exhibit 23



<div align="right">

**Company Update**
April 30, 2015
SPECIALTY PHARMACEUTICALS

</div>

**Equity Research**

<div align="right">

**Irina Rivkind Koffler**
212-915-1237
irivkind@cantor.com

</div>

## Valeant Pharmaceuticals International, Inc. (VRX-$214.06)

**Rating: BUY**
**Target Price: $271.00**

## Positive Sentiment Post-Strong 1Q:15; Reiterate BUY, Raising PT to $271 from $222

| REV | 1Q | 2Q | 3Q | 4Q |
|---|---|---|---|---|
| **2014A** | 1,886.2A | 2,041.1A | 2,056.2A | 2,280.0A |
| **2015E** | 2,190.9A | 2,476.4E | 2,880.5E | 3,252.3E |
| *Prev* | *2,090.1E* | *2,292.8E* | *2,672.9E* | *3,110.0E* |
| **2016E** | — | — | — | — |

| EPS | 1Q | 2Q | 3Q | 4Q |
|---|---|---|---|---|
| **2014A** | 1.76A | 1.91A | 2.11A | 2.58A |
| **2015E** | 2.36A | 2.46E | 3.00E | 3.66E |
| *Prev* | *2.33E* | *2.51E* | *2.46E* | *3.03E* |
| **2016E** | — | — | — | — |

| FY | 2014A | 2015E | 2016E |
|---|---|---|---|
| **REV** | 8,263.5A | 10,800.1E | 13,698.7E |
| *Prev* | — | *10,165.7E* | — |
| **EPS** | 8.34A | 11.53E | 16.03E |
| *Prev* | — | *10.50E* | — |
| **P/E** | 25.7x | 18.6x | 13.4x |

- **1Q:15 top- and bottom-line beat/2015 guidance raised:** Valeant reported revenues of $2.19B (+16% Y/Y) and adjusted non-GAAP EPS of $2.36 in 1Q:15 vs. guidance of 10-15% organic revenue growth and >$2.30 and FactSet consensus of $2.15B and $2.33. Management raised 2015 guidance from $9.2-9.3B and $10.10-10.40 to $10.4-10.6B and $10.90-11.20; and introduced 2Q:15 guidance of $2.45-2.55B and $2.40-2.50 cash EPS. With the expected addition of $1.0B in Salix revenue, approx. $300M from Provenge, and at least $500M from Marathon products, we anticipate that U.S. sales could approach $7.4B in 2015 and surpass $10B in 2016. This quarter we saw a 14.7% Q/Q revenue decline in ROW Developed Markets, and an 18.3% Q/Q decline in Emerging Markets. We pessimistically do not expect selling conditions to improve and therefore lowered our estimates (we now model declines in all of these OUS segments in 2015, and took down outer year estimates). In spite of these cuts we still arrive at above-guidance 2015 estimates of $10.8B and $11.53 cash EPS. We reiterate our BUY rating and raise our PT to $271 from $222 using DCF analysis. If we applied an 18x multiple to our 2016 cash EPS of $16.03 we would arrive at a $289 valuation.

- **Contemplating expenses:** Management guided to improving gross margins (approaching 80% by year end) due to lower discounts in the high margin Salix business. SG&A is expected to come down as a percent of revenue though we contemplate the addition of approximately 400 reps from Salix (including headcount expansion) along with a pain sales force that together could add at least $130M in expense. We also anticipate additional DTC investment behind Xifaxan and Onexton. Management indicated it is extremely comfortable with its 2016 $7.5B EBITDA guidance and we are in the same range if we assume combined depreciation and stock based comp of ~$250M.

- **Other potential upside:** (1) Jublia profitability is expected to increase as Valeant launches the 8 mL size, which could cannibalize 75% of existing 4 mL sales at double the price. (2) Onexton guidance was raised to $100-200M from $50-75M (with Luzu) previously. (3) By expanding its sales presence into pain, urology, and the hospital setting the company could grow sales of its existing products. (4) Management acknowledged that it is now actively looking at development stage GI assets (we believe that SGYP and EVOK represent inexpensive late-stage programs in constipation and gastroparesis, respectively) and also views ophthalmic and dermatology generics as attractive niche areas to target.

**Current Statistics**

| | | | |
|---|---|---|---|
| **Market Cap ($Mil)** | $71,705.5 | **Free Float (%):** | 341.000 |
| **Avg. Daily Trading Volume (3 mo.):** | 2,910,024 | | |
| **Shares Out (Mil):** | 334.978 | | |

**The Disclosure Section may be found on pages 6 - 8.**

**CANTOR Fitzgerald**

April 30, 2015

## EARNINGS SUMMARY:

We summarize 1Q:15 earnings in Exhibit 1 below.

Exhibit 1: 1Q:15 Performance

| $ in millions except per-share data | 1Q:15E | 1Q:15A | % Variance | Y/Y Growth | Q/Q Growth | Comments |
|---|---|---|---|---|---|---|
| Revenues | 2090.1 | 2190.9 | 4.8% | 16.2% | -3.9% | $2.15B FactSet Consensus |
| COGS (including alliance & service) | 522.5 | 540.7 | 3.5% | 7.6% | -5.2% | |
| **Gross Profit** | **1567.6** | **1650.2** | **5.3%** | **19.3%** | **-3.5%** | |
| SG&A | 497.5 | 564.8 | 13.5% | 19.5% | 9.8% | $511M FactSet Consensus |
| R&D | 56.4 | 55.5 | -1.7% | -9.5% | -6.1% | $62M FactSet Consensus |
| Other Adjustments | 0.0 | 0.0 | NM | NM | NM | |
| **EBIT** | **1013.7** | **1029.9** | **1.6%** | **21.2%** | **-9.4%** | |
| Interest and Other Income | -180.0 | -201.5 | 11.9% | -13.3% | -8.0% | |
| Pre-tax income | 833.7 | 828.4 | -0.6% | 34.2% | -9.7% | |
| Income tax expense | 37.5 | 18.3 | -51.2% | 21.2% | -51.1% | |
| **Net income** | **796.2** | **809.3** | **1.6%** | **34.4%** | **-8.1%** | |
| Diluted shares | 341.8 | 343.4 | 0.5% | 0.6% | -69.8% | |
| **Operating EPS** | **$2.33** | **$2.36** | **1.2%** | **33.7%** | **-8.5%** | **$2.32 FactSet Consensus** |
| | | | | | | |
| **Margin Analysis** | | | | | | |
| Product Gross Margin | 74.6% | 75.3% | 1.0% | 2.7% | 0.7% | |
| SG&A | 23.7% | 25.8% | 8.8% | 2.9% | 4.1% | |
| R&D | 2.5% | 2.5% | 1.3% | -22.1% | -12.8% | |
| Operating Income | 48.4% | 47.0% | -2.8% | 4.4% | -1.2% | |
| Interest and Other Income | -8.4% | -9.2% | -9.6% | -25.4% | -14.4% | |
| Tax | 3.2% | 2.2% | -31.0% | -9.7% | -96.1% | |
| Net Income | 38.7% | 36.9% | -4.5% | 15.7% | 3.8% | |
| | | | | | | |
| **Product Sales** | | | | | | |
| **Developed Markets:** | **1593.5** | **1764.4** | **10.7%** | **24.1%** | **0.4%** | |
| U.S. | 1157.4 | 1403.7 | 21.3% | 39.5% | 5.2% | |
| ROW | 436.2 | 360.7 | -17.3% | -13.2% | -14.7% | |
| Emerging Markets: | 496.6 | 426.5 | -14.1% | -8.2% | -18.3% | |
| European/MiddleEast | 246.6 | 212.1 | -14.0% | -10.5% | -20.5% | |
| Latin America | 109.2 | 89.0 | -18.5% | -10.4% | -21.0% | |
| Asia/Africa | 140.8 | 125.4 | -10.9% | -2.0% | -12.2% | |

Source: Company reports and Cantor Fitzgerald Estimates

## OTHER INTERESTING DATA POINTS:

- Management indicated that it believes that Jublia could be a $750 million brand following the launch of the 8 mL dose. Approximately 50% of Jublia prescriptions are now running through the Philidor specialty pharmacy and management plans to utilize this service to distribute its other chronic use drugs. Management also noted that there was some inventory work-down of Jublia in the past quarter (we estimate $13 million) and we think that this brand could rebound next quarter with the load-in of the 8 mL SKU.

- While the announcement of the pending departure of CFO Howard Schiller was surprising, we believe that investors could be reassured by his commitment to remain on the company's Board of Directors. Management indicated that it is not worried about the ongoing IRS audits of its 2011 and 2012 financial statements.

- Management was confident about its pending approval of Xifaxan in IBS-D and indicated that approximately 30% of 550 mg prescriptions are used off-label by gastroenterologists (for a number of indications); and 10% of 550 mg prescriptions are used off-label by primary care physicians (for IBS-D). The company plans to launch a new bottle of Xifaxan to accommodate the three times per day dosing IBS-D regimen (we assume 42 pills/bottle for two weeks of treatment).

- With respect to its pipeline, management indicated that it is excited about Luminesse (eye whitening product) that is expected to compete with Visine; IDP-118, a topical psoriasis drug that is currently in Phase III, and Vesneo in glaucoma. Valeant also plans to meet with FDA this summer to outline next steps in its regulatory pathway to submitting Emerade, its novel epinephrine auto-injector that is currently available in the European market.



April 30, 2015

**Valuation**

We value Valeant using discounted cash flow analysis (assuming a 10% WACC and 2% terminal growth rate), which generates a $271 price target (up from $222 previously) and incorporates the contributions from Salix and Dendreon, along with additional debt and shares associated with the acquisitions. This represents approximately 27% upside from the current share price and supports our BUY thesis on the stock.

If we utilize an 18x multiple applied to our $16.03 2016 cash EPS estimate, we would arrive at a $289 value per share, which also supports our BUY rating. We note that lower growth large-cap pharmas trade at an average 18x 2016 EPS and therefore believe that this multiple is conservative.

**Risks**

(1) Geopolitical events could adversely impact economic growth (hurting consumer spending on elective treatments or cash pay products).

(2) M&A competition over attractive assets could increase asset valuation to levels that exceed Valeant's investment criteria.

(3) Clinical and generic risks are present to some extent in the business but do not represent key sources of risk to Valeant, in our view.

(4) As the company invests more heavily in SG&A it may encounter commercial risk.

# Exhibit 24

**Table of Contents**

**Filed Pursuant to Rule 424(b)(5)**
**Registration No. 333-189192**

<span style="color:red">**The information in this preliminary prospectus supplement and the accompanying prospectus is not complete and may be changed. This preliminary prospectus supplement and the accompanying prospectus are not an offer to sell these securities and are not soliciting an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.**</span>

<span style="color:red">*Subject to completion*
*Preliminary Prospectus Supplement dated March 16, 2015*</span>

Prospectus supplement
(To Prospectus dated June 10, 2013)



$1,450,000,000

Common Shares

———————————

We are offering $1.45 billion of common shares (the "Common Shares") of Valeant Pharmaceuticals International, Inc. (the "Company") (the "Firm Shares") in connection with the tender offer (as it may be amended or extended, the "Tender Offer") by a wholly owned subsidiary of the Company for the outstanding shares of common stock, par value $0.001 per share, of Salix Pharmaceuticals, Ltd. ("Salix") which is being made pursuant to the Agreement and Plan of Merger, dated February 20, 2015 (as amended on March 16, 2015 and as may be further amended, the "Merger Agreement"), among Valeant Pharmaceuticals International, Sun Merger Sub, Inc., Salix and, for the limited purposes set forth therein, the Company.

Our Common Shares are traded on the New York Stock Exchange (the "NYSE") and on the Toronto Stock Exchange (the "TSX") under the symbol "VRX." On March 13, 2015, the last reported sale price of our Common Shares was $197.43 per share on the NYSE and Cdn$252.29 per share on the TSX.

We will receive all of the net proceeds of the offering.

*Investing in our Common Shares involves certain risks. See "Risk Factors" beginning on page S-23 of this prospectus supplement to read about important factors you should consider before investing in our Common Shares.*

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if the prospectus or this prospectus supplement is truthful or complete. Any representation to the contrary is a criminal offense.**

Although the Common Shares have been registered under the U.S. Securities Act of 1933, as amended, the Common Shares have not been qualified for distribution by prospectus under the securities laws of any province or territory of Canada, and sales of the Common Shares outside Canada are being made pursuant to an exemption from the prospectus requirements of Canadian securities laws. Investors seeking to purchase Common Shares will be required to deliver a signed representation letter. See "Requirements of the Offering" beginning on page S-iv of this prospectus supplement.

