# Exhibit 31

Case 3:15-cv-07658-MAS-LHG   Document 167-9   Filed 09/13/16   Page 2 of 112 PageID: 3557

**Southern Investigative Reporting Foundation** │ (http://sirf-online.org/2015/10/19/hidden-in-plain-sight-valeants-big-crazy-sort-of-secret-story/)

**UNCATEGORIZED**                                                    October 19, 2015

# The King's Gambit: Valeant's Big Secret

By **Roddy Boyd**

If the name Valeant Pharmaceuticals International doesn't ring a bell, its business practices should. The Quebec-based drug manufacturer's policy of implementing regular price increases (http://www.zerohedge.com/news/2015-09-28/dear-martin-shkreli-how-you-hike-drug-prices) that often run north of 100% has generated plenty of anger, a congressional investigation (http://www.mccaskill.senate.gov/imo/media/doc/20150923McCaskilllettertoValeant.pdf), constant press coverage (http://www.nytimes.com/2015/10/05/business/valeants-drug-price-strategy-enriches-it-but-infuriates-patients-and-lawmakers.html?_r=0) and a subpoena (http://ir.valeant.com/investor-relations/news-releases/news-release-details/2015/Valeant-Provides-Update-Regarding-Government-Inquiries/default.aspx) from the U.S. Attorneys offices in both the Southern District of New York and the District of Massachusetts.

But as strange as it may seem, a slim legal filing in California federal court is poised to make Valeant's world rockier still.

The story starts 50 miles northwest of Los Angeles in Camarillo, Ca. with R&O Pharmacy, a modestly-sized operation co-owned by veteran compounding pharmacists Russell Reitz and Robert Osbakken.

According to a lawsuit filed by R&O, Russell Reitz got a letter (http://sirfonline.wpengine.netdna-cdn.com/files/2015/10/1-1-Exhibit-A.pdf) from Robert Chai-Onn (http://d1lge852tjjqow.cloudfront.net/CIK-0000885590/731bf529-b534-4425-83ce-23fb994868ec.pdf?noexit=true), Valeant's general counsel and director of business development, requesting repayment of $69.8 million for "invoiced amounts." This apparently struck Reitz as odd since R&O had done no business, at least in any direct fashion, with Valeant. Moreover, he had never received a single invoice from Valeant or its subsidiaries.

Reitz forwarded the letter to Gary Jay Kaufman, his lawyer down in Los Angeles, who sent a letter (http://sirfonline.wpengine.netdna-cdn.com/files/2015/10/1-2-Exhibit-B.pdf) to Chai-Onn on September 8 noting that the lack of invoices from Valeant indicated to him one of two things was happening: Valeant and R&O were being jointly defrauded by someone, or Valeant was defrauding R&O. He suggested they talk it over by phone.

Chai-Onn never responded and on October 6, Kaufman filed suit (http://sirfonline.wpengine.netdna-cdn.com/files/2015/10/1-Complaint-1-1.pdf), seeking a determination from the court that R&O owes Valeant nothing.

There is, however, a hook and as these things go, it's a big one: the Southern Investigative Reporting Foundation has confirmed that Reitz was indeed doing business of some sort through a company called Philidor Rx Services (http://www.philidorrxservices.com/) and a man named Andrew Davenport.

Which makes Valeant's demand letter very interesting.

To understand why, it's important to understand what Philidor is. To the public, it describes itself as a "pharmacy administrator" and, according to a call service operator last Thursday, Valeant is its only client. Located in Hatboro about 30 miles outside Philadelphia, its corporate filings indicate both companies are independent of the other.

Pharmacy administrator appears to be, in Philidor's case, a term of art.

A better description is a "specialty pharmacy, (http://www.drugchannels.net/2013/02/defining-specialty-pharmacy.html)" filling, shipping and getting insurance approval for prescriptions of the more complex drugs Valeant makes. In its third quarter conference call last year, the only instance

where Philidor has been publicly mentioned by an analyst, Valeant chief executive Mike Pearson said that perhaps 40% of its business flows through specialty pharmacies. In July, he reiterated the company's guidance for up to $11.1 billion in 2015 revenue, implying that as much as $4.4 billion in product could move through this channel.

(Note that specialty pharmacies are exempt from reporting the drugs they sell to IMS Health, the tracking service used by companies and analysts to monitor drug sales and inventory channels.)

Like many private companies, Philidor's financials are hard to come by but it is unmistakably an operation of some mass, with around 900 employees and its own legal (https://www.linkedin.com/pub/gretchen-sprigg-wisehart/12/341/139) unit (https://www.linkedin.com/pub/kevin-schmidt/8/8ba/228). A Pennsylvania State Senator posted an April 6 interview (https://www.facebook.com/senatorgreenleaf/posts/807822615960322) with company CEO Andy Davenport where he stated the company was on track to process between 12,000 and 15,000 prescriptions daily by December. With prescription costs regularly running into the hundreds and even thousands of dollars, the company could potentially handle upwards of $1.5 billion in product this year.

A key cog in Valeant's "patient access" program, patients referred to Philidor often receive coupons for reduced or waived co-pay requirements–given to the prescriber by Valeant's sales representatives–and in turn, Philidor would appear to attempt to recoup the cost of the drug from private insurers or Medicare. Theoretically, this makes price increases less risky for Valeant given that a sizable population of a drug's users frequently won't observe them. Still, the patient access program is central to the company's distribution program, and one of the issues the U.S. Attorney subpoenas specifically sought information on.

Philidor's business practices have generated mixed reviews (at best) on consumer message boards — including numerous instances of alleged unwanted refills (http://philidor-rx-services.pissedconsumer.com/beware-unwanted-refills-customer-service-hassle-20150904694524.html) and an allegation of the improper removal (http://philidor-rx-services.pissedconsumer.com/philidor-rx-services-llc-took-mv-hsa-funds-20150102577512.html) of HSA funds. Another message board account alleges (http://philidor-rx-services.pissedconsumer.com/unethical-20150901692440.html) that to get reimbursement approvals, prescriptions already denied at larger insurers were "pushed through" their sister pharmacies. (To be sure, comments on these sites can be gamed, both by consumers and the company, and the Southern Investigative Reporting Foundation was unable to verify these accounts.)

Several questions remain unanswered: On the assumption that there is $69.8 million due someone, why wouldn't Philidor's two in-house attorneys have issued a demand letter to R&O? Similarly, why wouldn't Valeant's high-profile general counsel, when challenged, not provide support for his demand and avoid the risk and expense of litigation? Additionally, if Valeant does have some sort of claim to that nearly $70 million, what then is their real relationship to Philidor?

——————————————-

The Southern Investigative Reporting Foundation was able to uncover Valeant's financial connection to Philidor–one that it hasn't disclosed to investors–as laid out below.

The first task was to establish who owns Philidor. What we discovered was indeed revealing, albeit probably not in the way its owners intended.

Put bluntly, Philidor has gone to great lengths to conceal its ownership. Start with a man named Matthew Davenport, the listed principal on most of Philidor's state registrations; additionally, several states list David Wing, John Carne and Gregory Blaszczynski as officers, and a few more have an End Game Partnership LLP listed as an assistant treasurer.

Given Andy Davenport's video above, his role as Philidor's chief executive is clear. Plugging the address of End Game Partnership LLP (which in turn is owned by End Game LLC, a Las Vegas-based entity) from its filings into a search engine turns up a match to a house Andy Davenport owns in Horsham.

A Southern Investigative Reporting Foundation phone call to Philidor's administration revealed that there is no Matthew Davenport, David Wing, (Edward) John Carne or Gregory Blaszczynski working at Philidor. On the other hand, all four work at BQ6 Media (http://www.bq6media.com/content/matt-davenport), a pharmaceutical marketing company located about

Case 3:15-cv-07658-MAS-LHG   Document 167-9   Filed 09/13/16   Page 4 of 112 PageID: 3559

2.5 miles
(https://www.google.com/maps/dir/400+Horsham+Road,+Horsham,+PA/330+S+Warminster+Rd,+Hatboro,+PA+19040/@40.1788105,-75.1268203,15z/(
3m1!4b1!4m13!4m12!1m5!1m1!1s0x89c6afo72a4be005:0xd3b5fa645563889e!2m2!1d-75.1367413!2d40.183998!1m5!
1m1!1s0x89c6ac360034a0b5:0x4cbedq88cb578194!2m2!1d-75.101816!2d40.171785) from the company. At one
point, prior to Philidor, Andy Davenport was its CEO
(http://web.archive.org/web/20130225052836/http://www.bq6media.com/content/andy-davenport). Both BQ6
(https://who.is/whois/https://www.bq6media.com) and Philidor
(https://who.is/whois/https://www.philidorrxservices.com) share the same domain registrar, Perfect Privacy
LLC. The company's LinkedIn profile lists 28 employees but the majority are consultants or
contract workers, with several listing time spent at Philidor.

The Philidor state registration in North Carolina
(https://www.secretary.state.nc.us/Search/profcorp/10657029) was particularly helpful in that it listed a
broader array of owners than other states.

David Cowen is a former hedge fund manager and Elizabeth Kardos
(http://www.us.zolfocooper.com/our-people/elizabeth-s-kardos) is general counsel for restructuring
consultants Zolfo Cooper (http://www.us.zolfocooper.com/about-us) who are married
(http://sirfonline.wpengine.netdna-cdn.com/files/2015/10/WEDDINGS-Elizabeth-Kardos-and-David-Cowen-The-New-
York-Times.pdf) and own Four Beads LLC (http://sirfonline.wpengine.netdna-cdn.com/files/2015/10/NJ-Four-
Beads-BE_Copies_0400379477_5289740384.pdf) ; they did not return a message left at their house or
reply to an email sent to Ms. Kardos. Nick Spuhler (https://www.linkedin.com/in/nickspuhler) is a BQ6
alum who could not be reached, David Ostrow (http://sirfonline.wpengine.netdna-
cdn.com/files/2015/10/NPI-Registry-Provider-Details-David-Ostrow.pdf) is a Physical Therapist
(http://medcenter100.com/david-ostrow-pt/) and golf swing coach (https://www.linkedin.com/in/davidostrow)
who did not return multiple calls to his house and residence, Jeffrey Gottesman
(https://www.jeffgottesman.com/) is an insurance agent who has a sideline as a competitive poker
(http://forumserver.twoplustwo.com/65/mttc-live/borgata-winter-open-2011-jan-19-feb-4-a-914247/index36.html)
player; reached on his mobile phone, he declined comment. The address listed for Gina Miller
tracked to a code inspection business with no apparent connection to Philidor. Alternatively, a
Gina Milner (http://www.bq6media.com/content/gina-milner) works at BQ6, but it couldn't be determined
if she is involved. Fabien Forrester-Charles (https://www.linkedin.com/profile/view?
id=AAkAAAFVYwsBhcCoGdvBVXLG6bXlPX0fp7A4!3U&authType=NAME_SEARCH&authToken=JtoJ&locale=en_US&trk=tyah&trkInfo=clickedVertical%
3Amynetwork%2Cclickedentityld%3A2237313%2CauthType%3ANAME_SEARCH%2Cidx%3A1-1-1%2CtarId%
3A1445199174372%2Ctas%3Afabien%20forre) of Hatboro, Pa. and Francis Jennings of Naples, Fla. could
not be reached, and Michael Ostrow of Bala Cynwyd, Pa. did not return a voice message left at his
house. Paula Schuler of Old Greenwich, Ct., listed as an owner along with her husband Timothy,
said she couldn't talk at that moment; she never returned two follow-up calls.

It is not readily apparent if there are any specific relationships among group members, beyond
the general ties to Matthew and Andy Davenport (according to an online database they appear to
be brothers), BQ6 and Philadelphia. One that does jump out is David Cowen and Andy
Davenport's tenure together at hedge fund Quasar Financial between 2004 and 2008; Davenport
also donated (http://www.moaf.org/ways-to-give/corporate-support/corp-member-list) to the Museum of
American Finance, where Cowen is the president.

Not every state looked kindly upon the way Philidor went about securing out-of-state pharmacy
operation privileges. California took exception to Matthew Davenport's attempt to register as
Philidor's principal and rejected (http://sirfonline.wpengine.netdna-
cdn.com/files/2015/10/Davenport_Calrejection.pdf) the company's application for a Non-Residency
Pharmacy Permit in May 2014. The state's Department of Consumer Affairs Board of Pharmacy
cited a series of disclosure-related problems, specifically his swearing to what was termed "false
statement of facts" on the application, several of which involved the failure to disclose Philidor's
ownership group, as well as Andrew's 27% ownership stake.

(A brief aside: Francois-Andre Philidor (http://biography.yourdictionary.com/francois-andre-philidor) was
an 18th century French Chess master, writing a book about it, The Analysis of Chess. BQ6 Media
(http://www.bq6media.com/introduction) is named after the chess shorthand for Bobby Fisher's
legendary move against Russian chess master Boris Spassky in 1972. Another popular chess move
is the King's Gambit Accepted, or as it's often referred to in chess notation, KGA.)

Establishing the economic connection between Valeant and Philidor was less time-consuming.

As it happens, Valeant has a wholly-owned unit named KGA Fulfillment Services Inc (http://www.sec.gov/Archives/edgar/data/885590/000088559015000015/exhibit211.htm) , that was formed in Delaware in November, 2014. Its only mention in any Valeant filings is that sole line in last year's annual report. An exhaustive search didn't turn up any references to it in trade publications, nor state and federal databases. (What the initials stand for, apart from the similarity to the chess strategy, is unknown.)

The Southern Investigative Reporting Foundation found KGA Fulfillment Services listed  as the "secured party" on UCC-1 liens (http://smallbusiness.chron.com/ucc-lien-15791.html) placed this January and February against the members of Philidor's ownership group. These liens are the public notice that a lending entity may have an interest in the debtor's personal property. In this case, Valeant/KGA lent money to Philidor's ownership group and per the rules, is announcing that their equity stakes in Philidor are potentially collateral.

The UCC-1 financing statements for the group are: David Cowen (http://sirfonline.wpengine.netdna-cdn.com/files/2015/10/NJ-UCC-David-Cowen-KGA.pdf) and Elizabeth Kardos (http://sirfonline.wpengine.netdna-cdn.com/files/2015/10/NJ-UCC-Elizabeth-Kardos-KGA.pdf) , Timothy (http://sirfonline.wpengine.netdna-cdn.com/files/2015/10/CT-Schuler-UCC1.pdf) and Paula Schuler, Nick Spuhler (http://sirfonline.wpengine.netdna-cdn.com/files/2015/10/NY-UCC-Spuhler-KGA.pdf) , Andrew Davenport Trust (http://sirfonline.wpengine.netdna-cdn.com/files/2015/10/PA-UCC-Andrew-Davenport-Trust-KGA.pdf) , David Ostrow (http://sirfonline.wpengine.netdna-cdn.com/files/2015/10/PA-UCC-David-Ostrow-KGA.pdf) , David Wing (http://sirfonline.wpengine.netdna-cdn.com/files/2015/10/PA-UCC-David-Wing-KGA.pdf) , John Carne (http://sirfonline.wpengine.netdna-cdn.com/files/2015/10/PA-UCC-Edward-Carne-KGA.pdf) , Matthew Davenport (http://sirfonline.wpengine.netdna-cdn.com/files/2015/10/PA-UCC-Matthew-Davenport-KGA.pdf) , Fabien Forrester-Charles (http://sirfonline.wpengine.netdna-cdn.com/files/2015/10/PA-UCC-Fabien-Forrester-Charles-KGA.pdf) , End Game Partnership LLP (http://sirfonline.wpengine.netdna-cdn.com/files/2015/10/PA-UCC-End-Game-Partnership-LP-KGA.pdf) , End Game LP (http://sirfonline.wpengine.netdna-cdn.com/files/2015/10/PA-UCC-End-Game-LP-KGA.pdf) and Michael Ostrow (http://sirfonline.wpengine.netdna-cdn.com/files/2015/10/PA-UCC-Michael-Ostrow-KGA.pdf) .

That an important financial relationship exists between Philidor and Valeant's KGA unit is inarguable; why it exists is much less clear. From the standpoint of rational self-interest, the owner of a rapidly growing business would almost never want to borrow against their equity stake, let alone from the newly launched subsidiary of the enterprise's sole customer.

—————————

Over several days, since coming across the California lawsuit, the Southern Investigative Reporting Foundation made repeated phone calls to every person or company discussed above. With the exception of Jeffrey Gottesman from the Philidor ownership group and R&O Pharmacy's lawyer, Gary Jay Kaufman–both of whom declined comment–every other person did not return our calls.

Robert Chai-Onn did not reply to a call to his office; a call to a mobile phone registered to his name was answered by his wife, who said she was on the West Coast and was unsure where her husband was at that moment.

Meghan Gavigan (http://www.sardverb.com/people/meghan-gavigan/) of Sard Verbinnen & Co., an outside spokeswoman for Valeant Pharmaceuticals, was unable to secure a response from the company.

# Exhibit 32

# Valeant Pharmaceuticals International, Inc.

**Q3 2015 Financial Results**
**October 19, 2015**



# 2015 Valeant Price Volume Growth

| | 2015 % of business % | Q3 2015 | | 2015 YTD | |
|---|---|---|---|---|---|
| | | Unit volume growth % | Net realized price change % | Unit volume growth % | Net realized price change % |
| Ex-U.S. | 39 | 4 | (2) | 4 | (1) |
| U.S. Contact lens, Surgical, Consumer, Solta, Obagi | 14 | 4 | (2) | 3 | 2 |
| U.S. Branded Pharmaceuticals | 43 | 19 | 15 | 17 | 24 |
| U.S. Generics | 4 | (9) | 5 | (10) | 6 |
| **Total** | **100** | **8.2** | **4.4** | **8** | **8** |

21

VALEANT
Pharmaceuticals International, Inc.

# Specialty Pharmacy (1/2)

- We have viewed our relationship with Philidor and our other specialty pharmacies as proprietary and as one of our competitive advantages

- Similar to many pharmaceutical companies in the U.S., an increasing percentage of our revenue is coming from products dispensed through multiple specialty pharmacies

- We find specialty pharmacies improve patients' access to medicines at an affordable price and help ensure physicians are able to prescribe the medications they believe most appropriate for their patients

- In almost all cases, our inventory with specialty pharmacies and the title for our medicines only transfer to the pharmacy when the actual prescription is filled – this significantly reduces our distribution fees and product returns. Less than 5% of our U.S. channel inventory sits in the specialty pharmacy channel

- Philidor, one of our specialty pharmacy partners, provides prescription services to patients across the country, and provides administrative services for our co-pay cards and is a dispensary that fills prescriptions. We have a contractual relationship with Philidor and late last year we purchased an option to acquire Philidor



# Specialty Pharmacy (2/2)

- Based on a VIE (variable interest entity) assessment in accordance with ASC 810, we consolidate the financials of Philidor.  Inventory held at Philidor remains on Valeant's books and is not included in the specialty pharmacy channel inventory

- For many of our dermatology products, many of our specialty pharmacies, including Philidor, dispense Valeant medications before adjudication of the reimbursement may be finalized. Patients get their medicines more quickly and Valeant takes the risk for non-reimbursement

- We understand that Philidor:

  - Provides services under our programs for commercially insured and cash-paying claims only. Any claim that would be reimbursed in whole or in part by government insurance is not eligible for our co-pay subsidy programs

  - Does not restrict prescriptions it fills to any particular manufacturers (including Valeant)

  - Dispenses generic products as specified in patient's prescription or as requested by patient





# Recent Government Inquiries

- On October 14, 2015, we responded to a letter from Senator Claire McCaskill (Democrat-Missouri)

- The letter addressed the history of Nitropress and Isuprel, the reimbursement process for hospital procedures involving Nitropress and Isuprel, the analysis and reasons underlying Valeant's pricing decisions, and Valeant's programs designed to improve patient access, among other topics

- We are beginning outreach to hospitals where the impact of a price change was significantly greater than the average

- We received a subpoena from the U.S. Attorney's Office for the District of Massachusetts and a subpoena from the U.S. Attorney's Office for the Southern District of New York

- We intend to cooperate with the investigations



# Exhibit 33

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-Q

☒   **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Quarterly Period Ended March 31, 2016**

**OR**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from ＿ to ＿**

**Commission File Number: 001-14956**

# VALEANT PHARMACEUTICALS INTERNATIONAL, INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **British Columbia, Canada** | **98-0448205** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **2150 St. Elzéar Blvd. West, Laval, Quebec** | **H7L 4A8** |
| (Address of principal executive offices) | (Zip Code) |

**(514) 744-6792**
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer ☒ | Accelerated filer ☐ | Non-accelerated filer ☐ (Do not check if a smaller reporting company) | Smaller reporting company ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

Common shares, no par value - 343,030,281 shares outstanding as of June 2, 2016.

**VALEANT PHARMACEUTICALS INTERNATIONAL, INC.**
**FORM 10-Q**
**FOR THE QUARTERLY PERIOD ENDED MARCH 31, 2016**

**Introductory Note**

Except where the context otherwise requires, all references in this Quarterly Report on Form 10-Q (this "Form 10-Q") to the "Company", "we", "us", "our" or similar words or phrases are to Valeant Pharmaceuticals International, Inc. and its subsidiaries, taken together. In this Form 10-Q, references to "$" are to United States ("U.S.") dollars, references to "€" are to Euros, and references to RUR are to Russian rubles. Unless otherwise indicated, the statistical and financial data contained in this Form 10-Q are presented as of March 31, 2016.

**Forward-Looking Statements**

Caution regarding forward-looking information and statements and "Safe-Harbor" statements under the U.S. Private Securities Litigation Reform Act of 1995:

*To the extent any statements made in this Form 10-Q contain information that is not historical, these statements are forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, and may be forward-looking information within the meaning defined under applicable Canadian securities legislation (collectively, "forward-looking statements").*

*These forward-looking statements relate to, among other things: our business strategy, business plans and prospects, product pipeline, prospective products or product approvals, product development and distribution plans, future performance or results of current and anticipated products; the expected benefits of our acquisitions and other transactions, such as cost savings, operating synergies and growth potential of the Company; the impact of material weaknesses in our internal control over financial reporting; our liquidity and our ability to satisfy our debt maturities as they become due; the impact of our distribution, fulfillment and other third party arrangements; proposed price reductions and limitations; changes in management; our ability to reduce debt levels; our ability to reduce certain inventory levels; exposure to foreign currency exchange rate changes and interest rate changes; the outcome of contingencies, such as litigation, subpoenas, investigations, reviews, audits and regulatory proceedings; general market conditions; our expectations regarding our financial performance, including revenues, expenses, gross margins and income taxes; our ability to meet the financial and other covenants contained in our Credit Agreement and senior note indentures; the changes in our forecast for the fiscal year 2016; and our impairment assessments, including the assumptions used therein and the results thereof.*

*Forward-looking statements can generally be identified by the use of words such as "believe", "anticipate", "expect", "intend", "estimate", "plan", "continue", "will", "may", "could", "would", "should", "target", "potential", "opportunity", "tentative", "positioning", "designed", "create", "predict", "project", "forecast", "seek", "ongoing", "increase", or "upside" and variations or other similar expressions. In addition, any statements that refer to expectations, intentions, projections or other characterizations of future events or circumstances are forward-looking statements. These forward-looking statements may not be appropriate for other purposes. Although we have indicated above certain of these statements set out herein, all of the statements in this Form 10-Q that contain forward-looking statements are qualified by these cautionary statements. These statements are based upon the current expectations and beliefs of management. Although we believe that the expectations reflected in such forward-looking statements are reasonable, such statements involve risks and uncertainties, and undue reliance should not be placed on such statements. Certain material factors or assumptions are applied in making forward-looking statements, including, but not limited to, factors and assumptions regarding the items outlined above. Actual results may differ materially from those expressed or implied in such statements. Important factors that could cause actual results to differ materially from these expectations include, among other things, the following:*

- *the expense, timing and outcome of legal and governmental proceedings, investigations and information requests relating to, among other matters, our distribution, marketing, pricing, disclosure and accounting practices (including with respect to our former relationship with Philidor), including pending investigations by the U.S. Attorney's Office for the District of Massachusetts, the U.S. Attorney's Office for the Southern District of New York and the State of North Carolina Department of Justice, the pending investigation by the U.S. Securities and Exchange Commission (the "SEC") of the Company, pending investigations by the U.S. Senate Special Committee on Aging and the U.S. House Committee on Oversight and Government Reform, the request for documents and information received by the Company from the Autorité des marchés financiers (the "AMF") (the Company's principal securities regulator in Canada), the document subpoena from the New Jersey State Bureau of Securities and a number of pending purported class action litigations in the U.S. and Canada and other claims, investigations or proceedings that may be initiated or that may be asserted;*

ii

- *our ability to manage the transition to our new Chairman and Chief Executive Officer, the success of such individual in assuming the roles of Chairman and Chief Executive Officer and the ability of such individual to implement and achieve the strategies and goals of the Company as they develop;*

- *the election of the slate of directors who are standing for election at our upcoming annual general meeting of shareholders, many of whom are new or recently appointed directors, and our ability to manage the transition to this new Board of Directors and the success of these individuals in their new roles as members of the Board of Directors of the Company;*

- *potential additional litigation and regulatory investigations (and any costs, expenses, use of resources, diversion of management time and efforts, liability and damages that may result therefrom), negative publicity and reputational harm that may result from the completed review by the Ad Hoc Committee of our Board of Directors;*

- *the effect of the misstatements identified in, and the resultant restatement of, certain of our previously issued financial statements and results (as further described herein); the material weaknesses in our internal control over financial reporting identified by the Company; and any claims, investigations or proceedings (and any costs, expenses, use of resources, diversion of management time and efforts, liability and damages that may result therefrom), negative publicity or reputational harm that may arise as a result;*

- *the effectiveness of the remediation measures and actions currently being implemented and to be taken in the future to remediate the material weaknesses in our internal control over financial reporting identified by the Company, our deficient control environment and the contributing factors leading to the misstatement of our results and the impact such measures may have on the Company and our businesses;*

- *potential additional litigation and regulatory investigations (and any costs, expenses, use of resources, diversion of management time and efforts, liability and damages that may result therefrom), negative publicity and reputational harm on our Company, products and business that may result from the recent public scrutiny of our distribution, marketing, pricing, disclosure and accounting practices and from our former relationship with Philidor, including any claims, proceedings, investigations and liabilities we may face as a result of any alleged wrongdoing by Philidor;*

- *the current scrutiny of our business practices including with respect to pricing (including the investigations by the U.S. Attorney's Offices for the District of Massachusetts and the Southern District of New York, the U.S. Senate Special Committee on Aging, the U.S. House Committee on Oversight and Government Reform and the State of North Carolina Department of Justice) and any pricing controls or price reductions that may be sought or imposed (or that we may elect to implement) on our products as a result thereof (such as the recent decision of the Company to take no further price increases on our Nitropress® and Isuprel® products and to implement an enhanced rebate program for such products);*

- *any default under the terms of our senior notes indentures or Credit Agreement and our ability, if any, to cure or obtain waivers of such default;*

