SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
DAVID R. BUCHANAN
550 Broad Street, Suite 920
Newark, NJ  07102
Telephone:  973/639-9100
973/639-9393 (fax)

Local Counsel

ROBBINS GELLER RUDMAN
   & DOWD LLP
JAMES E. BARZ
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  312/674-4674
312/674-4676 (fax)

Lead Counsel for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re VALEANT PHARMACEUTICALS INTERNATIONAL, INC. SECURITIES LITIGATION | ) ) ) ) Master No. 3:15-cv-07658-MAS-LHG ) ) CLASS ACTION ) |
| This Document Relates To:  ALL ACTIONS. | ) PLAINTIFFS' OMNIBUS OPPOSITION ) TO DEFENDANTS' MOTIONS TO ) DISMISS ) ) |

**TABLE OF CONTENTS**

**PAGE**

I.  Introduction .................................................................................................1

II. Statement of Facts ........................................................................................6

   A.  Valeant's Deceptive Business Practices ............................................6

      1.  The Philidor Network ...............................................................8

      2.  Altering Prescriptions and Submitting False Information to Payors .........11

      3.  Price Gouging and Copay Deception.........................................13

      4.  Accounting Fraud....................................................................16

   B.  Additional Efforts to Conceal the Fraud ........................................17

      1.  Denying Allergan's Claims......................................................18

      2.  Concealing the Deceptive Practices from Ackman ..................18

      3.  Denying R&O's Claims...........................................................20

      4.  Denying Citron's Claims ........................................................20

      5.  Denying Investigative Journalist Claims ................................21

   C.  The Truth Is Gradually Revealed ....................................................22

III. Argument: The Complaint Sufficiently Pleads Violations of §10b and Rule 10b-5 .........23

   A.  Legal Standards................................................................................23

   B.  The Complaint Adequately Alleges Material Misrepresentations and Omissions.......................................................24

      1.  Defendants Have Admitted Certain of Their Statements Were False and Misleading ...................................24

         a.  Statements Not Challenged by Defendants Are Waived ..............25

         b.  The Restatement.........................................................29

         c.  Material Weaknesses in Internal Controls ....................................30

         d.  Valeant's Correction of Pearson's Volume Statement .................32

2.     The Complaint Alleges Several Categories of Misrepresentations ..........33

    a.     False and Misleading Statements Concerning the Independence of Valeant's Specialty Pharmacies ........................34

    b.     False and Misleading Statements Concerning Valeant's Pricing and Copay Practices .......................................36

    c.     False and Misleading Statements Concerning the Source of Valeant's Dramatic Growth in Revenues, Sales, and Profitability ...................................................................40

    d.     False and Misleading Statements Concerning Accounting and Internal Controls....................................................43

        (1)     False and Misleading Statements that Valeant Complied with GAAP .........................................43

        (2)     False and Misleading Statements Concerning Valeant's Controls and Compliance ..................................45

        (3)     False and Misleading Statements Concerning Philidor's Controls and Compliance................................46

        (4)     False and Misleading Statements Concerning VIE ..........47

        (5)     Item 303 Violation ............................................49

    e.     False and Misleading Statements Concerning Valeant's Alternative Fulfillment Strategy .....................................50

    f.     False and Misleading Statements Concerning Valeant's Business Strategy and Its Sustainability .........................53

3.     Defendants' False Statements and Omissions Were Material ..................55

    a.     Defendants Cannot Alter the Complaint's Allegations ................56

    b.     The Statements Were Not Mere Puffery.......................................57

    c.     Philidor and the Deceptive Practices Were Material ....................60

    d.     The Restatement Was Material .....................................................65

    e.     The Internal Control Misstatements Were Material .....................69

    f.     The Stock Price Reaction Supports Materiality............................70

4.     Defendants' Statements Are Not Protected by the Safe Harbor ...............71

a.  Statements of Present or Historical Fact Are Not Protected by the Safe Harbor ........................................................71

b.  Valeant's Financial Guidance Was Knowingly False When Made and Was Not Accompanied by Meaningful Cautionary Language ........................................................74

5.  The Complaint Adequately Alleges Misrepresentations by Each Defendant ........................................................................79

C.  The Totality of Allegations Support a Strong Inference of Scienter ...................80

1.  Defendants' Direct Role in the Deceptive Practices ................................82

a.  Pricing, Copay, and Acquisition Strategies ...................................83

b.  Philidor ..........................................................................84

2.  Defendants' Senior Roles, the Specificity of Statements, and Core Operations Doctrine ................................................................88

3.  Defendants' Pattern of Denials and Subsequent Admissions ..................90

4.  Failure to Pursue Remedies ................................................................92

5.  The Restatement and Material Weaknesses ...........................................93

6.  Sheer Volume of Executive and Director Departures..............................96

7.  The Exchange Act Defendants' Unique Compensation and the Company's Dependence on Acquisitions ..................................................98

8.  The Totality of Factors Alleges a Strong Inference of Scienter as to Each Individual Defendant ................................................................103

a.  Schiller's Motion ......................................................................105

b.  Carro's Motion ..........................................................................108

c.  Jorn's Motion ..........................................................................109

9.  Corporate Scienter ..........................................................................110

D.  The Complaint Adequately Alleges Loss Causation ...........................................111

1.  Legal Standard ................................................................................112

2.  The Complaint Alleges Valeant-Specific Loss Causation Events between September 28 and October 15, 2015 ........................................113

3.      The Complaint Alleges Loss Causation for Disclosure Events
        Concerning Philidor that Occurred After October 30, 2015 ................. 116

IV.   The Complaint Pleads Violations of §§11 and 12(a)(2) of the Securities Act ............... 121

      A.   Legal Standards ................................................................................. 121

      B.   The Securities Act Claims Are Subject to Rule 8 ................................. 122

      C.   The Complaint Adequately Alleges Standing ...................................... 122

           1.    Tucson Purchased Valeant Shares "In" the Stock Offering ................. 123

           2.    Plaintiffs Are Not Required to Specify Which Bank Offering
                 Defendants Sold to Which Plaintiffs ................................................ 125

      D.   The Complaint Adequately Alleges the Falsity of the Statements in the
           Debt Offerings Prospectuses and the Stock Offering Materials ...................... 126

           1.    The Statements Were Material ................................................... 126

           2.    The Statements Were False and Misleading ............................... 127

                 a.    False and Misleading Statements Concerning the
                       Independence of Valeant's Specialty Pharmacies ...................... 128

                 b.    False and Misleading Pricing Related Statements ..................... 128

                 c.    False and Misleading Accounting and Internal Control
                       Statements ........................................................................ 129

                 d.    False and Misleading Statements Concerning the
                       Company's VIEs, Transactions and Acquisitions ...................... 130

                 e.    Items 303 and 503 Violations .................................................. 130

                 f.    False and Misleading Statements Concerning Valeant's
                       Business Strategy and its Sustainability ................................ 131

           3.    The Securities Act Defendants' Puffery, Safe Harbor, and Scienter
                 Arguments Should Be Rejected ................................................. 132

      E.   The Complaint Adequately Alleges §11 Liability Against PwC ...................... 132

           1.    PwC Is Liable for Valeant's False and Misleading Statements in
                 the Stock Offering Materials ................................................... 133

           2.    PwC Is Liable for Its False and Misleading Statements and
                 Material Omissions in the 2014 Audit Report ......................... 135

a.  PwC Is Liable Under *Omnicare* ................................................136

   (1)  PwC's Audit Report Contained Embedded
       Statements of Untrue Facts ...............................138

   (2)  PwC's Audit Report Omitted Material Facts that
       Rendered It Misleading ....................................139

b.  PwC's Statements Do Not Fall Under *Omnicare* .......................141

F.  The Complaint Adequately Alleges §12(a)(2) Claims for the Debt
  Offerings ...........................................................................................145

  1.  Whether the Debt Offerings Were Public Is a Question of Fact.............146

  2.  Rule 144A Does Not Alter the Fact-Specific Inquiry Required by
    *Ralston Purina* ..........................................................................150

  3.  The Debt Offerings Were Public Offerings .............................152

    a.  The Size of the Debt Offerings ................................152

    b.  The Offerees' Limited Access to Information ...........................153

    c.  The Manner of the Debt Offerings................................154

    d.  The Debt Offering Defendants' Factual Disputes Are
      Inappropriate for a Motion to Dismiss........................155

V.  The Complaint Pleads Control Person Liability Under §§15 and 20(a).........................156

VI.  Conclusion ............................................................................................157

# TABLE OF AUTHORITIES

**CASES**                                                                                   **PAGE**

*AAL High Yield Bond Fund v. Ruttenberg*,
    2001 U.S. Dist. LEXIS 25572 (N.D. Ala. Oct. 1, 2001) ...............................................152, 153

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
    554 F.3d 342 (3d Cir. 2009).........................................................................................70

*Aldridge v. A.T. Cross Corp.*,
    284 F.3d 72 (1st Cir. 2002).........................................................................................101

*Allergan, Inc. v. Valeant Pharms. Int'l, Inc.*,
    No. 8:14-cv-01214-DOC-(ANx) (C.D. Cal. Nov. 3, 2014)........................................... *passim*

*Asher v. Baxter, Int'l Inc.*,
    377 F.3d 727 (7th Cir. 2004) ................................................................................77

*Aviva Partners, LLC v. Exide Techs.*,
    2007 U.S. Dist. LEXIS 17347 (D.N.J. Mar. 13, 2007).........................................................48

*Bauer v. Prudential Fin., Inc.*,
    2010 U.S. Dist. LEXIS 64384 (D.N.J. June 29, 2010) ........................................................25

*Bell v. Fore Sys., Inc.*,
    17 F. Supp. 2d 433 (W.D. Pa. 1998).............................................................................94

*Belmont v. MB Inv. Partners, Inc.*,
    708 F.3d 470 (3d Cir. 2013)......................................................................................157

*Berckeley Inv. Grp., Ltd. v. Colkitt*,
    455 F.3d 195 (3d Cir. 2006)................................................................................147, 148

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) ...............................................................................36, 73

*Better v. YRC Worldwide, Inc.*,
    2012 U.S. Dist. LEXIS 136749 (D. Kan. Sept. 25, 2012) .....................................................87

*Bruni v. City of Pittsburgh*,
    824 F.3d 353 (3d Cir. 2016).......................................................................................35

*Carpenters Pension Trust Fund v. Barclays PLC*,
    750 F.3d 227 (2d Cir. 2014).......................................................................................70

*Chamberlain v. Reddy Ice Holdings, Inc.*,
    757 F. Supp. 2d 683 (E.D. Mich. 2010)......................................................100, 101

*Citiline Holdings, Inc. v. iStar Fin., Inc.*,
    701 F. Supp. 2d 506 (S.D.N.Y. 2010)....................................................................131

*City of Hialeah Emps.' Ret. Sys. v. Toll Bros., Inc.*,
    2008 U.S. Dist. LEXIS 66906 (E.D. Pa. Sept. 2, 2008) ........................................76

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc*.,
    713 F. Supp. 2d 378 (D. Del. 2010), *aff'd*, 442 F. App'x 672 (3d Cir. 2011) ........88

*City of Sterling Heights Gen. Emps. Ret. Sys. v. Hospira, Inc.*,
    2013 U.S. Dist. LEXIS 19156 (N.D. Ill. Feb. 13, 2013) ........................................89

*Craftmatic Sec. Litig. v. Kraftsow*,
    890 F.2d 628 (3d Cir. 1989).....................................................................................69

*Doe v. Delie*,
    257 F.3d 309 (3d Cir. 2001)...................................................................................145

*Dow Corning Corp. v. BB&T Corp*.,
    2010 U.S. Dist. LEXIS 124031 (D.N.J. Nov. 23, 2010)..................................61, 103

*Dudley v. Haub*,
    2013 U.S. Dist. LEXIS 61386 (D.N.J. Apr. 30, 2013) .........................................157

*Duk Park v. Hee Nam Bae*,
    2016 U.S. Dist. LEXIS 48690 (D.N.J. Apr. 12, 2016) ........................149, 150, 154

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)........................................................................................ *passim*

*ECA & Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009).....................................................................................68

*EP Medsystems, Inc. v. Echocath, Inc.*,
    235 F.3d 865 (3d Cir. 2000)........................................................................... *passim*

*Fisk v. SuperAnnuities*,
    927 F. Supp. 718 (S.D.N.Y. 1996) ........................................................................152

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
    270 F.3d 645 (8th Cir. 2001) .................................................................................103

*Flake v. Hoskins*,
    55 F. Supp. 2d 1196 (D. Kan. 1999).......................................................................149

*Frater v. Hemispherx Biopharma, Inc.*,
   996 F. Supp. 2d 335 (E.D. Pa. 2014) ........................................................99, 100

*Freedman v. St. Jude Med., Inc.*,
   4 F. Supp. 3d 1101, 1114-21 (D. Minn. 2014) ...........................................62, 63

*Freeland v. Iridium World Commc'ns*,
   545 F. Supp. 2d 59 (D.D.C. 2008) ....................................................................116

*Freudenberg v. E*Trade Fin. Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010) ...............................................60, 76, 77, 79

*Galati v. Commerce Bancorp, Inc.*,
   2005 U.S. Dist. LEXIS 26851 (D.N.J. Nov. 7, 2005), *aff'd*, 220 F. App'x 97
   (3d Cir. 2007) .............................................................................................61, 62

*Ganino v. Citizens Utils. Co.*,
   228 F.3d 154 (2d Cir. 2000) ...............................................................................66

*Glickenhaus & Co. v. Household Int'l, Inc.*,
   787 F.3d 408 (7th Cir. 2015) ..............................................................27, 29, 113

*Goodman v. De Azoulay*,
   554 F. Supp. 1029 (E.D. Pa. 1983) ...................................................................149

*GSC Partners CDO Fund v. Washington*,
   368 F.3d 228 (3d Cir. 2004) .............................................................................102

*Gustafson v. Alloyd Co.*,
   513 U.S. 561 (1995) ...................................................................................*passim*

*Hall v. Children's Place Retail Stores, Inc.*,
   580 F. Supp. 2d 212 (S.D.N.Y. 2008) .................................................................95

*Henning v. Orient Paper, Inc.*,
   2011 U.S. Dist. LEXIS 79135 (C.D. Cal. July 20, 2011) ............................107, 108

*Herman & MacLean v. Huddleston*,
   459 U.S. 375 (1983) ...............................................................................121, 133

*In re Adams Golf, Inc. Sec. Litig.*,
   618 F. Supp. 2d 343 (D. Del. 2009) ..................................................................131

*In re Adams Golf, Inc. Sec. Litig.*,
   381 F. 3d 267 (3d. Cir. 2004) ....................................................................*passim*

*In re Adams Golf, Sec. Litig.*,
  176 F. Supp. 2d 216 (D. Del. 2001), *aff'd in part, rev'd in part*, 381 F.3d 267
  (3d Cir. 2004) ................................................................................................126

*In re Advanta Corp. Sec. Litig.*,
  180 F.3d 525 (3d Cir. 1999)............................................................................82

*In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*,
  2007 U.S. Dist. LEXIS 932 (E.D. Pa. Jan. 9, 2007) ......................................60

*In re Am. Realty Capital Props., Inc. Litig.*,
  No. 1:15-mc-00040-AKH (S.D.N.Y Aug. 5, 2016)........................................141

*In re AT&T Corp. Sec. Litig.*,
  2002 U.S. Dist. LEXIS 22219 (D.N.J. Jan. 30, 2002) ...................................58, 102

*In re Baan Co. Sec. Litig.*,
  103 F. Supp. 2d 1 (D.D.C. 2000) ....................................................................94

*In re Bear Stearns Co. Sec., Deriv., & ERISA Litig.*,
  763 F. Supp. 2d 423 (S.D.N.Y. 2011) ............................................................69

*In re Bradley Pharms., Inc. Sec. Litig.*,
  421 F. Supp. 2d 822 (D.N.J. 2006) ................................................................ *passim*

*In re Bristol Myers Squibb Co. Sec. Litig.*,
  586 F. Supp. 2d 148 (S.D.N.Y. 2008).............................................................104, 105

*In re Campbell Soup Co. Sec. Litig.*,
  145 F. Supp. 2d 574 (D.N.J. 2001) ................................................................49, 83, 90, 156

*In re Cell Pathways, Inc. Sec. Litig.*,
  2000 U.S. Dist. LEXIS 8584 (E.D. Pa. June 21, 2000) .................................73

*In re Cendant Corp. Litig.*,
  60 F. Supp. 2d 354 (D.N.J. 1999) ..................................................................134

*In re Cigna Corp. Sec. Litig.*,
  459 F. Supp. 2d 338 (E.D. Pa. 2006) .............................................................113

*In re Citigroup Inc. Sec. Litig.*,
  753 F. Supp. 2d 206 (S.D.N.Y. 2010).............................................................48

*In re CommVault Sys., Sec. Litig.*,
  2016 U.S. Dist. LEXIS 135257 (D.N.J. Sept. 30, 2016) ................................70

*In re Diamond Foods, Inc., Sec. Litig.*,
  2012 U.S. Dist. LEXIS 170704 (N.D. Cal. Nov. 30, 2012).............................104

*In re DVI, Inc. Sec. Litig.*,
    2010 U.S. Dist. LEXIS 92768 (E.D. Pa. Sept. 3, 2010) ................................................69, 107

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
    310 F. Supp. 2d 819 (S.D. Tex. 2004) .....................................................................149, 155

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
    761 F. Supp. 2d 504 (S.D. Tex. 2011) .............................................................................150

*In re Enron Corp. Sec. Litig.*,
    No. H-01-3624 (S.D. Tex. May 14, 2003) ...........................................................................33

*In re Enzymotec Sec. Litig.*,
    2015 U.S. Dist. LEXIS 167403 (D.N.J. Dec. 14, 2015) ................................................ *passim*

*In re Fisker Auto. Holdings, Inc. Sec. Litig.*,
    128 F. Supp. 3d 814 (D. Del. 2015)...............................................................149, 153, 154

*In re Hertz Glob., Inc. Sec. Litig.*,
    2015 U.S. Dist. LEXIS 95569 (D.N.J. July 22, 2015) ..........................................................75

*In re IKON Office Solutions, Inc.*,
    277 F.3d 658 (3d Cir. 2002)........................................................................................144

*In re Iso Ray Sec. Litig.*,
    2016 U.S. Dist. LEXIS 71953 (E.D. Wash. June 1, 2016) ...................................................33

*In re Lehman Bros. Sec. & ERISA Litig.*,
    131 F. Supp. 3d 241 (S.D.N.Y. 2015)..............................................................................135

*In re Lucent Techs., Inc. Sec. Litig.*,
    217 F. Supp. 2d 529 (D.N.J. 2002) ....................................................................55, 73, 76

*In re Medicis Pharm. Corp. Sec. Litig.*,
    2010 U.S. Dist. LEXIS 81410 (D. Ariz. Aug. 9, 2010) ........................................................94

*In re Merck & Co. Sec., Derivative, & ERISA Litig.*,
    2011 U.S. Dist. LEXIS 87578 (D.N.J. Aug. 8, 2011)................................................... *passim*

*In re Merck & Co., Sec., Derivative & "ERISA" Litig.*,
    2013 U.S. Dist. LEXIS 77097 (D.N.J. May 29, 2013) .........................................................28

*In re MicroStrategy Inc. Sec. Litig.*,
    115 F. Supp. 2d 620 (E.D. Va. 2000) ...............................................................................94

*In re MobileMedia Sec. Litig.*,
    28 F. Supp. 2d 901 (D.N.J. 1998) .............................................................................59, 76

x

*In re Omnicom Grp., Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010)................................................................120

*In re OSG Sec. Litig.*,
  971 F. Supp. 2d 387 (S.D.N.Y. 2013)..............................................134, 143, 144

*In re Par Pharm. Sec. Litig.*,
  2009 U.S. Dist. LEXIS 90602 (D.N.J. Sept. 30, 2009). Val. Defs. Mem. ...............96, 97

*In re Penn Treaty Am. Corp. Sec. Litig.*,
  202 F. Supp. 2d 383 (E.D. Pa. 2002) ...............................................59, 60

*In re PerkinElmer, Inc. Sec. Litig.*,
  286 F. Supp. 2d 46 (D. Mass. 2003) .......................................................63

*In re Petrobras Sec. Litig.*,
  116 F. Supp. 3d 368 (S.D.N.Y. 2015)..................................................68, 96

*In re Petrobras Sec. Litig.*,
  2016 U.S. Dist. LEXIS 21036 (S.D.N.Y. Feb. 19, 2016)............................139, 144

*In re Pfizer Sec. Litig.*,
  2012 U.S. Dist. LEXIS 39454 (S.D.N.Y. Mar. 22, 2012) ...................................28

*In re Ply Gem Holdings, Inc. Sec. Litig.*,
  2016 U.S. Dist. LEXIS 130588 (S.D.N.Y. Sept. 23, 2016).......................66, 67, 68

*In re PMA Capital Corp. Sec. Litig.*,
  2005 U.S. Dist. LEXIS 15696 (E.D. Pa. July 27, 2005).....................................30

*In re ProQuest Sec. Litig.*,
  527 F. Supp. 2d 728 (E.D. Mich. 2007)...............................................95, 96

*In re Providian Fin. Corp. Sec. Litig.*,
  152 F. Supp. 2d 814 (E.D. Pa. 2001) ......................................................82

*In re Ravisent Techs., Inc. Sec. Litig.*,
  2004 U.S. Dist. LEXIS 13255 (E.D. Pa. July 12, 2004).................................93, 94

*In re Resource Am. Sec. Litig.*,
  2000 U.S. Dist. LEXIS 10640 (E.D. Pa. July 26, 2000).......................................5

*In re Salix Pharms., Ltd.*,
  2016 U.S. Dist. LEXIS 54202 (S.D.N.Y. Apr. 22, 2016)....................................77

*In re Schering-Plough Corp. / Enhance Sec. Litig.*,
  2009 U.S. Dist. LEXIS 78852 (D.N.J. Sept. 2, 2009) .......................................24

*In re Schering-Plough Corp. / ENHANCE Sec. Litig.*,
    No. 08-cv-00397 (D.N.J. Sept. 15, 2008) .............................................................33

*In re Sipex Corp. Sec. Litig.*,
    2005 U.S. Dist. LEXIS 30854 (N.D. Cal. Nov. 17, 2005).......................................66

*In re Stone & Webster, Inc. Sec. Litig.*,
    414 F.3d 187 (1st Cir. 2005)..............................................................................72, 73

*In re Suprema Specialties, Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir. 2006)........................................................................ *passim*

*In re Synchronoss Sec. Litig.*,
    705 F. Supp. 2d 367 (D.N.J. 2010) ....................................................................94, 95

*In re Tellium, Inc. Sec. Litig.*,
    2005 U.S. Dist. LEXIS 19467 (D.N.J June 30, 2005) ..........................................157

*In re U.S. Interactive, Inc. Sec. Litig.*,
    2002 U.S. Dist. LEXIS 16009 (E.D. Pa. Aug. 23, 2002).........................................56

*In re Urban Outfitters, Inc. Sec. Litig.*,
    103 F. Supp. 3d 635, 655 (E.D. Pa. 2015) ...................................................112, 115

*In re Velti PLC Sec., Litig.*,
    2015 U.S. Dist. LEXIS 135004 (N.D. Cal. Oct. 1, 2015)...........................138, 141

*In re Veritas Software Corp. Sec. Litig.*,
    2006 U.S. Dist. LEXIS 32619 (D. Del. May 23, 2006)...............................71, 74, 76

*In re Viropharma, Inc. Sec. Litig.*,
    2003 U.S. Dist. LEXIS 5623 (E.D. Pa. Apr. 7, 2003) ............................................55

*In re ViroPharma Inc. Sec. Litig.*,
    21 F. Supp. 3d 458 (E.D. Pa. 2014) ......................................................................34

*In re Vivendi, S.A. Sec. Litig.*,
    2016 U.S. App. LEXIS 17566 (2d Cir. Sept. 27, 2016) ................................ *passim*

*In re Vivendi Universal, S.A. Sec. Litig.*,
    765 F. Supp. 2d 512 (S.D.N.Y. 2011).....................................................................55

*In re Westinghouse Sec. Litig.*,
    90 F.3d 696 (3d Cir. 1996).........................................................................68, 125, 126

*In re Wilmington Tr. Sec. Litig.*,
    29 F. Supp. 3d 432, 448 (D. Del. 2014).......................................................62, 134

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009)......................................................................... *passim*

*Janus Capital Grp., Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011)................................................................................27, 28, 29

*Katz v. Image Innovations Holdings, Inc.*,
    542 F. Supp. 2d 269 (S.D.N.Y. 2008)..............................................................107

*KBC Asset Mgmt. v. 3D Syst. Corp.*,
    2016 U.S. Dist. LEXIS 96499 (D.S.C. July 25, 2016) ...............................25, 50, 90

*Key Equity Inv'rs Inc. v. Sel-Leb Mktg.*,
    246 F. App'x 780 (3d Cir. 2007). .....................................................................60

*Klein v. Boyd*,
    1996 U.S. Dist. LEXIS 5956 (E.D. Pa. May 6, 1996) ...................148, 149, 153, 154

*Laborers' Int'l Union v. Foster Wheeler Energy Corp.*,
    26 F.3d 375 (3d Cir. 1994).........................................................................26, 49, 133

*Lewis v. Fresne*,
    252 F.3d 352 (5th Cir. 2001). ...........................................................................149

*Li v. Aeterna Zentaris, Inc.*,
    2016 U.S. Dist. LEXIS 26772 (D.N.J. Mar. 2, 2016)..........................................90

*Li v. Aeterna Zentaris, Inc.*,
    2016 U.S. Dist. LEXIS 92552 (D.N.J. June 30, 2016) .........................................97

*Lindelow v. Hill*,
    2001 U.S. Dist. LEXIS 10301 (N.D. Ill. July 20, 2001)......................................110

*Litwin v. Blackstone Grp., L.P.*,
    634 F.3d 706 (2d Cir. 2011)...........................................................................130

*Local 731 I.B. of T. Excavators & Pavers Pension Trust Fund v. Swanson*,
    2011 U.S. Dist. LEXIS 62551 (D. Del. June 14, 2011).......................................59

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) ...........................................................................61

*Lupin Atlantis Holdings v. Ranbaxy Labs., Ltd.*,
    2011 U.S. Dist. LEXIS 43175 (E.D. Pa. Apr. 20, 2011) ......................................87

*Makor Issues & Rights, Ltd. v. Tellabs*,
    513 F.3d 702 (7th Cir. 2008) .......................................................................72, 81, 90

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ................................................................................. *passim*

*Mauss v. NuVasive, Inc.*,
    2015 U.S. Dist. LEXIS 178117 (S.D. Cal. Aug. 28, 2015) ................................54, 55

*McGowan Inv'rs LP v. Frucher*,
    481 F. Supp. 2d 405 (E.D. Pa. 2007), *aff'd*, 392 F. App'x 39 (3d Cir. 2010) .......................101

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ...........................................................................89

*Minneapolis Firefighters' Relief Ass'n v. Medtronic, Inc.*,
    2010 U.S. Dist. LEXIS 10029 (D. Minn. Feb. 3, 2010) .......................................59

*Monk v. Johnson & Johnson*,
    2011 U.S. Dist. LEXIS 145554 (D.N.J. Dec. 19, 2011) ................................82, 87

*Nakkhumpun v. Taylor*,
    782 F.3d 1142 (10th Cir. 2015) ........................................................................85

*Nat'l Junior Baseball League v. PharmaNet Dev. Grp.*,
    720 F. Supp. 2d 517 (D.N.J. 2010) ..............................................................98, 111

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
    455 F. App'x 10 (2d Cir. 2011) ........................................................................67

*Norfolk Cty. Ret. Sys. v. Ustian*,
    2009 U.S. Dist. LEXIS 65731 (N.D. Ill. July 28, 2009)................................100, 101

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
    834 F.3d 481 (3d Cir. 2016).............................................................................31

*Omanoff v. Patrizio & Zhao LLC*,
    2015 U.S. Dist. LEXIS 43086 (D.N.J. Mar. 31, 2015)................................... *passim*

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015) .......................................................................... *passim*

*Oran v. Stafford*,
    226 F. 3d 275 (3d Cir. 2000)...........................................................................50

*P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*,
    142 F. Supp. 2d 589 (D.N.J. 2001) ..................................................................93

*Pa. Dept. of Pub. Welfare v. U.S. Dep't HHS*,
    101 F.3d 939 (3d Cir. 1996)...........................................................................56

*Patel v. Ashcroft*,
    123 F. App'x 72 (3d Cir. 2005) ...............................................................77, 79, 135

*Perlman v. Virtua Health, Inc.*,
    2005 U.S. Dist. LEXIS 34833 (D.N.J. May 3, 2005) ...........................................125

*Pfizer Inc. v. Teva Pharms. U.S., Inc.*,
    460 F. Supp. 2d 659 (D.N.J. 2006) ....................................................................111

*Phillips v. Cty. of Allegheny*,
    515 F.3d 224 (3d Cir. 2008)................................................................................23

*Pinter v. Dahl*,
    486 U.S. 622 (1988)..........................................................................................155

*Polanco v. Omnicell, Inc.*,
    988 F. Supp. 2d 451 (D.N.J. 2013) ...................................................................126

*Police Ret. Sys. v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) ............................................................................39

*Pub. Emps. Ret. Sys. v. Amedisys, Inc.*,
    769 F.3d 313 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 2892 (2015)....................112

*Querub v. Moore Stephens Hong Kong*,
    649 F. App'x 55 (2d Cir. 2016) ..................................................................138, 141

*Rahman v. Kid Brands, Inc.*,
    2012 U.S. Dist. LEXIS 31406 (D.N.J. Mar. 8, 2012)......................................87, 88

*Ross v. Career Educ. Corp.*,
    2012 U.S. Dist. LEXIS 155037 (N.D. Ill. Oct. 30, 2012)................................25, 46

*Schottenfeld Qualified Assocs., L.P. v. Workstream, Inc.*,
    2006 U.S. Dist. LEXIS 96035 (S.D.N.Y. May 3, 2006)......................................102

*Schueneman v. Arena Pharms., Inc.*,
    2016 U.S. App. LEXIS 19318 (9th Cir. Oct. 26, 2016)....................................53, 55

*SEC v. Kearns*,
    691 F. Supp. 2d 601 (D.N.J. 2010) .....................................................................61

*SEC v. Kelly*,
    663 F. Supp. 2d 276 (S.D.N.Y. 2009)............................................................29, 65

*SEC v. Lucent Techs., Inc.*,
    610 F. Supp. 2d 342 (D.N.J. 2009) ...................................................................107

*SEC v. Ralston Purina Co.,*
  346 U.S. 119 (1953)..............................................................147, 148, 150, 151

*Semerenko v. Cendant Corp.,*
  223 F.3d 165 (3d Cir. 2000).........................................................76, 112, 114

*SEPTA v. Orrstown Fin. Servs., Inc.,*
  2015 U.S. Dist. LEXIS 80584 (M.D. Pa. June 22, 2015) ............................... *passim*

*Shapiro v. UJB Fin. Corp.,*
  964 F.2d 272 (3d Cir. 1992)........................................................... *passim*

*Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp., N.V.,*
  941 F. Supp. 1369 (S.D.N.Y. 1996)................................................... *passim*

*Steed Fin. LDC v. Nomura Sec. Int'l, Inc.,*
  2001 U.S. Dist. LEXIS 14761 (S.D.N.Y. Sept. 20, 2001)....................148, 149, 155

*Steiner v. MedQuist Inc.,*
  2006 U.S. Dist. LEXIS 71952 (D.N.J. Sept. 29, 2006) ...............................43, 59, 85

*Stratte-Mcclure v. Morgan Stanley,*
  776 F.3d 94 (2d Cir. 2015)....................................................................50

*Strougo v. Barclays PLC,*
  105 F. Supp. 3d 330 (S.D.N.Y. 2015).......................................................120

*Sun v. Han,*
  2015 U.S. Dist. LEXIS 170005 (D.N.J. Dec. 21, 2015) ...............................86, 110

*Swack v. Credit Suisse First Boston,*
  383 F. Supp. 2d 223 (D. Mass. 2004) .........................................................33

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
  551 U.S. 308 (2007)................................................................... *passim*

*Underland v. Alter,*
  2012 U.S. Dist. LEXIS 98450 (E.D. Pa. July 16, 2012)...............................129, 130

*United States ex rel. Spay v. CVS Caremark Corp.,*
  913 F. Supp. 2d 125 (E.D. Pa. 2012) ..........................................................58

*United States v. Arutunoff,*
  1 F.3d 1112 (10th Cir. 1993) ................................................................148

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.,*
  2015 U.S. Dist. LEXIS 77495 (E.D. Pa. June 16, 2015) ...............................53, 59, 92, 96, 97

*Weiner v. Quaker Oats Co.*,
    129 F.3d 310 (3d Cir. 1997)........................................................................58

*West v. Innotrac Corp.*,
    463 F. Supp. 2d 1169 (D. Nev. 2006) ........................................148, 149

*Wilson v. Bernstock*,
    195 F. Supp. 2d 619 (D.N.J. 2002) .......................................................101

*Winer Family Trust v. Queen*,
    503 F.3d 319 (3d Cir. 2007)..........................................................62, 126

*Yang v. Tibet Pharms., Inc.*,
    2015 U.S. Dist. LEXIS 20463 (D.N.J. Feb. 20, 2015) ................. *passim*

*Yung v. Lee*,
    432 F.3d 142 (2d Cir. 2005)..................................................................150

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
    §77aa(25)............................................................................................ 133
    §77g.....................................................................................................133
    §77k................................................................................................ *passim*
    §77k(a)......................................................................................... 133, 134
    §77l(a)(2).......................................................................................... *passim*
    §77o.............................................................................................. 1, 157
    §78e.............................................................................................150, 151
    §78j.............................................................................147, 154, 156
    §78j(b).......................................................................................... *passim*
    §78r.....................................................................................................144
    §78n.......................................................................................................57
    §78t(a)...........................................................................................1, 157

Federal Rules of Civil Procesure
    Rule 8..................................................................................................122
    Rule 8(a)..........................................................................122, 126, 152
    Rule 8(a)(2)......................................................................................111, 122
    Rule 9(b) .............................................................................................122

17 C.F.R.
    §210.4-01(a)(1) ..................................................................................48
    §229.303...............................................................................................49
    §230.144A ..................................................................................... *passim*

64 Fed. Reg. 45,150 (1999) ......................................................66, 67, 68, 95

## I.       Introduction

This securities class action alleges violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), Rule 10b-5 promulgated thereunder, and §§11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act") on behalf of purchasers of Valeant equity securities and senior notes between January 4, 2013 and March 15, 2016, inclusive ("Class Period").  Defendants filed six motions to dismiss the Consolidated Complaint for Violations of the Federal Securities Laws ("Complaint").[1]  Boiled down, those briefs try to argue that this case is nothing more than "a stock price decline following adverse business news" based on run-of-the-mill "business setbacks and accounting errors."  *See, e.g.*, Val. Defs. Mem. at 1-2.  Not so.  This case involves a multi-faceted fraud that – once disclosed – resulted in ongoing investigations by the Department of Justice ("DOJ"), U.S. Securities and Exchange Commission ("SEC"), and both houses of Congress.  ¶¶5, 204, 232, 237, 292.  Indeed, the disclosure of the fraud caused Valeant's stock price to lose 90% of its value, inflicting Valeant investors with $80 billion in market losses, exceeding the losses suffered in Enron's collapse.

---

[1]      All defined terms herein shall have the same definitions as set forth in the Complaint. Citations to "¶__" refer to paragraphs in the Complaint.  Dkt. No. 80.  Defendants Valeant Pharmaceuticals International, Inc. ("Valeant" or "Company"), J. Michael Pearson ("Pearson"), Robert L. Rosiello ("Rosiello"), Ari S. Kellen ("Kellen"), and the Director Defendants (as defined in ¶51) (collectively, "Valeant Defendants"), filed a motion to dismiss and a memorandum in support.  Dkt. No. 167-1 ("Val. Defs. Mem.").  Defendants Howard B. Schiller ("Schiller"), Tanya Carro ("Carro"), Deborah Jorn ("Jorn"), and PricewaterhouseCoopers LLP ("PwC"), each filed separate motions to dismiss and a memorandum in support.  Dkt. No. 168-1 ("Schiller Mem."); Dkt. No. 166-1 ("Carro Mem."); Dkt. No. 169-1 ("Jorn Mem."); Dkt. No. 165-1 ("PwC Mem.").  The Bank Offering Defendants (as defined in ¶566) collectively filed a motion to dismiss and a memorandum in support.  Dkt. No. 164-1 ("Bank Defs. Mem.").  This Omnibus Opposition responds to all six motions.  "Exchange Act Defendants" (as defined in ¶53) refers to all defendants in Count I and II, and "Securities Act Defendants" (as defined in ¶568) refers to all defendants in Counts III through VIII.  "Defendants" refers to the Exchange Act Defendants and the Securities Act Defendants, collectively.  "Individual Defendants" (as defined in ¶52) refers to Pearson, Schiller, Rosiello, Jorn, Kellen, Carro and the "Director Defendants" (as defined in ¶51).

*Id.*; *see also* Dkt. No. 65-1 at 2 n.4.  ¶25.  As a result of the misconduct alleged herein, 12 of the 15 Individual Defendants were forced out of Valeant as it replaced its CEO, CFO, controller, audit committee, head of dermatology, and most members of its board of directors.  ¶¶45, 49, 440-447.  The Complaint easily alleges sufficient facts – corroborated by investigative journalists, Congressional investigations, Pearson's and Schiller's testimony, internal documents, criminal investigations, an accounting restatement, and the departure of nearly every Valeant executive and board member – to state plausible claims of violations of the federal securities laws against each of the Defendants.

This case arises out of a fraudulent scheme and wrongful course of business pursuant to which Valeant and its senior insiders created and utilized a network of secretly controlled pharmacies and relied on deceptive pricing and reimbursement practices, as well as fictitious accounting, to misrepresent Valeant's business operations and financial performance.  The alleged misconduct enabled Valeant's senior insiders to sell more than $15 billion of newly issued Valeant securities to investors at artificially inflated prices and enrich themselves with hundreds of millions of dollars' worth of equity awards and compensation payments.  *See* ¶¶36-37, 461-467, 472.

In essence, Valeant's revenues and earnings were dependent on a multitude of undisclosed and deceptive practices carefully designed to deceive payors into reimbursing Valeant for drugs and at higher prices than they would have paid if such practices had not been utilized.  These practices included:

- routing prescriptions through Valeant's captive network of pharmacies while concealing that such pharmacies were not independent;

- physically altering physician prescriptions to require Valeant products;

- submitting false information to third party payors; and

- concealing from payors the fact that Valeant was secretly waiving patient copays to reduce patient complaints about the price increases.

*See generally* ¶¶58-119.

The market learned the truth about Valeant through a series of disclosures that resulted in the closure of the Company's secret network of controlled pharmacies, the refusal of payors to reimburse Valeant's products, the forced cessation of the Company's deceptive practices, and the reduction of its drug prices. *See, e.g.*, ¶¶260-262, 285, 296, 526-528. Valeant withdrew its financial statements and acknowledged them to be false, restated its revenue for fiscal year 2014, drastically reduced its revenue and profitability guidance for 2016, and admitted that its internal controls over financial reporting suffered from material weaknesses. *See, e.g.*, ¶¶277, 289-291, 294, 302-305. As these revelations reached the market, Valeant's stock price fell from a Class Period high of over $262 per share to less than $25 on June 7, 2016. ¶¶25-26.

What the Exchange Act Defendants euphemistically refer to as a "business setback" was the Exchange Act Defendants being caught and exposed for engaging in a coordinated series of fraudulent business practices. Val. Defs. Mem. at 1. For example, Valeant's employees used alias names while working at Philidor Rx Services, LLC ("Philidor") and Valeant's secret pharmacy network relied on code names based on chess moves and strategies. ¶¶54, 95, 98, 107-113. The Exchange Act Defendants also claim they were victims of a "perfect storm" of negative media attention. To the contrary, they were willing participants in a scheme that defrauded investors and grossly inflated the price of Valeant's securities. It is absurd for the Exchange Act Defendants to suggest that this massive onslaught of investigations follows each time one of the nearly 4,000 publicly traded companies experiences a stock drop from "adverse business news." Val. Defs. Mem. at 1.

Unable to contest the Complaint on its merits, the Exchange Act Defendants resort to mischaracterizing allegations, ignoring allegations to which they have no answer, and supplementing the record with materials outside the Complaint in an attempt to dispute the facts alleged and the inferences to be drawn from those facts.  For example, the Exchange Act Defendants argue that the Complaint fails to plead loss causation or scienter because "Valeant had for years disclosed to investors the risk of future mandated price restrictions."  Val. Defs. Mem. at 16, 37.  However, this is a red herring because there has been no legislative reform or mandated price restrictions.  Rather, this case arises out of revelations that Valeant's results were inflated by deceptive practices and accounting fraud to deceive investors and payors (who subsequently refused to reimburse Valeant products).  *See generally* ¶¶231-313.  Having been caught, Valeant could no longer use those tactics and had to close Philidor, change its pricing practices, and both report and forecast significantly lower financial results.  *See id.*  Without such deceptive and unsustainable practices Valeant was a shell of the business the Exchange Act Defendants represented it to be, and the disclosure of those practices caused Valeant's stock price to lose 90% of its value.  *See, e.g.*, ¶¶25, 526-528.

The Exchange Act Defendants also claim the market was fully aware of their fraud because third parties had already claimed that Valeant's business was unsustainable and reliant on price increases, and that Valeant was engaged in accounting fraud through Philidor.  Val. Defs. Mem. at 16-17.  As an initial matter, such an argument is improper at the motion to dismiss stage.  *In re Enzymotec Sec. Litig.*, 2015 U.S. Dist. LEXIS 167403, at *51-52 (D.N.J. Dec. 14, 2015) ("Given the strong inferences in favor of Lead Plaintiffs, the Court finds that it is inappropriate to rule at this stage whether the truth on the market defense applies.").[2]  Moreover,

---

[2]   Internal citations and quotations are omitted, and emphasis is added, unless otherwise noted.

during the Class Period, the Exchange Act Defendants explicitly denied each of those claims, saying they were "misleading assertions" and "we stand by our accounting treatment of Philidor completely." ¶¶18, 164, 218. Valeant's stock price lost 90% of its value on the corrective disclosures and "[s]uch a drop in price creates a reasonable inference that the information contained in those reports was material information that had not been previously available to the market." *See In re Resource Am. Sec. Litig.*, 2000 U.S. Dist. LEXIS 10640, at *14-15 (E.D. Pa. July 26, 2000).

Similarly, while the Exchange Act Defendants now claim they were unaware of the deceptive practices used by Philidor, during the Class Period they assured investors that "[w]e have been working with outside counsel and we have found no evidence of illegal activity whatsoever at Philidor." ¶218(f). Whether it was in response to claims by third parties or investigative journalists, each time the Exchange Act Defendants had the chance to tell the truth, they chose not to and issued strongly worded denials. *See* ¶¶162, 164, 204, 209, 213. Having done so, the Exchange Act Defendants can hardly contest they acted with scienter. *See Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009) (holding inference of scienter supported where defendant "did not simply make statements inconsistent with the existence of widespread and unusual discounting; he explicitly denied the existence of such discounting in response to repeated questions"). The multitude of factors, including their direct roles in the deceptive practices and accounting fraud, the mass firings, and compensation practices that incentivized the fraud, collectively support an inference of scienter. *See infra* §III.C.

Turning to the strict liability Securities Act claims, the Securities Act Defendants seek dismissal based on factual disputes not properly considered at the pleading stage. The Securities

Act Defendants argue that the Debt Offerings were private and not public.  Bank Defs. Mem. at 7-15; Val. Defs. Mem. at 63; Schiller Mem. at 29.  However, the allegations here distinguish this case from those relied on by the Securities Act Defendants.  Similarly, the Securities Act Defendants argue that the claims relating to the March 2015 Stock Offering ("Stock Offering") should be dismissed because Plaintiffs' purchases were not traceable to the offering.  However, they ignore both that Plaintiffs allege that named Plaintiff, City of Tucson together with and on behalf of the Tucson Retirement System ("Tucson"), purchased *in* the offering and that "[i]n the Third Circuit, the question of determining standing through tracing is a 'factual one, to be resolved through discovery, as to whether plaintiffs can demonstrate that the shares they allegedly purchased are in fact traceable to the registration statement alleged to be false and misleading.'"  *Enzymotec*, 2015 U.S. Dist. LEXIS 167403, at *69.

Thus, each of the motions to dismiss should be denied in its entirety.

## II.      Statement of Facts

### A.      Valeant's Deceptive Business Practices

Valeant's former CEO, Pearson, had no prior experience running a pharmaceutical company.  ¶8.  Rather, Pearson came from a consulting firm, where his clients included Tyco, infamous for an aggressive acquisition strategy that led to a multibillion dollar securities fraud settlement and criminal convictions.  *Id.*  Rather than learn from Tyco's mistakes, Pearson implemented the Tyco playbook, operating Valeant like a hedge fund – buying scores of companies and drug products rather than developing them through research.  ¶¶8-11, 56-57. Pearson was dismissive of the billions spent by competitors on developing new medicines, characterizing it as wasteful and saying cancer research was a "losing proposition."  ¶¶7-8, 10. Valeant instead bought existing drugs and used deceptive practices to raise prices.  *See* ¶¶65-67.

Under Pearson, Valeant engaged in an aggressive acquisition strategy, acquiring over 100 businesses and drug portfolios and accumulating over $30 billion in debt.  ¶9.  Just before the start of the Class Period, Pearson announced an incredibly aggressive goal of growing revenues from $3-$4 billion to $10-$20 billion.  ¶86.  This announcement was simultaneous with Valeant's acquisition of Medicis and the formation of Philidor.  ¶¶84-88.

The Exchange Act Defendants were under significant pressure to increase Valeant's profits from the sale of the acquired products or its ability to finance the massive debt it accumulated would be called into doubt.  ¶¶11, 57, 272, 285.  The Exchange Act Defendants assured investors that Valeant was growing revenue and sales volume through "innovative marketing," which fueled further acquisitions as its revenues and stock price skyrocketed.  *See* ¶¶13, 16, 26, 175, 183, 618, 647.  In truth, Valeant did not have a secret formula for marketing products better, it was using deceptive tactics to increase both sales volume and the sales prices of its drugs.  *See* ¶¶12, 58-128.  These undisclosed, deceptive tactics made investment in Valeant far riskier than it appeared and made its increased revenue and profit growth illusory, as they were subject to being halted the moment they were uncovered, which is exactly what happened. *See, e.g.*, ¶¶259-296.

To increase sales volume and sales prices, the Exchange Act Defendants developed a complex scheme that deceived payors, patients, physicians, pharmacy benefit managers ("PBMs"),[3] and, most relevant to this case, investors.

---

[3]   PBMs administer prescription drug benefits on behalf of employers, labor unions, and other entities, known as "sponsors," that provide those benefits as part of their health insurance plans. ¶20 n.4.

### 1.     The Philidor Network

Historically, a separation has existed between companies that manufacture pharmaceuticals and the pharmacies that sell those products because of the perceived conflict of interest.  ¶¶247, 249 n.30.  Pharmacies can act as a check on price gouging and unnecessary refills in the healthcare system by suggesting cheaper alternatives to patients.  ¶¶12, 82-83, 151(a).  A pharmacy that was exclusive to, or owned or controlled by, a manufacturer would raise red flags to payors and PBMs (which negotiate for lower prices) and result in increased scrutiny or audit of the pharmacy.  ¶¶12, 98, 104, 118-119, 260-261.  PBM contracts generally require notification of any change in pharmacy ownership.  ¶118.  Likewise, any pushback by independent pharmacies increases pushback by physicians who face increased administrative burdens from rejected prescriptions.  ¶83.

To evade this system of checks and balances, Valeant secretly assisted in the formation of a controlled pharmacy, Philidor, to distribute its products.  ¶88.  The Exchange Act Defendants misleadingly referred to this as Valeant's "alternative fulfillment" or "AF" strategy.  ¶¶14, 138.  The strategy was implemented in late 2012 in connection with Valeant's acquisition of Medicis and the formation of Philidor on January 2, 2013.  ¶¶87-88.

Philidor was formed with the assistance of Valeant employees, for Valeant's benefit, and with full knowledge of the Exchange Act Defendants.  ¶¶87-99, 402-405.  Philidor's owners had worked at BQ6, a consultant named after a chess strategy that did work for Valeant.  ¶¶54, 103.  Valeant used Medicis employees, who had begun to develop the alternative fulfillment strategy and had connections with Philidor's owners, and staffed Philidor with several Valeant employees.  ¶¶88-89, 95-96.  At all times Philidor was under the close coordination and supervision of Valeant.  *See* ¶¶87-99, 253-254, 401-412.

Laizer Kornwasser ("Kornwasser"), Valeant's Executive Vice President/Company Group Chairman, was hired at the same time Philidor was formed, reported directly to Pearson, and he and his direct report Gary Tanner ("Tanner") oversaw Philidor.  ¶¶87-88, 91, 96.  Tanner used the alias "Brian Wilson" (of the Beach Boys) while working for Philidor.  ¶95.  Tanner was praised by one of Philidor's owners for having "an immeasurable contribution to Philidor's success."  ¶96.  As Valeant employees have acknowledged, Philidor was part of the Valeant organization.  ¶¶95-97.  Valeant's agreements with Philidor required Philidor to "proactively follow up with customers" for refills, to switch prescriptions to the Philidor network, to reprocess rejected claims, and to administer Valeant's co-pay assistance programs to offset patient copays for Valeant products.  ¶¶89-92.

Each of the Exchange Act Defendants was directly involved with Philidor.  They either spoke directly of the purported benefits of the alternative fulfillment strategy, attended conference calls where their co-defendants did, or approved the strategy.  *See, e.g.*, ¶¶133, 138, 162, 169, 196, 206-207, 216(c), 219.  Valeant's agreements with Philidor were signed and/or approved by Pearson, Schiller, Kellen, and Carro.  ¶¶92, 101.  The Director Defendants approved the entire alternative fulfillment strategy.  ¶¶129, 216(a), 216(c), 405.  Jorn ran the dermatology division, which accounted for most of the products sold through Philidor.  ¶¶39, 259, 353-354, 359, 361-362, 407.  Kellen had supervisory responsibilities over Philidor's practices.  ¶¶40, 407.  Carro and Schiller determined the accounting treatment for Philidor and the Director Defendants and Pearson reviewed and approved it.  ¶¶130-131, 444.

While publicly highlighting the benefits of Valeant's AF strategy, the Exchange Act Defendants concealed its reliance on deceptive tactics, including that Valeant's distribution channel (Philidor and its network) was effectively controlled by Valeant.  ¶¶54, 252, 262.

9

Valeant was Philidor's only client and had the ability to shut it down. *Id*. Although Pearson later claimed that Valeant concealed the relationship for "competitive" reasons, a Philidor employee explained it was "so it didn't appear Valeant was using the pharmacy to steer patients" to its products. ¶¶98, 207. The Exchange Act Defendants concealed Valeant's relationship with Philidor because if PBMs and payors had known that the alternative fulfillment channel was secretly controlled by Valeant, they would have subjected reimbursements to additional scrutiny and audit, or otherwise refused to reimburse prescriptions and/or required substitution of cheaper generics. ¶¶118-119, 260-261. This is exactly what occurred when Valeant's relationship with Philidor was uncovered. *Id*.

In December 2014, Valeant made a secret $100 million payment to Philidor's owners. ¶99. In a carefully crafted effort to avoid disclosure of its control over Philidor, Valeant structured the deal to enable Valeant to claim that it had not acquired Philidor, and therefore avoid any required change of ownership notifications (*see* ¶118), even though the transaction allowed Valeant to acquire Philidor for $0 at any time in the next ten years (¶99). The Exchange Act Defendants were also aware of the network of related entities Philidor used, as the agreement required Philidor to enter into a purchase agreement with two of them, Isolani and Lucena. ¶¶99, 107-110. The agreement gave Valeant the right to form a joint steering committee to review and amend Philidor's internal policies and manuals. ¶100. Notably, those internal manuals documented many of the deceptive practices used by Philidor to boost the sales of Valeant drugs, such as resubmitting rejected claims using false information. ¶¶116-117, 258-259. Kellen signed a new agreement with Philidor which gave Valeant the right conduct site visits and confirm compliance with any policies. ¶101.

## 2. Altering Prescriptions and Submitting False Information to Payors

Philidor formed, acquired, and obtained control over numerous additional pharmacies to distribute Valeant products and obscure Valeant's close and essentially controlling relationship with Philidor. ¶¶104, 107-114. It created the appearance to payors that many independent pharmacies were distributing Valeant's high priced drugs without complaint, which drew less scrutiny than if those payors had known Valeant was essentially distributing its own products through a controlled distribution channel. ¶¶104, 118. When Philidor tried to expand into the lucrative California market, Philidor's application was denied for submitting false information regarding its ownership. ¶¶105-106. In turn, Philidor used Isolani to acquire an interest in the California pharmacy R&O. ¶107. Even before the deal was signed, Philidor began secretly using R&O's pharmacy identification number, without permission, and thereafter began using R&O to distribute Valeant products outside California. ¶¶108, 120, 125. When R&O's owner learned of this and other illegal practices, he complained to Philidor and withheld payment. ¶¶109, 120-125. In response, Valeant's general counsel, Robert Chai-Onn,[4] sent a letter seeking $69 million from R&O to avoid "further damage to Valeant and other parties." ¶126. R&O responded by filing a lawsuit and claiming it had no relationship with Valeant and either they were both victims of fraud or Valeant was conspiring with the others to defraud R&O. ¶¶109, 128. Valeant quickly settled with R&O. ¶128.

Philidor's internal training manual documented many of its deceptive practices for obtaining reimbursement from payors. ¶¶116-117, 258-259. The manual instructed employees to alter pharmacy identification numbers and resubmit rejected claims as a "back door" approach

---

[4] Chai-Onn was replaced as general counsel after new management took over. *See Valeant Pharmaceuticals Announces Changes To Executive Management Team*, VALEANT PHARM. INT'L, INC. (Aug. 8, 2016), http://ir.valeant.com/news-releases/2016/08-08-2016-130431498.

to getting paid.  ¶¶116, 258.  Employees were instructed to keep submitting rejected claims under alternate pharmacy identification numbers and "essentially shop around for one that would be accepted."  ¶258.  In addition, Philidor provided written instructions on how to alter prescriptions to require Valeant products instead of cheaper generics and how to falsify the "usual and customary" price of drugs to obtain the maximum reimbursement.  ¶¶116, 259. Philidor also trained employees to break up prescriptions into smaller numbers to avoid reimbursement maximums, lower copays for patients, and enlist patients in auto-refill programs. ¶¶116-117.

Valeant took several steps to conceal its close and controlling relationship with the Philidor network.  ¶¶98, 104-119.  Valeant employees working at Philidor used aliases like Brian Wilson and Peter Parker (a/k/a Spiderman) to hide their involvement from outsiders.  ¶¶88, 95, 98.  Additional pharmacies were created or acquired to make it appear there were multiple independent pharmacies distributing Valeant products and ensure Philidor attracted less attention.  ¶¶104, 107, 110-113.  Like Philidor, entities used to acquire these pharmacies were named for chess strategies, reflecting the purpose for which they were created.  ¶¶54, 113.  For example, Philidor was named for an opening chess move.  ¶¶54, 88.  When Philidor was denied a license in California, Philidor created Isolani (named for a chess strategy involving the use of a pawn) to acquire R&O as its pawn so it could operate in California.  ¶¶54, 106-107.

Demonstrating the close coordination between Valeant and Philidor, the Exchange Act Defendants used a Valeant subsidiary, also named for a chess strategy, to make a $100 million payment to Philidor.  ¶54; *see also* ¶¶401-412.  The subsidiary was named KGA after King's Gambit Accepted, a chess strategy involving a move that can either be accepted or rejected,

exactly as Valeant crafted its deal to purportedly allow it to formally acquire Philidor or decline to.  ¶¶54, 99.

Just as the chess names were carefully chosen, so were the deceptive practices used at Philidor to boost Valeant sales.  Valeant had the ability to review and approve Philidor's training manuals and Pearson, Schiller, and members of Valeant's Board of Directors had multiple site visits to Philidor.  ¶¶100-101, 116-117, 258-259, 405.  The Exchange Act Defendants held meetings to discuss Philidor's practices, as confirmed by an email from Kellen to Pearson where Kellen said he had met with Jorn and wanted a follow up meeting "to go over the practices in each district where Philidor is working well and identify next 10 practices where we should push harder" to "help fuel growth."  ¶407.

Valeant's ownership of Philidor was not illegal *per se*, but it was concealed to avoid increased audit and scrutiny by payors.  ¶70.  And the only reason to avoid additional audit and scrutiny was to conceal the deceptive tactics used to inflate sales and sale prices of Valeant drugs.  ¶¶98, 104, 116-119, 258-261.  Once the relationship and practices were revealed, the three largest PBMs each announced the immediate termination of their agreements with Philidor and refused to reimburse Valeant prescriptions filled at Philidor.  ¶¶119, 260-261.

### 3.    Price Gouging and Copay Deception

The Exchange Act Defendants desperately needed to drive reported revenue growth with respect to the drugs they acquired to service the massive debt Valeant accumulated through its acquisition strategy.  ¶¶9, 12.  There were only two ways to do this: raise prices or increase volumes.  Unable to sufficiently increase volumes, the Exchange Act Defendants decided to implement price gouging practices that raised prices by up to 5,800%.  ¶¶12, 65-67.  Valeant raised prices on brand name drugs an average of 66%, which was five times more than industry peers, and by over 200% on at least 20 drugs.  ¶¶66, 421.  These increases were reflected in

drugs like Cuprimine, which was raised from $450 to $26,000.  ¶¶66-67 (listing additional examples).

Valeant used price gouging to artificially inflate its financial performance.  ¶¶59-61, 421. The price increases dropped straight to the bottom line and increased reported profits even more than revenues, as profit margins approached 90% to 99%.  ¶¶65-66, 77.  For example, after acquiring Isuprel and Nitropress, Valeant recorded approximately $540 million in sales against $2 million in costs.  ¶65.  While these two products constituted just two of Valeant's 1,800 products (or approximately 0.1%) they accounted for a disproportionate amount of total revenue, almost 40 times more than proportional.  ¶422.

Valeant used several means to get payors to pay massive price increases.  One way was to focus on small volume drugs ("orphan drugs") that represented small portions of payor budgets and therefore drew less scrutiny.  ¶¶59, 63, 73-76.  Valeant's consultants advised Pearson and senior management that smaller volume and older products "have been in the system for so long that reviews are practically rubber stamped."  ¶63.  Valeant took advantage of the 3-4 year regulatory delay in approving new generics and concealed its massive price increases to avoid attracting competition.  ¶¶59, 436.

Another way was to reduce pushback by pharmacies, which Valeant accomplished by concealing its control over the Philidor network and enabling Philidor's deceptive practices, resulting in reduced audit scrutiny by payors and PBMs.  ¶¶98, 104, 116-119, 258-259.  Next, Valeant reduced pushback by physicians and patients over such massive price increases by increasing its patient assistance programs ("PAPs") and waiving copays so that complaining

patients paid little or nothing.[5]   ¶¶68, 71.   Valeant diverted patients away from independent pharmacies and into Valeant's captive network of pharmacies through promises of generous copay assistance.   ¶¶71-74.   This reduced the incentive to substitute cheaper products or resist unnecessary refills.   ¶¶69-72.   Valeant's PAP spending grew by 1,100% from $53 million in 2012 to $600 million by 2015, far greater than the 300% increase in revenue during this period. ¶68.   Rather than increasing generosity to needy patients, Valeant utilized the waiver of copays to facilitate gouging payors.   ¶69.   Valeant's analysis showed that increased PAP could be funded by price increases to payors and would "maximize overall returns" because increased revenue from price increases would "dwarf the amount that [they were] giving in customer assistance."   ¶¶74, 436.   Valeant's secret internal analysis showed that the risks to its scheme were that it "could attract undue negative publicity from patients, HCP's, payors, and/or government agencies" that could result in actions to "limit/restrict re-imbursement" of its products.   ¶75.

The Exchange Act Defendants also designed a public relations strategy to conceal Valeant's scheme and wrongful course of business.   The strategy was to aggressively challenge any negative pushback from price increases and provide deceptive responses to any questions regarding price increases such as, "[t]hese rate increases are essential to ensure that Valeant is able to continue to offer these important pharmaceuticals to our patients."   ¶77; *see also* ¶¶76-80. This was false.   In fact, Valeant reinvested a tiny fraction of revenues in research, the costs of the affected drugs had not increased, and the price increases raised margins to, or above, 90%.   ¶77; *see also* ¶¶65-66.   For instance, Valeant gave this false response to a patient who complained to

---

[5]   Waiving copays can violate criminal law when government payors are involved, so Valeant targeted private payors.   ¶¶70-71.   And while not necessarily criminal in the context of private payors, such practices violated payor and PBM agreements.   ¶¶68, 70.

Pearson about the massive price increase of her life saving medication.  ¶78.  She was also sent flowers to quell her complaints to the media and allow Valeant to continue gouging others without interruption.  ¶¶79-80.  Pearson closely monitored these types of complaints and was particularly warned of complaints by influential people, such as a January 2015 warning that the complaining individual was "a very politically connected and influential person."  ¶¶81, 394.

### 4.    Accounting Fraud

Valeant's senior management received compensation incentives far beyond other highly paid executives, which were tied to driving up Valeant's stock price as much as possible by 2017.  ¶¶462-464.  In order to hit compensation targets, they had to increase Valeant's stock price year over year, which required increasing reported revenues and profitability and, in turn, relied on the acquisition strategy and deceptive practices used to inflate sales.  ¶¶9-12, 459-460, 464.  Pearson, along with other senior management, drove a "tone at the top" that prioritized achieving financial targets over following the rules.  ¶342.  This "tone at the top" filtered down to the rest of senior management, which faced pressure to increase revenues at a growing rate. ¶¶342, 459.  Not only did this lead to the use of deceptive practices to boost sales and sale prices, but, when those failed to achieve financial targets, the Defendants simply booked, and approved the booking of, fictitious revenue.  ¶¶315-318.

Defendants violated GAAP by shipping product to Philidor and treating it as a sale. ¶315.  Given Valeant's control over Philidor, this was the equivalent of selling to itself, and clearly in violation of GAAP, which required Valeant to record a sale only after shipment to patients.  ¶¶316-317.  Worse still, Valeant recorded revenues a second time when Philidor sold the product.  ¶318.

The Exchange Act Defendants later admitted to this accounting scheme and were forced to withdraw, tell investors not to rely upon, and ultimately restate Valeant's financial statements

for fiscal year 2014 and the first nine months of fiscal year 2015.  ¶¶302, 315, 319-320.  Schiller and Carro initiated the unlawful accounting treatment.  ¶¶23, 444.  The Audit Committee (Norma Provencio ("Provencio"), Theo Melas-Kyriazi ("Melas-Kyriazi"), and Katherine Stevenson ("Stevenson")), Finance and Transactions Committee (Colleen Goggins ("Goggins"), Anders Lönner ("Lönner"), and Jeffrey W. Ubben ("Ubben")), then the full board of directors along with Pearson reviewed, approved and defended the accounting treatment when Citron Research ("Citron") reported on Valeant's clandestine relationship with Philidor and questioned whether Valeant was using Philidor to inflate reported sales results.  ¶¶215(a), 216(a), 219.  Lead Independent Director, Robert A. Ingram ("Ingram"), confirmed that "the full Board of Directors" reviewed and "confirmed the appropriateness" of the accounting.  *See, e.g.*, ¶216(a).  Given the importance of refuting any claims of accounting fraud, Provencio, Melas-Kyriazi, Stevenson, Schiller, Carro, Rosiello, and Kellen participated in the investor call wherein Pearson and Ingram defended the accounting, even though it was unusual to have such a large group attend conference calls.  ¶¶131, 217.

Despite denials that Valeant had improperly booked sales through Philidor, the SEC commenced an investigation into Valeant.  Ultimately, Valeant was forced to admit that it had in fact used Philidor to both prematurely book and double book revenue.  ¶¶289, 292, 302-303, 411.  Valeant also admitted its internal controls were not effective as they failed to design and maintain controls over quarter-end transactions and implemented a "tone at the top" that prioritized achieving difficult financial targets over compliance.  ¶¶304-305, 693.

## B.   Additional Efforts to Conceal the Fraud

At several points during the Class Period, the Exchange Act Defendants were confronted with accusations regarding the concealed and deceptive business practices.  Each time, they vigorously denied the claims and aggressively attacked the accuser.  These denials were false

and further confirm the knowing and reckless nature of the Exchange Act Defendants' misconduct.

### 1.     Denying Allergan's Claims

Valeant targeted Allergan for acquisition in 2014 with an offer of cash and Valeant stock. ¶154.  Allergan's management rebuffed the offer claiming that "the Valeant business model is not sustainable" and dependent on "some eye-popping increases of price."  ¶159.  Although both of these points were revealed to be true at the end of the Class Period, many of the Exchange Act Defendants vigorously denied these claims by arguing Valeant was growing by volume and limited to 9% and 10% price increases just like Allergan and other pharmaceutical companies. *See, e.g.*, ¶¶162-164, 176.  In fact, Pearson and Schiller denounced Allergan's claims as "misleading."  *See* ¶164.  Pearson attacked Allergan, stating "[w]e can no longer tolerate unjustified attacks on Valeant's business," accused Allergan of disparagement and misleading investors to manipulate Valeant's stock price, and even falsely claimed Allergan's management built themselves a golf course using company money.  ¶396.

### 2.     Concealing the Deceptive Practices from Ackman

Bill Ackman ("Ackman") runs Pershing Square Capital Management ("Pershing Square") and partnered with Valeant in its effort to acquire Allergan.  ¶¶154, 449.  Ackman acquired 9.7% of Allergan and planned to vote in favor of Valeant's acquisition.  ¶154.  He conducted due diligence regarding Valeant and had many meetings with Pearson and Valeant to discuss Valeant's business.  ¶¶449-450.  With his reputation for careful investment, Ackman was used by Valeant to refute Allergan's claims and vouch for the value of Valeant's "currency" (stock price) in the proposed deal.  ¶¶452-455.  Pearson requested that Ackman defend Valeant from Allergan's accusations regarding its business practices and asked him to "emphasize [the]

quality of our company" when speaking to the media.  ¶452.  When the Allergan offer fell short, Ackman invested directly in Valeant and continued to have many meetings with Pearson.  ¶451.

However, toward the end of the Class Period, as information was leaking out about the deceptive practices to boost sales, an outraged Ackman criticized Pearson's use of scripted answers and his abrupt end to a conference call, telling him in an email "[t]he only people that need scripts and limited questions are crooks.  Joe Nocera [of *The New York Times*] is right.  You look like Enron."  ¶257.  Ackman told Ingram that Pearson needed to leave Valeant, and, once Ackman joined the board, he told Congress his reason for joining was to change leadership. ¶¶265, 445.  Pearson and the majority of the members of the board of directors were replaced soon after Ackman joined the board.  ¶446.  Ackman told Congress and the media he was unaware of the "horrible" and "wrong" price gouging by Valeant and that replacing Pearson was "appropriate."  ¶456.  After these revelations came out and Charlie Munger said Valeant was a "sewer, and those who created it deserve all the opprobrium that they got," Ackman essentially conceded the point and only responded it was "not fair to indict an[] entire company based on the actions of a few."  ¶457.

Losing Philidor and the price gouging devastated Valeant, with it reporting disappointing first quarter 2016 ("1Q16") results and Rosiello admitting that the lower revenues were "driven by dermatology…and the transition [from Philidor] to Walgreens…"  ¶311.  The new CEO, Joseph C. Papa ("Papa"), added that the vast majority of the revenue shortfall related to a decline in average selling prices and that Valeant actually had negative selling prices on certain drugs post-Philidor.  ¶313.  Emphasizing the lower prices after the deceptive practices ceased, Papa said that every time a prescription goes out the door "we're taping dollar bills to that prescription."  ¶313.

### 3.    Denying R&O's Claims

As noted, R&O discovered that Philidor was using its National Provider Identifier without permission, filling prescriptions under R&O's name in states R&O did not operate, signing false and misleading audits without permission, and engaging in "widespread fraud." ¶¶120-128.  As a result, R&O began withholding payment to Philidor.  ¶¶120, 125.  Valeant responded by sending a threatening letter to R&O claiming the money was owed directly to Valeant and threatening R&O with legal claims.  ¶126.  When news of the lawsuit was revealed, rather than denounce the wrongful conduct or even claim it was unaware, Valeant defended Philidor and issued public statements telling investors that R&O was part of its pharmacy network, that R&O was "improperly holding significant amounts," and that Valeant "look[ed] forward to showing in court that we are owed the money."  ¶210.  Despite these initial denials, soon thereafter, Valeant closed Philidor and quickly settled the lawsuit with R&O.  ¶128.

### 4.    Denying Citron's Claims

As news regarding Valeant's hidden relationship with Philidor began to leak out, Citron issued a report questioning whether Valeant was using Philidor to inflate revenues.  ¶¶213, 246. Valeant issued a release where it denied recording revenues prematurely through Philidor, assured the public that it only recorded sales when products were shipped to patients, and claimed that revenue recognition was actually "delayed" through Philidor.  ¶213.  Pearson claimed that Citron's allegations were "completely untrue" and said Valeant stood behind its accounting "completely."  ¶¶218(a), 218(c).  Ingram reaffirmed Pearson's statements with the full weight of the board by stating that the "audit committee of the Board and the full Board have reviewed the Company's accounting, the Philidor relationship, and have confirmed the appropriateness of the Company's revenue recognition and accounting treatment."  ¶219. Rosiello also confirmed the accounting, as did Carro, in claiming disclosure of Philidor was not

required because it was not material.  ¶¶220-221.  Despite these false assurances, soon thereafter, Valeant was forced to restate its financial statements due to premature recognition of revenue and double counting of revenues through Philidor.  ¶¶289-290, 302-303.

### 5.    Denying Investigative Journalist Claims

In October 2015, it was reported that Philidor had its application for licensing rejected in California for submitting false information.  ¶245.  It was also reported that Valeant was using Philidor to "keep the health system paying for high-priced drugs."  ¶245.  In addition, Valeant employees were reported to have used aliases while working for Philidor to "conceal the ties so it didn't appear Valeant was using the pharmacy to steer patients."  ¶250.

Valeant held multiple conferences in October 2015 to refute these claims.  Pearson, Rosiello, and Kellen attended a conference call to discuss Philidor and claimed that it did not "restrict prescriptions it fills to any particular manufacturer (including Valeant)" and that it only dispensed products "as specified in patient's prescriptions or as requested by patient[s]."  ¶206. Pearson refuted the "incorrect assertions" regarding Valeant's relationship and claimed that the Philidor network improved access at "an affordable price" and Valeant's use of specialty pharmacies was "similar to many pharmaceutical companies in the US."  ¶207.  Valeant held another conference call attended by Pearson, Schiller, Rosiello, Ingram, Provencio, Melas-Kyriazi, Stevenson, Carro, and Kellen in which they presented slides claiming prescriptions filled through Philidor were "less profitable than traditional channels" and said "Philidor is independent."  ¶217.  Pearson added that "[w]e have been working with outside counsel and we have found no evidence of illegal activity whatsoever at Philidor."  ¶218(f).  Just days later, Valeant announced it was closing Philidor.  ¶¶259, 262.  Valeant's ability to shut down Philidor by terminating the relationship confirmed that the Exchange Act Defendants' statements that

Philidor was independent and did not limit distribution to Valeant products were false and misleading.  ¶¶54, 259, 262, 267.

C.     **The Truth Is Gradually Revealed**

The truth regarding Valeant's financial condition, deceptive business practices, and fraudulent accounting was revealed through a series of disclosures between September 28, 2015 and June 7, 2016.  ¶¶231-301, 473-528.  These Valeant-specific events included Congressional calls to subpoena Valeant (¶¶475-477), revelations of investigations of Valeant by U.S. Attorney's Offices and the SEC (¶¶480-481, 515), disclosures regarding Valeant's ties to Philidor (¶¶482-484), investigative reports uncovering further deceptive practices by Valeant and Philidor (¶¶485-497), and revelation of the financial impact on Valeant, with payors refusing to reimburse prescriptions, Philidor being shut down, and Valeant being forced to lower prices, withdraw its financial statements, and admit material weaknesses in internal controls (¶¶498-517).  In addition, analysts slashed their ratings on Valeant securities.  ¶¶486-487, 499, 503, 506, 509.

As partial disclosures reached the market and removed some of the artificial inflation from the price of Valeant securities, the Exchange Act Defendants made additional false and misleading statements in an effort to conceal the full truth and allow Valeant securities to continue trading at inflated levels.  For example, many of the Exchange Act Defendants initially defended the accounting, their pricing practices and Philidor's business practices, and claimed Philidor was independent.  ¶¶216-218.  In addition, the Exchange Act Defendants increased Valeant's 2015 and 2016 financial guidance to mitigate the impact of negative news and further conceal Valeant's financial dependency upon Philidor and the deceptive practices.  ¶¶223, 227.

However, as sales plummeted, government investigations mounted, and certain Exchange Act Defendants were called to testify before Congress, Valeant was forced to make additional

22

corrective statements.  On February 22, 2016, Valeant withdrew its false financial statements and announced it would restate its financial results.  ¶¶510-511.  On March 15, 2016, the market learned more about the extent of Valeant's reliance on the deceptive practices when Valeant revealed poor financial results for fourth quarter 2015 ("4Q15") and drastically reduced its 2016 guidance.  ¶¶518-522.  Finally, on June 7, 2016, Valeant announced disappointing 1Q16 financial results and further reduced its guidance for 2016.  ¶524.  The disclosures caused Valeant's stock price to drop from Class Period highs of over $260 to $25.  ¶¶474, 524.

## III.   Argument: The Complaint Sufficiently Pleads Violations of §10b and Rule 10b-5

### A.   Legal Standards

In considering a motion to dismiss a securities fraud case the court must treat the pleaded facts as true and draw all reasonable inferences in favor of the plaintiff.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321, 324 (2007).  Rather than parse the allegations for individual analysis, the "court[] must consider the complaint in its entirety" to determine if the claims are properly stated.  *Id.* at 322.  Dismissal is inappropriate even where "it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits."  *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

To state a claim for securities fraud under §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).  The Exchange Act Defendants argue the Complaint fails to allege any misrepresentation or omission, scienter, and loss causation.  Each of their arguments lack merit and the motions to dismiss should be

denied.

**B.    The Complaint Adequately Alleges Material Misrepresentations and Omissions**

The Complaint sets forth each of the alleged misrepresentations and omissions, and identifies which one of the Exchange Act Defendants made or was responsible for each statement, the date of the statement, and the reason it was false.  *See* ¶¶133-228.  Nothing more is required.  *See In re Schering-Plough Corp. / Enhance Sec. Litig.*, 2009 U.S. Dist. LEXIS 78852, at *13 (D.N.J. Sept. 2, 2009) (finding plaintiffs described the alleged misrepresentations with sufficient particularity "to demonstrate the 'who, what, where, when and how' for each").

In determining whether the Complaint adequately pleads a misstatement, the Court must draw all inferences in favor of the plaintiff and evaluate the false and misleading statements in the context they would have been understood by a reasonable investor.  *See Matrixx*, 563 U.S. at 47.  Context matters because "[s]ome statements, although literally accurate, can become through their context and manner of presentation, devices which mislead investors."  *In re Merck & Co. Sec., Derivative, & ERISA Litig.*, 2011 U.S. Dist. LEXIS 87578, at *52 (D.N.J. Aug. 8, 2011).  Literally true statements can form the basis of liability because "a statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false representation as if all the facts stated were untrue."  *In re Vivendi, S.A. Sec. Litig.*, 2016 U.S. App. LEXIS 17566, at *24 (2d Cir. Sept. 27, 2016).

**1.    Defendants Have Admitted Certain of Their Statements Were False and Misleading**

With the exception of Jorn, the Exchange Act Defendants fail to challenge all of their alleged false and misleading statements.  The Exchange Act Defendants also conceded the falsity of statements by Valeant, Pearson, Schiller, Rosiello, and the Director Defendants by restating certain of Valeant's reported financial statements, admitting to material weaknesses in internal

24

controls, and issuing a correction of Pearson's April 29, 2015 statement.  Since plaintiffs need only allege a single false or misleading statement to state a claim for securities fraud against each defendant, courts hold that it is unnecessary to rule upon each and every statement at this stage of the case.  *See, e.g.*, *KBC Asset Mgmt. v. 3D Syst. Corp.*, 2016 U.S. Dist. LEXIS 96499, at *22 (D.S.C. July 25, 2016) (stating "this Court declines to rule on the sufficiency of every alleged misrepresentation at this stage of the proceedings as all that is required is for Plaintiff to have pled sufficient facts to permit a reasonable person to find a plausible claim for relief for the misrepresentation element").[6]  Thus, motions to dismiss on the ground that the Complaint fails to allege a false or misleading statement should be denied, on this basis alone, as to all Exchange Act Defendants except Jorn.

### a.  Statements Not Challenged by Defendants Are Waived

Accompanying their 65-page brief, the Valeant Defendants filed two argumentative appendices spanning nearly 50 more pages.  Dkt. Nos. 167-2, 167-3.[7]  According to them, Appendix B "catalogue[s] the Complaint's alleged misstatements and identifies the grounds for which each should be dismissed."  Val. Defs. Mem. at 48 n.50.  However, absent from that chart are the following false and misleading statements:

---

[6]   *See also Enzymotec*, 2015 U.S. Dist. LEXIS 167403 (identifying categories of alleged false statements and finding certain were actionable without explicitly ruling on each statement within each category); *Bauer v. Prudential Fin., Inc.*, 2010 U.S. Dist. LEXIS 64384, at *30 (D.N.J. June 29, 2010) (stating "because this Court finds that dismissal is inappropriate at this time…it need not reach Plaintiff's FAS 97 and Item 303 arguments"); *Ross v. Career Educ. Corp.*, 2012 U.S. Dist. LEXIS 155037, at *22 (N.D. Ill. Oct. 30, 2012) (ruling that "because plaintiffs have, by the allegations already discussed, met their burden of alleging the first requirement of a Rule 10b-5 claim, the Court need not address" the additional alleged false and misleading statements).

[7]   All Exchange Act Defendants joined in the Valeant Defendants' Motion.  *See* Schiller Mem. at 1 n.2; Jorn Mem. at 1; Carro Mem. at 1.  Moreover, Schiller joined in the motions filed by any of the Exchange Act Defendants.  *See* Schiller Mem. at 1 n.2.

- Pearson's statements regarding the AF channel and/or Philidor network on: January 4, 2013 (¶133(e), first two paragraphs); February 28, 2013 (¶134(b)); January 7, 2014 (¶147); May 8, 2014 (¶156); July 31, 2014 (¶169); and October 19, 2015 (¶210).

- Pearson's May 28, 2014 statements denying Allergan's claims (¶162(e), second paragraph) and stating Valeant had a lot of pricing constraints "just like other pharma companies do" and the "vast majority" of Valeant's growth was from volume (¶163(a), second paragraph).

- Pearson's May 21, 2015 statements assuring investors that "our accounting practices are fine," "[w]e get audited all the time, by the SEC . . . we have absolutely no issue from a government standpoint," and "we never had a financial irregularity." ¶192(e).

- Pearson's October 26, 2015 statement denying accounting fraud or improper practices involving Philidor and saying "we follow the law and we comply with the accounting and disclosure rules." ¶218(b).[8]

- Pearson's October 26, 2015 statement that Valeant's accounting with respect to the Philidor relationship was "fully compliant with the law." ¶216(b).

- Kellen's July 23, 2015 statement touting the continued adoption of Valeant's products by "multiple specialty pharmacies" (¶196).[9]

- Valeant's October 21, 2015 statement that "there is no sales benefit from any inventory held at these specialty pharmacies" (¶213).

By failing to challenge these statements, Pearson, Kellen, and Valeant concede falsity is sufficiently alleged as to them for purposes of the motion to dismiss. *See Laborers' Int'l Union v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) ("[A]n issue is waived unless a party raises it in its opening brief.").

---

[8]   The Valeant Defendants include Pearson's statements from ¶192(e) and ¶218(b) in their Appendix B as general statements about accounting but do not argue any basis for dismissal. *See* Val. Defs. Mem. Appx. B at 13.

[9]   Kellen offers no basis to dismiss this statement but erroneously claims this statement "is not alleged to be inaccurate." Val. Defs. Mem. at 61.  Kellen is wrong, as the statement was clearly emphasized in the Complaint like all other challenged statements and explained to be false and misleading. *See* ¶¶14 n.3, 196, 202.

In addition to the foregoing, the Exchange Act Defendants do not address the liability of Kellen, Rosiello, Carro, and the Director Defendants for the false and misleading statements made in presentations and releases on October 19, 2015 (¶206) and October 26, 2015 (¶¶215-217).  Rule 10b-5 liability extends to those who "make" allegedly false or misleading statements. *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142-43 (2011).  The Supreme Court has explained that "attribution" is "strong evidence" that the attributed party made the statement, and attribution can be found "within a statement" or "implicit from surrounding circumstances."  *Id.*  Moreover, "[n]othing in *Janus* precludes a single statement from having multiple makers."  *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 427 (7th Cir. 2015) (holding false statement was made by both the executive who drafted it and the executive who read it to the media).

During the conference calls on October 19 and 26, 2015, certain Exchange Act Defendants made oral statements (addressed below), with many of them attending to demonstrate solidarity in defending Philidor and Valeant's accounting through a slide presentation to investors.  First, the October 19, 2015 conference was hosted by Valeant with Pearson, Rosiello, and Kellen participating and distributing a presentation with draft questions and false and misleading answers defending Philidor's business practices, claiming the relationship with Philidor was concealed because it was a "competitive advantage," and claiming Valeant's use of specialty pharmacies was "[s]imilar to many pharmaceutical companies."  ¶206. The presentation repeatedly referred to "we" prior to making these false and misleading assertions and each of them is liable.  ¶206.

Second, the October 26, 2015 conference was attended by the Audit and Risk Committee (Provencio, Melas-Kyriazi, and Stevenson), the Lead Independent Director (Ingram), the

Controller (Carro), the current and former CFOs (Rosiello and Schiller), and two of the Company's top executives (Pearson and Kellen).   ¶217.   The show of force was intended to assure investors that the accounting fraud allegations by Citron were untrue.   Investors were provided with an additional slide presentation, which made several false and misleading statements refuting the claims about Philidor and accounting fraud.   *Id*.   Pearson, Ingram, and Rosiello also made oral statements confirming attribution to the full board, various committees of the board, and management, where they stated that they had all reviewed and approved the appropriateness of the accounting and the Philidor transaction.   ¶¶218(a), 219, 220(d).   Thus, all those who attended are liable for the false and misleading statements in the slide presentation.

Third, given that Ingram was the lead director, his statement that the "full Board" reviewed and approved the accounting sufficiently attributes his false and misleading statement defending the accounting to all the Director Defendants.   ¶219; *see also* ¶220(d) (Rosiello: same).   Finally, each Director Defendant is liable for Valeant's October 26, 2015 release, which also claimed that the "***Audit and Risk Committee and the full Board of Directors . . . have confirmed the appropriateness of the company's related revenue recognition and accounting treatment***."   ¶216(a); *see also* ¶215(a) (3Q15 10-Q same).   The evidence of attribution for the October 19 and 26, 2015 slide presentations, Ingram's oral statement on behalf of the "full Board," and the press release exceeds what is necessary under *Janus*.   *See In re Pfizer Sec. Litig.*, 2012 U.S. Dist. LEXIS 39454, at *20 (S.D.N.Y. Mar. 22, 2012) (holding multiple individual defendants were liable under *Janus* for statements in press releases they "approved or ratified" even though the statements "were not explicitly attributed to [them]"); *see In re Merck & Co., Sec., Derivative & "ERISA" Litig.*, 2013 U.S. Dist. LEXIS 77097, at *47 (D.N.J. May 29, 2013) (holding Merck and Merck employee were makers of statement in academic article even though

article was co-authored by various Merck and non-Merck employees).  At the very least, the question is one of fact for trial, not appropriately decided on a motion to dismiss.  *See Household Int'l*, 787 F.3d at 427 (holding in post-trial appeal that executive's presence during presentation and participation in subsequent Q&A created question for jury on remand as to his liability under *Janus*).  Since Kellen, Rosiello, Carro, and the Director Defendants fail to address their liability as co-makers of these alleged false and misleading statements, the issue is also waived.

### b.      The Restatement

Valeant's withdrawal and restatement of Valeant's 2014 annual financial statements as well as each quarterly financial statement for 2015 is sufficient to establish that they were false and misleading.  *See SEC v. Kelly*, 663 F. Supp. 2d 276, 285 (S.D.N.Y. 2009) ("[T]he mere fact that financial results were restated is a sufficient basis for pleading that those statements were false and misleading.").  Instead of challenging whether the statements were false, the Exchange Act Defendants claim the restatement was immaterial.  Val. Defs. Mem. at 48-51.  That is a separate issue and easily refuted below as only material errors are required to be restated.  *See Kelly*, 663 F. Supp. 2d at 285.  ("[U]nder [GAAP], a restatement issues only when errors are material."); *infra* §III.B.3.d.

Valeant and Pearson are liable because Valeant issued, and Pearson signed, each of the subsequently restated financial statements.  ¶¶184(a), 187, 198, 214.  Schiller (2014 10-K and first quarter 2015 ("1Q15") and Rosiello (second quarter 2015 ("2Q15") and third quarter 2015 ("3Q15")), are each liable for the financial statements they signed that were later restated.  *Id.*  Likewise, the Director Defendants are liable for the restated 2014 10-K that each of them signed.  ¶¶184, 302-305.  In addition, Valeant is liable for the press releases it issued that incorporated and repeated the false (and subsequently restated) revenues and earnings.  ¶¶174, 182.

### c.    Material Weaknesses in Internal Controls

The Complaint alleges that Valeant's false financial statements and Sarbanes-Oxley ("SOX") certifications assured investors that Valeant "maintained effective internal controls." *See, e.g.*, ¶¶135-136, 143, 145, 151(c), 157(b), 170, 179, 184(f)-(h), 187, 201, 215(d).   As revealed at the end of the Class Period, these statements were also acknowledged to be false and misleading as Valeant's internal controls suffered from multiple material weaknesses.  ¶304. "[I]t is a violation of [the] securities laws to fail to disclose the true facts regarding the adequacy of . . . internal controls."  *In re PMA Capital Corp. Sec. Litig.*, 2005 U.S. Dist. LEXIS 15696, at *32 n.8 (E.D. Pa. July 27, 2005); *see also Enzymotec*, 2015 U.S. Dist. LEXIS 167403, at *53 (holding SOX certifications adequately alleged to be misleading where internal controls were not effective and allowed defendants to engage in the fraudulent behavior).

Here, Pearson, Schiller, and Rosiello signed false certifications attesting that they had designed appropriate internal controls and the controls were operating effectively.  *See, e.g.*, ¶341.  However, on March 21, 2016, Valeant confirmed that its controls had not been effective in prior periods and instead suffered from multiple material weaknesses.  ¶304.  Valeant disclosed that one such weakness was that "the company has determined that the tone at the top of the organization, and the performance-based environment at the company, where challenging targets were set and achieving those targets was a key performance expectation, may have been a contributing factor resulting in the company's improper revenue recognition" and that the Company would replace CEO Pearson.  ¶305.  The Company also admitted that it suffered from an additional material weakness, namely that it failed to design and maintain effective controls over non-standard transactions at quarter-ends, which contributed to the overstatement of revenues through Philidor.  ¶693 & n.93.

The Exchange Act Defendants argue that "later internal control weaknesses" do not render prior internal control certifications false, citing *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481 (3d Cir. 2016). Val. Defs. Mem. at 51; *see also* Schiller Mem. at 17 n.8. In *Cooper Tire*, there was no restatement of prior results and the company only said that as of a certain date it could not collect accounting information. 834 F.3d at 498. The *Cooper Tire* plaintiff made the "bald assertion" that the problem existed prior to that date, which the court rejected. *Id.* In contrast, Valeant did not claim to have material weaknesses only as of the date it disclosed them, *i.e.*, 2016; rather, Valeant admitted the control deficiencies existed in prior periods and restated prior results. ¶¶342-343. Thus, Valeant admitted the 2014 certification and each quarterly certification thereafter were false and restated those financial statements. *See* ¶345.

As to certifications prior to the 2014 10-K, the Exchange Act Defendants' reliance upon *Cooper Tire* is still unavailing. Unlike *Cooper Tire*, where controls worked prior to the date they ceased, here, Valeant admitted it had an improper tone at the top, which was set by senior management including Pearson who became CEO before the Class Period. ¶¶36, 305, 693 n.93. Valeant also admitted it failed to design and implement quarter-end controls and it is axiomatic that if Valeant had not designed a control by year-end 2014, it did not have it in 2013. Likewise, the Exchange Act Defendants ignore that Pearson and Schiller certified that there were no material changes with respect to Valeant's controls between 2013 and 2014, further showing the lack of effective controls and improper tone existed in 2013. ¶¶136, 184(h); *see Enzymotec*, 2015 U.S. Dist. LEXIS 167403, at *53-54 (upholding allegations that "the internal controls were deficient, such that Defendants were allowed to engage in the allegedly fraudulent behavior

during the Class Period"). Thus Valeant, Pearson, Schiller, and Rosiello are liable for the false and misleading internal control statements.

### d.    Valeant's Correction of Pearson's Volume Statement

On April 29, 2015, Pearson discussed the relative contribution of price increases and volume growth on Valeant's 1Q15 growth, stating "*[i]n terms of price volume, actually volume was greater than price in terms of our growth*" adding that "*in the US it's shifting more to volume than price, and we expect that to continue*." ¶186(b). On February 3, 2016, the day before Schiller testified before the House Oversight Committee, Valeant issued a release correcting this false statement as price had accounted for 80% of growth, four times the portion of growth due to volume. ¶¶191(d) & n.23, 418. This admission alone is sufficient to plead the falsity of the April 29, 2015 statement. *See Avaya*, 564 F.3d 242, 263-264 (finding defendants' statements regarding pricing pressure were false and misleading, where after denying the existence of unusual discounting and pricing pressure, defendants thereafter admitted that the company was in fact providing discounts).

The Exchange Act Defendants argue that other statements made clear Valeant was growing more by price than volume and argue for alternative interpretations of Pearson's statement. Val. Defs. Mem. at 15. But if Pearson's statement was not false and misleading, then Valeant would not have needed to correct it nine months later.[10] The statements the Exchange Act Defendants rely upon were contradicted by Pearson's April 29, 2015 statement as well as the Exchange Act Defendants' other false and misleading statements claiming price increases were capped at 9% or 10% and within industry norms and highlighting increased sales volumes. *See*

---

[10]   For the same reason, Pearson's argument that his statement was not material is without merit. Val. Defs. Mem. at 7. *See also In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 276 (3d Cir. 2004) (stating "a company often chooses to issue an extraordinary press release when it needs to disseminate important information to its investors").

*infra* §§III.B.2.b.-c.   The Exchange Act Defendants' effort to argue the various statements counterbalanced one another is a factual dispute inappropriate for a motion to dismiss.   *See Merck*, 2011 U.S. Dist. LEXIS 87578, at *134-35 (rejecting "fact-intensive" truth on the market defense where defendants made "repeated reassurances" to counteract the negative information).[11]   *See also Enzymotec*, 2015 U.S. Dist. LEXIS 167403, at *51-52 (rejecting truth on the market argument, holding it is "inappropriate" at the motion to dismiss phase).

### 2.   The Complaint Alleges Several Categories of Misrepresentations

During the Class Period, the Exchange Act Defendants made false and misleading statements regarding several topics,[12] and then discussed and repeated the same or closely related misrepresentations at each quarterly conference call.[13]   The statements made up "a network of interrelated lies, each one slightly distinct from the other, but all collectively aimed at perpetuating a broader, material lie."   *See Vivendi*, 2016 U.S. App. LEXIS 17566, at *55

---

[11]   *See also In re Iso Ray Sec. Litig.*, 2016 U.S. Dist. LEXIS 71953, at *28-29 (E.D. Wash. June 1, 2016) (rejecting truth on the market argument and holding "Defendants bear a 'heavy burden' of proving that information withheld or misrepresented was transmitted to the public with a degree of intensity and credibility to effectively counterbalance the misleading impressions created by insider one-sided representations"); *Swack v. Credit Suisse First Boston*, 383 F. Supp. 2d 223, 238 (D. Mass. 2004) (rejecting truth on the market defense where "the market knew of general problems, but not the nature or extent").

[12]   The Complaint sets forth the misrepresentations in chronological order.   *See* ¶¶132-228. Here, they are grouped by topic to facilitate the Court's analysis.

[13]   The Exchange Act Defendants make a passing comment that the Complaint is too long.   Val. Defs. Mem. at 48 n.50.   The length of the Complaint is a consequence of the number of Defendants and claims, length of the Class Period, and that the false and misleading statements were critical to Valeant's operations and discussed at each quarterly conference call.   The length is similar to other corporate scandals.   *See, e.g.*, First Amended Consolidated Complaint for the Violations of Securities Laws, *In re Enron Corp. Sec. Litig.*, No. H-01-3624 (S.D. Tex. May 14, 2003) (640 pages); Consolidated Class Action Complaint for the Violations of the Federal Securities Laws, *In re Schering-Plough Corp. / ENHANCE Sec. Litig.*, No. 08-cv-00397 (D.N.J. Sept. 15, 2008) (230 pages).

(upholding jury finding that fifty-six statements concealed company's "liquidity risk" where some spoke "directly to liquidity risk, while others concern[ed] components that contributed to [the company's] liquidity risk").  The Exchange Act Defendants twist their statements in order to argue alternative and innocent meanings, but such factual disputes are inappropriate for a motion to dismiss wherein all inferences are to be drawn in plaintiff's favor.  *See In re ViroPharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 470 n.20 (E.D. Pa. 2014) (denying motion to dismiss and rejecting defendants' alternative version of the facts, noting plaintiff is entitled "to discovery to flesh out the truth of the narrative").

<blockquote>

a.    **False and Misleading Statements Concerning the Independence of Valeant's Specialty Pharmacies**

</blockquote>

The Exchange Act Defendants concealed Valeant's control over the Philidor network by misleadingly suggesting that Valeant's products were being distributed by "multiple," "independent" and "specialty" pharmacies and that its relationship with and use of such pharmacies was just like everyone else in the industry.   Specifically, the Exchange Act Defendants made the following false and misleading statements:

- Valeant, Pearson, Schiller, Rosiello, Director Defendants:[14]  quarterly and annual reports reviewed, approved, and signed by Pearson (all), Schiller (all prior to 2Q15), Rosiello (2Q15 and 3Q15), and the Director Defendants (2014 10-K) claimed Valeant's products "***are distributed by third parties over which we have no or limited control***"  ¶¶137, 143, 145, 153, 158, 171, 178, 184(g), 189, and 200.

- Valeant, Pearson, Schiller, Rosiello, Ingram, Provencio, Melas-Kyriazi, Stevenson, Carro, Kellen: presented a slide presentation in response to Philidor disclosures that said, "***[w]e do not own or control Philidor***," "***Philidor employees do not report to Valeant,***" and "***Philidor is independent***"  ¶¶217(b)-(d).

- Valeant, Pearson, Rosiello, Kellen: presented a slide presentation responding to questions about Philidor that claimed "***[s]imilar to many pharmaceutical***

---

[14]   Valeant is also liable for each false and misleading statement by the Individual Defendants. *See Avaya*, 564 F.3d at 252 (holding that "a corporation is liable for statements by employees who have apparent authority to make them").

> ***companies in the U.S., an increasing percentage of our revenue is coming from products dispensed through multiple specialty pharmacies***"  ¶206; *see also* ¶207 (Pearson: stating the same).

- Kellen: in discussing the dramatic growth of Jublia sales said, "***[y]es, the adoption through multiple specialty pharmacies continues.***  I think last time we said Jublia was around 50%.  That trend continues.  For derm[atology] overall, it varies by product, but it's around 40%"  ¶196.

Kellen fails to challenge his statement.  *See supra* §III.B.1.a.  The Valeant Defendants list the lack of control statement on their appendix and label it as true, though Schiller argues it was forward-looking, which is addressed below.  *See* Val. Defs. Mem. Appx. B at 23; Schiller Mem. at 18.  In any event, these statements were all false and misleading because they concealed that Philidor was not independent, was not a specialty pharmacy,[15] and was formed by and completely dependent upon Valeant.  ¶¶54 & n.8, 87-96, 262, 267, 406.  Valeant formed Philidor and operated it as a division of Valeant wherein employees worked for both companies and saw each other as part of the same organization.  ¶¶94-98.  Valeant had the power, as exercised at the end of the Class Period, to shut down the entire "specialty" pharmacy network because Valeant was Philidor's only client.  ¶¶54 & n.8, 252, 262, 267.  Moreover, the claim that "multiple" pharmacies were "adopting" Valeant products reinforced the deceptive impression that they were independent, when it was effectively a single pharmacy, Philidor, that just used the identification

---

[15]   The Exchange Act Defendants raise a red herring by citing analyst reports referencing "specialty pharmacy Philidor."  Val. Defs. Mem. at 12-13.  Reference to materials outside the complaint for their truth is impermissible for a motion to dismiss, *Bruni v. City of Pittsburgh*, 824 F.3d 353, 360 (3d Cir. 2016).  Also the name did not reveal the relationship with Philidor and the use of deceptive practices to inflate sales and sale prices that misled investors and payors.  *See, e.g.*, ¶165.  The reference to Philidor as a "specialty" pharmacy was itself misleading since it distributed acne and toenail products, not the complex drugs that required specialized handling or involve unique therapies.  Val. Defs. Mem. at 1; ¶¶93, 245.  That Philidor was not a "specialty" pharmacy was made clear when Valeant replaced it with a traditional retail pharmacy, Walgreens.  ¶¶276, 296.

numbers of related and controlled pharmacies to resubmit rejected claims or to distribute in states where Philidor was not licensed.  ¶¶108, 110-111, 113, 116-117.

The refusals of PBMs to reimburse Philidor prescriptions and the shutting down of Philidor when the scam was exposed confirmed these practices were not "similar" to other pharmaceutical companies.  ¶¶252, 260-262.  As media also confirmed after the relationship was exposed, Valeant had a relationship with Philidor that "other [drug] companies don't appear to have."  ¶249 n.30.  While the Exchange Act Defendants fail to explain their conclusory assertion that the statements were true, any alternative interpretation is inappropriate for a motion to dismiss.  *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008) (reversing dismissal of complaint and rejecting defendants' alternative interpretation of statements because "[w]hile this is a conceivable interpretation of this paragraph, it is hardly the only – or even the most plausible – one").

> **b.     False and Misleading Statements Concerning Valeant's Pricing and Copay Practices**

The Complaint also alleges the Exchange Act Defendants made numerous false and misleading statements regarding Valeant's pricing, including:

- Pearson: in response to assertions by Allergan about large price increases said, "[s]o I think most external sources talk about gross prices which have nothing to do with net pricing through managed care contracts, etc., etc.  *We are limited. For example in the US with our managed care contracts, I think the maximum price increase we can take a year is 9% across dermatology, across ophthalmology, etc.  So that is what limits. It is managed care in the United States*" ¶162(e); *see also* ¶163(a) (Pearson: repeating "*the highest price increase we could take under any managed care contract we have in the US is 9% a year*"); ¶192(a) (Pearson: making similar statement).

- Pearson: "*[s]o, we have a lot of constraints, just like other pharma companies do, in terms of pricing.  So, we focus on volume growth, and the vast majority of our growth on a global basis – and we went through some of that this morning – is volume*" ¶163(a); *see also* ¶163(b) (Pearson: claiming "*[w]e're more like a generics company in terms of the amount of revenue we get per product*").

36

- Pearson: "*[o]ur view on pricing* – across most of our portfolio, *we do not take prices. . . . But our base strategy is, how do we grow organically through volume, which is – I think this quarter, we once again exhibited our ability to do so*." ¶197.[16]

- Valeant, Pearson, Schiller, Director Defendants: Valeant's 2013 10-K and 2014 10-K, which were reviewed, approved, and signed by Pearson (both), Schiller (both), and the Director Defendants (2014 10-K), claimed, "*[t]o successfully compete for business with managed care and pharmacy benefits management organizations, we must often demonstrate that our products offer* not only medical benefits but also *cost advantages as compared with other forms of care*." ¶¶151(a), 184(c);

- Valeant Pearson, Schiller, Rosiello, Ingram, Provencio, Melas-Kyriazi, Stevenson, Carro, Kellen: presented a slide presentation in response to Philidor disclosures that stated "*[p]rescriptions through Philidor are less profitable than traditional channels due to lower copay rates, lower cash pay rates and more cash pay scripts in Philidor than in retail and other channels*" ¶217(a).

- Pearson: claimed Valeant raised the prices of Isuprel and Nitropress because Marathon left money "on the table" and "*the drugs were mispriced vs. comparative products*," and "*that can create lot of value[] for shareholders*" ¶192(c); *see also* ¶192(b) (Pearson: saying Valeant raised prices after acquisitions because the companies "*did not . . . price their product the right way*").

The Exchange Act Defendants waive argument as to Pearson's statement in ¶163(a) above. *See supra* §III.B.1.a. The Exchange Act Defendants claim some of the other statements are vague. *See, e.g.*, Val. Defs. Mem. at 57-58. Of course, in order to argue the statements are vague, they resort to altering these statements by removing the emphasis in the Complaint on the phrase "just like other pharma companies do," thus stripping the comparison to industry pricing. *Compare* Val. Defs. Mem. Appx. B at 15-16, 19 *with* ¶¶176, 197, 198, 206. These statements were clearly false and misleading because, far from competing on "cost advantages," Valeant

---

[16] *See also* ¶176 (Valeant's: SEC filing in response to Allergan claiming "*[l]ike all PhRMA companies, including Allergan, our managed care contracts restrict our price increases each year, and many of our managed care contracts restrict price increases to less than 10% net price increase per year*"); ¶197 (Pearson: stating Valeant's price increases were "*just consistent with what most companies do*"); ¶209 (Pearson: responding to allegations of price gouging that "*it's clear that the pharmaceutical industry is being aggressively attacked for past pricing actions. And that's not just Valeant, but I think it's all companies*.").

raised the prices of numerous drugs by many multiples of its competitors, far beyond generics pricing and any purported 10% cap, including by as much as 5,800%. ¶¶66-67, 236, 296. As Valeant's price gouging was revealed, Pearson effectively admitted that Valeant's price increases had exceeded industry norms and contractual limits when he promised that "future price increases will be more modest and in line with industry practices and managed-care contracts." ¶296.

All of these statements concealed Valeant's dependency on its strategy of acquiring products wherein it could implement its deceptive tactics to engage in price gouging as a main driver of profitability and growth. *See, e.g.*, ¶¶58-67, 232-236, 421. Moreover, the acquired drugs, like Isuprel and Nitropress, were not mispriced relative to competitors but were products with no alternatives, where Valeant raised prices to exploit the FDA delays in introducing generic alternatives, and concealed its practices with deceptive copay waivers and PR strategies. ¶¶59-68, 73-80.

Contrary to the claim that Philidor was a "less profitable" channel, shutting Philidor down caused Valeant's revenues and profitability to plummet. ¶¶267-270, 277, 361-362. The very reason for creating Philidor, rather than using Walgreens as Valeant did once Philidor was closed, was to increase profits through deceptive tactics that could not be used with an independent pharmacy. *See infra* §III.C.1.b. For example, Pearson, Schiller, and Kellen touted the massive growth of Jublia sales to investors as it became Valeant's second highest selling drug with annual sales of $450 million. *See, e.g.*, ¶¶168, 173 175, 183, 185, 195, 196. But, almost half of those sales were through Philidor. ¶253. When Philidor closed, Jublia's sales fell to an annual rate of only $150 million. *See* ¶¶353-354.

38

The Exchange Act Defendants also argue they "had no duty to disclose more about [Valeant's] pricing and sales practices than [they] did."[17] Val. Defs. Mem. at 56. However, having chosen to speak about pricing, they were obligated to speak truthfully, and it was simply not true that Valeant's price increases were capped or within industry norms. *See Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992) (by choosing to speak, defendant puts the subject "in play" and is "bound to speak truthfully" on the subject).

Relatedly, the Exchange Act Defendants' claims regarding increased co-pay assistance were false and misleading, including:

- Jorn: "*we have launched additional access programs so that patients can get the medicines that their physician prescribes for them*" ¶162(b).

- Valeant, Pearson, Rosiello: Valeant's 2Q15 10-Q, reviewed, approved, and signed by Pearson and Rosiello stated, "*[a]s is customary in the pharmaceutical industry, our gross product sales are subject to a variety of deductions* in arriving at reported net product sales. . . . *Provisions as a percentage of gross sales increased* to 32% and 33% for the second quarter and first half of 2015, respectively, compared with 27% and 26% in the second quarter and first half of 2014. *The increase was driven by (i) higher provisions for rebates, chargebacks, and returns, including managed care rebates for Jublia® and the co-pay assistance programs . . . .*" ¶198; *see also* ¶215(a) (Valeant's 3Q15 10-Q, reviewed, approved, and signed by Pearson and Rosiello, stating "*[a]s is customary in the pharmaceutical industry, our gross product sales are subject to a variety of deductions* in arriving at reported net product sales.").

---

[17]   Their argument relies on a clearly distinguishable case, *Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014). Val. Defs. Mem. at 56. In *Intuitive Surgical*, the court found that a statement discussing the company's "increased revenue" was not misleading because revenue had increased and the statement did not trigger a duty to disclose declining growth, as defendants "do not purport to speak to any trends" in growth or revenues. 759 F.3d at 1061. In contrast, the statements here were not alleged to be misleading for omitting to disclose future trends. The statements were misleading, for example, because Valeant was raising prices by as much as 5,800% and far beyond industry norms, price increases were essential to its "base strategy," the deceptive practices including copay waivers increased sales and profitability through Philidor, and the acquired products had not been mispriced. Under any reasonable interpretation of those statements, they were clearly false. *See Merck*, 2011 U.S. Dist. LEXIS 87578, at *51 (holding that even if a statement is literally true, "there is an affirmative duty to disclose when there has been an inaccurate, incomplete, or misleading prior disclosure.").

In truth, Valeant's increased patient assistance program was neither motivated by charity nor undertaken to ensure patients got access to the medicines prescribed for them, but based upon writing off the increased cost of drugs whose prices had been massively inflated. *See, e.g.*, ¶¶68-74, 421, 436.  Valeant's write-offs were not "customary" but reflected giveaways to patients directed at deceiving payors into paying higher prices by increasing the likelihood that patients would not refuse automatic refill programs and otherwise use Valeant's high-priced medicines without requesting that their physicians prescribe cheaper alternatives. *See, e.g.*, ¶¶68-69, 116.  While the Exchange Act Defendants argue that such practices did not violate criminal laws (Val. Defs. Mem. at 13 n.10), that is irrelevant because directing such practices to private payors still violated PBM contracts and risked alienating physicians,[18] payors, and PBMs, thereby reducing overall sales or increasing refusals to pay. *See* ¶¶68, 118-119, 260-261, 267; *see Enzymotec*, 2015 U.S. Dist. LEXIS 167403, at *49 (stating "the Court agrees that the question of whether disclosure was required is best left to the trier of fact, since whether a prior disclosure is inaccurate, incomplete, or misleading in light of all of the evidence is a mixed question of law and fact").

### c.    False and Misleading Statements Concerning the Source of Valeant's Dramatic Growth in Revenues, Sales, and Profitability

Given Valeant's accumulation of debt to fund its acquisition strategy, it was imperative that Valeant demonstrate strong revenue growth to service its debt. *See, e.g.*, ¶¶9-11, 148(d)-(e). During the Class Period, the Exchange Act Defendants misled investors by claiming the dramatic growth in Valeant's revenue, profitability, and product sales volume resulted from legitimate

---

[18]   When the relationship with Philidor was revealed physicians began writing fewer Valeant prescriptions and described the concealment as "misleading and dishonest" and "[v]ery shady business practices."  ¶275 n.37.

practices like "innovative" marketing and denying that deceptive practices were responsible, with statements including:

- Pearson: attributing increased revenues in dermatology to "*[n]ew leadership [that] has brought stability to the sales force and has led to innovative new marketing approaches that are working well.* This has resulted in market share and revenue gains across the portfolio, including launch products" ¶175.[19]

- Schiller: "*The outstanding work of our sales teams, implementation of innovative marketing approaches, great leadership,* a portfolio of great products, and our four new launch products *have contributed to the turnaround and the outstanding results in our dermatology business in Q4 and 2014*" ¶183.[20]

- Pearson: "*When we acquired Medicis*, I think we mentioned that *we picked up a couple of orphan drugs, which they weren't marketing optimally. And so we have been able to take advantage of that and grow those products*." ¶150.

- Pearson: "*we focus on volume growth, and the vast majority of our growth on a global basis – and we went through some of that this morning – is volume*" ¶163(a).

- Pearson: in discussing 1Q15, wherein price accounted for 80% of growth, "*[i]n terms of price volume, actually volume was greater than price in terms of our growth,*" adding that "*in the US it's shifting more to volume than price, and we expect that to continue*" ¶186(b).

- Pearson: "*we've been accused of our growth being price and not volume*" and "*organic growth is more volume than price and will continue to be*" ¶192(d).[21]

---

[19] These statements need to be considered in the context in which they were made, namely, they were offered to explain Valeant's purportedly strong results.

[20] A substantial portion of dermatology products were sold through the Philidor network, including nearly half of Jublia sales, which relied upon numerous deceptive practices to boost sales. *See, e.g.*, ¶¶116-117, 133, 259, 353-354, 361-362. Valeant, Pearson, Schiller, and Rosiello made several additional false and misleading statements highlighting the sales growth of products sold through Philidor or boosted through deceptive practices. *See* ¶¶144, 149, 185, 193, 205(a) (Valeant); ¶¶146, 162, 164(a)(c), 167-168, 173, 175, 186(a), 194-195, 203(c) (Pearson); ¶183 (Schiller); ¶215(b) (Valeant, Pearson, and Rosiello).

[21] *See also* ¶164(b) (Pearson: saying "*a lot of assertions are that it's all about price but it's not*"); ¶164(b) (Pearson: claiming "*volume is a much larger piece of our organic growth than much people would assume it is*"); ¶203(a) (Pearson: refuting claim that Valeant's business model and strategy is dependent upon large price increases as "*incorrect*" and claiming "*Valeant is well-positioned for strong organic growth, even assuming little to no price increases*");

- <u>Jorn</u>: in the context of discussing the "energized sales force" highlighted that "*[w]e have returned many of our core brands to growth*" and "*we have been able in 2014 to turn around our largest brand Solodyn*" and increase market share as well as "*maintain greater than 80% share of … the market with our brand, Acanya*" ¶162(c)

For most of these statements, the Exchange Act Defendants do not contest their falsity, but rather assert that they were immaterial puffery. *See* Val. Defs. Mem. Appx. B at 1-6; *see also* Schiller Mem. at 14-15. The puffery argument is addressed below. *See infra* §III.B.3.b. It is clear that each of these statements was false and misleading because Valeant's concealed and deceptive business practices drove Valeant's remarkable increase in revenues and profitability. ¶¶12, 57-131, 350-354, 357-362, 365, 373-374. Moreover, "[g]iven that [Valeant] was in a phase of intense buying, . . . any investor attuned to [Valeant's] pattern of behavior would be keen to know whether and how [Valeant] was making sufficient profits to translate into cash flow that would cover all of [Valeant's] sundry debt obligations." *Vivendi*, 2016 U.S. App. LEXIS 17566, at *57 (holding reasonable investor could find statements about a company's EBITDA misleading where the statements suggested the company had better liquidity to service increasing debt than it actually did).

Schiller argues that the statements were true and it was the innovative marketing that was the true source of the revenue and sales growth, claiming such statements were not "false when made or even proved inaccurate in hindsight." Schiller Mem. at 14-16 & n.7. However, since 2013, Valeant had grown more by price than volume in all quarters except one. ¶432. As Pearson later admitted, price increases had 150% greater impact on growth than volume in 2014 and 2015, with, for example, "Neuro and Other" products losing 7% of volume but having a net

¶203(b) (<u>Pearson</u>: after disclosure of subpoenas directed at pricing practices, saying "[a]s we have stated many times, *Valeant's core operating principles include a focus on volume growth*" and "the majority of our portfolio *will continue to deliver strong volume-based organic growth and is not dependent on price increases*").

realized price increase of 30%.  ¶242.  Contrary to Schiller's claim that these statements were true, (Schiller Mem. at 14-15), Valeant's growth in 2014 and 2015 was driven by its deceptive practices and price gouging, as reflected by the massive reduction in financial guidance when those practices ceased.  *See infra* §III.B.3.c.; *Steiner v. MedQuist Inc.*, 2006 U.S. Dist. LEXIS 71952, at *51-52 (D.N.J. Sept. 29, 2006) (finding the failure to disclose the true source of company's revenues actionable when the company made statements putting the source of its revenues at issue).  For the same reasons, Jorn's argument that her statements highlighting growth of dermatology products were "accurate," (Jorn Mem. at 10) fails to acknowledge that, when discussed in the context of an energized sales force, they were misleading in light of the omission of the deceptive practices.  *Id*.

> **d.   False and Misleading Statements Concerning Accounting and Internal Controls**
>
> **(1)   False and Misleading Statements that Valeant Complied with GAAP**

The Exchange Act Defendants claimed they had no accounting errors and complied with GAAP, even when specific questions regarding Valeant's accounting for Philidor were raised at the end of the Class Period.  ¶¶206, 213, 246-247.  Specifically, the following statements were false and misleading:

- Pearson: "***our accounting practices are fine,*** " "***[w]e get audited all the time, by the SEC...and we have absolutely no issue from a government standpoint,***" and "***we never had a financial irregularity***"  ¶192(e).

- Valeant, Pearson, and Rosiello: in response to Citron, claiming Valeant had not recognized revenues through Philidor prematurely but waited until the products were distributed to patients, Pearson said "***[s]ince we do not recognize the revenue of our products [sold through Philidor] until the prescriptions are filled, this consolidation has the impact of delaying revenue recognition as compared to products that are sold through traditional distribution channels***" ¶208; ¶207 (Pearson: same); ¶213 (Valeant: same); ¶¶220(a)-(c) (Rosiello: same).

43

- <u>Valeant and the Director Defendants</u>: denying accounting fraud through Philidor in response to Citron and stating in a release that Valeant's "***Audit and Risk Committee and the full Board of Directors have reviewed the company's accounting for its Philidor arrangement and have confirmed the appropriateness of the company's related revenue recognition and accounting treatment***," ¶216(a); ¶219 (Ingram on behalf of full board: same); ¶216(c) (Ingram repeating the same in a Valeant release); ¶215(a) (Valeant, Pearson, Rosiello: issuing 3Q15 10-Q repeating the same).

- <u>Pearson</u>: in response to Citron stating "***we stand by our accounting treatment of Philidor completely***"; "***[w]e follow the law and we comply with accounting and disclosure rules***"; "***the sensational claims made by the short seller Andrew Left, through his entity Citron, are completely untrue . . .***"; "***[t]here have been no issues with regards to the accounting or revenue recognition of the business***" ¶218; *see also* ¶¶216(a)-(b) (release quoting Pearson defending accounting); ¶225(Pearson refuting Citron and defending accounting).

- <u>Rosiello</u>: in response to Citron, "***[t]he finance and transactions committee, audit and risk committee, and full Board, all reviewed the transaction. The appropriate accounting treatment was determined by management and reviewed with the Audit and Risk Committee***." ¶220(d).

- <u>Carro</u>: in defense of Valeant's failure to disclose Philidor previously, "***Philidor is not considered to be material to Valeant's business for reporting purposes***" and "***Philidor was not specifically mentioned in our disclosures because it had not been material to the consolidated financial statements***, . . ." ¶¶221(a), (b).

The Exchange Act Defendants waive any argument as to some of these statements. *See supra* §III.B.1.a. To the others they argue that "Plaintiffs do not contend that Citron's accusations of 'phantom sales' and 'channel stuffing' were even remotely true." Val. Defs. Mem. at 2. This is wrong. The Complaint alleges that Citron accused Valeant of inflating sales through Philidor and that the Exchange Act Defendants' denials that they had not done so and had complied with GAAP were false and misleading. *See, e.g.*, ¶¶213, 216-221, 228(h)-(k), 246. All of the above false and misleading statements sought to reassure investors that Valeant's accounting complied with GAAP, that its accounting for Philidor transactions complied with GAAP, that its board and various committees had carefully reviewed and confirmed such compliance, and that Citron's claims were "completely untrue." *See, e.g.*, *supra* §II.B.4. In

44

truth, Valeant committed clear violations of GAAP by selling to itself (*i.e.*, Philidor) and then booking revenues twice when Philidor sold the same products. *See supra* §II.B.4. Moreover, Carro's argument that her statement was not false, (Carro Mem. at 2-3, 7), overlaps with her materiality argument and is without merit because, as explained below, Philidor was clearly material to Valeant's operations. *See infra* §§III.B.3.c.-d.

**(2)     False and Misleading Statements Concerning
          Valeant's Controls and Compliance**

In addition to falsely certifying that Valeant's internal controls were effective, the Exchange Act Defendants made the following false and misleading controls and compliance related statements:

- <u>Pearson</u>: in response to disclosures of the investigations and Philidor, "***[a]ll of us at Valeant firmly believe in maintaining strong regulatory and financial controls and believe we have operated our business in a fully compliant manner***" ¶204.

- <u>Valeant</u>: a document filed with the SEC responding to Allergan's claims stated, "***[w]e have no knowledge of any exposures or issues other than those disclosed or for which reserves have been established***" (¶172), and an investor presentation filed with the SEC listed "Valeant Operating Principles" to include, "***[p]ut patients and our customers first by maintaining the highest ethical standards in the industry***" and "***[e]nsure tight controls and rigorous compliance standards*** while avoiding overspending" ¶166.

- <u>Director Defendants</u>: Ingram, on behalf of the full board, and after disclosures regarding Philidor and the investigations, said the board of directors "***has fully supported the company's specialty pharmacy strategy***" and Pearson "***operates with the highest degree of ethics***." ¶216(c). [22]

---

[22]   *See also* ¶140 (<u>Valeant</u>: publicly filed employee memorandum stating, "***[h]ealthcare companies are held by society to the highest possible ethical standard—and they should be. Adhering to this extremely high ethical bar supersedes any financial or other objective.***"); ¶142 (<u>Pearson</u>: claiming "***[i]n terms of compliance, compliance is obviously very, very important for us*. And has to be for every pharmaceutical company. . . . *That's our most important thing that – that comes before everything.***") ¶91(b) (Pearson: concealing improper tone at the top).

45

The Exchange Act Defendants' argument that all compliance statements were puffery ignores the context in which the statements were made and is more fully addressed below in §III.B.3.b.  *See also Ross*, 2012 U.S. Dist. LEXIS 155037, at *20 (rejecting puffery argument and finding statements regarding a "culture of compliance" were sufficiently alleged as misleading in context).  The statements were false and misleading as Valeant's business model was built on using deceptive practices to boost sales and sale prices which, once discovered, resulted in massive sales losses and refusals to reimburse Valeant products.  *See infra* §III.B.3.c.

**(3)     False and Misleading Statements Concerning
Philidor's Controls and Compliance**

In addition to assuring investors that Valeant was not engaged in deceptive practices, as Valeant's relationship with Philidor was uncovered and Philidor's practices began to be questioned, the Exchange Act Defendants defended Philidor stating:

- Pearson: in response to Philidor allegations, "*[w]e have been working with outside counsel and we have found no evidence of illegal activity whatsoever at Philidor*"  ¶218(f).

- Valeant, Pearson, Schiller, Kellen: a slide presentation responding to questions about Philidor stated, "*[w]e understand that Philidor . . . [d]oes not restrict prescriptions it fills to any particular manufacturers (including Valeant)*" and "*[d]ispenses generic products as specified in patient's prescription or as requested by patient*"  ¶206.[23]

- Pearson: in response to the R&O lawsuit, "*R&O is one of the specialty pharmacies in our network*" and "*R&O is currently improperly holding significant amounts it receives from payers*.  We will refrain from comment on active litigation, and *look forward to showing in court that we are owed the money*."  ¶210.

---

[23]   The slide presentation also claimed: "*We find specialty pharmacies improve patients' access to medicines at an affordable price and help ensure physicians are able to prescribe the medications they believe most appropriate for their patients*."   ¶206; *see also* ¶207 (Pearson: stating the same); ¶166 (Valeant: SEC filing stating Valeant focused on "*[s]elect high-growth business segments . . . where the healthcare professional is still the primary decision maker*").

46

The Complaint details how Philidor engaged in deceptive practices that included operating in states without a proper license and submitting false information to payors (such as false pharmacy identification numbers).  ¶¶115-117.  Likewise, R&O was not a specialty pharmacy in Valeant's network but was having its identification number used without its consent to fill Valeant prescriptions that otherwise would have been rejected if submitted by Philidor, which had its license application rejected in California.  ¶¶106-108, 125.  Far from improving access at "affordable prices" to ensure patients got the medications their physicians prescribed, Philidor altered prescriptions to require Valeant products.  ¶¶82-119.  Valeant was using Philidor to offer copay waivers to increase the use of its products by minimizing patient complaints over the high prices being charged payors while concealing its relationship with Philidor and such practices from payors.  *Id.*  These alleged false and misleading statements together concealed Philidor's deceptive practices from investors.  *See Vivendi*, 2016 U.S. App. LEXIS 17566, at *54 (holding statements must be "*taken together and in context*" to determine whether they "would have misled a reasonable investor" (emphasis in original)).  The Exchange Act Defendants argue some of the statements were forward-looking or puffery, but their arguments are without merit for the reasons discussed below.  *See infra* §III.B.3.; III.B.4.a.

**(4)     False and Misleading Statements Concerning VIE**

Valeant's financial statements were false and misleading because they failed to identify the Philidor network as a variable interest entity ("VIE").  Under the relevant GAAP, FASB Accounting Standards Codification Topic 810 ("ASC 810"), a reporting entity must disclose information about its involvement with both unconsolidated and consolidated VIEs, including each VIE's "nature, size, purpose, activities, and how it is financed."  ¶¶323, 325.  The Exchange Act Defendants' failure to identify Philidor as a VIE violated GAAP and thus was false and

misleading.  *See, e.g.*, *Aviva Partners, LLC v. Exide Techs.*, 2007 U.S. Dist. LEXIS 17347, at

*48 n.1 (D.N.J. Mar. 13, 2007) (holding "[company] filings that plaintiffs allege violated GAAP

are actionable misstatements under Rule 10b-5").

Here, Valeant subsequently admitted Philidor was an unconsolidated VIE prior to the

purchase option agreement and a consolidated VIE after the purchase option agreement.  ¶¶323-

324, 327.  However, Valeant's Class Period SEC filings made no mention of Philidor; its nature,

size, purpose, activities, or financing; or the bases for consolidation.  Instead, the SEC filings

contained the following false and misleading statements:

- <u>Valeant, Pearson, Schiller</u>: Valeant's 2013 10-K, reviewed, approved, and signed by Pearson and Schiller, claimed "***[t]here were no material arrangements determined to be variable interest entities***."  ¶151(b).

- <u>Valeant, Pearson, Schiller, Director Defendants</u>: Valeant's 2014 10-K, reviewed, approved, and signed by Pearson, Schiller, and the Director Defendants, claimed "***[t]he consolidated financial statements include the accounts of the Company and those of its subsidiaries and any variable interest entities ('VIEs') for which the Company is the primary beneficiary*,**" ¶184(d), and "***[d]uring the year ended December 31, 2014, the Company completed other smaller acquisitions, including the consolidation of variable interest entities, which are not material individually or in the aggregate*.**"  ¶184(e).[24]

Thus, these financial statements violated GAAP and are actionable.  *See* 17 C.F.R. §210.4-

01(a)(1) (stating financial statements that do not comply with GAAP "will be presumed

misleading or inaccurate"); *see also In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 235

(S.D.N.Y. 2010) (holding "boilerplate" disclosures that company "may" have interests in VIEs

were rendered false and misleading by omission of interests in VIEs carrying additional risk).

The Exchange Act Defendants argue that disclosing Philidor as a VIE was not required

prior to October 2015 since Philidor purportedly accounted for less than 10% of net revenues.

---

[24]   The same statement was made in Valeant's 1Q15 10-Q, reviewed, approved, and signed by <u>Pearson</u> and <u>Schiller</u>.  ¶187.

Val. Defs. Mem. at 11, 52; Schiller Mem. at 19; Carro Mem. at 6.  To the extent the Exchange Act Defendants argue Philidor was immaterial, they are incorrect for the reasons set forth below. *See infra* §§III.B.3.c.-d.

To the extent the Exchange Act Defendants argue that disclosure was not required under GAAP applicable to VIEs, they are also wrong.  First, they fail to cite the relevant GAAP, ASC 810, and rely solely on Item 101(c)(1) of SEC Regulation S-K, which is unrelated and concerns disclosure of certain customers, rather than VIEs.  Val. Defs. Mem. at 11 n.6, 54; Carro Mem. at 6.  ASC 810 does not contain a percentage threshold for disclosure.  *See* ¶¶323 n.47, 325-328. Second, their position that Philidor was not required to be disclosed because it accounted for less than 10% of sales is contradicted by their disclosure of Philidor as a VIE in their 3Q15 financial statements when they claim Philidor accounted for 7% of net revenues.  ¶215(a).  In any event, whether Valeant's accounting practices were consistent with GAAP is a factual question best resolved by expert testimony and not appropriate for a motion to dismiss.  *See In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 593 (D.N.J. 2001) (holding "it is well-settled in this circuit that what accounting practices comprise GAAP is a question of fact . . . and thus inappropriate for resolution on a motion to dismiss").

### (5)      Item 303 Violation

In addition, Valeant's Class Period Form 10-Ks and Form 10-Qs (signed by Pearson, Schiller, Rosiello, and the Director Defendants) were false and misleading because they failed to disclose information required by Item 303 of SEC Regulation S-K ("Item 303"), 17 C.F.R. §229.303.  ¶¶135-137, 143, 145, 151-153, 157-158, 170-171, 177-179, 184, 187-189, 198-201, 214-215.  The Exchange Act Defendants do not dispute that an Item 303 violation can give rise to 10b-5 liability, as they do not mention Item 303 at all in their motions to dismiss.  Thus, the argument has been waived.  *See Foster Wheeler*, 26 F.3d at 398 ("[a]n issue is waived unless a

party raises it in its opening brief . . .").  Valeant's SEC filings violated Item 303 by failing to disclose: (i) Valeant's increasing dependence on its deceptive practices for revenues, profits, and growth; (ii) Valeant's sales through its concealed relationship with Philidor were unsustainable; (iii) Valeant's increasing sales through Philidor as a distinct sales channel; and (iv) the impact of Philidor and price gouging on revenue growth trends.  *See* ¶¶229-230, 346-375.

To the extent the argument has not been waived, Plaintiffs acknowledge that the Third Circuit held that Item 303 violations do not "create an independent cause of action" and that the materiality standards of Rule 10b-5 and Item 303 differ such that a violation of Item 303 "does not automatically give rise to a material omission under Rule 10b-5."  *Oran v. Stafford*, 226 F. 3d 275, 287-88 (3d Cir. 2000).  Since then, courts have recognized that if the omissions were material, as they were in this case, *see infra* §III.B.3., then Item 303 violations can form the basis of liability.  *See Stratte-Mcclure v. Morgan Stanley*, 776 F.3d 94, 103-04 (2d Cir. 2015) (stating the Third Circuit's decision in *Oran* "is consistent with" the holding that an Item 303 violation "can give rise to liability under Rule 10b-5 so long as the omission is material under *Basic*, and the other elements of Rule 10b-5 have been established").  *See also infra* at §IV.D.2.e.

### e.   False and Misleading Statements Concerning Valeant's Alternative Fulfillment Strategy

During the Class Period, the Exchange Act Defendants presented an incomplete and misleading view of Valeant's AF strategy by continually describing its benefits while concealing Valeant's use of deceptive tactics to inflate sales.  *See, e.g.*, *KBC Asset Mgmt.*, 2016 U.S. Dist. LEXIS 96499, at *13-14, *16 (holding statements that "represented [company's] acquisition strategy to investors as positive," including statements that defendants were "very happy" with how it was going, "all the while presenting little downside about the process," were sufficiently

alleged as misleading). Specifically, the Exchange Act Defendants' false and misleading statements included:

- <u>Pearson</u>: discussing pharmaceutical product pricing and stating Valeant was not "***making any kind of major price increases in terms of the end consumer. Through the AF [alternative fulfillment] programs, it will allow us our sort of average price internally to go up, because of the way that system works***." ¶133(b).

- <u>Pearson</u>: stating AF strategy "***can be used to start generating truly profitable scripts through a different channel. That's the intent, and we're seeing evidence that that will work***." ¶133(d).

- <u>Pearson</u>: discussing AF strategy and stating things could be done to get rejections paid because "***just because the script was rejected at retail pharmacy, does not mean that eventually you can't get the payer to actually pay for it***" and "***[s]o, all of a sudden if it goes to a different channel where the incentives are in place to actually try to get that claim adjudicated, then – so there's a significant amount of that volume that gets rejected by retail that you can then adjudicate, and actually get fully paid***" ¶133(e).

- <u>Pearson</u>: in response to a question about the AF strategy, "***[t]he program is working actually quite well. We are going to be rolling out a couple new generations of the program but we're not going to talk about it on this call***," and "***[w]hat we can reiterate is that all of our key brands in dermatology since our sales force meeting are now growing***" ¶¶134(a)-(b).

- <u>Pearson</u>: in response to a question about AF initiatives, "***[w]e're not going to give specifics. It's – we think it's a competitive advantage that we have***. And it is still primarily the Medicis products, although not exclusively the Medicis products. ***And – but I don't want to give specific numbers, but it is a very successful initiative***."[25] ¶169.

- <u>Schiller</u>: AF is all about "***trying to focus on profitable scripts, and stay away from those scripts that are unprofitable, and more judicious use of co-pay cards and the rest, and making sure when a customer, a patient is covered, you get reimbursed for it***" and "***that's really the focus, is growing profits***" ¶138.

- <u>Schiller</u>: "***the alternative fulfillments was an example of what the whole pharmaceutical industry – certainly what Mike and I believe is the trend, and that is the focus on the profitable scripts***." ¶138.

---

[25] <u>Pearson's</u> additional false and misleading AF statements are set forth in ¶¶133(c), 133(e), 147, 156, 162(e), 224.

- <u>Valeant, Pearson, Schiller, and Kellen</u>:  a slide presentation responding to questions about Philidor stated, "*[w]e have viewed our relationship with Philidor and our other specialty pharmacies as proprietary and as one of our competitive advantages*"  ¶206; *see also* ¶207 (Pearson stating the same).

The Exchange Act Defendants do not challenge the falsity of many of these statements. Instead, the Exchange Act Defendants primarily claim these statements were forward-looking or puffery.  Val. Defs. Mem. Appx. B at 7-11; Schiller Mem. at 13-14; *see also infra* §III.B.3.b. and §III.B.4.  The Valeant Defendants include an appendix of AF related statements to raise a red herring that Valeant did not conceal its AF program, but regularly discussed it.  Val. Defs. Mem. at 12; Val. Defs. Mem. Appx. A.  As alleged in the Complaint, however, the statements were false and misleading because they concealed the fact that Valeant controlled Philidor.  *See, e.g.*, ¶¶139(a), 148(a), 181(a), 228(a); *supra* §II.A.1.

Likewise, the Exchange Act Defendants touted the benefits of the AF initiative while omitting the deceptive tactics utilized and the multitude of risks, which risks manifested when the scheme was exposed and payors refused to reimburse Valeant products.  *See, e.g.*, *supra* §§II.A.1.-2.; ¶¶239-275.   In other words, the Exchange Act Defendants "systematically misrepresent[ed]" Valeant's AF strategy and "assiduously conceal[ed] any material facts (of which there were many)" that would cause its control of Philidor or the deceptive practices to be revealed.  *See Vivendi*, 2016 U.S. App. LEXIS 17566 at *55.  These statements, along with Schiller and Pearson's claims that the whole industry was using specialty pharmacies in a similar manner (¶¶138, 162, 207), were designed to and did reinforce the misimpression that Valeant's business practices were legitimate, sustainable, and low risk.

Schiller argues that his AF strategy statements were opinions because they were qualified by "I think" or "I believe," relying on *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1325-26 (2015).  Schiller Mem. at 13.  Schiller's statements

conveyed facts such as that the AF strategy was being employed by the whole industry, focused on profitable scripts, employed judicious use of copay cards, and got products reimbursed. Those statements were false and misleading because others did not use "specialty" pharmacies as a secretly controlled distribution network and the statements omitted the deceptive practices employed.  *See supra* §II.B.1.-2.; *see Shapiro*, 964 F.2d at 282 ("[I]f a defendant represents that its lending practices are 'conservative' and that its collateralization is 'adequate,' the securities laws are clearly implicated if it nevertheless intentionally or recklessly omits certain facts contradicting these representations.").   As *Omnicare* made clear, speakers cannot convert statement of facts to opinions by simply adding a qualifier such as "we believe."  *See also Schueneman v. Arena Pharms., Inc.*, 2016 U.S. App. LEXIS 19318, at *16 (9th Cir. Oct. 26, 2016) (stating that "once defendants choose to tout positive information to the market" they must "do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information"); *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2015 U.S. Dist. LEXIS 77495, at *36 (E.D. Pa. June 16, 2015) (finding that at the motion to dismiss stage, "it is incorrect to conclude as [a] matter of law that the statements highlighted by Defendants are opinions, let alone opinions lacking honest belief and a reasonable basis").

### f.    False and Misleading Statements Concerning Valeant's Business Strategy and Its Sustainability

Similar to their AF statements, the Exchange Act Defendants repeatedly emphasized the purported benefits of their business strategy, including superior financial results, while concealing the deceptive business practices. *See, e.g.*, ¶¶139(c)-(d).  Specifically:

- Valeant: a release announced an investor meeting "***to respond to assertions Allergan has made that the Valeant model is not sustainable***" and stated, "[o]ur goal for this meeting is ***to provide transparency into Valeant's historic, current, and future operating performance and to refute Allergan's allegations through a thoughtful and fact-based presentation***" ¶160.

- Pearson: at a conference call with Schiller "***to refute recent misleading assertions made by Allergan***," in response to claims about the weakness of Valeant's business, "***[i]n short, our business is strong and I can assure you our operating model is both durable and sustainable***" ¶164(a).

- Valeant, Pearson, Schiller, Rosiello, Director Defendants: Valeant's financial statements signed by Pearson (all), Schiller (all prior to 2Q15), Rosiello (2Q15 and 3Q15), and the Director Defendants (the 2014 10-K) claimed "***[t]he growth of our business is further augmented through our lower risk research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense***." ¶¶152, 157(a), 170, 177, 184(b), 188, 199, 215(c).

- Pearson: "***We think we can be successful by not doing what large pharma companies are doing, and that's been our strategy, that will continue to be our strategy.  And so we're not looking to get into the traditional*** [model] *. . . and we don't plan to spend – increase our R&D spend as a percent of sales to what other companies are doing.  And we'll continue to focus on both specialty segments and attractive geographic markets*." ¶141.[26]

Rather than dispute that all these statements were false and misleading, the Exchange Act Defendants challenge most of these statements as immaterial puffery or forward-looking.  *See* Val. Defs. Mem. Appx. B at 1-11.  Those arguments are addressed below.  *See infra* §III.B.3.b. and §III.B.4.

These statements were designed to and did create the false and misleading impression that Valeant's touted growth in revenues and profitability were the result of its purportedly "low risk" business model and concealed deceptive practices driving the growth.  ¶¶240-241, 260-262, 267, 276, 285, 296, 310-313, 427.  Valeant subsequently admitted that Allergan's claims were true when it was forced to cease the unsustainable and high risk deceptive practices as a result of payor refusals to reimburse Valeant products, reported disappointing results, and had to lower its guidance to reflect the lower profitability of its business model.  *See, e.g.*, *Mauss v. NuVasive, Inc.*, 2015 U.S. Dist. LEXIS 178117, at *26-28 (S.D. Cal. Aug. 28, 2015) (holding allegations

---

[26]  Pearson's additional false and misleading strategy statements are set out in ¶¶133(a), 155, 162(a), 163(c), 191(a).

that defendants "failed to disclose that the reported revenues were partially attributable to illegal sales, marketing, and billing practices" were "sufficient, at this stage, to show that Defendants' representations and omissions created an impression of a state of affairs that materially differed from reality"); *Schueneman*, 2016 U.S. App. LEXIS 19318, at *16 (stating that "'once defendants choose to tout' positive information to the market" they must "do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information").

### 3.   Defendants' False Statements and Omissions Were Material

The Exchange Act Defendants' false and misleading statements were undeniably material, as they related to Valeant's most critical business matters and were reported in conference calls, press releases and SEC filings throughout the Class Period. *Adams Golf*, 381 F. 3d at 274 (holding that defendant's reported highlighting of its exclusive distribution network indicated it was material to the company). "[A] misrepresentation or omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." *EP Medsystems, Inc. v. Echocath, Inc.*, 235 F.3d 865, 872 (3d Cir. 2000).

Statements considered puffery in one context may be material in other contexts. *In re Lucent Techs., Inc. Sec. Litig.*, 217 F. Supp. 2d 529, 558-59 (D.N.J. 2002); *see also In re Viropharma, Inc. Sec. Litig.*, 2003 U.S. Dist. LEXIS 5623, at *20 (E.D. Pa. Apr. 7, 2003) ("To determine whether a statement is puffery, a court must examine the context in which the statement was made."). "[T]he mere fact that a statement uses conclusory, indefinite, and unverifiable terms, rather than expressing a reason in dollars and cents, does not compel a conclusion that it is immaterial as a matter of law." *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 572 (S.D.N.Y. 2011). Accordingly, courts have held that "strong" and similar

phrases are not puffery, depending on the context in which the statements were made.  *See, e.g.*, *In re U.S. Interactive, Inc. Sec. Litig.*, 2002 U.S. Dist. LEXIS 16009, at *49-51 (E.D. Pa. Aug. 23, 2002) (holding statements about "incredible demand," "robust" demand, and "strong" demand were actionable when considered in context).  For this reason, "[m]ateriality is a mixed question of law and fact, and the delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts are peculiarly for the trier of fact."  *Enzymotec*, 2015 U.S. Dist. LEXIS 167403, at *45.  "Only if the alleged misrepresentations or omissions are so *obviously unimportant* to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law."  *Adams Golf*, 381 F.3d at 275 (emphasis in original).

### a.  Defendants Cannot Alter the Complaint's Allegations

The Valeant Defendants' Appendix B lists 29 statements that they argue are "puffery." Yet, they do so without any further analysis of most of the listed statements, which alone is reason to reject the argument, as undeveloped arguments are deemed waived.  *Pa. Dep't of Pub. Welfare v. U.S. Dep't HHS*, 101 F.3d 939, 945 (3d Cir. 1996) (holding that an argument briefly mentioned in conclusory manner was waived).

While it is unfair to require Plaintiffs to respond to undeveloped arguments, worse still, the Exchange Act Defendants alter the Complaint's allegations by highlighting different words in their brief and Appendix than were emphasized as false and misleading in the Complaint.  The Complaint adds emphasis to certain statements to make clear the false and misleading nature of statements by providing them in their full context.  ¶133(a) n.20.  For example, the Complaint alleges Pearson's statement that "*[w]e're more like a generics company in terms of the amount of a revenue we get per product*" was false and misleading because Valeant was engaged in price gouging and raising prices far beyond industry norms and the price of generics.  ¶¶163(b),

165(b)-(d).   However, the Exchange Act Defendants completely change the meaning of that statement by removing the emphasis on revenue per product and arguing that Pearson's statement "*[w]e're more like a generics company*" was vague.   Val. Defs. Mem. Appx. B at 3.   By deflecting the focus away from pricing and revenue per product, the Exchange Act Defendants attempt to change the meaning of their statements.   Not only is this tactic improper, but it underscores why the interpretation of these statements is a factual issue inappropriate for a motion to dismiss.   *See Adams Golf*, 381 F.3d at 274 (stating materiality is a factual determination not typically a matter for Rule 12(b)(6) dismissal).[27]

### b.      The Statements Were Not Mere Puffery

The Exchange Act Defendants make three puffery arguments.   First, they argue their statements about the "sustainability" of Valeant's business strategy were immaterial to investors and inactionable puffery.   Val. Defs. Mem. at 57.   Their argument that such statements were not material is directly contradicted by their own conduct, namely, in publicly refuting Allergan's allegations as "attempts to mislead investors and manipulate the market for Valeant stock." ¶¶164, 396.   Valeant even sued Allergan for violations of §14 of the Exchange Act claiming Allergan made "materially false and misleading statements" when Allergan said Valeant's business strategy was "unsustainable."[28]   Having publicly stated that such statements were

---

[27]   The Exchange Act Defendants alter several other statements in an attempt to bolster their puffery argument.   *Compare* ¶146 *with* Val. Defs. Mem. Appx. B at 1 (adding emphasis to phrases); *compare* ¶162(a) *with* Val. Defs. Mem. Appx. B at 3 (deleting emphasis and altering quote); *compare* ¶162(d) *with* Val. Defs. Mem. Appx. B at 3 (deleting emphasis and deleting reference to "8%" growth rate to argue "strong organic growth" is non-specific and vague); *compare* ¶182 *with* Val. Defs. Mem. Appx. B at 5 (deleting reference to specific numbers to argue "outstanding growth" was vague); *compare* ¶183 *with* Val. Defs. Mem. Appx. B at 4 (deleting emphasis); *compare* ¶184(c) *with* Val. Defs. Mem. Appx. B at 5 (deleting emphasis).

[28]   *See* Amended Counterclaims of Valeant and Pershing Square at ¶¶102, 109, *Allergan, Inc. v. Valeant Pharms. Int'l, Inc.*, No. 8:14-cv-01214-DOC-(ANx) (C.D. Cal. Nov. 3, 2014), attached hereto as Ex. A to the Declaration of Christopher A. Seeger in Support of Plaintiffs' Omnibus

material to investors and the stock price is, at a minimum, sufficient to raise a factual issue regarding their present contention to the contrary. *See Weiner v. Quaker Oats Co.*, 129 F.3d 310, 317 (3d Cir. 1997) ("fact-specific determination of materiality militates against a dismissal on the pleadings"). Moreover, in context here, those statements were not vague and meaningless, but were direct responses to Allergan's claim that Valeant's model was unsustainable and over reliant on price increases. ¶¶160-164; *see, e.g.*, *Enzymotec*, 2015 U.S. Dist. LEXIS 167403, at *43 (finding statements regarding "sustainable" nature of business were actionable).

Second, the Exchange Act Defendants remove the context surrounding statements to argue that certain other misrepresentations were also puffery. Val. Defs. Mem. at 57; Val. Defs. Mem. Appx. B; Schiller Mem. at 14. Context, however, shows the statements were not made as isolated and immeasurable corporate cheerleading, but were provided to explain the sources of Valeant's remarkable growth in revenue and profits (and conceal the deceptive practices). *See supra* §§III.B.2.b.-c., e.-f.; *In re AT&T Corp. Sec. Litig.*, 2002 U.S. Dist. LEXIS 22219, at *69 (D.N.J. Jan. 30, 2002) (where puffery is mixed with actionable statements, the statements "in their entirety do not constitute mere puffery" and will not be dismissed). The statements were revealed to be false when Valeant had to cease its price gouging and deceptive practices and shut down Philidor, and then reported disappointing results and slashed guidance. ¶¶294-295, 518-523.

The Exchange Act Defendants furthered this misleading impression when they claimed Valeant was competing by demonstrating the "cost advantages" of its products, which concealed

Opposition to Defendants' Motions to Dismiss ("Seeger Decl."). The Court may take judicial notice of this complaint, as it is a matter of public record and it is not offered here to prove the truth of the matter asserted but only to undermine the Exchange Act Defendants' present claims to the contrary. *See United States ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 139-141 (E.D. Pa. 2012).

massive price increases far above industry norms, by as much as 5,800%. *Id.* By speaking on the source of Valeant's reported growth in revenues and profits, the Exchange Act Defendants had a duty to speak fully and truthfully on the topic. They failed to do so.[29] *See, e.g.*, *Steiner*, 2006 U.S. Dist. LEXIS 71952, at *51-52 (finding the failure to disclose the true source of company's revenues actionable when the company made statements putting the source of its revenues at issue), *Minneapolis Firefighters' Relief Ass'n v. Medtronic, Inc.*, 2010 U.S. Dist. LEXIS 10029, at *22 (D. Minn. Feb. 3, 2010) (holding "[i]nformation about why a product experiences increased sales growth, and the potential for the product to continue to experience that growth, is almost by definition the sort of information on which investors rely when making investment decisions."). Similarly, the Exchange Act Defendants' statements about being lower risk, pricing Valeant products like a generics company, and offering lower cost products (Val. Defs. Mem. Appx. B at 3, 5) were not puffery, as these statements were demonstrably false.[30]

Third, contrary to the Exchange Act Defendants' arguments, their statements such as claiming that compliance was prioritized over "everything" (¶¶140, 142), and that Valeant's business was operated on the "highest standards of ethics" (¶216), are actionable in context given that Valeant used deceptive tactics to boost sales. *In re Penn Treaty Am. Corp. Sec. Litig.*, 202

---

[29]  To sidestep this case law, the Exchange Act Defendants remove from the Complaint the emphasis on the portion of their statements referring to the source or driver of the touted growth. *See, e.g.*, Val. Defs. Mem. Appx. B at 14 (removing emphasis from "***[t]he growth in Developed Markets was driven by***…" in ¶¶144, 149); *id.* at 16-19 (same for ¶¶168, 185, 193-195).

[30]  *See, e.g.*, *In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 928 (D.N.J. 1998) (statement by defendant that acquisition would "enhance its competitive position" held actionable where the company could have had no reasonable basis for this belief); *DFC Glob.*, 2015 U.S. Dist. LEXIS 77495, at *38 (statements about the "conservative nature" of the company's underwriting were not puffery but instead "a fundamental aspect" of its business and of vital importance to its investors); *Local 731 I.B. of T. Excavators & Pavers Pension Trust Fund v. Swanson*, 2011 U.S. Dist. LEXIS 62551, at *30 (D. Del. June 14, 2011) ("statements about the strength and stability of the print yellow pages market" were not puffery where defendants lacked a factual basis for their statements).

F. Supp. 2d 383, 392-93 (E.D. Pa. 2002) (holding statement "[w]e are not in trouble" was not puffery and "does not appear to be vague or generally optimistic, particularly given its context").[31]

The Exchange Act Defendants rely on *Key Equity Inv'rs Inc. v. Sel-Leb Mktg.*, 246 F. App'x 780 (3d Cir. 2007). Val. Defs. Mem. at 57. *Key Equity* found a one-off vague statement that the company was "slated to begin to generate strong revenue and earnings growth in 2002" to be immaterial. 246 F. App'x at 782. In contrast, the Exchange Act Defendants refuted specific disclosures by Allergan, Citron, and investigative journalists who claimed that Valeant's or Philidor's business practices were improper.[32] ¶¶159, 213, 453; *see also infra* §III.C.3. The Exchange Act Defendants' specific and concrete attempts to refute such claims cannot be considered immaterial given this context. *Shapiro*, 964 F.2d at 282 (by choosing to speak, defendant puts the subject "in play" and is "bound to speak truthfully" on the subject).

### c.   Philidor and the Deceptive Practices Were Material

The Exchange Act Defendants contend they had no obligation to disclose Philidor or further information regarding the pricing practices and copay strategies because the information

---

[31]  *See Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 189 (S.D.N.Y. 2010) ("[M]isstatements regarding risk management, discipline, monitoring and credit quality are not 'puffery' where, as alleged here, they were misrepresentations of existing facts."); *Shapiro*, 964 F.2d at 282 ("[W]here a defendant affirmatively characterizes management practices as 'adequate,' 'conservative,' 'cautious,' and the like, the subject is 'in play.' . . . By addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully.").

[32]  Similarly, the Exchange Act Defendants' reliance on *In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*, 2007 U.S. Dist. LEXIS 932, at \*28 (E.D. Pa. Jan. 9, 2007) is unavailing, as the statement found to be immaterial puffery in that case was also a one-time statement made in the company's registration statement regarding a "strong credit culture." In stark contrast, the statements here were clearly material as Defendants repeatedly made false and misleading statements concerning the sources of Valeant's tremendous growth and reaffirmed that the growth was based on legitimate business practices that were sustainable such as offering "cost advantages." *See supra* §III.B.2.

was immaterial.  Val. Defs. Mem. at 51-57.  However, a duty to disclose arises when "necessary to make . . . statements made, in the light of the circumstances under which they were made, not misleading."  *Matrixx*, 563 U.S. at 44; *SEC v. Kearns*, 691 F. Supp. 2d 601, 616 (D.N.J. 2010) (same).

First, the Exchange Act Defendants argue that "courts do not require a company to disclose every risk arising from its business practices."  Val. Defs. Mem. at 54.  As discussed above in §III.B.2., the Exchange Act Defendants chose to speak about Valeant's AF strategies, pricing and copay practices, superior marketing strategies, and the sources of Valeant's growth. In doing so, they assumed a duty to speak fully and truthfully and not to omit the deceptive practices and associated risks.  *See, e.g.*, ¶190(d); *Dow Corning Corp. v. BB&T Corp*., 2010 U.S. Dist. LEXIS 124031, at *33 (D.N.J. Nov. 23, 2010) (finding defendants were obligated to disclose allegedly known and serious risks about an investment when offering positive commentary about that investment in general); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 248 (5th Cir. 2009) ("The omission of a known risk, its probability of materialization, and its anticipated magnitude, are usually material to any disclosure discussing the prospective result from a future course of action.").

The Exchange Act Defendants, relying on *Galati v. Commerce Bancorp, Inc.*, 2005 U.S. Dist. LEXIS 26851, at *19 (D.N.J. Nov. 7, 2005), *aff'd*, 220 F. App'x 97 (3d Cir. 2007), claim they had no duty to disclose the risks of their deceptive practices.  Val. Defs. Mem. at 54 n.56. The district court in *Galati* found that the defendants made no statements that would trigger a duty to disclose the speculative risk of criminal indictments of certain employees at a subsidiary. *Id.* at *14-16.  Affirming, the Third Circuit distinguished the lack of relevant statements in *Galati* from those in *Shapiro*, which had put the integrity of business practices into play.  220 F. App'x

at 102.  Here, like *Shapiro*, the Exchange Act Defendants put the integrity of their business practices into play through specific denials of wrongdoing, denials that Valeant's practices were unsustainable, claims that its business was "low risk," and multitude of specific statements set forth herein.  *See Shapiro*, 964 F.2d at 282 ("[I]f a defendant represents that its lending practices are 'conservative' and that its collateralization is 'adequate,' the securities laws are clearly implicated if it nevertheless intentionally or recklessly omits certain facts contradicting these representations.").

Moreover, while the Exchange Act Defendants address only the omission of the risks, they also concealed the deceptive practices used to inflate sales and Valeant's control over the Philidor network.  ¶¶116, 196, 358.  *Galati* actually supports the allegations here because it found that the Exchange Act Defendants' failure to disclose deceptive conduct was material. 2005 U.S. Dist. LEXIS 26851, at *17-18.  A reasonable investor clearly would consider it material to know that Valeant's incredible growth in revenues and profitability was a house of cards whose foundation rested on deceptive practices to inflate sales.[33]  *See In re Wilmington Tr. Sec. Litig.*, 29 F. Supp. 3d 432, 448 (D. Del. 2014) (finding defendant liable for misstatements that "created the false impression that the commercial loan portfolio was 'holding up well'" when in reality the portfolio was experiencing significant deterioration); *see also Freedman v. St. Jude Med., Inc.*, 4 F. Supp. 3d 1101, 1114-21 (D. Minn. 2014) (finding defendants liable for misstatements and omissions regarding compliance with applicable laws and regulations and the

---

[33]  The Exchange Act Defendants' reliance upon *Winer Family Trust v. Queen*, 503 F.3d 319 (3d Cir. 2007) to argue they had no duty to disclose Philidor's name is unavailing.  Val. Defs. Mem. at 54-55; *see also* Carro Mem. at 15.  Plaintiffs' allegations are not based on a failure to disclose a name; rather, they are based on making numerous statements touting the success of the AF initiative while actively concealing Valeant's controlling relationship over the Philidor network to deceive payors.

safety and durability of the company's products because they created "false impression" of the company's true state of affairs).

Second, the Exchange Act Defendants argue Philidor was not quantitatively material to Valeant's business.  Val. Defs. Mem. at 52; Carro Mem. at 15.  But, in assessing materiality, courts must consider "the entire context of the alleged omission," instead of looking strictly at a numerical impact.  *See In re PerkinElmer, Inc. Sec. Litig.*, 286 F. Supp. 2d 46, 54 (D. Mass. 2003) ("The concept of 'materiality' is not necessarily tied to a specific fraction of a company's profits, and the fact that a misrepresentation pertained to a relatively small portion of the company's business does not automatically establish that the misrepresentation was not material."); *Matrixx*, 563 U.S. at 43-45 (rejecting quantitative materiality test).

All of the deceptive practices, especially the role of Philidor, were material to investors and to Valeant's financial performance.  Valeant's price gouging was broad-based, as it increased prices by an average of 66% across its brand-named drugs.  ¶478.  Valeant's price gouging and sales through Philidor had a significant impact on Valeant's performance as demonstrated by the fact that price increases on just eight of those drugs accounted for 7% of Valeant's revenues and 13% of the Company's earnings in 2Q15.  *Id.*  It has been estimated by financial media that without the price increases "Valeant would be losing money.  A lot of money."  ¶306.  Specifically, Valeant's revenues would have decreased 10%, its profit margins shrunk from 24% to 7%, and instead of having reported a net income of $527 million it would have reported a loss of $842 million.  *Id.*

Once the deceptive practices were uncovered, Valeant lowered its 2016 revenue guidance by 20% from $12.5-$12.7 billion to $9.9-$10.1 billion and EBITDA guidance by approximately 30% from $6.9-$7.1 billion to $4.8-$4.95 billion.  ¶¶226, 294, 519.  Valeant's dermatology sales

immediately plummeted by 50% upon Philidor's closing, from $465 million in 3Q15 to just $228 million in 1Q16.  ¶362 & n.67.  Jublia, discussed each quarter by Exchange Act Defendants as it had been Valeant's fastest growing and second largest selling product, fell over 60% in sales from $106 million in 3Q15 to just $38 million in 1Q16.  ¶353.  Upon the announcement that Philidor would close, Pearson admitted that the "disruption in our dermatology business will be significant."  ¶268.  Soon thereafter, both Pearson and Papa noted that average selling prices were declining.  ¶¶270, 313.  Valeant also disclosed it had "volume challenges" that "were exacerbated by the loss of refills following the shutdown" of Philidor.  ¶312.

Analysts also disputed the Exchange Act Defendants' claim that Philidor had a limited impact on its business.  A Wells Fargo analyst reported that despite the claim that Philidor accounted for only 7% of revenues, Valeant lowered revenue guidance by 17%-19% in 4Q15 and EPS guidance by 37%.  ¶283.  The analyst noted that "Valeant has not explained how the unwinding of a business that represents approximately 7% of total revenue, and is, according to Valeant, less profitable than traditional prescriptions, results in a 36.6% reduction in EPS" and that Valeant's "new guidance is not compatible with the data presented by Valeant."  *Id.*  As stated by media, "[w]hile Valeant may argue it didn't think the consolidation of Philidor was material, the market's reaction shows investors think otherwise.  And since materiality is a qualitative, not a quantitative concept, the company shouldn't try to stonewall with answers that try to purport that it wasn't enough of assets to talk about it."  ¶251.  The fact that Valeant's board approved the specialty pharmacy strategy and toured Philidor upon the $100 million transaction is more proof that Philidor was material to Valeant's operations.  ¶¶129, 2016(c), 219, 405.

Third, the Exchange Act Defendants argue they had no duty to disclose Philidor's deceptive practices because "Plaintiffs do not plead facts demonstrating that any Defendant knew of those practices prior to their public disclosure." Val. Defs. Mem. at 52. This argument goes to scienter, not materiality, and is addressed below in §III.C.

Fourth, the Exchange Act Defendants argue it was only "a matter of months" between when Philidor's deceptive business practices started and the actual disclosure of the improper practices. Val. Defs. Mem. at 53. This directly contradicts the Complaint's allegations, which detail how the very formation of Philidor at the start of the Class Period, its operations, and its concealment was rooted in deception and fraud. *See* ¶¶82-131; *infra* §III.C.1.b. The Exchange Act Defendants also claim that "Valeant's use of Philidor was known to investors who cared to look" (Val. Defs. Mem. at 54), but that is an improper attempt to shift their burden to be truthful onto investors to uncover the concealed and deceptive practices and refuted by Ackman's inability to uncover the deceptive practices. ¶¶448-457. Any argument regarding countervailing disclosures are improper for a motion to dismiss. *See Enzymotec*, U.S. Dist. LEXIS 167403, at *51-52 (stating "[t]he truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality").

### d. The Restatement Was Material

The Exchange Act Defendants claim the GAAP violations were immaterial to investors as a matter of law. Val. Defs. Mem. at 48-50; Schiller Mem. at 16. They are wrong. Under GAAP, "a restatement issues only when errors are material." *Kelly*, 663 F. Supp. 2d at 285. Thus, Valeant's decision to restate "belies any suggestion that any misstatement or omission was not material." *Id.* Valeant's withdrawal and restatement of its financial statements is an admission that the financial statements were materially false and misleading. ¶378. In addition, Valeant noted that it was revising, as opposed to restating, certain errors in its third quarter 2014

65

financial statements because they were purportedly immaterial, thereby confirming that the items in the 2014 10-K and the 2015 quarterly financial statements they did restate were material.  Val. Defs. Mem. Ex. 1 at F-91.

The Exchange Act Defendants contend that "the SEC itself has opined that a restatement that results in less than a 5% change is per se quantitatively insignificant."  Val. Defs. Mem. at 49.  Not so.  The standard they cite, SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150 (1999) ("SAB No. 99"), specifically provides that "exclusive reliance on this [5% threshold] or any percentage or numerical threshold has no basis in the accounting literature or the law."  SAB No. 99 at 45,151.  SAB No. 99 further provides that "there are numerous circumstances in which misstatements below 5% could well be material.  Qualitative factors may cause misstatements of quantitatively small amounts to be material; as stated in the auditing literature."  *Id.* at 45,152.

Courts have also held that "[s]etting up a *per se* numerical bar to materiality – whether five percent of sales or otherwise – runs counter to the guidance of the Supreme Court and the Second Circuit, which have described materiality as an 'inherently fact-specific finding,' defying 'formulaic' assessment."  *In re Ply Gem Holdings, Inc. Sec. Litig*., 2016 U.S. Dist. LEXIS 130588, at *11 (S.D.N.Y. Sept. 23, 2016) (finding defendants' alleged omissions that amounted to less than 5% of Ply Gem's net sales were material); *Ganino v. Citizens Utils. Co*., 228 F.3d 154, 162 (2d Cir. 2000) (reversing the district court's ruling that a misrepresentation implicating fees totaling 1.7% of the company's total revenue was immaterial as a matter of law); *see also In re Sipex Corp. Sec. Litig.*, 2005 U.S. Dist. LEXIS 30854, at *5 (N.D. Cal. Nov. 17, 2005) (finding company's overstatement of revenue that amounted to approximately 2% of revenues "cannot be said to be immaterial as a matter of law at the pleading stage.").  The quantitative impact of the errors here supports a finding of materiality since they were 4.4% of fourth quarter

2014 ("4Q14") net income and 4% of 4Q14 GAAP EPS.  ¶¶184, 320.[34]  *See, e.g.*, *Adams Golf*, 381 F. 3d at 274 (finding misstatement concerning 2% of inventory was material).

In addition, qualitative factors demonstrate the materiality of the restatement.  SAB No. 99 lists numerous qualitative factors that can render misstatements material, including whether the misstatement: concealed a failure to meet earnings expectations; concerned a portion of the business identified as playing a significant role in operations or profitability; or caused stock price volatility upon disclosure.  64 Fed. Reg. at 45152; *see also* ¶¶321, 380-383.  Each of these factors is present here, and courts routinely uphold quantitatively small misstatements where one or more of these factors is present.  *See, e.g.*, *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 16 (2d Cir. 2011) (refusing to dismiss complaint based on losses that "were minuscule in comparison to [defendant's] global assets and annual revenues" due to other qualitative factors); *Ply Gem Holdings*, 2016 U.S. Dist. LEXIS 130588, at *11-14 (finding omission concerning less than 5% of the company's net sales material based on the importance of the segment to the company's operations and stock declines following disclosures).  The U.S. Supreme Court has made clear that the question of materiality does not turn solely on numbers. *Matrixx*, 563 U.S. at 30 (rejecting a "statistical significant" test for materiality in favor of a qualitative one).

Here, Valeant improperly inflated revenues through Philidor which allowed Valeant to meet EPS targets.  ¶¶129-130, 316-319, 321; *see also* ¶182; *cf. Celestica*, 455 F. App'x at 16 (finding that misstatements that concealed failure to meet analyst expectations, concerned an issue significant to the company's operations, and caused a stock price decline once revealed

---

[34]   Although the Exchange Act Defendants attempt to inject Valeant's assets into the discussion (Val. Defs. Mem. at 49), they identified the restatement as one of "net revenues" resulting from "improper revenue recognition."  ¶¶289, 302-305.

were material).   Also, knowledge of Valeant's ability to inflate revenues through its secret control of Philidor would have caused investors to "question the integrity of the company as a whole."   *See In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 380 (S.D.N.Y. 2015).   When the market did begin to learn of Valeant's relationship with Philidor, the Exchange Act Defendants took extraordinary steps to specifically and repeatedly emphasize the proper accounting treatment of Philidor sales in releases, statements by directors and the entire board, special conference calls, and SEC filings.   ¶¶208, 213, 215-216, 218-220.   In *Adams Golf*, just one press release addressing the unauthorized inventory at issue weighed against a finding of immateriality because "a company often chooses to issue an extraordinary press release when it needs to disseminate important information to its investors."   381 F.3d at 276.

The materiality of the restatement is further supported by Valeant's admission that its CFO and controller engaged in "improper conduct" and committed clear violations of GAAP. ¶¶130, 315, 380.   SAB No. 99 notes that quantitatively small misstatements may be material if management has intentionally violated GAAP.   ¶380.[35]   The cases relied on by the Exchange Act Defendants are inapposite because they lacked any qualitative materiality factors, much less the litany of factors detailed and outlined above.   *See In re Westinghouse Sec. Litig.*, 90 F.3d 696, 714 n.14, 715 (3d Cir. 1996) (plaintiffs' "only" materiality allegations were quantitative); *ECA & Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*, 553 F.3d 187, 204-05 (2d Cir. 2009) (misclassification of assets immaterial because plaintiff failed to allege relation to an important segment, negative market reaction, or improper transaction).

---

[35]   Analysts noted "[t]he need to restate hurts management's credibility," and Pearson admitted the "recent events are disappointing to everyone."   ¶¶290-291 & n.40; *see also Ply Gem*, 2016 U.S. Dist. LEXIS 130588, at *9 (negative analyst reaction supported a finding of materiality).

**e.      The Internal Control Misstatements Were Material**

Given the admission that their internal control deficiencies were "material weaknesses" (¶¶304, 308, 342, 343), the Exchange Act Defendants cannot now call those deficiencies immaterial.  Val. Defs. Mem. at 50-51.  Pearson, Schiller, and Rosiello each signed false SOX certifications that Valeant maintained effective internal controls over financial reporting and that the Company's financial statements were accurate and fairly presented the Company's financial condition.  ¶¶136, 143, 145, 157(b), 170, 184(h), 187, 201, 228(n).  Signing these certifications is "not a mere formality, but rather signifies that the signer has read the document and attests to its accuracy."  *See generally In re DVI, Inc. Sec. Litig.*, 2010 U.S. Dist. LEXIS 92768, at *16 n.6 (E.D. Pa. Sept. 3, 2010) (denying motion for summary judgment where defendants signed SEC filings).  Material misstatements regarding financial reporting and internal controls appearing in SOX certifications are actionable.  *See, e.g.*, *Enzymotec*, 2015 U.S. Dist. LEXIS 167403, at *53-54 (holding SOX certifications were actionable); *In re Bear Stearns Co. Sec., Deriv., & ERISA Litig.*, 763 F. Supp. 2d 423, 471 (S.D.N.Y. 2011) (finding that "[m]anagement's assessment of internal control over financial reporting was a critical metric for investors because it provided assurance that the Company's financial statements were reliable and in compliance with applicable laws"); *see also Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 641 n.17 (3d Cir. 1989) ("Disclosures mandated by law are presumably material.").

The Exchange Act Defendants' reliance on cases that involved low level employees and obscure internal controls (Val. Defs. Mem. at 51 n.53)[36] is unpersuasive here where the material

---

[36]   The Exchange Act Defendants' reliance on *SEPTA* is misplaced because the plaintiff in *SEPTA* failed to allege defendants were aware of the ineffective internal controls that related to the process of reporting information and loan ratings, which was handled by lower-level employees.  *SEPTA v. Orrstown Fin. Servs., Inc.*, 2015 U.S. Dist. LEXIS 80584, at *137 (M.D. Pa. June 22, 2015).  Here, the ineffective internal controls emanated from the focus on hitting financial targets over compliance with the rules and included an "improper tone at the top,"

weaknesses included senior management having created the improper "tone at the top" during the Class Period. *See, e.g.*, ¶¶304-306; *see also* ¶228(n); *see supra* §III.B.1.c.

**f.     The Stock Price Reaction Supports Materiality**

The Exchange Act Defendants' argument that the stock drop following Valeant's announcement of its restatement does not demonstrate materiality (Val. Defs. Mem. at 49 n.51) is contrary to the law in this Circuit. *See, e.g.*, *Alaska Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 352 (3d Cir. 2009). Indeed, "the materiality of disclosed information may be measured post hoc by looking at the movement, in the period immediately following disclosure, of the price of the firm's stock." *In re CommVault Sys., Sec. Litig.*, 2016 U.S. Dist. LEXIS 135257, at *25 (D.N.J. Sept. 30, 2016) (denying motion to dismiss on materiality grounds). Here, "the materiality of the alleged misrepresentations [was] self-evident when we look at the market's negative reaction" when the truth was disclosed. *Pharmacia*, 554 F.3d at 352.

The stock price declines alleged in the Complaint following each of the corrective disclosures, including the restatement, clearly show each of the misstatements was material. ¶526. The Exchange Act Defendants' attempt to argue that Valeant's lowering of guidance was the true cause for certain drops is a factual dispute inappropriate at the pleading stage. *See Omanoff v. Patrizio & Zhao LLC*, 2015 U.S. Dist. LEXIS 43086, at *16 (D.N.J. Mar. 31, 2015) (Arleo, J.) ("While Defendants argue that the titanic decline in share price is attributable to

---

which defendants were fully aware of because they set the tone. *See, e.g.*, ¶¶304-305, 693 & n.93. The Exchange Act Defendants' reliance on *Barclays* is also unavailing because it did not involve SOX certifications and the court found that vague statements concerning the company's "minimum control requirements" were not materially false because the statements were not specifically tied to the practices at issue. *Carpenters Pension Trust Fund. v. Barclays PLC*, 750 F.3d 227, at 235-36 (2d Cir. 2014). Conversely, here, the Exchange Act Defendants certified the effectiveness of Valeant's internal controls, including controls over financial reporting, which certifications were false and directly contributed to Valeant's accounting fraud. *See, e.g.*, ¶¶418, 444.

several material weaknesses . . . disclosed during this period, this is a factual dispute that cannot be adjudicated at this early stage."). In any event, the relative impact of the restatement and guidance on the stock price is irrelevant at this stage because the guidance was also alleged to be false and misleading. ¶¶228, 315-322; *see infra* §III.B.4.b.

### 4.      Defendants' Statements Are Not Protected by the Safe Harbor

Despite the Exchange Act Defendants' efforts to characterize numerous present tense statements as forward-looking, the only forward-looking statements alleged in the Complaint are statements providing financial guidance for future periods.[37] Even the financial guidance statements are not protected by the safe harbor because Plaintiffs allege that the Exchange Act Defendants knew their guidance was issued without reasonable basis and those statements were not accompanied by meaningful cautionary language. *See In re Veritas Software Corp. Sec. Litig.*, 2006 U.S. Dist. LEXIS 32619, at *20 (D. Del. May 23, 2006) ("Consistent with Third Circuit case law, an opinion about future events is actionable if it lacks a reasonable basis when made.").

### a.      Statements of Present or Historical Fact Are Not Protected by the Safe Harbor

The Exchange Act Defendants do not contest, and therefore concede for purposes of their motion, that most of the statements labeled as forward-looking in their Appendix B at 7-11, are not false or misleading. Instead, they only argue those statements are protected by the safe harbor. *Cf.* Val. Defs. Mem. Appx. B at 14-25. With the exception of the financial guidance statements discussed below, every statement in the Valeant Defendants' Appendix B at 7-11

---

[37] The Exchange Act Defendants include several statements on a chart and label them as forward-looking or opinion statements without addressing each specific statement. Val. Defs. Mem. at 58-60; Val. Defs. Mem. Appx. B at 7-11. The safe harbor does not apply for the reasons set forth herein, and to the extent the alleged statements are characterized as opinions to incorporate their puffery argument, that is addressed in §III.B.3.b.

conveys present or historical facts, and "statements of present or historical fact . . . are not entitled to PSLRA's safe harbor at [the motion to dismiss] stage." *Enzymotec*, 2015 U.S. Dist. LEXIS 167403, at *35.

First, as they have done elsewhere (*see supra* §III.B.3.b.), the Exchange Act Defendants misleadingly remove emphasis from the past or present portion of a challenged statement in order to label the entire statement as forward-looking. *See* Val. Defs. Mem. Appx. B at 7-11. For example, Plaintiffs allege that Pearson's statement that the alternative fulfillment "***program is working actually quite well. We are going to be rolling out a couple new generations of the program but we're not going to talk about it on this call***…." was false and misleading. ¶134(a). However, the Exchange Act Defendants delete the emphasis from the "program is working actually quite well," a reference to historical and present performance, and only emphasize the latter portion to argue the entire statement is forward-looking. Val. Defs. Mem. Appx. B at 8. The Exchange Act Defendants do this repeatedly to other statements[38] in an attempt to evade the Third Circuit's holding that even "a mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Avaya*, 564 F.3d at 255 (citing *Makor Issues & Rights, Ltd. v. Tellabs*, 513 F.3d 702, 705 (7th Cir. 2008)); *see also In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187, 213 (1st Cir. 2005) ("The mere fact that a statement contains some reference to a projection of future events cannot sensibly bring the

---

[38]   *Compare* ¶167 *with* Dkt. No. 167-3 at 8 (removing emphasis from "historic, current" performance); *compare* ¶168 *with* Dkt. No. 167-1 (removing emphasis from "last week's script demand"); *compare* ¶203(b) *with* Dkt. No. 167-3 at 9 (removing emphasis from "is not dependent on price increases"); *compare* ¶204 *with* Dkt. No. 167-3 (removing emphasis from "we have operated our business in a fully compliant manner"). In addition to deleting emphasis in the Complaint on the present and past portions of a statement, the Exchange Act Defendants add emphasis to forward-looking aspects of statements that were never challenged. *Compare* ¶180 *with* Dkt. No. 167-3 at 9 (adding emphasis to phrase "strong organic growth for the foreseeable future").

statement within the safe harbor if the allegation of falsehood relates to non-forward-looking aspects of the statement.").

Second, the Exchange Act Defendants argue for unreasonable interpretations of their statements to convert present tense statements into forward-looking statements.  For example, Schiller strains credibility in arguing that his statement that Valeant had "no or limited control" over the pharmacies distributing its products was a reference to future control and thus forward-looking.  Schiller Mem. at 17-18.  Even the Exchange Act Defendants concede the statements were statements of historical fact.  Val. Defs. Mem. Appx. at 23, 28.  The statement clearly (and falsely) referred to Valeant's purported lack of control over the Philidor network at the time of the statement.  *See Berson*, 527 F.3d at 986 (reversing dismissal of complaint and rejecting Defendants' alternative interpretation of statements on motion to dismiss as "hardly" the "most plausible" interpretation).

Third, statements that the Exchange Act Defendants attempt to label as forward-looking were materially false and misleading due to omissions and "allegations based upon omissions of existing facts or circumstances do not constitute forward looking statements protected by the safe harbor."  *In re Cell Pathways, Inc. Sec. Litig.*, 2000 U.S. Dist. LEXIS 8584, at *42 (E.D. Pa. June 21, 2000); *see also Lucent Techs.*, 217 F. Supp. 2d at 557 (finding "since these statements depict, in part, the Company's past and current performance, safe-harbor protections are inapplicable").  For example, the Exchange Act Defendants label Pearson's statement that alternative fulfillment "***can be used to start generating truly profitable scripts through a different channel.  That's the intent, and we're seeing evidence that that will work***" as forward-looking.  Val. Defs. Mem. Appx. B at 7.  However, claiming they had been "seeing evidence" is a reference to present and historical facts that omits the deceptive tactics being used

by the Company to increase profits through the AF program.   Therefore, the statement is not

protected by the safe harbor.

> ### b.     Valeant's Financial Guidance Was Knowingly False When Made and Was Not Accompanied by Meaningful Cautionary Language

The financial guidance statements by Valeant, Pearson, and Rosiello fail to meet the

requirements of the safe harbor.   First, the PSLRA's safe harbor provision does not protect

statements known to be false when made.   *See Veritas Software*, 2006 U.S. Dist. LEXIS 32619,

at *19.   In other words, "the safe harbor provision does not afford corporations a free pass to lie

to investors."   *Id*. at *20.

On October 19, 2015, Valeant raised 2015 full year revenue guidance by $200 million

and Cash EPS guidance by $0.12.   ¶205(b).   Thereafter, Valeant, Pearson, Rosiello, and Kellen

reaffirmed robust growth in Addyi sales, total revenues, EBITDA, gross margins, and Cash EPS,

with Pearson claiming they "***put an extra dose of conservatism***" in 2016 guidance.   ¶¶205(c).[39]

The Exchange Act Defendants do not contest that these financial guidance statements were

inaccurate.   *See* Val. Defs. Mem. Appx. B at 20-24.   Nor could they since Valeant issued a

release formally withdrawing the inflated 2015 revenue and EPS guidance and also withdrew

and substantially lowered the inflated 2016 guidance.   ¶¶226-227, 269, 277, 291, 294, 307, 311.

The Exchange Act Defendants instead argue that they are not liable because the

allegations are insufficient to demonstrate that these forward-looking statements were knowingly

false when made.   Val. Defs. Mem. at 58-60.   However, the allegations make clear that at the

time the Valeant's financial guidance was raised and reaffirmed, Valeant's deceptive practices

were under investigation and being uncovered by media and analysts.   *See* ¶¶231-313.   As more

---

[39]   The alleged false and misleading financial guidance statements by Pearson, Rosiello, and Valeant are set out in ¶¶203(d), 205(b)-(c), 211, 223, 226, 227.

bad news was revealed, the Exchange Act Defendants continued to reaffirm 2015 financial guidance and even issued, and reaffirmed, robust financial guidance predicting substantial growth for 2016. *See, e.g.*, ¶¶223, 226. The Exchange Act Defendants had no reasonable basis to believe that, as payors and PBMs learned of the concealed relationship with Philidor and began to uncover the deceptive practices used to boost sale prices, sales volume and prices would actually increase. ¶¶260-261. The very reason such practices were concealed is the Exchange Act Defendants knew that the disclosure of such practices (particularly in the face of unprecedented scrutiny from payors, Congress, the DOJ, and the media) would only cause revenues and profitability to decrease. That is exactly what happened, forcing Valeant to report disappointing 2015 results and slash 2016 guidance by 20%-30%. *See supra* §III.B.3.c.; ¶¶204, 232-238, 275. Moreover, by the time the Company issued increased guidance based on projections for Addyi (*see* ¶¶211, 223, 227), Valeant had already doubled Addyi's price, making insurance reimbursement or PBM coverage improbable. ¶¶67, 228(l), 307. Valeant also cancelled its distribution agreement with Cardinal Health and planned to rely solely on Philidor for Addyi's distribution. *Id.* Pearson and Rosiello knew that the disclosures regarding Philidor could only reduce, rather than increase, Addyi sales. *See, e.g.*, ¶¶240, 244-251, 258-262, 267-268.

The Exchange Act Defendants rely on *In re Hertz Glob., Inc. Sec. Litig.*, 2015 U.S. Dist. LEXIS 95569, at *33 (D.N.J. July 22, 2015) where the Court found allegations insufficient to allege knowledge because the financial guidance was dependent upon numerous complex business judgments. Val. Defs. Mem. at 59. Unlike in *Hertz*, Valeant's financial guidance had no reasonable basis given the disclosures of the widespread deceptive tactics. *See supra* §II.C. As reflected by the refusal of payors to reimburse Philidor and by Valeant's abrupt decision to

shut it down rather than defend it, Pearson and Rosiello had no reasonable basis to believe such practices could continue once exposed. *See, e.g.*, *City of Hialeah Emps.' Ret. Sys. v. Toll Bros., Inc.*, 2008 U.S. Dist. LEXIS 66906, at *8 (E.D. Pa. Sept. 2, 2008) (finding financial projections actionable because of sales difficulties that existed at the time they were made); *see also Veritas Software*, 2006 U.S. Dist. LEXIS 32619, at *20 (stating "[c]onsistent with Third Circuit case law, an opinion about future events is actionable if it lacks a reasonable basis when made").

The Exchange Act Defendants' second safe harbor argument is equally unavailing because their forward-looking statements were not accompanied by meaningful cautionary language. Val. Defs. Mem. at 59. The question of whether cautionary language is meaningful is fact intensive and generally inappropriate for a motion to dismiss. *See Lucent Techs.*, 217 F. Supp. 2d at 557 ("The question whether any cautionary language is sufficiently 'meaningful' raises fact issues that are improperly resolved on this motion to dismiss.").

"Cautionary language," must be tailored and specific for the safe harbor to apply. *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 182 (3d Cir. 2000). Warning of potential risks is insufficient if the event creating the risk is already happening. *See MobileMedia*, 28 F. Supp. 2d at 930 ("Warnings of possible adverse events are insufficient to make omissions of present knowledge of certain future events legally immaterial."). The warnings must specifically address the risks, as mere boilerplate warnings are not sufficient. *Semerenko*, 223 F.3d at 182 (stating "a vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation"). Simply put, "the law provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *Freudenberg*, 712 F. Supp. 2d at 193-94 (holding warnings that loan losses "could be affected by

76

market risks and were subject to change" were "insufficient to counterbalance" misleading statements concealing the company's investment in high-risk loans).

Here, in a single conclusory paragraph of the Valeant Defendants' 65-page brief, the Exchange Act Defendants argue that their forward-looking statements were accompanied by meaningful cautionary language. Val. Defs. Mem. at 59. Again, such a conclusory argument is waived. *Patel v. Ashcroft*, 123 F. App'x 72, 77 n.4 (3d Cir. 2005) ("It is our rule that arguments mentioned in passing, but not squarely argued, will be deemed waived.").

Even if the Court were to consider the argument, the Exchange Act Defendants all but concede the ineffectiveness of these "warnings" by stressing that they were repeated "each quarter," regardless of changed circumstances. *See* Val. Defs. Mem. at 10, 14-16; s*ee also Asher v. Baxter, Int'l Inc.*, 377 F.3d 727, 734-35 (7th Cir. 2004) (holding the "complaint could not be dismissed under the safe harbor" where "the cautionary language remained fixed even as the risks changed"); *In re Salix Pharms., Ltd.*, 2016 U.S. Dist. LEXIS 54202, at *38 (S.D.N.Y. Apr. 22, 2016) ("Defendants' failure to update these statements from quarter to quarter and from year to year renders them meaningless in light of the changing circumstances and risks.").

The Exchange Act Defendants rely upon a few "warnings" that are identified in their statement of facts. Val. Defs. Mem. at 10, 14-15, 59. However, none of these generic warnings were meaningful because they were not specific to the deceptive practices that were occurring. Specifically:

- The Exchange Act Defendants claim they warned of distributors "like Philidor." Val. Defs. Mem. at 14. But their risk warnings made no mention of Philidor or the controlling relationship until after it was exposed. *Id.* ¶252. Moreover, risks from "declines in pricing and sales volumes," is a generic risk of all businesses and not specific to the price gouging and deceptive practices used by Valeant. Similarly, warning of the risk of Valeant's "ability to secure and maintain third party . . . marketing or distribution arrangements," *id.*, was inapplicable as Valeant was able to replace Philidor with Walgreens, it just was not able to

continue the deceptive practices through an independent pharmacy.  *See supra* §II.A.1.-2., §III.B.3.c.

- Warning of risks of "obtaining or maintaining such reimbursement on the price of our products" from third parties, Val. Defs. Mem. at 14, was too generic as it encompassed boilerplate risks of bankruptcy or inability to pay.  The warning was not specific to the risk that payors would refuse to pay because of contractual violations and deceptive practices.  *See* ¶¶118-119, 260-261.

- Warnings of risks from "extensive regulation" governing "marketing, promotional, and pricing practices, as well as the manner in which sales forces interact with purchasers, prescribers, and patients," Val. Defs. Mem. at 14-15, was also too generic as it encompassed common pharmaceutical warnings directed at issues such as off-label marketing.  The warnings were irrelevant because there were no changes in governmental regulations and these warnings did nothing to warn investors of the specific risks attendant to the host of deceptive tactics relating to price gouging, copay waivers, and the concealed network of pharmacies.  *See, e.g.*, ¶¶58-119; *supra* §III.B.2.b.

- Warning that Valeant's "inability to properly manage or support" its "rapid growth could have a material adverse effect on our business," Val. Defs. Mem. at 10, was also a generic warning more applicable to a host of innocent matters of mismanaging the opportunities of fully exploiting rapid growth.  These warnings were not specific to the deceptive practices Valeant was using, such as those directed at acquiring drugs wherein it could engage in price gouging.  *See supra* §II.A., §III.B.2.c.  The inadequacy of all of the warnings is also clear when considered in the context of their false and misleading statements such as claiming their first priority was to "*[p]ut patients and our customers first by maintaining the highest ethical standards in the industry*."  *See supra* §III.B.2.d.(2).[40]

Finally, at the time these supposed "risk warnings" were made, Valeant was already engaged in deceptive practices.  Courts have routinely held that warning of what might happen in the future is insufficient if the risks were then occurring at the time.  *See Enzymotec*, 2015 U.S. Dist. LEXIS 167403, at *36 ("Lead Plaintiffs specifically allege that these risks had already

---

[40]  While not mentioned in their argument, the Valeant Defendants identify in the factual background section of their motion certain statements purportedly warning of risks of price controls and that their growth in a certain segment was "driven primarily by price."  Val. Defs. Mem. at 15-16, 59.  As previously noted, there were no price controls so any such warnings were irrelevant, *see supra* §II.A.3. and §III.B.2.b., and the statements about price were insufficient to counteract the Exchange Act Defendants' false and misleading statements regarding volume and the source of growth.  *See supra* §III.B.2.c.

come to pass and that it was therefore unreasonable to make generalized warnings when Defendants knew, or should have known, of the specific regulations and their likely effect."). The law does not provide shelter for defendants who warn investors to "walk slowly because there might be a ditch ahead when [they knew] with near certainty that the Grand Canyon lies one foot away." *Freudenberg*, 712 F. Supp. 2d at 193. Accordingly, the safe harbor is inapplicable to any forward-looking statements.

### 5.     The Complaint Adequately Alleges Misrepresentations by Each Defendant

In just a few lines of a single paragraph of their 65-page brief, Goggins, Provencio, Stevenson, Farmer, Lönner, Melas-Kyriazi, Power, Ubben, Kellen, Rosiello, and Ingram separately claim that the Complaint fails to explain how their statements were false or misleading. Val. Defs. Mem. at 60-61. However, the Complaint and this opposition make clear why each of the statements they made was false and misleading. *See, e.g.*, *supra* §III.B.2.; ¶¶184, 190, 215(a), 219, 228. In addition, such cursory and undeveloped arguments are waived. *See Patel*, 123 F. App'x at 77 n.4 ("It is our rule that arguments mentioned in passing, but not squarely argued, will be deemed waived.").

The Director Defendants claim the only statement they are accountable for is the 2014 10-K and it does not contain "any material misstatement." Val. Defs. Mem. at 60. The Director Defendants are wrong on both points. First, they ignore their liability for the false and misleading denials of Citron's allegations and defense of Valeant's accounting, *see supra* §III.B.1.a. Second, they likewise ignore that the 2014 10-K was restated because it contained materially false statements regarding revenues, profits, and internal controls, as well as actionable statements concerning Valeant's business strategy, pricing and copay practices,

undisclosed VIEs, and lack of control over specialty pharmacies.  *See, e.g.*, ¶184; *supra* §III.B.2.-3.

Schiller, Carro, and Jorn filed individual motions to dismiss raising the same materiality, puffery, and safe harbor arguments as the Valeant Defendants, which are addressed herein.  *See supra* §§III.B.3.-4.  Schiller also contends that certain of his statements are similar to distinguishable cases that involved truthful statements about past results.  Schiller Mem. at 14-15.  However, Schiller ignores that statements attributing favorable results to a false source are actionable.  *See supra* §III.B.2.c.  Schiller was one of the architects of the decision to portray Valeant's purportedly incredible financial performance as the result of growing sales volumes of acquired products through "innovative" marketing rather than the deceptive tactics Valeant employed and made false and misleading statements to that effect.  *See* ¶183.  Equally meritless is Schiller's attempt to distance himself from his false and misleading internal control statements by suggesting that they are merely "statements by the Company or other Defendants that the Complaint attributes to Schiller by virtue of his position with the Company."  Schiller Mem. at 10.  Unfortunately for Schiller, he signed the SOX certifications (as he was required to do as the $27 million per year CFO) and those are his statements.  *See supra* §III.B.1.

## C.  The Totality of Allegations Support a Strong Inference of Scienter

The PSLRA's "scienter standard requires plaintiffs to allege facts giving rise to a strong inference of either reckless or conscious behavior."  *Avaya*, 564 F.3d at 267.  In *Tellabs*, the Supreme Court articulated the standard to determine if a complaint alleges a "strong inference" of scienter under the PSLRA: "[T]he reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"  551 U.S. at 326.  Explicitly rejecting a higher standard, the Supreme Court concluded that "[t]he inference that the defendant acted with

scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324.

This case has virtually every factor held to be relevant to scienter, and those factors are collectively sufficient to plead a strong inference of scienter for each Individual Defendant. The Exchange Act Defendants' attempt to parse scienter allegations for individual analysis has been squarely rejected by the Supreme Court in *Tellabs*, which directs courts "not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id.* at 326. Further, the Third Circuit squarely rejected the tactic used by the Exchange Act Defendants here of collecting cases that reject a factor as insufficient to plead scienter in isolation and then arguing "[t]he sum of several zeros … is still zero," because "inference is not arithmetic" and the "inferential significance of any single allegation can be determined only by reference to all other allegations." *Avaya*, 564 F.3d at 273.

The Exchange Act Defendants also overstate the factual detail required at the pleading stage. Val. Defs. Mem. at 15. The Exchange Act Defendants' argument is essentially that it is more plausible they were being fed false information and simply repeating it to the public, but that argument has been repeatedly rejected. *See Tellabs*, 513 F.3d at 709-11 (finding scienter adequately alleged and stating, "[i]s it conceivable that he was unaware of the problems of his company's two major products and merely repeating lies fed to him by other executives of the company? It is conceivable, yes, but it is exceedingly unlikely"). As the Third Circuit has recognized, the allegations must be considered in light of the fact that securities fraud plaintiffs do not have the benefit of discovery. *EP Medsystems*, 235 F.3d at 882 (finding scienter adequately alleged and stating "[i]t is difficult to see how [plaintiff] could have pled fraud or

scienter with more specificity without having been given the opportunity to conduct any discovery").

Finally, Schiller's brief is replete with arguments that he would not "deliberately" misstate facts or did not act with "fraudulent intent." Schiller Mem. at 25-26. While the allegations are sufficient to support an inference of deliberate and intentional behavior, less is required as plaintiff may "allege facts giving rise to a 'strong inference' of 'either reckless or conscious behavior.'" *Avaya*, 564 F.3d at 267. As the Third Circuit has recognized, allowing recklessness to serve as a sufficient basis for liability "promotes the policy objectives of discouraging deliberate ignorance and preventing defendants from escaping liability solely because of the difficulty of proving conscious intent to commit fraud." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 535 (3d Cir. 1999). And, while the Exchange Act Defendants acknowledge recklessness is sufficient, they attempt to elevate it to an "extreme recklessness" standard (Val. Defs. Mem. at 34), even though the authority they cite makes clear the inquiry is whether defendants "should know that they were misrepresenting material facts related to the corporation." *Monk v. Johnson & Johnson*, 2011 U.S. Dist. LEXIS 145554, at *27 (D.N.J. Dec. 19, 2011).

### 1.     Defendants' Direct Role in the Deceptive Practices

The Individual Defendants' direct role in the deceptive practices is strong evidence of scienter. *See In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 818 (E.D. Pa. 2001) (finding scienter adequately alleged where defendants played a "direct role" in creating the sales climate that led the sales force to engage in deceptive practices). While the Exchange Act Defendants try to label this as mere "group pleading," the Complaint has particular examples of each Individual Defendant's direct role in and knowledge of the deceptive practices. The Complaint also sufficiently alleges that the practices were so widespread and central to Valeant's

operations that the Individual Defendants could only have been aware of or recklessly disregarded the falsity of their statements. *See Campbell Soup*, 145 F. Supp. 2d 599 (holding plaintiffs may "state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements").

a.   **Pricing, Copay, and Acquisition Strategies**

The deceptive practices were so widespread that they could not have been implemented but for the direct involvement of the Individual Defendants who ran the business. As senior management and directors, the Individual Defendants were directly aware of and participated in rejecting the traditional R&D approach to revenue growth and employing the acquisitions and dramatic price increases strategy.

Pearson, Schiller, Kellen, and Rosiello were McKinsey consultants and investment bankers who were brought to Valeant specifically to implement the non-traditional business practices for running Valeant like a hedge fund. ¶¶8, 37-38, 40, 387-388. The Board and senior management approved the acquisitions targeted at companies wherein they could raise prices dramatically. ¶¶55-67. Pearson, Schiller, Rosiello, and Carro held meetings to decide how much to raise prices. ¶¶392-393. The Individual Defendants even engaged and worked with consultants on pricing, including Pearson's former colleagues at McKinsey (¶63) and designed a PR strategy and copay waiver practices to minimize complaints and increase automatic refills. ¶¶68-81. Pearson later admitted to Congress the price gouging was so prevalent he could not name a single drug that Valeant acquired where it did not raise prices in the United States. ¶365.

Pearson also admitted at the hearing that Valeant was "not allowed to" use their copay practices on federal government programs because, as Senator Warren noted, "it's illegal." ¶436. The Individual Defendants each had a role in designing or concealing the system of raising prices, then routing patients into Valeant's captive network of pharmacies wherein they

83

could obtain copay assistance, while minimizing the risks of "public displays of negative sentiment" and efforts to "limit/restrict re-imbursement" in order to "maximize overall returns." ¶¶74-75.  As part of their PR effort to quell pushback by payors, they also designed false and misleading answers to anticipated questions about price increases.  ¶¶77-81, 387.

Pearson held weekly meetings each Tuesday to discuss and assess Valeant's business and quarter-ends, and he hired "cronies," including friends and family members, for senior positions "who would basically do whatever he told them to do."  ¶¶387-389.  Former employees have confirmed that Pearson was a micromanager who "had his fingers in everything."  ¶389.  The extent of the Individual Defendants' scienter is further magnified by the fact that the deceptive practices were concealed from Ackman, one of Valeant's largest investors who conducted thorough due diligence, met with Pearson, had access to "management," and was being used by Valeant to "vouch" for its stock value.  ¶¶448, 452-454.  The Exchange Act Defendants' suggestion that Ackman knew of the deceptive practices is contrary to Ackman's statements to Congress and his telling Pearson and others that they looked "like Enron."  *Compare* ¶¶256-257, 456.

### b.    Philidor

The Exchange Act Defendants are wrong to suggest the Complaint's allegations "amount to mere speculation that the Individual Defendants could have or should have known about Philidor's alleged 'deceptive' sales practices."  Val. Defs. Mem. at 39.  To the contrary, the Complaint contains numerous detailed examples of each Individual Defendant's direct role with regard to Philidor.

For example, the Director Defendants approved the "specialty pharmacy" program that was centered on Philidor, approved the $100 million payment, reviewed and approved the fraudulent accounting for Philidor, and engaged in due diligence, with many doing site visits to

Philidor's offices.   ¶¶99, 129, 405.   Indeed, a strong inference of scienter is reasonable from the suspicious manner in which Valeant's directors and senior management structured the $100 million option to purchase Philidor, so that Valeant could acquire Philidor for $0 at any point in the next ten years.   *Id.* ¶¶99, 129, 181(a), 438.   This was done to avoid triggering change of control notification to payors.   ¶118.   As Philidor's counsel informed Congress, the reason Valeant did not purchase Philidor directly was its concern of the negative reaction of PBMs if they learned of the deal.   ¶438.   The Exchange Act Defendants concealed Philidor to reduce scrutiny and audits of its practices by payors.   *See, e.g.*, ¶¶12, 82, 116, 118, 133, 139, 159-165, 180-181, 190, 202.[41]   Further evidence of the close coordination is the use of coded chess terms by both Valeant and Philidor in naming related entities.   ¶¶54, 98, 113.

Moreover, Pearson, Schiller, Carro, Ingram, Kellen, Rosiello, and the Director Defendants approved the fraudulent accounting through Philidor and/or signed the agreements with Philidor giving Valeant the right to approve and set policies.   ¶100.   As Carro admitted, Valeant reviewed the financials of the entire "Philidor network pharmacies on a regular basis." ¶254.   Kellen directly supervised Philidor's practices and reported back to Pearson on his meetings with Jorn and district managers to "go over the practices in each district where Philidor is working well" and to identify next "practices where we should push harder to build it out" in

---

[41]   The Exchange Act Defendants' argument that scienter has not been sufficiently alleged because the targets of the Exchange Act Defendants' deception were payors not investors ignores the obvious.   Val. Defs. Mem. at 39.   The Exchange Act Defendants deceived both payors *and* investors.   "[S]cienter is not limited to situations in which a defendant acted with the primary purpose of misleading shareholders; scienter also exists when a defendant acted with a reckless disregard of a substantial likelihood of misleading investors."   *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1150 (10th Cir. 2015) (rejecting argument that defendants intended to mislead strategic partners rather than shareholders); *see also Steiner*, 2006 U.S. Dist. LEXIS 71952, at *14-15, *53 (finding scienter where defendants, in addition to fraudulently billing their customers, misled their investors by reporting inflated financial results without disclosing the fraudulent billing scheme).

order to "fuel growth."   ¶407.   Kellen further signed the Philidor distribution and services agreement on behalf of Valeant.   ¶101.   Jorn ran the division that accounted for most of Philidor's sales and repeatedly touted growth of the dermatology products sold by Philidor.   ¶39. Each of the Defendants made public statements relating to Valeant's alternative fulfillment strategy, the benefits that strategy was purportedly producing through increased sales, and/or the accounting for Philidor.   *See infra* §III.B.2.e.   The decision to bring those with direct responsibility for Philidor and the accounting for Philidor to the October 2015 conference call with investors, in an effort to refute the allegations of wrongdoing, further demonstrates their knowledge of Philidor's operations.   *See, e.g.*, ¶¶217-220.

It is implausible to suggest that the Individual Defendants believed there was a legitimate purpose for Valeant employees to conceal their identities with aliases while working at Philidor. As Philidor employees explained, the aliases were used "so it didn't appear Valeant was using the pharmacy to steer patients to" Valeant products.   ¶98.   Philidor employees have also disclosed that the deceptive practices were openly discussed and included in training manuals, the same manuals Valeant had the right to inspect and approve.   ¶¶258, 406.   Essentially, employing the deceptive practices to inflate Valeant's sales was the sole purpose of creating Philidor, and when these practices could no longer be used after they were exposed, Valeant closed Philidor.   ¶361.   At a minimum, recklessness can be found here where "defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud."   *See generally Sun v. Han*, 2015 U.S. Dist. LEXIS 170005, at *38 (D.N.J. Dec. 21, 2015).

The Exchange Act Defendants' only response is to raise factual disputes such as claiming that having Philidor employees sign confidentiality agreements was consistent with Pearson's claim that Philidor was a competitive advantage.   Val. Defs. Mem. at 41 n.43.   The Exchange

Act Defendants conveniently ignore that Philidor began requiring employees to sign these agreements more than two years after Philidor was formed and only once the fraud was being exposed and unraveling, in order to impede multiple investigations.  ¶¶401, 412.  This actually supports a strong inference of scienter.  *See Better v. YRC Worldwide, Inc.*, 2012 U.S. Dist. LEXIS 136749, at *30-31 (D. Kan. Sept. 25, 2012) (finding strong inference of scienter where plaintiffs alleged, inter alia, that defendants insisted that employees sign confidentiality agreements in order to conceal company's true condition).

The Exchange Act Defendants also suggest they could blindly rely on Philidor's representations and warranties that it would provide services in accordance with applicable laws, citing to *Monk*, 2011 U.S. Dist. LEXIS 145554.  Val. Defs. Mem. at 41.  The district court in *Monk* found that scienter could not be inferred from a parent corporation's reliance on its subsidiary's internal controls.  Here, however, Valeant created Philidor, staffed Philidor with Valeant employees using aliases to disguise their involvement, conducted due diligence at Philidor, had the right to review and approve Philidor's policies, concealed the relationship from third parties and investors, and falsely claimed that Philidor was independent.[42]  ¶¶82-102.

These same factors distinguish this case from *Rahman v. Kid Brands, Inc.*, 2012 U.S. Dist. LEXIS 31406 (D.N.J. Mar. 8, 2012), upon which the Exchange Act Defendants rely.  Val. Defs. Mem. at 42.  Whereas *Rahman* involved the evasion of an obscure tax on just a few

---

[42]   The Exchange Act Defendants improperly rely on an agreement between Medicis and Philidor to argue that Philidor was responsible for performing services in accordance with applicable laws and industry standards.  *See* Val. Defs. Mem. at 11, 41, 59, Ex. 6.  The Exchange Act Defendants ignore their control over Philidor.  *See supra* §II.A.2.  Moreover, their attempt to use statements from the Agreement for the truth of the matter asserted in order to counteract Plaintiffs' allegations is improper at this stage.  *Lupin Atlantis Holdings v. Ranbaxy Labs., Ltd.*, 2011 U.S. Dist. LEXIS 43175, at *9 n.8 (E.D. Pa. Apr. 20, 2011) (stating in ruling on a motion to dismiss, a district court "can only consider materials outside the pleadings to establish the truth of their existence, not the truth of their contents"); *see also Tellabs*, 551 U.S. at 322 ("courts must … accept all factual allegations in the complaint as true.").

products, Valeant's fraud was widespread, pervasive, and fundamental to Valeant's "non-traditional business strategy."   ¶¶82-131, 401-412.   Moreover, unlike *Rahman*, where the plaintiff failed to allege a "means by which information would have been transferred between parent and subsidiary," *Rahman*, 2012 U.S. Dist. LEXIS 31406, at *69, Philidor and Valeant were connected by a web of inter-related employees, supervision, and constant contact.   *See, e.g.*, ¶¶113-114.[43]

### 2.   Defendants' Senior Roles, the Specificity of Statements, and Core Operations Doctrine

The Individual Defendants were the CEO, CFO, Company Group Chairman, controller, head of dermatology, and directors of Valeant with access to its internal documents and control over its operations, record keeping, press releases, public statements, and strategies.   ¶¶36-50, 386-472.   While such factors, standing alone, may not allege a strong inference of scienter, they are important to the collective analysis.   *See In re Bradley Pharms.*, *Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 830 (D.N.J. 2006) (finding defendants' position, role in drafting statements, and access to information entitled to weight in scienter analysis).   Defendants' argument that their "role in managing the Company or monitoring a distributor [Philidor]" has been rejected as a basis for inferring scienter (Val. Defs. Mem. at 6) ignores Third Circuit precedent that "there can be a

---

[43]   The Exchange Act Defendants' reliance on *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378 (D. Del. 2010), *aff'd*, 442 F. App'x 672 (3d Cir. 2011) is also misplaced.   Val. Defs. Mem. at 43.   The *Horizon* court found there was no basis to infer that defendants "were aware or should have been aware" of the falsity of their statements when one of them resigned prior to the disclosure of a "covert" government investigation into price fixing. *Horizon*, 713 F. Supp. 2d at 401-02.   Indeed, none of the cases cited by the Exchange Act Defendants come remotely close to the totality of factors present in this case.

number of special circumstances which, taken together with an officer's position, may support a strong inference of scienter." *Avaya*, 564 F.3d at 271.[44]

In addition to their roles, the Individual Defendants' public statements were specific and spoke directly to their alternative fulfilment channel and their purported "multiple," "independent," and "specialty" pharmacies. *See supra* §III.B.2.a. The Individual Defendants directly refuted claims of price gouging, accounting fraud, and dependency on price increases. *See supra* §§III.C.3., 5. The fact that they made such specific statements at every conference call further supports an inference that the Exchange Act Defendants either "knew of what they spoke" or were reckless in making clearly false statements. *City of Sterling Heights Gen. Emps. Ret. Sys. v. Hospira, Inc.*, 2013 U.S. Dist. LEXIS 19156, at *80 (N.D. Ill. Feb. 13, 2013); *see also Enzymotec*, 2015 U.S. Dist. LEXIS 167403, at *59 (stating that plaintiffs "alleged that the matter at issue is central to the core business of the Company, about which Defendants spoke regularly" and while "such allegations are not sufficient in and of themselves to show scienter, the Court keeps them in consideration when viewing the entirety" of the allegations). The Exchange Act Defendants' alternative explanation, that the Individual Defendants innocently repeated false information fed to them, is hardly more plausible than an inference of scienter.

---

[44] The Exchange Act Defendants' argument that their roles in the day-to-day operations of Valeant do not establish scienter "absent additional allegation of specific information conveyed to management and related to the fraud" and reliance on *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1068 (9th Cir. 2008) in support thereof is unpersuasive. Val. Defs. Mem. at 39. In *Metzler*, plaintiffs' allegations of defendants' knowledge were limited to the fact that management had access to an information monitoring system. *Id.* at 1068. Here, the totality of allegations, including e-mails and testimony obtained from the Congressional investigation, show the Individual Defendants directly participated in pricing meetings, monitored Philidor's business practices and policies, and concealed the deceptive practices, including control over Philidor with alias names and coded chess terms. *See infra* at III.C.3-9. The Court in *Avaya* specifically distinguished *Meltzer* wherein the allegations only showed defendants were "simply ignorant of the facts" from cases like this one wherein the totality of the allegations show knowledge or reckless disregard for the truth. *Avaya*, 564 F.3d at 270.

*See Tellabs*, 513 F.3d at 709 (finding it "exceedingly unlikely" that false statements were "the result of merely careless mistakes at the management level based on false information fed it from below"); *Li v. Aeterna Zentaris, Inc.*, 2016 U.S. Dist. LEXIS 26772, at *11 (D.N.J. Mar. 2, 2016) (finding it "highly improbable" that defendant had not known that its "data sample was modified in violation of the usual policy").

Finally, since the deceptive practices (*e.g.*, price gouging, copay waivers, Philidor network) were the most profitable components of Valeant's operations and comprised the "non-traditional" approach that the Individual Defendants used to run Valeant's business, the core operations doctrine supports an inference of scienter. *Campbell Soup*, 145 F. Supp. 2d at 599 ("knowledge may be imputed to individual defendants when the disclosures involve the company's core business") (collecting cases).

### 3.      Defendants' Pattern of Denials and Subsequent Admissions

This case is unusual in that, throughout the Class Period, the Exchange Act Defendants were actually confronted with specific allegations that would have partially uncovered the fraud, yet they repeatedly denied the allegations by Allergan, Citron, and investigative journalists and attacked the accusers. *See supra* §II.B.  The Individual Defendants' series of initial denials followed by eventual admissions supports an inference of scienter.  That is so because "when a defendant is specifically asked, directly and repeatedly about . . . core operations, denials of any issues can support a strong inference of scienter;" *KBC Asset Mgmt.*, 2016 U.S. Dist. LEXIS 96499, at *30; *Avaya*, 564 F.3d at 269 (finding inference of scienter supported where defendant "did not simply make statements inconsistent with the existence of widespread and unusual discounting; he explicitly denied the existence of such discounting in response to repeated questions about pricing by analysts"); *see also supra* §III.C. and §III.B.

Relatedly, when Congress began investigating Valeant's price increases, it noted that Valeant stonewalled them and "failed to adequately answer our questions about the basis for their skyrocketing prices" while refusing to produce "any of the requested documents." ¶¶233, 238. Consistent with Valeant's PR strategy of providing false answers, when asked why they raised the prices of Isuprel and Nitropress so much, Valeant responded to Senator McCaskill that they were "significantly underpriced." ¶234. Members of Congress complained that Valeant had "obstructed our abilities to investigate their actions" and sent a letter to Pearson stating, "[y]our refusal to cooperate fully with Congress is extremely troubling and reflects a pattern of obstruction." ¶428. Shockingly, despite being under oath, Schiller received a strong rebuke for "lying" and being "disingenuous" in his answers to Congress. ¶426.

Further, Valeant's admission on February 3, 2016 that Pearson's April 29, 2015 statement that "volume was greater than price in terms of our growth" was false supports an inference of scienter. ¶418. While the Exchange Act Defendants argue that Pearson was just making an "unscripted statement," (Val. Defs. Mem. at 36) based on Pearson's role in certifying the financial statements and exorbitantly raising Valeant drug prices, he either knew or was reckless in making this statement. *See Bradley Pharms.*, 421 F. Supp. 2d at 830 (finding defendants' position, role in drafting statements, and access to information weighed in favor of inference of scienter). Moreover, it can hardly be written off as an unscripted statement when Pearson repeated the same false claim just a few weeks later at a May 21, 2015 conference, stating "we've been accused of our growth being price and not volume" but "organic growth is more volume than price and will continue to be." ¶192(d). Pearson repeated it a third time in an October 12, 2015 letter to Senator McCaskill. ¶432. Each of Pearson's volume statements was

contradicted by his later sworn testimony to Congress admitting that, since 2013, price had been more responsible for growth than volume in all quarters except one. *Id*.[45]

### 4.    Failure to Pursue Remedies

Valeant's failure to pursue contractual remedies against Pearson, Schiller, and Philidor further supports an inference of scienter.  As Philidor began to be exposed, Schiller sought to reassure investors by claiming they had "indemnification from the equity holders of Philidor for breaches of fundamental representations and covenants" which was also explicitly provided for in the agreements.  ¶416.  However, the agreements also provided that Philidor's liability would be reduced by the extent it arose out of misconduct by Valeant.  *Id*.  Valeant's failure to pursue its claims is further support that the Individual Defendants had approved of Philidor's deceptive practices, which precluded Valeant from pursuing the remedies.  *Id*.  Despite publicly telling investors that Valeant had the right to seek indemnification from Philidor, Schiller privately signed away those rights giving Philidor a retroactive and full release.  ¶282.

Similarly, Valeant has failed to pursue a clawback of compensation against Pearson and Schiller.  The Exchange Act Defendants claim that the only plausible inference is that "the Company had no basis to do so."  Val. Defs. Mem. at 44.  Yet, the most plausible inference as to why Valeant had no basis to do so is because the board acknowledged it fully approved the specialty pharmacy strategy and improper accounting, so it could hardly seek the clawback against those who executed the deceptive practices.  ¶¶216(a), 216(c), 219, 220(d), 414.

---

[45]   The Exchange Act Defendants' attempt to discount these admissions as "nothing more than hindsight regrets" (Val. Defs. Mem. at 37) fails here where Plaintiffs have alleged extraordinary efforts throughout the Class Period by the Exchange Act Defendants to conceal the massive price increases and deceptive practices that were employed to achieve those increases.  *See DFC Glob*., 2015 U.S. Dist. LEXIS 77495, at *40-41 (finding that plaintiffs were not relying on a fraud-by-hindsight theory where defendants engaged in numerous improper practices and lied about the company's abuses).

### 5.     The Restatement and Material Weaknesses

A strong inference of scienter is further supported by the fact that Pearson, Schiller, and the Director Defendants certified Valeant's financial statements as compliant with GAAP and their internal controls to be effective, when in fact they were not.  *See, e.g.*, *In re Ravisent Techs., Inc. Sec. Litig.*, 2004 U.S. Dist. LEXIS 13255, at *39 (E.D. Pa. July 12, 2004) (finding defendants' premature recognition of revenue in violation of GAAP probative of scienter).  *P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 142 F. Supp. 2d 589, 608 (D.N.J. 2001) ("when combined with other circumstances suggesting fraudulent intent, allegations of improper accounting [in violation of GAAP] may support a strong inference of scienter").

The fact all of the Individual Defendants took the unusual step of joining together to refute Citron's allegation that Valeant was using Philidor to engage in accounting fraud adds considerably more weight to the inference of scienter from the restatement.  As the Philidor relationship began to be exposed, Pearson, Rosiello, and Kellen held a conference call to assure investors that Valeant did not recognize revenues from shipments to Philidor until the prescriptions were filled, which was false.  ¶¶206-208.  When more questions were raised about the accounting for Philidor, Valeant issued a press release, and even more of the Individual Defendants joined together to provide investors with a presentation denying accounting fraud and claiming the accounting was carefully reviewed by Valeant management and the Director Defendants and that revenue recognition was delayed through Philidor, which was also false.  ¶¶208, 213, 215.  During that conference call, investors were assured that "*we* stand by our accounting treatment of Philidor completely" and "the audit committee of the Board and the full Board . . . and confirmed the appropriateness of the Company's revenue recognition and accounting treatment."  ¶¶218-219.

The Exchange Act Defendants discount the significance of the restatement, claiming it involved "nuanced questions on the timing of revenues." Val. Defs. Mem. at 5. To the contrary, the simplicity of the fraud further supports an inference of scienter. Valeant recorded revenue for selling to itself (*i.e.* Philidor) and then recorded revenue a second time when Philidor sold the products. These are simple and obvious accounting errors. *See, e.g.*, *In re MicroStrategy Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 638 (E.D. Va. 2000) ("violations of simple rules are obvious, and an inference of scienter becomes more probable as the violations become more obvious"). As in *MicroStrategy*, this was a simple accounting fraud involving premature revenue recognition through booking sales to a controlled entity (Philidor) before products were dispensed to patients – a violation of "the well-worn adage, 'Don't count your chickens before they hatch.'" *Id.* Moreover, by permitting the double-counting of revenue when Philidor distributed the products to patients, the Individual Defendants violated an even more obvious rule, as they counted each chicken twice. *See, e.g.*, *In re Medicis Pharm. Corp. Sec. Litig.*, 2010 U.S. Dist. LEXIS 81410, at *17-18 (D. Ariz. Aug. 9, 2010) (finding that GAAP violations supported an inference of scienter "where the accounting violation was not particularly great in magnitude, but where the relevant violation was relatively straightforward or obvious.").[46]  In contrast, the Exchange Act Defendants' reliance on *In re Synchronoss Sec. Litig.*, 705 F. Supp. 2d 367 (D.N.J. 2010) to argue the size of the restatement does not suggest an intent to defraud (Val. Defs. Mem. at 46) is misplaced. *Synchronoss* did not involve a failure to comply with

---

[46]  *In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 21 (D.D.C. 2000) ("violations involving the premature or inappropriate recognition of revenue suggest a conscious choice to recognize revenue in a manner alleged to be improper, and may therefore support a stronger inference of scienter"); *Bell v. Fore Sys., Inc.*, 17 F. Supp. 2d 433, 440 (W.D. Pa. 1998) (finding improper revenue recognition supported inference of scienter); *Ravisent Techs.*, 2004 U.S. Dist. LEXIS 13255, at *38 (finding scienter sufficiently alleged where defendant violated simple revenue recognition rules).

GAAP through improper conduct that led to a restatement, rather it only concerned a failure to meet projections.  705 F. Supp. 2d at 410.

Next, Schiller and Carro, who were found to have engaged in "improper conduct" relating to the accounting fraud, try in vain to argue that "improper" can have an innocent interpretation.  Schiller Mem. at 28; Carro Mem. at 11.  Carro argues that "improper conduct" means "not following rules of acceptable behavior" or "legally or morally wrong" among other dictionary definitions.  Carro Mem. at 11.  But, even those definitions are consistent with scienter.  Schiller and Carro also ignore the significance of the fact that their "improper conduct" included providing "inaccurate information" to Valeant's auditors.  ¶¶41, 444.  That Schiller was asked to resign from the board and Carro was essentially fired also cuts against their argument of innocent mistake.  *See infra* §III.C.5.

Turning to the material weaknesses in internal controls, an improper tone at the top by the highest level of management supports an inference of scienter.  *See Hall v. Children's Place Retail Stores, Inc*., 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) (scienter supported by resignation of the company's CEO following the company's admission of internal control weaknesses).  As SAB No. 99 makes clear, the tone at the top is "the most important factor contributing to the integrity of the financial reporting process" and "if the tone set by management is lax, fraudulent financial reporting is more likely to occur."  ¶336.  That the Individual Defendants responsible for setting the tone were forced out of Valeant adds to the inference of scienter.  ¶¶439-447.  That Pearson, Schiller, and Rosiello signed SOX certifications certifying the effectiveness of Valeant's financial internal controls further supports a strong inference of scienter.  *See, e.g.*, *In re ProQuest Sec. Litig*., 527 F. Supp. 2d 728, 743 (E.D. Mich. 2007) ("The SOX certifications give rise to an inference of . . . scienter because they provide evidence either that [defendant]

knew about the improper accounting practices or, alternatively, knew that the controls he attested to were inadequate.").

The Exchange Act Defendants attempt to discount the false SOX certifications relying on *In re Par Pharm. Sec. Litig.*, 2009 U.S. Dist. LEXIS 90602 (D.N.J. Sept. 30, 2009).  Val. Defs. Mem. at 41.  However, *Par Pharm* involved internal control failures several levels below the named defendants.  Valeant's material weaknesses did not relate to obscure controls that were under the control of low level bookkeepers.  Rather, here the improper tone at the top was set by the same defendants (Pearson, Schiller, and Rosiello) who certified the controls.  ¶¶322, 342, 693 & n.93.

Further, the Exchange Act Defendants' reliance upon cases involving mere "accounting errors" in the absence of the totality of aggravating factors present here, is of no avail.  Val. Defs. Mem. at 34-36; Carro Mem. at 12-13.  Unlike those cases, the accounting fraud here did not involve complex accounting judgments, but was the result of an "improper tone at the top" and "improper conduct."  ¶¶302-305, 308; *see also Petrobras*, 116 F. Supp. 3d at 380-81 ("[P]laintiffs allege that at the time the Company's management was professing its opinion that the company's internal controls were effective, that same management was well aware of the extensive corruption in the Company's procurement activities.  These allegations are sufficient to infer that the Company disbelieved the alleged statements at the time they were made.").

### 6.    Sheer Volume of Executive and Director Departures

The fact that nearly all of the Individual Defendants were forced to resign as the deceptive practices were uncovered (¶¶41, 419, 439-447) also contributes to the already strong inference of scienter raised by the Complaint's collective allegations.  *See, e.g.*, *DFC Glob.*, 2015 U.S. Dist. LEXIS 77495, at *47 ("[W]hen considering the totality of Plaintiffs' scienter allegations, the Court concludes that the resignation of key executives, including the President

and COO responsible for implementing new regulations, bolsters the evidence of conscious or reckless behavior."); *Li v. Aeterna Zentaris, Inc.*, 2016 U.S. Dist. LEXIS 92552, at *6 (D.N.J. June 30, 2016) (finding the suspicious timing of CEO's departure supported a finding of scienter).

Here, nearly everyone involved in the fraud was forced out of Valeant.  For example, in conjunction with Valeant's March 21, 2016 announcement regarding the restatement and material weakness, it was announced that Pearson and Carro were leaving the Company.  ¶444. Pearson's departure was reported to be "not a mutual decision."  ¶23.  Around the same time, Jorn, the head of dermatology division that accounted for most of Philidor's sales, resigned. ¶443.  By April 2016, it was reported that a majority of the board of directors were departing. ¶¶23, 445-446.  This included the board members who had approved the specialty pharmacy strategy and accounting for Philidor.  ¶¶130-131.  Virtually all of the Individual Defendants departed within months of each other and after the revelations of wrongdoing.  ¶¶439-447. Additionally, as Congress began to investigate price gouging, non-defendants with ties to the wrongdoing, including Kornwasser, who was hired to supervise Philidor, departed.  ¶441.  All of these factors, combined with the totality of allegations herein, further support an inference of scienter.  *See Par Pharm.*, 2009 U.S. Dist. LEXIS 90602 (considering a single resignation as part of the court's scienter analysis).

The Exchange Act Defendants make the implausible argument that the departures of "nine of the Individual Defendants and three other Valeant employees" is entitled to zero weight in the scienter analysis.  Val. Defs. Mem. at 44.  The Exchange Act Defendants again alter the facts and understate the number of departures -- the Complaint alleges 11 of 15 the Individual Defendants were forced out.  ¶¶45, 49, 439-447.  Further, shortly after the Complaint was filed, a

twelfth Individual Defendant, Rosiello, was replaced as CFO.[47]   Indeed, all of the cases Defendants rely upon involve the departure of one or two executives and/or the complete absence of suspicious circumstances.  Val. Defs. Mem. at 44-45; Jorn Mem. at 8; Carro Mem. at 13.   Jorn argues that she coincidentally left at the same time as all the others, but only for "personal reasons."  Jorn Mem. at 8.  Yet, this is a heavily disputed factual issue as her departure was announced to be "effective immediately" and followed the disclosure of deceptive practices at Philidor, which primarily sold dermatology products from her division.  ¶443.  The number of departures, along with the closing of Philidor, builds upon one another and makes more plausible the inference of scienter and less plausible Exchange Act Defendants' alternative inference that they all left simultaneously for "personal reasons."  ¶¶23, 419, 439-447.

### 7.    The Exchange Act Defendants' Unique Compensation and the Company's Dependence on Acquisitions

Because the allegations discussed in the previous sections, taken collectively, plead a strong inference of scienter, Plaintiffs are not required to allege motive.  Indeed, "the absence of a motive allegation is not fatal."  *Tellabs*, 551 U.S. at 325.[48]  Nevertheless, the Exchange Act Defendants' motive to misrepresent the true state of Valeant's affairs due to their unusually lavish compensation system, tied directly to raising the Company's stock price, and the

---

[47]   *See Valeant Pharmaceuticals Appoints Paul S. Herendeen As Executive Vice President, Finance And Chief Financial Officer*, VALEANT PHARM. INT'L, INC. (Aug. 22, 2016), http://ir/valeant.com/news-releases/2016/8-22-2016-110124712.

[48]   Notwithstanding this Supreme Court directive, the Exchange Act Defendants argue that the absence of motive requires stronger circumstantial evidence of scienter relying on *Nat'l Junior Baseball League v. PharmaNet Dev. Grp.*, 720 F. Supp. 2d 517, 553 (D.N.J. 2010).   The Exchange Act Defendants overstate the holding of that district court case.  In any event, the Third Circuit stated in *Avaya* its "hesitan[ce] to formulate categorical rules about the sufficiency of different types of allegations," *Avaya*, 564 F.3d at 272.  Rather, the Third Circuit requires courts to consider "the composite picture" rather than "isolated components," when determining whether a plaintiff has sufficiently alleged a strong inference of scienter.  *Id.*

Company's dependence on acquisitions funded by the debt and equity offerings to spur growth provides further support for a strong inference of scienter. *See Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, 350 (E.D. Pa. 2014) (finding defendant's incentive bonus related to an offering, the company's need to raise capital, and the timing of the allegedly misleading statements being "concurrent" with the offering were sufficient motives to support scienter).

First, the Exchange Act Defendants' compensation was based upon a "unique pay model" that was directly tied to increasing Valeant's stock price. ¶¶459-463.  As Pearson acknowledged, among "senior management and the Board . . . there's only one metric that really counts, and it's total return to shareholders.  That's how we're paid."  ¶459.  Describing the aggressive compensation targets, Pearson noted, "if we don't at least achieve a 15% total return to shareholders each year, compounded annual growth rate, that basically the equity we receive in terms of our stock grabs is worth nothing."  ¶459.  Hitting even more aggressive targets increased the "stock grabs" substantially more as Pearson admitted that "[w]e expect our stock to go up 50%, 70% a year, that's our expectation, that's what I get paid to do . . . "  ¶397.  A board meeting presentation reflected that the Company was increasing compensation targets for all business units and warned there would be no bonuses for failure to hit targets.  ¶460. Throughout the Class Period, Pearson and Schiller reaped millions in performance based bonuses that amounted to multiples of their base salaries.  ¶¶461-467.  By 2015, Pearson's compensation was $140 million and his stock value ballooned to $2 billion when Valeant's inflated share price hit its peak.  ¶¶56, 466.  Schiller was paid $27 million in 2014 beyond his options, Rosiello was paid $60 million in 2015, Jorn was paid nearly $10 million during the Class Period, and Kellen received $50 million in 2014.  ¶¶36-40.

As courts recognize, "[s]imple greed is a powerful motivator" and "[p]ersonal profit, coupled with professional motives to hide internal weaknesses and paint a rosy picture … lend weight to not only a cogent inference of scienter, but a compelling one in light of the alternative suggested by defendants -- that the misstatements and errors were due to bungling management." *Norfolk Cty. Ret. Sys. v. Ustian*, 2009 U.S. Dist. LEXIS 65731, at *32 (N.D. Ill. July 28, 2009).

While the Exchange Act Defendants stood to gain enormous financial benefits from driving up the stock price, they also faced termination for failure to do so.  As Pearson described it, "[t]here's no tenure at Valeant.  It's up or out" which he said was "more like a professional services firm than a sort of traditional pharmaceutical company."  ¶459.  Pearson bragged that the high turnover among senior ranks "has been, by and large, our decision, not their decisions." *Id.*  Pearson bluntly said "[i]f a business does not make money, we either exit the business or we fire the person," adding "[u]sually we fire the person."  ¶458.

The Exchange Act Defendants argue that there is "no allegation that any Individual Defendant used accounting errors or the alleged Philidor sales practices or made any other alleged misstatement, to benefit himself or herself in any 'concrete and personal' way."  Val. Defs. Mem. at 32.  But that is at odds with Plaintiffs' allegations and is contradicted by Valeant's admission that the "performance-based" compensation contributed to the Company's improper revenue recognition and "tone at the top."  ¶¶468-469.  Such a "depart[ure] from executives' typical compensation incentives" clearly demonstrates that "defendants possessed ample motive and opportunity to commit the fraud in question."  *See Frater*, 996 F. Supp. 2d at 350 (finding defendant's 5% bonus provided a sufficient "personal incentive[]" that supported scienter); *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 711 (E.D. Mich. 2010) (finding defendants were motivated to keep company stock artificially inflated where defendants "almost

doubled their compensation with performance based incentive pay"); *see also Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) (stating "[w]hen financial incentives to exaggerate earnings go far beyond the usual arrangements of compensation based on the company's earnings, they may be considered among other facts to show scienter").

The Exchange Act Defendants' attempts to characterize these amounts as routine compensation are equally baseless. Val. Defs. Mem. at 4, 32-33; Schiller Mem. at 23. Courts have recognized that small fractions of the tens of millions, hundreds of millions or even billions of dollars Defendants stood to gain can provide motive. *See, e.g.*, *Ustian*, 2009 U.S. Dist. LEXIS 65731, at *32 (rejecting defendants' argument that $2 million and $800,000 bonuses were routine and explaining that "[a]lthough these may be modest sums in the eyes of some [corporate] securities lawyers, this court does not regard such bonuses and awards to be common among corporate executives in general, or these particular sums to be insignificant"). Moreover, the Exchange Act Defendants' reliance upon cases involving standard compensation packages and speculative financial benefits resulting from an increase in the company's stock price are factually distinguishable. *See* Val. Defs. Mem. at 32, 33 n.34; Schiller Mem. at 23 (citing *Wilson v. Bernstock*, 195 F. Supp. 2d 619, 635 (D.N.J. 2002) (finding desire to inflate the company's stock price to "potential[ly]" increase executive compensation and not violate debt covenants "standing alone" were insufficient); *McGowan Inv'rs LP v. Frucher*, 481 F. Supp. 2d 405, 417 (E.D. Pa. 2007), *aff'd*, 392 F. App'x 39 (3d Cir. 2010) (allegations that defendants "might eventually become eligible for lucrative stock compensation" failed to plead scienter).

Second, the Complaint further details the Exchange Act Defendants' motivation to increase Valeant's stock price in order to further acquisitions, and conduct over $15 billion in debt and equity offerings while the Company's stock was artificially inflated. ¶¶470-472. The

Exchange Act Defendants were motivated to increase Valeant's stock price because the higher the price of Valeant's securities, the cheaper it could acquire their targets, facilitating more acquisitions.  ¶¶470-472.  Driving Valeant's stock price from $9 per share when Pearson joined, (*see* Val. Defs. Mem. at 1), to the $262 Class Period high (¶25) was impossible, but for the increased revenues from the acquisition spree conducted by the Exchange Act Defendants during their tenure (¶¶9, 470-472, 558).  The inflated stock price was also critical to the Exchange Act Defendants meeting their compensation goals (¶459) and Pearson and Schiller obtaining excessive bonuses.  ¶¶461-467.

Courts routinely hold that specific allegations, like these, lend weight to a strong inference of scienter.  *AT&T*, 2002 U.S. Dist. LEXIS 22219, at *78-79 (finding strong inference of scienter based upon motive to increase investor interest in IPO and to complete an acquisition to avoid a $3.6 billion payout); *see also Schottenfeld Qualified Assocs., L.P. v. Workstream, Inc.*, 2006 U.S. Dist. LEXIS 96035, at *11 (S.D.N.Y. May 3, 2006) (finding motive where defendant's revenue-based compensation system incentivized him to artificially inflate stock to facilitate acquisitions).  Because the acquisitions were needed to drive the stock price, which in turn dictated the Exchange Act Defendants' compensation, their reliance on cases failing to allege "a particularized, concrete benefit that could have been realized by" the Exchange Act Defendants as a result of generalized business transactions, are unavailing.  *See* Val. Defs. Mem. at 33 n.35; Schiller Mem. at 23.  For example, unlike the detailed allegations connecting the acquisitions to compensation in this case, in *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004), the plaintiff only speculated that the defendant would likely have received stock options as a result of an acquisition.

Lastly, the fact that Pearson was unable to keep the scheme going until 2017 and therefore lost $1.5 billion in the value of Valeant stock he had rewarded to himself (Val. Defs. Mem. at 28 n.32) does nothing to "neutralize [Plaintiffs'] motive allegations for purposes of the motions to dismiss." *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 663 (8th Cir. 2001) (finding "[w]e may not dismiss the investors' complaint merely because the alleged plan did not come to fruition"). Notably, in 2014, Pearson was permitted to derive massive immediate financial gain by pledging his Valeant stock for a $100 million loan, while it was trading at artificially inflated levels. ¶464. At the same time, Valeant and Pearson were actively refuting claims by Allergan. ¶¶172-173, 176. Pearson's incentive to hedge his bets and cash out at least part of his holdings at this particular time further supports an inference of scienter. *See Dow Corning*, 2010 U.S. Dist. LEXIS 124031, at *27-28 (finding motive that "defendants allegedly needed to unload their own inventory of [stock] on investors, such as plaintiffs, in order to reduce their own exposure" supported scienter).

### 8. The Totality of Factors Alleges a Strong Inference of Scienter as to Each Individual Defendant

The pertinent question is "'whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *Avaya*, 564 F.3d at 272 (quoting *Tellabs*, 551 U.S. at 323 (emphasis in original)). Here, the totality of allegations supports a strong inference of scienter as to each of them. The remaining non-culpable inferences provided by Defendants are not compelling.

The Exchange Act Defendants conflate loss causation with scienter in arguing that the "more compelling inference from circumstances alleged in the Complaint are that congressional inquiries, Philidor's collapse and a short-seller – not securities fraud – drove down Valeant's

stock price." Val. Defs. Mem. at 31.  The Exchange Act Defendants have not only failed to offer a "more compelling" inference, they have offered none at all.

Next, the Exchange Act Defendants claim they publicized their practices with a level of candor inconsistent with fraud.  Val. Defs. Mem. at 47.  This is just a regurgitation of their truth on the market argument, which was refuted above.  *See supra* §III.B.1.d.

Equally unavailing is the Exchange Act Defendants' argument, repeated by Schiller, that PwC's failure to catch the accounting fraud absolves them of wrongdoing.  Val. Defs. Mem. at 47 n.49; Schiller Mem. at 27.  Following the disclosure of the fraud, Valeant itself found that Schiller and Carro provided inaccurate information to the auditors.  ¶41.  This fact supports, not negates, scienter.  Even in the absence of such an admission whether reliance on the auditors absolves any one of the Exchange Act Defendants of liability can only be resolved through discovery.  As stated in *In re Diamond Foods, Inc., Sec. Litig*., 2012 U.S. Dist. LEXIS 170704, at *23 (N.D. Cal. Nov. 30, 2012), rejecting the argument that a clean audit opinion negated scienter, "[i]n order to know how much reasonable reliance should be accorded the audit opinion, we will eventually have to evaluate what communications passed between the company and the auditor as well as what, if anything, was hidden from the auditor."  Senior management has "an independent duty to ensure compliance with GAAP and maintain effective internal controls" and this duty cannot be delegated to their auditor.  *Id.* at *23-24.  Moreover, just as Schiller blames the board and PwC, they in turn point the finger at him and Carro in seeking to escape liability. PwC Mem. at 7, 9, 15-16.  But, at this stage of the litigation, the finger pointing is enough to keep them all liable until it can be sorted out at trial.  *See In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 171-72 (S.D.N.Y. 2008) (where co-defendants point the finger at each other on motions to dismiss, the court, in viewing allegations in the light most favorable to

plaintiffs, "[c]rediting [defendants'] mutual accusations" as confirmations that both engaged in deceptive conduct).

Lastly, Schiller, Jorn, and Carro filed separate motions to dismiss. Each of them is discussed above and the factors and arguments set forth above refute their scienter arguments. However, their additional arguments are addressed below.

### a.    Schiller's Motion

As to scienter, Schiller makes the same "zero plus zero equals zero" argument employed by the Exchange Act Defendants, rejected by *Avaya*, and refuted herein. *Infra* §III.C. Schiller argues that allegations concerning his position and financial motive to engage in fraud are insufficient. Schiller Mem. at 21-22. However, as discussed above, Schiller's senior role as CFO and attendant responsibility for preparing and signing the financial statements, the specificity of his multiple false and misleading statements, his role certifying the inadequate internal controls, and his incredibly high compensation tied to Valeant's stock price support a strong inference of scienter. ¶¶37, 400, 458-469.

Next, Schiller raises a host of factual disputes that are inappropriate for a motion to dismiss. First, Schiller claims that he would not "deliberately overstate a trivial amount of revenue." Schiller Mem. at 29. But, the company found that he did overstate revenues and engaged in "improper conduct" in doing so. ¶¶302-305. Recording the same sale twice can hardly be written off as a complex judgment call. If Schiller had committed an honest mistake, he would not have tried to conceal it by providing inaccurate information to the auditors. ¶¶41, 444.

Second, Schiller claims that he was unaware of Philidor, the pricing practices, and internal control weaknesses. Schiller Mem. at 22-24. But this is contrary to his testimony to Congress wherein he spoke as an authority on the subjects of Philidor and Valeant's pricing

practices.  *See, e.g.*, ¶¶392, 424, 427.  Schiller cannot run from his role in devising and implementing the strategies as he told investors during the Class Period that he "completely bought into our unique strategy and culture."  ¶391.  The Complaint adequately alleges that Schiller participated in pricing meetings and was pivotal in devising the deceptive scheme to operate Valeant in a non-traditional manner.  *See, e.g.*, ¶¶392-396.  Schiller participated in on-site visits of Philidor facilities, signed the agreements with Philidor, and routinely spoke about the purported advantages of their AF program.  *See, e.g.*, ¶¶282, 403, 405.  Moreover, Schiller stood shoulder-to-shoulder with Pearson in refuting Allergan's claims about Valeant's business model and business practices.  ¶¶162, 164, 396.  When Pearson went out on medical leave, Schiller was one of three executives that stepped in to the role of CEO, because of his intimate familiarity with the business.  ¶280.  Further, Schiller reassured investors about Pearson, and the tone at the top of Valeant.  ¶391.  He also claimed the business "has never been stronger" and did so just before it all imploded.  ¶391.

Third, Schiller argues he was unaware that the "pricing risked the public backlash and other negative consequences."  Schiller Mem. at 24.  It borders on absurdity for Schiller to feign ignorance that payors would refuse to pay when they uncovered the Exchange Act Defendants' deceptive practices.  *See* ¶427.  Schiller admitted he was aware of the risks of increased pressure for rebates, substitution of products, and decreased sales in his testimony before Congress.  ¶¶386, 398-399, 423.  Schiller's attempt now to spin his testimony is inappropriate for a motion to dismiss.  Schiller Mem. at 12-13, 25.

Fourth, Schiller's argument that Pearson and members of the board, or the auditors, also approved the fraudulent accounting is irrelevant because they are also liable, as explained above.

Schiller Mem. at 27.  That the auditors failed to catch the fraud is also of no avail as many frauds involved auditors approving the accounting, like *Tyco* and *Enron*.[49]

Fifth, Schiller attempts to distinguish himself from Pearson who cashed out $100 million in stock and argues his lack of stock sales "undermines, rather than supports an inference of scienter."  Schiller Mem. at 23.  However, in clinging to one factor, Schiller conveniently ignores the rest, including that he was also incentivized, like Pearson, to run up the stock price.  *See* ¶¶462, 464, 467; *see DVI*, 2010 U.S. Dist. LEXIS 92768, at *37 ("[T]he lack of stock sales by a defendant is not dispositive of scienter.").

Finally, Schiller argues that Valeant's decision to form an ad hoc committee negates any inference of scienter.  Schiller Mem. at 26.  Schiller claims Valeant voluntarily decided to conduct an internal review of Philidor "in response to the negative allegations that were being made."  Schiller Mem. at 27.  This again raises a contested factual issue as no committee was formed in response to Allergan's and Citron's claims.  ¶¶213, 218, 411.  Valeant had the ability to conduct a review of Philidor at any time under its agreements (¶100) and the fact that it only chose to do so after investigations by Congress, the DOJ, and the SEC were initiated says little about the Exchange Act Defendants' intent.  Rather, the far more reasonable inference is, having been caught, they decided it was best to create the appearance of cooperation.  *See, e.g.*, *Henning v. Orient Paper, Inc.*, 2011 U.S. Dist. LEXIS 79135, at *12-13 (C.D. Cal. July 20, 2011) (finding

---

[49]   Schiller relies upon *SEC v. Lucent Techs., Inc.*, 610 F. Supp. 2d 342, 351-52, 367 (D.N.J. 2009) to argue the auditor's approval of the accounting weighed against a finding of scienter. However, that determination was made at summary judgment, the accounting errors were complex, and, it did not involve the aggravating factors here, such as Schiller providing inaccurate information to the auditors.  ¶¶23, 41, 419, 444; *infra* §III.C.5.  *See Katz v. Image Innovations Holdings, Inc*., 542 F. Supp. 2d 269, 274 (S.D.N.Y. 2008) (finding that "the allegations that [defendant] attempted to obstruct the investigation into the falsified 2004 financials is sufficient to overcome the argument that [defendant's] earlier investigation of accounting irregularities prevents the plaintiffs from raising a strong inference of scienter").

defendants' decision to commence an independent investigation did not negate any inference of scienter).

### b.      Carro's Motion

The Complaint adequately alleges that, through her role as controller, Carro was directly involved in the improper accounting.  ¶¶23, 221.  Carro admitted that Valeant reviewed "the financials of the Philidor network pharmacies on a regular basis."  ¶254.  In addition, Carro stood by the others in defending the accounting that she knew (or recklessly disregarded) was false. ¶¶221, 224, 267.  Carro normally did not appear at conference calls, but appeared as the expert accountant to lend her credibility to the Exchange Act Defendants' denials of Citron's claims and defense of the accounting.  *Id.*  Significantly, while Valeant's Ad Hoc Committee was not assigned to do a complete review of Valeant's business practices, in the limited review it did of the accounting for Philidor it found material errors that required a restatement and that Carro had engaged in "improper conduct," for which she was terminated.  ¶¶411, 419.  Specifically, Carro provided inaccurate information to the auditors and audit committee.  ¶¶41, 444.  Taking all of these factors together, it is far more plausible that Carro acted knowingly or recklessly than it is that an experienced corporate controller made an innocent mistake and genuinely believed GAAP allowed Valeant to book the same revenues twice and to record revenues for selling products to itself.  ¶4.  *See supra* §III.C.5.

Finally, Carro contends that she did not sign the financial statements and her "improper conduct" related to the accounting fraud but not her false and misleading statements that Philidor was not material.  Carro Mem. at 10.  However, her role in fraudulently inflating sales through Philidor is directly related to her decision not to disclose Philidor in the 2014 annual financial statements and 1Q15 and 2Q15 financial statements.  Disclosing Philidor and admitting it was material would have raised the same questions that were raised in 3Q15, which led to the

uncovering of her fraud and the restatement.  ¶¶380, 411.  Thus, Carro's claim that Philidor was never disclosed because it was "not material," which was baseless and contrary to GAAP, served to conceal the accounting fraud that ultimately led to her firing.  ¶¶221, 441.

###### c.      Jorn's Motion

Plaintiffs have also alleged a strong inference of scienter for Jorn.  Jorn was the head of the dermatology practice at Valeant, which accounted for most of Philidor's sales.  ¶23.  In particular, Philidor accounted for half of Jublia sales, Valeant's second best-selling, fastest-growing dermatology product.  ¶354.  Jorn, through her role at Valeant, knew that the network of Philidor related pharmacies were misleadingly referred to as "specialty pharmacies" even though they distributed the toenail and acne cream products in her division rather than specialty products that required refrigeration and special care.  ¶92.

Jorn, who was not at all conference calls, participated with Schiller and Pearson in the May 2014 conference call where they refuted and denied Allergan's claims.  ¶162.  Jorn's suggestion that she lacked knowledge that her statements during this conference call were false, as the statements were made "before Plaintiffs allege that questions about Philidor arose," ignores the Complaint's well pled scienter allegations as to Jorn.  Jorn Mem. at 5.  For example, Jorn was directly involved in the copay practices used by Valeant to boost sales and sale prices of its drugs by waiving copays to minimize patient pushback from price increases or enrollment in auto-refill programs.  *See, e.g.*, ¶162(b).  Jorn monitored "the practices in each district where Philidor is working well" and met with Kellen and district managers to discuss how to "push harder to build it out" and "fuel growth."  ¶407.  The same year she was pushing harder for growth through Philidor, Jorn received a raise of nearly 250%, far beyond a typical cost of living raise, and far beyond even the 35% raise she got in 2014.  ¶39.  As the deceptive practices used

by Philidor were revealed, Philidor was shut down and, like the majority of the Individual Defendants, Valeant announced Jorn was leaving "effective immediately." ¶443.

Jorn claims that she did not know of the improper copay and pricing practices and the concealment of the relationship with Philidor. Jorn Mem. at 4. However, e-mails show Jorn was directly involved in discussing Philidor's "practices" and how to expand them to grow sales. ¶407. Philidor's corrupt practices were well known among Philidor and Valeant employees and documented in training manuals. ¶¶116, 406. Moreover, if Jorn did not know that the copay waivers were being used as kickbacks to make their products cheaper to patients despite being more expensive to payors, then it was reckless of her to disregard the truth and claim otherwise. ¶¶116, 406-407. *See Lindelow v. Hill*, 2001 U.S. Dist. LEXIS 10301, at *24 (N.D. Ill. July 20, 2001) (holding "it is strongly inferential that every officer or director . . . either had the knowledge of "the feasibility of launching" the new website "or, if not, that his failure to have such knowledge equated to reckless disregard"). Jorn cannot rely upon cases where the fraud was confined to a few individuals and a tiny fraction of a subsidiary's operations. Jorn Mem. at 4. Here, the deceptive practices were widespread and constituted the "non-traditional" and primary business strategy of Valeant. Jorn Mem. at 7.

### 9.     Corporate Scienter

In addition to pleading a strong inference of scienter as to each of the Individual Defendants, the Individual Defendants' scienter is imputed to Valeant. *See Sun*, 2015 U.S. Dist. LEXIS 170005, at *36-37 (finding corporate scienter where "the pleaded facts [and allegations] create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter").

**D.     The Complaint Adequately Alleges Loss Causation**

To plead loss causation, the Complaint need only provide a "short and plain statement" giving defendants "some indication of the loss and the causal connection that [they have] in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005); *Bradley Pharms.*, 421 F. Supp. 2d at 829 ("As the Supreme Court noted in *Dura*, 'pleading rules are not meant to impose a great burden upon a plaintiff.'").   Perhaps because it is subject to a lesser standard, the Exchange Act Defendants only make a cursory argument that loss causation is inadequately pled, devoting only a page and a half of their 65-page brief to the argument.   The Exchange Act Defendants' failure to challenge specific corrective disclosures, and to instead make broad brush arguments, are insufficient to meet their burden in moving to dismiss.   *See, e.g.*, *Pfizer Inc. v. Teva Pharms. U.S., Inc.*, 460 F. Supp. 2d 659, 665 n.6 (D.N.J. 2006) (stating argument mentioned in passing was waived).

Under any applicable standard, the Complaint adequately alleges loss causation.   The Exchange Act Defendants' limited loss causation argument cites only one case from within the Third Circuit[50] and makes but two points: (i) that nothing new was disclosed or corrected between September 28 and October 15, 2015; and (ii) that any omission concerning Philidor was fully disclosed by October 30, 2015.   Val. Defs. Mem. at 62.   The Exchange Act Defendants are wrong.   The Complaint alleges in sufficient detail what was disclosed, what it revealed, when it was disclosed, how it was disclosed, and the market's reaction to each disclosure.   ¶¶473-528.   It

---

[50]   The Exchange Act Defendants rely upon *Nat'l Junior Baseball League*, a readily distinguishable opinion.   First, the court recognized that a plaintiff need only satisfy the requirements of Rule 8(a)(2) for loss causation.   720 F. Supp. 2d at 558.   Second, Judge Wolfson held that "noticeably absent" from the complaint was "any assertion that any wrongdoing was disclosed to the market" and that the disclosures instead revealed business problems.   *Id.* at 561. Here, by contrast, the Complaint has specific allegations that the market learned of the fraud and extent of the fraud over time.   ¶¶473-528.

includes a table listing each disclosure event, Valeant's stock price reaction, and the price movement (or lack thereof) of Valeant's peer group.   ¶526.   The table shows that in each instance Valeant stock moved down at levels far exceeding its peers, negating any inference that the losses "were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Exchange Act Defendants' fraudulent conduct."   *Id.* Loss causation is sufficiently alleged as to each corrective disclosure, and the Executive Act Defendants' motions should be denied.

### 1.   Legal Standard

"[L]oss causation [is] a causal connection between the material misrepresentation [or omission] and the loss [suffered]."   *Dura*, 544 U.S. at 341-42.   "[T]he issue of causation is 'usually reserved for the trier of fact.'"   *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 655 (E.D. Pa. 2015) (quoting *EP Medsystems*, 235 F.3d at 872); *Omanoff*, 2015 U.S. Dist. LEXIS 43086, at \*14 (denying motion to dismiss and stating, "The Third Circuit has repeatedly cautioned that [the loss causation] determination is a fact-sensitive inquiry typically left to the trier of fact").   "Although a corrective disclosure must be related to the same subject as the misrepresentation, and not some other adverse facts about the company, there is no requirement that the disclosure mirror the earlier misrepresentation."   *Urban Outfitters*, 103 F. Supp. 3d at 655; *see also Semerenko*, 223 F.3d at 185, 187 (holding that "other contributing forces will not bar recovery"); *Pub. Emps. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 324 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 2892 (2015) ("[T]he 2008 Citron Report, the . . . resignations, the 2010 WSJ Article and the above governmental investigations, coupled with Amedisys's second quarter 2010 earnings report, collectively constitute and culminate in a corrective disclosure that adequately pleads loss causation for purposes of a Rule 12(b)(6) analysis.").

Thus, loss causation can be predicated on a series of partial corrective disclosures. *See, e.g.*, *Bradley Pharms.*, 421 F. Supp. 2d at 828-29 (applying a "pragmatic understanding of *Dura*" to conclude revelation "did not take the form of a single, unitary disclosure, but occurred through a series of disclosing events"). Put simply, "[t]he exposure of the alleged fraud need not occur in a single, all-encompassing corrective disclosure. Such a requirement would be at odds with *Dura* in that it would essentially allow wrongdoers to immunize themselves with a protracted series of partial disclosures." *Merck*, 2011 U.S. Dist. LEXIS 87578, at *119-20; *see also Household Int'l*, 787 F.3d at 422 ("[T]he Supreme Court has generally recognized that the truth can leak out over time. So have we.").

### 2.    The Complaint Alleges Valeant-Specific Loss Causation Events between September 28 and October 15, 2015

The Exchange Act Defendants contend the news reports published on September 28th and 29th and October 5th "described government scrutiny" but "did not disclose anything new" or "'correct' any prior misstatement or omission." Val. Defs. Mem. at 61-62. But such issues are fact intensive and often require expert analysis, which are inappropriate for a motion to dismiss. *See In re Cigna Corp. Sec. Litig.*, 459 F. Supp. 2d 338, 356 (E.D. Pa. 2006) (evaluating at summary judgment stage issues of whether fraud was sole reason for inflated price of stock and whether any prior disclosures impacted price of stock were factual disputes precluding summary judgment).

To support their factual challenge, the Exchange Act Defendants rely upon newspaper articles from April, August, and September 2015, improperly requesting that the Court not only take notice of the matters asserted in their contents, but also factually determine that those articles fully disclosed all aspects of the alleged fraud. Val. Defs. Mem. at 19-20, 62, Ex. 25-29. For example, the Exchange Act Defendants contend an August 14, 2015 article disclosed all the

information revealed on September 28, 2015.  *Id.* at 20 n.24.  The Exchange Act Defendants fail to demonstrate this and also do not show that it had the same impact or intensity as the disclosure on September 28, 2015, which revealed the new fact that members of Congress were calling for Valeant to be subpoenaed and investigated, causing the price of Valeant stock to decline by 20%, with its peers only declining 4.4%.  ¶526.  To the contrary, the Exchange Act Defendants claim that "[b]y late September 2015, press and political scrutiny on drug price increases reached a fever pitch . . ."  Val. Defs. Mem. at 20.  This alone is sufficient to deny their motion.  *See Semerenko*, 223 F.3d at 183-84 (rejecting argument that "several intervening events, and not the alleged misrepresentations, led first to the artificial inflation and then to the decline in the market price of ABI common stock."); *Omanoff*, 2015 U.S. Dist. LEXIS 43086, at *15-16 (denying motion to dismiss and holding argument about prior disclosures "cannot be adjudicated at this early stage").

Next, without specifying the disclosures they refer to, the Exchange Act Defendants make a general claim that "many" of the "risks that Plaintiffs here contend were 'concealed' until September and October 2015" were disclosed by Allergan.  Val. Defs. Mem. at 16.  But Valeant explicitly denied each of those so-called disclosures as "misleading" attempts to manipulate the stock price.  *See supra* §III.B.3.(b); Seeger Decl., at Ex. A.  Factual disputes cannot be used to counter Plaintiffs' well-pled loss causation allegations at the pleadings stage. *See Omanoff*, 2015 U.S. Dist. LEXIS 43086, at *15-16.

The Exchange Act Defendants also contend that the four stock drops between September 28 and October 15, 2015, were not in response to new information because the high prices of Nitropress and Isuprel were already reported in an April 26, 2015 *Wall Street Journal* article and a September 20, 2015 *New York Times* article.  Val. Defs. Mem. at 61-62.  The Exchange Act

Defendants again cite no case law and offer no analysis beyond these bare conclusions, but do concede the prior articles reported on "other drug makers." *Id.* at 62. In contrast, the corrective disclosures alleged in the Complaint were Valeant-specific disclosures, as set forth below:

| Date | Valeant-Specific Event |
|------|------------------------|
| September 28, 2015 | *Bloomberg* reports that all Democratic members of the House Committee were calling for a subpoena and an investigation of price gouging by Valeant and that Valeant previously refused to answer questions regarding its practices. ¶475. Valeant stock dropped more than 16%. ¶¶476-477. |
| September 29, 2015 | Numerous reports stated that Valeant was "in the crosshairs" of Congress. ¶475. Valeant stock dropped an additional 5%. ¶¶476-477. |
| October 4, 2015 | *The New York Times* published a scathing article questioning Pearson's letter to employees, specifically his claim that Valeant could grow without ongoing price increases. The article also noted the severity of Valeant's price increases when analyzed against its peers. ¶478. In response, Valeant stock dropped more than 10%. ¶¶478-479. |
| October 14-15, 2015 | Valeant issued an after-hours release on October 14th revealing its receipt of subpoenas from the U.S. Attorney's Offices for the District of Massachusetts and the Southern District of New York, requesting documents regarding Valeant's PAPs, financial support provided by the Company for patients, distribution of the Company's products, and pricing decisions. ¶480. On October 15th, reports surfaced that Valeant was failing to be responsive or transparent with Congress's investigation, despite being served with a subpoena. *Id.* Valeant stock dropped 4.75%, and its debt securities declined. ¶¶480-481. |

These were all publicly made, Valeant-specific disclosures and served to reveal portions of the truth about the existence and severity of the Exchange Act Defendants' fraudulent conduct. *See Urban Outfitters*, 103 F. Supp. 3d at 656 (the market can learn the truth from almost any source); *Bradley Pharms.*, 421 F. Supp. 2d at 828-29 (finding loss causation through a series of disclosing events and holding "*Dura* did not address what type of events or disclosures may reveal the truth. Nor did *Dura* explain how specific such disclosure must be."). Each of them revealed new information in both content and degree as reflected by the market reaction.

In short, the Exchange Act Defendants ignore the Third Circuit's repeated instruction that factual disputes regarding loss causation are best left to the trier of fact. *Omanoff*, 2015 U.S. Dist. LEXIS 43086, at *14. Thus, their loss causation arguments should be rejected.[51]

### 3.    The Complaint Alleges Loss Causation for Disclosure Events Concerning Philidor that Occurred After October 30, 2015

The Exchange Act Defendants also argue no new information was disclosed regarding Philidor after Valeant announced termination of its relationship with Philidor on October 30, 2015.[52]   Val. Defs. Mem. at 62.   While the Exchange Act Defendants fail to specify the particular corrective disclosures they challenge, it is clear that several disclosures after October 30, 2015, related to matters other than, or not exclusively connected to, Philidor and thus are not being contested.[53]  *See, e.g.*, ¶¶495-523.

The Exchange Act Defendants' claim, that the full extent of the fraud at Philidor and the financial impact of Valeant was revealed by October 30, 2015, is a factual dispute for trial. *Omanoff*, 2015 U.S. Dist. LEXIS 43086, at *15-16.   Moreover, it ignores the allegations.   For example, prior to October 30, 2015, the Exchange Act Defendants publicly defended Valeant's accounting for Philidor, but after that date they admitted Valeant was required to withdraw and

---

[51]   To the extent the Exchange Act Defendants advance a truth on the market argument, it fails for the same reasons.  *See Freeland v. Iridium World Commc'ns*, 545 F. Supp. 2d 59, 79-80 (D.D.C. 2008) ("In fact, most of Motorola's loss causation argument rests on establishing that the disclosures revealed information already known to the market, and thus could not have negatively affected the market.  The Court holds that this remains a factual determination to be decided by the jury . . . .") (citing *EP Medsystems*, 235 F.3d at 884); *see also supra* §III.B.1.d.

[52]   The Exchange Act Defendants further claim that the filing of the first lawsuit against Valeant on October 22, 2015 shows the full extent of the Philidor related fraud was revealed.  Val. Defs. Mem. at 62.  But, the Complaint was filed ***before*** Valeant announced Philidor's closing on October 30, 2015, which Defendants admit was new information.  *See* Dkt. No. 1.

[53]   The Exchange Act Defendants do not challenge the October 19-20, 2015; October 21-22, 2015; October 25-26, 2015 drops, thus conceding loss causation as to those dates.  Val. Defs. Mem. at 61-62.

restate Valeant's financial statements.  ¶¶192(e), 308, 215, 315.  Similarly, prior to October 30, 2015, Valeant claimed it had developed effective internal controls, only to later admit that Valeant lacked sufficient controls for quarter-end transactions and had an improper tone at the top.  *See, e.g.*, ¶¶136, 143, 151(c), 289-290, 304-305.  Also prior to October 30, 2015, the Exchange Act Defendants minimized the impact of price increases on Valeant's profitability and revenue growth by claiming Philidor was immaterial and stating, "***Valeant is well-positioned for strong organic growth, even assuming little to no price increases***," and even raising earnings guidance.  ¶203(a).  However, after October 30, 2015, the Exchange Act Defendants announced Valeant could no longer rely on price increases, which were certainly achieved, in part, through Philidor, and lowered revenue and earning guidance so substantially as to raise concerns over Valeant's ability to repay its massive debt.  ¶277.  Valeant similarly announced declining sales of dermatology products, like Jublia, which had been sold by Philidor, and declines in average selling prices overall.  ¶¶269, 296, 313; *see also* §III.B.3.c.

A closer look at two specific examples of corrective disclosures disproves the Exchange Act Defendants' position.  First, two pieces of news hit the market on November 4, 2015.  Before the market opened, investors learned that shortly before closing Philidor, Valeant was expanding its use of the clandestine pharmacy to further boost sales and profits.  ¶495.  This new fact led investors to question the viability of Valeant's future guidance without Philidor (which the Company ultimately withdrew) and refuted the prior efforts to assure investors that Philidor was immaterial.  In response, Valeant stock dropped 6%.  ¶496.  Then, after the market closed, investors learned that Ackman, one of Valeant's largest shareholders and now a board member, had requested that Valeant management "come clean" and disclose the full extent of their knowledge regarding Philidor and that he "expressed his disappointment that Valeant did not do

117

so." ¶¶263-265, 495.[54]  In plain language reported in *The Wall Street Journal*, investors learned Valeant had not yet "come clean" regarding the full extent of the fraud and its impact on Valeant. In response, Valeant stock fell 14.36%.  ¶¶495-496.  The Exchange Act Defendants offer no response to this loss causation allegation.

Second, over February 28-29, 2016, investors were besieged by several new Valeant-specific disclosures.  To start, on February 28 (a Sunday), investors learned that: (i) Pearson was returning from medical leave as CEO, but he would no longer be Chairman of the Board; (ii) Valeant was postponing its February 29th conference call to discuss its preliminary 4Q15 results, deliver a business review, and provide updated expectations for 2016; and (iii) Valeant was withdrawing its prior financial guidance and would continue to delay filing its 2015 10-K pending completion "of the review of certain accounting matters by the ad hoc Committee" and the "ongoing assessment of the impact on financial reporting and internal controls."  ¶513. Worse still, on February 29, 2016: (i) Bloomberg reported midday that although the earnings call was canceled, Valeant would, that same day, hold a non-public call with sell-side analysts only; (ii) Moody's reported placing Valeant's corporate credit ratings under review for downgrade; (iii) Valeant abruptly canceled its non-public conference call as a result of "media interest"; and (iv) reports surfaced, and then Valeant confirmed, that it was under a previously undisclosed SEC investigation, which included a subpoena received during 4Q15. ¶¶514-515.  In response to these disclosures, Valeant stock dropped 18% on February 29, 2016, with Valeant debt securities also declining.  ¶516.  These events further revealed the materiality of Philidor, the impact of Philidor's closure, Valeant's lack of controls, and the fraudulent accounting.  *See Bradley*, 421 F.

---

[54]  The Complaint specifically alleges that on October 27, 2015, Ackman wrote an email to Pearson, Schiller, and other board members stating, "[y]ou look like Enron" and noting that Valeant had become "toxic."  ¶¶256-257.

Supp. 2d at 829 ("Our securities laws do not operate in a vacuum.  Defendants' contention that the announcement of the SEC inquiry did not satisfy Dura's 'revelation of the truth' requirement fails to acknowledge the significance of the market reaction to the. . . disclosure.").

While these examples above refute the Exchange Act Defendants' loss causation arguments, to be clear, the Complaint alleges each disclosure after October 30, 2015 contained new information:

- <u>November 10, 2015</u>:  Before the market opened, Valeant provided a "business update" call and disclosed a "significant short-term disruption" to Valeant's dermatology business, short-term pressure in neurology, and that it was "working to quantify the potential short-term impact" on 4Q15 of the termination of the relationship with Philidor.  ¶498.  Valeant stock dropped 2%.  *Id.*

- <u>November 11, 2015</u>:  After the market closed on November 10, 2015, investors learned that one of Valeant's largest shareholders was offering to pay Philidor employees for information about Valeant's Philidor-related practices, indicating to investors that Valeant still had not "come clean" about its secret pharmacy network.  As this and additional news (a ratings cut and reports that Valeant creditors were "spooked" by growing disruption to Valeant's cash flow) were digested by market on November 11, 2015, Valeant stock declined 5.71%.  ¶499.

- <u>November 12, 2015</u>:  Before the market opened, *Bloomberg* published an article regarding the Company's relationship with Philidor, and multiple media outlets reported that analysts were slashing their Valeant price targets.  Valeant stock dropped 6.5%.  *Id.*

- <u>December 17, 2015</u>:  Before the market opened, analyst Mizuho cut its Valeant rating, citing a lack of clarity and understanding regarding the Walgreens agreement, which was purportedly put in place to make up for the loss of Philidor.  ¶503.  Valeant stock fell nearly 6%.  ¶504.

- <u>February 19, 2016</u>:  Before the market opened, analyst Wells Fargo issued a report questioning whether Valeant had been truthful regarding Philidor, the negative effects of terminating that relationship, management's credibility, and irregularities with Valeant's accounting.  ¶506.  The analyst report pointed out that Valeant's reduction in guidance did not match the financial impact of Philidor, implying additional, undisclosed problems.  *Id.*  Valeant stock fell 9.7%.  ¶507.

- February 22, 2016:  Analyst Wells Fargo released an updated note, pointing to new valuation models and a reduced price target.  Also, CVS announced it would restrict the use of Jublia, a drug heavily distributed by Philidor, by first requiring patients to use a less expensive generic.  After the market closed, *The Wall Street Journal Breaking News* reported Valeant was likely to restate its 2014 and 2015 earnings, which Valeant confirmed later in the evening.  ¶¶509-510.  Valeant stock drops 10.7%, and its debt securities decline.  ¶511.

- March 15, 2016:  Before the market opened, the Company revealed its 4Q15 financial results, deficient internal controls and compliance programs, its dependence on price hikes, additional facts regarding the negative financial impact of closing Philidor, improper accounting, and the withdrawal and lowering of Valeant's 2016 guidance.  ¶¶518-521.  Valeant stock fell more than 50%.  ¶522.

- June 7, 2016:  Valeant released its 1Q16 financial results, further revealing the true negative impact of closing Philidor and the fact Walgreens prescriptions for Valeant products (that previously went through Philidor at high profit margins) "actually have a negative average selling price."  ¶524.  Valeant stock dropped 14.6% to close at $24 on June 7, 2016.  *Id.*

The Exchange Act Defendants fail to specifically address the Complaint's loss causation allegations, including post-October 30th disclosures related to Philidor.  *Compare* ¶¶473-528 *with* Val. Defs. Mem. at 61-62.  Instead, they make conclusory claims that nothing new was revealed and unconvincingly point to a summary judgment opinion where evidence indicated the stock drop came solely from a negative article reporting facts disclosed a year earlier, which expert testimony failed to account for.  *Id.* at 62 (citing *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010)).[55]  The Exchange Act Defendants' loss causation arguments should be rejected.

---

[55]  The Exchange Act Defendants also rely on *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 339, 352 (S.D.N.Y. 2015).  Val. Defs. Mem. at 62.  There, the New York Attorney General sued Barclays, causing a stock price decline of 7.38%.  Shortly thereafter, an article summarized the attorney general complaint and speculated about the size of a possible fine, and the next trading day *Barclays'* stock moved down 1.5%.  *Barclays*, 105 F. Supp. 3d at 339.  The district court found the article did not reveal any new truth, only speculation about the size of a possible fine.  *Id.* at 352.  Here, by contrast, each corrective disclosure contained new information.

**IV.    The Complaint Pleads Violations of §§11 and 12(a)(2) of the Securities Act**

In arguing for dismissal of Plaintiffs' Securities Act claims, the Securities Act Defendants: (i) challenge Plaintiffs' standing; (ii) incorporate their Exchange Act arguments that none of the statements were false or misleading; and (iii) argue the Securities Act somehow does not apply to the Debt Offerings.  PwC separately argues it is not liable under §11 for its false and misleading Audit Report incorporated in the Stock Offering.  As described herein, each argument is without merit.  The Securities Act Defendants' motions to dismiss should be denied.

**A.    Legal Standards**

Section 11 "places a relatively minimal burden on a plaintiff."  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983).  To establish a *prima facie* claim under §11, plaintiffs need only allege that they purchased a security issued pursuant to a registration statement that contained a material misstatement or omission.  *Id*.  Plaintiffs need not allege scienter, loss causation, or reliance.  *Huddleston*, 459 U.S. at 381-82.  The parties subject to strict liability under §11 include, "the issuer of securities, its directors or partners, underwriters, and accountants who prepared or certified the registration statement."  *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 269 (3d Cir. 2006); 15 U.S.C. §77k.  As the Supreme Court reaffirmed in *Omnicare*, "Congress adopted §11 to ensure that issuers tell the whole truth to investors."  135 S. Ct. at 1331.  Under §11, liability of an issuer is "virtually absolute, even for innocent misstatements" and all "[o]ther defendants bear the burden of demonstrating due diligence."  *Huddleston*, 459 U.S. at 382.

Section 12(a)(2) provides for liability for anyone who offers or sells a security by means of a prospectus that contains a material misstatement or omission.  15 U.S.C. §77l(a)(2); *Suprema*, 438 F.3d at 269-70.  To state a *prima facie* claim under §12(a)(2), the plaintiff need only allege "the purchase of securities pursuant to a materially false or misleading prospectus or

oral communication." *Suprema*, 438 F.3d at 269-70. "Like Section 11, Section 12(a)(2) is a virtually absolute liability provision that does not require an allegation that defendants possessed scienter." *Id*. at 269.

### B.   The Securities Act Claims Are Subject to Rule 8

Sections 11 and 12(a)(2) claims are governed by the notice pleading standard of Federal Rule of Civil Procedure 8(a)(2), which requires only a short and plain statement of the claim showing the pleader is entitled to relief. *See Suprema*, 438 F.3d at 270. In a footnote, the Securities Act Defendants suggest the heightened pleading requirements of Rule 9(b) should apply to the Securities Act claims because they are grounded in fraud. *See* Val. Defs. Mem. at 63 n.66. However, it is well settled in this Circuit that when "defendants are accused in separate claims of the same complaint of having violated Section 11, Section 12(a)(2), and Section 10(b), the Securities Act claims do not sound in fraud if ordinary negligence is expressly pled in connection with those claims." *Suprema*, 438 F.3d at 272-73 (applying Rule 8(a) to §11 and 12(a)(2) claims where plaintiffs "disavow[ed] already-pled allegations of fraud"); *Enzymotec*, 2015 U.S. Dist. LEXIS 167403, at *68-69 (plaintiffs avoided "triggering Rule 9(b)" where §10(b) claims were pleaded before the §§11 and 12(a)(2) claims, and plaintiffs disclaimed any allegations of knowing or reckless misconduct). The Complaint here follows the requirements of *Suprema* and its progeny by pleading the Exchange Act claims and Securities Act claims in separate sections, and pleading strict liability and negligence for the Securities Act claims while disclaiming any allegations of fraud. *See, e.g.*, ¶551.

### C.   The Complaint Adequately Alleges Standing

The Securities Act Defendants initially argue that named plaintiff Tucson lacks standing to assert §§11 and 12(a)(2) claims because it did not purchase Valeant directly in the Stock

Offering (Bank Defs. Mem. at 16-24),[56] and that both Tucson and lead plaintiff, the Teachers Insurance and Annuity Association of America ("TIAA"), lack §12(a)(2) standing because they did not allege which specific Bank Offering Defendants they purchased from in the Stock Offering and the Debt Offerings.[57]  *Id*. at 16-18, 24, n.20.  The Securities Act Defendants are mistaken on both points.

In the Third Circuit, a plaintiff need only allege that he purchased shares "in" and/or "traceable to" a stock offering to sufficiently allege standing under §§11 and 12(a)(2).  *See Suprema*, 438 F.3d at 274 n.7 (finding "[b]ecause Plaintiffs have alleged that they have purchased 'in' or 'traceable to' the 2000 and 2001 secondary offerings, Plaintiffs have pled standing sufficiently at this motion to dismiss stage").  "For the purposes of determining standing, the court must accept as true all material allegations set forth in plaintiffs' complaint and must construe those facts in favor of the plaintiffs."  *Id.*  The Third Circuit has further noted that the question of Securities Act standing is a "factual one" that should only be raised "at the summary judgment stage after discovery."  *Id.*  The Securities Act Defendants' attacks on Plaintiffs' standing clearly conflict with Third Circuit precedent and should be rejected.

### 1.     Tucson Purchased Valeant Shares "In" the Stock Offering

Plaintiffs allege that Tucson purchased directly in the Stock Offering and, therefore, has standing for both its §§11 and 12(a)(2) claims.  ¶¶557, 667, 715 ("Tucson purchased Valeant stock *in* the March 2015 Stock Offering.").  Tucson's signed certification also demonstrates that

---

[56]  All Securities Exchange Act Defendants joined in the Bank Offering Defendants' Motion.  *See* Val. Defs. Mem. at 63 n.5; Schiller Mem. at 1; PwC Mem. at 2.  The Bank Defendants also joined in the Valeant Defendants' Motion.  *See* Bank Defs. Mem. at 2.  Moreover, Schiller joined in the motions filed by any one of the Securities Act Defendants.  *See* Schiller Mem. at 1 n.2.

[57]  The Securities Act Defendants do not contest that TIAA purchased shares directly in the Debt Offerings, nor can they, given Plaintiffs' detailed allegations.  ¶¶579, 601, 623, 649, 715.

Tucson purchased 300 shares of Valeant common stock at the offering price of $199 per share directly in the offering on March 17, 2015, which was the day that the offering was priced.[58] Such detailed allegations are sufficient to allege standing. *See Suprema*, 438 F.3d at 274 n.7; *Enzymotec*, 2015 U.S. Dist. LEXIS 167403, at *69-70 (denying motion to dismiss §§11 and 12(a)(2) claims on standing grounds where plaintiffs alleged shares were purchased "in, or traceable to … either the [initial public offering] or [secondary public offering].").

Ignoring Tucson's March 17, 2015 purchases, the Securities Act Defendants feign ignorance as to how the Stock Offering was conducted and claim that Tucson did not purchase at the offering price of $199 by pointing to purchases for $198.24 and $198.46, ten days later, on March 27, 2015. *See* Bank Defs. Mem. at 6, 18-20. The Securities Act Defendants' argument is a red herring because March 27, 2015 is the date the offering closed, but not the only day investors could purchase shares in the Stock Offering. *Id*. at 19 n.17. Valeant announced the Stock Offering on March 16, 2015 (¶671), and Prospectus Supplements were filed on March 16, 2015 (Val. Defs. Mem. Ex. 24) and March 18, 2015, respectively.[59] Therefore, the Complaint sufficiently alleges that Tucson's purchase of Valeant common stock on March 17, 2015 for $199 was pursuant to the Stock Offering and Tucson has standing.[60]

---

[58] *See Valeant Pharmaceuticals Prices Offering Of $1.45 Billion Of Common Shares*, VALEANT PHARM. INT'L, INC. (Mar. 17, 2015), http://ir.valeant.com/news-releases/2015/17-03-2015. *See* Complaint, Exhibit 3 (Dkt. No. 80-2).

[59] *See* Valeant's Prospectus Supplement (Form 424B5) dated March 17, 2015 and filed with the SEC on March 18, 2015 (excerpted). The Court may take judicial notice of SEC filings that are relied upon and integral to the complaint. *Enzymotec*, 2015 U.S. Dist. LEXIS 167403, at *50-51.

[60] Because Tucson purchased shares in the Stock Offering, the Securities Act Defendants' argument that Plaintiffs have not adequately alleged tracing is irrelevant. *See* Bank Defs. Mem. at 21-23.

### 2. Plaintiffs Are Not Required to Specify Which Bank Offering Defendants Sold to Which Plaintiffs

The Securities Act Defendants argue Plaintiffs lack standing under §12(a)(2) because they failed to specify which Bank Offering Defendant they purchased from.  *See* Bank Defs. Mem. at 16-18, 24 n.20.[61]  But, in *Westinghouse*, which the Securities Act Defendants ignore, the Third Circuit expressly rejected this exact argument.  90 F.3d 696; *see also Perlman v. Virtua Health, Inc.*, 2005 U.S. Dist. LEXIS 34833, at *33-34 (D.N.J. May 3, 2005) (stating since movant failed to address the relevant and "controlling New Jersey authority on the issue, the Court will not proceed to address its argument").

The Third Circuit in *Westinghouse* reversed the district court's denial of plaintiffs' §12(2)[62] claim against underwriter defendants, specifically noting that "we do not find support . . . for the district court's statement that . . . plaintiffs are required to allege which underwriter sold securities to each plaintiff."   90 F.3d at 718 & n.22 (finding allegations that underwriter defendants sold securities "directly to plaintiffs and other Class members" were sufficient). Accordingly, "[w]hile these [standing] concerns might be relevant on a motion for class certification, they do not address whether, as a threshold matter, plaintiffs properly stated a section 12(2) claim under Rule 12(b)(6)."  *Id.*

Here, the Complaint specifically alleges that TIAA and Tucson purchased debt and common stock in the Stock and Debt Offerings directly "from" the Bank Offering Defendants.

---

[61]   Neither Valeant, the Individual Securities Act Defendants nor the Bank Offering Defendants deny that they were statutory sellers under §12(a)(2).  In fact, as Plaintiffs allege, all of the Defendants "directly and actively participated in the solicitation and sale of the securities sold in the debt and equity offerings during the Class Period," and "participated in the drafting and/or dissemination of the offering materials."  ¶555; *see also* ¶¶564-567, 570, 574, 579, 587, 595, 601, 610, 618, 623, 636, 644, 649, 663, 715-719.

[62]   Section 12(2) was subsequently renumbered as §12(a)(2).

¶¶579, 601, 623, 649, 715.  This is sufficient to allege standing.  *See, e.g.*, *Westinghouse*, 90 F.3d at 718 & n.22; *Suprema*, 438 F.3d at 274 n.7 (plaintiff pled viable §12(a)(2) claims against all underwriters even though plaintiff purchased from just one).[63]

### D.   The Complaint Adequately Alleges the Falsity of the Statements in the Debt Offerings Prospectuses and the Stock Offering Materials

The Complaint adequately pleads that the Debt Offerings Prospectuses and the Stock Offering Materials contained untrue statements and omissions of material fact.  The Securities Act Defendants argue that Plaintiffs fail to plead any actionable misstatements in the Debt Offerings and the Stock Offering.  *See* Val. Defs. Mem. at 62-65.  In support, they merely note the false and misleading statements in the Securities Act are a "subset" of the statements in the Exchange Act and incorporate the Valeant Defendants' arguments addressing the Exchange Act claims.  *Id.* at 62.  Thus, Plaintiffs also incorporate Plaintiffs' responses herein, *see supra* §II.B., while addressing additional reasons that the perfunctory falsity arguments fail and the Securities Act Defendants' motions should be denied.

### 1.   The Statements Were Material

"[A] misrepresentation or omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]."  *EP Medsystems*, 235 F.3d at 872; *Matrixx*, 563 U.S. at 38.  To that end, materiality is a mixed question of law and

---

[63]   The cases the Securities Act Defendants rely upon are inapposite because they involved circumstances (unlike the present) where the plaintiff had no injury.  *See* Bank Defs. Mem. at 16-17.  For example, *Winer Family Trust*, 503 F.3d 319 involved standing to assert §10b-5 claims (not Securities Act claims) where the fraudulent conduct occurred after the plaintiff's stock purchase.  Similarly, *Polanco v. Omnicell, Inc.*, 988 F. Supp. 2d 451 (D.N.J. 2013) involved a data breach where plaintiff failed to allege any concrete injury.  In contrast, here Plaintiffs purchased securities pursuant to false and misleading offering materials and were injured thereby.  *See, e.g.*, ¶¶589, 612, 635, 665, 711, 720.  Likewise, *In re Adams Golf, Sec. Litig.*, 176 F. Supp. 2d 216 (D. Del. 2001), *aff'd in part, rev'd in part*, 381 F.3d 267 (3d Cir. 2004) – addressed whether §12(a)(2) claims are available for secondary market purchases.  Here, Plaintiffs purchased their securities directly in the offerings.

fact that is not normally appropriate for resolution on a motion to dismiss.  *See Enzymotec*, 2015 U.S. Dist. LEXIS 167403, at *45.

Here, Plaintiffs sufficiently alleged the materiality of the statements in the Debt Offerings Prospectuses and the Stock Offering Materials.  *See supra* §III.B.3.  A reasonable person deciding whether to invest in Valeant securities would "attach importance" to the fact that prior to and during the Debt Offerings and the Stock Offering, Valeant's business model was dependent upon a host of undisclosed and deceptive practices which inflated Valeant's financial results and subjected the Company (and investors) to undisclosed risks.  *See* ¶¶583, 606, 632, 659(k)-(m), 681(n); *supra* §III.B.3.

Moreover, investors would undoubtedly place significance on the fact that prior to and during the Debt Offerings and the Stock Offering, the Company lacked adequate internal controls, and consider it important that the third quarter 2014 financial statements included in the January 2015 Debt Offering and the fourth quarter and full year 2014 financial statements included in the March 2015 Debt Offering and the Stock Offering were materially misstated and failed to comply with GAAP.  ¶¶632, 659(k)-(m), 681(n); *see also supra* §III.B.2.d. and §§III.C.3.e.-f.  Contrary to the Securities Act Defendants' claims (Val. Defs. Mem. at 65), Plaintiffs sufficiently alleged the materiality of both the internal control issues and Valeant's restatement.  *See supra* §III.B.3.d.

### 2.       The Statements Were False and Misleading

The statements in the Debt Offerings and the Stock Offering are false and misleading for the same reasons argued in support of the Exchange Act claims.  *See supra* §III.B.

### a.   False and Misleading Statements Concerning the Independence of Valeant's Specialty Pharmacies

The statements in the Debt Offerings and Stock Offering regarding Valeant's products being "distributed by third parties, over which" Valeant had "no or limited control" (¶¶581(d), 603(d), 625(d), 651(b), 678(c)) and Valeant's inventory being held at retail pharmacies and other non-wholesale locations "whose buying patterns" Valeant had "limited influence" (¶678(c)) were false and misleading when made because they omitted any reference to Philidor, as well as Valeant's control over Philidor and ability to inflate sales by sending products to Philidor prematurely.   ¶¶583, 606, 632, 659, 681.   These statements are actionable because Valeant created Philidor in January of 2013, controlled it, paid $100 million in December 2014 for the right to acquire Philidor and obtained explicit rights to direct Philidor's activities, and consolidated Philidor's revenues with its own.   ¶¶54, 632, 659, 681; *see supra* §III.B.2.a., and §III.B.3.c.; *see also Adams Golf*, 381 F.3d 267 at 277 (statements in registration statement touting company's limited distribution of its products violated §11 because they omitted any mention of company's use of unauthorized retailers to sell its products on gray market).

### b.   False and Misleading Pricing Related Statements

The Securities Act Defendants' statements in the January 2015 and March 2015 Debt Offerings regarding the "cost advantages" of Valeant's products (¶¶626, 653) were also false and misleading at the time they were made.   In truth, far from providing cost advantages, Valeant was engaged in price gouging that was furthered by a host of deceptive practices that permitted Valeant to raise prices far above industry norms, including by as much as 5,800%.   ¶¶632, 659; *see supra* §III.B.2.b. and §III.B.3.b.

**c.      False and Misleading Accounting and Internal Control Statements**

The statements in the Debt Offerings and the Stock Offering regarding the effectiveness of the Company's internal controls and regarding Pearson and Schiller's SOX certifications that Valeant's financial statements were being presented fairly and in accordance with GAAP (¶¶582, 605, 628, 631, 656, 658, 676), were also false and misleading at the time they were made. Valeant lacked adequate internal controls, compliance, and training programs necessary to ensure that its SEC filings and public disclosure were free from material misstatements, and the SOX certifications were inaccurate. ¶¶582, 606. Moreover, Valeant, at the time of the January 2015 and March 2015 Debt Offerings and the Stock Offering, had material weaknesses in internal controls and was improperly recognizing revenue sold through Philidor. *See* ¶¶632, 659, 681; *see also supra* §III.B.2.d. and §III.B.3.c.-d.

For these same reasons, the Securities Act Defendants' statements in the January 2015 and March 2015 Debt Offerings and Stock Offering regarding Valeant's reported revenues, net income, and EPS for the third and fourth quarter 2014 and full year 2014 (¶¶630, 654, 678(d)) were materially false and misleading when made. *See supra* §III.B.1.b. and §III.B.3.d.; *see also Yang v. Tibet Pharms., Inc.*, 2015 U.S. Dist. LEXIS 20463, at *20 (D.N.J. Feb. 20, 2015) (Hochberg, J.) (denying motion to dismiss §11 claims against corporation, auditor, director and underwriter for false and misleading statements in IPO that overstated company's assets and misrepresented its indebtedness); *Underland v. Alter*, 2012 U.S. Dist. LEXIS 98450, at *17-21 (E.D. Pa. July 16, 2012) (§11 claim adequately alleged against company, officers, directors, and auditor for material misstatements and omissions in registration statement regarding adequacy of loan loss reserves and compliance with capital adequacy requirements).

### d.    False and Misleading Statements Concerning the Company's VIEs, Transactions and Acquisitions

Given Valeant's creation and control of Philidor, as well as Valeant's admission it considered Philidor a VIE before and after the purchase option, the Securities Act Defendants' statements in the January 2015 and March 2015 Debt and Stock Offerings regarding Valeant's lack of "variable interest entities" (¶627) or immateriality of VIEs (¶¶655, 656), and Valeant "not currently" being a party to "any significant transactions" or recent "acquisitions" (¶¶652, 679) were also false and misleading at the time those offerings occurred.   ¶¶54,632, 659, 681; s*ee supra* §III.B.2.d. and §III.B.3.c.

### e.    Items 303 and 503 Violations

The Securities Act Defendants are liable under §§11 and 12(a)(2) because they failed to disclose information required by the SEC to be included in the Debt Offerings under Item 303, and in the Stock Offering Materials under Items 303 and 503 of Regulation S-K.   ¶¶584-585, 607-608, 633-634, 682-684.   First, the Securities Act Defendants are liable under Item 303 for the reasons discussed above in §III.B.2.d.(5).   ¶¶682-683.[64]   *See*, *e.g.*, *Underland*, 2012 U.S. Dist. LEXIS 98450, at *25-26 (Item 303 required disclosure of "change in [company's] pricing practices" that would have material effect on its financial position).   Second, Item 503 required the Securities Act Defendants to disclose that the Stock Offering was "speculative or risky" because, at the time of the offering, Valeant was operating an unsustainable business model based on undisclosed practices designed to drive short-term sales prices, but exposing Valeant to numerous risks of nonpayment, regulatory sanctions, costs of investigations, reputational harm,

---

[64]   *See Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716 (2d Cir. 2011) (defendant "was required by Item 303 to disclose trends in the real estate market" where the downward trend was already known and existing at time of IPO, and was reasonably likely to have a material impact on company's financial condition).

decreased sales and reimbursements, increased scrutiny, and substitution of Valeant products. ¶¶684-685.[65]  *In re Adams Golf, Inc. Sec. Litig.*, 618 F. Supp. 2d 343, 349 (D. Del. 2009) (denying defendants' motion for summary judgment, finding defendants' sale of products on an unauthorized market and risks associated with it could reasonably constitute a known trend requiring a duty to disclose under Items 303 and 503).

### f.    False and Misleading Statements Concerning Valeant's Business Strategy and its Sustainability

The Securities Act Defendants' statements regarding Valeant's business strategy and sustainability, including that the Company had a "lower risk" business strategy that would maximize or improve "growth rate and the profitability of the Company" and "enhance shareholder value" (¶¶581(a), 603(a), 625(a), 629, 651(a), 678(a)), were false and misleading at the time they were made.[66]  This is because they created a false and misleading impression that Valeant's touted growth in revenues and profitability were the result of its purportedly "low risk" business model, which was actually dependent upon a host of undisclosed practices that enabled Valeant to report inflated short-term profitability and drive growth.  ¶¶583, 606, 632, 659, 681. In fact, at the end of the Class Period, when Valeant's diminished growth rates and profitability were disclosed, Valeant ceased its unsustainable and high risk practices, lowered guidance, and

---

[65]  *See*, *e.g.*, *Citiline Holdings, Inc. v. iStar Fin., Inc.*, 701 F. Supp. 2d 506, 515 (S.D.N.Y. 2010) (plaintiffs stated claims under Item 503(c) where defendants failed to sufficiently warn of iStar's deteriorating performance).

[66]  *See also* ¶¶581(b), 603(b), 625(c) (discussing Valeant's "attractive [dermatology] market" and certain "key growth drivers" of that market); ¶¶625(c) 651(c), 678(b) (discussing Valeant's operation in a "high growth business" where the "patient is still the primary decision maker" "to ensure decisions are made close to the customer"); ¶678(b) (discussing the "significant opportunity to create value through applicability of the Valeant business model"); ¶¶581(e), 603(e), 625(b) (claiming Valeant was not betting on "high-risk science" and avoiding "high risk blockbuster programs"); ¶¶581(c), 603(c) (discussing Valeant's "specialized channels" that "strengthen the Company's "competitive" position and "continue to drive organic growth").

conceded it would have to change its strategy to the more traditional R&D-based platform. ¶¶277, 424; *see supra* §§III.B.2.e.-f. and §III.B.3.b.

### 3.  The Securities Act Defendants' Puffery, Safe Harbor, and Scienter Arguments Should Be Rejected

The Securities Act Defendants attack the falsity of the statements in the Debt Offerings Prospectuses and the Stock Offering with three cursory arguments: (1) the statements regarding the success of Company's business strategy were only puffery and the reinstatement was not material; (2) the Offering documents contained sufficient risk warnings; and (3) Pearson and Schiller did not act with scienter.  *See* Val. Defs. Mem. at 63-65.  All of these arguments fail.

The puffery, materiality and safe harbor arguments fail for the reasons addressed above in §III.B.3.b., §III.B.3., and §III.B.4.  And, contrary to the Securities Act Defendants' argument, §§11 and 12(a)(2) are strict liability statutes, with no scienter requirement.  *Suprema*, 438 F.3d at 269-70.  Accordingly, whether or not Pearson and Schiller "honestly believed their certifications when made," does not impact their liability for the Securities Act claims.  Accordingly, the Securities Act Defendants' motion should be denied.

### E.  The Complaint Adequately Alleges §11 Liability Against PwC

Plaintiffs' allegations sufficiently allege PwC's liability under §11 based for three distinct reasons.  First, the Complaint alleges PwC's liability for the Valeant Defendants' false and misleading statements and omissions in the Stock Offering based upon PwC's certification of those statements.  ¶¶686-687, 709.  Second, the Complaint alleges PwC is liable for its own false and misleading statements and material omissions in the 2014 Audit Report under both the second (embedded statements of fact) and third (omissions) prongs of *Omnicare*, 135 S. Ct. at 1326-30.  ¶¶686-690.  Third, the Complaint alleges PwC's liability for its statements in the 2014 Audit Report outside of *Omnicare*.  ¶¶691-709.  PwC's Motion only addresses the first prong of

*Omnicare* (subjective disbelief), and fails to even address these alternative arguments for liability. *See* PwC Mem. at 10-16. This alone is sufficient reason to deny its motion. *See Foster Wheeler*, 26 F.3d at 398 ("[a]n issue is waived unless a party raises it in its opening brief").

### 1.      PwC Is Liable for Valeant's False and Misleading Statements in the Stock Offering Materials

Pursuant to the plain language of §11, any person that acquired a securities pursuant to a false or misleading registration statement "may . . . sue . . . every accountant . . . , who has with his consent been named as having . . . certified any part of the registration statement . . . , with respect to the statement, in such registration statement . . . , which purports to have been . . . certified by him."   15 U.S.C. §77k(a).   Section 11 "expressly imposes liability for misrepresentations in the financial statement on auditors who 'prepare[] or *certify*[]' the registration statement."  *Yang*, 2015 U.S. Dist. LEXIS 20463, at *12 (emphasis in original); *Huddleston*, 459 U.S. at 382 n.13 ("§11 action can be brought only against certain parties such as … accountants who are named as having prepared or certified the registration statement"); *Suprema*, 438 F.3d at 269 (same).

Here, PwC audited Valeant's 2014 financial statements and those financial statements were included in the Stock Offering Materials.  ¶¶686-687.  By issuing the clean 2014 Audit Report on Valeant's 2014 financial statements, PwC "certified" Valeant's 2014 financial statements.[67] PwC referred to itself as an "independent registered public accounting firm" in its

---

[67]   According to §7(a)(1) of the Securities Act, all registration statements must include financial statements that have been "certified by an independent public or certified accountant."  *See* 15 U.S.C. §77aa(25).  In summarizing the requirements for "Registration Under the Securities Act of 1933," the SEC identifies "[f]inancial statements certified by independent accountants" as being "essential" information to be included in a registration statement.  https://www.sec.gov/about/laws.shtml#secact1933 (last visited Nov. 14, 2016).

2014 Audit Report,[68] and PwC's consent to include the 2014 Audit Report in the Stock Offering Materials referred to PwC as an "expert in accounting and auditing." ¶709. *See In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 400 n. 87 (S.D.N.Y. 2013) (finding auditor's consent to the inclusion of their audit opinion in a registration statement amounted to a certification of the accuracy of the financial statements included therein).

Despite PwC's certification in the 2014 Audit Report, Valeant's 2014 financial statements were admittedly materially false and misleading, and contained overstatements of revenue, net income, and EPS. Valeant itself was forced to admit that the financial statements should no longer be relied upon. As a result of the restatement, PwC was forced to withdraw the 2014 Audit Report. ¶¶302, 687, 693 n.92; *see supra* §III.B.2.d. and §III.B.3.d.[69]

Because there is no dispute that the 2015 Stock Offering Materials contained false and misleading statements and omissions that PwC certified, PwC is subject to liability under the plain language of §11. *See Yang*, 2015 U.S. Dist. LEXIS 20463, at *12; *In re Cendant Corp. Litig.*, 60 F. Supp. 2d 354, 364 (D.N.J. 1999) (finding "Plaintiffs have [pled] that the Registration Statement contained material misstatements and omissions and they have alleged that [defendants] and [auditor] are within the class of individuals and entities who may be sued pursuant to 15 U.S.C. §77k(a)"); *see also Wilmington Tr.*, 29 F. Supp. 3d at 453 (denying auditor's motion to dismiss where it certified loan reserves that were not calculated in accordance with GAAP).

*Yang*, where Judge Hochberg found the auditor liable under §11 for certifying materially misleading statements in Tibet's registration statement, is particularly instructive. 2015 U.S.

---

[68]   *See* 2014 Form 10-K, p. F-3.

[69]   PwC did not join the other Securities Act Defendants in contending that the Valeant statements were not materially false and misleading and has thus waived the argument.

Dist. LEXIS 20463, at *12.   In denying the auditor's motion to dismiss, Judge Hochberg specifically rejected the argument that "an auditor may only be held liable for its own audit report – in other words, that Plaintiffs must allege that [the] audit report itself contained material misrepresentations."  *Id*.  Relying on the plain language of §11, Judge Hochberg held: "Section 11 . . . expressly imposes liability for misrepresentations in the financial statement on auditors who 'prepare[] or *certify*[]' the registration statement, and Plaintiffs have alleged that [the auditor] certified the financial statements."  *Id*. (emphasis in original).

Moreover, even *SEPTA*, 2015 U.S. Dist. LEXIS 80584, at *97-98, a post-*Omnicare* case relied upon by PwC (PwC Mem. at 13-14), acknowledges that an auditor can be held liable for an issuer's false and misleading statements and omissions in offering materials.  In *SEPTA*, the court evaluated the auditor's liability for the false and misleading statements and omissions in the offering documents before performing an analysis of the auditor's own statements in the audit opinion under *Omnicare*.  *Id.* at *98-102; *see also In re Lehman Bros. Sec. & ERISA Litig.*, 131 F. Supp. 3d 241 (S.D.N.Y. 2015) (post-*Omnicare* case, holding auditor strictly liable under §11 for factual misstatements contained in the company's certified financial statements, without analyzing those misstatements under *Omnicare*).

Here, the Complaint adequately alleges that PwC is liable for certifying Valeant's false and misleading financial statements included in the Stock Offering Materials.  Since PwC does not contend otherwise, its motion to dismiss should be denied.  *See Patel*, 123 F. App'x at 77 n.4.

### 2.  PwC Is Liable for Its False and Misleading Statements and Material Omissions in the 2014 Audit Report

PwC is also liable under §11 for its own false and misleading statements and material omissions in the 2014 Audit Report both under *Omnicare* and outside of *Omnicare* as objective false statements of fact.  PwC consented to being referred to as an "expert in accounting and

135

auditing" and its 2014 Audit Report was incorporated into the Stock Offering Materials. ¶709. PwC's audit report contained the following false and misleading statements, which omitted material information, and for which it is liable: (a) that Valeant's financial statements "present fairly, in all material respects, the financial position of Valeant . . . at December 31, 2014 . . . in conformity with" GAAP; (b) that Valeant "maintained, in all material respects, effective internal control over financial reporting"; and (c) that PwC conducted its "audits in accordance with the standards of the Public Company Accounting Oversight Board." ¶692.[70]

### a.    PwC Is Liable Under *Omnicare*

As the Supreme Court held in *Omnicare*, "§11's false-statement provision . . . appl[ies] to expressions of opinion." 135 S. Ct. at 1326. For example, opinion statements, even those that begin with "I believe" may contain embedded statements of fact. *Id*. at 1327. "Accordingly, liability under §11's false-statement provision would follow (once again, assuming materiality) not only if the speaker did not hold the belief she professed, but also if the supporting fact she supplied were untrue." *Id.*

Under *Omnicare*, §11 liability can attach to opinion statements if: (1) the speaker does not actually hold the stated opinion; (2) the opinion contains an embedded statement of fact that is misleading; or (3) the opinion omits a fact that makes the opinion misleading to an ordinary investor. *Omnicare*, 135 S. Ct. at 1326-30. PwC's only argument is that the §11 claims should be dismissed because the Complaint fails to plead that PwC "did not sincerely believe" its statements made in the 2014 Audit Report. PwC Mem. at 10-16. PwC's argument is based solely on the first prong (subjective disbelief) articulated in *Omnicare*. *Id*. However, in so

---

[70]   As alleged in the Complaint, PwC's March 13, 2015 consent was also misleading because it gave contemporaneous assurance to investors that Valeant's financial information included in the Stock Offering Materials was accurate, but omitted material facts, making them misleading to an ordinary investor. ¶¶705-709.

arguing, PwC ignores that the Complaint pleads liability under both the second (embedded statements of fact) and third (omissions) prongs of *Omnicare*. *See generally* PwC Mem. at 10-16.

In *Omnicare*, the Supreme Court rejected an issuer's attempt to avoid the strict liability imposed under §11 for opinions by arguing that its allegedly false statements were pure opinions requiring plaintiffs to plead with particularity that the issuer actually did not believe the opinions professed. 135 S. Ct. at 1326. Indeed, the Court held that plaintiffs could show that an opinion was false without allegations about the speaker's subjective belief, because:

> [A] reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion – or, otherwise put, about the speaker's basis for holding that view. And if the real facts are otherwise, but not provided, the opinion statement will mislead its audience.

*Id.* at 1328. This is especially important when opinions relate to financial statements, because "[i]nvestors do not, and are right not to, expect opinions contained in those statements to reflect baseless, off-the-cuff judgments," and when – "as in a registration statement – a speaker 'holds himself out or is understood as having special knowledge of the matter which is not available to the plaintiff.'" *Id.* at 1330. If parties were not liable for opinion statements made without a proper foundation, it "would punch a hole in the statute for half-truths in the form of opinion statements . . . [and provide] virtual carte blanche to assert opinions . . . free from worry about §11." *Id.* at 1331.

As an initial matter, PwC mischaracterizes the Complaint to improperly limit the analysis to only the first prong of *Omnicare*. To do so, PwC cherry-picks a single reference to PwC's "false statements" in the Complaint (PwC Mem. at 8 n.5, 10), and then incorrectly argues the Complaint does not plead any omissions against PwC, despite three separate references to PwC's omissions. *Compare* PwC Mem. at 8 n.5 *with* ¶¶693, 705, 708. PwC ignores the allegations

related to the second and third prong of *Omnicare* and contends that subjective falsity must be proven.[71]   Neither *Omnicare* nor any of PwC's cases stand for the extremely limited basis of liability PwC advances.   *See, e.g.*, PwC Mem. at 13-14 (citing *SEPTA*, 2015 U.S. Dist. LEXIS 80584, at *98 (evaluating audit opinion under all three prongs of *Omnicare*); *Querub v. Moore Stephens Hong Kong*, 649 F. App'x 55, 58 (2d Cir. 2016) (evaluating audit opinion under both the subjective falsity and omissions prong of *Omnicare*); *In re Velti PLC Sec., Litig.*, 2015 U.S. Dist. LEXIS 135004, at *55 (N.D. Cal. Oct. 1, 2015) (same).

As discussed below, the Complaint sufficiently alleges PwC's liability under both the second and third prongs of *Omnicare* because the 2014 Audit Report contained embedded statements of fact that were misleading and omitted facts that made the opinions misleading to an ordinary investor (*see*, *e.g.*, ¶¶687, 693, 705, 708) and the PwC's liability under the second and third prong of *Omnicare*.

### (1)    PwC's Audit Report Contained Embedded Statements of Untrue Facts

PwC's 2014 Audit Report misrepresented three facts: (1) that Valeant's financial statements complied with GAAP; (2) that internal controls were effective; and (3) that PwC's audit complied with PCAOB standards.   ¶692.   Valeant's Complaint specifically alleges that PwC's statements "rested upon the underlying facts contained in Valeant's financial statements for the year ended December 31, 2014" such as that the transfer of products to Philidor constituted a sale permitting Valeant to report revenue under GAAP, that Valeant's internal controls did not contain any material weaknesses, and that PwC performed the required procedures and complied with PCAOB standards.   ¶691.   Because PwC's audit report contained

---

[71]   Since PwC only addresses its liability under the first prong of *Omnicare*, its argument and relied upon authority focusing on a failure to sufficiently allege an auditors' subjective disbelief are misguided.

these embedded statements of fact, that were not true, it was misleading under *Omnicare*. *See Omnicare*, 135 S. Ct. at 1327.

In the Southern District of New York, Judge Rakoff denied PwC's motion to dismiss §11 claims against it for this very reason. *See In re Petrobras Sec. Litig.*, 2016 U.S. Dist. LEXIS 21036, at *14-16 (S.D.N.Y. Feb. 19, 2016). As Judge Rakoff explained: "PwC's audit opinions that 'the accompanying consolidated [financial] statement[s] . . . present fairly, in all material respects, the financial position of [Petrobras]' rested on the underlying facts contained in the financial statements," which were untrue. *Id*. at *14. He then concluded, under *Omnicare*, that because the untrue "facts of the financial statements were embedded in PwC's audit opinions," PwC's opinions that those financial statements fairly presented the company's financial position were misleading. *Id*. at *14-15. As Judge Rakoff further explained: "PwC's audit opinions would be of no use to anyone if they announced, without any basis in the content of the financial statements or other evidence, that a company's presentation of its financial health was sound." *Id.* at *15.[72] The same reasoning applies to the statements in PwC's 2014 Audit Report here, and its motion should be denied.

### (2)   PwC's Audit Report Omitted Material Facts that Rendered It Misleading

The Complaint also sufficiently alleges that PwC is also liable under the third prong of *Omnicare* for omitting material facts necessary to make its 2014 Audit Report not misleading to a reasonable investor. *Omnicare*, 135 S. Ct. at 1328-29. As the Supreme Court made clear, an opinion statement is actionable under §11 if it does not "fairly align[] with the information in the

---

[72]   The restatement and material weaknesses admissions make the instant case factually distinguishable from *SEPTA*, where plaintiff failed to point to any "untrue material fact embedded in" the audit opinion. *See* PwC Mem. at 13-14.

[speaker's] possession at the time," or when the speaker "lacked the basis for making those statements that a reasonable investor would expect." *Id.* at 1329, 1333.

Here, PwC's opinion on Valeant's compliance with GAAP, the effectiveness of Valeant's internal controls, and PwC's compliance with PCAOB standards did not align with the information PwC possessed at the time the statements were made. For example, the Complaint identifies significant facts, including a December 15, 2014 purchase option agreement with Philidor and a direct conversation with Valeant's Corporate Controller Carro regarding the Philidor transactions (¶¶695-697) which should have alerted PwC to the fact that it did not have a reasonable basis for its opinions as Valeant could not record revenue for selling to itself under GAAP and its decision to do so demonstrated that its controls were not effective. *See* ¶¶694-704.[73]

In addition, the Complaint identifies particular PCAOB auditing standards that PwC failed to meet. ¶¶697-704. For example, had PwC complied with Auditing Standard No. 18 (*Related Parties*) and exercised heightened scrutiny when encountering and testing related party transactions, it undoubtedly would have disapproved of the fictitious sales made to Philidor that caused Valeant to restate its 2014 financial statements. ¶¶698-700. Moreover, had PwC exercised "due professional care," and "professional skepticism" (¶697) when reviewing and discussing the Philidor Sales Transactions with Carro, it would not have permitted such sales. ¶¶316-317, 694. In addition, Valeant's controlling relationship over Philidor resulted in last

---

[73] PwC improperly attempts to evade liability under §11 by arguing that it was "provided with incorrect information" by Carro. *See* PwC Mem. at 9, 16. First, PwC is asking the Court to assign weight to competing inferences in PwC's favor, and to ignore the Complaint's well pleaded allegations against PwC. (¶¶696-697). This is improper at this stage, and PwC's attempt should be disregarded. *Tellabs*, 551 U.S. at 322. Second, PwC's contention is amiss here as Section 11 is a strict liability statute, and Plaintiffs are not required to allege PwC's scienter. *See* PwC Mem. at 10, 16. Moreover, all inferences must be drawn in favor of Plaintiffs as to PwC's factual disputes. *See supra* §III.B.2.

minute sales conducted outside the normal course of business.  ¶¶316-317.  The application of basic audit procedures would have detected these transactions and application of basic accounting rules would have precluded them.  ¶¶317, 694.  Similarly, had PwC complied with AS 5 and adequately tested Valeant's control environment when auditing Valeant's internal controls (¶¶701-703), it would have identified that Valeant suffered from multiple material weaknesses, including a deficient tone at the top of the organization where reporting growth in revenues and profitability was prioritized over proper accounting.[74]  ¶¶337, 344, 693(b) & n.93.

As a result of its failure to comply with these PCAOB standards, PwC lacked a reasonable basis for its statements in the 2014 Audit Report.  *See In re Am. Realty Capital Props., Inc. Litig.*, Summary Order Granting in Part and Denying in Part Defendants' Motions to Dismiss the Second Amended Complaint, No. 1:15-mc-00040-AKH (S.D.N.Y Aug. 5, 2016) (Dkt. No. 290) (finding plaintiffs' allegations that an auditor "was privy to information that plausibly challenged that reliability of [Company's] accounts and that [auditor] negligently failed to heighten its audit investigation," satisfied *Omnicare*).  Seeger Decl., at Ex. B.  Accordingly, PwC's motion should be denied.[75]

### b.  PwC's Statements Do Not Fall Under *Omnicare*

As PwC acknowledges, the Third Circuit has yet to address whether audit opinions are considered "opinions" under *Omnicare*.  *See* PwC Mem. at 13 n.6.  As such, PwC is incorrect to

---

[74]  Under AS 5, "if one or more material weaknesses exist, the company's internal control over financial reporting cannot be considered effective."  AS 5.25.

[75]  Because the Complaint alleged specific facts that were omitted, this case is distinguishable from those that PwC relies upon.  *See* PwC Mem. at 14 (citing *Querub*, 649 F. App'x at 58 (dismissing §11 claim against auditor because there was no allegation auditor "omitted material facts about the basis for its audit reports"); *Velti*, 2015 U.S. Dist. LEXIS 135004, at *67 (dismissing §11 claim against auditor where the alleged omissions "and the risks they entailed – w[ere already] disclosed in the registration statements")).

assert that its statements were merely subjective opinions incapable of objective verification that fall under *Omnicare*.  PwC Mem. at 11-13.  *Omnicare* involved statements regarding legal compliance by an issuer.  But, the Supreme Court made clear that speakers cannot convert facts to opinions by adding phrases like "we believe" or "we think" to give defendants "virtual carte blanche to assert opinions in registration statements free from worry about §11" because it would go against Congress's intent "to establish a strict liability offense promoting full and fair disclosure of material information."  *Omnicare*, 135 S. Ct. at 1331.

The Complaint here includes several additional and specific allegations not present in other cases to make clear that despite PwC's audit report being framed as an "opinion," it is not a subjective opinion under the common use of the term, but an expert opinion based on gathering evidence and applying it to objective accounting standards.  ¶¶688-690.  Unlike subjective opinions, financial statements contain specific numbers and the auditing standards required PwC to "[g]ather[] and objectively evaluate[] audit evidence" before issuing its audit report on Valeant's financial statements and internal controls.  ¶689.  The audit procedures gather evidence and then apply that evidence to an objective set of accounting principles, GAAP.  *Id*.  Indeed, the entire reason for having GAAP is to provide for "comparability" and allow investors to compare the financial performance of different companies across different time periods.  ¶690.  Otherwise investors would be left to rely on the subjective assessments of management as to how the business was performing.  *Id*.  Similarly, the only purpose of an audit is to verify compliance with GAAP.  ¶690.  Without objective criteria, auditors would be free to disagree based on their own subjective and unverifiable beliefs, which would render audits useless as management could simply find another auditor who held a different subjective belief as to the accuracy of their financial statements.  *Id*.  The fact that PwC's 2014 Audit Report was withdrawn confirms that

the 2014 Audit Report contained objectively false statements of fact, not mere subjective opinions. ¶693(a) n.92.

Contrary to PwC's statements in the 2014 Audit Report, Valeant's financial statements were neither fairly presented nor prepared in compliance with GAAP, as Valeant admitted by its restatement. ¶¶343, 694. Similarly, contrary to PwC's statement, Valeant's internal controls were not effective as Valeant admitted it had multiple material weaknesses. ¶¶693-703. Finally, PwC's statement that it conducted its audit in accordance with PCAOB standards was false and omitted material facts due to PwC's failures identified in the Complaint. *Id*.

In fact, Judge Hochberg's pre-*Omnicare* decision in *Yang* lends support to the view that *Omnicare* should not apply to audit opinions. Notably, Judge Hochberg rejected the auditor's claim that its audit report should be evaluated as an "opinion," finding that because "[p]laintiffs' allegations . . . concern misrepresentations of fact regarding Tibet's assets and debts and [the auditor's] conduct relative to professional standards in performing its audit. Plaintiffs' allegations do not concern 'opinions, predictions [or] other forward-looking statements.'" 2015 U.S. Dist. LEXIS 20463, at *13-14 n.7. The court added that "there is no analogous reason to read a subjective falsity requirement into misrepresentations of objective fact." *Id.* As a result, the court held that the auditor's statements in the audit opinion that the audit was "conducted . . . in accordance with the standards of the Public Company Accounting Oversight Board" were materially and objectively false because the auditor "failed to exercise such appropriate professional care and judgment" by not verifying basic information within the financial statement. *Id*. at *12-13.

Likewise, in *In re OSG*, 971 F. Supp. 2d at 399, another pre-*Omnicare* decision, Judge Scheindlin rejected defendants auditor's argument that an audit opinion is a statement of belief or

opinion, merely because it stated "opinion" in its title.  Judge Scheindlin went to the state, "it would render Section 11 meaningless to find that an accountant's liability turns on this semantic choice.  Auditors may not shield themselves from the scope of liability specifically delineated as to auditors under Section 11 merely by using the word 'opinion' as a disclaimer."

Similarly, in *Petrobras*, a post-*Omnicare* decision, Judge Rakoff acknowledged that "an auditor's 'opinion' is a term of art, the meaning of which may not be entirely synonymous with the more everyday use of the word discussed in *Omnicare*."  2016 U.S. Dist. LEXIS 21036, at *13.  Ultimately, Judge Rakoff held that he would not "grapple with this distinction," because the auditor opinion at issue sufficiently met both the embedded statement of fact and omissions prongs of *Omnicare*.  *Id.* at *14-16.

In support of its position, PwC relies upon a pre-*Omnicare* case, *In re IKON Office Solutions, Inc*., 277 F.3d 658, 673 (3d Cir. 2002), to argue that Third Circuit case law "is consistent with the concept" that an auditor opinion should be considered an opinion under *Omnicare*.  *See* PwC Mem. at 13 n.6.  *IKON*, however, is easily distinguished as it involved claims under §18(a) of the Exchange Act.  277 F.3d at 673.  First, unlike §11, §18(a) of the Exchange Act does not impose liability on auditors for their certification of financial statements.  Indeed, Judge Hochberg in *Yang* specifically distinguished *IKON* on this ground when upholding §11 claims against the auditor.  2015 U.S. Dist. LEXIS 20463, at *12.  Second, the specific language that PwC cites to, inferring that an audit is not a guarantee, (PwC Mem. at 13 n.6) was stated in the context of the *IKON* court's evaluation of whether discrete errors in an audit opinion supported finding an auditor's scienter under the Exchange Act.  *See IKON*, 277 F.3d at 376.

There is no scienter requirement here.[76]   Thus, both pre and post-*Omnicare* decisions confirm that PwC's Audit Report statements should not be treated as subjective opinion.

### F.   The Complaint Adequately Alleges §12(a)(2) Claims for the Debt Offerings

To state a claim for violations of §12(a)(2), the Complaint need only allege "the purchase of securities pursuant to a materially false or misleading prospectus." *Suprema*, 438 F.3d at 269-70.   The Complaint alleges that Plaintiff TIAA purchased notes in four separate debt offerings by means of the respective prospectuses and alleges that each of them was materially false and misleading.   ¶556.   Valeant, Pearson, Schiller, and the Bank Offering Defendants (collectively "Debt Offering Defendants") have moved to dismiss,[77] arguing that the Debt Offerings were not public offerings but rather were private placements under SEC Rule 144A.[78]   Bank Defs. Mem. at 7-8.   However, the Complaint sufficiently alleges that the offerings were public and subject to §12(a)(2) liability.

---

[76]   PwC also relies upon *SEPTA*, 2015 U.S. Dist. LEXIS 80584, at *98-99, to argue that its audit opinions must be evaluated under *Omnicare*.   PwC Mem. at 13.   However, the *SEPTA* decision did not evaluate the totality of the factual allegations regarding audit opinions as objective statements of fact that are present in this case, instead automatically assuming that the plaintiffs' Securities Act claims based on audit opinions fell under *Omnicare*.   2015 U.S. Dist. LEXIS 80584, at *98-99.   Moreover, when evaluating the statements in the auditor's opinions under the Exchange Act, the court did not evaluate them as opinions under *Omnicare* or otherwise finding plaintiffs' conclusory allegations failed to plead with particularity the auditor's "material misrepresentation or omission."   *Id*. at *148-49.   Finally, *SEPTA* is not binding on this court.   *See Doe v. Delie*, 257 F.3d 309, 321 n.10 (3d Cir. 2001) ("[D]istrict court decisions do not establish the law of the circuit, and are not even binding on other district courts within the district.").   Moreover, as previously discussed, *SEPTA* confirms that PwC's liability must first be assessed under §11 based upon its certification of Valeant's false and misleading statements.

[77]   *See also* Val. Defs. Mem. at 63 (adopting the Bank Offering Defendants' motion to dismiss); Schiller Mem. at 29 (same).

[78]   The SEC requires certain offerings to be registered and exempts certain offerings from registration.   Rule 144A exempts from registration offerings sold to qualified institutional buyers ("QIBs").   *See* Bank Defs. Mem. at 8-9.

### 1.    Whether the Debt Offerings Were Public Is a Question of Fact

Regardless of whether an offering is required to be registered, the issue of whether an offering is a public offering as opposed to a private offering is dependent on the particular facts. The Debt Offering Defendants argue that Rule 144A offerings are private, not public, and §12(a)(2) is unavailable to investors "as a matter of law" in light of *Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995).  *See* Bank Defs. Mem. at 7.  The Debt Offering Defendants are wrong.  In *Gustafson*, the Supreme Court made clear that "[t]he liability imposed by §12(2) has nothing to do with the fact of registration." 513 U.S. at 579.

The Debt Offering Defendants argue that *Gustafson* held that §12(a)(2) liability cannot attach unless there is an obligation to distribute a prospectus and that obligation does not attach for non-public offerings.  Bank Defs. Mem. at 8.  However, in *Gustafson*, there was no dispute that the offering at issue (made via a private stock purchase contract of sale between two parties) was not a public offering.  *See* 513 U.S. at 564-65, 569.  The Supreme Court did not find that all offerings exempt from registration were non-public offerings as a matter of law.  Rather, the Court found the term prospectus, as used in §12(a)(2), is a term of art meaning "a document soliciting the public to acquire securities."  *Id.* at 574.  The Court explicitly recognized that "public offerings" may encompass offerings exempt from registration when it held "[w]e agree with the SEC that §12(2) applies to every class of security … whether exempted from registration or not . . . ."  *Id.* at 580; *see also id.* at 571.  It also held that "the liability imposed by §12(2) cannot attach unless there is an obligation to distribute the prospectus in the first place (or unless there is an exemption)."  The Court made clear an issuer cannot "avoid[] liability by calling a soliciting document something other than a prospectus."  *Id.* at 576.  Instead, the Court

146

established the test as a "functional" one that "includes communications held out to the public at large but that might have been thought to be outside the other words in the definitional section [of §2(a)(10)]." *Id*.  Thus, soliciting documents such as "notices," "circulars" and even "advertisements" may fall within the ambit of "prospectus" if, as here, they functionally solicit the public to acquire the issuer's securities. *Id*.[79]

Not only does the language of *Gustafson* contradict the Debt Offering Defendants' argument, they also fail to address the seminal case *SEC v. Ralston Purina Co.*, 346 U.S. 119 (1953).  In *Ralston Purina*, the Supreme Court established a fact-specific test, endorsed by the Third Circuit, for determining whether an offering is "public."  The Court stated that the answer to the "public" versus "private" question "turn[s] on whether the particular class of persons affected needs the protection of the Act."  346 U.S. at 125.  In particular, the Supreme Court pointed to the disparity in access to information regarding the issuer and directed focus "on the knowledge of the offerees." *Id*. at 126; *see also Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 215 (3d Cir. 2006) ("whether an issuance of stock is a 'public offering' turns on the need of the offerees for the protections of the securities laws. . . the 'offeree's access to financial information about the investment, similar to what would be found in a registration statement, is crucial.'").  The Court stressed that it was "clear" that "to be public an offer need not be open to

---

[79]  The Supreme Court's discussion of exemptions in *Gustafson* reinforces the conclusion that offering documents used in connection with offerings exempt from registration are subject to §12(a)(2) liability, even though they may otherwise be outside the reach of the Securities Act. *See* 513 U.S. at 569, 579.  For example, the Court stated, "[i]t does mean that a document is not a prospectus within the meaning of [§10] if, absent an exemption, it need not comply with §10's requirements in the first place." *Id*. at 569.  The Court also held that the failure to qualify for registration exemption "has nothing to do with the question presented here: whether a prospectus is a document soliciting the public to purchase securities from the issuer." *Id*. at 579; *see also Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp., N.V.*, 941 F. Supp. 1369, 1376 (S.D.N.Y. 1996) ("[*Gustafson*] effectively limited §12(2) claims to all public offerings subject to the registration and prospectus requirements of §10, which exempts securities issued pursuant to §3 and transactions pursuant to §4.").

the whole world." *Ralston Purina*, 346 U.S. at 123.  Citing the "broadly remedial purposes of federal securities legislation," the Supreme Court held that the issuer bears the burden of proving that an offering is truly private.  *Id.* at 126; *Berckeley*, 455 F.3d at 212 ("The burden of proving entitlement to an exemption rests with the party claiming the entitlement.").  Thus, the Debt Offering Defendants' rigid interpretation that no offering exempt from registration pursuant to Rule 144A can qualify as "public" is simply wrong.  *See West v. Innotrac Corp.*, 463 F. Supp. 2d 1169, 1175 (D. Nev. 2006) ("Arguably, when the majority in *Gustafson* used the term 'public offering,' they were using the term as it had been defined in *Ralston Purina* and its progeny.").

Courts applying *Ralston Purina* have developed flexible factors to determine whether a transaction constitutes a public offering.  These typically focus on such factors as: (1) the number of offerees; (2) the sophistication of the offerees, including their access to the type of information that would be contained in a registration statement; and (3) the manner of the offering.  *See United States v. Arutunoff*, 1 F.3d 1112, 1118 (10th Cir. 1993); *Klein v. Boyd*, 1996 U.S. Dist. LEXIS 5956 (E.D. Pa. May 6, 1996); *West*, 463 F. Supp. 2d at 1176 ("Courts have developed flexible tests to determine whether a transaction involves a public offering.").  However, these "factors are 'simply criteria which are helpful in arriving at the ultimate determination,'" the answer to which "depends not on one factor but on all of the surrounding circumstances."  *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, 2001 U.S. Dist. LEXIS 14761, at *16 (S.D.N.Y. Sept. 20, 2001).

Courts also consider factors such as whether the information in the offering document is comparable to information "contained in the registration statement," which "refers to, *inter alia*, the names and addresses of the directors and underwriters, a statement of the capitalization of the issuer, the amount of capital stock of each class issued, the amount of the funded debt

outstanding, the estimated net proceeds to be derived from the security, the price at which the security is to be offered, a balance sheet, and a profit and loss statement of the issuer." *See Duk Park v. Hee Nam Bae*, 2016 U.S. Dist. LEXIS 48690, at *7-8 (D.N.J. Apr. 12, 2016); *West*, 463 F. Supp. 2d at 1176 (prospectus should include information contained in registration statement).

Therefore, "[w]hat constitutes a public offering turns on a number of factors and requires a fact-specific analysis on a case by case basis." *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 310 F. Supp. 2d 819, 862 (S.D. Tex. 2004) (denying motion to dismiss §12(a)(2) claim for Rule 144A and Regulation S offering); *see also Goodman v. De Azoulay*, 554 F. Supp. 1029, 1037 (E.D. Pa. 1983) ("[W]e will not dismiss [plaintiff's] 1933 Act claim on the ground that her transaction falls within that Act's private offering exemption" because "[w]hether an offering is public or private is a question of fact."); *Flake v. Hoskins*, 55 F. Supp. 2d 1196, 1228-29 (D. Kan. 1999) (same); *Steed Fin.*, 2001 U.S. Dist. LEXIS 14761, at *18-19 (same).

The Debt Offering Defendants' argument that the court in *In re Fisker Auto. Holdings, Inc. Sec. Litig.*, 128 F. Supp. 3d 814 (D. Del. 2015), arrived at its conclusion "as a matter of law" is incorrect. *See* Bank Defs. Mem. at 15. Instead, the court analyzed the complaint's allegations against the relevant factors. *See Fisker Auto.*, 128 F. Supp. 3d at 836. Similarly, the Debt Offering Defendants cite *Lewis v. Fresne*, 252 F.3d 352, 357 (5th Cir. 2001). Bank Defs. Mem. at 7. But, there the Fifth Circuit also applied a factual analysis focused on "[t]he evidence" showing the offering at issue was a "private transaction." *Id.*; *cf. Duk Park*, 2016 U.S. Dist. LEXIS 48690, at *8 (analyzing §12(a)(2) claim and finding "Plaintiff fails to allege sufficient *facts* to support a finding that Defendants sold securities by means of a materially false or misleading prospectus"); *Boyd*, 1996 U.S. Dist. LEXIS 5956, at *39 (stating, "[h]ad plaintiffs alleged anywhere in the complaint that the offering . . . was a public offering, the court could not

assess the factors [since] the motion before the court is one to dismiss the complaint"). Thus, these cases further undermine the Debt Offering Defendants' position that Plaintiffs' §12(a)(2) claim should be foreclosed as a matter of law. Although the Debt Offering Defendants point to a few district courts outside the Third Circuit that have endorsed their absolutist viewpoint, respectfully these decisions got it wrong for reasons addressed herein.[80]

### 2.     Rule 144A Does Not Alter the Fact-Specific Inquiry Required by *Ralston Purina*

In an effort to dismiss the claims, the Debt Offering Defendants misconstrue the purpose of Rule 144A. Rule 144A was designed to allow for an exemption from the Securities Act's registration requirements for the sale of securities among QIBs, but the rule does not otherwise alter the fact-specific nature of the public-versus-private-offering inquiry articulated by the Supreme Court for purposes of §12(a)(2) liability.[81] As Rule 144A expressly states, the rule "***relates solely to the application of section 5 of the Act***" – the Securities Act's registration

---

[80] The Debt Offering Defendants also cite *Yung v. Lee*, 432 F.3d 142 (2d Cir. 2005), Bank Defs. Mem. at 7, but in that case, unlike here, the parties ***agreed*** that the offerings at issue were private. 432 F.3d at 149. Similarly, Defendants claim that the *Enron* Court "reversed course" from an earlier decision denying a motion to dismiss a §12(a)(2) claim for a Rule 144A offering. Bank Defs. Mem. at 11 n.12. But, the court simply arrived at a different conclusion when presented with different factual allegations. *See In re Enron Corp. Sec., Derivative & ERISA Litig.*, 761 F. Supp. 2d 504, 531 & n.19 (S.D. Tex. 2011) (distinguishing plaintiffs who purchase pursuant to "face-to-face sales meetings" from others who "purchase[d] the Notes, which were sold through Rule 144A and Reg S offerings and formal offering memoranda"). Although, *in dicta*, the court discussed the meaning of "prospectus" and Rule 144A, the court conducted a "factual" analysis focused on the informal and small-scale nature of the offerings, which involved only a handful of purchasers and no formal offering memoranda. *See id.* n.16 (discussing the "[c]riteria relevant to determining the factual issue of whether an offering is public").

[81] The Valeant bonds were also offered under Regulation S, and courts have likewise held that an "offering issued pursuant to Regulation S is subject to liability under §12(2) if it is a public offering." *Sloane Overseas Fund*, 941 F. Supp. at 1376.

requirements – and "***not to antifraud or other provisions of the federal securities laws***."[82]  For

the avoidance of doubt, Rule 144A also states its use does "not affect the availability of section

4(a)(2)," the private offering exemption.  As discussed above, the *Ralston Purina* test for the

private offering exemption is what courts look to in order to determine the extent of §12(a)(2)

liability post-*Gustafson*.

The Debt Offering Defendants quote language in Rule 144A that securities are "'deemed

not to have been offered to the public'" (Bank Defs. Mem. at 8), but notably they omit the

qualifying language "within the meaning of section 4(3)(A) of the [Securities] Act."  *See* 17

C.F.R. §230.144A(c).  This omitted language indicates that the limited purpose of this subsection

(230.144A(c)) is to protect dealers from the registration requirements of §5 of the Securities Act.

The subsection does not relate to issuers, nor does it render Rule 144A offerings non-public as a

matter of law for the purposes of §12(a)(2).

Thus, by its own terms, Rule 144A was not intended to disrupt the functional test for

public offerings imposed by courts.  Rather, the purpose and limits of the rule are clear: to

increase liquidity and efficiency in offerings exempt from registration under Rule 144A, but not

to unsettle investor protections for offerings that, although exempt from registration, are

"functionally" public for the purposes of §12(a)(2).[83]  While a majority of Rule 144A offerings

---

[82]   Although a non-fraud cause of action, the SEC includes §12(a)(2) among the "general anti-fraud provisions" in the federal securities laws.  *See, e.g.*, Existing Regulatory Protections Unchanged     by     Either     H.R.     3606     or     S.     1933,     SEC, https://www.sec.gov/info/smallbus/acsec/ongoinginvestorprotections.pdf (last visited Nov. 14, 2016).

[83]   The necessity of maintaining the distinction between registration exemptions and §12(a)(2) liability was further shown by recent amendments to Rule 144A.  In July 2013, the SEC adopted final rules allowing for "general solicitation" to the public in Rule 144A offerings, including to persons other than QIBs.  *See* SEC Release No. 33-9415; No. 34-69959; No. IA-3624; File No. S7-07-12 at 54.  Since September 2013, sellers have been expressly allowed to publicly offer securities under Rule 144A so long as they "reasonably believe" QIBs will purchase them.  *Id.*

may in fact be private, applying the factors in situations such as this that involve some of the largest corporate debt offerings in history, with the concomitant potential for severe and widespread damage to the investing public, the protections of §12(a)(2) must still apply.

Thus, courts have found that since the issue of whether an offering is public is a fact specific determination, "[w]hether the transaction in question was not registered because it is claimed it was exempt under Section 4(2) or Regulation S or Rule 144A is not dispositive." *AAL High Yield Bond Fund v. Ruttenberg*, 2001 U.S. Dist. LEXIS 25572, at \*21 (N.D. Ala. Oct. 1, 2001); *Fisk v. SuperAnnuities*, 927 F. Supp. 718, 730-31 (S.D.N.Y. 1996) (denying motion to dismiss §12(a)(2) claim because defendants bore burden and private structuring of offering did not mean the plaintiff could not prevail); *Sloane Overseas*, 941 F. Supp. at 1376-77 (finding Rule 144A and Regulation S offering sufficiently alleged as "public" for §12(a)(2) claim). Defendants are thus wrong to assert that the Rule 144A debt offerings in this case are private as a matter of law.

### 3.    The Debt Offerings Were Public Offerings

The applicable test is highly factual and inappropriate for a motion to dismiss in light of the Rule 8(a) pleading standard.   TIAA adequately alleged that the debt offerings were functionally "public" under §12(a)(2) and that the offering memoranda are thus "prospectuses" under *Gustafson*.   It is obvious why the Debt Offering Defendants argue the issue is one of law and seek to avoid the fact-specific, multi-factor inquiry.   They lose on every factor.

### a.    The Size of the Debt Offerings

The Debt Offering Defendants underwrote, solicited, and sold billions of dollars of debt securities in some of the largest and most widely dispersed corporate debt offerings of all time.

---

Thus, the amendments further confirm that a Rule 144A offering may constitute a "public" offering even though it is exempt from registration.

¶¶567-571.  While raising billions of dollars from all sectors of the United States economy, each of the offering documents was materially false and misleading.  ¶¶572-592 (July 2013 Debt Offering); ¶¶593-615 (December 2013 Debt Offering); ¶¶616-641 (January 2015 Debt Offering); ¶¶642-668 (March 2015 Debt Offering).  The size of these debt offerings was many times greater than any in the cases the Debt Offering Defendants cite.  *Compare* ¶¶558, 569-571 *with* Bank Defs. Mem. at 7-15.  In early 2015 alone, the Debt Offering Defendants sold more than $13 billion worth of Valeant debt securities.  ¶558.  Less than a year later, as truth was revealed regarding Valeant's business, operations and prospects the value of the bonds plummeted causing billions of dollars in investor losses.

The offerings here were marketed, distributed, and sold to hundreds (and potentially thousands) of investors, widely dispersed across every geographic region in the United States. ¶570.  Totaling more than $13 billion, the bond offerings were some of the largest corporate offerings by a drug company in the last five years.  ¶569.  Indeed, at the time it was consummated, the March 2015 Debt Offering was the third largest high-yield corporate debt offering in history.  *Id*.  The offerings were larger and more widespread than other offerings that have been found to be functionally public.  *See, e.g.*, *AAL High Yield*, 2001 U.S. Dist. LEXIS 25572, at *8 ($200 million Rule 144A and Reg S debt offering adequately alleged to be public); *Sloane Overseas*, 941 F. Supp. at 1372 ($50 million Rule 144A and Reg. S debt offering adequately alleged to be public); *compare with Fisker Auto.*, 128 F. Supp. 3d at 825-26 (only handful of venture capital firms invested); *Boyd*, 1996 U.S. Dist. LEXIS 5956, at *4 (only family of investors).

### b.    The Offerees' Limited Access to Information

Each of the offering documents functioned as a prospectus and included the type of information found in registered offerings.  ¶571.  For example, each of these offering documents

included, *inter alia*: (i) the name of the issuer and the state under which it was organized; (ii) a statement of Valeant's business; (iii) the price and terms of the senior notes; (iv) the estimated net proceeds to be derived from the offering; (v) a statement of Valeant's capitalization; (vi) a balance sheet and profit and loss statement of Valeant; and (vii) the names of the investment firms selling the securities to investors. *Id.* Clearly, these documents were required to be "prepared with care" and, ostensibly, after sufficient "due diligence." *See Gustafson*, 513 U.S. 578.

Equally clear, Valeant found it necessary to provide this detailed information as offerees did not have access to it. Otherwise the preparation of the offering documents would have been a waste of time and money. Valeant acknowledged as much, stating on multiple occasions with respect to the Debt Offerings, "[n]o offer of securities shall be made except by means of a prospectus meeting the requirements of Section 10 of the Securities Act." ¶571. This is a far cry from circumstances like those in *Fisker Auto.*, where the offerors were venture capital firms provided with special access to information not publicly available and, in some cases, password protected. *See* 128 F. Supp. 3d at 836; *see also Duk Park*, 2016 U.S. Dist. LEXIS 48690, at *8-9 (plaintiff did not allege offering materials were a prospectus, or that they contained information required in a registration statement or even identify "a single materially false statement or omission of material fact"); *Boyd*, 1996 U.S. Dist. LEXIS 5956, at *4 (no offering materials provided at all).

### c.      The Manner of the Debt Offerings

The Complaint adequately alleges the bonds were offered in a public manner. Valeant widely marketed and sold the bonds to hundreds of investors, which included TIAA and other

retirement and pension plans operated for the benefit of many more beneficiaries. *See* ¶570.[84] The Debt Offering Defendants actively solicited and sold senior notes in the Debt Offerings to investors across the United States – from Hawaii to New York and Texas to Wyoming, and dozens of places in between, including Pennsylvania, Oregon, and Missouri, among many others. *Id.*; *see also Enron*, 310 F. Supp. 2d at 865 (finding wide distribution and sales to investors widely dispersed throughout U.S. and world supported finding Rule 144A offering was public); *Sloane Overseas*, 941 F. Supp. at 1376 (stating "the wide distribution of the Offering Circular made Sapiens' Note offering public."). The largest of the offerings, the March 2015 Debt Offering, was also carried out in conjunction with a $1.45 billion public offering of Valeant stock, and eight of the Bank Offering Defendants simultaneously underwrote and distributed both offerings. ¶¶558, 567; *see also Steed Fin.*, 2001 U.S. Dist. LEXIS 14761, at *17 (denying motion to dismiss §12(a)(2) claim for private offering carried out in conjunction with public offering). TIAA's allegations that these offerings were functionally public are far beyond what is necessary to state a claim at the pleading stage.

<blockquote>
**d.    The Debt Offering Defendants' Factual Disputes Are Inappropriate for a Motion to Dismiss**
</blockquote>

Despite Plaintiffs' detailed allegations, the Debt Offering Defendants improperly mischaracterize and ignore specific language in the Debt Offering Prospectuses that cuts against their arguments. First, the Debt Offering Defendants erroneously claim that the Debt Offering Documents each stated that the respective notes would not be offered to the general public. *See*

---

[84] The Debt Offering Defendants are wrong to suggest that Plaintiffs alleged the ultimate beneficiaries of the bonds in order to inflate the number of offerees as no inflation is needed. *See* Bank Defs. Mem. at 13-15. Direct investors alone numbered in the hundreds as discussed above. The fact that the beneficiaries were countless, only serves to underscore the need to apply §12(a)(2) in furtherance of the statute's broad remedial purpose to "promote full and fair disclosure of information to the public in the sales of securities." *Pinter v. Dahl*, 486 U.S. 622, 646 (1988).

Bank Defs. Mem. at 3.  However, they ignore that the language was expressly limited to sales in Canada under Canadian law.  *Id.* ("The notes have not been and will not be qualified for sale to the public by prospectus under applicable laws in Canada . . . .").  With respect to sales in the United States, the Debt Offering Defendants ignore and fail to refute the fact that Valeant specifically represented on multiple occasions that the Debt Offerings would be made pursuant to the prospectus requirements for public offerings of §10 of the Securities Act.  ¶571 ("[n]o offer of securities shall be made except by means of a prospectus meeting the requirements of Section 10 of the Securities Act").

Similarly, the Debt Offering Defendants argue that the Debt Offering Prospectuses stated that "there is no public trading market for the notes" (Bank Defs. Mem. at 5).  But these Defendants disregard the fact that this language was simply explaining that there was "[n]o prior market" (which is true for every initial public offering).  *See, e.g.*, Dkt. No. 164-2 at Ex. 1 (July 2013 Debt Offering at 16).  In fact, the Debt Offering Documents explicitly state that the Bank Offering Defendants "intend[ed] to make a market in the notes."  *See* Dkt. No. 164-2 at Ex. 1 (p.30); Ex. 2 (p.21); Ex. 3 (p.21) and Seeger Decl., at Ex. C.

Under the applicable standards, TIAA has sufficiently alleged the Debt Offering Defendants' bond offerings were *de facto* public under §12(a)(2), and the Debt Offering Defendants' motion must be denied.

## V.    The Complaint Pleads Control Person Liability Under §§15 and 20(a)

Plaintiffs alleged primary violations of §10(b) of the Exchange Act and §§11 and 12(a)(2) of the Securities Act.  Since Pearson, Schiller, and Rosiello controlled the Company by virtue of their positions and day-to-day responsibilities, they are liable as control persons under both the Exchange Act and Securities Act.  *See Campbell Soup*, 145 F. Supp. 2d at 599-600 (holding plaintiffs adequately alleged the underlying violations and defendants were control

persons under §20(a)); *Enzymotec*, 2015 U.S. Dist. LEXIS 167403, at \*69 (finding that plaintiffs sufficiently pled a §15 control person claim by adequately alleging an underlying violation of §§11 and 12(a)(2)).

Schiller argues Plaintiffs failed to allege the "culpable participation" required to hold him liable as a control person.[85]  Schiller Mem. at 30.  However, the "overwhelming trend in [the Third Circuit]" is that "culpable participation does not have to be pled in order to survive a motion to dismiss." *Dudley v. Haub*, 2013 U.S. Dist. LEXIS 61386, at \*55 n.5 (D.N.J. Apr. 30, 2013).  In any event, the Complaint alleges Schiller was Valeant's Executive Vice President and CFO, signed every 10-K and 10-Q filed with the SEC from the first quarter of 2013 through the first quarter of 2015, and signed numerous offering documents, including the Stock Offering Materials.  ¶¶37, 725-726.  The Complaint further details a strong inference of scienter against Schiller, including the Company's finding that he engaged in "improper conduct," which is sufficient to allege his culpable participation.  *See* §III.C.8.  Accordingly, Plaintiffs alleged control person liability for Valeant, Pearson, Schiller, and Rosiello under §20(a) of the Exchange Act and Valeant, Pearson and Schiller under §15 of the Securities Act.

## VI.   Conclusion

For the above reasons, the motions to dismiss should be denied in their entirety.[86]

---

[85]   Schiller relies upon *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470 (3d Cir. 2013).  Schiller Mem. at 30.  That case however addressed not whether §20(a) was adequately pled (it was), but whether the evidence was sufficient at summary judgment (it was not).  708 F.3d at 484-85.  *In re Tellium, Inc. Sec. Litig.*, 2005 U.S. Dist. LEXIS 19467, at \*72-73 (D.N.J. June 30, 2005) likewise offers Schiller no cover, because there the plaintiff adequately alleged the defendant was, like Schiller, involved in the alleged fraud, and thus stated a claim under §15.  Schiller fails to articulate why a different result is warranted here.

[86]   While the motions should be denied in their entirety, the Valeant Defendants, Jorn, and PwC are wrong to suggest a dismissal of any defendant or portion of the Complaint should be with prejudice as the Court's analysis of the Complaint should not "foreclose the possibility that discovery might reveal information as to a particular Defendant whose individual culpability was

DATED:  November 14, 2016                SEEGER WEISS LLP
                                         CHRISTOPHER A. SEEGER
                                         DAVID R. BUCHANAN


                                         /s  Christopher A. Seeger
                                         _____
                                         Christopher A. Seeger

                                         550 Broad Street, Suite 920
                                         Newark, NJ  07102
                                         Telephone:  973/639-9100
                                         973/639-9393 (fax)
                                         cseeger@seegerweiss.com
                                         dbuchanan@seegerweiss.com

                                         Local Counsel

                                         ROBBINS GELLER RUDMAN
                                           & DOWD LLP
                                         DARREN J. ROBBINS
                                         655 West Broadway, Suite 1900
                                         San Diego, CA  92101
                                         Telephone:  619/231-1058
                                         619/231-7423 (fax)
                                         darrenr@rgrdlaw.com

                                         ROBBINS GELLER RUDMAN
                                           & DOWD LLP
                                         SAMUEL H. RUDMAN
                                         58 South Service Road, Suite 200
                                         Melville, NY  11747
                                         Telephone:  631/367-7100
                                         631/367-1173 (fax)
                                         srudman@rgrdlaw.com

---

not sufficiently alleged in the Complaint." *Merck*, 2011 U.S. Dist. LEXIS 87578, at *113-14 n.9 (granting motion to dismiss, in part, without prejudice).  *See* Val. Defs. Mem. at 65; Jorn Mem. at 11; PwC Mem. at 17.

ROBBINS GELLER RUDMAN
  & DOWD LLP
JAMES E. BARZ
200 South Wacker Drive, 31st
Floor
Chicago, IL  60606
Telephone:  312/674-4674
312/674-4676 (fax)
jbarz@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
JACK REISE
ROBERT J. ROBBINS
120 East Palmetto Park Road,
Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
jreise@rgrdlaw.com
rrobbins@rgrdlaw.com

Lead Counsel for Plaintiffs