<u>**NOT FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE VALEANT PHARMACEUTICALS INTERNATIONAL, INC. SECURITIES LITIGATION | Civil Action No. 15-7658 (MAS) (LHG) **MEMORANDUM OPINION** |

<u>**SHIPP, District Judge**</u>

This matter comes before the Court on six Motions to Dismiss. The first Motion was filed by Defendants Goldman Sachs & Co.; J.P. Morgan Securities LLC; Merrill Lynch, Pierce, Fenner & Smith, Inc.; CIBC World Markets Corp.; Citigroup Global Markets, Inc.; DBS Bank Ltd.; TD Securities (USA) LLC; BMO Capital Markets Corp.; SMBC Nikko Securities America, Inc.; Deutsche Bank Securities Inc.; HSBC Securities (USA) Inc.; Mitsubishi UFJ Securities (USA), Inc.; DNB Markets, Inc.; Barclays Capital Inc.; Morgan Stanley & Co. LLC; RBC Capital Markets, LLC; and SunTrust Robinson Humphrey, Inc. (collectively, the "Bank Offering Defendants"), seeking dismissal with prejudice of Counts Three through Eight of Plaintiffs the City of Tucson, together with and on behalf of the Tucson Supplemental Retirement System, (the "City of Tucson") and Lead Plaintiff Teachers Insurance and Annuity Association of America-College Retirement Equities Fund's ("TIAA-CREF") (collectively, "Plaintiffs") Consolidated Complaint (the "Complaint") as to the Bank Offering Defendants. (ECF No. 164.) The second Motion was filed by Defendant PricewaterhouseCoopers LLP ("PwC"), seeking dismissal of Count Seven of the Complaint as to PwC. (ECF No. 165.) The third Motion was filed by Defendant Tanya Carro ("Carro"), seeking dismissal of Count One as to Carro. (ECF No. 166.)

The fourth Motion was filed by Defendants Valeant Pharmaceuticals International, Inc. ("Valeant"), J. Michael Pearson ("Pearson"), Robert L. Rosiello ("Rosiello"), Ari S. Kellen ("Dr. Kellen"), Ronald H. Farmer ("Farmer"), Colleen Goggins ("Goggins"), Robert A. Ingram ("Ingram"), Anders Lönner ("Lönner"), Theo Melas-Kyriazi ("Melas-Kyriazi"), Robert N. Power ("Power"), Norma Provencio ("Provencio"), Katherine B. Stevenson ("Stevenson"), and Jeffrey W. Ubben ("Ubben") (collectively, the "Valeant Defendants"), seeking dismissal of all Counts as to the Valeant Defendants. (ECF No. 167.) The fifth Motion was filed by Defendant Howard B. Schiller ("Schiller") (ECF No. 168), seeking dismissal of all Counts as to Schiller, and the sixth Motion was filed by Defendant Deborah Jorn ("Jorn") (ECF No. 169), seeking dismissal of Count One as to Jorn.[1]

Plaintiffs filed an omnibus opposition brief in response to all six Motions to Dismiss ("Plaintiffs' Opposition Brief") (ECF No. 178), and all six movants replied (ECF Nos. 185, 186, 187, 188, 191, 196).

Additionally, nonparty Securities Industry and Financial Markets Association ("SIFMA") filed an amicus curiae brief (ECF No. 193), and Plaintiffs filed opposition (ECF No. 208). Finally, Plaintiffs submitted supplemental authority on the issue of auditor liability under Section 11 of the Securities Act of 1933 (the "Securities Act") (ECF No. 211), and PwC responded (ECF No. 212).

---

[1] Given the substantial number of parties, the Court utilizes the categories of Defendants as set forth in the Complaint: (1) the "Director Defendants" are comprised of Ingram, Farmer, Goggins, Lönner, Melas-Kyriazi, Power, Provencio, Stevenson, and Ubben; (2) the "Individual Defendants" are comprised of Pearson, Schiller, Rosiello, Jorn, Kellen, Carro, and the Director Defendants; (3) the "Exchange Act Defendants" are comprised of Valeant and the Individual Defendants; (4) the "Individual Securities Act Defendants" are comprised of Pearson, Schiller, Farmer, Goggins, Ingram, Lönner, Melas-Kyriazi, Power, Provencio, Stevenson, and Ubben; and (5) the "Stock Underwriter Defendants" are comprised of Deutsche Bank Securities, Inc., HSBC Securities (USA) Inc., Mistubishi UFJ Securities (USA), Inc., DNB Markets, Inc., Barclays Capital, Inc., Morgan Stanley & Co. LLC, RBC Capital Markets, and SunTrust Robinson Humphrey, Inc. Additionally, the Court refers to all Defendants, collectively, as "Defendants."

The Court has carefully considered the parties' submissions and heard oral argument on April 10, 2017. For the reasons stated below, the Exchange Act Defendants' Motions to Dismiss are **DENIED** with regard to Count One; Valeant, Pearson, Schiller, and Rosiello's Motions to Dismiss are **DENIED** with regard to Count Two; Valeant, Pearson, Schiller, and the Bank Offering Defendants' Motions to Dismiss are **GRANTED**, without prejudice, with regard to Counts Three, Four, Five, and Six; Valeant, the Individual Securities Act Defendants, PwC, and the Stock Underwriter Defendants' Motions are **DENIED** with regard to Count Seven; Valeant, Pearson, Schiller, and the Stock Underwriter Defendants' Motions are **DENIED** with regard to Count Eight; and Valeant, Pearson, and Schiller's Motions Dismiss are **DENIED** with regard to Count Nine.

I.   **Background**[2]

A.   **Overview of the Litigation**

This securities class action is brought on behalf of purchasers of Valeant equity securities and senior notes between January 4, 2013 and March 15, 2016 (the "Class" and the "Class Period," respectively), alleging nine counts pursuant to the Securities Exchange Act of 1934 (the "Exchange Act"), Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, and the Securities Act. (Compl. ¶ 1, ECF No. 80.) The Complaint alleges that Valeant engaged in deceptive practices, which Defendants concealed through materially false and misleading statements and omissions. (*Id.* ¶¶ 7-17.) Once Valeant's deceptive practices were disclosed to the public, Valeant's stock price fell dramatically. (*Id.* ¶¶ 18-26.) Plaintiffs now seek compensatory damages, rescission, and litigation costs and attorneys' fees against Defendants. (*Id.* at 279-80.)

---

[2] In light of the applicable legal standard, the Court sets forth the allegations of the Complaint as true for the purposes of evaluating the pending Motions to Dismiss. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).

**B.      Valeant's Deceptive Practices**

Pearson became Valeant's Chief Executive Officer ("CEO") in February 2008.[3]  (*Id.* ¶ 55.)

Pearson's strategy as CEO was to grow Valeant through acquisitions as opposed to research and

development.  (*Id.* ¶ 56.)  Accordingly, Pearson's strategy resembled that of a hedge fund manager

and Pearson's compensation, along with the compensation of other senior executives, consisted of

substantial awards tied to rises in Valeant's stock price.  (*Id.* ¶¶ 36-40, 56, 458-69.)  In addition to

Valeant's acquisition strategy, other aspects of Valeant's overall business strategy included "using

deceptive tactics to exploit gaps [the Exchange Act] Defendants had identified in the healthcare

system," and targeting pharmaceutical markets where major pharmaceuticals were less prevalent,

such as the dermatological treatment market.  (*Id.* ¶ 57.)

