CHRISTOPHER A. SEEGER
SEEGER WEISS LLP
55 Challenger Rd., 6th Floor
Ridgefield Park, NJ 07660
Telephone: (973) 639-9100
Facsimile: (973) 639-9393
cseeger@seegerweiss.com

Local Counsel

JAMES E. BARZ
ROBBINS GELLER RUDMAN
    & DOWD LLP
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  312/674-4674
312/674-4676 (fax)
jbarz@rgrdlaw.com

Lead Counsel

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re VALEANT PHARMACEUTICALS INTERNATIONAL, INC. SECURITIES LITIGATION | ) ) ) ) ) ) ) ) ) ) ) | Master No. 3:15-cv-07658-MAS-LHG<br><br>CLASS ACTION<br><br>**FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |
| This Document Relates To:<br><br>    ALL ACTIONS. | | |

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

JURISDICTION AND VENUE .........................................................................................13

EXCHANGE ACT CLAIMS .............................................................................................14

    Plaintiffs .................................................................................................................14

    Defendants .............................................................................................................15

    Non-Defendant Relevant Parties...........................................................................22

FACTUAL BACKGROUND .............................................................................................23

    Valeant's Non-Traditional Business Strategy.......................................................23

    Price Gouging ........................................................................................................24

    Valeant's Deceptive Use of Patient Assistance ...................................................28

    Valeant's Clandestine Pharmacy Network ...........................................................32

    Philidor's Efforts to Deceive Payors.....................................................................39

    The R&O Lawsuit..................................................................................................47

    Valeant's Use of Philidor to Book Fictitious Sales ..............................................49

DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE CLASS
PERIOD ...........................................................................................................51

THE TRUTH BEGINS TO EMERGE .............................................................................110

    Valeant's Price Gouging Practices Are Revealed...............................................111

    Valeant's Secret Relationship with Philidor is Revealed ..................................113

    Valeant Reveals that the Deceptive Practices Require Philidor's Closure ....................119

    Additional Disclosures of the Financial Impact of the Fraud ...........................125

    Valeant's Fraudulent Accounting is Revealed....................................................129

POST-CLASS PERIOD DEVELOPMENTS....................................................................134

VALEANT'S FINANCIAL STATEMENTS WERE MATERIALLY MISSTATED..............138

ADDITIONAL SCIENTER ALLEGATIONS..........................................................160

    The Individual Defendants' Role in Valeant's Non-Traditional Business Strategy........161

    The Individual Defendants' Monitoring of and Decision to Close Philidor...................166

    Valeant's Refusal to Pursue Remedies Against Wrongdoers..........................................169

    Valeant Admits it Made Misrepresentations During the Class Period ...........................171

    Pearson's and Schiller's Admissions and Obstruction During the Congressional
        Hearings ............................................................................................................172

    Executive Departures ....................................................................................................177

    Pearson's Misrepresentations to Ackman ....................................................................179

    Executive Compensation ..............................................................................................182

    Inflating Valeant's Stock Price to Facilitate Cheaper Acquisitions................................186

LOSS CAUSATION/ECONOMIC LOSS ...........................................................187

PRESUMPTION OF RELIANCE ........................................................................212

THE SAFE HARBOR DOES NOT APPLY .........................................................214

CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT....................................215

    COUNT I For Violations of Section 10(b) of the Exchange Act and Rule 10b-5..........215

    COUNT II For Violations of Section 20(a) of the Exchange Act ..................................216

    COUNT III For Violations of Section 20A of the Exchange Act Against the
        Insider Trading Defendants...............................................................................218

    COUNT IV For Violations of Sections 20(a) the Exchange Act Against
        Defendants ValueAct Capital, VA Partners, ValueAct Holdings, and
        Ubben .............................................................................................................225

SECURITIES ACT CLAIMS................................................................................227

    Securities Act Parties ....................................................................................................229

    Plaintiffs........................................................................................................................229

Defendants ....................................................................................................230

CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ......................................235

    COUNT V For Violations of Section 12(a)(2) of the Securities Act in Connection
        with the July 2013 Debt Offering .................................................................235

    COUNT VI For Violations of Section 12(a)(2) of the Securities Act in Connection
        with the December 2013 Debt Offering........................................................243

    COUNT VII For Violations of Section 12(a)(2) of the Securities Act in
        Connection  with the January 2015 Debt Offering ........................................251

    COUNT VIII For Violations of Section 12(a)(2) of the Securities Act in
        Connection  with the March 2015 Debt Offering ...........................................260

    COUNT IX For Violations of Section 11 of the Securities Act in Connection  with
        the March 2015 Stock Offering ...................................................................270

    COUNT X For Violations of Section 12(a)(2) of the Securities Act in Connection
        with the March 2015 Stock Offering ............................................................291

    COUNT XI For Violations of Section 15 of the Securities Act .....................................293

CLASS ACTION ALLEGATIONS ................................................................................295

PRAYER FOR RELIEF .................................................................................................297

JURY DEMAND ............................................................................................................298

1352297_1

Plaintiffs, by their undersigned attorneys, individually and on behalf of all other persons similarly situated, herein allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters, based on the investigation of Plaintiffs' attorneys.[1]  This investigation included, but was not limited to, a review and analysis of:  Defendants' public documents, conference calls, announcements, and United States Securities and Exchange Commission ("SEC") filings; releases published by and regarding Valeant Pharmaceuticals International, Inc. ("Valeant" or "Company"); analyst reports and advisories about the Company; Valeant's own documents, which included emails, correspondence, and agreements by or among Valeant, Philidor Rx Services, LLC ("Philidor"), and R&O Pharmacy ("R&O");  Congressional hearings, Defendants' testimony, interrogatory responses, and documents submitted by Valeant relating to those hearings; former Philidor and Valeant employee statements; media articles; and other publicly available information.   Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.      This securities class action is brought on behalf of purchasers of Valeant equity securities and senior notes between January 4, 2013 and March 15, 2016, inclusive ("Class" and "Class Period"), seeking to pursue remedies under §§10(b), 20(a), and 20A of the Securities Exchange Act of 1934 ("Exchange Act"), SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5), and §§11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act").

---

[1]   This First Amended Complaint leaves unchanged the prior allegations which were subject to the Court's April 28, 2017 ruling on the motions to dismiss.  *See* ECF No. 216.  The new allegations are contained in ¶¶33, 55-62, 560-582 and add insider trading claims (*see* Counts III and IV).

- 1 -

2.      Valeant is a specialty pharmaceutical and medical device company that develops, manufactures, and markets a range of branded and generic pharmaceuticals, over-the-counter products, and medical devices.  Most relevant to this lawsuit are Valeant's sales of branded and generic drugs.

3.      This case arises out of a fraudulent scheme and wrongful course of business pursuant to which Valeant and its senior insiders used a network of secretly controlled pharmacies, deceptive pricing and reimbursement practices, and fictitious accounting to misrepresent Valeant's business operations and financial performance.  The misconduct detailed herein enabled Valeant's senior insiders to sell more than $15 billion dollars of newly issued Valeant securities to investors at artificially inflated prices and enrich themselves with hundreds of millions of dollars' worth of equity awards and compensation payments.  Valeant's business model relied on a multitude of deceptive practices which were designed to induce the purchase of Valeant drugs notwithstanding dramatic price increases far beyond industry norms, including:

- routing prescriptions through Valeant's captive network of pharmacies while concealing that such pharmacies were not independent;

- physically altering physician prescriptions to require Valeant products;

- submitting false information to third party payors; and

- secretly waiving patient copays to reduce patient complaints about the price increases, while concealing these practices from payors.

4.      These practices were carefully designed to deceive payors into reimbursing Valeant for drugs and at higher prices than they would have paid if such practices had not been utilized. Valeant also falsified its financial statements in violation of generally accepted accounting principles ("GAAP") by recording revenues for products shipped to pharmacies it controlled (essentially selling to itself) and double counting revenues by recording revenues a second time when the products were sold by the pharmacies.

- 2 -

5.     The market became aware of the truth about Valeant through a series of disclosures that resulted in the closure of the Company's secret network of controlled pharmacies, the refusal of payors to reimburse Valeant, the cessation of the Company's deceptive practices, and the reduction of its drug prices.  Valeant withdrew its financial statements and acknowledged them to be false, restated its revenue for fiscal year ("FY") 2014, drastically reduced its revenue and profitability guidance for 2015 and 2016, and admitted that its disclosure controls and internal controls over financial reporting had been inadequate.  The revelations of pervasive misconduct at Valeant forced the departure of most of the officers and directors responsible for its misconduct, with Valeant specifically admitting that its former Chief Financial Officer ("CFO") and Corporate Controller had engaged in "improper conduct."

6.     As a result of the misconduct alleged herein, Valeant became the subject of Congressional hearings and investigations by federal prosecutors and the SEC.  As these revelations reached the market, the Company suffered a market capitalization decline of nearly $80 billion, and its stock price fell from a Class Period high of over $262 per share to less than $25 on June 7, 2016.

**Valeant's Non-Traditional Business Strategy and Improper Practices**

7.     Traditional pharmaceutical companies grow by developing new medications to cure and treat diseases and typically spend approximately 15%-20% of revenues on research and development ("R&D").  Such companies receive patent protection, permitting them to charge high prices for the newly developed drugs and thereby recoup their investments in R&D and re-invest in R&D for new treatments.  After time, that protection expires and generic drugs enter the market.  Entry of generic products can be delayed for years, however, due to a backlog at the FDA and the priority new drug applications may receive over generic applications.

8.     Valeant's "Non-Traditional" Business Strategy:   Unlike the Chief Executive Officers ("CEO") of such traditional pharmaceutical companies, Defendant CEO J. Michael Pearson ("Pearson") did not come from a science or pharmaceutical background.  Pearson had been a consultant at McKinsey & Co. ("McKinsey"), working closely with (among other clients) Tyco International, Ltd. ("Tyco"), which had been known for its aggressive strategy of growing through a series of business acquisitions.[2]  Under Pearson's leadership, Valeant followed a path similar to that of Tyco by growing through business acquisitions rather than the development of new and better medicines.  Current board member Bill Ackman ("Ackman") has noted, "Valeant believes that they are not good at drug development."  Thus, Valeant limited R&D expenditures to approximately 3% of revenue.

9.     Executing Pearson's strategy, Valeant completed more than 100 acquisitions since 2008 for a total of more than $30 billion.  Notably, on December 11, 2012, Valeant acquired Medicis Pharmaceutical Corporation ("Medicis") for $2.6 billion; on August 5, 2013, Valeant acquired Bausch & Lomb Holdings Incorporated ("Bausch & Lomb") for $8.7 billion; on February 10, 2015, Valeant acquired certain drugs from Marathon Pharmaceuticals ("Marathon") for $350 million; on April 1, 2015, Valeant acquired Salix Pharmaceuticals, Ltd. ("Salix") for $14.5 billion; and on October 1, 2015, Valeant acquired Sprout Pharmaceuticals, Inc. ("Sprout") for approximately $1 billion.

10.    Valeant's "roll-up" strategy consisted of growing revenues through acquisitions and cutting R&D spending, which Pearson considered to be low return and wasteful given that

---

[2]     Tyco's CEO, Dennis Kozlowski, was sentenced to up to 25 years in prison for various charges relating to his conduct at Tyco.  PricewaterhouseCoopers LLP ("PwC"), Valeant's Class Period auditor here, was Tyco's auditor as well and its lead audit partner on the Tyco engagement was permanently banned from appearing or practicing before the SEC.

research efforts often fail to result in marketable drugs.  For example, when asked about cancer research, Pearson responded:  "I think it's a losing proposition.  I don't know any pharmaceutical company who has generated positive returns on it."[3]  By contrast, Defendants claimed their non-traditional strategy was more profitable and carried a lower risk.  Valeant's growth and cost-cutting strategy appeared to be working, as Valeant's profitability and the price of its securities rose.

11.     A roll-up strategy is typically finite, however, because consolidation leaves fewer targets to be acquired, and the debt used to finance such transactions can grow to unsustainable levels.  To demonstrate the long-term value of Pearson's strategy, therefore, Defendants had to convince investors that Valeant could increase the sales volume of the drugs Valeant acquired.  During the Class Period, Defendants assured investors that Valeant's "non-traditional" business strategy with its purportedly superior marketing was doing just that.  Defendants further assured the market that Valeant's business strategies were "sustainable."  In response, Valeant's stock price climbed from just under $60 on December 31, 2012, just before the start of the Class Period, to over $260 on August 5, 2015 – the Class Period high – an increase of nearly 350%.

12.     Valeant's Undisclosed Business Practices:  Valeant's "non-traditional" business strategy, however, was neither low risk nor sustainable.  Rather, it consisted of deceptive practices that enabled Defendants to report inflated short-term profitability while exposing the Company to massive undisclosed risks, including lost sales, regulatory sanctions, and reputational harm.  The concealed practices included:

- Price Gouging:  Defendants concealed from investors the extent to which Valeant's profitability and purported growth were dependent on dramatic price increases far beyond industry norms.  For example, Valeant claimed it was contractually limited to price increases of 10% or less but often raised the price of drugs by 100% to 3,000%.  Such drastic price increases

---

[3]     *See* Appendix of Media Sources, filed herewith.

provided an illusory boost to profitability and were unsustainable as they exposed Valeant to business and regulatory risks that payors would reject payment or substitute non-Valeant products, and served to mislead investors as to Valeant's true financial performance and prospects.

- Clandestine Network of Captive Pharmacies:  Independent pharmacies serve as a check on price gouging, to reduce fraud, by encouraging the substitution of cheaper products.  A key component of Valeant's deceptive strategy was to re-route prescriptions away from independent pharmacies into Valeant's secret network of controlled pharmacies, made up of entities named after chess moves.  Philidor was the primary pharmacy in Valeant's secret network, and was formed with the assistance of Valeant employees who used aliases to conceal their involvement at Philidor.  Valeant concealed its control over Philidor to create the false impression that Philidor and its entire network of pharmacies were independent, reducing the likelihood that payors or pharmacy benefit managers ("PBMs") would subject the pharmacies to enhanced scrutiny through audits and, as a result, refuse to reimburse the high priced drugs or unnecessary refills.  Concealing its relationship with (and avoiding scrutiny of) Philidor was particularly important because Philidor engaged in additional deceptive practices to wrongfully obtain payment for Valeant's drugs, such as altering physician prescriptions to require Valeant products and resubmitting rejected claims using false information.

- Patient Assistance:  Patient copays also reduce fraud by ensuring patients have an incentive to complain and/or seek generic alternatives from their physicians if they are prescribed high-priced medications or receive unnecessary refills.  Thus, certain practices designed to waive or eliminate patient copays to increase sales and sale prices can violate criminal anti-kickback laws if government payors, such as Medicaid, are targeted.  Valeant targeted private payors with such deceptive practices, even though those practices still carried massive business risks, including violating state laws and contracts and alienating physicians, payors, and PBMs, and thereby reducing overall sales.  To prolong its scheme to defraud, Valeant secretly waived copays, and even sent flowers, to patients who complained about the massive price increases, thereby diverting negative media attention and silencing patients from complaining to their physicians and insurers.

- Misrepresenting Volume Growth:  To conceal the size of Valeant's price increases, and the extent to which its growth was dependent on such increases, Defendants misrepresented volume growth in its statements to investors.  For example, even though price increases were responsible for 80% of Valeant's growth in the first quarter of 2015 ("1Q15"), Pearson falsely claimed that Valeant had grown more due to volume increases than price increases.

- **Accounting Fraud**:  Valeant used Philidor to record fictitious sales and inflate its revenues in violation of GAAP.  Although GAAP required Valeant to record revenues only on the ultimate sale to a patient, Valeant recognized revenue on shipments to Philidor.  Worse, Valeant double-counted revenues by recognizing revenue a second time when Philidor shipped products to patients.  Valeant lacked adequate internal controls to prevent this accounting fraud.

**Defendants Concealed Their Improper Practices**

13.    During the Class Period, Defendants' deceptive practices and the associated risks therefrom were concealed from investors.  Valeant and its senior executives claimed Valeant's dramatic growth in revenues and profitability was attributable to Valeant's "innovative" marketing strategies, increased sales volume, and purportedly lower-risk and sustainable business model. Defendants further misled investors by repeatedly assuring investors that Valeant had strong internal controls and compliance, and that its accounting complied with GAAP.

14.    For example, on January 4, 2013, Defendants announced their alternative fulfillment ("AF") strategy to boost revenues by routing prescriptions through an alternate channel of seemingly independent specialty pharmacies.  Defendants concealed the formation of Philidor, and thereafter continued to conceal Valeant's relationship with Philidor and the numerous practices used to deceive payors.  Simply put, Defendants touted the purported benefits of the AF strategy, while concealing the deception and risks associated therewith.  In response to an analyst question about the AF initiative on a July 31, 2014 conference call, Pearson succinctly noted, "***it's a competitive advantage that we have***" and "***a very successful initiative.***"[4]

15.    Valeant's deception was front and center when Valeant engaged in a hostile takeover attempt of drug manufacturer Allergan, Inc. ("Allergan") in 2014.  Allergan rebuffed the

---

[4]    Emphasis has been added to the particular statements alleged to be false and misleading.

offer, arguing that Valeant's business model was unsustainable and reliant on "some eye popping increases of price."   Defendants repeatedly assured investors that Allergan's claims were completely false.  On May 28, 2014, Pearson told investors:  "**the highest price increase we could take under any managed care contract we have in the US is 9% a year**."  Thus, Pearson reasoned, "**we have a lot of constraints, just like other pharma companies do, in terms of pricing.**"  Pearson explicitly confirmed that "**the vast majority of our growth on a global basis. . . is volume**."  On June 17, 2014, Pearson told investors, "**I can assure you our operating model is both durable and sustainable**," pointing out that most of the Company's top products were "**growing by volume, not just price**."  On July 18, 2014, Pearson even claimed that at Valeant, we "**[p]ut patients and our customers first by maintaining the highest ethical standards in the industry**."  In truth, however, Valeant did nothing of the sort.  Rather, to hit its financial targets, Valeant dramatically increased the prices of certain products by many multiples of any 9% limit or normal industry increases, facilitated by the deceptive practices detailed herein.

16.     Defendants falsely claimed the growth in sales was the result of marketing the acquired drugs better than their predecessors.  For example, on February 23, 2015, Howard B. Schiller ("Schiller"), Valeant's CFO, attributed "**the outstanding results in our dermatology business**" to the "**implementation of innovative marketing approaches**," while concealing from investors that an increasing portion of dermatology sales were being routed through Philidor, and that those sales were being boosted by deceptive practices and accounting fraud.  And on April 29, 2015, Pearson falsely told analysts, "**In terms of price volume, actually, volume was greater than price in terms of our growth**" – when in fact 80% of Valeant's growth had been achieved through increasing prices and only 20% through increasing volume during 1Q15.

17.     Defendants used Valeant's securities, inflated by their prior misrepresentations, to further Valeant's acquisition strategy and acquire companies more cheaply.  Valeant conducted numerous debt and equity offerings, generating approximately $15 billion in proceeds for the Company from the investing public, and used the proceeds to fund cash acquisitions of other companies.

**The Gradual Disclosure of the Truth**

18.     Defendants' scheme started to come to light in September 2015 as a result of government investigations, a lawsuit by a pharmacy whose National Provider Identifier ("NPI") Philidor had fraudulently used to obtain payments from insurers, and the revelation by investigative journalists of Valeant's secret relationship with Philidor.  Despite these partial disclosures, Defendants continued to mislead.  For example, on October 21, 2015, when a report surfaced questioning whether Valeant could "be the pharmaceutical Enron" and suggesting that Valeant could be using Philidor to inflate sales, Defendants responded days later by stating:  "*we stand by our accounting treatment of Philidor completely*."  Valeant Director Robert A. Ingram ("Ingram") added that "*[t]he audit committee of the Board and the full Board have reviewed the Company's accounting, the Philidor relationship, and have confirmed the appropriateness of the Company's revenue recognition and accounting treatment*."  In truth, however, Valeant had fraudulently inflated its revenues through Philidor in violation of GAAP, requiring it to restate its false financial statements just months later after the SEC commenced an investigation.

19.     On October 27, 2015, one of Valeant's largest shareholders, Ackman, wrote an email to Pearson, Schiller, and other board members regarding an article by Joe Nocera in *The New York Times* that described Valeant as "sleazy" and questioned whether Valeant was the "Next Enron."  Ackman told Pearson, "when one of the most credible journalists in the world accuses

you of being the next Enron, time is short."  He warned that "Your reputation and that of the rest of the board along with the company is at grave risk of being destroyed on a permanent basis." Ackman advised them to hold a conference call to "answer the questions honestly no matter how embarrassing the answers are and no matter what the legal implications are."  Ackman criticized Pearson's abrupt end to the previous conference call and his scripted answers, stating:  "The only people that need scripts and limited questions are crooks.  Joe Nocera is right.  You look like Enron."

20.     On October 29, 2015, investigative journalists reported that former Philidor employees admitted Philidor's deceptive practices and provided Philidor manuals documenting some of those practices, including "a couple of different 'back door' approaches to receive payment from the insurance company."  In response to these revelations, the three major PBMs[5] (Express Scripts, CVS Caremark, and OptumRx) announced that they would no longer reimburse prescriptions from Philidor; and Valeant (which had vigorously defended Philidor only days before) announced it severed ties with Philidor, implicitly conceding the deceptive conduct and forcing Philidor to close.

21.     In late fall 2015 and early 2016, congressional inquiries and hearings, together with SEC and DOJ investigations into Valeant's accounting, forced the Company to make further corrective statements.  On February 3, 2016, Valeant issued a release admitting that Pearson's April 29, 2015 statement that Valeant grew more by volume than price in 1Q15 was false.  On February 22, 2016, Valeant issued a release confirming the falsity of its previously reported

---

[5]     A PBM administers prescription drug benefits on behalf of employers, labor unions, and other entities, known as "sponsors," that provide those benefits as part of their health insurance plans. PBMs also negotiate the prices that the sponsors pay to drug manufacturers, which are then sold through retail or specialty pharmacies that also have contracts with PBMs.

financial statements for 2014 and the first three quarters of 2015 due to Valeant's improper accounting for transactions with Philidor.

22.     On March 15, 2016, Valeant provided "unaudited" financial results that disclosed unexpectedly poor fourth quarter 2015 ("4Q15") results and slashed guidance for 2016, further revealing the substantial financial impact of Valeant's inability to continue its deceptive price gouging and use of the Philidor network.  Valeant further disclosed that it had inadequate internal controls and disclosure controls and that it could not release audited financial statements until the board completed its assessment of the Company's internal controls.  This delay risked an event of default under the Company's credit agreement and bond indentures.

23.     Most of the key players involved in the deceptive practices, detailed herein, have been forced out at Valeant.  Philidor was shuttered and Pearson replaced as CEO, with media reporting that his departure was not a "mutual" decision.  Valeant asked Schiller to resign from the board.  Tanya Carro ("Carro"), Valeant's Corporate Controller, was replaced after the Company disclosed that both Schiller and Carro had engaged in "improper conduct" associated with Valeant's accounting fraud.  Deborah Jorn ("Jorn"), who led the dermatology division (representing a large portion of Philidor sales), departed.  Valeant also announced that most of the members of the Audit Committee of the Board of Directors, who reviewed and approved the accounting for Philidor and conducted due diligence at Philidor, would be replaced.

24.     In sum, the revelations about Valeant between late September 2015 and the summer of 2016 have confirmed:  (a) the pervasiveness of the fraudulent business practices Valeant used to deceive payors; (b) the falsification of Valeant's financial statements in violation of GAAP; (c) the material weaknesses in Valeant's internal controls; (d) Valeant's misrepresentations concerning the impact on Valeant's growth of volume versus pricing increases; and (e) Valeant's

- 11 -

resulting exposure to massive business and regulatory risks which have resulted in numerous state and federal investigations, PBM and payor refusals to reimburse prescriptions and a dramatic reduction in Valeant's financial guidance.  In short, Valeant revealed that its business prospects and profitability were anything but what they were reported to be during the Class Period.

**The Impact on Valeant Securities**

25.     By the end of the Class Period, the revelations described above decimated the price of Valeant debt and equity securities, removing the artificial inflation therein and eliminating nearly $80 billion of market capitalization.  Valeant's stock price fell from its Class Period high of over $262 per share to less than $25 per share on June 7, 2016.  The price of Valeant debt securities likewise plummeted as a result of these disclosures.  For example, the price of Valeant's 2023 5.875% Notes and its 2025 6.125% Notes (both as defined herein) each suffered a one-day decline of more than 10%, to close 23% below par by March 15, 2016, despite having been issued and sold at par only one year earlier.

26.     The following chart demonstrates the artificial inflation caused by certain of the materially false and misleading statements during the Class Period, as alleged herein, and the dramatic decline in Valeant's stock price as the artificial inflation was removed:



## JURISDICTION AND VENUE

27.     The claims asserted herein arise under and pursuant to §§10(b), 20(a), and 20A of the Exchange Act [15 U.S.C. §§78j(b), 78t(a), and 78t-1], SEC Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5], and §§11, 12(a)(2), and 15 of the Securities Act [15 U.S.C. §§77k, 77l(a)(2), and 77o].

28.     This Court has jurisdiction over this action pursuant to §27 of the Exchange Act [15 U.S.C. §78aa], §22 of the Securities Act [15 U.S.C. §77v], and 28 U.S.C. §1331.

29.     Venue is proper in this District pursuant to §27 of the Exchange Act, §22 of the Securities Act and 28 U.S.C. §1391(b).  Valeant maintains its U.S. headquarters in this District,

the acts and conduct complained of herein occurred in substantial part in this District, and the debt

and equity offerings giving rise to certain claims alleged herein were marketed in this District.

30.     In connection with the acts and conduct alleged in this Complaint, Defendants,

directly or indirectly, used the means and instrumentalities of interstate commerce, including the

mails, interstate telephone communications, and the facilities of the national securities markets.

Valeant securities trade in an efficient market.  Valeant common stock trades on the New York

Stock Exchange ("NYSE").

## EXCHANGE ACT CLAIMS

**Plaintiffs**

31.     Lead Plaintiff Teachers Insurance and Annuity Association of America ("TIAA"

or "Lead Plaintiff") was founded in 1918 and is a joint stock life insurance company incorporated

in New York with its principal place of business in New York.[6]  CREF, a companion organization

to TIAA, is a not-for-profit membership corporation incorporated in New York with its principal

place of business in New York.  TIAA is a Fortune 100 financial services organization that forms

the principal retirement system for the nation's education and research communities and one of

the largest retirement systems in the world based on assets under management.  As set forth in

TIAA's previously filed certification, TIAA purchased Valeant debt and equity securities in the

United States during the Class Period and was damaged thereby, including Valeant senior notes

---

[6]     TIAA consists of Teachers Insurance and Annuity Association of America, College Retirement
Equities Fund ("CREF"), TIAA-CREF Funds (including the TIAA-CREF Growth & Income
Fund, TIAA-CREF Large-Cap Growth Fund and TIAA-CREF Enhanced Large-Cap Value Fund),
TIAA-CREF Life Funds (including the TIAA-CREF Life Growth Equity Fund, TIAA-CREF Life
Growth & Income Fund and TIAA-CREF Life Bond Fund), TIAA-CREF Bond Funds (including
the TIAA-CREF Bond Fund, TIAA-CREF Bond Plus Fund, TIAA-CREF High-Yield Fund,
TIAA-CREF Social Choice Bond Fund and TIAA-CREF Short-Term Bond Fund) and TIAA
Global Public Investments.

issued in the July 2013 Debt Offering, December 2013 Debt Offering, January 2015 Debt Offering, and March 2015 Debt Offering.

32.    Named Plaintiff is the City of Tucson together with and on behalf of the Tucson Supplemental Retirement System ("Tucson").  The Tucson Supplemental Retirement System is a defined benefit pension plan, qualified under Internal Revenue Code §401(a), and was established by the City of Tucson charter in 1953 to provide eligible City employees with retirement benefits. As set forth in Tucson's previously filed certification, Tucson purchased Valeant securities in the United States during the Class Period and was damaged thereby, including Valeant stock issued in the March 2015 Stock Offering.

33.    Additional Named Plaintiff is IBEW Local Union 481 Defined Contribution Plan and Trust ("IBEW").  As set forth in IBEW's certification attached hereto and incorporated herein, IBEW purchased Valeant common stock in the United States during the Class Period, including on June 11, 2015, and was damaged thereby.

34.    TIAA, Tucson, and IBEW are collectively referred to as "Plaintiffs."

**Defendants**

35.    Plaintiffs assert securities fraud claims under the Exchange Act against Valeant and certain of its officers and directors who made materially false and misleading statements during the Class Period.[7]

36.    Defendant Valeant is incorporated in British Columbia, Canada and managed from its U.S. headquarters in this District.  Valeant was a California company until September 2010, when it merged with Biovail Corporation ("Biovail"), a Canadian company.  To lower its overall

---

[7]    Additional defendants against whom Securities Act claims are alleged are listed in ¶¶595-598.

tax rate, Valeant structured the merger to make Biovail the technical acquirer, but the combined company kept Valeant's name and executives, and it continued to be managed out of Valeant's New Jersey offices.  Shares of Valeant stock trade on the NYSE under the ticker symbol "VRX."

<u>Management Defendants</u>

37.     Defendant Pearson was CEO and a member of Valeant's board of directors from 2008 until May 3, 2016.  Pearson served as Chairman of the Board from March 2011 to January 2016.  Pearson took a medical leave of absence in January and February 2016.  On March 21, 2016, Valeant announced he would be replaced.  Prior to Valeant, Pearson worked at McKinsey as a consultant to Valeant.  During the Class Period, Pearson awarded himself with Valeant stock and stock awards valued, at one time, at over $2 billion.  His total compensation (cash and stock awards) for 2013, 2014, and 2015 was approximately $7 million, $10.3 million, and $140.3 million, respectively.

38.     Defendant Schiller was an Executive Vice President and the CFO of the Company from December 2011 until June 30, 2015, when he resigned from those positions.  Schiller joined Valeant's board of directors in September 2012, and he remained a director until June 14, 2016. Schiller served as the Company's interim CEO in January and February 2016 while Pearson was out on medical leave.  Before joining Valeant in December 2011, Schiller had a 24-year career as an investment banker at Goldman Sachs & Co. ("Goldman Sachs"), a firm that was paid more than $70 million by Valeant, principally for its roles in advising Valeant on the Biovail merger and raising capital for acquisitions.  On March 21, 2016, Valeant stated Schiller had engaged in "improper conduct" and the Company asked him to resign from his position on the board.  Schiller refused, and the Company announced he would not be a candidate for re-election to the Board in

June 2016.   Schiller's total compensation (cash and stock awards) for 2013 and 2014 was approximately $4 million and $27 million, respectively.

39.    Defendant Robert L. Rosiello ("Rosiello") has been the Company's CFO since July 2015 and is also an Executive Vice President of the Company.   Rosiello briefly served as one of the three members of the Office of the CEO in the interim period between Pearson beginning his medical leave and Schiller being named interim CEO.   Like Pearson, Rosiello is a McKinsey veteran, having spent over 30 years at the consulting group.   Rosiello's total compensation (cash and stock awards) for 2015 was approximately $60.4 million.

40.    Defendant Jorn was Vice President of Global Marketing at Bausch & Lomb from June 2010 until Valeant acquired Bausch & Lomb in August 2013, at which time Jorn joined Valeant.   Jorn served as a Valeant Executive Vice President and Company Group Chairman, until her departure on March 2, 2016.   Jorn was general manager of the Company's U.S. dermatology business.   Jorn's total compensation (cash and stock awards) for 2013, 2014, and 2015, was approximately $1.7 million, $2.3 million, and $5.6 million, respectively.

41.    Defendant Dr. Ari S. Kellen ("Kellen") has been the Company's Executive Vice President, Company Group Chairman since January 1, 2014.   Kellen briefly served as one of the three members of the Office of the CEO in the interim period between Pearson beginning his medical leave and Schiller being named interim CEO.   Like Pearson and Rosiello, Kellen is a McKinsey veteran, having spent over 22 years at the consulting group.   Following Jorn's departure, Kellen became and currently serves as the head of Valeant's U.S. dermatology business.   Kellen's total compensation (cash and stock awards) for 2014 and 2015 was approximately $50.6 million and $4.7 million, respectively.

42.     Defendant Carro was at all relevant times the Company's Corporate Controller.  On March 21, 2016, Valeant announced Carro had been placed on administrative leave after committing "improper conduct" that "resulted in the provision of incorrect information to the [ad hoc] committee and the company's auditors."  On May 23, 2016, Valeant announced the hiring of a new Controller.

### Director Defendants

43.     Defendant Ingram has been a member of Valeant's board of directors since September 2010.  He served as the Board's Lead Independent Director from March 2011 to February 2016, and then Chairman of the Board from January 2016 to May 2016, when he was replaced as Chairman by the incoming CEO.  At all relevant times Ingram was a member of the Company's Talent and Compensation Committee, Corporate Governance Committee, and Ad Hoc Committee formed to investigate issues related to Philidor.  Ingram signed the Company's 2013 10-K and 2014 10-K (both as defined herein).

44.     Defendant Ronald H. Farmer ("Farmer") joined the Company's board of directors in August 2011.  Farmer is also Director Emeritus of McKinsey, where he spent 25 years in the Toronto and New York offices prior to his retirement in 2003.  At Valeant, Farmer was the Chairman of the Talent and Compensation Committee and a member of the Nominating and Corporate Governance Committee.  Farmer signed the Company's 2014 10-K.  On April 29, 2016, Valeant announced that Farmer would not be seeking re-election, and he was replaced in June 2016.

45.     Defendant Colleen Goggins ("Goggins") joined the Company's board of directors in May 2014.  Before joining Valeant, Goggins was employed from 1981 to 2011 by Johnson &

- 18 -

Johnson.  At Valeant, Goggins was a member of the Finance and Transactions Committee[8] and the Nominating and Corporate Governance Committee.  Goggins signed the Company's 2014 10-K.  On April 29, 2016, Valeant announced that Goggins would not be seeking re-election, and she was replaced in June 2016.

46.     Defendant Anders Lönner ("Lönner") served as a member of Valeant's board of directors from May 2014 until March 8, 2016, when he left.  At Valeant, Lönner was a member of the Finance and Transactions Committee and the Talent and Compensation Committee.  Lönner signed the Company's 2014 10-K.

47.     Defendant Theo Melas-Kyriazi ("Melas-Kyriazi") joined the Company's board of directors in September 2010.  At Valeant, Melas-Kyriazi was a member of the Audit and Risk Committee and the Chairman of the Finance and Transactions Committee.  Melas-Kyriazi signed the Company's 2014 10-K.  On April 29, 2016, Valeant announced that Melas-Kyriazi would not be seeking re-election, and he was replaced in June 2016.

48.     Defendant Robert N. Power ("Power") has served as a member of the Company's board of directors since August 2008.  At Valeant, Power has been the Chairman of the Nominating and Corporate Governance Committee and a member of the Talent and Compensation Committee.  Power signed the Company's 2014 10-K.

49.     Defendant Norma Provencio ("Provencio") joined the Company's board of directors in September 2010.  Before joining Valeant, Provencio was, among other positions, a partner at Arthur Andersen until its collapse in 2002 in connection with its work for Enron, and a director at Signalife, Inc. ("Signalife") from 2005 to 2007, where she headed the Audit Committee.

---

[8]    This committee was dissolved on March 8, 2015.

During her tenure at Signalife, certain employees engaged in a revenue inflation scheme that resulted in large fines and a 17-year prison sentence for one of the company's executives.  At Valeant, Provencio served as the Chairman of the Company's Audit and Risk Committee. Provencio signed the Company's 2013 10-K and 2014 10-K.  On April 29, 2016, Valeant announced that Provencio and four other directors – including the two other members of the Audit and Risk Committee – would not be seeking re-election, and she was replaced in June 2016.

50.     Defendant Katherine B. Stevenson ("Stevenson") served as a member of the Company's board of directors from September 2010 through March 21, 2016, when she resigned. At Valeant, Stevenson was a member of the Audit and Risk Committee and the Finance and Transactions Committee.  Stevenson signed the Company's 2014 10-K.

51.     Defendant Jeffrey W. Ubben ("Ubben") served as a member of the board of directors from October 2014 through August 19, 2015, when he resigned.  Ubben was a member of the Finance and Transactions Committee and the Talent and Compensation Committee.  Ubben signed the Company's 2014 10-K.

52.     Ingram, Farmer, Goggins, Lönner, Melas-Kyriazi, Power, Provencio, Stevenson, and Ubben are collectively referred to herein as the "Director Defendants."

53.     Pearson, Schiller, Rosiello, Jorn, Kellen, Carro, and the Director Defendants are collectively herein referred to as the "Individual Defendants."

54.     Valeant and the Individual Defendants are collectively referred to herein as the "Exchange Act Defendants."

**Insider Trading Defendants**

55.     Defendant ValueAct Capital Management L.P. ("ValueAct Capital") is an investment adviser co-founded by Ubben in 2000 and registered with the SEC under the

Investment Advisers Act of 1940.  ValueAct Capital trades securities through and on behalf of several hedge fund investment vehicles.  ValueAct Capital determines the securities bought or sold by the hedge funds, the amount and price of securities traded, the timing of trades, and the types of transactions used to complete the trades.  According to its website, ValueAct Capital, through its hedge funds, has approximately $13 billion of assets under management.

56.     Defendant ValueAct Capital Master Fund, L.P. ("Master Fund") is one of ValueAct Capital's hedge fund investment vehicles through which ValueAct Capital trades securities.

57.     Defendant ValueAct Co-Invest Master Fund, L.P. ("Co-Invest Fund") is one of ValueAct Capital's hedge fund investment vehicles through which ValueAct Capital trades securities.  Master Fund and Co-Invest Fund are together referred to herein as the "ValueAct Funds."

58.     Defendant VA Partners I, LLC ("VA Partners") is the general partner of ValueAct Capital's hedge fund investment vehicles, including the ValueAct Funds.  According to ValueAct's SEC registration materials, VA Partners "is responsible for the overall management of [the ValueAct Funds]."

59.     Defendant ValueAct Holdings, L.P. ("ValueAct Holdings"), through its affiliates, owns ValueAct Capital and VA Partners.

60.     ValueAct Capital, VA Partners, and ValueAct Holdings are organized under the laws of Delaware, and the Master Fund and the Co-Invest Fund are organized under the laws of the British Virgin Islands.  ValueAct Capital, VA Partners, ValueAct Holdings, the Master Fund, and the Co-Invest Fund (collectively, "ValueAct" or the "ValueAct Entities") are managed by the same executives and share the same principal place of business in San Francisco, California.

61.     Defendant Ubben, at all relevant times herein, was ValueAct's CEO and Chief Investment Officer ("CIO").  In these roles, Ubben controlled, managed, and directed the business and investment practices of ValueAct Holdings, VA Partners, and ValueAct Capital, and the trading of the ValueAct Funds.  Ubben had ultimate authority on what securities ValueAct Capital bought or sold on behalf of the ValueAct Funds and the timing and amount of such trades.

62.     Ubben and the ValueAct Entities are collectively referred to herein as the "Insider Trading Defendants."  On June 12, 2015, the Insider Trading Defendants filed with the SEC a Form 4 reporting that, on or around June 10, 2015, they – through the ValueAct Funds – sold 4.2 million shares of Valeant common stock for proceeds of approximately $925 million.  The Form 4 was signed by each Insider Trading Defendant and listed each Insider Trading Defendant as a beneficial owner of the sold shares.

**Non-Defendant Relevant Parties**

63.     Formed in January 2013 with the assistance of Valeant employees, Philidor was a specialty pharmacy registered as a Delaware limited liability company.  Philidor's headquarters were located at 400 Horsham Road, Suite 109, Horsham, Pennsylvania 19044.  Philidor operated as the hub of Valeant's secret network of specialty pharmacies, and Valeant was Philidor's only client.[9]  Demonstrating the close coordination between Valeant and Philidor, the numerous related entities which formed Valeant's secret network of specialty pharmacies were named for chess strategies, including:

- Philidor:  The "Philidor Defense" refers to an opening chess move;

---

[9]     On November 25, 2015, Philidor sent notice to the Pennsylvania Bureau of Workforce Development that it was closing its facilities and laying off its workers.  In the notice, Philidor listed Valeant as its only client.

- <u>KGA</u>: KGA was a wholly owned Valeant subsidiary that paid $100 million to obtain the option to acquire Philidor in December 2014. KGA stands for King's Gambit Accepted, an opening move in chess;

- <u>BQ6 Media Group LLC ("BQ6")</u>: BQ6 was a marketing firm that consulted for Valeant and shared a Pennsylvania address with Philidor as well as employees. BQ6 also refers to a chess move involving a bishop and queen moving;

- <u>End Game Partnership L.P. ("End Game")</u>:   owned a 31.5% stake in Philidor and is also a chess term;

- <u>Isolani, LLC ("Isolani")</u>:  Isolani was a Delaware company with Eric Rice, Philidor's Senior Director of Call Center Operations, as its sole member. In chess, an isolated queen's pawn is called an "isolani." Isolated pawns are usually a weakness but there can be counter-plays. After being denied a license to operate in California, Philidor, through Isolani, acquired a California-based pharmacy as its pawn to gain entry into the lucrative market;

- <u>Back Rank LLC</u>:  Back Rank used one of Philidor's Pennsylvania addresses and its president, James Fleming ("Fleming") was the Controller at Philidor. In chess, the term "back rank" involves a checkmate along the back rank (last row); and

- <u>Lucena Holdings, LLC ("Lucena")</u>:  Lucena was used to take a 10% stake in another California pharmacy and is also a chess term.

## FACTUAL BACKGROUND

**Valeant's Non-Traditional Business Strategy**

64.     In February 2008, Valeant named Pearson CEO.  ValueAct, a large investor in Valeant since 2006 with one seat on its board of directors, was credited with getting Pearson the job and designing Pearson's pay package.[10]

65.     As noted, traditional pharmaceutical companies spend 15% - 20% of revenue on R&D, which allows them to develop new or better cures and treatments for diseases and provide

---

[10]   There has been at least one high-ranking ValueAct individual on Valeant's board since 2007. On June 10, 2015, when Valeant's stock was trading near an all-time high, ValueAct sold 4.2 million shares of Valeant stock for proceeds of nearly $1 billion.

future revenue growth.  In order to encourage investment in such research, newly developed products are generally protected from generic competition for a period of time, which permits the manufacturer to recoup its investment through non-competitive pricing.  However, Pearson claimed that such spending was wasteful, R&D had a low rate of success, and a better business strategy would be to grow through acquisitions.  Under Pearson's command, Valeant operated like a hedge fund and Pearson was paid like a hedge fund manager.  When Valeant's stock peaked in August 2015, Pearson's stock based compensation was valued at more than $2 billion.

66.     Valeant focused on acquiring companies with already established products to sell, cutting costs (R&D), and dramatically raising prices while using deceptive tactics to exploit gaps Defendants had identified in the healthcare system.  Valeant targeted areas of the pharmaceutical market where the biggest players were less prevalent, like dermatological treatments.

**Price Gouging**

67.     Valeant's business strategy was directed at running up the stock price by reporting short term gains in order to create an illusory picture of Valeant's business performance and prospects through deceptive practices targeted toward private payors.  The practice undermined the interests of the Company because price gouging is an unsustainable business practice that carries increased business, reputational, compliance, and regulatory risks, as it increases the overall costs in the healthcare system and leads to push back from patients, physicians, pharmacies, and PBMs, as well as risks of nonpayment by payors.

68.     Several of the drugs acquired by Valeant were considered "orphan drugs," which treat rare medical conditions.  Due to the small populations that these drugs service, orphan drugs face little to no competition, despite being past the point of protection from generics.  In addition, because of the small patient populations, such drugs represented smaller portions of hospital and

private payor budgets and drew less scrutiny.  As a result, Valeant saw such drugs as a prime opportunity to boost revenue by increasing prices.  While the higher prices could attract competition by generics, according to the Pharmaceutical Care Management Association ("PCMA"), generic drugs face a 42 – month backlog at the FDA for approval because the FDA prioritizes breakthrough therapies.  Valeant used this backlog to calculate the amount of time it could engage in price gouging to meet financial targets.[11]  For example, on December 26, 2014, Valeant's consultant reported that "FDA Average Review Time for ANDAs [Abbreviated New Drug Application, a form used for generics] is 36-48 months."  As noted below, Valeant used other deceptive tactics to further delay generic competition by reducing or eliminating negative publicity and regulatory scrutiny of its price increases.

69.     Valeant's strategy of acquiring products and dramatically increasing their prices to extraordinary levels is exemplified by its acquisition of Isuprel and Nitropress from Marathon.  In late 2014, Valeant began exploring the acquisition of Isuprel and Nitropress, which were heart medications used in emergency situations.  The drugs had been owned by Hospira and moderately priced for years.  Marathon acquired them and implemented significant price increases.  But Defendants were far bolder and still saw money left on the table.

70.     On December 3, 2014, Andrew Davis, Valeant's Senior VP for Business Development, emailed Laizer Kornwasser ("Kornwasser") that another "opportunity company is [M]arathon, value is largely derived from 2 hospital products they bought from Hospira which have no IP [intellectual property protections]."  Steve Sembler, the general manager of Neurology

---

[11]   For example, on July 20, 2015, Pearson asked his team for an update on the status of financial forecasts.  The next day, Brian Stolz ("Stolz"), senior VP for Neurology & Other, Dentistry and Generics responded that they were planning to, among other things, "Take additional price increase on Isuprel…"

responded that those two drugs "make up the VAST majority of revenue" at Marathon and "[t]his would also have to be a price play (if we determine there is upside to take price)…"

71.     Defendants worked with consultants from Marketing Medical Economics ("MME") to study the pricing of Nitropress and Isuprel.  In a presentation, MME noted that Hospira had priced Nitropress at $47 in 2013.  Marathon acquired the drug and increased the price to $214.  Similarly, MME noted that Hospira had priced Isuprel at $48 in 2013.  Marathon raised the price to over $200.  MME claimed there was still "upward potential for pricing" on these drugs, adding that for Nitropress "most patients treated are in critical condition."

72.     Defendants also worked with consultants from Pearson's former employer, McKinsey, as they considered the potential for dramatically increasing the prices of Isuprel and Nitropress.  On December 29, 2014, Aamir Malik, the co-leader of McKinsey's global Pharmaceuticals & Medical Products Practice, wrote an email to Pearson and Andrew Davis regarding those and other drugs stating that they "have material pricing potential."  McKinsey also noted that "Smaller/older products (*e.g.*, Isuprel and Nitropress) are not reviewed on formulary. . . . Products have been in the system for so long that reviews are practically rubber stamped."

73.     Valeant's analyses showed that generic competition would likely not come until mid-2017 with volume decreases each year following generic entry.  As soon as the drugs were acquired, Pearson, Schiller, Davis, and others held a meeting to discuss price.  Davis recommended a steep increase in price, but Pearson decided to raise prices even higher than recommended.

74.     As an example of how price increases could be used to provide a short term boost to profitability, Isuprel and Nitropress had total revenues of approximately $150 million in 2014.  However, Valeant forecast an increase to approximately $525 million for 2015 based on "Aggressive Pricing through consultant recommendation."  The increased revenue had nearly the

same impact on bottom line profitability because, as Valeant's Senior Director of Finance said in an email to Andrew Davis (Valeant's senior VP for Business Development) on March 24, 2015, the price assumptions "are leading to high gross margins (more than 99%)." By the end of 2015, Valeant recorded gross revenues from the sale of Isuprel and Nitropress of approximately $540 million against a cost of approximately $2 million.

75.   These practices were wide-spread. According to a Deutsche Bank Securities Inc. ("Deutsche Bank") analysis, in 2015 alone, Valeant raised prices on its brand-name drugs an average of 66%, approximately five times more than its closest industry peers. As another example of Valeant's strategic price gouging, 100 capsules of Syprine and 100 capsules of Cuprimine were priced at approximately $650 and $450, respectively, in May 2010. By July 2015, Valeant had raised the prices of Syprine to over $21,000 for 100 capsules (a more than 3,200% increase) and Cuprimine to over $26,000 for 100 capsules (a more than 5,800% increase), even though Valeant had spent little or no money on additional R&D relating to those medications. These products also had incredibly high margins as, for example, Valeant sold Cuprimine for approximately $240 in Brazil and $350 in Canada, roughly 1% of its price in the United States.[12]

76.   Additional examples where Valeant dramatically increased the prices of the drugs it acquired included (a) Glumetza, a diabetes drug which was increased from approximately $900 per 90 tablets to over $10,000 (a more than 1,100% increase); (b) Targetin, a T-cell lymphoma drug which was increased from approximately $1,800 per tube to over $30,000 (a more than 1,600% increase); (c) Carac Cream, a drug for precancerous legions which was increased from

---

[12]   Similarly, Syprine costs $1 a pill in some countries, but Valeant charged nearly $300,000 per year in the United States. *See* Bethany Mclean, *The Valeant Meltdown and Wall Street's Major Drug Problem*, VANITY FAIR, June 5, 2016.

approximately $230 to over $2,800 per tube (a more than 1,200% increase); (d) Wellbutrin XL, an anti-depressant, had eleven price increases during the Class Period as a one month supply of Wellbutrin XL cost approximately $1,400 while its generic counterpart costs just $30; and (e) Addyi, a recently FDA approved "Female Viagra" drug, was increased by 100% immediately following Valeant's acquisition of the drug from Sprout.

**Valeant's Deceptive Use of Patient Assistance**

77.     To reduce regulatory scrutiny, negative media, and pushback by patients and payors, Valeant concealed its price gouging by increasing patient assistance programs ("PAPs") so, unbeknownst to payors, complaining patients paid little or nothing for Valeant medications which had experienced dramatic price hikes.  Valeant increased its PAPs in order to waive or substantially reduce patient copays without full disclosure to payors that while they were paying more, patients were paying less.[13]  Valeant's total spend on PAPs increased by over 1,100% from 2012 to 2015, from $53 million to $600 million, respectively, with expectations for PAPs spending to reach over $1 billion in 2016.  In comparison, the Company's revenues increased by only 300%, in the same time period, from $3.5 billion in 2012 to $10.4 billion in 2015.

78.     While PAPs are intended to ensure that financially needy persons are not deprived of, in some cases, lifesaving medications, Valeant manipulated its patient assistance into another deceptive tactic to conceal its price gouging from the private payors it was fleecing.  While Valeant's increased financial assistance appeared to be increased support for patients needing financial aid, Valeant waived or reduced patient obligations for high-priced Valeant drugs to

---

[13]   OptumRx's 2015 Provider Manual "strictly prohibited" pharmacies from waiving patient cost-sharing amounts (*i.e.* copays).

reduce patient complaints, patient refusal to accept unnecessary refills or enrollment in automatic refill programs, and negative publicity.

79.     Given the federal anti-kickback laws prohibiting such practices involving government payors, Valeant targeted its PAP practices toward patients with private insurance. Engaging in such activities, however, left Valeant open to potential violations of state fraud and deceptive practice statutes and contract terms.  It also increased the risk that private insurers would apply extra scrutiny to Valeant or refuse to reimburse Valeant prescriptions.

80.     Mark Merritt ("Merritt"), President and CEO at the PCMA, which represents PBMs, explained to Congress at a hearing on Valeant that PBMs "encourage the use of generics and more affordable brand medications."  He noted that PBMs restrain drug costs by "using differential copays and other tools to encourage patients to choose more affordable options." Merritt explained that the pricing and marketing tactics by Valeant were designed to reduce "resistance to higher prices."  He testified that by providing copay coupons to encourage patients to bypass generic and cheaper drugs "for higher cost branded drugs," Valeant forced "the employer's unions and others to pay hundreds of thousands more for the most expensive brands on the formulary."  Merritt noted that "such practices are considered illegal kickbacks in federal programs."

81.     As Valeant dramatically increased drug prices, it directed patients into Valeant's controlled distribution channel and offered discounts as a means to quell any pushback on price increases.  Valeant developed a PR strategy to divert attention from any negative media regarding patient complaints over massive price increases by highlighting their purported increased PAPs.

82.     For example, an internal Valeant analysis reflected this strategy when it outlined the Company's "Orphan Drug Model" for Syprine, Cuprimine, and Demser.  The analysis stated

"Take initial 25% price increase to drive patients into the restricted distribution model," and noted that "[h]igh deductible copay requires increased foundation support."  The analysis "assume[d] target price increases of 100% for Demser and Cuprimine" and "price target increases of 500% for Syprine."

83.    Another internal Valeant presentation detailed the proposed launch of a new PAP called "Valeant Coverage Plus Program."  The presentation plainly stated that "[t]he program will be funded through planned price increases [*i.e.* funded by higher prices to payors rather than by Valeant]."  The analysis directed adjudicators to "[u]tilize all of patient resources prior to co-pay mitigation or foundation assistance" when adjudicating claims and to use a "[p]atient assistance program or free goods as last resort."  The presentation noted that Valeant had an opportunity to expand utilization "for niche brands" that "[i]nvolves a combination of alternative/restricted distribution model, advocacy support and patient assistance programs" along with "planned pricing actions expected to maximize overall returns."

84.    The presentation also identified the risks of such tactics (that were concealed from investors), including that "[s]ubstantial price actions could attract undue negative publicity from patients, HCP's, payors, and/or government agencies" and "Managed Care plan actions against products could limit/ restrict re-imbursement."  To address the risks, the presentation included a "PR Mitigation" plan to "Privately address concerns from patients, insurance companies or managed care providers to prevent public displays of negative sentiment" and "[m]inimize media coverage of the pricing increase."

85.    The presentation included a June 4, 2013 "PR Draft Communications Plan:  Orphan Drug Rate Increases," which noted that orphan drugs "often command a substantial premium in the market – to offer pharmaceutical companies a greater return on investment."  It explained that

1352297_1

"[w]hile the high cost of orphan drugs has been largely tolerated by the medical community because the overall impact of these pharmaceuticals on health budgets has been relatively small, there has recently been a renewed focus on the cost of these drugs." The presentation warned that the "press has also picked up on these trends" and Valeant's planned price increases on drugs to treat Wilson's disease "needs to be managed carefully."

86.     As part of the PAP and PR strategy, the presentation also encouraged false and misleading responses to inquiries about price increases. Notably, a draft Q&A directed that the response to the question of "Isn't Valeant just trying to make insurers and managed care providers pay as much as possible for these drugs?" was: "No. These rate increases are essential to ensure that Valeant is able to continue to offer these important pharmaceuticals to our patients who are afflicted with Wilson's disease while also remaining commercially viable." In truth, Valeant's costs of producing these drugs had not increased and the price increases, which resulted in gross margins exceeding 90%, were not required to keep Valeant commercially viable. Kornwasser essentially conceded the fact that Valeant was using price increases to chase outsized profit margins when he wrote a May 2014 email stating, "These patients are too valuable to lose."

87.     For example, Valeant employed its PR strategy on Berna Heyman, a patient who testified at the April 27, 2016 Senate Committee hearing as to her experience with Valeant and Wilson's disease. On November 1, 2013, Ms. Heyman wrote to Pearson that she was "outraged…by the unbelievably steep increases in prices charged for Syprine." She wrote "to ask for an explanation of how the drug costs could have increased so dramatically."

88.     On December 9, 2013, Valeant's customer service department responded (following the PR strategy) that "there are many challenges associated with developing treatments for rare conditions such as Wilson's disease, the investments we make to develop and distribute

novel medicines are only viable if there is a reasonable return on the company's investment and if our business is sustainable." This was dishonest and misleading because despite Valeant's massive price increase for Syprine, Valeant was not reinvesting in R&D to find better treatments for Wilson's disease.

89.    Thereafter, Valeant continued raising prices and Ms. Heyman's copay increased to over $10,000 per year with her insurance company paying $26,000 per year. Ms. Heyman could not afford the copay and was forced to use an alternative and, in her view, less desirable treatment. However, once Ms. Heyman took her complaints to the media, Valeant responded by offering her financial assistance, sending her flowers, and offering free medication for life, while continuing to charge the exorbitant prices to other patients.

90.    Pearson monitored such complaints. For example, in January 2015, Drew Katz ("Katz") wrote an email to Ackman complaining that "Valeant charges approximately $300,000 / yr for the average does [sic] needed for a patient with WD [Wilson's disease] (200X higher than Merck charged when it owned the drug. Merck did not raise its rates for … 20 years." Katz noted that "[w]e hear that healthcare providers are now beginning to deny coverage due to the cost of the drug. And those without coverage are in real trouble." Ackman forwarded the email to Pearson warning that "Drew is a very politically connected and influential person."

**Valeant's Clandestine Pharmacy Network**

91.    Valeant's price increases were more likely to draw scrutiny, refusal to pay, and generic substitution if routed through independent pharmacies. So Valeant created a secret network of specialty pharmacies, which included Philidor, to boost the sale prices of Valeant drugs and avoid the scrutiny and fallout from doing so.

- 32 -

92.     Valeant's specialty pharmacies reduced the likelihood of pushback or substitution of cheaper products by: (i) physicians: by simplifying administrative burdens associated with rejections or illegally altering prescriptions; (ii) patients: by filling prescriptions immediately regardless of insurance approval and by offering assistance to reduce or eliminate copays; (iii) independent pharmacies: by taking products out of that chain; and (iv) PBMs and payors: by concealing the close relationship between Valeant and its captive pharmacies, which, among other things, falsified paperwork to resubmit rejected claims.

93.     The genesis of Valeant's specialty pharmacy strategy was its acquisition of Scottsdale, Arizona based dermatology specialist Medicis for $2.6 billion at around the same time Philidor was formed.  Despite assuring the Medicis employees they would compete for jobs, after acquiring the company, Valeant terminated 750 of Medicis' 790 employees and sent their termination notices in black envelopes, described as being reminiscent of a funeral.  Medicis' former CEO Jonah Shacknai said he "was sickened by the deception."

94.     Medicis was primarily a dermatological company and about 40% of Medicis' sales came from an acne medication named Solodyn.  News articles reported that Solodyn sales had been sluggish and Medicis had attempted to increase sales through an AF channel.

95.     In Valeant's annual letter to shareholders that accompanied its annual report on Form 10-K for the year ended December 31, 2012 ("2012 10-K"), Pearson described the Company's bold strategic plan to increase sales from $3-$4 billion to $10-$20 billion.  The letter to shareholders also noted that "Valeant's combined commercial dermatology operations were relocated to Scottsdale, Arizona and now operate under the name Medicis, a division of Valeant."

96.     On January 3, 2013, the Company announced that it had hired Kornwasser as Executive Vice President/Company Group Chairman with responsibilities for U.S. Neurology,

managed care, and distribution.  Kornwasser had prior experience as a PBM executive with responsibility for "mail pharmacy products and strategy" and overseeing "programs that maximized the retail and mail channels."  Pearson noted that Kornwasser's experience and "understanding [of] the retail and mail channels" would be of benefit to Valeant.  Kornwasser and his direct report Gary Tanner ("Tanner") would be Valeant's main contacts for Philidor.

97.     Defendants did not disclose that, on January 2, 2013, Philidor was formed with an address in Horsham, Pennsylvania, approximately 30 miles outside Philadelphia.  From the outside, Philidor was made to appear to be an independent specialty pharmacy operated by Andrew Davenport ("A. Davenport"), established to file, ship, and get insurance approval for prescriptions. In reality, Valeant kept secret that it was Philidor's only client and Valeant employees had assisted in the formation and staffing of Philidor, with several eventually joining Philidor full time.  To conceal their identities while working at Philidor, Valeant employees used fake names such as Jack Reacher (a fictional character played by Tom Cruise in a movie based on a series of novels), Peter Parker (a/k/a Spiderman), and Brian Wilson (of the Beach Boys).

98.     Philidor also came to open offices in Arizona.  It entered into a Master Service and Pharmacy Dispensing Agreement with Valeant's Medicis division on January 11, 2013, almost immediately after its formation, to dispense products and provide call intake, prior authorization, delivery, and "[p]roduct refill services."  The agreement provided that the manufacturer (Valeant) had a right to inspect and audit Philidor to verify compliance with the agreement "and to assess and evaluate the operation of the program."  Ryan Weldon ("Weldon"), who later became the head of dermatology at Valeant, signed on behalf of Medicis.  Medicis' rights under the agreement were assigned to Valeant.

99.     Part of the Philidor/Medicis pharmacy agreement included the "Medicis Alternative Fulfillment Program," which required Philidor to "work with the retail pharmacy to transition the prescription over to [Philidor]" and if Philidor could not get the retail pharmacy to agree then it was to "call the physician's office for a new prescription as needed" and "contact the Consumer in an attempt to resolve any issues regarding the retail pharmacy withholding medication fulfillment."  The agreement also required Philidor to "*proactively* follow-up with customer[s] for covered Product refills." (Emphasis added.)  The agreement required Philidor to exclude any transaction identifying the payor "as any state or federally funded program."  The agreement made clear that "[i]f the insurance claim is adjudicated and a rejection code is received, it should be evaluated and reprocessed per written pharmacy SOP's [Standard Operating Procedures] as necessary."

100.    On July 27, 2013, Valeant entered into a "Distribution Services Agreement" with Philidor.  Weldon signed on behalf of Valeant and Tanner was listed as Valeant's contact.  This agreement provided that Philidor would indemnify Valeant "against any and all claims, liabilities, losses" that arose "directly or indirectly" out of the "acts or omissions of Philidor" including any "Fraud, intentional misconduct, or negligence of Philidor."

101.    On August 2, 2013, Valeant amended its pharmacy dispensing agreement with Philidor.  Such contracts required signature approval, and Pearson, Schiller, Weldon, and Carro all signed the approval.  The amendment provided that Philidor would administer Valeant's "co-pay assistance programs," and that "patient savings cards" would be used to "offset all or part of their out of pocket costs with respect to [Valeant's] various branded pharmaceutical products."

102.    Specialty pharmacies typically exist to handle complex drugs and end-of-life situations for patients in need of unique therapies or drugs that require refrigeration.  Importantly,

- 35 -

specialty pharmacies are exempt from reporting the drugs they sell to IMS Health, the tracking service used by companies and analysts to monitor drug sales and inventory channels.  Philidor and the specialty pharmacies that became part of its network did not operate in this typical sense of handling complex drugs that required special care; rather, they sold acne medication like Solodyn or drugs to treat toenail fungus like Jublia, while avoiding reporting to IMS.

103.    According to documents obtained and four former employees interviewed by *Reuters*, along with former Philidor employees interviewed by *The Wall Street Journal*, Valeant employees worked with the founders of Philidor to set up the business in 2013, worked at Philidor in its infancy, assisted in expanding its operations, and remained closely involved in running the pharmacy.

104.    More specifically, *Reuters* reported that A. Davenport had headed a marketing firm that did work for Medicis.  Bijal Patel ("Patel")[14] and Alison Pritchett ("Pritchett")[15] had been responsible for building relationships with specialty pharmacies for Medicis.  After Valeant's acquisition of Medicis, Patel, Pritchett, and Tanner, while working at Valeant, collaborated with A. Davenport to establish Philidor.  Tanner used the alias "Brian Wilson" and Patel used the alias "Peter Parker."

105.    According to former employees interviewed by *Reuters* and a Valeant spokeswoman interviewed by CNBC, Tanner was Valeant's liaison to Philidor.  Tanner traveled frequently between Philidor's offices in Pennsylvania and Arizona and Valeant's U.S.

---

[14]   Patel's LinkedIn page lists him as "Manager, Access Solutions" at Valeant since January 2013 (the same month Philidor was formed).

[15]   Pritchett's LinkedIn page lists her as having worked at Medicis from 2005 to 2012, then at Valeant until March 2014, then at Philidor as Vice President, Strategic Relationships from April 2014 until present.

headquarters in New Jersey and reported to Kornwasser (who in turn reported to Pearson). According to a former Philidor employee interviewed by *Reuters*, "Tanner had authority 'over all the people who worked at Valeant first and then came over to Philidor.'"  In August 2015, Tanner left Valeant to join Philidor and A. Davenport sent a memo to employees noting the close connection by stating that "[Tanner] has been our client liaison with Valeant since the very beginning in January 2013 and has made an immeasurable contribution to Philidor's success."

106.    Brad Greenfield ("Greenfield") also joined Valeant from Medicis and worked closely with Philidor.  Greenfield had been the Area Director for Dermatology sales at Medicis and was the Senior Director Marketing, Acne Division at Valeant's Scottsdale, Arizona office with responsibility for products such as Solodyn.  Greenfield also saw Philidor as part of the Valeant organization.  For example, Jeff Becker ("Becker") was the Operations Manager at Philidor starting in April 2015.  On Becker's LinkedIn profile, Greenfield provided a recommendation stating that he had "experience working with Jeff over the past 6 months" and that Becker "joined *our organization*, making an immediate impact by connecting with multiple layers of *our* staff and helping *our* Claims team…" (Emphasis added.)

107.    Despite Philidor effectively operating as a division of Valeant, careful steps were taken by Valeant to conceal the coordination and close ties between Valeant and Philidor from PBMs, payors, and physicians.  News outlets, including *Bloomberg* and *The Wall Street Journal*, which interviewed former Philidor employees, reported that the use of fake names by Valeant employees "was to conceal the ties so it didn't appear Valeant was using the pharmacy to steer patients to the drug company's products."  Pearson later claimed they concealed the relationship for "competitive" reasons.

108.    Valeant's ties to Philidor went beyond personnel.  On December 15, 2014, Valeant richly rewarded Philidor's owners with a "Purchase Option Agreement" wherein it paid $100 million for the option to acquire Philidor for $0 for 10 years, plus various milestone payments based on Philidor's sales.  The first milestone payment of $33 million was paid on January 15, 2015.  The remaining milestone payments were tied to Philidor hitting sales targets.  Valeant's little known subsidiary, KGA was used to obtain the option to acquire Philidor.  Notably, the agreement provided that Philidor was to enter into a purchase agreement with Isolani and Lucena (discussed below) as a condition to the acquisition and stated that Philidor's business "ha[d] been conducted in the Ordinary Course of Business" since December 31, 2013.

109.    The Philidor purchase agreement also gave Valeant, through KGA, the right to form a joint steering committee to "assess and discuss" matters relating to legal compliance and Philidor's "internal policies, manuals and processes," including amending existing policies or establishing new ones.  Significantly, it documented Valeant's right to "make the final determination" regarding all matters with respect to "the Strategic Plan of Philidor" and "the compliance of [Philidor] with applicable Legal Requirements, Contractual obligations (including agreements with Third Party Payors) and the Company's internal policies and manuals" in the case of any tie of the joint steering committee members.  The agreement provided for meetings and reviews of Philidor's strategic plan and compliance matters, including Philidor's policies and manuals.  The joint steering committee also had "the right to review, prior to their submission, all applications of the Company for licenses and permits (including state pharmacy licenses)."

110.    On December 15, 2014, Valeant and Philidor entered into a distribution and services agreement that superseded the original Medicis services agreement of January 11, 2013. In the new agreement, Philidor represented it would "operate in full compliance with all licenses

and permits required by Laws and all contracts with participating insurance companies and Third Party Payors." The agreement gave Valeant the right to inspect Philidor's policies and procedures and do site visits to verify such compliance. Kellen signed on behalf of Valeant with A. Davenport again signing for Philidor. Products covered by the agreement included, among others, Elidel, Jublia, and Solodyn.

111.    Philidor sold many other Valeant drugs as well. For example, when Valeant acquired Sprout in October 2015, it chose to rely on Philidor to distribute Sprout's flagship product, Addyi, and cancelled Sprout's existing distribution agreement with Cardinal Health.

**Philidor's Efforts to Deceive Payors**

112.    Philidor's owners included Matthew Davenport ("M. Davenport"), A. Davenport, and Greg Blaszczynski ("Blaszczynski"), all of whom had worked at BQ6, a marketing firm that consulted for Valeant and shared a Pennsylvania address with Philidor.

113.    Through these individuals, and with the aid of Valeant, Philidor formed a network of specialty pharmacies in order to distribute Valeant's products throughout the United States. Included within the Philidor network of pharmacies that distributed Valeant drugs were: Cambria Pharmacy, West Wilshire Pharmacy, R&O, SafeRx Pharmacy, Orbit Pharmacy, D&A Pharmacy, Prescriptions Shoppe, Heritage Compounding Pharmacy, and Parkwest Pharmacy. The multitude of pharmacies were designed to obscure Valeant's close ties to Philidor and draw less scrutiny to the deceptive business practices by creating the appearance that many independent pharmacies were distributing (without complaint) Valeant's (high priced) products.

114.    Philidor provided false information to state licensing bodies and independent pharmacies in expanding its corrupt network to cover the entire United States. For example, Philidor was not licensed in California, the nation's largest pharmaceutical market, and in August

2013, Philidor requested a permit.  The application was submitted by M. Davenport, who certified "under penalty of perjury the truthfulness of all statements, answers, and representations in the application."  According to published reports, less than 1% of such applications are denied.

115.    However, in May 2014, the California Board of Pharmacy denied Philidor's application after finding that Philidor made "false statements of fact with the intent to substantially benefit itself or others on its application for licensure," including false statements regarding the true ownership of Philidor.

116.    Undeterred by the denial, Philidor found an indirect and deceptive way to operate in California.  R&O had a California license and was owned and operated by pharmacist Russell Reitz ("Reitz").  Reitz put R&O up for sale in late 2014 and Isolani stepped in to buy it.  Reitz agreed to sell 10% of R&O to Isolani for $350,000, with an agreement to sell the remaining 90% when Isolani got its permit from the pharmacy board.  In the meantime, Isolani secured the right to take on profits and losses pursuant to a management agreement.

117.    Even before the R&O-Isolani agreement was executed, Philidor began using R&O's NPI number without permission.  Reitz discovered that some prescriptions using R&O's NPI were being filled by Philidor outside of California.  When Reitz complained of the practice, Philidor employees, including A. Davenport, began communicating with Reitz directly, and acknowledged Philidor's practice.  A. Davenport said they had stopped using R&O's NPI number and "[w]hile we remain comfortable with the practice, we halted activity pending coming to some alignment with you."  Reitz later uncovered this was not true.

118.    Reitz was not told of the link between Valeant and Philidor.  As Reitz began to discover fraudulent practices, he began withholding millions of dollars of prescription reimbursements for Valeant drugs, rather than turning the funds over to Isolani/Philidor.  This

- 40 -

prompted Valeant's General Counsel, Robert Chai-Onn ("Chai-Onn"), to send a letter "reflecting gross invoiced amounts due of $69,861,343.08" and demanding "immediate payment" to avoid "further damage to Valeant and other parties."  R&O responded by filing a lawsuit in October 2015 against Valeant stating that R&O had no relationship with Valeant and that either they were both the victims of fraud or Valeant was conspiring with others to defraud R&O.

119.   R&O was not Philidor's only pawn.  In September 2014, another Philidor affiliate, Lucena, took a 10% stake in a California pharmacy named West Wilshire Pharmacy.[16]   In paperwork filed with the California State Board of Pharmacy, Sherri Leon ("Leon") was listed as Lucena's CEO, Blaszczynski was listed as a member of Lucena, and Fleming was listed as a director of Lucena.  The paperwork did not disclose that Leon was Philidor's Director of Pharmacy Operations, that Blaszczynski was an owner of Philidor, or that Fleming was the controller at Philidor.  Also, Leon attested that she had not been associated with any person or corporation that had a professional license denied, even though Philidor's application had been denied in California.

120.   In 2015, Philidor took control of Orbit Pharmacy, Inc., an independent pharmacy based in Houston, Texas.  Following the acquisition, Orbit used the Horsham, Pennsylvania address shared by BQ6 and Philidor as its address.  Philidor gained control of Orbit Pharmacy through Back Rank,[17] whose president was Fleming, the controller at Philidor.

---

[16]   Defendants were clearly aware of Philidor's use of affiliated entities because, among other reasons, Valeant's $100 million purchase agreement with Philidor provided that Philidor was to enter into a purchase agreement with Lucena and Isolani as a condition to the acquisition.

[17]   Back Rank used "philidorrxservices.com" as its email address, Philidor's Hatboro, Pennsylvania address as its address, and Gretchen S. Wisehart ("Wisehart"), Philidor's general counsel, was Back Rank's general counsel.

- 41 -

121.    The Texas State Board of Pharmacy asked Orbit if any of its owners or partners had been the subject of a professional disciplinary action, including license denial.  Although Philidor had its license denied in California, the pharmacy said "no."  Leon also checked "no" in response to a question about whether Lucena was a subsidiary.

122.    The chart below illustrates just a few of the associations in the Philidor network:



123.    On or about June 10, 2015, in response to a violation warning from the Texas State Board of Pharmacy, Orbit belatedly disclosed the change in ownership.  Orbit was also warned of a failure to maintain and document completion of training and for its lack of written policy and procedure manuals.  On June 29, 2015, Rhoshona Carroll, the pharmacist-in-charge ("PIC") of Orbit, sent a response, noting that "Corporate headquarters is currently putting the last of the

paperwork together."  Notably, Ms. Carroll used a Philidor email address, which further reflects that the pharmacies used common policies.

124.    Philidor engaged in a host of deceptive practices to increase reimbursement of Valeant products.  A department within Philidor was set up to receive prescriptions from doctors. It was responsible for shipping drugs so patients got them even before health insurance coverage was in place.

125.    A separate department at Philidor, the adjudication department, existed to seek insurance coverage for Valeant drugs.  The adjudication department at Philidor committed some of its most egregious acts while under the direction of Valeant and/or its employees and/or due to the reckless indifference of Valeant, and in furtherance of Defendants' fraudulent scheme and deceptive course of business.  Philidor documented many of these deceptive practices in a training manual entitled the "Adjudication Reference Binder," and other materials.  Philidor's improper tactics included:

- **Altering NPI Numbers**:  This fraudulent tactic involved representing that a prescription filled by Philidor was filled by a different pharmacy.  By utilizing a different pharmacy's NPI number – such as R&O, Orbit Pharmacy, or West Wilshire, Philidor was able to hide its involvement and ensure reimbursement from insurers for Valeant drugs that it otherwise could not have secured.  This tactic was described by former Philidor employees interviewed by *The Wall Street Journal* and *Bloomberg*.  It was also contained in Philidor's employee training manual which provided, "We have a couple of different 'back door' approaches to receive payment from the insurance company" where they "will not pay us for medication."  The manual added:

  > You will run across several insurances that we are not contracted with. . . [In that case,] submit the NPI for our partner in California, West Wilshire Pharmacy.  There is a good chance they are contracted.  [If denied, the next step is to] add the Cambria Central Fill insurance and run that as the primary. . .  They should get a paid claim and then Cambria, another one of our partners, will reimburse us.

- 43 -

- **Operating a Pharmacy Without a License**:  Philidor used its network of pharmacies, or simply their NPIs, to fill prescriptions and obtain reimbursements in states where Philidor was not licensed, including California.  Philidor also shipped Valeant drugs to states where neither Philidor nor the pharmacy associated with the NPI were licensed.

- **Altering Prescriptions**:  Typically, a pharmacist may substitute a cheaper generic alternative for a branded prescription medication when available.  The prescribing doctor, however, may state that the prescription be "dispensed as written" ("DAW") prohibiting generic substitution.  Philidor clandestinely altered prescriptions for Valeant products to include a "DAW" indication without the consent of the prescribing physician or the patient, making it appear as though the physician or patient desired Valeant's expensive branded drug, rather than the cheaper alternative.  *Bloomberg* has reported that an "undated Philidor document . . . provides a step-by-step guide on how to proceed when a prescription for Valeant dermatological cream and gels, including Retin-A Micro and Vanos is rejected.  Similar instructions for changing the DAW indication are supplied for patients who are paying in cash."   *Bloomberg* reported that ex-employees of Philidor confirmed prescriptions were altered as the document instructs and said the intent was to fill more prescriptions with Valeant products than generics.

- **Misrepresenting Drug Prices**:  Philidor's employees were instructed to manipulate the "usual and customary price"[18] of prescription drugs when adjudicating claims in an attempt to secure insurance payment for high-priced Valeant drugs, which was accomplished by lowering the purported usual and customary price until the insurer's system accepted the claim.  Rather than accept payment at that price, Philidor employees were trained to raise the price again in order to pinpoint a plan's maximum allowable price.  For example, an internal Philidor PowerPoint titled "Program Drug-Cost Exceeds Maximum Error," which was used to train Philidor employees, instructed employees to request that the insurance company representative provide the maximum reimbursement amount and if the representative did not do so to manipulate the process by "drop[ping] down by $500 until paid and then increase by $100 to get as close as possible to the max amount allowed by the insurance company."  In addition, Valeant employees Patel and Tanner were copied on a November 2014 email that included an attachment explaining how Philidor employees could bill the highest amount an insurance company was willing to pay by resubmitting rejected claims at different price points.

---

[18]   The usual and customary price represents the price the pharmacy would charge a cash-paying customer without insurance.

- **Misrepresenting Drug Quantities**:  Using this tactic, if a claim for reimbursement was rejected by the insurer Philidor employees would also re-submit the claim with a lower quantity of drugs so the price would be lower in order to secure insurance approval.  The employee would then compensate for the lower quantity by increasing the number of prescription refills in order to secure the maximum reimbursement.

- **Waiving Copays**:  This tactic involved waiving copays through patient assistance programs or making no reasonable effort to collect applicable copayment amounts from patients.  Philidor's training manual instructed employees that Philidor had set up "numerous house insurances that will bring [patient] copay[s] down."  Philidor employed zero copay practices to increase sales by removing incentives for patients to use much cheaper generics.

- **Automatically Refilling Prescriptions**:  This tactic reportedly involved, for example, "enlisting patients in an unadvertised 'auto-refill' subscription program that automatically delivered more toenail-fungus remover [Jublia] and charged them ongoing co-pays to do it."[19]

126.    Several former Philidor employees interviewed by *The Wall Street Journal*, *Bloomberg Businessweek*, and *Reuters* confirmed use of the practices in the employee manual, such as resubmitting rejected claims with lower prices, using alternative NPIs, or altering prescriptions to ensure that Valeant products, rather than generics, would be provided.  Patel, while employed at Valeant, sent regular emails to Philidor employees detailing how many prescriptions Philidor was filling, which drugs were most popular and what doctors were the biggest prescribers.  These tactics helped Valeant obtain high-priced reimbursements that would otherwise have been denied for products like Solodyn, which cost approximately $1,100 for a one month supply, about 2 1/2 times more than generic versions.

127.    Had Valeant not concealed its relationship with Philidor, and had Philidor not spread its prescriptions across the broad network of captive pharmacies, payors would have taken

---

[19]    Stephen Witt, *Valeant Pharmaceuticals' Novel Business Approach Made It a Wall Street Darling – Then a Pariah*, N.Y. MAG., Jan. 13, 2016.  The article further explained that "[g]etting unsubscribed from this program was, according to patient complaints, almost impossible."

notice of Philidor's high volume of claims for Valeant and the high prices which would have resulted in additional audits or claim rejections.  PBMs have agreements that govern participation in the pharmacy networks.   For example, Express Scripts' 2014 Network Provider Manual provides for termination if the participating pharmacy failed to inform the PBM of any change in the pharmacy's ownership or control, failed to notify the PBM of any changes or additions to the pharmacy's locations, failed to maintain appropriate licensing, or submitted any fraudulent information in support of a prescription drug claim.  Similarly, OptumRx's 2014 Pharmacy Manual provided a partial list of violations that could result in "immediate termination from the [PBM] Network," including using "dummy" NPIs to obtain a paid response and billing for a brand with DAW when the prescriber had not so specified.  OptumRx's 2015 Provider Manual stated that "[a]lteration of the U&C [usual and customary] price to attempt to increase Claim payment without a true change to the cash price being offered to the general public will be considered non-compliance and a violation of the agreement."  It also prohibited pharmacies from entering quantities other than those reflected in the prescription and entering into a captive pharmacy relationship with a manufacturer without PBM consent.

128.    The practices employed by Valeant and Philidor to conceal the relationship and falsify claims information would have violated such provisions.  In fact, in September 2014, OptumRx (then one of Philidor's largest revenue sources) sent a cease and desist letter to Philidor citing a breach of contract and began rejecting claims.  Thereafter, according to former employees interviewed by *Reuters*, Philidor devoted special training sessions on how to bill OptumRx by deceptively using alternate pharmacies' NPI numbers.  Eventually, OptumRx traced some of these orders back to Philidor and in 2015 issued cease and desist letters to West Wilshire and R&O also barred them from doing business with OptumRx.

- 46 -

**The R&O Lawsuit**

129.    In mid-2015, Reitz raised serious concerns about Isolani and Philidor.  Among other things, Isolani had not received its pharmacy permit, which was a condition of the sale agreement between R&O and Isolani.  Reitz was also concerned that a large volume of prescription drug sales were being processed with R&O's NPI and a significant portion of those sales were in states where R&O was not licensed to operate, for drugs R&O had never dispensed, and filled by a pharmacy Reitz did not own.  Reitz found out that Philidor had been using R&O's NPI even before the sale agreement with Isolani was executed in 2014.  When R&O was audited by an insurance company, Reitz refused to sign the audit, but then learned later that it was signed by Rice (the sole member of Isolani who also worked at Philidor).  Given all this, Reitz stopped paying Isolani and Philidor for drugs sold by R&O.

130.    On July 14, 2015, Reitz wrote an email to Rice to address "the issue of Philidor's improper, and perhaps illegal, use of my [pharmacy] number without my knowledge or consent to bill for prescriptions that were" either filled by other pharmacies or billed before the execution of the agreement to purchase R&O.  Reitz demanded that they stop the practices immediately.  Reitz added that the agreement required Philidor/Isolani to apply for a permit and that "this process does not take 7 months" and asked for all documents relating to the application and noted he had already asked for this information from Dean Griffin.

131.    On July 19, 2015, A. Davenport wrote an email to Reitz sating that Philidor stopped using R&O's NPI number and "halted activity pending coming to some alignment with you."  The next day, Reitz wrote back asking why "Philidor is responding to my concerns instead of Eric Rice" who executed the agreement on behalf of Isolani.  Reitz further stated that he learned that Rice signed off on the "Argus-Humana audit, the same audit I refused to sign," and "Eric Rice is

- 47 -

not the PIC [pharmacist-in-charge] (I am) and has never stepped through R&O's doors.  I am not sure how he could verify the accuracy of anything pertaining to that audit."

132.    On July 21, 2015, Rice and several Philidor executives, including A. Davenport, Fleming, and Wisehart, flew to California to meet Reitz at R&O.  The meeting did not satisfy R&O's concerns, and the next day counsel for R&O sent a letter to Rice noting that they "appear[ed] to be engaging in a widespread fraud."

133.    On August 18, 2015, Fleming sent an email to Reitz suggesting responses to an audit.  One of the issues identified in the audit was the large number of prescriptions being filled by R&O that were shipped to patients from Pennsylvania (where Philidor was located).

134.    On August 31, 2015, counsel for R&O sent a notice of termination to Duane Morris LLP, counsel for Isolani.  R&O's counsel wrote that "[i]t is now crystal clear that Isolani/Philidor fraudulently induced Mr. Reitz to sign the [Sale, Management Services, and related] Agreements in order to allow Isolani/Philidor to engage in a massive fraud."  R&O's counsel added that "Isolani is simply a shell created by Philidor to perpetrate a massive fraud against not only Mr. Reitz and R&O, but also the California State Board of Pharmacy, [and] various payer networks…"  R&O's counsel continued by noting that Philidor had been denied a California license and "targeted Mr. Reitz and R&O back in the fall of 2014 because it needed access to R&O's valuable multi-state pharmacy licenses and payer contracts" and "Philidor then created Isolani as the instrumentality to improperly use R&O's NCPDP and NPI numbers to distribute pharmaceuticals in jurisdictions that Philidor would not have had access to but for R&O."  Counsel added that "Mr. Reitz's worst fears have been realized, as he has obtained irrefutable proof that despite Mr. Davenport's written assurance, Isolani/Philidor continue to use R&O's . . . NPI numbers to bill payors for prescriptions dispensed by Philidor."  Counsel also asserted that "Mr. Reitz now has concrete evidence that

- 48 -

representatives of Isolani/Philidor have signed false and misleading payer audits and falsely represented themselves as officers or employees of R&O…to certain payors."

135.   Valeant was closely monitoring the situation, as evidenced by Chai-Onn, who wrote a letter to Reitz stating that as of August 31, 2015 R&O owed Valeant $69,861,343.08.  Chai-Onn added that "Valeant is contacting you so that you may take the requisite steps to ensure immediate payment and avoid further damage to Valeant and other parties" and threatened to take "any and all actions to ensure" payment including seeking damages and attorney's fees.

136.   On September 6, 2015, Heather Guerena, an attorney at Duane Morris LLP, and counsel to Isolani, sent an email to counsel for R&O informing him that they were seeking a protective order against Reitz and for an accounting.  Counsel for R&O responded that Isolani had known for "at least six weeks that Mr. Reitz was in receipt of checks paid to his company to protect himself and his company from the massive potential / actual civil, regulatory and even potential criminal liability that your clients have exposed him to due to their malfeasance," adding that the conduct was outlined in prior correspondence "to which your clients have provided no denials."

137.   R&O stated it never received a previous invoice from Valeant for any amount and that either Valeant and R&O are "victims of a massive fraud perpetuated by third parties" or that "Valeant is conspiring with other persons or entities to perpetuate a massive fraud against R&O and others."  Valeant eventually reached a confidential settlement with R&O.

**Valeant's Use of Philidor to Book Fictitious Sales**

138.   Prior to Valeant's $100 million payment to Philidor, Valeant's senior management and members of the board of directors, including the entire Audit Committee, went on site visits to Philidor, during which time Valeant was provided further access and exposure to Philidor's business practices and operations.  After the payment, Valeant intentionally avoided disclosing its

relationship with Philidor in its financial statements.  Defendants concealed from investors, as well as, physicians, patients, private payors, and PBMs the $100 million payment, Valeant's controlling relationship and that Philidor's financials were being consolidated into Valeant's.

139.   In addition, Valeant used the hidden relationship to inflate its revenues.  The Defendants knew that, at a minimum, after the formal consolidation of Philidor was completed Valeant was prohibited from recording revenue for shipping products to Philidor, because that was akin to shipping products to itself.  Instead, Valeant would have to wait until Philidor shipped the products to patients.  Therefore, before the agreement was signed in December 2014, Valeant shipped millions of dollars of products to Philidor to inflate revenue.  This manipulative practice was a clear violation of GAAP.  Nevertheless, Schiller, Carro, Ingram, the Audit Committee, the Finance and Transactions Committee, and the entire board of directors approved the accounting relating to Philidor.

140.   Ingram, during a subsequent conference call on October 26, 2015 in which Provencio, Melas-Kyriazi, Stevenson, Schiller, Pearson, Carro, Rosiello, and Kellen participated, admitted that the Audit Committee of the Board and the full board had approved the Company's (improper) accounting for Philidor.  Slides accompanying the call stated that the "Finance and Transactions Committee, Audit and Risk Committee and [the] Full Board reviewed the transaction" and "[t]he appropriate accounting treatment was determined by management and reviewed with the Audit and Risk Committee."[20]

---

[20]   At the time, the Company's Audit and Risk Committee was made up of Provencio, Melas-Kyriazi, and Stevenson.  The Company's Finance and Transactions Committee, which was dissolved on March 8, 2015, consisted of Melas-Kyriazi, Goggins, Lönner, Provencio, Stevenson, and Ubben.

- 50 -

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS
## DURING THE CLASS PERIOD

141.     Philidor was formed as a Delaware limited liability company on January 2, 2013.

The Class Period begins two days later, on January 4, 2013.  The Exchange Act Defendants' false

and misleading statements alleged below were material and caused Valeant securities to trade at

artificially inflated prices during the Class Period.  The Exchange Act Defendants' false statements

had the inflationary effect of increasing, maintaining, or preventing a decrease in the price of

Valeant securities during the Class Period.

**January to June 2013 False and Misleading Statements**

142.     <u>On January 4, 2013</u>, Pearson and Schiller hosted a conference call with investors

and analysts to discuss Valeant's 2013 financial guidance.  Pearson and Schiller made several

statements concerning Valeant's business model, financial prospects, and the benefits of its new

AF initiative.  Specifically:

      (a)     Pearson said:

> 2012 was another very strong year for Valeant.  From a top line perspective we
> added over $1 billion in revenue in 2012 . . . . On the bottom line, we delivered cash
> EPS growth of greater than 50% as compared to 2011, ***demonstrating once again***
> ***the sustainability of our business model***.[21]

> Our businesses continued to deliver strong organic growth, and we expect full year
> 2012 to have same-store sales, organic growth of approximately 8%, and pro forma
> organic growth of approximately 10%.

      (b)     When asked about pricing for Solodyn, a dermatological product acquired

in the Medicis transaction, Pearson responded:

---

[21]   Emphasis is added to the particular statement alleged to be false and misleading, but the
statements must be considered in the context in which they were given and would be understood
by investors.

Sure. *In terms of Solodyn, we're not assuming we're making any kind of major price increases in terms of the end consumer. Through the AF [alternative fulfillment] programs, it will allow us our sort of average price internally to go up, because of the way that system works.*

      (c)     Pearson also discussed the expansion of Valeant's AF initiative, stating:

Yes, the more we understand about it the more excited we get about it, *quite frankly because it's not just a singular sort of initiative that there's a whole evolution being planned in terms of the Stage I, Stage II, Stage III.   And there's some exciting opportunities there that we're not going to give specifics of.  And also as we had hoped, we think it will apply to more than just Solodyn. Ziana is actually also being – already Medicis has Ziana being used in the AF program, and we see application for a number of our dermatology products and potentially neurology products in the US*.

      (d)     When asked what percentage of Solodyn revenue would go through the AF initiative, Pearson replied it would increase because there was "evidence" AF was working, stating:

Well the last question, it's much – it will be much closer to 50% than 10%, that's for sure.  And yes, what we – *the AF, if it all works out, will both help eliminate or get rid of non-revenue producing or non-profitable scripts, but hopefully can be used to start generating truly profitable scripts through a different channel. That's the intent, and we're seeing evidence that that will work.*

      (e)     Later in the call, one analyst asked Pearson "why are you so encouraged by the AF strategy when net sales have been heading in the wrong direction for the one case study we can observe, Solodyn?"  In response, Pearson said the AF channel had "incentives" in place to get paid for drugs that were being rejected by retail pharmacies stating:

And again, Medicis is still learning and we're just still learning about what we can do with these AF scripts.  So when someone actually makes the call or sends the script to the alternate channel, what can be done with that.  And a number of things can be done.  One is you can continue to try to adjudicate the claim just because the claim was or *just because the script was rejected at retail pharmacy, does not mean that eventually you can't get the payer to actually pay for it*.  If you think about the retail pharmacist, the retail pharmacist doesn't have a huge incentive to work hard to get that script reimbursed.  In fact you might argue they have the opposite incentive, because they get paid more if they convert it to a generic.

- 52 -

*So, all of a sudden if it goes to a different channel where the incentives are in place to actually try to get that claim adjudicated, then – so there's a significant amount of that volume that gets rejected by retail that you can then adjudicate, and actually get fully paid.*

\*          \*          \*

So, I think through as we continue to learn about this *AF program, there are some things that we can do that might actually change the direction in terms of so rather than see a decline in Solodyn, if we're really successful we can begin starting to grow that product again.* So it's things like that that sort of start giving us some real optimism in terms of what you can do, *and how this program can sort of turn out to a much better case than assuming you didn't have the AF program.*

143.    <u>On February 28, 2013</u>, the Company issued a release and hosted a nationwide conference call reporting Valeant's 2012 financial results.  Pearson and Schiller attended on behalf of the Company.   During the call, Pearson and Schiller again touted the purported benefits of their AF strategy without disclosing the improper practices and risks.

(a)    In response to a question about the AF strategy, Pearson said:

*The program is working actually quite well.  We are going to be rolling out a couple new generations of the program but we're not going to talk about it on this call.*  And we are, obviously, looking at other products that could run through this system.  Currently, it's just Ziana and Solodyn.  But certainly, probably by mid year, there will be a number of other products that we will be using alternate fulfillment as well.

(b)    When pressed for details on the "Medicis alternate fulfillment channel" and "how that sort of contributes to the growth," Pearson said it had increased sales volumes but refused to disclose the improper practices and risks, stating:

*We have never given details.  Medicis never gave details.  And that was probably a smart practice.  We are not going to give details in terms of what's flowing through full alternate fulfillment and what's not.  What we can reiterate is that all of our key brands in dermatology since our sales force meeting are now growing.*

144.    <u>On May 3, 2013</u>, the Company filed its quarterly report on Form 10-Q for the period ended March 31, 2013 ("1Q13 10-Q").  The 1Q13 10-Q was signed by Pearson and Schiller and

represented that management's disclosure controls and procedures were effective: "Our management, with the participation of our CEO and Chief Financial Officer ('CFO'), *has evaluated the effectiveness of our disclosure controls and procedures as of March 31, 2013. Based on this evaluation, our CEO and CFO concluded that our disclosure controls and procedures were effective as of March 31, 2013*" (hereafter, "Internal Controls Statement").

145. The 1Q13 10-Q included Sarbanes Oxley Certifications signed by both Pearson and Schiller pursuant to Rules 13a-14(a) of the Exchange Act, which stated, among other things, that the 1Q13 10-Q did not contain any untrue statement of material fact or omit to state a material fact (hereafter, the "SOX Certifications"). Specifically, the SOX Certifications stated:

**Exhibit 31.1**

**CERTIFICATION OF THE CHIEF EXECUTIVE OFFICER**
**PURSUANT TO RULE 13a-14(a)**
**AS ADOPTED PURSUANT TO**
**SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, J. Michael Pearson, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Valeant Pharmaceuticals International, Inc. (the "Company");

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report;

4.  The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Company and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.  Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.  Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the Company's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5.  The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent functions):

    a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

    b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

Date: May 3, 2013
**/s/ J. MICHAEL PEARSON**
_____

146.   The 1Q13 10-Q represented that "***pricing and sales volume of certain of our products . . . are distributed by third parties, over which we have no or limited control***" while concealing that Valeant controlled and had significant influence over Philidor.

- 55 -

147.   <u>On June 11, 2013</u>, Schiller presented at the Goldman Sachs Healthcare Conference. Schiller was asked about the Company's "alternative fulfillment program" by a Goldman Sachs analyst.  Schiller responded that it was increasing profits and that AF was a trend in "the whole pharmaceutical industry," stating:

> Alternative fulfillment, I think a couple things.  One is, to me, ***the alternative fulfillments was an example of what the whole pharmaceutical industry – certainly what Mike and I believe is the trend, and that is the focus on the profitable scripts***.  There was a day when you could call on anybody, and almost any script was profitable.  Those days are gone.  ***So segmenting your customer base and really focusing on profitability*** has got to be the future*.  **And that's – alternative fulfillment was the beginning of that journey, but not the endpoint***.
>
> So I probably think under Medicis, ***alternative fulfillment*** was held out a little bit too much as the holy grail.  I really think it's – it's actually the starting points, and in some ways, it was quite a clumsy starting point.  It wasn't that different, but ***it's a process where we have generation two and generation three.  But it's all trying to focus on profitable scripts, and stay away from those scripts that are unprofitable, and more judicious use of co-pay cards and the rest, and making sure when a customer, a patient is covered, you get reimbursed for it. . . . Yes, I think – I'm hoping – we've got generation two and generation three, which I'm hoping sort of turn it into a pure defense, into more of an offensive tool to allow us to grow profits.  And that's really the focus, is growing profits***.

148.   The statements in ¶¶142-147 above were false and misleading when made.  The true facts, which were then known to or recklessly disregarded by Defendants, were:

(a)     that Philidor had been formed with the assistance and for the benefit of Valeant to increase the sales prices of Valeant products and to subvert the substitution of Valeant products with competitors' drugs, Valeant employees worked at Philidor, Valeant could close Philidor by severing ties as Valeant was its only client, and these facts were being concealed by Valeant from private payors, patients, physicians, PBMs, and investors;

(b)     the "incentives" were in place in the AF channel to get rejected claims paid because of Valeant's clandestine and controlling relationship with Philidor;

(c)     that Valeant's purportedly "sustainable" business strategy consisted of, and a material source of the touted growth in revenues and sales of its key dermatology products resulted from, using deceptive practices of:  (i) price increases which were far beyond industry norms and Defendants knew were unsustainable; (ii) routing patients into its clandestine network of pharmacies that were falsely made to appear independent; (iii) using patient assistance and PR strategies to minimize patient complaints; and (iv) concealing Valeant's deceptive practices from payors in order to obtain reimbursement for drugs that would not be reimbursed or not reimbursed at similarly high prices if such practices were known to private payors, patients, physicians, and PBMs;

(d)     that Valeant's business risks had materially increased as a result of the deceptive practices in subparagraph (c) above and exposed the Company to increased risks of regulatory sanctions, increased costs of investigations, reputational harm, contractual violations, decreased sales, and increased scrutiny, nonpayment, and substitution of Valeant products by PBMs, private payors, and physicians if such practices became known, which is the true reason Defendants refused to discuss the specifics;

(e)     that the way the AF "system works" to make the "average price internally go up" and get claims "rejected by retail" pharmacies "fully paid" was through the deceptive practices set forth in subparagraph (c) above which carried the increased risks set forth in subparagraph (d) above;

(f)     that the Company's reported revenues, earnings per share ("EPS"), and profitability as well as its future business prospects were dependent on Valeant's ability to continue and conceal the deceptive practices in subparagraph (c) above and because of the undisclosed risks

- 57 -

in subparagraph (d) above did not accurately portray Valeant's financial performance and business prospects; and

(g)     that Valeant lacked adequate internal controls, compliance and training programs which resulted in an "improper tone at the top" with the Defendants prioritizing increasing Valeant's stock price over ensuring that Valeant and its clandestine network of pharmacies complied with applicable laws, regulations, contracts, and ensured that its SEC filings and public disclosures were free of material misstatements, as set forth in ¶¶340-354.

**July 2013 through January 2014 False and Misleading Statements**

149.     On July 29, 2013, the Company filed a Form 8-K with the SEC that attached a memorandum to employees of Valeant and Bausch & Lomb[22] and a copy of the anticipated organizational chart of the combined company upon closing of the merger.  The memorandum purported to describe Valeant's "Organizational Design and Philosophy" by stating:

> ***In the end, our primary mission is to serve the patients and consumers who use our products, the physicians who prescribe / recommend them and the customers who provide retail outlets for these products.  Healthcare companies are held by society to the highest possible ethical standard – and they should be. Adhering to this extremely high ethical bar supersedes any financial or other objective****.*

> *      *      *

> Consistent with our decentralized operating philosophy, our corporate center will be small, lean and focused on three things:

> 1.     ***Ensuring adequate controls to protect our shareholders and to ensure we are in compliance with all regulatory requirements****.*

150.     On August 7, 2013, Pearson and Schiller held a conference call with analysts to discuss Valeant's second quarter 2013 ("2Q13") financial results.  During the call Pearson was

---

[22]   On May 27, 2013, the Company announced it had entered into a definitive agreement under which Valeant would acquire Bausch & Lomb for $8.7 billion in cash.  On August 6, 2013, the Company announced completion of the acquisition.

asked whether the Company would need to adopt "more of a mainstream strategy" to "become one of the world's largest healthcare companies."  In response, Pearson continued to defend Valeant's purportedly superior non-traditional acquisitions strategy, stating, in part:

> I don't – I think we would plan to have our same model.  *We think we can be successful by not doing what large pharma companies are doing, and that's been our strategy, that will continue to be our strategy.  And so we're not looking to get into the traditional –* we're not going to go – therapeutic areas are largely driven by R&D in terms of why people organize that way, *and we don't plan to spend – increase our R&D spend as a percent of sales to what other companies are doing.  And we'll continue to focus on both specialty segments* and attractive geographic markets.

151.   Pearson further assured investors that there were no increased compliance risks to accompany Valeant's non-traditional strategy, stating:

> *In terms of compliance, compliance is obviously very, very important for us.*  And has to be for every pharmaceutical company.  And actually I was – I just got the employee survey that we send out every year.  And we have a huge response rate, well over 50%, and even higher in the emerging markets.  When people come back and they rate our Company on our most positive attributes and our most negative attributes, and at the very top of the list of the positive is ethical.  So our employees really do appreciate it.  *That's our most important thing that – that comes before everything.*

152.   Also on August 7, 2013, the Company filed its quarterly report on Form 10-Q for the second quarter ended June 30, 2013 ("2Q13 10-Q"), signed by Pearson and Schiller.  The 2Q13 10-Q represented that "*pricing and sales volume of certain of our products . . . are distributed by third parties, over which we have no or limited control*" while concealing that Valeant controlled and had significant influence over Philidor.  The 2Q13 contained the same Internal Controls Statement and SOX Certifications as set forth in the 1Q13 10-Q at ¶¶144-145.

153.   On October 31, 2013, the Company issued a release reporting its 2013 third quarter ("3Q13") financial results.  The release again emphasized Valeant's incredibly rapid growth, stating that "Valeant's Developed Markets revenue was $1.14 billion, up 77% as compared to the

third quarter of 2012" and that "*[t]he growth in the Developed Markets was driven by continued improvement in many of our Dermatology prescription brands*, our aesthetics and oral health portfolios, *our orphan drug products* and CeraVe."

154.    <u>On November 1, 2013</u>, the Company filed its quarterly report on Form 10-Q for its 3Q13 ended September 30, 2013 ("3Q13 10-Q"), signed by Pearson and Schiller.  The 3Q13 10-Q represented that "*pricing and sales volume of certain of our products . . . are distributed by third parties, over which we have no or limited control*" while concealing that Valeant controlled and had significant influence over Philidor.  The 3Q13 contained the same Internal Controls Statement and SOX Certifications, as set forth in the prior financial statements at ¶¶144-145.

155.    <u>On January 7, 2014</u>, Pearson and Schiller hosted a financial guidance conference call with investors and analysts.  During the call, Pearson emphasized the Company's growth in sales volume was the result of its business strategy, stating:

> If we compare Valeant's performance in 2013 to the company's average performance from 2009 through 2012, you can see a continuing track record of consistent strong performance in terms of growth in revenues, earnings, and most important, returns to all of you, our shareholders.  *This is a result of achieving strong organic growth in a fiscally responsible manner for the products that we already own,* coupled with a consistent track record of buying durable assets in a very disciplined manner and over-achieving in terms of improving growth rates and extracting cost synergies.

156.    Also on January 7, 2014, Pearson took part in the Goldman Sachs Healthcare CEOs Unscripted:  A View from the Top Conference.  When asked about the Company's dermatology business and Valeant's AF program Pearson continued to conceal the practices, stating:

> *The AF program* was I think rolled out a little bit too quickly and there were lots of bugs in it and *we have a next generation that we're going to – which we are implementing, which we aren't going to talk about the details of,* but net-net I think Solodyn, it's a lot less important to us now than when we – than it was to Medicis obviously.

- 60 -

157.    The statements in ¶¶149-156 above were false and misleading when made.  The true facts, which were then known to or recklessly disregarded by Defendants, were:

(a)    that Philidor had been formed with the assistance and for the benefit of Valeant to increase the sales prices of Valeant products and to subvert the substitution of Valeant products with competitors' drugs, Valeant employees worked at Philidor, Valeant could close Philidor by severing ties as Valeant was its only client, and that these facts were being concealed by Valeant from private payors, patients, physicians, PBMs, and investors;

(b)    that Valeant's business strategy consisted of, and a material source of its growth in revenue and sales of its key dermatology products resulted from, using deceptive practices of:  (i) price increases which were far beyond industry norms and Defendants knew were unsustainable (for example, doubling the price of Syprine on July 12, 2013, doubling it again on August 2, 2013, and doubling it yet again on August 30, 2013, for a total increase of 700% from $1,500 to $10,500); (ii) routing patients into its clandestine network of pharmacies that were falsely made to appear independent; (iii) using patient assistance and PR strategies to minimize patient complaints; and (iv) concealing these practices from payors in order to obtain reimbursement for drugs that would not be reimbursed or not reimbursed at similarly high prices if such practices were known to private payors, patients, physicians, and PBMs;

(c)    that by "not doing what large pharma companies are doing" and focusing on R&D and instead using the AF strategy, Valeant's business risks had materially increased as a result of the concealed practices in subparagraph (b) above which exposed the Company to increased risks of regulatory sanctions, increased costs of investigations, reputational harm, contractual violations, decreased sales, and increased scrutiny, nonpayment, and substitution of Valeant products by PBMs, private payors, and physicians if such practices became known;

(d)     that the Company's reported revenues, EPS, and profitability as well as its future business prospects were dependent on Valeant's ability to continue and conceal the deceptive practices in subparagraph (b) above and because of the undisclosed risks in subparagraph (c) above did not accurately portray Valeant's financial performance and business prospects;

(e)     that the Company's growth and ability to service its debt were substantially dependent on acquiring companies and drug portfolios in which it could engage in price gouging and the deceptive practices in subparagraph (b) above and any slow-down or cessation of such acquisitions would have a material adverse effect on the Company's business, cash flows, and results of operations; and

(f)     that adhering to the "extremely high ethical bar" did not "supersede[] any financial" objective and "compliance" did not "come[] before everything," because contrary to Defendants' claims, Valeant lacked adequate internal controls, compliance and training programs which resulted in having an "improper tone at the top" in which senior management and directors prioritized increasing Valeant's stock price over ensuring that Valeant and its clandestine network of pharmacies complied with applicable laws, regulations, contracts, and ensured that its SEC filings and public disclosures were free of material misstatements, as set forth in ¶¶340-354.

**February to June 2014 False and Misleading Statements**

158.     <u>On February 27, 2014</u>, the Company issued a release detailing its 2013 financial results.  The release noted that the source of growth was increased volume of dermatology sales, stating:

> Valeant's Developed Markets revenue was $1.6 billion, up 122% as compared to the fourth quarter of 2012.  This increase was primarily led by the acquisition of Bausch + Lomb, which was completed on August 5, 2013.  Same store organic product sales growth was 13%, excluding the impact of the genericization of the Zovirax franchise, Retin-A Micro and BenzaClin.  ***The growth in the Developed Markets was driven by continued growth in certain dermatology prescription***

- 62 -

**brands**, *our aesthetics, consumer, neurology and other and oral health portfolios*, and our Canadian business unit.

159.     Also on February 27, 2014, Pearson and Schiller hosted a conference call with investors and analysts to discuss Valeant's 4Q13 and FY 2013 financial results.  When discussing Valeant's growth in "neurology and other," Pearson stated, "***When we acquired Medicis, I think we mentioned that we picked up a couple of orphan drugs, which they weren't marketing optimally.  And so we have been able to take advantage of that and grow those products.***"

160.     <u>On February 28, 2014</u>, the Company filed its annual report on Form 10-K for the year ended December 31, 2013 ("2013 10-K").  The 2013 10-K was signed by Pearson and Schiller.  The 2013 10-K stated that the Company faced significant competition from generic pharmaceutical products without disclosing the deceptive steps Valeant took to prevent substitution of its products.  It included statements that:

(a)     addressed generic competition stating, "Generic versions are generally significantly less expensive than branded versions, and, where available, may be required in preference to the branded version under third party reimbursement programs, or substituted by pharmacies," and claiming "***[t]o successfully compete for business with managed care and pharmacy benefits management organizations, we must often demonstrate that our products offer not only medical benefits but also cost advantages as compared with other forms of care***";

(b)     addressed Variable Interest Entities ("VIE"), which are defined in GAAP as a legal entity that is subject to consolidation.  Although, Philidor was a VIE under GAAP (*infra* ¶¶332-339), in its 2013 10-K, Valeant explicitly stated that Valeant did not hold any interests in VIEs:  "[*t*]***here were no material arrangements determined to be variable interest entities***"; and

(c)     included Management's Conclusion, signed by Pearson and Schiller, "***that our internal control over financial reporting was effective as of December 31, 2013***."  The 2013

- 63 -

10-K also included the same Internal Controls Statement and SOX Certifications, as set forth in the prior financial statements at ¶¶144-145.

161.    The 2013 10-K included numerous statements regarding the Company's purportedly lower risk business strategy.  For example, the 2013 10-K stated:

> ***The growth of our business is further augmented through our lower risk research and development model. This model allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense.*** This is achieved primarily as follows:
>
> - focusing our efforts on niche therapeutic areas such as eye health, dermatology and podiatry, aesthetics, and dentistry, including life-cycle management programs for currently marketed products; and
>
> - acquiring dossiers and registrations for branded generic products, which require limited manufacturing start-up and development activities.

162.    The 2013 10-K represented that "***pricing and sales volume of certain of our products. . . are distributed by third parties, over which we have no or limited control***," while failing to disclose that Valeant controlled and had significant influence over Philidor.

163.    On April 22, 2014, the Company issued a release stating that "it ha[d] submitted a merger proposal to the Board of Directors of Allergan under which each Allergan share would be exchanged for $48.30 in cash and 0.83 shares of Valeant common stock."  In total, this unsolicited offer to acquire Allergan, the maker of Botox (a popular anti-wrinkle treatment), was valued at approximately $46 billion.  The release disclosed that the proposal was made with the full support of Ackman and Pershing Square, which had rapidly accumulated 9.7% of Allergan's outstanding stock leading up to the proposed acquisition, making it Allergan's single largest shareholder.

164.    On May 8, 2014, the Company issued a release announcing Valeant's first quarter 2014 ("1Q14") financial results.  The release reported on Valeant's continued trend of extraordinary growth, including revenue growth which represented "an increase of 77% over the prior year," which "[e]xceeded our expectations," along with "[p]ositive organic growth in the

U.S. . . . ."  The release quoted Pearson as stating, in part, "*[o]ur first quarter results demonstrate the strong, durable nature of our diversified business model*."

165.    That same day, Pearson and Schiller hosted an earnings conference call with investors and analysts to discuss its 1Q14 results.  When asked about the Company's dermatology products and whether "you're doing [anything] differently, in terms of how you're marketing them . . . [o]r improving the gross to nets on those products," Pearson responded, in relevant part:

> I think the other thing is – that *we've worked on is a much more sophisticated alternate fulfillment system that we've implemented the US, which is really helping.*  Those scripts don't show up in IMS, in terms of what's doing*, but we're very pleased that Solodyn is now growing.  And we've applied that to a number of our other products, which is also helping in terms of the growth*.

166.    <u>On May 9, 2014</u>, the Company filed its quarterly report on Form 10-Q for the first quarter ended March 31, 2014 ("1Q14 10-Q").  The 1Q14 10-Q was signed by Pearson and Schiller.  In addition to confirming the financial results announced in the Company's May 8, 2014 earnings release, the 1Q14 10-Q included:

(a)    numerous statements regarding the Company's purportedly lower risk business strategy, for example:

> *The growth of our business is further augmented through our lower risk research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense*.

(b)    the same Internal Controls Statement and SOX Certifications signed by Pearson and Schiller, as set forth in ¶¶144-145.

167.    The 1Q14 10-Q represented that "*pricing and sales volume of certain of our products . . . are distributed by third parties, over which we have no or limited control*" while concealing that Valeant controlled and had significant influence over Philidor.

168.     On May 12, 2014, Allergan issued a release formally rejecting Valeant's unsolicited bid, and stating its board of directors "believes that the Valeant business model is not sustainable." During a conference call on the same day, David E.I. Pyott ("Pyott") (Allergan's Chairman and CEO) referred to "the unsustainability of Valeant's business model," emphasized Valeant's lack of organic growth, and cautioned investors to "very carefully" check the results "actually achieved" by Valeant's new product launches and "dig in what are the price increases behind those very low [organic growth] numbers because there are some eye-popping increases of price."

169.     On May 20, 2014, Valeant issued a release announcing that it would be hosting an investor meeting and webcast on May 28, 2014, "*to respond to assertions Allergan has made that the Valeant model is not sustainable*."   The release continued:  "Our goal for this meeting is *to provide transparency into Valeant's historic, current, and future operating performance and to refute Allergan's allegations through a thoughtful and fact-based presentation*."

170.     On May 27, 2014, Allergan filed a Form 8-K with the SEC.  Allergan attached a slide presentation entitled "Certain Potential Business Risks and Issues With Valeant Pharmaceuticals International, Inc.," which expressed concern about "Valeant's low organic sales growth (driven mostly by price increases)".  It asserted that much of Valeant's growth was attributable to "unsustainable price increases – not volume."  The presentation also noted Valeant's "depleted R&D engine" and questioned its "roll-up" business model and "Significant Management Turnover."

171.     On May 28, 2014, Valeant issued a release announcing it had substantially increased its merger proposal for Allergan by raising the cash consideration and making the total consideration approximately $49 billion.  That same day, the Company hosted its previously

announced investor meeting and conference call attended by Pearson, Schiller, and Jorn.  During the conference call, they refuted Allergan's claims:

      (a)      Pearson said they would provide investors with "***a much deeper understanding of our operating model and why we believe it is sustainable for many years to come***" and show that "***when we buy a platform asset, we have either maintained the growth or in most cases, we have accelerated the growth***";

      (b)      Jorn emphasized the launch of "***additional access programs so that patients can get the medicines that their physician prescribes for them***";

      (c)      Jorn reiterated "***that in 2014 we have returned the business to growth"*** and highlighted the growth of dermatology products, including Solodyn and Acanya stating:[23]

> We have stabilized, focused and energized the sales force.  We are launching several new brands which I will talk about.  ***We have returned many of our core promoted brands to growth***.  We have new managed care capabilities, ***we have launched additional access programs so that patients can get the medicines that their physician prescribes for them***.
>
>        \*       \*       \*
>
> So what type of growth are we talking about?  ***It is important that we recognize that we have been able in 2014 to turn around our largest brand, Solodyn***.  We entered the year with 49% share, branded  share of the dermatology space.  We are now up at 51% and as you can see, our competitors have issues.  Doryx has been declining and Monodox is flat. We are very proud of this accomplishment.
>
> Further, ***we continue to maintain greater than 80% share of the branded Clindamycin/BPO market with our brand, Acanya.***  Despite loss in some major accounts in managed care, we have been able to achieve this;

---

[23]   Solodyn and Acanya are prescription medications used to treat acne that were sold through Philidor.

(d)     Pearson concluded the presentation portion of the investor meeting by claiming Valeant "*has delivered strong organic growth since I have been here*" and "[*w*]*e are very transparent*" and "*our basic underlying growth rate is about 8%*"; and

(e)     During the question and answer session, Pearson was asked to reconcile industry data showing 15% price increases with slides used during the presentation showing a 1% increase.  Pearson claimed Valeant was **"*limited*"** to "**9%**" price increases in dermatology and denied all Allergan's claims stating:

> So I think most external sources talk about gross prices which have nothing to do with net pricing through managed care contracts, etc., etc.  *We are limited.  For example in the US with our managed care contracts, I think the maximum price increase we can take a year is 9% across dermatology, across ophthalmology, etc.  So that is what limits. It is managed care in the United States*.
>
> *         *         *
>
> I think we showed that when *we went through the 10 points that Allergan asserted* which was based on just looking at conventional sources and *it is just not applicable to the way we run our business.  And I would argue it would be less and less applicable to most pharma companies because the role of specialty pharmacies, the role of managed care is changing the landscape in terms of what you can look at*.

172.    Also on May 28, 2014, Pearson participated in the Sanford C. Bernstein Strategic Decisions Conference on behalf of the Company.  Pearson was asked several questions during the conference about price, volume, and the sufficiency of Valeant's disclosures.

(a)     With regard to price and volume, Pearson stated:

> The only country in the world that you can really sustainably increase pricing is the United States.  *And in the United States, you're governed by managed care contracts.  And the managed care contract – the highest price increase we could take under any managed care contract we have in the US is 9% a year*.
>
> *So, we have a lot of constraints, just like other pharma companies do, in terms of pricing.  So, we focus on volume growth, and the vast majority of our growth on a global basis – and we went through some of that this morning – is volume*.

- 68 -

(b)      In response to why Valeant did not provide more detailed disclosures on product sales, Pearson responded, "***We're more like a generics company in terms of the amount of revenue we get per product***," adding "[it] just makes no sense" to make such disclosures; and

(c)      Pearson was also asked if others were copying Valeant's business model and said they were transparent in what they were doing but it was hard to execute claiming:  "***as Howard [Schiller] always says, it's not a very easy model to replicate.  It's very simple.  We tell you exactly what we're doing.  But it's very hard.  It requires working really, really hard, sweating the details every day***."

173.   <u>On June 17, 2014,</u> Pearson and Schiller hosted a conference call "***to refute recent misleading assertions made by Allergan***."  Defendants made the following statements:

(a)      During his opening remarks, Pearson emphasized that Valeant's "***business is strong***" and "***[Valeant's] operating model is both durable and sustainable***," stating, in part:

> I am pleased to update all of you that our business is continuing to perform well.  I find it very odd that Allergan continues to suggest that our Q2 and in particular our Q3 results will demonstrate weakness….  ***In short, our business is strong and I can assure you our operating model is both durable and sustainable***.

> In Allergan's investor presentation dated June 10, 2014, they asserted that Valeant has experienced volume decreases in 11 of its top 15 worldwide pharmaceutical products.

> First, the products listed in the presentation are not Valeant's top 15 products by revenue. Only 6 of the products listed are in Valeant's top 15 products.  ***The presentation also claimed that most of our products are not growing, when in fact, 13 of our top 15 products are growing and 9 of the top 15 are growing by volume, not just price***.

> *        *        *

> We expect to go through each and every one of the other mischaracterizations later this week and will post the facts to our website;

(b)     Pearson continued to respond to assertions regarding Valeant's organic growth and price increases later in the call:

> We have been and we've been doing things the right way and that's going to come to light.  So I think that's – so while there's some opportunity cost, on the flip side, people are really going to see how well our business, our underlying business is doing.  I think that's a really good thing.
>
> *         *         *
>
> I think the other thing we will probably start doing again is price volume.  ***People – a lot of assertions are that it's all about price, but it's not***.  If you think about first of all, most geographies in the world you can't raise price.  You're just not allowed to and – in terms of pharmaceutical products.  And also given our mix, we have about 25% of our products are OTC, and there's limited price increase there.  About 25% are devices, things like contact lenses where we're not raising price.
>
> So I think what we're talking about earlier this morning is ***probably we will report what the volume and price parts of our organic growth are.  And I suspect it will be surprising to people because I think volume is a much larger piece of our organic growth than most people would assume it is***; and

(c)     Pearson further stated during the June 17, 2014 conference call that "[o]ur sales force in dermatology now has been stable for a few quarters and . . . ***all our promoted products in dermatology are growing***."

174.     The statements in ¶¶158-173 above were false and misleading when made.  The true facts, which were then known to or recklessly disregarded by Defendants, were:

(a)     that Philidor had been formed with the assistance and for the benefit of Valeant to increase the sales prices of Valeant products and to subvert the substitution of Valeant products with competitors' drugs, Valeant employees worked at Philidor, Valeant could close Philidor by severing ties as Valeant was its only client, and that rather than providing "transparency" and telling investors "exactly" what Valeant was doing these facts were being concealed by Valeant from private payors, patients, physicians, PBMs, and investors;

(b)     that Valeant's business strategy consisted of, and a material source of its growth, including its organic growth, in revenues and sales of its key dermatology, neurology and other products resulted from, using deceptive practices of:  (i) price increases which were far beyond industry norms and Defendants knew were unsustainable (for example, increasing the price of Cuprimine on February 28, 2014 and again on May 30, 2014 for a total increase of 60%); (ii) routing patients into its clandestine network of pharmacies that were falsely made to appear independent; (iii) using patient assistance and PR strategies to minimize patient complaints rather than obtaining a higher "self-pay component" from patients; and (iv) concealing these practices from payors in order to obtain reimbursement for drugs that would not be reimbursed or not reimbursed at similarly high prices if such practices were known to private payors, patients, physicians, and PBMs;

(c)     that Valeant was neither "like a generics company in terms of the amount of revenue we get per product," limited "just like other pharma companies" on pricing, nor "limited" to 9% price increases, but rather Valeant's growth was substantially driven by and dependent upon price increases far exceeding industry norms;

(d)     Valeant's business model and pricing strategy was not sustainable and Valeant was not competing by demonstrating the "cost advantages" of its products, as Defendants were deceiving payors into paying massive price increases without justification as Valeant had not increased spending on R&D to improve the affected medications;

(e)     that Valeant's business risks had materially increased as a result of the concealed practices in subparagraph (b) above which exposed the Company to increased risks of regulatory sanctions, increased costs of investigations, reputational harm, contractual violations,

decreased sales, and increased scrutiny, nonpayment, and substitution of Valeant products by PBMs, private payors, and physicians if such practices became known;

(f)      that the Company's reported revenues, EPS, and profitability as well as its future business prospects were dependent on Valeant's ability to continue and conceal the deceptive practices in subparagraph (b) above and because of the undisclosed risks in subparagraph (e) above did not accurately portray Valeant's financial performance and business prospects;

(g)      that the Company's growth and ability to service its debt were dependent on acquiring companies and drug portfolios in which it could engage in price gouging and the deceptive practices in subparagraph (b) above and any slow-down or cessation of such acquisitions would have a material adverse effect on the Company's business, cash flows, and results of operations;

(h)      that Valeant was not employing a "lower risk research and development model," but rather employing a strategy that subjected Valeant to the increased risks set forth in subparagraph (e) above;

(i)      that Valeant's "much more sophisticated alternate fulfillment system that we've implemented in the US" that was "really helping" and driving sales growth, was predicated on the deceptive practices described in subparagraph (b) above and carried the undisclosed risks set forth in subparagraph (e) above;

(j)      that the "additional access programs so that patients can get the medicines that their physician prescribes for them" were neither designed to make prices more affordable nor to get patients the medicines their doctors prescribed, but were used to force patients into Valeant's controlled distribution channel and reroute prescriptions away from retail pharmacies and/or alter

- 72 -

physician orders to ensure that prescriptions for their branded products, rather than the generic alternatives, would be filled and reimbursed;

(k)    that rather than being like "most pharma companies" with respect to specialty pharmacies, Defendants had a close and effectively controlling relationship with Philidor and its network;

(l)    that Valeant lacked adequate internal controls, compliance and training programs which resulted in an "improper tone at the top" with the Defendants prioritizing increasing Valeant's stock price over ensuring that Valeant and its clandestine network of pharmacies complied with applicable laws, regulations, contracts, and ensured that its SEC filings and public disclosures were free of material misstatements, as set forth in ¶¶340-354; and

(m)    that in violation of GAAP, the 2013 10-K and 1Q14 10-Q failed to disclose Philidor as a VIE as set forth in ¶¶332-339.

**July 2014 to January 2015 False and Misleading Statements**

175.    <u>On July 18, 2014</u>, the Company issued a release announcing it had filed an investor presentation with the SEC that would be used in meetings with Allergan's institutional investors and proxy advisors.   The presentation, entitled "Investor Presentation Regarding the Allergan Special Meeting Process," included "Valeant Operating Principles," stated as:

- ***Put patients and our customers first by maintaining the highest ethical standards in the industry***

- ***Select high-growth business segments*** (therapeutic areas and geographies) ***where the healthcare professional is still the primary decision maker***

*       *       *

- ***Ensure tight controls and rigorous compliance standards*** while avoiding overspending[.]

- 73 -

176.   <u>On July 31, 2014</u>, the Company issued a release announcing its second quarter 2014 ("2Q14") financial results.  The release reported "2014 Second Quarter Total Revenue [of] $2.0 billion; an increase of 86% over the prior year."  It quoted Pearson as stating "***Valeant once again delivered strong quarterly results and, as expected, organic growth has accelerated from the first quarter***.  As we look across the entire business, I have never been more confident about the growth trajectory across the entire company."

177.   That same day the Company hosted a conference call to discuss its 2Q14 financial results.  Pearson and Schiller attended on behalf of the Company.  During his opening remarks, Pearson stated, in part:

> ***Turning to medical dermatology***. . . The business has now stabilized, with a new management team.  ***And the branded market share has increased across all key Medicis products since the beginning of 2014.  This includes Solodyn, Ziana, and Zyclara***.
>
> \*        \*        \*
>
> Moving to our performance by business.  I would like to touch on the growth and performance of our developed market operations, excluding the Bausch & Lomb businesses.  ***In the US, dermatology grew approximately 7% in the quarter,*** including the headwinds from generics***, driven by the continued growth of Acanya, Targretin, and Elidel***.
>
> \*        \*        \*
>
> ***Given the strong reception from both physicians and patients of our recently launched products Jublia***, Ultra, and Luzu, each of them has exceeded our expectations.  As I mentioned, ***after only three weeks of being available, last week's script demand for Jublia exceeded over 1,300 scripts.  This trend is expected to accelerate, as*** regulatory approval for marketing materials are received and ***our dermatology sales forces is appropriately trained***.

178.   Later in the call, a Deutsche Bank analyst asked a "question on the alternative fulfillment initiatives" and whether Defendants could "just give us a sense of how much volume tends to run through that channel".  In response, Pearson stated:

- 74 -

> *We're not going to give specifics.  It's – we think it's a competitive advantage that we have.*  And it is still primarily the Medicis products, although not exclusively the Medicis products.  *And – but I don't want to give specific numbers, but it is a very successful initiative*.

179.   <u>On August 1, 2014</u>, the Company filed its quarterly report on Form 10-Q for 2Q14 ("2Q14 10-Q"), signed by Pearson and Schiller.  The 2Q14 10-Q contained the same Internal Controls Statement and SOX Certifications, set forth in ¶¶144-145.  The 2Q14 10-Q included a statement regarding the Company's purportedly lower risk business strategy, stating:

> *The growth of our business is further augmented through our lower risk research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense.*

180.   The 2Q14 10-Q represented that "*pricing and sales volume of certain of our products . . . are distributed by third parties, over which we have no or limited control*" while concealing that Valeant controlled and had significant influence over Philidor.

181.   <u>On August 19, 2014</u>, the Company filed with the SEC a "[c]larification on assertions made about Valeant's business," which purported to respond to statements made by Allergan in its August 5, 2014 release and in an August 15, 2014 *Financial Times* article.  Among other things, Valeant stated that the Company's "*Promoted Pharmaceutical brands (i.e., Dermatology*, Dental) *are growing from a combination of price and volume*" and that "*[w]e have no knowledge of any exposures or issues other than those disclosed or for which reserves have been established*."

182.   <u>On September 11, 2014</u>, the Company filed with the SEC a letter sent by Pearson to Valeant's employees, which included reference to Allergan's "attack[s] [o]n our business" and "our business model and our track record of organic growth."  In the letter, Pearson responded that "[h]ighlights across Valeant's businesses include":

- 75 -

- *return to growth of our U.S. Prescription Dermatology business,* including the Obagi Medical business**, *coupled with the early, but exciting launch successes of Jublia and Luzu***

  \*       \*       \*

- *continued tremendous growth in our U.S. Neuro & Other and OraPharma businesses*

183.   <u>On October 20, 2014</u>, the Company issued a release announcing its third quarter 2014 ("3Q14") financial results.  The release reported, in relevant part: ***"Total Revenue [of] $2.1 billion . . . GAAP EPS [of] $0.81, [and] Cash EPS $2.11."***  The release also reported ***net income of $275.4*** million.  The release further reported that "***[t]otal same store sales organic growth was 19%,*** including impact from generics."

184.   The same day, Pearson, Schiller, and Kellen hosted a conference call to discuss Valeant's 3Q14 financial results.   In his opening remarks, Pearson emphasized improved marketing and increased dermatology sales as the source of Valeant's earnings growth stating, in part:

> *Revenues for our dermatology business,* including the recent Precision acquisition***, grew 33% quarter over quarter.  The turnaround of our dermatology business is continuing.  New leadership has brought stability to the sales force and has led to innovative new marketing approaches that are working well.  This has resulted in market share and revenue gains across the portfolio, including launch products***.
>
> *Elidel, Acanya, Zyclara, and Ziana have all gained market share since the beginning of 2014. Elidel has had an exceptional year, increasing market share from 45% to 52%*. And it has overtaken Protopic as the leader in this category.
>
> *After years of declines Solodyn market share has stabilized.  On the new products side, both Jublia and Luzu quickly gained share, with Jublia reaching 7% script share of the total onychomycosis market, both branded and generics.  And Luzu accelerated its script share to 13% of the branded topical antifungal market.  In addition, quarter-over-quarter result growth for all of our dermatology promoted brands was over 40%.*

185.   <u>On October 20, 2014</u>, Allergan filed a response to Valeant's 3Q14 financial results with the SEC and Valeant in turn filed a document entitled "October 20th rebuttal items." In the document, Valeant rebutted Allergan's assertion that "price is a large drive[r] of growth for select Valeant U.S. pharmaceutical businesses" by stating, in part:

- ***Overall price/volume for the Valeant business was ~50% volume and ~50% price.***

- ***Like all PhRMA*** [Pharmaceutical Research and Manufacturers of America] ***companies, including Allergan, our managed care contracts restrict our price increases each year, and many of our managed care contracts restrict price increases to less than 10% net price increase per year.***

  - ***Gross price increases could be seen as higher but do not contribute to our reported net sales growth.***

186.   <u>On October 24, 2014</u>, the Company filed its quarterly report on Form 10-Q for the third quarter ended September 30, 2014 ("3Q14 10-Q"). The 3Q14 10-Q was signed by Pearson and Schiller. The 3Q14 10-Q reported ***3Q14 revenue of $2.056 billion, net income of $275.4 million, and GAAP EPS of $0.81*** and included a statement regarding the Company's purportedly lower risk business strategy, stating:

> ***The growth of our business is further augmented through our lower risk research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense.*** We believe this strategy will allow us to maximize both the growth rate and profitability of the Company and to enhance shareholder value.

187.   The 3Q14 10-Q represented that "***pricing and sales volume of certain of our products . . . are distributed by third parties, over which we have no or limited control***" while concealing that Valeant controlled and had significant influence over Philidor.

188.   The 3Q14 10-Q also included the same Internal Controls Statement and SOX Certifications signed by Pearson and Schiller as set forth in ¶¶144-145.

189.   <u>On January 8, 2015</u>, the Company hosted a guidance call to discuss its expected 2015 financial performance and strategic initiatives for the year.  Pearson, Schiller, and Kellen attended on behalf of the Company.  During the call, Pearson stated, in relevant part:

> ***We demonstrated tremendous organic growth improvement in 2014*** . . .
>
> \*       \*       \*
>
> In conclusion, ***all the successes from 2014*** and our [process] for 2015 and beyond ***continue to validate that Valeant's business model is both sustainable and value creating.  Our robust organic growth profile is evidenced by our ability to deliver double-digit organic growth, not only in 2014*** and 2015 but strong organic growth for the foreseeable future.

190.   The statements in ¶¶175-189 above were false and misleading when made.  The true facts, which were then known to or recklessly disregarded by Defendants, were:

(a)   that Philidor had been formed with the assistance and for the benefit of Valeant to increase the sales prices of Valeant products and to subvert the substitution of Valeant products with competitors' drugs, Valeant employees worked at Philidor, in December 2014, Valeant paid Philidor's owners $100 million for the right to acquire Philidor for $0, was consolidating Philidor's results as its own, and had obtained explicit rights to direct Philidor activities, and these facts were being concealed from private payors, patients, physicians, PBMs, and investors;

(b)   that Valeant's business strategy was not based on focusing on areas where doctors were "the primary decision maker" for medications but consisted of, and a material source of its  growth in revenues and sales of its key dermatology, neurology and other products resulted from, using deceptive practices of:  (i) price gouging which Defendants knew was unsustainable and far beyond industry norms, (for example, increasing the price of Syprine and Cuprimine by 50% on July 18, 2014); (ii) routing patients into its clandestine network of pharmacies that were

falsely made to appear independent; (iii) using patient assistance and PR strategies to minimize patient complaints; and (iv) concealing these practices from payors in order to obtain reimbursement for drugs that would not be reimbursed or not reimbursed at similarly high prices if such practices were known to private payors, patients, physicians, and PBMs;

(c)     that Valeant's business risks had materially increased as a result of the concealed practices in subparagraph (b) above, which exposed the Company to increased risks of regulatory sanctions, increased costs of investigations, reputational harm, contractual violations, decreased sales, and increased scrutiny, nonpayment, and substitution of Valeant products by PBMs, private payors, and physicians if such practices became known;

(d)     that the Company's reported revenues, EPS, and profitability as well as its future business prospects were dependent on Valeant's ability to continue and conceal the deceptive practices in subparagraph (b) above and because of the undisclosed risks in subparagraph (c) above did not accurately portray Valeant's financial performance and business prospects;

(e)     that the Company's growth and ability to service its debt were dependent on acquiring companies and drug portfolios in which it could engage in price gouging and the deceptive practices in subparagraph (b) above and any slow-down or cessation of such acquisitions would have a material adverse effect on the Company's business, cash flows, and results of operations;

(f)     that the source of Valeant's growth, including its organic growth and the growth of dermatology prescription products Solodyn, Ziana, Zyclara, Elidel, and Jublia, was not the improved marketing, business strategies, and increased sales volume of certain products, but was the result of the deceptive practices described in subparagraph (b) above;

(g)   that Allergan's claims were not "unjustified" as Valeant's business strategy relied upon extraordinary price increases which were not capped at 10% but were far beyond industry norms which carried the undisclosed risks detailed in subparagraph (c) above and were unsustainable due to practices described in subparagraph (b) above;

(h)   that Valeant lacked adequate internal controls, compliance and training programs which resulted in an "improper tone at the top" with the Defendants prioritizing increasing Valeant's stock price over ensuring that Valeant and its clandestine network of pharmacies complied with applicable laws, regulations, contracts, and ensured that its SEC filings and public disclosures were free of material misstatements, as set forth in ¶¶340-354;

(i)   that far from "maintaining the highest ethical standards in the industry," Defendants were engaged in the deceptive practices set forth in subparagraph (b) above; and despite "ensur[ing] tight controls and rigorous compliance standards" Valeant lacked controls and compliance standards as described in subparagraph (h) above;

(j)   that Valeant improperly recognized Philidor revenue, in violation of GAAP, causing the revenues, net income and GAAP EPS reported in Valeant's October 20, 2014 release and 3Q14 10-Q to be materially misstated, as set forth in ¶¶323-331, 385-392; and

(k)   that in violation of GAAP, the 2Q14 10-Q and 3Q14 10-Q failed to disclose Philidor as a VIE as set forth in ¶¶332-339.

**February to April 2015 False and Misleading Statements**

191.   On February 22, 2015, the Company issued a release announcing its fourth quarter 2014 ("4Q14") and FY 2014 financial results.  For 4Q14, the release reported "***Revenue [of] $2.3 billion . . . GAAP EPS [of] $1.56, [and] Cash EPS [of] $2.58***."  For the full year 2014, the release

reported: "*Revenue [of] $8.3 billion* . . . *GAAP EPS [of] $2.67, [and] Cash EPS [of] $8.34*, (excluding Allergan gain)." The release also reported *4Q14 net income of $534.9 million* and *2014 net income of $913.5* million. The release further reported that "*Total Same Store Sales organic growth" was 16% and 13% for the 4Q14 and FY 2014, respectively* and quoted Pearson as claiming Valeant's strategy "is paying off for all of our stakeholders" and reporting "*Outstanding growth in the U.S., most notably dermatology*."

192.   On February 23, 2015, Pearson and Schiller hosted a conference call to discuss Valeant's 4Q14 and FY 2014 financial results. During the call, Schiller touted Valeant's sources of growth, including that "*[r]evenues for our dermatology business were very strong and increased 70% year-over-year*" and:

> *The outstanding work of our sales teams, implementation of innovative marketing approaches, great leadership, a portfolio of great products, and our four new launch products have contributed to the turnaround and the outstanding results in our dermatology business in Q4 and 2014*.
>
> *Core products such as Zyclara, Elidel, and the RAM franchise continued their strong growth.  And Solodyn grew in Q4 and grew 5% for all of 2014, after a tough year in 2013*.
>
> *Jublia continues its rapid growth trajectory and reported more than 20,000 weekly scripts for the last reported weekly sales report*. This yields an annualized run rate of greater than $250 million for the product.

193.   On February 25, 2015, the Company filed with the SEC its annual report on Form 10-K for the year ended December 31, 2014 ("2014 10-K"). The 2014 10-K was signed by Pearson, Schiller, and the Director Defendants. The 2014 10-K:

(a)     reported the Company's *4Q14 revenue of $2.28 billion, net income of $534.9 million, and GAAP EPS of $1.56, and full year 2014 revenues of $8.264 billion, net income of $913.5 million, and GAAP EPS of $2.67*;

- 81 -

(b)       attributed the source of Valeant's growth to "*our lower risk, output-focused research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense*";

(c)       claimed "*[t]o successfully compete for business with managed care and pharmacy benefits management organizations, we must often demonstrate that our products offer not only medical benefits but also cost advantages as compared with other forms of care . . .*";

(d)       stated that "*[t]he consolidated financial statements include the accounts of the Company and those of its subsidiaries and any variable interest entities ('VIEs') for which the Company is the primary beneficiary*," while omitting any mention of Philidor;

(e)       stated, under the heading "Business Combinations":

> *During the year ended December 31, 2014, the Company completed other smaller acquisitions, including the consolidation of variable interest entities, which are not material individually or in the aggregate*.  These acquisitions are included in the aggregated amounts presented below;

(f)       included "Reports of Management on Financial Statements and Internal Control over Financial Reporting" signed by Pearson and Schiller, stating:

**Financial Statements**

The Company's management is responsible for preparing the accompanying consolidated financial statements in conformity with United States generally accepted accounting principles ("U.S. GAAP"). In preparing these consolidated financial statements, *management selects appropriate accounting policies* and uses its judgment and best estimates *to report events and transactions as they occur*. *Management has determined such amounts on a reasonable basis in order to ensure that the consolidated financial statements are presented fairly, in all material respects. Financial information included throughout this Annual Report is prepared on a basis consistent with that of the accompanying consolidated financial statements.*

**Internal Control Over Financial Reporting**

- 82 -

Under the supervision and with the participation of management, including the Company's Chief Executive Officer and Chief Financial Officer, the Company conducted an evaluation of the effectiveness of its internal control over financial reporting based on the framework described in Internal Control — Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. ***Based on its evaluation under this framework, management concluded that the Company's internal control over financial reporting was effective as of December 31, 2014***;

(g)     represented that "***pricing and sales volume of certain of our products . . . are distributed or marketed by third parties, over which we have no or limited control***"; and

(h)     included the same Internal Controls Statement and SOX Certifications signed by Pearson and Schiller, as set forth in ¶¶144-145.

194.    <u>On April 29, 2015</u>, the Company issued a release announcing its financial results for 1Q15, as well as increased guidance for full-year 2015.  The release reported: "***Same Store Sales Organic Growth was 15%, driven by***":

- ***Growth from launch brands,*** including BioTrue Multipurpose Solution, BioTrue ONEday Contact Lens, ***Jublia, Luzu,*** and Ultra Contact Lens
- ***Double digit growth in U.S. businesses such as*** Contact Lens, ***Dermatology, Neurology and Other,*** Obagi, and Oral Health[.]

195.    On April 29, 2015, Pearson, Schiller and Kellen hosted a conference call to discuss Valeant's 1Q15 financial results with investors and analysts.  During the call:

(a)     Pearson stated, in part:

***Our US dermatology business had an outstanding quarter. Dermatology revenue grew 38% year on year and script growth grew 37% year on year. Jublia scripts grew 87% in Q1 versus Q4 of last year.***

(b)     An analyst asked "if you could quantify a little bit how much was price versus volume that contributed to growth in 1Q?  And what do you factor in your full-year guidance price versus volume?"  Pearson responded:

*In terms of price volume, actually volume was greater than price in terms of our growth.* Outside the United States it's all volume. . . . *And in the US it's shifting more to volume than price, and we expect that to continue* with our launch brands. A lot of our prices for most of our products are negotiated with managed care. And there's only a limited amount of price that we can take.

196.    On April 30, 2015, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2015 ("1Q15 10-Q"). The 1Q15 10-Q was signed by Pearson and Schiller and:  (a) reported the Company's *1Q15 revenue of $2.191 billion*;  (b) included the same statement related to Valeant's "*Business Combinations*" as in the Company's 2014 10-K, discussed above at ¶193(e); (c) failed to mention the existence of Philidor as a *VIE*; and (d) included the same Internal Controls Statement and SOX Certifications signed by Pearson and Schiller, as and set forth in ¶¶144-145.

197.    The 1Q15 10-Q also included a statement regarding the Company's purportedly lower risk business strategy, stating:

*The growth of our business is further augmented through our lower risk, output-focused research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense.* We believe this strategy will allow us to maximize both the growth rate and profitability of the Company and to enhance shareholder value.

198.    The 1Q15 10-Q represented that "*pricing and sales volume of certain of our products . . . are distributed or marketed by third parties, over which we have no or limited control*" while concealing that Valeant controlled and had significant influence over Philidor.

199.    The statements in ¶¶191-198 above were false and misleading when made.  The true facts, which were then known to or recklessly disregarded by Defendants, were:

(a)    that Philidor had been formed with the assistance and for the benefit of Valeant to increase the sales prices of Valeant products and to subvert the substitution of Valeant products with competitors' drugs, Valeant employees worked at Philidor, Valeant paid Philidor's

owners $100 million for the right to acquire Philidor for $0, was consolidating Philidor's results as its own, and had obtained explicit rights to direct Philidor activities, and these facts were being concealed from private payors, patients, physicians, PBMs, and investors;

(b)     that Valeant's business strategy consisted of, and a material source of its growth in revenues and sales of its key dermatology, neurology and other products resulted from, using deceptive practices of:  (i) price increases which were far beyond industry norms and Defendants knew were unsustainable; (ii) routing patients into its clandestine network of pharmacies that were falsely made to appear independent; (iii) using patient assistance and PR strategies to minimize patient complaints; and (iv) concealing these practices from payors in order to obtain reimbursement for drugs that would not be reimbursed or not reimbursed at similarly high prices if such practices were known to private payors, patients, physicians, and PBMs;

(c)     that rather than competing by demonstrating their products' "cost advantages," Defendants were deceiving payors into paying dramatic price increases which included raising the price of products far above industry norms and by as much as 3,000% during the Class Period without justification as Valeant had not increased spending on R&D to improve the affected medications;

(d)     that Valeant's business risks had materially increased as a result of the concealed practices in subparagraph (b) above which exposed the Company to increased risks of regulatory sanctions, increased costs of investigations, reputational harm, contractual violations, decreased sales, and increased scrutiny, nonpayment, and substitution of Valeant products by PBMs, private payors, and physicians if such practices became known;

(e)     that the Company's reported revenues, EPS, and profitability as well as its future business prospects were dependent on Valeant's ability to continue and conceal the

deceptive practices in subparagraph (b) above and because of the undisclosed risks in subparagraph (d) above did not accurately portray Valeant's financial performance and business prospects;

(f)     that the Company's growth and ability to service its debt were dependent on acquiring companies and drug portfolios in which it could engage in price gouging and the deceptive practices in subparagraph (b) above and any slow-down or cessation of such acquisitions would have a material adverse effect on the Company's business, cash flows, and results of operations;

(g)     that Valeant was not employing a "*lower risk research and development model*" but employing a strategy that subjected Valeant to the increased risks;

(h)     that Valeant had materially increased sales volume through Philidor as Philidor expanded its network of pharmacies and began selling in states where it did not have, or had been denied, a license;

(i)     that Valeant lacked adequate internal controls, compliance, and training programs which resulted in an "improper tone at the top" with the Defendants prioritizing increasing Valeant's stock price (for example by implementing the massive price increases for Isuprel and Nitropress to exceed its $2.36 EPS consensus target) over ensuring that Valeant and its clandestine network of pharmacies complied with applicable laws, regulations, contracts, and ensured that its SEC filings and public disclosures were free of material misstatements, as set forth in ¶¶340-354;

(j)     that Valeant's board of directors and senior management reviewed and approved the improper accounting which reflected a material weakness in internal controls;

(k)     that in violation of GAAP, the 2014 10-K and 1Q15 10-Q failed to disclose Philidor as a VIE as set forth in ¶¶332-339; and

(l)       that Valeant improperly recognized Philidor revenue, in violation of GAAP, causing the revenues, net income, and GAAP EPS reported in Valeant's February 22, 2015 release and 2014 10-K, and the revenues reported in the 1Q15 10-Q to be materially misstated, as set forth in ¶¶323-331, 385-392.

**May to July 2015 False and Misleading Statements**

200.    On May 19, 2015, Pearson addressed investors at Valeant's 2015 annual shareholder meeting.  Pearson made numerous statements about the business strategy, source of growth, pricing, and stock price including:

(a)       Pearson said that "*we have a differentiated R&D model that has and will continue to deliver more innovative products to our customers at a lower cost than our competitors*" adding that "*[w]e've delivered three consecutive strong quarters of organic growth, 19% and 16% and 15% respectively*"; and

(b)       Pearson said Valeant had a "*unique executive compensation system tied to generating disproportionate returns for our shareholders*."

201.    On May 21, 2015, Pearson attended an RBC Investor Meeting on behalf of the Company and made numerous statements about the Company's pricing, source of growth, and accounting practices, including:

(a)       when asked to discuss pricing in the United States, Pearson said that due to managed care contracts, Valeant was "*contractually not allowed to raise prices beyond*" an average of "*5%,*" including in its Dermatology business;

(b)       in discussing pricing, Pearson said of the Neurology and Other business segment "*that's where we have the most ability to raise price[s] and play with price*" and raising prices "*is I believe not, at least from your [an investor's] standpoint a bad thing.*"  Pearson said

orphan products was where he had flexibility to raise prices.  Pearson said Valeant's base plan was around 5% price increases adding that Valeant had raised prices more in certain areas but that "*we don't plan for them, but again if we can take advantage of – during times we've had significant price increases in acquisitions*."  Rather than disclosing the deceptive tactics to implement the price increases, Pearson claimed Valeant was able to raise prices by buying products from companies "*that did not not price their product the right way*";

(c)     Pearson said they raised the prices of Isuprel and Nitropress because Marathon left money "on the table" and claimed the drugs were priced much lower than competitive products ,stating they raised prices "*because the drugs were mispriced vs. comparative products*" and adding "*that can create lot of value[] for shareholders*";

(d)     Pearson added that "*we've been accused of our growth being price and not volume*" but claimed that "*organic growth is more volume than price and will continue to be*";[24] and

(e)     turning to Valeant's accounting practices and financial status, Pearson reassured investors "*our accounting practices are fine*" and added "*[w]e get audited all the time, by the SEC…and we have absolutely no issue from a government standpoint*"  and that "*we never had a financial irregularity*".

202.     On July 23, 2015, the Company issued a release announcing its second quarter 2015 ("2Q15") financial results and increasing the Company's full-year 2015 guidance.  The release

---

[24]   On May 21, 2015, Schiller, in an email with a subject "price/volume," wrote to Pearson "Last night, one of the investors asked about price versus volume for Q1.  Excluding [M]arathon, price represented about 60% of our growth.  If you include [M]arathon, price represents about 80%."  In addition, on May 26, 2015, an RBC Capital Markets, LLC ("RBC Capital Markets") analyst reported that one of the key takeaways from the meetings with Valeant management and Pearson, was "volume not price is fueling organic growth."

reported that "***Same Store Sales Organic Growth was 19%, driven by:  U.S. businesses, driven by the strength of dermatology***, contact lenses, dental and Obagi."

203.    The July 23, 2015 release also quoted Pearson as stating:

> ***We once again exceeded our guidance and delivered our fourth consecutive quarter of greater than 15% organic growth***.  ***Our strong second quarter results were driven by outperformance in our U.S. businesses***, strong results in certain emerging markets and outstanding starts to both the Salix and Dendreon acquisitions.

204.    On July 23, 2015, the Company also hosted a conference call to discuss its 2Q15 financial results.  Pearson, Rosiello, and Kellen attended on behalf of the Company.  Commenting on the Company's results, Pearson stated, in relevant part:

> ***We have now delivered four consecutive quarters of more than 15% same-store organic growth***.  ***Strong performance throughout our businesses resulted in both our top and bottom line exceeding the Q2 guidance that we provided on our last call.***

> *         *         *

> ***Turning to organic growth, our overall same-store total company organic growth was 19% for the quarter.  The exceptional growth of our US businesses driven by the strength of dermatology***, contact lenses, dental and Obagi was complimented by many of our emerging markets including China, Middle East/North Africa, Russia and South Korea.

> *         *         *

> ***Jublia is now our second largest product with annual run-rates sales of approximately $450 million***. . . .

> ***Our US dermatology business had another excellent quarter*** with our launch brands leading the way.  ***Both launch and core brands contributed to the dermatology revenue growth of 55% year-on-year. Jublia scripts grew 37% in Q2 versus Q1*** . . .

205.    During the question and answer session of the Company's July 23, 2015 conference call, a Jefferies LLC analyst questioned whether the number of prescriptions for Jublia going

through specialty pharmacy channels had improved.  In response, Kellen, Valeant's Company Group Chairman, concealed Valeant's control over the Philidor network, and stated:

> **Yes, the adoption through multiple specialty pharmacies continues.**  I think last time we said Jublia was around 50%.  That trend continues.  For derm[atology] overall, it varies by product, but it's around 40%.

206.    As the call continued, Pearson was asked about the price increase on Glumetza and the "extent to which you envision more pricing power . . . broadly speaking, in the U.S.?"  In response, Pearson stated:

> I think most pharma companies that I'm aware of, as the product gets into the last stages of their life, like Glumetza -- we're going to lose Glumetza within six months -- often price increases are taken at the end. **So that was just consistent with what most companies do**.
>
> **Our view on pricing** -- across most of our portfolio, **we do not take prices**. Outside the US, there's like zero price. I think, David, as we get more and more into segments like contact lenses and consumer products and other devices, we're not able to take price. So we're opportunistic when it comes to price. **But our base strategy is, how do we grow organically through volume, which is -- I think this quarter, we once again exhibited our ability to do so**.[25]

207.    <u>On July 28, 2015</u>, the Company filed its quarterly report on Form 10-Q with the SEC for its 2Q15, ended June 30, 2015 ("2Q15 10-Q").  The 2Q15 10-Q was signed by Pearson and Rosiello.  The 2Q15 10-Q **reported the Company's revenues for the six months ended June 30, 2015 of $4.923 billion**.  The 2Q15 10-Q also stated:

> **As is customary in the pharmaceutical industry, our gross product sales are subject to a variety of deductions** in arriving at reported net product sales. Provisions for these deductions are recorded concurrently with the recognition of gross product sales revenue and include cash discounts and allowances, chargebacks, and distribution fees, which are paid to direct customers, as well as rebates and returns, which can be paid to both direct and indirect customers. . . .

---

[25]   After the call, Ackman sent an email to Pearson stating, "I can't think of a business over the course of my career that has delivered such strong operating performance" which was "combined with transparency, accountability."  Ackman noted that Pearson "sounded a little defensive on the price increase question," and Pearson responded "Yes.  Was a weak answer."

> *Provisions as a percentage of gross sales increased to 32% and 33% for the second quarter and first half of 2015,* respectively, compared with 27% and 26% in the second quarter and first half of 2014.  *The increase was driven by (i) higher provisions for rebates, chargebacks, and returns, including managed care rebates for Jublia® and the co-pay assistance programs for launch products including Jublia®, Onexton®, and Retin-A Micro® Microsphere 0.08% ("RAM 0.08%")* . . .

208.   The 2Q15 10-Q also included a statement regarding the Company's purportedly lower risk business strategy, stating:

> *The growth of our business is further augmented through our lower risk, output-focused research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense.*

209.   The 2Q15 10-Q represented that "*pricing and sales volume of certain of our products . . . are distributed or marketed by third parties, over which we have no or limited control*" while concealing that Valeant controlled and had significant influence over Philidor.

210.   The 2Q15 10-Q included the same Internal Controls Statement and SOX Certifications as in the prior financial statements (but signed by Rosiello and Pearson) and set forth in ¶¶144-145.

211.   The statements in ¶¶200-210 above were false and misleading when made.  The true facts, which were then known to or recklessly disregarded by Defendants, were:

(a)     that Philidor had been formed with the assistance and for the benefit of Valeant to increase the sales prices of Valeant products and to subvert the substitution of Valeant products with competitors' drugs, Valeant employees worked at Philidor, Valeant paid Philidor's owners $100 million for the right to acquire Philidor for $0, Valeant was consolidating Philidor's results as its own, and had obtained explicit rights to direct Philidor's activities, and these facts were being concealed by Valeant from private payors, patients, physicians, PBMs, and investors;

(b)      that Valeant's business strategy consisted of, and a material source of its growth in revenues and sales of its key dermatology, neurology and other products resulted from, using deceptive practices of:   (i) price increases which were far beyond industry norms and Defendants knew were unsustainable; (ii) routing patients into its clandestine network of pharmacies that were falsely made to appear independent; (iii) using patient assistance and PR strategies to minimize patient complaints; and (iv) concealing these practices from payors in order to obtain reimbursement for drugs that would not be reimbursed or not reimbursed at similarly high prices if such practices were known to private payors, patients, physicians, and PBMs;

(c)      that Valeant's business risks had materially increased as a result of the concealed practices in subparagraph (b) above, which exposed the Company to increased risks of regulatory sanctions, increased costs of investigations, reputational harm, contractual violations, decreased sales, and increased scrutiny, nonpayment, and substitution of Valeant products by PBMs, private payors, and physicians if such practices became known;

(d)      that the Company's reported revenues, EPS, and profitability as well as its future business prospects were dependent on Valeant's ability to continue and conceal the deceptive practices in subparagraph (b) above and because of the undisclosed risks in subparagraph (c) above did not accurately portray Valeant's financial performance and business prospects;

(e)      that the Company's growth and ability to service its debt were dependent on acquiring companies and drug portfolios in which it could engage in price gouging and the deceptive practices in subparagraph (b) above and any slow-down or cessation of such acquisitions would have a material adverse effect on the Company's business, cash flows, and results of operations;

(f)     that Valeant was not employing a "lower risk, output-focused research and development model" but employing a strategy that subjected Valeant to the increased risks;

(g)     that Valeant had materially increased sales volume through Philidor as Philidor expanded its network of pharmacies and began selling in states where it did not have, or had been denied, a license;

(h)     that price increases represented 80% of Valeant's 1Q15 growth compared to only 20% attributable to volume increases;

(i)     that contrary to Pearson's suggestions that price increases were not a "bad thing" for investors and that prior owners had underpriced drugs, Valeant had achieved the price increases through the deceptive practices described in subparagraph (b) above which carried the undisclosed risks described in subparagraph (c) above;

(j)     that Valeant's growth, including its organic growth, and financial results were driven in significant part by Defendants' decision to implement massive and unsustainable prices increases in Isuprel and Nitropress to hit financial targets;

(k)     that the provisions for rebates and chargebacks, including managed care rebates for Jublia had increased due to the Company's use of copay reimbursements and other methods of financial assistance to conceal its price gouging as described in subparagraph (b) above and were not "customary" deductions;

(l)     that Valeant lacked adequate internal controls, compliance and training programs which resulted in an "improper tone at the top" with the Defendants prioritizing increasing Valeant's stock price over ensuring that Valeant and its clandestine network of pharmacies complied with applicable laws, regulations, contracts, and ensured that its SEC filings and public disclosures were free of material misstatements, as set forth in ¶¶340-354;

(m)    that Valeant's "unique" compensation system was part of Valeant's improper "tone at the top" as described in subparagraph (l) above;

(n)    that Valeant's board of directors and senior management reviewed and approved the improper accounting which reflected a material weakness in internal controls;

(o)    that in violation of GAAP, the 2Q15 10-Q failed to disclose Philidor as a VIE as set forth in ¶¶332-339; and

(p)    that Valeant improperly recognized Philidor revenue, in violation of GAAP, causing the revenues reported in Valeant's 2Q15 10-Q for the six months ending June 30, 2015 to be materially misstated, as set forth in ¶¶323-331, 385-392.

**September to December 2015 False and Misleading Statements**

212.    <u>On September 28, 2015</u>, Valeant filed a Form 8-K with the SEC that attached a letter from Pearson to the Company's employees responding to claims that Valeant's "business model and strategy is dependent upon large price increases in our U.S. pharmaceutical business" and "[c]oncern around our exposure to U.S. government drug price reimbursement."  In his letter:

(a)    Pearson referred to these concerns as a "bear thesis," claimed they were "*incorrect on both accounts*," and dismissed the dependency on price increases stating "***Valeant is well-positioned for strong organic growth, even assuming little to no price increases***";

(b)    Pearson added that, "[a]s we have stated many times, ***Valeant's core operating principles include a focus on volume growth*** and a concentration on private and cash pay markets that avoid government reimbursement in the U.S." and "the majority of our portfolio ***will continue to deliver strong volume-based organic growth and is not dependent on price increases***";

(c)    Pearson went on to "lay out the facts" noting, in part, that:  (i) growth in dermatology, ophthalmology, Rx and dentistry was based on having "***delivered over 30% script***

*growth year to date*," and (ii) they expected "***double-digit script growth and corresponding revenue growth trends to continue***" in the "Salix business"; and

(d)    Pearson added, "***we expect double-digit organic growth in 2016 and beyond as we prepare for the launch of Addyi and anticipate other potential product approvals*** . . . ." Pearson closed by noting that "[t]his is not the first time we have faced questions about our business model and strategy in the market, and it likely won't be the last," adding he was "convinced we will continue to generate the best outcomes for our shareholders and the healthcare community."

213.    <u>On October 14, 2015</u>, Valeant issued a release that noted it received Department of Justice subpoenas for documents regarding its patient assistance and distribution practices.  The release quoted Pearson as stating that "***All of us at Valeant firmly believe in maintaining strong regulatory and financial controls and believe we have operated our business in a fully compliant manner***."

214.    <u>On October 19, 2015</u>, Valeant issued a release announcing its third quarter 2015 ("3Q15") financial results and hosted an earnings conference call that began before the market opened:

(a)    The release stated, in part, "***Same store sales organic growth of 13%***; ***5th consecutive quarter of > 10% organic growth***, driven by: ***Continued outperformance of U.S. businesses, particularly dermatology*** and contact lens . . . .";

(b)    As discussed in ¶¶248-253, by this time Valeant's ties to Philidor were beginning to be uncovered by investigative journalists, which forced Valeant to publicly disclose the relationship.  To offset the downward pressure on the price of Valeant securities, the Company *raised* revenue and EPS guidance for the 4Q and full year 2015, stating:

<u>4Q15 Guidance</u>

- ***Total Revenue increased to $3.25 - $3.45 billion [midpoint of $3.35 billion] from $3.2 - $3.4 billion [midpoint of $3.3 billion]***

- ***Cash EPS increased to $4.00 - $4.20 [midpoint of $4.10] from $3.98 - $4.18 [midpoint of $4.08]***

  <u>Full Year 2015 Guidance</u>

- ***Total Revenue increased to $11.0 - $11.2 billion [midpoint of $11.1 billion] from $10.7 - $11.1 billion [midpoint of $10.9 billion]***

  \*      \*      \*

- ***Cash EPS increased to $11.67 - $11.87 [midpoint of $11.77] from $11.50 - $11.80 [midpoint of $11.65]***; and

  (c)   In addition, the release quoted Pearson as stating, in part, "***With our strong product portfolio and growth prospects, we feel very confident in our future outlook and we are reaffirming our $7.5 billion EBITDA floor for 2016.***"

  215.   That same day, Pearson, Rosiello, and Kellen hosted a conference call. In the slide deck presentation accompanying the earnings conference call, Valeant included a list of anticipated "Questions from Investors." One of the "anticipated" questions was "How does Valeant work with specialty pharmacies and what is Valeant's relationship with Philidor" to which the presentation noted:

- ***We have viewed our relationship with Philidor and our other specialty pharmacies as proprietary and as one of our competitive advantages***

- ***Similar to many pharmaceutical companies in the U.S.,*** an increasing percentage of our revenue is coming from products dispensed ***through multiple specialty pharmacies***

- ***We find specialty pharmacies improve patients' access to medicines at an affordable price and help ensure physicians are able to prescribe the medications they believe most appropriate for their patients***

- 96 -

*   *   *

- ***We understand that Philidor:***

  - Provides services under our programs for commercially insured and cash-paying claims only.  Any claim that would be reimbursed in whole or in part by government insurance is not eligible for our co-pay subsidy programs

  - ***Does not restrict prescriptions it fills to any particular manufacturers (including Valeant)***[26]

  - ***Dispenses generic products as specified in patient's prescription or as requested by patient***

216.    During the conference call, Pearson repeated some of the same claims, saying that the relationship with Philidor had not been disclosed previously for "***competitive reasons***" and suggesting Valeant's use of specialty pharmacies was similar to its competitors and resulted in more affordable prices, stating, in part:

> ***The topic of specialty pharmacies has not been a focus of ours on past calls because we believe this was a competitive advantage that we did not want to disclose to our competitors.  But given all the incorrect assertions*** by some, we will provide an update to this call.

> ***Similar to many pharmaceutical companies in the US, an increasing percentage of our revenue is coming from products dispensed through multiple specialty pharmacies.  We find specialty pharmacies improve patients' access to medicines at an affordable price, and help ensure physicians are able to prescribe the medications they believe most appropriate for their patients.  In almost all cases, our inventory with specialty pharmacies in this channel and the title to our medicine only transfers to the pharmacy when the actual prescription is filled***.

217.    Pearson also claimed that "***[s]ince we do not recognize the revenue of our products [sold through Philidor] until the prescriptions are filled, this consolidation has the impact of***

---

[26]    As Defendants knew, and as Philidor admitted on November 25, 2015, Valeant was Philidor's only customer.

- 97 -

*delaying revenue recognition as compared to products that are sold through traditional distribution channels*."

218.    In reference to media and governmental scrutiny of Valeant's pricing practices (discussed below) Pearson claimed that such criticism was an industry-wide problem and told investors that Valeant's  forecast was appropriately discounted for such scrutiny, claiming "*it's clear that the pharmaceutical industry is being aggressively attacked for past pricing actions. And that's not just Valeant, but I think it's all companies*.  I do think given that environment, the pricing that pharmaceutical companies will take in the future will be more modest, and *we built that into our forecast for next year*."

219.    With regard to a lawsuit that had been filed by one of the pharmacies in the Philidor network, R&O, which had claimed fraudulent practices were being employed, Pearson reassured investors that the business practices of Valeant and Philidor were proper by claiming:

> *R&O is one of the specialty pharmacies in our network*, and Valeant has shipped approximately $69 million at wholesale prices to them.   This represents approximately $25 million at net prices.  Any products R&O dispensed to patients were recognized as our revenues, and are reflected in our receivables.  Any products still held by R&O are reflected in our inventory.  *R&O is currently improperly holding significant amounts it receives from payers*.  We will refrain from comment on active litigation, and *look forward to showing in court that we are owed the money*.

220.    During the conference call, Rosiello repeated the increased guidance from the release, ¶214(b)-(c), and added that "*[w]e expect our gross margins to approach 80% in the fourth quarter, driven by continued growth in our dermatology and Salix businesses, the launch of Addyi*, and decreased sales of Xenazine."  His statements were accompanied by the following chart in the slide presentation:

|  | Previous Q4 2015 | New Q4 2015 | Previous full year | New full year 2015 |
|---|---|---|---|---|
| Revenues | $3.2 - $3.4B | $3.25 - $3.45B | $10.7 - $11.1B | $11.0 - $11.2B |
| Cash EPS | $3.98 - $4.18 per share | $4.00 - $4.20 per share | $11.50 - $11.80 per share | $11.67 - $11.87 per share |
| Adj. Cash Flow from Operations | NA | NA | >$3.2B | >$3.35B |

221.    To further allay investor concern, and buoy the price of Valeant's securities, the slide presentation also stated that Valeant was "*reaffirming our expectations to exceed $7.5 [billion] in EBITDA in 2016*."  When Pearson was asked during the conference call how the lack of price increases going forward may affect the Company's ability to meet EBITDA guidance in 2016, he responded, in part, "*today . . . we feel very comfortable with the $7.5 billion and we expect our guidance next year will exceed that*."

222.    <u>On October 21, 2015</u>, Valeant issued a release in response "to recent accusations made regarding its financial reporting and operations" by Citron Research ("Citron") that Valeant was inflating revenues through its hidden network of pharmacies to refute such allegations and confirm it was complying with GAAP stating, in part:

- *All shipments to Philidor and other pharmacies in the Philidor pharmacy network, including R&O, are not recorded in Valeant's consolidated net revenue.  Sales are recorded only when the product is dispensed to the patient.  All sales to Philidor and Philidor network pharmacies are accounted for as intercompany sales and are eliminated in consolidation.   They are not included in the consolidated financial results that Valeant reports externally.*

- Any inventory at pharmacies in the Philidor pharmacy network are included in Valeant's consolidated inventory balances – *there is no sales benefit from any inventory held at these specialty pharmacies* and inventory held at the Philidor network pharmacies is reflected in Valeant's reported inventory levels.

*        *        *

- ***The timing of our revenue recognition by selling through the Philidor pharmacy network is actually delayed when compared to selling through the traditional wholesaler channel.***

223.   <u>On October 26, 2015</u>, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2015 ("3Q15 10-Q").  The 3Q15 10-Q was signed by Pearson and Rosiello.  The 3Q15 10-Q reported the Company's ***revenue for the nine months ended September 30, 2015 of $7.71 billion***.

224.   The 3Q15 10-Q disclosed that Valeant had the "power to direct Philidor's activities"  and stated that Valeant's entire board of directors had reviewed Valeant's accounting for Philidor and had confirmed its appropriateness.  Specifically, the 3Q15 10-Q stated:

(a)   During the year ended December 31, 2014, the Company completed other smaller acquisitions, including the consolidation of variable interest entities, ***which were not material individually or in the aggregate.***  These acquisitions are included in the aggregated amounts presented below.  Beginning in December 2014, the Company has consolidated Philidor Rx Services, LLC ("Philidor") pharmacy network, which includes R&O Pharmacy, LLC.  The Company determined that based on its rights, including its option to acquire Philidor, Philidor is a variable interest entity for which the Company is the primary beneficiary, given its power to direct Philidor's activities and its obligation to absorb their losses and rights to receive their benefits.  As a result, since December 2014, the Company has included the assets and liabilities and results of operations of Philidor in its consolidated financial statements.  Net sales recognized through Philidor represent approximately 7% and 6% of the Company's total consolidated net revenue for the three-month and nine-month periods ended September 30, 2015, respectively, and the total assets of Philidor represent less than 1% of the Company's total consolidated assets as of September 30, 2015.  The impact of Philidor as a consolidated entity on the Company's net revenues for 2014 was nominal.

\*       \*       \*

On October 26, 2015, the Company also announced that its ***Audit and Risk Committee and the full Board of Directors have reviewed the Company's accounting for its Philidor arrangement and have confirmed the appropriateness of the Company's related revenue recognition and accounting treatment.***

\*       \*       \*

1352297_1

*As is customary in the pharmaceutical industry, our gross product sales are subject to a variety of deductions* in arriving at reported net product sales. *Provisions for these deductions are recorded concurrently with the recognition of gross product sales revenue and include cash discounts and allowances, chargebacks, and distribution fees, which are paid to direct customers, as well as rebates and returns, which can be paid to both direct and indirect customers. . . . Gross product sales for products dispensed through Philidor Rx Services, LLC* ("Philidor") pharmacy network (which is consolidated as a variable interest entity within our consolidated financial statements) *are recognized when a prescription is dispensed to a patient.* Net sales recognized through the Philidor pharmacy network represents 7% and 6% of our total consolidated net revenue for the three months and nine months ended September 30, 2015, respectively;

      (b)     The 3Q15 10-Q also described the Company's performance:

Excluding the items described above, we realized incremental product sales revenue from the remainder of the existing business of $236 million and $820 million in the third quarter and first nine months of 2015, respectively. *The growth, which incorporates sales directly to wholesalers and retailers as well as use of specialty pharmacies (primarily Philidor), reflected (1) higher sales of (i) Jublia®* (launched in mid-2014), (ii) the *Retin-A® franchise* (including the launch of RAM 0.08% in mid-2014), (iii) Xenazine®, (iv) Arestin®, (v) *Solodyn®*, and (vi) the Carac® franchise, and (2) higher sales from other recent product launches, including the launches of Biotrue® ONEday, Bausch + Lomb Ultra®, and Onexton®;

      (c)     The 3Q15 10-Q also included a statement regarding the Company's purportedly lower risk business strategy, stating:

*The growth of our business is further augmented through our lower risk, output-focused research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense*; and

      (d)     The 3Q15 10-Q included the same Internal Controls Statement and SOX Certifications (this time signed by Pearson and Rosiello) as set forth in ¶¶144-145.

      225.    On October 26, 2015, Valeant issued a release designed to allay investor concerns and re-inflate the price of Valeant stock, which:

      (a)     repeated that Valeant's "*Audit and Risk Committee and the full Board of Directors have reviewed the company's accounting for its Philidor arrangement and have*

*confirmed the appropriateness of the company's related revenue recognition and accounting treatment*";

(b)     quoted Pearson as stating that "*As we have said previously, our accounting with respect to the Company's Philidor arrangements is fully compliant with the law*," and "*We operate our business based on the highest standard of ethics, and we are committed to transparency*"; and

(c)     quoted Ingram as stating that the board of directors "*has fully supported the company's specialty pharmacy strategy*," adding that Pearson "*operates with the highest degree of ethics*."

226.    Also on October 26, 2015, the Company hosted a conference call with investors that was accompanied by a presentation.   Pearson, Schiller, Rosiello, Ingram, Provencio, Melas-Kyriazi, Stevenson, Carro, and Kellen attended on behalf of the Company.   The presentation disclosed that "[o]ur specialty pharmacy strategy originated from the Medicis Alternate Fulfillment Program."   Among other things, the presentation also stated that:

(a)     "*Prescriptions through Philidor are less profitable than traditional channels due to lower copay rates, lower cash pay rates and more cash pay scripts in Philidor than in retail and other channels*";

(b)     "*We do not own or control Philidor . . .*" and "*Philidor employees do not report to Valeant . . .*";

(c)     "*Philidor is independent . . .*"; and

(d)     "Unless and until Valeant exercises the option to acquire Philidor, *Philidor remains independent* and Valeant has no rights to remove CEO or management."

- 102 -

227.    Pearson assured investors there was no improper accounting or other improper practices involving Philidor stating:

(a)    "*we stand by our accounting treatment of Philidor completely*";

(b)    "*[w]e follow the law and we comply with accounting and disclosure rules*";

(c)    "*the sensational claims made by the short seller Andrew Left, through his entity Citron, are completely untrue.  His motivation is the same as someone who runs into a crowded theater to falsely yell fire.  He wanted people to run*";

(d)    "*after we saw the false report from Citron, we promptly coordinated with our outside regulatory counsel from Cahill to make a request that the SEC investigate Mr. Left and Citron*";[27]

(e)    "We still believe that the strategy of working with specialty pharmacies is sound and it's good for patients and physicians. *There have been no issues with regards to the accounting or revenue recognition of the business*"; and

(f)    "*We have been working with outside counsel and we have found no evidence of illegal activity whatsoever at Philidor*."

228.    Ingram, Valeant's lead independent director, speaking on behalf of the entire board of directors, including the Director Defendants, reaffirmed these statements saying:

> Thank you, Mike [Pearson].  *As Mike stated, the Company stands by its accounting completely.  The audit committee of the Board and the full Board have reviewed the Company's accounting, the Philidor relationship, and have confirmed the appropriateness of the Company's revenue recognition and accounting treatment*.

---

[27]   Ironically, this request eventually led the SEC to investigate Valeant's accounting, which as noted below, resulted in a restatement.

229.    Rosiello reinforced the statements by Pearson and Ingram adding:

(a)    "*Valeant consolidates financials with Philidor and the Philidor network, ensuring that revenue recognition and financial statement presentation is appropriate*";

(b)    "*Valeant recognizes revenue only when products are dispensed to patients, and Valeant records this at net realized price*";

(c)    "*There is simply no way to stuff the channel of consolidated variable interest entities, or VIEs, since all inventory remains on Valeant's consolidated balance sheet until dispensed to patients*"; and

(d)    "Philidor was considered a VIE prior to the purchase option agreement, but since Valeant was not determined to be the primary beneficiary, consolidation was not appropriate. A purchase option agreement for Philidor was executed in December 2014. *The finance and transactions committee, audit and risk committee, and full Board, all reviewed the transaction. The appropriate accounting treatment was determined by management and reviewed with the Audit and Risk Committee.*"

230.    Valeant's corporate controller, Carro also defended Valeant's accounting and lack of prior disclosure regarding Philidor. Specifically:

(a)    Carro claimed that, as of year-end 2014, *"Philidor is not considered to be material to Valeant's business for reporting purposes*" at the end of 2014 because the "GAAP requirement for disclosing sales to large customers is 10% of revenue" and in December 2014 Philidor's year-to-date net sales were $111 million; and

(b)    Carro claimed that for the first two quarters of 2015 "*Philidor was not specifically mentioned in our disclosures because it had not been material to the consolidated*

*financial statements*," because "[i]t represented 1% or less of total assets and 7% or less of consolidated net revenues since the fourth quarter of 2014."

231.    Schiller reassured investors that there was no evidence of wrongdoing by Pearson, stating "if I had any concerns whatsoever about Valeant or Mike, I would not have stayed on the Board. It's as simple as that. When we announced that I was leaving, and Mike and I had a bit of our lovefest, I don't want to repeat all the words but I meant them in terms of Mike is professional, his ethics, his work ethic, his commitment to doing the right thing."

232.    To mitigate the impact of the negative news, Pearson reaffirmed Valeant's recently increased 2015 guidance, stating: "***Given the continued healthy growth in dermatology***, Salix, eye health, ***and the recent Addyi launch, we expect to meet or exceed our fourth-quarter projections***, excluding the one-time expenses associated with recent events." He added, "***we continue to be very comfortable with our 2016 EBITDA expectation of greater than $7.5 billion***."

233.    <u>On November 10, 2015</u>, before the market opened, Pearson, Rosiello, Carro, and Kellen hosted a conference call with investors to "update [the market] on our strategy with respect to specialty pharmacies, to explain our transition plans for Philidor, to discuss our business performance for the first half of the quarter, and perhaps most importantly to take questions from all of you."[28] Pearson stated, in relevant part:

> ***We began working with Philidor because we believed a strong relationship with one specialty pharmacy would deliver better, faster customer service for doctors and patients. We were also looking for a pharmacy which would be willing to process prescriptions before adjudicating the claims, which would allow us rather than the patient, to assume the risk if the commercial payer denied the claim***.

---

[28]   As discussed below, in late October Valeant announced that it would be terminating its relationship with Philidor  and that Philidor would shut down.

234.     An analyst noted that there were "two kind[s] of major accusations aimed at the Company," one regarding pricing and the other regarding Philidor, and noted that Valeant "decided to limit your pricing going forward" and "cut operations with Philidor."  With regard to Philidor, Pearson responded in part:

> Well Philidor was very specific.  ***First, there was the Citron report which claimed financial fraud and other things.  They quickly came out and there was no financial fraud, in terms of Valeant had to do.***  But then other allegations were made in terms of the practices of Philidor.  And we felt, both management and the Board felt that given these allegations, given what was happening to our stock price and given what many of our major shareholders were asking us to do that the best thing to do was to sever.

235.     On December 16, 2015, its analyst day, Valeant issued a release formally withdrawing the inflated guidance it issued less than two months earlier on October 19, 2016.  In an attempt to offset the disappointing revised 2015 guidance and notwithstanding the financial impact of its lost sales through Philidor and increased scrutiny by PBMs and private payors for its products, Valeant's December 16, 2015 release projected robust 2016 growth with revenue of *$12.5 - $12.7 billion, Cash EPS of $13.25 - $13.75, and EBITDA of $6.9 - $7.1 billion*.

236.     On that same day, the Company hosted a conference call.  Pearson, Rosiello, Jorn, and Kellen participated on behalf of the Company.  Rosiello repeated the 2016 guidance and Pearson stated the guidance was conservative, noting:  "***I feel very comfortable with the guidance***. But each little pieces [sic], I feel little less comfortable this year just given – ***so we put an extra dose of conservatism in***."  Pearson added:

> ***Addyi*** . . . a lot of people have said, Addyi is a disaster; ***today you'll see it's not a disaster***.  So ***we believe we'll sell between $100 million and $150 million in sales of Addyi next year***.

237.     The statements in ¶¶212-236 above were false and misleading when made.  The true facts, which were then known to or recklessly disregarded by Defendants, were:

(a)      that Philidor was not "independent," but instead Philidor had been formed with the assistance and for the benefit of Valeant to increase the sales prices of Valeant products and to subvert the substitution of Valeant products with competitors' drugs, Valeant employees worked at Philidor, and Valeant could close Philidor by severing ties with it as it was Philidor's only customer, and that these facts were being concealed by Valeant from private payors, patients, physicians, PBMs, and investors;

(b)      that Valeant's business strategy consisted of, and a material source of its growth in revenues and sales of its key dermatology, neurology and other products resulted from, using deceptive practices of:  (i) price increases which were far beyond industry norms and Defendants knew were unsustainable (for example, increasing the price of Cuprimine on July 31, 2015 by more than 400%); (ii) routing patients into its clandestine network of pharmacies that were falsely made to appear independent; (iii) using patient assistance and PR strategies to minimize patient complaints; and (iv) concealing these practices from payors in order to obtain reimbursement for drugs that would not be reimbursed or not reimbursed at similarly high prices if such practices were known to private payors, patients, physicians, and PBMs;

(c)      that Valeant's business risks had materially increased as a result of the concealed practices in subparagraph (b) above which exposed the Company to increased threat of regulatory sanctions, increased costs of investigations, reputational harm, contractual violations, decreased sales, and increased scrutiny, nonpayment, and substitution of Valeant products by PBMs, private payors, and physicians if such practices became known;

(d)      that the Company's reported revenues, EPS, and profitability as well as its future business prospects were dependent on Valeant's ability to continue and conceal the

deceptive practices in subparagraph (b) above and because of the undisclosed risks in subparagraph (c) above did not accurately portray Valeant's financial performance and business prospects;

(e)     that Valeant was not employing a "lower risk, output-focused research and development model" but employing a strategy that subjected Valeant to the increased risks;

(f)     that Valeant's secret network of captive pharmacies was not concealed because it was a "competitive advantage" and designed to make prices more "affordable," but rather because disclosure thereof carried the impact described in subparagraph (c) above;

(g)     Philidor was not formed to deliver better service or transfer risks to Valeant of non-payment but was part of Valeant's strategy to implement the deceptive practices described in subparagraph (b) above;

(h)     that Valeant lacked adequate internal controls, compliance and training programs which resulted in it having an "improper tone at the top" with the Defendants prioritizing increasing Valeant's stock price over ensuring that Valeant and its clandestine network of pharmacies complied with applicable laws, regulations, contracts, and ensured that its SEC filings and public disclosures were free of material misstatements, as set forth in ¶¶340-354;

(i)     that Valeant was inflating revenue by sending products to Philidor and prematurely recording them as revenue and also by having Philidor send products to patients prior to adjudication of claims which resulted in large increases in provision for product sales that ultimately were not paid;

(j)     that Valeant improperly recognized Philidor revenue, in violation of GAAP, causing the revenues reported in Valeant's 3Q15 10-Q for the nine months ending September 30, 2015 to be materially misstated, as set forth in ¶¶323-331, 385-392;

(k)     that Valeant's board of directors and senior management reviewed and approved the improper accounting which reflected a material weakness in internal controls;

(l)     that at the time of issuing increased guidance, Defendants were aware that they had doubled the price of Addyi making it unlikely to be covered by insurance or approved by PBMs, cancelled a distribution agreement with Cardinal Health in order to rely on Philidor to distribute Addyi, and the disclosure of Valeant's relationship with Philidor and investigations into their price gouging would result in decreased sales, sale prices, revenue, and earnings;

(m)     that, as a result of subparagraphs (a)-(l) above, Defendants had no reasonable basis to believe and, in fact, did not believe that Valeant could achieve 4Q15 and FY 2015 revenue of $3.25-$3.45 billion and $11-$11.2 billion, respectively; 4Q15 and FY 2015 Cash EPS of $4.00-$4.20 and $11.67-$11.87, respectively; FY 2016 EBITDA of at least $7.5 billion; FY2016 revenue of $12.5-$12.7 billion, Cash EPS of $13.25-$13.75 billion or EBITDA of $6.9-$7.1 billion; and

(n)     that at the time Pearson, Schiller, and Rosiello signed their respective SOX certifications in the 10-Qs for 1Q13 through 3Q15, the 2013 10-K, and the 2014 10-K, they knew or recklessly disregarded that they were false and misleading for the reasons stated in ¶¶148, 157, 174, 190, 199, 211, 237(a)-(m).

## FAILURE TO DISCLOSE INFORMATION REQUIRED UNDER ITEM 303 OF SEC REGULATION S-K

238.   Item 303 of SEC Regulation S-K, 17 C.F.R. §229.30 ("Item 303") required Valeant's 1Q13 10-Q, 2Q13 10-Q, 3Q13 10-Q, 2013 10-K, 1Q14 10-Q, 2Q14 10-Q, 3Q14 10-Q, 2014 10-K, 1Q15 10-Q, 2Q15 10-Q, and 3Q15 10-Q (collectively, "Form 10-Ks and Form 10-Qs") to describe "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income

from continuing operations."  17 C.F.R. §229.303(a)(3)(ii).  Similarly, the regulation required Valeant's Form 10-Ks and Form 10-Qs to disclose events that the registrant knew would "cause a material change in the relationship between costs and revenues" and "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected."  17 C.F.R. §229.303(a)(3)(i), (ii).

239.   In violation of Item 303, the Form 10-Ks and Form 10-Qs failed to disclose that Valeant's growth and profitability were increasingly dependent upon its deceptive practices of price gouging, routing patients into its clandestine and controlled network of pharmacies, and using PAP and PR strategies, all of which were designed to deceive payors into reimbursing Valeant's products at higher prices and had a major impact in driving Valeant's revenue growth while exposing the Company to increased risks of regulatory sanctions, increased costs of investigations, reputational harm, contractual violations, decreased sales, and increased scrutiny, nonpayment, and substitution of Valeant products.  These known trends, events or uncertainties that were reasonably likely to have a material unfavorable impact on Valeant's net sales or revenues or income from continuing operations and cause reported financial information to not necessarily be indicative of future results were not disclosed in the Form 10-Ks and Form 10-Qs.  *See* ¶¶148, 157, 174, 190, 199, 211, 237, 355-394.

## THE TRUTH BEGINS TO EMERGE

240.   In September 2015, the truth began to emerge regarding Valeant's true business, operations and prospects through a series of partial disclosures.

**Valeant's Price Gouging Practices Are Revealed**

241.   On September 28, 2015, *Bloomberg* reported that members of Congress were calling for an investigation of price gouging by Valeant.  It reported that "[a]ll Democratic members of [the] House Oversight and Government Reform [Committee] sent a letter to Chairman Jason Chaffetz urging him to subpoena Valeant Pharmaceuticals documents related to 'massive price increases' for two drugs used to treat heart conditions."  In the letter, U.S. Representatives wrote, in part:

> [I]n February, Valeant purchased the rights to sell Nitropress, which is used to treat congestive heart failure and hypertensive episodes, and Isuprel, which is used to treat heart block and abnormal heart rhythm.  The same day, Valeant increased the prices of these drugs to $805.61 and $1,346.62, respectively (increases of 212% and 525%).  When asked about its price increases, a Valeant spokeswoman responded: "Our duty is to our shareholders and to maximize the value" of the drugs.

242.   The September 28, 2015 letter also revealed that earlier in the year, on July 31, 2015, staff members from the Committee on Oversight and Government Reform, U.S. House of Representatives ("House Oversight Committee") had a call with representatives from Valeant wherein Valeant "failed to adequately answer our questions about the basis for their skyrocketing prices."  It also revealed that on August 12, 2015, "Ranking Member Cummings sent [a] document request to Valeant" and on September 3, 2015, "Valeant rejected Ranking Member Cummings' request in a dismissive two-page letter that refused to provide any of the requested documents."

243.     Also, on September 28, 2015, *The Washington Post* disclosed that U.S. Senator Claire McCaskill "sent a detailed list of 22 questions to [Valeant], probing its simple explanation that it increased two heart drug prices because they were 'significantly underpriced.'"[29]

244.     On September 28 and 29, 2015, media outlets reported that Valeant was "in [the] crosshairs of [the] U.S. Congress" for its practice of "engag[ing] in a business strategy of buying old neglected drugs and turning them into high-price specialty drugs."

245.     On October 4, 2015, *The New York Times* wrote an article questioning Pearson's September 28, 2015 letter to employees, discussed above.  The article called into doubt Pearson's claim that the Company was well positioned for growth even without price increases by noting that "[a]nalysts at Morgan Stanley estimated that 'outsized' price increases on eight drugs accounted for about 7 percent of Valeant's revenue and 13 percent of its earnings before taxes and interest in the second quarter."  The article provided further insight into Valeant's dependency on price gouging by describing how, in 2015 alone, "Valeant raised prices on its brand-name drugs an average of 66 percent . . . about five times as much as its closest industry peers."  As an example, it noted that Glumetza, (a diabetes pill that was part of the Salix business) increased in price over 800% during the year, with a monthly supply increasing from approximately $500 to $4,600.

246.     The news continued to worsen as interest expanded to include the legality of Valeant's PAPs, which reduced patients' copays for the high priced drugs.  After the market closed on October 14, 2015, Valeant issued a release revealing that it "recently received" subpoenas from both the U.S. Attorney's Office for the District of Massachusetts and the U.S. Attorney's Office

---

[29]   Citron published a report the same day revealing that Valeant had more than doubled the price of 30 other drugs during the Class Period.  The report also highlighted that "Valeant has made little to no effort to improve these products."

for the Southern District of New York.  The Company disclosed that "[m]ost of the materials requested by the subpoenas relate to documents with respect to our patient assistance programs, and also include requests relating to financial support provided by the company for patients, distribution of the company's products, information provided to the Centers for Medicare and Medicaid Services, and pricing decisions."  The release further stated that Valeant "responded to a letter from Senator Claire McCaskill" regarding the pricing of Nitropress and Isuprel and the "reimbursement process for hospital procedures involving Nitropress and Isuprel, the analysis and reasons underlying Valeant's pricing decisions."  The release noted that the Company was "beginning outreach to hospitals where the impact of a price change was significantly greater than average."

247.   On or about October 15, 2015, media reported that U.S. Senator Claire McCaskill stated, "[i]t appears obvious to me that Valeant has been anything but responsive or transparent – it refused to take any action until served with federal subpoenas, and is still refusing to provide answers to many of the questions I've asked."

**Valeant's Secret Relationship with Philidor is Revealed**

248.   On October 19, 2015, more of Valeant's hidden practices were revealed as the Company's use of a secret network of pharmacies began to come to light.  At 6:28 a.m., Ackman sent an email to Laurie Little ("Little"), Valeant's Senior Vice President, Investor Relations, and Pearson regarding a Southern Investigating Reporting Foundation ("SIRF") report on Valeant, which described the connection between Valeant and Philidor.  Little responded, "We knew it was coming and will address on today's call."

249.   That day, the Company issued a release announcing its 3Q15 financial results and hosted an earnings call that began before the market opened.  Pearson, Rosiello, and Kellen hosted

the call using a prepared slide presentation.  Pearson said he wanted to address "the turmoil over the past few weeks from both governmental and media scrutiny."  The Company admitted limited facts such as confirming its relationship with and option to acquire Philidor and that it had been consolidating Philidor's financial results with its own.  The Company also effectively conceded its non-traditional strategy was neither sustainable nor less risky by disclosing it would rely less on acquisitions and more on R&D, with Pearson adding that Valeant would be "making pricing a smaller part of our growth looking forward" and "will pursue fewer, if any, transactions that are focused on mispriced products."

250.    Valeant disclosed that it nearly doubled its R&D spending of $56 million in 1Q15 to $102 million in 3Q15 and that "internal R&D will become more of an area of focus" signaling the unsustainable nature of their non-traditional strategy and the illusory nature of the purported lower cost and more profitable business strategy.

251.    Pearson also disclosed that price accounted for approximately 60% of growth in 2014 (the constituent portion of the 20% growth was 12% price and 8% volume) as well as in 2015 (the 41% growth was 24% price and 17% volume).  The slide presentation disclosed that 85 of Valeant's 156 U.S. branded Pharma products had an average gross price increase of 36%.  With respect to the "Neuro and Other" portfolio, the presentation further disclosed that the year to date volume had declined by 7% but the net realized price had increased by 30%.  Pearson repeated during the call that the Company was "seriously considering spinning off or selling" the "Neuro and Other portfolio, which is dependent on price," and that "internal R&D will become more of a focus."

252.    Pearson declined to discuss the subpoenas from federal prosecutors, stating that

"[w]e will not be answering questions."   Regarding the government inquiries on price gouging,

Pearson stated:

> As you all know, Valeant has responded to Senator McCaskill, and addressed her
> questions regarding Nitropress and Isuprel.   In a letter to her last Wednesday, we
> discussed . . . , the analysis and reasons underlying Valeant's pricing decision, and
> Valeant's programs designed to improve patient access, among other topics.   We
> also noted that we are beginning an outreach to hospitals where the impact of a
> price change was significantly greater than average.

253.    When asked what percentage of U.S. branded prescription business flowed through

"alternat[ive] fulfillment" and "how much of that is Philidor"  Pearson stated:

> Sure.  It's really primarily our dermatology brands and then some of our specialty
> products like Ruconest, Arestin, and some of the other orphan drugs.  For certain
> products it's quite large.   For Jublia it's probably 50%.   For a lot of other
> dermatologies it's much less.  I'm sorry, I can't – it's significant but it's – I don't
> know the precise number but it's certainly, of our US portfolio, 10%, 20%, maybe.
> Tanya's nodding probably closer to 10%.

254.    After the market closed on October 19, 2015, *The New York Times* published an

article entitled "Drug Makers Sidestep Barriers on Pricing."[30]  The article discussed how Philidor's

application for a license in California had been rejected because it had concealed  its owners.  The

article reported that Valeant used Philidor to "keep the health system paying for high-priced drugs"

and to keep prices high for its dermatology products, quoting a Florida dermatologist as stating

that Valeant's program was designed to buffer physicians and insurers from complaints about high

prices.  Discussing Philidor, the article stated, in part:

> Valeant had said little about Philidor until Monday, when J. Michael Pearson,
> Valeant's chief executive, revealed on his company's quarterly earnings call that

---

[30]   A version of this article appeared in print in *The New York Times* on October 20, 2015, on page
B1 of the New York edition with the headline: "Drug Makers Sidestep Barriers on Pricing."

Valeant had purchased an option to acquire Philidor late last year.  He said that
Valeant consolidated Philidor's results in its own financial reports.

*      *      *

Specialty pharmacies are most known for providing patients with assistance with
complex drugs, many of them requiring refrigeration and injections, for diseases
like cancer, multiple sclerosis and rare genetic disorders.  But the drugs dispensed
through the specialty pharmacies used by . . . Valeant are for common ailments like
arthritis pain, acne, and toenail fungus.

255.    On October 21, 2015, the news got worse as Citron published a report entitled

"Valeant: Could this be the Pharmaceutical Enron?" which raised questions regarding the propriety

of Valeant's accounting and prior disclosures.  Among other things, the report questioned why

Valeant would "be secretly maneuvering to buy a little known pharmacy [Philidor] with a dubious

ownership structure" and questioned why this entity was "NEVER disclosed in any prior company

disclosure?"  The Citron report charged that Valeant was using a network of controlled mail-order

pharmacies to prop up sales and keep patients and their insurance companies from switching to

less costly generics.  Citron also questioned whether Valeant's revenues were inflated through

Philidor.

256.    The Citron report linked Philidor to other pharmacies through shared phone

numbers, identical privacy notices, a shared facsimile number, and shared websites.  Citron

claimed "it appears to Citron that Valeant/Philidor have created an entire network of phantom

captive pharmacies," which included West Wilshire, SafeRx and Orbit Pharmacy.  The Citron

report also provided investors with details of the R&O lawsuit.  When trading resumed, Valeant

shares plummeted nearly 40%, resulting in another trading suspension.

257.    After the market closed on October 21, 2015, Philidor issued a release of its own,

disclosing that it had a contractual relationship with "affiliated pharmacies," including R&O, and

stating that Philidor "does not currently have a direct equity ownership in R&O Pharmacy or the

- 116 -

affiliated pharmacies, but does have a contractual right to acquire the pharmacies now or in the future subject to regulatory approval."

258.    The following day, October 22, 2015, BMO Capital Markets Corp. ("BMO") stated that it "cannot defend the specialty Pharmacy structure" Valeant was using and downgraded the shares to "market perform."  Continuing, BMO's report stated:  "We've been strong, vocal Valeant bulls," but "we find Valeant's arrangements with specialty pharmacy Philidor as not just aggressive, but questionable."[31]

259.    Next, Philidor employees came forward and began to reveal the improper business practices being used by Philidor.  On October 25, 2015, *The Wall Street Journal* reported that it had interviewed former Philidor employees who revealed that Valeant employees worked directly at Philidor and were using fictitious names such as "Peter Parker," "Jack Reacher," and "Brian Wilson" in order to "conceal the ties so it didn't appear Valeant was using the pharmacy to steer patients to the drug company's products . . . ."

260.    That night, around 10:00 p.m. Ackman sent an email to Pearson, Schiller, Rosiello, Ingram, and Little.  Ackman forwarded a media article which reported that Pearson's explanation that Valeant did not disclose Philidor because it was a competitive advantage "comes up short."  The article noted that "[w]hile Valeant may argue it didn't think the consolidation of Philidor was material, the market's reaction shows investors think otherwise.  And since materiality is a qualitative, not a quantitative concept, the company shouldn't try to stonewall with answers that

---

[31]  The same day, a *Bloomberg* article titled "Valeant Still Has Explaining to Do, Citron Research's Left Says," reported on Valeant's option to buy Philidor and noted it was "a relationship other [drug] companies don't appear to have" with pharmacies.  The article noted that when manufacturers previously owned PBMs in the 1990s they were all spun off because it was "perceived" as a conflict of interest.

try to purport that it wasn't enough of assets to talk about it."  Ackman suggested they "consider whether you should admit that some mistakes were made.  This should probably come first from Mike [Pearson] and be supplemented by Bob [Ingram] for the board's point of view."  Ackman said, "For example, was it a mistake not to disclose Philador [sic]?  In retrospect, it certainly appears to have been a mistake as the lack of disclosure made the company a potential target for a short attack which implied the company was hiding something."  Ackman observed that "the lack of disclosure on Philidor was a big surprise and raised concerns among shareholders."  Ackman suggested that they "explain whether or not the board, audit committee, auditors understood and agreed with the accounting, strategy, and disclosure of this business."  Ackman added that "Investors fear fraud."

261.    Before the market opened on October 26, 2015, the Company filed its 3Q15 10-Q which included disclosures related to Philidor, including that the Company now had the "power to direct Philidor's activities."  The 3Q15 10-Q also revealed that Valeant established a special "ad hoc" committee of the board of directors to investigate Valeant's relationship with Philidor to be led by Ingram, the Company's lead outside director, and to include Provencio, chairman of the Audit and Risk Committee, Goggins, and Mason Morfit ("Morfit"). [32]

262.    As discussed above, on October 26, 2015, the Company hosted a conference call which included a presentation that stated, among other things:

- that "44% of Jublia revenue flowed through Philidor in Q3 2015";

- that "we maintain regular communication, have a joint steering committee, have rights (and have utilized them) to approve key positions (*e.g.*, in-house lawyer, chief compliance officer), included Philidor in Valeant's SOX 404 Internal Control Testing and Internal Audit program for 2015";

---

[32]  Morfit, the President of ValueAct, was added to the board of directors on the morning of October 26, 2015 and immediately placed on Valeant's ad hoc committee.

- that "Valeant [has] contractual rights [to Philidor] including: Joint Steering Committee, Right to require hires for certain positions, Substantial information rights, Covenants respecting Philidor's compliance with all applicable laws"; and

- in a section addressing Valeant's "Management Rights" over Philidor, that "Valeant has the right (but not the obligation) to appoint or cause Philidor to hire: Advisor to the CEO, Head Compliance Officer, In-House lawyer, Head IT officer, Other employees as reasonably requested."

263.    On the conference call, Rosiello disclosed Philidor's status as a VIE, and stated: "Philidor was considered a VIE prior to the purchase option agreement, but since Valeant was not determined to be the primary beneficiary, consolidation was not appropriate.  A purchase option agreement for Philidor was executed in December 2014."  Moreover, Carro admitted that "Valeant reviews the financials of the Philidor network pharmacies on a regular basis."[33]

**Valeant Reveals that the Deceptive Practices Require Philidor's Closure**

264.    On October 27, 2015, Ackman wrote an email to Pearson and Schiller stating "I don't think you are handling this correctly and the company is at risk of getting into a death spiral as a result."

265.    In another email the same day, Ackman wrote to Ingram, Pearson, Schiller, Morfit, and Little regarding *The New York Times* article by Joe Nocera on whether Valeant was the "Next Enron?" in which the reporter wrote that "Valeant . . . is a sleazy company."  Ackman said, "when one of the most credible journalists in the world accuses you of being the next Enron, time is short."  He warned that "Your reputation and that of the rest of the board along with the company is at grave risk of being destroyed on a permanent basis."  He criticized Pearson for ending the last conference call abruptly and said, "When Mike said that you were running out of time on the call,

---

[33]   On October 26, 2015, following the Company's conference call, *Bloomberg* reported that the remarks on the call "left investors skeptical, failing to answer critical questions on Valeant's continuing relationship with Philidor, according to analysts."

he was right in that the company is running out of time to save itself.  When shareholders hear that management doesn't have time to address their concerns, they assume the worst. There is no amount of time that should [be] spared addressing shareholders [sic] concerns."  Ackman noted that it took a "short seller to bring Philador [sic] to light and that has destroyed managements [sic] compact with shareholders."

266.    Ackman advised, "I strongly recommend you immediately hold a conference call to address every remaining question from shareholders" of "unlimited duration."  Ackman pleaded with them to "answer the questions honestly no matter how embarrassing the answers are and no matter what the legal implications are."  Ackman noted the business risks, including, "Valeant has become toxic.  Doctors will stop prescribing your products" and "Regulators around the world will start investigating and competing to find problems with every element of your business."  Ackman said, "The only people that need scripts and limited questions are crooks.  Joe Nocera is right.  You look like Enron."  Ackman added, "You should assume that the truth will come out eventually so there is zero downside to having it out now" and "If mistakes have been made, admit them immediately and apologize."  Ackman closed by noting, "We are on the brink of tragedy.  Please do the right thing."

267.    Pearson did not follow Ackman's advice, but nevertheless, the truth continued to be uncovered.[34]  After the market closed on October 28, 2015, it was reported by *Bloomberg* that an internal Philidor training manual showed that Philidor relied on "back door" tactics to boost payments and "instructed employees to submit claims under different pharmacy identification

---

[34]   On October 29, 2015, Ackman sent another email to Pearson, copying Ingram and wrote "I am only disappointed that you have not yet been willing to do an open line q&a with all of your shareholders, and as a result, certain important questions remain unanswered."

numbers if an insurer rejected Philidor's claim – to essentially shop around for one that would be accepted."

268.    Then, on October 29, 2015, Valeant announced it would cut all ties with Philidor. That same day, *Bloomberg Businessweek* reported additional accounts by former Philidor employees of the improper tactics by Philidor, some of which were formally documented, reporting that, in order "to fill more prescriptions with Valeant products instead of generics":

- "[w]orkers at . . . Philidor . . . were given written instructions to change codes on prescriptions in some cases so it would appear that physicians required or patients desired Valeant's brand-name drugs – not less expensive generic versions – be dispensed, the former employees said";

- that "[a]n undated Philidor document obtained by *Bloomberg* provides a step-by-step guide on how to proceed when a prescription for Valeant dermatological creams and gels . . . is rejected"; and

- that an October 2014 employee manual noted that "[w]e have a couple of different 'back door' approaches to receive payment from the insurance company."

269.    In addition, while the market was open on October 29, 2015, reports disclosed that CVS Caremark, (one of the three largest PBMs in the United States) terminated its relationship with Philidor, citing "noncompliance" with its provider agreement after an audit of Philidor's practices.

270.    After the market closed on October 29, 2015, Express Scripts and UnitedHealth's OptumRx, the other two largest PBMs, announced that they also terminated their relationships with Philidor.  Thus, the three largest PBMs in the country stated they would no longer pay for drugs dispensed by Philidor.

271.    On October 30, 2015, before the market opened, and just after touting the purported benefits and independence of Philidor, Valeant announced that Philidor would be shutting down

as soon as possible.  Pearson issued a statement that Valeant had "lost confidence in Philidor's ability to continue to operate in a manner that is acceptable."

272.    On November 4, 2015, before the market opened, it was reported that the U.S. Senate formally launched a probe into Valeant's price increases for three drugs.  Also before the market opened that day, *Bloomberg* reported further information regarding the financial impact of closing Philidor, as it disclosed that, just weeks earlier, Valeant was planning to expand its use of the specialty pharmacy.

273.    Around 5:10 p.m., Matt Miller ("Miller") wrote an email to Pearson, Schiller, and Ingram, as well as Little and Chai-Onn stating that *The Wall Street Journal* was going to publish a story about Ackman. He said Ackman "has given the reporter a lot of details unfortunately" and "it won't be pretty."  Miller gave a "rundown of what I expect to be in it" that included Ackman telling Ingram "that Pearson might have to step down" and that Ackman thought the October 26 conference call was "disappointing" and "too scripted and Mike [Pearson] was in a hurry to get off."  Miller added that he expected the call to reveal that Ackman told Ingram that "What the company needs now is a reputational recovery, someone who can deal with the press and testify before Congress, and that's not Mike's strength."

274.    After the market closed on November 4, 2015, *The Wall Street Journal* published a story that aligned with Miller's account, as it reported that Ackman, the head of Pershing Square, Valeant's largest shareholder, told Valeant's lead director, Ingram, that Pearson might need to leave Valeant and that Ackman was considering liquidating his entire $3.8 billion investment in the Company.  The article also said that Ackman had pushed Valeant to hold a conference call to "come clean" and disclose the full extent of executives' knowledge regarding Philidor, and that he was disappointed the Company did not comply.

275.    Later that night, Miller wrote an email to Pearson, Schiller, and Ingram, as well as Little and Chai-Onn forwarding the article and stating "I don't love the outcome, but it draws less blood than I thought it would."

276.    On November 10, 2015, before the market opened, the Company hosted a conference call with investors to "update [the market] on our strategy with respect to specialty pharmacies, to explain our transition plans for Philidor, to discuss our business performance for the first half of the quarter, and perhaps most importantly to take questions from all of you." Pearson, Rosiello, Carro, and Kellen participated on behalf of the Company.  Pearson stated that, "As of last week, Philidor has stopped adjudicating claims. . . .  Philidor has committed to cease operations by January 30, 2016 at the latest."

277.    Pearson also began to disclose the negative financial impact the closing of Philidor and the government inquiries into its practices were having, stating, in relevant part:

> In the very short term, disruption in our dermatology business will be significant. Last week, we asked Philidor to stop adjudicating claims and to fill all prescriptions at no cost for the week.
>
> *          *          *
>
> Turning to Neuro, we are also seeing some short-term pressure in our Neuro business, in particular with respect to Nitropress and Isuprel,[35] given all the publicity around those two drugs.  We're working with our large customers and providing direct discounts to protect volume.[36]

278.    Despite having just raised guidance less than a month before, on October 19, 2015, Pearson suggested it would be withdrawn and lowered, stating:

> Turning to guidance.  In terms of guidance, we are working to quantify the potential short-term impact of recent events, including the termination of our relationship

---

[35]   Valeant disclosed that sales of Isuprel and Nitropress dropped approximately $50 million from 1Q15 to 3Q15.

[36]   This was not true. *See* ¶¶443-444 (Valeant refused to offer discounts).

with Philidor.  Specifically, the downsides in Q4 will be primarily in dermatology and to a lesser extent, neurology RX.  Obviously, what has happened will impact Q4.  We are working to quantify the impact on Q4 and 2016 and we will provide you with updated guidance at our investor day in December.

279.    During the call, Pearson was asked about the impact the Company would see in 4Q15 in the dermatology division[37] and responded:

So, again, based on the data we have, we've not seen volume declines.  It's largely the value of the average selling price for a script.  Now, I would not be shocked to see some volume declines over the next few weeks.

In fact, I would expect that.  But I don't think they're going to be hugely material. The onus is on us to get some sort of a Plan B in place, and we are quite confident that we'll be able to get that done quite quickly.

280.    In responding to an analyst question related to pricing scrutiny, Pearson stated, "if we're viewed as aggressive, we're going to have to listen to that."  Pearson acknowledged "the past few weeks have been a painful learning experience for me personally" and that "[t]he other things I'm dedicated to doing going forward is listening more to our patients, our partners, and our critics."

281.    On November 11, 2015, before the market opened, *Bloomberg* reported that Valeant creditors were "spooked by possibility of revenue squeeze" and that concern was "growing that disruption to Valeant's cash flow could heighten the risk of the company violating lender limits on its debt burden."  Then, while the market was open on November 11, 2015, Nomura analysts cut their Valeant price target.

---

[37]   After the November 10, 2015 conference call, S&P Capital IQ issued a report noting that dermatology represented approximately 17% of Valeant's sales.

282.    Before the market opened on November 12, 2015, *Bloomberg* released another article regarding Valeant's relationship with Philidor and media reports recounted how a string of analysts had slashed their price targets for the Company.

283.    While the market was open on November 16, 2015, *Bloomberg* reported that U.S. Representative Elijah Cummings wrote Pearson requesting that Pearson make Tanner, Patel, and Pritchett available for interviews based on allegations "that a group of Valeant employees helped launch Philidor's business in 2013 and have remained involved in its daily operations." Representative Cummings also asked for contact information for Kornwasser, who recently left the Company.

284.    Later that day, after the market closed, *The Washington Post* published an article entitled "House Committee to hold hearing on prescription drug pricing" and reported that the House Oversight Committee would hold a formal hearing in early 2016 focusing on prescription drug pricing, and that the Committee had reached out to Valeant to gather information.  The article also disclosed that members of the House Oversight Committee were urging for Valeant's executives to testify at the hearing.[38]

**Additional Disclosures of the Financial Impact of the Fraud**

285.    On December 15, 2015, Valeant issued a release announcing that it had entered into a deal with Walgreens to distribute its products.  In conjunction with this agreement, Valeant also

---

[38]  On November 17, 2015, Deutsche Bank published a report detailing a survey it commissioned of 25 dermatologists in light of the disclosures relating to Philidor.  The vast majority of them noted that they were prescribing fewer Valeant products and expected to write fewer prescriptions in the future.  One added, "Did not know clearly about the Philidor-Valeant relationships Somewhat misleading and dishonest."  Another more bluntly stated, "Very shady business practices."

announced that it would reduce the price of its branded prescription-based dermatological and ophthalmological products by 10%.

286.    On December 16, 2015, its analyst day, Valeant issued a release formally withdrawing the inflated guidance it issued on October 19, 2015.  Defendants issued new fourth quarter revenue guidance of $2.7 – $2.8 billion (a reduction of approximately $600 million and 17% from $3.25 – $3.45 billion) and new fourth quarter Cash EPS guidance of $2.55 – $2.65 (a reduction of approximately $1.50 and 37% from $4.00 – $4.20).  Defendants also issued new 2015 full year revenues guidance of $10.4 – $10.5 billion (a reduction of approximately $700 million and 16% from $11.0 – $11.2 billion) and new 2015 Cash EPS guidance of $10.23 – $10.33 (an approximately $1.50, or 13% decline from $11.67 – $11.87).  Finally, Defendants issued new 2016 EBITDA guidance of $6.9 – $7.1 billion (a reduction of approximately $500 million and 7% from $7.5 billion).[39]

287.    On December 16, 2015, an analyst for Piper Jaffray issued a report stating "Sanguine Business Update, but Credibility Deficit Remains, Reiterating Neutral."  The analyst reported that Valeant was not "well positioned for significant [price/earnings] recovery anytime soon given the credibility gap associated with senior management."

288.    Before the market opened on December 17, 2015, Mizuho Securities USA ("Mizuho") cut its rating on Valeant stock to "neutral" from "buy," pointing to a lack of clarity regarding Valeant's agreement with Walgreens and stating that Valeant management had "not done a good job in articulating the details" and that "[w]e still don't understand how this partnership will improve filled prescriptions if payer restrictions persist."  While the market was

---

[39]    To offset the disappointing 2015 guidance, as discussed above, Valeant issued robust 2016 revenue guidance.  *See* ¶235.

open that day, *Bloomberg* published an article titled, "Valeant Falls as Mizuho Analyst says Drugmaker Outlook Unclear."

289.    On December 28, 2015, Valeant announced that Pearson had left Valeant, effective immediately, on a medical leave of absence.  To fill the gap, Valeant created an "Office of the CEO," which included Chai-Onn, Kellen, and Rosiello to serve in an interim capacity.  The board also created a committee to "oversee and support" the Office of the CEO, which included Ingram, Morfit, and Schiller.

290.    Then, on January 6, 2016, Valeant announced that Schiller would serve as the Company's interim CEO while Pearson remained on medical leave and that Ingram would serve as the interim Chairman of the board of directors.

291.    On January 22, 2016, but undisclosed to investors, Valeant entered into a termination agreement with Philidor that was effective as of November 1, 2015.  Schiller signed on behalf of Valeant and Rosiello signed on behalf of KGA.  The agreement included a retroactive mutual release dated November 1, 2015.

292.    On February 19, 2016, news reports commented on a February 18, 2016 Wells Fargo report by analyst David Maris ("Maris") that provided a detailed analysis of Valeant.  First, the analyst identified inconsistencies with regard to Defendants' disclosures concerning Philidor's impact on the business.  Specifically, the analyst noted that Defendants initially claimed that Philidor accounted for 7% of sales, yet lowered 4Q15 revenue guidance by 17%-19% (from $3.25-$3.45 to $2.7-$2.8 billion) and EPS guidance by nearly 37% (from $4.00-$4.20 to $2.55-$2.65).  The analyst commented that "Valeant has not explained how the unwinding of a business that represents only approximately 7% of total revenue, and is, according to Valeant, less profitable than traditional prescriptions, results in a 36.6% reduction in EPS."  The analyst added that at

- 127 -

approximately 7% of revenue, Philidor would have represented approximately $227.8 million in revenue for 4Q, yet guidance was lowered by $526.5 million.  The analyst concluded that "the new guidance is not compatible with the data presented by Valeant" and "the reduction in guidance does not match the impact, as described by Valeant."

293.    Second, Wells Fargo's Maris commented on management, stating "we believe investors are likely questioning the judgment and decision making of [the] management team and board," adding that "corporate cultures . . . are difficult to change without management and board changes."  Wells Fargo continued by noting that "the slide in Valeant's shares is directly related to decisions that the board and management have made" including "the board review and approval of a relationship with Philidor,[40] which later caused a significant decline in shareholder value and corporate reputation."

294.    Third, the analyst discussed the reduced financial outlook for Valeant.  Wells Fargo noted that "management has said that it is not planning to complete any acquisitions in 2016, nor is it planning to raise prices excessively" and concluded that "this will pose significant risk for a company that was dependent on both."  Wells Fargo commented that "the model of cutting R&D and spending, and dramatically raising prices, in pursuit of higher and higher EPS to fuel a roll-up strategy built on earnings accretion for deals is shortsighted, as often the cuts undermine the longer-term prospects of the business."

295.    Fourth, the analyst identified how Valeant's accounting was misaligned with Valeant's purported performance.  The analyst said "receivables growth has outstripped sales growth over the past several years."  Wells Fargo noted that a screening tool it uses "to predict the

---

[40]   The report noted that "Valeant has stated that prior to the Philidor deal, the board conducted due diligence."

likelihood of accounting misstatements, puts Valeant in the 'substantial risk' category," adding that when "receivables are increasing faster than revenue, it can often indicate that customers are hesitant to pay for products" and "[a]n alternative explanation for a dramatic rise in receivables is a company's improperly timed recognition of revenue."  Wells Fargo noted that "gross-to-net revenue adjustments" in 2012 were 19.1% of gross revenues but had steadily increased to 41.1% of gross revenues by 3Q15.  It reported that "Valeant suggests the reason for the increasing provision is growing returns, rebates, and co-pay assistance programs related to select dermatology products, as well as increasing sales of certain generic products…which carry higher rebate percentages."  Wells Fargo concluded that "Valeant has made business decisions that have led to increased scrutiny and share price decline."

**Valeant's Fraudulent Accounting is Revealed**

296.    On February 22, 2016, Wells Fargo analyst David Maris released an updated note regarding Valeant that included two additional valuation models and a $62 price target on the stock.  Also that day, CVS announced it would restrict the use of Jublia, the drug that was heavily distributed by Philidor, by requiring patients to first try a less expensive generic drug.

297.    After the market closed on February 22, 2016, *Market Watch* reported that Valeant "likely needs to restate some of its previous financial results based on the findings of an internal investigation into its business, according to people familiar with the matter."  It noted that the "potential revisions concern revenue that Valeant booked when its drugs were shipped to a distributor" and involved "late 2014 and early 2015."

298.    Later that night, Valeant issued a release reporting that "Valeant Ad Hoc Committee has Made Substantial Progress in Its Review of Philidor and Related Accounting Matters."  Valeant admitted that "the Company has preliminarily identified certain sales to Philidor

- 129 -

during 2014, prior to Valeant's entry into an option to acquire Philidor, that should have been recognized when product was dispensed to patients rather than on delivery to Philidor." This contradicted Defendants' statements in October 2015 that they were not inflating revenues through Philidor and that the Citron accusation was completely false. The release noted that the "Company currently believes that approximately $58 million of net revenues previously recognized in the second half of 2014 should not have been recognized upon delivery of product to Philidor," and "[c]orrecting the misstatements is expected to reduce reported 2014 GAAP EPS by approximately $0.10…"

299.    Valeant also disclosed internal control problems by revealing that they would "delay filing its 2015 10-K pending completion of the review of related accounting matters by the Ad Hoc Committee . . . and the Company's ongoing assessment of the impact on financial reporting and internal controls." Schiller said they were "committed to improving reporting procedures, internal controls and transparency for our investors" and "[w]e have made mistakes in the past and our focus today is on executing our business plan and rebuilding trust."[41]

300.    On February 28, 2016 (a Sunday), Valeant issued a release announcing that Pearson was returning from his medical leave but that the Company was separating the role of CEO and Chairman of the Board, and Ingram would be Chairman. On February 29, 2016, Valeant was scheduled to hold a conference call to discuss its 4Q15 financial results. However, the release stated that "[g]iven the timing of Mr. Pearson's return, the Company will be rescheduling its previously announced call to discuss preliminary fourth quarter 2015 results" deliver a business review, and provide update expectations for 2016. Notably, the release also revealed that "[i]n the

---

[41]   As a Nomura Securities report stated, "The need to restate hurts management's credibility, and we recognize that investor confidence in Valeant has been shaken."

interim, the Company is withdrawing its prior financial guidance," adding that, "[a]s previously announced, the Company will delay filing its 2015 10-K pending completion of the review of certain accounting matters by the Ad Hoc Committee" and "the Company's ongoing assessment of the impact on financial reporting and internal controls."  Pearson was quoted as admitting that "I realize that recent events are disappointing to everyone" and that among his priorities would be "improving Valeant's reporting procedures, internal controls and transparency."

301.    In the early afternoon on February 29, 2016, *Bloomberg* reported that although the scheduled call was canceled, Valeant "will hold a call for sell-side analysts later Monday that will include Pearson," noting the call was not publicly announced.  That same day, *Moody's* reported that it had placed Valeant's corporate credit ratings "under review for downgrade," which it stated "reflect[ed] concerns that Valeant's underlying operating performance is weaker than Moody's previous expectations," potentially impeding the Company's deleveraging plans.  Then, within hours of release of the *Bloomberg* article regarding Valeant's non-public conference call, it was reported that the call was canceled as a result of "media interest."  Moreover, Valeant announced later in the day that it was under investigation by the SEC, during 4Q15.[42]

302.    According to a *Bloomberg* article, on March 2, 2016, Pearson held a meeting with certain Valeant employees in the second-floor conference room at Valeant's headquarters in Bridgewater, New Jersey.  Pearson claimed, "We're under a barrage of external government and media and everything else," adding that "Everyone is nervous.  The board is nervous."

---

[42]    According to a *Reuters* article the next morning, Valeant was holding "one-on-one" meetings with certain investors and said that it had pulled the guidance as a precautionary measure and that investors should not assume revised guidance will be significantly lower.  A *Forbes* article the same day reported that "it is definitive that Valeant has not been entirely forthcoming to investors."

303.    On March 15, 2016, before the market opened, Valeant reduced its financial guidance for 2016 and provided unaudited financial information regarding its 4Q15 performance. With regard to 2016 guidance, Valeant lowered revenue guidance to $11-$11.2 billion (a reduction of approximately $1.5 billion and 12% from the FY 2016 $12.5-$12.7 billion guidance given on December 16, 2015), Cash EPS guidance to $9.50 - $10.50 (a reduction of approximately $3.50 and 26% from the prior $13.25 - $13.75 guidance), and FY 2016 EBITDA guidance to $5.6-$5.8 billion (an approximately $1.3 billion and 19% reduction from the prior $6.9-$7.1 billion guidance).   The Company blamed "reduced revenue assumptions for certain businesses, new managed care contracts, and increased investment in key functions, such as financial reporting, public and government relations and compliance, as well as the impact of the weak first quarter of 2016."

304.    Pearson, Rosiello, and Kellen also hosted a conference call on the same day. Rosiello stated that Valeant's first quarter results were below guidance in part due to "realizing a slower-than-expected rebound in dermatology . . ."  Pearson added that "increases in rebates are due to more competitive pressure in response to our store price increases for our late life cycle products."  In a release issued the same day, Valeant also disclosed $51.3 million in "wind down costs" for Philidor which included write-downs of fixed assets and bad debt expenses during the "wind down period November 1, 2015 through December 31, 2015."  In addition the Company disclosed a "$79.0 million impairment charge related to Philidor Rx Services."

305.    During the Company's conference call with analysts, Pearson noted that guidance was being lowered, in part, "due to the higher-than-expected inventory reductions that transition from Philidor to Walgreens and the cancellation of almost all price increases."  Pearson added that "any future price increases will be more modest and in line with industry practices and managed-

- 132 -

care contracts.  We have experienced increased competitive pressure at the payer level, resulting in increased rebates for access for our key growth products, like Jublia . . . ."[43]  Pearson added that "We have already committed to reducing pricing" on certain dermatology products "within the Walgreens' portfolio, on average, 10%" and that the "price reduction is on WAC and will impact and will be taken across all channels, not just Walgreens."  Pearson's statement that future price increases would be "in line" with industry norms and managed care contracts, confirmed that their past increases had not been.

306.    During the conference call an analyst noted "the fact that management needs to rebuild credibility with investors" and that the guidance was "lowered far more than any investor anticipated" and asked "how can we be confident in what you're saying today about the business, given that you were positive in December and January?"  Pearson responded, in part "we have to earn back the credibility."

307.    Moreover, on March 16, 2016, in a publicly disclosed message to Valeant employees, Pearson reiterated that "Restoring the public's confidence will take time."

308.    Valeant's lack of disclosure controls was further reflected in the release, wherein, Valeant provided guidance for the next four quarters of $6.2-$6.6 billion of adjusted EBITDA. Later, during the conference call, an analyst pointed out that the slide deck accompanying the conference call forecast only $6 billion.  When asked to explain the discrepancy, Rosiello revealed that the release was wrong and should have only forecast guidance of $6 billion.

309.    A March 15, 2016, email from Ackman to Pearson, Ingram, Morfit, and Steve Fraiden titled "Leaks" addressed this noting that media told Ackman's "PR team" they "heard that

---

[43]    Jublia's 4Q15 sales fell by 36% from 3Q15 and "more modest growth in Salix" was given as a reason for lowering 2016 guidance.

- 133 -

Pershing Square believed that the Company should not have reset expectations so much while ValueAct wanted to be more conservative" and that "most executives were aligned with Pershing Square and that these complications led to some of the mix ups with the numbers."  Ackman seemed to confirm the accounts, stating that "one or more directors/employees is clearly leaking to the FT and other media."  Ackman added that "Directors and employees need to be reminded of their confidentiality obligations and the risk that this creates at the company."

310.    Also on March 15, 2016 Moody's downgraded the credit rating of Valeant and its subsidiaries, including Valeant's Corporate Family Rating to B1 from Ba3, its Probability of Default Rating to B1-PD from Ba3-PD, its senior secured rating to Ba2 (LGD2) from Ba1 (LGD2) and its senior unsecured rating to B2 (LGD5) from B1 (LGD5).

## POST-CLASS PERIOD DEVELOPMENTS

311.    On March 21, 2016, Valeant filed a Form 8-K announcing the restatement of its prior financial statements.  The Company disclosed that in light of the Ad Hoc Committee's review of recent allegations and related matter it was determined that "approximately $58 million in net revenues relating to sales of Philidor during the second half of 2014 should not have been recognized upon delivery of product to Philidor."  It was therefore concluded that the Company's last four financial statements, the 2014 10-K and three quarterly 10-Qs for 2015 (first, second, and third quarter), along with PwC's audit report on the 2014 10-K, should no longer be relied upon.

312.    More specifically, the Ad Hoc Committee determined that the Company's recognizing of revenue "on a sell-in basis (*i.e.*, recorded when the Company delivered the product to Philidor)" prior to the Company's purchase option agreement with Philidor was improper.  Instead, "revenue for certain transactions should have been recognized on a sell-through basis (*i.e.*, record[ed] revenue when Philidor dispensed the products to patients) prior to entry into the option

agreement." As a result, the Company was no longer able to record revenues for shipments to Philidor and could only record revenues on shipment to the patient.

313.    The March 21, 2016 release noted that "[m]anagement, in consultation with the [Ad Hoc] committee, has concluded that one or more material weaknesses exist in the Company's internal control over financial reporting and that, as a result, internal control over financial reporting and disclosure controls and procedures were not effective as of December 31, 2014 and disclosure controls and procedures were not effective as of March 31, 2015 and the subsequent interim periods in 2015 and that internal control over financial reporting and disclosure controls and procedures will not be effective at December 31, 2015."

314.    The March 21, 2016 release further disclosed that "the company has determined that the tone at the top of the organization, and the performance-based environment at the company, where challenging targets were set and achieving those targets was a key performance expectation, may have been a contributing factors resulting in the company's improper revenue recognition."  The Company also stated it would initiate the search for a new CEO to replace Pearson who would continue to serve as CEO and a Director until his replacement was appointed.

315.    On March 22, 2016, the *Business Insider*, in an article entitled "Bill Ackman's Plan to Fix Valeant Is Doomed," reviewed an analysis done by *Bloomberg* and attempted to quantify the impact of the change in business strategy from Valeant's non-traditional approach to that of a traditional pharmaceutical company.  The article noted that without price hikes, "Valeant would lose 10% of its revenue."  The analysis showed that operating margins would decrease from 24% to 7% and with an increase in R&D spending to 13% instead of 3% that "Valeant would be losing money.  *A lot of money*." (Emphasis in original.)  The article noted that according to the analysis

"Valeant could have had an adjusted net loss of $842 million instead of net income of $527 million."

316.    On April 9, 2016, *The New York Times* reported, in an article entitled "The Female Viagra, Undone by a Drug Maker's Dysfunction," that "Valeant dismissed the entire sales force behind [Addyi]" and "doctors had prescribed the drug fewer than 4,000 times as of February." Citing interviews with former employees, analysts, investors and doctors, the article attributed Addyi's failure to Valeant's pricing actions and reliance on Philidor.  The article explained that Sprout (the maker of Addyi) had determined that Addyi should be sold at $400 and "Anthem, one of the nation's largest insurers, said it would cover the drug at the $400 price."  Upon acquisition, however, Valeant doubled the price to $800, causing payors to reconsider covering the drug. Valeant also terminated Sprout's distribution agreement with Cardinal Health, deciding instead to rely on Philidor.

317.    On April 29, 2016, Valeant released its annual report on Form 10-K for the year ended December 31, 2015 ("2015 10-K") confirming the Company's material weaknesses and restatement.  Additions to the 2015 10-K demonstrated the inadequacy of the disclosures in the Company's prior annual and quarterly reports.  For example, the 2015 10-K revealed that while the Company historically depended on acquisitions, that the volume and size of acquisitions in 2016 and beyond was expected to be minimal and this "could have a material adverse effect on our business, financial condition, cash flows and results of operations and could cause the market value of our common shares and/or debt securities to decline."

318.    On May 3, 2016, Valeant announced the appointment of Joseph C. Papa ("Papa") as its CEO and Chairman of the Board, reuniting the roles it recently separated.  Three weeks later, on May 23, 2016, Papa spoke publicly at the UBS Global Healthcare Conference.  In answering

questions from investors and analysts, Papa described Valeant as "a great turnaround opportunity" and discussed a number of the challenges he inherited.  Papa acknowledged that with Philidor "clearly we had some question marks" and that he and the Company believed "there were some pricing mistakes that were made" and that there were "some transparency things that [could be] improve[d] on at Valeant."  Regarding internal controls, Papa recognized "there are some functions that we need to put some additional [] controls" and  "there is some investment that needs to happen in areas," such as finance, "where [Valeant] just need[s] to bring some additional financial capabilities."  To that end, Papa disclosed that the Company "just recently hired a new Controller."

319.    On June 7, 2016, Valeant further revealed the financial impact that shutting down the Philidor network and ceasing the practices to deceive payors had on its business which removed additional artificial inflation from the price of Valeant stock.  On that day, Valeant issued a release and hosted a conference call regarding the Company's first quarter 2016  ("1Q16") financial results, which had been delayed by several months.  After the market closed, the Company also filed its first quarter 2016 10-Q ("1Q16 10-Q") with the SEC.

320.    In the earnings release, Valeant revealed a GAAP loss per share of ($1.08) for 1Q16 and significantly lowered its 2016 guidance again to total revenue of $9.9-$10.1 billion (down from $11-$11.2 billion), adjusted EPS (non-GAAP) of $6.60-$7.00 (down from $8.50-$9.50), and adjusted EBITDA (non-GAAP) of $4.80-$4.95 billion (down from $5.6-$5.8 billion).   In the conference call that day, Rosiello stated that "[t]he base business in Q1 declined by $289 million, driven by dermatology. . . and the transition to Walgreens. . ."

321.    Further revealing the negative impact that the loss of Philidor was having on Valeant's pricing, volume, and drug refills, Rosiello added that:

> Following the launch of the Walgreens program in January, we saw volume flattening and ASPs [average selling price] declining post launch.  Overall volume

challenges were exacerbated by the loss of refills following the shutdown at the end of January of our previous specialty pharmacy [Philidor] relationship, as well as the negative external narrative and some internal disruptions. . .

322.    Papa added that the "vast majority" of Valeant's "revenue shortfall in dermatology in our revised guidance relates to this average selling price shortfall."  During the question and answer portion of the call, Papa further revealed how much the Company's drug pricing and profitability was suffering as a result of ceasing the deceptive practices and of Philidor's closure, stating, in part:

> The issue is that there is a percentage of the business where the average selling price is significantly below what we had previously expected as we put the program together.  And in fact, in some places that average selling price is negative and by that [it] means, every time a prescription goes out the door we're taping dollar bills to that prescription as it goes out the door.  That's something that we have to get fixed.

## VALEANT'S FINANCIAL STATEMENTS WERE MATERIALLY MISSTATED

323.    During the Class Period, Valeant's financial statements were materially misstated for the following reasons:

- Valeant improperly recognized Philidor revenue, in violation of GAAP;

- Valeant concealed Philidor as a VIE, in violation of GAAP;

- Valeant falsely certified that its internal controls over financial reporting ("ICFR") and its disclosure controls were effective, in violation of SOX and SEC rules;

- Valeant concealed information regarding the impact of Philidor and price increases on its reported revenue and earnings, in violation of SEC disclosure rules; and

- Defendants' false and misleading statements were quantitatively and qualitatively material.

A.    Valeant Improperly Recognized Philidor Revenue in Violation of GAAP

324.    On March 21, 2016, Valeant filed its Form 8-K and confirmed that it had materially overstated Philidor revenue in violation of GAAP and would be restating its financial statements

for FY 2014 and the first nine months of fiscal 2015, and that, as a result, the Company's 2014 10-K and three quarterly Form 10-Qs for 2015 (first, second, and third quarter), could no longer be relied upon.  More specifically, Valeant management concluded that, prior to Valeant's purchase option agreement with Philidor in 4Q14, certain Philidor sales transactions (as defined herein) were not executed in the normal course of business, and collectability was not reasonably assured at the time the revenue was recognized. [44]

325.    As described herein, Valeant entered into a purchase option agreement with Philidor on December 15, 2014.  Prior to the option agreement being signed, Valeant had recognized revenue on sales to Philidor on a sell-in basis (*i.e.*, recorded when Valeant delivered products to Philidor).  But after the option agreement, Valeant was required to recognize revenue on a sell-through basis (*i.e.*, recorded revenue when Philidor dispensed the products to end customers).

326.    In 4Q14, leading up to the execution of the option agreement, Valeant improperly recognized revenue on sales transactions with Philidor that were not executed in Valeant's normal course of business, but done to inflate revenues.  As admitted in the Company's 2015 10-K, these purported sales transactions included:  "fulfillment of unusually large orders with extended payment terms and increased pricing, an emphasis on delivering product prior to the execution of the purchase option agreement and seeking and filling a substitute order of equivalent value for an unavailable product."  As a result of these improper sales transactions, Valeant recorded revenue.

---

[44]    *See* Financial Accounting Standards Board ("FASB") Accounting Standards Codification Topic 605, *Revenue Recognition*; SEC Staff Accounting Bulletin No. 104 ("SAB 104").

327. After recording revenue on those phony sales, and after the execution of the option agreement, Valeant recognized revenue a second time as Philidor sold this same $58 million in products to end customers.

328. With regards to the 4Q14 Philidor transactions, collectability was not reasonably assured at the time the revenue was originally recognized, and thus should not have been recognized. Valeant acknowledged in its March 21, 2016 release that, as a result, the Company's financial statements for the year ended December 31, 2014 were materially misleading and required restatement.

329. Valeant acknowledged that its reported revenues for the financial periods below were overstated by the following amounts during the Class Period:[45]

| Financial Period: | Reported revenue overstated by: |
|---|---|
| 3 months ended Sept. 30, 2014 | $12.9 million |
| 3 months ended Dec. 31, 2014 | $44.6 million |
| 12 months ended Dec. 31, 2014 | $57.5 million |
| 3 months ended March 31, 2015 | $20.8 million |
| 6 months ended June 30, 2015 | $20.8 million |
| 9 months ended Sept. 30, 2015 | $20.8 million |

330. As set forth more fully in ¶¶385-394, each of the Philidor-related misstatements and disclosure violations were quantitatively and qualitatively material to Valeant's Class Period financial statements. For example, throughout the Class Period, Valeant stressed U.S. organic sales growth and dermatology sales growth. *See*, *e.g.*, ¶¶158, 194-195, 202, 214. To that end, Philidor was a material portion of Valeant's U.S. organic sales growth and dermatology sales

---

[45] Valeant's overstatement of revenue in 3Q14, 4Q14, and FY 2014 also caused its net income and EPS to be overstated. For 3Q14, net income was overstated by $10.4 million and EPS by $0.03. For 4Q14, net income was overstated by $22.4 million and EPS by $0.06. For FY 2014, net income was overstated by $32.8 million and EPS by $0.09.

- 140 -

growth.  *See*, *e.g.*, ¶¶361-363, 370-371.  In addition, the improperly recognized revenue from the Philidor transactions enabled Valeant to report "Cash EPS"[46] of $2.58 for 4Q14 and exceed its 4Q14 Cash EPS guidance of $2.55.  Had it not improperly recognized revenue from the Philidor transactions, Valeant would have missed its guidance and reported Cash EPS of $2.51.

331.    Valeant's decision to restate is an admission that the misstatements were material, as only materially misstated financial statements are to be restated.[47]

       B.    <u>Valeant Concealed Philidor as a VIE in Violation of GAAP</u>

332.    Valeant also failed to disclose Philidor's existence as a VIE during the Class Period.[48]  Notably, ASC 810 requires disclosure in a company's financial statements for both unconsolidated VIEs and consolidated VIEs.   In its October 26, 2015 investor presentation, Valeant admitted that it considered Philidor a VIE prior to the Purchase Agreement.  Because Valeant considered Philidor a VIE, under ASC 810, Valeant was required to determine if Philidor, as its VIE, needed to be consolidated in its financial statements.  Under ASC 810, the test for determining if a VIE should be consolidated in an entity's financial statements is determining whether or not the entity is the "primary beneficiary" of the VIE.[49]

---

[46]   Notably, on December 4, 2015, the SEC advised Valeant to rename its so-called "Cash EPS" metric because "it could be read to imply that it is related to cash flows," when it is not. On December 18, 2015, Valeant informed the SEC that it would no longer report "Cash EPS," but would instead report "Adjusted Earnings Per Share."

[47]   *See, e.g.*, ASC Topic 250, Accounting Changes and Error Corrections, SEC Topic 1-M, and SEC Staff Accounting Bulletin Topic 1-N, Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements.

[48]   The GAAP covering VIE accounting is located in FASB Accounting Standards Codification Topic 810, *Consolidation* ("ASC 810").

[49]   A company is determined to be the primary beneficiary of a VIE when it is deemed to have a controlling financial interest.  A controlling financial interest is met if both of the following criteria are present:  (1) the entity has the power to direct activities of the VIE that most significantly impact the VIEs economic performance and (2) the entity has an obligation to absorb losses or

- 141 -

333.    On October 26, 2015, Valeant claimed that it was not the primary beneficiary of Philidor until after the purchase option agreement was executed in December 2014.  However, ASC 810's guidance still requires disclosure of material unconsolidated VIEs.

334.    Specifically, prior to the December 15, 2014 option agreement, Valeant was required under ASC 810 to disclose even its unconsolidated VIE relationship with Philidor because it was material.  Valeant was required to disclose the following information in its financial statements prior to December 15, 2014:

- information (quantitative and qualitative) about the reporting entity's involvement with the VIE, including its nature, size, purpose, activities, and how it is financed; and

- methodology for concluding the reporting entity [is not] the primary beneficiary of the VIE, including disclosure of key factors, assumptions, and significant judgments used in making this determination.[50]

335.    In violation of GAAP, Valeant explicitly stated in its 2013 10-K that:  "There were no material arrangements determined to be variable interest entities."[51]

336.    Following the execution of the $100 million purchase option agreement on December 15, 2014, wherein Valeant concluded it was the primary beneficiary of the Philidor VIE and consolidated Philidor's results, it was required under ASC 810 to disclose the same as in ¶334, plus:

---

receive benefits from the VIE.  *See* ASC 810-10-25-38 to 810-10-25-41 and PwC Accounting Guide: Variable Interest Entities (Second edition).

[50]   ASC 810-10-50-5A; *see also* PwC Accounting Guide: Variable Interest Entities (Second edition) and PwC Accounting Guide: Financial Statement Presentation (First edition).  PwC not only issued this interpretative guidance, but it was Valeant's auditor.

[51]   2013 10K at F-10.  The disclosure appears in reference to "collaboration and license arrangements with other entities for various products under development."  Even if the disclosure was intended to be limited, it would be misleading to mention the absence of any VIEs in one segment of the business without any mention of VIEs existing in another segment of the business.

- Which factors resulted in a change in reporting, if applicable, including the impact of that change on the consolidated financial statements (*e.g.*, the reporting entity did not previously consolidate the VIE and is now consolidating it).[52]

337.    However, Valeant failed to disclose this information in its 2014 10-K.  Valeant was also required to make additional VIE disclosures to comply with the principle disclosure objective of ASC 810 to provide users of the reporting entity's financial statements with information that includes:

- significant judgments and assumptions made in determining whether it needs to consolidate a VIE and/or disclose information about its involvement with a VIE;

- the nature of and changes in the risks associated with a reporting entity's involvement with a VIE; and

- how a reporting entity's involvement with a VIE affects its financial position, financial performance, and cash flows.[53]

338.    According to an accounting guide on financial statement presentation issued by Valeant's independent auditor, PwC:

the FASB's inclusion of these disclosure objectives emphasizes the need for reporting entities not to assume that the specific disclosure requirements represent the minimum requirements.  Instead, reporting entities should apply judgment in determining what is necessary to provide financial statement users with decision useful information.[54]

---

[52]    ASC 810-10-50-5A; *see also* PwC Accounting Guide: Variable Interest Entities (Second edition) and PwC Accounting Guide: Financial Statement Presentation (First edition).

[53]    ASC 810-10-50-8; *see also* PwC Accounting Guide:  Financial Statement Presentation (First Edition).

[54]    PwC Accounting Guide on Financial Statement Presentation (First Edition).  PwC also noted that "VIE disclosure is an area that commonly draws SEC staff comments in their reviews of filings by public registrants."  *Id.*

- 143 -

339.    However, Valeant did not make any required disclosures related to its VIE relationship with Philidor until its 3Q15 10-Q.  *See* ¶224.

C.    Defendants' False Statements Regarding Valeant Internal Controls

340.    As detailed herein, the Defendants falsely and misleadingly represented that the Company's disclosure and internal controls were operating effectively.  Valeant has now admitted that was not true.

341.    Valeant management was responsible for establishing and maintaining effective ICFR and disclosure controls pursuant to SOX.  SOX required Valeant management to perform annual assessments of Valeant's ICFR and disclosure controls and to issue a report on whether Valeant's ICFR were effective and free from material weaknesses. [55]

342.    SOX required the use of an appropriate framework in assessing ICFR, such as the Committee of Sponsoring Organizations, ("COSO") *Internal Control – Integrated Framework* ("COSO Framework").[56]  During the Class Period, Valeant's financial statements represented that management's evaluations were based on the COSO Framework:

> we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework described in Internal Control — Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission.

---

[55]   SEC Final Rule: Management's Report on Internal Control over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports, Release Nos. 33-8238; 34-47986; IC-26068; File Nos. S7-40-02; S7-06-03, Effective Date: August 14, 2003.

[56]   The COSO Framework was developed and published in 1992 by COSO of the former Treadway Commission.  The 1992 publication included a section, "Reporting to External Parties," and in 1997, COSO issued an addendum to this section.

343.    According to the COSO Framework, the control environment sets the tone for the entire structure of internal control and has a pervasive influence on all business activity:

> The control environment sets the tone of an organization, influencing the control consciousness of its people. It is the foundation for all other components of internal control, providing discipline and structure. Control environment factors include the integrity, ethical values and competence of the entity's people; management's philosophy and operating style; the way management assigns authority and responsibility, and organizes and develops its people; and the attention and direction provided by the board of directors.[57]

344.    As a result, deficiencies affecting the control environment are strong indicators of a material weakness. Circumstances that may indicate that a company's control environment is ineffective include, but are not limited to, "Identification of fraud of any magnitude on the part of senior management" and "Ineffective oversight of the company's external financial reporting and ICFR by the company's audit committee."[58]

345.    The concept of "tone at the top" has become widely accepted within the accounting profession and the field of corporate governance to describe the attitude and actions of an entity's senior management toward internal financial controls and the control environment. SEC Staff Accounting Bulletin No. 99 ("SAB 99") refers to "tone at the top" as:

> The tone set by top management – the corporate environment or culture within which financial reporting occurs – is the most important factor contributing to the integrity of the financial reporting process. Notwithstanding an impressive set of written rules and procedures, if the tone set by management is lax, fraudulent financial reporting is more likely to occur.[59]

---

[57]   COSO Framework at 23.

[58]   Exchange Act Release No. 54976 (Dec. 20, 2006) at 44-45.

[59]   SAB 99. *See also* Report of the National Commission on Fraudulent Financial Reporting (Oct. 1987); Report and Recommendations of the Blue Ribbon Committee on Improving the Effectiveness of Corporate Audit Committees (Feb. 1999).

346.    The COSO Framework states, "[m]ore than any other individual [or function], the chief executive sets the 'tone at the top' that affects control environment factors and other components of internal control.  The influence of the CEO on an entire organization cannot be overstated."[60]

347.    A material weakness, as defined in Public Company Accounting Oversight Board ("PCAOB") Auditing Standard No. 5 ("AS 5") is a:

> [D]eficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.[61]

348.    Control deficiencies that are determined to be a material weakness must be disclosed in management's annual report on its assessment of the effectiveness of ICFR.  Management may not disclose that it has assessed ICFR as effective if there is one or more control deficiencies determined to be a material weakness in ICFR. [62]

349.    AS 5 also provides indicators of material weaknesses in ICFR that includes the following:

> Identification of fraud, whether or not material, on the part of senior management;

> Restatement of previously issued financial statements to reflect the correction of a material misstatement;

> Identification by the auditor of a material misstatement of financial statements in the current period in circumstances that indicate that the misstatement would not have been detected by the company's internal control over financial reporting; and

---

[60]   COSO Framework at 83-86.

[61]   An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements, AS 5.A7.

[62]   Exchange Act Release No. 54976 at 41.

> Ineffective oversight of the company's external financial reporting and internal control over financial reporting by the company's audit committee.[63]

350. During the Class Period, Defendants made repeated assurances that its internal controls functioned properly to prevent or detect material misstatements. Each of Valeant's quarterly reports on Form 10-Q and annual reports on Form 10-K included the Internal Controls Statement and SOX Certifications set forth in ¶¶144-145.

351. On March 21, 2016, Valeant admitted that material weaknesses in its ICFR existed during the Class Period and also that its disclosure controls and procedures were not effective. Specifically, the Company disclosed:

> As a result of the restatement, management is continuing to assess the Company's disclosure controls and procedures and internal control over financial reporting. Management, in consultation with the committee, has concluded that one or more material weaknesses exist in the company's internal control over financial reporting and that, as a result, internal control over financial reporting and disclosure controls and procedures were not effective as of December 31, 2014 and disclosure controls and procedures were not effective as of March 31, 2015 and subsequent interim periods in 2015 and that internal control over financial reporting and disclosure controls and procedures will not be effective at December 31, 2015.
>
> *     *     *
>
> [A]s part of this assessment of internal control over financial reporting, the company has determined that the tone at the top of the organization and the performance-based environment at the company, where challenging targets were set and achieving those targets was a key performance expectation, may have been contributing factors resulting in the company's improper revenue recognition and the conduct described above.

352. On April 29, 2016, Valeant filed its 2015 10-K, which confirmed the Company's ineffective ICFR, including the existence of two separate material weaknesses as of December 31,

---

[63]   AS 5.69.

2014, including the "tone at the top" and regarding the failure to catch the Philidor accounting

fraud. *See* ¶317.

353.    Valeant's remediation plans for its tone at the top material weakness sheds further

light on the control environment during the Class Period and includes:

> The ARC will conduct quarterly private sessions with the Company's business unit
> leaders and their Vice Presidents in the Finance and Accounting areas to ensure a
> candid and timely dialogue regarding accounting and financial reporting matters,
> including but not limited to significant unusual transactions and the business
> purposes thereof, significant changes in business terms and/or conditions, tone at
> the top and the level of senior management pressure to meet key performance
> targets.

> One or more independent Board members will periodically attend the Company's
> planning and forecasting telephone conferences and the Company's periodic
> business reviews to monitor, and, if necessary, address any tone at the top,
> management override, corporate governance, internal control, and accounting and
> financial reporting issues.

354.    The March 21, 2016 and April 29, 2016 disclosures regarding the existence of

material weaknesses are effectively a concession their internal controls were ineffective.

D.    Defendants Concealed the Impact of Philidor and Price Increases on Revenues

355.    Valeant was also required to disclose the Philidor relationship and its impact on

Valeant's revenues as well as Valeant's dependency on price gouging in the Management's

Discussion and Analysis ("MD&A") section of each of the Company's Class Period 10-Q's and

10-K's.  Item 303(a)(3)(ii), requires companies to:

> Describe any known trends or uncertainties that have had or that the
> registrant reasonably expects will have a material favorable or unfavorable impact
> on net sales or revenues or income from continuing operations.

> *       *       *

> The discussion and analysis shall focus specifically on material events and
> uncertainties known to management that would cause reported financial
> information not to be necessarily indicative of future operating results.

356.    With regard to Philidor, Valeant was required to make the following MD&A disclosures related to Philidor and its impact on Valeant's revenues during the Class Period:

(a)    Philidor's impact on Valeant's revenue growth;

(b)    Philidor's existence as a distinct sales channel; and

(c)    Philidor sales were unsustainable.

357.    During the Class Period, Valeant emphasized U.S. organic sales growth and sales growth in its dermatology segment.  *See*, *e.g.*, ¶¶158, 194-195, 202, 214.  For example, on the April 29, 2015 conference call Pearson emphasized the Company's organic growth in dermatology, stating:

> Our US dermatology business had an outstanding quarter.  Dermatology revenue grew 38% year on year and script growth grew 37% year on year.  Jublia scripts grew 87% in Q1 versus Q4 of last year.

358.    Valeant also emphasized the role of volume increases, as opposed to price increases, on its revenue growth.  For example, on the same April 29, 2015 conference call Pearson stated:

> In terms of price volume, actually volume was greater than price in terms of our growth.  Outside the United States it's all volume…And in the US it's shifting more to volume than price, and we expect that to continue with our launch brands.

359.    The Philidor network and price increases were major drivers of Valeant's purported revenue and profitability growth trends including U.S. organic sales growth, dermatology and neurology sales growth, and overall prescription volume growth throughout the Class Period.  *See*, *e.g.*, ¶¶74, 361-363, 370-371, 380.  As a result, Valeant was required to disclose the impact of Philidor and price increases on its revenue growth trends.

360.    In SAB 104, the SEC Staff provided specific guidance on required MD&A disclosures pertaining to a Company's revenue and changes in revenue:

Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease.[64]

361.     For example, after its relationship with Philidor had been terminated, Valeant revealed Philidor's impact on its Class Period sales growth. At the Company's December 16, 2015 Investor Day presentation, Valeant highlighted "double-digit organic growth" during the period 2011/2012 through 2015.  Among the select list of "innovative strategies" that drove the revenue growth in the 2013-2014 timeframe, Valeant listed "created attractive access program in dermatology initially through partnership with Philidor."

362.     In addition, Philidor had a major impact on the growth of Jublia sales after its launch.  After launching Jublia in 2Q14, it became one of Valeant's top-selling products.  Valeant frequently highlighted the performance of Jublia during the Class Period.  *See, e.g.*, ¶¶182, 192, 194, 204.  It would have been impossible to accurately describe the drivers of Jublia sales growth between 2Q14 and 3Q15 without disclosing the role of Philidor.  Jublia sales growth, which peaked in 3Q15, the last full quarter of operations for Philidor, is shown in the charts below:

|  | 2Q14 | 3Q14 | 4Q14 | 1Q15 | 2Q15 | 3Q15 | 4Q15 | 1Q16 |
|---|---|---|---|---|---|---|---|---|
| Jublia sales (in millions) | $3 | $12 | $54 | $62 | $102 | $106 | $68 | $38 |
| % change (Q/Q) | N/A | 333% | 308% | 17% | 65% | 4% | -36% | -44% |

---

[64]     *See also* MD&A requirements and *principal objectives* at ¶¶372, 376.



363.   The rapid spike in Jublia sales was directly linked to Valeant's efforts to route prescriptions through Philidor.  By 3Q15, 44% of Jublia sales, totaling $46.6 million in revenue, were sold through Philidor.  As reflected above, demonstrating the importance of Philidor to Jublia's revenue growth, Valeant's reported revenue for Jublia declined 36% in 4Q15 when Valeant was forced to close Philidor on October 30, 2015 and dropped another 44% in 1Q16.

364.   Despite Philidor's impact in driving Valeant's revenue growth during the Class Period, Valeant failed to disclose Philidor in its MD&A until 3Q15.

365.   Valeant was also required to disclose the trend of increasing sales through Philidor because Philidor was a separate sales channel with different characteristics than Valeant's

1352297_1

traditional sales channels.   The SEC Staff provides specific examples of required MD&A disclosures regarding sales channels, including:

- Changing trends in shipments into, and sales from, a sales channel or separate class of customer that could be expected to have a significant effect on future sales or sales returns.[65]

366.   During the Class Period, Valeant disclosed "Provisions to reduce gross product sales to net product sales" in its financial statements.   As shown below, the sales provisions as a percentage of gross sales increased dramatically throughout the Class Period:

|  | 2012 | 2013 | 2014 | 3Q15 |
|---|---|---|---|---|
| Provisions as a percentage of gross sales | 19% | 28% | 30% | 41% |
| increase v. prior year | -- | 47% | 7% | 28% |

367.   Concealed from investors was the fact that these significant increases in provisions were tied to the deceptive practices that included routing patients into Valeant's clandestine network of pharmacies and increasing patient assistance.   To that end, Philidor's tactics included waiving copays through patient assistant programs or making no reasonable effort to collect copayments.   As a result, the more products that were sold through Philidor, the higher the number of provisions as a percentage of gross sales.

368.   Indeed, throughout the Class Period, Valeant attributed the provisions increase in 2013, in part, on sales of products acquired in the Medicis acquisition including Solodyn and Ziana; the provisions increase in 2014, in part, on increased sales of Jublia; and the provisions increase in 2015, in part, on increased sales of Jublia, Solodyn, and Retin-A-Micro (which were all products sold through Philidor).

---

[65]   SAB 104, Topic 13.B.

369.    Valeant failed to disclose Philidor as a distinct sales channel and, as a result, its reported growth was not indicative of future performance because the use of Philidor to generate revenue growth was also resulting in increasing risks of non-payment and higher sales provisions.

370.    As described above, Philidor employed practices to deceive payors.  As a result, Valeant's sales, through its concealed relationship with Philidor, were unsustainable.  When private insurers and PBMs became more aware of Philidor and its practices in late 2015, they immediately stopped reimbursing Philidor.  ¶¶269-270.  As a result, Valeant closed Philidor.  This had a material impact on Valeant's revenues and earnings.  In its December 16, 2015 Investor Day presentation, Valeant disclosed that the "Philidor separation" would negatively impact 4Q15 financial results by approximately $250 million in revenue and $0.65 in EPS.  During its December 16, 2015 conference call, Valeant also disclosed that without Philidor, its dermatology prescriptions declined by 20%.

371.    The material impact of closing Philidor is also evident in the drastic drop in Valeant's Dermatology revenues.  In 4Q15, Valeant reported total Dermatology revenues of $324.2 million, a *30% decline* from the $465.5 million in 3Q15 Dermatology revenues.[66]  Similarly in 4Q15, Valeant reported Jublia revenues of $68 million, a *36% decline* from the $106 million in 3Q15 Jublia revenues.  For Solodyn, the decline was even more dramatic as revenues declined 60% to $26 million from 3Q15 revenues of $66 million.

372.    The significant financial impact that the Philidor closing ultimately had on Valeant's future financial results is precisely the type required to be disclosed by Valeant under the SEC's MD&A rules, which provide:

---

[66]    Dermatology revenues declined another 29% in 1Q16 down to $228.6 million.

MD&A must specifically focus on known material events and uncertainties that would cause reported financial information not to be necessarily indicative of future operating performance or of future financial condition.

*    *    *

One of the principal objectives of MD&A is to provide information about the quality and potential variability of a company's earnings and cash flow, so that readers can ascertain the likelihood that past performance is indicative of future performance.[67]

373.    Valeant was required to warn investors that its results were not indicative of future results due to the significant financial impact Valeant would suffer upon Philidor closing.

374.    Finally, Valeant's price gouging was another major driver of Valeant's revenue and profitability growth trends that was required to be disclosed in each 10-Q and 10-K throughout the Class Period.  For example, at the April 27, 2016 Senate Hearing, Pearson testified that 1Q13 to 3Q15 revenue growth and profitability were driven primarily by price, not volume.  When asked if he could name a single drug that Valeant acquired where it did not raise the price, Pearson responded "[n]ot in the United States."

375.    Valeant was required to disclose its dependency on and the impact of price increases on its reported revenues and earnings, as Item 303 explicitly requires reporting issuers to report details in MD&A disclosures describing changes in volume or price that impact reported revenues.

376.    In addition, SEC Release No. 33-8350, *Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations*, states:

The MD&A requirements are intended to satisfy three principal objectives:

- to provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management;

---

[67]   SEC Release Nos. 33-8350; 34-48960; Financial Reporting Release 72 ("FR-72").

- 154 -

- to enhance the overall financial disclosure and provide the context within which financial information should be analyzed; and

- to provide information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance.[68]

377.    SEC Release No. 33-8350 also provides the following analogous disclosure guidance requiring an analysis of volume and price changes affecting the Company's revenues:

> [F]or example, if a company's financial statements reflect materially lower revenues resulting from a decline in the volume of products sold when compared to a prior period, MD&A should not only identify the decline in sales volume, but also should analyze the reasons underlying the decline in sales when the reasons are also material and determinable.  The analysis should reveal underlying material causes of the matters described, including for example, if applicable, difficulties in the manufacturing process, a decline in the quality of a product, loss in competitive position and market share, or a combination of conditions.

378.    In SAB 104, the SEC Staff makes it clear that an analysis of volume and price changes affecting changes in revenue are required MD&A disclosures:

> Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease.[69]

379.    As alleged in detail herein, Valeant's dependency on price increases and their impact on Valeant's reported revenues was concealed from investors.

380.    In 1Q15, Valeant significantly increased prices on two drugs, Isuprel and Nitropress, which had a material impact on its reported revenues, as they generated $134 million in revenues, and, given their high margins, a nearly equivalent impact on income.  Despite the

---

[68]   SEC Release Nos. 33-8350; 34-48960; FR-72.

[69]   *See also* MD&A requirements and principal objectives at ¶¶372, 376.

material impact these price increases had on Valeant's reported revenues and income for 1Q15, Valeant, in violation of SEC rules, concealed the impact of these price increases. [70]

381.    The SEC MD&A rules require disclosure of material events that would cause reported financial information to not necessarily be indicative of future operating performance. Due to the unsustainable nature of Valeant's deceptive practices, Valeant was required to disclose the practices and associated risks and that its financial performance was not indicative of future results.

382.    In October 2015, Valeant provided certain price and volume disclosures as part of its 3Q15 earnings presentation.  These disclosures of how price and volume impacted Valeant's sales growth were not provided throughout the Class Period.[71]  The October 19, 2015 Investor Presentation showed that through the first nine months of 2015, volume had declined 7% while net realized price had increased 30% for Valeant's Neurology business.  This showed that without price increases, revenues for Neurology would have declined.  As another example, Valeant doubled its revenues from Wellbutrin XL from 2013 to 2015, despite declining volume, by repeatedly increasing the drug's price.

383.    As an additional example, in the MD&A section of the 2015 10-K, Valeant provided disclosures about how the price increases it implemented in 2015, significantly contributed to revenue growth:

---

[70]   Other examples of Valeant implementing massive price increases to assist in hitting financial targets include Cuprimine, Syprine, and Glumetza.

[71]   Valeant essentially conceded its Class Period disclosures were inadequate when on December 16, 2015 at its Investor Day, it admitted it would  disclose in future quarterly presentations its "Volume and Price/Mix for total company and U.S. branded Rx business."

Of the $2.12 billion increase, approximately one-quarter of such amount was attributable to price increases implemented subsequent to such acquisitions (primarily related to Isuprel, Nitropress, and Glumetza).

*        *        *

Excluding the items described above, we realized incremental product sales revenue from the remainder of the existing business of $667 million in 2015, driven by pricing actions, including those implemented in the first three quarters of 2015, in particular with respect to the neurology portfolio. These pricing actions included approximately $130 million of price appreciation credits. Volume was essentially flat as gains realized during the first nine months of 2015 were offset by volume reductions in the fourth quarter 2015 primarily due to continued declines in neurology and lower volumes in dermatology as a result of the wind-down of the Philidor relationship.

384.   Valeant provided similar disclosures about price and volume in its 1Q16 10-Q filed on June 7, 2016. However, during the Class Period, in violation of SEC rules, Valeant failed to provide adequate disclosures showing how increases or decreases in price and volume impacted its revenue growth. This lack of disclosure violated MD&A requirements because it prevented investors from seeing "the company through the eyes of management."[72]

E.   Defendants' False and Misleading Statements Were Quantitatively and Qualitatively Material

385.   SEC Codification of Staff Accounting Bulletins Topic 1-M, *Materiality* ("SEC Topic 1-M") sets forth the generally accepted methods for accountants to evaluate materiality as it relates to the financial statements of SEC registrants. SEC Topic 1-M states that:

The omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item.

---

[72]   SEC Release Nos. 33-8350, 34-48960; FR-72.

386.    SEC Topic 1-M also states that both "quantitative" and "qualitative" factors must be considered in assessing materiality.[73]  SEC Topic 1-M notes that assessing materiality solely on a quantitative basis "has no basis in the accounting literature or the law."  It notes that the Financial Accounting Standards Board "has long emphasized that materiality cannot be reduced to a numerical formula."  As alleged herein, each of Defendants' Class Period misstatements and disclosure violations were quantitatively and/or qualitatively material to investors as they related to central aspects of Valeant's business, operations, and prospects.

387.    Valeant has restated its financial statements for the quarter and year ending December 31, 2014 and the first nine months of 2015 and said that, as originally reported, its financial statements should no longer be relied upon.  Valeant's financial restatement is an admission that the financial statements it issued to investors during the Class Period were materially false and misleading, as only materially misstated financial statements and measures need be corrected and reissued on a retroactive basis.[74]

388.    Further, the material impact of Philidor on Valeant's revenue growth is evident from the closing of Philidor.  *See*, *e.g.*, ¶¶370-371.  Valeant disclosed that the "Philidor separation" would negatively impact 4Q15 financial results by approximately $250 million in revenue, $0.65 in EPS, and its dermatology prescriptions would decline by 20%.

389.    Each of the Philidor-related misstatements and disclosure violations were also considered material from a qualitative perspective.  For example, SEC Topic 1-M notes that

---

[73]   SEC Topic 1-M provides: "there are numerous circumstances in which misstatements below 5% could well be material. Qualitative factors may cause misstatements of quantitatively small amounts to be material."

[74]   *See, e.g.*, ASC Topic 250, Accounting Changes and Error Corrections, SEC Topic 1-M, and SEC Staff Accounting Bulletin Topic 1-N, Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements.

quantitatively small misstatements may be material if management has intentionally violated GAAP.  Here, Valeant has admitted that a "tone at the top" and the "improper conduct" of its Controller and CFO contributed to the misstatements.

390.    Philidor masked Valeant's sales trends throughout the Class Period, which is also a qualitative materiality consideration under SEC Topic 1-M.  Unbeknownst to investors, Philidor was a key driver of Valeant's publicly reported, and highly touted, dermatology segment revenue growth rate.  Philidor also had a material effect on Jublia sales trends, as described above at ¶¶362-363.

391.    Philidor's significant growth also impacted a portion of Valeant's business that played a significant role in its operations.  As detailed above, Valeant stressed U.S. organic sales growth and dermatology sales growth.  Philidor was a material portion of both.

392.    SEC Topic 1-M also states:  "the demonstrated volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material."  When Valeant finally disclosed the existence of Philidor on October 19, 2015, the market's reaction to Valeant's stock price was devastating.  After the October 19, 2015 disclosure regarding Philidor, the price of Valeant stock declined over 17% over the course of two days.  On October 25, 2015, *The Wall Street Journal* noted, "[w]hile Valeant may argue it didn't think the consolidation of Philidor was material, the market's reaction shows investors think otherwise.  And since materiality is a qualitative, not a quantitative concept, the company shouldn't try to stonewall with answers that try to purport that it wasn't enough of assets to talk about it."

<u>Materiality of MD&A Disclosures</u>

393.    In addition to the quantitative and qualitative criteria presented above, the MD&A

disclosure violations and omissions were also material under SEC disclosure rules, which place an

emphasis on materiality in regards to MD&A disclosure:

> Companies must provide specified material information in their MD&A, and they
> also must provide other material information that is necessary to make the required
> statements, in light of the circumstances in which they are made, not misleading.[75]

394.    Each of the MD&A disclosure violations and omissions discussed above (¶¶ 355-

393) were either required MD&A disclosures on their own or, at a minimum, were required in

light of the existing MD&A disclosures that Valeant made regarding revenue trends.  By belatedly

making additional MD&A disclosures regarding price increases and Philidor, Valeant has

conceded their materiality.

## ADDITIONAL SCIENTER ALLEGATIONS

395.    The Exchange Act Defendants participated in a years-long scheme to defraud

investors by issuing false and misleading statements about Valeant and its operating performance,

and also defrauded PBMs, physicians, and payors by designing and concealing improper practices

to boost sales and sale prices of Valeant products.  The Individual Defendants were personally

aware of, designed, and implemented the deceptive practices detailed herein.  The Individual

Defendants were also personally aware of, or were severely reckless in disregarding, the improper

and deceptive tactics employed by Philidor by virtue of their frequent meetings, effective control

over, and contractual right to review and approve Philidor's records and policies.  Other facts

---

[75]    SEC Release Nos. 33-8350; 34-48960; FR-72.

evidencing the Individual Defendants' scienter, including their motive to engage in the fraudulent conduct detailed herein, are detailed below.

**The Individual Defendants' Role in Valeant's Non-Traditional Business Strategy**

396.   Pearson was the architect of the non-traditional business strategy and, with the other Individual Defendants, directly orchestrated the dramatic price increases and deceptive business practices.  Pearson formed his views regarding the operations of pharmaceutical companies while at McKinsey and when brought over as Valeant's CEO, implemented the strategies discussed herein.  The non-traditional approach of acquiring existing drugs, cutting R&D and engaging in price gouging while hiding such practices by intentionally concealing Valeant's network of captive pharmacies formed the very core of Valeant's operations.  It was a strategy well known to the Individual Defendants who designed, implemented and/or approved of the strategy that allowed Defendants to claim profit margins as high as 99%.

397.   A former Valeant executive confirmed to *Forbes* that Pearson "wanted to win at all costs and surrounded himself with people who would basically do whatever he told them to do." According to *Forbes*, Pearson "liked to hire cronies like his former McKinsey partner Robert Rosiello, (now Valeant's chief financial officer")," his "brother-in-law [Robert Brabandt], who was paid $299,000 a year," and "Ryan Weldon, head of Valeant's U.S. dermatology operation," who was the son of Pearson's former client, Johnson & Johnson CEO Bill Weldon.  Other members of the board of directors and executives also had prior ties to Pearson.  *See*, *e.g.*, ¶¶41, 44-45.

398.   Former employees interviewed by *Bloomberg Businessweek* confirmed that Pearson had a hands-on management style and "had his fingers in everything, from operations to making decisions about the salaries of individual employees."  *Forbes* also confirmed that Pearson "micromanaged things he deemed important."

399.    Pearson held weekly calls with the leaders of Valeant's business groups on Tuesdays at 11:00 a.m., during which Valeant's senior management would assess the business, address developing issues, and ensure that there were no surprises facing the Company at each quarter end.

400.    During the April 29, 2015 conference call, Schiller commented on his resignation as CFO and confirmed the role that he and Pearson played in implementing the non-traditional practices, stating that, "Mike [Pearson] sets the tone at Valeant" and adding, in part in part:

> I've completely bought into our unique strategy and culture, the transparency and fact-based approach to running our business, and our relentless focus on building a great Company and on creating shareholder value.
>
> . . . . Valeant's business has never been stronger and its prospects have never been brighter. . . .

401.    In addition, Valeant documents and sworn testimony confirm that the Individual Defendants were directly involved in the business and pricing strategies implemented by Valeant. For example, when Isuprel and Nitropress were acquired, Pearson, Schiller, Kornwasser, Andrew Davis, Steve Sembler (former Senior Vice President of Neurology and Other), and Sandeep Lalilt (Senior Director of Marketing) ("Lalilt") held a meeting to discuss pricing. *The Wall Street Journal* reported that the group was recommending smaller increases implemented over time but Pearson wanted the dramatic increases to reach profit targets.  At the Senate hearing, Schiller confirmed that despite the recommendation of the business unit "Mr. Pearson made a decision to go with the higher price."  In a written statement to the Senate Committee, Pearson admitted that he, "as [Valeant's] leader, was too aggressive – in pursuing price increases on certain drugs."

402.    In another meeting in July 2015, Pearson met with Rosiello, Carro, Stolz (Senior Vice President of Neurology/Dentistry/Generics), Craig Olson (Vice President of Finance), and

Lalilt, and decided to raise the price of Cuprimine by 400% from approximately $6,500 for 100 capsules to over $26,000.

403.    At the Senate hearing, Pearson confirmed his hands-on style, testifying in response to questions about patient complaints that "we do track every patient that calls and make sure that it's run to the ground" and "I read the reports."

404.    Further, in a May 28, 2014 conference call with investors, Schiller stated that he and Pearson "religiously track each deal on a quarterly basis. Our Board of Directors get a report every quarter on each deal. We go back every quarter and ask how are we doing, we are our own biggest critics."  Later the same day, at a Sanford C. Bernstein Strategic Decisions Conference, Pearson stated, "we're tracking every product around the world."

405.    Furthermore, when Allergan called into question Valeant's pricing practices in mid-2014, Pearson and Schiller vigorously refuted these allegations and claimed Allergan lacked knowledge about Valeant's business which they possessed.  For example, on July 21, 2014, the Company announced it had contacted Quebec and U.S. regulators regarding Allergan's "false and misleading statements regarding Valeant's business," including assertions by Allergan in "an SEC filing that Bausch + Lomb's pharmaceutical sales were stagnant or declining."  The release quoted Pearson as stating:

> We can no longer tolerate unjustified attacks on Valeant's business and strongly believe we are obligated to take action to protect Valeant shareholders from Allergan's apparent attempts to mislead investors and manipulate the market for Valeant stock. . . .  Allergan's continued disparagement of Valeant and repeated questioning of Bausch + Lomb's performance demonstrate their fundamental lack of knowledge about Valeant's business. . .
>
> Finally, we do not believe that it is productive for either company to conduct due diligence in a public forum and although we have consistently offered Allergan the opportunity to conduct due diligence on our business, its management and board

have refused, and have instead chosen to make misrepresentations and false statements about our business.[76]

406.   Moreover, throughout the Class Period, the Individual Defendants held themselves out to investors as the persons most knowledgeable about Valeant's business, operating model, and strategies (including pricing, the AF initiative, and specialty pharmacies), acquisitions, organic growth, internal controls, ethical standards, compliance programs, and the volume, pricing, and performance of Valeant's products.  The Individual Defendants voluntarily and repeatedly chose to speak on these issues throughout the Class Period and in doing so either knew or recklessly disregarded that their statements were contrary to the underlying facts alleged herein while making the specific and detailed statements alleged herein.  For example, during a May 21, 2016 RBC Investor Meeting, Pearson discussed Valeant's stock price, stating "[w]e expect our stock to go up 50%, 70% a year, that's our expectation, that's what I get paid to do and our long-term investors appreciate it."  He also said "I believe that our company is fundamentally undervalued" and that "last year when we were trading at 105 it was so obvious to me that we were so undervalued why wouldn't all you guys rush in?  Not just you guys but I mean investors clearly we weren't worth 105."

407.   The Individual Defendants, were active and culpable participants in the fraudulent scheme and wrongful course of business alleged herein by virtue of their receipt of information reflecting the true facts regarding Valeant, its operations, and its business practices, and their control over and/or receipt of Valeant's materially misleading misstatements and/or their

---

[76]   Media outlets reported Pearson falsely told investors that Allergan's executives wasted money on a golf course at its headquarters, which was not true, and sent a threatening letter to Allergan's CEO asking him to consider how he wanted to be perceived by "investors" and even "his immediate family."

associations with the Company that made them privy to confidential proprietary information concerning Valeant's unsustainable business model and its reliance on deceptive practices.  The ongoing fraud as described herein was pervasive, multi-faceted, and carefully designed, and could not have been perpetrated without the knowledge and/or recklessness and complicity of personnel at the highest level of the Company, including the Individual Defendants.

408.    During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Valeant, were privy to confidential and proprietary, non-public information concerning Valeant's operations, finances, financial condition, and present and future business prospects, including in connection with due diligence undertaken as part of Valeant's acquisitions, via internal documents and conversations with other officers and employees, and/or attendance at management and/or board of directors meetings and committees thereof.  Because of their possession of such information, the Individual Defendants had the ability and opportunity to prevent the issuance of the Company's reports and releases alleged herein to be false or misleading and/or to cause them to be corrected.  The Individual Defendants' materially false and misleading statements during the Class Period violated their duty to promptly disseminate accurate, full, and truthful information with respect to Valeant's operations, business, financial statements, and financial metrics, so that the market price of Valeant securities would be based upon truthful and accurate information.

409.    Moreover, Pearson, Schiller, and Rosiello undertook the affirmative obligation to obtain the requisite knowledge to ensure the Company's disclosures to the market were true by executing SOX Certifications.   Pearson, Schiller and Rosiello participated in the drafting, preparation, and/or approval of the various SEC filings, releases, and other public statements

complained of herein and because of their managerial positions had control over the information that was disclosed and the true facts relating to those disclosures.

**The Individual Defendants' Monitoring of and Decision to Close Philidor**

410.    The Individual Defendants were personally aware of Valeant's use of Philidor and its network of pharmacies, from Philidor's inception until the Exchange Act Defendants decided to shut Philidor down in October 2015, and were aware that the relationship was being concealed. The Individual Defendants were intimately involved in the acquisition of Medicis, which employed an AF strategy and led to the formation of Philidor on January 2, 2013.

411.    On January 3, 2013, Valeant announced the hiring of Kornwasser. Kornwasser and Tanner were main contacts for Philidor. Tanner reported to Kornwasser, who reported to Pearson. Kornwasser's position and compensation within the Company make clear that Philidor was of critical importance to Valeant. Kornwasser received over $8.8 million in total compensation (cash and stock awards) in his first year of employment.

412.    Pearson, Schiller, and senior management signed the Philidor agreements, and Pearson and other executive officers often touted Valeant's new "alternative fulfillment program."

413.    While unknown to investors, the Individual Defendants knew that several Valeant employees were assisting in the formation of Philidor, working at Philidor, and eventually transferred employment to Philidor, where these employees (both while still employed at Valeant and after transferring to Philidor) would oversee the deceptive business practices designed to artificially boost the sales and sale prices of Valeant drugs.

414.    Prior to obtaining the option to acquire Philidor, Pearson, Schiller, and Valeant's Board of Directors engaged in due diligence, which included multiple site visits. In fact, the majority of Valeant's Board of Directors, including the entire Audit and Risk Committee, went to

tour the Philidor facility in Pennsylvania in person and prior to the transaction.  In addition, Valeant's entire Board of Directors, including the Finance and Transactions Committee and the Audit and Risk Committee, reviewed and approved the Philidor transaction and the accounting treatment that violated GAAP.

415.   Valeant effectively controlled Philidor from its inception.  Philidor was created to orchestrate Defendants' scheme and wrongful course of business.  Valeant had a contractual right to inspect Philidor's books, records, and facilities and to audit its practices for compliance and either did so, and knowingly approved of the deceptive practices, or was severely reckless in failing to do so.  As Philidor employees have confirmed, the deceptive practices were widely known, discussed, and even documented in Philidor's training manuals.  Philidor was included in Valeant's internal control testing and internal audit program for 2015.  Valeant and Philidor formed a joint steering committee which held regular meetings to discuss, among other things, Philidor's "Strategic Plan," contractual obligations with third party payors, and "internal policies, manuals and processes."

416.   As further example that Pearson was personally monitoring Philidor's practices, on March 9, 2015, Kellen sent an email to Pearson updating him on their earlier conversation stating "Met with Deb [Jorn]….Suggested we get all the DMs [District Managers] in for a day…*goal to go over the practices in each district where Philidor is working well* and identify next [approximately] 10 practices where we should push harder to build it out.  that [sic] will help fuel growth." (Ellipses in original, emphasis added.)  Pearson responded, "Good stuff."  Philidor managers were invited to meet with Valeant's board in July 2015, which meeting ValueAct also attended.

417.    Not only were the Individual Defendants closely monitoring the relationship with Philidor, but they also monitored the network of pharmacies through which Philidor operated.  For example, Valeant made approximately 75 shipments of product to R&O between January and August 2015 and received millions of dollars in payment directly from R&O in return.   On September 4, 2015, after R&O began withholding invoices upon suspicion of fraudulent conduct, Valeant's general counsel sent a letter to R&O's owner seeking "immediate payment."   In the October 19, 2015 conference call, Pearson told investors that R&O was a part of the Company's specialty pharmacy network and discussed the lawsuit.

418.    On October 19, 2015, as questions about Philidor arose, Pearson, at a conference attended by Rosiello, and Kellen, defended Philidor and the decision to conceal the relationship as "a competitive advantage that we did not want to disclose to our competitors."  Pearson repeated this at the October 26th conference attended by Schiller, Rosiello, Ingram, Provencio, Melas-Kyriazi, Stevenson, Carro, and Kellen and added that Philidor was purportedly "independent" and sales through it were "less profitable."  Just days later, on October 30, 2015, Valeant announced Philidor would cease operations as Philidor's improper practices were publicly revealed.  The Exchange Act Defendants' decision to shut Philidor down so quickly, rather than needing to investigate and confirm the devastating allegations, shows they were fully aware of Philidor's deceptive practices.

419.    Pearson repeatedly spoke of the purported benefits of the AF strategy during the Class Period but refused to provide details of the particular practices when asked.  In addition, when Valeant's relationship with Philidor was uncovered, Pearson admitted that it was a conscious decision to conceal Philidor for purported "competitive" reasons, and Ingram made clear that the board "has fully supported the company's specialty pharmacy strategy."

420.   When Citron issued its report questioning whether Valeant was inflating revenue through Philidor, Pearson, Ingram, and Carro all publicly defended Valeant's accounting.  On October 26, 2015, Ingram noted that the entire board and Audit Committee had reviewed and confirmed the appropriateness of the accounting relating to Philidor.  Valeant's 3Q15 10-Q filed that same day, signed by Pearson and Rosiello, repeated this fact.  In a conference call with investors, Ingram forcefully defended Pearson, saying, "I also want to reiterate the Board's complete and total faith in Mike Pearson" because "[h]e operates with the highest degree of ethics and he has the Board's unanimous support."  However, as the SEC began to investigate, Carro and Schiller were asked to leave for engaging in "improper conduct" related to the accounting.  Valeant admitted it had improperly inflated revenues through Philidor and would need to restate its previously issued financial statements because it, for example, double booked revenues, which is an obvious and indefensible violation of GAAP.

421.   In addition, in light of Valeant's effective control over Philidor, the efforts by Philidor to cover up its wrongdoing further support an inference of scienter.  Specifically, as reported by *Reuters*, starting in September 2015, "Philidor began requiring employees to sign confidentiality agreements empowering the pharmacy to sue workers who divulged information about its activities."  The fact that Philidor compelled its employees to sign such agreements, two years after it began operations and just after the R&O dispute and government inquiries, demonstrates such efforts were intended to conceal wrongdoing rather than protect purported business secrets.

**Valeant's Refusal to Pursue Remedies Against Wrongdoers**

422.   Valeant's failure to pursue remedies against Pearson, Schiller, and Philidor supports an inference that the deceptive business practices alleged herein were fully approved.

- 169 -

Valeant, therefore, could not pursue such remedies for the very wrongdoing it condoned, and thus was limited to terminating the employment of the wrongdoers and shutting down Philidor.

423.    In 2014, Valeant instituted a clawback policy that allows the Company to recover incentive compensation from management if a restatement is required within three years of the relevant period and an executive is found to have participated in fraudulent or illegal conduct. However, as Ingram noted, the board approved the accounting for Philidor and thus, notwithstanding this clawback right, Valeant's board has taken no public action to recover payments to Pearson, Schiller, or the other executives.

424.    To the contrary, although Pearson was only to receive a performance bonus but no salary for 2016, a month after announcing that Pearson would be replaced as the CEO, the Company retroactively modified his employment contract to provide him with a $2 million salary for 2016, along with other financial benefits, and has since provided him a $9 million severance.

425.    Similarly, on October 26, 2015, Schiller claimed that "we received indemnification from the equity holders of Philidor for breaches of fundamental representations and covenants, including for a breach of Philidor's covenant to comply with applicable laws.  The equity holders indemnification obligation survived indefinitely and is kept in the amount of the upfront fee and all the milestones achieved."  The Valeant purchase option agreement with Philidor confirms the indemnification rights, providing that Philidor "shall indemnify, defend, and hold harmless" Valeant "from and against any and all Losses" to Valeant "as a result of the operation of the Pharmacy or the performance by the Pharmacy of its duties."  But it provides that such liability "shall be reduced by the extent…that such Losses are caused by or arise out of (a) the negligence or intentional misconduct of Manufacturer."  Rather than pursue its claims against Philidor, Valeant entered into a mutual release with Philidor, effective as of November 1, 2015, and the

Exchange Act Defendants have not publicly announced any steps to recover from Philidor any damages the Company sustained as a result of Philidor's alleged practices.

**Valeant Admits it Made Misrepresentations During the Class Period**

426.    Valeant has admitted that several of the Exchange Act Defendants' Class Period statements were false and misleading, that Carro and Schiller engaged in improper conduct, and that Valeant had an improper "tone at the top."

427.    On February 3, 2016, Valeant admitted that Pearson's April 29, 2015 statement that "volume was greater than price in terms of our growth" was false.  On February 22, 2016, Valeant issued a release wherein the Company stated it had improperly recognized revenues.  On March 21, 2016, the Company issued a release and Form 8-K disclosing that it had material weaknesses in internal controls and the 2014 10-K and three 10-Qs during 2015 could no longer be relied upon.

428.    Further, Schiller was accused of "improper conduct" and the Company "determined that the tone at the top of the organization and the performance-based environment…may have been contributing factors resulting in…improper revenue recognition."[77]  Valeant asked Schiller to resign from the board and forced Pearson and Carro out and quickly replaced them.

---

[77]   Valeant routinely provided non-GAAP compliant financial disclosures in an effort to make Valeant appear more profitable than it was.  On December 4, 2015, the SEC raised concerns regarding the "overall format and presentation of the non-GAAP measures" and regarding the prominence given to such numbers.  In a March 18, 2016 letter to the Company, the SEC noted that "over the past four years, you have reported approximately $9.8 billion of non-GAAP net income" compared to having "reported [a] GAAP net loss of approximately $330 million."  The Exchange Act Defendants' willingness to continually push the envelope with opaque and misleading disclosures further supports an inference of scienter.  On April 8, 2016, under Valeant's new CEO, the Company told the SEC it would change its approach to non-GAAP financial measures.

**Pearson's and Schiller's Admissions and Obstruction During the Congressional Hearings**

429.   The House Oversight Committee and the Committee on Aging of the U.S. Senate ("Senate Aging Committee") began investigating Valeant's business practices in 2015.  Numerous admissions during the course of these investigations further support an inference of scienter.

February 4, 2016 House Oversight Committee Hearing

430.   Valeant produced 75,000 pages of documents to the House Oversight Committee. A summary of those documents corroborates the allegations herein confirming:  (i) "that Mr. Pearson purchased Isuprel and Nitropress in order to dramatically increase their prices" and "Valeant identified goals for revenues first, and then set drug prices to reach those goals," (ii) "that Valeant used its patient assistance programs to justify raising prices and to generate increased revenues by driving patients into closed distribution systems," (iii) that Valeant "sought to exploit this temporary monopoly by increasing prices dramatically to extremely high levels very quickly," and (iv) that "Mr. Pearson utilized this strategy with many more drugs than Isuprel and Nitropress" as Valeant had increased the price of 20 prescription products by more than 200% from 2014 to 2015.

431.   During the February 4, 2016 hearing, Schiller demonstrated his intimate familiarity with and knowledge of Valeant's drug pricing practices and spoke as an authority on the subject. In his prepared testimony, Schiller acknowledged that Valeant had acquired Nitropress and Isuprel in February 2015 and that even though they were only two of 1,800 total Valeant products (0.1%), they accounted for 4%[78] of full year 2015 revenues.  Schiller admitted that "patient assistance"

---

[78]   Moreover, they had an even greater impact on profitability given that they generated 99% margins.

Valeant provided to lower co-pays for patients with private insurance was not permitted by federal anti-kickback laws.

432.    In live testimony at the hearing, Schiller admitted that the previously concealed risks of the Company's price gouging practices included: "increased pressure for rebates from the payers, decreased sales volumes from hospitals, increased substitution of alternative products, and heightened competition from new generic or branded drugs."

433.    Schiller also effectively acknowledged what the Exchange Act Defendants had repeatedly denied throughout the Class Period:  that Valeant's business strategy was neither sustainable nor more profitable.  Schiller did so by acknowledging "we made a lot of mistakes" and would no longer pursue such "aggressive" price increases and would be lowering prices. Schiller also admitted they were "too aggressive" in raising the prices of Nitropress and Isuprel, and said "[w]e are not going to be looking for those kinds of acquisitions going forward."  In addition, Schiller admitted that Valeant would spend more heavily on R&D.

434.    Schiller was asked if Pearson's statement, "do not bet on science, bet on management," was Valeant's operating philosophy.  Schiller responded that the Company was "chang[ing] quite a bit."  Representative Maloney asked if "price increases represented 80 percent of your company's growth for the first quarter of 2015" and Schiller admitted they did.

435.    At one point, Chairman Chaffetz asked Schiller to identify all of the factors that Valeant considered when raising prices, and when Schiller omitted to mention that increasing profits was a factor, Chairman Chaffetz stated that Schiller was "lying" and being "disingenuous."

436.    Representative Cummings said Valeant's documents showed "[t]heir basic strategy has been to buy drugs that are already on the market and then raise the prices astronomically [for a] temporary period of time before other competitors enter the market."  Representative Cummings

- 173 -

noted reports that "in 2014, Valeant led the industry in price hikes, raising prices on 62 [drugs]" by "an average of 50 percent" with Glumetza, a diabetes drug, increasing "by a whopping 800 percent over a mere six-week period."  Schiller said he was "not familiar with all those numbers" but "directionally, that is true."

437.   Representative Cummings complained that Valeant had "refused my previous request and obstructed our abilities to investigate their actions."  After the hearing, members of the House Oversight Committee continued to emphasize that Valeant was not being cooperative. In September 2015, Valeant asserted privilege over various documents, but by March 2016 members of Congress complained that Valeant had still not produced a privilege log.  On April 12, 2016, Representative Cummings sent another letter to Pearson stating "[y]our refusal to cooperate fully with Congress is extremely troubling and reflects a pattern of obstruction. . ." Cummings said he had asked on November 16, 2015 that Valeant make Tanner, Pritchett, and Patel available for interviews but that Valeant had "failed" to do so.

Senate Aging Committee Hearing

438.   On April 27, 2016, the Senate Aging Committee held hearings relating to Valeant. Pearson (who had been terminated as CEO after returning from a leave of absence) along with Schiller and Ackman testified.

439.   Pearson submitted a written statement admitting "the company was too aggressive – and I, as its leader, was too aggressive – in pursuing price increases on certain drugs."  He said he "regret[ted] pursuing transactions where a central premise was a planned increase in the prices of the medicines, such as our acquisitions of Nitropress and Isuprel."  During the hearing, Pearson and Schiller displayed their intimate familiarity with and knowledge of the Company's drug pricing practices and spoke as authorities on the subject.

440.     Senator Kaine noted that Pearson previously claimed Valeant's business model was not fully understood by all investors and the Company had "nothing to be ashamed of."  Senator Kaine asked if Pearson still felt that way and Pearson testified "No," adding, "we have been too aggressive on pricing."  Pearson also admitted he had raised prices higher than Valeant's consultants recommended.

441.     Senator McCaskill noted that since 2013 price had been more responsible for growth than volume in all quarters except one, and Pearson confirmed that was correct.  This admission contradicted Pearson's April 29, 2015 statement and his October 14, 2015 letter to Senator McCaskill, wherein Pearson claimed "[t]here is a misperception in the media that Valeant's revenue growth for existing products has been driven primarily by price."  Pearson had written that the average selling price for "products that we owned a year ago" had increased by 13% "[b]ut our prescription volume for these products over this same timeframe increased by approximately 20% showing that volume growth contributes *significantly more than price* for our U.S. branded pharmaceutical business."  (Emphasis added).[79]

442.     Pearson's October 14, 2015 letter to Senator McCaskill claimed that Nitropress and Isuprel were only "two of the approximately 209 prescription products sold by Valeant" and that "[b]road conclusions about Valeant cannot be drawn from the pricing or history of any one drug or set of drugs."  This was also misleading because far from raising prices on just two of 209 products, Valeant had raised prices (in just 2015 alone) on 85 of its 156 "U.S. Branded Pharma" products by an average of 36%.  At the hearing, Pearson was asked if he could name a single drug

---

[79]  Pearson, in his letter, was also contradicted by Valeant's investor presentation published on October 19, 2015 showing price had a greater impact on growth than volume in both 2014 (12% vs. 8%) and 2015 (24% vs. 17%).

that Valeant had acquired where it did not raise the prices and he conceded, "[n]ot in the United States."

443.    Pearson provided other misleading responses like claiming in his October 30, 2015 letter to Senator McCaskill that "for those institutions where the impact was significantly greater, *we are beginning to reach out to hospitals* to determine an appropriate pricing strategy."  Soon thereafter, Valeant announced a 30% discount program.  But, at the hearing, Senator McCaskill noted that she had not found a single hospital that had received the discounts.  Hospital affiliated witnesses at the hearing also denied receiving the discounts and several more sent letters to the Senate Aging Committee stating they had not received any such discounts.

444.    For example, Cleveland Clinic noted that it called Stolz of Valeant to ask about the discounts, and Stolz promised to get back to them but never did.  Similarly, University of Utah Health Care wrote to the Senate Aging Committee that "Valeant noted in a letter to Ranking Member McCaskill that their company would be reaching out to hospitals that were impacted by the new pricing" but when they called "Valeant refused to talk to me about better contracted prices."  Valeant essentially conceded that Pearson's claim was inaccurate, when, on April 23, 2016, Stolz submitted a written response admitting that "[a]s of this date, Valeant has not entered into contracts with individual hospitals to provide volume-based discounts for Nitropress and Isuprel" but had entered into contracts with only three hospital groups.  Valeant issued a public statement that they formed a committee which was working to "develop solutions so any hospital that is eligible for discounts on Nitropress and Isuprel receives them," and Stolz left the Company.

445.    During the hearing, Senator Collins commented that Valeant's "price-gouging strategy appears to be based on careful study of the FDA approval process.  The Company knows it often takes years before generic competitors can clear the hurdles imposed by that process to

enter the market and to compete.  During that period, Valeant exploits its de facto monopoly." Senator McCaskill added that "[e]ven Valeant's patient assistance program appears to be set up solely to increase Valeant's bottom line," with  Senator Collins adding that Valeant's PAP was used "so that you can still get the payments primarily from commercial insurers, which dwarf the amount that you're giving in customer assistance."  Senator Warren asked Pearson "[w]hy don't you use these co-pay reduction programs for federal government insurance programs, like Medicare Part D or Medicaid," to which Pearson acknowledged "we're not allowed to."  Warren responded, "Yeah, because it's illegal."

446.    Senator Collins noted that in February 2015 "Valeant paid just $40,000 for the Isuprel it sold and it made more than $17 million in net income on that one drug alone."  Pearson acknowledged "your figures are correct from a gross margin standpoint."

447.    Philidor was asked why Valeant did not simply purchase Philidor outright rather than acquire the option to purchase it for $0.  Philidor's counsel, in a written response, said that "Philidor concluded that Valeant's conduct was consistent with a concern about the economic impacts of any PBM response if Valeant had purchased Philidor." Thus, Philidor confirmed that Valeant knew PBMs would refuse to reimburse Philidor prescriptions if PBMs knew of the controlling relationship.

**Executive Departures**

448.    Numerous executive and director departures, including many of the Individual Defendants in close temporal proximity to revelations regarding the deceptive practices by Valeant and Philidor, further support an inference of scienter.

449.    On April 29, 2015, just a few months before the scandal would become public and just after the false 2014 financial statements were issued, the Company issued a release announcing that Schiller would be stepping down as CFO upon appointment of a successor.

450.    In July 2015, Kornwasser departed.  CNBC subsequently attempted to contact Kornwasser, but received a call from Valeant's crisis management department who said Kornwasser was not interested in discussing Valeant or Philidor.  The House Oversight Committee also sought to interview Kornwasser, and Representative Cummings noted he was never made available.

451.    On August 25, 2015, the Company issued a release announcing that Ubben of ValueAct had resigned from the board.  Notably, before Ubben resigned, on June 10, 2015, Ubben, through ValueAct, sold 4.2 million shares of Valeant stock, which had been held for many years, for nearly $1 billion at prices near all-time highs.

452.    On or about March 2, 2016, it was reported that Jorn, head of the U.S. Gastrointestinal and Dermatology divisions was "leaving the company effective immediately." Jorn was responsible for some of Valeant's top selling drugs, including Jublia, a dermatology drug which was sold in massive quantities through Philidor.

453.    On March 21, 2016, the Company issued a release regarding the restatement and material weaknesses in internal controls and confirmed that Pearson would be leaving the Company.  In addition, the Company disclosed that Schiller and Carro engaged in improper conduct and provided inaccurate information to the Ad Hoc Committee investigating the false revenues.  Schiller was asked to resign from the board.  Carro was replaced as controller.

454.    After joining the board, Ackman was asked by media and Congress about the corrective actions Valeant was taking and he responded by stating that Pearson was replaced as

CEO.  For example, at the Senate hearing on April 27, 2016, Ackman told the committee he joined the board to "assist in a management transition."  When asked what Valeant would do to correct its behavior he responded by noting "We have a new CEO starting" and that a "lot of the board is going to turn over, so we're going to have a new board for the most part."

455.    On April 29, 2016, Valeant announced that seven of its board members would not be standing for re-election.  This included Pearson and Schiller, as well as Mason Morfit (of ValueAct), Provencio (chair of the Audit Committee), Goggins,[80] Farmer (who, like Pearson had previously worked at McKinsey and who Pearson had also known for many years prior to joining Valeant's board), and Melas-Kyriazi (member of the Audit Committee).  Notably, Provencio, Goggins, and Morfit were also members of the Ad Hoc Committee.

456.    On May 20, 2016, Valeant stated in a filing with the SEC that Stolz had resigned as Senior Vice President Neurology, Dentistry and Generics.  Stolz had been involved in both the price increases and the purported pricing discounts Pearson promised Congress but failed to deliver.

**Pearson's Misrepresentations to Ackman**

457.    That Ackman himself asserts that he was unaware of the improper business practices alleged herein underscores Pearson's elaborate and affirmative efforts to conceal those practices not only from the investing public, but even from a large investor with whom Pearson had a cooperative business relationship, thereby supporting a strong inference of his scienter.  Although Ackman met with Pearson on many occasions to discuss Valeant's business, Pearson

---

[80]   Goggins previously worked at Johnson & Johnson, a Pearson client while he was at McKinsey, and reportedly left there after a series of cost cutting measures led to safety recalls which media observed were a result of "blindly executing the Pearson McKinsey plan."

concealed the deceptive practices described herein from Ackman, while using Ackman to refute Allergan's claims and defend Valeant's business model.

458.     In 2014, Ackman, who controlled one of the Company's largest stakeholders (Pershing Square), met with Pearson to form a partnership between Valeant and Pershing Square in an effort to take over Allergan.  According to the plan, Pershing Square would acquire stock in Allergan both to assist in providing shareholder support and to validate the value of Valeant's stock.

459.     Pershing Square is, as Ackman has described, an investment company whose business is to thoroughly investigate companies before taking large investment positions.  In an October 2014 deposition, Ackman testified that because Valeant was attempting to acquire Allergan with Valeant stock, Pershing Square "had the benefit really for the first time of doing due diligence on a company with full access to management and access to inside information, so we could vet Valeant as company, we could assess its value and we could have helped, you know, vet the credibility of the currency [Valeant's stock]."

460.     When Allergan resisted Valeant's takeover attempt and challenged the sustainability of Valeant's business and its pricing practices (which claims Valeant denied), Pershing Square engaged in further due diligence before investing $4 billion in Valeant in early 2015.  Ackman and Pearson had frequent contact, through calls, emails, and dinners, and Ackman introduced other investors to Pearson, offered to help Pearson prepare for earnings calls, and gave advice after those calls.  In short, during 2014 and 2015, Ackman had numerous conversations with Pearson about Valeant's business.

461.     Despite these extensive contacts and Ackman's "full access to management," Pearson concealed Valeant's price gouging and other deceptive practices from Ackman, in order

to have Ackman publicly vouch for Valeant's "currency," *i.e.*, stock value, during the attempted Allergan acquisition and defend Pearson and Valeant's business practices.  For example, on April 22, 2014, Pearson emailed Ackman, asking him to "emphasize [the] quality of our company" to the media.

462.    On another occasion (April 9, 2015), Ackman wrote an email to Warren Buffett ("Buffett") in response to criticism of Valeant and Pearson by Buffett's partner, Charlie Munger ("Munger"), vice-chairman of Berkshire Hathaway.  Ackman wrote that Munger "has gotten this one wrong," that "[w]e have gotten to know Valeant and Pearson well over the last year," and that others also "hold Mike Pearson in extremely high regard."  Ironically, Ackman claimed that Pearson was "an extremely direct person," and offered to set up a meeting to "meet Mike Pearson and ask him anything you would like."  Indicating that he had discussed the matter with Pearson, Ackman noted that "Mike would like the opportunity to clear his reputation in response to Charlie's recent comments."  Buffett suggested that Ackman contact Munger directly.

463.    On April 11, 2015, Ackman sent an email to Munger.  He claimed there "was a lot of misinformation disseminated by Allergan about Valeant," and "[p]erhaps that is the source of your misinformation."  Ackman asked him to meet with Pearson, stating, "I think you have the facts wrong," and "it seems fair that you would give Mike an opportunity to respond to your concerns . . ."  Further demonstrating that Ackman had been led to believe Allergan's claims were false and revealing the extent of his ignorance about the true state of affairs at Valeant, Ackman even claimed that Pearson followed a "rational approach to operations," and that "Valeant stock has been and continues to remain perennially undervalued," even though it was trading at over $200 per share.

464.    Even as late as October 6, 2015, Ackman had not been told of the extent of Valeant's price gouging.  In a media interview that day, Ackman claimed a "[v]ery small part of Valeant's business is repricing drugs" and said it was price increases by other companies that were resulting in Valeant getting "dragged into the story."  Ackman went on to claim that Valeant was "the most undervalued" stock Pershing Square owned at the time.

465.    After the truth regarding Valeant's deceptive practices came to light and Ackman joined the board, Ackman dramatically reversed course in his defense of Pearson and Valeant's business practices.  Ackman testified to the Senate under oath that he was unaware of what he called the "horrible" and "wrong" price increases that were later publicly disclosed with regard to Cuprimine, Isuprel, and Nitropress, and testified that Pershing Square did not approve of the "rapid and large increases in the prices of certain drugs."  Ackman testified, "[c]learly [there] were things I did not understand about the business."  Ackman also told the Senate Aging Committee, and repeated on CNBC and in other media interviews, that replacing Pearson as CEO was "appropriate."

466.    After the disclosures, Munger's criticism was even sharper, stating "Valeant of course is a sewer, and those who created it deserve all the opprobrium that they got."  Buffett added:  "I don't think you'd want your son to grow up and run a company in the manner that Valeant was run."  This time, rather than defend Pearson, as he had to Munger and Buffet in the past, Ackman essentially concealed Pearson's misconduct by stating only that "it is not fair to indict an[] entire company based on the actions of a few."

**Executive Compensation**

467.    Valeant's unusual compensation contributed to the high pressure environment by providing incredibly rich compensation packages based on achieving increasingly challenging

performance goals, backed by the threat of termination.  As Pearson described it, "[i]f a business does not make money, we either exit the business or we fire the person running that business.  Usually we fire the person running the business."

468.    At a May 28, 2014 conference, Pearson made clear "there's been a lot of turnover at the senior ranks; but that has been, by and large, our decision, not their decisions, as we continue to upgrade talent."  Pearson bluntly stated "[t]here's no tenure at Valeant.  It's up and out. . . .  It's more like a professional services firm than a sort of traditional pharmaceutical company."  Pearson admitted that the compensation system at Valeant was entirely dependent on increasing the stock price, stating:

> So, our Company senior management and the Board -- we -- there's only one metric that really counts, and it's total return to shareholders.  That's how we're paid.  We have a unique pay model, that at least we -- at least -- if we don't at least achieve a 15% total return to shareholders each year, compounded annual growth rate, that basically the equity we receive in terms of our stock grabs is worth nothing.

469.    A December 12, 2013 Board of Directors presentation regarding Valeant's 2014 budget reflected the aggressive targets noting that budgets submitted by business units were increased based on "[m]ultiple challenges by corporate."  The presentation noted that "[b]udget reflects stretched targets for all business units," and there would be "[n]o bonuses to be paid for performance < 90% of base budget."

470.    While missing budgets was punished with forfeiture of bonuses or worse, Valeant's highest ranking executives received millions of dollars for achieving the increasingly aggressive financial targets.  For example, in 2014, Pearson's base compensation was $2 million and Schiller's was $1 million.  However, under the bonus program they could earn multiples of their base salary.  For example, Pearson received an $8 million bonus, an amount equal to 400% of

Pearson's base compensation, and Schiller received a $2.4 million bonus, nearly 250% of Schiller's base compensation.

471.    However, the cash salary and bonuses paled in comparison to the rewards tied to driving Valeant's stock price as high as possible until 2017.  Observers noted that Valeant's compensation scheme, which was designed by board member and hedge fund activist Mason Morfit, paid Pearson "like a hedge fund manager."  For example, on April 22, 2014, the Company filed a proxy statement with the SEC disclosing that the value of Pearson's shares on March 31, 2014 was approximately $1.3 billion.

472.    During an April 22, 2014 presentation in New York, Ackman appeared with Pearson and referred to the $1.3 billion, stating that "this is one of the more unusual and leveraged shareholder aligned compensation packages we've ever seen."  Ackman also highlighted that a large portion of Pearson's compensation was tied to the grant of performance share units that vest only if he delivered incredibly aggressive annual returns over three years of between 15% and 60%, which compounded each successive year.

473.    The compensation program afforded Pearson the opportunity to become a billionaire and obtain wealth far beyond even a typical highly paid CEO, and incentivized Pearson and other Valeant executives to do whatever it took to increase the stock price through 2017, even at the expense of ethical and compliant practices that would benefit shareholders in the long term. Moreover, Pearson was allowed to effectively cash out a significant portion of his stock, simply pledging it as collateral for $100 million loaned to him by Goldman Sachs in 2014.

474.    With such powerful incentives, Pearson made statements to drive up the stock price, including in an October 27, 2014 letter Pearson wrote to Allergan's Board of Directors, which was

publicly disclosed by the Company.  In it Pearson stated, in part, "We believe our stock is trading at artificially low levels."  *See also* ¶406.

475.    On January 13, 2015, the Company filed a Form 8-K with the SEC announcing it had entered into an amended and restated employment agreement with Pearson.  Pearson stopped earning an annual base salary, but his "target bonus opportunity" was increased from $6 million to $10 million.  Again, as large as it was, the cash bonus was miniscule compared to the hundreds of millions in compensation, Pearson would receive if he successfully drove Valeant's share price higher.  Specifically, it disclosed:

> The Employment Agreement provides for the grant of 450,000 PSUs with a base price of $140.63 (with the potential to earn between zero and 2,250,000 PSUs depending on performance). The PSUs vest based on achievement of the following performance metrics (applying linear interpolation for performance between the applicable thresholds): if the total shareholder return ("TSR") over the five year measurement period is less than 10% over the base price, none of the PSUs will vest; if the TSR over the five year measurement period is 10% over the base price, 450,000 of the PSUs will vest; if the TSR over the five year measurement period is 20% over the base price, 900,000 of the PSUs will vest; if the TSR over the five year measurement period is 30% over the base price, 1,350,000 of the PSUs will vest; if the TSR over the five year measurement period is 40% over the base price, 1,800,000 of the PSUs will vest and if the TSR over the five year measurement period is 50% or more over the base price, 2,250,000 of the PSUs will vest.

476.    During the Class Period, Schiller also had millions of dollars of his executive compensation tied to meeting challenging share price increase.  On top of their extreme compensation, Pearson and Schiller were permitted personal use of Valeant's $60 million fleet of private jets which were used by them to fly friends and family for vacations.

477.    On March 21, 2016, the Company admitted that its aggressive compensation and performance goal practices contributed to the wrongdoing stating: "the Company has determined that the tone at the top of the organization and the performance-based environment at the Company, where challenging targets were set and achieving those targets was a key performance expectation,

may have been contributing factors resulting in the Company's improper revenue recognition" and other misconduct detailed in the release.

478.   The "tone at the top" material weakness is further support for an inference of scienter as accounting and internal control guidance makes clear the importance "top management" has setting an appropriate tone (*see* ¶345).[81]   As CEO during the Class Period, Pearson had ultimate responsibility for Valeant's internal control system and setting the "tone at the top" to prioritize ethical business and accounting practices and compliance over personal financial compensation.   As the COSO Framework states, "[t]he influence of the CEO on an entire organization cannot be overstated."[82]

**Inflating Valeant's Stock Price to Facilitate Cheaper Acquisitions**

479.   In addition to personal compensation, the Individual Defendants were motivated to conceal the negative facts described herein in order to artificially inflate Valeant's stock price to more cheaply acquire other companies and further its acquisition strategy.

480.   For example, in 2014, Valeant offered cash and shares of Valeant stock in exchange for Allergan shares of stock.   Thus, the Individual Defendants had an incentive to increase the price of Valeant shares to hit or exceed their $46 billion offer to Allergan, which was to be substantially funded with Valeant shares.   *See* ¶¶163, 459.   On May 28 and 29, 2014, meetings were held with some of Allergan's largest shareholders to gather their support for Valeant's bid. Ackman reported that Allergan's shareholders would support the transaction if Valeant could "deliver $180 a share in Valeant in the value of the bid."   The higher Valeant's stock price, the lower the cash required to deliver $180 per Allergan share.

---

[81]   SEC Staff Accounting Bulletin No. 99 at 16.

[82]   COSO Framework at 84.

481.    Valeant also took advantage of the artificially inflated price of Valeant securities to conduct numerous debt and equity offerings during the Class Period, including one of the largest high-yield debt offerings in history, which generated in the aggregate almost $15 billion of cash for the Company from the investing public at artificially high prices, the proceeds of which were used primarily to fund acquisitions.  *See* ¶586.  For example, Valeant used proceeds from the March 2015 Note Offering to acquire Salix and proceeds from the July 2013 Note Offering to acquire Bausch & Lomb.

## LOSS CAUSATION/ECONOMIC LOSS

482.    As detailed herein, Defendants' fraudulent scheme artificially inflated the price of Valeant debt and equity securities by misrepresenting and concealing:

- Valeant's growth, profitability, and business prospects were dependent on its deceptive practices to boost sales and sale prices of its drugs;

- that the deceptive practices included price gouging and misconduct to conceal such price gouging, including routing prescriptions through its secret network of captive pharmacies and employing PAP and PR strategy to conceal such practices;

- that Valeant's secret network of specialty pharmacies were employing deceptive tactics to boost the sales prices of Valeant's drugs and obtain funds from PBMs and private payors in amounts greater than would have been obtained if the deceptive tactics were not employed;

- Valeant's deceptive practices exposed it to massive business, reputational, and financial risks that included increased scrutiny from governmental agencies such as the SEC, federal prosecutors and Congress and related costs, as well as decreased sales, refusal to pay, and reputational harm from PBMs, payors, physicians, and patients;

- Valeant's reported financials for the third and fourth quarters and full year of 2014 and the first nine months of 2015 were prepared in violation of GAAP and its financial guidance for 2016 had no reasonable basis in fact; and

- Valeant had deficient internal controls and compliance programs.

483.   Defendants' false and misleading statements, individually and collectively, concealed Valeant's true business prospects and risks, resulting in Valeant debt and equity securities being artificially inflated until, as indicated herein, the relevant truth about the Company was revealed through several partial disclosures.   These false and misleading statements, among others, had the intended effect of preventing the market from learning the full truth and keeping the price of Valeant debt and equity securities artificially inflated throughout the Class Period. Indeed, Defendants' statements had the intended effect and caused, or were a substantial contributing cause of, Valeant securities to trade at artificially inflated prices, with the price of Company stock reaching over $260 per share on August 5, 2015.   As the truth began to leak out during 3Q15, the price of Valeant securities declined dramatically, inflicting tens of billions of dollars of harm on the Class.

**September 28-29, 2015**

484.   The truth began to emerge on September 28, 2015.   ¶¶241-244.   On that day, *Bloomberg* reported that members of Congress were calling for an investigation of price gouging by Valeant.   The article reported that all Democratic members of the House Committee sent a letter to Chairman Chaffetz, urging him to subpoena Valeant for documents related to massive price increases for two drugs used to treat heart conditions.   The letter also revealed that Valeant had previously failed to "adequately answer" questions from House Committee staff members regarding the Company's basis for "skyrocketing prices" and refused to provide requested documents.   Reports on September 28, 2015 also included reference to the fact that Senator McCaskill sent a detailed list of 22 questions to Valeant, probing the Company's explanation that it had increased the prices for two heart rate medications because they were "underpriced."   On September 29, 2015, numerous additional news reports were released detailing that Valeant was

- 188 -

in the crosshairs of Congress as a result of its purchasing older drugs and then subjecting such drugs to steep price hikes.

485.    As a result of the information provided to the market, the price of Valeant stock dropped more than 16%, from a close of $199 per share on Friday, September 25, 2015, to a closing price of $166 per share on Monday, September 28, 2015, on unusually high trading volume of nearly 19.8 million shares.   The price of Valeant stock continued falling the following day, dropping an additional 5% to close at $158 per share on September 29, 2015, on unusually high trading volume of 14.5 million shares.   The total stock price decline over this period was 20.7%, or $41 per share.   Valeant debt securities likewise declined in value on the news.

486.    The decline in the price of Valeant securities between September 28 and 29, 2015 was the direct result of the nature and extent of the partial revelations made to the market regarding the Company's reliance on, and the associated risks of, price gouging that had been concealed or misrepresented by Defendants and of the House Oversight Committee's investigation into the Company, which Valeant was refusing to fully cooperate with.   The partial removal of artificial inflation from the price of Valeant securities would have been greater had Defendants fully disclosed the truth.   But, because of Defendants' materially false and misleading statements and/or failure to disclose the full truth, the price of Valeant securities remained artificially inflated.

**October 4, 2015**

487.    Additional problems regarding the Company's reliance on such improper practices for growth were revealed to the market on Sunday, October 4, 2015, when, as detailed in ¶245 above, *The New York Times* published a scathing article questioning Pearson's September 28, 2015 letter to employees and, specifically, Pearson's claim that Valeant was well positioned for growth even assuming no price increases on its drugs.   The article noted that outsized price increases on eight drugs accounted for approximately 7% of Valeant's revenue and 13% of its earnings before

taxes and interest in the second quarter, and that Valeant raised the prices on its brand-name drugs an average of 66%, about five times as much as its closest industry peers.  On this news, the price of Valeant stock suffered another large decline of over 10%, falling from a close of $182 per share on Friday, October 2, 2015 to a close of $163 per share on Monday, October 5, 2015, on unusually high trading volume of 11.6 million shares.

488.    The decline in the price of Valeant stock on October 5, 2015 was the direct result of the nature and extent of the partial revelations made to the market regarding the Company's price gouging and improper practices, as well as the extent of the Company's dependence on such practices for growth that had been concealed or misrepresented by Defendants.  The partial removal of artificial inflation from the price of Valeant securities would have been greater had Defendants fully disclosed the truth.  But, because of Defendants' materially false and misleading statements and/or failure to disclose the full truth, the price of Valeant securities remained artificially inflated.

**October 14-15, 2015**

489.    Additional problems were revealed to the market on October 14 and 15, 2015. ¶¶246-247.  After the market closed on October 14, 2015, concerns about the legality of the Company's financial assistance programs were revealed to the market when Valeant issued a release revealing that it received subpoenas from the U.S. Attorney's Offices for the District of Massachusetts and the Southern District of New York, requesting documents related to, among other things, Valeant's PAPs, financial support provided by the Company for patients, distribution of the Company's products, and pricing decisions.  The release also noted that the Company had responded to Senator McCaskill's previous requests and was beginning to reach out to hospitals impacted by above average price increases.  On October 15, 2015, additional information was revealed to the market, when, as detailed in ¶¶246-247 above, news reports referenced the fact that

Valeant had failed to be responsive or transparent with Congress's investigation, and that despite being served with a federal subpoena, Valeant was still refusing to provide adequate answers regarding its price gouging and improper practices.  On this news, the price of Valeant stock dropped by 4.75%, from a close of $177 per share on October 14, 2015 to a close of $168 per share on October 15, 2015, on elevated trading volume of more than 10 million shares.  The price of Valeant debt securities also declined on this news.

490.    The decline in the price of Valeant securities on October 15, 2015 was the direct result of the nature and extent of the partial revelations made to the market regarding the investigations by the U.S. Attorney's Office for the District of Massachusetts and the Southern District of New York and questions surrounding the legality and sustainability of the Company's PAPs and price gouging.  The partial removal of artificial inflation from the price of Valeant securities would have been greater had Defendants fully disclosed the truth.  But, because of Defendants' materially false and misleading statements and/or failure to disclose the full truth, the price of Valeant securities remained artificially inflated.

**October 19-20, 2015**

491.    On October 19, 2015, additional problems were revealed to the market.  ¶¶249-254. Specifically, the Company disclosed additional information related to its dependence on increasing prices for growth, the Company's controlling interest in Philidor, and a related secret network of specialty pharmacies to increase the price of Valeant's drugs and volume of Valeant's sales, when it reported its third quarter 2015 financial results and hosted an earnings conference call that began before the market opened.  While the Company raised its 4Q15 and FY 2015 revenue and EPS guidance, during the call, the Company revealed  its direct relationship with and reliance on certain specialty pharmacies, including Philidor, and Valeant's option to purchase Philidor.  In addition, the Company disclosed, among other things, that pricing accounted for approximately 60% of its

growth in 2014 and 2015, that the Company would be making drug pricing a smaller part of growth going forward, and that R&D would become an increased area of focus.  After the market closed on October 19, 2015, *The New York Times* published an article that described Philidor as not a "typical" specialty pharmacy, noted that Philidor's application for a license in California had been rejected for submitting false statements, and stated that Valeant was using Philidor as a means to keep its drug prices high.

492.    On this news, additional artificial inflation was removed from the price of Valeant stock, which declined 7.7%, falling from a close of $177 per share on Friday, October 16, 2015 to a close of $163 per share on Monday, October 19, 2015, on elevated trading volume of nearly 10 million shares.  The following day, additional artificial inflation came out of the price of Valeant stock, which fell an additional 10.43% to close at $146 per share on October 20, 2015, on unusually high trading volume of 16 million shares traded.  Valeant's stock price decline over this period, as the market digested the disclosures, was 17.36%, or $30 per share.

493.    The partial removal of artificial inflation from the price of Valeant stock on October 19 and 20, 2015 was the direct result of the nature and extent of the partial revelations made to the market regarding the extent of the Company's dependence on prices increases for growth, as well as Valeant's controlling interest in Philidor, and a related secret network of specialty pharmacies, to increase the price and volume of Valeant's sales, which had been concealed or misrepresented by Defendants.  The partial removal of artificial inflation from the price of Valeant securities would have been greater had Defendants fully disclosed the truth.  But, because of Defendants' materially false and misleading statements and/or failure to disclose the full truth, the price of Valeant securities remained artificially inflated.

**October 21-22, 2015**

494.    Additional problems regarding the Company's improper practices related to Valeant's secret relationships with specialty and "affiliate" pharmacies, including Philidor and R&O, as well as concern regarding Valeant's accounting practices were revealed to the market on October 21 and 22, 2015 ¶¶255-258.   On that day, Citron published a report questioning the relationship between Valeant and Philidor, as well as Valeant's accounting practices and suggesting that Valeant had created a clandestine network of "phantom" specialty pharmacies for the purpose of inflating the Company's revenues.   The report also provided further details of the lawsuit between R&O and Valeant, where R&O accused Valeant of "conspiring . . . to perpetuate a massive fraud."   On the same day, trading in Valeant shares was halted because of the rapid price decline after Citron published its report on its website.[83]

495.    After the market closed, Philidor issued a release disclosing its contractual relationship with "affiliated pharmacies," including R&O, and the fact that it had a right to acquire such pharmacies now or in the future subject to regulatory approval.   The following day, analysts reacted to the troubling disclosures regarding Philidor.   For example, before the market opened on October 22, 2015, BMO issued a report downgrading its rating of Valeant and concluding that Valeant's arrangements with Philidor were "not just aggressive, but questionable."

496.    As a result of the information provided to the market, the price of Valeant stock dropped more than 19%, from a close of $146 per share on October 20, 2015, to a close of $118 per share on October 21, 2015, on extraordinary trading volume of nearly 88.6 million shares.   As analysts reacted to the disclosures and the market continued to digest the negative news, the price

---

[83]   The Single Stock Circuit Breaker Rule stops trading when there are large, sudden price moves in an individual stock.   It stops trading when stock moves 10% or more in a five-minute period. The pause lasts five minutes but can extend if there is a significant imbalance in buy and sell orders.

of Valeant stock declined the following day, falling an additional 7.37%, to close at $109 per share on October 22, 2015, on unusually high trading volume of 57.7 million shares.  The total stock price decline over this period was 25.1%, or $36 per share.  The disclosures also caused a steep decline in the price of Valeant debt securities.

497.    The decline in the price of Valeant securities between October 20 and 22, 2015 removed some artificial inflation and was the direct result of the nature and extent of the partial revelations made to the market regarding Valeant's secret relationships with specialty and "affiliated" pharmacies, including Philidor and R&O, as well as concern regarding Valeant's accounting practices that had been concealed or misrepresented by Defendants.  The partial removal of artificial inflation from the price of Valeant securities would have been greater had Defendants fully disclosed the truth.  But, because of Defendants' materially false and misleading statements and/or failure to disclose the full truth, the price of Valeant securities remained artificially inflated.

**October 25-26, 2015**

498.    Additional problems regarding the Company's improper and secret relationship with and reliance on specialty pharmacies, including Philidor, to increase the price and volume of Valeant products, as well as the fact that the Company may have to potentially terminate such relationships, were revealed to the market on Sunday, October 25 and October 26, 2015.  ¶¶259, 261-263.  On October 25, 2015, *The Wall Street Journal* reported that it had interviewed former Philidor employees who revealed that Valeant employees worked directly at Philidor and were using fictitious names in order to "conceal the ties so it didn't appear Valeant was using the pharmacy to steer patients to the drug company's products."  Before the market opened on October 26, 2015, the Company filed its 3Q15 10-Q and hosted a conference call, which disclosed, among other things, that the Company had the "power to direct" Philidor's activities, and that the

Company was conducting an investigation into its relationship with Philidor, which would include creation of an ad hoc committee.  Later that day, *Bloomberg* reported that the remarks on the call "left investors skeptical, failing to answer critical questions on Valeant's continuing relationship with Philidor, according to analysts."  As a result of the information provided to the market, the price of Valeant stock dropped more than 5%, from a close of $116 per share on Friday, October 23, 2015, to a close of $110 per share on Monday, October 26, 2015, on unusually high trading volume of nearly 27.7 million shares.  The price of Valeant debt securities likewise declined in value.

499.    The decline in the price of Valeant securities on October 26, 2015 removed a portion of the stock's artificial inflation and was the direct result of the nature and extent of the partial revelations made to the market regarding the Company's secret relationship with and dependence on specialty pharmacies, including Philidor, to increase the price and volume of Valeant's sales, the deceptive conduct used to hide Valeant's ties to specialty pharmacies, and the formation of an ad hoc committee within the Company to investigate its accounting and relationship with Philidor.  The partial removal of artificial inflation from the price of Valeant securities would have been greater had Defendants fully disclosed the truth.  But, because of Defendants' materially false and misleading statements and/or failure to disclose the full truth, the price of Valeant securities remained artificially inflated.

**October 28-30, 2015**

500.    Further disclosures regarding the Company's secret relationship with and reliance on specialty pharmacies, including Philidor, to increase the price and volume of Valeant's sales were revealed after the market closed on October 28, 2015 and 29, 2015.  ¶¶267-270.  It was reported by *Bloomberg* on October 28, 2015 that Philidor used "back door" tactics to boost payments and "instructed employees to submit claims under different pharmacy identification

numbers if an insurer rejected Philidor's claim – to essentially shop around for one that would be accepted." Then on October 29, 2015, *Bloomberg Businessweek* reported facts based on the accounts of former Philidor employees and disclosed that it had obtained internal company documents regarding clearly improper business practices and training at Philidor regarding Valeant products, including that Philidor was modifying prescriptions to boost sales. While the market was open on October 29, 2015, reports disclosed that CVS Caremark (one of the three largest PBMs in the United States), terminated its relationship with Philidor based on an audit of Philidor's practices. As a result of the information provided to the market, the price of Valeant stock dropped 4.7%, from a close of $117 per share on October 28, 2015, to a close of $111 per share on October 29, 2015, on unusually high trading volume of nearly 16 million shares.

501.   After the market closed on October 29, 2015, Express Scripts and OptumRx, two of the three largest PBMs in the United States, announced that they also terminated their relationships with Philidor. These disclosures revealed that the three largest PBMs in the country would no longer pay for drugs dispensed by Valeant's specialty pharmacy, Philidor.

502.   Before the market opened on October 30, 2015, as detailed in ¶271 above, the Company issued a release revealing that it would be terminating its relationship with Philidor and that Philidor would be shutting down its entire business as soon as possible. Specifically, Defendants noted that Valeant had lost its confidence in Philidor's ability to continue to operate in an acceptable manner. This news, as well as the October 29, 2015 after-market disclosures, removed additional artificial inflation from the price of Valeant stock, which suffered another large decline, dropping 15.9% from a close of $111 per share on October 29, 2015, to a close of $93 per share on October 30, 2015, on unusually high trading volume of 44.8 million shares.

503.    The declines in the price of Valeant stock on October 29-30, 2015 were the direct result of the nature and extent of the partial revelations made to the market, further revealing the Company's deceptive practices and secret relationship with and dependency on specialty pharmacies, including Philidor, to increase the price and volume of Valeant's sales, and that the three largest PBMs in the country, as well as the Company, would be abruptly terminating their relationships with Philidor due to its deceptive practices that had been concealed or misrepresented by Defendants.  The partial removal of artificial inflation from the price of Valeant securities would have been greater had Defendants fully disclosed the truth.  But, because of Defendants' materially false and misleading statements and/or failure to disclose the full truth, the price of Valeant securities remained artificially inflated.

**November 4-5, 2015**

504.    Further information was revealed on November 4, 2015.  ¶¶272, 274.  Before the market opened, the Senate Aging Committee announced it had formally launched a probe and requested documents and information from the Company regarding skyrocketing drug prices. Before the market opened that same day, *Bloomberg* reported that just weeks prior to announcing Valeant was cutting ties with Philidor, Valeant had planned to expand its use of Philidor, thus further calling into question the viability of the Company's recently issued financial guidance. Then, after the market closed on November 4, 2015, additional information was revealed to the market when *The Wall Street Journal* reported that Valeant's largest shareholder, Ackman, was considering liquidating his entire $3.8 billion investment in the Company believed that Pearson needed to leave Valeant and had requested that Valeant management "come clean" and disclose the full extent of their knowledge regarding Philidor, and expressed his disappointment that Valeant did not do so.

505.    As a result of the information disclosed to the market on November 4, 2015, a portion of the artificial inflation was removed from the price of Valeant stock, which dropped approximately 6%, from a close of $97 per share on November 3, 2015, 2015, to a close of $91 per share on November 4, 2015, on elevated trading volume of nearly 14.5 million shares.  As additional information was disclosed, after the market closed, by *The Wall Street Journal* and further reported on the following day by *Bloomberg*, the stock price continued to decline, falling an additional 14.36%, to close at $78 per share on November 5, 2015, on unusually high trading volume of 57.2 million shares.  The total stock price decline over this period was 19.5%, or $19 per share.  The price of Valeant debt securities also declined over this period.

506.    The decline in the price of Valeant securities between November 4 and 5, 2015 was the direct result of the nature and extent of the partial revelations made to the market regarding Valeant's secret relationship with and dependency on specialty pharmacies, including Philidor, to increase the price and volume of Valeant's sales; the negative financial impact that closing Philidor would have on Valeant's business and financial guidance that had been concealed or misrepresented by Defendants; the U.S. Senate Special Committee on Aging's formal probe into Valeant's pricing, which threatened the sustainability of Defendants' price gouging tactics; and the disclosure that one of Valeant's biggest investors was urging its highest-ranking executives to "come clean."  The partial removal of artificial inflation from the price of Valeant securities would have been greater had Defendants fully disclosed the truth.  But, because of Defendants' materially false and misleading statements and/or failure to disclose the full truth, the price of Valeant securities remained artificially inflated.

**November 10-12, 2015**

507.    As detailed in ¶¶276-280 above, on November 10, 2015, before the market opened, the Company hosted a business update call and disclosed to the market the "significant" negative

financial impact that the closing of Philidor and increased government inquiries into its pricing practices were having on Valeant, including a potential impact on guidance.  The Company disclosed that there would be a significant short-term disruption to Valeant's dermatology division, that the Company was seeing short-term pressure in its neurology business, and that the Company was "working to quantify the potential short-term impact" on 4Q15 of the termination of its relationship with Philidor.  The Company also acknowledged that filling prescriptions for free would "obviously" have an impact on the rest of the quarter and that if Valeant's pricing is "viewed as aggressive we're going to have to listen to that."  As a result of the information provided to the market, additional artificial inflation was removed from the price of Valeant stock, which dropped 2.03%, from a close of $85 per share on November 9, 2015, to a close of $83 per share on November 10, 2015, on unusually high trading volume of more than 28.7 million shares.

508.    After the market closed on November 10, 2015, reports surfaced that the Sequoia Fund, Valeant's biggest shareholder, had paid and was offering to pay money to Philidor employees in order to get information on Valeant's practices.  The next morning, before the market opened on November 11, 2015, *Bloomberg* reported that Valeant's creditors were "[s]pooked by [p]ossibility of [r]evenue [s]queeze" and that concern was "growing that disruption to Valeant's cash flow could heighten the risk of the company violating lender limits on its debt burden."  ¶281. Then, while the market was open on November 11, 2015, Nomura analysts cut their Valeant price target.  *Id*.  As a result, the price of Valeant stock continued to decline, falling an additional 5.71%, to close at $78 per share on November 11, 2015.  Before the market opened on November 12, 2015, *Bloomberg* released another article regarding the Company's relationship with Philidor and multiple media reports reported that numerous analysts had slashed their price targets for Valeant. ¶282.  As these additional disclosures reached the market, the stock dropped an additional 6.5%,

to close at $73 per share.  The total stock price decline from November 10 through November 12, 2015 was 13.6%, or $11 per share.

509.    The decline in the price of Valeant stock between November 10 and 12, 2015 was the direct result of the nature and extent of the partial revelations made to the market regarding the significant negative financial impact that the closing of Philidor and increased government scrutiny into its deceptive practices were having on Valeant.  The partial removal of artificial inflation from the price of Valeant securities would have been greater had Defendants fully disclosed the truth. But, because of Defendants' materially false and misleading statements and/or failure to disclose the full truth, the price of Valeant securities remained artificially inflated.

**November 16, 2015**

510.    As set forth in ¶283 above, while the market was open on November 16, 2015, *Bloomberg* reported that U.S. Representative Elijah Cummings wrote Pearson requesting that Pearson make certain Valeant employees available for interviews.  As detailed in ¶284 above, after the market closed on November 16, 2015, *The Washington Post* reported that the House Oversight Committee announced it would hold a hearing in early 2016 on prescription drug pricing, and that the Committee had reached out to Valeant to gather information.  The article also disclosed that members of the House Oversight Committee were urging for Valeant's executives to testify at the hearing and for Valeant to be subpoenaed.  As a result of the information provided to the market, additional artificial inflation was removed from the price of Valeant stock, which dropped 2.77%, from a close of $75 per share on November 13, 2015, to a close of $73 per share on November 16, 2015, the next trading day, on unusually high trading volume of more than 10 million shares.  The price of Valeant stock declined on November 17, 2015, dropping an additional 4% to close at $70 on trading volume exceeding 13 million shares.

511.     The declines in the price of Valeant stock on November 16-17, 2015 were the direct result of the nature and extent of the partial revelations made to the market regarding the continued investigation by the House Oversight Committee into Valeant's price gouging practices, including the legality and unsustainability of such practices.  The partial removal of artificial inflation from the price of Valeant securities would have been greater had Defendants fully disclosed the truth.  But, because of Defendants' materially false and misleading statements and/or failure to disclose the full truth, the price of Valeant securities remained artificially inflated.

**December 17, 2015**

512.     Before the market opened on December 17, 2015, Mizuho cut its rating on Valeant stock to "neutral" from "buy," and pointed to a lack of clarity regarding Valeant's agreement with Walgreens and stated that Valeant management had "not done a good job in articulating the details" and that "[w]e still don't understand how this partnership will improve filled prescriptions if payer restrictions persist."  ¶288.  While the market was open that day, *Bloomberg* published an article titled, "Valeant Falls as Mizuho Analyst Says Drugmaker Outlook Unclear."  *Id*.

513.     On this news, the price of Valeant stock declined nearly 6%, falling $7 from a closing price of $118 on December 16, 2015 to close at $111 on December 17, 2015.

514.     The decline in the price of Valeant stock on December 17, 2015 was the direct result of the nature and extent of the partial revelations made to the market regarding the uncertainty facing Valeant's business in the wake of the Philidor scandal, Philidor's closure, and restrictions from payors on Valeant's high-priced drugs.  The partial removal of artificial inflation from the price of Valeant securities would have been greater had Defendants fully disclosed the truth.  But, because of Defendants' materially false and misleading statements and/or failure to disclose the full truth, the price of Valeant securities remained artificially inflated.

**February 19, 2016**

515.    As detailed in ¶¶292-295, before the market opened on February 19, 2016, news reports commented on a February 18, 2016 Wells Fargo analyst report that included an in-depth analysis on Valeant and, among other things, questioned whether Valeant had been truthful regarding Philidor's impact on Valeant's business and the negative effects of terminating that relationship, management's credibility, and irregularities with Valeant's accounting.[84] Specifically, the analysis noted that Valeant's "new guidance is not compatible with the data presented by Valeant" and "the reduction in guidance does not match the impact [of Philidor], as described by Valeant."  The report noted that "the slide in Valeant's shares is directly related to decisions that the board and management have made" including "the board review and approval of a relationship with Philidor."  The report also noted that Valeant's accounting was misaligned with its purported performance, and suggested that the dramatic rise in Valeant's accounts receivables could be an indication of Valeant's "improperly timed recognition of revenue."

516.    On this news, the price of Valeant stock dropped 9.7%, falling from a close of $94 per share on February 18, 2016 to a close of $84 per share on February 19, 2016, on elevated trading volume of over 14 million shares.

517.    The decline in the price of Valeant stock on February 19, 2016 was the direct result of the nature and extent of the partial revelations made to the market regarding the extent of the negative impact from Philidor's closing on Valeant's business and irregularities with Valeant's accounting.  The partial removal of artificial inflation from the price of Valeant securities would have been greater had Defendants fully disclosed the truth.  But, because of Defendants' materially

---

[84]   The February 18, 2016 Wells Fargo analyst report was issued after the market closed that day.

false and misleading statements and/or failure to disclose the full truth, the price of Valeant securities remained artificially inflated.

**February 22, 2016**

518.   On February 22, 2016, Wells Fargo analyst Maris released an updated note regarding Valeant that included two additional valuation models and a $62 price target on the stock.  ¶296.  Also on February 22, 2016, CVS announced it would restrict the use of Jublia, the drug that was heavily distributed by Philidor, by requiring patients to first try a less expensive generic drug before selling Jublia.  *Id.*

519.   After the market closed on February 22, 2016, as detailed in ¶297 above, *The Wall Street Journal Breaking News* reported that Valeant was likely to restate its 2014 and 2015 earnings following an internal review of its financials.  Later that evening, as detailed in ¶¶298-299, the Company confirmed the news through a release, revealing that it would be restating its 2014 and 2015 earnings by at least $58 million, which would result in reducing 2014 GAAP EPS by approximately $0.10.  The Company stated that it had been improperly recognizing revenue upon the delivery of products to Philidor, instead of when the products were dispensed to patients. The Company also announced it would delay filing its 2015 10-K pending completion of related accounting matters.  Schiller also commented that the Company would be "improving reporting procedures, internal controls and transparency for our investors."

520.   On this news, the price of Valeant stock dropped by 10.7%, from a close of $84 per share on February 19, 2016 to a close of $75 per share on February 22, 2016, the next trading day, on unusually high trading volume of over 28 million shares.  As news of the restatement hit the market, the stock continued falling in after-hours trading on February 22, 2016, dropping as low as $68 per share.  As a result of the disclosures, the price of Valeant debt securities also declined.

521.     The removal of additional artificial inflation from the price of Valeant securities on February 22, 2016 was the direct result of the nature and the extent of the partial revelations made to the market regarding the Company's fraudulent accounting practices and insufficient internal controls that had been concealed or misrepresented by Defendants.  The partial removal of artificial inflation from the price of Valeant securities would have been greater had Defendants fully disclosed the truth.  But, because of Defendants' materially false and misleading statements and/or failure to disclose the full truth, the price of Valeant securities remained artificially inflated.

**February 28-29, 2016**

522.     On February 28 and 29, 2016, additional problems were revealed to the market. ¶¶300-301.  On Sunday, February 28, 2016, Valeant issued a release announcing Pearson's return, effective immediately, that Ingram was appointed Chairman of the Board as the Company separated the roles of Chairman and CEO, and that the Company was canceling a call set for February 29, 2016 to discuss Valeant's preliminary 4Q15 financial results, deliver a business review and provide updated expectations for 2016.  The release also revealed that the Company was withdrawing its prior financial guidance.  The Company confirmed that it would delay filing its 2015 10-K pending completion of the review of accounting matters by the ad hoc committee "and the Company's ongoing assessment of the impact on financial reporting and internal controls."

523.     Numerous news articles reached investors before the market opened on February 29, 2016, detailing Valeant's withdrawal of its financial forecast, delayed release of fourth quarter results, abrupt cancellation of its earnings call, and Pearson's return to the Company.  On the morning of February 29, 2016, Wells Fargo analyst Maris wrote in a research note that he was "concerned by Pearson's return" and that "[a]s of this writing, Valeant has lost more market value than it has created."  In the early afternoon on February 29, 2016, *Bloomberg* reported that Pearson

- 204 -

would hold a call with sell-side analysts that day, despite canceling the public earnings call scheduled for earlier in the day.  Around that same time, *Moody's* placed Valeant ratings on review for potential downgrade, reflecting concerns that Valeant's underlying operating performance was weaker than *Moody's* previous expectations, potentially impeding the Company's deleveraging plans.  Then, in a surprising turn of events and within hours of release of the *Bloomberg* article regarding Valeant's non-public conference call, reports surfaced that Valeant had cancelled its non-public analyst call "due to media interest."

524.    The market learned more as the day went on, with reports surfacing, and the Company ultimately confirming, that Valeant was under a previously *undisclosed* SEC investigation, including that Valeant received a subpoena from the SEC during 4Q15.

525.    On this news, the price of Valeant stock dropped significantly, falling 18.4% from a close of $80 per share on February 26, 2016 to a close of $65 per share on February 29, 2016, the next trading day, on unusually high trading volume of over 27 million shares.  The price of Valeant debt securities likewise declined.  For example, the price of the 5.875% Notes, the 6.125% Notes, and the 5.5% Notes each declined approximately 7% on February 29 compared to the prior trading day's closing price.

526.    The decline in the price of Valeant securities between February 26, 2016 and February 29, 2016 was the direct result of the nature and the extent of the partial revelations made to the market regarding Valeant's fraudulent accounting practices and deficient internal controls the SEC's investigation into Valeant and the extent of the negative financial impact on Valeant of ceasing its deceptive practices that had been concealed or misrepresented by Defendants.  The partial removal of artificial inflation from the price of Valeant securities would have been greater had Defendants fully disclosed the truth.  But, because of Defendants' materially false and

misleading statements and/or failure to disclose the full truth, the price of Valeant securities remained artificially inflated.

**March 15, 2016**

527.    As detailed in ¶¶303-306 above, before the market opened on March 15, 2016 the Company reported its preliminary unaudited 4Q15 financial results, held its much anticipated conference call, and more fully revealed to the market the nature and extent of its problems associated with:  the Company's deficient internal controls and compliance programs; the Company's growth being dependent upon substantial price increases for Valeant's drugs; the significant negative financial impact that the Company's termination of its relationship with Philidor would cause; the significant negative financial impact that increased government scrutiny into Valeant's practices would have on Valeant's business; Valeant engaging in improper accounting procedures; and Valeant needing to withdraw and lower its prior financial guidance for 2016.

528.    Specifically, the Company revealed it was reducing its financial guidance for 2016 and provided certain unaudited financial information regarding its 4Q15 performance.   For example, the Company lowered its 2016 revenue guidance from $12.5- $12.7 billion to $11-$11.2 billion; reduced its Cash EPS guidance from $13.25-$13.75 to $9.50 -$10.50; and cut its EBITDA guidance from $6.7-$7.1 billion to $5.6-$5.8 billion because of "reduced revenue assumptions for certain businesses, new managed care contracts and increased investment in key functions, such as financial reporting, public and government relations and compliance, as well as the impact of the weak first quarter of 2016."  The Company also reported $51.3 million in "wind down costs" for Philidor, including "write-downs of fixed assets and bad debt expenses" and a $79 million impairment charge related to Philidor.  Regarding price increases, Pearson noted that all increases

going forward "will be more modest and in line with industry practices and managed-care contracts."

529.     Also on March 15, 2016, Moody's downgraded the credit rating of Valeant and its subsidiaries, including Valeant's Corporate Family Rating, to B1 from Ba3, its Probability of Default Rating to B1-PD from Ba3-PD, its senior secured rating to Ba2 (LGD2) from Ba1 (LGD2), and its senior unsecured rating to B2 (LGD5) from B1 (LGD5).  ¶310.

530.     During the conference call, Defendants further admitted that even the Company's release from that morning was inaccurate in reporting forecasted adjusted EBITDA for the next four quarters of $6.2 to $6.6 billion, when the number should have been only $6.0 billion.  ¶308.

531.     On this news, the price of Valeant stock fell more than 50% from a close of $69 per share on March 14, 2016 to a close of $33 per share on March 15, 2016, on extraordinarily high trading volume of over 138 million shares, or more than 30% of Valeant's outstanding shares.  The price of Valeant debt securities also dropped precipitously.  For example, the price of the 5.375% Notes, the 5.875% Notes, the 6.125% Notes, the 5.5% Notes, the 5.625% Notes, and the 7.5% Notes each suffered a one-day decline of more than 10% by the close of trading on March 15.  The 5.875% Notes and the 6.125% Notes each closed below $0.77 on the dollar, despite being issued at par only a year previously in one of the largest corporate debt offerings ever.

532.     The precipitous decline in the price of Valeant securities on March 15, 2016 removed additional artificial inflation and was the direct result of the nature and the extent of the partial revelations made to the market regarding: the Company's deficient internal controls and compliance programs; the extent to which the Company's growth was dependent upon price gouging; the extent of the negative financial impact that the Company's closing of Philidor and halting of the deceptive practices would cause; the significant negative financial impact that

increased government scrutiny into Valeant's practices would have on Valeant's business and Valeant's engaging in fraudulent accounting procedures.  The partial removal of artificial inflation from the price of Valeant securities would have been greater had Defendants fully disclosed the truth.  But, because of Defendants' materially false and misleading statements and omissions and failure to disclose the full truth, the price of Valeant securities remained artificially inflated.

**June 7, 2016**

533.    Additional artificial inflation was removed from the price of Valeant stock after the close of the Class Period, when, on June 7, 2016, as detailed in ¶¶319-322, Valeant issued a release and hosted a conference call regarding the Company's 1Q16 financial results, which had been delayed by several months.  While the Company reported a GAAP loss per share of $1.08 and significantly lowered its 2016 guidance, Papa, Valeant's new CEO, and Rosiello further revealed that the poor financial results and outlook were caused, in large part, by the loss of Philidor.  For example, Rosiello stated that sales volume declines were "exacerbated by the loss of refills following the shutdown at the end of January of our previous specialty pharmacy relationship." Papa added that with respect to dermatology, "a significant portion of our Walgreens prescriptions have profitability significantly below our internal projections and meaningfully below non-Walgreens prescriptions" and that "[i]n some instances, these prescriptions actually have a negative average selling price."  In response to these additional disclosures, which further revealed how much Valeant relied on Philidor to boost prescription drug sales, refills, and prices during much of the Class Period, the price of Valeant stock dropped 14.6% to close at $24 on June 7, 2016, on unusually high trading volume of more than 103 million shares.

534.    The decline in the price of Valeant securities on June 7, 2016 removed additional artificial inflation and was the direct result of the nature and extent of the partial revelations made to the market regarding the true extent to which Valeant relied on Philidor to meet its financial

guidance and the extent of the negative financial impact on Valeant of ceasing its deceptive practices.

535.    The timing and magnitude of the declines in the price of Valeant securities in response to the partial disclosures on September 28-29, 2015; October 4, 14-15, 19-22, 25-26, 28-30, 2015; November 4-5, 10-12, 16, 2015; December 17, 2015; February 19, 22, 28-29, 2016; March 15, 2016; and June 7, 2016 negate any inferences that the losses suffered by Plaintiffs were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  This is further evidenced by the chart below, which demonstrates the clear divergence of the Company's stock price from its peer company stock prices as the revelation of the truth became known to the market:

| **Date of Stock Reaction** | **Corrective Event** | **VRX $** | **VRX %** | **Peer %** |
|---|---|---|---|---|
| 09/28/15 - 09/29/15 | House members request Valeant subpoena; Senator McCaskill questions Valeant's pricing; news reports detail Congressional focus on Valeant's pricing | ($41.39) | -20.7% | -4.4% |
| 10/05/15 | *The New York Times* publishes scathing Valeant article | ($18.86) | -10.3% | -0.2% |
| 10/15/15 | Valeant reveals subpoenas by two U.S. Attorney's Offices | ($8.42) | -4.7% | 2.3% |
| 10/19/15 - 10/22/15 | Valeant reports 3Q15 financials and reveals information regarding Philidor; Citron reports on Valeant's suspicious ties to | ($67.69) | -38.1% | -2.8% |

|  | Philidor; Valeant discloses relationship with "affiliated pharmacies" |  |  |  |
|---|---|---|---|---|
| 10/26/15 | *The Wall Street Journal* uncovers more Philidor facts; Company files 3Q15 10-Q, adds Philidor disclosures | ($6.12) | -5.3% | 0.8% |
| 10/29/15 - 10/30/15 | News reports reveal more Philidor facts; three largest PBMs drop Philidor; Valeant cuts ties with Philidor; Philidor to close | ($23.23) | -19.9% | -0.4% |
| 11/04/15 - 11/05/15 | Formal Senate investigation begins; *The Wall Street Journal* reports on Ackman's negative opinion of Valeant | ($19.09) | -19.5% | -1.7% |
| 11/10/15 - 11/12/15 | Valeant hosts business update call; *Bloomberg* reports creditors are concerned about Valeant's revenues and debt; analysts slash price targets for Valeant | ($11.64) | -13.6% | -2.2% |
| 11/16/15 - 11/17/15 | *Bloomberg* reports on House members' scrutiny of Valeant; House Oversight Committee announces hearing on drug pricing | ($5.09) | -6.7% | 2.5% |
| 12/17/15 | Mizuho analysts cut Valeant's rating and criticize clarity of Walgreens deal | ($7.09) | -6.0% | -1.4% |
| 02/19/16 | New reports comment on Wells Fargo report | ($9.12) | -9.7% | 0.0% |
| 02/22/16 | CVS restricts use of Jublia; Valeant confirms it will restate earnings | ($9.07) | -10.7% | 0.8% |
| 02/29/16 | Pearson returns; earnings call cancelled; Valeant financial guidance withdrawn; annual report delayed; Valeant announces SEC investigation | ($14.85) | -18.4% | -2.1% |
| 03/15/16 | Valeant announces reduced revenue guidance for 2016 | ($35.53) | -51.5% | -2.6% |
| 06/07/16 | Valeant announces 1Q16 results and reduces guidance for 2016 | ($4.21) | -14.6% | -1.1 |

536.   In sum, as detailed above, the rapid declines described herein served to remove

artificial inflation from the price of Valeant securities, and were direct and foreseeable

- 210 -

consequences of the revelation of the falsity of Defendants' Class Period misrepresentations and omissions to the market and a materialization of the risks concealed by Defendants' fraud.  Thus, the revelations of truth, as well as the resulting clear market reactions, support a reasonable inference that the market understood that Defendants' prior statements were false and misleading and omitted material information.  In short, as the truth about Defendants' prior misrepresentations and omissions was revealed, the price of Valeant securities quickly sank as the artificial inflation was removed from the price of the securities and Plaintiffs and similarly situated investors were damaged, suffering true economic losses.

537.    Accordingly, the economic losses, *i.e.*, damages, suffered by Plaintiffs and similarly situated investors in response to the partial disclosures on September 28-29, 2015; October 4, 14-15, 19-22, 25-26, 28-30, 2015; November 4-5, 10-12, 16, 2015; December 17, 2015; February 19, 22, 28-29, 2016; March 15, 2016; and June 7, 2016 were a direct and proximate result of Defendants' misrepresentations and omissions that artificially inflated the price of Valeant securities and the subsequent declines in the price of Valeant securities when the truth concerning Defendants' prior misrepresentations and fraudulent conduct entered the marketplace.   The following chart demonstrates the impact of certain of the loss causation events alleged herein on the price of Valeant stock.



**PRESUMPTION OF RELIANCE**

538.    A Class-wide presumption of reliance for the Exchange Act claims is appropriate

in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*,

406 U.S. 128 (1972), because the Class claims are grounded on Defendants' material omissions.

Because this action involves Defendants' failure to disclose material adverse information

regarding Valeant's business operations and financial prospects – information that Defendants

were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is

necessary is that the facts withheld be material in the sense that a reasonable investor might have

considered them important in making investment decisions.  Given the importance of Defendants'
Class Period material misstatements and omissions set forth above, that requirement is satisfied
here.

539.    A Class-wide presumption of reliance is also appropriate for the Exchange Act
claims in this action under the fraud-on-the-market doctrine.  As a result of Defendants' materially
false and misleading statements, Valeant's equity securities and senior notes traded at artificially
inflated prices during the Class Period on markets that were open, well-developed, and efficient at
all times.  Plaintiffs and other members of the Class purchased Valeant's securities relying upon
the integrity of the market price of those securities and the market information relating to Valeant,
and have been damaged thereby.

540.    At all relevant times, the markets for Valeant securities were an efficient market for
the following reasons, among others:

(a)    Valeant stock met the requirements for listing and was listed and actively
traded on the NYSE, a highly efficient and automated market;

(b)    Valeant debt securities, including its senior notes, were widely distributed
and actively traded, with trade information available through the Trade
Reporting and Compliance Engine;

(c)    As a regulated issuer, Valeant filed periodic public reports with the SEC
and the NYSE;

(d)    Valeant securities, including its debt securities, were rated by nationally
recognized credit rating agencies, including Moody's and Standard &
Poor's Rating Services;

(e)    Valeant regularly communicated with public investors via established
market communication mechanisms, including regular disseminations of
releases on the national circuits of major newswire services and other wide-
ranging public disclosures, such as communications with the financial press
and other similar reporting services; and

(f)    Valeant was followed by several securities analysts employed by major
brokerage firms who wrote reports which were distributed to the sales force

- 213 -

and certain customers of their respective brokerage firms.  These reports were publicly available and entered the public marketplace.

541.    As a result of the foregoing, the market for Valeant securities promptly digested current information regarding Valeant from all publicly available sources and reflected such information in the price of such securities.  Under these circumstances, all purchasers of Valeant securities during the Class Period suffered similar injury through their purchase of Valeant securities at artificially inflated price and a presumption of reliance applies.

542.    At the times they purchased Valeant securities, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts.

543.    As a result of the above circumstances, the presumption of reliance applies.

## THE SAFE HARBOR DOES NOT APPLY

544.    The false and misleading statements alleged herein were either not forward-looking statements ("FLS") and therefore not subject to any Safe Harbor protection, or, to the extent any were FLS, the Safe Harbor protection does not apply because:  (a) the warnings accompanying any FLS issued during the Class Period were boilerplate or otherwise ineffective in immunizing those statements from liability; (b) the statements were made in connection with a rollup transaction or the operations of a limited liability company; and/or (c) the statements were included in a financial statement purportedly prepared in accordance with GAAP.

545.    Defendants are also liable for any false and misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Valeant who knew that the FLS was false. In addition, the FLS were contradicted by existing, undisclosed material facts that were required to be disclosed so that the FLS would not be misleading.  Finally, Defendants' purported "Safe

- 214 -

Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide meaningful disclosures of the relevant risks.

546.   Throughout the Class Period, Defendants' quarterly and annual reports included a section entitled "Forward-Looking Statements" that purported to identify factors that *could* cause the Company's actual results to differ materially from its expectations.   The listed factors, however, were themselves false and misleading because they failed to provide meaningful cautionary language by omitting to disclose that many of the purported contingent risks were then occurring and/or omitted several known risks stemming from Valeant's deceptive practices and clandestine relationship with Philidor.

### CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Against the Exchange Act Defendants

547.   Plaintiffs incorporate ¶¶1-546 by reference.

548.   During the Class Period, the Exchange Act Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and concealed material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

549.   The Exchange Act Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

> (a)   employed devices, schemes, and artifices to defraud;

> (b)   made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Valeant securities during the Class Period.

550.    In addition to the duties of full disclosure imposed on the Exchange Act Defendants as a result of their affirmative false and misleading statements to the public, the Exchange Act Defendants had a duty to promptly disseminate truthful information with respect to Valeant's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market prices of the Company's securities would be based on truthful, complete, and accurate information.  SEC Regulations S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*).

551.    As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiffs and the Class have suffered damages in connection with their respective purchases of Valeant securities during the Class Period, because, in reliance on the integrity of the market, they paid artificially inflated prices for Valeant securities and experienced losses when the artificial inflation was released from Valeant securities as a result of the revelations and prices decline detailed herein.  Plaintiffs and the Class would not have purchased Valeant securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

552.    By virtue of the foregoing, Valeant and the Exchange Act Defendants have each violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against Valeant, Pearson, Schiller, and Rosiello

553.    Plaintiffs incorporate ¶¶1-552 by reference.

- 216 -

554.    During their tenures as officers and/or directors of Valeant, Pearson, Schiller, and Rosiello were controlling persons of Valeant within the meaning of §20(a) of the Exchange Act. By reason of their positions of control and authority as officers and/or directors of Valeant, these defendants had the power and authority to cause Valeant to engage in the conduct complained of herein.  These defendants were able to, and did, control, directly and indirectly, the decision-making of Valeant, including the content and dissemination of Valeant's public statements and filings described herein, thereby causing the dissemination of the materially false and misleading statements and omissions as alleged herein.  Valeant exercised control over and directed the actions of its senior managers, directors and agents, including the Individual Defendants.   Valeant controlled Pearson, Schiller, Rosiello and all of its employees and subsidiaries.

555.    In their capacities as senior corporate officers and/or directors of Valeant, and as more fully described herein, Pearson, Schiller, and Rosiello participated in the misstatements and omissions set forth above.  Indeed, these defendants had direct and supervisory involvement in the day-to-day operations of the Company, and had access to non-public information regarding Valeant's deceptive and risky business practices.  Valeant, Pearson, Schiller and Rosiello had the ability to influence and direct and did so influence and direct the activities of the Exchange Act Defendants in their violations of §10(b) of the Exchange Act and Rule 10b-5 as detailed in ¶¶407-409.

556.    As a result, Valeant, Pearson, Schiller, and Rosiello, individually and as a group, were control persons within the meaning of §20(a) of the Exchange Act.

557.    As set forth above, Valeant violated §10(b) of the Exchange Act.  By virtue of their positions as controlling persons, and as a result of their aforementioned conduct and culpable participation, Pearson, Schiller, and Rosiello are liable pursuant to §20(a) of the Exchange Act,

jointly and severally with, and to the same extent as Valeant is liable to Plaintiffs and the other members of the Class.  Valeant exercised control over the Individual Defendants and all of its employees and subsidiaries and, as a result of its aforementioned conduct and culpable participation, is liable pursuant to §20(a) of the Exchange Act, jointly and severally with, and to the same extent as the Individual Defendants are liable to Plaintiffs and the other members of the Class.

558.    This claim is brought within the applicable statute of limitations.

559.    By reason of the foregoing, Valeant, Pearson, Schiller, and Rosiello violated §20(a) of the Exchange Act, 15 U.S.C. §78(a).

## COUNT III

### For Violations of Section 20A of the Exchange Act
### Against the Insider Trading Defendants

560.    Plaintiffs incorporate ¶¶1-559 by reference.

561.    The insider trading claims alleged herein arise from the Insider Trading Defendants' sale of 4.2 million shares of Valeant stock on or around June 10, 2015, while in possession of material, nonpublic information.

562.    ValueAct and Valeant have a closely-tied history, providing the Insider Trading Defendants with material nonpublic information.  ValueAct began investing in Valeant in 2006 and has since had near-continuous board representation at Valeant.  Morfit, a partner and the President of ValueAct, served on Valeant's board of directors from May 2007 to May 2014, and again from October 2015 to June 2016.  Ubben, the co-founder, CEO, and CIO of ValueAct, served on Valeant's board of directors from October 2014 to August 2015.  D. Robert Hale, another ValueAct partner, assumed Ubben's position on Valeant's board of directors in August 2015, and has since remained in that position.

563.    Moreover, ValueAct Capital is well known as an "activist investor," and emphasizes the "active, constructive involvement" it has in the management of the companies in which it invests.  As an activist investor on Valeant's board, ValueAct helped shape Valeant's operations and communicated with Pearson and Valeant on a frequent, at times daily, basis. According to media sources, and as alleged herein, ValueAct has been credited with recruiting Pearson from McKinsey and as being an architect of Valeant's compensation model.   The Company later admitted this compensation model contributed to an improper "tone at the top of the organization" and wrongdoing by Valeant and its executives and directors.  *See* ¶477. ValueAct also influenced Valeant's hedge-fund-like business model of cutting R&D, rapidly acquiring products and companies, and significantly increasing prices.

564.    The Insider Trading Defendants are experienced investors that are well aware of the prohibitions on trading based on material nonpublic information.  ValueAct's SEC registration materials recognize that because "its employees often serve as directors of the [ValueAct Funds'] portfolio companies," it "may come into possession of material non-public information concerning an entity in which the [ValueAct Funds] have invested or propose to invest," which "may limit the ability of the [ValueAct Funds] to trade securities of such entity while such information remains non-public and material."

565.    When Morfit left Valeant's board of directors in May 2014, he explained in a letter to Pearson that ValueAct wanted to "manage down" its Valeant holdings but, due to Morfit's position on Valeant's board of directors, ValueAct had been "restricted from selling any shares in Valeant since 2013."   Morfit said his departure was "a portfolio management decision" so ValueAct could sell "later this year."  Similarly, in a 2017 deposition, Pearson testified that Morfit had left Valeant's board in 2014 because Morfit did not want to worry about having inside

information if ValueAct wanted to sell shares of Valeant stock since ValueAct purported to have a rule limiting concentration in any particular investment to below 20% of its total holdings. Despite this purported concern, Ubben joined Valeant's board in October 2014, and remained a member of the board when the Insider Trading Defendants sold 4.2 million shares of Valeant stock during June 2015.

566.    Notwithstanding ValueAct's purported concentration policy, ValueAct's holdings of Valeant stock have exceeded 20% of its total holdings without ValueAct selling Valeant stock to get below a 20% concentration level.  For example, in 2010, and for several months prior to the sale on or around June 10, 2015, Valeant exceeded 20% of ValueAct's holdings.  Thus, any claim that the Insider Trading Defendants' sales in June 2015 were pursuant to ValueAct's concentration policy are refuted by its history of not following any such policy, as such sales clearly occurred while in the possession of material nonpublic information.

567.    As alleged herein, Ubben and his co-defendants who signed the 2014 10-K on February 25, 2015, knowingly and recklessly made materially false and misleading statements and/or omitted to state facts necessary to make the statements made therein not false or misleading.[85]  ValueAct, through Ubben, had access to and knowledge of Valeant's material, nonpublic information concerning the undisclosed improper business and accounting practices which gave rise to the Restatement, closing of Philidor, cessation of such improper business practices, and resulting corrective disclosures, as set forth herein.

---

[85]   The Court's April 28, 2017 Order denied Ubben's motion to dismiss and found that the Consolidated Complaint adequately alleged that Ubben, and others, made materially false and misleading statements with scienter.  *See* ECF No. 216.

568.    On or around June 10, 2015, while in possession of the material, nonpublic information, the Insider Trading Defendants sold 4.2 million shares of Valeant stock for proceeds of approximately $925 million.  The Insider Trading Defendants' sale was suspicious because they purchased the shares at an average cost of $11, held the shares for nine years, had not previously sold Valeant stock in more than four years, and timed the sale to maximize profit from Valeant's then artificially inflated stock price, which was trading near all-time highs of around $229 per share.  Thus, approximately 95% of the $925 million in illicit trading proceeds was profit.

569.    As set forth herein, in the months that followed the sale, the price of Valeant shares dropped precipitously as the material, nonpublic information was disclosed to the public.  *See* ¶¶483-536.  Within five months, investors who purchased shares contemporaneously with the Insider Trading Defendants' sale lost 70% of their investment, and within a year they lost 90% of their investment.  On June 7, 2016, Valeant stock traded at just $24 per share.

570.    According to a ValueAct release, ValueAct's sale on or around June 10, 2015, was executed through "brokers' transactions on the NYSE," meaning the shares were sold into the open market through brokers.  Trading volume shows that although ValueAct initiated the brokers' transactions on June 10, 2015, not all of the shares were sold to purchasers on the open market on that day.  For example, while the Insider Trading Defendants sold 4.2 million shares, only approximately 2.8 million Valeant shares traded on the NYSE on June 10, 2015.  Thus, the earliest date by which all of the 4.2 million shares could have been sold to purchasers on the open market was June 11, 2015, when another approximately 2.8 million Valeant shares traded on the NYSE. That the Insider Trading Defendants' shares were sold on June 10 and June 11, 2015 through brokers is apparent from the fact that the trading volume on June 10 and June 11, 2015 was

unusually high, outpacing the average trading volume of the five days preceding June 10 and the five days following June 11 by more than 1.4 million shares.

571.    This claim is asserted pursuant to §20A of the Exchange Act, which provides, in part, that "[a]ny person who violates any provision of [the Exchange Act] or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased . . . securities of the same class."

572.    Ubben violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by knowingly and recklessly making false and misleading statements and omitting to disclose material facts in the 2014 10-K.   While in possession of the material, nonpublic information, on or around June 10, 2015 and June 11, 2015, Ubben sold 4.2 million shares of Valeant stock.   As beneficial owner of the sold shares, Ubben expected to, and did, receive a pecuniary benefit from the sale.

573.    The Insider Trading Defendants violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by unlawfully trading Valeant stock on or around June 10, 2015 and June 11, 2015, while in possession of material, non-public information.   The Insider Trading Defendants owed a duty to Valeant and its shareholders to maintain the material, nonpublic information in confidence and not trade on the basis of it.   In breach of that duty, the Insider Trading Defendants knowingly and recklessly traded Valeant stock on the basis, and while in possession, of the material, nonpublic information concerning Valeant's improper business and accounting practices that Ubben held as a Valeant insider.   As beneficial owners of the sold shares, each Insider Trading Defendant expected to, and did, receive a pecuniary benefit from the sale.

574.   ValueAct Capital, VA Partners, ValueAct Holdings, and Ubben also violated §20(a) of the Exchange Act because they controlled and culpably participated in the unlawful insider trading  in violation of §10(b) of the Exchange Act and Rule 10b-5 thereunder alleged herein.  More specifically:

(a)   ValueAct Capital, as the investment adviser of the ValueAct Funds, was able to, and did, control, directly and indirectly, the decision-making and activities of the ValueAct Funds, including the manner and timing of the ValueAct Funds' sales of Valeant stock and the unlawful insider trading alleged herein.  On June 11, 2015, ValueAct Capital issued a release stating, in part, "ValueAct Capital Management, L.P. announced today that it has sold 4.2 million shares of Valeant [stock]."

(b)   VA Partners, as the general partner of the ValueAct Funds, was able to, and did, control, directly and indirectly, the decision-making and activities of the ValueAct Funds, including the manner and timing of the ValueAct Funds' sales of Valeant stock and the unlawful insider trading alleged herein.  ValueAct's SEC registration materials acknowledge that the ValueAct Funds rely on VA Partners and ValueAct Capital, and "[t]he quality of the decisions of [VA Partners] and ValueAct Capital, among other factors, will determine the [ValueAct Funds'] success or failure."

(c)   ValueAct Holdings, as owner of ValueAct Capital and VA Partners, was able to, and did, control, directly and indirectly, the decision-making and activities of ValueAct Capital, VA Partners, and the ValueAct Funds, including the manner and timing of the ValueAct Funds' sales of Valeant stock and the unlawful insider trading alleged herein.  ValueAct Holdings' CEO, CIO, President, and Chief Operating Officer are also the CEO, CIO, President, and Chief Operating Officer of ValueAct Capital and VA Partners.  ValueAct's SEC registration materials

acknowledge that ValueAct Capital and VA Partners are under "common control" and that ValueAct Holdings is a "control person."

(d)     Ubben, as CEO/CIO of ValueAct Holdings, ValueAct Capital, VA Partners, and other entities affiliated with ValueAct, was able to, and did, control, directly and indirectly, the decision-making and activities of ValueAct Holdings, ValueAct Capital, VA Partners, and the ValueAct Funds, including the manner and timing of the ValueAct Funds' sales of Valeant stock and the unlawful insider trading alleged herein.   ValueAct's SEC registration materials acknowledge that the ValueAct Funds depended on Ubben and, if Ubben were to leave ValueAct, "the consequence to the [ValueAct Funds] could be material and adverse and could lead to the premature termination of the [ValueAct Funds]."   ValueAct's SEC registration materials further acknowledge that ValueAct Capital and VA Partners are under "common control" and that Ubben is a "control person."

575.   Named Plaintiff IBEW brings this claim against the Insider Trading Defendants pursuant to §20A of the Exchange Act, 15 U.S.C. §78t-1, on behalf of itself and the other members of the Class who purchased shares of Valeant common stock contemporaneously with the unlawful insider trading described herein.

576.   Named Plaintiff IBEW and all similarly situated members of the Class: (i) have suffered damages in that they paid artificially inflated prices for Valeant stock as a result of the violations herein described, and suffered economic losses as the truth was revealed through several partial disclosures; (ii) have suffered damages because the Insider Trading Defendants gained an advantageous market position through their possession of material, nonpublic information; and (iii) would not have purchased Valeant stock at the prices they paid, or at all, if they had been

aware that the market prices had been artificially inflated by the Exchange Act Defendants' false and misleading statements and material omissions.

577.    Under Section 20A of the Exchange Act, the Insider Trading Defendants are jointly and severally liable to Named Plaintiff IBEW and the Class for all profits gained and losses avoided by them as a result of their insider trading.

578.    By virtue of the foregoing, the Insider Trading Defendants violated §20A of the Exchange Act.

## COUNT IV

### For Violations of Sections 20(a) the Exchange Act
### Against Defendants ValueAct Capital, VA Partners, ValueAct Holdings, and Ubben

579.    Plaintiffs incorporate ¶¶1-578 by reference.

580.    As set forth above, ValueAct Capital and VA Partners were at all relevant times controlling persons of the ValueAct Funds within the meaning of §20(a) of the Exchange Act.  By virtue of their positions as control persons, and as a result of their aforementioned conduct and culpable participation, ValueAct Capital and VA Partners are liable pursuant to §20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the ValueAct Funds for their violations of §20A of the Exchange Act.

581.    As set forth above, ValueAct Holdings was at all relevant times a controlling person of ValueAct Capital, VA Partners, and the ValueAct Funds within the meaning of §20(a) of the Exchange Act.  By virtue of its position as a control person, and as a result of its aforementioned conduct and culpable participation, ValueAct Holdings is liable pursuant to §20(a) of the Exchange Act, jointly and severally with, and to the same extent as, ValueAct Capital, VA Partners, and the ValueAct Funds for their violations of §20A of the Exchange Act.

- 225 -

582.     As set forth above, Ubben was at all relevant times a controlling person of ValueAct Holdings, ValueAct Capital, VA Partners, and  the ValueAct Funds within the meaning of §20(a) of the Exchange Act.  By virtue of his position as a control person, and as a result of his aforementioned conduct and culpable participation, Ubben is liable pursuant to §20(a) of the Exchange Act, jointly and severally with, and to the same extent as, ValueAct Holdings, ValueAct Capital, VA Partners, and the ValueAct Funds for their violations of §20A of the Exchange Act.

# SECURITIES ACT CLAIMS

583.    Plaintiffs assert non-fraud based claims pursuant to §§11, 12, and 15 of the Securities Act against the Securities Act Defendants (defined herein), as set forth below.  These claims are based on strict liability and negligence, and not on knowing or reckless conduct by or on behalf of the Securities Act Defendants – *i.e.*, they do not allege, nor do they sound in, fraud – and Plaintiffs specifically disclaim any allegations of fraud, scienter, or recklessness in connection with these non-fraud claims.

584.    During the Class Period, Valeant completed five securities offerings for which Plaintiffs allege Securities Act claims.  As alleged herein, the relevant offering materials and documents incorporated therein contained untrue statements of material fact and/or omitted to state material facts required to be stated therein or necessary to make the statements made therein not misleading at the time they were made.

585.    Valeant, Pearson, and Schiller directly and actively participated in the solicitation and sale of the securities sold in the debt and equity offerings during the Class Period.  As the issuer of the securities and the Company's senior most executives, these defendants' solicitation and selling activities included participating in the drafting and/or approval of the offering materials used (including materials incorporated by reference), participating in conference calls and promotional meetings contemporaneously with the offerings, holding themselves out to the public as persons knowledgeable about the offerings and the securities being offered, drafting and/or approving filings providing the requisite information about the offerings, and hiring agents (including the Bank Offering Defendants) to distribute and disseminate the offering materials and effectuate the offer and sale of the securities.

586.    Valeant, Pearson, and Schiller were motivated by their own personal financial interests and to raise money for Valeant.  Valeant raised more than $15 billion dollars directly

from the sale of the securities, which allowed it to fund numerous corporate acquisitions and create apparent growth which resulted in stock price increases, pay down and refinance debt, generate funds for corporate activities, and pay for millions of dollars in executive compensation to Pearson and Schiller.  Pearson's and Schiller's compensation (more than $150 million and $30 million, respectively, during the Class Period) was tied to Valeant's business and prospects, including by meeting growth and financial performance targets facilitated by funds raised and business acquisitions financed by proceeds from the offerings.  Indeed, Pearson's 2015 employment agreement included hundreds of millions in compensation linked to whether the price of Valeant stock went up by significant amounts over time, and Schiller received equity awards that vested only if Valeant achieved certain share price increases.

587.    Similarly, the Bank Offering Defendants directly and actively participated in the solicitation and sale of the securities sold in the debt and equity offerings during the Class Period. These defendants participated in the drafting and/or dissemination of the offering materials in exchange for tens of millions of dollars in discounts, commissions, and other fees.

**Securities Act Parties**

**Plaintiffs**

588.    Lead Plaintiff TIAA purchased Valeant senior notes in the July 2013 Debt Offering, December 2013 Debt Offering, January 2015 Debt Offering, and March 2015 Debt Offering described below from the Securities Act Defendants by means of the securities' respective offering prospectuses, each of which contained untrue statements of material fact and/or omitted to state material facts required to be stated therein or necessary to make the statements made therein not misleading at the time they were made.

589.    Named Plaintiff Tucson purchased Valeant stock in the March 2015 Stock Offering described below from the Securities Act Defendants traceable to the registration statement and by means of the prospectus, each of which contained untrue statements of material fact and/or omitted to state material facts required to be stated therein or necessary to make the statements made therein not misleading at the time they were made.

**Defendants**

590.    Valeant is a corporation with its United States headquarters in this District.  During the Class Period, Valeant issued billions of dollars in debt and equity securities.  Relevant to Plaintiffs' Securities Act claims, Valeant offered the following securities in the United States on the dates set forth below:[86]

| Date of Offering | Securities Offered | Proceeds |
|---|---|---|
| July 2013 | 6.75% senior notes due 2018 ("6.75% Notes") | $1.6 billion |
| | 7.5% senior notes due 2021 ("7.5% Notes") | $1.625 billion |
| December 2013 | 5.625% senior notes due 2021 ("5.625% Notes") | $900 million |
| January 2015 | 5.5% senior notes due 2023 ("5.5% Notes") | $1 billion |
| March 2015 | 5.375% senior notes due 2020 ("5.375% Notes") | $2.0 billion |
| | 5.875% senior notes due 2023 ("5.875% Notes") | $3.25 billion |
| | 6.125% senior notes due 2025 ("6.125% Notes") | $3.25 billion |
| March 2015 | 7.3 million shares of Valeant stock at $199 per share | $1.45 billion |

Director Defendants

591.    Pearson was the Company's CEO and served on Valeant's Board of Directors during the Class Period and at the time of the debt and equity offerings listed in ¶590.  Pearson signed Valeant's June 10, 2013 shelf registration statement and prospectus ("Registration

---

[86]    The 6.75% Notes, 7.5% Notes, 5.375% Notes, 5.875% Notes, and 6.125% Notes were initially issued by subsidiaries of Valeant and under the control of Valeant in order to fund Company acquisitions which were ultimately liquidated with the offering proceeds given to and all obligations assumed by Valeant after the acquisitions closed.  "Valeant," as used herein includes its current and former subsidiaries, including, but not limited to, VRX Escrow Corp. and VPII Escrow Corp.

Statement," and together with Valeant's March 18, 2015 prospectus supplement ("Prospectus Supplement"), the "March 2015 Stock Offering Materials") used in connection with the offering in March 2015 of 7.3 million shares of Valeant common stock at a price of $199 per share ("March 2015 Stock Offering"), and Valeant's 2014 Form 10-K expressly incorporated into the March 2015 Stock Offering Materials.  During the Class Period, Pearson solicited purchasers in the debt and equity offerings listed in ¶590 for his own financial interest.  *See* ¶¶585-586.

592.    Schiller was an Executive Vice President and CFO of the Company and served on Valeant's Board of Directors during the Class Period and at the time of the debt and equity offerings listed in ¶590.  Schiller signed the Registration Statement used in connection with the March 2015 Stock Offering and the incorporated 2014 10-K.  During the Class Period, Schiller solicited purchasers in the debt and equity offerings listed in ¶590 for his own financial interest. *See* ¶¶585-586.

593.    Farmer, Ingram, Melas-Kyriazi, Power, Provencio, and Stevenson were members of Valeant's Board of Directors, including at the time of the March 2015 Stock Offering.  Each also signed the Registration Statement used in connection with the March 2015 Stock Offering and Valeant's incorporated 2014 10-K.  Goggins, Lönner, and Ubben were members of Valeant's Board of Directors at the time of the March 2015 Stock Offering and signed Valeant's incorporated 2014 10-K.

594.    During the Class Period, Pearson, Schiller, Farmer, Goggins, Ingram, Lönner, Melas-Kyriazi, Power, Provencio, Stevenson, and Ubben ("Individual Securities Act Defendants") acted and/or made the statements detailed herein in his or her capacity as an officer and/or director of Valeant, signatories to the Registration Statement and/or solicitors and sellers of the securities

- 231 -

sold in the July 2013 Debt Offering, the December 2013 Debt Offering, the January 2015 Debt Offering, the March 2015 Debt Offering and/or the March 2015 Stock Offering.

Auditor Defendant

595.   Defendant PricewaterhouseCoopers LLP is and at all relevant times was Valeant's outside auditor.  PwC certified Valeant's 2014 10-K, and included a February 25, 2015 Audit Report relating to the financial statements, financial statement schedule, and the effectiveness of Valeant's internal control over financial reporting ("2014 Audit Report").  PwC provided its consent to incorporate by reference the 2014 Audit Report in Valeant's 2014 10-K and related Prospectus Supplement filed with the SEC in connection with the March 2015 Stock Offering.  For its services rendered to Valeant in 2013, 2014, and 2015, PwC was paid audit fees of $13.4 million, $12.6 million, and $19.9 million, respectively.

Bank Offering Defendants

596.   Defendants Deutsche Bank Securities Inc.; HSBC Securities (USA) Inc. ("HSBC"); Mitsubishi UFJ Securities (USA), Inc. ("MUFJ");   DNB Markets Inc. ("DNB Markets"); Barclays Capital, Inc. ("Barclays");  Morgan Stanley & Co. LLC ("Morgan Stanley"); RBC Capital Markets; and SunTrust Robinson Humphrey, Inc. ("SunTrust") (collectively, the "Stock Underwriter Defendants") acted as co-lead underwriters of, and as sellers in, the March 2015 Stock Offering.

597.   The Stock Underwriter Defendants acted as the underwriting syndicate in the March 2015 Stock Offering and participated in the drafting and/or dissemination of the March 2015 Stock Offering Materials as well as in the sale of the common stock to Tucson and other members of the Class in connection with the March 2015 Stock Offering.  The Stock Underwriter Defendants received over $16 million for their participation in the March 2015 Stock Offering.

1352297_1

598.    The Stock Underwriter Defendants together with Goldman Sachs; J.P. Morgan Securities LLC ("JP Morgan"); Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch"); CIBC World Markets Inc. ("CIBC"); Citigroup Global Markets Inc. ("Citigroup"); DBS Bank Ltd. ("DBS"); TD Securities (USA) LLC. ("TD Securities"); BMO Capital Markets Corp. ("BMO"); and SMBC Nikko Securities America, Inc. ("SMBC Nikko Securities") (collectively, the "Bank Offering Defendants") each agreed to be an "initial purchaser" from the issuer in the offering of one or more of the 6.75% Notes, 7.5% Notes, 5.625% Notes, 5.5% Notes, 5.375% Notes, 6.125% Notes, and/or 5.875% Notes (collectively, the "Debt Offerings") with the intent to market the senior notes and to resell the notes to investors by means of the notes' prospectuses.  The Bank Offering Defendants participated in the offer and sale of the senior notes issued and sold in the Debt Offerings for their own financial interest, and collectively received tens of millions of dollars for their sale, marketing, and distribution of the senior notes in the form of discounts, commissions, and other fees. The Bank Offering Defendants participated in the drafting and/or dissemination of the senior notes' defective prospectuses, as well as in the solicitation and sale of the notes to Lead Plaintiff and the Class, in connection with the note offerings.

599.    Each of the Bank Offering Defendants participated in the Valeant debt and equity offerings as follows:

| Defendant | July 2013 Notes | December 2013 Notes | January 2015 Notes | March 2015 Notes | March 2015 Equity |
|---|---|---|---|---|---|
| Deutsche Bank | | | X | X | X |
| HSBC | X | X | X | X | X |
| MUFJ | X | X | X | X | X |
| DNB Markets | X | X | X | X | X |
| Barclays | X | X | X | X | X |
| Morgan Stanley | X | X | X | X | X |
| RBC Capital Markets | X | X | X | X | X |
| SunTrust | X | X | X | X | X |
| Goldman Sachs | X | X | | | |
| JP Morgan | X | X | X | | |

| Merrill Lynch | X | X |   |   |   |
|---|---|---|---|---|---|
| CIBC | X | X |   | X |   |
| Citigroup |   | X | X | X |   |
| DBS |   | X |   |   |   |
| TD Securities | X | X |   | X |   |
| BMO |   |   |   | X |   |
| SMBC Nikko Securities |   |   |   | X |   |

600.    Valeant, the Individual Securities Act Defendants, PwC, and the Bank Offering Defendants are collectively referred to herein as the "Securities Act Defendants."

**Valeant's Debt Offerings Were Public Offerings**

601.    Although Valeant asserted that the Debt Offerings were exempt from registration, Valeant's July 2013 Debt Offering, December 2013 Debt Offering, January 2015 Debt Offering, and March 2015 Debt Offering (all as defined herein) constituted public offerings.  The Debt Offerings were some of the largest corporate offerings by a drug company in the last five years, raising more than $13 billion from TIAA and other members of the Class.  At the time it was consummated, the March 2015 Debt Offering was the third largest high-yield corporate debt offering in history.

602.    Via the Debt Offerings, Valeant widely marketed and sold its debt securities to hundreds, if not thousands, of investors, which included TIAA and other retirement and pension plans operated for the benefit of millions of teachers, firefighters, policemen, state and local government employees, manufacturing employees, actors and screenwriters, construction workers, and other professionals in both the public and private sectors.  Valeant, Pearson, Schiller, and the Bank Offering Defendants actively  solicited and sold senior notes in the Debt Offerings to investors across the United States – from Hawaii to New York and Texas to Wyoming, and dozens of places in between, including Pennsylvania, Oregon, and Missouri, among many others.  In short, the securities sold by Valeant, Pearson, Schiller, and the Bank Offering Defendants were widely

- 234 -

marketed via teleconferences and meetings and sold to a large cross-section of American investors, and the decreases in the value of these securities has adversely impacted the retirement savings of tens of millions of Americans.

603.    In addition, the July 2013 Debt Offering Prospectus, the December 2013 Debt Offering Prospectus, the January 2015 Debt Offering Prospectus, and the March 2015 Debt Offering Prospectus (all as defined herein) also included the information required in connection with the sale of registered securities.  For example, each of these offering documents, included, *inter alia*: (i) the name of the issuer and the state under which it was organized; (ii) a statement of Valeant's business; (iii) the price and terms of the senior notes; (iv) the estimated net proceeds to be derived from the offering; (v) a statement of Valeant's capitalization; (vi) a balance sheet and profit and loss statement of Valeant; and (vii) the names of the investment firms selling the securities to investors.  As Valeant itself has acknowledged on multiple occasions with respect to the Debt Offerings, "[n]o offer of securities shall be made except by means of a prospectus meeting the requirements of Section 10 of the Securities Act."

### CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT V

### For Violations of Section 12(a)(2) of the Securities Act in Connection with the July 2013 Debt Offering

### Against Valeant, Pearson, Schiller, Goldman Sachs, Barclays, Merrill Lynch, JP Morgan, Morgan Stanley, RBC Capital Markets, DNB Markets, SunTrust, CIBC, HSBC, MUFJ, and TD Securities

604.    Plaintiffs incorporate ¶¶583-603 as though fully set forth herein.  With respect to this Count, Plaintiffs exclude allegations that could be construed as alleging fraud or intentional misconduct, as this Count is based solely on claims of strict liability and/or negligence.

605.    Lead Plaintiff TIAA brings this claim pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of itself and other members of the Class who purchased the 6.75% Notes and the 7.5% Notes from Defendants in the July 2013 Debt Offering against Valeant, Pearson, Schiller, Goldman Sachs, Barclays, Merrill Lynch, JP Morgan, Morgan Stanley, RBC Capital Markets, DNB Markets, SunTrust, CIBC, HSBC, MUFJ, and TD Securities.

606.    In July 2013, Valeant, Pearson, and Schiller, together with, Goldman Sachs, Barclays, Merrill Lynch, JP Morgan, Morgan Stanley, RBC Capital Markets, DNB Markets, SunTrust, CIBC, HSBC, MUFJ, and TD Securities solicited to sell and sold to investors $1.6 billion aggregate principal amount of the 6.75% Notes and $1.625 billion aggregate principal amount of the 7.5% Notes ("July 2013 Debt Offering").  A Valeant release issued in connection with the offering stated that net proceeds of the July 2013 Debt Offering would be used to fund the recently announced acquisition of Bausch & Lomb and the repayment of Bausch & Lomb's outstanding debt.

607.    On June 27, 2013, Valeant filed a Form 8-K signed by Schiller announcing the pricing of the senior notes sold in the July 2013 Debt Offering.

608.    On July 12, 2013, Valeant filed a Form 8-K signed by Schiller announcing the closing of the July 2013 Debt Offering.

609.    In addition, Pearson and Schiller participated in conference calls with investors in connection with the July 2013 Debt Offering to emphasize Valeant's business operations and prospects, including calls held on May 28 and June 11, 2013.  For example, during the May 28, 2013 call, Pearson and Schiller discussed Valeant's acquisition of Bausch & Lomb, that the Company would be issuing notes to fund the acquisition, and the substantial benefits that would

accrue to Valeant from the acquisition, including $800 million in purported cost synergies for the Company by the end of 2014.

610.    A comprehensive offering memorandum was drafted and/or approved by Valeant, Pearson, Schiller, and the Bank Offering Defendants named in this Count for the July 2013 Debt Offering ("July 2013 Debt Offering Prospectus").  The July 2013 Debt Offering Prospectus solicited purchasers for the offering and contained information required to be disclosed in a prospectus prepared under §10 of the Securities Act as alleged in ¶¶602-603.[87]

611.    The Bank Offering Defendants named in this Count acted as "initial purchasers" and agreed to purchase the senior notes sold in the July 2013 Debt Offering from the issuer with the intent to sell the notes to investors by means of the prospectus and to market the notes in exchange for discounts, commissions, and additional fees and expenses.  Lead Plaintiff and other members of the Class purchased Valeant senior notes in the July 2013 Debt Offering from the Bank Offering Defendants named in this Count and did so by means of the July 2013 Debt Offering Prospectus.

612.    The July 2013 Debt Offering Prospectus was negligently prepared and, as a result, contained untrue statements of material fact and/or omitted to state material facts required to be stated therein or necessary to make the statements made therein not misleading at the time they were made.

Actionable Statements

---

[87]   The July 2013 Debt Offering Prospectus also expressly incorporated Valeant's financial filings, including its:  (i) 2012 10-K; (ii) 1Q13 10-Q; (iii) Form 8-K current reports filed on February 25, May 14, May 16, May 21, May 30, May 31, and June 18, 2013 (other than documents or portions of these documents deemed to be furnished rather than filed); (iv) 2013 Proxy Statement; and (v) all additional annual and quarterly financial statements, quarterly reports, and proxy statements issued prior to the completion of the July 2013 Debt Offering.

613. The July 2013 Debt Offering Prospectus represented that:

(a)     A "key element" of Valeant's business strategy, which allowed it to *"improve both the growth rate and profitability of the Company"* and *"enhance shareholder value,"* was its *"low-risk research and development ('R&D') model."*

(b)     Valeant's dermatology segment was an "attractive market" for Valeant because of "solid market growth."  The prospectus identified "*[k]ey growth drivers*" for Valeant's dermatology products as "aging and growing population," consumer "self-awareness," and "improved technology," but failed to disclose Valeant's dramatic price increases, network of controlled pharmacies, or use of PAP and PR strategies to avoid patient scrutiny.

(c)     Valeant's dermatology and other product markets had "*specialized channels*" that positioned the Company to "*strengthen its competitive positioning*" and "*continue to drive organic growth,*" but failed to disclose Valeant's relationship with Philidor and that Philidor had been formed for the benefit of Valeant to increase the sales price of Valeant products far beyond industry norms and prevented substitution of Valeant products with those of other companies.

(d)     Although Valeant controlled and had significant influence over Philidor, "*pricing and sales volume of certain of our products . . . are distributed by third parties, over which we have no or limited control.*"

(e)     Valeant "*do[es] not like to 'bet' on high-risk science*" and "*avoid[s] high-risk blockbuster programs*" typical of large pharmaceutical companies.

614. The 1Q13 10-Q, which was expressly incorporated into the July 2013 Debt Offering Prospectus, represented that management's disclosure controls and procedures were effective: "Our management, with the participation of our CEO and Chief Financial Officer ('CFO'), has

evaluated the effectiveness of our disclosure controls and procedures as of March 31, 2013. ***Based on this evaluation, our CEO and CFO concluded that our disclosure controls and procedures were effective as of March 31, 2013***" ("Internal Controls Statement").  The 1Q13 10-Q also included SOX Certifications signed by Pearson and Schiller stating that the 1Q13 10-Q did not contain any untrue statements or omissions of material facts, as described in ¶145.

615.    The July 2013 Debt Offering Prospectus (¶¶613-614) contained untrue statements of material fact and/or omitted to state material facts required to be stated therein or necessary to make the statements made therein not misleading at the time they were made.  The true facts were:

(a)    that, although not disclosed to private payors, patients, physicians, PBMs , and investors, Valeant employees worked at Philidor, and Philidor had been formed with the assistance and for the benefit of Valeant to increase the sale prices of Valeant products;

(b)    that Valeant's business strategy, and the key growth driver of dermatology sales, consisted of a material source of its growth in sales of its key dermatology, neurology, and other products resulted from undisclosed practices of: (i) dramatic price increases that were unsustainable and far beyond industry norms; (ii) routing patients into Valeant's network of controlled pharmacies that appeared independent, when in truth they were not; (iii) using PAP and PR practices to avoid patient scrutiny; and (iv) not disclosing these practices to payors and obtaining reimbursement for drugs that would not otherwise be reimbursed or would not be reimbursed at such rates if these practices were disclosed to private payors, patients, physicians, and PBMs;

(c)    that Valeant's business strategy was not "low-risk" as its business risks had materially increased as a result of the undisclosed practices in subparagraph (b) above, which exposed the Company to regulatory sanction, investigation and associated costs, reputational harm,

contractual violations, decreased sales, nonpayment/substitution of Valeant products by PBMs, private payors, and physicians if such practices were disclosed;

(d)     that Valeant was not employing a "low risk research and development model" or avoiding "high-risk" strategies, but rather employing a strategy that subjected Valeant to the increased risks set forth in subparagraph (c) above;

(e)     that the Company's reported revenue, EPS, and profitability, as well as its future business prospects and ability to service its debt, were dependent on Valeant's ability to continue the undisclosed practices in subparagraph (b) above, and because of the undisclosed risks in subparagraph (c) above did not accurately portray Valeant's financial performance and business prospects;

(f)     that Valeant lacked adequate internal controls, compliance, and training programs that failed to ensure that its SEC filings and public disclosures were free of material misstatements; and

(g)     that the SOX Certifications in Valeant's 1Q13 10-Q inaccurately certified that the 1Q13 10-Q did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made not misleading.

616.     In addition, Item 303 required the 1Q13 10-Q incorporated into the July 2013 Debt Offering Prospectus to describe "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."   17 C.F.R. §229.303(a)(3)(ii).   Similarly, the regulation required the 1Q13 10-Q to disclose events that the registrant knew would "cause a material change in the relationship between costs and revenues" and "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of

reported income from continuing operations and, in each case, indicate the extent to which income was so affected." 17 C.F.R. §229.303(a)(3)(i)(ii).

617. In violation of Item 303, the 1Q13 10-Q omitted that at the time of the July 2013 Debt Offering, Valeant's growth and profitability were increasingly dependent upon its undisclosed practices of price gouging, routing patients into its undisclosed and controlled network of pharmacies, and using PAP and PR practices, all of which resulted in Valeant obtaining higher reimbursements for Valeant's products and had a major impact in driving Valeant's revenue growth while exposing the Company to increased risks of regulatory sanctions, increased costs of investigations, reputational harm, contractual violations, decreased sales, and increased scrutiny, nonpayment, and substitution of Valeant products. These known trends, events, or uncertainties were reasonably likely to have a material unfavorable impact on Valeant's net sales or revenues or income from continuing operations and cause reported financial information to not necessarily be indicative of future results and were negligently omitted in the 1Q13 10-Q incorporated into the July 2013 Debt Offering Prospectus.

618. The July 2013 Debt Offering closed on or around July 12, 2013, allowing Valeant to obtain more than $3.2 billion from TIAA and the other members of the Class who purchased senior notes in the July 2013 Debt Offering from the Bank Offering Defendants named in this Count by means of the July 2013 Debt Offering Prospectus.

619. The Defendants named in this Count were statutory sellers who sold and assisted in the sale of securities to Lead Plaintiff and other members of the Class by means of the July 2013 Debt Offering Prospectus, and they did so for the benefit of Valeant and/or for their own personal gain, including payments directly to these individuals and/or to entities affiliated with them in the form of compensation, discounts, fees, commissions, and other transaction-related payments. The

Bank Offering Defendants named in this Count alone collectively received approximately $40 million in fees for their role in the July 2013 Debt Offering.

620.    Each of the Securities Act Defendants against whom this claim is asserted were obligated by law to make a reasonable and diligent investigation of the statements contained in the July 2013 Debt Offering Prospectus including financial statements and statements regarding Valeant's internal controls and failed to do so.  Had these Defendants exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

621.    As a result of the conduct alleged herein, Defendants named in this Count violated §12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Lead Plaintiff and the other members of the Class who purchased Valeant's senior notes in the July 2013 Debt Offering by means of the July 2013 Debt Offering Prospectus from these defendants sustained substantial damages.

622.    The 6.75% Notes and the 7.5% Notes were sold in the July 2013 Debt Offering at par, and by March 2016, had declined to less than $0.90 cents on the dollar.

623.    Lead Plaintiff and the other members of the Class who hold such securities have the right to rescind and recover the consideration paid for their securities, upon tender of their securities to the defendants sued herein.  Class members who have sold their securities seek damages to the extent permitted by law.

624.    At the time of acquisition of the securities, Lead Plaintiff and the other members of the Class were not aware of the untrue or misleading nature of the statements and/or the omissions alleged herein and could not have reasonably discovered such untrue statements or omissions before they acquired the securities for which this claim is asserted.  Less than one year elapsed from the time that Lead Plaintiff discovered or reasonably could have discovered the facts upon

which this Consolidated Complaint is based until the time that plaintiffs filed the earlier complaint for violations of the securities laws.  Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the date the action commenced.

## COUNT VI

### For Violations of Section 12(a)(2) of the Securities Act in Connection with the December 2013 Debt Offering
### Against Valeant, Pearson, Schiller, Goldman Sachs, Merrill Lynch, JP Morgan, Barclays, Citigroup, DNB Markets, Morgan Stanley, RBC Capital Markets, SunTrust, CIBC, DBS, HSBC, MUFJ, and TD Securities

625.    Plaintiffs incorporate ¶¶583-603 as though fully set forth herein.  With respect to this Count, Plaintiffs exclude allegations that could be construed as alleging fraud or intentional misconduct, as this Count is based solely on claims of strict liability and/or negligence.

626.    Lead Plaintiff TIAA brings this claim pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of itself and other members of the Class who purchased the 5.625% Notes from Defendants in the December 2013 Debt Offering against Valeant, Pearson, Schiller, Goldman Sachs, Merrill Lynch, JP Morgan, Barclays, Citigroup, DNB Markets, Morgan Stanley, RBC Capital Markets, SunTrust, CIBC, DBS, HSBC, MUFJ, and TD Securities.

627.    In December 2013, Valeant, Pearson, and Schiller, together with HSBC, MUFJ, DNB Markets, Barclays, Morgan Stanley, RBC Capital Markets, SunTrust, Goldman Sachs, JP Morgan, Merrill Lynch, CIBC, Citigroup, DBS, and TD Securities, solicited to sell and sold to investors $900 million aggregate principal amount of 5.625% Notes ("December 2013 Debt Offering").  A Valeant release issued in connection with the offering stated that net proceeds of the December 2013 Debt Offering would be used to pay down the Company's outstanding 6.50% senior notes due 2016.

628.    On November 15, 2013, Valeant filed a report on Form 8-K signed by Schiller stating that the Company would commence the December 2013 Debt Offering.

629.    On November 18, 2013, Valeant filed a report on Form 8-K signed by Schiller stating that the December 2013 Debt Offering had been increased to $900 million.

630.    On December 2, 2013, Valeant filed a report on Form 8-K signed by Schiller announcing the closing of the December 2013 Debt Offering.

631.    Pearson and Schiller participated in conference calls with investors in connection with the December 2013 Debt Offering in order to emphasize Valeant's business operations and prospects, including a call that took place on October 31, 2013.

632.    A comprehensive offering memorandum was drafted and/or approved by Valeant, Pearson, Schiller, and the Bank Offering Defendants named in this Count for the December 2013 Debt Offering ("December 2013 Debt Offering Prospectus").  The December 2013 Debt Offering Prospectus solicited purchasers for the offering and contained information required to be disclosed in a prospectus prepared under §10 of the Securities Act as alleged in ¶¶602-603.[88]

633.    The Bank Offering Defendants named in this Count acted as "initial purchasers" and agreed to purchase the senior notes sold in the December 2013 Debt Offering from the issuer with the intent to sell the notes to investors by means of the prospectus and to market the notes in exchange for discounts, commissions, and additional fees and expenses.  Lead Plaintiff and other

---

[88]   The December 2013 Debt Offering Prospectus also expressly incorporated Valeant's financial filings, including its:  (i) 2012 10-K; (ii) 1Q13 10-Q, 2Q13 10-Q, and 3Q13 10-Q; (iii) Form 8-K current reports filed on February 25, May 14, May 16, May 21, May 30, and May 31, June 19, June 24, June 27, July 12, August 8, August 13, and October 21, 2013 (other than documents or portions of these documents deemed to be furnished rather than filed); (iv) 2013 Proxy Statement; and (v) all additional annual and quarterly financial filings, quarterly reports, and proxy statements issued prior to the completion of the December 2013 Debt Offering.

members of the Class purchased Valeant senior notes in the December 2013 Debt Offering from the Bank Offering Defendants named in this Count and did so by means of the December 2013 Debt Offering Prospectus.

634.    The December 2013 Debt Offering Prospectus was negligently prepared, and, as a result, contained untrue statements of material fact and/or omitted to state material facts required to be stated therein or necessary to make the statements made therein not misleading at the time they were made.

Actionable Statements

635.    The December 2013 Debt Offering Prospectus represented that:

(a)    A "key element" of Valeant's business strategy, which allowed it to "*improve both the growth rate and profitability of the Company*" and "*enhance shareholder value,*" was its "*lower-risk research and development ('R&D') model*."

(b)    Valeant's dermatology segment was an "attractive market" for Valeant because of "solid market growth."  The prospectus identified "*[k]ey growth drivers*" for Valeant's dermatology products as "aging and growing population," consumer "self-awareness," and "improved technology," but failed to disclose Valeant's dramatic price increases, network of controlled pharmacies, or use of PAP and PR strategies to avoid patient scrutiny.

(c)    Valeant's dermatology and other product markets had "*specialized channels*" that positioned the Company to "*strengthen its competitive positioning*" and "*continue to drive organic growth,*" but failed to disclose Valeant's relationship with Philidor and that Philidor had been formed for the benefit of Valeant to increase the sales price of Valeant products far beyond industry norms and prevented substitution of Valeant products with those of other companies.

(d)      "***pricing and sales volume of certain of our products . . . are distributed or marketed by third parties, over which we have no or limited control***," without disclosing that Valeant controlled and had significant influence over Philidor.

(e)      Valeant "***avoid[s] high-risk blockbuster programs***" typical of large pharmaceutical companies.

(f)      Valeant had consolidated revenues for the nine months ended September 30, 2013 of approximately $3.7 billion, an approximately 46% increase year-over-year, but failed to disclose that this growth had been achieved in part through high-risk and improper practices that exorbitantly raised sales prices through the use of captive specialty pharmacies while preventing substitution of Valeant products with those of other companies.

636.      The December 2013 Debt Offering Prospectus also expressly incorporated and thereby restated statements from the 1Q13 10-Q listed in ¶614 that contained untrue statements of material fact and/or omitted to state material facts required to be stated therein or necessary to make the statements made therein not misleading at the time they were made.

637.      In addition, Valeant's 2Q13 10-Q and 3Q13 10-Q, which were expressly incorporated into the December 2013 Debt Offering Prospectus, contained the same Internal Controls Statement and SOX Certifications, signed by Pearson and Schiller, as set forth in ¶¶144-145.

638.      The December 2013 Debt Offering Prospectus (¶¶635-637) contained untrue statements of material fact and/or omitted to state material facts required to be stated therein or necessary to make the statements made therein not misleading at the time they were made.  The true facts were:

(a)      that, although not disclosed to private payors, patients, physicians, PBMs, and investors, Valeant employees worked at Philidor, and Philidor had been formed with the assistance and for the benefit of Valeant to increase the sale prices of Valeant products and to prevent the substitution of Valeant products with those of other companies;

(b)      that Valeant's business strategy, and the key growth driver of dermatology sales, consisted of a material source of its growth in sales of its key dermatology, neurology, and other products resulted from undisclosed practices of:  (i) dramatic price increases that were unsustainable (including, for example doubling the price of Syprine on July 12, 2013, doubling it again on August 2, 2013, and doubling it yet again on August 30, 2013, for a total increase of 700% from $1,500 to $10,500); (ii) routing patients into Valeant's network of controlled pharmacies that appeared independent, when in truth they were not; (iii) using PAP and PR practices to avoid patient scrutiny; and (iv) not disclosing these practices to payors and obtaining reimbursement for drugs that would not otherwise be reimbursed or would not be reimbursed at such rates if these practices were disclosed to private payors, patients, physicians and PBMs;

(c)      that Valeant's business strategy was not "low-risk" as its business risks had materially increased as a result of the undisclosed practices in subparagraph (b) above, which exposed the Company to regulatory sanction, investigation and associated costs, reputational harm, contractual violations, decreased sales, nonpayment/substitution of Valeant products by PBMs, private payors, and physicians if such practices were disclosed;

(d)      that Valeant was not employing a *"lower risk research and development model"* or avoiding "high-risk" strategies, but rather employing a strategy that subjected Valeant to the increased risks set forth in subparagraph (c) above;

(e)     that the Company's reported revenue, EPS and profitability, as well as its future business prospects and ability to service its debt, were dependent on Valeant's ability to continue the undisclosed practices in subparagraph (b) above, and because of the undisclosed risks in subparagraph (c) above did not accurately portray Valeant's financial performance and business prospects;

(f)     that Valeant lacked adequate internal controls, compliance and training programs that failed to ensure that its SEC filings and public disclosures were free of material misstatements; and

(g)     that the SOX Certifications in Valeant's 1Q13 10-Q, 2Q13 10-Q, and 3Q13 10-Q did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made not misleading.

639.     In addition, Item 303 required each of the 2013 quarterly statements on Form 10-Q incorporated into the December 2013 Debt Offering Prospectus to describe "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(a)(3)(ii).  Similarly, the regulation required the quarterly statements to disclose events that the registrant knew would "cause a material change in the relationship between costs and revenues" and "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected." 17 C.F.R. §229.303(a)(3)(i), (ii).

640.     In violation of Item 303, each of the 2013 quarterly statements on Form 10-Q omitted that at the time of the December 2013 Debt Offering, Valeant's growth and profitability

- 248 -

were increasingly dependent upon its undisclosed practices of price gouging, routing patients into its undisclosed and controlled network of pharmacies, and using PAP and PR practices, all of which resulted in Valeant obtaining higher reimbursements for Valeant's products and had a major impact in driving Valeant's revenue growth while exposing the Company to increased risks of regulatory sanctions, increased costs of investigations, reputational harm, contractual violations, decreased sales, and increased scrutiny, nonpayment, and substitution of Valeant products.  These known trends, events or uncertainties that were reasonably likely to have a material unfavorable impact on Valeant's net sales or revenues or income from continuing operations and cause reported financial information to not necessarily be indicative of future results were negligently omitted in the quarterly statements incorporated into the December 2013 Debt Offering Prospectus.

641.    The December 2013 Debt Offering closed on or around December 2, 2013, allowing Valeant to obtain approximately $900 million from TIAA and the other members of the Class who purchased senior notes directly in the December 2013 Debt Offering from the Bank Offering Defendants named in this Count by means of the December 2013 Debt Offering Prospectus.

642.    The Defendants named in this Count were statutory sellers who sold and assisted in the sale of securities to Lead Plaintiff and other members of the Class by means of the December 2013 Debt Offering Prospectus, and they did so for the benefit of Valeant and/or for their own personal gain, including payments directly to these individuals and/or to entities affiliated with them in the form of compensation, discounts, fees, commissions and other transaction-related payments.  The Bank Offering Defendants named in this Count alone collectively received approximately $8.5 million in fees for their role in the December 2013 Debt Offering.

643.    Each of the Securities Act Defendants against whom this claim is asserted were obligated by law to make a reasonable and diligent investigation of the statements contained in the December 2013 Debt Offering Prospectus including financial statements and statements regarding Valeant's internal controls and failed to do so.  Had these defendants exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

644.    As a result of the conduct alleged herein, Defendants named in this Count violated §12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Lead Plaintiff and the other members of the Class who purchased Valeant's senior notes in the December 2013 Debt Offering by means of to the December 2013 Debt Offering Prospectus from these defendants sustained substantial damages.

645.    The 5.625% Notes were sold in the December 2013 Debt Offering at par, and by March 2016 had declined to $0.77 cents on the dollar.

646.    Lead Plaintiff and other members of the Class who hold such securities have the right to rescind and recover the consideration paid for their securities, upon tender of their securities to the Defendants sued herein.  Class members who have sold their securities seek damages to the extent permitted by law.

647.    At the time of acquisition of the securities, Lead Plaintiff and other members of the Class were not aware of the untrue or misleading nature of the statements and/or the omissions alleged herein and could not have reasonably discovered such untrue statements or omissions before they acquired the securities for which this claim is asserted.  Less than one year elapsed from the time that Lead Plaintiff discovered or reasonably could have discovered the facts upon which this Consolidated Complaint is based until the time that plaintiffs filed the earlier complaint for violations of the securities laws.  Less than three years elapsed between the time that the

- 250 -

securities upon which this Count is brought were offered to the public and the date the action commenced.

## COUNT VII

### For Violations of Section 12(a)(2) of the Securities Act in Connection with the January 2015 Debt Offering
### Against Valeant, Pearson, Schiller, Barclays, RBC Capital Markets, Deutsche Bank, DNB Markets, HSBC, MUFJ, Morgan Stanley, Citigroup, JP Morgan, and SunTrust

648.    Plaintiffs incorporate ¶¶583-603 as though fully set forth herein.  With respect to this Count, Plaintiffs also exclude allegations that could be construed as alleging fraud or intentional misconduct, as this Count is based solely on claims of strict liability and/or negligence.

649.    Lead Plaintiff TIAA brings this claim pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of itself and other members of the Class who purchased the 5.5% Notes from Defendants in the January 2015 Debt Offering against Valeant, Pearson, Schiller, Barclays, RBC Capital Markets, Deutsche Bank, DNB Markets, HSBC, MUFJ, Morgan Stanley, Citigroup, JP Morgan, and SunTrust.

650.    In January 2015, Valeant, Pearson, and Schiller, together with Barclays, RBC Capital Markets, Deutsche Bank, DNB Markets, HSBC, MUFJ, Morgan Stanley, Citigroup, JP Morgan, and SunTrust, solicited to sell and sold to investors $1 billion aggregate principal amount of the 5.5% Notes ("January 2015 Debt Offering").  A Valeant release issued in connection with the offering stated that net proceeds of the January 2015 Debt Offering would be used to pay down the Company's outstanding 6.875% senior notes due 2018, repay amounts outstanding under the Company's revolving credit facility and for general corporate purposes, including acquisitions.

651.    On January 15, 2015, Valeant filed a report on Form 8-K signed by Schiller stating that the Company would commence the January 2015 Debt Offering.

652.    On January 30, 2015, Valeant filed a report on Form 8-K signed by Schiller announcing the closing of the January 2015 Debt Offering.

653.    In addition, Pearson and Schiller participated in conference calls in connection with the January 2015 Debt Offering with investors to emphasize Valeant's business operations and prospects, including calls held on January 8 and January 13, 2015.

654.    A comprehensive offering memorandum was drafted and/or approved by Valeant, Pearson, Schiller and the Bank Offering Defendants named in this Count for the January 2015 Debt Offering ("January 2015 Debt Offering Prospectus").  The January 2015 Debt Offering Prospectus solicited purchasers for the offering and contained information required to be disclosed in a prospectus prepared under §10 of the Securities Act as alleged in ¶¶602-603.[89]

655.    The Bank Offering Defendants named in this Count acted as "initial purchasers" and agreed to purchase the senior notes sold in the January 2015 Debt Offering from the issuer with the intent to sell the notes to investors by means of the prospectus and to market the notes in exchange for discounts, commissions and additional fees and expenses.  Lead Plaintiff and the other members of the Class purchased Valeant senior notes in the January 2015 Debt Offering from these Bank Offering Defendants named in this Count and did so by means of the January 2015 Debt Offering Prospectus.

---

[89]   The January 2015 Debt Offering Prospectus also expressly incorporated Valeant's financial filings, including its: (i)  2013 Form 10-K; (ii) each of the 2014 quarterly statements on Form 10-Q; (iii) Form 8-K current reports filed on June 10, 2013 (as amended by the Form 8-K/A filed on October 21, 2013) and April 21, May 8, May 21, May 28, September 15, September 25, November 28, 2014 and January 13, 2015 (other than documents or portions of these documents deemed to be furnished rather than filed); (iv) 2014 Proxy Statement; and (v) all additional annual and quarterly financial filings, quarterly reports and proxy statements issued prior to the completion of the January 2015 Debt Offering.

656.    The January 2015 Debt Offering Prospectus was negligently prepared and, as a result, contained untrue statements of material fact and/or omitted to state material facts required to be stated therein or necessary to make the statements made therein not misleading at the time they were made.

<u>Actionable Statements</u>

657.    The January 2015 Debt Offering Prospectus represented that:

(a)    A "key element" of Valeant's business strategy, which allowed it to "*maximize both the growth rate and profitability of the Company*" and "*enhance shareholder value*," was its "*lower risk, output-focused research and development model*";

(b)    Valeant "*avoid[s] high-risk blockbuster programs*" typical of large pharmaceutical companies;

(c)    Valeant's dermatology segment and other segments were "attractive markets" in which Valeant operated because they were "*high-growth businesses*" where the "*healthcare professional or patient is still the primary decision maker*," and similarly stated that Valeant's business strategy operated "*to ensure decisions are made close to the customer*," but failed to disclose the Company's exorbitant price increases or improper accounting as a source of growth or that the Company was making sales, pricing and even prescription decisions without the knowledge and consent of healthcare professionals or patients;

(d)    "*pricing and sales volume of certain of our products . . . are distributed or marketed by third parties, over which we have no or limited control*," without disclosing that Valeant controlled and had significant influence over Philidor"; and

(e)    Valeant had consolidated revenues for the nine months ended September 30, 2014 of approximately $6 billion, an approximately 61% increase year-over-year, but failed to

disclose that this growth had been achieved in part through high-risk and improper practices, which exorbitantly raised sales prices through the use of captive specialty pharmacies, while preventing substitution of Valeant products with those of other companies.

658.    Valeant's 2013 10-K, which was expressly incorporated into the January 2015 Debt Offering Prospectus, also stated that the Company faced significant competition from generic pharmaceutical products without disclosing the steps taken to avoid the substitution of Valeant products, stating, in part:  "Generic versions are generally significantly less expensive than branded versions, and, where available, may be required in preference to the branded version under third party reimbursement programs, or substituted by pharmacies."  It added:  "*To successfully compete for business with managed care and pharmacy benefits management organizations, we must often demonstrate that our products offer not only medical benefits but also cost advantages as compared with other forms of care*."

659.    The 2013 10-K also expressly addressed VIEs.  A VIE is defined in GAAP as a legal entity that is subject to consolidation.  Although Philidor was a VIE under GAAP, in its 2013 10-K, Valeant explicitly stated that it did not hold any interests in VIEs, stating:  "*there were no material arrangements determined to be variable interest entities*."

660.    The 2013 10-K included Management's Conclusion, signed by Pearson and Schiller, "*that the Company's internal control over financial reporting was effective as of December 31, 2013*, and the same Internal Controls Statement and SOX Certifications, as set forth in the prior financial statements at ¶¶144-145.

661.    The 1Q14 10-Q, 2Q14 10-Q and 3Q14 10-Q, which were expressly incorporated into the January 2015 Debt Offering Prospectus, made numerous statements regarding the

Company's purportedly "*lower risk*" business strategy that would "*maximize both the growth rate and the profitability of the Company*" and "*enhance shareholder value*."

662.    Valeant's 3Q14 10-Q, signed by Pearson and Schiller and expressly incorporated into the January 2015 Debt Offering Prospectus, reported the Company's *3Q14 revenues of $2.056 billion, net income of $275.7 million, and GAAP EPS of $0.81*.

663.    Each of Valeant's 2014 quarterly statements on Form 10-Q were each incorporated into the January 2015 Debt Offering Prospectus and contained the same Internal Controls Statement and SOX Certifications as set forth in ¶¶144-145.

664.    The January 2015 Debt Offering Prospectus (¶¶657-663) contained untrue statements of material fact and/or omitted to state material facts required to be stated therein or necessary to make the statements made therein not misleading at the time they were made.  The true facts were:

(a)    that, although  not disclosed to private payors, patients, physicians, PBMs and investors:  Valeant employees worked at Philidor, Philidor had been formed with the assistance and for the benefit of Valeant to increase the sale prices of Valeant products, Valeant paid Philidor's owners $100 million in December 2014 for the right to acquire Philidor for $0 and had obtained explicit rights to direct Philidor activities, and Valeant was consolidating Philidor's results as its own;

(b)    that Valeant's business strategy, and the key growth driver of dermatology sales, consisted of a material source of its  growth in sales of its key dermatology, neurology and other products resulted from undisclosed practices of:  (i) dramatic price increases that were unsustainable and far beyond industry norms (including for example, increasing the price of Syprine and Cuprimine by 50%, on July 18, 2014); (ii) routing patients into Valeant's network of

- 255 -

controlled pharmacies that appeared independent, when in truth they were not; (iii) using PAP and PR practices to avoid patient scrutiny; and (iv) not disclosing these practices to payors and obtaining reimbursement for drugs that would not otherwise be reimbursed or would not be reimbursed at such rates if these practices were disclosed to private payors, patients, physicians, and PBMs;

(c)     that Valeant's business strategy was not "low risk" as its business risks had materially increased as a result of the undisclosed practices in subparagraph (b) above, which exposed the Company to regulatory sanction, investigation and associated costs, reputational harm, contractual violations, decreased sales, nonpayment/substitution of Valeant products by PBMs, private payors, and physicians if such practices were disclosed;

(d)     that Valeant was not employing a "lower risk, output-focused research and development model" but rather employing a strategy that subjected Valeant to the increased risks set forth in subparagraph (c) above;

(e)     that the Company's "high-growth businesses" including its dermatology business had grown through exorbitant price increases dependent on acquiring companies and drug portfolios in which it could engage in the undisclosed practices in subparagraph (b) above and any slow-down or cessation of such acquisitions would have a material adverse effect on the Company's business, cash flows, and results of operations;

(f)     that rather than competing by demonstrating their products' "cost advantages," Defendants were using undisclosed methods to secure payment for massive price increases, which included raising the price of products far above industry norms, including by as much as 3,000%;

(g)      that while the Company's branded products were subject to competition with more cost-efficient generics that were preferred by PBMs and substituted by pharmacies, the undisclosed practices described in subparagraph (b) above allowed Valeant to avoid such substitution;

(h)      that the Company's reported revenue, EPS and profitability, as well as its future business prospects and ability to service its debt, were dependent on Valeant's ability to continue the undisclosed practices in subparagraph (b) above, and because of the undisclosed risks in subparagraph (c) above did not accurately portray Valeant's financial performance and business prospects;

(i)      that Valeant lacked adequate internal controls, compliance and training programs that failed to ensure that its SEC filings and public disclosures were free of material misstatements;

(j)      that Valeant improperly recognized Philidor revenue, in violation of GAAP, causing the revenues, net income, and GAAP EPS reported in Valeant's 3Q14 10-Q to be materially misstated;

(k)      that in violation of GAAP, Valeant's Form 10-K and each Form 10-Q failed to disclose Philidor as a VIE; and

(l)      that the SOX certifications in Valeant's  Form 10-K and each Form 10-Q 2013 did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made not misleading.

665.   In addition, Item 303 required Valeant's Form 10-K and each Form 10-Q incorporated into the January 2015 Debt Offering Prospectus to describe "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable

or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. §229.303(a)(3)(ii).  Similarly, the regulation required Valeant's 2013 Form 10-K and each Form 10-Q to disclose events that the registrant knew would "cause a material change in the relationship between costs and revenues" and "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected." 17 C.F.R. §229.303(a)(3)(i), (ii).

666.    In violation of Item 303, Valeant's 2013 10-K and 2014 10-Qs omitted that at the time of the January 2015 Debt Offering, Valeant's growth and profitability were increasingly dependent upon its undisclosed practices of price gouging, routing patients into its undisclosed and controlled network of pharmacies, and using PAP and PR practices, all of which resulted in Valeant obtaining higher reimbursements for Valeant's products and had a major impact in driving Valeant's revenue growth while exposing the Company to increased risks of regulatory sanctions, increased costs of investigations, reputational harm, contractual violations, decreased sales, and increased scrutiny, nonpayment, and substitution of Valeant products.  These known trends, events or uncertainties that were reasonably likely to have a material unfavorable impact on Valeant's net sales or revenues or income from continuing operations and cause reported financial information to not necessarily be indicative of future results were negligently omitted from the 2013 10-K, 1Q14 10-Q, 2Q14 10-Q, and 3Q14 10-Q incorporated into the January 2015 Debt Offering Prospectus.

667.    The January 2015 Debt Offering closed on or around January 30, 2015, allowing Valeant to obtain approximately $1 billion from TIAA and the other members of the Class who

purchased senior notes directly in the January 2015 Debt Offering from the Bank Offering Defendants named in this Count by means of the January 2015 Debt Offering Prospectus.

668.    The Defendants named in this Count were statutory sellers who sold and assisted in the sale of securities to Lead Plaintiff and other members of the Class by means of the January 2015 Debt Offering Prospectus, and they did so for the benefit of Valeant and/or for their own personal gain, including payments directly to these individuals and/or to entities affiliated with them in the form of compensation, discounts, fees, commissions and other transaction-related payments.   The Bank Offering Defendants named in this Count alone collectively received approximately $8.5 million in fees for their role in the January 2015 Debt Offering.

669.    Each of the Securities Act Defendants against whom this claim is asserted were obligated by law to make a reasonable and diligent investigation of the statements contained in the January 2015 Debt Offering Prospectus including financial statements and statements regarding Valeant's internal controls and failed to do so.   Had these defendants exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

670.    As a result of the conduct alleged herein, Defendants named in this Count violated §12(a)(2) of the Securities Act.   As a direct and proximate result of such violations, Lead Plaintiff and the other members of the Class who purchased Valeant's senior notes in the January 2015 Debt Offering by means of the January 2015 Debt Offering Prospectus from these defendants sustained substantial damages.

671.    The 5.5% Notes were sold in the January 2015 Debt Offering at par, and by March 2016 had declined to 77 cents on the dollar.

672.    Lead Plaintiff and the other members of the Class who hold such securities have the right to rescind and recover the consideration paid for their securities, upon tender of their

securities to the defendants sued herein.  Class members who have sold their securities seek damages to the extent permitted by law.

673.    At the time of acquisition of the securities, Lead Plaintiff and the other members of the Class were not aware of the untrue or misleading nature of the statements and/or the omissions alleged herein and could not have reasonably discovered such untrue statements or omissions before they acquired the securities for which this claim is asserted.  Less than one year elapsed from the time that Lead Plaintiff discovered or reasonably could have discovered the facts upon which this Consolidated Complaint is based until the time that plaintiffs filed the earlier complaint for violations of the securities laws.  Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the date the action commenced.

**COUNT VIII**

**For Violations of Section 12(a)(2) of the Securities Act in Connection
with the March 2015 Debt Offering
Against Valeant, Pearson, Schiller, Deutsche Bank, HSBC, MUFJ, DNB Markets,
SunTrust, Barclays, Morgan Stanley, RBC Capital Markets, Citigroup, BMO,
CIBC, SMBC Nikko Securities, and TD Securities**

674.    Plaintiffs incorporate ¶¶583-603 as though fully set forth herein.  With respect to this Count, Plaintiffs also exclude allegations that could be construed as alleging fraud or intentional misconduct, as this Count is based solely on claims of strict liability and/or negligence.

675.    Lead Plaintiff TIAA brings this claim pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of itself and other members of the Class who purchased the 5.375% Notes, the 5.875% Notes and the 6.125% Notes from Defendants in the March 2015 Debt Offering against Valeant, Pearson, Schiller, Deutsche Bank, HSBC, MUFJ, DNB Markets, SunTrust, Barclays, Morgan Stanley, RBC Capital Markets, Citigroup, BMO, CIBC, SMBC Nikko Securities, and TD Securities.

- 260 -

676.    In March 2015, Valeant, Pearson, and Schiller, together with Deutsche Bank, HSBC, MUFJ, DNB Markets, SunTrust, Barclays, Morgan Stanley, RBC Capital Markets, Citigroup, BMO, CIBC, SMBC Nikko Securities, and TD Securities, solicited to sell and sold to investors $2 billion aggregate principal amount of the 5.375% Notes, $3.25 billion aggregate principal amount of the 5.875% Notes, and $3.25 billion of the 6.125% Notes ("March 2015 Debt Offering").  A Valeant release issued in connection with the offering stated that net proceeds would be used to for the Company's acquisition of Salix.

677.    On March 9, 2015, Valeant filed a report on Form 8-K signed by Schiller stating that the Company would commence the March 2015 Debt Offering.

678.    On March 13, 2015, Valeant filed a report on Form 8-K signed by Schiller announcing the closing of the March 2015 Debt Offering.

679.    In addition, Pearson and Schiller participated in conference calls with investors in connection with the March 2015 Debt Offering to emphasize Valeant's business operations and prospects, including a call held on February 23, 2015.  During the February 23 call, Pearson and Schiller discussed Valeant's acquisition of Salix and the fact that the Company would be issuing bonds to fund the acquisition, emphasizing the benefits Valeant would derive from the acquisition, including more than $500 million in run rate synergies.

680.    A comprehensive offering memorandum was drafted and/or approved by Valeant, Pearson, Schiller, and the Bank Offering Defendants named in this Count for the March 2015 Debt Offering ("March 2015 Debt Offering Prospectus").  The March 2015 Debt Offering Prospectus

solicited purchasers for the offering and contained information required to be disclosed in a prospectus prepared under §10 of the Securities Act as alleged in ¶¶602-603.[90]

681.    The Bank Offering Defendants named in this Count acted as "initial purchasers" and agreed to purchase the senior notes sold in the March 2015 Debt Offering from the issuer with the intent to sell the notes to investors by means of the prospectus and to market the notes in exchange for discounts, commissions and additional fees and expenses.  Lead Plaintiff and the other members of the Class purchased Valeant senior notes in the March 2015 Debt Offering from the Bank Offering Defendants named in this Court and did so by means of the March 2015 Debt Offering Prospectus.

682.    The March 2015 Debt Offering Prospectus was negligently prepared and, as a result, contained untrue statements of material fact and/or omitted to state material facts required to be stated therein or necessary to make the statements made therein not misleading at the time they were made.

Actionable Statements

683.    The March 2015 Debt Offering Prospectus represented that:

(a)    A "key element" of Valeant's business strategy, which allowed it to "***maximize both the growth rate and profitability of the Company***" and "***enhance shareholder value***", was its "***lower-risk, output-focused research and development model***";

---

[90]   The March 2015 Debt Offering Prospectus also expressly incorporated Valeant's financial filings, including its:  (i) 2014 10-K; (ii) Form 8-K current reports filed on January 13, January 30, February 23 and March 9, 2015 (other than documents or portions of these documents deemed to be furnished rather than filed); (iii) 2014 Proxy Statement; and (iv) all additional annual and quarterly financial filings, quarterly reports and proxy statements issued prior to the completion of the March 2015 Debt Offering.

- 262 -

(b)     Although Valeant controlled and had significant influence over Philidor, *"pricing and sales volume of certain of our products . . . are distributed or marketed by third parties, over which we have no or limited control"*;

(c)     Valeant's dermatology segment and other segments were "attractive markets" in which Valeant operated because they were "***high-growth businesses***" with "***sustainable*** organic ***growth***" where the "***healthcare professional or patient is still the primary decision maker***," and similarly stated that Valeant's business strategy operated "***to ensure decisions are made close to the customer***," but  failed to disclose the Company's exorbitant price increases or improper accounting as a source of growth or that the Company was making sales, pricing and even prescription decisions without the knowledge and consent of healthcare professionals or patients, and, further, that such practices and Valeant's growth dependent on them were not sustainable; and

(d)     Valeant had consolidated revenues for the year ended December 31, 2014 of approximately \$8.3 billion, an approximately 43% increase year-over-year, but failed to disclose that this growth had been achieved in part through high-risk and improper practices which exorbitantly raised sales prices through the use of captive specialty pharmacies while preventing substitution of Valeant products.

684.    The March 2015 Debt Offering Prospectus discussed the Company's "Other Recent Acquisitions," but failed to mention Philidor at all, let alone disclose Valeant's erroneous accounting related to Philidor or that Valeant paid \$100 million for the option to acquire Philidor just three months prior to the March 2015 Debt Offering.  Instead, the March 2015 Debt Offering Prospectus stated that the Company was "***not currently a party to any significant transactions, other than the [Salix merger]***."

685.    The 2014 10-K, which was expressly incorporated into the March 2015 Debt Offering Prospectus, claimed the Company faced significant competition from generic pharmaceutical products without disclosing Valeant's practices to prevent the substitution of its products.  For example, the 2014 10-K stated, in part: "Generic versions are generally significantly less expensive than branded versions, and, where available, may be required in preference to the branded version under third party reimbursement programs, or substituted by pharmacies."  It added:  "*To successfully compete for business with managed care and pharmacy benefits management organizations, we must often demonstrate* that our products offer not only medical benefits but also *cost advantages as compared with other forms of care*."

686.    The 2014 10-K further reported the Company's *4Q14 revenue of $2.28 billion, net income of $534.9 million, and GAAP EPS of $1.56, and full year 2014 revenue of $8.264 billion, net income of $913.5 million, and GAAP EPS of $2.67*."

687.    The 2014 10-K addressed Valeant's "Significant Accounting Policies" including its "Principles of Consolidation" stating that "*[t]he consolidated financial statements include the accounts of the Company and those of its subsidiaries and any variable interest entities ('VIEs') for which the Company is the primary beneficiary*," while omitting any mention of Philidor.

688.    The 2014 10-K stated, under the heading "Business Combinations:"

*During the year ended December 31, 2014, the Company completed other smaller acquisitions, including the consolidation of variable interest entities, which are not material individually or in the aggregate*.  These acquisitions are included in the aggregated amounts presented below.

689.    The 2014 10-K included "Reports of Management on Financial Statements and Internal Control over Financial Reporting" signed by Pearson and Schiller, stating:

**Financial Statements**

The Company's management is responsible for preparing the accompanying consolidated financial statements in conformity with United States generally accepted accounting principles ("U.S. GAAP"). In preparing these consolidated financial statements, *management selects appropriate accounting policies* and uses its judgment and best estimates *to report events and transactions as they occur*. *Management has determined such amounts on a reasonable basis in order to ensure that the consolidated financial statements are presented fairly, in all material respects. Financial information included throughout this Annual Report is prepared on a basis consistent with that of the accompanying consolidated financial statements.*

**Internal Control Over Financial Reporting**

Under the supervision and with the participation of management, including the Company's Chief Executive Officer and Chief Financial Officer, the Company conducted an evaluation of the effectiveness of its internal control over financial reporting based on the framework described in Internal Control — Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. *Based on its evaluation under this framework, management concluded that the Company's internal control over financial reporting was effective as of December 31, 2014*.

690.    The 2014 Form 10-K was signed by Pearson and Schiller and contained the same Internal Controls Statement and SOX Certifications as set forth in ¶¶144-145.

691.    The March 2015 Debt Offering Prospectus (¶¶683-690) contained untrue statements of material fact and/or omitted to state material facts required to be stated therein or necessary to make the statements made therein not misleading at the time they were made.  The true facts were:

(a)    that, although not disclosed to private payors, patients, physicians, PBMs and investors Valeant employees worked at Philidor, Philidor had been formed with the assistance and for the benefit of Valeant to increase the sale prices of Valeant products, Valeant paid Philidor's owners $100 million in December 2014 for the right to acquire Philidor for $0 and had obtained explicit rights to direct Philidor activities, and Valeant was consolidating Philidor's results as its own;

- 265 -

(b)     that Valeant's business strategy consisted of a material source of its growth in sales of its key dermatology, neurology and other products resulted from undisclosed practices of: (i) dramatic price increases that were unsustainable and far beyond industry norms (including for example, increasing the price of Syprine and Cuprimine by 50%, on July 18, 2014); (ii) routing patients into Valeant's network of controlled pharmacies appeared independent, when in truth they were not; (iii) using PAP and PR practices to avoid patient scrutiny; and (iv) not disclosing these practices to payors and obtaining to obtain reimbursement for drugs that would not otherwise be reimbursed or would not be reimbursed at such rates if these practices were disclosed to private payors, patients, physicians and PBMs;

(c)     that Valeant's business strategy was not "lower-risk" as its business risks had materially increased as a result of the undisclosed practices in subparagraph (b) above, which exposed the Company to regulatory sanction, investigation and associated costs, reputational harm, contractual violations, decreased sales, nonpayment/substitution of Valeant products by PBMs, private payors, and physicians if such practices were disclosed;

(d)     that rather than competing by demonstrating their products' "cost advantages," Defendants were using undisclosed methods to secure payment for massive price increases, which included raising the price of products far above industry norms, including by as much as 3,000%, and without justification that would be acceptable to payors as Valeant had not increased spending on R&D to improve the affected medications;

(e)     that the Company's reported revenue, EPS and profitability, as well as its future business prospects and ability to service its debt, were dependent on Valeant's ability to continue the undisclosed practices in subparagraph (b) above, and because of the undisclosed risks

in subparagraph (c) above did not accurately portray Valeant's financial performance and business prospects;

(f)     that Valeant was not employing a "lower risk research and development model" but employing a strategy that subjected Valeant to the increased risks set forth in subparagraph (c) above;

(g)     that the Company's "high-growth businesses" including its dermatology business had grown through exorbitant price increases dependent on acquiring companies and drug portfolios in which it could engage in the undisclosed practices in subparagraph (b) above and any slow-down or cessation of such acquisitions would have a material adverse effect on the Company's business, cash flows, and results of operations;

(h)     that while the Company's branded products were subject to competition with more cost-efficient generics that were preferred by PBMs and substituted by pharmacies, the undisclosed practices described in subparagraph (b) above allowed Valeant to avoid such substitution;

(i)     that Valeant had materially increased the amount of sales through Philidor as Philidor expanded its network of pharmacies and began selling in states where it did not have, or had been denied, a license;

(j)     that Valeant lacked adequate internal controls, compliance and training programs that failed to ensure that its SEC filings and public disclosures were free of material misstatements;

(k)     that in violation of GAAP, the 2014 10-K failed to disclose Philidor as a VIE;

1352297_1

(l)     that the SOX certifications in Valeant's 2014 10-K inaccurately certified that the 2014 10-K did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made not misleading; and

(m)     that Valeant improperly recognized Philidor revenue, in violation of GAAP, causing the revenues, net income, and GAAP EPS reported in Valeant's 2014 10-K, to be materially misstated.

692.     In addition, Item 303 required the 2014 10-K incorporated into the March 2015 Debt Offering Prospectus to describe "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(a)(3)(ii).  Similarly, the regulation required the 2014 10-K to disclose events that the registrant knew would "cause a material change in the relationship between costs and revenues" and "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected." 17 C.F.R. §229.303(a)(3)(i), (ii).

693.     In violation of Item 303, the 2014 10-K omitted that at the time of the March 2015 Debt Offering, Valeant's growth and profitability were increasingly dependent upon its undisclosed practices of price gouging, routing patients into its undisclosed and controlled network of pharmacies, and using PAP and PR practices, all of which resulted in Valeant obtaining higher reimbursements for Valeant's products and had a major impact in driving Valeant's revenue growth while exposing the Company to increased risks of regulatory sanctions, increased costs of investigations, reputational harm, contractual violations, decreased sales, and increased scrutiny, nonpayment, and substitution of Valeant products.  These known trends, events or uncertainties

that were reasonably likely to have a material unfavorable impact on Valeant's net sales or revenues or income from continuing operations and cause reported financial information to not necessarily be indicative of future results were negligently omitted from the 2014 10-K incorporated into the March 2015 Debt Offering Prospectus.

694.    The March 2015 Debt Offering closed on or around December 2, 2013, allowing Valeant to obtain billions of dollars from TIAA and the other members of the Class who purchased senior notes directly in the March 2015 Debt Offering from the Bank Offering Defendants named in this Count by means of the March 2015 Debt Offering Prospectus.

695.    The Defendants named in this Count were statutory sellers who sold and assisted in the sale of securities to Lead Plaintiff and other members of the Class by means of the March 2015 Debt Offering Prospectus, and they did so for the benefit of Valeant and/or for their own personal gain, including payments directly to these individuals and/or to entities affiliated with them in the form of compensation, discounts, fees, commissions and other transaction-related payments.  The Bank Offering Defendants named in this Count alone collectively received almost $100 million in fees for their role in the March 2015 Debt Offering.

696.    Each of the Securities Act Defendants against whom this claim is asserted were obligated by law to make a reasonable and diligent investigation of the statements contained in the March 2015 Debt Offering Prospectus including financial statements and statements regarding Valeant's internal controls and failed to do so.  Had these defendants exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

697.    As a result of the conduct alleged herein, Defendants named in this Count violated §12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Lead Plaintiff and the other members of the Class who purchased senior notes in the March 2015 Debt Offering

pursuant to the March 2015 Debt Offering Prospectus from these defendants sustained substantial damages.

698.    The 5.375% Notes, the 5.875% Notes and the 6.125% Notes were sold in the March 2015 Debt Offering at par, and by March 2016 had declined to $0.80, $0.77 and $0.75, respectively, on the dollar.

699.    Lead Plaintiff and the other members of the Class who hold such securities have the right to rescind and recover the consideration paid for their securities, upon tender of their securities to the Defendants sued herein.  Class members who have sold their securities seek damages to the extent permitted by law.

700.    At the time of acquisition, Lead Plaintiff and the other members of the Class were not aware of the untrue or misleading nature of the statements and/or the omissions alleged herein and could not have reasonably discovered such untrue statements or omissions before they acquired the securities for which this claim is asserted.  Less than one year elapsed from the time that Lead Plaintiff discovered or reasonably could have discovered the facts upon which this Consolidated Complaint is based until the time that plaintiffs filed the earlier complaint for violations of the securities laws.  Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the date the action commenced.

## COUNT IX

### For Violations of Section 11 of the Securities Act in Connection with the March 2015 Stock Offering Against Valeant, the Individual Securities Act Defendants, PwC, and the Stock Underwriter Defendants

701.    Plaintiffs incorporate ¶¶583-603 as though fully set forth herein.  With respect to this Count, Plaintiffs also exclude allegations that could be construed as alleging fraud or intentional misconduct, as this Count is based solely on claims of strict liability and/or negligence.

702.     Named Plaintiff Tucson brings this claim pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of itself and the other members of the Class who purchased Valeant common stock in the March 2015 Stock Offering against Valeant, the Individual Securities Act Defendants, PwC, and the Stock Underwriter Defendants.

703.     On or about March 16, 2015, Valeant announced a $1.45 billion public offering of 7.3 million shares of Valeant common stock at a price of $199 per share, the proceeds of which were used to fund the acquisition of Salix and related costs.  The March 2015 Stock Offering was conducted pursuant to the March 2015 Stock Offering Materials.

704.     The June 2013 Registration Statement was 23 pages long (excluding exhibits) and it did not itself describe any offering, but rather noted, "[e]ach time we sell securities, we will provide a prospectus supplement that will contain specific information about the terms of that offering.  The prospectus supplement may also add, update or change information contained in this prospectus."  The Valeant financial statements incorporated by reference in the June 2013 Registration Statement showed, among other things, approximately $3.5 billion in annual revenues, $11 billion in long-term debt, and 7,000 employees.

705.     In contrast, the March 2015 Prospectus Supplement was 75 pages long (excluding exhibits) and, by its own terms, "describe[d] the specific terms of the offering and also supplement[ed], add[ed] to and update[d] information contained in the [June 2013 Registration Statement] and the documents incorporated by reference into the [June 2013 Registration Statement]."  At the time of the March 2015 Stock Offering, the information contained in the June 2013 Registration Statement was more than 21 months old.  The financial statements incorporated by reference in the March 2015 Prospectus Supplement were significantly different, showing

approximately $8.3 billion in annual revenues, $15.2 billion in long-term debt (and in the process

of completing a $14.5 billion acquisition), and 16,800 employees.

706.    The March 2015 Prospectus Supplement contained additional new information that

was fundamental to assessing the value of the March 2015 Stock Offering, including, but not

limited to:

- the statements set forth in ¶710(b) and (d), below, including the financial results for 2014, that contained untrue statements of material fact and/or omitted to state material facts required to be stated therein or necessary to make the statements made therein not misleading at the time they were made;

- information regarding acquisitions completed between the June 2013 Registration Statement and the March 2015 Stock Offering, including Obagi Medical Products, Inc. (April 2013); Bausch + Lomb (August 2013) Solta Medical Inc. (January 2014) PreCision Dermatology, Inc. (July 2014) products from Marathon, such as Nitropress and Isuprel (February 2015) and Dendreon Corporation (February 2015);

- a description of the purported risks related to the March 2015 Stock Offering and Valeant's common shares;

- an explanation that the offering was being completed in connection with Valeant's $14.5 billion acquisition of Salix;

- a description of Salix, including its business, products and risks, as well as the purported risks related to the acquisition and the post-merger company;

- a description of a firm commitment letter between Valeant and various banks for up to $9.725 billion in unsecured bridge loans for purposes of, in part, financing the Salix acquisition;

- updated financial information, including the Company's audited financial statements for full year 2013 and 2014, and unaudited financial statements of the combined company; and

- basic information about the economics of the offering, including the public offering price and proceeds to the Company.

707.    The March 2015 Prospectus Supplement incorporated by reference, among others,

the Company's 2014 10-K.

- 272 -

708.     Pursuant to the March 2015 Stock Offering Materials, the Company issued and sold 7.3 million shares of Valeant common stock via an underwriting syndicate composed of the Stock Underwriter Defendants.   In exchange, the Stock Underwriter Defendants received over $16 million.   The number of shares sold by each Stock Underwriter Defendant and their resulting discounts and commissions are set forth in the chart below.

| Underwriter | Number of Shares | Discounts and Commissions |
|---|---|---|
| Deutsche Bank | 5,464,871 | $12,234,47.95 |
| HSBC | 554,503 | $1,241,393.59 |
| MUFJ | 304,578 | $681,874.00 |
| DNB Markets | 225,447 | $504,719.47 |
| Barclays | 213,131 | $477,147.03 |
| Morgan Stanley | 213,131 | $477,147.03 |
| RBC Capital Markets | 213,131 | $477,147.03 |
| SunTrust | 97,640 | $218,591.55 |
| TOTAL | 7,286,432 | $16,312,499.64 |

709.     Tucson purchased shares of Valeant common stock in the March 2015 Stock Offering pursuant to the March 2015 Stock Offering Materials, and brings this claim pursuant to §11 of the Securities Act, 15 U.S.C. §77k on behalf of itself and the other members of the Class who purchased shares in the March 2015 Stock Offering pursuant to the March 2015 Stock Offering Materials, against:

| DEFENDANT | | SECTION 11 LIABILITY |
|---|---|---|
| Registrant | Valeant | As registrant, strictly liable for misstatements and omissions in March 2015 Stock Offering Materials and statements incorporated therein. |
| Management Defendants | Pearson and Schiller | Each signed and/or authorized the signing of the Registration Statement, which includes the information incorporated therein by reference, as alleged in ¶¶591-592, above, and was a director of Valeant at the time of the filing of the part of the March 2015 Stock Offering Materials with respect to which his or her liability is asserted. |

- 273 -

| DEFENDANT | | SECTION 11 LIABILITY |
|---|---|---|
| **Director Defendants** | Farmer, Goggins, Ingram, Lönner, Melas-Kyriazi, Power, Provencio, Stevenson, and Ubben | Each signed and/or authorized the signing of the Registration Statement, which includes the information incorporated therein by reference, as alleged in ¶593, above, or was a director of Valeant at the time of the filing of the part of the March 2015 Stock Offering Materials with respect to which his or her liability is asserted. |
| **Outside Auditor Defendant** | PwC | As accounting experts, PwC certified Valeant's financial statements contained in the March 2015 Stock Offering Materials, and consented to the inclusion of its 2014 Audit Report in the March 2015 Stock Offering Materials. |
| **Stock Underwriter Defendants** | Deutsche Bank, HSBC, MUFJ, DNB Markets, Barclays, Morgan Stanley, RBC Capital Markets, and SunTrust | As underwriters, liable for misstatements and omissions in March 2015 Stock Offering Materials. |

Actionable Statements

710.   The March 2015 Stock Offering Materials represented that:

(a)   A "key element" of Valeant's business strategy, which allowed it to "***improve both the growth rate and profitability of the Company***" and "***enhance shareholder value***", was its "***low-risk research and development ('R&D') model***";

(b)   Valeant's dermatology segment and other segments were "attractive markets" in which Valeant operated because they were "***high-growth businesses***" with "***sustainable*** organic ***growth***" where the "***healthcare professional or patient is still the primary decision maker***," and similarly stated that Valeant's business strategy operated "***to ensure decisions are made close to the customer***" and that there was "***significant opportunity to create value through application of the Valeant business model***";

- 274 -

(c)     Valeant's "*inventory is held at retail pharmacies and other non-wholesale locations over whose buying patterns we will have limited influence*" and the "*pricing and sales volume of certain of our products (or Salix's products) . . . are distributed or marketed by third parties, over which we have no or limited control*"; and

(d)     Valeant's financial results for the year ended December 31, 2014: *total revenues of $8.264 billion; net income of $913.5 million; and basic and diluted EPS of $2.72 and $2.67, respectively*, and stated that revenues had grown by approximately 43% year-over-year, it failed to disclose that this growth had been achieved through high-risk and improper practices which raised sales prices via captive specialty pharmacies, while preventing substitution of Valeant products with those of other companies.

711.    The March 2015 Stock Offering Materials discussed the Company's "Other Recent Acquisitions," but failed to mention Valeant paid $100 million for the option to acquire Philidor just three months prior to the March 2015 Stock Offering, and claimed that the Company was "not currently a party to any significant transactions, other than the [Salix merger]."

712.    Valeant's 2014 10-K, which was expressly incorporated into the March 2015 Stock Offering Materials, included the same Internal Controls Statement and SOX Certifications as set forth in ¶¶144-145.  The 2014 10-K also included the statements listed in ¶¶685-689.

713.    The March 2015 Stock Offering Materials (¶¶710-712) contained untrue statements of material fact and/or omitted to state material facts required to be stated therein or necessary to make the statements made therein not misleading at the time they were made.  The true facts were:

(a)     that, although not disclosed to private payors, patients, physicians, PBMs and investors, Valeant employees worked at Philidor,  Philidor had been formed with the assistance and for the benefit of Valeant to increase the sale prices of Valeant products, Valeant paid

- 275 -

Philidor's owners $100 million in December 2014 for the right to acquire Philidor for $0 and had obtained explicit rights to direct Philidor activities, and Valeant was consolidating Philidor's results as its own;

(b)     that Valeant's business strategy consisted of a material source of its growth in sales of its key dermatology, neurology and other products including Jublia, Onexton, Solodyn, Ancanya, Ciana, Luza, and Retin-A Micro resulted from undisclosed practices of: (i) dramatic price increases that were unsustainable and far beyond industry norms (including for example, increasing the price of Syprine and Cuprimine by 50%, on July 18, 2014); (ii) routing patients into Valeant's network of controlled pharmacies that appeared independent, when in truth they were not; (iii) using PAP and PR practices to avoid patient scrutiny; and (iv) not disclosing these practices to payors and obtained reimbursement for drugs that would not otherwise be reimbursed or would not be reimbursed at such rates if these practices were disclosed to private payors, patients, physicians, and PBMs;

(c)     that Valeant's business strategy was not "low-risk" as its business risks had materially increased as a result of the undisclosed practices in subparagraph (b) above, which exposed the Company to regulatory sanction, investigation and associated costs, reputational harm, contractual violations, decreased sales, nonpayment/substitution of Valeant products by PBMs, private payors, and physicians if such practices were disclosed;

(d)     that rather than competing by demonstrating their products' "cost advantages," Defendants were using undisclosed methods to secure payment for massive price increases, which included raising the price of products far above industry norms, including by as much as 3,000%, and without justification that would be acceptable to payors as Valeant had not increased spending on R&D to improve the affected medications;

(e)      that the Company's reported revenue, EPS and profitability, as well as its future business prospects, were dependent on Valeant's ability to continue the undisclosed practices in subparagraph (b) above, and, because of the undisclosed risks in subparagraph (c) above, did not accurately portray Valeant's financial performance and business prospects;

(f)      that Valeant was not employing a "lower risk research and development model" but rather employing a strategy that subjected Valeant to the increased risks set forth in subparagraph (c) above;

(g)      that the Company's growth and ability to service its debt was dependent on acquiring companies and drug portfolios in which it could engage in the undisclosed practices in subparagraph (b) above and any slow-down or cessation of such acquisitions would have a material adverse effect on the Company's business, cash flows, and results of operations;

(h)      that the Company's growth, immediately preceding the March 2015 Stock Offering, was driven in significant part by dramatic and unsustainable price increases of Nitropress and Isuprel;

(i)      that while the Company's branded products were subject to competition with more cost-efficient generics that were preferred by PBMs and substituted by pharmacies, the undisclosed practices described in subparagraph (b) above allowed Valeant to avoid such substitution;

(j)      that Valeant had materially increased the amount of sales through Philidor as Philidor expanded its network of pharmacies and began selling in states where it did not have, or had been denied, a license;

(k)      that Valeant lacked adequate internal controls, compliance and training programs that failed to ensure that its SEC filings and public disclosures were free of material misstatements;

(l)      that in violation of GAAP, the 2014 10-K failed to disclose Philidor as a VIE;

(m)      that the SOX certifications in Valeant's 2014 10-K, inaccurately certified that the 2014 10-K did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made not misleading; and

(n)      that Valeant improperly recognized Philidor revenue, in violation of GAAP, causing the revenues and GAAP EPS reported in Valeant's 2014 10-K, and the revenues reported in the 1Q15 10-Q to be materially misstated.

Failure to Disclose Information Required Under Items 303 and 503 of SEC Regulation S-K

714.      In addition, Item 303 required the March 2015 Stock Offering Materials and the 2014 10-K incorporated into the March 2015 Stock Offering Materials to describe "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(a)(3)(ii).  Similarly, the regulation required the March 2015 Stock Offering Materials and the 2014 10-K to disclose events that the registrant knew would "cause a material change in the relationship between costs and revenues" and "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected."  17 C.F.R. §229.303(a)(3)(i), (ii).

715.     In violation of Item 303, the March 2015 Stock Offering Materials and the 2014 10-K omitted that at the time of the March 2015 Stock Offering, Valeant's growth and profitability were increasingly dependent upon its undisclosed practices of price gouging, routing patients into its undisclosed and controlled network of pharmacies, and using patient assistance and PR strategies, all of which resulted in Valeant obtaining higher reimbursements for Valeant's products and had a major impact in driving Valeant's revenue growth while exposing the Company to increased risks of regulatory sanctions, increased costs of investigations, reputational harm, contractual violations, decreased sales, and increased scrutiny, nonpayment, and substitution of Valeant products.  *See* ¶¶355-394, 713.  These known trends, events or uncertainties that were reasonably likely to have a material unfavorable impact on Valeant's net sales or revenues or income from continuing operations and cause reported financial information to not necessarily be indicative of future results were negligently omitted from the March 2015 Stock Offering Materials and the 2014 10-K incorporated into the March 2015 Stock Offering Materials.

716.     Additionally, Item 503 of SEC Regulations S-K, 17 C.F.R. §299.503 ("Item 503"), required the March 2015 Stock Offering Materials to include among other things, a "discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. §299.503(c). Although the March 2015 Stock Offering Materials included a discussion or risk factors, it was materially incomplete and therefore misleading.

717.     In violation of Item 503, the March 2015 Stock Offering Materials did not disclose that one of the most significant factors that made the March 2015 Stock Offering speculative or risky to investors was the fact that Valeant was operating an unsustainable business model based on undisclosed practices designed to drive short-term sales prices but had exposed the Company to: increased risks of nonpayment, regulatory sanctions and associated costs of investigations,

reputational harm, decreased sales and reimbursements, increased scrutiny and substitution of Valeant products.  *See* ¶713.  Nowhere within the March 2015 Stock Offering Materials did Valeant disclose these material facts which it was required to do under Item 503.

PwC's Actionable Statements

*PwC's Certification of Valeant's Actionable Financial Statements*

718.    PwC was Valeant's auditor throughout the Class Period and certified Valeant's financial statements for 2014, which were included in the March 2015 Stock Offering Materials. PwC further provided its consent to incorporate by reference in the March 2015 Stock Offering Materials PwC's 2014 Audit Report for Valeant's 2014 10-K, which included a clean audit opinion regarding Valeant's financial statements and the effectiveness of Valeant's internal controls over financial reporting.

719.    Valeant has now admitted that it had material weaknesses in its internal controls and that its financial statements were not prepared in accordance with GAAP and contained untrue statements of material fact and/or omitted to state material facts required to be stated therein or necessary to make the statements made therein not misleading at the time they were made.  Valeant restated its 2014 financial statements, which were audited by PwC, because revenue was overstated by $58 million, net income was overstated by $33 million and EPS was overstated by $0.09.  PwC is liable for the false March 2015 Stock Offering Materials it audited.

*Auditing Standards and Purpose of an Audit*

720.    Auditing standards have been established to ensure that a registrant's external auditors fulfill their obligations when auditing and reviewing financial statements and other

information contained in SEC filings.[91]  An audit is a specific type of attestation service performed by qualified Certified Public Accountants.[92]  The results of an audit are expressed by a Certified Public Accounting Firm in the form of an audit opinion.  For example, PwC as part of its 2014 audit of Valeant's financial statements and internal controls, issued audit opinions attesting that Valeant's financial statements complied with GAAP and attesting to the effectiveness of Valeant's internal controls for the year ended December 31, 2014.  *See* 2014 10-K at F-3.

721.    Auditing standards require that an auditor "state whether, in his opinion the financial statements are presented in conformity with generally accepted accounting principles and to identify those circumstances in which such principles have not been consistently observed…"  AU §110.01.  The standards make clear that, rather than rely on subjective opinion, in performing an audit "[s]ufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit."  AU §150.02.  Thus, an audit includes procedures to gather evidence, through which the auditor can certify that the financial statements comply with GAAP, opine that they do not comply, or state that the auditor is unable to form an opinion on compliance.  *Id*.  In conducting the audit, the auditor is required to exercise professional skepticism which requires "[g]athering and objectively evaluating audit evidence."  AU §§230.07, 230.08.

---

[91]   As a result of SOX, the PCAOB was created to oversee the audits of public companies, and has now adopted, amended, and expanded upon the auditing standards and interpretations previously issued by the American Institute of Certified Public Accountants ("AICPA") (referred to herein as "AU__"), and has also promulgated additional auditing standards (referred to herein as "AS__").

[92]   "In an attest service, the practitioner expresses a conclusion about the reliability of a written assertion that is the responsibility of another party, the asserter."  AICPA *Statement on Standards for Consulting Services No. 1*., 1992.  To "attest" means "to establish or verify."  Thus, through its audit, PwC was verifying that the financial statements were prepared in accordance with GAAP.

722.    Audits provide an objective evaluation from an accounting professional independent of the company being audited as to whether the company's financial statements are prepared in accordance with the objective GAAP standards.  An important concept in accounting is comparability, which provides that accounting information is comparable when accounting standards and policies are applied consistently from one period to another and from one company to another.  *See*, *e.g.*, Statement of Financial Accounting Concepts No. 8, September 2010, QC 20. Comparability is important to investors as it allows a comparison of a company's financial statements from one period with its results from a prior period, and also allows a comparison to the financial results of other companies.  *Id.*  GAAP provides the common criteria against which to compare the financial results of different companies and across different time periods. Otherwise, investors would be forced to rely upon the subjective views of management regarding matters such as assets, revenues, and earnings which would be incapable of verification through an audit, could vary tremendously from executive to executive, and would therefore lack comparability.  *See*, *e.g.*, Statement of Financial Accounting Concepts No. 8, September 2010, QC 25.[93]  Thus, the reason for an audit is so an auditor can gather evidence and perform audit procedures as part of attesting to a company's compliance or non-compliance with GAAP to alert investors as to whether financial statements of one company can objectively be compared to those of another.

*Actionable Statements in PwC's Audit Report*

---

[93]  "One of the most important reasons that financial reporting standards are needed is to increase the comparability of reported financial information."  Statement of Financial Accounting Concepts No. 8, Sept. 2010, BC3.33.

723.     By way of its accounting restatement, Valeant admitted that, despite PwC's original certification and audit opinion, Valeant's financial statements for the year ended December 31, 2014 did not comply with GAAP and, as a result, were materially misstated as Valeant's revenue was overstated by $58 million, net income was overstated by $33 million and EPS was overstated by $0.09.   PwC's 2014 Audit Report rested upon the underlying facts contained in Valeant's financial statements for the year ended December 31, 2014, such as the purported fact that the $58 million was earned during that period and that Valeant's financial statements complied with GAAP.  Further, Valeant has admitted that, despite PwC's assertion to the contrary, its ICFR were not effective as of December 31, 2014, and that material weaknesses existed in Valeant's ICFR, including an inappropriate tone at the top of the organization that was not effective in supporting the Company's control environment.

724.     Specifically, the 2014 Audit Report contained the following actionable statements:

- *In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of income (loss), comprehensive income (loss), shareholders' equity, and cash flows present fairly, in all material respects, the financial position of Valeant Pharmaceuticals International, Inc. and its subsidiaries (the "Company") at December 31, 2014 and December 31, 2013, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2014 in conformity with accounting principles generally accepted in the United States of America.*

- *Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2014, based on criteria established in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).*

- *We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board.*

725.     The statements in ¶724 contained untrue statements of material fact and/or omitted to state material facts required to be stated therein or necessary to make the statements made therein not misleading at the time they were made, including:

(a)     that Valeant's 2014 financial statements did not "present fairly, in all material respects, the financial position of Valeant . . . and the results of their operations and their cash flows" and were not prepared in conformity with GAAP due to material overstatements of revenue, net income and EPS and Valeant overstated revenue by $58 million, net income by $33 million and EPS by $0.09 for the year ended December 31, 2014;[94]

(b)     that Valeant did not maintain "in all material respects, effective ICFR as of December 31, 2014 as," Valeant's internal controls included the existence of two material weaknesses as of December 31, 2014;[95] and

(c)     that PwC did not conduct its 2014 audit of Valeant's financial statements and internal controls in accordance with the standards of the PCAOB for the reasons stated below in ¶¶726-735.

---

[94]   As a result of Valeant's March 21, 2016 withdrawal of its prior financial statements and announcement that they should no longer be relied upon, PwC's original audit opinions pertaining to the fairness of Valeant's financial statements and effectiveness of its ICFR were consequently withdrawn.

[95]   The first material weakness was Valeant's determination that the tone at the top of the organization, with its performance-based environment in which challenging targets were set and achieving those targets was a key performance expectation, was not effective in supporting the control environment. The second material weakness was due to Valeant's failure to adequately design and maintain effective controls over the review, approval and documentation of the accounting and disclosure for non-standard revenue transactions particularly at quarter-ends, including for the $58 million of overstated revenue giving rise to the restatement and other revenue transactions involving non-standard terms or amendments to arrangements.

726.    On April 29, 2016, Valeant filed its 2015 10-K with the SEC, which provided specific details about the improper sales made to Philidor that caused Valeant to restate its 2014 financial statements ("Philidor Sales Transactions"):

> In connection with the work of the Ad Hoc Committee, the Company determined that certain sales transactions for deliveries to Philidor in the second half of 2014 leading up to the execution of the purchase option agreement were not executed in the normal course of business under applicable accounting standards and included actions taken by the Company (including fulfillment of unusually large orders with extended payment terms and increased pricing, and emphasis on delivering product prior to the execution of the purchase option agreement and seeking and filling a substitute order of equivalent value for an unavailable product) in contemplation of the purchase option agreement. . . .
>
> *        *        *
>
> As a result of the foregoing, the Company has restated its financial statements for the year ended December 31, 2014.  The restatement reduced revenue by approximately $58 million and reduced the Company's net income attributable to Valeant Pharmaceuticals International, Inc. and diluted earnings per share for the year ended December 31, 2014 by approximately $33 million and $0.09 per share, respectively.

727.    As detailed above, the $58 million did not constitute earned revenues under GAAP and PwC falsely certified this fact as part of its 2014 audit.  For example, in 4Q14, leading up to the Company's December 15, 2014 purchase option agreement with Philidor, Valeant improperly recognized revenue on the Philidor Sales Transactions that were not executed in the normal course of business.  Valeant recorded the sales before collectability was probable, a GAAP requirement for proper revenue recognition.  As a result, Valeant overstated revenues by $58 million and GAAP EPS by $0.09 for the year ended December 31, 2014.

728.    PwC reviewed and discussed the Philidor Sales Transactions with Carro, Valeant's former Corporate Controller, during its 2014 audit, and prior to the issuance of the 2014 Audit Report.  At the time PwC was reviewing the transactions it would also have been aware of Valeant's December 15, 2014 purchase option agreement to acquire Philidor.

729.   PwC failed to conduct its audit in accordance with PCAOB standards by failing to identify the accounting for the Philidor Sales Transactions as non-compliant with GAAP. Accordingly, PCAOB standards required PwC to exercise "due professional care," which "requires the auditor to exercise professional skepticism" – "an attitude that includes a questioning mind and a critical assessment of audit evidence."[96]  However, even after discussing and reviewing the facts of the Philidor Sales Transactions with Carro, PwC still offered its approval of the Philidor Sales Transactions even though the characteristics of the sale violated basic revenue recognition criteria as discussed above.

730.   In doing so, PwC failed to exercise appropriate professional care and judgment and failed to adequately follow applicable auditing standards when reviewing the Philidor Sales Transactions.  For example, auditing standards require auditors to exercise heightened scrutiny when encountering and testing related party transactions, such as the Philidor Sales Transactions, due to their susceptibility to fraud or inappropriate manipulation.  AU §§334.07, 334.09, *Related Parties* ("AU 334") states:

> The auditor should place emphasis on testing material transactions with parties he knows are related to the reporting entity . . . apply the procedures [the auditor] considers necessary to obtain satisfaction concerning the purpose, nature, and extent of these transactions and their effect on the financial statements.

731.   In June 2014, the PCAOB issued Auditing Standard No. 18 *Related Parties* ("AS 18") to replace AU 334, with an effective date of December 15, 2014, because the PCAOB's oversight activities at the time were indicating continuing weaknesses in auditors' scrutiny of related party transactions.[97]  AS 18 required PwC to adopt and follow the new auditing standard

---

[96]   AU §§230.07, 316.13.

[97]   AS 18, page 2.

as part of its audit of Valeant's financial statements and internal controls for the year ended December 31, 2014.  Like AU 334, AS 18 again warned auditors of the risks of related party transactions, including that "such transactions potentially provide more of an opportunity for management to act in its own interests, rather than in the interests of the Company and its investors."[98]  Further, AS 18 reiterated that "the objective of the auditor is to obtain sufficient appropriate audit evidence to determine whether related parties and relationships and transactions with related parties have been properly identified, accounted for, and disclosed in the financial statements."[99]

732.    Accordingly, PwC was required by auditing standards to exercise heightened scrutiny over testing related party transactions between Valeant and Philidor.  Despite these PCAOB standards requiring PwC to place extra emphasis on material transactions with related parties, including whether such transactions have been properly accounted for, PwC still offered its approval for sales that violated basic revenue recognition principles.

733.    PwC also failed to adequately comply with PCAOB standards when auditing Valeant's ICFR for the year ended December 31, 2014.  Despite PwC's 2014 Audit Report's assertion that Valeant's internal controls were effective, the truth was the Company had material weaknesses in its internal controls as of December 31, 2014.  (*See* ¶¶723, 725(b)).  PwC was required to follow AS 5, when performing its 2014 audit on Valeant's ICFR.  Under AS 5, PwC was required to audit Valeant's assessment of its internal controls and also independently reach its own conclusion about the effectiveness of Valeant's internal controls.[100]  AS 5 further describes

---

[98]    AS 18, page 4.

[99]    AS 18, page A1-1.

[100]    AS 5.1 and 5.3.

specific procedures an auditor must perform over a Company's control environment due to the control environment's significance in maintaining effective internal controls:[101]

> Because of its importance to effective internal control over financial reporting, the auditor must evaluate the control environment at the company.  As part of evaluating the control environment, the auditor should assess –
>
> - Whether management's philosophy and operating style promote effective internal control over financial reporting;
>
> - Whether sound integrity and ethical values, particularly of top management, are developed and understood; and
>
> - Whether the Board or audit committee understands and exercises oversight responsibility over financial reporting and internal control.[102]

734.   Under AS 5, "if one or more material weaknesses exist, the company's internal control over financial reporting cannot be considered effective."[103]

735.   Valeant's internal controls contained a material weakness in its control environment as of December 31, 2014, including an inappropriate tone at the top of the organization.  This was demonstrated by Schiller and Carro prematurely recording revenues for the Philidor Sales Transactions.  As such Valeant's internal controls were not effective as of December 31, 2014.  PwC failed to identify that Valeant's tone at the top and control environment were both ineffective in 2014, which allowed Valeant to record $58 million in improper Philidor

---

[101]   A company's control environment is the "foundation for all other components of internal control, providing discipline and structure.  Control environment factors include the integrity, ethical values, and competence of the entity's people; management's philosophy and operating style; the way management assigns authority and responsibility, and organizes and develops its people; and the attention and direction provided by the board of directors."  *See* Committee of Sponsoring Organizations Framework for Internal Controls ("COSO Framework") Executive Summary at 4.

[102]   AS 5.25.

[103]   AS 5.2.

Sales Transactions that ultimately led to the restatement.  Consequently, PwC failed to conduct its audit in accordance with PCAOB standards.

736.    The statements made in PwC's 2014 Audit Report, as described in ¶724 above, were included, or incorporated by reference, into the March 2015 Stock Offering Materials in connection with the March 2015 Stock Offering.  Consequently, PwC is liable for these false statements.

*Actionable Statements in PwC's Audit Consent*

737.    PwC gave its consent as assurance to investors that Valeant's financial information included in the March 2015 Stock Offering Materials was accurate and did not omit facts that would make the statements in the March 2015 Stock Offering Materials misleading.

738.    Specifically, PwC's March 13, 2015 consent stated:

We hereby consent to the incorporation by reference in the Registration Statement on Form S-3 (No. 333-189192) of Valeant Pharmaceuticals International, Inc. of our report dated February 25, 2015 relating to the financial statements, financial statement schedule and the effectiveness of internal control over financial reporting, which appears in Valeant Pharmaceuticals International, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2014.

739.    As part of issuing its consent, PwC was required, under the Securities Act and auditing standards, to extend its procedures with respect to subsequent events from the date of its Audit Report up to the effective date of the March 2015 Stock Offering Materials, or as close thereto as is reasonable and practicable under the circumstances.  Procedures that PwC should have undertaken prior to issuing its consent included:

- reading the entire prospectus and other pertinent portions of the March 2015 Stock Offering Materials;

- inquiring of and obtaining written representations from officers and other executives responsible for financial and accounting matters about whether any events occurred, other than those reflected in the March 2015 Stock Offering Materials, that in their opinion had a material effect on the audited financial statements included therein or that should be disclosed in order to keep those statements from being misleading;

- reading the latest available interim financial statements to make any appropriate comparisons and inquiring as to whether interim statements were prepared on the same basis as that used for the statements under audit;

- inquiring whether there had been any changes in the Company's related parties or any significant new related-party transactions;

- inquiry into whether the Company has entered into any significant unusual transactions; and

- making such additional inquiries or performing such procedures as considered necessary and appropriate to dispose of questions that arise in carrying out the foregoing procedures, inquiries and discussions.

740. For the same reasons set forth above (¶725), PwC's consents contained untrue statements of material fact and/or omitted to state material facts required to be stated therein or necessary to make the statements made therein not misleading at the time they were made.

741. As part of the March 2015 Stock Offering, PwC also consented to being referred to in the March 2015 Stock Offering Materials as "experts in accounting and auditing," whose 2014 Audit Report was being relied upon by investors.

<u>All Securities Act Defendants Named in This Count</u>

742. Each of the Securities Act Defendants against whom this claim is asserted were obligated by law to make a reasonable and diligent investigation of the statements contained in the March 2015 Offering Materials including financial statements and statements regarding Valeant's internal controls and failed to do so. Had these defendants exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

743.     The March 2015 Stock Offering was conducted pursuant to the March 2015 Stock Offering Materials, which were negligently prepared and, as a result, contained untrue statements of material fact and/or omitted to state material facts required to be stated therein or necessary to make the statements made therein not misleading at the time they were made.

744.     At the time of acquisition, Tucson and other members of the Class who purchased stock in the March 2015 Stock Offering were not aware of the untrue or misleading nature of the statements and/or the omissions alleged herein and could not have reasonably discovered such untrue statements or omissions before they acquired the securities for which this claim is asserted. Less than one year elapsed from the time that Tucson discovered or reasonably could have discovered the facts upon which this Consolidated Complaint is based until the time that plaintiffs filed the earlier complaint for violations of the securities laws.  Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the date the action commenced.

## COUNT X

**For Violations of Section 12(a)(2) of the Securities Act in
Connection with the March 2015 Stock Offering
Against the Valeant, Pearson, Schiller, and the Stock Underwriter Defendants**

745.     Plaintiffs incorporate ¶¶583-603 and 701-744 as though fully set forth herein.  With respect to this Count, Plaintiffs also exclude allegations that could be construed as alleging fraud or intentional misconduct, as this Count is based solely on claims of strict liability and/or negligence.

746.     Named Plaintiff Tucson brings this claim pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of itself and other members of the Class who purchased Valeant common stock from Defendants in the March 2015 Stock Offering against Valeant, Pearson, Schiller, and the Stock Underwriter Defendants.

- 291 -

747.    Tucson and other members of the Class who purchased common stock from the Stock Underwriter Defendants in the March 2015 Stock Offering did so by means of the March 2015 Stock Offering Materials.

748.    The March 2015 Stock Offering Materials contained untrue statements of material fact and/or omitted to state material facts required to be stated therein or necessary to make the statements made therein not misleading at the time they were made regarding Valeant's operating and financial condition and specifically incorporated by reference and thereby restated other filings of the Company as detailed in ¶¶710-719, 723-727, 737-740.

749.    The March 2015 Stock Offering closed on or around March 27, 2015, allowing Valeant to obtain approximately $1.45 billion from Tucson and other members of the Class who purchased stock directly in the March 2015 Stock Offering from the Defendants named in this Count by means of the March 2015 Stock Offering Materials.

750.    The Defendants named in this Count were statutory sellers who sold and assisted in the sale of Valeant stock to Tucson and other members of the Class by means of the March 2015 Stock Offering Materials, and they did so for the benefit of Valeant and/or for their own personal gain, including payments directly to these individuals and/or to entities affiliated with them in the form of compensation, discounts, fees, commissions and other transaction-related payments.  The Stock Underwriter Defendants collectively received approximately $16 million in fees for their role in the March 2015 Stock Offering.

751.    Valeant, Pearson, and Schiller were sellers of Valeant stock within the meaning of §12(a)(2) of the Securities Act and promoted the sale of said securities directly to Tucson and other Class members or solicited Tucson and other Class members to buy such securities, and in so acting, were motivated by a desire to serve their own financial interests.

752.    As a result of the conduct alleged herein, Valeant, Pearson, and Schiller and the Stock Underwriter Defendants violated §12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Tucson and the other members of the Class who purchased securities in the March 2015 Stock Offering by means of the March 2015 Stock Offering Materials from the Defendants named in this Count sustained substantial damages as Valeant shares sold in the March 2015 Stock Offering at $199 per share.

753.    Tucson and the other members of the Class who hold such securities have the right to rescind and recover the consideration paid for their securities, upon tender of their securities to the Defendants sued herein.  Class members who have sold their securities seek damages to the extent permitted by law.

754.    At the time of acquisition, Tucson and the other members of the Class were not aware of the untrue or misleading nature of the statements and/or the omissions alleged herein and could not have reasonably discovered such untrue statements or omissions before they acquired the securities for which this claim is asserted.  Less than one year elapsed from the time that Tucson discovered or reasonably could have discovered the facts upon which this Consolidated Complaint is based until the time that plaintiffs filed the earlier complaint for violations of the securities laws.  Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the date the action commenced.

## COUNT XI

### For Violations of Section 15 of the Securities Act
### Against Valeant, Pearson, and Schiller

755.    Plaintiffs incorporate ¶¶583-754 as though fully set forth herein.  With respect to this Count, Plaintiffs also exclude allegations that could be construed as alleging fraud or intentional misconduct, as this Count is based solely on claims of strict liability and/or negligence.

- 293 -

756.     This claim is brought against Pearson and Schiller for their control of Valeant, and also against Valeant for its control of the Individual Securities Act Defendants and all of its employees and subsidiaries in connection with the controlled persons' violations of §§11, 12(a)(2) of the Securities Act relating to the debt and equity offerings listed in ¶590.

757.     Throughout the Class Period, Pearson and Schiller each signed SEC filings which contained untrue statements of material fact and/or omitted to state material facts required to be stated therein or necessary to make the statements made therein not misleading at the time they were made, demonstrating that each of these persons possessed the power to control, and did control, the contents of those filings:

> **Pearson:**  Signed every 10-K, 10-Q, and offering document filed with the SEC by Valeant during the Class Period, including the March 2015 Stock Offering Materials;

> **Schiller:**  Signed every 10-K filed with the SEC by Valeant during the Class Period, signed every 10-Q filed with the SEC by Valeant from first quarter 2013 through 1Q15, and signed numerous offering documents filed with the SEC by Valeant during the Class Period, including the March 2015 Stock Offering Materials.

758.     Pearson and Schiller possessed the power to control, and did control, directly and/or indirectly, the actions of Valeant throughout the Class Period.  Pearson and Schiller held executive and director positions at Valeant, as detailed above.  Pearson was Valeant's Chairman and CEO. Schiller was an Executive Vice President of the Company and its CFO.  By their positions, Pearson and Schiller possessed the power and authority to control the contents of Valeant's offering materials, financial reports, press releases, and presentations to securities analysts and institutional investors, *i.e.*, the market, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Pearson and Schiller were also responsible for the running of the Company and the management of its affairs, including decisions to raise and deploy capital, conduct securities offerings and hire the Bank Offering Defendants.  Valeant exercised control over and

- 294 -

directed the actions of its senior managers, directors and agents, including the Individual Securities Act Defendants. Valeant controlled Pearson, Schiller and all of its employees and subsidiaries. Valeant, Pearson and Schiller had the ability to influence and direct and did so influence and direct the activities of the Securities Act Defendants in their violations of the §§11, 12(a)(2) of the Securities Act in connection with the offer and sale of Valeant securities in the July 2013 Debt Offering, the December 2013 Debt Offering, the January 2015 Debt Offering, the March 2015 Debt Offering and the March 2015 Stock Offering.

759.    This claim is brought within the applicable statute of limitations.

760.    Pearson and Schiller exercised control directly and indirectly over the actions of Valeant in connection with its violations of §§11, 12(a)(2) of the Securities Act as described in ¶758. Valeant exercised control over Pearson, Schiller and all of its employees and subsidiaries. By reason of such conduct, and participation, these Defendants are liable pursuant to §15 of the Securities Act, 15 U.S.C. §77(o).

## CLASS ACTION ALLEGATIONS

761.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all those who purchased Valeant equity securities and senior notes in the United States during the Class Period, including all persons who purchased Valeant securities in the United States in the offerings listed in ¶590. Excluded from the Class are Defendants herein; members of the immediate families of each of the Defendants; any person, firm, trust, corporation, officer, director, or other individual or entity in which any of the Defendants has a controlling interest or which is related to or affiliated with any the Defendants; and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

762.    The members of the Class are so numerous that joinder of all members is impracticable.  Valeant stock trades on the NYSE and according to the Company's SEC filings had more than 343 million shares outstanding as of April 22, 2016 owned by thousands of persons. Similarly, by the end of 2015, outstanding Valeant senior notes had an aggregate principal amount of approximately $20 billion, were owned by hundreds, if not thousands, of persons.  While the exact number of Class members can only be determined by appropriate discovery, Plaintiffs believe that Class members number at least in the hundreds, if not the thousands, and that they are geographically dispersed.

763.    Plaintiffs' claims are typical of the claims of the other members of the Class because Plaintiffs' and all the Class members' damages arise from and were caused by the same representations and omissions made by or chargeable to Defendants.  Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

764.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by or chargeable to Defendants during the Class Period omitted and/or misrepresented material facts;

(c)    whether the prices of Valeant securities were artificially inflated during the Class Period; and

(d)    the extent of damages sustained by members of the Class and the appropriate measure of damages.

765.    Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs have retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intend to prosecute this action vigorously.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impracticable for Class members to individually seek redress for the conduct alleged herein.   Plaintiffs know of no difficulty that will be encountered in this litigation that would preclude its maintenance as a class action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs on their own behalf and on behalf of the Class, pray for relief and for judgment as follows:

A.    Declaring this action to be a class action properly maintained pursuant to Rule 23(a) and b(3) of the Federal Rules of Civil Procedure and certifying Plaintiffs as Class Representatives and Robbins Geller Rudman & Dowd LLP as Class Counsel;

B.    Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs rescission or a rescissory measure of damages;

D.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including reasonable attorneys' fees, accountants' fees, and experts' fees, and other costs and disbursements; and

E.      Awarding Plaintiffs and other members of the Class such other and further relief, including any injunctive or other equitable relief that may be deemed just and proper by the Court.

**JURY DEMAND**

766.    Plaintiffs hereby demand a trial by jury.

DATED:  September 20, 2018          SEEGER WEISS LLP
                                    CHRISTOPHER A. SEEGER
                                    DAVID R. BUCHANAN


                                         *s/ Christopher A. Seeger*
                                    CHRISTOPHER A. SEEGER


                                    55 Challenger Rd., 6th Floor
                                    Ridgefield Park, NJ 07660
                                    Telephone: (973) 639-9100
                                    Facsimile: (973) 639-9393
                                    cseeger@seegerweiss.com
                                    dbuchanan@seegerweiss.com

                                    Local Counsel

                                    ROBBINS GELLER RUDMAN
                                        & DOWD LLP
                                    DARREN J. ROBBINS
                                    TOR GRONBORG
                                    X. JAY ALVAREZ
                                    MATTHEW I. ALPERT
                                    DEBASHISH BAKSHI
                                    655 West Broadway, Suite 1900
                                    San Diego, CA  92101
                                    Telephone:  619/231-1058
                                    619/231-7423 (fax)

                                    ROBBINS GELLER RUDMAN
                                        & DOWD LLP
                                    JAMES E. BARZ
                                    FRANK RICHTER
                                    200 South Wacker Drive, 31st Floor
                                    Chicago, IL  60606
                                    Telephone:  312/674-4674
                                    312/674-4676 (fax)
                                    jbarz@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
JACK REISE
ROBERT J. ROBBINS
KATHLEEN DOUGLAS
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
jreise@rgrdlaw.com
rrobbins@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
JOHN C. HERMAN
Monarch Tower, Suite 1650
3424 Peachtree Road, N.E.
Atlanta, GA  30326
Telephone:  404/504-6500
404-504-6501 (fax)

Lead Counsel for Plaintiffs

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

IBEW LOCAL UNION 481 DEFINED CONTRIBUTION PLAN AND TRUST ("Plaintiff") declares:

1.  Plaintiff has reviewed a complaint and authorized its filing.

2.  Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.  Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.  Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

6.  Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

VALEANT

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _20_ day of September, 2018.

IBEW LOCAL UNION 481 DEFINED
CONTRIBUTION PLAN AND TRUST

By: _____

Robert G. Cadwell, Administrator

- 2 -

VALEANT

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date<br>Acquired | Amount of<br>Shares Acquired | Price |
|---|---|---|
| 06/11/2015 | 850 | $233.58 |
| 06/26/2015 | 150 | $229.12 |
| 08/07/2015 | 70 | $246.96 |
| 08/12/2015 | 50 | $237.37 |
| 08/21/2015 | 100 | $223.31 |
| 08/24/2015 | 60 | $222.69 |
| 08/24/2015 | 70 | $213.79 |

| Date<br>Sold | Amount of<br>Shares Sold | Price |
|---|---|---|
| 07/13/2015 | 100 | $236.55 |
| 10/05/2015 | 50 | $162.90 |
| 10/09/2015 | 180 | $175.32 |
| 10/15/2015 | 50 | $164.28 |
| 10/21/2015 | 970 | $113.05 |