## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: VALEANT PHARMACEUTICALS INTERNATIONAL, INC., SECURITIES LITIGATION | Civil Action No. 15-7658 (MAS) (LHG) |
| | **MEMORANDUM OPINION** |

**SHIPP, District Judge**

This matter comes before the Court upon Defendants[1] Motion to Dismiss. (ECF No. 387.) Plaintiffs[2] opposed (ECF No. 401), and Defendants replied (ECF No. 404). The Court has carefully considered the parties' arguments and decides the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth herein, Defendants' Motion to Dismiss is denied.

## I.   BACKGROUND[3]

This case and the claims asserted herein arise from the same facts and circumstances the Court previously summarized. *See In re Valeant Pharm. Int'l, Inc. Sec. Litig.*, No. 15-7658, 2017 WL 1658822 (D.N.J. Apr. 28, 2017). The Court assumes the parties' familiarity with the underlying facts and recites the facts only to the extent necessary to decide the instant motion.

On October 22, 2015, Laura Potter brought a putative class action on "behalf of all persons who purchased or otherwise acquired Valeant stock between February 23, 2015 and

---

[1] The Court refers to ValueAct Capital Management L.P.; VA Partners I, LLC; ValueAct Holdings, L.P.; ValueAct Capital Master Fund, L.P.; ValueAct Co-Invest Master Fund, L.P. (collectively, "ValueAct"); and Jeffrey W. Ubben ("Ubben") collectively as "Defendants".

[2] The Court refers to Teachers Insurance and Annuity Association of America ("TIAA" or "Lead Plaintiff"); the City of Tucson together with and on behalf of the Tucson Supplemental Retirement System ("Tucson"); and IBEW Local Union 481 Defined Contribution Plan and Trust ("IBEW") collectively as "Plaintiffs".

[3] For the purpose of considering the instant motion, the Court accepts all factual allegations in the Complaint as true. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

October 20, 2015, inclusive . . . , against Valeant and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 [(the "Exchange Act")] . . . ." (Compl. ¶ 1, ECF No. 1.) On May 31, 2016, the Court consolidated Ms. Potter's action with several other actions, and pursuant to the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, the Court appointed Lead Counsel and Lead Plaintiff in the consolidated action. (Order 3, ECF No. 67.)

On June 24, 2016, Lead Plaintiff and Tucson filed a Consolidated Class Complaint. (Consol. Compl., ECF No. 80.) On April 28, 2017, the Court decided six motions to dismiss filed by Ubben and several other groups of defendants. *See generally In re Valeant*, 2017 WL 1658822. The Court found that Lead Plaintiff and Tucson had adequately pled a violation of Section 10(b) of the Exchange Act against Ubben and other defendants. *Id.* at *13. On September 5, 2017, the Court denied Deborah Jorn's Motion for Reconsideration of the Court's denial of her previous motion to dismiss the Section 10(b) claim. *In re Valeant Pharm. Int'l, Inc. Sec. Litig.*, No. 15-7658, 2017 WL 3880657, at *1 (D.N.J. Sept. 5, 2017).

On June 5, 2018, the Court lifted a stay of the proceedings in this matter. (Order, ECF No. 316.) On September 20, 2018, Lead Plaintiff, Tucson, and IBEW, without leave of Court, filed the First Amended Consolidated Complaint ("FAC") naming additional defendants and bringing additional claims. (*See generally* FAC, ECF No. 352.) Plaintiffs aver that the FAC "leaves unchanged the prior allegations[,] which were subject to the Court's April 28, 2017 ruling on the motions to dismiss[,]" and "new allegations are contained in ¶¶ 33, 55-62, 560-582 and [the FAC] add[s] insider trading claims (*see* Counts III and IV)." (*Id.* at 1 n.1.) On October 10, 2018, the Honorable Lois H. Goodman, U.S.M.J. entered a consent order accepting the filing of the FAC *nunc pro tunc*. (Order, ECF No. 366.)

### A. The Defendants

Ubben was, at times relevant in the FAC, the Chief Executive Officer and Chief Investment Officer of ValueAct. (FAC ¶ 61.) Ubben also served as a member of Valeant Pharmaceuticals International, Inc.'s ("Valeant") Board of Directors from October 2014 through August 19, 2015. (*Id.* ¶ 51.) As a director, Ubben served on the Finance and Transaction Committee as well as the Talent and Compensation Committee. (*Id.*)

Ubben co-founded Value Act Capital Management L.P. ("ValueAct Capital"), an investment adviser, in 2000. (*Id.* ¶ 55.) ValueAct Capital Master Fund, L.P. and ValueAct Co-Invest Master Fund, L.P. (collectively, the "VA Funds") are two of ValueAct Capital's hedge fund investment vehicles. (*Id.* ¶¶ 56-7.) VA Partners I, LLC is the general partner of the VA Funds and "is responsible for the overall management of" the VA Funds. (*Id.* ¶ 58.) ValueAct Holdings, L.P., through its affiliates, owns ValueAct Capital and VA Partners I, LLC. (*Id.* ¶ 59.)

### B. The Allegations

ValueAct began investing in Valeant in 2006. (*Id.* ¶ 562.) IBEW's claims against Valeant arise from a "sale of 4.2 million shares of Valeant stock on or around June 10, 2015" (the "June 2015 Transaction"). (*Id.* ¶ 561.)

