SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
JENNIFER SCULLION
55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
Telephone:  212/584-0700
212/584-0799 (fax)

Local Counsel

ROBBINS GELLER RUDMAN
  & DOWD LLP
JAMES E. BARZ
FRANK A. RICHTER
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  312/674-4674
312/674-4676 (fax)

Lead Counsel for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re VALEANT PHARMACEUTICALS INTERNATIONAL, INC. SECURITIES LITIGATION | Master No. 3:15-cv-07658-MAS-LHG |
| | CLASS ACTION |
| This Document Relates To: | Judge Michael A. Shipp<br>Magistrate Judge Lois H. Goodman |
| SECURITIES CLASS ACTION. | Special Master Dennis M. Cavanaugh, U.S.D.J. (Ret.) |
| | MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................1

II.     PROCEDURAL HISTORY ....................................................................4

      A.      The Class Action Complaints.....................................................4

      B.      Motion Practice ..........................................................................5

      C.      Investigation, Fact Discovery, and Consultation with Experts
          and Consultants .........................................................................8

      D.      Arm's-Length Settlement Negotiations .............................................11

      E.      Preliminary Approval of the Settlement and Plan of Allocation ........13

III.    LEAD PLAINTIFF HAS PROVIDED NOTICE TO THE CLASS IN
      COMPLIANCE WITH RULE 23 AND DUE PROCESS ...........................14

IV.     THE SETTLEMENT WARRANTS THIS COURT'S FINAL
      APPROVAL .........................................................................................17

      A.      Lead Plaintiff and Lead Counsel Have Adequately Represented
          the Class ...................................................................................20

      B.      The Settlement Negotiations Were Conducted at Arm's Length
          and with an Experienced Mediator.....................................................23

      C.      The Settlement Is Adequate Considering the Costs, Risks, and
          Delay of Trial and Appeal.................................................................24

             1.      Risks of Establishing Liability and Damages...........................25

             2.      Risks Relating to Valeant's Financial Condition......................28

             3.      The Settlement Falls Within the Range of
                 Reasonableness ........................................................................30

      D.      The Settlement Satisfies the Remaining Rule 23(e)(2) Factors..........33

**Page**

1.  The Proposed Method for Distributing Relief Is Effective ......34

2.  Attorneys' Fees Are Reasonable................................................34

3.  The Parties Have No Other Agreements Besides an Agreement to Address Requests for Exclusion .......................35

4.  Class Members Are Treated Equitably and the Reaction of the Class Supports Final Approval .......................................35

V.   THE COURT SHOULD APPROVE THE PLAN OF ALLOCATION .......37

VI.  CERTIFICATION OF THE CLASS REMAINS WARRANTED...............39

VII. CONCLUSION...............................................................................40

4820-2567-9289.v5

# TABLE OF AUTHORITIES

**Page**

## CASES

*Alves v. Main*,
No. 01-789 (DMC), 2012 WL 6043272
(D.N.J. Dec. 4, 2012),
*aff'd*, 559 F. App'x 151 (3d Cir. 2014) ................................................................. 23

*Christine Asia Co., Ltd. v. Yun Ma*,
No. 1:15-md-02631(CM)(SDA), 2019 WL 5257534
(S.D.N.Y. Oct. 16, 2019) ............................................................................................ 37

*City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*,
No. 12-5275, 2015 WL 5097883
(D.N.J. Aug. 31, 2015) ................................................................................................ 21

*Ehrheart v. Verizon Wireless*,
609 F.3d 590 (3d Cir. 2010) ...................................................................................... 17

*Eubank v. Pella Corp.*,
753 F.3d 718 (7th Cir. 2014) ...................................................................................... 34

*Girsh v. Jepson*,
521 F.2d 153 (3d Cir. 1975) ............................................................................. *passim*

*In re Cendant Corp. Litig.*,
264 F.3d 201 (3d Cir. 2001) ...................................................................................... 36

*In re Ins. Brokerage Antitrust Litig.*,
282 F.R.D. 92 (D.N.J. 2012) ...................................................................................... 27

*In re Lucent Techs., Inc., Sec. Litig.*,
307 F. Supp. 2d 633 (D.N.J. 2004) .............................................................. 22, 30, 33, 36

*In re Merck & Co., Inc. Vytorin ERISA Litig.*,
No. 08-CV-285 (DMC), 2010 WL 547613
(D.N.J. Feb. 9, 2010) .................................................................................. 27, 30, 32, 37

**Page**

*In re New Jersey Tax Sales Certificates Antitrust Litig.*,
   No. 12-1893 (MAS)(TJB), 2016 WL 5844319
   (D.N.J. Oct. 3, 2016) ........................................................................21, 30, 32

*In re Par Pharm. Sec. Litig.*,
   No. 06-cv-3226 (ES), 2013 WL 3930091
   (D.N.J. July 29, 2013) .......................................................................25, 27, 38

*In re Schering-Plough Corp./ENHANCE Sec. Litig.*,
   No. 8-397 (DMC)(JAD), 2012 WL 4482032
   (D.N.J. Sept. 25, 2012) ....................................................................................21

*In re Schering-Plough Corp. Enhance ERISA Litig.*,
   No. 08-1432 (DMC)(JAD), 2012 WL 1964451
   (D.N.J. May 31, 2012) .....................................................................................37

*In re Schering-Plough/Merck Merger Litig.*,
   No. 09-CV-1099 (DMC), 2010 WL 1257722
   (D.N.J. Mar. 26, 2010) ....................................................................................19

*In re Viropharma Inc. Sec. Litig.*,
   No. 12-2714, 2016 WL 312108
   (E.D. Pa. Jan. 25, 2016) ..............................................................16, 23, 24, 38

*In re Warfarin Sodium Antitrust Litig.*,
   391 F.3d 516 (3d Cir. 2004) ....................................................................*passim*

*Schuler v. Medicines Co.*,
   No. 14-1149 (CCC), 2016 WL 3457218
   (D.N.J. June 24, 2016) .............................................................................*passim*

*Wong v. Accretive Health, Inc.*,
   773 F.3d 859 (7th Cir. 2014) .....................................................................32, 33

- iv -

Page

## STATUTES, RULES AND REGULATIONS

15 U.S.C.

§77k ...................................................................................................4
§77l(a)(2) ...........................................................................................4
§77o ...................................................................................................4
§78j(b) ...............................................................................................4
§78t(a) ...............................................................................................4
§78t-1 ................................................................................................5
§78u-4 .........................................................................................22, 30
§78u-4(a)(4) ..............................................................................1, 8, 17
§78u-4(a)(7) .....................................................................................14

Federal Rules of Civil Procedure

Rule 23 .......................................................................................14, 15
Rule 23(c)(2)(B) .........................................................................14, 16
Rule 23(c)(3) ....................................................................................14
Rule 23(e) .........................................................................................14
Rule 23(e)(1) .....................................................................................13
Rule 23(e)(1)(B) ...............................................................................14
Rule 23(e)(2) ..............................................................................*passim*
Rule 23(e)(2)(A) ........................................................................20, 22
Rule 23(e)(2)(B) ...............................................................................23
Rule 23(e)(2)(C)(i) ...........................................................................24
Rule 23(e)(2)(C)(ii)-(iv) ..................................................................34
Rule 23(e)(2)(D) ........................................................................34, 35
Rule 23(e)(3) ..............................................................................18, 20

4820-2567-9289.v5

## I.    INTRODUCTION

Pursuant to Federal Rule of Civil Procedure ("Rule") 23(e), Lead Plaintiff TIAA seeks final approval of the all-cash $1,210,000,000.00 Settlement that will resolve this securities class action against all Defendants and Former Defendants, except defendant PricewaterhouseCoopers, LLP ("PwC"), which is not a party to, or released by, the Stipulation.[1]   The Settlement is a remarkable result – the largest Private Securities Litigation Reform Act of 1995 ("PSLRA") class action recovery ever against a pharmaceutical company, the largest in this District in almost two decades, and the ninth largest of all time.  *See* Ex. B (ISS Report) at 5.

