SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
JENNIFER SCULLION
55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
Telephone:  212/584-0700
212/584-0799 (fax)

Local Counsel

ROBBINS GELLER RUDMAN
  & DOWD LLP
JAMES E. BARZ
FRANK A. RICHTER
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  312/674-4674
312/674-4676 (fax)

Lead Counsel for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re VALEANT PHARMACEUTICALS INTERNATIONAL, INC. SECURITIES LITIGATION | ) ) ) |
| | ) |
| This Document Relates To: | ) ) ) |
| SECURITIES CLASS ACTION. | ) ) ) |

Master No. 3:15-cv-07658-MAS-LHG

<u>CLASS ACTION</u>

Judge Michael A. Shipp
Magistrate Judge Lois H. Goodman

Special Master Dennis M. Cavanaugh, U.S.D.J. (ret.)

MEMORANDUM IN SUPPORT OF MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES AND AWARDS TO PLAINTIFFS PURSUANT TO 15 U.S.C. §78U-4(A)(4)

4814-4680-2362.v2

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...........................................................................1

II. ATTORNEYS' FEES SHOULD BE AWARDED BASED ON A PERCENTAGE OF THE COMMON FUND...............................................4

    A. Lead Counsel Are Entitled to a Fee From the Common Fund .............5

    B. The Court Should Award Attorneys' Fees Using the Percentage Approach ...........................................................................5

III. THE NEGOTIATED FEE IS PRESUMPTIVELY REASONABLE.............7

IV. THE REQUESTED FEE IS FAIR AND REASONABLE UNDER THE *GUNTER* FACTORS ...........................................................10

    A. The Size of the Common Fund Created and the Number of Persons Benefited by the Settlement..................................................11

    B. Reaction of Class Members to the Fee Request.................................14

    C. The Skill and Efficiency of Lead Counsel .........................................15

    D. The Complexity and Duration of the Litigation.................................17

    E. The Risk of Non-Payment.................................................................19

    F. The Significant Time Devoted to This Case by Lead Counsel...........25

    G. The Range of Fees Typically Awarded...............................................26

V. THE REQUESTED FEE IS REASONABLE UNDER A LODESTAR CROSS-CHECK.....................................................................29

VI. LEAD COUNSEL'S REASONABLY INCURRED LITIGATION EXPENSES SHOULD BE APPROVED......................................................33

VII. PLAINTIFF AWARDS PURSUANT TO 15 U.S.C. §78u-4(a)(4)..............35

VIII. CONCLUSION.........................................................................38

- i -

# TABLE OF AUTHORITIES

**Page**

## CASES

*Abrams v. Lightolier, Inc.*,
50 F.3d 1204 (3d Cir. 1995) ...............................................................33

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
572 F.3d 221 (5th Cir. 2009) ..............................................................20

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
No. 03-1519 (AET), 2013 WL 12153597
(D.N.J. Jan. 30, 2013) ........................................................................27

*Allapattah Servs., Inc. v. Exxon Corp.*,
454 F. Supp. 2d 1185 (S.D. Fla. 2006) ...............................................28

*Bodnar v. Bank of Am., N.A.*,
No. 14-3224, 2016 WL 4582084
(E.D. Pa. Aug. 4, 2016) ......................................................................31

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980) ..............................................................................5

*Carlson v. Xerox Corp.*,
596 F. Supp. 2d 400 (D. Conn. 2009),
*aff'd*, 355 F. App'x 523 (2d Cir. 2009) ..............................................27

*Christine Asia Co., Ltd. v. Yun Ma*,
No. 1:15-md-02631(CM)(SDA), 2019 WL 5257534
(S.D.N.Y. Oct. 16, 2019) ....................................................................26

*Ciuffitelli v. Deloitte & Touche LLP*,
No. 3:16-cv-00580-AC, 2019 WL 6893018
(D. Or. Nov. 26, 2019) ........................................................................26

*Dartell v. Tibet Pharm., Inc.*,
No. 14-3620 (JMV), 2017 WL 2815073
(D.N.J. June 29, 2017) ...................................................................7, 11

4814-4680-2362.v2

**Page**

*Demaria v. Horizon Healthcare Servs.*,
   No. 2:11-cv-07298 (WJM), 2016 WL 6089713
   (D.N.J. Oct. 18, 2016)..................................................................................31

*Girsh v. Jepson*,
   521 F.2d 153 (3d Cir. 1975) ...................................................................4

*Goldberger v. Integrated Res., Inc.*,
   209 F.3d 43 (2d Cir. 2000) ....................................................................29

*Gunter v. Ridgewood Energy Corp.*,
   223 F.3d 190 (3d Cir. 2000) ..............................................10, 14, 15, 28

*Hensley v. Eckerhart*,
   461 U.S. 424 (1983)...............................................................................11

*Hubbard v. BankAtlantic Bancorp, Inc.*,
   688 F.3d 713 (11th Cir. 2012) ...............................................................22

*In re AremisSoft Corp. Sec. Litig.*,
   210 F.R.D. 109 (D.N.J. 2002)..........................................................17, 27

*In re AT&T Corp.*,
   455 F.3d 160 (3d Cir. 2006) ..................................................................29

*In re AT&T Corp. Sec. Litig.*,
   No. 00-5364 (GEB), 2005 WL 6716404
   (D.N.J. Apr. 25, 2005),
   *aff'd*, 455 F.3d 160 (3d Cir. 2006)........................................................16

*In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*,
   792 F. Supp. 2d 1028 (N.D. Ill. 2011)..................................................27

*In re Bank of Am. Corp. Sec., Derivative, and ERISA Litig.*,
   No. 09 MDL 2058, 2013 WL 12091355
   (S.D.N.Y. Apr. 8, 2013).........................................................................37

- iii -

**Page**

*In re Bristol-Myers Squibb Sec. Litig.*,
   No. 06-2964, 2007 WL 2153284
   (3d Cir. July 27, 2007) .......................................................................27

*In re Cardinal Health Inc. Sec. Litig.*,
   528 F. Supp. 2d 752 (S.D. Ohio 2007) ..............................................27

*In re Cendant Corp. Litig.*,
   264 F.3d 201 (3d Cir. 2001) ...............................................6, 7, 8, 14

*In re Cendant Corp. Sec. Litig.*,
   404 F.3d 173 (3d Cir. 2005) .................................................................7

*In re Credit Default Swaps Antitrust Litig.*,
   No. 13md2476 (DLC), 2016 WL 2731524
   (S.D.N.Y. Apr. 26, 2016).........................................................9, 28, 31

*In re Daimlerchrysler AG Sec. Litig.*,
   No. 00-993, 2004 U.S. Dist. LEXIS 31774
   (D. Del. Jan. 28, 2004) .......................................................................31

*In re Dairy Farmers of Am., Inc.*,
   80 F. Supp. 3d 838 (N.D. Ill. 2015) .....................................................8

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
   No. 1:17-md-2800-TWT, 2020 WL 256132
   (N.D. Ga. Mar. 17, 2020).............................................................29, 32

*In re Global Crossing Sec. & ERISA Litig.*,
   225 F.R.D. 436 (S.D.N.Y. 2004) ..........................................................9

*In re Ikon Office Sols., Inc., Sec. Litig.*,
   194 F.R.D. 166 (E.D. Pa. 2000).....................................20, 22, 27, 29

*In re Initial Pub. Offering Sec. Litig.*,
   671 F. Supp. 2d 467 (S.D.N.Y. 2009) .................................................27

4814-4680-2362.v2

**Page**

*In re Ins. Brokerage Antitrust Litig.*,
  579 F.3d 241 (3d Cir. 2009) ............................................................................5, 6

*In re JDS Uniphase Corp. Sec. Litig.*,
  No. C-02-1486 CW(EDL), 2007 WL 4788556
  (N.D. Cal. Nov. 27, 2007) ...............................................................22

*In re Lucent Techs., Inc., Sec. Litig.*,
  307 F. Supp. 2d 633 (D.N.J. 2004).....................................................12

*In re Lucent Techs., Inc., Sec. Litig.*,
  327 F. Supp. 2d 426 (D.N.J. 2004)...............................................*passim*

*In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*,
  No. 05-1151 (SRC)(CLW), 2016 WL 11575090
  (D.N.J. June 28, 2016) .....................................................24, 26, 34, 37

*In re Merck & Co., Inc. Vytorin ERISA Litig.*,
  No. 08-CV-285 (DMC), 2010 WL 547613
  (D.N.J. 2010).................................................................................28

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
  187 F.R.D. 465 (S.D.N.Y. 1998) .......................................................27

*In re New Jersey Tax Sales Certificates Antitrust Litig.*,
  No. 12-1893 (MAS)(TJB), 2016 WL 5844319
  (D.N.J. Oct. 3, 2016).................................................................10, 13

*In re Oracle Corp. Sec. Litig.*,
  No. C 01-00988 SI, 2009 WL 1709050
  (N.D. Cal. June 19, 2009),
  *aff'd*, 627 F.3d 376 (9th Cir. 2010)...................................................21

