SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
JENNIFER SCULLION
55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
Telephone:  212/584-0700
212/584-0799 (fax)

Local Counsel

ROBBINS GELLER RUDMAN
  & DOWD LLP
JAMES E. BARZ
FRANK A. RICHTER
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  312/674-4674
312/674-4676 (fax)

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re VALEANT PHARMACEUTICALS INTERNATIONAL, INC. SECURITIES LITIGATION | Master No. 3:15-cv-07658-MAS-LHG <br><br> <u>CLASS ACTION</u> <br><br> Judge Michael A. Shipp <br> Magistrate Judge Lois H. Goodman <br><br> Special Master Dennis M. Cavanaugh, U.S.D.J. (ret.) <br><br> DECLARATION OF JAMES E. BARZ IN SUPPORT OF MOTIONS FOR (1) FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (2) AN AWARD OF ATTORNEYS' FEES AND EXPENSES AND AWARDS TO PLAINTIFFS PURSUANT TO 15 U.S.C. §78U-4(A)(4) |
| This Document Relates To: <br><br> SECURITIES CLASS ACTION. | |

I, JAMES E. BARZ, declare as follows:

1. I am a partner of the law firm of Robbins Geller Rudman & Dowd LLP ("Robbins Geller" or "Lead Counsel"), the firm approved as Lead Counsel by the Court to represent Lead Plaintiff TIAA in the above-captioned action (the "Litigation").[1] I have been the lead attorney responsible for the prosecution and resolution of this Litigation, am familiar with its proceedings, and have knowledge of the matters set forth herein based upon my involvement in this matter and supervision of or communications with other lawyers and staff assigned to this case. This declaration was prepared with the assistance of other lawyers at the firm, reviewed by me before signing, and the information contained herein is believed to be accurate based on what I know and what I have been told by others.

2. I submit this declaration in support of Lead Plaintiff's and Lead Counsel's motions for approval of: (1) the cash settlement of $1,210,000,000 (the "Settlement"); (2) the proposed Plan of Allocation; and (3) Lead Counsel's application for an award of attorneys' fees and litigation expenses.

I. THE SETTLEMENT

3. The relevant facts and allegations that describe the allegations in this case and support approval of the Settlement, Plan of Allocation, and Lead Counsel's fee

---

[1] Capitalized terms not otherwise defined herein have the same meanings as that ascribed to them in the Stipulation of Settlement executed on December 15, 2019 (the "Stipulation").

and expense award are set forth in the concurrently filed (1) Memorandum of Law in Support of Motion for Final Approval of Class Action Settlement and Plan of Allocation ("Final Approval Brief"), and (2) Memorandum of Law in Support of Motion for an Award of Attorneys' Fees and Expenses and Awards to Plaintiffs Pursuant to 15 U.S.C. §78u-4(a)(4) ("Fee Brief"), as well as in this Court's prior rulings on Defendants' motions to dismiss.

4.      Securities class actions are complex cases that are challenging to prevail upon and, given the stakes involved, result in defendants hiring some of the largest law firms and vigorously disputing liability and damages.  This case was no exception.  The legal risks to continued litigation are discussed in the Final Approval Brief and Fee Brief and include Defendants' arguments that: (1) the risks and "truth" about Valeant's business model and pricing practices had been disclosed to the market; (2) Valeant was not obligated to disclose its relationship with Philidor Rx Services, LLC ("Philidor") prior to October 2015; (3) Valeant's restatement of its 2014 financial statements was immaterial; (4) Valeant was the victim of a fraud perpetrated by its former employee and a former Philidor executive; (5) Plaintiffs could not prove scienter; (6) Plaintiffs could not prove loss causation; (7) Plaintiffs did not have standing to bring the insider-trading claim and the insider-trading defendants did not possess or trade on the basis of non-public information; and (8) certain Defendants on the §11 March 2015 Stock Offering claim had a due

diligence defense and Plaintiffs lacked standing to bring that claim. Additional risks to a successful prosecution of a securities fraud case, including this case, include defendants' likely challenges to class certification, plaintiffs' damages models, and the admissibility of plaintiffs' experts.