———————————

|  | Per Share | Total |
|---|---|---|
| Public offering price | $ | $ |
| Underwriting discounts and commissions | $ | $ |
| Proceeds, before expenses, to us | $ | $ |

We have granted the underwriter an option for a period of up to 30 days from the date of this prospectus supplement to purchase additional Common Shares (the "Additional Shares", together with the Firm Shares, the "Offered Shares"), equal to up to 15% of the Common Shares initially sold by us, at the public offering price, less underwriting discounts and commissions. If the underwriter exercises this option in full, the total underwriting discounts and commissions will be $ and the total proceeds, before expenses, to us will be $ .

It is expected that delivery of the Offered Shares will be made against payment therefor on or about March , which is the business day following the date hereof (such settlement cycle being referred to as "T+ "). Under Rule 15c6-1 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), trades in the secondary market generally are required to settle in three business days unless the parties to any such trade expressly agree otherwise. Accordingly, purchasers who wish to trade the Offered Shares prior to the delivery thereof will be required, prior to the delivery of the Offered Shares hereunder, to specify an alternative settlement cycle at the time of any such trade to prevent failed settlement. Purchasers of the Offered Shares who wish to trade the Offered Shares prior to their date of delivery should consult their own advisors.

———————————

# Deutsche Bank Securities

The date of this prospectus supplement is March , 2015.

**Table of Contents**

### CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

This prospectus supplement, the accompanying prospectus and the documents incorporated by reference herein and therein contain forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995 (or forward-looking information within the meaning of the CSA's National Instrument 51-102 Continuous Disclosure Obligations) with respect to, among other things, the anticipated use of proceeds of this offering, the timing of the Acquisition (as defined below), the expected benefits of the Acquisition and other transactions, such as cost savings, operating synergies and growth potential of the Company; our business strategy, business plans and prospects, product pipeline, prospective products or product approvals, future performance or results of current and anticipated products; exposure to foreign currency exchange rate changes and interest rate changes; the outcome of contingencies, such as certain litigation and regulatory proceedings; general market conditions; and our expectation regarding our financial performance, including revenues, expenses, gross margins, liquidity and income taxes (collectively, "forward-looking statements").

Forward-looking statements can generally be identified by the use of words such as "believe", "anticipate", "expect", "intend", "estimate", "plan", "continue", "will", "may", "could", "would", "target", "potential", "forecast", "project", "should" and other similar expressions. In addition, any statements that refer to expectations, projections or other characterizations of future events or circumstances are forward-looking statements. Such forward-looking statements are found at various places throughout this prospectus supplement, the accompanying prospectus and the documents incorporated by reference herein and therein and all such statements are qualified by these cautionary statements. Although we believe that the expectations reflected in such forward-looking statements made by us are reasonable, all forward-looking statements involve risks and uncertainties, and undue reliance should not be placed on such statements. Certain material factors or assumptions are applied in making forward-looking statements, including, but not limited to, factors and assumptions regarding the items outlined above. Actual results may differ materially from those expressed or implied in such statements. Important factors that could cause our actual results to differ materially from these expectations include, among other things, the following:

- the challenges and difficulties associated with managing the rapid growth of our company and a large, complex business;

- our ability to retain, motivate and recruit executives and other key employees;

- the introduction of products that compete against our products (or Salix's products) that do not have patent or data exclusivity rights;

- our ability to compete against companies that are larger and have greater financial, technical and human resources than we do, as well as other competitive factors, such as technological advances achieved, patents obtained and new products introduced by our competitors;

- our ability to identify, finance, acquire, close and integrate acquisition targets successfully and on a timely basis;

- factors relating to the acquisition and integration of the companies, businesses and products acquired by us, such as the time and resources required to integrate such companies, businesses and products, the difficulties associated with such integrations (including potential disruptions in sales activities and potential challenges with information technology systems integrations), the difficulties and challenges associated with entering into new business areas and new geographic markets, the difficulties, challenges and costs associated with managing and integrating new facilities, equipment and other assets, and the achievement of the anticipated benefits from such integrations, as well as risks associated with the acquired companies, businesses and products;

- factors relating to our ability to achieve all of the estimated synergies from our acquisitions as a result of cost-rationalization and integration initiatives. These factors may include greater than

S-vii

Table of Contents

expected operating costs, the difficulty in eliminating certain duplicative costs, facilities and functions, and the outcome of many operational and strategic decisions, some of which have not yet been made;

Ÿ factors relating to our proposed acquisition of Salix, including our ability to consummate such transaction on a timely basis, if at all; the impact of substantial additional debt on our financial condition and results of operations; our ability to effectively and timely integrate the operations of the Company and Salix; our ability to achieve the estimated synergies from this proposed transaction; and, once integrated, the effects of such business combination on our future financial condition, operating results, strategy and plans;

Ÿ the ability to reduce wholesaler inventory levels of certain of Salix's products and the timing of such reduction;

Ÿ our ability to secure and maintain third-party research, development, manufacturing, marketing or distribution arrangements;

Ÿ our eligibility for benefits under tax treaties and the continued availability of low effective tax rates for the business profits of certain of our subsidiaries;

Ÿ our substantial debt and debt service obligations and their impact on our financial condition and results of operations;

Ÿ our future cash flow, our ability to service and repay our existing debt, our ability to raise additional funds, if needed, and any restrictions that are or may be imposed as a result of our current and future indebtedness, in light of our current and projected levels of operations, acquisition activity and general economic conditions;

Ÿ any downgrade by rating agencies in our corporate credit ratings, which may impact, among other things, our ability to raise additional debt capital and implement elements of our growth strategy;

Ÿ interest rate risks associated with our floating rate debt borrowings;

Ÿ the risks associated with the international scope of our operations, including our presence in emerging markets and the challenges we face when entering new geographic markets (including the challenges created by new and different regulatory regimes in such countries;

Ÿ adverse global economic conditions and credit market and foreign currency exchange uncertainty in the countries in which we do business (such as the recent instability in Russia, Ukraine and the Middle East);

Ÿ economic factors over which we have no control, including changes in inflation, interest rates, foreign currency rates, and the potential effect of such factors on revenues, expenses and resulting margins;

Ÿ the introduction of generic competitors of our brand products (or Salix's products);

Ÿ the ability to obtain and maintain sufficient intellectual property rights over our products (or Salix's products) and defend against challenges to such intellectual property;

Ÿ the outcome of legal proceedings, arbitrations, investigations and regulatory proceedings;

Ÿ the risk that our products (or Salix's products) could cause, or be alleged to cause, personal injury and adverse effects, leading to potential lawsuits, product liability claims and damages and/or withdrawals of products from the market;

Ÿ the availability of and our ability to obtain and maintain adequate insurance coverage and/or our ability to cover or insure against the total amount of the claims and liabilities we face, whether through third party insurance or self-insurance;

S-viii

Table of Contents

- the difficulty in predicting the expense, timing and outcome within our legal and regulatory environment, including with respect to approvals by the U.S. Food and Drug Administration (the "FDA"), Health Canada and similar agencies in other countries (such as the approval by the FDA of Salix's Xifaxan® product for the indication of the treatment of irritable bowel syndrome with diarrhea ("IBS-D")), legal and regulatory proceedings and settlements thereof, the protection afforded by our and Salix's patents and other intellectual and proprietary property, successful generic challenges to our products (or Salix's products) and infringement or alleged infringement of the intellectual property of others;

- the results of continuing safety and efficacy studies by industry and government agencies;

- the availability and extent to which our products (or Salix's products) are reimbursed by government authorities and other third party payors, as well as the impact of obtaining or maintaining such reimbursement on the price of our products (or Salix's products);

- the inclusion of our products (or Salix's products) on formularies or our ability to achieve favorable formulary status, as well as the impact on the price of our products (or Salix's products) in connection therewith;

- the impact of price control restrictions on our products (or Salix's products), including the risk of mandated price reductions;

- the success of preclinical and clinical trials for our or Salix's drug development pipeline or delays in clinical trials that adversely impact the timely commercialization of our pipeline products (or Salix's pipeline products), as well as factors impacting the commercial success of our currently marketed products, which could lead to material impairment charges;

- the results of management reviews of our research and development portfolio, conducted periodically and in connection with certain acquisitions (including as may be conducted in connection with the Acquisition), the decisions from which could result in terminations of specific projects which, in turn, could lead to material impairment charges;

- negative publicity or reputational harm to our or Salix's products and business;

- the uncertainties associated with the acquisition and launch of new products, including, but not limited to, the acceptance and demand for new pharmaceutical products, and the impact of competitive products and pricing;

- the ability to obtain components, raw materials or finished products supplied by third parties and other manufacturing and related supply difficulties, interruptions and delays;

- the disruption of delivery of our products (or Salix's products) and the routine flow of manufactured goods;

- the seasonality of sales of certain of our products;

- our ability to grow organically;

- declines in the pricing and sales volume of certain of our products (or Salix's products) that are distributed or marketed by third parties, over which we have no or limited control;

- compliance with, or the failure to comply with, health care "fraud and abuse" laws and other extensive regulation of our marketing, promotional and pricing practices, worldwide anti-bribery laws (including the U.S. Foreign Corrupt Practices Act), worldwide environmental laws and regulation and privacy and security regulations;

- the impacts of the Patient Protection and Affordable Care Act (as amended) and other legislative and regulatory healthcare reforms in the countries in which we operate;

- interruptions, breakdowns or breaches in our information technology systems; and

Table of Contents

Ÿ  other risks detailed from time to time in our filings with the SEC and the CSA, as well as our ability to anticipate and manage the risks associated with the foregoing.

Additional information about these factors and about the material factors or assumptions underlying such forward-looking statements may be found in this prospectus supplement, the accompanying prospectus and the documents incorporated by reference into this prospectus supplement and the accompanying prospectus. These important factors also include those set forth under "Risk Factors" in this prospectus supplement.

Investors are cautioned that any forward-looking statement speaks only as of the date of this prospectus supplement or, if such statement is included in a document incorporated by reference into this prospectus supplement, as of the date of such other document. We undertake no obligation to update or revise any forward-looking statement, whether as a result of new information, future events or otherwise, except as may be required by law. We caution further that, as it is not possible to predict or identify all relevant factors that may impact forward-looking statements, the foregoing list should not be considered a complete statement of all potential risks and uncertainties.

S-x

**Table of Contents**

## RISK FACTORS

*Any investment in our Common Shares involves risks. In addition to the other information included or incorporated by reference into this prospectus supplement and the accompanying prospectus, including the matters addressed in the section entitled "Cautionary Note Regarding Forward-Looking Statements", you should carefully consider the following risks before purchasing our Common Shares. In addition, you should read and consider the risks associated with our business and our recent and proposed acquisitions, including our proposed acquisition of Salix, because these risks will also affect the Company. These risks can be found in our Annual Report on Form 10-K that is filed with the SEC and the CSA, and incorporated by reference into this prospectus supplement and the accompanying prospectus. You should also read and consider the other information in this prospectus supplement and the accompanying prospectus and the other documents incorporated by reference into this prospectus supplement and the accompanying prospectus, including the risk factors set forth in Salix's Annual Report on Form 10-K included in our Current Report on Form 8-K, dated March 16, 2015, and incorporated by reference into this prospectus. See "Available Information and Incorporation by Reference."*

### Risks Related to the Acquisition

***The Acquisition may not be consummated on the current terms or at all.***

The completion of the Tender Offer and the Merger is subject to the satisfaction of a number of conditions that may not be satisfied. The Tender Offer is subject to the Minimum Condition. Such Minimum Condition may not be waived by Valeant or Merger Sub without the prior written consent of Salix. If the Minimum Condition is not satisfied, the Tender Offer may not be consummated. It is also a condition to the consummation of the Tender Offer and the Merger that such transactions not be restrained, enjoined or prohibited by any order, judgment, decree, injunction or ruling (whether temporary, preliminary or permanent) of a court of competent jurisdiction or any other governmental entity and there shall not be in effect any statute, rule or regulation enacted, promulgated or deemed applicable to the Tender Offer or the Merger by any governmental entity which prevents or prohibits the consummation of the Tender Offer or the Merger.

There can be no assurance that the Tender Offer, the Merger or any of the other Transactions will be consummated on the terms described herein, or at all. This offering is not conditioned upon the completion of the Tender Offer or the Merger. If the Acquisition is not consummated on the current terms, the market price of our Common Shares could be adversely affected and the value of your investment could decline.

***Failure to successfully combine our businesses with the business of Salix in the expected timeframe may adversely affect the future results of the combined organization.***

The success of the proposed Acquisition will depend, in part, on our ability to realize the anticipated benefits and synergies from combining our business with the business of Salix. We have estimated that the proposed Acquisition will result in significant synergies. We may not achieve all of the anticipated synergies we have identified or we may not achieve these synergies in the anticipated timeframe, whether due to difficulties in integration or otherwise. To realize these anticipated benefits, the businesses must be successfully combined. Historically, the Company and Salix have been independent companies, and they will continue to be operated as such until the completion of the Acquisition. Our management may face significant challenges in consolidating the functions of Salix, integrating the technologies, organizations, procedures, policies and operations, as well as addressing the different business cultures at the two companies and retaining key personnel. If we are not able to achieve these objectives, or are not able to achieve these objectives on a timely basis, the anticipated

S-23

Table of Contents

benefits of the Acquisition may not be realized fully or at all. In addition, the actual integration may result in additional and unforeseen expenses, which could reduce the anticipated benefits of the Acquisition and could result in declines in the market value of the Common Shares.