- *any delay in the filing of any subsequent financial statements or other filings and any default under the terms of our senior notes indentures or Credit Agreement as a result of such delays;*

- *our substantial debt (and potential future indebtedness) and current and future debt service obligations and their impact on our financial condition, cash flows and results of operations;*

- *our ability to meet the financial and other covenants contained in our Credit Agreement, senior note indentures and other current or future debt agreements and the limitations, restrictions and prohibitions such covenants impose or may impose on the way we conduct our business, including the restrictions imposed by the April 11, 2016 amendment (the "April 2016 amendment") to our Credit Agreement that restrict us from, among other things, making acquisitions over an aggregate threshold (subject to certain exceptions) and from incurring debt to finance such acquisitions, until we achieve a specified leverage ratio;*

- *our ability to service and repay our existing or any future debt, including our ability to reduce our outstanding debt levels during 2016 in accordance with our stated intention;*

- *any downgrade by rating agencies in our credit ratings (such as the recent downgrades by Moody's Investors Service and Standard & Poor's Ratings Services), which may impact, among other things, our ability to raise debt and the cost of capital for additional debt issuances;*

- *our ability to raise additional funds, as needed, in light of our current and projected levels of operations, general economic conditions (including capital market conditions) and any restrictions or limitations imposed by the financial and other covenants of our debt agreements with respect to incurring additional debt;*

- *any further reductions in, or changes in the assumptions used in, our forecasts for fiscal year 2016 or beyond, which could lead to, among other things, a failure to meet the financial and/or other covenants contained in our Credit Agreement and/or senior note indentures and/or impairment in the goodwill associated with certain of our reporting units (including our U.S. reporting unit) or impairment charges related to certain of our products (in particular, our Addyi® product) or other intangible assets, which impairments could be material;*

- *changes in the assumptions used in connection with our impairment analyses or assessments, which would lead to a change in such impairment analyses and assessments and which could result in an impairment in the goodwill associated with any of our reporting units (such as our U.S. reporting unit) or impairment charges related to certain of our products (in particular, our Addyi® product) or other intangible assets;*

- *the potential divestiture of certain of our assets or businesses and our ability to successfully complete any future divestitures on commercially reasonable terms and on a timely basis, or at all;*

- *the impact of any such future divestitures on our Company, including the reduction in the size or scope of our business or market share, any loss on sale or any adverse tax consequences suffered as a result of such divestitures;*

- *our shift in focus to minimal business development activity through acquisitions in 2016 and possibly beyond as we focus on reducing our outstanding debt levels and as a result of the restrictions imposed by the April 2016 amendment to our Credit Agreement that restrict us from, among other things, making acquisitions over an aggregate threshold (subject to certain exceptions) and from incurring debt to finance such acquisitions, until we achieve a specified leverage ratio;*

- *the uncertainties associated with the acquisition and launch of new products (in particular, our Addyi® product launched in October 2015), including, but not limited to, our ability to provide the time, resources, expertise and costs required for the commercial launch of new products, the acceptance and demand for new pharmaceutical products, and the impact of competitive products and pricing, which could lead to material impairment charges;*

- *our ability to retain, motivate and recruit executives and other key employees and the termination or resignation of executives or key employees, such as the recent departure of our former chief executive officer;*

- *our ability to implement effective succession planning for our executives and key employees;*

- *our ability to successfully manage the transition of new executives and key employees, such as our new Corporate Controller;*

- *our implemented and proposed price freezes and reductions on certain of our products, including the recent decision of the Company to take no further price increases on, and to implement an enhanced rebate program with respect to, our Nitropress® and Isuprel® products and the planned price reductions in conjunction with our arrangements with Walgreen Co. ("Walgreens"), and any future pricing freezes, reductions, increases or changes we may elect to make, as well as any proposed or future legislative price controls or price regulation, including mandated price reductions, that may impact our products;*

- *the challenges and difficulties associated with managing a large complex business, which has grown rapidly over the last few years;*

- *our ability to compete against companies that are larger and have greater financial, technical and human resources than we do, as well as other competitive factors, such as technological advances achieved, patents obtained and new products introduced by our competitors;*

- *the success of our recent and future fulfillment and other arrangements with Walgreens, including market acceptance of, or market reaction to, such arrangements (including by customers, doctors, patients, pharmacy benefit managers ("PBMs"), third party payors and governmental agencies), the continued compliance of such arrangements with applicable laws and the ability of the anticipated increased volume across all distribution channels resulting from such arrangements to offset the impact of lower average selling prices associated with these arrangements;*

- *the extent to which our products are reimbursed by government authorities, PBMs and other third party payors; the impact our distribution, pricing and other practices (including as it relates to our former relationship with Philidor, any alleged wrongdoing by Philidor and our current relationship with Walgreens) may have on the decisions of such government authorities, PBMs and other third party payors to reimburse our products; and the impact of obtaining or maintaining such reimbursement on the price and sales of our products;*

- *the inclusion of our products on formularies or our ability to achieve favorable formulary status, as well as the impact on the price and sales of our products in connection therewith;*

iv

- *our eligibility for benefits under tax treaties and the continued availability of low effective tax rates for the business profits of certain of our subsidiaries, including the impact on such matters of the proposals published by the Organization for Economic Co-operation and Development ("OECD") respecting base erosion and profit shifting ("BEPS");*

- *the actions of our third party partners or service providers of research, development, manufacturing, marketing, distribution or other services, including their compliance with applicable laws and contracts, which actions may be beyond our control or influence, and the impact of such actions on our Company, including the impact to the Company of our former relationship with Philidor and any alleged legal or contractual non-compliance by Philidor;*

- *the risks associated with the international scope of our operations, including our presence in emerging markets and the challenges we face when entering new geographic markets (including the challenges created by new and different regulatory regimes in such countries);*

- *adverse global economic conditions and credit markets and foreign currency exchange uncertainty and volatility in the countries in which we do business (such as the instability in Brazil, Russia, Ukraine, Argentina, certain countries in Africa and the Middle East);*

- *our ability to reduce wholesaler inventory levels in Russia, Poland and certain other countries, in-line with our targeted levels for such markets;*

- *our ability to obtain, maintain and license sufficient intellectual property rights over our products and enforce and defend against challenges to such intellectual property;*

- *the introduction of generic, biosimilar or other competitors of our branded products and other products, including the introduction of products that compete against our products that do not have patent or data exclusivity rights;*

- *once the additional limitations in our Credit Agreement restricting our ability to make acquisitions are no longer applicable, and to the extent we elect to resume business development activities through acquisitions, our ability to identify, finance, acquire, close and integrate acquisition targets successfully and on a timely basis;*

- *factors relating to the acquisition and integration of the companies, businesses and products that have been acquired by the Company (and that may in the future be acquired by the Company, once the additional limitations in our Credit Agreement restricting our ability to make acquisitions are no longer applicable and to the extent we elect to resume business development activities through acquisitions), such as the time and resources required to integrate such companies, businesses and products, the difficulties associated with such integrations (including potential disruptions in sales activities and potential challenges with information technology systems integrations), the difficulties and challenges associated with entering into new business areas and new geographic markets, the difficulties, challenges and costs associated with managing and integrating new facilities, equipment and other assets, and the achievement of the anticipated benefits from such integrations, as well as risks associated with the acquired companies, businesses and products;*

- *factors relating to our ability to achieve all of the estimated synergies from such acquisitions as a result of cost-rationalization and integration initiatives. These factors may include greater than expected operating costs, the difficulty in eliminating certain duplicative costs, facilities and functions, and the outcome of many operational and strategic decisions, some of which have not yet been made;*

- *the expense, timing and outcome of pending or future legal and governmental proceedings, arbitrations, investigations, subpoenas, tax and other regulatory audits, reviews and regulatory proceedings against us or relating to us and settlements thereof;*

- *our ability to obtain components, raw materials or finished products supplied by third parties (some of which may be single-sourced) and other manufacturing and related supply difficulties, interruptions and delays;*

- *the disruption of delivery of our products and the routine flow of manufactured goods;*

- *ongoing oversight and review of our products and facilities by regulatory and governmental agencies, including periodic audits by the U.S. Food and Drug Administration (the "FDA"), and the results thereof;*

- *economic factors over which the Company has no control, including changes in inflation, interest rates, foreign currency rates, and the potential effect of such factors on revenues, expenses and resulting margins;*

- *interest rate risks associated with our floating rate debt borrowings;*

- *our ability to effectively distribute our products and the effectiveness and success of our distribution arrangements, including the impact of our recent arrangements with Walgreens;*

- *our ability to secure and maintain third party research, development, manufacturing, marketing or distribution arrangements;*

- *the risk that our products could cause, or be alleged to cause, personal injury and adverse effects, leading to potential lawsuits, product liability claims and damages and/or withdrawals of products from the market;*

- *the availability of, and our ability to obtain and maintain, adequate insurance coverage and/or our ability to cover or insure against the total amount of the claims and liabilities we face, whether through third party insurance or self-insurance;*

- *the difficulty in predicting the expense, timing and outcome within our legal and regulatory environment, including with respect to approvals by the FDA, Health Canada and similar agencies in other countries, legal and regulatory proceedings and settlements thereof, the protection afforded by our patents and other intellectual and proprietary property, successful generic challenges to our products and infringement or alleged infringement of the intellectual property of others;*

- *the results of continuing safety and efficacy studies by industry and government agencies;*

- *the success of preclinical and clinical trials for our drug development pipeline or delays in clinical trials that adversely impact the timely commercialization of our pipeline products, as well as factors impacting the commercial success of our currently marketed products (such as our Addyi® product launched in October 2015), which could lead to material impairment charges;*

- *the results of management reviews of our research and development portfolio, conducted periodically and in connection with certain acquisitions, the decisions from which could result in terminations of specific projects which, in turn, could lead to material impairment charges;*

- *the seasonality of sales of certain of our products;*

- *declines in the pricing and sales volume of certain of our products that are distributed or marketed by third parties, over which we have no or limited control;*

- *compliance by the Company or our third party partners and service providers (over whom we may have limited influence), or the failure of our Company or these third parties to comply, with health care "fraud and abuse" laws and other extensive regulation of our marketing, promotional and business practices (including with respect to pricing), worldwide anti-bribery laws (including the U.S. Foreign Corrupt Practices Act), worldwide environmental laws and regulation and privacy and security regulations;*

- *the impacts of the Patient Protection and Affordable Care Act (as amended) and other legislative and regulatory healthcare reforms in the countries in which we operate, including with respect to recent government inquiries on pricing;*

- *the impact of the upcoming United States elections, including any healthcare reforms arising therefrom, including with respect to pricing controls;*

- *factors relating to our acquisition of Salix Pharmaceuticals, Ltd. ("Salix"), including the impact of substantial additional debt on our financial condition, cash flows and results of operations; our ability to effectively and efficiently integrate the operations of the Company and Salix; our ability to achieve the estimated synergies from this transaction; once integrated, the effects of such business combination on our future financial condition, operating results, strategy and plans; and, our ability to achieve the anticipated benefits of such acquisition, including the anticipated revenue growth resulting from such acquisition (such as the anticipated revenue of the Xifaxan® product, including the recently-approved IBS-D indication);*

- *potential ramifications, including financial penalties, relating to Salix's restatement of its historical financial results;*

- *illegal distribution or sale of counterfeit versions of our products;*

- *interruptions, breakdowns or breaches in our information technology systems; and*

- *other risks detailed from time to time in our filings with the SEC and the Canadian Securities Administrators (the "CSA") (including in our 2015 Form 10-K), as well as our ability to anticipate and manage the risks associated with the foregoing.*

*Additional information about these factors and about the material factors or assumptions underlying such forward-looking statements may be found in our 2015 Form 10-K under Item 1A. "Risk Factors" and in the Company's other filings with the SEC and CSA. When relying on our forward-looking statements to make decisions with respect to the Company, investors and others should carefully consider the foregoing factors and other uncertainties and potential events. These forward-looking statements speak only as of the date made. We undertake no obligation to update or revise any of these forward-looking statements to reflect events or circumstances after the date of this Form 10-Q or to reflect actual outcomes, except as required by law. We caution that, as it is not possible to predict or identify all relevant factors that may impact forward-looking statements, the foregoing list of important factors that may affect future results is not exhaustive and should not be considered a complete statement of all potential risks and uncertainties.*

**VALEANT PHARMACEUTICALS INTERNATIONAL, INC.**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(All tabular amounts expressed in millions of U.S. dollars, except per share data)**
**(Unaudited)**

Company recognized the $25 million charge in the third quarter of 2015 in Other expense (income) in the consolidated statements of (loss) income.

Following the decision of the IP Court, AnviLab filed two more claims against Natur Produkt relating to the matter described above (the "Original AnviLab Matter). The first claim by AnviLab was filed on December 3, 2015 with the Saint Petersburg Arbitration Tribunal (Case No. A-56-89244/2015) and seeks an amount in respect of the interest payable on the amount awarded by the appeal court in the Original AnviLab Matter for the period between the date the amount was awarded by the appeal court (August 4, 2015) and the date AnviLab received the payment (September 29, 2015). A hearing in this matter was held on March 24, 2016 and a subsequent hearing was held on April 14, 2016. The second claim by AnviLab was filed on December 15, 2015 with the Saint Petersburg Arbitration Tribunal (Case No.A-56-23056/2013) and seeks an amount in respect of litigation costs related to Original AnviLab Matter. A hearing in this matter was held on February 25, 2016 and a subsequent hearing was held on April 14, 2016. The Court awarded amounts to AnviLab with respect to each of these claims. For both of these claims, the amount awarded to AnviLab was insignificant. On May 25, 2016, Natur Produkt appealed both of these decisions.

*Patent Litigation/Paragraph IV Matters*

The Company (and/or certain of its affiliates) is also party to certain patent infringement proceedings in the United States and Canada, including as arising from claims filed by the Company (or that the Company anticipates filing within the required time periods) in connection with Notices of Paragraph IV Certification (in the United States) and Notices of Allegation (in Canada) received from third party generic manufacturers respecting their pending applications for generic versions of certain products sold by or on behalf of the Company, including Onexton®, Relistor®, Prolensa®, Apriso®, Uceris®, Moviprep®, Acanya® and Bepreve® in the United States and Sublinox® in Canada, or other similar suits. These matters are proceeding in the ordinary course.

In addition, on or about February 16, 2016, the Company received a Notice of Paragraph IV Certification dated February 11, 2016, from Actavis Laboratories FL, Inc. ("Actavis"), in which Actavis asserted that the following U.S. patents, each of which is listed in the FDA's Orange Book for Salix Pharmaceuticals, Inc.'s ("Salix Inc.") Xifaxan® tablets, 550 mg, are either invalid, unenforceable and/or will not be infringed by the commercial manufacture, use or sale of Actavis' generic rifaximin tablets, 550 mg, for which an ANDA has been filed by Actavis: U.S. Patent No. 8,309,569 (the "'569 patent"), U.S. Patent No. 8,642,573 (the "'573 patent"), U.S. Patent No. 8,829,017 (the "'017 patent"), U.S. Patent No. 8,946,252 (the "'252 patent"), U.S. Patent No. 8,969,398 (the "'398 patent"), U.S. Patent No. 7,045,620 (the "'620 patent"), U.S. Patent No. 7,612,199 (the "'199 patent"), U.S. Patent No. 7,902,206 (the "'206 patent"), U.S. Patent No. 7,906,542 (the "'542 patent"), U.S. Patent No. 7,915,275 (the "'275 patent"), U.S. Patent No. 8,158,644 (the "'644 patent"), U.S. Patent No. 8,158,781 (the "'781 patent"), U.S. Patent No. 8,193,196 (the "'196 patent"), U.S. Patent No. 8,518,949 (the "'949 patent"), U.S. Patent No. 8,741,904 (the "'904 patent"), U.S. Patent No. 8,835,452 (the "'452 patent"), U.S. Patent No. 8,853,231 (the "'231 patent"), U.S. Patent No. 6,861,053 (the "'053 patent"), U.S. Patent No. 7,452,857 (the "'857 patent"), U.S. Patent No. 7,605,240 (the "'240 patent"), U.S. Patent No. 7,718,608 (the "'608 patent") and U.S. Patent No. 7,935,799 (the "'799 patent") (collectively, the "Xifaxan® Patents"). Salix Inc. holds the NDA for Xifaxan® and its affiliate, Salix Pharmaceuticals, Ltd. ("Salix Ltd."), is the owner of the '569 patent, the '573 patent, the '017 patent, the '252 patent and the '398 patent. Alfa Wassermann S.p.A. ("Alfa Wassermann") is the owner of the '620 patent, the '199 patent, the '206 patent, the '542 patent, the '275 patent, the '644 patent, the '781 patent, the '196 patent, the '949 patent, the '904 patent, the '452 patent and the '231 patent, each of which has been exclusively licensed to Salix Inc. and its affiliate, Valeant Pharmaceuticals Luxembourg S.à r.l. ("Valeant Luxembourg") to market Xifaxan® tablets, 550 mg. Cedars-Sinai Medical Center ("Cedars-Sinai") is the owner of the '053 patent, the '857 patent, the '240 patent, the '608 patent and the '799 patent , each of which has been exclusively licensed to Salix Inc. and its affiliate, Valeant Luxembourg, to market Xifaxan® tablets, 550 mg. On March 23, 2016, Salix Inc. and its affiliates, Salix Ltd. and Valeant Luxembourg, Alfa Wassermann and Cedars-Sinai filed suit against Actavis in the U.S. District Court for the District of Delaware (Case No. 1:16-cv-00188), pursuant to the Hatch-Waxman Act, alleging infringement by Actavis of one or more claims of each of the Xifaxan® Patents, thereby triggering a 30-month stay of the approval of Actavis' ANDA for rifaximin tablets, 550 mg. On May 24, 2016, Actavis filed its answer in this matter. The Company believes the allegations raised in Actavis' notice are without merit and intends to vigorously pursue this suit.

**General Civil Actions**

*Afexa Class Action*

On March 9, 2012, a Notice of Civil Claim was filed in the Supreme Court of British Columbia which seeks an order certifying a proposed class proceeding against the Company and a predecessor, Afexa Life Sciences Inc. ("Afexa") (Case No. NEW-

38

**VALEANT PHARMACEUTICALS INTERNATIONAL, INC.**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(All tabular amounts expressed in millions of U.S. dollars, except per share data)**
**(Unaudited)**

S-S-140954). The proposed claim asserts that Afexa and the Company made false representations respecting Cold-FX® to residents of British Columbia who purchased the product during the applicable period and that the proposed class has suffered damages as a result. On November 8, 2013, the Plaintiff served an amended notice of civil claim which sought to re-characterize the representation claims and broaden them from what was originally claimed. On December 8, 2014, the Company filed a motion to strike certain elements of the Plaintiff's claim for failure to state a cause of action. In response, the Plaintiff proposed further amendments to its claim. The hearing on the motion to strike and the Plaintiff's amended claim was held on February 4, 2015. The Court allowed certain amendments, while it struck others. The hearing to certify the class was held on April 4-8, 2016 and a decision is pending. The Company denies the allegations being made and is vigorously defending this matter.

*R&O Pharmacy Complaint*

On October 6, 2015, R&O Pharmacy, LLC ("R&O") filed a complaint against Valeant Pharmaceuticals North America LLC ("VPNA") in the U.S. District Court for the Central District of California (Case No. 2:15-cv-07846). R&O's lawsuit did not seek damages, but sought a declaration of rights against VPNA that R&O owes no duties or amounts to VPNA with respect to certain Company products ordered by and shipped to R&O. On October 29, 2015, VPNA filed its answer to R&O's complaint. Also on that date, VPNA filed a counterclaim against R&O, including claims for breach of contract, unjust enrichment, accounting, and an open book account, with respect to these unpaid amounts. VPNA's counterclaim sought damages in excess of $19 million. On November 19, 2015, R&O filed its answer to VPNA's counterclaim. R&O did not assert any counterclaims. R&O generally claimed an entitlement to hold the funds achieved from the sale of Company products as an offset to potential claims arising out of Philidor's conduct, which R&O asserts is attributable to the Company under an alter ego theory (being the theory that the Company should be responsible for Philidor's actions in disregard of the fact that the two are separate legal entities). The Court held a scheduling conference with the parties on February 8, 2016 and set a November 2016 trial date. Subsequently, on March 8, 2016, the parties reached a confidential settlement that resolved all claims between them and, on March 10, 2016, the Court dismissed the lawsuit with prejudice. While the terms of the settlement are confidential, the resolution includes a payment by R&O to VPNA for less than the damages sought by VPNA in its counterclaim. VPNA firmly believes it acted appropriately and refutes any suggestion of wrongdoing.

**Salix Legal Proceedings**

The estimated fair values of the potential losses regarding the matters described below, along with other matters, are included as part of contingent liabilities assumed in the Salix Acquisition. Refer to Note 4 for additional information. Each of the Salix legal proceeding matters set out below was commenced prior to the Company's acquisition of Salix.

*DOJ Subpoena*

On February 1, 2013, Salix received a subpoena from the U.S. Attorney's Office for the Southern District of New York requesting documents regarding sales and promotional practices for its Xifaxan®, Relistor® and Apriso® products. The Company, the United States and the state Medicaid Fraud Control Unit negotiating team have agreed to resolve the investigation as to the Company for approximately $54 million, plus payment of applicable interest and reasonable attorneys' fees. In June 2016, the Company and the United States executed a settlement agreement concerning the federal portion of the settlement, which requires payment of approximately $47 million plus interest and which will likely become effective by mid-June 2016, pending the receipt of certain approval. The Company's settlement agreement with the states, the total amount of which is approximately $8 million plus interest, is pending review and approval by the various state attorneys general. The Company can provide no assurance as to whether or when the settlement will be finalized, in whole or in part. The amount of the settlement (including the interest and attorneys' fees payable in connection therewith) is included within the liability recorded at fair value as part of the Salix Acquisition and an adjustment, if any, to this liability will be recorded when and if the settlement is finalized.

*Salix SEC Investigation*

The SEC is conducting a formal investigation into possible securities law violations by Salix relating to disclosures by Salix of inventory amounts in the distribution channel and related issues in press releases, on analyst calls and in Salix's various SEC filings, as well as related accounting issues. Salix and the Company are cooperating with the SEC in its investigation, including through the production of documents to the SEC Enforcement Staff. The Company cannot predict the outcome or the duration of the SEC investigation or any other legal proceedings or any enforcement actions or other remedies that may be imposed on Salix or the Company arising out of the SEC investigation.

*Salix Securities Litigation*

39

**VALEANT PHARMACEUTICALS INTERNATIONAL, INC.**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(All tabular amounts expressed in millions of U.S. dollars, except per share data)**
**(Unaudited)**

Beginning on November 7, 2014, three putative class action lawsuits were filed by shareholders of Salix, each of which generally alleges that Salix and certain of its former officers and directors violated federal securities laws in connection with Salix's disclosures regarding certain products, including with respect to disclosures concerning historic wholesaler inventory levels, business prospects and demand, reserves and internal controls. Two of these actions were filed in the U.S. District Court for the Southern District of New York, and are captioned: Woburn Retirement System v. Salix Pharmaceuticals, Ltd., et al. (Case No: 1:14-CV-08925 (KMW)), and Bruyn v. Salix Pharmaceuticals, Ltd., et al. (Case No. 1:14-CV-09226 (KMW)). These two actions have been consolidated under the caption In re Salix Pharmaceuticals, Ltd. (Case No. 14-CV-8925 (KMW)). Defendants' Motions to Dismiss were fully briefed as of August 3, 2015. The Court denied the Motions to Dismiss in an order dated March 31, 2016 for the reasons stated in an opinion dated April 22, 2016. Defendants' Answers to the operative Complaint were filed on May 31, 2016. Salix and the Company are vigorously defending this consolidated matter. A third action was filed in the U.S. District Court for the Eastern District of North Carolina under the caption Grignon v. Salix Pharmaceuticals, Ltd. et al. (Case No. 5:14-cv-00804-D), but was subsequently voluntarily dismissed.

**Philidor Matters**

As mentioned above in this section, the Company is involved in certain investigations, disputes and other proceedings related to the Company's now terminated relationship with Philidor. These include the putative class action litigation and the investigations by certain offices of the Department of Justice, the SEC, the request for documents and other information received from the AMF and certain Congressional committees and a document subpoena from the New Jersey State Bureau of Securities. There can be no assurances that governmental agencies or other third parties will not commence additional investigations or assert claims relating to the Company's former relationship with Philidor or Philidor's business practices, including claims that Philidor or its affiliated pharmacies improperly billed third parties or that that the Company is liable, directly or indirectly, for such practices. The Company is cooperating with all existing governmental investigations related to Philidor and is vigorously defending the putative class action litigation. No assurance can be given regarding the ultimate outcome of any present or future proceedings relating to Philidor.

**17. SEGMENT INFORMATION**

**Reportable Segments**

The Company has two operating and reportable segments: (i) Developed Markets and (ii) Emerging Markets. The following is a brief description of the Company's segments as of March 31, 2016:

- ***Developed Markets*** consists of (i) sales in the U.S. of pharmaceutical products, OTC products, and medical device products, as well as alliance and contract service revenues, in the areas of dermatology and podiatry, neurology, gastrointestinal disorders, eye health, oncology and urology, dentistry, aesthetics, and women's health and (ii) pharmaceutical products, OTC products, and medical device products sold in Western Europe, Canada, Japan, Australia and New Zealand.

- ***Emerging Markets*** consists of branded generic pharmaceutical products and branded pharmaceuticals, OTC products, and medical device products. Products are sold primarily in Central and Eastern Europe (primarily Poland and Russia), Asia, Latin America (Mexico, Brazil, Argentina, and Colombia and exports out of Mexico to other Latin American markets), Africa and the Middle East.

Segment profit is based on operating income after the elimination of intercompany transactions. Certain costs, such as restructuring and acquisition-related costs, other (income) expense, and in-process research and development impairments and other charges, are not included in the measure of segment profit, as management excludes these items in assessing financial performance.

Corporate includes the finance, treasury, tax and legal operations of the Company's businesses and maintains and/or incurs certain assets, liabilities, expenses, gains and losses related to the overall management of the Company, which are not allocated to the other business segments. In addition, a portion of share-based compensation is considered a corporate cost, since the amount of such expense depends on Company-wide performance rather than the operating performance of any single segment.

**Segment Revenues and Profit**

Segment revenues and profit for the three-month periods ended March 31, 2016 and 2015 were as follows:

40

# Exhibit 34



October 21, 2015

# Valeant: Could this be the Pharmaceutical Enron?

## Citron Publishes the Smoking Gun!!
## Price Target lowered to $50

Just four days ago in the world of Valeant, no one had ever heard of Philidor RX. Recent concerns about the company focused on its unsavory business practices of massive prices raises on pharmaceuticals acquired in a rapid succession of acquisitions, while slashing research and development.  But no one had discussed how these drugs were distributed....until this week.