One deceptive practice that Valeant implemented was price gouging.  (*Id.* ¶ 58.)  Valeant

strategically acquired products that had very little competition from existing competitors, such as

generics, so that it could subsequently raise the prices of the newly-acquired products to increase

short term revenues.  (*Id.* ¶¶ 58-65, 67, 71-81.)  Accordingly, in 2015, Valeant raised the prices of

its brand-name drugs by 66% on average, which was "approximately five times more than its

closest industry peers."  (*Id.* ¶ 66.)  To conceal its price gouging practices, Valeant increased its

participation in patient assistance programs ("PAPs"), which essentially entailed Valeant waiving

or substantially reducing patient co-pays for complaining patients without full disclosure to payors

who were paying the raised prices.  (*Id.* ¶¶ 68-69, 71-81.)  In light of federal anti-kickback laws,

Valeant targeted patients with private insurance with regard to its PAP tactics.  (*Id.* ¶ 70.)

To facilitate its price gouging strategy, Valeant "created a secret network of specialty

pharmacies" that would raise the prices of Valeant's products while avoiding scrutiny.  (*Id.* ¶ 82.)

---

[3] The positions of CEO and Chairman of the Board were combined into a single CEO position
until the roles were separated on or around February 28, 2016.  (Compl. ¶ 291.)

Specifically, Valeant's secret network reduced pushback or requests for substantiation, with respect to competing and cheaper products, by: (1) physicians (by "simplifying administrative burdens associated with rejections or illegally altering prescriptions"); (2) patients ("by filling prescriptions immediately regardless of insurance approval and by offering assistance to reduce or eliminate copays"); (3) independent pharmacies ("by taking products out of that chain"); and (4) pharmacy benefit managers ("PBMs") and payors ("by concealing the close relationship between Valeant and its captive pharmacies"). (*Id.* ¶ 83.)

On January 2, 2013, as part of its captive pharmacy network, Valeant created Philidor, a seemingly independent pharmacy operated by Andrew Davenport that was actually controlled by Valeant.[4] (*Id.* ¶ 88.) Philidor's only client was Valeant and Valeant employees formed and staffed Philidor under the guise of fake aliases. (*Id.*) Philidor's owners included Matthew Davenport, Andrew Davenport, and Greg Blaszczynzki, who all worked at a marketing firm that consulted for Valeant and shared Philidor's Pennsylvania address. (*Id.* ¶ 103.)

Soon after its formation, on January 11, 2013, Philidor entered into a Master Service and Pharmacy Dispensing Agreement with Valeant's Medicis division (the "MSPD Agreement"). (*Id.* ¶ 89.) The MSPD Agreement: (1) permitted Valeant to inspect and audit Philidor to verify compliance with the agreement and to otherwise evaluate Philidor's operation; (2) set forth the "Medicis Alternative Fulfillment Program" ("AF Program"), which required Philidor to "work with the retail pharmacy to transition the prescription over to [Philidor]" and if Philidor could not get the retail pharmacy to agree, then Philidor was to "call the physician's office for a new prescription as needed" and "contact the Consumer in an attempt to resolve any issues regarding the retail pharmacy withholding medication fulfillment"; (3) required Philidor to "*proactively*

---

[4] In addition to Philidor, the captive pharmacy network consisted of Cambria Pharmacy, West Wilshire Pharmacy, R&O, SafeRx Pharmacy, Orbit Pharmacy, D&A Pharmacy, Prescriptions Shoppe, Heritage Compounding Pharmacy, and Parkwest Pharmacy. (*Id.* ¶ 104.)

follow-up with customer[s] for covered Product refills"; and (4) "required Philidor to exclude any transaction identifying the payor 'as any state or federally funded program.'" (*Id.* ¶ 90 (alterations in original).)

On December 15, 2014, Valeant paid $100 million to Philidor's owners for the option to acquire Philidor for $0 for ten years, plus "various milestone payments based on Philidor's sales." (*Id.* ¶ 99.) The option was obtained by KGA, which was Valeant's subsidiary.[5] (*Id.*) Pursuant to the purchase option agreement, KGA obtained the right to create a joint steering committee to "assess and discuss" legal compliance and Philidor's "internal policies, manuals and processes." (*Id.* ¶ 100.) Valeant was given the right, through KGA, to "make the final determination" regarding Philidor's strategic planning, legal compliance, contractual obligations, and internal policies and manuals. (*Id.*) In addition to the purchase option agreement, Valeant and Philidor executed a new distribution and services agreement, which gave Valeant the right to inspect Philidor's compliance, policies, and procedures, and to conduct site visits. (*Id.* ¶ 101.)

After being denied a permit to operate in California due to the submission of false statements on its application, Philidor implemented deceptive tactics to operate in California without a permit. (*Id.* ¶¶ 105-07.) Isolani, LLC ("Isolani")[6] (a Delaware limited liability company whose sole member was Philidor's Senior Director of Call Center Operations), purchased 10% of R&O Pharmacy ("R&O"), a pharmacy with a California license, for $350,000, and R&O agreed to sell the remaining 90% when Isolani obtained a California permit. (*Id.* ¶¶ 54, 107.) The owner of R&O, however, discovered fraudulent practices and, therefore, withheld from Isolani millions of dollars of prescription reimbursements for Valeant drugs. (*Id.* ¶ 109.) In response, Valeant's

---

[5] "KGA" stands for Kings Gambit Accepted, which is an opening move in chess. "[T]he numerous related entities which formed Valeant's secret network of specialty pharmacies were named for chess strategies." (Compl. ¶ 54.)

[6] Isolani is a chess term that refers to an isolated queen's pawn. (*Id.*)

General Counsel, Robert Chai-Onn, demanded "immediate payment" from R&O to avoid "further damage to Valeant and other parties." (*Id.*) R&O subsequently filed suit in October 2015, stating that R&O had no relationship with Valeant and alleging that either both R&O and Valeant were victims of fraud or Valeant was conspiring to defraud R&O. (*Id.* ¶¶ 109, 120-28.) Philidor similarly took control over numerous other independent pharmacies through subsidiaries that failed to disclose their connections to Philidor and Valeant. (*Id.* ¶¶ 110-14.)

To further Valeant's deceptive business strategies, Philidor engaged in numerous deceptive practices that increased reimbursement for sales of Valeant's drugs. (*Id.* ¶ 115.) A department at Philidor would ship drugs to patients before health insurance coverage was in place, while a separate department engaged in seven categories of fraudulent practices in seeking insurance coverage for the Valeant drugs: (1) altering National Provider Identifier ("NPI") Numbers (by using the NPI Number of a different pharmacy, Philidor concealed its involvement from insurers reimbursing for Valeant products); (2) operating a pharmacy without a license (by filling prescriptions and obtaining reimbursements in states where Philidor was not licensed); (3) altering prescriptions (by including a DAW[7] indication, without consent of the prescribing physician or patient, thereby preventing substitution with a generic drug); (4) misrepresenting drugs prices (by raising prices "to pinpoint a plan's maximum allowable price"); (5) misrepresenting drug quantities (by resubmitting a claim with a lower quantity of drugs to secure approval if the claim for reimbursement was originally rejected by the insurer); (6) waiving copays; and (7) automatically refilling prescriptions. (*Id.* ¶¶ 115-16.)

---

[7] "Dispensed as written." "[A] prescribing doctor . . . may state that the prescription be 'dispensed as written' ('DAW') prohibiting generic substitution." (Compl. ¶ 116.)