In May 2007, Mason Morfit, ValueAct's President, joined Valeant's Board of Directors and served until May 2014. (*Id.*) When Morfit left the Valeant Board in May 2014, in correspondence to J. Michael Pearson, Valeant's CEO and Chairman of the Board, Morfit stated that "ValueAct wanted to 'manage down' its Valeant holdings but, due to Morfit's position on Valeant's [B]oard of [D]irectors, ValueAct had been 'restricted from selling any shares in Valeant since 2013.'" (*Id.* ¶ 565.) Thus, Morfit's departure was a "'portfolio management decision' so ValueAct could sell 'later [in 2014].'" (*Id.*)

Ubben served on Valeant's Board of Directors from October 2014 to August 2015. (*Id.* ¶ 562.) D. Robert Hale, a ValueAct partner, joined Valeant's Board in August 2015 and remains on the Board. (*Id.*)

ValueAct has a concentration policy limiting its concentration in any investment to less than 20% of its total holdings. (*Id.* ¶ 565.) In 2010, despite that policy, ValueAct's holdings in Valeant stock exceeded 20% of its total holdings and ValueAct did not sell Valeant stock to comply with the concentration policy. (*Id.* ¶ 566.)

"On or around June 10, 2015, while in possession of . . . material, nonpublic information, [ValueAct] sold 4.2 million shares of Valeant stock for proceeds of approximately $925 million." (*Id.* ¶ 568.) Plaintiffs aver that this trade was suspicious because:

> [Value Act] purchased the shares at an average cost of $11, held the shares for nine years, had not previously sold Valeant stock in more than four years, and timed the sale to maximize profit from Valeant's then artificially inflated stock price, which was trading near all-time highs of around $229 per share. Thus, approximately 95% of the $925 million in illicit trading proceeds was profit.

(*Id.*) A Press Release dated June 11, 2015 and released at 9:28 A.M., EST, stated that "Valeant ValueAct Capital Management, L.P. announced today that it has sold 4.2 million shares of Valeant Pharmaceuticals International, Inc. (NYSE: VRX;TSX: VRX) in brokers' transactions on the NYSE." (*Id.* ¶ 570; Ex. 10, ECF No. 387-12.)

Plaintiffs aver that "although ValueAct initiated the brokers' transactions on June 10, 2015, not all of the shares were sold to purchasers on the open market on that day." (FAC ¶ 570.) Plaintiffs reach this conclusion because "only approximately 2.8 million shares traded on the [New York Stock Exchange ("NYSE")] on June 10, 2015. Thus, the earliest date by which all of the 4.2 million shares could have sold to purchasers on the open market was June 11, 2015 when another approximately 2.8 million Valeant shares traders on the NYSE." (*Id.*)

IBEW purchased Valeant common stock on June 11, 2015 and in Count Three brings claims for violations of Section 20A of the Exchange Act, 15 U.S.C. § 78t-1, against Defendants "on behalf of itself and the other members of the Class who purchased shares of Valeant common stock contemporaneously with the unlawful insider trading . . . ." (*Id.* ¶¶ 33, 575.) In Count Four, IBEW also brings claims for violation of Section 20(a) of the Exchange Act against ValueAct Capital; VA Partners I, LLC; ValueAct Holdings, L.P.; and Ubben. (*Id.* ¶¶ 579-82.)

### C. The Instant Motion

On October 31, 2018, Defendants moved pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss Count One against Ubben, and Counts Three and Four in their entirety.[4] (Defs.' Mot. to Dismiss, ECF No. 387.) Recognizing that the Court previously denied Ubben's motion to dismiss Count One, Defendants seek "the Court's indulgence in revisiting whether Plaintiffs state a viable Section 10(b) claim in Count One against Ubben." (Defs.' Moving Br. 4, ECF No. 387-1.) Defendants attach to their motion a number of exhibits including: certain Value Act and Valeant filings with the Securities and Exchange Commission, a June 11, 2015 Press Release issued by ValueAct Capital, print-outs reflecting Valeant's stock price history for certain relevant time periods, and screen captures from ValueAct's website. (*See* Exs. 1-14, ECF Nos. 387-3 to 387-18.)

On November 19, 2018, Plaintiffs opposed Defendants' motion. (Pls.' Opp'n Br., ECF No. 401.) On November 28, 2018, Defendants replied to Plaintiffs' opposition. (Defs.' Reply Br., ECF No. 404.)

---

[4] All references to a Rule herein are references to a Federal Rule of Civil Procedure.

## II. LEGAL STANDARD

A district court must conduct a three-part analysis when considering a motion to dismiss pursuant to Rule 12(b)(6). *See Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). The Court must take note of the elements a plaintiff must plead to state a claim; review the complaint to strike conclusory allegations; and accept as true all of the plaintiff's well-pled factual allegations while "constru[ing] the complaint in the light most favorable to the plaintiff." *Id.*; *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). The Court must determine "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 678).

When considering a Rule 12(b)(6) motion, the Court is generally "not permitted to go beyond the facts alleged in the complaint and the documents on which the claims made therein were based." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1424-25 (3d Cir. 1997) (alterations omitted). The Court, however, may consider "a document integral to or explicitly relied upon in the complaint," and the Court may consider "items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case." *Id.* at 1426 (internal citations, quotations, and emphasis omitted); *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (citation omitted).

## III. DISCUSSION

Defendants seek dismissal on two fronts—dismissal of Count One as to Ubben and dismissal of Counts Three and Four in their entirety. The Court considers each issue in turn.