The result is all the more extraordinary in light of Valeant's financial condition and "the ability of the defendants to withstand a greater judgment." *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975).  In fact, Valeant's stock price had collapsed more than 90% to around $20 per share by the time Lead Plaintiff filed its consolidated complaint and to less than $9 per share by 2017, with analysts questioning whether Valeant could declare bankruptcy.  At the time of this filing, Valeant has around

---

[1]    Unless otherwise stated, capitalized terms used herein have the same meanings as provided in the Stipulation of Settlement, dated December 15, 2019 (the "Stipulation"), which is attached as Exhibit A to the Declaration of Christopher A. Seeger in Support of Motions for (1) Final Approval of Class Action Settlement and Plan of Allocation; and (2) an Award of Attorneys' Fees and Expenses and Awards to Plaintiffs Pursuant to 15 U.S.C. §78u-4(a)(4) ("Seeger Declaration"), submitted herewith.  Citations to "Ex. __" refer to exhibits to the Seeger Declaration.  All citations and internal quotation marks are omitted and emphasis is added, unless otherwise indicated.

$25 billion in outstanding debt and its stock price has declined from trading around $32 per share during the month this Settlement was reached to as low as $13 per share in the month before this filing. *See* Ex. C (Valeant stock price history). Remarkably, the $1.21 billion Settlement was nearly 50% greater than the total amount of Valeant's cash on hand at the time of Settlement, $825 million (as reported in the Company's November 4, 2019 quarterly report on Form 10-Q), requiring Valeant to issue debt to raise sufficient capital to fund the Settlement. *See* Stipulation, ¶2.2; Ex. D.

This outstanding recovery did not come easily or quickly. It was obtained through four years of hard-fought litigation among sophisticated parties and experienced counsel, and follows repeated and extensive arm's-length mediation and settlement discussions overseen by an experienced mediator, Professor Eric D. Green, Esq. of Resolutions, LLC. By the time of settlement, the Settling Parties were well-informed of the strengths and weaknesses of their claims and defenses. In addition to having the benefit of this Court's rulings on not just one or even two motions to dismiss, but no less than *seven* motions to dismiss, and motions for reconsideration and/or appeal thereof, Lead Plaintiff and Lead Counsel had engaged in an extensive investigation, retained five experts and consultants, and obtained and analyzed: (i) more than 11 million pages of documents produced from more than 20 Defendants and approximately 150 third parties; (ii) 11 deposition transcripts from related proceedings; (iii) Congressional testimony, including that by certain Defendants and a

former Valeant director; (iv) exhibits and testimony from the criminal trial and sentencing of a former Valeant executive and the former CEO of key third party Philidor Rx Services, LLC ("Philidor"); and (v) over 50 public videos consisting of media interviews of certain Defendants and witnesses.

Lead Plaintiff respectfully requests that this Court grant final approval of both the Settlement and the Plan of Allocation.  First, the Settlement easily satisfies each of the Rule 23(e)(2) and Third Circuit *Girsh* factors for final approval of a class action settlement.  It is a fair, reasonable, and adequate resolution for the Class that balances the objective of securing the highest possible recovery with the recognition of the risks and costs of continued litigation, the risks inherent in Valeant's financial position and, as with any complex case, the risk that the Class could receive nothing or an amount equal to or less than the Settlement Amount several years into the future.  Accordingly, Lead Plaintiff and Lead Counsel believe the Settlement is not just in the best interests of the Class, but represents an exceptional result and should be approved.

Second, the Plan of Allocation to distribute the Settlement to the Class was developed with Lead Plaintiff's damages consultant to track Lead Plaintiff's damages models, taking into account securities purchased, acquired, held, and sold.  The Plan of Allocation treats the Class equitably by providing that each Class Member that

properly submits a valid Proof of Claim and Release form will receive a *pro rata* share of the monetary relief.  It too is fair, reasonable, and adequate, and should be approved.

## II.   PROCEDURAL HISTORY

### A.   The Class Action Complaints

The initial securities class action complaint was filed by Robbins Geller Rudman & Dowd LLP ("Robbins Geller") four-and-a-half years ago on October 22, 2015.  ECF No. 1.  On May 31, 2016, the Court appointed TIAA as Lead Plaintiff and Robbins Geller as Lead Counsel.  ECF No. 67.

On June 24, 2016, Lead Plaintiff TIAA filed its Consolidated Complaint for Violations of the Federal Securities Laws ("Complaint").  ECF No. 80.  The Complaint alleged a complex fraudulent scheme and course of business pursuant to which Valeant and its senior insiders created and utilized a network of secretly controlled pharmacies, including Philidor, and relied on deceptive pricing and reimbursement practices, and fictitious accounting, to misrepresent Valeant's business, operations, and financial performance.  *See id.,* ¶¶3-12, 21-131.

At 280 pages long, the Complaint named 34 defendants, including Defendants, Former Defendants, and PwC, and alleged violations of Sections 10(b) and 20(a) under the Exchange Act, and Sections 11, 12(a)(2), and 15 under the Securities Act, based on, among other things, Defendants' and Former Defendants' alleged materially false and misleading statements or omissions regarding Valeant's business operations and

- 4 -

financial performance, which had the effect of artificially inflating the price of Valeant Securities. *See id.*, ¶¶13-17, 32-230, 551-728. Plaintiffs further alleged that as the truth regarding Valeant's business, operations, and prospects was revealed through a series of 22 partial disclosures, artificial inflation was removed from the price of Valeant Securities, damaging members of the Class. *See id.*, ¶¶18-26, 473-527.

On September 20, 2018, Plaintiffs filed the First Amended Complaint ("FAC"), adding IBEW as an additional named plaintiff and insider trading claims under Section 20A of the Exchange Act against the ValueAct Defendants and Defendant Jeffrey W. Ubben ("Ubben"). ECF No. 352.

### B.    Motion Practice

On September 13, 2016, Defendants, Former Defendants, and PwC filed a total of six Rule 12(b)(6) motions to dismiss the Complaint, arguing that Plaintiffs had not adequately pled, *inter alia*, false and misleading statements, a strong inference of scienter, loss causation, or standing. *See* ECF Nos. 164-169. The parties submitted nearly 400 pages of briefing and engaged in a lengthy oral argument. *See id.*; ECF Nos. 178, 184-188, 191, 196, 215. On April 28, 2017, the Court denied the motions in substantial part against Defendants, in full against PwC, but granted the motion to dismiss against the Former Defendants. ECF No. 216. On May 12, 2017, Defendant Deborah Jorn filed a motion for reconsideration of the Court's April 28th opinion,

claiming that the Court failed to properly analyze allegations of scienter for her individually, which the Court subsequently denied.  ECF Nos. 220, 256.

On October 19, 2017, the Court issued an Order to Show Cause directing the parties to brief whether the Court should stay the action and other related opt-out litigation during the pendency of the criminal trial involving Philidor's former CEO Andrew Davenport and former Valeant executive Gary Tanner, *United States v. Tanner*, No. 17-cr-61 (S.D.N.Y.).  ECF No. 273.  After submitting briefing, the parties provided the Court with a stipulation to stay certain discovery but continue document production by Valeant and PwC in response to Plaintiffs' outstanding first requests for production.  ECF Nos. 274, 279, 290.  The Court entered the stipulation, and on June 5, 2018, lifted the stay following the jury's conviction of Gary Tanner and Andrew Davenport on all charges.  ECF Nos. 291, 316.

Following notice from TIAA, on June 11, 2018, the Court issued a Letter Order consolidating into this action *Timber Hill LLC v. Valeant Pharms. Int'l, Inc.*, No. 18-cv-10246 (D.N.J.), a newly-filed securities class action arising from the same facts and alleging violations of the same securities laws.  ECF No. 318.  Soon after, on June 18, 2018, Timber Hill LLC ("Timber Hill") filed a motion seeking relief from the consolidation order, which Lead Plaintiff opposed.  ECF Nos. 322-323.  After briefing, the Court denied Timber Hill's motion for relief as well as its motion for appointment as lead plaintiff for options investors.  ECF No. 392.