*In re Rite Aid Corp. Sec. Litig.*,
  146 F. Supp. 2d 706 (E.D. Pa. 2001)................................................31

*In re Rite Aid Corp. Sec. Litig.*,
  362 F. Supp. 2d 587 (E.D. Pa. 2005)................................................31

- v -

**Page**

*In re Rite Aid Corp. Sec. Litig.*,
   396 F. 3d 294 (3d Cir. 2005) ......................................................................30, 32

*In re Schering-Plough Corp. Enhance ERISA Litig.*,
   No. 08-1432 (DMC)(JAD), 2012 WL 1964451
   (D.N.J. May 31, 2012) ...................................................................24, 26, 29, 33

*In re Schering-Plough Corp. Enhance Sec. Litig.*,
   No. 08-379 (DMC) (JAD), 2013 WL 5505744
   (D.N.J. Oct. 1, 2013).....................................................................14, 26, 35, 37

*In re Schering-Plough Corp. Sec. Litig.*,
   No. 01-CV-0829 (KSH/MF), 2009 WL 5218066
   (D.N.J. Dec. 31, 2009) ........................................................................................27

*In re Syngenta AG MIR 162 Corn Litig.*,
   357 F. Supp. 3d 1094 (D. Kan. 2018)................................................................26

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   No. M 07-1827 SI, 2013 WL 1365900
   (N.D. Cal. Apr. 3, 2013) .....................................................................................27

*In re Tyco Int'l, Ltd. Multidistrict Litig.*,
   535 F. Supp. 2d 249 (D.N.H. 2007)...................................................................28

*In re Veritas Software Corp. Sec. Litig.*,
   396 F. App'x 815 (3d Cir. 2010) ......................................................................30

*In re Viropharma Inc. Sec. Litig.*,
   No. 12-2714, 2016 WL 312108
   (E.D. Pa. Jan. 25, 2016) .............................................................................*passim*

*In re WorldCom, Inc. Sec. Litig.*,
   388 F. Supp. 2d 319 (S.D.N.Y. 2005) ...............................................................32

*In re Xcel Energy, Inc. Sec., Derivative & ERISA Litig.*,
   364 F. Supp. 2d 980 (D. Minn. 2005)................................................................21

**Page**

*King Drug Co. of Florence, Inc. v. Cephalon, Inc.*,
No. 2:06-cv-01797-MSG, 2015 WL 12843830
(E.D. Pa. Oct. 15, 2015).......................................................................26

*Kornell v. Haverhill Ret. Sys.*,
790 F. App'x 296 (2d Cir. 2019) ........................................................28

*Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*,
No. 02-C-5893, 2016 WL 10571774
(N.D. Ill. Nov. 10, 2016).....................................................................26

*Moore v. GMAC Mortgage*,
No. 07-4296, 2014 WL 12538188
(E.D. Pa. Sept. 19, 2014) ....................................................................29

*Schuler v. Medicines Co.*,
No. 14-1149 (CCC), 2016 WL 3457218
(D.N.J. June 24, 2016) ........................................................30, 31, 35, 37

*Shaw v. Toshiba Am. Info. Sys., Inc.*,
91 F. Supp. 2d 942 (E.D. Tex. 2000)...................................................27

*Silverman v. Motorola Solutions, Inc.*,
739 F.3d 956 (7th Cir. 2013) ..............................................................30

*Stevens v. SEI Investments Co.*,
No. 18-4205, 2020 WL 996418
(E.D. Pa. Feb. 28, 2020) ................................................................30, 33

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*,
552 U.S. 148 (2008).............................................................................23

*Will v. Gen. Dynamics Corp.*,
No. 06-698-GPM, 2010 WL 4818174
(S.D. Ill. Nov. 22, 2010) .....................................................................29

4814-4680-2362.v2

**Page**

*Yedlowski v. Roka Bioscience, Inc.*,
    No. 14-CV-8020-FLW-TJB, 2016 WL 6661336
    (D.N.J. Nov. 10, 2016)..........................................................................................34

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
    §78j(b) ..............................................................................................................18
    §78u-4 ........................................................................................................*passim*
    §78u-4(a)(4) ..............................................................................................*passim*
    §78u-4(a)(6) ......................................................................................................7
    §77z-1(a)(4) ....................................................................................................35

## SECONDARY AUTHORITIES

Report of the Third Circuit Task Force,
    *Court Awarded Attorney Fees*,
    108 F.R.D. 237, 242 (Oct. 8, 1985) ....................................................................6

4814-4680-2362.v2

## I.  INTRODUCTION

In awarding fees, courts consider several factors, the most important of which is the quality of work as reflected in the result obtained.  Here, the $1,210,000,000.00 all-cash recovery is an outstanding result and the ninth largest securities class action recovery ever.  This result is particularly remarkable given the risks Lead Counsel faced at the outset of the Litigation.[1]  Valeant had limited available directors and officers insurance that was not only wasting due to the numerous defense firms retained but was also the subject of litigation between Valeant and its insurers.  The bigger risk, and most challenging hurdle to a fair recovery, was Valeant's uncertain financial condition.  Rather than take a less risky path and negotiate a settlement within Valeant's reported cash balance, Lead Counsel pursued a highly-favorable recovery that exceeded Valeant's cash balance by nearly 50%, or hundreds of millions of dollars, and, in fact, required Valeant to issue debt to fund the Settlement.  The terms of the Settlement evidence Lead Counsel's significant experience in handling these cases and the quality of its work in this particular case.

---

[1]     Unless otherwise stated, capitalized terms used herein have the same meanings as provided in the Stipulation of Settlement attached as Exhibit A to the Declaration of Christopher A. Seeger in Support of Motions for (1) Final Approval of Class Action Settlement and Plan of Allocation; and (2) Award of Attorneys' Fees and Expenses and Awards to Plaintiffs Pursuant to 15 U.S.C. §78u-4(a)(4) ("Seeger Declaration"), submitted herewith.  Citations to "Ex. __" refer to exhibits to the Seeger Declaration. All citations and internal quotation marks are omitted and emphasis is added, unless otherwise indicated.

Lead Counsel obtained this result through its skill, experience, and effective advocacy in the face of the considerable risk of non-payment and also an aggressive defense by several of the largest and most sought-after defense firms in the country. Lead Counsel advanced costs and devoted dozens of lawyers and staff to this case for over four years, without pay, and its work is not done as the litigation continues against a non-settling defendant. Lead Counsel undertook significant risk in diverting so many resources to such a large case, where it could not know at the start how long the Litigation would last or whether there would be any recovery at all, particularly since analysts had been speculating that Valeant was on the verge of bankruptcy.

The Settlement was reached only after Lead Counsel achieved several notable litigation successes, such as overcoming Defendants' seven motions to dismiss, including a motion directed at dismissing the Valeant directors, whose liability is rarely pursued, much less upheld, on securities *fraud* claims. In addition, Lead Counsel succeeded in amending the complaint to add insider trading claims against a former board member and his hedge fund, defeating their motion to dismiss involving novel legal arguments regarding standing. Lead Counsel briefed and prevailed on a motion to reconsider, a motion for interlocutory appeal, and discovery matters. In addition, Lead Counsel reviewed and produced over 1.5 million pages of documents from Plaintiffs and obtained and analyzed nearly 11.5 million pages of documents from over 20 Defendants and approximately 150 third parties. Lead Counsel retained

five experts and put forth a compelling factual and legal analysis that was presented over two mediations and ultimately convinced Defendants to settle this securities class action for the highest amount ever against a pharmaceutical manufacturer.

As compensation for its efforts, Lead Counsel respectfully requests an award of attorneys' fees equal to 13% of the Settlement Amount and payment of litigation expenses of $1,673,016.13, plus the interest earned thereon at the same rate and for the same period of time as that earned on the Settlement Fund. The fee was negotiated by Court-appointed Lead Plaintiff TIAA, an institutional investor, at the outset of the Litigation, before the outcome was known and while the risks and uncertainty were substantial. The fee is therefore entitled to a presumption of reasonableness. The claims could have been settled at a far lesser amount and earlier in the Litigation, but Lead Counsel continued to incur risk and expense by litigating to a more favorable resolution on an entirely contingent basis, even as the Company's financial condition was deteriorating. In light of Lead Counsel's well-known reputation to try cases if required and its effective advocacy in this particular case, Defendants agreed to settle for such an extraordinary sum prior to exhausting all of their legal challenges through trial and appeal, which saves judicial resources and achieves the Class Members' goal of recovering money sooner, rather than later.

If all aspects of the Settlement and fee request are approved, the recovery for the Class will be ranked in the top ten of all time for securities class actions, while the

4814-4680-2362.v2

negotiated fee of 13% is well below the 25%-33% range commonly awarded in securities class actions. *See In re Viropharma Inc. Sec. Litig.*, No. 12-2714, 2016 WL 312108, at *17 (E.D. Pa. Jan. 25, 2016) (noting that "'awards of thirty percent are not uncommon in securities class actions'"). And, as discussed below, it is also below fee awards generally in large class action settlements. Thus, the fee award is fair and reasonable, and should be approved.