5.  The case was hard fought by both sides as reflected by the numerous hearings and briefs on the docket, which consists of over 500 entries. For example, the parties engaged in extensive briefing on Defendants' seven motions to dismiss, Defendant Jorn's motion for reconsideration, and the insider trading defendants' motion for interlocutory appeal, with Lead Counsel presenting detailed arguments on complex areas of law and substantially prevailing on the nine motions. The parties engaged in contentious discovery, resulting in numerous meet and confers and each side identifying issues for impending motions to compel, including on privilege issues. Lead Counsel prevailed on a motion to compel against a key third party and submitted a detailed motion for class certification.

6.  In addition to producing and collecting millions of pages of documents in discovery, Lead Counsel retained five experts to help analyze the evidence in support of the claims on complex issues, including accounting, loss causation and damages, corporate governance, and pharmaceutical manufacturing and distribution practices. Lead Counsel analyzed the factual and expert evidence to build a compelling narrative that supported liability and damages.

7. The parties engaged in extensive arm's-length and hard-fought negotiations before an experienced mediator, Professor Eric D. Green, Esq. of Resolutions, LLC. The first in-person mediation session occurred on September 17, 2018. In advance of mediation, the parties exchanged and provided to Professor Green detailed mediation statements addressing liability and damages. The mediation briefs addressed the specific evidence and legal arguments each side would rely upon as the case progressed. The first mediation session ended without a settlement agreement and with the parties far apart.

8. While continuing to litigate the case, the parties engaged in numerous teleconferences, phone calls, and e-mails with Professor Green. More than a year after the first mediation session, on November 6, 2019, Professor Green held a second in-person mediation session. In advance of the second mediation session, the parties again exchanged detailed and updated mediation briefs that addressed additional evidence uncovered in the Litigation as well as the developing arguments by each side. Plaintiffs provided 127 exhibits in support of their mediation briefs. During the second session, Professor Green engaged in extensive discussions with counsel, and the parties exchanged several rounds of settlement demands and offers. However, the parties again failed to reach a resolution.

9. After the second mediation session, Professor Green continued discussions with the parties. The parties continued discovery, were on the verge of

filing motions to compel against each other relating to unresolved discovery and privilege disputes, and were preparing for several noticed depositions. Following additional negotiations, on November 20, 2019, Professor Green issued a mediator's proposal, which the Settling Parties accepted on November 22, 2019, agreeing to settle the claims against all Defendants and Former Defendants, except PwC, in the amount of $1,210,000,000.

10. The $1,210,000,000 all-cash Settlement is a very favorable result considering the immediate and substantial benefit to the Class and the risks posed by continuing litigation. As set forth more fully in the Final Approval Brief, the Settlement was reached after more than four years of investigation and hard-fought litigation; the Settlement was the result of an arm's-length settlement process between experienced parties and counsel, overseen by an experienced mediator; and the Settlement provides an immediate recovery without the risks, uncertainties, and delay of continued litigation, including trial and likely appeals.

11. The Settlement confers a substantial benefit to the Class. Valeant's ability to withstand a larger settlement or judgment was uncertain throughout the Litigation due to, *inter alia*: the drastic decline of Valeant's stock price and market capitalization; Valeant's significant debt; Valeant's limited cash on hand; Valeant's potential liability in dozens of other civil and government proceedings; and the lack of sufficient insurance to cover the Settlement amount. Accordingly, in addition to

weighing the strengths and weaknesses of the arguments in support of liability and damages, Lead Counsel and its forensic accountants spent significant time analyzing Valeant's financial statements, stock price, and analyst and media reports to assess Valeant's ability to pay.