***The pendency of the Acquisition could adversely affect our business and operations as well as the business and operations of Salix.***

In connection with the pending Acquisition, some of our customers and of the customers of Salix may delay or defer decisions, which could negatively impact our and Salix's revenues, earnings, cash flows and expenses, regardless of whether the Acquisition is completed. Similarly, our and Salix's current and prospective employees may experience uncertainty about their future roles with us and Salix following the Acquisition, which may materially adversely affect our as well as Salix's ability to attract, retain and motivate key personnel during the pendency of the Acquisition and which may materially adversely divert attention from the daily activities of our and Salix's existing employees.

***We and Salix will incur substantial transaction-related costs in connection with the Acquisition.***

We and Salix expect to incur a number of non-recurring transaction-related costs associated with completing the Acquisition, combining the operations of the two companies and achieving desired synergies. These costs will be substantial. Non-recurring transaction costs include, but are not limited to, fees paid to legal, financial and accounting advisors, filing fees and printing costs. Additional unanticipated costs may be incurred in the integration of our businesses with the business of Salix. There can be no assurance that the elimination of certain duplicative costs, as well as the realization of other efficiencies related to the integration of the two businesses, will offset the incremental transaction-related costs over time. Thus, any net benefit may not be achieved in the near-term, the long-term or at all.

***We are entering into a new business area in connection with the Acquisition, which business may not be successful or which may adversely affect our financial results.***

We may encounter financial and operational difficulties in integrating Salix's GI business with our current lines of business or in operating Salix's business successfully. We cannot be certain of the degree and scope of operational and integration problems that may arise. We may not be successful in this new area and this may adversely affect our financial results. In addition, Salix's product portfolio does not share all of the characteristics of the durable products that we primarily focus on, including, for example, that many of Salix's products rely on patent or regulatory exclusivity. In addition, Salix has a number of pipeline products that may not align with our lower risk, output-focused R&D model, which may result in increased costs, lower success rates or a rationalization of certain projects, each of which may adversely affect our financial results.

Table of Contents

**Risks Related to the Company After Completion of the Acquisition**

***The combined company will have significantly higher levels of indebtedness than the Company and Salix currently have, which will result in substantial debt and debt service obligations.***

After giving effect to the Transactions (including this offering) and the other transactions set forth under "Summary—Recent Developments," as of December 31, 2014, we would have had approximately $1.2 billion available for borrowing under the Revolving Credit Facility, after adjusting for amounts drawn of $225.0 million as of March 16, 2015 and outstanding standby letters of credit of $35.6 million. We may also incur additional long-term debt and working capital lines of credit to meet future financing needs, subject to certain restrictions under our indebtedness, including our credit facilities and senior notes (including the Acquisition Senior Notes), which would increase our total debt.

The potential significant negative consequences on our financial condition and results of operations that could result from our substantial debt include:

- Ÿ limitations on our ability to obtain additional debt or equity financing;

- Ÿ instances in which we are unable to meet the financial covenants contained in our debt agreements or to generate cash sufficient to make required debt payments, which circumstances would have the potential of resulting in the acceleration of the maturity of some or all of our outstanding indebtedness (which we may not have the ability to pay);

- Ÿ the allocation of a substantial portion of our cash flow from operations to service our debt, thus reducing the amount of our cash flow available for other purposes, including operating costs and capital expenditures that could improve our competitive position and results of operations;

- Ÿ requiring us to sell debt or equity securities or to sell some of our core assets (subject to certain restrictions under our existing indebtedness, including our credit facilities and senior notes (including the Acquisition Senior Notes)), possibly on unfavorable terms, to meet payment obligations;

- Ÿ compromising our flexibility to plan for, or react to, competitive challenges in our business and the pharmaceutical and medical device industries;

- Ÿ the possibility that we are put at a competitive disadvantage relative to competitors that do not have as much debt as us, and competitors that may be in a more favorable position to access additional capital resources; and

- Ÿ limitations on our ability to execute business development activities to support our strategies.

***To service the combined company's debt, we will require a significant amount of cash. Our ability to generate cash depends on many factors, many of which are beyond our control, and any failure to meet our debt service obligations could harm our business, financial condition and results of operations.***

Our ability to satisfy the combined company's debt obligations will depend principally upon our future operating performance. As a result, prevailing economic conditions and financial, business and other factors, many of which are beyond our control, will affect our ability to make payments on our debt. In addition, we may be subject to volatility in our interest expense and coupon payments on those Acquisition Senior Notes denominated in euro, due to changes in the value of the euro relative to the U.S. dollar. If we do not generate sufficient cash flow to satisfy our debt service obligations, we may have to undertake alternative financing plans, such as refinancing or restructuring our debt, selling assets, reducing or delaying capital investments or seeking to raise additional capital. Our ability to restructure or refinance our debt will depend on the capital markets and our financial condition at such time. Any refinancing of our debt could be at higher interest rates and may require us to comply with more onerous covenants, which could further restrict our business operations. Our inability to generate

**Table of Contents**

sufficient cash flow to satisfy our debt service obligations or to refinance our obligations on commercially reasonable terms, would have an adverse effect, which could be material, on our business, financial position, results of operations and cash flows.

Repayment of our indebtedness is dependent on the generation of cash flow by our subsidiaries (including, following the Merger, Salix and its subsidiaries) and their ability to make such cash available to us, by dividend, debt repayment or otherwise. Our subsidiaries may not be able to, or may not be permitted to, make distributions to enable us to make payments in respect of our indebtedness. Each subsidiary is a distinct legal entity and, under certain circumstances, legal and contractual restrictions may limit our ability to obtain cash from our subsidiaries. Certain non-guarantor subsidiaries include non-U.S. subsidiaries that may be prohibited by law or other regulations from distributing funds to us and/or we may be subject to payment of repatriation taxes and withholdings. While the agreements governing some of our indebtedness limits the ability of some of our subsidiaries to incur consensual restrictions on their ability to pay dividends or make other intercompany payments to us, these limitations are subject to certain qualifications and exceptions. In the event that we do not receive distributions from our subsidiaries or receive cash via cash repatriation strategies for services rendered and intellectual property, we may be unable to make required principal and interest payments on our indebtedness.

***The terms of the agreements governing our indebtedness may restrict our current and future operations, particularly our ability to respond to changes in our business or to take certain actions.***

The agreements governing our existing and future indebtedness contain or will likely contain, a number of restrictive covenants imposing significant operating and financial restrictions on us and our subsidiaries, including restrictions that may limit our ability to engage in acts that may be in our long-term best interests and may adversely affect our ability to finance future operations or capital needs or to engage in other business activities, including covenants restricting, among other things, our ability to:

- Ỿ  incur or guarantee additional indebtedness;
- Ỿ  make certain investments and other restricted payments;
- Ỿ  create liens;
- Ỿ  enter into transactions with affiliates;
- Ỿ  engage in mergers, consolidations or amalgamations; and
- Ỿ  transfer and sell assets.

These covenants and other restrictive covenants are subject to a number of qualifications and exceptions.

***We may be unable to accurately estimate wholesaler demand and monitor wholesaler inventory levels of Salix's major products. Although Salix currently receives and monitors wholesaler inventory, Salix also relies on third party information, which is inherently uncertain and may not be accurate, to assist it in monitoring estimated inventory levels and prescription trends. Inaccurate estimates of the demand for a product may cause revenues to fluctuate significantly from quarter to quarter and may cause operating results for a particular quarter to be below expectations.***

The majority of sales of Salix's products are to wholesale pharmaceutical distributors who, in turn, sell the products to pharmacies, hospitals and other customers. Four wholesale pharmaceutical distributors individually comprised 39%, 26%, 18% and 9%, respectively, of Salix's total gross product

**Table of Contents**

sales for the year ended December 31, 2014. Historically, Salix has not had distribution services agreements with any of its major wholesale distributors and accordingly has had no control over their buying patterns, which fluctuated in response to, among other things, its inventory levels of products, promotional activity, anticipated future price increases or other factors that did not directly correlate to end-user demand.

Salix announced in November 2014 that it was negotiating with their principal wholesalers to enter into distribution services agreements for each of the products in Salix's portfolio and that it expected these agreements to be finalized and become effective in the first quarter of 2015. However, as a result of entering into the Merger Agreement, we do not expect that these distribution services agreements will be entered into prior to the consummation of the Merger. As a result, the benefits of the distribution services agreements, including enabling Salix to better forecast revenue and expenses, will not be realized prior to the consummation of the Merger.

We expect that distribution services agreements, once finalized following the consummation of the Merger, will enable the combined company to reduce wholesaler inventory levels of Xifaxan® 550, Apriso®, Glumetza® and Uceris® to two months or less at or before the end of 2015, depending on future demand for these products. We believe this is an appropriate level of inventory for these products given the prescription growth rates of these products and other relevant factors. While we anticipate that these agreements will be entered into following the consummation of the Merger, we may experience delays in implementing these agreements. Additionally, wholesale distributors may not agree to commercially reasonable terms, including with respect to target reductions in wholesaler inventory levels of Xifaxan® 550, Apriso®, Glumetza® and Uceris®. Failure to enter into a distribution services agreement with one or more of these principal distributors would diminish the combined company's ability to predictably and deliberately reduce wholesaler inventory levels of Xifaxan® 550, Apriso®, Glumetza® and Uceris® as we currently anticipate.

Even after the inventory held by wholesalers has reached desired levels, wholesalers will make estimates to determine end-user prescription demand, and may not be completely effective in matching their inventory levels to actual end-user prescription demand. In addition to wholesalers, inventory is held at retail pharmacies and other non-wholesale locations over whose buying patterns we will have limited influence. Adverse changes in economic conditions and other factors may cause retail pharmacies to reduce their inventories of the combined company's GI products, which would reduce their orders from wholesalers and, consequently, the wholesalers' orders from the combined company, even if end-user prescription demand has not changed. As a result, changes to inventory levels held by wholesalers may cause the combined company's operating results to fluctuate unexpectedly if the combined company's sales to wholesalers do not match end-user prescription demand.

***Implementing our plan to decrease wholesaler inventory levels will adversely affect the combined company's revenues. We may not be successful in reducing wholesaler levels in the targeted timeframe under our remediation plan, which could further decrease revenues.***

In order to reduce wholesaler inventory levels of Xifaxan® 550, Apriso®, Glumetza® and Uceris® to two months or less at or before the end of 2015, we intend to sell to wholesalers amounts of Xifaxan® 550, Apriso®, Glumetza® and Uceris® that are less than end user demand until the target levels are reached. As a result of similar sales reductions by Salix in the fourth quarter of 2014, Salix's revenue and cash flows were decreased in the fourth quarter of 2014. We expect that the combined company's revenue and cash flows, as well as EBITDA and adjusted EBITDA, from such products may be similarly decreased in the full year 2015, compared to prior periods. In addition, wholesalers may demand increased discounts on our GI products, which could further decrease revenue and cash flows. While we are targeting to reduce wholesaler inventory levels of Xifaxan® 550, Apriso®,

S-27

Table of Contents

Glumetza® and Uceris® to two months or less at or before the end of 2015, it may take longer than anticipated to reach our target wholesaler inventory levels, which could result in decreased revenues and cash flows for a longer period than anticipated.

***The SEC is conducting an investigation into possible securities law violations by Salix, which may adversely affect the combined company's financial condition and results of operations.***

The Audit Committee of Salix's Board of Directors has retained outside counsel and is conducting an internal investigation of disclosures of inventory amounts in the distribution channel and related issues in press releases, on analyst calls and in Salix's various SEC filings. That investigation includes certain accounting issues identified during the course of the investigation, including returns of Giazo®, marketing fees paid to a wholesaler, and Salix's practices for recognizing revenue for shipments made to another wholesaler on or after October 1, 2013, and resulted in Salix restating its financial results for 2013 and the first three quarters of 2014. Salix's Audit Committee has notified the SEC Enforcement Staff that it is conducting this investigation, and has had meetings with the SEC Enforcement Staff with respect to the Audit Committee's investigation. Moreover, counsel to the Audit Committee has voluntarily provided relevant documents to the SEC Enforcement Staff, and is cooperating with the SEC Enforcement Staff in the SEC's investigation. Salix has received information requests from the SEC and expects to receive subpoenas for documents and testimony during the course of the SEC's investigation.

We cannot predict the outcome or the duration of the SEC investigation or any other legal proceedings or enforcement that may arise out of the SEC investigation. The combined company also could be subjected to other lawsuits and could become the subject of other regulatory inquiries or investigations in addition to the SEC investigation now underway. If the combined company is subject to adverse findings in any proceedings, we may be required to incur costs or pay damages or penalties or have other remedies imposed upon us which could have a material adverse effect on the combined company's financial condition and results of operations.