On Monday morning before earnings, a report came out of SIRF, uncovering undisclosed relationships with specialty pharmas, namely Philidor RX.  **Most importantly, the article introduced Wall Street to a court filing made by a company called R&O Pharmacy, filed with the California District Court in September, in which this small regional pharmacy claims it had received an improper demand for payment from Valeant to the tune of $69 million.**

Just yesterday, the New York Times increased its scrutiny on Philidor by questioning if its operation was the target of subpoenas recently served on Valeant over its pricing strategy, covered the prior week.

## This is Not Where the Story Ends; it is Where the Story Begins

With its quarterly earnings report scheduled for first thing Monday morning, Valeant was well aware of the scrutiny that was about to come down on Philidor and the R&O lawsuit, as both SIRF and the NYT had contacted management. Valeant came prepared for the conference call with pre-written questions and answers -- one about Philador, and one about R&O -- in its slide deck.   This is where the cover up begins.

We will let the New York Times start:

"Valeant had said little about Philidor until Monday, when J. Michael Pearson, Valeant's chief executive, revealed on his company's quarterly earnings call that Valeant had purchased an option to acquire Philidor late last year. He said that Valeant consolidated Philidor's results in its own financial reports."

An **option**?  To acquire a company to which you are the only customer?  **Why** would Valeant, a major **big cap pharma**, a **darling** of the hedge fund crowd, a **suitor** of Allergan and an aggressive acquirer of **pharmas** like Salix, Bausch & Lomb, etc., etc., be secretly maneuvering to buy a little known pharmacy with a dubious ownership structure? And then consolidate its financials?  Why was this entity NEVER disclosed in any prior company disclosure?  (See Valeant Slides on Philador here.)

## What is being covered up??

In the same slide presentation we read Valeant's explanation of a mysterious court document. R&O Pharmacy filed for pre-emptive relief in California District Court for having received a demand for $69 million from Valeant, stating it had no invoices from Valeant.  Valeant's explanation was this one slide:



So we are to believe that Valeant putatively owns Philidor and is acting as its "protector" in sending the demand letter to R&O for payment?  The story seemed

a bit far-fetched, but it was somewhat plausible if you wanted to suspend all disbelief.

But after a fair amount of due diligence Citron is about to post the line that should send alarm through all Valeant shareholders:

## Philidor Owns R&O Pharmacy.

Citron believes the whole thing is a fraud to create invoices to deceive the auditors and book revenue.  PHANTOM ACCOUNTS.  Here is the reasoning.

# The Smoking Gun!!

From the links below, it is obvious that Philidor and R&O are **ARE THE SAME COMPANY AND SHARE MANAGEMENT.**  The two companies have the same patient privacy disclosure, in fact formatted identically, on both companies' websites.  Note the R&O website refers to themselves as Philidor.



http://randopharmacy.com/downloads/ro_npp.pdf



### PHILIDOR RX SERVICES, LLC NOTICE OF PRIVACY PRACTICES

THIS NOTICE DESCRIBES HOW MEDICAL INFORMATION ABOUT YOU MAY BE USED AND DISCLOSED AND HOW YOU CAN GET ACCESS TO THIS INFORMATION. PLEASE REVIEW IT CAREFULLY.

**It's Your Information.** This Notice describes your rights concerning your health record.
The law requires health organizations, such as Philidor Rx Services, LLC, to:
-maintain the privacy of your health information
-provide you with this Notice of our legal duties
-describe our privacy practices
-notify you if we have an information breach
We know your health information is very personal and we are committed to protecting your privacy.

**YOUR RIGHTS**
When it comes to your health information, you have certain rights. This section explains your rights and some of our responsibilities to help you.

http://www.philidorrxservices.com/downloads/philidor_npp.pdf

(Yes we've archived these pages and will republish them in case the links are down by the time you click on them.)

And look!  The pharmacies -- **R&O, in Camarillo California**, and **Philidor RX in Horsham PA**, have **the identical toll free number to reach their Privacy Officer** (at the bottom.) Now that's some service!

**CONTACT**
We have designated the Privacy Officer as our contact person for all issues regarding patient privacy and exercising your rights under the Federal privacy standards. You may contact this person at:  Privacy Officer, R&O Pharmacy, 651 Via Alondra, Suite 708, Camarillo, CA 93012, privacy@randopharmacy.com or toll free at (855) 815-7688.

Effective Date June 1, 2015

http://randopharmacy.com/downloads/ro_npp.pdf

**CONTACT**
We have designated the Privacy Officer as our contact person for all issues regarding patient privacy and exercising your rights under the Federal privacy standards. You may contact this person at:  Philidor Rx Services, LLC, 330 S. Warminster Rd., Suite 350, Hatboro, PA 19040, privacy@philidorrxservices.com or toll free at (855) 815-7688.

Effective Date June 1, 2015

http://www.philidorrxservices.com/downloads/philidor_npp.pdf

## If you dial the fax # on the R&O website and press 1, you will get Philidor RX.  It does not stop at an R&O phone.

And as if this isn't enough, it appears to Citron that Valeant/Philidor have created an entire network of phantom captive pharmacies ...  the same privacy notice appears on several other "ghost ship" putative pharmacy websites.

http://westwilshirepharma.com/downloads/ww_npp.pdf

http://saferxpharma.com/downloads/saferx_npp.pdf

http://orbitpharmacy.com/downloads/orbit_npp.pdf

Oh, and as by mere coincidence, these all have the same Privacy Officer contact phone number:  **(855) 815-7688**.  And these domains were all registered on the same day!  **[ Click Here to See them all ]**

It is apparent to Citron that Valeant has created a network of "pharmacies" as clones of Philidor.  Why do these exist?  Citron believes it is merely for the purpose of  phantom sales or stuff the channel, and avoid scrutiny from the auditors.

## How Can This Be, Citron ?  Doesn't the Head of the Audit Committee have Any Responsibility Here?

Let us not forget that the head of the Valeant audit committee is Norma Provencio.  Mrs. Provencio herself was a director of Signalife which was run by now convicted stock fraudster Mitchell Stein. She was in fact his close associate for years -- information now conveniently omitted from her biography.  Mrs. Provencio's integrity was first challenged by Bronte Capital in this posting you should read for yourself.  Now the relevance of its full context becomes clear.

## Is this Enron part Deux??

These similarities are too close to ignore.  Does everyone remember during the Allergan takeover battle, when Allergan chose the words "house of cards" ?  Look at the following similarities between statements by Valeant and those of Enron:

Enron CEO Jeff Skilling, phone call with *Fortune*, 2/14/2001: "It is unfair to us and unethical if you don't take the time to understand our business... we are doing it purely right... people who raise questions are people who have not gone through our business in detail..."

vs.

Valeant Chairman, CEO Michael Pearson, investor presentation, 5/28/2014: "So again, it is unfortunate that Allergan has not taken the time to understand our business... There is a number of inaccuracies in the report that was put out yesterday... They are just factually incorrect..."

---

Enron CEO Jeff Skilling, phone call with *Fortune*, 2/14/2001: "[Enron] is a very simple model... it is a logistics company, not a trading company."

vs.

Valeant Chairman, CEO Michael Pearson, Sanford Bernstein conference, 5/28/2014: "[Valeant] is more like a professional services firm than a sort of traditional pharmaceutical company."

---

Enron CFO Andy Fastow, meeting with *Fortune*, 2/15/2001: "[Enron's] disclosure is more complete than anyone's."

vs.

Bill Ackman, conference call hosted by Pershing Square, 7/17/2014: "I will also point out that Valeant gives massively more disclosure about its business and did so prior to this transaction than Allergan."

---

Enron Chairman, Ken Lay, email to employees August 2001: "I have never felt better about the prospects of the Company... our growth has never been more certain."

vs.

Valeant Chairman, CEO Michael Pearson, 2Q 2014 earnings press release, 7/31/2014: "As we look across the entire business, I have never been more confident about the growth trajectory across the entire company."

**This is just too much of an eerie coincidence**

<u>Jeff Skilling Bio</u>
Experience running a business before joining Enron in 1990: **0 years**
Job before joining Enron: <span style="color:red">Head of the Global Energy Practice and Head of North American Chemical Practice of McKinsey & Company, 11 year tenure at McKinsey</span>

vs.

<u>Michael Pearson Bio</u>
Experience running a business before joining Valeant in 2008: **0 years**
Job before joining Valeant: <span style="color:red">Head of the Global Pharmaceutical Practice and Head of mid-Atlantic region of McKinsey & Company</span>, 23 year tenure at McKinsey

Citron has seen this movie before.  In 2008, Arthrocare, a successful medical device company, was doing its dirty deeds through Discocare, an undisclosed captive "independent company".  When Citron exposed the relationship, Arthrocare tried to make it all go away by **announcing it was buying Discocare**. At the time, virtually every investment banking house on the Street had a "buy" or "strong buy" on Arthrocare, and Goldman-Sachs had been engaged to "explore strategic alternatives".  The entire thing began to unravel when <u>Citron discovered -- and published -- that Arthrocare and Discocare -- ostensibly separate companies, **had the same fax number**</u>.

The CEO of Arthrocare is now doing 20 years.

While it is impossible for Citron to state for certain at this point, this has the distinct aroma of product being jammed into a channel.  It had to have started small, and now it's just too big.  "We have an option to purchase Philidor"  is simply ... **trying to put the genie back in the bottle.**

 # Conclusion 

***All truths are easy to understand once they are discovered; the point is to discover them......Galileo Galilei***

Citron Research has delivered the proof that something really stinks at Valeant and it is goes beyond their egregious price hikes

All of a sudden, one thread unravels this whole web of deception. From the moment of the first public mention of Philidor, within 72 hours, Valeant is now holding an option to acquire Philidor and investors find out only in retrospect that Valeant has been consolidating Philador financials?

Let's get the explanation -- Certainly Mr. Lay and Skilling had one all the way down to the trial -- and in which they still blamed the short sellers.

**Extremely Cautious Investing to All**

# Exhibit 35

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
#### Washington, D.C. 20549

# FORM 10-Q

☒   **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the Quarterly Period Ended September 30, 2015**

**OR**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the transition period from ＿ to ＿**

**Commission File Number: 001-14956**

## VALEANT PHARMACEUTICALS INTERNATIONAL, INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **British Columbia, Canada** | **98-0448205** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **2150 St. Elzéar Blvd. West, Laval, Quebec** | **H7L 4A8** |
| (Address of principal executive offices) | (Zip Code) |

**(514) 744-6792**
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer ☒ | Accelerated filer ☐ | Non-accelerated filer ☐ (Do not check if a smaller reporting company) | Smaller reporting company ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

Common shares, no par value - 343,101,797 shares outstanding as of October 19, 2015.

VALEANT PHARMACEUTICALS INTERNATIONAL, INC.
FORM 10-Q
FOR THE QUARTERLY PERIOD ENDED SEPTEMBER 30, 2015

**Introductory Note**

Except where the context otherwise requires, all references in this Quarterly Report on Form 10-Q (this "Form 10-Q") to the "Company", "we", "us", "our" or similar words or phrases are to Valeant Pharmaceuticals International, Inc. and its subsidiaries.

In this Form 10-Q, references to "$" are to United States ("U.S.") dollars, references to "€" are to Euros, and references to RUR are to Russian rubles.

**Forward-Looking Statements**

Caution regarding forward-looking information and statements and "Safe-Harbor" statements under the U.S. Private Securities Litigation Reform Act of 1995:

*To the extent any statements made in this Form 10-Q contain information that is not historical, these statements are forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, and may be forward-looking information within the meaning defined under applicable Canadian securities legislation (collectively, "forward-looking statements").*

*These forward-looking statements relate to, among other things: the expected benefits of our acquisitions and other transactions (including the acquisition of Salix Pharmaceuticals, Ltd. ("Salix")), such as cost savings, operating synergies and growth potential of the Company; our business strategy, business plans and prospects, product pipeline, prospective products or product approvals, future performance or results of current and anticipated products; exposure to foreign currency exchange rate changes and interest rate changes; the outcome of contingencies, such as certain litigation, investigations and regulatory proceedings; general market conditions; and our expectations regarding our financial performance, including revenues, expenses, gross margins, liquidity and income taxes.*

*Forward-looking statements can generally be identified by the use of words such as "believe", "anticipate", "expect", "intend", "estimate", "plan", "continue", "will", "may", "could", "would", "should", "target", "potential", "opportunity", "tentative", "positioning", "designed", "create", "predict", "project", "forecast", "seek", "ongoing", "increase", or "upside" and variations or other similar expressions. In addition, any statements that refer to expectations, projections or other characterizations of future events or circumstances are forward-looking statements. These forward-looking statements may not be appropriate for other purposes. Although we have indicated above certain of these statements set out herein, all of the statements in this Form 10-Q that contain forward-looking statements are qualified by these cautionary statements. These statements are based upon the current expectations and beliefs of management. Although we believe that the expectations reflected in such forward-looking statements are reasonable, such statements involve risks and uncertainties, and undue reliance should not be placed on such statements. Certain material factors or assumptions are applied in making forward-looking statements, including, but not limited to, factors and assumptions regarding the items outlined above. Actual results may differ materially from those expressed or implied in such statements. Important factors that could cause actual results to differ materially from these expectations include, among other things, the following:*

- *the challenges and difficulties associated with managing the rapid growth of our Company and a large complex business;*

- *our ability to retain, motivate and recruit executives and other key employees;*

- *the introduction of products that compete against our products that do not have patent or data exclusivity rights;*

- *our ability to compete against companies that are larger and have greater financial, technical and human resources than we do, as well as other competitive factors, such as technological advances achieved, patents obtained and new products introduced by our competitors;*

- *our ability to identify, finance, acquire, close and integrate acquisition targets successfully and on a timely basis;*

- *factors relating to the acquisition and integration of the companies, businesses and products acquired by the Company, such as the time and resources required to integrate such companies, businesses and products, the difficulties associated with such integrations (including potential disruptions in sales activities and potential challenges with information technology systems integrations), the difficulties and challenges associated with entering into new business areas and new geographic markets, the difficulties, challenges and costs associated with managing and integrating new facilities,*

*equipment and other assets, and the achievement of the anticipated benefits from such integrations, as well as risks associated with the acquired companies, businesses and products;*

- *factors relating to our ability to achieve all of the estimated synergies from our acquisitions as a result of cost-rationalization and integration initiatives. These factors may include greater than expected operating costs, the difficulty in eliminating certain duplicative costs, facilities and functions, and the outcome of many operational and strategic decisions, some of which have not yet been made;*

- *factors relating to our acquisition of Salix, including the impact of substantial additional debt on our financial condition and results of operations; our ability to effectively and efficiently integrate the operations of the Company and Salix; our ability to achieve the estimated synergies from this transaction; our ability to further reduce wholesaler inventory levels of certain of Salix's products and the timing of such reduction; and, once integrated, the effects of such business combination on our future financial condition, operating results, strategy and plans;*

- *our ability to secure and maintain third party research, development, manufacturing, marketing or distribution arrangements;*

- *our eligibility for benefits under tax treaties and the continued availability of low effective tax rates for the business profits of certain of our subsidiaries, including the impact on such matters of the recent reports published by the Organization for Economic Co-operation and Development (OECD) respecting base erosion and profit shifting (BEPS) and the potential enactment in law of such measures by individual countries;*

- *our substantial debt and debt service obligations and their impact on our financial condition and results of operations;*

- *our future cash flow, our ability to service and repay our existing debt, our ability to raise additional funds, if needed, and any restrictions that are or may be imposed as a result of our current and future indebtedness, in light of our current and projected levels of operations, acquisition activity and general economic conditions (including capital market conditions and a lack of liquidity therein);*

- *any downgrade by rating agencies in our corporate credit ratings, which may impact, among other things, our ability to raise additional debt capital and implement elements of our growth strategy;*

- *interest rate risks associated with our floating rate debt borrowings;*

- *the risks associated with the international scope of our operations, including our presence in emerging markets and the challenges we face when entering new geographic markets (including the challenges created by new and different regulatory regimes in such countries);*

- *adverse global economic conditions and credit markets and foreign currency exchange uncertainty and volatility in the countries in which we do business (such as the recent instability in Brazil, China, Russia, Ukraine and the Middle East);*

- *economic factors over which the Company has no control, including changes in inflation, interest rates, foreign currency rates, and the potential effect of such factors on revenues, expenses and resulting margins;*

- *the introduction of generic competitors of our branded products;*

- *our ability to obtain and maintain sufficient intellectual property rights over our products and defend against challenges to such intellectual property;*

- *the expense, timing and outcome of legal proceedings, arbitrations, investigations, tax and other regulatory audits, and regulatory proceedings and settlements thereof (including the matters assumed as part of our acquisition of Salix, the pending investigations by the U.S. Attorney's Office for the District of Massachusetts and the U.S. Attorney's Office for the Southern District of New York, the recent shareholder class action suits and other matters relating to our distribution and pricing practices);*

- *the risk that our products could cause, or be alleged to cause, personal injury and adverse effects, leading to potential lawsuits, product liability claims and damages and/or withdrawals of products from the market;*

- *the availability of and our ability to obtain and maintain adequate insurance coverage and/or our ability to cover or insure against the total amount of the claims and liabilities we face, whether through third party insurance or self-insurance;*

- *the difficulty in predicting the expense, timing and outcome within our legal and regulatory environment, including with respect to approvals by the U.S. Food and Drug Administration (the "FDA"), Health Canada and similar agencies in*

*other countries, legal and regulatory proceedings and settlements thereof, the protection afforded by our patents and other intellectual and proprietary property, successful generic challenges to our products and infringement or alleged infringement of the intellectual property of others;*

- *the results of continuing safety and efficacy studies by industry and government agencies;*

- *ongoing oversight and review of our products and facilities by regulatory and governmental agencies, including periodic audits by the FDA, and the results thereof;*

- *the availability and extent to which our products are reimbursed by government authorities and other third party payors, as well as the impact of obtaining or maintaining such reimbursement on the price of our products;*

- *the inclusion of our products on formularies or our ability to achieve favorable formulary status, as well as the impact on the price of our products in connection therewith;*

- *the impact of price control restrictions on our products, including the risk of mandated price reductions;*

- *the success of preclinical and clinical trials for our drug development pipeline or delays in clinical trials that adversely impact the timely commercialization of our pipeline products, as well as factors impacting the commercial success of our currently marketed products, which could lead to material impairment charges;*

- *the results of management reviews of our research and development portfolio, conducted periodically and in connection with certain acquisitions, the decisions from which could result in terminations of specific projects which, in turn, could lead to material impairment charges;*

- *negative publicity or reputational harm to, or other adverse impacts on, our Company, products and business, including as a result of the recent public scrutiny of our pricing and distribution practices, recent statements made by a short seller respecting our business practices and financial accounting and the pending investigations by the U.S. Attorney's Office for the District of Massachusetts and the U.S. Attorney's Office for the Southern District of New York;*

- *the outcome of the review of the Company's business relationship with Philidor Rx Services, LLC and the negative publicity or reputational harm to, or other adverse impacts on, the Company that could derive therefrom;*

- *the uncertainties associated with the acquisition and launch of new products, including, but not limited to, the acceptance and demand for new pharmaceutical products, and the impact of competitive products and pricing;*

- *our ability to obtain components, raw materials or finished products supplied by third parties and other manufacturing and related supply difficulties, interruptions and delays;*

- *the disruption of delivery of our products and the routine flow of manufactured goods;*

- *the seasonality of sales of certain of our products;*

- *declines in the pricing and sales volume of certain of our products that are distributed or marketed by third parties, over which we have no or limited control;*

- *compliance by the Company or our third party partners and service providers (over whom we may have limited influence), or the failure of our Company or these third parties to comply, with health care "fraud and abuse" laws and other extensive regulation of our marketing, promotional and pricing practices, worldwide anti-bribery laws (including the U.S. Foreign Corrupt Practices Act), worldwide environmental laws and regulation and privacy and security regulations;*

- *the impacts of the Patient Protection and Affordable Care Act (as amended) and other legislative and regulatory healthcare reforms in the countries in which we operate;*

- *potential ramifications, including possible financial penalties, relating to Salix's restatement of its historical financial results and our ability to address historical weaknesses in Salix's internal control over financial reporting;*

- *interruptions, breakdowns or breaches in our information technology systems; and*

- *other risks detailed from time to time in our filings with the U.S. Securities and Exchange Commission (the "SEC") and the Canadian Securities Administrators (the "CSA"), as well as our ability to anticipate and manage the risks associated with the foregoing.*

*Additional information about these factors and about the material factors or assumptions underlying such forward-looking statements may be found under Item 1A. "Risk Factors" of the Company's Annual Report on Form 10-K for the year ended*

*December 31, 2014, under Item 1A. "Risk Factors" of Part II of the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2015, under 1A. "Risk Factors" of Part II of this Form 10-Q, and in the Company's other filings with the SEC and CSA. When relying on our forward-looking statements to make decisions with respect to the Company, investors and others should carefully consider the foregoing factors and other uncertainties and potential events. These forward-looking statements speak only as of the date made. We undertake no obligation to update or revise any of these forward-looking statements to reflect events or circumstances after the date of this Form 10-Q or to reflect actual outcomes, except as required by law. We caution that, as it is not possible to predict or identify all relevant factors that may impact forward-looking statements, the foregoing list of important factors that may affect future results is not exhaustive and should not be considered a complete statement of all potential risks and uncertainties.*

**VALEANT PHARMACEUTICALS INTERNATIONAL, INC.**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(All tabular amounts expressed in millions of U.S. dollars, except per share data)**
**(Unaudited)**

*Acquisition-Related Costs*

The Company has incurred to date $9 million, in the aggregate, of transaction costs directly related to these business combinations, which includes expenditures for advisory, legal, valuation, accounting and other similar services. These costs have been expensed as acquisition-related costs.

*Revenue and Net Income*

The revenues of these business combinations for the period from the respective acquisition dates to September 30, 2015 were $540 million, in the aggregate, and net income was $141 million, in the aggregate. The net income includes the effects of the acquisition accounting adjustments and acquisition-related costs.

*(b) Business combinations in 2014 included the following:*

In the year ended December 31, 2014, the Company completed business combinations, which included the acquisition of the following businesses, for an aggregate purchase price of $1.43 billion. The aggregate purchase price included contingent consideration payment obligations with an aggregate acquisition date fair value of $133 million.

•     On July 7, 2014, the Company acquired all of the outstanding common stock of PreCision Dermatology, Inc. ("PreCision") for an aggregate purchase price of $459 million. Under the terms of the merger agreement, the Company agreed to pay contingent consideration of $25 million upon the achievement of a sales-based milestone for 2014. The fair value of this contingent consideration was determined to be nominal as of the acquisition date, based on the sales forecast. As the sales-based milestone was not achieved, no such payment was made. The Company recognized a post-combination expense of $20 million within Other (income) expense in the third quarter of 2014 related to the acceleration of unvested stock options for PreCision employees. In connection with the acquisition of PreCision, the Company was required by the Federal Trade Commission ("FTC") to divest the rights to PreCision's Tretin-X® (tretinoin) cream product and PreCision's generic tretinoin gel and cream products. PreCision develops and markets a range of medical dermatology products, treating a number of topical disease states such as acne and atopic dermatitis with products such as Locoid® and Clindagel®.

•     On January 23, 2014, the Company acquired all of the outstanding common stock of Solta Medical, Inc. ("Solta Medical") for $293 million, which includes $2.92 per share in cash and $44 million for the repayment of Solta Medical's long-term debt, including accrued interest. Solta Medical designs, develops, manufactures, and markets energy-based medical device systems for aesthetic applications, and its products include the Thermage CPT® system, the Fraxel® repair system, the Clear + Brilliant® system, and the Liposonix® system.

•     During the year ended December 31, 2014, the Company completed other smaller acquisitions, including the consolidation of variable interest entities, which were not material individually or in the aggregate. These acquisitions are included in the aggregated amounts presented below. Beginning in December 2014, the Company has consolidated Philidor Rx Services, LLC ("Philidor") pharmacy network, which includes R&O Pharmacy, LLC. The Company determined that based on its rights, including its option to acquire Philidor, Philidor is a variable interest entity for which the Company is the primary beneficiary, given its power to direct Philidor's activities and its obligation to absorb their losses and rights to receive their benefits. As a result, since December 2014, the Company has included the assets and liabilities and results of operations of Philidor in its consolidated financial statements. Net sales recognized through Philidor represent approximately 7% and 6% of the Company's total consolidated net revenue for the three-month and nine-month periods ended September 30, 2015, respectively, and the total assets of Philidor represent less than 1% of the Company's total consolidated assets as of September 30, 2015. The impact of Philidor as a consolidated entity on the Company's net revenues for 2014 was nominal.

*Assets Acquired and Liabilities Assumed*

These transactions have been accounted for as business combinations under the acquisition method of accounting. The following table summarizes the estimated fair values of the assets acquired and liabilities assumed related to the business combinations, in the aggregate, as of the applicable acquisition dates. The following recognized amounts related to certain smaller acquisitions are provisional and subject to change:

•     amounts for income tax assets and liabilities, pending finalization of estimates and assumptions in respect of certain tax aspects of the transaction; and

**VALEANT PHARMACEUTICALS INTERNATIONAL, INC.**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(All tabular amounts expressed in millions of U.S. dollars, except per share data)**
**(Unaudited)**

(3)     Developed Markets segment profit in the three-month and nine-month periods ended September 30, 2015 reflects the impact of acquisition accounting adjustments related to the fair value adjustments to inventory and identifiable intangible assets of $628 million and $1.50 billion, in the aggregate, primarily from the Salix Acquisition, compared with $224 million and $665 million in the corresponding periods of 2014.

(4)     Emerging Markets segment profit in the three-month and nine-month periods ended September 30, 2015 reflects the impact of acquisition accounting adjustments related to the fair value adjustments to inventory and identifiable intangible assets of $78 million and $230 million, in the aggregate, compared with $90 million and $243 million in the corresponding periods of 2014.

(5)     Corporate reflects non-restructuring-related share-based compensation expense of $40 million and $78 million in the three-month and nine-month periods ended September 30, 2015, respectively, compared with $11 million and $32 million in the corresponding periods of 2014.

**Segment Assets**

Total assets by segment as of September 30, 2015 and December 31, 2014 were as follows:

|  | As of September 30, 2015 | | As of December 31, 2014 | |
| --- | --- | --- | --- | --- |
| Assets: | | | | |
| Developed Markets[1] | $ | 40,336.3 | $ | 19,093.4 |
| Emerging Markets[1] | | 5,939.2 | | 6,332.9 |
| | | 46,275.5 | | 25,426.3 |
| Corporate | | 2,179.1 | | 901.0 |
| Total assets | $ | 48,454.6 | $ | 26,327.3 |

_____

(1)     Segment assets as of September 30, 2015 were impacted by the identifiable intangible assets and goodwill from the various acquisitions in the current year. See Note 3 for additional information regarding the current year acquisitions.

**18. SUBSEQUENT EVENTS**

On October 26, 2015, the Company announced that G. Mason Morfit, President of ValueAct Capital, was appointed to its board of directors effective immediately. Morfit had originally served on the Valeant Board of Directors from May 2007 to May 2014.