C.      **Valeant's Deceptive Practices are Revealed to the Public**

Beginning in September 2015, Valeant's "true business, operations, and prospects" began to emerge. (*Id.* ¶ 231.) First, Valeant's price gouging practices were revealed. (*Id.* ¶¶ 232-38.) *Bloomberg* reported that members of Congress were requesting an investigation into price gouging by Valeant, the *Washington Post* reported that United States Senator Claire McCaskill had sent a list of questions to Valeant regarding the price increases of two heart drugs, and various media outlets reported that Valeant was turning "old neglected drugs" into "high-price specialty drugs." (*Id.* ¶¶ 232, 234.) On October 14, 2015, Valeant issued a press release revealing it had received federal subpoenas from two districts. (*Id.* ¶ 237.)

Next, Valeant's use of a secret network of pharmacies through its relationship with Philidor was revealed. (*Id.* ¶¶ 239-54.) The connection between Valeant and Philidor was confirmed in an earnings call hosted by Valeant on October 19, 2015. (*Id.* ¶¶ 239-40.) Pearson also disclosed that price increases accounted for approximately 60% of Valeant's growth in 2014 and 2015, and that eighty-five of Valeant's 156 pharmaceutical products in the United States had an average gross price increase of 36%. (*Id.* ¶ 242.) "When asked what percentage of U.S. branded prescription business flowed through" Philidor, Pearson stated that it varied among products, but for the "U.S. Portfolio," it was probably ten or twenty percent. (*Id.* ¶ 244.)

On October 21, 2015, Citron Research[8] published a report alleging that Valeant was using a network of phantom captive pharmacies created by Valeant and Philidor to "prop up sales" and prevent access to generics. (*Id.* ¶ 246.) That same day, Philidor issued a release describing its "contractual relationship with 'affiliated pharmacies.'" (*Id.* ¶ 248.) On October 22, 2015, BMO Capital Markets Corp. stated that it "[found] Valeant's arrangements with specialty pharmacy

---

[8] The Complaint does not provide any additional background information regarding Citron Research.

8

Philidor as not just aggressive, but questionable." (*Id.* ¶ 249.) *The Wall Street Journal* reported that former Philidor employees had revealed that Valeant employees worked directly at Philidor and were using fictitious names to conceal their identities. (*Id.* ¶ 250.) On October 26, 2015, Valeant filed its 10-Q Form for the third quarter of 2015 ("3Q15 10-Q"), including disclosures related to Philidor, and revealed that Valeant had established a board committee that would investigate the relationship between Valeant and Philidor. (*Id.* ¶ 252.) Valeant also hosted a conference call where Rosiello, Valeant's Chief Financial Officer ("CFO") since July 2015 and Executive Vice President, disclosed Philidor's status as a Variable Interest Entity ("VIE")[9] and Carro, Valeant's Corporate Controller, admitted that Valeant reviewed Philidor's financials regularly. (*Id.* ¶¶ 38, 254.)

A number of disclosures then led to the announcement that Philidor would be permanently closing. (*Id.* ¶¶ 255-75.) On October 27, 2015, Bill Ackman ("Ackman"), current board member of Valeant, sent Pearson and Schiller, Valeant's then-CFO, an e-mail message and stated that "the company is running out of time to save itself" and advised that they hold a conference call to answer questions "honestly," "no matter how embarrassing" or "what the legal implications are." (*Id.* ¶¶ 255-57.) Ackman further advised that "the truth will come out eventually" and to "do the right thing." (*Id.* ¶ 257.) On October 28, 2015, *Bloomberg* reported that an internal Philidor training manual showed that Philidor "instructed employees to submit claims under different pharmacy identification numbers if an insurer rejected Philidor's claim." (*Id.* ¶ 258.) On October 29, 2015, Valeant announced "it would cut all ties with Philidor." (*Id.* ¶ 259.)

On November 4, 2015, it was announced that the United States Senate was investigating Valeant's price increases for three drugs. (*Id.* ¶ 263.) Valeant hosted a conference call on

---

[9] A Variable Interest Entity is defined in generally accepted accounting principles ("GAAP") "as a legal entity that is subject to consolidation." (Compl. ¶ 151(b).)

November 10, 2015, where Pearson: (1) stated that Philidor committed to ceasing operations by January 30, 2016; (2) disclosed that the closing of Philidor and the government inquiries were having a negative financial impact on Valeant; (3) suggested 2015 fourth quarter and full year guidance with respect to revenues and earnings per share ("EPS") would have to be withdrawn; and (4) stated that declines in the dermatology division would not be "hugely material" and that he was confident Valeant would get a "Plan B" in place. (*Id.* ¶¶ 267-70.)

Valeant began to disclose additional information concerning the financial impact of Philidor's closing on December 15, 2015. (*Id.* ¶¶ 276-86.) Valeant announced its deal with Walgreens and indicated that it would reduce the price of prescription-based dermatological and ophthalmological products by 10%. (*Id.* ¶ 276.) Valeant then formally withdrew the guidance issued on October 19, 2015, and issued new fourth quarter revenue guidance, cash EPS guidance, 2015 full year guidance, and 2016 earnings before interest, tax, depreciation and amortization ("EBITDA") guidance, which were all substantially reduced. (*Id.* ¶ 277.) On December 28, 2015, Valeant announced that Pearson had left Valeant on a medical leave of absence. (*Id.* ¶ 280.) "On January 22, 2016, but undisclosed to investors, Valeant entered into a termination agreement with Philidor that was effective as of November 1, 2015." (*Id.* ¶ 282.)

Additionally, Valeant's fraudulent accounting began to come to light. (*Id.* ¶¶ 287-301.) On February 22, 2016, Valeant issued a release admitting that the committee reviewing Philidor had "identified certain sales to Philidor during 2014 . . . that should have been recognized when product was dispensed to patients rather than on delivery to Philidor," indicating that this amounted to approximately $58 million of net revenues and that Valeant would delay filing its 2015 Form 10-K pending completion of the review. (*Id.* ¶ 289.) On February 28, 2016, Valeant announced

that Pearson was returning but only in the capacity of CEO[10] and withdrew its prior financial guidance. (*Id.* ¶ 291.) Valeant announced the next day that it was under investigation by the SEC. (*Id.* ¶ 292.)

On March 15, 2016, Valeant reduced its financial guidance for 2016, lowering its revenue guidance, cash EPS guidance, and EBITDA guidance, and blamed the reductions on "reduced revenue assumptions for certain businesses, new managed care contracts, and increased investment in key functions, such as financial reporting, public and government relations and compliance, as well as the impact of the weak first quarter of 2016." (*Id.* ¶ 294.) Valeant also hosted a conference call where Pearson noted that guidance was being lowered, in part, "due to the higher-than-expected inventory reductions [from having to transition] from Philidor to Walgreens and the cancellation of almost all price increases." (*Id.* ¶ 295-96.)

As information regarding the Exchange Defendants' misrepresentations and omissions continued to become public, Valeant's stock prices correspondingly fell. (*Id.* ¶¶ 473-528.)

**D.     The Exchange Act Defendants' False and Misleading Statements During the Class Period**

On January 4, 2013, in a conference call with investors and analysts regarding Valeant's 2013 financial guidance, Pearson stated, in part, the following:[11]

> 2012 was another very strong year for Valeant.  From a top line perspective we added over $1 billion in revenue in 2012 . . . . On the bottom line, we delivered cash EPS growth of greater than 50% as compared to 2011, ***demonstrating once again the sustainability of our business model***.

---

[10] Valeant decided to separate the role of CEO and Chairman of the Board, and Ingram became the Chairman.  (Compl. ¶ 291.)