### A. Defendants' Motion to Dismiss Count One is an Untimely Motion for Reconsideration

Defendants argue that the Court should dismiss Count One "because the FAC does not contain sufficient particularized allegations (i) that Ubben made any false or misleading statements or (ii) providing a strong inference of his scienter." (Defs.' Moving Br. 32.) Defendants state "the Court does not appear to have separately or squarely addressed Ubben, and is not precluded from doing so now." (*Id.*) Defendants aver that "[b]y asserting new insider-trading claims via last-minute amendment, Plaintiffs have opened the door to the Court to revisit its ruling." (*Id.*)

Plaintiffs oppose dismissal of Count One with numerous arguments, only two of which the Court will address because they are dispositive of the issue. (Pls.' Opp'n Br. 4-10.) First, Plaintiffs argue that Local Civil Rule 7.1(i) imposes a 14-day window on when a party can file a motion for reconsideration and Defendants' motion is outside of that window. (*Id.* at 4.) Relatedly, Plaintiffs argue that the law of the case doctrine "limits relitigation of an issue once it has been decided in the same case or litigation." (*Id.* (quoting *Scudder v. Colgate Palmolive Co.*, No. 16-7433, 2018 WL 4188456, at *2 (D.N.J. Aug. 31, 2018)).) Second, Plaintiffs assert that Defendants' argument regarding the Court's April 28, 2017 decision and a lack of specificity therein regarding Ubben is the same argument previously advanced by Deborah Jorn in her Motion for Reconsideration and rejected by the Court. (*Id.* at 5.) The Court agrees with Plaintiffs on both points.

Local Civil Rule 7.1 provides, in relevant part:

> [A] motion for reconsideration shall be served and filed within 14 days after the entry of the order or judgment on the original motion by the Judge or Magistrate Judge. A brief setting forth concisely the matter or controlling decisions which the party believes the Judge or Magistrate Judge has overlooked shall be filed with the Notice of Motion.

L.Civ.R. 7.1(i). While Defendants argue that Plaintiffs' amendments create an opportunity for the Court to consider Count One as to Ubben, Defendants fail to contend with the fact that the

amendments do not alter the allegations against Ubben in relation to Count One. Accordingly, Defendants' motion as to Count One is effectively a motion for reconsideration. Local Rule 7.1 requires that motions for reconsideration be filed within 14 days of the entry of the order. The Court denied Ubben's previous motion to dismiss on April 28, 2017. (*See* Order, ECF No. 218). The instant motion, filed on October 31, 2018—551 days after the Court's Order—is therefore untimely.

"A court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'" *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) (quoting *Arizona v. California*, 460 U.S., 605, 618, n.8 (1984)). "[A]pplication of the [law of the case] rule is a discretionary, not absolute, process and if, . . . a party advances a basis for a court to reach a different result than it did previously the court will not be bound by its earlier decision." *Bridges v. Comm'r Soc. Sec.*, 672 F. App'x 162, 167 (3d Cir. 2016). "The [law of the case] doctrine is designed to protect traditional ideals such as finality, judicial economy and jurisprudential integrity." *In re City of Phila. Litig.*, 158 F.3d 711, 717-18 (3d Cir. 1998)

Defendants raise previously rejected arguments in support of dismissal of Count One as to Ubben. The Valeant Defendants,[5] including Ubben, previously argued that "Plaintiffs have not pled with particularity that any Individual Defendant made false or misleading statements knowingly or with extreme recklessness. Rather, the more compelling inference from circumstances alleged in the Complaint is that congressional inquiries, Philidor's collapse and a

---

[5] The Valeant Defendants include Valeant, J. Michael Pearson, Robert L. Rosiello, Ari S. Kellen, Ronald H. Farmer, Colleen Goggins, Robert A. Ingram, Anders Lönner, Theo Melas-Kyriazi, Robert N. Power, Norma Provencio, Katherine B. Stevenson and Ubben.

short-seller—not securities fraud—drove down Valeant's stock price." (Valeant Defs.' Moving Br. 31, ECF No. 167-1.) Valeant Defendants also previously argued that the PSLRA, Rule 9(a), and Third Circuit precedent set a heightened pleading standard, and "[n]one of Plaintiffs' alleged misstatements or omissions satisfie[d] this pleading standard." (*Id.* at 47-48.) Specifically, Valeant Defendants argued Ubben's liability was based on his signing of the 2014 10-K, "but the Complaint fails to allege with specificity any material misstatement contained therein." (*Id.* at 60.) Defendants repeat the same arguments in the instant motion. (Defs.' Moving Br. at 32 (arguing "the FAC does not contain sufficient particularized allegations (i) that Ubben made any false or misleading statements or (ii) providing a strong inference of his scienter . . . . [T]he only relevant allegation properly attributable to Ubben is that he signed the 2014 Form 10-K, which alone is insufficient to attribute to him either an actionable misstatement or a strong inference of scienter.").)

Pursuant to the law of the case doctrine, the Court will not reconsider its previous decision regarding Count One. Defendants have not offered a compelling reason why the Court should reconsider the same arguments other than "the common-sense proposition that the Court has a far better perspective to judge the Section 10(b) allegations against Ubben than it did when claims against many other defendants were at issue." (Defs.' Reply Br. 14.) This proposition, however, fails under the weight of the Court's previous rejection of these arguments and the Court's rejection of Deborah Jorn's argument that the Court "did not consider Jorn's specific scienter when deciding the six motions to dismiss in its April 28, 2017 Memorandum Opinion." *In re Valeant Pharm. Int'l, Inc. Sec. Litig.*, No. 15-7658, 2017 WL 3880657, at *2 (D.N.J. Sept. 5, 2017).[6] Simply put,

---

[6] Because the Court finds that Defendants raise similar arguments to those previously raised by Deborah Jorn, the Court hereby adopts its previous discussion and analysis contained in the Memorandum Opinion accompanying the Order denying her timely Motion for Reconsideration.

the Court will not expend resources performing an individual analysis of Ubben's arguments in support of dismissal when the Court has already considered and rejected the same arguments. In a litigation of this magnitude with so many parties, claims, and allegations, such an effort is the opposite of judicial economy and would only encourage other defendants to seek a second bite at the apple, which the Court will not entertain.