On September 28, 2018, Plaintiffs served on Defendants their motion for class certification, accompanying memorandum of law, and supporting declarations and exhibits, which included two expert opinions on market efficiency. *See* ECF No. 474-3.

Following Plaintiffs' filing of the FAC to assert insider trading claims, the ValueAct Defendants and Defendant Ubben moved to dismiss the FAC on October 31, 2018, arguing, among other things, that Plaintiffs had not adequately alleged scienter nor that IBEW traded contemporaneously with the insider sales in June 2015. ECF No. 387. On November 13, 2018, the parties submitted a joint stipulation and proposed order agreeing to stay further party discovery during the pendency of that motion, while allowing discovery against the nearly 150 non-parties to continue. ECF No. 396. While the ValueAct Defendants and Defendant Ubben denied Plaintiffs' allegations, after extensive briefing on the issues, the Court denied their motion to dismiss. *See* ECF Nos. 387, 401, 404, 463.

On July 29, 2019, Defendant Ubben and the ValueAct Defendants filed a motion seeking certification for immediate appeal under 28 U.S.C. §1292(b) of the Court's denial of their motion to dismiss. ECF No. 474. Plaintiffs opposed the motion. ECF No. 482. Following the appointment of the Honorable Judge Cavanaugh (Ret.) as Special Master, on December 4, 2019, Judge Cavanaugh entered an order denying the request. ECF No. 493.

With regard to discovery motion practice, on October 26, 2018, Plaintiffs also filed a motion to compel third parties Philidor and 34 Philidor-related entities to produce documents in response to Plaintiffs' valid subpoenas.  ECF No. 386.[2] Following briefing, on April 12, 2019, the Court issued a Letter Opinion and Order granting Plaintiffs' motion.  ECF No. 441.  As a result, Philidor has produced more than one million documents.

As reflected above, motion practice in this Litigation has been substantial, as Plaintiffs were required to submit 28 briefs totaling more than 450 pages.

### C.    Investigation, Fact Discovery, and Consultation with Experts and Consultants

To date, Lead Plaintiff and Lead Counsel have secured substantial information in support of their claims through both formal and informal discovery.  *See* ECF No. 80 at 1; ECF No. 80-1; Stipulation at 4; accompanying Declaration of James E. Barz in Support of Motions for (1) Final Approval of Class Action Settlement and Plan of Allocation; and (2) an Award of Attorneys' Fees and Expenses and Awards to Plaintiffs Pursuant to 15 U.S.C. §78u-4(a)(4) ("Barz Decl."), ¶¶5-6, 30-32; and Declaration of Robert J. Robbins Filed on Behalf of Robbins Geller Rudman & Dowd LLP in Support of Application for Award of Attorneys' Fees and Expenses ("Robbins Geller Decl."), ¶7(f), submitted herewith.

---

[2] At the start of the Litigation, Lead Plaintiff also engaged in extensive motion practice relating to its attempt to lift the stay of discovery under the PSRLA against Valeant, Philidor, and Philidor-related entities.  *See, e.g.*, ECF Nos. 52, 65, 66, 75.

4820-2567-9289.v5

First, with regard to documents, discovery has been broad, directed at all Plaintiffs, all 25 Defendants and PwC, and approximately 150 third parties, and included the exchange of more than 13 million pages of documents.  Collectively, Plaintiffs produced over 1.5 million pages of documents.  During the Litigation, the parties engaged in numerous and lengthy meet and confers.  After exchanging arguments in correspondence and lengthy phone calls, the parties were able to resolve the majority of disputes that might otherwise have resulted in motion practice, but were also preparing motions regarding unresolved issues at the time of the Settlement.

Second, the parties also engaged in extensive written discovery.  Plaintiffs served six sets of interrogatories and three sets of requests to admit on Defendants and PwC during the Litigation.

Third, Lead Plaintiff accumulated witness statements and testimony from dozens of potential trial witnesses, including certain Defendants, from multiple sources.  For example, Lead Counsel conducted interviews of former employees while also thoroughly analyzing the public record regarding Valeant, which included analysis of the Company's SEC filings, conference call transcripts, presentations, analyst reports, and detailed investigative reporting regarding the topics at issue in the Litigation.  Lead Counsel also obtained and analyzed transcripts, testimony, and prepared statements from two separate Congressional hearings before the House Oversight Committee and U.S. Senate Special Committee on Aging, related civil

cases involving Valeant employees and Defendants, trial and sentencing proceedings in the criminal trial against former Valeant and Philidor employees, and over 50 public interviews of certain Defendants and witnesses relating to matters at issue in the Litigation.  For example, with regard to Defendant Pearson (Valeant's former CEO and Chairman of the Board), in addition to millions of relevant pages of production, Lead Counsel analyzed his deposition transcript in the related *Allergan v. Valeant* litigation, written and oral testimony before the U.S. Senate Special Committee on Aging, and over 20 media interviews conducted both prior to and subsequent to this Litigation being filed.

Fourth, in addition to documents, written discovery, and testimonial evidence, Lead Counsel retained five experts/consultants in this case.  Lead Counsel conferred with these experts/consultants, who also reviewed relevant documents and provided valuable insight and analysis on critical matters to the Litigation, such as the background of the pharmaceutical industry, the alleged improper practices by Valeant and Philidor as compared to industry norms, corporate governance practices, accounting and auditing matters, and expert analysis of loss causation, market efficiency, and damages.  Lead Counsel used all of these sources of information to analyze and cull the key documents in the case, with assistance of internal forensic accountants and retained experts/consultants to select the "hot" and "critical" documents, which would have comprised the bulk of deposition and trial exhibits.  In

- 10 -

addition, Lead Counsel identified the key witnesses in the case and the topics upon which each possessed information.

In summary, given Lead Plaintiff's thorough investigation and extensive discovery, by the time of the Settlement, Lead Plaintiff and Lead Counsel had extensive and detailed information regarding the strengths and weaknesses of the case based on having uncovered the best documents in the case and having developed an understanding of the likely trial testimony from key witnesses, as well as an understanding, through experts, of the industry, accounting, and damages issues to be proven at trial. All of this, combined with Lead Counsel's extensive experience in securities fraud cases and trials, was more than sufficient to knowledgeably evaluate the relative strengths weaknesses of the claims and defenses.

### D.    Arm's-Length Settlement Negotiations

The Settling Parties engaged in extensive arm's-length negotiations before Professor Green. *See* Stipulation, at 4-5; Barz Decl., ¶¶7-9. The first in-person mediation session occurred on September 17, 2018. In advance of mediation, the parties exchanged with each other and provided the mediator detailed mediation briefs addressing liability and damages. Given the sophistication of the parties involved, scope of claims, and magnitude of damages at issue, the mediation briefs were detailed and addressed the specific evidence and legal arguments each side would rely

- 11 -

upon.  The first mediation session ended without a settlement agreement and with the parties far apart.

Following the first mediation session, the Settling Parties continued with fact discovery and the briefing described above.  In addition, the Settling Parties engaged in numerous follow-up teleconferences, phone calls, and e-mails with Professor Green.  More than a year after the first mediation session, on November 6, 2019, the parties agreed to engage in a second in-person mediation session.  In advance, the Settling Parties again exchanged detailed and updated mediation briefs with each other and Professor Green that addressed additional evidence uncovered in the Litigation as well as responding to the new arguments developed by each side.  In total, Plaintiffs provided more than 100 exhibits with their mediation briefs.  While the Settling Parties made progress and narrowed the gap during this second session, they again were unable to reach agreement.