In addition, Plaintiffs seek awards of $66,495, $3,275, and $3,002.75 pursuant to 15 U.S.C. §78u-4(a)(4) in connection with their representation of the Class. Plaintiffs support their applications with declarations setting forth the basis for the awards and respectfully request that the Court approve the requested awards.

## II.  ATTORNEYS' FEES SHOULD BE AWARDED BASED ON A PERCENTAGE OF THE COMMON FUND

Fee awards should be designed to incentivize counsel to obtain the best possible *net* result for the Class. The fee structure negotiated by Lead Plaintiff in this case was designed to do exactly that, and it worked. The Settlement represents the ninth largest securities class action settlement of all time. *See* Ex. B (ISS Report) at 5. As shown below, virtually all of the eight larger securities class action settlements were paid by entities far more financially stable than Valeant, whose stock price declined by 96% to as low as $8.50 per share, making the present recovery that much more extraordinary. *See Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975) (stating courts are to consider "'the ability of the defendants to withstand a greater judgment'" when evaluating the

- 4 -

sufficiency of a settlement).  The fee requested in this case is fair and reasonable in light of the excellent recovery and in light of the significant obstacles and risks Lead Counsel faced in bringing and prosecuting this case.

### A.     Lead Counsel Are Entitled to a Fee From the Common Fund

It is well-settled that an attorney "who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *see also, e.g.*, *Viropharma*, 2016 WL 312108, at *15 (same).  "'[T]he percentage-of-recovery method is used in common fund cases on the theory that class members would be unjustly enriched if they did not adequately compensate counsel responsible for generating the fund.'"  *In re Lucent Techs., Inc., Sec. Litig.*, 327 F. Supp. 2d 426, 431 (D.N.J. 2004).  The ultimate determination of the proper amount of attorneys' fees rests within the sound discretion of the district court based on the specifics of the case.  *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 280 (3d Cir. 2009).

### B.     The Court Should Award Attorneys' Fees Using the Percentage Approach

The Supreme Court has recognized that it is appropriate to award counsel a reasonable percentage of the common fund as a fee.  *See, e.g.*, *Boeing*, 444 U.S. at 478-79.  Led by former District of New Jersey and Third Circuit Judge Sarokin, the Third Circuit Task Force concluded an exhaustive review of attorneys' fees and

determined that fees had historically been awarded as a percentage of the common fund. *See* Report of the Third Circuit Task Force, *Court Awarded Attorney Fees*, 108 F.R.D. 237, 242 (Oct. 8, 1985). In *Cendant*, the Third Circuit likewise recognized that "counsel fees in securities litigation have generally been fixed on a percentage basis rather than by the so-called lodestar method." *In re Cendant Corp. Litig.*, 264 F.3d 201, 220 (3d Cir. 2001) ("*Cendant I*"); *see also Brokerage Antitrust*, 579 F.3d 241 at 280 (noting that "'[t]he percentage-of-recovery method is generally favored in common fund cases'").

The percentage method aligns counsel's interests with the Class, which is only interested in obtaining the largest recovery as soon as possible. While the lodestar method is sometimes favored in fee-shifting cases, in class actions the lodestar method has been criticized for incentivizing and rewarding billing a lot of hours and drawing out litigation, while at the same time failing to incentivize lawyers to seek the biggest recovery possible because they will only get paid their lodestar. For example, the Third Circuit has noted that the lodestar method can have the perverse incentive of causing lawyers to "work excessive hours" and "decline beneficial settlement offers that are made early in litigation." *Cendant I*, 264 F.3d at 256. And, judges of this Court recognize that "[t]he percentage-of-recovery method is preferred in common fund cases because it 'rewards counsel for success and penalizes it for failure.'"

- 6 -

*Dartell v. Tibet Pharm., Inc.*, No. 14-3620 (JMV), 2017 WL 2815073, at *8 (D.N.J. June 29, 2017) (citing cases).

Consistent with Supreme Court and Third Circuit law on fees in common fund cases, the Private Securities Litigation Reform Act of 1995 ("PSLRA") also expressly provides that "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a *reasonable percentage* of the amount of any damages and prejudgment interest actually paid to the class." 15 U.S.C. §78u-4(a)(6). Courts therefore recognize that "the PSLRA has made percentage-of-recovery the standard for determining whether attorneys' fees are reasonable." *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 188 n.7 (3d Cir. 2005) ("*Cendant II*").

## III.   THE NEGOTIATED FEE IS PRESUMPTIVELY REASONABLE

Unlike consumer or other class actions, the lead plaintiff in a securities class action is appointed pursuant to a statutory mandate that was enacted specifically to encourage sophisticated institutional investors to seek a leadership role where they could actively direct securities class actions and effectively monitor counsel. *See Cendant I*, 264 F.3d at 220, 282 (noting that the PSLRA lead plaintiff selection process "is far different" from other class actions and "designed to infuse lead plaintiffs with the responsibility (and motivation) to drive a hard bargain with prospective lead counsel"). "[U]nder the PSLRA, courts should accord a presumption of reasonableness to any fee request submitted pursuant to a retainer agreement that

- 7 -

was entered into between a properly-selected lead plaintiff and a properly-selected lead counsel." *Id.* at 282; *see also Viropharma*, 2016 WL 312108, at *15. Not only is a negotiated fee entitled to a presumption of reasonableness but that presumption is even stronger when, as here, the fee was negotiated *ex ante*. *See generally In re Dairy Farmers of Am., Inc.*, 80 F. Supp. 3d 838, 844 (N.D. Ill. 2015) (noting it is preferable for parties "to establish a fee structure at the outset of a lawsuit," which better reflects "the prevailing market rate between willing buyers and willing sellers of legal services").

Lead Plaintiff TIAA is one of the largest institutional investors in the world, with $1 trillion of assets under management and a large in-house legal department. *See* Declaration of Laurie A. Gomez on Behalf of Lead Plaintiff TIAA ("TIAA Decl."), submitted herewith; *see also* TIAA, *Q4 2019 Facts and Stats*, https://www.tiaa.org/public/pdf/facts_and_stats.pdf. In addition, TIAA has now helmed two of the 15 largest securities class action settlements in history. *See also In re Am. Realty Capital Props., Inc. Litig.*, No. 1:15-MC-00040, ECF No. 1308 (S.D.N.Y. Jan. 22, 2020) (approving $1.050 billion settlement). TIAA's substantial financial interest in the Litigation makes clear that it had significant incentive to negotiate a fair, but reasonable, fee that aligned the incentives of Lead Counsel and the Class and was designed to maximize the net recovery to the Class. *See* TIAA Decl., ¶4. TIAA

negotiated a fee schedule at the outset of the case that was structured to incentive counsel to maximize the net recovery to the Class:

| Recovery Amount | Attorneys' Fees |
|---|---|
| $0-$30 million | 0% |
| $30-$75 million | 7.5% |
| $75-$125 million | 10% |
| $125-$250 million | 12% |
| $250-$750 million | 13.5% |
| Amounts above $750 million | 15% |

*See id.*, ¶5.  Further illustrating its vigorous advocacy, TIAA also negotiated an overall cap of 13% on fees.  *See id.*  Applying the fee schedule to the Settlement in this case results in a 13% fee that is constrained by the overall cap.

Thus, the 13% fee, negotiated *ex ante* by Lead Plaintiff TIAA and approved by all Plaintiffs,[2] is entitled to a rebuttable presumption of reasonableness.  *See, e.g.*, *In re Credit Default Swaps Antitrust Litig.*, No. 13md2476 (DLC), 2016 WL 2731524, at *16-*17 (S.D.N.Y. Apr. 26, 2016) (approving 13.6% fee on $1.86 billion settlement and applying a "presumption of correctness" to the *ex ante* fee agreement negotiated by sophisticated lead plaintiff with a "very substantial" stake in the litigation and "strong incentive to negotiate the retainer agreement with care"); *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 466 (S.D.N.Y. 2004) (approving

---

[2]     The two additional named plaintiffs in this action, which are also sophisticated institutional investors, support the 13% fee request.  *See* Declaration of Roy Arthur Cuaron on Behalf of Named Plaintiff City of Tucson with and on Behalf of the Tucson Supplemental Retirement System ("Tucson Decl."), ¶8; Declaration of David Ray on Behalf of Named Plaintiff IBEW Local Union 481 Defined Contribution Plan and Trust ("IBEW Decl."), ¶7, submitted herewith.

reasonableness of 16%-19% fee negotiated by sophisticated lead plaintiff *ex ante* "when each party operated behind a veil of ignorance regarding how the case would ultimately fare"); *Lucent*, 327 F. Supp. 2d at 433 (finding 17% fee negotiated by lead plaintiffs "properly appointed under the terms of the PSLRA" was "presumptively reasonable").