12. From its analysis, Lead Counsel determined that there were significant risks to continuing the litigation due to the possibility of Valeant's financial condition deteriorating further and significant risks to Valeant's ability to withstand a judgment in the full or even a substantial amount of the potential damages in this case. Lead Counsel expended substantial time and effort to achieve the Settlement in this case which attempts to maximize the amount of the settlement without the costs, expense, and risks of continued litigation through summary judgment, trial, and appeals. These efforts are outlined herein as well as in the Final Approval Brief and Fee Brief, and include efforts that achieved substantial litigation victories early in the case; analysis of millions of pages of documents; analysis of prior testimony and interviews of various Defendants and key third parties; consultation with five experts; identification of key "hot" and "critical" documents that would likely represent main exhibits at trial; and drafting persuasive mediation briefs.

13. As set forth in the Final Approval Brief, the result is the $1,210,000,000 Settlement, which is approximately $385 million more than Valeant's reported cash on hand for the third quarter of 2019. In holding out for a Settlement that exceeded

Valeant's reported cash, Lead Plaintiff and Lead Counsel undertook significant risk based on their careful assessment of all of the matters discussed herein relating to the strength of the claims and Valeant's ability to pay. In order to fund the Settlement, Valeant made installment payments and publicly stated that it would issue additional debt to raise the funds. In Lead Counsel's experience, and as set forth in more detail in the Final Approval Brief and the Fee Brief, the $1,210,000,000 recovery is an exceptional result under the facts of this case.

14.   As additional guidance in its analysis, Lead Counsel retained Professor Steven P. Feinstein (Ph.D., CFA), the President of Crowninshield Financial Research, Inc. and an Associate Professor of Finance at Babson College, to offer opinions and testify in this Litigation regarding market efficiency, loss causation, and damages. Given the few securities fraud class actions that have gone to trial in the last 25 years, there are risks and uncertainties regarding the amount of recoverable damages and the defense arguments relating thereto. For example, in this case, Defendants have argued that the truth had been revealed by October 30, 2015 and the Class Period should end on that date as none of the losses thereafter could be attributed to the claims alleged. Accepting just that one argument, and assuming Lead Plaintiff defeated all of Defendants' other loss causation arguments, Dr. Feinstein and his team estimated that the $1.21 billion Settlement results in a recovery of approximately 11.5% of the preliminary estimated damages. In addition, in Lead Counsel's view, the maximum

recoverable damages in this case had less impact on the settlement value of the case than they might otherwise have due to the substantial uncertainty that Valeant could pay maximum or even a substantial portion of the maximum recoverable damages as explained further in the Final Approval Brief and Fee Brief.

15. Notably, after the Settlement was publicly disclosed, several analysts that cover Valeant (now known as Bausch Health) commented in words or substance that the Settlement was larger than expected, as set forth in the Final Approval Brief and Fee Brief. This assessment further confirmed Lead Counsel's view that it is an excellent recovery.

16. Lead Plaintiff and Lead Counsel could have settled the Litigation earlier in the case at a substantially lower amount, but instead litigated the case through seven motions to dismiss, two amended complaints, additional motion practice, and contested document discovery resulting in the exchange of more than 13 million pages of documents by approximately 25 Defendants and 150 non-parties. In contrast, continuing to litigate would not guarantee a larger recovery for the Class but would only guarantee further delay in any recovery and the continued risk of a smaller or no recovery. Based on its experience in securities class action litigation and in this case, and after weighing the substantial benefits of the Settlement against the numerous obstacles to a better recovery after continued litigation, Lead Counsel has determined that the Settlement is fair, reasonable, and in the best interest of the Class.

## II. THE PLAN OF ALLOCATION

17. As set forth fully in the Notice, the Plan of Allocation provides for the distribution of the Net Settlement Fund to Class Members who timely submit valid Proof of Claim and Release forms. The Plan of Allocation attempts to equitably distribute the Net Settlement Fund to Class Members who suffered economic loss as a proximate result of the alleged wrongdoing.