Responding to the SEC investigation could divert management's attention from managing the combined company's day-to-day operations. Additionally, expenses that may arise from responding to the SEC investigation, management's review of responsive materials, any related litigation or other associated activities may be significant. Current and former Salix employees, officers and directors may seek indemnification, advancement or reimbursement of expenses from the combined company, including attorneys' fees, with respect to the current investigation or future proceedings related to this matter if any such investigation or proceeding involves such employees, officers and directors personally. These events could adversely affect the combined company's financial condition and results of operations.

***Salix has restated certain prior consolidated financial statements, which may lead to additional risks and uncertainties, including shareholder litigation and governmental investigation.***

Salix has restated its audited consolidated financial statements for the year ended December 31, 2013, and its unaudited condensed consolidated financial statements for the quarters ended March 31, 2014, June 30, 2014 and September 30, 2014. The determination to restate these financial statements was made by Salix's Audit Committee, after discussion with management and Salix's independent registered public accounting firm, Ernst & Young LLP, following the identification of certain errors in Salix's accounting, which are primarily associated with the timing of recognition of certain revenue, revenue-reducing returns and discounts, and expenses. There can be no assurance that additional errors in Salix's accounting will not be uncovered. As a result of these events, Salix has become subject to a number of additional risks and uncertainties, including substantial unanticipated costs for accounting and legal fees in connection with or related to the restatement and shareholder litigation

S-28

**Table of Contents**

and governmental investigation. The combined company may incur additional substantial defense costs regardless of the outcome of such litigation. Likewise, such events may cause a diversion of the combined company's management's time and attention. If we do not prevail in any such litigation or governmental investigation, the combined company could be required to pay substantial damages or settlement costs.

***If Salix is unable to maintain effective internal control over financial reporting prior to the consummation of the Acquisition or if, after consummation of the Acquisition, we are unable to remediate the material weaknesses in the internal control over such financial reporting, the accuracy and timeliness of Salix's or the combined company's financial reporting may be adversely affected.***

In connection with the filing of Salix's Annual Report on Form 10-K for the year ended December 31, 2014, Salix management evaluated the effectiveness of its internal control over financial reporting as of December 31, 2014 and, based on this evaluation using the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control—Integrated Framework (2013 framework), Salix management concluded that Salix did not maintain effective internal control over financial reporting as of December 31, 2014 because it did not (1) establish and maintain adequate procedures and controls for (a) product returns and for the communications between its sales and accounting/finance functions to record agreed upon returns and (b) the recognition of revenue for sales to customers with FOB Destination shipping terms, (2) comply with established policies to properly obtain, evaluate, review and approve agreements with customers and (3) periodically review and assess its account classification policies in light of changes in its organization, management and personnel over time, and the effect of non-routine transactions. These control deficiencies also resulted in the restatement of Salix's audited consolidated financial statements as of December 31, 2013 and for the year then ended, and the restatement of its unaudited quarterly condensed consolidated financial information for the quarters ended March 31, 2014, June 30, 2014, and September 30, 2014. If Salix and, following the consummation of the Acquisition, we are unable to effectively remediate these material weaknesses or are otherwise unable to maintain effective internal control over financial reporting, it could result in another material misstatement of financial statements that would require a restatement. Likewise, such remediation efforts may cause a diversion of the combined company's management's time and attention

***Salix and some of its current and former officers and directors have been named as parties to various lawsuits arising out of or related to Salix's disclosures regarding certain products, including with respect to disclosures concerning historic wholesaler inventory levels, business prospects and demand, reserves and internal controls and those lawsuits could adversely affect the combined company, require significant management time and attention, result in significant legal expenses or damages, and cause the combined company's business, financial condition, results of operations and cash flows to suffer.***

Beginning on November 7, 2014, three putative class action lawsuits were filed by shareholders of Salix, each of which generally alleges that Salix and certain former officers and directors violated the federal securities laws in connection with Salix's disclosures regarding certain products, including with respect to disclosures concerning historic wholesaler inventory levels, business prospects and demand, reserves and internal controls. Additional information regarding the lawsuits may be found in Note 14 to Salix's audited consolidated financial statements included in our Current Report on Form 8-K, dated March 16, 2015, and incorporated by reference into this prospectus supplement. See "Available Information and Incorporation by Reference."

We cannot predict the outcome of these lawsuits. The matters which led to Salix's Audit Committee's review and the restatement of Salix's consolidated financial statements have exposed the

S-29

**Table of Contents**

combined company to greater risks associated with litigation, regulatory proceedings and government enforcement actions. Salix and its current and former officers and directors may, in the future, be subject to additional litigation relating to such matters. Subject to certain limitations, Salix is obligated to indemnify its current and former officers and directors in connection with such lawsuits and any related litigation or settlements amounts. Regardless of the outcome, these lawsuits, and any other litigation that may be brought against Salix or its current or former officers and directors, could be time-consuming, result in significant expense and divert the attention and resources of the combined company's management and other key employees. An unfavorable outcome in any of these matters could exceed coverage provided under potentially applicable insurance policies, which is limited. Any such unfavorable outcome could have a material effect on the combined company's business, financial condition, results of operations and cash flows. Further, the combined company could be required to pay damages or additional penalties or have other remedies imposed against it, or Salix's current or former directors or officers, which could harm the combined company's reputation, business, financial condition, results of operations or cash flows.

***We could be exposed to significant product liability claims in connection with Salix's products that could prevent or interfere with our product commercialization efforts.***

Salix has been in the past and the combined company might in the future be subjected to product liability claims that arise through the testing, manufacturing, marketing and sale of their products. These claims could expose the combined company to significant liabilities that could prevent or interfere with the combined company's product commercialization efforts. Product liability claims could require the combined company to spend significant time and money in litigation or to pay significant damages.

***Future sales of Xifaxan® and Salix's other marketed products might be less than expected.***

Salix currently actively markets and sells more than 20 products. We expect Xifaxan®, which was launched by Salix in mid-2004 for the treatment of travelers' diarrhea, and approved and launched in March 2010 for the treatment of hepatic encephalopathy, to continue to be the combined company's most significant source of GI revenue in the future. If sales of Salix's marketed products decline or if we experience product returns significantly in excess of estimated amounts recorded, particularly with respect to Xifaxan®, it may have a material adverse effect on the combined company's business, financial condition and results of operations following the Acquisition. In addition, as further described below, Salix has applied for approval of a new indication of Xifaxan® for the treatment of IBS-D, but there is no assurance that the FDA will approve this additional indication in a timely manner, or at all, with the result that any anticipated sales based on this new indication may be delayed or not occur at all. As this development project represents a significant IPR&D asset for Salix and a substantial portion of Salix's total IPR&D assets, the refusal of the FDA to approve this new indication could lead to a material impairment charge.

***Certain of Salix's products require supplies of raw materials that may be subject to uncertainty.***

Raw material used in the production of Fulyzaq® is obtained from *Croton lechleri* trees growing in certain South American countries while a key raw material for Relistor® grows in Tasmania, Australia. The combined company's ability to obtain reliable supplies of these products is not entirely within our control. Failure to obtain these raw materials or delay in their delivery to us, whether due to international, political or economic conditions or otherwise, could adversely affect the combined company's ability to have the relevant products manufactured or, with respect to additional indications for the products, delay the combined company's ability to develop the new indications and obtain regulatory approval for them, which could prevent the combined company from generating related revenue.

S-30

Table of Contents

***The FDA may require significant additional clinical testing for Salix's product candidates, and we may not receive regulatory approval for some or all of these product candidates.***

Each of Salix's investigational drugs is subject to risks that may cause the combined company to incur significant additional costs and the FDA, or applicable foreign regulator, may ultimately refuse to approve of one or more of the combined company's GI product candidates. If we experience delays or setbacks for any reason, the combined company's GI product development costs will increase and we may decide to abandon a product candidate entirely. If any of the combined company's GI product candidates fails to receive regulatory approval, we will have incurred significant expenses without the possibility of generating revenues, which could have a material adverse effect on the combined company's business.

For example, Salix is seeking approval for an additional indication for the treatment of irritable bowel syndrome with diarrhea (IBS-D) for its Xifaxan® 550 (rifaximin) product, which represents a substantial portion of the IPR&D that we expect to record in connection with our acquisition of Salix. In August 2010, the FDA accepted Salix's sNDA for rifaximin for IBS, and gave Salix an action date of December 7, 2010. In October 2010, the FDA informed Salix that it was extending the action date by three months to provide for a full review and extended Salix's action date to March 7, 2011. Salix received a Complete Response Letter ("CRL") from the FDA on March 7, 2011. The FDA deemed that the Xifaxan® 550 mg sNDA was not ready for approval, primarily due to a newly expressed need for retreatment information. On August 29, 2014, Salix submitted a response to the CRL and subsequently the FDA informed Salix that it considered Salix's resubmission of the sNDA to be accepted for review. The resubmission is considered a class 2 response to the FDA's March 7, 2011 CRL and has been assigned a PDUFA of May 27, 2015 (extended from the initial PDUFA date of February 28, 2015). There is no assurance, however, that the FDA will approve rifaximin for the treatment of IBS-D in a timely manner, or at all.

***Regulatory approvals for GI products, even if granted, might entail ongoing requirements or restrictions on marketing. These requirements or restrictions, or inquiries into our marketing practices, or inquiries into the combined company's marketing practices, could increase our expenses and limit revenue.***

Regulatory approvals might entail ongoing requirements for post-marketing studies or limit how or to whom the combined company can sell its GI products. Even if we obtain regulatory approvals, labeling and promotional activities are subject to continual scrutiny by the FDA and other federal and state authorities. For example, in 2008, the FDA required Salix to put a "black box" warning on the OsmoPrep® and Visicol® labels regarding potential kidney damage that could result from their use, and a "black box" warning for Metozolv® regarding tardive dyskensia which could result from its use. Salix believes these warnings contributed to reduced sales of those products, and they could limit future sales of those products. With regard to OsmoPrep® and Visicol®, following consultation with the FDA, Salix also developed a risk evaluation and mitigation strategy, including a medication guide. Salix has conducted post-marketing clinical trials as part of this strategy. In December 2011, the FDA agreed that a risk evaluation and mitigation strategy was no longer required for OsmoPrep® and Visicol®.

On February 1, 2013, Salix received a subpoena from the U.S. Attorney's Office for the Southern District of New York requesting documents regarding its sales and promotional practices for Xifaxan®, Relistor® and Apriso®. Salix is in the process of responding to the subpoena and intends to cooperate fully with the subpoena and related government investigation, which has and will continue to increase Salix's legal expenses, and might require management time and attention. Currently, we cannot predict or determine the timing or outcome of this inquiry or its impact on the financial condition or results of operations of the combined company.

Table of Contents

***Salix does not have any manufacturing facilities and is dependent on third parties to manufacture its products.***

Salix owns no manufacturing facilities and has limited capabilities in manufacturing pharmaceutical products. Following the Merger, we do not generally expect to engage directly in the manufacturing of GI products, but instead contract with and rely on third-party vendors for these services. A limited number of contract manufacturers exist which are capable of manufacturing Salix's marketed products and its product candidates, and, with respect to certain of its products, such as Uceris®, a single manufacturer currently serves as Salix's sole supplier. In addition, in the case of Xifaxan®, a single company converts Salix's rifaximin supply into its Xifaxan® drug product.

The combined company's manufacturers must comply with U.S. regulations, including cGMP regulations relating to manufacturing, packaging, documentation, quality control and quality assurance, and our GI facilities must be inspected and approved by the FDA and other regulatory agencies on an ongoing basis. The combined company may be subject to serious consequences if its manufacturers are found to have deficiencies in their manufacturing processes and/or their overall cGMP compliance (particularly in the case of sole suppliers), including potential delays in the regulatory approval process for our drug candidates and recalls of our commercialized products. For example, in April 2010 Salix received a CRL from the FDA related to its NDA for Giazo®. The sole issue raised in this letter concerned a deficiency of the manufacturing facility for this application, which delayed FDA approval almost two years. Given Salix's ongoing dependence on third-party vendors for the supply and manufacture of material for use in clinical trials and for commercial product, the combined company's manufacturing strategy presents the following risks:

Ÿ the manufacture of products might be difficult to scale up when required and result in delays, inefficiencies and poor or low yields of quality products;

Ÿ some of Salix's contracts contain purchase commitments that require Salix to make minimum purchases that might exceed our needs or limit our ability to negotiate with other manufacturers, which might increase costs;

Ÿ the cost of manufacturing certain products might make them prohibitively expensive;

Ÿ delays in scale-up to commercial quantities and any change in manufacturers could delay clinical studies, regulatory submissions and commercialization of our GI products;

Ÿ manufacturers are subject to the FDA's cGMP regulations and similar foreign standards, and we do not have control over compliance with these regulations by the third-party manufacturers;

Ÿ if we need to change manufacturers, transfers of technical expertise would be required which would include educating the new manufacturer in the processes necessary for the production of our GI products, which might take extensive amounts of time or might not be successful; and

Ÿ if we need to change manufacturers, FDA and comparable foreign regulators might require additional testing and compliance inspections prior to the new manufacturer being qualified for the production of our GI products.