On October 26, 2015, the Company also announced that its Audit and Risk Committee and the full Board of Directors have reviewed the Company's accounting for its Philidor arrangement and have confirmed the appropriateness of the Company's related revenue recognition and accounting treatment. Based on its review conducted through that date, the Company believed that it was in compliance with applicable law. In light of the recent allegations made regarding Philidor, however, the Board of Directors decided to establish an ad hoc committee of the board to review allegations related to the Company's business relationship with Philidor and related matters. The committee is chaired by Robert Ingram, the Company's lead outside director. Other members will include Norma Provencio, chairman of the Audit and Risk Committee; Colleen Goggins; and Mason Morfit.

On October 19, 2015, the Company acquired Mercury (Cayman) Holdings, the holding company of Amoun Pharmaceutical ("Amoun"), for consideration of approximately $838 million, plus contingent payments. Amoun develops and markets a wide range of pharmaceutical brands in therapeutic areas such as anti-hypertensives, broad spectrum antibiotics, and anti-diarrheals in the Middle East and North Africa.

On October 1, 2015, the Company acquired Sprout Pharmaceuticals, Inc. ("Sprout"), pursuant to the merger agreement, among Sprout, the Company, Valeant, Miranda Acquisition Sub, Inc., a wholly owned subsidiary of Valeant, and Shareholder Representative Services LLC, as stockholder representative, on a debt-free basis, for approximately $1 billion in cash (the Company paid approximately $530 million, inclusive of customary purchase price adjustments, upon the closing of the transaction in October 2015, and an additional payment of $500 million is payable in the first quarter of 2016), plus a share of future profits based upon the achievement of certain milestones. Sprout has focused solely on the delivery of a treatment option for the unmet need of premenopausal women with acquired, generalized Hypoactive Sexual Desire Disorder as characterized by low sexual desire that causes marked distress or interpersonal difficulty and is not due to a co-existing medical or psychiatric condition, problems within the relationship, or the effects of a medication or other drug substance. In August

**VALEANT PHARMACEUTICALS INTERNATIONAL, INC.**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(All tabular amounts expressed in millions of U.S. dollars, except per share data)**
**(Unaudited)**

2015, Sprout received approval from the FDA on its New Drug Application ("NDA") for flibanserin, which is being marketed as Addyi™ in the U.S. Sprout also has global rights for flibanserin.

On October 1, 2015, pursuant to an agreement entered into with AstraZeneca Collaboration Ventures, LLC ("AstaZeneca"), the Company was granted an exclusive license to develop and commercialize brodalumab. Brodalumab is an IL-17 receptor monoclonal antibody in development for patients with moderate-to-severe plaque psoriasis and psoriatic arthritis. Under the agreement, the Company will hold the exclusive rights to develop and commercialize brodalumab globally, except in Japan and certain other Asian countries where rights are held by Kyowa Hakko Kirin Co., Ltd under a prior arrangement with Amgen Inc., the originator of brodalumab. The Company will assume all development costs associated with the regulatory approval for brodalumab. Regulatory submission in the U.S. and European Union for brodalumab in moderate-to-severe psoriasis is planned for the fourth quarter of 2015. Under the terms of the agreement, the Company made an up-front payment to AstraZeneca of $100 million in October 2015, and may pay additional pre-launch milestones of up to $170 million and further sales-related milestone payments of up to $175 million following launch. After approval, AstraZeneca and the Company will share profits.

# Exhibit 36

# Valeant Pharmaceuticals International, Inc.

**Investor Conference Call**
**October 26, 2015**





# Channel economics

- In Q3 2015, Philidor represented 6.8% of total Valeant revenue

- In Q3 2015, Philidor represented ~7% of Valeant EBITA

- Prescriptions through Philidor are less profitable than traditional channels due to lower copay rates, lower cash pay rates and more cash pay scripts in Philidor than in retail and other channels

VALEANT
Pharmaceuticals International, Inc.

# Exhibit 37

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

---

# FORM 8-K

---

### CURRENT REPORT
### Pursuant to Section 13 or 15(d)
### of the Securities Exchange Act of 1934

### Date of report (Date of earliest event reported): March 21, 2016

---

# VALEANT PHARMACEUTICALS INTERNATIONAL, INC.
#### (Exact name of registrant as specified in its charter)

---

| | | |
|---|---|---|
| **British Columbia, Canada** | **001-14956** | **98-0448205** |
| (State or other jurisdiction of incorporation) | (Commission file number) | (IRS Employer Identification No.) |

**2150 St. Elzéar Blvd. West, Laval, Quebec, Canada H7L 4A8**
**(Address of principal executive offices) (Zip Code)**

**(514) 744-6792**
**(Registrant's telephone number, including area code)**

**N/A**
**(Former name or former address, if changed since last report)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 2.02.**       **Results of Operations and Financial Condition.**

On March 21, 2016, Valeant Pharmaceuticals International, Inc. (the "Company") issued a press release announcing that it had reached a determination to restate certain prior period financial statements. The information contained in Items 4.02 and 9.01 of this Form 8-K is incorporated herein by reference.

**Item 4.02.**       **Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**

As previously disclosed, (i) on October 26, 2015, in light of allegations regarding the Company's relationship with Philidor Rx Services, LLC ("Philidor"), the Board of Directors (the "Board") established an ad hoc committee of the Board (the "Ad Hoc Committee") to review the allegations and related matters and (ii) on February 22, 2016, based on the work of the Ad Hoc Committee, as well as additional work and analysis by the Company, the Company preliminarily determined that approximately $58 million in net revenues relating to sales to Philidor during the second half of 2014 should not have been recognized upon delivery of product to Philidor.

On March 21, 2016, management of the Company, the Audit and Risk Committee (the "Committee") and the Board concluded that the Company's audited financial statements for the year ended, and unaudited financial statements for the quarter ended, December 31, 2014 included in the Company's Annual Report on Form 10-K and the unaudited financial statements included in the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2015 should no longer be relied upon due to the misstatements described below. In addition, due to the fact that the first quarter 2015 results are included within the financial results for the six-month period included in the Quarterly Report on Form 10-Q for the period ended June 30, 2015 and the financial results for the nine-month period included in the Quarterly Report on Form 10-Q for the period ended September 30, 2015, management, the Committee and the Board have concluded that the financial statements for such six-month and nine-month periods reflected in those Quarterly Reports should no longer be relied upon.

This determination is based on the findings of the Ad Hoc Committee and additional work and analysis by the Company. Based on this work, the Company determined that the earnings impact of certain revenue transactions should have been recognized at a later date than when originally recognized.

As previously disclosed, on December 15, 2014, a subsidiary of Valeant entered into a purchase option agreement with Philidor in which Valeant received an exclusive option to acquire 100% of the equity interest in Philidor, and as of which time Philidor was consolidated with the Company for accounting purposes as a variable interest entity for which the Company was the primary beneficiary. Prior to consolidation, revenue on sales to Philidor was recognized by the Company on a sell-in basis (i.e., recorded when the Company delivered product to Philidor). In connection with the work of the Ad Hoc Committee, the Company has determined that certain sales transactions for deliveries to Philidor in 2014 leading up to the option agreement were not executed in the normal course of business and included actions taken by the Company in contemplation of the option agreement. As a result of these actions, revenue for certain transactions should have been recognized on a sell-through basis (i.e., record revenue when Philidor dispensed the products to patients) prior to entry into the option agreement rather than incorrectly recognized on the sell-in basis utilized by the Company. Additionally, related to these and certain earlier transactions, the Company also has concluded that collectability was not reasonably assured at the time the revenue was originally recognized, and thus these transactions should have been recognized on a sell-through basis instead of a sell-in basis. Following the consolidation of Philidor at the option agreement date, the Company began recognizing revenue as Philidor dispensed product to patients.

The Company has identified misstatements to date that would reduce previously reported fiscal year 2014 revenue by approximately $58 million, net income attributable to Valeant by approximately $33 million, and basic and diluted earnings per share by $.09 (as compared to the previously reported amounts of $8,264 million for revenue, $914 million for net income attributable to Valeant and $2.72 and $2.67 for basic and diluted earnings per share respectively). A substantial part of the earnings impact of these misstatements will reverse in the first quarter of 2015. The Company has identified misstatements in the first quarter of 2015, consisting primarily of the reversing effect on earnings of the 2014 misstatements, which would reduce revenue by approximately $21 million (timing of recognition of managed care rebates), increase net income attributable to Valeant by approximately $24 million and increase basic and diluted earnings per share by $.07 (as compared to the previously reported amounts of $2,191

million for revenue, $74 million for net income attributable to Valeant and $.22 and $.21 for basic and diluted earnings per share respectively). The improper conduct of the Company's former Chief Financial Officer and former Corporate Controller, which resulted in the provision of incorrect information to the Committee and the Company's auditors, contributed to the misstatement of results described above.

The revenue that is being eliminated from 2014 does not result in an increase to revenue in 2015 as a result of the Company having previously also recognized that revenue in 2015. Under the sell-in method previously utilized by the Company prior to the consolidation of Philidor in December 2014, revenue was recognized upon delivery of the products to Philidor. At the date of consolidation, certain of that previously sold inventory was still held by Philidor. Subsequent to the consolidation, Philidor recognized revenue on that inventory when it dispensed products to patients, and that revenue was consolidated into the Company's results. As long as those pre-consolidation sales transactions were in the normal course of business and not entered into in contemplation of the option agreement, the Company's historical accounting for this revenue was in accordance with generally accepted accounting principles and consistent with its independent auditors' published guidance on this topic. Now that the Company has determined that certain sales transactions for deliveries to Philidor, leading up to the option agreement, were not executed in the normal course of business and included actions taken by the Company in contemplation of the option agreement, the revenue recorded in 2014, prior to the option agreement, is now being reversed. However, because that revenue was also recorded by Philidor subsequent to consolidation, upon dispensing of products to patients, the elimination of the revenue in 2014, prior to consolidation, does not result in additional revenue being recorded in 2015. However, the profit that was recognized in 2014 will now be recognized in 2015 as a reduction to previously recorded Cost of Goods Sold ("CGS") for that revenue (adjusting CGS from Philidor's acquisition cost to Valeant's actual cost). Additionally, provisions for managed care rebates of $21 million previously recorded in 2014 will now be recognized against that revenue in 2015. The adjustment amounts described above are preliminary, unaudited and subject to change.

The Company is in the process of restating the affected financial statements and the restated financial statements will be included in the Company's Annual Report on Form 10-K for the year ended December 31, 2015, which the Company intends to file with the SEC on or before April 29, 2016. The Company believes that after giving effect to the restatement it will have remained in compliance with all of the financial maintenance covenants in its credit facility at the end of each affected quarterly period.

As a result of the restatement, management is continuing to assess the Company's disclosure controls and procedures and internal control over financial reporting. Nevertheless, management, in consultation with the Committee, has concluded that one or more material weaknesses exist in the Company's internal control over financial reporting and that, as a result, internal control over financial reporting and disclosure controls and procedures were not effective as of December 31, 2014 and disclosure controls and procedures were not effective as of March 31, 2015 and subsequent interim periods in 2015 and that internal control over financial reporting and disclosure controls and procedures will not be effective at December 31, 2015.

As part of this assessment of internal control over financial reporting, the Company has determined that the tone at the top of the organization and the performance-based environment at the Company, where challenging targets were set and achieving those targets was a key performance expectation, may have been contributing factors resulting in the Company's improper revenue recognition and the conduct described above.

In connection with the Ad Hoc Committee's work to date, certain remediation actions have been recommended and are being implemented by the Company, including placing the Company's former Corporate Controller on administrative leave. The Board and the Talent and Compensation Committee, based on recommendations of the Ad Hoc Committee, have determined that the deficient control environment, among other things, would impact executive compensation decisions with respect to 2015 compensation for certain members of senior management. The Company is in the process of implementing additional remedial measures.

While the Ad Hoc Committee believes it is nearing completion of its review of accounting and financial reporting matters, it has not concluded its work, there remains a possibility that additional accounting adjustments may be identified that further impact prior periods and that additional remediation actions may be recommended.

Management, the Committee and the Board have discussed the matters disclosed in this Item 4.02 with the Company's independent registered public accounting firm, PricewaterhouseCoopers LLP.

**Item 9.01.      Financial Statements and Exhibits.**

(d)      **Exhibits**

99.1 Press Release of Valeant Pharmaceuticals International, Inc., dated March 21, 2016

**Forward Looking Statements**

Certain matters discussed in this Current Report on Form 8-K regarding expectations and beliefs constitute forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements are based on management's current beliefs, assumptions and expectations regarding future events, which in turn are based on information currently available to management. Such forward-looking statements include statements regarding materiality or significance, the quantitative effects of the restated financial statements, and any anticipated conclusions of the Company, the ad hoc committee, the Committee or the Board. We caution you not to place undue reliance on any such forward-looking statements. Several factors could cause actual results, as well as our expectations regarding materiality or significance, the restatement's quantitative effects, the effectiveness of our disclosure controls and procedures, and the effectiveness of our internal control over financial reporting, to differ materially from those expressed in or contemplated by the forward-looking statements. Such factors include, but are not limited to, the risk that additional information may arise out of the continuing review by the ad hoc committee of the Board or otherwise prior to the expected filing with the SEC of the restated financial statements, the preparation of our restated financial statements or other subsequent events that would require us to make additional adjustments, as well as inherent limitations in internal control over financial reporting. Other risk factors affecting the Company are discussed in detail in the Company's filings with the SEC, including its Annual Report on Form 10-K. We undertake no obligation to publicly update or revise any forward-looking statement, whether as a result of new information, future events or otherwise.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Date: March 21, 2016

**VALEANT PHARMACEUTICALS INTERNATIONAL, INC.**

By:  /s/ Robert L. Rosiello
     ——————————————————
     Robert L. Rosiello
     Executive Vice President, Chief Financial Officer

**EXHIBIT INDEX**

Exhibit
Number    Description

99.1      Press Release of Valeant Pharmaceuticals International, Inc., dated March 21, 2016

Exhibit 99.1



International Headquarters
2150 St. Elzéar Blvd. West
Laval, Quebec H7L 4A8
Phone: 514.744.6792
Fax: 514.744.6272

**Contact Information:**

Laurie W. Little
949-461-6002
laurie.little@valeant.com

Elif McDonald
905-695-7607
elif.mcdonald@valeant.com

Media:
Renée E. Soto/Meghan Gavigan
Sard Verbinnen & Co.
212-687-8080
rsoto@sardverb.com / mgavigan@sardverb.com

**VALEANT ANNOUNCES CEO SUCCESSION PLAN AND CHANGES TO BOARD OF DIRECTORS; PROVIDES ACCOUNTING AND FINANCIAL REPORTING UPDATE**

**Initiates Search for New CEO; J. Michael Pearson to Remain as CEO Until Successor is Named**

**William A. Ackman Joins Board of Directors; Katharine B. Stevenson Steps Down from Board**

**Ad Hoc Committee Review of Accounting and Financial Reporting Matters
Nearing Completion**

**Valeant Plans Restatement Based on Previously Announced Misstatements**

**Valeant Explains Circumstances that Resulted in Delay in the Filing of 10-K**

LAVAL, Quebec, March 21, 2016 – Valeant Pharmaceuticals International, Inc. (NYSE: VRX) (TSX: VRX) today announced that it has initiated a search for a new chief executive officer, appointed William A. Ackman to its board of directors, and provided an update on certain accounting and financial reporting matters.

**CEO Search**

Valeant today announced that the board has initiated a search to identify a candidate to succeed J. Michael Pearson as chief executive officer. Mr. Pearson will continue to serve as CEO and a director until his replacement is appointed.



Robert Ingram, chairman of the board, stated, "While the past few months have been difficult, Valeant has a collection of leading brands, valuable franchises and great people, and I am confident that the company will be able to rebuild its reputation and thrive under new leadership. We thank Mike for his dedicated service to Valeant and for agreeing to stay on until we conclude our search. As a colleague and a friend he will be missed, and we wish him the best for the future."

"It's been a privilege to lead Valeant for the past eight years," said J. Michael Pearson, chief executive officer. "While I regret the controversies that have adversely impacted our business over the past several months, I know that Valeant is a strong and resilient company, and I am committed to doing everything I can to ensure a smooth transition to new leadership."

**Changes to Board of Directors**

Valeant today announced that William A. Ackman, CEO of Pershing Square Capital Management, L.P., will join its board of directors, effective immediately. Mr. Ackman, whose firm has a 9.0% stake in Valeant, will join Pershing Square's Vice Chairman, Stephen Fraidin, on the board. As the maximum size of Valeant's board currently is fixed at 14 directors, Katharine B. Stevenson voluntarily resigned from the Board to create a vacancy to permit Mr. Ackman's appointment. The Board requested that former chief financial officer Howard Schiller tender his resignation as a director, but Mr. Schiller has not done so.

Robert Ingram, chairman of the board said, "We look forward to Bill Ackman's perspective and contributions as a new member of our board and one of Valeant's largest shareholders. The Board thanks our valued colleague, Kate, for her service on our Board and for voluntarily offering to step down in order to allow Bill Ackman to join the Board."

William A. Ackman, CEO of Pershing Square, said, "I am looking forward to working with the board to identify new leadership for Valeant. The company's large scale and dominant franchises in eye care, dermatology, GI, and other therapeutic areas coupled with its extraordinarily low valuation present a spectacular opportunity for a world-class health care executive. On behalf of all shareholders, we are extremely appreciative of Valeant employees' hard work and commitment during this challenging time for the company."

**Accounting and Financial Reporting Update**

As previously disclosed, on February 22, 2016, based on the work of an ad hoc committee of the Board (the "Ad Hoc Committee") established to review allegations regarding the company's relationship with Philidor and related matters, as well as additional work and analysis by the company, the company preliminarily determined that approximately $58 million in net revenue relating to sales to Philidor in the second half of 2014 should not have been recognized upon delivery of product to Philidor.

Management of the company, the Audit and Risk Committee (the "Committee") and the Board have concluded that the company's audited financial statements for the year ended, and unaudited financial statements for the quarter ended, December 31, 2014 included in the company's Annual Report on Form 10-K and the unaudited financial statements included in the company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2015 should no longer be relied upon due to the misstatements described in the company's Form 8-K filed today. In addition, due to the fact that the first quarter 2015 results are included within the financial results for the six-month period included in the Quarterly Report on Form 10-Q for the period ended June 30, 2015 and the financial results for the nine-month period included in the Quarterly Report on Form 10-Q for the period ended September 30, 2015, management, the Committee and the Board have concluded that the financial statements for such six-month and nine-month periods reflected in those Quarterly Reports should no longer be relied upon.



The company is in the process of restating the affected financial statements and the restated financial statements will be included in the company's Annual Report on Form 10-K for the year ended December 31, 2015, which the company intends to file with the Securities and Exchange Commission and the Canadian Securities Regulators on or before April 29, 2016. The company believes that after giving effect to the restatement, it will have remained in compliance with all of the financial maintenance covenants in its credit facility at the end of each affected quarterly period.

Robert Ingram, chairman of the board and chair of the Ad Hoc Committee stated, "Over the past five months, the Ad Hoc Committee has worked closely with our independent advisors to conduct a comprehensive review of Philidor and related matters. While the Ad Hoc Committee is still reviewing certain accounting related items, and has identified certain concerns related to those items with respect to the tone of the organization, it has not identified any additional items affecting the financial statements to date."

**Impact of Misstatements**

As described in the company's Form 8-K filed today, the company has identified misstatements to date that would reduce previously reported fiscal year 2014 revenue by approximately $58 million, net income attributable to Valeant by approximately $33 million, and basic and diluted earnings per share by $.09. A substantial part of the earnings impact of these misstatements will reverse in the first quarter of 2015. The company has identified misstatements in the first quarter of 2015, consisting primarily of the reversing effect on earnings of the 2014 misstatements, which would reduce revenue by approximately $21 million (timing of recognition of managed care rebates), increase net income attributable to Valeant by approximately $24 million and increase basic and diluted earnings per share by $.07. These adjustments are preliminary, unaudited and subject to change.

We refer you to the company's Form 8-K filed today for a more detailed description of the restatement.

**Assessment of Disclosure Controls and Procedures and Internal Controls Over Financial Reporting**

As a result of the restatement, management is continuing to assess the company's disclosure controls and procedures and internal control over financial reporting. Management, in consultation with the committee, has concluded that one or more material weaknesses exist in the company's internal control over financial reporting and that, as a result, internal control over financial reporting and disclosure controls and procedures were not effective as of December 31, 2014 and disclosure controls and procedures were not effective as of March 31, 2015 and the subsequent interim periods in 2015 and that internal control over financial reporting and disclosure controls and procedures will not be effective at December 31, 2015.

The improper conduct of the company's former Chief Financial Officer and former Corporate Controller, which resulted in the provision of incorrect information to the Committee and the company's auditors, contributed to the misstatement of results. In addition, as part of this assessment of internal control over financial reporting, the company has determined that the tone at the top of the organization and the performance-based environment at the company, where challenging targets were set and achieving those targets was a key performance expectation, may have been contributing factors resulting in the company's improper revenue recognition.



In connection with the Ad Hoc Committee's work to date, certain remediation actions have been recommended and are being implemented by the company, including placing the company's former Corporate Controller on administrative leave. The board and the talent and compensation committee, based on recommendations of the Ad Hoc Committee, have determined that the deficient control environment, among other things, would impact executive compensation decisions with respect to 2015 compensation for certain members of senior management. The company is in the process of implementing additional remedial measures.

**Circumstances that Resulted in Delay in the Filing of 10-K**

Valeant announced on October 30, 2015 that the Ad Hoc Committee appointed former Deputy Attorney General of the United States, Mark Filip of Kirkland & Ellis LLP, to advise the committee in its review. Over the past five months, Mr. Filip and his colleagues at Kirkland & Ellis have conducted more than 70 interviews and reviewed over one million documents as part of their comprehensive review to assist the Ad Hoc Committee. In addition to certain Philidor-related accounting matters, the Ad Hoc Committee determined that certain other accounting issues required review. That additional work, along with the administrative leave of our former Corporate Controller, has led to the delayed filing of Valeant's 10-K.

J. Michael Pearson, CEO of Valeant, said, "While we regret the circumstances that have resulted in the delay of our 10-K filing, we are committed to filing the 10-K on or before April 29, 2016."

**Covenant Highlights**

***Bond indentures:***

As discussed on its March 15, 2016 preliminary earnings call, Valeant could receive a notice of default under its bond indentures as a result of the delay in filing its Form 10-K for the year ended December 31, 2015.

If such notice is received, Valeant has 60 days from the receipt of the notice to file its 10-K, which will cure the default in all respects. The notice does not result in the acceleration of any of Valeant's indebtedness.

***Credit agreement:***

If Valeant does not file its Form 10-K by March 30, 2016, there will be a default under the credit facility. The company will have 30 days, or until April 29, to cure this default by filing its Form 10-K.

Valeant expects to file its Form 10-K and become current on its financial filings by April 29, 2016 (within the curing period) but to be prudent, the company also announced that it intends to seek a waiver from the lenders under its credit facility. The waiver that the company is seeking will include a request to extend the deadline to file its Form 10-K for December 31, 2015 and the deadline to file its Form 10-Q for the quarter ended March 31, 2016.

Robert L. Rosiello, Valeant's Chief Financial Officer, said, "I appreciate the dedication and effort of our finance staff, who are working diligently to complete and file our 10-K."



**Delay in Canadian Annual Filings**

Valeant announced today that it anticipates a delay in filing its audited annual financial statements for the year ended December 31, 2015, the related management's discussion and analysis, certificates of its CEO and CFO and its 2015 Form 10-K (collectively, the "Canadian Required Filings") with Canadian securities regulators until after the March 30, 2016 filing deadline. The company is working diligently and intends to make the Canadian Required Filings on or before April 29, 2016.

In connection with this anticipated delay, the company will apply for a customary management cease trade order (the "MCTO") relating to the trading in securities of the company by the company's CEO and CFO and each other member of the company's board of directors from the Autorité des marchés financiers, the company's principal regulator in Canada. If granted, the MCTO should not affect the ability of other shareholders to trade in the securities of the company.

If the MCTO is granted, the company intends to comply with the provisions of the alternative information guidelines set out in Canadian National Policy 12-203 Cease Trade Orders for Continuous Disclosure Defaults ("NP 12-203") by providing bi-weekly updates by way of news release until the Canadian Required Filings have been made.

**Mr. William A. Ackman**

Mr. Ackman is the founder and Chief Executive Officer of Pershing Square Capital Management. Mr. Ackman currently serves as a member of the board of Canadian Pacific Railway Limited, chairman of the board of The Howard Hughes Corporation, a trustee of the Pershing Square Foundation, a member of the Board of Trustees at The Rockefeller University and a member of the Board of Dean's Advisors of the Harvard Business School. Mr. Ackman holds an M.B.A. from Harvard Business School and a Bachelor of Arts magna cum laude from Harvard College.

**About Valeant**

Valeant Pharmaceuticals International, Inc. (NYSE/TSX:VRX) is a multinational specialty pharmaceutical company that develops, manufactures and markets a broad range of pharmaceutical products primarily in the areas of dermatology, gastrointestinal disorder, eye health, neurology and branded generics. More information about Valeant can be found at www.valeant.com.

**Forward-looking Statements**

This press release may contain forward-looking statements, including, but not limited to, statements regarding Valeant's Board of Directors. Forward-looking statements may generally be identified by the use of the words "anticipates," "expects," "intends," "plans," "should," "could," "would," "may," "will," "believes," "estimates," "potential," "target," or "continue" and variations or similar expressions. These statements are based upon the current expectations and beliefs of management and are subject to certain risks and uncertainties that could cause actual results to differ materially from those described in the forward-looking statements. These risks and uncertainties include, but are not limited to, risks and uncertainties discussed in the company's most recent annual or quarterly report and detailed from time to time in Valeant's other filings with the Securities and Exchange Commission and the Canadian Securities Administrators, which factors are incorporated herein by reference. In addition, as the Ad Hoc Committee has not concluded its work, there remains a possibility that additional accounting adjustments may be identified that further impact prior periods and additional remediation actions may be recommended. Readers are cautioned not to place undue reliance on any of these forward-looking statements. These forward-looking statements speak only as of the date hereof. Valeant undertakes no obligation to update any of these forward-looking statements to reflect events or circumstances after the date of this press release or to reflect actual outcomes, unless required by law.

###

# Exhibit 38

THOMSON REUTERS STREETEVENTS

# EDITED TRANSCRIPT

VRX.TO - Valeant Pharmaceuticals International Inc To Hold Investor
Conference Call

EVENT DATE/TIME: OCTOBER 26, 2015 / 12:00PM GMT

**OVERVIEW:**

On 10/26/15, Co. provided an investor update.

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited
without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its
affiliated companies.