[11] The Court sets forth the bolding and italicization as utilized by Plaintiffs in their Complaint, indicating the particular alleged misleading or false portion of the quoted statements.  (*See id.* ¶ 133 n.20.)

Our businesses continued to deliver strong organic growth, and we expect full year 2012 to have same-store sales, organic growth of approximately 8%, and pro forma organic growth of approximately 10%.

[When asked about pricing for a dermatological product called Solodyn in the Medicis transaction, Pearson stated:]

Sure. *In terms of Solodyn, we're not assuming we're making any kind of major price increases in terms of the end consumer. Through the AF [alternative fulfillment][12] programs, it will allow us our sort of average price internally to go up, because of the way that system works.*

[When discussing the expansion of Valeant's AF initiative, Pearson stated:]

Yes, the more we understand about it the more excited we get about it, *quite frankly because it's not just a singular sort of initiative that there's a whole evolution being planned in terms of the Stage I, Stage II, Stage III. And there's some exciting opportunities there that we're not going to give specifics of. And also as we had hoped, we think it will apply to more than just Solodyn. Ziana is actually also being—already Medicis has Ziana being used in the AF program, and we see application for a number of our dermatology products and potentially neurology products in the US.*

[When asked about the percentage of Solodyn revenue that would go through the AF initiative, Pearson stated:]

Well the last question, it's much—it will be much closer to 50% than 10%, that's for sure. And yes, what we—*the AF, if it all works out, will both help eliminate or get rid of non-revenue producing or non-profitable scripts, but hopefully can be used to start generating truly profitable scripts through a different channel. That's the intent, and we're seeing evidence that that will work.*

(*Id.* ¶ 133.)

On February 28, 2013, Valeant hosted a nationwide conference call to report Valeant's 2012 financial results, where Pearson answered further questions regarding the AF Program. (*Id.* ¶ 134.) On May 3, 2013, Valeant filed its quarterly report on Form 10-Q for the period ending on

---

[12] (Alteration in original.)

March 31, 2013 ("1Q13 10-Q").  (*Id.* ¶ 135.)  Pearson and Schiller signed the 1Q13 10-Q, which

stated:

> Our management, with the participation of our CEO and Chief
> Financial Officer ("CFO"), ***has evaluated the effectiveness of our***
> ***disclosure controls and procedures as of March 31, 2013.  Based***
> ***on this evaluation, our CEO and CFO concluded that our***
> ***disclosure controls and procedures were effective as of March 31,***
> ***2013.***

("Internal Controls Statement") (*Id.*)  Additionally, among other things, the 1Q13 10-Q stated that

"***pricing and sales volume of certain of our products . . . are distributed by third parties, over***

***which we have no or limited control.***"  (*Id.* ¶ 137.)  On June 11, 2013, Schiller gave a presentation

at the Goldman Sachs Healthcare Conference, where he made additional representations regarding

the success of the AF Program.  (*Id.* ¶ 138.)

On July 29, 2013, Valeant filed a Form 8-K with the SEC with a memorandum describing

Valeant's "Organizational Design and Philosophy" as: "***Healthcare companies are held by society***

***to the highest possible ethical standard – and they should be.  Adhering to this extremely high***

***ethical bar supersedes any financial or other objective.***"  (*Id.* ¶ 140.)  Additionally, the

memorandum stated that Valeant focuses on "***[e]nsuring adequate controls to protect our***

***shareholders and to ensure we are in compliance with all regulatory requirements.***"  (*Id.*)

In Valeant's August 7, 2013, quarterly report on Form 10-Q ("2Q13 10-Q"), Valeant

represented that "***pricing and sales volume of certain of our products . . . are distributed by third***

***parties, over which we have no or limited control,***" while simultaneously concealing its control

and influence over Philidor.  (*Id.* ¶ 143.)  Similarly, in a release reporting Valeant's 2013 third

quarter financials, Valeant stated that the "***growth in the Developed Markets was driven by***

***continued improvement in many of our Dermatology prescription brands,*** our aesthetics and oral

health portfolios, ***our orphan drug products*** and CeraVe."  (*Id.* ¶ 144.)  The following day, on

Form 10-Q for Valeant's third quarter in 2013 ("3Q13 10-Q"), Valeant stated that "***pricing and***

*sales volume of certain of our products . . . are distributed by third parties, over which we have no or limited control.*" (*Id.* ¶ 145.) Pearson, Schiller, and Valeant continued to make similar statements concerning the legitimacy of Valeant's growth, limited control over pricing and sales, and effective internal controls throughout the Class Period, at times responding directly to public suspicions of their deceptive practices. (*Id.* ¶¶ 147-202.)

By October 2015, Valeant had received subpoenas from the Department of Justice for documents regarding its patient assistance and distribution practices and investigative journalists had uncovered Valeant's relationship with Philidor. (*Id.* ¶¶ 204-05.) On October 19, 2015, Valeant issued a press release and hosted an earnings conference call and stated that Philidor: "*[d]oes not restrict prescriptions it fills to any particular manufacturers (including Valeant)*" and "*[d]ispenses generic products as specified in [a] patient's prescription or as requested by [the] patient.*" (*Id.* ¶ 206.) Additionally, Pearson stated that Valeant's relationship with Philidor had not been disclosed for "competitive reasons" and claimed that Valeant's use of "*specialty pharmacies improve[d] patients' access to medicines at an affordable price, and help[ed] ensure physicians [were] able to prescribe the medications they believe[d] most appropriate for their patients.*" (*Id.* ¶ 207.) Additionally, on October 26, 2015, Valeant reported that its entire board of directors reviewed Valeant's accounting for Philidor and had "*confirmed the appropriateness of the Company's related revenue recognition and accounting treatment,*" and subsequently continued to assure investors that the revelations concerning Philidor would not affect Valeant's business. (*Id.* ¶¶ 215-30.)

**E.     Valeant's Financial Statements were Materially Misstated**[13]

During the Class Period, Valeant's financial statements were materially misstated because:

(1) Valeant improperly recognized Philidor revenue, in violation of GAAP; (2) Valeant concealed

Philidor as a VIE, in violation of GAAP; (3) Valeant falsely certified that its internal controls over

financial reporting ("ICFR") and its disclosure controls were effective, in violation of Sarbanes

Oxley and SEC rules; and (4) Valeant concealed information regarding the impact of Philidor and

price increases on its reported revenue and earnings, in violation of SEC disclosure rules.  (*Id.*

¶ 314.)

Valeant improperly recognized Philidor revenue by recognizing sales to Philidor (i.e.,

when Valeant delivered products to Philidor) and recorded revenue again for delivering those

products to patients.  (*Id.* ¶¶ 315-22.)  Additionally, Valeant failed to make the proper disclosures

in violation of GAAP even though it considered Philidor to be a VIE.  (*Id.* ¶¶ 323-30.)  Next, the

Exchange Act Defendants misrepresented that Valeant's internal controls were operating

effectively under Sarbanes Oxley, when in fact material weakness existed during the Class Period.

(*Id.* ¶¶ 331-45.)   Finally, the Exchange Act Defendants concealed Valeant's relationship with

Philidor instead of disclosing the relationship in the Management's Discussion and Analysis

section of each 10-Q and 10-K Form during the Class Period.  (*Id.* ¶¶ 346-75.)