### B.  Plaintiffs Adequately Plead a Section 20A Violation

Defendants advance several arguments in support of dismissal of IBEW's Section 20A claims. Defendants attack (1) the specificity of Plaintiffs' allegations regarding the material nonpublic information Defendants allegedly possessed; (2) whether Plaintiffs' allegations give rise to a sufficiently strong inference of scienter; and (3) whether Plaintiffs traded contemporaneously with Defendants. In opposition, Plaintiffs raise the issue of what type of predicate violation of the Exchange Act they must plead to sufficiently plead a Section 20A claim. The Court first considers the threshold issue Plaintiffs raise and then addresses each of Defendants' arguments.

### 1.  Plaintiffs Sufficiently Plead a Predicate Violation

To state a claim for a violation of Section 20A plaintiffs must allege "(1) a predicate violation of the Exchange Act; (2) that the plaintiff traded contemporaneously with the insider; and (3) that the insider was in possession of material nonpublic information." *In re Schering-Plough Corp./Enhance Sec. Litig.*, No. 08-397, 2009 WL 2855457, at *3 (D.N.J. Sept. 2, 2009). "Section 20A, which provides an express private cause of action for insider trading against contemporaneous traders, requires the alleged insider trader to have committed an independent violation of the Exchange Act or SEC rules and regulations promulgated under that law." *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 175 (3d Cir. 2014).

---

*In re Valeant Pharm. Int'l, Inc. Sec. Litig.*, No. 15-7658, 2017 WL 3880657, at *1 (D.N.J. Sept. 5, 2017).

Plaintiffs argue that in this matter they only need to allege two elements of a Section 20A violation to adequately plead their claim. (Pls.' Opp'n Br. 2-3.) Specifically, Plaintiffs argue that the first element, "a predicate violation of the Exchange Act[,]" also satisfies the third element "that the insider was in possession of material nonpublic information." (*Id.* at 2.) Plaintiffs aver that because the Court previously found that they adequately plead a violation of Section 10(b) (for making false and misleading statements with scienter) against Ubben, the third element is "satisfied by the same [Section] 10(b) violation because the facts that adequately pled a strong inference of scienter are sufficient to adequately plead possession of material nonpublic information." (*Id.*) As a result, per Plaintiffs, they "need only allege two things: [a Section] 10(b) violation by Ubben and contemporaneous trading," and the Court has already found the former and the FAC sufficiently alleges the latter. (*Id.* at 3.) Defendants, on the other hand, argue that the "predicate violation" must be for insider trading. (Defs.' Reply. Br. 4.)

The parties cite extensively to divergent case law that directly supports their respective positions. (*See e.g.*, Pls.' Opp'n Br. 2 (citing *In re Able Labs. Sec. Litig.*, No. 05-2681, 2008 WL 1967509, at *26 (D.N.J. Mar. 24, 2008)); Defs.' Reply Br. 6 n.4 (collecting cases).) The Third Circuit, however, in *City of Edinburgh Council v. Pfizer, Inc.*, held that the plaintiffs "failed to adequately plead an insider trading violation under section 20A of the Exchange Act because they ha[d] failed to adequately plead *a predicate section 10(b) violation.*" 754 F.3d 159, 175-76 (3d Cir. 2014) (emphasis added) (citing *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 541 (3d Cir. 1999) ("Liability under section 20(A) is predicated upon an independent violation of this chapter or the rules or regulations thereunder. Hence, claims under section 20(A) are derivative, requiring proof of a separate underlying violation of the Exchange Act.") (internal citation omitted)). Thus,

Defendants' argument that the predicate violation *must* be an insider trading violation is directly contradicted by Third Circuit precedent.

Defendants cite to portions of paragraph 573 of the FAC to argue that Plaintiffs' opposition attempts to inappropriately amend the FAC and make a reckless omission in violation of Section 10(b)(5) the basis of their Section 20A claim. (Defs.' Reply Br. 5.) Defendants, however, do not contend with the allegations of paragraph 572 of the FAC which alleges, in part:

> Ubben violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by knowingly and recklessly making false and misleading statements and omitting to disclose material facts in the 2014 10-K. While in possession of the material, nonpublic information, on or around June 10, 2015 and June 11, 2015, Ubben sold 4.2 million shares of Valeant stock.

(FAC ¶ 572.)  Under a plausible interpretation of the FAC, Plaintiffs allege that (1) Ubben individually violated Section 20A with the predicate violation being a violation of Section 10(b), and (2) Ubben and ValueAct collectively violated Section 20A with the predicate violation being an insider trader violation.  (*See* FAC ¶¶ 572-73.)  Thus, Defendants' characterizations of Plaintiffs' allegations regarding the requisite predicate violation are unavailing.  Moreover, per Third Circuit precedent, Plaintiffs sufficiently pled predicate violations for both Ubben and the Value Act Defendants.  *See City of Edinburgh Council*, 754 F.3d at 175-76.