Thereafter, the parties continued discovery and were on the verge of filing motions to compel against each other relating to unresolved privilege disputes.  They were also preparing for several noticed depositions.  But, following additional negotiations, on November 20, 2019, Professor Green issued a mediator's proposal to settle the case and gave each side several days to consider.  The Settling Parties accepted the mediator's proposal, agreeing to settle the claims of all Defendants and Former Defendants, but not PwC, in the amount of $1,210,000,000.00.  After

extensive negotiation regarding the terms of the Settlement, on December 15, 2019, the Settling Parties executed the Stipulation, which sets forth the terms of the Settlement.

### E.  Preliminary Approval of the Settlement and Plan of Allocation

On January 21, 2020, Special Master Cavanaugh conducted a preliminary fairness hearing on Lead Plaintiff's unopposed motion for preliminary approval of the Settlement.  *See* Ex. E (hearing transcript).  Counsel for Plaintiffs, Defendants, non-settling Defendant PwC, and (untimely) lead plaintiff movant Timber Hill all attended with an opportunity to be heard.  *See id.* at 2-6.  Lead Counsel argued that the Settlement warranted preliminary approval, Valeant's counsel stated its support, no party or non-party in attendance objected, and the Special Master explained his reasoning and said an order granting preliminary approval would soon be entered.  *Id.* at 8-13.  On January 23, 2020, Special Master Cavanaugh entered the Order Granting Preliminary Approval Pursuant to Fed. R. Civ. P. 23(e)(1) and Permitting Notice to the Class, which preliminarily approved the Settlement as "fair, reasonable and adequate" and authorized that the Notice be sent to the Class.  ECF No. 510 ("Preliminary Approval Order"), ¶¶1, 7-8.  The Preliminary Approval Order was adopted as an Order of this Court on February 5, 2020.  ECF No. 515.

## III.   LEAD PLAINTIFF HAS PROVIDED NOTICE TO THE CLASS IN COMPLIANCE WITH RULE 23 AND DUE PROCESS

Rule 23(e) governs notice requirements for class action settlements.  The Rule provides that "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal."  Fed. R. Civ. P. 23(e)(1)(B).  In addition, Rule 23(c)(2)(B) requires that a certified class receive "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).

Here, the Court-approved distribution of Notice and Summary Notice complies with Rule 23.  The Notice apprises Class Members of (among other disclosures) the nature of the Litigation, the definition of the Class, the claims and issues in the Litigation, and the claims that will be released in the Settlement.  The Notice also: (i) advises that a Class Member may enter an appearance through counsel if desired; (ii) describes the binding effect of a judgment on Class Members under Rule 23(c)(3); (iii) states the procedures and deadline for Class Members to exclude themselves from the Class and for objection to the proposed Settlement, the proposed Plan of Allocation, and the requested attorneys' fees and expenses; (iv) states the procedures and deadline for submitting a Proof of Claim and Release form to recover from the Settlement; and (v) provides the date, time, and location of the Settlement Hearing.

In addition, the Notice and Summary Notice also satisfy the PSLRA's separate disclosure requirements (15 U.S.C. §78u-4(a)(7)) by, *inter alia*, stating: (i) the amount

- 14 -

of the Settlement determined in the aggregate and on an average per-share basis; (ii) that the Settling Parties do not agree on the average amount of damages per share that would be recoverable in the event Plaintiffs prevailed at trial, and stating the issue(s) on which the Settling Parties disagree; (iii) that Lead Counsel intends to make an application for an award of attorneys' fees and expenses, including the amount of the requested fees and expenses determined on an average per-share basis; (iv) contact information for Lead Counsel; and (v) the reasons the Settling Parties are proposing the Settlement.  The contents of the Notice and Summary Notice therefore satisfy all applicable requirements.

The Court's Preliminary Approval Order found that the form and content of the notice program here, as well as the methods for notifying the Class proposed on preliminary approval, "meet the requirements of Rule 23 of the Federal Rules of Civil Procedure, the Private Securities Litigation Reform Act of 1995 and due process, constitute the best notice practicable under the circumstances, and shall constitute due and sufficient notice to all Persons entitled thereto."  Preliminary Approval Order, ¶15.  Pursuant to the Preliminary Approval Order, the Claims Administrator, Gilardi & Co. LLC ("Gilardi"), commenced mailing the Notice and Proof of Claim and Release form ("Notice Package") on February 6, 2020.  *See* accompanying Declaration of Ross D. Murray Regarding Notice Dissemination, Publication, and Requests for Exclusion Received to Date ("Murray Decl."), ¶5.  On February 13,

- 15 -

2020, Gilardi published the Summary Notice in *The Wall Street Journal* and over the *Business Wire*. *Id.*, ¶12. Additionally, on February 6, 2020, Gilardi posted copies of the Notice, Proof of Claim and Release, Stipulation, and Preliminary Approval Order on the website maintained for the Settlement, www.ValeantSecuritiesSettlement.com. *Id.*, ¶14.

This combination of individual first-class mail to all Class Members who could be identified with reasonable effort, supplemented by notice in an appropriate, widely-circulated publication, transmitted over the newswire, and set forth on internet websites, is typical of notice plans in securities class actions and constituted "the best notice . . . practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B); *see also, e.g.*, *In re Viropharma Inc. Sec. Litig.*, No. 12-2714, 2016 WL 312108, at *5 (E.D. Pa. Jan. 25, 2016) (approving similar notice and process in securities class action settlement).

Out of the thousands of potential Class Members, as of this filing, there have only been requests for exclusion from the Settlement by certain plaintiffs in the 32 previously-filed opt-out cases that are pending before this Court and ten individual investors, eight of whom failed to report any transactions of Valeant Securities, with the other two claiming net Class Period purchases of just 3 shares and 21 shares. Murray Decl., ¶16 and Ex. D thereto. To date, there has been a single objection to the Settlement by an individual who proposes the Settlement be increased to an amount that

- 16 -

would be roughly $25 billion without any explanation of how Valeant could fund such a settlement as it is exceedingly unlikely, if not completely unrealistic, to suggest there would be a market for another $25 billion in debt for a Company already carrying $25 billion in debt.  Separately, there has been only one objection to the attorneys' fee request, filed by an individual who suggests that attorneys' fees should be limited to three to five times expenses in class actions, which is a method never endorsed by any court.  *See* Memorandum in Support of Motion for an Award of Attorneys' Fees and Expenses and Awards to Plaintiffs Pursuant to 15 U.S.C. §78u-4(a)(4) ("Fee Brief"), §IV.B.  Both objections (which are included as exhibits hereto) will be addressed further in the reply brief, but, it is sufficient to note the Settlement appears to have the overwhelming support of the Class as of this filing.

## IV.    THE SETTLEMENT WARRANTS THIS COURT'S FINAL APPROVAL

It is well established in this Circuit that the settlement of class action litigation is both favored and encouraged.  *See Ehrheart v. Verizon Wireless*, 609 F.3d 590, 594-95 (3d Cir. 2010) (noting that the "strong presumption in favor of voluntary settlement agreements" is "especially strong in 'class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation'"); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004) ("[T]here is an overriding public interest in settling class action litigation, and it should therefore be encouraged.").

- 17 -

Rule 23(e)(2), as recently amended, identifies the following factors to be considered by a district court at final approval:

> (2)    Approval of the Proposal.   If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:
>
> > (A)    the class representatives and class counsel have adequately represented the class;
> >
> > (B)    the proposal was negotiated at arm's length;
> >
> > (C)    the relief provided for the class is adequate, taking into account:
> >
> > > (i)    the costs, risks and delay of trial and appeal;
> > >
> > > (ii)    the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
> > >
> > > (iii)    the terms of any proposed award of attorney's fees including timing of payment; and
> > >
> > > (iv)    any agreement required to be identified under Rule 23(e)(3); and
> >
> > (D)    the proposal treats class members equitably relative to each other.

Rule 23(e)(2).  These factors are to be considered alongside of, and largely overlap with, those set forth by the Third Circuit in *Girsh*:

> ". . . (1) the complexity, expense and likely duration of the litigation . . . ; (2) the reaction of the class to the settlement . . . ; (3) the stage of the proceedings and the amount of discovery completed . . . ; (4) the risks of establishing liability . . . ; (5) the risks of establishing damages . . . ; (6) the risks of maintaining the class action through the trial . . . ; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible

recovery . . . ; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation . . . ."