## IV.   THE REQUESTED FEE IS FAIR AND REASONABLE UNDER THE *GUNTER* FACTORS

The Third Circuit gives a "great deal of deference to a district court's decision to set fees." *See, e.g.*, *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 (3d Cir. 2000). As guidance, there are several factors courts may consider in exercising that broad discretion, including: (A) the size of the fund created and the number of persons benefited; (B) the presence or absence of substantial objections by members of the class to the settlement terms and/or the fees requested by counsel; (C) the skill and efficiency of the attorneys involved; (D) the complexity and duration of the litigation; (E) the risk of non-payment; (F) the amount of time devoted to the case by plaintiffs' counsel; and (G) awards in similar cases. *Id.* at 195 n.1; *accord In re New Jersey Tax Sales Certificates Antitrust Litig.*, No. 12-1893 (MAS)(TJB), 2016 WL 5844319, at *10 (D.N.J. Oct. 3, 2016) (Shipp, J.). These factors "need not be applied in a formulaic way . . . and in certain cases, one factor may outweigh the rest." *Gunter*, 223 F.3d at 195 n.1. Here, each factor supports the 13% fee award.

### A.    The Size of the Common Fund Created and the Number of Persons Benefited by the Settlement

Clients are better off paying a reasonable fee for a great result than a low fee for a poor result.  Thus, courts acknowledge that in awarding fees, the "most critical factor is the degree of success obtained." *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983); *Viropharma*, 2016 WL 312108, at *16 (same).  In assessing this factor, courts "'consider the fee request in comparison to the size of the fund created and the number of class members to be benefitted.'"  *Dartell*, 2017 WL 2815073, at *9.

Here, the $1.21 billion recovery is an outstanding result that provides an immediate cash recovery to a large Class of investors.  Not only is it the largest securities class action settlement in this Court in 20 years, compared to the 312 securities class action settlements in 2019, this Settlement exceeds the largest by more than 300% and exceeds the largest six settlements – combined:



Largest Securities Class Action Settlements in 2019 ($ millions)

- 11 -

*See* Ex. L (Nera Economic Consulting, Recent Trends in Securities Class Action Litigation: 2019 Full-Year Review (Jan. 21, 2020)) at 16.

The result is more extraordinary when viewed in light of the risks posed by continued litigation and Valeant's financial condition as discussed herein. *See In re Lucent Techs., Inc., Sec. Litig.*, 307 F. Supp. 2d 633, 647 (D.N.J. 2004) (approving $517 million settlement as "extraordinary" where company "was slowly degenerating" and the settlement was "one of the largest recoveries ever in a securities class action"). In addition, the Settlement *far* exceeds many other top securities settlements as a percentage of the defendant corporation's reported cash balance:



*See* Ex. B at 5-6; Ex. L at 17.[3]

The highly-favorable nature of the result is confirmed by the reaction of financial analysts who provide an objective, third party assessment.  For example, when the Settlement was announced, analysts from Wells Fargo reported that "the settlement amount is much larger than Street expectations."  *See* Ex. M.  Analysts from Guggenheim Securities likewise recognized that the "settlement is larger than we anticipated."  *See* Ex. N.  And media discussing Valeant's credit ratings reported that the Settlement was "larger than expected."  *See* Ex. O.

In addition to being a large recovery, the "number of class members to be benefitted" is large, since the Class includes all Persons who purchased or otherwise acquired Valeant Securities in the three years between January 4, 2013 and March 15, 2016, inclusive.  Likely thousands of investors from across the country who bought stocks or bonds, or traded in options, will benefit from the Settlement.  *See generally* ECF No. 474-4, ¶¶50-51, 187; *see also infra* §IV.B (describing Notice sent to thousands of potential Class Members); *New Jersey Tax Sales*, 2016 WL 5844319, at

---

[3]      *See also* Bausch Health Companies Inc., Quarterly Report (Form 10-Q) at 1 (Nov. 4, 2019) ("Valeant 3Q19 Form 10-Q") (showing $825 million in cash); Tyco International Ltd., Quarterly Report (Form 10-Q) at 2 (May 8, 2007) (showing $4.1 billion in cash); Time Warner Inc., Quarterly Report (Form 10-Q) at 44 (Aug. 3, 2005) (showing $7.6 billion in cash); Petroleo Brasielo S.A. – Petrobras, Annual Report (Form 10-K) at 13 (April 18, 2018) (showing $22.5 billion in cash); Merck & Co., Inc., Annual Report (10-K) at 76 (Feb. 26, 2016) (showing $8.5 billion in cash); Bank of America Corporation, Quarterly Report (Form 10-Q) at 156 (Nov. 2, 2013) (showing $106.4 billion in cash); HSBC Holdings, PLC, Earnings Release (1Q16) at 15 (May 3, 2016) (showing $126 billion in cash).

*11 (finding that settlement of $10 million for the benefit of thousands of class members justified 30% fee). Thus, the first *Gunter* factor clearly weighs in favor of approving the negotiated fee.

### B.      Reaction of Class Members to the Fee Request

Notice of this Settlement and Lead Counsel's fee request was provided to over 430,000 potential Class Members.  *See* Declaration of Ross D. Murray Regarding Notice Dissemination, Publication, and Requests for Exclusion Received to Date ("Murray Decl."), ¶11, submitted herewith.  To date, counsel has not received a single objection from any institutional investor.  Counsel has received only one objection to the fee from an individual investor, who suggests that the fee should be limited to three to five times the *expenses* of litigation (roughly $4.5 million to $7.5 million in this case), which is something no court has ever endorsed as a proper method for calculating fees.  *See* ECF No. 525.[4]  Thus, the reaction of the Class also weighs in favor of approval of the fee.  *See, e.g.*, *Cendant I*, 264 F.3d at 235 (stating that "[t]he vast disparity between the number of potential class members who received notice of the Settlement and the number of objectors creates a strong presumption that this factor weighs in favor of the Settlement"); *In re Schering-Plough Corp. Enhance Sec. Litig.*, No. 08-379 (DMC) (JAD), 2013 WL 5505744, at *40 (D.N.J. Oct. 1, 2013)

---

[4]      Objections are due May 6, 2020.  *See* ECF No. 510, ¶24.  Lead Counsel will respond more fully to this objection and any others in its reply brief.

("*Schering-Plough II*") (overruling objection to 28% fee on $215 million settlement and noting lack of significant number of objections).

### C.     The Skill and Efficiency of Lead Counsel

The third *Gunter* factor – the skill and efficiency of the attorneys involved – is measured by the "'quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel.'" *Viropharma*, 2016 WL 312108, at *16.

The fact that the large recovery here significantly exceeded available cash and required Valeant to issue debt and structure the payments over time is proof of Lead Counsel's tenacity and skill.  *See supra* §II.A; Stipulation, ¶2.2 (structuring payments); Ex. D (Company press release stating that $1.25 billion notes offering would be used to finance the Settlement).  Moreover, the fact that Defendants settled for such a large amount before exhausting all legal challenges through summary judgment, trial, or appeal, is likewise proof of Lead Counsel's effective advocacy and efficiency.  *See infra* §IV.D; *see also* Memorandum in Support of Motion for Final Approval of Class Action Settlement and Plan of Allocation ("Final Approval Brief"), §IV.C.

Lead Counsel has one of the strongest track records in successfully prosecuting securities class actions and that reputation was undoubtedly considered by Defendants

in forgoing further legal challenges and agreeing to settle the case for $1.21 billion. *See In re AT&T Corp. Sec. Litig.*, No. 00-5364 (GEB), 2005 WL 6716404, at *9 (D.N.J. Apr. 25, 2005) (stating that Robbins Geller is comprised of "highly skilled attorneys with great experience in prosecuting complex securities action[s], and their professionalism and diligence displayed during [this] litigation substantiates this characterization"), *aff'd*, 455 F.3d 160 (3d Cir. 2006); *see also* Declaration of Robert J. Robbins Filed on Behalf of Robbins Geller Rudman & Dowd LLP in Support of Application for Award of Attorneys' Fees and Expenses ("Robbins Geller Decl."), Ex. G (Firm Resume). Lead Counsel is one of very few plaintiff securities class action firms with a demonstrated willingness to take PSLRA cases to trial if required to achieve the best possible result. *See, e.g.*, *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc., et al.*, No. 1:02-cv-05893 (N.D. Ill.) (Robbins Geller obtaining $1.575 billion settlement after 14 years of litigation and prevailing at jury trial); *HsingChing Hsu v. Puma Biotechnology*, *Inc.*, No. 8:15-cv-00865 (C.D. Cal.) (Robbins Geller securing 2019 jury verdict in securities fraud class action).