18. To this end, Lead Plaintiff and Lead Counsel consulted with their damages expert, Dr. Feinstein and his staff, and conducted legal research to include the review of similar settlements. Based on their analysis of causation and damages, Dr. Feinstein and his staff worked with Lead Counsel to develop the Plan of Allocation, which contains separate formulas to calculate damages for each of the Valeant Securities at issue.

19. Consistent with the allegations in the complaint, to have a Recognized Loss Amount under the Plan of Allocation, shares or units of Valeant Securities must have been purchased or acquired during the Class Period and held until at least September 28, 2015, the date of the first alleged corrective disclosure. As set forth in the Notice, the calculation of a Recognized Loss Amount is based upon various formulas that take into account: (a) the statutory schemes and damages models for the claims alleged; (b) when the shares or units were sold; (c) whether the shares or units were held at the close of trading on particular dates; (d) the amount of the estimated

artificial inflation per share or unit for the §§10(b) and 11 common stock and §10(b) notes claims; (e) the purchase/acquisition price; (f) the sale/closing price; and (g) the PSLRA's limitation on damages, 15 U.S.C. §78u-4(e).

20. The Plan of Allocation also provides that no more than 5% of the Net Settlement Fund will be allocated to options on Valeant common stock. This 5% maximum options allocation is consistent with options caps used in other securities class action settlements and is supported for the reasons set forth in the Final Approval Brief and in Lead Plaintiff's brief in opposition to Timber Hill's objection to preliminary approval.

21. As set forth in the Notice, under the Plan of Allocation, the Claims Administrator will assess each Authorized Claimant's overall transactions to determine each Authorized Claimant's "Recognized Claim," which is the lesser of the Authorized Claimant's (a) overall market loss; and (b) aggregated Recognized Loss Amounts. If the Authorized Claimant had an overall market gain, its Recognized Claim will be zero. Based on their Recognized Claims, Authorized Claimants will receive their *pro rata* share of the Net Settlement Fund.

22. For the reasons set forth in the Final Approval Brief, including the declaration of the Claims Administrator, Lead Counsel believes that the Plan of Allocation represents a fair and reasonable method to equitably distribute the Net Settlement Fund among Authorized Claimants.

### III.   LEAD COUNSEL'S ATTORNEYS' FEES AND EXPENSES

23.   Lead Counsel respectfully requests that the Court award 13% of the $1,210,000,000 Settlement for attorneys' fees. Lead Counsel believes such a fee is reasonable and appropriate. Lead Counsel further requests an award of $1,673,016.13 in litigation expenses and charges in connection with the prosecution of this Litigation. The arguments and authorities supporting the requested fees and expenses are set forth in the Fee Brief.

24.   The requested 13% fee is the result of a fee schedule that TIAA negotiated with Lead Counsel at the outset of the case. As set forth in the Fee Brief and the Declaration of Laurie A. Gomez on Behalf of Lead Plaintiff TIAA, submitted herewith, TIAA is an institutional investor with a substantial stake in the outcome of the Litigation. The fee negotiated by TIAA is lower than what Lead Counsel would typically seek under the facts of this case, and Lead Counsel believes that the result obtained, the skill and effort needed to obtain the result, the complexity of the Litigation, and the risks of undertaking this Litigation on a contingent basis justify the fee. In addition, named plaintiffs City of Tucson together with and on behalf of the Tucson Supplemental Retirement System, and IBEW Local Union 481 Defined Contribution Plan and Trust, which are both also sophisticated institutional investors, support the 13% fee.

25. The time and resources in the research, investigation, and prosecution of this Litigation, and additional support for the fees and expenses sought, are set forth in the separate declarations of Lead Counsel and other counsel that are submitted with the Fee Brief and Final Approval Brief.

26. As set forth in the Fee Brief, Lead Counsel worked diligently to obtain an excellent result for the Class. The recovery obtained for the Class is the direct result of the significant efforts of attorneys who possess substantial experience in the prosecution of complex securities class actions. *See* www.rgrdlaw.com.