Any manufacturing defect or error discovered after products have been produced and distributed could result in even more significant consequences, including:

Ÿ additional delays, warning letters and fines;

Ÿ product recalls or seizures and injunctions on sales;

Ÿ refusal of the FDA to review pending applications;

Ÿ total or partial suspension of production;

Ÿ withdrawals of previously approved marketing applications;

S-32

**Table of Contents**

ϒ  damage to our reputation; and

ϒ  product liability claims, civil penalties and criminal prosecutions.

In addition, the occurrence of manufacturing-related compliance issues could require subsequent withdrawal of the drug approval, reformulation of the drug product, additional testing or changes in labeling of the finished product. Any delay, interruption or cessation of production by the combined company's third-party manufacturers or strategic partners of its commercial products or product candidates, or their respective materials and components, as a result of any of the above factors or otherwise may limit the combined company's ability to meet demand for commercial products and/or delay ongoing clinical trials, either of which could have a material adverse effect on the combined company's business, results of operations and financial condition.

***Intense competition might render Salix's GI products noncompetitive or obsolete.***

Competition in the GI business is intense and characterized by extensive research efforts and rapid technological progress. Technological developments by competitors, regulatory approval for marketing competitive products, including potential generic or OTC products, or superior marketing resources possessed by competitors could adversely affect the commercial potential of the combined company's GI products and could have a material adverse effect on the combined company's revenue and results of operations. Generic competition is an increasing risk, as Salix has experienced with Colazal® and Pepcid®, and with challenges to Salix's bowel-cleansing products' intellectual property. We believe that there are numerous pharmaceutical and biotechnology companies, as well as academic research groups throughout the world, engaged in research and development efforts with respect to pharmaceutical products targeted at GI diseases and conditions addressed by Salix's current and potential products. In particular, we are aware of products in research or development by competitors that address the diseases being targeted by Salix's products. Developments by others might render Salix's current and potential products obsolete or noncompetitive. Competitors might be able to complete the development and regulatory approval process sooner and, therefore, market their GI products earlier than the combined company can.

Many of Salix's current competitors have significant financial, marketing and personnel resources and development capabilities. For example, many large, well-capitalized companies already offer GI products in the United States and Europe that target the indications for:

ϒ  Xifaxan® for HE, including lactulose (various manufacturers);

ϒ  Xifaxan® for TD, including ciprofloxacin, commonly known as Cipro (Bayer AG);

ϒ  Apriso®, including Asacol and Delzicol (Warner Chilcott plc, or Warner Chilcott), sulfasalazine (Pfizer Pharmaceuticals, or Pfizer), Dipentum (Alaven Pharmaceutical LLC), Pentasa and once-a-day Lialda (Shire Pharmaceuticals Group, or Shire) and three generic balsalazide disodium capsule products;

ϒ  OsmoPrep® and MoviPrep®, including Colyte (Meda Pharmaceuticals Inc.), Golytely (Braintree Laboratories, Inc., or Braintree), Halflytely (Braintree), SuPrep (Braintree), and Nulytely (Braintree), Trilyte (Alaven) and Prepopik (Ferring Pharmaceuticals, Inc.), as well as potential generics from Novel or others;

ϒ  Relistor® for OIC, including OTC laxatives (various manufacturers), Amitiza (Sucampo AG), Kristalose (Cumberland Pharmaceuticals, Inc.), and Entereg (Cubist Pharmaceuticals, Inc.);

ϒ  Solesta®, including various OTC antidiarrheals, fiber, stool softeners and laxatives (various manufacturers), biofeedback, the medical device Inter Stim (Medtronic, Inc.) and sphincteroplasty surgery;

ϒ  Metozolv® ODT, including Reglan (Ani Pharmaceuticals, Inc.), and various generics;

S-33

**Table of Contents**

- Ÿ Uceris®, including Asacol and Delzicol (Warner Chilcott), Lialda and Pentasa (Shire), Remicade (Janssen Biotech, Inc.) and Humira (AbbVie Inc., or AbbVie);

- Ÿ Zegerid®, including Nexium (AstraZeneca plc), Aciphex (Eisai Inc.) and Dexilant (Takeda Pharmaceuticals, Inc., or Takeda) and various generics and OTC proton—pump inhibitor products;

- Ÿ Glumetza®, including Fortamet (Andrx Laboratories LLC), Glucophage and Glucophage XR (Bristol Myers Squibb, or BMS), various generics and other prescription diabetes treatments;

- Ÿ Cycloset®, including Januvia (Merck), Onglyza (BMS), Byetta (Amylin Pharmaceuticals, Inc., or Amylin), Victoza (Novo Nordisk Inc.), Bydureon (Amylin), Avandia (SB PharmCo Puerto Rico, Inc.), Actos (Takeda), Amaryl (Sanofi Aventis), Glynase (Pfizer) and various branded and generic metformin products;

- Ÿ Fenoglide®, including Tricor (AbbVie), Antara (Lupin Atlantis Holdings, S.A.), Lipofen (Cipher Pharmaceuticals, Inc.), Lopid (Pfizer), Trilipix (AbbVie) and other prescription treatments for primary hyperlipidemia, mixed dyslipidemia and hypertriglyceridemia (such as statins and niacin); and

- Ÿ Ruconest®, including Cinryze (Shire), Berinert (CSL Behring), Kalbitor (Dyax) and Firazyr (Shire).

In addition, other GI products are in research or development by competitors that address the diseases and diagnostic procedures being targeted by these and Salix's other products.

***Many of Salix's products rely on patent and/or regulatory exclusivity. These intellectual property rights may not afford such products with meaningful protection, which could result in substantial costs to the combined company and negatively affect its revenues by impacting pricing and sales volume, as well as royalties and other payments owed to the combined company by third parties.***

Many of the products in the Salix product portfolio rely on patent and regulatory exclusivity. The intellectual property rights protecting the Salix products might not afford the combined company with meaningful protection from generic and other competition. In addition, because Salix's strategy is to in-license or acquire pharmaceutical products which typically have been discovered and initially researched by others, future products might have limited or no remaining patent protection due to the time elapsed since their discovery. Competitors could also design around any of Salix's intellectual property or otherwise design competitive products that do not infringe Salix's intellectual property. For instance, Salix commenced litigation during 2014 against Par and Mylan and in 2015 against Par, Actavis and Alvogen, which have launched Paragraph IV challenges against certain of Salix's products. If competitors are successful in such claims, Salix (and the combined company following the consummation of the Acquisition) could experience reduced revenues for such products from lower sales volume, the need to reduce prices, or both. In addition, upon expiration of patent protection, Salix's products could become subject to generic competition, which could negatively affect product pricing and sales volume.

### Risks Related to the Offering and Our Common Shares

***The market price of our Common Shares may be volatile, which could cause the value of your investment to decline.***

The market price of our Common Shares could fluctuate significantly for various reasons, many of which are beyond our control, including the following:

- Ÿ changes or perceived changes in the condition, operations, results or prospects of our businesses and market assessments of these changes or perceived changes;

Table of Contents

- our announcements or our competitors' announcements regarding new products or services, enhancements, significant contracts, acquisitions or strategic investments;
- changes in our capital structure, such as future issuances of securities, sales of large blocks of Common Shares by our shareholders or our incurrence of additional debt;
- changes in governmental regulations or proposals, or new government regulations or proposals, affecting us;
- changes in key personnel;
- expiration of lock-up periods applicable to us and our directors and executive officers;
- our quarterly or annual earnings or those of other companies in our industry;
- operating and stock price performance of companies that investors deem comparable to us;
- changes in earnings estimates or recommendations by securities analysts who track our Common Shares;
- changes in industry conditions;
- developments related to investigations, regulatory proceedings, or litigation that involve us; and
- changes in general market, economic and political conditions in the United States, Canada and global economies or financial markets in which we do business, including those resulting from natural disasters, terrorist attacks, acts of war and responses to such events.

The stock markets have experienced extreme volatility that has often been unrelated to the operating performance of particular companies. These broad market fluctuations may adversely affect the trading price of our Common Shares.

***Future sales or issuances of our Common Shares in the public markets, or the perception of such sales, could depress the trading price of our Common Shares.***

The sale of a substantial number of Common Shares or other equity-related securities in the public markets, or the perception that such sales could occur, could depress the market price of our Common Shares and impair our ability to raise capital through the sale of additional equity securities. We cannot predict the effect that future sales of Common Shares or other equity-related securities would have on the market price of our Common Shares.

***All of our debt obligations, and any future indebtedness we may incur, will have priority over our Common Shares with respect to payment in the event of a liquidation, dissolution or winding up.***

In any liquidation, dissolution or winding up of the Company, our Common Shares would rank below all debt claims against us. In addition, any convertible or exchangeable securities or other equity securities that we may issue in the future may have rights, preferences and privileges more favorable than those of our Common Shares. As a result, holders of our Common Shares will not be entitled to receive any payment or other distribution of assets upon the liquidation or dissolution until after our obligations to our debt holders and holders of equity securities that rank senior to our Common Shares have been satisfied.

***We have no plans to pay regular dividends on our Common Shares, so shareholders may not receive funds without selling their Common Shares.***

While our board of directors will review our dividend policy from time to time, we currently do not intend to pay any cash dividends in the foreseeable future on our Common Shares. Any declaration

S-35

Table of Contents

and payment of future dividends to holders of Common Shares will be at the sole discretion of our board of directors and will depend on many factors, including our financial condition earnings, capital requirements, level of indebtedness, statutory and contractual restrictions applying to the payment of dividends and other considerations that our board of directors deems relevant. In addition, our existing debt instruments restrict or prevent us from paying dividends on our Common Shares. Agreements governing any future indebtedness, in addition to those governing our current indebtedness, may not permit us to pay dividends on our Common Shares.

***If securities analysts do not publish research or reports about our company, or if they issue unfavorable commentary about us or our industry or downgrade our Common Shares, the price of our Common Shares could decline.***

The trading market for our Common Shares depends in part on the research and reports that third-party securities analysts publish about our company and our industry. If one or more analysts cease coverage of our company, we could lose visibility in the market. In addition, one or more of these analysts could downgrade our Common Shares or issue other negative commentary about our company or our industry. As a result of one or more of these factors, the trading price of our Common Shares could decline.

S-36

# Exhibit 25

## Firms Buy Rival Drugs, Then Raise Their Prices

The Wall Street Journal

April 27, 2015 Monday

Copyright 2015 Factiva ®, from Dow Jones

All Rights Reserved



Copyright © 2015, Dow Jones & Company, Inc.

**Section:** Pg. A1

**Length:** 1437 words

**Byline:** By Jonathan D. Rockoff and Ed Silverman

# Body

On Feb. 10, Valeant Pharmaceuticals International Inc. bought the rights to a pair of life-saving heart drugs. The same day, their list prices rose by 525% and 212%.

Neither of the drugs, Nitropress or Isuprel, was improved as a result of costly investment in lab work and human testing, Valeant said. Nor was manufacture of the medicines shifted to an expensive new plant. The big change: the drugs' ownership.

"Our duty is to our shareholders and to maximize the value" of the products that Valeant sells, said Laurie Little, a company spokeswoman. "Sometimes pricing comes into it, sometimes volume comes into it."

More pharmaceutical companies are buying drugs that they see as undervalued, then raising the prices. It is one of a number of industry tactics, along with companies regularly upping the prices of their own older medicines and launching new treatments at once unheard of sums, driving up the cost of drugs.

Since 2008, branded-drug prices have increased 127%, compared with an 11% rise in the consumer price index, according to drug-benefits manager Express Scripts Holding Co. Needham & Co. said in a June 2014 research note there were as many as 50% drug-price increases during the previous 2 1/2 years as there were in the prior decade.

For drug companies, price hikes offer an easy way to boost sales without years of costly, risky research to find new medicines.

Profits help pay for companies' research, says Paul Howard, director of health policy at the Manhattan Institute. Increases help bring the prices more in line with the value the medicines provide to patients and hospitals, and the returns pay for manufacturing the drug, "in marketing it and even researching additional indications for the product that deliver more value to patients," he said.

So far, the impact on total health-care spending has been limited. Prescription drugs still account for only about one-tenth of the country's health-care costs, and drug spending overall has risen relatively slowly the past few years to $376 billion last year, because many of the biggest-selling medicines lost patent protection and lower-priced generics were prescribed instead.

Firms Buy Rival Drugs, Then Raise Their Prices

But hospitals and drug-benefit managers increasingly worry about having to absorb higher costs. There aren't as many big patent expirations looming, which will mean fewer cheap generics to offset the rising prices of brand-name drugs.

Some payers and health-care providers complain they are already feeling the hit from large and sudden price increases for drugs like Isuprel and Nitropress.