## OCTOBER 26, 2015 / 12:00PM, VRX.TO - Valeant Pharmaceuticals International Inc To Hold Investor Conference Call

### CORPORATE PARTICIPANTS

**Laurie Little** *Valeant Pharmaceuticals International, Inc. - Head of IR*

**J. Michael Pearson** *Valeant Pharmaceuticals International, Inc. - Chairman and CEO*

**Bob Ingram** *Valeant Pharmaceuticals International, Inc. - Lead Independent Director*

**Ari Kellen** *Valeant Pharmaceuticals International, Inc. - Company Group Chairman*

**Howard Schiller** *Valeant Pharmaceuticals International, Inc. - Board Member and Former CFO*

**Robert Rosiello** *Valeant Pharmaceuticals International, Inc. - CFO*

**Tanya Carro** *Valeant Pharmaceuticals International, Inc. - Corporate Controller*

**Seana Carson** *Valeant Pharmaceuticals International, Inc. - Chief Compliance Officer*

**Robert Chai-Onn** *Valeant Pharmaceuticals International, Inc. - General Counsel*

### CONFERENCE CALL PARTICIPANTS

**Corey Davis** *Canaccord Genuity - Analyst*

**Alan Ridgeway** *Scotiabank - Analyst*

**Marc Goodman** *UBS - Analyst*

**Douglas Tsao** *Barclays Capital - Analyst*

**Andrew Finkelstein** *Susquehanna Financial Group - Analyst*

**Annabel Samimy** *Stifel Nicolaus - Analyst*

**Umer Raffat** *Evercore ISI - Analyst*

**David Common** *JPMorgan - Analyst*

### PRESENTATION

**Operator**

Good morning. My name is Steve and I will be your conference operator today. At this time I would like to welcome everyone to the Valeant investor conference call.

(Operator Instructions)

Head of Investor Relations, Laurie Little, you may begin your conference.

---

**Laurie Little** *- Valeant Pharmaceuticals International, Inc. - Head of IR*

Thank you, Steve. Good morning, everyone, and welcome to Valeant's investor conference call. In addition to a live webcast, a copy of today's slide presentation can be found on our website under the investor relations section.

Before we begin, our presentation today contains forward-looking information. We would ask that you take a moment to read the forward-looking statement legend at the beginning of our presentation, as it contains important information.

In addition, this presentation contains non-GAAP financial measures For more information about non-GAAP financial measures, please refer to slide 1. Non-GAAP reconciliations can be found in the press release issued earlier today and posted on our website.

2

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## OCTOBER 26, 2015 / 12:00PM, VRX.TO - Valeant Pharmaceuticals International Inc To Hold Investor Conference Call

Finally, the financial guidance in this presentation is effective only as of today. It is our policy to update our Firm guidance only through broadly disseminated public disclosure.

Participating on today's call are Robert Ingram, Lead Independent Director; Norma Provencio, Board Member, Chairman Audit and Risk Committee; Theo Melas-Kyriazi, Board Member, Member Audit and Risk Committee; Katherine Stevenson, Board Member, Member Audit and Risk Committee; Mason Morfit, Board Member, President of ValueAct Capital; Howard Schiller, Board Member, Former Chief Financial Officer; Robert Hale, Board Member, Partner of ValueAct Capital; J. Michael Pearson, Chairman and Chief Executive Officer; Tanya Carro, Corporate Controller; Seana Carson, Chief Compliance Officer; Robert Chai-Onn, General Counsel; Robert Rosiello, Chief Financial Officer; and Doctor Ari Kellen, Company Group Chairman.

With that, I will turn the call over to Mike.

---

**J. Michael Pearson** - *Valeant Pharmaceuticals International, Inc. - Chairman and CEO*

Thank you all for joining. We wanted to hold this call today because the Company I have heard described in the press the past week is not one that I recognize, it is not one that our Board of Directors recognizes, and it's certainly not one that reflects the reality of our business and day-to-day operations.

Some of that is our fault. We have been slow to answer some of the questions investors and the media have raised. And some of it is a function of false attacks and misleading statements by short sellers looking to profit from harming our stock.

We are going to get into the details today around these specific questions. But before we do, I wanted you all to hear directly from me about how we conduct business at Valeant.

Our Company's mission is to make drugs available that will improve people's lives, and do it more efficiently and with greater speeds than traditional pharmaceutical companies have been able to. Our commitment is to the patients who use our drugs, the doctors who prescribe them, our partners, who make them available across the country, and to our shareholders.

We operate our business based on the highest standards of ethics and we are committed to transparency. We follow the law, and we comply with accounting and disclosure rules. These values are the core of our business model, and if I find examples of violations, I will not hesitate to take action.

I know you all have questions in a number of areas. We've been hearing them from you the past week. We will address them as openly and candidly as we possibly can. So, as we go through this presentation, our team will try and answer the questions we have gotten over the past few days. Management is here to discuss these issues. But the audit committee and Board members are here, as well.

There are three points I want to make before we get into the presentation. First, as we made clear last week, the sensational claims made by the short seller Andrew Left, through his entity Citron, are completely untrue. His motivation is the same as someone who runs into a crowded theater to falsely yell fire. He wanted people to run.

He intentionally designed to report to frighten our shareholders, to drive down the price of our stock, so he could make money for his short selling. To protect our shareholders, after we saw the false report from Citron, we promptly coordinated with our outside regulatory counsel from Cahill to make a request that the SEC investigate Mr. Left and Citron. Our counsel has met with the SEC to discuss the matter.

Second, with respect to Philidor, the business model of using specialty pharmacies is sound and is an important part of our strategy. It is a model that delivers enormous benefits to both patients and physicians, and we know from their feedback how useful they find it. Furthermore, as we will detail in this call, we stand by our accounting treatment of Philidor completely.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



sales, which are eliminated in consolidation, bills Philidor at wholesale acquisition cost, or WAC, and records and intercompany receivable from Philidor or affiliates.

Philidor for itself or affiliates records receipt of inventory and also records an intercompany payable in the appropriate ledger. Philidor and its affiliates dispense prescriptions to patients and records third-party revenue which appears in Valeant's consolidated income statement at the net realized price. The difference between WAC inventory value and the net realized price for dispensed prescriptions is recorded as an intercompany receivable from Valeant which offsets the intercompany payable to Valeant.

Amounts collected from patients and payers are deposited into Philidor or affiliates' operating accounts. Intercompany payables are repaid biweekly to Valeant from Philidor or its affiliates' operating accounts. Amounts outstanding due from payers are reflected in Philidor's or affiliates' accounts receivable and in Valeant's consolidated balance sheet. Finally, unsold inventory at Philidor or its affiliates is included in Valeant's consolidated balance sheet at standard cost.

On the next slide, Valeant evaluates the accounting treatment of variable interest entities, or VIEs, in accordance with ASC 810. Philidor was considered a VIE prior to the purchase option agreement, but since Valeant was not determined to be the primary beneficiary, consolidation was not appropriate. A purchase option agreement for Philidor was executed in December 2014.

The finance and transactions committee, audit and risk committee, and full Board, all reviewed the transaction. The appropriate accounting treatment was determined by management and reviewed with the Audit and Risk Committee.

After the purchase option agreement was executed, the VIE analysis was updated. Valeant was determined to be the primary beneficiary and consolidation became a requirement.

Now I'd like to turn the call over to Tanya Carro.

---

**Tanya Carro** - *Valeant Pharmaceuticals International, Inc. - Corporate Controller*

Good morning. I am Tanya Carro and I am Valeant's Corporate Controller. I'm going to share with you some information regarding Valeant's financial control approach to Philidor and disclosure considerations relating to Philidor.

Philidor is included in Valeant's SOX 404 internal control testing and internal audit program for 2015. This includes both the business process and IT general controls testing. We co-sourced with a big four firm that conducts the testing for these programs on our behalf.

Valeant reviews the financials of the Philidor network pharmacies on a regular basis. The credit and collections team at Valeant, along with Philidor's CFO, monitor payment activity to ensure receipt of biweekly payments from Philidor and the affiliated pharmacies. Financial statements of Philidor network pharmacies our consolidated and reviewed monthly by Valeant, including review of accounts receivable and inventory balances, as well as the reconciliation of all intercompany balances.

Philidor is not considered to be material to Valeant's business for reporting purposes. At the time of the purchase option agreement in December 2014, Philidor's year-to-date net sales were $111 million. The GAAP requirement for disclosing sales to large customers is 10% of revenue, and the revenue from the smallest customer disclosed in 2014 was $0.9 billion.

Because of consolidation, Philidor and its affiliates are no longer customers for accounting purposes. If they were, however, they would still not require disclosure when applying this 10% threshold.

Valeant has a pre-established internal threshold for specifically disclosing transactions in the business combination footnotes to its quarterly and annual financial statements. And the purchase of the option to acquire Philidor did not meet this threshold.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## OCTOBER 26, 2015 / 12:00PM, VRX.TO - Valeant Pharmaceuticals International Inc To Hold Investor Conference Call

Valeant reviews this threshold at least annually with its Audit and Risk Committee and external auditors, and we make adjustments, as appropriate. The review includes benchmarking disclosures of other pharmaceutical companies and companies that are similarly acquisitive. Even if Valeant had acquired Philidor, the accounting treatment would have been the same and the transaction would not have met the pre-established threshold.

As Philidor was not considered to be material to Valeant for reporting purposes, it was not specifically mentioned prior to October 2015. The consolidation of variable interest entities, which includes Philidor and its affiliates, was disclosed in Valeant's 2014 10-K in two places. First, in footnote number 2 on critical accounting policies; second, it was disclosed in footnote 3 on business combinations.

Philidor was not specifically mentioned in our disclosures because it had not been material to the consolidated financial statements. It represented 1% or less of total assets and 7% or less of consolidated net revenues since the fourth quarter of 2014.

On our third-quarter earnings call last week, Valeant disclosed its relationship with Philidor in light of the R&O litigation and investor interest. There remained no obligation for a disclosure as the amounts are not material, and materiality is evaluated quarterly as part of Valeant's internal disclosure checklist. We will continue to share financial information on Philidor for the foreseeable future.

Now, let me turn to the questions. Question one, did you use an outside law firm to design the Philidor arrangement? Hogan Lovells advised us on structuring our distribution and services arrangement with Philidor, along with supporting our due diligence on the company.

Question two, how does Valeant account for other specialty pharmacies revenue? Pharmacies in the Philidor network, including R&O, are consolidated by Valeant, and net revenue is booked when the product is dispensed to a patient. Specialty pharmacies outside of the Philidor network are treated like the rest of our customers and revenue is recorded when they take ownership of the inventory.

Question three, are there any other accounting standards that could have been applied to Philidor with regard to revenues and/or inventories? Based on the rights acquired by Valeant with the option purchase, and applying the criteria described in ASC 810, the only appropriate treatment from an accounting perspective was determined to be consolidation.

Question four, are there any other consolidated specialty pharmacies or VIEs besides Philidor? Valeant consolidates two VIEs in addition to the Philidor network, PTK UM, the 15% minority interest owner of a company we acquired in Indonesia last year, and UAE Corp, a local shareholder of a company acquired in the UAE last year.

Now I would like to turn the call over to Seana.

---

**Seana Carson** - *Valeant Pharmaceuticals International, Inc. - Chief Compliance Officer*

Thank, Tanya. Good morning. I'm Seana Carson and I am Valeant's Chief Compliance Officer. At this point I will share with you some information regarding the diligence conducted by Valeant prior to entering into its option agreement with Philidor, as well as details regarding Valeant's oversight and rights.

All agreements between Valeant and Philidor have been reviewed or drafted by legal counsel. Our legal, compliance, regulatory and business diligence was conducted in connection with the purchase option and distribution services agreement with the assistance of our external advisors. This included multiple site visits.

Furthermore, Valeant negotiated representations, warranties, indemnities and ongoing covenants for its protection. The diligence conducted covered legal, regulatory, and compliance matters, including but not limited to corporate structure, pharmacy licensing, federal healthcare program requirements, privacy, pharmacy practices, and IT security. Last year the majority of Valeant Board, including the entire Audit and Risk Committee, went to tour the Philidor facility in Pennsylvania in person, ahead of completing the transaction.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



Number five, why did Philidor's suit with R&O seek $15 million if Valeant expects net revenues of $25 million? Philidor's suit references the total accounts receivable of $19.3 million, and also references $15 million as the amount that was due to be collected and deposited in the operating account by the end of August. The remaining $4.3 million was due to be collected and deposited in the operating account in September. The difference between the $19.3 million and the $25 million is the estimated value of inventory at WAC still on hand at R&O.

Question six, what financial and other support does Valeant provide to R&O? Valeant provides no financial or other support to R&O.

Question seven, why did you request payment from R&O when they said they never heard of Valeant? From January to July of this year, Valeant sent email invoices to R&O approximately 75 times, and R&O consistently received and paid these invoices. This is a recent collection dispute.

Question eight, did Philidor commit wrongdoing by shipping products to California residents without a California license? We understand that Philidor did not dispense products to patients in California; that Philidor only dispenses products to patients in states where Philidor has a nonresident license, and that does not include California; that Philidor has agreements with affiliated pharmacies that have California licenses, and those pharmacies have dispensed products to patients in California.

Question nine, did Philidor misuse R&O's NCPDP number? We understand that Philidor denies this allegation.

Question 10, are there two R&O websites? Are you sure you are suing the right person? R&O filed suit against Valeant. Valeant intends to file a counterclaim.

Number 11, why does R&O and Philidor have the same phone number? Philidor provides back-end services for R&O.

And now, I'd just like to turn the call back over to Mike.

---

**J. Michael Pearson** - *Valeant Pharmaceuticals International, Inc. - Chairman and CEO*

Thank you, Rob. We still believe that the strategy of working with specialty pharmacies is sound and it's good for patients and physicians. There have been no issues with regards to the accounting or revenue recognition of the business.

We have been working with outside counsel and we have found no evidence of illegal activity whatsoever at Philidor. We have created an ad hoc committee of independent directors to review the allegations that have surfaced related to the Company's business relationships with Philidor and related matters. Going forward, the Company will consider all options, which will include exercising our option to acquire Philidor, or to sever ties and move to one or more new third-party specialty pharmacies.

Even as we've been dealing with all the issues we have discussed today, we have been focused on performance and the business has continued to respond. We were pleased to report exceptional results for our third quarter. We once again exceeded both top-line and bottom-line guidance, and realized our fifth consecutive quarter of greater than 10% same-store organic growth.

This outperformance absorbs the negative foreign exchange impact of $172 million in revenues and $0.13 cash EPS, and continues to be primarily driven by the performance of our US businesses, particularly the stellar execution in both dermatology and contact lens. We also realized strong results in several key geographies outside the US, notably China, which saw 23% organic growth, South Korea at 15% growth, and Mexico with 10% organic growth.

We continue to see our sales integration exceeding expectations following the regulatory approval for Xifaxan IBS-D indication in May. And we recently launched both our unbranded and branded DTC campaigns. Sales inventory levels have been reduced to approximately 8 to 10 weeks.

We also have remained active on the business developed front, with eight deals signed in Q3, and all are closed as of today. Based on our strong base performance and despite the genericization of Targretin and Xenazine, we delivered GAAP cash flow of $737 million with a 90% cash conversion.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## OCTOBER 26, 2015 / 12:00PM, VRX.TO - Valeant Pharmaceuticals International Inc To Hold Investor Conference Call

One new point to address investors' questions -- for 2015, year to date, our promoted branded RX business showed organic growth of 53%. 32% of this was from volume, only 7% from pricing actions, and 14% from gross to net adjustments.

I would also like to clear up the confusion around Valeant's M&A and R&D strategies. These strategies have not changed. We continue to believe in our operating model that focuses on high output, low fixed cost R&D. Every project is reviewed and carefully evaluated on an individual basis. We do expect our overall R&D spend to increase, but that is nationally tied to a growing business and not tied to a fundamental shift in our strategy.

We now have an eight-year track record of effectively deploying capital through small, medium, and large transactions. We will continue to pursue both small and medium deals, and look to opportunistically pursue larger deals, as appropriate.

With the noise that accumulated this week, I want to reiterate our expectations for the business going forward. As we mentioned last week, we have identified and incorporated some headwind adjustments, such as continued FX erosion and new expectations for future pricing environment, into our future expectations. Given the continued healthy growth in dermatology, Salix, eye health, and the recent Addyi launch, we expect to meet or exceed our fourth-quarter projections, excluding the one-time expenses associated with recent events.

In addition, we continue to be very comfortable with our 2016 EBITDA expectation of greater than $7.5 billion. While we are not anticipating any impact, it is hard to predict how and whether recent events will impact the business in the short term.

Before we turn to questions, I want to close by thanking all of their employees who have stayed just as dedicated as ever to deliver on our mission, even as we have dealt with the issues we are discussing here today. Our employees are the backbone of this Company,, and their commitment to its success is why we are so confident that we will continue to deliver the results for which we are known.

We have also heard from a number of physicians, patients, long-term shareholders, and business partners over the past few days. And we truly appreciate their support, as well. They are the reason we are in this business. And we look forward to continuing to perform for them at the same high level as we always have.

So, with that, we will conclude our formal remarks and we will open up the line to questions.

---

### QUESTIONS AND ANSWERS

**Operator**

(Operator Instructions)

Corey Davis, Canaccord.

---

**Corey Davis** - *Canaccord Genuity - Analyst*

Thanks very much. Bob, it's very good to hear that you're so involved in this process, but my question is for Mike.

What are your current plans for the neuro and other division? And have they changed at all since last Monday?

---

**J. Michael Pearson** - *Valeant Pharmaceuticals International, Inc. - Chairman and CEO*

Hi, Corey. Thanks.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## OCTOBER 26, 2015 / 12:00PM, VRX.TO - Valeant Pharmaceuticals International Inc To Hold Investor Conference Call

**Douglas Tsao** - *Barclays Capital - Analyst*

But is there any kind of structure for insight into the day-to-day operations currently?

---

**Seana Carson** - *Valeant Pharmaceuticals International, Inc. - Chief Compliance Officer*

No, Philidor is operated independently.

---

**Douglas Tsao** - *Barclays Capital - Analyst*

Great. Thank you very much for all the color this morning.

---

**Operator**

Andrew Finkelstein, Susquehanna Financial Group.

---

**Andrew Finkelstein** - *Susquehanna Financial Group - Analyst*

Thanks for taking the question. I was hoping you could address your distribution around the world, and in particular whether you have any non-traditional models that you're using outside the US. Obviously what is typical varies by country but models aren't typical for the particular country that you are operating in. Thanks.

---

**J. Michael Pearson** - *Valeant Pharmaceuticals International, Inc. - Chairman and CEO*

I am not aware of any non-traditional distribution arrangements either in this country or outside the country.

---

**Operator**

Annabel Samimy, Stifel.

---

**Annabel Samimy** - *Stifel Nicolaus - Analyst*

Hi. Thanks for taking my questions.

I was curious, what is this threshold that would be used to decide whether you would continue this relationship with this pharmacy or move on to other pharmacies? And if specialty pharmacies in general account for less than 10% of your business, even without a specialty pharmacy can you maintain the growth that you have right now in your business? Thank you.

---

**J. Michael Pearson** - *Valeant Pharmaceuticals International, Inc. - Chairman and CEO*

Sure. I think we will allow the ad hoc committee to do their work. And once that is completed, we will make a decision on Philidor. Obviously, in parallel, we will develop contingency plans if we choose not to continue with Philidor.

What's very important is we really care about our physicians and our patients. And we want to make sure that physicians and patients, which I don't think has been talked about a whole lot in terms of Philidor, they really love this access program. So, we want to make sure there's continuity in the programs that we offer whether it's with Philidor or with other specialty pharmacies. The second question was -- I'm sorry?

17

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



OCTOBER 26, 2015 / 12:00PM, VRX.TO - Valeant Pharmaceuticals International Inc To Hold Investor Conference Call

**Annabel Samimy** - *Stifel Nicolaus - Analyst*

If specialty pharmacies account for such a small portion of your revenues and your EBITDA, if you took away specialty pharmacies overall, what kind of impact would that have?

**J. Michael Pearson** - *Valeant Pharmaceuticals International, Inc. - Chairman and CEO*

It is impossible to know for sure what prescriptions that currently are flowing to specialty pharmacies in dermatology would then go back into the traditional channel. Many things are driving our growth.

One is our access programs. One is our sales force efforts. Another is DTC. And another is all the other commercial activities that we have. So, if I were to guess, it would slow our growth but not dramatically.

**Annabel Samimy** - *Stifel Nicolaus - Analyst*

Okay. Thank you.

**J. Michael Pearson** - *Valeant Pharmaceuticals International, Inc. - Chairman and CEO*

And Howard, as a good a former CFO, mentioned, any scripts that do end up going through traditional channel would be more profitable.

**Operator**

Umer Raffat, Evercore ISI.

**Umer Raffat** - *Evercore ISI - Analyst*

Hi, guys, thanks for taking my questions. I have a few, if I may.

First, as for the 10-K, in US you have about 50% of your revenues going through McKesson and Amerisource. Can you break down the remaining 50% for specialty pharmacies but also physician dispensaries? That's the first.

Second, are you are indemnified from Philidor liabilities based on the email address issue and the Wall Street Journal article?

Third, and I have gone back and forth with Lori on this, are you or are you not consolidating R&O altogether? And is does that include non-Valent sales? I still don't have it straight.

Fourth, Philidor is 5.9% of Valeant revs. Specialty pharmacies are 7.2%. Can you tell us what the other ones are?

And then, finally, Howard, good to have you back on the call. And I have one for you and this may not be the most comfortable question but I feel like a lot of us outside Valeant, including me, haven't really figured out your decision-making process behind moving on.

And I know you went over you rationale previously but I feel like no one is satisfied and I keep getting that question from many investors in many meetings. So, I would appreciate all your input there. Thank you.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



# Exhibit 39

# Valeant To Terminate Relationship With Philidor

October 30, 2015

LAVAL, Quebec, Oct. 30, 2015 /PRNewswire/ -- Valeant Pharmaceuticals International, Inc. (NYSE: VRX) (TSX: VRX) announced today that it is severing all ties with Philidor Rx Services, LLC, and that Philidor has informed Valeant that it will shut down operations as soon as possible, consistent with applicable laws.

"The newest allegations about activities at Philidor raise additional questions about the company's business practices," said J. Michael Pearson, Valeant's chairman and chief executive officer. "We have lost confidence in Philidor's ability to continue to operate in a manner that is acceptable to Valeant and the patients and doctors we serve."

"We understand that patients, doctors and business partners have been disturbed by the reports of improper behavior at Philidor, just as we have been," Pearson said. "We know the allegations have also led them to question Valeant and our integrity, and for that I take complete responsibility. Operating honestly and ethically is our first priority, and you have my absolute commitment that we will make it right."

Valeant intends to develop a plan to ensure patients' access to drugs is minimally disrupted. Valeant has informed Philidor that to the extent that managed care plans will no longer reimburse prescriptions in process, Valeant will fill them at the company's expense.

"We are committed to doing everything we can to provide important medicines to the patients and doctors who depend on them, and will continue to explore relationships with the full range of pharmacies to ensure patients have access to the drugs they need," Pearson said.

In the Third Quarter 2015, Philidor represented 6.8% of total Valeant revenue.

**About Valeant**

Valeant Pharmaceuticals International, Inc. (NYSE/TSX:VRX) is a multinational specialty pharmaceutical company that develops, manufactures and markets a broad range of pharmaceutical products primarily in the areas of dermatology, gastrointestinal disorder, eye health, neurology and branded generics. More information about Valeant can be found at **www.valeant.com**.

**Forward-looking Statements**

This press release may contain forward-looking statements, including, but not limited to, statements regarding the termination of Valeant's relationship with Philidor, the timing of the shutdown of Philidor operations, Valeant's plans to ensure patients' access to drugs and the potential disruption of such access and Valeant's filling of prescriptions not reimbursed by managed care plans.  Forward-looking statements may generally be identified by the use of the words "anticipates," "expects," "intends," "plans," "should," "could," "would," "may," "will," "believes," "estimates," "potential," "target," or "continue" and variations or similar expressions. These statements are based upon the current expectations and beliefs of management and are subject to certain risks and uncertainties that could cause actual results to differ materially from those described in the forward-looking statements. These risks and uncertainties include, but are not limited to, risks and uncertainties discussed in the Company's most recent annual or quarterly report and detailed from time to time in Valeant's other filings with the Securities and Exchange Commission and the Canadian Securities Administrators, which factors are incorporated herein by reference. Readers are cautioned not to place undue reliance on any of these forward-looking statements. These forward-looking statements speak only as of the date hereof.  Valeant undertakes no obligation to update any of these forward-looking statements to reflect events or circumstances after the date of this press release or to reflect actual outcomes, unless required by law.

**Contact Information:**
Laurie W. Little
949-461-6002
laurie.little@valeant.com

Elif McDonald
905-695-7607
elif.mcdonald@valeant.com

Media:
Renee E. Soto/Meghan Gavigan
Sard Verbinnen & Co.
212-687-8080
rsoto@sardverb.com / mgavigan@sardverb.com



Logo - http://photos.prnewswire.com/prnh/20101025/LA87217LOGO

To view the original version on PR Newswire, visit:http://www.prnewswire.com/news-releases/valeant-to-terminate-relationship-with-philidor-300169414.html

# Exhibit 40

THOMSON REUTERS STREETEVENTS

# EDITED TRANSCRIPT

VRX.TO - Valeant Pharmaceuticals International Inc Conference Call to Provide Business Update

EVENT DATE/TIME: NOVEMBER 10, 2015 / 1:00PM GMT

**OVERVIEW:**

On 11/10/15, VRX provided a business update.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## NOVEMBER 10, 2015 / 1:00PM, VRX.TO - Valeant Pharmaceuticals International Inc Conference Call to Provide Business Update

**Operator**

Good morning, my name is Keith, and I'll be your conference operator today. At this time, I'd like to welcome everyone to the Valeant Pharmaceuticals investor call.

(Operator Instructions)

Thank you. Laurie Little, head of Investor Relations, you may begin your conference.

---

**Laurie Little** - *Valeant Pharmaceuticals International, Inc. - Head of IR*

Thanks, Keith. Good morning, everyone, and welcome to today's investor conference call. Participating on today's call are J. Michael Pearson, Chairman and Chief Executive Officer; Rob Rosiello, Chief Financial Officer; Dr. Ari Kellen, Company Group Chairman; Deb Jorn, Company Group Chairman; and Tanya Carro, Corporate Controller.

Before we begin, our call today contains forward-looking information. Certain statements made during this call including the Q&A session may constitute forward-looking statements, including but not limited to statements regarding the Philidor transition and wind-up, future patient access programs, the impacts of recent events including Philidor and investigations by Congress or other governmental agencies on our business operations, our expectations regarding the performance and the growth of our business operations, timing and outcome of development programs, our balance sheet and debt repayment, future guidance and the review of the ad hoc committee of the Board.

Forward-looking statements may generally be identified by the use of the words anticipates, expects, intends, plans, should, could, would, may, will, believe, estimates, potential, target or continue, and variations or similar expressions. These statements are based upon the current expectation and beliefs of management and are subject to certain risks and uncertainties that could cause actual results to differ materially from those described in the forward-looking statements.