---

[13] The Court recognizes that Plaintiffs' allegations concerning materiality inherently consist of both factual allegations and legal conclusions.  For the purposes of coherently summarizing Plaintiffs' allegations, the Court sets forth the following allegations as true only to the extent that they constitute factual allegations.  The Court does not accept as true any conclusions of law represented in these allegations.  The Court separately addresses Plaintiffs' proposed legal conclusions in the Discussion section below.

F.      Scienter Allegations[14]

Each of the Exchange Act Defendants was personally involved in and aware of the scheme

to defraud investors by implementing and concealing Valeant's deceptive practices.  (*Id.* ¶ 386.)

Specifically, the Individual Defendants had direct oversight of the operations and with regard to

pricing and other deceptive practices.  (*Id.* ¶¶ 387-400.)  Additionally, the Individual Defendants

were aware of Valeant's use of Philidor and the captive network of pharmacies, and the fact that

these relationships were being concealed.  (*Id.* ¶ 401.)   The Individual Defendants were aware

because they were involved in signing the relevant agreements, touting the deceptive programs as

legitimate, conducting due diligence related to acquiring the option to purchase Philidor, and

otherwise monitoring Philidor.  (*Id.* ¶¶ 401-12.)

As further indication that the Individual Defendants possessed the requisite scienter,

Valeant refused to pursue remedies against wrongdoers for committing the deceptive practices,

Pearson and Schiller made key admissions and provided misleading testimony in Congressional

hearings, and numerous executives and directors departed Valeant just a few months before the

Exchange Act Defendants' scheme became public.  (*Id.* ¶¶ 413-47.)  The driving motive for

facilitating the scheme, however, was Valeant's unusual compensation structure, which provided

"incredibly rich compensation packages based on achieving increasingly challenging performance

goals, backed by the threat of termination."  (*Id.* ¶ 458.)  There were significant "rewards tied to

driving Valeant's stock price as high as possible until 2017," which "afforded Pearson the

opportunity to become a billionaire and obtain wealth far beyond even a typical highly paid CEO."

---

[14] The Court recognizes that Plaintiffs' allegations concerning scienter inherently consist of both
factual allegations and legal conclusions.  For the purposes of coherently summarizing Plaintiffs'
allegations, the Court sets forth the following allegations as true only to the extent that they
constitute factual allegations.  The Court does not accept as true any conclusions of law represented
in these allegations.  The Court separately addresses Plaintiffs' proposed legal conclusions in the
Discussion section below.

(*Id.* ¶¶ 462-64.)  Similarly, Schiller's compensation was also tied to increasing share prices.  (*Id.* ¶ 467.)  Moreover, the higher Valeant stock prices enabled the Individual Defendants to cheaply execute more acquisitions by compensating sellers with Valeant stock.  (*Id.* ¶¶ 470-72.)

> ### G.    Claims for Relief

Plaintiffs filed the instant nine-count action.  Count One is brought against the Exchange Act Defendants under Section 10(b) of the Exchange Act and SEC Rule 10b-5 arising from the Exchange Act Defendants' dissemination or approval of false statements related to Valeant's deceptive practices.  (*Id.* ¶¶ 538-43.)  Plaintiffs similarly bring Count Two, under Section 20(a) of the Exchange Act, against Valeant, Pearson, Schiller, and Rosiello in their capacities as senior corporate officers and directors, for their control over the dissemination of materially false and misleading statements and omissions.  (*Id.* ¶¶ 544-50.)

Next, Lead Plaintiff TIAA-CREF brings Counts Three, Four, Five, and Six, under Section 12(a)(2) of the Securities Act, against Valeant, Pearson, Schiller, and the Bank Offering Defendants for non-fraud based, strict liability claims for material misstatements and omissions in the offering materials tied to four different debt offerings by Valeant.  (*Id.* ¶¶ 551-668.)  The City of Tucson brings Count Seven, under Section 11 of the Securities Act, against Valeant, the Individual Securities Act Defendants, PwC, and the Stock Underwriter Defendants, and Count Eight, under Section 12(a)(2), against Valeant, Pearson, Schiller, and the Stock Underwriter Defendants.  (*Id.* ¶¶ 669-722.)  Counts Seven and Eight are non-fraud based claims for strict liability arising from material misstatements and omissions in the offering materials in connection with Valeant's March 2015 Stock Offering.  (*Id.*)  Finally, Plaintiffs bring Count Nine, under Section 15 of the Securities Act, against Valeant, Pearson, and Schiller on non-fraud based claims for strict liability for their control over material misstatements and omissions relating to Valeant's deceptive practices.  (*Id.* ¶¶ 723-28.)

## II.    Legal Standard

When analyzing a Rule 12(b)(6) motion, district courts conduct a three-part analysis.  First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim."  *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009).  Second, the court must accept as true all of a plaintiff's well-pleaded factual allegations and construe the complaint in the light most favorable to the plaintiff. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  The court, however, must disregard any conclusory allegations proffered in the complaint.  *Id.* at 210-11.  Finally, once the well-pleaded facts have been identified and the conclusory allegations ignored, the court must determine whether the "facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'"  *Id.* at 211 (quoting *Iqbal*, 556 U.S. at 679).

Where a plaintiff pleads fraud, however, the plaintiff "must meet a heightened pleading standard under Federal Rule of Civil Procedure 9(b)."  *Zuniga v. Am. Home Mortg.*, No 14-2973, 2016 WL 6647932, at *2 (D.N.J. Nov. 8, 2016).  "In alleging fraud . . . , a party must state with particularity the circumstances constituting fraud . . . ."  Fed. R. Civ. P. 9(b).  "A plaintiff alleging fraud must therefore support its allegations 'with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue.'"  *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) (quoting *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002)).  Additionally, the Private Securities Litigation Reform Act ("PSLRA") requires that a securities fraud complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 490

(3d Cir. 2016) (quoting *In re Suprema Specialties, Inc. Secs. Litig.*, 438 F.3d 256, 276 (3d Cir. 2006)).

## III.    Discussion

### A.    Count One: Section 10(b) of the Exchange Act and SEC Rule 10b-5 (against the Exchange Act Defendants)

To survive a motion to dismiss, a plaintiff bringing an action under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 must plead: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011) (quoting *Stoneridge Invest. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)). Here, Defendants argue that Plaintiffs have failed to plead a material misrepresentation or omission, scienter, and loss causation.

### 1.    Scienter

A complaint must "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,' . . . specifically 'scienter.'" *Cooper Tire*, 834 F.3d at 490 (quoting 15 U.S.C. § 78u-4(b)(2)(A)). "'[O]missions and ambiguities count against inferring scienter' under the PSLRA's particularity requirements." *Inst'l Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 263 (3d Cir. 2009) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007)). "[T]o determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court . . . must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff, . . . but also competing inferences rationally drawn from the facts alleged." *Tellabs, Inc.*, 551 U.S. at 314. "[A]n inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* Additionally, the Court must consider "whether

19

*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23.

For the purposes of evaluating "plausible, nonculpable explanations for [the Exchange Act Defendants'] conduct," *id.* at 324, the Court considers the Exchange Act Defendants' argument that "the more compelling inference from the circumstances alleged in the [C]omplaint is that congressional inquiries, Philidor's collapse and a short-seller—not securities fraud—drove down Valeant's stock price." (Valeant Defs.' Moving Br. 31, ECF No. 167-1; Carro's Moving Br. 8-15, ECF No. 166-1; Schiller's Moving Br. 20-29, ECF No. 168-1; Jorn's Moving Br. 4-8, ECF No. 169-1.) Here, however, the Court finds that "[w]hen all the allegations are accepted as true and taken collectively, . . . a reasonable person [would] deem the inference of scienter at least as strong as" the Exchange Act Defendants' alternative theory. *Tellabs, Inc.*, 551 U.S. at 326.