Notwithstanding the Court's conclusion that Plaintiffs sufficiently pled predicate violations, the Court must consider whether Plaintiffs sufficiently pled scienter as to ValueAct. Plaintiffs appear to partially rely upon the Court's previous conclusion that scienter as to Ubben and the Section 10(b) claim is sufficient for the scienter analysis for a Section 20A claim.  Plaintiffs cite to *Thomas v. Magnachip Semiconductor Corp.*, for the proposition that an individual defendant's scienter can be imputed to the entity for which he or she worked.  (Pls.' Opp'n Br. 3 n.2 (citing 167 F. Supp. 3d 1029, 1050-51 (N.D. Cal. 2016)).)  At the same time, Plaintiffs advance

arguments that they sufficiently pled scienter as to the ValueAct Defendants on the Section 20A claims. (*Id.* 8-9.) Defendants, on the other hand, argue that the Court's previous "ruling on a different cause of action for different conduct in a different context is of no moment on this Motion." (Defs.' Reply Br. 9.) Given the heightened pleading standard imposed by the PSLRA, the Court agrees with Defendants and it will not assume that the Court's previous conclusion regarding scienter for Ubben's alleged Section 10(b) violation is sufficient to sustain Plaintiffs' Section 20A claims against Ubben and ValueAct.

2. **Plaintiffs' Allegations Regarding the Material Nonpublic Information Defendants Possessed are Sufficient**

Defendants argue that IBEW does not identify "with any specificity, . . . what material nonpublic information [Defendants] possessed when the ValueAct Funds sold." (Defs.' Moving Br. 15.) Specifically, Defendants argue that IBEW only makes a "generalized allegation" regarding material, nonpublic information Defendants possessed, but IBEW does not "identify with the requisite particularity what that information was." (*Id.* at 17.) Defendants also argue that IBEW's claims rest on Ubben's "*access* to material nonpublic information (whatever it was) by virtue of his position on the Valeant [B]oard and its committees." (*Id.* at 19 (emphasis in original).) Defendants argue that access, however, is insufficient because "access to material nonpublic information is very different from actually possessing it[,]" and "[t]he former is not enough to plead an insider trading claim under Section 20A." (*Id.* at 20-21.)

Plaintiffs respond to Defendants' argument with a simple proposition. Plaintiffs argue that "the material nonpublic information Defendants possessed was that . . . Ubben's statements were false and misleading which formed the basis for his [Section] 10(b) liability . . . ." (Pls.' Opp'n Br. 10.)

Here, the Court finds that Defendants' arguments fail in light of Plaintiffs' allegations regarding Ubben and the material nonpublic information he possessed. Specifically, Plaintiffs allege that ValueAct, "through Ubben, had access to and knowledge of Valeant's material, nonpublic information concerning the undisclosed improper business and accounting practices which gave rise to the Restatement, closing of Philidor, cessation of such improper business practices, and resulting corrective disclosures . . . ." (FAC ¶ 567.) Elsewhere in the FAC, Plaintiffs assert that when Ubben, and other members of the Board signed the 2014 10-K, and other documents, they "kn[e]w or recklessly disregarded" certain facts including:

> (a) that Philidor had been formed with the assistance and for the benefit of Valeant to increase the sales prices of Valeant products and to subvert the substitution of Valeant products with competitors' drugs, Valeant employees worked at Philidor, Valeant paid Philidor's owners $100 million for the right to acquire Philidor for $0, was consolidating Philidor's results as its own, and had obtained explicit rights to direct Philidor activities, and these facts were being concealed from private payors, patients, physicians, PBMs, and investors; . . . (b) that Valeant's business strategy consisted of, and a material source of its growth in revenues and sales of its key dermatology, neurology and other products resulted from, using deceptive practices of: (i) price increases which were far beyond industry norms and Defendants knew were unsustainable; (ii) routing patients into its clandestine network of pharmacies that were falsely made to appear independent; (iii) using patient assistance and PR strategies to minimize patient complaints; and (iv) concealing these practices from payors in order to obtain reimbursement for drugs that would not be reimbursed or not reimbursed at similarly high prices if such practices were known to private payors, patients, physicians, and PBMs; . . . (e) that the Company's reported revenues, EPS, and profitability as well as its future business prospects were dependent on Valeant's ability to continue and conceal the deceptive practices in subparagraph (b) above and because of the undisclosed risks in subparagraph (d) above did not accurately portray Valeant's financial performance and business prospects; . . . (i) that Valeant lacked adequate internal controls, compliance, and training programs which resulted in an "improper tone at the top" with the Defendants prioritizing increasing Valeant's stock price . . . over ensuring that Valeant and its clandestine network of pharmacies complied with applicable

laws, regulations, contracts, and ensured that its SEC filings and public disclosures were free of material misstatements, as set forth in ¶¶ 340-354, 385-392 . . . .

(*Id.* ¶ 199.) Plaintiffs also allege that Ubben, and other defendants:

> [K]new that, at a minimum, after the formal consolidation of Philidor was completed Valeant was prohibited from recording revenue for shipping products to Philidor, because that was akin to shipping products to itself. Instead, Valeant would have to wait until Philidor shipped the products to patients. Therefore, before the agreement was signed in December 2014, Valeant shipped millions of dollars of products to Philidor to inflate revenue. This manipulative practice was a clear violation of GAAP. Nevertheless, Schiller, Carro, Ingram, the Audit Committee, the Finance and Transactions Committee[, which Ubben was a member of], and the entire board of directors approved the accounting relating to Philidor.

(*Id.* ¶ 139 (emphasis added).)

Here, Plaintiffs' allegations are distinguishable from, and more specific than, the allegations in the cases Defendants cite in support of their argument that Plaintiffs' allegations are too general. *See e.g., Gordon v. Sonar Capital Mgmt. LLC*, 962 F. Supp. 2d 525, 529-30 (S.D.N.Y. 2013) (finding allegations that two parties spoke at least twenty times and alleged insider trading occurred that coincided with these conversations were insufficient). Moreover, Defendants' arguments that Plaintiffs merely had access to certain information fails in light of Plaintiffs' allegation that Ubben, and other defendants, *knew* certain material non-public information, and *knew* that information when signing the 2014 10-K which was submitted on February 25, 2015, prior to the June 2015 Transaction.