*Girsh*, 521 F.2d at 157.[3]

For ease of reference, the Rule 23(e)(2) and Third Circuit *Girsh* factors are

summarized in the chart below and will be addressed in this order:

| Rule 23(e)(2) | *Girsh* |
|---|---|
| 23(e)(2)(A): the class representatives and class counsel adequately represented the class. | Factor 3: the stage of proceedings and discovery conducted. |
| 23(e)(2)(B): the settlement was negotiated at arm's length. | |
| 23(e)(2)(C)(i): relief provided for the class is adequate, taking into account the costs, risks, and delay of trial and appeal. | Factor 1: the complexity, expense, and likely duration of litigation; Factor 4: risks to liability; Factor 5: risks to damages; Factor 6: risks to maintaining a class action through trial; Factor 7: ability of defendants' to withstand a greater judgment; Factor 8: range of reasonableness in light of the best possible recovery; and Factor 9: range of reasonableness to a possible recovery in light of all risks. |
| 23(e)(2)(C)(ii): relief provided for the class is adequate, taking into account the effectiveness of the method of distributing relief to the class. | |
| 23(e)(2)(C)(iii): relief provided for the class is adequate, taking into account the terms of the requested attorneys' fees including timing of payment. | |

---

[3] The *Girsh* factors "are a guide and the absence of one or more does not automatically render the settlement unfair." *In re Schering-Plough/Merck Merger Litig.*, No. 09-CV-1099 (DMC), 2010 WL 1257722, at *5 (D.N.J. Mar. 26, 2010) (Cavanaugh, J.).

- 19 -

| 23(e)(2)(C)(iv): relief provided for the class is adequate, taking into account any agreement required to be identified under Rule 23(e)(3). | |
|---|---|
| 23(e)(2)(D): the settlement treats class members equitably. | Factor 2: the reaction of the class. |

Overall, just as they supported preliminary approval, an examination of all the factors favors final approval.

### A.   Lead Plaintiff and Lead Counsel Have Adequately Represented the Class

The first factor of Rule 23(e)(2) considers the adequacy of representation for the Class. *See* Rule 23(e)(2)(A). This factor dovetails into the third *Girsh* factor, which focuses on the stage of the proceedings and the amount of discovery completed. *Girsh*, 521 F.2d at 157; *see also Warfarin*, 391 F.3d at 535 (noting similar considerations for applying presumption of fairness). Courts in the Third Circuit generally consider two components in assessing adequacy: "(1) the qualifications, experience, and general abilities of the plaintiffs' lawyers to conduct the litigation, and (2) whether the interests of lead plaintiffs are sufficiently aligned with the interests of the absentees." *Schuler v. Medicines Co.*, No. 14-1149 (CCC), 2016 WL 3457218, at *4 (D.N.J. June 24, 2016).

Here, after receiving several lead plaintiff motions, this Court appointed Lead Plaintiff and Lead Counsel to represent the Class. ECF No. 67. Lead Counsel is highly competent and possesses substantial experience in prosecuting complex

- 20 -

securities class actions in this Circuit and throughout the country.  *See* Fee Brief, §IV.C; Robbins Geller Decl., Ex. G (firm resume); *see also City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc*., No. 12-5275, 2015 WL 5097883, at *9 (D.N.J. Aug. 31, 2015) (granting class certification and stating that it was "clear that [Robbins Geller] is highly qualified to represent the class").  In addition, Lead Plaintiff TIAA is an institutional investor with a substantial stake in the outcome of the Litigation.  *See* Declaration of Laurie A. Gomez on Behalf of Lead Plaintiff TIAA ("TIAA Decl."), submitted herewith.  Like the other Class Members, TIAA seeks damages under the federal securities laws for losses suffered by its purchases or acquisitions of Valeant Securities during the Class Period at prices that were allegedly inflated by Defendants' false and misleading statements.  *See, e.g.*, ECF Nos. 80, 80-2, 323-3.  Because TIAA is highly incentivized to pursue the same claims for the same damages as the Class, and has retained highly-competent counsel, TIAA is adequate.  *See, e.g.*, *In re Schering-Plough Corp./ENHANCE Sec. Litig*., No. 8-397 (DMC)(JAD), 2012 WL 4482032, at *6 (D.N.J. Sept. 25, 2012) (holding adequacy met where lead plaintiff and the class both "claim that they purchased [the] securities during the Class Period and have been injured by the allegedly wrongful course of conduct at issue").[4]

---

[4]   TIAA has also added Tucson and IBEW to serve as Class Representatives with standing for all claims alleged on behalf of the Class.  *See In re New Jersey Tax Sales Certificates Antitrust Litig*., No. 12-1893 (MAS)(TJB), 2016 WL 5844319, at *5

Proving their adequacy, Lead Plaintiff and Lead Counsel have diligently prosecuted this case on behalf of the Class.  Lead Plaintiff and Lead Counsel's efforts have included, but were far from limited to, drafting two detailed complaints, opposing and defeating seven motions to dismiss with substantial briefing and lengthy oral argument, defeating a motion for reconsideration and a motion for interlocutory appeal, searching for and assisting Plaintiffs in producing over 1.5 million pages of documents, prevailing on a key motion to compel, obtaining and analyzing nearly 11.5 million pages of documents produced by Defendants and approximately 150 third parties, preparing the motion and memorandum for class certification supported by two expert declarations, and engaging in a contentious negotiation process that spanned more than a year, including two in-person mediation sessions, resulting in the ninth largest PSLRA settlement of all time.  *See supra* §II.A-D; Barz Decl., ¶¶5-16, 30-33.

Thus, Lead Plaintiff and Lead Counsel have adequately represented the Class under Rule 23(e)(2)(A), and, in satisfaction of the third *Girsh* factor, completed sufficient litigation and discovery to have "'an adequate appreciation of the merits of the case.'"  *See Warfarin*, 391 F.3d at 537; *In re Lucent Techs., Inc., Sec. Litig.*, 307 F. Supp. 2d 633, 644 (D.N.J. 2004) (approving $517 million settlement where plaintiffs had conducted a thorough investigation, analyzed more than three million

(D.N.J. Oct. 3, 2016) (Shipp, J.) (holding adequacy met where plaintiffs represented interests for both types of claims alleged arising from the same allegations).

- 22 -

pages of documents, and retained and consulted with relevant experts); *see also Schuler*, 2016 WL 3457218, at *7 (approving settlement despite "no formal discovery" where lead counsel had conducted extensive investigation, briefed a motion to dismiss, consulted with an expert, and engaged in mediation).  Bringing this experience and knowledge to bear, Lead Plaintiff and Lead Counsel believe the Settlement is in the best interests of the Class and request that the Court grant final approval.  *See* Barz Decl., ¶16; TIAA Decl., ¶¶7-10; *see also Alves v. Main*, No. 01-789 (DMC), 2012 WL 6043272, at *22 (D.N.J. Dec. 4, 2012) (Cavanaugh, J.) ("[C]ourts in this Circuit traditionally 'attribute significant weight to the belief of experienced counsel that settlement is in the best interest of the class.'"), *aff'd*, 559 F. App'x 151 (3d Cir. 2014); *Viropharma*, 2016 WL 312108, at *11 (stating that courts "'afford[] considerable weight to the views of experienced counsel regarding the merits of the settlement'").

## B. The Settlement Negotiations Were Conducted at Arm's Length and with an Experienced Mediator

The second factor of Rule 23(e)(2) considers whether the Settlement was negotiated at arm's length.  *See* Rule 23(e)(2)(B); *see also Warfarin*, 391 F.3d at 535 (citing arm's-length negotiations as a factor for assessing presumption of fairness).