Simply put, no Defendant would agree to pay $1.21 billion after retaining some of the most highly-regarded defense firms unless the course of litigation and mediation presentations demonstrated Lead Counsel's tireless effort to master the legal and factual arguments in the case and its ability to field a team of lawyers that posed a substantial and credible trial threat. *See* accompanying Declaration of

James E. Barz in Support of Motions for (1) Final Approval of Class Action Settlement and Plan of Allocation; and (2) an Award of Attorneys' Fees and Expenses and Awards to Plaintiffs Pursuant to 15 U.S.C. §78u-4(a)(4) ("Barz Decl."), ¶¶30-36; Final Approval Brief, §§IV.A-C.   In short, the result is the best indicator of the experience and ability of the attorneys involved and this factor also supports the fee requested.   *See Lucent*, 327 F. Supp. 2d at 437 (approving fee request where "the result itself evidences counsel's skill and efficiency") (citing *In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 132 (D.N.J. 2002) (stating that "'the single clearest factor reflecting the quality of class counsels' services to the class are the results obtained'")).[5]

### D.      The Complexity and Duration of the Litigation

The Litigation was complex, lasted over four years, and is still ongoing against the non-settling defendant.   To secure the recovery, Lead Counsel had to persuasively weave together complex facts regarding Valeant's accounting, internal controls, corporate governance, executive compensation practices, pricing, copay practices, patient assistance programs, research and development, product acquisition strategy, distribution practices, and payor contracts into a single coherent narrative that

---

[5]      In *Lucent*, the court noted that although an SEC investigation "was ongoing, it neither prompted this litigation nor assisted [counsel] in handling this matter."   327 F. Supp. 2d at 436-37.   Similarly here, this Litigation was filed before disclosure of an investigation by the SEC, and to date there have been no orders or findings by the SEC that have advanced this case.

explained how the conduct amounted to securities fraud and not simply bad management. *See, e.g.*, ECF No. 80, ¶¶2-26, 21-131. Directors are rarely sued for securities fraud under §10(b) and it is even rarer for those claims to be upheld, but given the unique facts of this case those claims were brought and then upheld, which was a substantial victory. *See* ECF No. 216 at 2 n.1, 22. Complicating matters further, while securities cases commonly involve a single stock drop, this case had 22 alleged corrective disclosures, which Lead Counsel had to analyze carefully with its experts to rebut likely defense loss causation arguments. *See, e.g.*, ECF No. 80, ¶¶18-26, 473-527. The enormity of the task was reflected in the 280-page, incredibly detailed complaint that successfully asserted claims against 15 individual and 10 entity defendants and resulted in nearly 400 pages of briefing on the initial motions to dismiss. *See id.*; *Lucent*, 327 F. Supp. 2d at 434 (finding complexity of litigation favored approval of fee where action involved a "fraud arising from a number of circumstances" and presented "sophisticated issues of fact and law").

With regard to the quantity of work, the Settlement was achieved only after Lead Counsel had, *inter alia*: (i) conducted an extensive investigation that developed the factual basis for the claims asserted in the Litigation; (ii) interviewed witnesses concerning the subject matter of the Litigation; (iii) researched applicable law governing the claims alleged and potential defenses thereto; (iv) prepared and filed the nearly 300-page complaint and then amended the complaint to successfully assert an

- 18 -

insider trading claim against additional parties; (v) successfully opposed Defendants' seven motions to dismiss as well as motions to reconsider and to appeal the denial of those motions; (vi) drafted, retained experts for, and submitted Plaintiffs' detailed motion for class certification; (vii) engaged in document and written discovery that included analysis of nearly 11.5 million pages of documents produced from approximately 25 Defendants and 150 third parties, as well as interrogatories and requests for admission; (viii) analyzed witness testimony from the review of deposition transcripts from related proceedings, Congressional testimony, trial and sentencing testimony from the criminal case against Philidor's former CEO and a former Valeant executive, and over 50 public videos consisting of media interviews, all of which provided the factual accounts of several defendants and key Valeant employees and directors regarding issues relevant to this case; (ix) retained five experts to opine on accounting, auditing, industry practices, corporate governance, and loss causation and damages; and (x) engaged in extensive arm's-length settlement negotiations, including preparing detailed mediation briefs with more than 125 exhibits, and participating in two in-person mediations. *See* Barz Decl., ¶¶5-9, 30-33. Thus, the complexity and duration of litigation also supports the requested fee.

### E.    The Risk of Non-Payment

The recovery did not come easily and it was uncertain both because of the difficulty of prevailing in securities cases and due to Valeant's uncertain financial

condition.  First, the Litigation was risky and difficult from the outset because the claims are subject to the PSLRA, which has made it harder for investors to bring and successfully resolve securities class actions.  As the Fifth Circuit observed: "To be successful, a securities class-action plaintiff must thread the eye of a needle made smaller and smaller over the years by judicial decree and congressional action." *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 235 (5th Cir. 2009).

In addition to these cases becoming harder to win, this case had unique challenges, for example, relating to director liability, insider trading, and loss causation.  *See In re Ikon Office Sols., Inc., Sec. Litig.*, 194 F.R.D. 166, 194-95 (E.D. Pa. 2000) (noting "the legal obstacles of establishing scienter, damages, [and] causation" and that "securities actions have become more difficult from a plaintiff's perspective in the wake of the PSLRA" because it "substantially alters the legal standards applied to securities fraud claims in ways that generally benefit defendants rather than plaintiffs"); Final Approval Brief, §IV.C.  In addition, Defendants asserted they were the victims of a rogue employee who has since been convicted of defrauding the Company by steering business to Philidor in exchange for kickbacks. *See* ECF No. 196 at 18, n.17; Ex. F (Defendants emphasizing that "[a] jury has determined that Valeant was defrauded by Philidor").  Given that the government's theory in the criminal case was that Valeant was the victim of fraud, it was not inconceivable that such arguments could have some jury appeal.  While Lead Counsel

was confident in its ability to overcome this and Defendants' other purported defenses, trials are notably unpredictable. *See, e.g.*, *Viropharma*, 2016 WL 312108, at *16 ("'Here, the trial, as . . . all securities fraud trials, will be long and complex. . . . Thus, the complexity, expense and duration of the litigation weigh in favor of settlement.'").

Securities class actions are not only difficult and uncertain, but they also take many years to resolve.  Lead Counsel filed this case in 2015 and it is still ongoing against the non-settling defendant.  At the time the fee was negotiated, the outcome was anything but certain and Lead Counsel had no way of knowing how long the case would last or whether there would be any recovery at all.  For example, in *Household Int'l*, No. 1:02-cv-05893, Robbins Geller litigated a securities class action through trial and appeal for 14 years before reaching a settlement.  In addition, "[p]recedent is replete with situations in which attorneys representing a class have devoted substantial resources in terms of time and advanced costs yet have lost the case despite their advocacy." *See In re Xcel Energy, Inc. Sec., Derivative & ERISA Litig.*, 364 F. Supp. 2d 980, 994 (D. Minn. 2005) (citing cases); *In re Oracle Corp. Sec. Litig.*, No. C 01-00988 SI, 2009 WL 1709050 (N.D. Cal. June 19, 2009) (granting summary judgment to defendants after Robbins Geller spent eight years litigating with an approximate lodestar of $40 million and over $6 million in unreimbursed expenses), *aff'd*, 627 F.3d 376 (9th Cir. 2010); *Colman, et al. v. Theranos, Inc., et al.*, No. 5:16-cv-06822, ECF

- 21 -

No. 314 (N.D. Cal. July 20, 2018) (stipulating to dismissal of securities class action following financial collapse of defendant corporation after litigation by Robbins Geller).[6]

Absent this Settlement, Lead Counsel would have continued to litigate against all Defendants through class certification, summary judgment, trial, and appeals, which would have taken several more years at considerable expense, creating the very real risk that Lead Counsel and the Class could ultimately receive a smaller recovery, or even no recovery at all, as Defendants have consistently denied liability. *See* ECF No. 196; Ex. F (Letter from Counsel for Defendants, Oct. 11, 2019) at 5 (outlining defenses and arguments Defendants would pursue in the Litigation). During this time of working on this case without pay, Lead Counsel has devoted dozens of lawyers and staff to the case, and advanced costs, all the while having to pay salaries, leases, and all other expenses of running a large law firm with approximately 200 lawyers and approximately 200 additional employees and staff. *See* Barz Decl., ¶¶28-29; *Ikon*, 194 F.R.D. at 193 (stating fees need to compensate counsel for "the risk of undertaking complex or novel cases on a contingency basis"). In contrast, Defendants hired some

---

[6]    *See also Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713 (11th Cir. 2012) (affirming judgment as a matter of law for defendants nearly five years after the case was filed following a jury verdict partially in plaintiffs' favor); *In re JDS Uniphase Corp. Sec. Litig.*, No. C-02-1486 CW(EDL), 2007 WL 4788556, at *1 (N.D. Cal. Nov. 27, 2007) (jury returning verdict against plaintiffs following lengthy litigation and trial).

of the largest and most expensive defense firms in the nation who have undoubtedly been paid by the hour and in regular installments.