27. On the other side, the settling Defendants were represented by experienced lawyers from seven of the largest and most well-known defense firms: Simpson Thacher & Bartlett LLP; Debevoise & Plimpton LLP; Winston & Strawn LLP; Cooley LLP; O'Melveny & Myers LLP; Schulte Roth & Zabel LLP; and Paul Weiss, Rifkind, Wharton & Garrison LLP. Non-settling Defendant PwC is also represented by a large and well-known defense firm, King & Spalding LLP. Lead Counsel was fully aware that the case would be vigorously defended, just as the Company publicly stated, and that the Company would not simply pay a significant sum, much less over $1 billion, to make the case go away. The result was obtained, and the requested fee was earned, only through preparation, long hours, and hard work. The ability of Lead Counsel to obtain a favorable settlement in the face of such opposition confirms the quality of Lead Counsel's representation.

28.     When Lead Counsel undertook to represent Lead Plaintiff and the Class, it was with the expectation that its attorneys and paraprofessionals would have to devote a significant amount of time and effort to the prosecution of this case, and Lead Counsel would have to advance large sums of expenses on the investigation, discovery, case-related travel, experts, and mediation. The time spent by Lead Counsel and its staff on this case was at the expense of the time that it could have devoted to other matters. Lead Counsel undertook this case solely on a contingent fee basis, assuming a risk that the case would yield no recovery and leave Lead Counsel uncompensated. The only way Lead Counsel would be compensated was to achieve a successful result.

29.     Unlike counsel for Defendants, who are generally paid an hourly rate and paid for their expenses on a regular basis, Lead Counsel has not been compensated for any time or expenses since this case began. Lead Counsel is a large law firm with approximately 200 attorneys, approximately 200 additional employees and staff, and offices in nine cities. Lead Counsel has had to bear the expenses of salaries, rent, and costs of litigation, despite devoting dozens of lawyers and staff to this case, and advancing costs, without compensation for over four years.

30.     To date, Lead Counsel has litigated without any payment, during which time Lead Counsel, *inter alia*:

- conducted an extensive investigation that developed the factual basis for the claims asserted in the Litigation, which included the analysis of

> Valeant SEC filings, conference calls, and press releases, and financial analyst reports, media reports, and Congressional reports and letters concerning Valeant, Philidor, and the pharmaceutical industry;

- interviewed multiple witnesses concerning the subject matter of the Litigation;

- prepared and filed the 280-page complaint, and then successfully opposed Defendants' six motions to dismiss with hundreds of pages of briefing and an oral argument presentation;

- amended the complaint to assert an additional insider trading claim against a former Valeant director and his hedge fund, and then successfully opposed the insider trading defendants' motion to dismiss and motion for certification for interlocutory appeal;

- drafted, retained experts for, and submitted a detailed motion for class certification with two expert declarations concerning market efficiency and damages methodologies;

- engaged in extensive offensive written discovery directed at all 26 Defendants and approximately 150 third parties, including extensive meet and confers and preparing correspondence and potential motions to compel;

- drafted and prevailed on a motion to compel production of more than 1 million documents from Philidor and related entities;

- obtained and analyzed a total of nearly 11.5 million pages of documents from Defendants and third parties;

- assembled, reviewed, and produced more than 1.5 million pages of documents on behalf of Plaintiffs;

- issued interrogatories and requests for admission to Valeant, PwC, and the insider trading defendants, and responded to interrogatories issued to Plaintiffs;

- analyzed witness testimony from the review of deposition transcripts from related proceedings, Congressional testimony, trial and sentencing testimony from the criminal case against Philidor's former CEO and a

former Valeant executive, and over 50 public videos consisting of media interviews;

- prepared detailed mediation briefs with more than 125 exhibits that summarized the key discovery obtained, Plaintiffs' arguments on liability and damages, and why Defendants would have to pay a substantial sum to resolve the Litigation; and

- engaged in extensive arm's-length settlement negotiations spanning more than a year, including two in-person mediations and follow-up negotiations and discussions.