Cleveland Clinic says the price hikes for the two Valeant drugs is unexpectedly adding $8.6 million, or 7%, to this year's budget of roughly $122 million for medicines administered at its hospitals. Like its peers, Cleveland Clinic generally pays for drugs it administers, then hopes the reimbursement it receives for patient care will cover the expense. Hospitals typically pay a wholesale cost that is less than the list price known as average wholesale price, but still experience the increases.

"We're already under tremendous pressure to reduce costs because of reimbursement changes due to health-care reform," said Scott Knoer, Cleveland Clinic's chief pharmacy officer. He had hoped to lower his drug budget by $10 million this year, but no longer expects he will in large part because of the two drugs. "In one fell swoop, it eliminated nearly all of the savings we projected we would achieve," he said.

The companies are paying up for the drugs whose prices they raise. Early last year, Mallinckrodt PLC paid $1.4 billion for Cadence Pharmaceuticals, though the Ofirmev pain injections that were the crown jewel of the deal were projected to have just $110.5 million in 2013 revenue, according to a Mallinckrodt conference call with analysts discussing the deal.

Three months later, the list price for a package of 24 Ofirmev vials jumped almost 2 1/2 times to $1,019.52, according to health-care data firm Truven Health Analytics, which publishes average wholesale prices based on information from drug companies.

"It seemed like highway robbery," said Erin Fox, who directs the drug-information service at University of Utah Health Care. After the increase, three of the Salt Lake City health system's four hospitals were spending as much as $55,000 a month on the drug, up from $20,000 to $25,000 a month, Ms. Fox said. The system tried to steer doctors to alternative medicines, but it still spends about $40,000 a month.

Ofirmev was losing money before its price was raised, Mallinckrodt said, and even at the new price, hospitals using the drug save on patients' hospitalization costs in the thousands of dollars.

The price increases can be very lucrative for companies. Horizon Pharma PLC upped the price of Vimovo pain tablets after buying the rights from AstraZeneca in late 2013. On Jan. 1, 2014, its first day selling Vimovo, Horizon raised the list price for 60 tablets to $959.04, a 597% increase, according to Truven.

Horizon raised the price again on Jan. 1 this year to $1,678.32 for the tablets, Truven said.

Last year, Vimovo had $163 million in sales, up from $20 million in 2013, even though there were fewer prescriptions for the drug last year, Horizon said. In the first two months of this year, the drug had $50 million in sales, according to IMS Health.

Horizon said one of the company's "primary drivers is and always will be ensuring a limited financial impact on the patient," and about 97% of Vimovo patients don't pay any out-of-pocket costs due to the company's efforts.

Companies don't want to raise prices so much that hospitals or patients can no longer afford the medicine, causing demand to plunge, said Mick Kolassa, a former drug industry pricing official who now advises companies at Medical Marketing Economics LLC. Yet companies must balance those concerns with pressures they face to sustain their business and from shareholders.

When companies hold calls discussing drug costs with investors and analysts, "I've heard them ask, 'Why didn't you price it higher.' I've never heard anybody say, 'Why don't you price it lower?'" Mr. Kolassa said.

Firms Buy Rival Drugs, Then Raise Their Prices

The company leading the pack in drug-price increases is Canada-based Valeant, which lifted list prices by at least 20% some 122 times since the beginning of 2011, according to Needham & Co., in its June 2014 research note.

Isuprel and Nitropress, the heart drugs Valeant bought earlier this year, have been staples of medical care for decades. Doctors use Isuprel during procedures treating heart-rhythm problems, and give Nitropress to emergency patients whose blood pressure has risen to life-threatening levels. Doctors say there are few good alternatives.

Valeant was interested in the drugs in part because they hadn't yet faced generic competition even though they had lost patent protection, according to a person familiar with the matter. Adding the drugs would also expand Valeant's portfolio of hospital-administered drugs, the person said.

After Valeant agreed to buy the drugs in early January, the company hired a consultant to look at their prices. The consultant found the prices didn't reflect the benefits of the drugs to patients and the costs that hospitals save by using the medicines, the person said. Valeant decided to raise the price. The list price of a one-milliliter vial of Isuprel, a treatment for abnormal heart rhythms, jumped to $1,346.62, up from $215.46, according to Truven. Meantime, a two-milliliter vial of Nitropress, which combats dangerously high blood pressure and acute heart failure, increased from $257.80 to $805.61.

Pricing isn't the main driver of Valeant's organic growth, as the company counts on higher prices and more sales, the person said.

Terms of Valeant's purchase of the drugs from Marathon Pharmaceuticals LLC weren't disclosed. Isuprel notched $103 million in sales last year for privately held Marathon, while Nitropress recorded $58 million, according to Jefferies & Co.'s analyst David Steinberg. He expects the increases to help Valeant to "very substantially exceed" that in 2015.

Ascension health system, which operates 131 hospitals across the country, estimates the increases will triple its spending on the drugs this year to $8 million. Richard Fogel, a heart doctor at Ascensions St. Vincent Heart Center in Indianapolis, said the lack of good alternatives in certain clinical situations leaves him little choice but to keep using the pair.

"It is very frustrating, especially as we try to develop new systems to take better care and more efficient care of our patients," he said.

 License this article from Dow Jones Reprint Service

## Notes

PUBLISHER: Dow Jones & Company, Inc.

## Classification

**Language:** ENGLISH

**Publication-Type:** Newspaper

**Journal Code:** J

**Subject:** HEALTH CARE COSTS (89%); GENERIC PRODUCTS (89%); SHAREHOLDERS (78%); PHARMACEUTICALS PATENTS (78%); HOLDING COMPANIES (75%); CONSUMER PRICE INDEX (73%); HUMAN SUBJECTS (72%); BRANDING (72%); PATENTS (60%); e1103 Inflation/Prices; c1521 Analysts' Comments/Recommendations; c314 Pricing; neqac Equities Asset Class News; npag Page-One Stories; reqrhc Suggested Reading Health Care; c15 Financial Performance; c152 Earnings Projections; c31 Marketing/Markets; ccat Corporate/Industrial News; e11 Economic Performance/Indicators; ecat Economic News; ncat Content Types; nfact Factiva Filters; nfce C&E Exclusion Filter; nfcpin C&E Industry News Filter; redit Selection of Top

Firms Buy Rival Drugs, Then Raise Their Prices

Stories/Trends/Analysis; reqr Suggested Reading Industry News; PROVIDER TERMS: WSJ CNW DJWI FRT GEN HIY HLT PAG PRC WEI

**Company:**  VALEANT PHARMACEUTICALS INTERNATIONAL INC (93%);  ARDEA BIOSCIENCES INC (91%); EXPRESS SCRIPTS HOLDING CO (91%);   NEEDHAM & CO INC (68%); trimel Valeant Pharmaceuticals International Inc.

**Ticker:** VRX (TSX) (93%); VRX (NYSE) (93%); ESRX (NASDAQ) (91%)

**Company-Number:** DJ Ticker: HZNP MNK VRX VRX.T; ISIN: CA91911K1021 IE00BBGT3753 IE00BQPVQZ61

**Industry:** PRICE INCREASES (94%); PRICE CHANGES (91%); PHARMACEUTICALS INDUSTRY (91%); DRUG PRICES (90%); HEALTH CARE COSTS (89%); PHARMACY BENEFITS (89%); PRESCRIPTION DRUGS (89%); HEALTH CARE (88%); PHARMACEUTICALS PATENTS (78%); PHARMACEUTICAL PREPARATION MFG (76%); CARDIOVASCULAR DRUGS (73%); BRANDING (72%); BUDGETS (61%); i257 Pharmaceuticals; i951 Health Care/Life Sciences; PROVIDER TERMS: DRG HEA XDJGI XNYA XRUS XSLI XSP5 XTSE

**Geographic:** CLEVELAND, OH, USA (90%); cana Canada; caon Ontario; usa United States; usil Illinois; usoh Ohio; namz North America; usc Midwest U.S.; PROVIDER TERMS: CN IL MO NME ONT US USC

IP Codes: ABO AEQI EWR SGN HCR NND PGO TPT

**Load-Date:** April 27, 2015

---

**End of Document**

# Exhibit 26

# *Bernie Sanders, Elijah Cummings Question Valeant on Heart-Drug Price Increases;* Valeant raised the price of heart-rhythm treatment Isuprel after buying rights to the drug

The Wall Street Journal Online

August 14, 2015

Copyright 2015 Factiva ®, from Dow Jones

All Rights Reserved



Copyright 2015 Dow Jones & Company, Inc. All Rights Reserved.

**THE WALL STREET JOURNAL.**

**Section:** BUSINESS

**Length:** 383 words

**Byline:** By Jonathan D. Rockoff

## Body

Two members of Congress investigating drug-price increases asked Valeant Pharmaceuticals International Inc. on Friday for information that would help explain why it  raised prices  earlier this year of two commonly used heart drugs.

Valeant was sent a letter from Sen. Bernie Sanders (I., Vt.) and Rep. Elijah Cummings (D., Md.) seeking information such as the cost of ingredients and of manufacturing blood-pressure drug Nitropress and heart-rhythm treatment Isuprel "in order to evaluate the underlying causes" of their price increases earlier this year.

In the letter, the lawmakers also asked the Canadian company to explain the factors involved in the price increases, expected profits and the names of those involved in the decision.

On the day in February it bought the rights to the drugs, Valeant raised the list price of a vial of Isuprel more than sixfold to $1,346.62 and more than tripled Nitropress to $805.61.

The increases were featured in a Wall Street Journal article in April, cited in the congressional letter to Valeant, about how some drug companies are using deal-making to acquire rights to certain drugs and then increasing the prices. Hospitals, which buy the drugs for use during heart procedures or emergency treatment, complain the increases are hurting their budgets.

Since October, Sen. Sanders, who is seeking the Democratic nomination for president, and Rep. Cummings have been  sending letters  to pharmaceutical companies and generally investigating  significant price increases  for certain drugs  in an effort to understand the reasons.

Sen. Sanders and Rep. Cummings also sent a letter on Friday to Hospira Inc., which they said makes Isuprel and Nitropress for Valeant, seeking documents and information about the costs of making the two medicines, any "material changes" to the manufacturing and the contracts with Valeant.

Valeant and Hospira didn't immediately respond to requests for comment.

Write to Jonathan D. Rockoff at  Jonathan.Rockoff@wsj.com

Bernie Sanders, Elijah Cummings Question Valeant on Heart-Drug Price Increases;  Valeant raised the price of heart-rhythm treatment Isuprel after buying rights ....

## Notes

PUBLISHER: Dow Jones & Company, Inc.

## Classification

**Language:** ENGLISH

**Publication-Type:** Web Publication

**Journal Code:** WSJO

**Subject:** DRUG PRICES (90%); US PRESIDENTIAL CANDIDATES 2016 (89%); LEGISLATIVE BODIES (78%); LETTERS & COMMENTS (72%); c314 Pricing; ccat Corporate/Industrial News; ecat Economic News; ghea Health; glife Living/Lifestyle; gpol Domestic Politics; c31 Marketing/Markets; gcat Political/General News; gpir Politics/International Relations; ncat Content Types; nfact Factiva Filters; nfcpin C&E Industry News Filter; PROVIDER TERMS: OECN OHWN OLEM ONEW OPOL OUSB

**Company:**  VALEANT PHARMACEUTICALS INTERNATIONAL INC (93%);  ARDEA BIOSCIENCES INC (91%); HOSPIRA INC (81%);   WALL STREET JOURNAL (55%); trimel Valeant Pharmaceuticals International Inc.; PROVIDER TERMS: Valeant Pharmaceuticals International

**Ticker:** VRX (TSX) (93%); VRX (NYSE) (93%); HSP (NYSE) (81%)

**Company-Number:** DJ Ticker: HSP VRX.T

**Industry:** PRICE INCREASES (96%); PRICE CHANGES (91%); DRUG PRICES (90%); CARDIOVASCULAR DRUGS (90%); PHARMACEUTICALS INDUSTRY (90%); PHARMACEUTICAL PREPARATION MFG (76%); i257 Pharmaceuticals; i951 Health Care/Life Sciences; PROVIDER TERMS: 4530 4570

**Person:** BERNIE SANDERS (89%); ELIJAH E CUMMINGS (89%)

**Geographic:** usa United States; namz North America

IP Descriptors: Bernie Sanders Elijah Cummings Business

**Load-Date:** August 15, 2015

**End of Document**

# Exhibit 27

Case 3:15-cv-07658-MAS-LHG   Document 167-8   Filed 09/13/16   Page 63 of 82 PageID: 3536

The New York Times | http://nyti.ms/1V3cJvC

**BUSINESS DAY**

# Drug Goes From $13.50 a Tablet to $750, Overnight

By ANDREW POLLACK   SEPT. 20, 2015

Specialists in infectious disease are protesting a gigantic overnight increase in the price of a 62-year-old drug that is the standard of care for treating a life-threatening parasitic infection.