These risks and uncertainties include, but are not limited to, risks and uncertainties discussed in the Company's most recent annual or quarterly report, and detailed from time to time in Valeant's other filings with the Securities and Exchange Commission, and the Canadian securities administrators, which factors are incorporated herein by reference. Listeners are cautioned not to place undue reliance on any of these forward-looking statements. These forward-looking statements speak only as of the date hereof.

Valeant undertakes no obligation to update any of these forward-looking statements to reflect events or circumstances after the date of this call to reflect actual outcomes except to the extent required by law. And with that, I will turn the call over to Mike.

---

**J. Michael Pearson** - *Valeant Pharmaceuticals International, Inc. - Chairman and CEO*

Thank you, Laurie. Good morning, and thank you all for joining. We are holding this call today to update you on our strategy with respect to specialty pharmacies, to explain our transition plans for Philidor, to discuss our business performance for the first half of the quarter, and perhaps most importantly, to take questions from all of you.

Let me start discussing specialty pharmacies and our transition plans for patients and doctors who were using Philidor to fill prescriptions. Our original goal in working with the specialty pharmacy channel was to develop an innovative solution to a problem we often heard from healthcare professionals prescribing dermatology products, that their patients were not receiving the medications that they prescribed at affordable prices.

Specialty pharmacies address these concerns by adjudicating claims and ensuring that prescriptions that should be covered by commercial insurance are dispensed to patients in an efficient manner. They can also provide prescriptions to non-government program patients who aren't covered for that product at an affordable cost. Specialty pharmacies are used by all of our major competitors in the dermatology space and there are numerous specialty pharmacies throughout the country.

3

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



NOVEMBER 10, 2015 / 1:00PM, VRX.TO - Valeant Pharmaceuticals International Inc Conference Call to Provide Business Update

**Douglas Tsao** - *Barclays Capital - Analyst*

Hi, good morning, thanks, Mike. I believe in terms of the disruption that you expect to see in dermatology, is this basically just sort of a framework for how we should think about it, if we think that sort of like half that business? How much can transition to sort of traditional channels more quickly, or do you think much of that volume really does need to stay to sort of a specialty pharmacy channel and sort of really hinges on your ability to get that up and running?

**J. Michael Pearson** - *Valeant Pharmaceuticals International, Inc. - Chairman and CEO*

So if you look at our derm scripts, more than half flow through traditional pharmacies. And at least to date, we're seeing continued strong script growth in that channel. In specialty, we, obviously, had a disruption. Now I think a lot of scripts were filled last week, but they were all filled for free.

So in terms of short-term financials, that will, obviously, have an impact for the rest of the quarter. I do believe we need to put in place a new specialty program to complement the retail scripts, and we are working very hard on that and we will hope to have a solution sometime this quarter. We're also spending a huge amount of time out with doctors.

Ari and I have been going around the country, and we'll continue to go around the country, seeing doctors in all the major cities and the response has been quite good. Most of these doctors really appreciate all the investment we've made in their profession over the last couple of years, and they really like our product portfolios and they really like our people.

So we view this as getting a new solution in place that hopefully will, again, be the best in the industry. The one thing we'll do this time is make sure that these relationships are solely contractual.

**Douglas Tsao** - *Barclays Capital - Analyst*

And then just in terms of the volumes and the scripts, did you have some script writers who were almost wholly going through specialty?

**J. Michael Pearson** - *Valeant Pharmaceuticals International, Inc. - Chairman and CEO*

Yes. Many doctors will prefer to go to specialty because of callbacks and other things, but, again, patients will make their own choices. It's a patient decision whether they use a specialty pharmacy or whether they use retail. And I think a lot of patients who have good coverage just prefer going to retail. I think the patients that go to specialty tend to be ones that are not as well covered, or that they're looking for a cash pay option.

**Operator**

Chris Schott from JPMorgan.

**Chris Schott** - *JPMorgan - Analyst*

Great, thanks very much for the question. Just a question on broader payer relationships. How contained is this controversy with Philidor? I guess, have you had higher level discussions with payers, and are you comfortable that these issues aren't going to impact the formulary status of the broader portfolio at the Company?

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



# Exhibit 41

# Valeant Ad Hoc Committee has Made Substantial Progress in Its Review of Philidor and Related Accounting Matters

February 22, 2016

LAVAL, Quebec, Feb. 22, 2016 /PRNewswire/ -- Valeant Pharmaceuticals International, Inc. (NYSE: VRX) (TSX: VRX) ("Valeant" or the "Company") today announced that based on the work of  the Ad Hoc Committee of the Board of Directors appointed to review the Company's relationship with Philidor and related matters, as well as additional work and analysis by the Company, the Company has preliminarily identified certain sales to Philidor during 2014, prior to Valeant's entry into an option to acquire Philidor, that should have been recognized when product was dispensed to patients rather than on delivery to Philidor.

The Company currently believes that approximately $58 million of net revenues previously recognized in the second half of 2014 should not have been recognized upon delivery of product to Philidor.  Correcting the misstatements is expected to reduce reported 2014 GAAP EPS by approximately $0.10 and increase 2015 GAAP EPS by approximately $0.09.  Following entry into the option to acquire Philidor in December 2014, the Company began to consolidate Philidor's accounts and began to recognize sales to Philidor only when dispensed to patients, and no similar adjustments would be necessary for sales after that date.

The Company expects to delay filing its 2015 10-K pending completion of the review of related accounting matters by the Ad Hoc Committee, with the assistance of its independent advisors, and the Company's ongoing assessment of the impact on financial reporting and internal controls.

"This determination and the need to delay our 10-K filing are very disappointing but necessary," stated Howard Schiller, interim chief executive officer.  "We remain committed to improving reporting procedures, internal controls and transparency for our investors."

Mr. Schiller continued, "Valeant has a collection of great healthcare brands -- including strong franchises in dermatology, ophthalmology, gastro-intestinal health and consumer products -- with an exceptional team responsible for building and growing these franchises.  The last few months have been challenging on many levels.  We have made mistakes in the past and our focus today is on executing our business plan and rebuilding trust."

Robert Ingram, interim chairman of the board and head of the Ad Hoc Committee said, "The Ad Hoc Committee has made substantial progress in its review of Philidor and related accounting matters and we believe this correction is an important step forward.  Valeant is a strong company and we as a Board, Ad Hoc Committee and Company are working to restore confidence among investors and Valeant's other constituencies."

The preliminary, unaudited financial information provided above with respect to currently anticipated adjustments to 2014 and 2015 should not be viewed as final and remains subject to change based on the Company's ongoing procedures and review with respect to such periods.  In addition, the Ad Hoc Committee is continuing its review of the circumstances relating to the misstatements and appropriate actions to be taken.

**February 29, 2016 Conference Call Information**

 Company plans to host a conference call at 8:00 a.m. ET (5:00 a.m. PT), February 29, 2016 to discuss unaudited financial results for the fourth quarter of 2015, and provide a business update. The dial-in number to participate on this call is (877) 876-8393 confirmation code 36137959. International callers should dial (973) 200-3961, confirmation code 36137959. A replay will be available approximately two hours following the conclusion of the conference call through March 7, 2016 and can be accessed by dialing (855) 859-2056, or (800) 585-8367, confirmation code 36137959.

**About Valeant**

Valeant Pharmaceuticals International, Inc. (NYSE/TSX:VRX) is a multinational specialty pharmaceutical company that develops, manufactures and markets a broad range of pharmaceutical products primarily in the areas of dermatology, gastrointestinal disorder, eye health, neurology and branded generics. More information about Valeant can be found at www.valeant.com.

**Forward-looking Statements**

This press release may contain forward-looking statements, including, but not limited to, statements regarding Valeant's management, financial reporting, future prospects and ability to execute its strategic plan.  Forward-looking statements may generally be identified by the use of the words "anticipates," "expects," "intends," "plans," "should," "could," "would," "may," "will," "believes," "estimates," "potential," "target," or "continue" and variations or similar expressions. These statements are based upon the current expectations and beliefs of management and are subject to certain risks and uncertainties that could cause actual results to differ materially from those described in the forward-looking statements. These risks and uncertainties include, but are not limited to, risks and uncertainties discussed in the Company's most recent annual or quarterly report and detailed from time to time in Valeant's other filings with the Securities and Exchange Commission and the Canadian Securities Administrators, which factors are incorporated herein by reference. Readers are cautioned not to place undue reliance on any of these forward-looking statements.  Valeant has not completed its review procedures with respect to 2015 financial information or adjustments to 2014 financial information, and the information herein may be subject to change based on such review, including the subsequent identification of other adjustments.  These forward-looking statements speak only as of the date hereof. Valeant undertakes no obligation to update any of these forward-looking statements to reflect events or circumstances after the date of this press release or to reflect actual outcomes, unless required by law.

**Contact Information:**

Laurie W. Little
949-461-6002
laurie.little@valeant.com

Elif McDonald
905-695-7607
elif.mcdonald@valeant.com

Media:
Renée E. Soto/Meghan Gavigan
Sard Verbinnen & Co.
212-687-8080
rsoto@sardverb.com / mgavigan@sardverb.com



Logo - http://photos.prnewswire.com/prnh/20101025/LA87217LOGO

To view the original version on PR Newswire, visit:http://www.prnewswire.com/news-releases/valeant-ad-hoc-committee-has-made-substantial-progress-in-its-review-of-philidor-and-related-accounting-matters-300224251.html

SOURCE Valeant Pharmaceuticals International, Inc.

# Exhibit 42

# /C O R R E C T I O N -- Valeant Pharmaceuticals International, Inc./

March 15, 2016

In the news release, Valeant Pharmaceuticals Reports Preliminary Unaudited Fourth Quarter 2015 Financial Information, issued 15-Mar-2016 by Valeant Pharmaceuticals International, Inc. over PR Newswire, we are advised by the Company that under the "Next Four Quarters (Second Quarter 2016 - First Quarter 2017) Guidance" section, the third bullet should read "Adjusted EBITDA (non-GAAP) expected to be ~$6.0 billion" rather than "Adjusted EBITDA (non-GAAP) expected to be ~$6.2 - $6.6 billion" as originally issued inadvertently. The complete, corrected release follows:

## Valeant Pharmaceuticals Reports Preliminary Unaudited Fourth Quarter 2015 Financial Information

### Company Provides New 2016 Guidance

LAVAL, Quebec, March 15, 2016 /PRNewswire/ -- Valeant Pharmaceuticals International, Inc. (NYSE: VRX) (TSX: VRX) (the "Company") today announced preliminary unaudited financial information for the fourth quarter 2015.

As a result of the ongoing work of the Company's Ad Hoc Committee of the Board of Directors appointed to review the Company's relationship with Philidor and related matters, and the Company's ongoing assessment of the impact of the committee's findings on financial reporting and internal controls, the unaudited fourth quarter 2015 results are preliminary and, as previously announced, the Company has delayed the filing of its Annual Report on Form 10-K for the year ended December 31, 2015. The Company is working diligently and intends to file the Form 10-K as promptly as reasonably practicable.

### Fourth Quarter 2015 Preliminary Highlights:

- Unaudited Revenue of $2.8 billion
- Unaudited GAAP EPS ($0.98); Adjusted EPS (non-GAAP) $2.50
- Unaudited GAAP Cash Flow from Operations $562 million; Adjusted Cash Flow from Operations (non-GAAP)  $838 million

Preliminary unaudited fourth quarter results were impacted by softer-than-expected sales of the gastrointestinal business, as compared to previous guidance issued in December, driven by reductions in the wholesale and retail channel in reaction to Valeant's announcement of an agreement with Walgreens.

### First Quarter 2016 Guidance Update

- Total Revenue expected to be $2.3 - $2.4 billion from previous guidance of $2.8 - $3.1 billion
- Adjusted EPS (non-GAAP) expected to be $1.30 - $1.55 from previous guidance of $2.35 - $2.55

First quarter 2016 results have been impacted by continued inventory destocking in dermatology and GI, revenue shortfalls in several business such as Ophthalmology Rx, Commonwealth, Western Europe, Women's Health, Solta and Obagi, and little to no corresponding cost reductions to compensate.  In addition, management transition issues and continued organizational distractions are expected to negatively impact operations during the quarter.

### 2016 Guidance Update

- Total Revenue expected to be $11.0 - $11.2 billion from previous guidance of $12.5 - $12.7 billion
- Adjusted EPS (non-GAAP) expected to be $9.50 - $10.50 from previous guidance of $13.25 - $13.75
- Adjusted EBITDA (non-GAAP) expected to be $5.6 - $5.8 billion from previous guidance of $6.9 - $7.1 billion

Financial guidance for 2016 reflects reduced revenue assumptions for certain businesses, new managed care contracts and increased investment in key functions, such as financial reporting, public and government relations and compliance, as well as the impact of the weak first quarter of 2016.

To get a better sense of our business on a go forward basis, we are also providing guidance for the next four quarters – Second Quarter 2016 through First Quarter 2017.

### Next Four Quarters (Second Quarter 2016 – First Quarter 2017) Guidance

- Total Revenue expected to be $11.6 - $11.8 billion
- Adjusted EPS (non-GAAP) expected to be $10.75 - $11.25
- Adjusted EBITDA (non-GAAP) expected to be ~$6.0 billion

"The challenges of the past few months are not yet behind us and our goal for 2016 is to better balance our priorities across all of our constituencies - physicians, patients, employees, payors, debt holders and shareholders," said J. Michael Pearson, chief executive officer. "I want to again thank all our dedicated employees, as well as the entire management team, for their diligence throughout this difficult time to ensure that the business remains solid."

Pearson continued, "In discussion with the Board, we have assumed lower growth in our U.S. dermatology, gastrointestinal, and woman's health portfolios as well as certain consumer markets like Western Europe, while keeping our synergies largely unchanged. We plan to work hard to improve these metrics by delivering higher revenues and reducing our costs and, if successful, we hope to beat this guidance in the quarters to come. In the meantime, we are comfortable with our current liquidity position and cash flow generation for the rest of the year, and remain well positioned to meet our obligations."

**Note About Preliminary Results**

The financial results presented in this release are preliminary and may change. This preliminary financial information includes calculations or figures that have been prepared internally by management and have not been reviewed or audited by our independent registered public accounting firm.  There can be no assurance that the Company's actual results for the period presented herein will not differ from the preliminary financial data presented herein and such changes could be material.  This preliminary financial data should not be viewed as a substitute for full financial statements prepared in accordance with GAAP and is not necessarily indicative of the results to be achieved for any future periods.  This preliminary financial information, and previously reported amounts, could be impacted by the effects of the pending review of the Ad Hoc Committee of the Board of Directors.

**Conference Call and Webcast Information**

| | |
|---|---|
| Date | Tuesday, March 15, 2016 |
| Time | 8:00 a.m. ET |
| Webcast | http://ir.valeant.com/events-and-presentations |
| Participant Event Dial-in | (877) 295-5743 (North America) |
| | (973) 200-3961 (International) |
| Participant Passcode | 66610318 |
| Replay Dial-in | (855) 859-2056 (North America) |
| | (404) 537-3406 (International) |
| Replay Passcode | 66610318 (Replay available until 03/22/2016) |

**About Valeant**

Valeant Pharmaceuticals International, Inc. (NYSE/TSX:VRX) is a multinational specialty pharmaceutical company that develops, manufactures and markets a broad range of pharmaceutical products primarily in the areas of dermatology, gastrointestinal disorder, eye health, neurology and branded generics. More information about Valeant can be found at www.valeant.com.

**Forward-looking Statements**

This press release may contain forward-looking statements, including, but not limited to, statements regarding our expected future performance, including guidance with respect to total revenue, adjusted EPS and adjusted EBITDA, revenue and growth assumptions, our goals for 2016 and our ability to achieve such goals (including delivery of higher revenues and cost reduction), the sufficiency of our current liquidity position and cash flow generation and our ability to meet our obligations, the ongoing review by the Company's Ad Hoc Committee and the ongoing assessment by the Company of the impact of the committee's findings on financial reporting and internal controls, the timing of the filing of the Company's Form 10-K, expected investments in key functions, expected management transition issues and continued organizational distractions.  Forward-looking statements may generally be identified by the use of the words "anticipates," "expects," "intends," "plans," "should," "could," "would," "may," "will," "believes," "estimates," "potential," "target," or "continue" and variations or similar expressions. These statements are based upon the current expectations and beliefs of management and are subject to certain risks and uncertainties that could cause actual results to differ materially from those described in the forward-looking statements. These risks and uncertainties include, are are but not limited to, risks and uncertainties discussed in the Company's most recent annual or quarterly report and detailed from time to time in Valeant's other filings with the Securities and Exchange Commission and the Canadian Securities Administrators, which factors are incorporated herein by reference. Readers are cautioned not to place undue reliance on any of these forward-looking statements. Valeant has not completed its review procedures with respect to 2015 financial information and the information herein may be subject to change based on such review, including the subsequent identification of other adjustments.  These forward-looking statements speak only as of the date hereof.  Valeant undertakes no obligation to update any of these forward-looking statements to reflect events or circumstances after the date of this press release or to reflect actual outcomes, unless required by law.

**Non-GAAP Information**

To supplement the financial measures prepared in accordance with U.S. generally accepted accounting principles (GAAP), the Company uses certain non-GAAP financial measures including (i) Adjusted net income attributable to Valeant Pharmaceuticals International, Inc., (ii) Adjusted earnings per share ("EPS"), (iii) Revenue excluding currency impact, (iv) Cost of goods sold excluding fair value step-up adjustment in inventory and other, (v) Adjusted cash flow from operations, and (vi) Adjusted EBITDA.  The reconciliations of these non-GAAP measures to the most directly comparable financial measures calculated and presented in accordance with GAAP are shown in the tables below.  However, other than with respect to total revenue, the Company only provides guidance on a non-GAAP basis and does not provide reconciliations of such forward-looking non-GAAP measures to GAAP, due to the inherent difficulty in forecasting and quantifying certain amounts that are necessary for such reconciliations.

Management uses these non-GAAP measures as key metrics in the evaluation of Company performance and the consolidated financial results and is used in the determination of cash bonuses for its executive officers. The Company believes that these non-GAAP measures are useful to investors in their assessment of our operating performance and the valuation of our company.  In addition, these non-GAAP measures address questions the Company routinely receives from analysts and investors and, in order to assure that all investors have access to similar data, the Company has determined that it is appropriate to make this data available to all investors.  However, non-GAAP financial measures are not prepared in accordance with GAAP, as they exclude certain items as described below.  Therefore, the information is not necessarily comparable to other companies and should be considered as a supplement to, not a substitute for, or superior to, the corresponding measures calculated in accordance with GAAP.

<u>(i) Adjusted net income attributable to Valeant Pharmaceuticals International, Inc. and (ii) Adjusted EPS</u>

Management uses Adjusted net income attributable to Valeant Pharmaceuticals International, Inc. and Adjusted EPS for strategic decision making, forecasting future results and evaluating current performance.  In addition, cash bonuses for the Company's executive officers are based, in part, on the achievement of certain Adjusted EPS targets.  Such non-GAAP measures exclude the impact of certain items (as further described below) that may obscure trends in the Company's underlying performance.  By disclosing these non-GAAP measures, management intends to provide investors with a meaningful, consistent comparison of the Company's operating results and trends for the periods presented.  Management believes these measures are also useful to investors as such measures allow investors to evaluate the Company's performance using the same tools that management uses to evaluate past performance and prospects for future performance.

Adjusted net income attributable to Valeant Pharmaceuticals International, Inc. and Adjusted EPS reflect adjustments based on the following items:

- <u>Inventory step-up and property, plant and equipment (PP&E) step-up/down</u>:  The Company has excluded the impact of fair value step-up/down adjustments to inventory and PP&E in connection with business combinations as such adjustments represent non-cash items, and the amount and frequency is not consistent and is significantly impacted by the timing and size of our acquisitions.
- <u>Stock-based compensation</u>:  The Company has excluded the impact of previously accelerated vesting of certain stock-based equity instruments as such impact is not reflective of the ongoing and planned pattern of recognition for such expense.
- <u>Acquisition-related contingent consideration</u>:  The Company has excluded the impact of acquisition-related contingent consideration non-cash adjustments due to the inherent uncertainty and volatility associated with such amounts based on changes in assumptions with respect to fair value estimates, and the amount and frequency of such adjustments is not consistent and is significantly impacted by the timing and size of our acquisitions, as well as the nature of the agreed-upon consideration.
- <u>In-Process research and development impairments and other charges</u>:  The Company has excluded expenses associated with acquired in-process research and development (including any impairment charges), as these amounts are inconsistent in amount and frequency and are significantly impacted by the timing, size and nature of acquisitions. Although expenses associated with acquired in-process research and development are generally not recurring with respect to past acquisitions, the Company may incur these expenses in connection with any future acquisitions.
- <u>Philidor Rx Services wind down costs</u> – The Company has excluded certain costs associated with the wind down of the arrangement with Philidor Rx Services, primarily including write-downs of fixed assets and bad debt expenses.  The Company believes it is useful to understand the effect of excluding this item when evaluating ongoing performance.
- <u>Other (income) expense:</u>  The Company has excluded certain other expenses that are the result of other, unplanned events to measure operating performance, primarily including costs associated with the termination of certain supply and distribution agreements, legal settlements and related fees,Philidor-related and pricing-related investigation and litigation costs, post-combination expenses associated with business combinations for the acceleration of employee stock awards and/or cash bonuses, and gains/losses from the sale of assets and businesses.  These events are unplanned and arise outside of the ordinary course of continuing operations. The Company believes the exclusion of such amounts allows management and the users of the financial statements to better understand the financial results of the Company.
- <u>Restructuring, integration, and acquisition-related expenses</u>:  In recent years, the Company has completed a number of acquisitions, which result in operating expenses which would not otherwise have been incurred, and the Company may incur such expenses in connection with any future acquisitions. The Company has excluded certain restructuring, integration and other acquisition-related expense items resulting from acquisitions (including legal and due diligence costs) to allow more accurate comparisons of the financial results to historical operations and forward-looking guidance. Such costs are generally not relevant to assessing or estimating the long-term performance of the acquired assets as part of the Company, and are not factored into management's evaluation of potential acquisitions or its performance after completion of acquisitions. In addition, the frequency and amount of such charges vary significantly based on the size and timing of the acquisitions and the maturities of the businesses being acquired.  Also, the size, complexity and/or volume of past acquisitions, which often drives the magnitude of such expenses, may not be indicative of the size, complexity and/or volume of future acquisitions. By excluding the above referenced expenses from our non-GAAP measures, management is better able to evaluate the Company's ability to utilize its existing assets and estimate the long-term value that acquired assets will generate for the Company.  Furthermore, the Company believes that the adjustments of these items more closely correlate with the sustainability of the Company's operating performance.
- <u>Amortization and impairments of finite-lived intangible assets</u>:  The Company has excluded the impact of amortization and impairments of finite-lived intangible assets (including impairments of intangible assets related to Philidor Rx Services), as such non-cash amounts are inconsistent in amount and frequency and are significantly impacted by the timing and/or size of acquisitions.   The Company believes that the adjustments of these items more closely correlate with the sustainability of the Company's operating performance.  Although the Company excludes amortization of intangible assets from its non-GAAP expenses, the Company believes that it is important for investors to understand that such intangible assets contribute to revenue generation. Amortization of intangible assets that relate to past acquisitions will recur in future periods until such intangible assets have been fully amortized. Future acquisitions may result in the amortization of additional intangible assets and potential impairment charges.
- <u>Amortization of deferred financing costs and debt discounts</u>:  The Company has excluded amortization of deferred financing costs and debt discounts as this represents a non-cash component of interest expense.
- <u>Foreign exchange and other</u>:  The Company has excluded foreign exchange and other to eliminate the impact of foreign currency fluctuations primarily related to intercompany financing arrangements in evaluating operating performance.
- <u>Tax</u>: The Company has (i) excluded the tax impact of the non-GAAP adjustments and (ii) recorded adjustments for the use of tax attributes and other deferred tax items plus any payments made for settlement of tax audits, in order to reflect an expected tax rate for the current period.

<u>(iii) Revenue excluding currency impact</u>

Management uses this non-GAAP measure to calculate organic growth and assess performance of its business units, and the Company in total, without the impact of foreign currency exchange fluctuations.  In the fourth quarter of 2015, the Company also excluded revenue related to Philidor Rx Services for November and December of 2015.  Such measure is useful to investors as it allows for a more consistent period-to-period comparison of our revenue.

<u>(iv) Cost of goods sold excluding fair value step-up adjustment to inventory and other</u>

Management uses this non-GAAP measure to assess cost of goods sold as a percentage of sales for its reportable segments, and the Company in total, without the impact of fair-value adjustments to inventory and PP&E in connection with business combinations, and integration-related inventory charges and technology transfer costs.  In the fourth quarter of 2015, the Company also excluded costs related to Philidor Rx Services for November and December of 2015.  Such measure is useful to investors as it allows for a more consistent period-to-period comparison of costs.

(v) <u>Adjusted cash flow from operations</u>

Management uses this non-GAAP measure for strategic decision making and evaluating the ability of our businesses to generate cash.  Management believes this measure is useful to investors because it is an indication of the amount of cash flow that may be available for future repayment of debt, future investment in growth initiatives and other future discretionary and non-discretionary expenditures.

Adjusted cash flow from operations reflects adjustments primarily based on the following items:

- <u>Restructuring, integration, and acquisition-related amounts:</u>  The Company has excluded cash flows related to restructuring, integration, and acquisition-related costs as the size, complexity and/or volume of past acquisitions, which often drives the magnitude of such cash flows, may not be indicative of the size, complexity and/or volume of future acquisitions, as further described above. The Company may have such cash outflows in connection with any future acquisitions.
- <u>Acquired in-process research and development</u>:  The Company has excluded cash flows related to acquired in-process research and development as these amounts are inconsistent in amount and frequency and are significantly impacted by the timing, size and nature of acquisitions. Although cash flows associated with acquired in-process research and development are generally not recurring with respect to past acquisitions, the Company may have such cash outflows in connection with any future acquisitions.
- <u>Excess tax benefit from share-based compensation</u>:  Company has included an add-back for tax benefits for share-based compensation, which represents the benefits arising from the difference between the fair value of the awards at the date of grant and the fair value at the exercise/settlement date.  The benefit is added-back to reflect the cash benefits (in the form of reduced tax payments) from the tax deductions.
- <u>Working capital changes related to certain business combinations</u>:  The Company has excluded certain working capital impacts resulting from post-combination bonus payments to acquire employees.

(vi) <u>Adjusted EBITDA</u>

Adjusted EBITDA is net income (its most directly comparable GAAP financial measure) adjusted for certain items, as further described below.  Management uses this non-GAAP measure as part of its guidance and to forecast future results. Management also believes Adjusted EBITDA is a useful measure to evaluate current performance. Adjusted EBITDA is intended to show our unleveraged, pre-tax operating results and therefore reflects our financial performance based on operational factors, excluding anticipated non-operational, non-cash or non-recurring losses or gains.