In their opposition, Plaintiffs argue that the Complaint adequately pleads scienter by alleging: (1) the Exchange Act Defendants' direct roles in deceptive practices; (2) the Exchange Act Defendants' senior roles, specificity of their statements, and by way of the Core Operations Doctrine;[15] (3) the Exchange Act Defendants' pattern of denials and subsequent admissions; (4) the Exchange Act Defendants' failure to pursue remedies; (5) Valeant's restatement and material weaknesses in internal controls; (6) volume of executive and director departures; and the Individual Defendants' unique compensation and Valeant's dependence on acquisitions. (Pls.' Opp'n Br. 79-110, ECF No. 178.) The Exchange Act Defendants primarily respond by dividing Plaintiffs' allegations into discrete parts and arguing that each part fails to give rise to sufficient

---

[15] One argument that Plaintiffs assert is that because "the [Valeant's] deceptive practices . . . were the most profitable components of Valeant's operations . . . , the [C]ore [O]perations [D]octrine supports an inference of scienter." (Pls.' Opp'n Br. 90.) In reply, the Valeant Defendants argue that the Core Operations Doctrine is no longer a valid argument in light of the PSLRA. (Valeant Defs.' Reply Br. 20-21.) Here, the Court reaches its decision based upon the totality of Plaintiffs' allegations and without having to determine the viability of the Core Operations Doctrine.

scienter. (Valeant Defs.' Moving Br. 31-47; Valeant Defs.' Reply Br. 11-23; Carro's Moving Br. 8-15; Schiller's Moving Br. 20-29; Jorn's Moving Br. 4-8.)

Although the Exchange Act Defendants characterize their compilation of discrete arguments as holistically considering the entirety of the Complaint, the Court disagrees, with the exception of two arguments. The Exchange Act Defendants' lone arguments in support of their alternative explanation, in light of the *totality* of Plaintiffs' allegations, are that: (1) "[i]f the Individual Defendants, some allegedly owning Valeant stock worth tens or hundreds of millions of dollars . . . , kn[e]w their strategy was doomed, it is illogical that they would [have held] onto inflated stock"; and (2) Plaintiffs should have been able to identify confidential informants or internal documents demonstrating Defendants' knowledge of Philidor's deceptive tactics or accounting errors. (Defs.' Reply Br. 11-12.)  Because it is plausible that the Exchange Act Defendants were caught before they had a chance to sell their shares, the mere fact that the Exchange Act Defendants did not sell their shares is insufficient to render Plaintiffs' allegations deficient. (Pls.' Opp'n Br. 104).  Similarly, the mere lack of citations to confidential informants and internal documents does not preclude the Court from finding sufficient allegations of scienter based on its holistic review of the Complaint.

The Court further acknowledges the Exchange Act Defendants' reliance on the *Cooper Tire* case for the proposition that the Court should require Plaintiffs to re-plead the Complaint. 834 F.3d at 491.  In *Cooper Tire*, the Third Circuit stated that the "District Court enjoys substantial discretion in managing complex disputes, particularly when . . . the claims become unwieldy." *Id.* Accordingly, the Third Circuit described the complaint in *Cooper Tire* as presenting "an extraordinary challenge for application of the highly particularized pleading standard demanded by the PSLRA. . . . due to the length of the [c]omplaint . . . [and] its lack of clarity." *Id.*  Here, however, the Court does not find the Complaint to be unwieldy and finds the allegations

sufficiently clear for the Court to apply the appropriate pleading standard.  In accordance with the discretion afforded to the Court under *Cooper Tire*, the Court will not require Plaintiffs to re-plead.

For these reasons, the Court finds that Plaintiffs have sufficiently pled scienter based on the Court's holistic review of the Complaint.

2.      Materiality; Actionable Statements and Omissions

A misstatement or omission is material if "there is a substantial likelihood that a reasonable [investor] would consider it important in deciding how to [act]." *In re Donald J. Trump Casino Sec. Litig. – Taj Mahal Litig.*, 7 F.3d 357, 369 (3d Cir. 1993) (alterations in original) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).  In other words, a misstatement or omission is material if the information "would have been viewed by the reasonable investor as having significantly altered the total mix of information available to that investor." *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) (internal quotations and citations omitted).

Upon review of these allegations and the authorities presented by the parties, the Court finds that Plaintiffs have sufficiently pled materiality.  While the Exchange Act Defendants target certain portions of particular alleged statements and omissions, the Exchange Act Defendants fail to sufficiently address numerous alleged misstatements and omissions regarding Valeant's purported deceptive practices, which a reasonable investor would have considered important. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) ("'The test for whether a statement is materially misleading under Section 10(b)' is not whether the statement is misleading in and of itself, but 'whether the defendants' representations, *taken together and in context*, would have misled a reasonable investor.'" (quoting *Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004))).  Accordingly, the Court finds that the Complaint sufficiently pleads actionable statements with regard to all of the Exchange Act Defendants.

The Court, nonetheless, finds it appropriate to specifically address whether Plaintiffs have sufficiently attributed actionable misstatements or omissions to the Director Defendants, Kellen, Rosiello, and Carro.[16] First, the Court notes that the Exchange Act Defendants have failed to set forth authority precluding the attribution of the October 19, 2015, and October 26, 2015, presentations and releases to the Director Defendants, Kellen, Rosiello, Schiller, Pearson, and Carro.[17] The parties do not dispute that *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), is the controlling authority on this issue, and none of the parties have set forth any more specific authority from within the Third Circuit.[18] According to *Janus*, "the maker of a statement [for the purposes of SEC Rule 10b-5] is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id.* at 142. "[I]n the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed." *Id.* at 142-43.

Here, Plaintiffs allege that certain Director Defendants, Pearson, Schiller, Carro, Rosiello, and Kellen jointly distributed and presented slides that contained alleged misstatements and that the statements themselves attributed their content to the presenters with the pronoun "we." (Compl. ¶¶ 206-12, 217-23.) Moreover, according to the Complaint, the October 26, 2015 release

---

[16] Based on the analysis set forth above, the Court does not find it necessary to specifically address the attributable allegations for the remaining Exchange Act Defendants.

[17] The Complaint attributes the October 19, 2015 presentation to Pearson, Rosiello, and Kellen, and the October 26, 2015 presentation to Pearson, Schiller, Rosiello, Ingram, Provencio, Melas-Kyriazi, Stevenson, Carro, and Kellen. (Compl. ¶¶ 206, 217.)

[18] The Valeant Defendants do not discuss *Janus*, but rather rely generally upon cases that forbid group pleading. (Valeant Defs.' Moving Br. 4.) On the other hand, Plaintiffs, Jorn, and Schiller rely on *Janus* for their respective positions. (Pls.' Opp'n Br. 27-29; Jorn's Moving Br. 9; Schiller's Moving Br. 15-16.)

contained purported misstatements based on the review of the "Audit and Risk Committee and the full Board of Directors," and the October 26, 2015 presentation made a similar explicit attribution to the "full Board." (*Id.* ¶¶ 216, 219.) Accordingly, the Court finds that the Complaint sufficiently attributes purported material misstatements or omissions to all of the Exchange Act Defendants pursuant to the standard set forth in *Janus*. *See In re Pfizer Inc. Sec. Litig.*, No. 04-9866, 2012 WL 983548, at *4 (S.D.N.Y. Mar. 22, 2012) (finding that the complaint "adequately allege[d] that the . . . [d]efendants [were] liable for statements issued in . . . press releases, because they 'were involved in drafting, reviewing and/or disseminating the false and misleading financial statements that were issued . . . , approved or ratified these statements and, therefore, adopted them as their own'").