### 3. Plaintiffs' Scienter Allegations are as Equally Compelling as the Opposing Inference

The PSLRA requires plaintiffs bringing Section 20A claims "to allege facts giving rise to a 'strong inference' of scienter, which 'must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" *City of*

*Edinburgh Council*, 754 F.3d at 176 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)). This heightened pleading standard alters the Court's analytical approach when considering a Rule 12(b)(6) motion to dismiss a Section 20A claim. *See Tellabs, Inc.*, 551 U.S. at 322-24. The first step—"accept[ing] all factual allegations in the complaint as true[,]"—is unchanged from the normal analysis. *Id.* at 322. Next, the Court "must consider the complaint in its entirety" and the usual sources and documents the Court would normally consider. *Id.* At this step, "[t]he inquiry, . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23. At the third step, the Court must "determin[e] whether the pleaded facts give rise to a 'strong' inference of scienter," and "take into account plausible opposing inferences . . . ." *Id.* at 323. "The strength of an inference cannot be decided in a vacuum." (*Id.*) Instead,

> [t]he inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, i.e., of the "smoking-gun" genre, or even the "most plausible of competing inferences[.]" . . . Yet the inference of scienter must be more than merely "reasonable" or "permissible"—it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive, . . . only if a reasonable person would deem the inference of scienter cogent and *at least as compelling as any opposing inference* one could draw from the facts alleged.

*Id.* 323-34 (internal citations omitted) (emphasis added).

Defendants argue that "the FAC fails to plead facts giving rise to a strong inference that [Defendants] acted with scienter." (*Id.* at 22.) Defendants state that the FAC fails to allege suspicious trading because the combination of (1) Defendants' trading activity in November and

16

December 2014 (when Defendants purchased 460,000 shares of Valeant stock), (2) a subsequent 65% rise in the value of Valeant stock, and (3) Defendants' sale of Valeant stock in June 2015 is "consistent with an inference that a multi-billion dollar investment fund rebalanced its position." (*Id.* at 23.) Defendants aver that their December 2014 purchase of shares was days prior to Valeant's purchase of an option to acquire Philidor. (*Id.*) Thus, if Plaintiffs' allegations are taken as true, Defendants made this stock purchase "knowing that Valeant was purchasing a house of cards[,]" a theory that "makes no sense and cannot support the required cogent and compelling inference of scienter." (*Id.*) Defendants argue that their retention of approximately 80% of their Valeant holdings "rebuts an inference of scienter from stock sales." (*Id.* at 24.) Defendants also argue that IBEW does not "explain how [Defendants] could have been plotting to profit through insider trading, when the ValueAct Funds' 15 million-share retained holdings declined by approximately $2.785 billion from the trading price on June 10, 2015." (*Id.* at 24-25.)

Defendants also argue that the FAC's scienter allegations fail because of the timing of the sale and the lack of trades by other insiders. (*Id.* at 25-26.) Defendants aver that the FAC alleges that the June 2015 Transaction "was at once too late and too early," because Defendants "knew in December 2014 that Philidor and Valeant were a house of cards," but the first "negative disclosure by Valeant occurred nearly four months after the" June 2015 Transaction. (*Id.* at 25-26.) Regarding the lack of trades by other insiders, Defendants argue "the absence of such sales further reflects IBEW's failure to plead scienter." (*Id.* at 27.)

Defendants state that the FAC offers a "cogent and compelling non-fraudulent explanation for the June [2015 Transaction]: 'to limit concentration in any particular investment' in the ValueAct Funds." (*Id.* at 27 (quoting FAC ¶ 565).) Defendants argue that Valeant's stock price had risen 65% from December 2014 through June 2015 resulting in a $4.2 billion position in

Valeant stock. (*Id.*) Per Defendants, "a prudent investment advisor[] would look to 'manage down' that enormous stake." (*Id.* (quoting FAC ¶ 565).) Defendants dismiss Plaintiffs' allegations that they previously failed to follow a strict 20% concentration policy as "quibbles." (*Id.*). Defendants argue that the June 2015 Transaction reduced their position from $4.2 billion to $3.82 billion—an amount greater than their holdings in December 2014. (*Id.* at 28.) Thus, the June 2015 Transaction was "(i) . . . not inconsistent with the ValueAct Funds' history or previous trading patterns, and (ii) is fully consistent with prudent portfolio management." (*Id.*)

Plaintiffs maintain that the June 2015 Transaction was "highly suspicious[,]" because:

> Defendants previously had not sold Valeant stock in more than four years, the shares had been purchased nine years earlier at an average cost of $11, and they were sold for approximately $229 while the stock was artificially inflated—at near all-time highs. As a result, Defendants pocketed nearly $1 billion in profits just months before the stock collapsed. The sale was clearly unusual and additionally supports Plaintiffs' scienter allegations.

(Pls.' Opp'n Br. at 8.) Quoting the Court's previous Opinion, Plaintiffs argue that Defendants ignore that "it is plausible that the [Defendants] were caught before they had a chance to sell their shares." (*Id.* at 9 (quoting *In re Valeant*, 2017 WL 1658822, at *11).)