As this Court has found in granting preliminary approval of the Settlement, and as detailed above, the proposed Settlement was the result of extensive arm's-length and non-collusive negotiations.  *See* Preliminary Approval Order, ¶5; *supra* in §II.D; Barz Decl., ¶¶7-9.  Those negotiations spanned more than a year and involved

- 23 -

multiple mediation sessions, follow-up teleconferences, phone calls, and e-mail communications with Professor Green. The negotiations were vigorous and adversarial with highly-experienced counsel on both sides. In fact, the parties could not reach agreement despite those efforts, and the Settlement was reached only after Professor Green's issuance of a "mediator's proposal." The Settlement Amount is larger than Valeant's reported cash balance, requiring the payment to be structured and funded by the issuance of additional debt. In addition, the Litigation is ongoing against a non-settling defendant, PwC. All of these facts prove the arm's length nature of the Settlement negotiations and clearly favor final approval. *See Schuler*, 2016 WL 3457218, at *8 (finding that arm's-length negotiations, "facilitated by an experienced mediator," supported final approval and presumption of fairness); *Viropharma*, 2016 WL 312108, at *8 (stating the "'participation of an independent mediator in settlement negotiations virtually insures [sic] that the negotiations were conducted at arm's length and without collusion'").

### C. The Settlement Is Adequate Considering the Costs, Risks, and Delay of Trial and Appeal

The third factor of Rule 23(e)(2), which overlaps with several of the *Girsh* factors (*i.e.*, factors 1, 4-9), instructs courts to consider the adequacy of the settlement relief in light of the costs, risks, and delay that trial and appeal would inevitably impose. *See* Fed. R. Civ. P. 23(e)(2)(C)(i). The issues considered within this factor also weigh in favor of final approval, as the relief is adequate considering the costs,

- 24 -

risks, and delay of continued litigation, which would require Plaintiffs to prove (and defeat Defendants' counter-arguments regarding) falsity, materiality, scienter, loss causation, and damages at summary judgment, trial, and on any appeal.

### 1.   Risks of Establishing Liability and Damages

"Securities fraud class actions are notably complex, lengthy, and expensive cases to litigate." *In re Par Pharm. Sec. Litig.*, No. 06-cv-3226 (ES), 2013 WL 3930091, at *4 (D.N.J. July 29, 2013).  This case was no exception.  The stakes were high so the Defendants had a substantial financial incentive to, and did, raise virtually every conceivable defense to the claims, as exemplified by the lengthy motion to dismiss briefing and related motions for reconsideration and interlocutory appeal filed thereafter.  Defendants have, and but for the Settlement would have continued to, vigorously challenge Plaintiffs' ability to establish each element of the claims as to each of the Defendants.  *See, e.g.*, ECF No. 165-1 at 10-16; ECF No. 166-1 at 4-15; ECF No. 167-1 at 31-65; ECF No. 168-1 at 12-30; ECF No. 169-1 at 4-11; ECF No. 387-1 at 13-39; Ex. F (Letter from Counsel for Defendants, Oct. 11, 2019) at 5 (outlining defenses and arguments Defendants would pursue in the Litigation).  For example, Defendants have asserted that: investors were not misled as to the risky nature of Valeant's business because the pricing and business practices were publicly reported prior to the alleged corrective disclosures through various media articles; that they had no duty to disclose Valeant's relationship with Philidor prior to October

2015; and, to the extent there was any wrongdoing, they were the victims of a rogue employee who has since been convicted of defrauding the Company by steering business to Philidor in exchange for personal kickbacks. *See* ECF No. 167-1 at 51-55; ECF No. 196 at 18, n.17; Ex. F (Defendants emphasizing that "[a] jury has determined that Valeant was defrauded by Philidor"); *see also* Fee Brief, §§II.D-E.

Defendants have also vigorously challenged Lead Plaintiff's ability to prove loss causation and damages, maintaining that the sheer number of corrective disclosures alleged (22) and volume of reporting regarding Valeant rendered the Class particularly vulnerable on this element. *See generally* ECF No. 167-1 at 9-16, 61-62. For example, Defendants have argued that the truth regarding Valeant's pricing practices was disclosed during the Class Period in media articles and in a highly contentious acquisition battle with a competitor; that non-fraud related confounding information caused the stock drops, including speculation of regulatory action regarding pricing that did not come to fruition; and that certain analysts were aware of Philidor prior to the  alleged corrective disclosures. *See id.*

There is no doubt that Defendants would have relied on these arguments to attempt to blame investor losses on the actions of a rogue employee for which they could not be held accountable, or upon the disclosed business risks of their publicly disclosed non-traditional business model to either eliminate or substantially reduce recoverable damages, by, among other things, shortening the length of the Class

Period.  Ultimately, each side would rely on expert testimony to present their loss causation arguments and damages estimates to a jury at trial.  In the resulting "'battle of experts,' it is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found to have been caused by actionable, rather than the myriad nonactionable factors such as general market conditions.'"  *Schuler*, 2016 WL 3457218, at *7; *see also PAR Pharm.*, 2013 WL 3930091, at *6 (noting "the inherent unpredictability and risk associated with damage assessments in the securities fraud class-action context").

Prevailing upon these contested issues of liability and damages would subject the Class to considerable risk through class certification, summary judgment, trial, and the inevitable appeals.   The $1.21 billion Settlement is an outstanding result, providing an immediate recovery that eliminates the substantial expense, risk, and delay of advancing the Litigation through such a costly, lengthy, and uncertain battle. *See Schuler*, 2016 WL 3457218, at *7 (finding that the "uncertainty of success at trial and the certain, immediate benefit provided by the Settlement . . . weighs in favor of approval"); *In re Merck & Co., Inc. Vytorin ERISA Litig.*, No. 08-CV-285 (DMC), 2010 WL 547613, at *7 (D.N.J. Feb. 9, 2010) (Cavanaugh, J.) (observing that "there will necessarily be significant delay in recovery if this case is tried" and finding the "immediate recovery of more than $40 million" weighed in favor of final approval); *In re Ins. Brokerage Antitrust Litig.*, 282 F.R.D. 92, 103 (D.N.J. 2012) ("By reaching

- 27 -

a favorable Settlement with most of the remaining Defendants prior to the disposition of Defendants' renewed dismissal motions or even an eventual trial, Class Counsel have avoided significant expense and delay, and have also provided an immediate benefit to the Settlement Class.").

### 2.     Risks Relating to Valeant's Financial Condition

While some of the aforementioned risks to proving liability and damages are present in other securities fraud cases, this case was uncommonly risky due to the uncertainty surrounding Valeant's financial condition.  In fact, the financial recovery in this case is most remarkable when evaluated in the context of  Valeant's uncertain financial position, which relates directly to *Girsh* factor number seven.  *Girsh*, 521 F.2d at 157 (listing "the ability of the defendants to withstand a greater judgment" as a factor for final approval).

Valeant's market capitalization reached nearly $90 billion during the Class Period.  However, as the truth was revealed, Valeant's stock price dropped by 90% to around $20 per share by the time the Complaint was filed, and to less than $9 per share by April 2017, with analysts questioning Valeant's ongoing viability.  *See* Fee Brief, §II.E; Exs. I-K.  Accordingly, in addition to weighing the strengths and weaknesses of the arguments regarding liability and damages, Lead Counsel and its forensic accountants spent significant time analyzing Valeant's financial statements,

stock price, and analyst and media reports to assess Valeant's ability to pay. *See* Barz Decl., ¶¶11-12.