Second, the risk of non-payment was greater in this case because, unlike most of the other top securities class action recoveries, this case was litigated against a corporate Defendant whose financial condition was uncertain and deteriorating.  *See supra* §IV.A.[7]  Valeant's stock price dropped to dangerously low levels during the Litigation, falling to $8.50 per share for a market capitalization of Valeant of less than $3 billion, and analysts speculated that bankruptcy was possible.  *See, e.g.*, Ex. I (February 2017 analyst report saying data implied "significant level of distress" on Valeant, corresponding to a high chance of bankruptcy); Ex. C (showing Valeant closing price of $8.51 per share on April 21, 2017).[8]  In addition to this case, Valeant has roughly $25 billion in debt and is still facing 30 opt-out cases, a securities class action in Canada, a RICO class action, and multiple government investigations.  *See*

---

[7]    For example, in *Enron*, even though the company's financial condition was uncertain and deteriorating, the claims were paid by large banks under a theory of liability which the Supreme Court has since rejected.  *See Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 160 (2008) (rejecting use of "scheme liability" to hold other parties liable for securities fraud); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, No. H-01-3624, ECF No. 6028 (S.D. Tex. Sept. 8, 2008) (noting that around $6.9 billion of $7.2 billion settlement was paid by banks).

[8]    *See also* Ex. J (April 2016 *Reuters* article reporting that one of the "top priorities" of a new Valeant board member was "to protect the company from bankruptcy" and quoting the board member as saying "[w]e were in a death spiral"); Ex. K (April 2016 article questioning "Is Bankruptcy Ahead" and stating "[a] heavy debt load may lead to the demise of Valeant" and "[s]elling now is a prudent strategy").

4814-4680-2362.v2

ECF No. 421; Valeant 3Q19 Form 10-Q at 5, 29-38.  Against these competing claims,

Lead Counsel was able to obtain a settlement that is nearly 50% greater than the total

amount of Valeant's cash on hand, $825 million, as reported in the Company's third-

quarter 2019 financial statements.  *See* Valeant 3Q19 Form 10-Q at 1; *see also Lucent*,

327 F. Supp. 2d at 438 (approving 17% fee and finding risk of non-payment was

"truly grave" where defendant company was slowly "deteriorating" and multiple other

lawsuits needed to be resolved).

Comparing this case to *Merck*, the only other securities class action to settle for

over $1 billion dollars in this District in the last decade, shows the exceptional result,

risks in this case, and reasonableness of the fee sought:

| Case | Settlement | Cash On Hand | Settlement as % of Cash | Mkt Cap Low | Settlement as % Mkt Cap Low | Fee |
|------|-----------|--------------|-------------------------|-------------|------------------------------|-----|
| *Merck* | $1.06 bil | $8.5 bil | 12% | $44 bil | 2.4% | 20% |
| *Valeant* | $1.21 bil | $825 mil | 146% | $2.9 bil | 42% | 13% |

*See supra* §II.A; *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, No. 05-

1151 (SRC)(CLW), 2016 WL 11575090, at *5-*6 (D.N.J. June 28, 2016) (approving

settlement and fee).[9]  The fee was well earned in this case and "the risk created by

undertaking an action on a contingency fee basis militates in favor of approval." *In re*

---

[9]      "Mkt Cap Low" refers to the low-point of the company's market capitalization
while the litigation was pending, which is determined by taking the stock-price low
multiplied by the shares outstanding at that time based on SEC filings.

- 24 -

*Schering-Plough Corp. Enhance ERISA Litig.*, No. 08-1432 (DMC)(JAD), 2012 WL 1964451, at *7 (D.N.J. May 31, 2012) ("*Schering-Plough I*") (approving 33.3% fee).

### F.   The Significant Time Devoted to This Case by Lead Counsel

The Litigation is ongoing against a non-settling defendant so it is not possible to calculate a final lodestar.  However, to date, Lead Counsel has been litigating this case for over four years and their attorneys and paraprofessionals have expended over 75,000 hours and incurred more than $1.6 million in expenses prosecuting this Litigation for the benefit of the Class.  *See* Robbins Geller Decl., ¶¶5-7.  Local and additional counsel will share in the fee and have devoted substantial additional time.  *See* Stipulation, ¶¶1.20, 6.2; Declaration of Jennifer Scullion Filed on Behalf of Seeger Weiss LLP in Support of Application for Award of Attorneys' Fees and Expenses ("Seeger Weiss Decl."), ¶4; Declaration of Shelly L. Friedland on Behalf of Trief & Olk in Support of Application for Award of Attorneys' Fees and Expenses ("Trief & Olk Decl."), ¶4; Declaration of Frank J. Johnson on Behalf of Johnson Fistel in Support of Application for Award of Attorneys' Fees and Expenses ("Johnson Fistel Decl."), ¶5.  The detail regarding the work that was done to achieve this result is set forth above.  *See supra* §IV.C.  This factor also supports the fee award.  *See Lucent*, 327 F. Supp. 2d at 435 (finding fee supported where lead counsel devoted more than 61,000 hours to the case, including time spent on, among other things, investigations, motion practice, and service of forty-two subpoenas).

## G.     The Range of Fees Typically Awarded

There is no precise rule as to what percentage of the common fund should be awarded as attorneys' fees, but "[c]ourts have generally awarded fees in the range of nineteen to forty-five percent." *Schering-Plough I*, 2012 WL 1964451, at * 7 (citing cases); *see also Viropharma*, 2016 WL 312108, at *17 (noting that "[i]n this Circuit, 'awards of thirty percent are not uncommon in securities class actions'") (citing cases). Numerous courts within and outside the Third Circuit have awarded fee percentages much higher than the Lead Plaintiff's negotiated fee of 13% in this case, even on large recoveries, as reflected in the following chart:

| Case | Settlement | Fee |
| --- | --- | --- |
| *Ciuffitelli v. Deloitte & Touche LLP,* No. 3:16-cv-00580-AC, 2019 WL 6893018 (D. Or. Nov. 26, 2019) | $235 million | 24.6% |
| *Christine Asia Co., Ltd. v. Yun Ma,* No. 1:15-md-02631(CM)(SDA), 2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019) | $250 million | 25% |
| *In re Syngenta AG MIR 162 Corn Litig.,* 357 F. Supp. 3d 1094 (D. Kan. 2018) | $1.51 billion | 33% |
| *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.,* No. 02-C-5893, 2016 WL 10571774 (N.D. Ill. Nov. 10, 2016) | $1.575 billion | 24.6% |
| *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.,* No. 05-1151 (SRC)(CLW), 2016 WL 11575090 (D.N.J. June 28, 2016) | $1.062 billion | 20% |
| *King Drug Co. of Florence, Inc. v. Cephalon, Inc.,* No. 2:06-cv-01797-MSG, 2015 WL 12843830 (E.D. Pa. Oct. 15, 2015) | $512 million | 27.5% |
| *In re Schering-Plough Corp. Enhance Sec. Litig.,* No. 08-397 (DMC)(JAD), 2013 WL 5505744 (D.N.J. Oct. 1, 2013) | $473 million | 17% |

| Case | Settlement | Fee |
|------|------------|-----|
| *In re Merck & Co., Vytorin/Zetia Sec. Litig.*, 2013 WL 5505744 (D.N.J. Oct. 1, 2013) | $215 million | 28% |
| *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) | $1.08 billion | 28.6% |
| *Alaska Elec. Pension Fund v. Pharmacia Corp.*, No. 03-1519 (AET), 2013 WL 12153597 (D.N.J. Jan. 30, 2013) | $164 million | 27.5% |
| *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028 (N.D. Ill. 2011) | $956 million | 20% |
| *In re Schering-Plough Corp. Sec. Litig.*, No. 01-CV-0829 (KSH/MF), 2009 WL 5218066 (D.N.J. Dec. 31, 2009) | $165 million | 23% |
| *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467 (S.D.N.Y. 2009) | $510 million | 33% |
| *Carlson v. Xerox Corp.*, 596 F. Supp. 2d 400 (D. Conn. 2009), *aff'd*, 355 F. App'x 523 (2d Cir. 2009) | $750 million | 16% |
| *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752 (S.D. Ohio 2007) | $600 million | 18% |
| *In re Bristol-Myers Squibb Sec. Litig.*, No. 06-2964, 2007 WL 2153284 (3d Cir. July 27, 2007) | $185 million | 19.8% |
| *In re Lucent Techs., Inc., Sec. Litig.*, 327 F. Supp. 2d 426 (D.N.J. 2004) | $517 million | 17% |
| *In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109 (D.N.J. 2002) | $194 million | 28% |
| *Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942 (E.D. Tex. 2000) | $1.1 billion | 14% |
| *In re Ikon Office Sols., Inc., Sec. Litig.*, 194 F.R.D. 166 (E.D. Pa. 2000) | $108 million | 30% |
| *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y. 1998) | $1.027 billion | 14% |

The 13% negotiated fee in this case will result in a fee award that is significantly lower than the fee that might have been awarded in the absence of Lead

Plaintiff's negotiated fee agreement and based on the percentages awarded in those cases.  Even in larger settlements, of more than $2 or $3 billion, courts have approved fees of 13% and above as reasonable. *See, e.g.*, *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 266 (D.N.H. 2007) (approving 14.5% fee on $3.2 billion settlement); *Kornell v. Haverhill Ret. Sys.*, 790 F. App'x 296 (2d Cir. 2019) (affirming 13% fee on $2.3 billion settlement); *see also Credit Default Swaps*, 2016 WL 2731524, at *17 (approving 13.6% fee on $1.86 billion settlement); *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006) (approving 30% fee on $1.075 billion settlement).