31.     Identifying and analyzing the most favorable evidence from the massive volume of documents obtained that relate to complex issues in the pharmaceutical industry and technical accounting matters is a time consuming and challenging process. Lead Counsel applied its substantial experience and undertook considerable time and effort to select the best exhibits to use in mediations and for eventual use at trial.

32.     Lead Counsel also retained and consulted with highly-qualified experts on the complex issues in this case, fronting all fees and expenses related to their retention to date. The experts are described in the Declaration of Robert J. Robbins Filed on Behalf of Robbins Geller Rudman & Dowd LLP in Support of Application for an Award of Attorneys' Fees and Expenses and have substantial experience and qualifications relating to, *inter alia*, the pharmaceutical industry, manufacturers, payors, pharmacy benefit managers ("PBMs"), pharmacies, and pharmaceutical patients and customers; market efficiency, loss causation, and damages for stocks,

options, and notes; generally accepted accounting principles ("GAAP"), accounting policies and practices, and internal controls; and corporate governance.

33. As set forth in the Fee Brief and reflected in the complaints filed in the Litigation, Lead Counsel had to persuasively weave together complex facts pertaining to a broad array of issues into a coherent narrative that explained how the conduct amounted to securities fraud and not simply bad management. Lead Counsel also had to carefully analyze each of the 22 corrective disclosures to be prepared to rebut Defendants' attacks on loss causation. Lead Counsel's substantial experience and advocacy was required in presenting the strengths of this case at the pleading stage, in defeating seven motions to dismiss (and a motion for reconsideration and a motion to appeal), throughout the hard-fought discovery in this Litigation, in presenting its arguments for class certification, and during mediations in an effort to achieve the best possible settlement and convince Defendants, defense counsel, and the mediator of the risks Defendants faced from not settling and proceeding to trial.

34. To that end, Lead Counsel assembled a litigation team that included attorneys with significant trial and securities class action experience that could detail how Plaintiffs would prove their claims before a jury. The litigation team included former federal prosecutors, certified public accountants, and attorneys with significant experience in securities class actions, trial, hearings, depositions, expert issues, and briefing complex matters.

35. The undersigned, for example, is an experienced trial attorney, former Assistant United States Attorney, registered CPA, adjunct professor of law at Northwestern University Pritzker School of Law for over ten years (teaching courses on trial advocacy and class action litigation), and had previously been a partner in one of the largest national defense firms that, among other things, defended securities class action cases. Since joining Robbins Geller in 2011, the undersigned has been lead or co-lead trial counsel in several securities class actions cases that resulted in substantial and favorable recoveries, including those that proceeded to within days or weeks of trial prior to settling. If the case had not settled, Lead Counsel was fully prepared to litigate this case through the complex stages of summary judgment, trial, and appeal. Lead Counsel only recommended settlement after extensive efforts to obtain the best possible result for the Class.

36. As detailed in the Fee Brief, in light of the fee agreement negotiated by Lead Plaintiff TIAA at the outset of the case, the endorsement by the two additional named plaintiff institutional investors, the substantial recovery obtained, the skill and efficiency exhibited by Lead Counsel, the complexity of the issues presented, the contingent nature of Lead Counsel's representation, the time expended by Lead Counsel and its paraprofessionals, and fee awards in comparable class actions, Lead Counsel believes the requested fee and litigation expense awards are reasonable and

- 17 -

appropriate, particularly when considering the policy of incentivizing counsel to take on and diligently prosecute meritorious securities class actions.

## IV. CONCLUSION

37. As described above and in the Final Approval Brief and the Fee Brief, Lead Counsel respectfully submits that the Settlement and Plan of Allocation should be approved as fair and reasonable, and that the Court should award Lead Counsel a fee in the amount of 13% of the Settlement Amount plus $1,673,016.13 in expenses and charges, plus the interest earned thereon at the same rate and for the same period as that earned on the Settlement Amount until paid.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 21st day of April, 2020, at Naperville, Illinois.

*/s/ James E. Barz*
JAMES E. BARZ