The drug, called Daraprim, was acquired in August by Turing Pharmaceuticals, a start-up run by a former hedge fund manager. Turing immediately raised the price to $750 a tablet from $13.50, bringing the annual cost of treatment for some patients to hundreds of thousands of dollars.

"What is it that they are doing differently that has led to this dramatic increase?" said Dr. Judith Aberg, the chief of the division of infectious diseases at the Icahn School of Medicine at Mount Sinai. She said the price increase could force hospitals to use "alternative therapies that may not have the same efficacy."

Turing's price increase is not an isolated example. While most of the attention on pharmaceutical prices has been on new drugs for diseases like cancer, hepatitis C and high cholesterol, there is also growing concern about huge price increases on older drugs, some of them generic, that have long been mainstays of treatment.

Although some price increases have been caused by shortages, others have resulted from a business strategy of buying old neglected drugs and turning them into high-priced "specialty drugs."

Cycloserine, a drug used to treat dangerous multidrug-resistant tuberculosis, was just increased in price to $10,800 for 30 pills from $500 after its acquisition by

Rodelis Therapeutics. Scott Spencer, general manager of Rodelis, said the company needed to invest to make sure the supply of the drug remained reliable. He said the company provided the drug free to certain needy patients.

In August, two members of Congress investigating generic drug price increases wrote to Valeant Pharmaceuticals after that company acquired two heart drugs, Isuprel and Nitropress, from Marathon Pharmaceuticals and promptly raised their prices by 525 percent and 212 percent respectively. Marathon had acquired the drugs from another company in 2013 and had quintupled their prices, **according to the lawmakers**, Senator **Bernie Sanders**, the Vermont independent who is seeking the Democratic nomination for president, and Representative Elijah E. Cummings, Democrat of Maryland.

Doxycycline, an **antibiotic**, went from $20 a bottle in October 2013 **to $1,849 by April 2014**, according to the two lawmakers.

The Infectious Diseases Society of America and the **HIV Medicine Association** **sent a joint letter** to Turing earlier this month calling the price increase for Daraprim "unjustifiable for the medically vulnerable patient population" and "unsustainable for the health care system." An organization representing the directors of state AIDS programs has also been looking into the price increase, according to doctors and patient advocates.

Daraprim, known generically as pyrimethamine, is used mainly to treat **toxoplasmosis**, a parasite infection that can cause serious or even life-threatening problems for babies born to women who become infected during **pregnancy**, and also for people with compromised immune systems, like AIDS patients and certain **cancer** patients.

Martin Shkreli, the founder and chief executive of Turing, said that the drug is so rarely used that the impact on the health system would be minuscule and that Turing would use the money it earns to develop better treatments for toxoplasmosis, with fewer side effects.

"This isn't the greedy drug company trying to gouge patients, it is us trying to stay in business," Mr. Shkreli said. He said that many patients use the drug for far

less than a year and that the price was now more in line with those of other drugs for rare diseases.

"This is still one of the smallest pharmaceutical products in the world," he said. "It really doesn't make sense to get any criticism for this."

This is not the first time the 32-year-old Mr. Shkreli, who has a reputation for both brilliance and brashness, has been the center of controversy. He started MSMB Capital, a hedge fund company, in his 20s and drew attention for urging the Food and Drug Administration not to approve certain drugs made by companies whose stock he was shorting.

In 2011, Mr. Shkreli started Retrophin, which also acquired old neglected drugs and sharply raised their prices. Retrophin's board fired Mr. Shkreli a year ago. Last month, it filed a complaint in Federal District Court in Manhattan, accusing him of using Retrophin as a personal piggy bank to pay back angry investors in his hedge fund.

Mr. Shkreli has denied the accusations. He has filed for arbitration against his old company, which he says owes him at least $25 million in severance. "They are sort of concocting this wild and crazy and unlikely story to swindle me out of the money," he said.

Daraprim, which is also used to treat malaria, was approved by the F.D.A. in 1953 and has long been made by GlaxoSmithKline. Glaxo sold United States marketing rights to CorePharma in 2010. Last year, Impax Laboratories agreed to buy Core and affiliated companies for $700 million. In August, Impax sold Daraprim to Turing for $55 million, a deal announced the same day Turing said it had raised $90 million from Mr. Shkreli and other investors in its first round of financing.

Daraprim cost only about $1 a tablet several years ago, but the drug's price rose sharply after CorePharma acquired it. According to IMS Health, which tracks prescriptions, sales of the drug jumped to $6.3 million in 2011 from $667,000 in 2010, even as prescriptions held steady at about 12,700. In 2014, after further price increases, sales were $9.9 million, as the number of prescriptions shrank to 8,821. The figures do not include inpatient use in hospitals.

Turing's price increase could bring sales to tens or even hundreds of millions of dollars a year if use remains constant. Medicaid and certain hospitals will be able to get the drug inexpensively under federal rules for discounts and rebates. But private insurers, Medicare and hospitalized patients would have to pay an amount closer to the list price.

Some doctors questioned Turing's claim that there was a need for better drugs, saying the side effects, while potentially serious, could be managed.

"I certainly don't think this is one of those diseases where we have been clamoring for better therapies," said Dr. Wendy Armstrong, professor of infectious diseases at Emory University in Atlanta.

With the price now high, other companies could conceivably make generic copies, since patents have long expired. One factor that could discourage that option is that Daraprim's distribution is now tightly controlled, making it harder for generic companies to get the samples they need for the required testing.

The switch from drugstores to controlled distribution was made in June by Impax, not by Turing. Still, controlled distribution was a strategy Mr. Shkreli talked about at his previous company as a way to thwart generics.

Some hospitals say they now have trouble getting the drug. "We've not had access to the drug for a few months," said Dr. Armstrong, who also works at Grady Memorial Hospital, a huge public treatment center in Atlanta that serves many low-income patients.

But Dr. Rima McLeod, medical director of the toxoplasmosis center at the University of Chicago, said that Turing had been good about delivering drugs quickly to patients, sometimes without charge.

"They have jumped every time I've called," she said. The situation, she added, "seems workable" despite the price increase.

Daraprim is the standard first treatment for toxoplasmosis, in combination with an antibiotic called sulfadiazine. There are alternative treatments, but there is less data supporting their efficacy.

Case 3:15-cv-07658-MAS-LHG   Document 167-8   Filed 09/13/16   Page 67 of 82 PageID: 3540

Dr. Aberg of Mount Sinai said some hospitals will now find Daraprim too expensive to keep in stock, possibly resulting in treatment delays. She said that Mount Sinai was continuing to use the drug, but each use now required a special review.

"This seems to be all profit-driven for somebody," Dr. Aberg said, "and I just think it's a very dangerous process."

A version of this article appears in print on September 21, 2015, on page B1 of the New York edition with the headline: Once a Neglected Treatment, Now an Expensive Specialty Drug .

© 2016 The New York Times Company

# Exhibit 28

# Valeant, Turing Targets of Probes in Both Houses of Congress

Wednesday, November 04, 2015

By Anna Edney and Melissa Mittelman

Share:

Advertisement



Learn from practitioners
Specialize in your field
Study part-time, online
Get certified in 6 months

CERTIFICATE IN QUANTITATIVE FINANCE
CQF

(Updates with closing share price in fourth paragraph.)

(Bloomberg) -- Valeant Pharmaceuticals International Inc. and Turing Pharmaceuticals AG are the focus of two probes in Congress seeking to examine why the companies raised the prices of medications sharply after acquiring them.

In the House, Democrats are pushing for a vote to subpoena the chief executive officers of both drugmakers to hand over documents on price increases. The U.S. Senate's Special Committee on Aging, meanwhile, will investigate drug pricing practices by Valeant, Turing and two others.

The probes are part of intensifying scrutiny in Washington of the drug industry's pricing practices. Lawmakers in both houses have asked Valeant for documents related to the heart drugs Nitropress and Isuprel, whose prices shot up by 212 percent and 525 percent the day the drugmaker acquired the rights to sell them.

Case 3:15-cv-07658-MAS-LHG   Document 167-8   Filed 09/13/16   Page 70 of 82 PageID: 3543

Valeant shares dropped 6 percent to $91.98, erasing their gains for the week to reach the lowest closing price since July 2013.

"We look forward to cooperating with the committee on its inquiry," Valeant said in an e-mailed statement. "The list price of any individual drug typically does not reflect the actual amount paid by a health care provider or insurance company, and Valeant devotes a significant portion of its revenue to patient assistance programs that are designed to make important medicines more affordable to the patients who need them."

Turing also cited its patient assistance program and said more than 60 percent of its sales are going into research and development for new treatments. "We look forward to having an open and honest dialogue about drug pricing," the company said in an e-mailed statement.

Media Attention

Thus far, lawmakers have focused on a handful of companies that have drawn media attention for raising prices, though House Democrats hinted Wednesday that their scope could expand.

At a news conference, Representative Jan Schakowsky, an Illinois Democrat, mentioned Gilead Sciences Inc.'s hepatitis C cure Sovaldi, which debuted last year with a list price of $84,000.

"We finally have something that could cure hepatitis C, there is the cure -- oh, but you can't afford it, who could?" Schakowsky said. She said drug companies are taking advantage of the system and "ripping off consumers."

Gilead's shares fell as much as 1.7 percent on the remarks. While they recovered those losses later, closing little changed at $108.98, the immediate stock reaction was a sign of how seriously investors are taking the scrutiny of drug prices in Washington. Presidential candidate Hillary Clinton sent drugmaker stocks tumbling in September when she said in a tweet that Turing was "price gouging." The closely held drug company had bought a decades-old anti-parasitic treatment and raised the price from $13.50 a pill to $750.

Cara Miller, a spokeswoman for Gilead, declined to comment.

Drug-Price Forum

While Congress looks at drug prices more closely, the Obama administration is also drawing attention to the issue. The U.S. Health and Human Services Department said Tuesday it would hold a forum on Nov. 20 about high drug prices. The forum will bring together

Case 3:15-cv-07658-MAS-LHG   Document 167-8   Filed 09/13/16   Page 71 of 82 PageID: 3544

consumers, health-care providers, employers, manufacturers and insurers to discuss ways to improve patient access to affordable prescription drugs, the department said in an e-mailed invitation.

In the House, Democrats on the Oversight and Government Reform Committee have been seeking Republican support for the subpoenas they want to issue. The lawmakers wrote Chairman Jason Chaffetz, a Republican from Utah, again on Wednesday asking him to investigate Valeant and Turing -- or at least not block them from doing so. The group, led by Representative Elijah Cummings of Maryland, the ranking member on the committee, called for a vote Nov. 17 on whether it could subpoena the companies.

House Democrats also are forming an Affordable Drug Pricing Task Force. Cummings was joined Wednesday in announcing the group's plans by several other Democrats, including Schakowsky and representatives Lloyd Doggett of Texas, Jim McDermott of Washington, Rosa DeLauro of Connecticut and Peter Welch of Vermont.

"Over the past year, Democrats have asked you repeatedly to take action on this critical issue, but you have refused every request," according to the letter the Democrats sent to Chaffetz. "You have not signed one letter seeking documents from a drug company, and you have not held a single hearing to address this problem."

Chaffetz said Tuesday that he plans to hold a hearing on prescription drug costs, though he doesn't have any dates yet.

"We haven't finalized who the witnesses would be," he said. MJ Henshaw, a spokeswoman for Chaffetz, didn't immediately respond to a request for comment.


'Potential Solutions'


In the Senate, meanwhile, the Special Committee on Aging sent letters to Valeant, Turing, Retrophin Inc. and Rodelis Therapeutics asking about why they raised prices on drugs. Daraprim, Turing's anti-infection drug, is of particular interest, said the committee's leaders, Senator Susan Collins of Maine, a Republican, and Senator Claire McCaskill of Missouri, a Democrat.

"The Senate Special Committee on Aging considers these massive price increases worthy of a serious, bipartisan investigation into the causes, impacts, and potential solutions," Collins said in a statement. A spokesman for the committee's minority members said McCaskill would support the use of subpoenas if the companies don't cooperate.

The senators said the committee will hold a hearing on the issue on Dec. 9.

McCaskill had already requested details from Valeant on how it set prices for the drugs Isuprel and Nitropress, and called the company's response at the time "deeply disappointing." Collins could add weight to her inquiry by making it bipartisan.

Retrophin shares fell 15 percent to $18.56 at 10:59 a.m. in New York. In a statement, the company said, "Pharmaceutical pricing that strikes the right balance between affordability and enabling innovation is an issue of legitimate concern for patients and the industry, and we look forward to sharing our views with the special committee."

Closely held Rodelis didn't immediately respond to requests for comment.

Candidates' Views

Clinton and Democratic presidential candidate Bernie Sanders have both said they'll seek reforms in the drug industry. Republican presidential candidate Marco Rubio also has said "pure profiteering" in the pharmaceutical industry is something that needs to be confronted.