Adjusted EBITDA reflects, as applicable, the adjustments reflected in Adjusted EPS (see disclosure above). In addition, the Company excludes the impact of costs relating to stock-based compensation.  Due to subjective assumptions and a variety of award types, the Company believes that the exclusion of stock-based compensation expense, which is typically non-cash, allows for more meaningful comparisons of operating results to peer companies.  Stock-based compensation expense can vary significantly based on the timing, size and nature of awards granted. Finally, to the extent not already adjusted for, Adjusted EBITDA reflects adjustments for interest, taxes, depreciation and amortization (EBITDA represents earnings before interest, taxes, depreciation and amortization).

**Valeant Pharmaceuticals International, Inc**                                                                    **Table 1**

**Condensed Consolidated Statement of Income (Loss)**

**For the Three Months Ended December 31, 2015**

**(Unaudited)**

|  | Three Months Ended |
|---|---|
|  | December 31, |
| (In millions) | 2015 |
| Product sales | $    2,754.4 |
| Other revenues | 34.3 |

|  | 2,588.7 |
| Cost of goods sold (exclusive of amortization and impairments of finite-lived intangible assets shown separately below) | 727.0 |
| Cost of other revenues | 10.0 |
| Selling, general and administrative ("SG&A") | 725.8 |
| Research and development | 95.9 |
| Acquisition-related contingent consideration | (45.6) |
| In-process research and development impairments and other charges | 140.3 |
| Other (income)/expense | 42.9 |
| Restructuring, integration, acquisition-related and other costs | 96.0 |
| Amortization and impairments of finite-lived intangible assets | 774.5 |
|  | 2,566.8 |
| Operating income (loss) | 221.9 |
| Interest expense, net | (431.7) |
| Foreign exchange and other | (3.3) |
| Income (loss) before (recovery of) provision for income taxes | (213.1) |
| (Recovery of) provision for income taxes | 123.8 |
| Net income (loss) | (336.9) |
| Less:  Net income (loss) attributable to noncontrolling interest | (0.5) |
| Net income (loss) attributable to Valeant Pharmaceuticals International, Inc | $ (336.4) |

**Earnings (loss) per share:**

Basic and diluted:

| Earnings (loss) | $ (0.98) |
| Shares used in per share computation | 344.9 |

**Valeant Pharmaceuticals International, Inc.**                                                                    **Table 2**

**Reconciliation of GAAP EPS to Adjusted EPS Non-GAAP**

**For the Three Months Ended December 31, 2015**

**(Unaudited)**

| | Three Months Ended |
|---|---|
| | December 31, |
| (In millions) | **2015** |
| Net income (loss) attributable to Valeant Pharmaceuticals International, Inc. | $ (336.4) |
| **Non-GAAP adjustments:** | |
| Inventory step-up (a) | 36.0 |
| PP&E step-up/down (b) | 7.2 |
| Stock-based compensation (c) | (5.6) |
| Acquisition-related contingent consideration (d) | (45.6) |
| In-process research and development impairments and other charges (e) | 140.3 |
| Philidor Rx Services wind down costs (f) | 48.8 |
| Other (income)/expense (g) | 42.9 |
| Restructuring, integration, acquisition-related and other costs (h) | 96.0 |
| Amortization and impairments of finite-lived intangible assets and other non-GAAP charges (i) | 788.1 |
| | 1,108.1 |
| Amortization of deferred financing costs and debt discounts (j) | 27.7 |
| Foreign exchange and other (k) | (1.4) |
| Tax Effect of non-GAAP Adjustments (l) | (83.2) |
| Tax Effect of use of tax attributes and other timing items (m) | 160.9 |
| Total non-GAAP adjustments | 1,212.1 |
| Adjusted net income non-GAAP attributable to Valeant Pharmaceuticals International, Inc. (n) | $ 875.7 |
| GAAP earnings (loss) per share - diluted | $ (0.98) |

| | | |
|---|---|---|
| Adjusted earnings per share non-GAAP - diluted (n) | $ | 2.50 |

| | |
|---|---|
| Shares used in diluted per share calculation - Adjusted earnings per share non-GAAP | 349.9 |

(a) See footnote (c) to Table 2a.

(b) See footnote (d) to Table 2a.

(c) See footnote (e) to Table 2a.

(d) See footnote (f) to Table 2a.

(e) See footnote (g) to Table 2a.

(f) See footnote (b) (d) (e) to Table 2a.

(g) See footnote (h) to Table 2a.

(h) See footnote (i) to Table 2a.

(i) See footnote (j) (d) to Table 2a.

(j) See footnote (k) to Table 2a.

(k) See footnote (l) to Table 2a.

(l) See footnote (m) to Table 2a.

(m) See footnote (n) to Table 2a.

(n) See footnote (a) to Table 2a.

**Valeant Pharmaceuticals International, Inc.**                                     **Table 2a**

**Reconciliation of GAAP EPS to Adjusted EPS Non-GAAP**

**For the Three Months Ended December 31, 2015**

**(Unaudited)**

| | Non-GAAP Adjustments[(a)] for |
|---|---|
| | **Three Months Ended** |
| | **December 31,** |
| (In millions) | **2015** |

| | | | |
|---|---|---:|---|
| Product sales | | | (b) |
| Other revenues | | - | |
| Total revenues | | (4.6) | |
| | | | |
| Cost of goods sold (exclusive of amortization and impairments of finite-lived intangible assets shown separately below) | | (56.3) | (c) (d) |
| Cost of other revenues | | - | |
| Selling, general and administrative ("SG&A") | | (47.9) | (e) |
| Research and development | | (0.4) | |
| Acquisition-related contingent consideration | | 45.6 | (f) |
| In-process research and development impairments and other charges | | (140.3) | (g) |
| Other income/(expense) | | (42.9) | (h) |
| Restructuring, integration, acquisition-related and other costs | | (96.0) | (i) |
| Amortization and impairments of finite-lived intangible assets | | (774.5) | (j) |
| | | (1,112.7) | |
| Operating income (loss) | | 1,108.1 | |
| | | | |
| Interest expense, net | | 27.7 | (k) |
| Foreign exchange and other | | (1.4) | (l) |
| | | | |
| Income (loss) before (recovery of) provision for income taxes | | 1,134.4 | |
| | | | |
| Tax Effect of non-GAAP Adjustments | | (83.2) | (m) |
| Tax Effect of use of tax attributes and other timing items | | 160.9 | (n) |
| | | | |
| Total non-GAAP adjustments to net income (loss) attributable to Valeant Pharmaceuticals International, Inc. | $ | 1,212.1 | |

**Non-GAAP adjustments to Earnings (loss) per share:**

Diluted:

| | | | |
|---|---|---:|---|
| Total non-GAAP adjustments to earnings (loss) | $ | 3.46 | |
| Shares used in per share computation | | 349.9 | |

(a) To supplement the financial measures prepared in accordance with U.S. generally accepted accounting principles (GAAP), the Company uses certain non-GAAP financial measures. For additional information about the Company's use of such non-GAAP financial measures, see the body of the press release to which these tables are attached.

(b) Product sales of $4.6 million represents Philidor Rx Services sales during the wind down period November 1, 2015 through December 31, 2015.

(c) ASC 805, Business Combinations, requires inventory to be recorded at fair value, resulting in an inventory step-up whose total impact for the three months ended December 31, 2015 is $36.0 million primarily due to the acquisitions of Salix Pharmaceuticals Ltd on April 1, 2015, Amoun Pharmaceutical on October 19, 2015 and Synergetics on October 15, 2015.

(d) For the three months ended December 31, 2015, cost of goods sold includes $12.0 million of costs associated with integration related inventory charges and technology transfers, depreciation resulting from PP&E step up of $6.2 million primarily relating to the acquisition of Bausch & Lomb Holdings Incorporated and $2.1 million of cost of goods sold related to Philidor Rx Services products during the wind down period November 1, 2015 through December 31, 2015.

(e) For the three months ended December 31, 2015, SG&A of $47.9 million is primarily related to Philidor Rx Services wind down costs of $51.3 million which includes $23.3 million of depreciation expense resulting from the write-down of fixed assets, $18.3 million of bad debt reserve and $9.7 million of operating expenses during the wind down period November 1, 2015 through December 31, 2015, partially offset by $5.6 million stock-based compensation which primarily reflects the impact of previously accelerated vesting of certain stock-based equity instruments.

(f) Net expense/(income) from the changes in acquisition-related contingent consideration for the three months ended December 31, 2015 is ($45.6) million.

(g) In-process research and development impairments and other charges for the three months ended December 31, 2015 of $140.3 million is primarily related to the $100.0 million upfront payment in connection with the license of brodalumab, a $28.2 million impairment related to Emerade and other smaller impairments.

(h) For the three months ended December 31, 2015, other (income)/expense of $42.9 million is primarily due to costs resulting from the termination of supply and distribution agreements of $20.6 million, legal settlements and related fees of $12.7 million which includes legal fees associated with the Philidor Rx Services wind down and a post-combination expense of $11.7 million related to cash bonuses paid to Amoun Pharmaceutical employees in connection with the acquisition.

(i) Restructuring, integration, acquisition-related and other costs of $96.0 million primarily driven by the acquisitions of Salix Pharmaceuticals, Ltd, Dendreon Corporation, Philidor and Marathon Pharmaceuticals, LLC.   These include $51.5 million of contract terminations, integration consulting, transition services, duplicative labor and other, $24.0 million of employee severance costs, $8.1 million of acquisition costs, $3.8 million of facility closure costs and $8.6 million of other.  See additional information on footnote (c) to Table 5.2.

(j) Represents amortization and impairments of finite-lived intangible assets including a $79.0 million impairment charge related to Philidor Rx Services.

(k) Non-cash interest expense primarily associated with amortization and write-down of deferred financing costs and debt discounts for the three months ended December 31, 2015 is $27.7 million.

(l) Unrealized foreign exchange (gain)/loss on intercompany financing arrangements for the three months ended December 31, 2015 is ($1.4) million.

(m) Adjusted amounts represent Non-GAAP adjustments above multiplied by our effective tax rate within the jurisdictions the adjustments affect taking into account jurisdictions in which we have valuation allowances.  The effective rate is derived by reference to statutory tax rates within the jurisdictions we operate.

(n) Adjustment represents the effect of the use of tax attributes and other deferred tax items plus any payments made for the settlement of tax audits.

**Valeant Pharmaceuticals International, Inc.**                                                                                                          **Table 3**

**Statement of Revenues - by Segment**

**For the Three Months Ended December 31, 2015**

**(Unaudited)**

(In millions)

| Revenues | 2015 GAAP | 2015 currency impact & Other (a) | 2015 excluding currency impact & other non-GAAP (b) |
|---|---|---|---|
| Dermatology | $ 324.2 | $ (4.6) | $ 319.6 |
| Consumer | 155.9 | - | 155.9 |
| Ophthalmology Rx | 112.0 | - | 112.0 |
| Contact Lenses | 53.5 | - | 53.5 |
| Surgical | 65.4 | - | 65.4 |
| Neuro & Other/Generics | 557.5 | - | 557.5 |
| Dental | 44.7 | - | 44.7 |
| Oncology/Urology | 76.6 | - | 76.6 |
| GI | 509.0 | - | 509.0 |
| Total U.S. | 1,898.8 | (4.6) | 1,894.2 |
| ROW Developed | 363.4 | 49.2 | 412.6 |
| **Developed Markets** | 2,262.2 | 44.6 | 2,306.8 |
| Emerging Markets-Europe/Middle East/Africa | 284.7 | 47.4 | 332.1 |
| Emerging Markets-Latin America | 100.4 | 28.9 | 129.3 |
| Emerging Markets-Asia | 141.4 | 7.7 | 149.1 |
| **Emerging Markets** | 526.5 | 84.0 | 610.5 |

(a) Note: Currency effect for constant currency sales is determined by comparing 2015 reported amounts adjusted to exclude currency impact, calculated using 2014 monthly average exchange rates, to the actual 2014 reported amounts.  The $4.6 million in Dermatology represents product sales relating to Philidor Rx Services during the wind down period November 1, 2015 through December 31, 2015.

(b) To supplement the financial measures prepared in accordance with U.S. generally accepted accounting principles (GAAP), the Company uses certain non-GAAP financial measures. For additional information about the Company's use of such non-GAAP financial measures, see the body of the press release to which these tables are attached.

**Valeant Pharmaceuticals International, Inc.**                                                                    **Table 4**

**Reconciliation of GAAP Cost of Goods Sold to Non-GAAP Cost of Goods Sold - by Segment**

**For the Three Months Ended December 31, 2015**

**(Unaudited)**

(In millions)

**4.1   Cost of goods sold**

|  | **Three Months Ended** | | | |
|  | **December 31,** | | | |
|  | **2015 as reported GAAP** | **% of product sales** | **2015 fair value step-up adjustment to inventory and other non-GAAP (a)(b)** | **2015 excluding fair value step-up adjustment to inventory and other non-GAAP (a)** | **% of product sales** |
|---|---|---|---|---|---|
| Developed Markets | $ 506.4 | 23% | $ 51.7 | $ 454.7 | 20% |
| Emerging Markets | 220.6 | 42% | 4.6 | 216.0 | 41% |
|  | $ 727.0 | 26% | $ 56.3 | $ 670.7 | 24% |

(a) To supplement the financial measures prepared in accordance with U.S. generally accepted accounting principles (GAAP), the Company uses certain non-GAAP financial measures. For additional information about the Company's use of such non-GAAP financial measures, see the body of the press release to which these tables are attached.

(b) Certain adjustments in Valeant Pharmaceuticals include inventory step-up, integration related technology transfer costs, PP&E net step up adjustment of $5.4 million and $2.1 million of cost of goods related to Philidor Rx Services during the wind down period November 1, 2015 through December 31, 2015. Emerging Markets include $3.3 million of fair value step-up adjustment to inventory, $0.8 million of PP&E step up adjustment and $0.5 million of integration related technology transfer costs.

| | | Valeant Pharmaceuticals International, Inc | | Table 5 |
|---|---|---|---|---|

**Consolidated Balance Sheet and Other Data**

**(Unaudited)**

(In millions)

| | | | As of |
|---|---|---|---|
| | | | December 31, |
| 5.1 | Cash | | 2015 |
| | Cash and cash equivalents | $ | 597.3 |
| | **Debt** | | |
| | Revolving Credit Facility | $ | 250.0 |
| | Series A-1 Tranche A Term Loan Facility | | 140.4 |
| | Series A-2 Tranche A Term Loan Facility | | 137.3 |
| | Series A-3 Tranche A Term Loan Facility | | 1,881.5 |
| | Series A-4 Tranche A Term Loan Facility | | 951.3 |
| | Series D-2 Tranche B Term Loan Facility | | 1,087.5 |
| | Series C-2 Tranche B Term Loan Facility | | 835.1 |
| | Series E-1 Tranche B Term Loan Facility | | 2,531.2 |
| | Series F Tranche B Term Loan Facility | | 4,055.8 |
| | Senior Notes | | 19,206.0 |
| | Other | | 12.3 |
| | | | 31,088.4 |
| | Less: current portion | | (823.0) |
| | Total long-term debt | $ | 30,265.4 |

| 5.2 | **Summary of Cash Flow Statements** | | **Three Months Ended** |
|---|---|---|---|

|  | December 31, 2015 |
|---|---|
| Cash flow provided by (used in): | |
| Net cash provided by operating activities (GAAP) | $ 562.3 |
| Restructuring, integration and acquisition-related costs[c] | 96.0 |
| Payment of accrued legal settlements | 0.8 |
| Excess tax benefit from share-based compensation [a] | 35.2 |
| Acquired in-process research and development | 103.9 |
| Working capital change related to business development activities | 11.7 |
| Changes in working capital related to restructuring, integration and acquisition-related costs[c] | 27.8 |
| Adjusted cash flow from operations (Non-GAAP)[b] | $ 837.7 |

(a) Includes excess tax benefit from share-based compensation which will reduce taxes in future periods.

(b) To supplement the financial measures prepared in accordance with U.S. generally accepted accounting principles (GAAP), the Company uses certain non-GAAP financial measures. For additional information about the Company's use of such non-GAAP financial measures, see the body of the press release to which these tables are attached.

(c) Total restructuring, integration and acquisition-related costs cash payments of $123.8 million are broken down as follows:

| Project Type | Cash Paid | Expensed |
|---|---|---|
| Salix Pharmaceuticals, Ltd | 53.9 | 37.0 |
| Dendreon Corporation | 13.3 | 3.2 |
| Philidor Rx Services | 10.8 | 18.9 |
| Marathon Pharmaceuticals, LLC | 10.2 | 7.7 |
| Synergetics | 6.2 | 8.1 |
| Amoun Pharmaceutical | 3.9 | 2.0 |
| Sprout Pharmaceuticals | 3.2 | 2.2 |
| Medicis Pharmaceutical Corporation | 3.0 | 3.0 |
| Paragon Holdings I, Inc | 2.8 | 1.4 |
| Other (Various deals) | 16.5 | 12.5 |
| **Total** | **123.8** | **96.0** |

| Expense Type | Cash Paid |
|---|---|
| Integration related consulting, duplicative labor, transition services, and other | 55.3 |
| Acquisition-related costs paid to 3rd parties | 29.6 |
| Severance payments | 25.8 |
| Facility closure costs, other manufacturing integration, and other | 13.1 |
| | **123.8** |

Investor Relations:
Laurie W. Little
949-461-6002
laurie.little@valeant.com

Elif McDonald
905-695-7607
elif.mcdonald@valeant.com

Media:
Renee E. Soto/Meghan Gavigan
Sard Verbinnen & Co.
212-687-8080
rsoto@sardverb.com / mgavigan@sardverb.com



Logo - http://photos.prnewswire.com/prnh/20101025/LA87217LOGO

To view the original version on PR Newswire, visit:http://www.prnewswire.com/news-releases/valeant-pharmaceuticals-reports-preliminary-unaudited-fourth-quarter-2015-financial-information-300236021.html

SOURCE Valeant Pharmaceuticals International, Inc.

# Exhibit 43

THOMSON REUTERS STREETEVENTS

# EDITED TRANSCRIPT

VRX.TO - Q4 2015 Valeant Pharmaceuticals International Inc Earnings Call Unaudited

EVENT DATE/TIME: MARCH 15, 2016 / 12:00PM GMT

**OVERVIEW:**

VRX reported 4Q15 preliminary unaudited financial results. 4Q15 total revenue was $2.8b and GAAP loss per share was $0.98. Expects full-year 2016 revenues to be $11.0-11.2b and adjusted EPS to be $9.50-10.50. Expects 1Q16 revenues to be $2.3-2.4b and adjusted EPS to be $1.30-1.55.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

THOMSON REUTERS

## MARCH 15, 2016 / 12:00PM, VRX.TO - Q4 2015 Valeant Pharmaceuticals International Inc Earnings Call Unaudited

**Operator**

Good morning. My name is Heidi and I will be your conference operator today. At this time, I would like to welcome everyone to the Valeant fourth quarter 2015 unaudited financial results conference call.

(Operator Instructions)

Thank you. Head of Investor Relations, Laurie Little, you may begin your conference.

---

**Laurie Little** - *Valeant Pharmaceuticals International Incorporated - Head of IR*

Thanks Heidi. And good morning everyone and welcome to Valeant's investor conference call. Participating on today's call are Mike Pearson, Chief Executive Officer; Rob Rosiello, Chief Financial Officer; Dr. Ari Kellen, Company Group Chairman; Anne Whitaker, Company Group Chairman; and Linda LaGorga, our Treasurer. In addition to a live webcast, a copy of today's slide presentation can be found on our website, under the Investor Relations section.

Before we begin, our presentation today contains forward-looking information. We would ask that you take a moment to read the forward-looking statement legend at the beginning of our presentation, as it contains important information.

In addition, this presentation contains non-GAAP financial measures. Non-GAAP financial reconciliations can be found in the press release issued earlier today and posted on our website.

Finally, the financial guidance in this presentation is effective only as of today. It is our policy to affirm -- to update or affirm guidance only through broadly disseminated public disclosure and with that, I will turn the call over to Mike.

---

**Mike Pearson** - *Valeant Pharmaceuticals International Incorporated - CEO*

Good morning, everyone. And thank you, Lori. Thanks for joining us. Today, we would like to cover the following topics. First, we will discuss our preliminary unaudited fourth-quarter 2015 results. Second, we are going to take you through our new tax presentation. Third, we're going to provide revised Q1 2016 financial guidance.

Fourth, I'd like to take a few minutes to provide my perspective on the current state of the business since I've been back a couple weeks, including a revised 2016 guidance and other key business updates. Fifth, Linda LaGorga, our Treasurer, will provide a liquidity and cash flow update.

And finally, I'm going to address some questions that we've gotten ahead of the call. And then we will open it up to Q&A. We've added a number of slides in the Appendix around assumptions and our top 30 products which we will not be going through but are -- will be made available to you.

As we've previously disclosed, there is an ongoing review of our 2014 financials and as such, we're not able to provide year-over-year comparisons today. Financial metrics that are impacted by this include the organic growth, business unit growth, and price volume detail. What we can provide today are preliminary unaudited 2015 fourth-quarter results.

With this, let me turn the call over to our CFO, Rob Rosiello, to cover Q1 and -- Q4 and Q1.

---

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



**MARCH 15, 2016 / 12:00PM, VRX.TO - Q4 2015 Valeant Pharmaceuticals International Inc Earnings Call Unaudited**

This conservatism is expected to reduce adjusted EPS of approximately $1 in 2016. As previously mentioned, any future price increases will be more modest and in line with industry practices and managed-care contracts. We have experienced increased competitive pressure at the payer level, resulting an increased rebates for access for our key growth products, like Jublia, and this accounts for a further $1 reduction from our budget in the Fall of last year.

Other items that have reduced our outlook for 2016 include increased investments in select functions, FX headwinds and continued organizational distractions that will be cause of -- we estimate another $0.50 in 2016.

Finally, the new tax presentation will reduce reported adjusted EPS by another $1, although it has no impact on either the actual taxes paid or the cash flow. To assist in the walk down from our revenue guidance in December to today, we have bucketed the main areas: GI, dermatology and neurology portfolios represent the bulk of the change due to the items already mentioned.

Underperformance in certain US business units accounts for approximately $300 million and ex-US, $200 million in revenue reduction. In terms of FX, we estimate that to be $110 million and the remaining $90 million covers the rest of the decrease.

As we look out to the next several years, we wanted to highlight our growth expectations for our major business units. We expect double-digit growth from GI, Dendreon, dentistry, contact lenses and Women's Health over the next three years.

Single-digit growth should be realized in dermatology, emerging markets in Europe, Asia, Latin America, US consumer, Ophthalmology Rx Canada, surgical and our aesthetics businesses. Finally, we expect our neurology and other Western Europe and US generic units to have flat to declining revenue growth over this three-year period.

I do want to highlight that we do have some very exciting products that are either in the market and are new launches or we hope to get approved over the next year or so. We continue to be very excited about the prospects for Xifaxan and you've seen this continue the script growth.

We're also excited about growth opportunities in a number of our emerging markets and are Ultra and Biotrue contact lens lines. Potential opportunities lie with several R&D projects such as Latanoprostene bunod for glaucoma, which we hope to get approved later this year; IDP-118, a topical for moderate to severe psoriasis, which we hope to get approved next year ; and Brodalumab for moderate to severe psoriasis, which we hope to get approved at the end of this year. A number of these growth products have $1 billion-plus potential.

In terms of the next four quarters' guidance. With the weak results for the first quarter of 2016, we are providing a forward-look at the next fourth quarters, taking us through the first quarter of 2017.

On a roll-forward basis, we expect to realize between $11.6 billion and $11.8 billion in total revenues, and approximately $9.65 to $10.15 on adjusted EPS under the new tax reporting. We expect to realize approximately $6 billion in adjusted EBITDA over this time period. At this point, let me turn the call over to Linda LaGorga, our Treasurer, to discuss our balance sheet.

---

**Linda LaGorga** - *Valeant Pharmaceuticals International Incorporated - Treasurer*

Thank you, Mike. First, focusing on our liquidity. We are comfortable with our current liquidity and expect strong cash flow generation from our business for the remainder of the year and beyond. Currently, we have approximately $1.2 billion of cash on hand, including the proceeds from recent revolver draws.

Our revolver is currently drawn at $1.45 billion. We most recently drew our revolver to fund cash timing related to ordinary course needs for operations, including anticipated upcoming debt payments.

We are expecting to close the sale of the Synergetics contract manufacturing business in the second quarter, providing additional cash. To date in the first quarter, we have completed the Sprout payment of $500 million in January and have repaid $405 million in term loans, including our Q1 $145 million mandatory amortization and $260 million in term loan maturities.

6

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



8

## MARCH 15, 2016 / 12:00PM, VRX.TO - Q4 2015 Valeant Pharmaceuticals International Inc Earnings Call Unaudited

We have approximately $520 million of remaining mandatory term loan repayments in 2016, including $417 million of mandatory amortization and an estimated $100 million mandatory excess cash flow payment, which is an annual calculation under our credit agreement, which will be due at the end of March. We believe our term loan amortization and term loan and bond maturities in 2017 and 2018 are manageable.

Next, turning to some covenant highlights. Based on preliminary unaudited 2015 financial information and our 2016 guidance, we expect to remain in compliance with the financial maintenance covenants and our credit agreement for year-end 2015 and throughout 2016. There are no financial maintenance covenants in our indentures governing our bonds.

Our credit agreement includes two maintenance covenants, a secured leverage ratio and an interest coverage ratio. For the year-end 2015, we expect our secured leverage ratio to be approximately 2.1 times and our interest coverage ratio to be approximately 3.3 times, both within credit agreement requirements.

Our net leverage to pro forma adjusted EBITDA for the credit agreement expected to be approximately 5.8 times at year-end 2015. A couple of key factors contributed to the increase of our Q4 leverage ratio relative to our Q3 leverage ratio. First, for our last 12 months adjusted EBITDA per our credit agreement, we no longer have the benefit of the Allergan gain from Q4 2014 of approximately $287 million.

Second, also for our adjusted EBITDA per our credit agreement, our Q4 adjusted EBITDA was impacted by $100 million by our Broda transaction which is treated as cash IPR&D and reduces adjusted EBITDA in our credit agreement. Based on our 2016 guidance, we expect our net leverage to pro forma adjusted EBITDA per our credit agreement to be approximately 5 times by year-end 2016.

Now moving to some covenant highlights related to financial statement reporting. Both our credit agreement and our bond indenture contain financial reporting requirements which are impacted by the delay in the filing of our 10-K.

If we do not file our 10-K by March 30, a default will occur under our credit agreement. We will have 30 days, or until April 29, to cure this default by filing our 10-K. If our 10-K has not been filed before March 16, a breach of reporting covenant occurs under our bond indentures.

At any time after this breach, the trustee or holders of at least 25% of any series of notes may deliver a notice of default. From receipt of this notice, we would have 60 days to file our 10-K and that's to cure the default. While the failure to file the 10-K before March 16 does not have any immediate implications under our bond indentures, it does result in cross-default under our credit agreement.