        3.    <u>Loss Causation</u>

When pleading loss causation, a plaintiff "need not satisfy the PSLRA or Rule 9(b)'s heightened pleading requirements to survive a motion to dismiss" and "need only satisfy the requirements of Rule 8(a)(2)."[19] *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 558 (D.N.J. 2010) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005)). Upon review of the parties' submissions and the allegations set forth in the Complaint,

---

[19] Here, the parties do not dispute that loss causation is subject to Rule 8(a) of the Federal Rules of Civil Procedure. (*See* Valeant Defs.' Moving Br. 61-62 (relying on cases that apply Rule 8(a)); Valeant Defs.' Reply Br. 24-25 (same); Jorn's Moving Br. 11 (relying on the Valeant Defendants' submissions).) Plaintiffs argue that the Valeant Defendants' principal case applies Rule 8(a) (Pls.' Opp'n Br. 111 n.50.) The Valeant Defendants have not argued otherwise. Additionally, this District has consistently analyzed loss causation under Rule 8(a), as opposed to a heightened pleading standard. *See Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d at 558; *see also Dudley v. Haub*, No. 11-5196, 2013 WL 1845519, at *18 (D.N.J. Apr. 30, 2013) ("Allegations of loss causation are not subject to the heightened pleading requirements of Rule 9(b) and the PSLRA . . . ."); *In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*, No. 05-1151, 2011 WL 3444199, at *29 (D.N.J. Aug. 8, 2011) ("Loss causation is adequately alleged if it meets Rule 8(a)'s standard . . . ."); *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 277 (D.N.J. 2007) ("It appears that the heightened pleading requirements of [the] PSLRA are inapplicable to [loss causation].").

the Court finds that Plaintiffs have sufficiently pled loss causation pursuant to Rule 8(a)(2) of the Federal Rules of Civil Procedure.

For these reasons, the Court finds that Plaintiffs have sufficiently pled their claims under Section 10(b) of the Exchange Act and SEC Rule 10b-5. The Exchange Act Defendants' Motions to Dismiss, therefore, are denied with regard to Count One.

**B.      Counts Two & Nine: Section 20(a) of the Exchange Act (against Valeant, Pearson, Schiller, and Rosiello) and Section 15 of the Securities Act (against Valeant, Pearson, and Schiller)**

Valeant, Pearson, Schiller, and Rosiello (collectively, "these Defendants" for the purposes of this section) argue that to sustain the claims under Section 20(a) of the Exchange Act and Section 15 of the Securities Act, Plaintiffs "must prove . . . a primary violation of the securities laws." (Valeant Defs.' Moving Br. 65 n.68 (quoting *In re Suprema*, 438 F.3d at 284).) These Defendants further argue that because Plaintiffs have failed to establish primary liability under Section 10(b) of the Exchange Act or Sections 11 or 12(a)(2) of the Securities Act, the Court must also dismiss Counts Two and Nine. (*Id.* (citing *Bartesch v. Cook*, 941 F. Supp. 2d 501, 513 (D. Del. 2013) and *Castlerock Mgmt. Ltd. v. Ultralife Batteries, Inc.*, 114 F. Supp. 2d 316, 325 (D.N.J. 2000)).) Similarly, Schiller argues that Counts Two and Nine "necessarily fail because they derive from Plaintiffs' underlying claims under Section 10(b) of the Exchange Act and Sections 11 and 12(a)(2) of the Securities Act, . . . which are inadequately pled." (Schiller's Moving Br. 30.) Schiller further adds that, for the reasons argued with regard to the lack of scienter required to adequately plead Count One, Schiller lacks the requisite "knowledge" to sustain a control person liability claim. (*Id.*)

Because the Court finds that Plaintiffs have adequately pled Count One, and because these Defendants' sole argument in requesting dismissal of Counts Two and Nine relies on the dismissal

of Count One, the Court accordingly denies these Defendants' Motions as to both Counts Two and Nine.

      **C.**      **Counts Seven and Eight: Section 11 of the Securities Act (against Valeant, the Individual Securities Act Defendants, PwC, and the Stock Underwriter Defendants) and Section 12(a)(2) of the Securities Act (against Valeant, Pearson, Schiller, and the Stock Underwriter Defendants)**

              1.    <u>Standing</u>

Counts Seven and Eight are brought solely by Plaintiff the City of Tucson against Valeant, the Individual Securities Act Defendants, PwC,[20] and the Stock Underwriter Defendants (collectively, "these Defendants" for the purposes of this section). These Defendants argue that the City of Tucson failed to sufficiently plead its purported purchase of shares directly in the March 2015 Stock Offering.[21] "Section 11 and 12(a)(2) claims are generally not subject to the heightened pleading standards required under the PSLRA and Federal Rule of Civil Procedure 9(b); rather, the liberal notice pleading requirements of Rule 8 generally apply." *In re Enzymotec Sec. Litig.*, No. 14-5556, 2015 WL 8784065, at *21 (D.N.J. Dec. 15, 2015).[22]

To have standing under Section 12(a)(2), a plaintiff must have purchased "directly in the public offering." *In re Measurement Specialties, Inc. Sec. Litig.*, No. 02-1071, 2003 U.S. Dist. LEXIS 27904, at *26 (D.N.J. Sept. 29, 2003); *see also Ballay v. Legg Mason Wood Walker, Inc.*, 925 F.2d 682, 689 (3d Cir. 1991) (holding that Section 12(a)(2) "should not be expanded to

---

[20] PwC relies on and incorporates the Bank Offering Defendants' arguments with regard to the standing issue. (PwC's Moving Br. 16.)

[21] Bank Offering Defendants argue that standing can arise from directly purchasing in the Stock Offering or from the fact that the City of Tucson purchased shares traceable to the Stock Offering. (Bank Offering Defs.' Moving Br. 18-24.) The City of Tucson, however, argues that it is not relying on the traceability position, but rather that it sufficiently alleges directly purchasing in the Stock Offering. (Pls.' Opp'n Br. 124, n.60.)

[22] Although Rule 9(b)'s heightened pleading standards may apply where the liability sounds in fraud, Plaintiffs have disclaimed that any of their Section 11 and Section 12(a)(2) claims are based in fraud. (Compl. ¶¶ 572, 593, 616, 642, 669, 713, 723.)

aftermarket trading"). On the other hand, to have standing under Section 11, a plaintiff must have either purchased directly in the stock offering or, alternatively, have purchased securities in or "traceable to an offering that was covered by the allegedly false registration statement." *In re Constar Int'l Inc. Sec. Litig.*, No. 03-5020, 2008 WL 614551, at *2 (E.D. Pa. Mar. 4, 2008) (internal citation omitted).

Here, Plaintiffs plead that the City of Tucson "purchased Valeant stock in the March 2015 Stock Offering." (Compl. ¶ 557.) These Defendants, however, argue that the City of Tucson's allegations "do not tend to exclude the possibility that [its] shares came from the pool of previously issued shares." (Bank Offering Defs.' Moving Br. 22 (alteration in original) (quoting *In re Century Aluminum*, 729 F.3d 1104, 1107 (9th Cir. 2013)).) According to these Defendants, the allegations are more factually consistent with a purchase from a secondary market, than the purported direct purchase in the March 2015 Stock Offering. (*Id.* at 19-23.) The Court, however, finds persuasive Plaintiffs' reliance on *In re Suprema Specialties, Inc. Securities Litigation*, 438 F.3d 256 (3d Cir. 2006). In *Suprema*, the Third Circuit found that "plaintiffs' assertions of purchases 'in' . . . the . . . stock offerings were sufficient at the pleading stage." *Id.* at 275 n.7.