The Third Circuit has stated courts should "not infer fraudulent intent from the mere fact that some officers sold stock" but, "sales of company stock by insiders that are unusual in scope or timing may support an inference of scienter." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 277 (3d Cir. 2006), *abrogated on other grounds by Tellabs, Inc.*, 551 U.S. at 322-23 (internal quotation and punctuation omitted) (citing *In re Advanta*, 180 F.3d at 540) (citations and quotation marks omitted). To determine whether a stock sale was "unusual in scope," the Court looks to "factors such as 'the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved.'" *Id.* (quoting *Wilson v. Bernstock*, 195 F. Supp. 2d 619, 635 (D.N.J. 2002)). The Court may also look to "whether the sales were 'normal

and routine,' and whether the profits were substantial relative to the seller's ordinary compensation." *Id.*

Here, the Court begins its analysis by identifying the quantifiable factors. Defendants offer evidence showing that the June 2015 Transaction consisted of a sale of approximately 22% of the ValueAct Funds' total holdings of Valeant stock. (Defs.' Moving Br. 11, Ex. 6, ECF No. 387-38.)[7] Specifically, the ValueAct Funds sold 4.2 million shares of Valeant stock in five tranches at $219 and $230.60 per share. (*Id.*) After the June 2015 Transaction, Defendants held 14,994,261 shares of Valeant stock valued at approximately $3.28 billion. (*Id.*) The June 2015 Transaction generated approximately $925 million in profit. (Defs.' Moving Br. 10; FAC ¶ 568.)

Defendants' transaction history and the price of Valeant stock also provide additional context. Defendants offer evidence showing that during the class period they purchased Valeant stock in four different transactions on June 19, 2013; November 24, 2014; December 9, 2014; and December 10, 2014. (Defs.' Moving Br. 10; Exs. 2-5, ECF Nos. 387-4 to -7.) The June 29, 2013 purchase was at $85 per share and the November and December 2014 purchases were at approximately $140 per share. (Defs.' Moving Br. 10.) Plaintiffs aver that Valeant's stock price peaked at $262 per share on August 5, 2015. (FAC ¶ 26.)

From Defendants' perspective, the June 2015 transaction was not suspicious because the rapid increase in the value of Valeant stock triggered a necessary sale so that ValueAct would remain in compliance with its concentration policy. Thus, the timing and scope of the sale would not be suspicious because they were mandated by the concentration policy. Defendants also point

---

[7] The Court may consider documents incorporated by reference into the complaint, and take judicial notice of SEC filings. *City of Edinburgh Council*, 754 F.3d at 163. The Court, accordingly, considers each of the exhibits attached to Defendants' Motion because they are either SEC filings or incorporated into the FAC by reference.

out that Plaintiffs' theory requires their previous purchase of Valeant stock to have been completed while having knowledge that Valeant's stock was artificially inflated. There is also logical appeal to Defendants' argument that any allegation of scienter is refuted by the fact that Defendants' retained nearly 15 million shares, which lost nearly $3 billion in value.

On the other hand, the FAC offers facts and Plaintiffs argue a theory which would satisfy the scienter requirement. Plaintiffs' position that Defendants' failure to sell Valeant stock in the four years prior to the June 2015 Transaction is compelling in that it highlights that Defendants' trading routine was to purchase, not sell, Valeant stock. In fact, Defendants' transaction history, as provided to the Court by Defendants, shows that during the two years prior to the June 2015 Transaction Defendants had only purchased Valeant stock. From that perspective, a sale of Valeant stock is unusual. While Defendants rely, in part, on the concentration policy to explain the June 2015 Transaction, that reliance is undermined by other facts. Specifically, Plaintiffs allege that Defendants did not previously follow the concentration policy. Defendants brush this aside as "quibbles," but Defendants' failure to offer any explanation why the policy was not previously followed undercuts their reliance on the policy to explain the June 2015 Transaction. Additionally, Plaintiffs allege that when Morfit left Valeant's Board in May 2014, the stated reason was, in effect, so that Defendants could freely sell Valeant stock. Defendants' transaction history, however, shows that instead of selling, Defendants proceeded to purchase more Valeant stock. Thus, Defendants' trading pattern, as currently presented to the Court, significantly undermines their argument that the June 2015 Transaction was not unusual in timing and scope.

While Defendants' significant losses may suggest a lack of scienter, there are plausible opposing inferences. For example, as the Court previously observed, the fact that Defendants did not sell their shares does not render Plaintiffs' scienter allegations insufficient. There is a plausible

inference that Defendants' holdings of Valeant stock—approximately 15 million shares after the June 2015 Transaction—was so large that Defendants were unable to continue selling their shares without being caught. This theory would explain why, despite Defendants knowing that Philidor was "a house of cards," Defendants did not sell more Valeant stock—Defendants could not sell without arousing suspicions in other quarters. Under the totality of the circumstances, the Court concludes that the inference of scienter is equally compelling as the opposing inference. Thus, Plaintiffs have sufficiently plead scienter as to Defendants.

### 4.   Plaintiffs Sufficiently Alleged Contemporaneous Trading

Section 20A limits recovery to those individuals who "contemporaneously" traded with the insider. 15 U.S.C. § 78t-1 ( "Any person who violates any provision of [the Exhange Act] . . . shall be liable in an action . . . to any person who, *contemporaneously* with the purchase or sale of securities that is the subject of such violation, has purchased . . . or sold . . . securities of the same class.") (emphasis added). The Exchange Act does not provide a definition of contemporaneous trading, instead, Congress left it to the courts to resolve. *See* H.R.Rep. No. 100–910, at 27 (1988), reprinted in 1988 U.S.C.C.A.N. 6043, 6064 ("The bill does not define the term 'contemporaneous,' which has developed through case law."). The Third Circuit has not provided guidance on the scope of contemporaneous trading. *See In re Able Labs. Sec. Litig.*, 2008 WL 1967509, at *26.