At the time the Settling Parties accepted Professor Green's mediator's proposal, Valeant had roughly $825 million of cash on hand and $23 billion in debt, its market capitalization was around $10 billion (and is now billions lower at the time of this filing), and it was, and still is, facing potential liability in more than 30 opt-out cases, a Canadian securities class action, a RICO class action, government investigations, and other pending litigation. *See* Bausch Health Companies Inc., Quarterly Report (Form 10-Q) at 1, 5, 29-38 (Nov. 4, 2019) (showing cash, debt, and pending litigation); *see also* Fee Brief, §§II.A,E (discussing Valeant's uncertain financial condition). Despite its limited resources and many other pending claims, the Settlement in this case is nearly 150% of Valeant's cash on hand, requiring Valeant to issue additional debt to fund the Settlement, which makes it a particularly exceptional result in light of the risks of ongoing litigation. As further objective support of this assessment, after the Settlement was publicly announced, analysts following Valeant noted that the amount was "much larger than Street expectations." *See* Fee Brief, §II.A (including a chart showing that the Settlement, as nearly 150% of cash, far exceeds settlements in other all-time best securities class action settlements); Ex. D (Company press release announcing issuance of debt to fund the Settlement).

This case is similar to *Lucent*, where Judge Pisano observed that a "dramatic and severe" decline in the company's financial condition supported finding that the $517 million settlement was "extraordinary" because it was "one of the largest recoveries ever in a securities class action." 307 F. Supp. 2d at 647. Here, Lead Plaintiff's ability to obtain a settlement that more than doubles the recovery in *Lucent*, which makes it the ninth-largest PSLRA settlement ever, despite the decline in Valeant's financial condition shows the Settlement is also "extraordinary."

### 3. The Settlement Falls Within the Range of Reasonableness

While not an enumerated factor of Rule 23(e)(2), the Settlement easily falls within "a range of reasonable settlements in light of the best possible recovery (the eighth *Girsh* factor) and . . . in light of all the attendant risks of litigation (the ninth factor)." *Merck/Vytorin*, 2010 WL 547613, at *9. In making a "range of reasonableness" assessment, courts do not need a precise estimate of damages. *See New Jersey Tax Sales*, 2016 WL 5844319, at *8 (granting final approval where "it is not possible to predict the precise value of damages that Plaintiffs would recover if successful").

Here, not only are securities fraud class actions complex and trials rare, making precise estimates of recoverable damages incredibly complex, but Valeant's financial condition makes such a comparison pointless. For example, Valeant's market capitalization declined by tens of billions of dollars from its Class Period high to its

current market capitalization of roughly $7 billion.  Valeant's cash on hand was far less than the Settlement Amount, and it has approximately $25 billion in outstanding debt.  While the entire market capitalization decline is not recoverable as damages under the securities laws, any recovery at trial that exceeded Valeant's ability to pay would be a hollow victory.

For comparison, a primary argument Defendants advanced was that the truth had been revealed by, and no further damages were incurred after, October 30, 2015 when there was extensive media regarding Valeant's business practices, government and regulatory subpoenas had been issued, and Valeant announced it was closing Philidor.  *See, e.g.*, ECF No. 167-1 at 62.  Accepting just that one argument, and assuming Lead Plaintiff defeated all of Defendants' other loss causation arguments, the $1.21 billion Settlement results in a recovery of approximately 11.5% of the preliminary estimated maximum damages.  *See* Barz Decl., ¶14.  This is a conservative estimate because it assumes Valeant could satisfy a judgment in excess of $10 billion, which is highly improbable in light of its financial condition and competing debts and claims as discussed herein.  Still, using this conservative estimate, the recovery here is many multiples of the 0.7% median percentage recovery of estimated losses in securities class actions where losses exceed $10 billion.  *See*

Ex. G (NERA Report) at p. 35, fig. 27.[5]  While Lead Plaintiff and Lead Counsel were confident in their ability to defeat Defendants' arguments, given Valeant's financial condition and ability to pay, it is uncertain that doing so would have resulted in a higher recovery.

Even without certainty as to the maximum judgment Valeant could withstand, which depends on unknowable events regarding its future financial performance between the Settlement and the time the case would be tried and appeals exhausted, the Court can easily find the Settlement falls within the range of reasonableness.  For example, in *Merck/Vytorin*, the court stated that neither party presented an estimate of the maximum possible recovery but observed that it "appears that recovery would prove substantial in light of the billions of dollars grossed from global sales."  2010 WL 547613, at *9.  Nevertheless, the court approved the settlement and held that "the potential costs of continued litigation along with potential recovery favors settlement, especially by way of comparison to settlement recovery in the amount of $41.5 million."  *See id.*; *see also Wong v. Accretive Health, Inc.*, 773 F.3d 859, 863 (7th Cir. 2014) (affirming settlement despite absence of any indication of maximum damages because damages quantification would have been contested and "resulted in

---

[5]    *See also New Jersey Tax Sales*, 2016 WL 5844319, at *9 (granting final approval to $9.6 million settlement recovering approximately 2.5% of estimated best possible recovery); *Schuler*, 2016 WL 3457218, at *8 (granting final approval to $4.2 million securities settlement recovering 4% of estimated damages).

- 32 -

a lengthy and expensive battle of the experts, with the costs of such a battle borne by the class – exactly the type of litigation the parties were hoping to avoid by settling").

Here, while the theoretical damages could exceed $10 billion, the costs and risks of ongoing litigation clearly favor the $1.21 billion Settlement, particularly since "the best possible recovery" was significantly reduced due to Valeant's limited ability to pay.  *See id.*; *Lucent*, 307 F. Supp. 2d at 648 (D.N.J. 2004) (noting that although losses were likely "billions of dollars," the "best possible recovery here depended entirely on Lucent's ability to pay" and approving settlement because it "represents 'a very substantial portion of the *likely* recovery in this case, and is unquestionably better than another 'possibility' – little or no recovery at all'").  The Settlement is an excellent result, representing nearly 1.5 times Valeant's reported cash balance and likely a significant percentage of the possible recovery given that the likelihood of Valeant paying 10 or 12 times its cash balance is highly improbable, particularly with more than $20 billion of outstanding debt. Thus, the  Settlement falls well within the "range of reasonableness" and meets the eighth and ninth *Girsh* factors.

### D.   The Settlement Satisfies the Remaining Rule 23(e)(2) Factors

The remaining factors of Rule 23(e)(2) advise courts to consider: (i) the effectiveness of the proposed method for distributing relief; (ii) the terms of the proposed attorneys' fees, including the timing of payment; (iii) the existence of any other "agreements"; and (iv) whether the settlement treats class members equitably

- 33 -

relative to each other.  Fed. R. Civ. P. 23(e)(2)(C)(ii)-(iv); Fed. R. Civ. P. 23(e)(2)(D).

These factors are also readily met.

### 1. The Proposed Method for Distributing Relief Is Effective

As discussed above in §III and in the Murray Declaration, the method of the

proposed notice and claims administration process is effective and provides Class

Members with the necessary information to receive their *pro rata* share of the

Settlement.  The Notice and claims processes are similar to that commonly used in

securities class action settlements and provide for straightforward cash payments

based on the trading information provided.  *See supra* §III; Murray Decl., Ex. A.

### 2. Attorneys' Fees Are Reasonable

As set forth in the accompanying Fee Brief, Lead Counsel's request for an

award of attorneys' fees was negotiated at the outset of the case by the Court-

appointed Lead Plaintiff, is at or below the percentage awarded in similar cases, was

fully disclosed in the Notice, and is reasonable and appropriate.  Since this is an all-

cash settlement and the entire Settlement Fund will be distributed to Class Members

until it is no longer economically feasible to do so, there is no risk that counsel will be

paid but Class Members will not.  *Cf. Eubank v. Pella Corp.*, 753 F.3d 718, 726-27

(7th Cir. 2014) (rejecting settlement where attorneys would receive fees based on

inflated settlement value, as defendants were likely to pay only a fraction of the

purported settlement value to the class).

- 34 -

### 3. The Parties Have No Other Agreements Besides an Agreement to Address Requests for Exclusion

The Settling Parties have entered into a supplemental agreement, identified in the Stipulation (¶¶2.17, 7.3), which provides that Valeant will have the option to terminate the Settlement in the event that valid requests for exclusion from the Class exceed the criteria set forth in the Supplemental Agreement.  This is standard practice for these cases and the Settling Parties have no other side agreement.