In summary, Lead Plaintiff negotiated a fee at the outset of the case that not only obtained a record gross recovery amount, but was also designed to and did yield large savings on fees as compared to the comparable cases noted herein, which pass directly to Class Members.  Accordingly, the application of all the *Gunter* factors makes clear that Lead Counsel's requested fee of 13% is fair and reasonable.[10]

---

[10]   Courts in the Third Circuit have also considered additional factors, such as whether the fee award "reflects commonly negotiated fees in the private marketplace"; the comparative benefit lead counsel received from the efforts of government agencies; and any innovative terms of the settlement. *See In re Merck & Co., Inc. Vytorin ERISA Litig.*, No. 08-CV-285 (DMC), 2010 WL 547613, at *12-*13 (D.N.J. 2010).  Application of such additional factors also favors approval of the 13% fee. *See, e.g.*, *id.* at *13 (noting that contingent fees in private marketplace are commonly 30% to 40%); *supra* n.7 (noting lack of SEC orders or findings assisting Lead Counsel).

## V.     THE REQUESTED FEE IS REASONABLE UNDER A LODESTAR CROSS-CHECK

Courts in the Third Circuit may also use a "lodestar cross-check" to  confirm

the reasonableness of a percentage fee. *See Schering-Plough I*, 2012 WL 1964451, at

*8 (using lodestar cross-check). *But see Moore v. GMAC Mortgage*, No. 07-4296,

2014 WL 12538188, at *2 (E.D. Pa. Sept. 19, 2014) (stating the "lodestar cross-check

is 'suggested,' but not mandatory").  If used, the lodestar cross-check "should not

displace a district court's primary reliance on the percentage-of-recovery method." *In*

*re AT&T Corp.*, 455 F.3d 160, 164 (3d Cir. 2006).  Courts have cautioned that

focusing on lodestar runs the risk of "penalizing class counsel for achieving a

settlement" earlier in litigation which would "work against the interests of the class

and undercut the judicial policy favoring early settlement."  *In re Equifax Inc.*

*Customer Data Sec. Breach Litig.*, No. 1:17-md-2800-TWT, 2020 WL 256132, at *35

(N.D. Ga. Mar. 17, 2020); *see also Ikon*, 194 F.R.D. at 193 (noting that focusing on

lodestar "may encourage attorneys to delay settlement or other resolution to maximize

legal fees" and "may also compensate attorneys insufficiently for the risk of

undertaking complex or novel cases on a contingency basis")*.*  Given its limited value,

some courts consider a lodestar review "an inevitable waste of judicial resources."

*Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 49 (2d Cir. 2000); *see also Will v.*

*Gen. Dynamics Corp.*, No. 06-698-GPM, 2010 WL 4818174, at *3 (S.D. Ill. Nov. 22,

2010) ("The use of a lodestar cross-check in a common fund case is unnecessary,

arbitrary, and potentially counterproductive."); *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 958 (7th Cir. 2013) (affirming 27.5% fee award on $200 million settlement without any analysis of lodestar).

When used, the Third Circuit has recognized that the lodestar crosscheck "need entail neither mathematical precision nor bean-counting" and "district courts may rely on summaries submitted by the attorneys and need not review actual billing records." *In re Rite Aid Corp. Sec. Litig.*, 396 F. 3d 294, 306-07 (3d Cir. 2005). The lodestar crosscheck is done by simply comparing counsel's "lodestar" to the fee resulting from the requested percentage award and assessing the reasonableness of the resulting multiplier. The appropriate multiplier on counsel's lodestar varies based on the specifics of each case and it "'need not fall within any pre-defined range, provided that the [d]istrict [c]ourt's analysis justifies the award.'" *Schuler v. Medicines Co.*, No. 14-1149 (CCC), 2016 WL 3457218, at *10 (D.N.J. June 24, 2016) (quoting *Rite Aid*, 396 F.3d at 307). However, the Third Circuit has recognized that percentage awards that result in multipliers "'ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied.'" *See In re Veritas Software Corp. Sec. Litig.*, 396 F. App'x 815, 819 (3d Cir. 2010).

While multipliers of one to four are a common baseline, courts in the Third Circuit recognize that larger settlements or earlier settlements can – and often do – produce higher multipliers. *See, e.g.*, *Stevens v. SEI Investments Co.*, No. 18-4205,

- 30 -

2020 WL 996418, at *13 (E.D. Pa. Feb. 28, 2020) (approving multiplier of 6.16 and stating "multiples ranging from 1 to 8 are often used in common fund cases" to "compensate counsel for the risk of assuming the representation on a contingency fee basis"); *Bodnar v. Bank of Am., N.A.*, No. 14-3224, 2016 WL 4582084, at *5-*6 (E.D. Pa. Aug. 4, 2016) (approving 33% fee where counsel was able to negotiate the settlement "at the early stages" of the litigation and finding 4.69 multiplier was "appropriate and reasonable"); *In re Rite Aid Corp. Sec. Litig.*, 362 F. Supp. 2d 587, 589 (E.D. Pa. 2005) (approving fee award "with a 6.96 multiplier").[11]  Thus, courts award multipliers higher than four in large settlements when appropriate to reward counsel and incentivize counsel to pursue the best possible result for the class, rather than settling for less.  *See also, e.g., In re Enron Corp. Sec., Derivative, & ERISA Litig.*, No. H-01-3624, ECF No. 6026 (S.D. Tex. Sept. 8, 2008) (awarding fee on $7.2 billion settlement resulting in multiplier of 5.2); *Credit Default Swaps*, 2016 WL 2731524, at *17 (awarding fee on $1.86 billion settlement resulting in  multiplier of

---

[11]      *See also Demaria v. Horizon Healthcare Servs.*, No. 2:11-cv-07298 (WJM), 2016 WL 6089713, at *5 (D.N.J. Oct. 18, 2016) (approving 33% fee resulting in lodestar multiplier of 4.3); *In re Daimlerchrysler AG Sec. Litig.*, No. 00-993, 2004 U.S. Dist. LEXIS 31774, at *57 (D. Del. Jan. 28, 2004) (approving 22.5% fee on $300 million settlement with lodestar multiplier of 4.2, which "falls within the range of multiples approved by other courts of this Circuit");*In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 736 n.44 (E.D. Pa. 2001) (approving 25% fee resulting in 4.5 to 8.5 multiplier and noting lodestar analysis is "'cumbersome, enervating, and often surrealistic'"); *Schuler*, 2016 WL 3457218, at *9 (approving 33% fee resulting in 3.57 multiplier).

"just over 6"); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319 (S.D.N.Y. 2005) (awarding fee on $6.1 billion settlement resulting in multiplier of 4).

Here, it is not possible to conduct a final lodestar analysis because the Litigation is ongoing and Lead Counsel's lodestar is increasing. However, even considering just the current time invested by Lead Counsel and additional counsel confirms the reasonableness of a 13% fee award because it produces a multiplier of roughly 3.6. *See* Robbins Geller Decl., ¶5; Seeger Weiss Decl., ¶4; Trief & Olk Decl., ¶4; Johnson Fistel Decl., ¶5. Despite the exceptional result and extraordinary risks of this case that make it unique, the multiplier falls within the more common range of 1.0 to 4.0 awarded. *See Rite Aid*, 396 F.3d at 306 (noting multiplier should account for the "contingent nature or risk involved in a particular case and the quality of the attorneys' work"). This is significant because, as noted, higher multipliers are not uncommon in larger settlements and because the actual lodestar in this case is increasing as the litigation continues.

Courts have noted that it is appropriate to consider future time in the lodestar crosscheck, for example, time that will be needed in administering the settlement. *See Equifax*, 2020 WL 256132, at *39 (approving 20% fee on $380.5 million minimum settlement fund and noting that "[i]n addition to time spent through final approval, class counsel estimate they will spend" significantly more time "to implement and

administer the settlement" and calculating lodestar using past and future estimated time); *SEI Investments*, 2020 WL 996418, at *13 (approving fee with 6.16 multiplier where "Class Counsel is expected to perform additional work in connection with this case" and "the multiplier will likely be lower by the time the matter is closed and Class Counsel's work is complete"). In this case, not only will Lead Counsel incur additional time administering the Settlement but it is also continuing to litigate the case against the non-settling defendant.

Thus, the lodestar cross-check confirms the reasonableness of the fee award.