The Pharmaceutical Research and Manufacturers of America, the drug industry's main lobbying group, also has distanced itself from Turing and Valeant, saying their strategy "is more reflective of a hedge fund than an innovative biopharmaceutical company.'

Valeant has received subpoenas from the U.S. Attorney's offices in Massachusetts and Manhattan seeking information on drug pricing decisions, the company said last month. It also has been under scrutiny for its relationship with specialty pharmacy Philidor Rx Services LLC and has since severed its ties with the company. Former Philidor employees alleged that it altered doctors' orders to get larger reimbursements for Valeant from health insurers.

Weeks before Valeant said it would cut ties with Philidor, the drugmaker was planning to expand its use of the mail-order pharmacy, Bloomberg News reported Wednesday, citing three people familiar with the matter. Philidor was on the brink of becoming a larger part of Valeant's operations as the drugmaker planned to widen the pharmacy's role beyond dermatology to other lines of medications, the people said.

--With assistance from Billy House in Washington and Caroline Chen in San Francisco.

To contact the reporters on this story: Anna Edney in Washington at aedney@bloomberg.net; Melissa Mittelman in New York at mmittelman@bloomberg.net To contact the editors responsible for this story: Crayton Harrison at tharrison5@bloomberg.net Drew Armstrong

Share:

Advertisement



**Financial Risk Manager ()**

**Energy Risk Professional ()**

**Courses ()**

**Membership ()**

**Risk Intelligence ()**

About Us ()

Board of Trustees ()

Risk Manager of the Year ()

Academic Partnerships ()

Buy Side Risk Managers Forum ()

Press Room ()

Contact Us ()

**f** ( https://www.facebook.com/GARPRisk)     🐦 (https://twitter.com/GARP_Risk)

**in** (https://www.linkedin.com/company/global-association-of-risk-professionals)

📷 (https://instagram.com/garp_risk)   🔴 (http://weibo.com/garpfrm)

**g+** (https://plus.google.com/+GarpOrg1)   ▶ (https://www.youtube.com/user/GARPvideo)

---

• Bylaws   • Code of Conduct   • Privacy Policy   • Terms of Use

© 2016 Global Association of Risk Professionals

# Exhibit 29

Case 3:15-cv-07658-MAS-LHG   Document 167-8   Filed 09/13/16   Page 75 of 82 PageID: 3548

**The New York Times** | http://nyti.ms/1VwDjCL

**BUSINESS DAY**

# Valeant's Drug Price Strategy Enriches It, but Infuriates Patients and Lawmakers

By ANDREW POLLACK and SABRINA TAVERNISE   OCT. 4, 2015

J. Michael Pearson has become a billionaire from his tough tactics as the head of the fast-growing Valeant Pharmaceuticals International.

And consumers like Bruce Mannes, a 68-year-old retired carpenter from Grandville, Mich., are facing the consequences.

Mr. Mannes has been taking the same drug, Cuprimine, for 55 years to treat Wilson disease, an inherited disorder that can cause severe liver and nerve damage. This summer, Valeant more than quadrupled its price overnight.

Medicare will now have to cover about $35,000 for the 120 capsules he takes each month, and he will have to pay about $1,800 a month out of pocket, compared with about $366 he paid in May.

"My husband will die without the medicine," said his wife, Susan, who is now working a second part-time job to help pay for health care. "We just can't manage another two, three thousand dollars a month for pills."

Case 3:15-cv-07658-MAS-LHG    Document 167-8    Filed 09/13/16    Page 76 of 82 PageID: 3549

Cuprimine is just one of many Valeant drugs whose prices have spiked as part of the company's concerted strategy, which has richly rewarded its investors and made it one of Wall Street's most popular health stocks.

But Valeant's habit of buying up existing drugs and raising prices aggressively, rather than trying to develop new drugs, has also drawn the ire of lawmakers and helped stoke public outrage against the growing trend of higher and higher drug prices imposed by big drug companies. This year alone, Valeant raised prices on its brand-name drugs an average of 66 percent, according to a Deutsche Bank analysis, about five times as much as its closest industry peers.

Some presidential candidates have also seized on the issue. Hillary Rodham Clinton, who is seeking the Democratic nomination, called for efforts to control "price gouging" after a public outcry over the actions of Turing Pharmaceuticals, which abruptly increased the price on a drug to $750 a tablet from $13.50.

And last week, Democrats on the House Committee on Oversight and Government Reform demanded that Valeant be subpoenaed for information about big price increases on two old heart drugs that the company acquired in February.

The threat of government action is making the pharmaceutical industry nervous. A big sell-off in biotechnology stocks over the last two weeks helped wipe out the sector's gains for the entire year. Valeant's stock has been among the hardest hit, losing about a quarter of its value since Sept. 18. Still, the stock is trading for about six times as much as it was five years ago, a meteoric rise that far outpaced most drug companies.

Valeant defended itself, saying in a statement that it "prices its treatments based on a range of factors, including clinical benefits and the value they bring to patients, physicians, payers and society." It says patients are largely shielded from price increases by **insurance** and financial assistance programs the company offers, so that virtually no one is denied a drug they need.

But Mr. Pearson, a former McKinsey & Company consultant, has said he has a duty to shareholders to wring the maximum profit out of each drug. And in some cases old neglected drugs sell for far less than newer drugs for the same diseases.

Case 3:15-cv-07658-MAS-LHG   Document 167-8   Filed 09/13/16   Page 77 of 82 PageID: 3550

If "products are sort of mispriced and there's an opportunity, we will act appropriately in terms of doing what I assume our shareholders would like us to do," he told analysts in a conference call in April.

Valeant is an extreme example of practices that have been around in the pharmaceutical industry for years. The United States, unlike most countries, does not control drug prices, and pharmaceutical manufacturers have relied heavily on steady and sometimes outsize price increases in this country to bolster their revenue and profits.

Valeant is known for buying companies and laying off their employees to achieve savings, while accumulating a debt of about $30 billion. It spends an amount equivalent to only 3 percent of its sales on research and development, which it views as risky and inefficient compared with buying existing drugs. Traditional big drug companies spend 15 to 20 percent of sales on research and development. Valeant also pays extremely low taxes because it is officially based in Canada, although Mr. Pearson operates from New Jersey.

Price increases provide an extra boost to the company's sales and profits.

For example, after Valeant acquired Salix Pharmaceuticals this year, it raised the price of one Salix drug, the diabetes pill Glumetza, about 800 percent.

"How can they just do this?" said Gail Mayer, a retired computer systems analyst on Long Island, who said her monthly supply of Glumetza went from $519.92 in May to $4,643 in August. For now, her insurance is covering most of that increase, but she is worried that it will stop covering the drug altogether, as others have.

"I'm sure it didn't cost them $4,000 more to make," Ms. Mayer said. "You don't just go buy a bottle of milk and suddenly the supermarket charges you $100."

Mr. Pearson has told analysts that it is standard industry practice to raise the price of a drug shortly before it faces generic competition, which Glumetza might face in February.

Case 3:15-cv-07658-MAS-LHG   Document 167-8   Filed 09/13/16   Page 78 of 82 PageID: 3551

The drug industry argues that list prices are typically not what health plans pay after discounts and rebates are negotiated, and there is evidence that these discounts are increasing.

But even if patients are often shielded, the costs are paid by insurers, hospitals and taxpayers and lead to higher premiums and co-payments for everyone, critics say.

Jeffrey M. Rosner, the senior director for pharmacy sourcing and purchasing at the Cleveland Clinic, said that nine drugs with particularly egregious price increases had cost the hospital an additional $11.2 million annually, an increase of about 10 percent in drug costs for hospitalized patients. And Valeant's products represented 80 percent of that additional cost, he said.

The price of one Valeant drug, Mephyton, which helps blood clot better, has been increased eight times since July 2014, he said, and now costs about $58.76 a tablet, up from $9.37. The price of another, Edecrin, a diuretic, has gone up nine times since May 2014 and is now at $4,600 a vial, up from about $470. When his staff called to inquire, Valeant refused to discuss pricing over the phone, Mr. Rosner said.

Many drugs undergoing gigantic price increases are old and no longer have patent protection, raising the question of why generic alternatives do not pop up.

The generic equivalent of Cuprimine, the drug taken by Mr. Mannes, is being sold by some foreign pharmacies for $1 a tablet, in contrast to the $260 Valeant is now charging.

For some Valeant drugs there are generic alternatives. For others, the sales have been too small to interest a generic company. That could change now that the prices are higher, but it would probably take several years for a generic-drug maker to win approval from the Food and Drug Administration to start selling such a product.

More conventional pharmaceutical and biotechnology companies, which conduct their own research and development, have rushed to distance themselves from companies like Turing and Valeant. The Biotechnology Industry Organization,

Case 3:15-cv-07658-MAS-LHG   Document 167-8   Filed 09/13/16   Page 79 of 82 PageID: 3552

a trade group, expelled Turing, saying it did not reflect the organization's values. Martin Shkreli, who runs Turing, is also facing a federal criminal inquiry into his activities at a previous company, Retrophin, according to Retrophin regulatory filings.

But while more conventional companies do not typically triple or quadruple prices overnight, they do often raise them year after year at a rate far faster than inflation. Big pharmaceutical companies like Pfizer and Merck raised list prices an average of 13 percent in 2014 and 8 percent so far this year, according to Deutsche Bank.

Ronny Gal, a pharmaceutical analyst at Sanford C. Bernstein & Company, said smaller price increases on widely used drugs had a much bigger effect on health care spending than the larger increases by Valeant on drugs with small sales.

Dr. Irl B. Hirsch, a diabetes specialist at the University of Washington School of Medicine in Seattle, said insulin prices had risen so much in recent years that some patients were scrimping on groceries to pay for it. The price of a package of five Lantus injectable pens from Sanofi has gone from about $179 in 2010 to $372 last year, he said, and insurance will often cover only one package at a time.

"All of this stuff that makes life so inconvenient, this would have been unheard-of five or 10 years ago," he said.

The more conventional companies and their backers argue that research and development has a high risk of failure, so they deserve premium prices when a drug succeeds. They now are concerned that innovation will be undermined by a reaction to price increases imposed by companies like Turing and Valeant.

Jacking up prices of old drugs, "with no R&D risk-taking, is just not right," Bruce Booth, a prominent life sciences venture capitalist, posted on Twitter Tuesday, adding that the practice "hurts the industry & innovators."

With Valeant's stock price falling, Mr. Pearson sent a letter to employees last week, arguing that increased prices accounted for only a small and declining part of

the company's business. "Valeant is well positioned for strong organic growth, even assuming little to no price increases," he wrote.

But in the company's regulatory filing for the second quarter, Valeant said that its growth in the United States and other developed markets "was driven primarily by price," not by increased volume. Analysts at Morgan Stanley estimated that "outsized" price increases on eight drugs accounted for about 7 percent of Valeant's revenue and 13 percent of its earnings before taxes and interest in the second quarter.

For now, with Congress in the hands of Republicans and election season in full swing, quick government action on drug prices is considered unlikely.

The Manneses are applying for financial assistance from a foundation recommended by Valeant to help pay for Cuprimine. But Ms. Mannes was upset enough to write to elected officials and call local television stations.

"This madness has to stop," she said.

A version of this article appears in print on October 5, 2015, on page A1 of the New York edition with the headline: A Drug Company's Price Tactics Pinch Insurers and Consumers.

© 2016 The New York Times Company

# Exhibit 30



DRG  ↑ 522.88  +9.10                    -- /--
At 16:51 d  O 513.00  H 523.82  L 512.79  Prev 513.78

| DRG Index | 95) Compare | 96) Actions ▼ | 97) Edit ▼ | | Bar Chart |
|---|---|---|---|---|---|

09/17/2015 - 09/29/2015  Last Price ▼          Mov Avg          No Lower Chart  USD ▼

1D  3D  1M  6M  YTD  1Y  5Y  Max  Daily ▼    Chart    «    Security/Study    Event    ⚙

DRG Index

| | Date | Open | High | Low | Close |
|---|---|---|---|---|---|
| Tu | 09/29/2015 | 509.99 | 517.52 | 504.62 | 509.74 |
| Mo | 09/28/2015 | 528.60 | 528.60 | 505.78 | 509.99 |
| | | | | | |
| Fr | 09/25/2015 | 543.33 | 544.69 | 524.43 | 528.34 |
| Th | 09/24/2015 | 540.78 | 540.78 | 532.13 | 538.31 |
| We | 09/23/2015 | 542.31 | 546.55 | 539.91 | 541.23 |
| Tu | 09/22/2015 | 544.04 | 544.04 | 537.17 | 541.51 |
| Mo | 09/21/2015 | 562.09 | 563.71 | 547.54 | 550.35 |
| | | | | | |
| Fr | 09/18/2015 | 562.31 | 563.57 | 557.60 | 558.54 |
| Th | 09/17/2015 | 559.70 | 572.11 | 559.51 | 564.96 |

SN 632905 EDT   GMT-4:00 G260-1097-3  12-Sep-2016 17:06:42