The credit agreement lenders do not immediately have the right to accelerate on account of this cross-default but our ability to borrow under the revolver is restricted while the default continues. We now -- next week, we intend to launch an amendment process with our lenders to waive this cross-default and also to extend the time period for delivery of our 10-K and our Q1 10-Q.

Moving now to cash available for debt repayment and other purposes. One of our key 2016 priorities is to focus on our balance sheet. We remain committed to using the vast majority of our cash flow to pay down debt. At our Investor Day in December, we said we expect to pay down more than $2.25 billion of permanent debt in 2016.

Based on our revised guidance, we remain committed to debt repayment and now expect to pay down more than $1.7 billion of permanent debt this year. Relative to our prior guidance, the reduction in cash available for debt repayment and other purposes is less than the reduction in adjusted EBITDA. This is primarily due to less use of cash from working cap and less taxes based on our reduced sales expectations.

I will now turn it back over to Mike.

**Mike Pearson** - *Valeant Pharmaceuticals International Incorporated - CEO*

We have received several key questions from many of you so we thought we would address a number of them during our presentation. First, our approach to pricing. We have already committed to reducing pricing on our brand-new dermatology and ophthalmology products within the Walgreens' portfolio, on average, 10%.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



# Exhibit 44

# Valeant Pharmaceuticals Comments On Management Change

March 03, 2016

LAVAL, Quebec, March 3, 2016 /PRNewswire/ -- Valeant Pharmaceuticals International, Inc. (NYSE: VRX) (TSX: VRX) today issued the following comments in response to inquiries from investors regarding Deb Jorn's departure from Valeant.

It is our understanding that Deb Jorn decided to leave Valeant for personal reasons.  Her departure is not the result of an action taken by the Ad Hoc Committee of the Board of Directors.

"Deb is a true talent who consistently operated at the highest levels of performance and did an outstanding job as the driving force behind the successful launches of Jublia® and Luzu®," commented J. Michael Pearson, chief executive officer. "While we will miss Deb greatly, we are confident that the Dermatology and Gastrointestinal businesses will continue to deliver strong operating performance under the leadership of Dr. Ari Kellen."

On March 2, 2016, Valeant confirmed that Deb Jorn resigned as Executive Vice President and Company Group Chairman, effective immediately. In this role, she was responsible for running the company's U.S. Dermatology and Gastrointestinal businesses. Eric Abramson, Vice President Dermatology & Immunology Marketing, has been appointed General Manager of the U.S. Dermatology business and Dr. Ari Kellen, Executive Vice President and Company Group Chairman will oversee Valeant's gastrointestinal business.

**About Valeant**

Valeant Pharmaceuticals International, Inc. (NYSE/TSX:VRX) is a multinational specialty pharmaceutical company that develops, manufactures and markets a broad range of pharmaceutical products primarily in the areas of dermatology, gastrointestinal disorder, eye health, neurology and branded generics. More information about Valeant can be found at www.valeant.com.

**Forward-looking Statements**

This press release may contain forward-looking statements. Forward-looking statements may generally be identified by the use of the words "anticipates," "expects," "intends," "plans," "should," "could," "would," "may," "will," "believes," "estimates," "potential," "target," or "continue" and variations or similar expressions. These statements are based upon the current expectations and beliefs of management and are subject to certain risks and uncertainties that could cause actual results to differ materially from those described in the forward-looking statements. These risks and uncertainties include, but are not limited to, risks and uncertainties discussed in the Company's most recent annual or quarterly report and detailed from time to time in Valeant's other filings with the Securities and Exchange Commission and the Canadian Securities Administrators, which factors are incorporated herein by reference. Readers are cautioned not to place undue reliance on any of these forward-looking statements. These forward-looking statements speak only as of the date hereof.  Valeant undertakes no obligation to update any of these forward-looking statements to reflect events or circumstances after the date of this press release or to reflect actual outcomes.

**Contact Information:**

Laurie W. Little
949-461-6002
laurie.little@valeant.com

Elif McDonald
905-695-7607
elif.mcdonald@valeant.com

Media:
Renée E. Soto/Meghan Gavigan
Sard Verbinnen & Co.
212-687-8080
rsoto@sardverb.com / mgavigan@sardverb.com



Logo - http://photos.prnewswire.com/prnh/20101025/LA87217LOGO

To view the original version on PR Newswire, visit: http://www.prnewswire.com/news-releases/valeant-pharmaceuticals-comments-on-management-change-300230215.html

SOURCE Valeant Pharmaceuticals International, Inc.

# Exhibit 45

Valeant
Pharmaceuticals International, Inc.

# Valeant Ad Hoc Committee Announces Completion Of Its Review Of Philidor And Related Accounting Matters

April 05, 2016

LAVAL, Quebec, April 5, 2016 /PRNewswire/ -- Valeant Pharmaceuticals International, Inc. (NYSE: VRX and TSX: VRX) today announced that the ad hoc committee of the board of directors (the "Ad Hoc Committee") believes that its review of various Philidor and related accounting matters is complete, and that it has not identified any additional items that would require restatements beyond those required by matters previously disclosed.

Given the completion of the review, Valeant's Board has determined to dissolve the Ad Hoc Committee and that the 12 independent directors on Valeant's Board, including the members of the Board's Audit and Risk Committee, will assume oversight responsibility for remaining work associated with the completion of the Company's current and restated financial statements and disclosures, as well as its assessment of related internal controls and remediation matters.  As previously disclosed, the company intends to file its Form 10-K on or before April 29, 2016.

Robert Ingram, chairman of the board and chair of the Ad Hoc Committee stated, "We appreciate the efforts of the Ad Hoc Committee and its independent advisors over the past five months. After conducting more than 70 interviews and reviewing over one million documents, the Ad Hoc Committee has not identified any additional items requiring restatements beyond those matters previously disclosed. We believe it is appropriate to transfer responsibility for any continuing work to the Board's independent directors.  We continue to work diligently and are on schedule to file our Form 10-K on or before April 29, 2016."

The company is in the process of restating the affected financial statements and the restated financial statements will be included in the company's Form 10-K for the year ended December 31, 2015, which the company intends to file with the Securities and Exchange Commission and the Canadian Securities Regulators on or before April 29, 2016.  The company believes that after giving effect to the restatement, it will have remained in compliance with all of the financial maintenance covenants in its credit facility at the end of each affected quarterly period.

**About Valeant**

Valeant Pharmaceuticals International, Inc. (NYSE/TSX:VRX) is a multinational specialty pharmaceutical company that develops, manufactures and markets a broad range of pharmaceutical products primarily in the areas of dermatology, gastrointestinal disorder, eye health, neurology and branded generics. More information about Valeant can be found at www.valeant.com.

**Forward-looking Statements**

This press release may contain forward-looking statements, including, but not limited to, statements regarding the timing with respect to filing the company's Form 10-K for the fiscal year ended December 31, 2015 and expectations with respect to compliance with certain financial maintenance covenants under our credit facility.  Forward-looking statements may generally be identified by the use of the words "anticipates," "expects," "intends," "plans," "should," "could," "would," "may," "will," "believes," "estimates," "potential," "target," or "continue" and variations or similar expressions. These statements are based upon the current expectations and beliefs of management and are subject to certain risks and uncertainties that could cause actual results to differ materially from those described in the forward-looking statements. These risks and uncertainties include, but are not limited to, risks and uncertainties discussed in the company's most recent annual or quarterly report and detailed from time to time in Valeant's other filings with the Securities and Exchange Commission and the Canadian Securities Administrators, which factors are incorporated herein by reference. Readers are cautioned not to place undue reliance on any of these forward-looking statements.  These forward-looking statements speak only as of the date hereof.  Valeant undertakes no obligation to update any of these forward-looking statements to reflect events or circumstances after the date of this press release or to reflect actual outcomes, unless required by law.

**Contact Information:**

Laurie W. Little

949-461-6002

laurie.little@valeant.com

Elif McDonald

905-695-7607

elif.mcdonald@valeant.com

Media:

| Renée Soto/Jared Levy | Meghan Gavigan |
|---|---|
| Sard Verbinnen & Co. | Sard Verbinnen & Co. |
| 212-687-8080 | 415-618-8750 |
| rsoto@sardverb.com | mgavigan@sardverb.com |



Logo - http://photos.prnewswire.com/prnh/20101025/LA87217LOGO

To view the original version on PR Newswire, visit:http://www.prnewswire.com/news-releases/valeant-ad-hoc-committee-announces-completion-of-its-review-of-philidor-and-related-accounting-matters-300246267.html

SOURCE Valeant Pharmaceuticals International, Inc.

# Exhibit 46

DEF 14A 1 d713335ddef14a.htm PROXY STATEMENT

**Table of Contents**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, DC 20549**

# SCHEDULE 14A INFORMATION

**Proxy Statement Pursuant to Section 14(a) of the
Securities Exchange Act of 1934**

Filed by the Registrant ☑                    Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐   Preliminary Proxy Statement

☐   **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☑   Definitive Proxy Statement

☐   Definitive Additional Materials

☐   Soliciting Material Pursuant to § 240.14a-12

# VALEANT PHARMACEUTICALS INTERNATIONAL, INC.

**(Name of Registrant as Specified In Its Charter)**

**(Name of Person(s) Filing Proxy Statement if Other Than the Registrant)**

Payment of Filing Fee (Check the appropriate box)

☑   No fee required.

☐   Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

   (1)  Title of each class of securities to which transaction applies:

   (2)  Aggregate number of securities to which transaction applies:

   (3)  Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (Set forth the amount on which the filing fee is calculated and state how it was determined):

   (4)  Proposed maximum aggregate value of transaction:

   (5)  Total fee paid:

☐   Fee paid previously with preliminary materials.

☐   Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

   (1)  Amount Previously Paid:

   (2)  Form, Schedule or Registration Statement No.:

   (3)  Filing Party:

   (4)  Date Filed:

---

**Table of Contents**



April 21, 2014

To the Shareholders of
Valeant Pharmaceuticals International, Inc.:

You are cordially invited to attend Valeant Pharmaceuticals International, Inc.'s 2014 Annual Meeting of Shareholders to be held at 9:00 a.m., local time, on Tuesday, May 20, 2014 at 2150 Saint Elzear Blvd. West, Laval, Quebec, Canada H7L 4A8. At the meeting, we will vote on the proposals set forth in the Notice of Annual Meeting and the accompanying management proxy circular and proxy statement (the "Proxy Statement"), as well as address any other business matters that may properly come before the meeting.

Enclosed with this invitation are the Notice of Annual Meeting of Shareholders, the Proxy Statement, a Proxy Card and the Company's Annual Report for the year ended December 31, 2013. Your vote at this meeting is important. Whether or not you plan to attend the meeting, I hope you will vote as soon as possible. You will find voting instructions in the Proxy Statement and on the Proxy Card.

Sincerely,

J. Michael Pearson
Chairman of the Board and Chief Executive Officer

Table of Contents

## OWNERSHIP OF MANAGEMENT

The following table sets forth, as of March 31, 2014, certain information regarding the beneficial ownership of our Common Shares and the percentage of shares beneficially owned by each Director, each Director nominee and (i) the person serving as CEO of the Company during 2013, (ii) the person serving as CFO of the Company during 2013 and (iii) the other three most highly paid executive officers of the Company who were serving as executive officers at December 31, 2013 (together, the "Named Executive Officers"), and all current Directors, Director nominees and current executive officers of the Company as a group.

| Identity of Owner or Group | Number of Shares and Nature of Beneficial Ownership(1)(2)(3)(4) | Percentage of Class(5) |
|---|---|---|
| **Current Named Executive Officers, Directors and Director Nominees** | | |
| Robert R. Chai-Onn | 508,005 | * |
| Ronald H. Farmer | 28,230 | * |
| Colleen A. Goggins | 0 | * |
| Fred Hassan | 51,000 | * |
| Robert A. Ingram | 65,068 | * |
| Laizer D. Kornwasser | 105,090 | * |
| Anders Lönner | 25,698 | * |
| Theo Melas-Kyriazi | 216,925 | * |
| G. Mason Morfit(6) | 18,928,899 | 5.68% |
| J. Michael Pearson(7) | 10,600,263 | 3.18% |
| Robert N. Power | 11,623 | * |
| Norma A. Provencio | 143,692 | * |
| Howard B. Schiller | 328,212 | * |
| Lloyd M. Segal | 21,804 | * |
| Katharine B. Stevenson | 18,732 | * |
| Daniel M. Wechsler | 0 | * |
| Directors, Director nominees and executive officers of the Company as a group (20 persons) | 31,490,325 | 9.44% |

* Less than 1% of the outstanding Common Shares.

(1) This table is based on information supplied by current and former executive officers, Directors and Director nominees. We believe that shares shown as beneficially owned are those as to which the named persons possess sole voting and investment power. However, under the laws of California and certain other states, personal property owned by a married person may be community property, which either spouse may manage and control, and we have no information as to whether any shares shown in this table are subject to community property laws.

(2) The amounts reported include mandated RSUs issued on May 24, 2013 and payable on May 24, 2014, absent any deferred election, for the following Directors: Mr. Farmer (5,022); Mr. Ingram (5,022); Mr. Melas-Kyriazi (5,022); Mr. Morfit (5,022); Mr. Power (5,022); Ms. Provencio (5,022); Mr. Segal (5,022); and Ms. Stevenson (5,022). The amounts reported do not include mandated RSUs issued on August 22, 2013 and payable on August 22, 2014, absent any deferred election, for the following Director: Mr. Hassan (2,969).

(3) The amounts reported include elective RSUs and DSUs that are payable on separation of service for the following Directors: Mr. Farmer (11,176); Mr. Ingram (53,263); Mr. Melas-Kyriazi (69,155); Ms. Provencio (45,967) and Mr. Segal (8,967).

(4) Included in the shares set forth above are the following (i) stock options that are currently exercisable, or will become exercisable within 60 days after March 31, 2014, as follows: Mr. Chai-Onn (326,382),

32

Table of Contents

Mr. Kornwasser (21,250); Mr. Schiller (100,000); and Mr. Pearson (4,319,659), (ii) 580,676 RSUs of Mr. Pearson that vested and become deliverable February 1, 2019 but have not yet been released; (iii) RSUs that will vest and be deliverable within 60 days after March 31, 2014, as follows: Mr. Schiller (9,266) and Mr. Kornwasser (666) and (iv) PSUs that will vest and be deliverable within 60 days after March 31, 2014 as follows: Mr. Kornwasser (45,000).

(5)   These percentages are based on 333,520,028 Common Shares outstanding on March 31, 2014 plus shares deemed to be beneficially owned by each individual that are deemed outstanding. Under Rule 13d-3 of the SEC, certain shares may be deemed to be beneficially owned by more than one person (if, for example, a person shares the power to vote or the power to dispose of the shares). In addition, under Rule 13d-3(d)(1) of the SEC, shares not outstanding which are subject to options, warrants, rights or conversion privileges exercisable on or before 60 days of the date as of which the information is provided are deemed outstanding for the purpose of calculating the number and percentage owned by such person (or group), but not deemed outstanding for the purpose of calculating the percentage owned by each other person (or group) listed. As a result, the percentage of outstanding shares of any person as shown in this table does not necessarily reflect the person's actual ownership or voting power with respect to the number of Common Shares outstanding on March 31, 2014.

(6)   These shares are owned directly by ValueAct Capital Master Fund, L.P. and may be deemed to be beneficially owned by (i) VA Partners I, LLC as General Partner of ValueAct Capital Master Fund, L.P., (ii) ValueAct Capital Management, L.P. as the manager of ValueAct Capital Master Fund, L.P., (iii) ValueAct Capital Management, LLC as General Partner of ValueAct Capital Management, L.P., (iv) ValueAct Holdings, L.P. as the sole owner of the limited partnership interests of ValueAct Capital Management, L.P. and the membership interests of ValueAct Capital Management, LLC and as the majority owner of the membership interests of VA Partners I, LLC and (v) ValueAct Holdings GP, LLC as General Partner of ValueAct Holdings, L.P. G. Mason Morfit is a member of the Management Board of ValueAct Holdings GP, LLC and disclaims beneficial ownership of these shares except to the extent of his pecuniary interest therein.

(7)   The amount reported includes 2,028,516 shares which were pledged in connection with loans used to fund tax and other obligations associated with vesting and delivery of equity incentive awards and purchases of Company shares. The pledging of the shares was approved by the Company's Board of Directors

## SECTION 16(a) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE

Section 16(a) of the Exchange Act requires the Company's executive officers and Directors, and persons who own more than 10% of a registered class of the Company's equity securities, to file reports of ownership and changes in ownership with the SEC and the NYSE. Such executive officers, Directors and shareholders are required by SEC regulation to furnish the Company with copies of all Section 16(a) forms they file.

Based solely upon its review of the copies of such forms it received, or written representations from certain reporting persons for whom no such forms were required, the Company believes that during fiscal year 2013, the following of its executive officers, Directors and 10 percent beneficial owners failed to timely file all forms required by Section 16(a): Mr. Weldon and Ms. Provencio each filed one late Form 4 due to inadvertent administrative errors by the Company.

33

# Exhibit 47

# Valeant Now

## Statement Regarding the Relative Impact of Price and Volume on Growth

Share this on: Twitter | Facebook

February 3, 2016

Recent questions have been raised regarding comments made during Valeant's First Quarter 2015 Earnings Call, on April 29, 2015, addressing the relative impact of price and volume on growth. Here are the facts:

1. On the Q1 2015 earnings call, the company provided directional **price / volume mix for the Top 20 products for Q1**. (See Slide #8 of the Q115 Earnings deck dated April 29, 2015) "Top 20 products, excluding newly acquired products (Provenge, Isuprel, Nitropress), grew 36% Q1 2015 over Q1 2014 – **Majority of growth from volume.**"

2. On the April 29 earnings call, in response to a question that was asked of CEO J. Michael Pearson as to how much price contributed to growth in the quarter, Mr. Pearson responded that "In terms of price volume, actually, volume was greater than price in terms of our growth." To the extent that Mr. Pearson was asked a question about total revenue growth his response would not have been accurate; it would accurately reflect price/volume mix for Top 20 product revenue growth for the period.

3. **In the Q1 2015 10Q filed April 30, 2015, total revenue growth was described as follows:** Total revenues increased $305 million, or 16%, to $2.19 billion in the first quarter of 2015. The growth in the Developed Markets was driven primarily by price, as significant volume increases in dermatology and eye health were offset by volume declines for certain neurology & other/generic products and for the Japan market. The growth in the Emerging Markets was driven entirely by volume, as price had a negative impact.

4. Subsequently, in an email dated May 21, 2015, former Chief Financial Officer Howard Schiller referenced price vs volume mix for revenue growth in Q1 2015 as follows: "Excluding marathon, price represented about 60% of our growth. If you include marathon, price represents about 80%."

Valeant disclosed actual price volume mix for same store sales organic growth on its Third Quarter 2015 Earnings call. (See Slide 21 of Q3 2015 Earnings deck dated October 19, 2015), and has stated that, going forward, it intends to provide quantitative price volume disclosure on a same store sales organic growth basis for its full portfolio.

## Subscribe for Updates

enter email address        SUBMIT

RSS Feed

# Exhibit 48

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-Q

☒  **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Quarterly Period Ended March 31, 2013**

**OR**

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from ‿ to ‿**

**Commission File Number: 001-14956**

## VALEANT PHARMACEUTICALS INTERNATIONAL, INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Canada** | **98-0448205** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **2150 St. Elzéar Blvd. West, Laval, Quebec** | **H7L 4A8** |
| (Address of principal executive offices) | (Zip Code) |

**(514) 744-6792**
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definition of "large accelerated filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒        Accelerated filer ☐        Non-accelerated filer ☐        Smaller reporting company ☐
                                                              (Do not check if a smaller
                                                              reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

Common shares, no par value - 305,864,659 shares issued and outstanding as of April 30, 2013.

VALEANT PHARMACEUTICALS INTERNATIONAL, INC.
FORM 10-Q
FOR THE QUARTERLY PERIOD ENDED MARCH 31, 2013

**Introductory Note**

Except where the context otherwise requires, all references in this Quarterly Report on Form 10-Q (this "Form 10-Q") to the "Company", "we", "us", "our" or similar words or phrases are to Valeant Pharmaceuticals International, Inc. and its subsidiaries.

In this Form 10-Q, references to "$" and "US$" are to United States ("U.S.") dollars, references to "€" are to Euros, references to "R$" are to Brazilian real and references to "MXN$" are to Mexican peso.

**Forward-Looking Statements**

Caution regarding forward-looking information and statements and "Safe-Harbor" statements under the U.S. Private Securities Litigation Reform Act of 1995:

*To the extent any statements made in this Form 10-Q contain information that is not historical, these statements are forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, and may be forward-looking information within the meaning defined under applicable Canadian securities legislation (collectively, "forward-looking statements").*

*These forward-looking statements relate to, among other things: the expected benefits of our acquisitions and other transactions, such as cost savings, operating synergies and growth potential of the Company; business plans and prospects, prospective products or product approvals, future performance or results of current and anticipated products; exposure to foreign currency exchange rate changes and interest rate changes; the outcome of contingencies, such as certain litigation and regulatory proceedings; general market conditions; and our expectations regarding our financial performance, including revenues, expenses, gross margins, liquidity and income taxes.*

*Forward-looking statements can generally be identified by the use of words such as "believe", "anticipate", "expect", "intend", "estimate", "plan", "continue", "will", "may", "could", "would", "target", "potential" and other similar expressions. In addition, any statements that refer to expectations, projections or other characterizations of future events or circumstances are forward-looking statements. These forward-looking statements may not be appropriate for other purposes. Although we have indicated above certain of these statements set out herein, all of the statements in this Form 10-Q that contain forward-looking statements are qualified by these cautionary statements. Although we believe that the expectations reflected in such forward-looking statements are reasonable, such statements involve risks and uncertainties, and undue reliance should not be placed on such statements. Certain material factors or assumptions are applied in making forward-looking statements, including, but not limited to, factors and assumptions regarding the items outlined above. Actual results may differ materially from those expressed or implied in such statements. Important factors that could cause actual results to differ materially from these expectations include, among other things, the following:*

- *our ability to compete against companies that are larger and have greater financial, technical and human resources than we do, as well as other competitive factors, such as technological advances achieved, patents obtained and new products introduced by our competitors;*

- *the introduction of generic competitors of our brand products;*

- *the introduction of products that compete against our products that do not have patent or data exclusivity rights, which products represent a significant portion of our revenues;*

- *the challenges and difficulties associated with managing the rapid growth of our Company and a large, complex business;*

- *our ability to identify, acquire, close and integrate acquisition targets successfully and on a timely basis;*

- *factors relating to the integration of the companies, businesses and products acquired by the Company (including the integration relating to our recent acquisitions of Medicis and Obagi), such as the time and resources required to integrate such companies, businesses and products, the difficulties associated with such integrations, and the achievement of the anticipated benefits from such integrations;*

- *our ability to secure and maintain third-party research, development, manufacturing, marketing or distribution arrangements;*

- *our eligibility for benefits under tax treaties and the continued availability of low effective tax rates for the business profits of certain of our subsidiaries;*

- *our substantial debt and debt service obligations and their impact on our financial condition and results of operations;*

- *our future cash flow, our ability to service and repay our existing debt and our ability to raise additional funds, if needed, in light of our current and projected levels of operations, acquisition activity and general economic conditions;*

- *interest rate risks associated with our floating debt borrowings;*

- *the risks associated with the international scope of our operations, including our presence in emerging markets and the challenges we face when entering new geographic markets;*

- *adverse global economic conditions and credit market and foreign currency exchange uncertainty in Central and Eastern Europe, Latin America, Southeast Asia, South Africa, and other countries in which we do business;*

- *economic factors over which the Company has no control, including changes in inflation, interest rates, foreign currency rates, and the potential effect of such factors on revenues, expenses and resulting margins;*

- *our ability to retain, motivate and recruit executives and other key employees;*

- *the outcome of legal proceedings, investigations and regulatory proceedings;*

- *the risk that our products could cause, or be alleged to cause, personal injury, leading to potential lawsuits and/or withdrawals of products from the market;*

- *the difficulty in predicting the expense, timing and outcome within our legal and regulatory environment, including, but not limited to, the U.S. Food and Drug Administration, Health Canada and European, Asian, Brazilian and Australian regulatory approvals, legal and regulatory proceedings and settlements thereof, the protection afforded by our patents and other intellectual and proprietary property, successful generic challenges to our products and infringement or alleged infringement of the intellectual property of others;*

- *the results of continuing safety and efficacy studies by industry and government agencies;*

- *the availability and extent to which our products are reimbursed by government authorities and other third party payors, as well as the impact of obtaining or maintaining such reimbursement on the price of our products;*

- *the inclusion of our products on formularies or our ability to achieve favorable formulary status, as well as the impact on the price of our products in connection therewith;*

- *the impact of price control restrictions on our products, including the risk of mandated price reductions;*

- *the success of preclinical and clinical trials for our drug development pipeline or delays in clinical trials that adversely impact the timely commercialization of our pipeline products, as well as factors impacting the commercial success of our currently marketed products, which could lead to material impairment charges;*

- *the results of management reviews of our research and development portfolio, conducted periodically and in connection with certain acquisitions, the decisions from which could result in terminations of specific projects which, in turn, could lead to material impairment charges;*

- *the uncertainties associated with the acquisition and launch of new products, including, but not limited to, the acceptance and demand for new pharmaceutical products, and the impact of competitive products and pricing;*

- *our ability to obtain components, raw materials or finished products supplied by third parties and other manufacturing and supply difficulties and delays;*

- *the disruption of delivery of our products and the routine flow of manufactured goods;*

- *the seasonality of sales of certain of our products;*

- *declines in the pricing and sales volume of certain of our products that are distributed by third parties, over which we have no or limited control;*

- *compliance with, or the failure to comply with, health care "fraud and abuse" laws and other extensive regulation of our marketing, promotional and pricing practices, worldwide anti-bribery laws (including the U.S. Foreign Corrupt Practices Act), worldwide environmental laws and regulation and privacy and security regulations;*

iii

- the impacts of the Patient Protection and Affordable Care Act and other legislative and regulatory healthcare reforms in the countries in which we operate; and

- other risks detailed from time to time in our filings with the U.S. Securities and Exchange Commission (the "SEC") and the Canadian Securities Administrators (the "CSA"), as well as our ability to anticipate and manage the risks associated with the foregoing.

Additional information about these factors and about the material factors or assumptions underlying such forward-looking statements may be found under Item 1A. "Risk Factors" of the Company's Annual Report on Form 10-K for the year ended December 31, 2012, and in the Company's other filings with the SEC and CSA. We caution that the foregoing list of important factors that may affect future results is not exhaustive. When relying on our forward-looking statements to make decisions with respect to the Company, investors and others should carefully consider the foregoing factors and other uncertainties and potential events. These forward-looking statements speak only as of the date made. We undertake no obligation to update any of these forward-looking statements to reflect events or circumstances after the date of this Form 10-Q or to reflect actual outcomes.