Accordingly, the Court finds that the City of Tucson has sufficiently pled standing with regard to Counts Seven and Eight, and notes that "[i]f defendants [are] eventually to prove that the shares came from the secondary market," the City of Tucson's Section 11 and 12(a)(2) claims would be subject to dismissal. *Id.* The Court, therefore, denies these Defendants' Motions to Dismiss with regard to Counts Seven and Eight.[23]

---

[23] In denying PwC's Motion to Dismiss Count Seven, the Court also considered PwC's arguments under *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318 (2015), as set forth below.

      2.    PwC and *Omnicare* (Count Seven)

PwC argues that an auditor's statements in an audit report are inherently opinions and not statements of fact, and therefore not actionable under Section 11 of the Securities Act. (PwC's Moving Br. 10-16.) Both parties recognize that if PwC is correct that audit reports constitute mere statements of opinion, the Court's decision would be guided by the controlling authority of *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 135 S. Ct. 1318 (2015). Under *Omnicare*, a statement of opinion can give rise to Section 11 liability in three circumstances: (1) where the speaker does not subjectively believe his or her own opinion; (2) where the statement of opinion contains false embedded statements of facts; and (3) if a statement "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself." *Id.* at 1326-29. Here, the Court finds that Plaintiffs have sufficiently pled the third *Omnicare* exception—omission—and, therefore, does not reach the applicability of the other *Omnicare* exceptions or whether an audit report inherently consists of only pure statements of opinion.[24]

"An opinion statement . . . is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way." *Id.* at 1329. This is because a "reasonable investor does not expect that *every* fact known to an issuer supports its opinion statement." *Id.* Accordingly, "whether an omission makes an expression of opinion misleading always depends on context." *Id.* at 1330. Here, based on the context and unique allegations set forth in the Complaint, the Court finds that Plaintiffs have sufficiently pled a material omission under *Omnicare*. Unlike *SEPTA v. Orrstown Financial Services, Inc.*, No. 12-993, 2015 WL 3833849,

---

[24] The parties note that the Third Circuit has yet to determine whether audit reports are "opinions" subject to the analysis in *Omnicare*. (Pls.' Opp'n Br. 141-42; PwC's Moving Br. 13 n.6.)

at *34 (M.D. Pa. June 22, 2015), which PwC relies on, the Complaint "identif[ies] particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading." *Id.* (quoting *Omnicare*, 135 S. Ct. at 1332). In accordance with the liberal pleading standard under Rule 8(a) of the Federal Rules of Civil Procedure, the Court, therefore, denies PwC's Motion to Dismiss Count Seven.

    **D.**    **Counts Three, Four, Five, and Six: Section 12(a)(2) of the Securities Act (against Valeant, Pearson, Schiller, and the Bank Offering Defendants)**

The parties present an issue that has yet to be addressed by the Third Circuit: whether Rule 144A registration requires dismissal of Securities Act Section 12 claims of liability. In support of the proposition that Rule 144A registration nevertheless requires courts to engage in a fact-specific inquiry regarding the public or private nature of the offering, Plaintiffs specifically identify two directly applicable district court cases: *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 310 F. Supp. 2d 819 (S.D. Tex. 2004), and *AAL High Yield Bond Fund v. Ruttenberg*, No. 00-1404, 2001 WL 34372980 (N.D. Ala. Sept. 30, 2001). In response, the Bank Offering Defendants cite six district court cases from three different circuits, including four cases from the Southern District of New York, where the courts dismissed Section 12(a)(2) claims in connection with Rule 144A offerings. *See In re Merrill Lynch Auction Rate Sec. Litig.*, No. 10-124, 2012 WL 1994707, at *5 (S.D.N.Y. June 4, 2012), *aff'd sub nom. Iconix Brand Grp. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 505 F. App'x 14 (2d Cir. 2012); *Anegada Master Fund, Ltd. v. PXRE Grp. Ltd.*, 680 F. Supp. 2d 616, 621 (S.D.N.Y. 2010); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 625-26 (S.D.N.Y. 2007); *Am. High-Income Tr. v. AlliedSignal*, 329 F. Supp. 2d 534, 543 (S.D.N.Y. 2004); *In re Hayes Lemmerz Int'l, Inc. Equity Sec. Litig.*, 271 F. Supp. 2d 1007, 1028-29 (E.D. Mich. 2003); *In re Safety-Kleen Bondholders Litig.*, No. 00-1145, 2002 WL 32795741, at *3 (D.S.C. June 14, 2002).

Upon review of the authorities submitted by the parties, the Court finds the Bank Offering Defendants' interpretation persuasive. "Rule 144A specifically provides that securities sold in compliance with its provisions 'shall be deemed not to have been offered to the public.'" *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d at 625 (quoting 17 C.F.R. § 230.144A(c)). Accordingly, the Court finds that "exemption from registration and non-public status are necessary consequences of compliance with the conditions of Rule 144A." *Id.* A majority of the courts to rule on this issue, including the Southern District of New York, have adopted this interpretation of Rule 144A and its effect on Section 12(a)(2) liability.

On the other hand, the Court notes that the two cases from 2001 and 2004 representing the minority view, *AAL High Yield Bond Fund* and *In re Enron Corp.*, relied heavily on older Second Circuit cases for guidance, suggesting that both the Northern District of Alabama and the Southern District of Texas may arrive at different conclusions today based on the more recently developed case law specific to Rule 144A in the Southern District of New York. *See In re Enron Corp.*, 310 F. Supp. 2d at 864-66; *see also AAL High Yield Bond Fund*, 2001 WL 34372980, at *6-7, 8 n.3 (stating that "[t]he decision in *Sloane* [*Overseas Fund, Ltd. v. Sapiens Int'l Corp., N.V.*], 941 F. Supp. 1369 (S.D.N.Y. 1996) [was] instructive in regards to the factors a court may deem relevant in characterizing an offering as public or private"). Accordingly, the Court adopts the majority approach to Rule 144A and grants Valeant, Pearson, Schiller, and the Bank Offering Defendants' Motions to Dismiss with regard to Counts Three, Four, Five, and Six, without prejudice.

## IV.   **Conclusion**

For the reasons set forth above, the Exchange Act Defendants' Motions to Dismiss are **DENIED** with regard to Count One; Valeant, Pearson, Schiller, and Rosiello's Motions to Dismiss are **DENIED** with regard to Count Two; Valeant, Pearson, Schiller, and the Bank Offering

Defendants' Motions to Dismiss are **GRANTED**, without prejudice, with regard to Counts Three, Four, Five, and Six; Valeant, the Individual Securities Act Defendants, PwC, and the Stock Underwriter Defendants' Motions are **DENIED** with regard to Count Seven; Valeant, Pearson, Schiller, and the Stock Underwriter Defendants' Motions are **DENIED** with regard to Count Eight; Valeant, Pearson, and Schiller's Motions Dismiss are **DENIED** with regard to Count Nine.  An order consistent with this Memorandum Opinion will be entered.

s/ Michael A. Shipp
**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**

**Dated:** April 28, 2017