Defendants argue that the Court should interpret "contemporaneous" to require IBEW to have purchased Valeant stock on June 10, 2015. (Defs.' Moving Br. 28-29.) Defendants cite several opinions from the District of New Jersey District Court in support of their position that the same-day requirement is uniformly adopted in this District. (*Id.* (collecting cases).) Defendants also argue that the allegations in the FAC require the Court to speculate that Defendants may have sold Valeant stock on June 11, 2015. (*Id.* at 30-31.) Per Defendants, Plaintiffs inappropriately

rely on the June 11, 2015 Press Release to introduce ambiguity regarding Defendants' actual trade date. (*Id.* at 31.)

Plaintiffs oppose Defendants' contemporaneous trading arguments on several fronts. Plaintiffs argue that the brokers Defendants utilized "began selling the shares 'on the NYSE' on June 10, 2015[,]" and "not all shares were sold that day because the trading volume for all publicly traded Valeant stock on that day was less than 4.2 million." (Pls.' Opp'n Br. 11.) Plaintiffs argue that Defendants dispute the factual allegations of the FAC and those arguments should be rejected because (1) Defendants' Press Release concedes that "the brokers were not buyers in a private sale but mere conduits for Defendants' stock sales on the public market[,]" (2) the law does not require that Plaintiffs purchase directly from Defendants, (3) any factual dispute regarding whether Defendants' shares ever entered the market is appropriately resolved at summary judgment, and (4) even if Defendants' 4.2 million shares were all sold on June 10, 2015, the Exchange Act and the Third Circuit do not require same-day trading. (*Id.* at 11-15.)

Here, the Court finds that a same-day trading requirement is inappropriate given the alleged facts. In two of the cases Defendants cite in support of a same-day trading requirement, the Court adopted that standard without explanation. *See Steamfitters Local 449 Pension Fund v. Alter*, No. 09-4730, 2011 WL 4528385, at *12 (E.D. Pa. Sept. 30, 2011) ("[S]ome district courts within the Third Circuit have required plaintiffs to plead that they purchased stock on the same dates on which the defendant's sales took place. This Court will do likewise."); *Copland v. Grumet*, 88 F. Supp. 2d 326, 338 (D.N.J. 1999) ("After considering the issue of the appropriate interpretation of the contemporaneous requirement in this context, we find persuasive the reasoning applied in the cases cited by defendant."). In *In re Able Laboratories Securities Litigation*, the Honorable Joseph A. Greenaway, Jr. suggested that the same-day trading requirement was cabined to that case, or others

like it "involving a publicly traded company with millions of outstanding shares." *In re Able Labs.*

*Sec. Litig.*, 2008 WL 1967509, at *27. Notably, the trading at issue in this matter is several orders

of magnitude greater than the trading volume in each of the cases Defendants cite.

The purpose of the contemporaneous trading requirement does not require a same-day

trading standard. As explained by the Honorable Fern M. Smith in *Buban v. O'Brien*:

> The requirement of contemporaneousness developed as a proxy for
> the traditional requirement of contractual privity between plaintiffs
> and defendants. Since identifying the party in actual privity with the
> insider is virtually impossible in transactions occurring on an
> anonymous public market, the contemporaneousness standard was
> developed to give plaintiffs a more feasible avenue by which to sue
> insiders. William Wang, The Contemporaneous Traders Who Can
> Sue an Inside Trader, 38 Hastings L.Rev. 1175 (1987). The
> requirement was intended to preserve the notion that only plaintiffs
> who were harmed by the insider could bring suit, while nonetheless
> making it possible for such persons to bring suit. While an actual
> trade between plaintiff and defendant need not be expressly shown,
> harm to the plaintiff is a necessary factor. Such harm may be found
> where it appears the plaintiff might, in fact, have traded with the
> defendant,

No. 94-0331, 1994 WL 324093, at *3 (N.D. Cal. June 22, 1994). Given the underlying purpose

of the same-day trading requirement—preserving the notion that only parties injured by the

insiders' action can bring suit—and Plaintiffs' allegations that the total volume of Defendants'

4.2 million shares took two days to be reflected on the NYSE, the Court is not convinced that a

same-day trading requirement is appropriate in this matter, or at least at this stage in the

proceedings. Further, to the extent Defendants offer evidence that contradicts Plaintiffs'

allegations that the June 2015 Transaction occurred over two days, the Court finds such a factual

dispute is inappropriate for a motion to dismiss and is more properly resolved at summary

judgment. Even if the Court were to accept Defendants' proposition that their transactions were

exclusively with brokers and complete upon transfer to the brokers, Defendants fail to contend

with whether they may still be liable to Plaintiffs if Defendants' brokers sold to Plaintiffs. *See*

*Basile v. Valeant Pharm. Int'l, Inc.*, No. 14-2004, 2015 WL 7352005, at *7 (C.D. Cal. Nov. 9, 2015) ("To their credit, Defendants in their Reply acknowledge that a 'defendant who makes unlawful insider trades through an agent such as a broker is liable to those with whom the broker places the trades.'"). The Court, accordingly, finds that Plaintiffs sufficiently plead contemporaneous trading with Defendants.

## IV.   CONCLUSION

For the reasons set forth above, the Court denies Defendants' Motion for Reconsideration regarding Count One as to Ubben and finds that Plaintiffs sufficiently plead a Section 20A violation. Because Defendants' grounds for dismissal of Count Four are based on the grounds for dismissal of Count Three, the Court does not separately consider dismissal of Count Four. Defendants' Motion to Dismiss, therefore, is denied. An order consistent with this Memorandum Opinion will be entered.

s/Michael A. Shipp
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

**Dated:** June _30_, 2019