### 4. Class Members Are Treated Equitably and the Reaction of the Class Supports Final Approval

The Class Members are treated equitably under the terms of the Stipulation, which provides that each Class Member that properly submits a valid Proof of Claim and Release form will receive a *pro rata* share of the monetary relief based on the terms of the Plan of Allocation.  Importantly, the Stipulation does not release any claims against PwC, the only non-settling defendant, nor does it release any claim arising after the Class Period.

Related to this Rule 23(e)(2)(D) factor, a final *Girsh* factor considers the reaction of the class in connection with the final approval of a class action settlement. *See Girsh*, 521 F.2d at 157.  The reaction of the Class to the Settlement to date has been overwhelmingly positive, which supports the reasonableness of the Settlement and confirms that Class Members are treated equitably.  More specifically, while 431,576 Notice Packages have been mailed and the Summary Notice has been

published, only one objection to final approval of the Settlement and one objection to the fee have been received to date. *See* Murray Decl., ¶¶11-12. "The vast disparity between the number of potential class members who received notice of the Settlement and the number of objectors creates a strong presumption . . . in favor of the Settlement." *In re Cendant Corp. Litig.*, 264 F.3d 201, 235 (3d Cir. 2001); *see also Lucent*, 307 F. Supp. 2d at 643-44 (finding reaction of class favored final approval where court had received "about ten objections to the Settlement" and noting case where final approval was granted where "'only' 29 members of a class of 281 objected").

While one objection was received to the Settlement, it is based on a desire for a larger recovery that is divorced from an assessment of the risks of ongoing litigation and Valeant's current financial situation. And the single objection to the requested fee is based on a claim that lawyers should be paid three to five times their expenses, which has never been supported by any court for lawyers, and is certainly not a common method of compensating other professionals. *See* Fee Brief, §IV.B. These objections, and any others that are received before the May 6, 2020 deadline, will be addressed further in Lead Plaintiff's reply in support of final approval to be filed on May 20, 2020. *See* Preliminary Approval Order, ¶¶24, 27.

Thus, each factor identified under Rule 23(e)(2) and *Girsh* is satisfied. Moreover, the Third Circuit has held that there is a "presumption of fairness" for the

Settlement if certain of the factors are met, namely: "(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *See Warfarin*, 391 F.3d at 535.  Since, for the reasons discussed herein, each factor is met, this Settlement is entitled to a presumption of fairness and Lead Plaintiff and Lead Counsel respectfully submit that the Settlement is fair, reasonable, and adequate, and request that it be approved.

## V.   THE COURT SHOULD APPROVE THE PLAN OF ALLOCATION

The Notice contains the Plan of Allocation, detailing how the Settlement proceeds are to be divided among claiming Class Members.  *See* Murray Decl., Ex. A at 5-12.  "The '[a]pproval of a plan of allocation of a settlement fund in a class action is governed by the same standards of review applicable to approval of the settlement as a whole: the distribution plan must be fair, reasonable and adequate.'" *Merck/Vytorin*, 2010 WL 547613, at *6 (citing cases).  In determining whether a plan of allocation is fair, reasonable, and adequate, "courts give great weight to the opinion of qualified counsel." *In re Schering-Plough Corp. Enhance ERISA Litig*., No. 08-1432 (DMC)(JAD), 2012 WL 1964451, at *6 (D.N.J. May 31, 2012) (approving plan of allocation).  Indeed, "[a]s numerous courts have held, a plan of allocation need not be perfect" and "'need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel.'" *Christine Asia Co., Ltd.*

- 37 -

*v. Yun Ma*, No. 1:15-md-02631(CM)(SDA), 2019 WL 5257534, at *15 (S.D.N.Y. Oct. 16, 2019).

Here, the Plan of Allocation was drafted in consultation with Lead Counsel's damages expert to fairly distribute the available Settlement proceeds based on Lead Plaintiff's theory of damages and consistent with Lead Plaintiff's allegations.  *See* Barz Decl., ¶18.  The Plan of Allocation distributes the Net Settlement Fund on a *pro rata* basis, as determined by the ratio that the Authorized Claimant's Recognized Claim bears to the total Recognized Claims of all Authorized Claimants.  *See* Murray Decl., Ex. A at 12.  Calculation of a Recognized Claim will depend upon several factors, including when the securities were purchased, acquired, sold, or held.  *See id.* at 5-12.  This method of distributing settlement funds is fair, reasonable, and adequate, and has the support of Lead Counsel.  *See* Barz Decl., ¶¶17-22; *see also, e.g.*, *Par Pharm.*, 2013 WL 3930091, at *8 (approving plan of allocation in securities class action settlement that was developed "with the assistance of [lead plaintiff's] damages expert" and provides for distribution "on a *pro rata* basis based on a formula tied to liability and damages"); *Viropharma*, 2016 WL 312108, at *15 (approving similar plan of allocation).[6]

---

[6]   Purported class member, Timber Hill, attended the preliminary approval hearing and did not object to either the Settlement or the Plan of Allocation.  Ex. E. Thereafter, Timber Hill attempted to object to the Plan of Allocation.  ECF No. 517. That objection was premature but also without merit for the reasons set forth in Lead Plaintiff's response, which is incorporated herein.  ECF No. 522.  While Timber Hill

## VI.   CERTIFICATION OF THE CLASS REMAINS WARRANTED

In presenting its motion for preliminary approval, Lead Plaintiff requested that the Court preliminarily certify the Class for settlement purposes so that notice of the proposed Settlement, the final approval hearing, and the rights of Class Members to request exclusion, object, or submit Proofs of Claim and Release could be issued.  In its Preliminary Approval Order, the Court preliminarily certified the Litigation as a class action, for settlement purposes, on behalf "all Persons who purchased or otherwise acquired Valeant Securities between January 4, 2013 and March 15, 2016, inclusive." Preliminary Approval Order, ¶¶2, 4-5; *see also id.*, ¶¶2-3 (describing those excluded from the Class).  Nothing has changed since the Court issued its Preliminary Approval Order to alter the propriety of the Court's certification, and no potential Class Member has objected to class certification.[7]

Accordingly, and for each of the reasons set forth in Lead Plaintiff's motion for class certification and supporting declarations (Ex. H; ECF No. 474-3), the Court should finally certify, for settlement purposes, the Litigation on behalf of the Class and appoint Lead Plaintiff and named plaintiffs Tucson and IBEW as Class Representatives for the Class and Robbins Geller as Class Counsel.

---

has not objected to final approval, if Timber Hill does, Lead Plaintiff will respond in its reply.

[7]   To the extent Timber Hill objected to preliminary class certification, that objection was waived, is without merit, and has not been re-raised.  *See supra* n.6.

## VII.   CONCLUSION

For all the reasons stated above and in the accompanying declarations and Fee Brief, Lead Plaintiff respectfully requests that the Court grant its motion for final approval of both the Settlement and the Plan of Allocation.

DATED:  April 22, 2020                    Respectfully submitted,

                                          SEEGER WEISS LLP
                                          CHRISTOPHER A. SEEGER
                                          JENNIFER SCULLION


                                                s/ Christopher A. Seeger
                                          CHRISTOPHER A. SEEGER

                                          55 Challenger Road, 6th Floor
                                          Ridgefield Park, NJ  07660
                                          Telephone:  212/584-0700
                                          212/584-0799 (fax)
                                          cseeger@seegerweiss.com
                                          dbuchanan@seegerweiss.com

                                          Local Counsel

                                          ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                          DARREN J. ROBBINS
                                          THEODORE J. PINTAR
                                          655 West Broadway, Suite 1900
                                          San Diego, CA  92101
                                          Telephone:  619/231-1058
                                          619/231-7423 (fax)

- 40 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
JAMES E. BARZ
BRIAN E. COCHRAN
FRANK A. RICHTER
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  312/674-4674
312/674-4676 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
ROBERT J. ROBBINS
KATHLEEN B. DOUGLAS
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)

Lead Counsel for Plaintiffs

- 41 -