## VI.   LEAD COUNSEL'S REASONABLY INCURRED LITIGATION EXPENSES SHOULD BE APPROVED

Lead Counsel also requests payment of expenses incurred in connection with the prosecution of the Litigation in the aggregate amount of $1,673,016.13. Counsel in class actions "are entitled to reimbursement of expenses that were 'adequately documented and reasonable and appropriately incurred in the prosecution of the class action." *Viropharma*, 2016 WL 312108, at *18 (quoting *Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1225 (3d Cir. 1995)); *Schering-Plough I*, 2012 WL 1964451, at *8 (approving litigation expenses and noting that "[t]his type of reimbursement has been expressly approved by the Third Circuit").

Lead Counsel's and additional counsel's expenses and charges are adequately documented in the accompanying firm declarations. *See* Robbins Geller Decl., ¶6; Seeger Weiss Decl., ¶5; Trief & Olk Decl., ¶5; Johnson Fistel Decl., ¶6. The charges

- 33 -

and expenses consist of the typical categories: experts and consultants, travel, document hosting and production, legal and financial computerized research costs, mediation fees, filing fees, postage, copying, and delivery. *See* Robbins Geller Decl., ¶7; Seeger Weiss Decl., ¶6; Trief & Olk Decl., ¶6; Johnson Fistel Decl., ¶7. These expenses and charges were reasonable and necessary to the prosecution of the claims and achieving the Settlement, and are of the same type routinely approved in securities class actions. *See* Robbins Geller Decl., ¶4; Seeger Weiss Decl., ¶3; Trief & Olk Decl., ¶3; Johnson Fistel Decl., ¶4; *see also Viropharma*, 2016 WL 312108, at *18 (approving costs and expenses for, among other things, experts, travel, copying, postage, telephone, filing fees, and online and financial research); *Yedlowski v. Roka Bioscience, Inc.*, No. 14-CV-8020-FLW-TJB, 2016 WL 6661336, at *23 (D.N.J. Nov. 10, 2016) (approving costs and expenses for experts, investigation, mediation, publishing notice, and online legal research, and noting that "[c]ourts have held that all of these items are properly charged to the Class").

Moreover, the expenses are lower than the amount reserved in the Notice (up to $3 million), and there has been no objection. The expenses are also significantly lower than what has been awarded in other securities class actions. *See, e.g.*, *In re Lucent Techs., Inc. Sec. Litig.*, No. 2:00-cv-621, ECF No. 236 (D.N.J. July 23, 2004) (approving award of $3.5 million in expenses to lead counsel); *Merck*, 2016 WL

- 34 -

11575090, at *5 (approving award of $9.5 million in expenses to lead counsel).  Lead Counsel requests that the expenses be awarded.

## VII.   PLAINTIFF AWARDS PURSUANT TO 15 U.S.C. §78u-4(a)(4)

In class actions, the Third Circuit has "favor[ed] encouraging class representatives, by appropriate means, to create common funds and to enforce laws." *Schering-Plough II*, 2013 WL 5505744, at *37 (citing cases).  The PSLRA makes clear that "[n]othing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class." 15 U.S.C. §77z-1(a)(4).  In enacting this provision, "Congress explicitly acknowledged the importance of awarding appropriate reimbursement to class representatives." *Schering-Plough II*, 2013 WL 5505744, at *37.  Thus, district courts in the Third Circuit have approved awards under 15 U.S.C. §78u-4(a)(4) to compensate institutional class representatives "for the time and effort devoted by them" in representing the Class.  *See, e.g.*, *Schering-Plough II*, 2013 WL 5505744, at *37 (approving awards to four members of lead plaintiff group who spent time reviewing case materials, corresponding with counsel, and engaging in discovery and mediations); *Schuler*, 2016 WL 3457218, at *11 (approving award to lead plaintiff and noting that reviewing filings, gathering documents, and conferring with lead

- 35 -

counsel "are the types of activities courts have found to support reimbursement to class representatives").[12]

As set forth in the accompanying declaration, Lead Plaintiff TIAA seeks an award of $66,495 for the estimated time its employees devoted to supervising and participating in the Litigation.   TIAA Decl., ¶¶11-12.   The declaration provides estimates of time spent on activities directly related to representing the Class, including: (a) consulting with Lead Counsel regarding the Litigation and the Court's orders; (b) reviewing and commenting upon pleadings, motions, and briefs; (c) reviewing correspondence and status reports from Lead Counsel; (d) responding to written discovery and conferring and collecting documents for production; (e) conferring internally at TIAA and with Lead Counsel concerning litigation strategy; and (f) preparing for and attending the mediations and participating in settlement negotiations.  *Id.*, ¶6.

---

[12]     The Second Circuit also affirmed awards where class representatives submitted affidavits providing the "hours dedicated to the litigation and a statement that these hours constituted lost work time – an item for which § 78u-4(a)(4) expressly allows recovery." *Bank of Am. Corp. Sec., Derivative, and ERISA Litig.*, 772 F.3d 125, 133 (2d Cir. 2014). The declarations in that case stated, for example, that plaintiffs sought "reimbursement . . . for the time [their employees] devoted to supervising and participating in this Action," because "time that [the employees] devoted to the representation of the Class in this Action was time that [they] otherwise would have spent on other work for [the plaintiffs] and, thus, represented a cost to [the plaintiffs]." *See, e.g.*, *In re Bank of Am. Corp. Sec., Derivative, and ERISA Litig.*, No. 1:09-md-02058, ECF No. 829-2 at ¶14 (S.D.N.Y. Feb. 19, 2013).

In addition, Named Plaintiff Tucson seeks reimbursement of $3,275 and Named Plaintiff IBEW seeks reimbursement of $3,002.75 in fees paid by them to their respective fund counsel who assisted them in responding to discovery and other aspects of their involvement in this Litigation. *See* Tucson Decl., ¶¶9-10; IBEW Decl., ¶¶8-9. These were expenses borne by Tucson and IBEW directly relating to the representation of the Class, and Tucson and IBEW request reimbursement pursuant to 15 U.S.C. §78u-4(a)(4). *See In re EZCORP, Inc. Sec. Litig.*, No. 1:14-cv-06834, ECF Nos. 65-2 at 3 & 70 at ¶5 (S.D.N.Y. Apr. 26, 2017) (approving award to plaintiff to reimburse for expense of fund counsel on time spent assisting institutional plaintiff in serving as lead plaintiff); *In re Tower Group Int'l, Ltd. Sec. Litig.*, No. 1:13-cv-5852-AT, ECF Nos. 163-1 & 178 (S.D.N.Y. Nov. 23, 2015) (same).

Finally, the requested awards of $66,495 for TIAA, $3,275 for Tucson, and $3,002.75 for IBEW are reasonable and substantially less than awards in other cases. *See, e.g.*, *In re Bank of Am. Corp. Sec., Derivative, and ERISA Litig.*, No. 09 MDL 2058 (PKC), 2013 WL 12091355, at *2 (S.D.N.Y. Apr. 8, 2013) (approving collective awards to lead plaintiffs of more than $450,000); *Schering-Plough II*, 2013 WL 5505744, at *37 (approving collective awards to lead plaintiffs of more than $90,000); *id.*, at *56-57 (approving collective awards to lead plaintiffs of more than $105,000); *Merck*, 2016 WL 11575090, at *5 (same); *Schuler*, 2016 WL 3457218, at *11 (citing PSLRA cases awarding plaintiffs $54,000, $200,000, and $100,000). The awards

sought are also substantially lower than the amount reserved in the Notice, of up to $175,000 in the aggregate, and there has been no objection to date. Plaintiffs respectfully request the awards be approved.

## VIII. CONCLUSION

For all the reasons stated herein, and in the accompanying declarations and the Final Approval Brief, Plaintiffs and Lead Counsel respectfully request that the Court (i) award Lead Counsel attorneys' fees of 13% of the Settlement Amount and payment of litigation expenses of $1,673,016.13, plus interest on both amounts at the same rate as earned by the Settlement Fund; (ii) award Lead Plaintiff TIAA $66,495; (iii) award Tucson $3,275; and (iv) award IBEW $3,002.75.

DATED:  April 22, 2020                Respectfully submitted,

                                      SEEGER WEISS LLP
                                      CHRISTOPHER A. SEEGER
                                      JENNIFER SCULLION


                                            s/ Christopher A. Seeger
                                      CHRISTOPHER A. SEEGER

                                      55 Challenger Road, 6th Floor
                                      Ridgefield Park, NJ  07660
                                      Telephone:  212/584-0700
                                      212/584-0799 (fax)
                                      cseeger@seegerweiss.com
                                      dbuchanan@seegerweiss.com

                                      Local Counsel

- 38 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
THEODORE J. PINTAR
ROBERT R. HENSSLER, JR.
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
JAMES E. BARZ
BRIAN E. COCHRAN
FRANK A. RICHTER
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  312/674-4674
312/674-4676 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
ROBERT J. ROBBINS
KATHLEEN B. DOUGLAS
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)

Lead Counsel for Plaintiffs

4814-4680-2362.v2