# EXHIBIT K

```
 1  LERACH COUGHLIN STOIA GELLER
       RUDMAN & ROBBINS LLP
 2  PATRICK J. COUGHLIN (111070)
    JEFFREY W. LAWRENCE (166806)
 3  SHAWN A. WILLIAMS (213113)
    SHIRLEY H. HUANG (206854)
 4  LUKE O. BROOKS (212802)
    100 Pine Street, Suite 2600
 5  San Francisco, CA  94111
    Telephone:  415/288-4545
 6  415/288-4534 (fax)
            - and -
 7  WILLIAM S. LERACH (68581)
    401 B Street, Suite 1600
 8  San Diego, CA  92101
    Telephone:  619/231-1058
 9  619/231-7423 (fax)

10  Lead Counsel for Plaintiffs
```

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re VERITAS SOFTWARE CORPORATION SECURITIES LITIGATION | Master File No. C-03-0283-MMC |
| | <u>CLASS ACTION</u> |
| This Document Relates To: | |
| ALL ACTIONS. | DECLARATION OF BJORN I. STEINHOLT, CFA, IN SUPPORT OF THE PLAN OF ALLOCATION |
| | DATE: N/A<br>TIME: N/A<br>COURTROOM: The Honorable Maxine M. Chesney |

I, BJORN I. STEINHOLT, hereby declare and state as follows:

## Introduction and Qualifications

1. I am a Principal at Financial Markets Analysis, LLC ("FMA"), an economic consulting and valuation firm based in San Diego, California and Princeton, New Jersey. FMA provides financial analyses and related economic consulting services to various clients and has frequently been asked to prepare reports and expert testimony regarding the various economic issues that typically arise in securities class actions, including the issues relating to equitably allocating settlement proceeds following the resolution of such cases. I submit this declaration in support of the proposed plan of allocating the settlement proceeds in this matter.

2. I received a Master of International Business degree from the University of San Diego and a Bachelor of Science, Computer Science degree from California State University, Long Beach. Furthermore, I have earned the professional designation Chartered Financial Analyst awarded by the Association for Investment Management and Research. A summary of my background and qualifications is attached as Exhibit A to this declaration.

## Overview of Assignment – Overall Damages and Plan of Allocation

3. I was asked by plaintiffs' counsel to calculate the damages suffered by investors who acquired Veritas Software Corporation ("Veritas" or the "Company") securities from January 3, 2001 through January 16, 2003 (the "Class Period"). The securities analyzed include: a) Veritas common stock, b) Veritas 5.25% Convertible Subordinated Notes due 2004 ("5.25% Notes"), c) Veritas 1.856% Convertible Subordinated Notes due 2006 ("1.856% Notes"), and d) Options on Veritas common stock. For the reasons set out below, I calculated these damages based on the price decline in the respective securities that occurred on November 15, 2002.

4. For the common stock analysis, I used the November 15 market adjusted price decline of $1.32 per share, and a two trader model replicating the trading in Veritas common stock. The trading model was then tested against the available institutional ownership data to ensure a reasonable level of reliability. Finally, aggregate damages were calculated by applying the market adjusted price decline of $1.32 per share on November 15, 2002, limited by the statutorily required 90-day bounce back rule, to the replicated trading pattern of Veritas common stock, resulting in total

DECLARATION OF BJORN I. STEINHOLT, CFA, IN SUPPORT OF THE PLAN OF ALLOCATION - C-03-0283-MMC  - 1 -

damages for the common stock of $151 million. Specifically, the two trader model assumed that 30% of the public float made up 90% of the reported volume after adjusting for intra-day trading assumed to make up 75% of the reported volume.

5. For the Notes analysis, I had no available trading volume to determine how many of the Notes actually were purchased during the Class Period. As a result, I assumed that all of the Notes were damaged, arriving at maximum damages of $17 million for the 1.856% Notes and $9 million for the 5.25% Notes. It should be understood, however, that the damages for the Notes are substantially less than the maximum damages calculated. I did not perform a damage analysis for the options because of the difficulties involved and described in further detail below. In any event, total damages for all three securities were $177 million, which in turn means that the $35 million settlement proceeds in this case is roughly 20 percent of my preliminary damage estimate.[1]

6. Additionally, I was asked by plaintiffs' counsel to design an equitable plan to allocate the settlement proceeds in this matter (the "Plan of Allocation") among Class members. Because the amount to be distributed is far less than the full value of the Class claims, the plan of allocation must take into account the fact that claimants will not likely recover their full damages. Moreover, as I understand it, the case settled before the plaintiffs were able to take any discovery. Thus, the plan of allocation was designed without the benefit of information, such as the Company's communications with market participants during the Class Period that would have been available had the case progressed further.

7. My opinions regarding the Plan of Allocation are based on my professional experience, as well as a review of a substantial amount of information, including: a) the Second Amended Class Action Complaint, signed June 30, 2004; b) the Company filings with the Securities

---

[1] I noted that John C. Hammerslough calculated damages for the common stock of $324.9 million. There are two main differences between his analysis and mine. First, he does not limit damages for the so-called 90-day bounce-back rule, while I incorporated this limitation into my damage analysis because it is a statutory limitation on damages that is also accounted for in the Plan of Allocation. Had I ignored the 90-day bounce-back rule, my damage estimate would also be more than $300 million. Second, he calculates damages for the in-out shares, i.e., shares that receive the lesser of market losses or 10 cents per the Plan of Allocation, of $16 million. I did not calculate damages for this group.

DECLARATION OF BJORN I. STEINHOLT, CFA, IN SUPPORT OF THE PLAN OF ALLOCATION - C-03-0283-MMC - 2 -

and Exchange Commission ("SEC"); c) contemporaneous analyst and media reports; and d) price and volume data for Veritas' securities and market indices, as well as institutional trading data. Based on my review of the available information, as well as my understanding of plaintiffs' theory of the alleged fraud, I developed the Plan of Allocation discussed in greater detail below. In my opinion, for the reasons discussed in greater detail below, the proposed Plan of Allocation provides a fair and equitable way to allocate the settlement proceeds in this case among the various Class members.

### Plan of Allocation

8.  Veritas is a supplier of storage software products and services, including storage management, data protection software and clustering, replication and storage area networking software. Leading up to the Class Period, the Company had beaten analysts' consensus revenue and earnings forecasts for 17 straight quarters. Plaintiffs allege that Veritas engaged in earnings management, and, starting with the fourth quarter of 2000, was only able to meet analysts' forecasts by entering into a fraudulent transaction with America Online, Inc. ("AOL"). According to the Complaint, the AOL transaction, together with various other false and misleading statements throughout the Class Period, inflated the Company's stock price by concealing Veritas' true business condition and future prospect.

9.  During the Class Period, Veritas' stock price declined from a closing price high of $105 per share on January 23, 2001 to a closing price of $17.47 per share following the end of the Class Period on January 17, 2003, a price decline of more than $87.50 per share or 83 percent. Some portion of this substantial price decline most likely reflects damages caused by the alleged fraud. However, without the factual record that is generally developed through discovery prior to trial it is very difficult to specifically quantify such damages in this case. On the other hand, the causal link between the November 15, 2002 price decline and the revelations about the AOL transaction in Veritas' third quarter 2002 Form 10-Q can easily be established. The Form 10-Q stated:

> AOL/Time Warner
>
> In response to subpoenas issued by the Securities and Exchange Commission in the investigation entitled In the Matter of AOL/Time Warner, we are furnishing information to the SEC, including information relating to transactions we entered

DECLARATION OF BJORN I. STEINHOLT, CFA, IN SUPPORT OF THE PLAN OF ALLOCATION - C-03-0283-MMC - 3 -

into with AOL in September of 2000. We are cooperating with the SEC's investigation.

The transactions involved a $50 million software license and services sale to AOL and a $20 million advertising services purchase from AOL. We recognized $37 million of revenue in the fourth quarter of 2000 and have been recognizing the remaining $13 million as revenue over the three-year support period. The $20 million of advertising expense was recorded over the five quarters during which AOL provided advertising services to us, beginning in the fourth quarter of 2000 and ending in the fourth quarter of 2001. We are currently reviewing our accounting treatment for these transactions, focusing on the $20 million of advertising services expense and $20 million of the revenue.

10. Following the issuance of the above Form 10-Q, Veritas' stock price declined from a closing price of $18.25 per share on November 14, 2002 to a closing price of $16.75 per share on November 15, 2002 on volume of 25 million shares or 1.9 times the average daily volume. This disclosure resulted in a statistically significant price decline (at the 90 percent level) and, even absent discovery, could be said to be directly associated with the specific Company disclosure of its improper accounting for the AOL transaction.

11. Based on my event analysis, I calculated that the market adjusted price decline on November 15, 2002 was $1.32 per share. In my opinion, given the posture of this case, plaintiffs' ability to prove that the November 2002 price decline was attributable to fraud, is strong. Consequently, for shares of Veritas common stock purchased from January 3, 2001 through November 14, 2002, and retained at the end of November 14, 2002, the claim per share is the lesser of: a) $1.32 per share (the market adjusted price decline on November 15, 2002), or b) the purchase price less $16.75 per share (the November 15, 2002 closing price).[2]

12. I also examined the price declines prior to and after November 15, 2002. Again, absent discovery or further factual development, there did not readily appear to be a direct link between any such daily price declines and revelations specifically about the AOL transaction. That said, statements made by defendants revealed Veritas' true business condition and future prospect during various other times during the Class Period – which was the essence of plaintiffs' claims –

---

[2] The claims were capped to the difference between the purchase price less the closing price following the disclosure to account for the limitation resulting from the statutory 90-day bounce back rule.

DECLARATION OF BJORN I. STEINHOLT, CFA, IN SUPPORT OF THE PLAN OF ALLOCATION - C-03-0283-MMC -4-

1  likely removed some portion of the fraud inflation. Thus, while a detailed damage analysis could be
2  developed, it would require significantly more information than is available solely from the public
3  record without the benefit of discovery. Consequently, recognizing that these shareholders would
4  have substantially weaker claims than those with losses tied to the November 15, 2002 price decline,
5  I limited these claims to, at most, 10 cents per share. This amounts to 7.5 percent of the $1.32 per
6  share the allocation provides Class members who owned their shares at the time of the November 15,
7  2002 decline. As a result, for shares purchased and sold prior to November 15, 2002, the claim per
8  share is the lesser of: a) the purchase price less the sales price, or b) 10 cents per share. For shares
9  purchased from November 15, 2002 through January 16, 2003, and sold prior to January 17, 2003,
10 the claim is also the lesser of: a) the purchase price less the sales price, or b) 10 cents per share.
11 Finally, for shares purchased from November 15, 2002 through January 16, 2003, and retained at the
12 end of January 16, 2003, the claim is the lesser of: a) the purchase price less $17.47 (the January 17,
13 2003 closing price), or b) 10 cents per share.

14     13.    The 5.25% Notes and 1.856% Notes are treated similar to the Veritas common stock.
15 As a result, for 5.25% Notes purchased from January 3, 2001 through November 14, 2002, and
16 retained at the end of November 14, 2002, the claim per $1,000 par value 5.25% Note is the lesser
17 of: a) the purchase price less $1,795 (the November 15, 2002 closing price), or b) $138.14 (the
18 November 15, 2002 price decline). Similarly, for 1.856% Notes purchased from January 3, 2001
19 through November 14, 2002, and retained at the end of November 14, 2002, the claim per $1,000 par
20 value 1.856% Note is the lesser of: a) the purchase price less $880 (the November 15, 2002 closing
21 price), or b) $36.87 (the November 15, 2002 price decline). For Notes purchased and sold prior to
22 November 15, 2002, or purchased following November 14, 2002, the claim is equal to the losses
23 limited by roughly 7.5 percent of the November 15, 2002 price decline, same as for the Veritas
24 common stock.

25     14.    Options, however, involve far more variables than stocks or bonds, making it very
26 difficult to translate the common stock allocation into a similar allocation for the option purchasers.
27 As noted in one of the recent texts addressing the determination of option damages: "Quantifying
28 losses to these options is complex and difficult due to both the necessary discovery of investment

DECLARATION OF BJORN I. STEINHOLT, CFA, IN SUPPORT OF THE PLAN OF
ALLOCATION - C-03-0283-MMC     - 5 -

1  banking trading records to identify the open interest and the sophisticated mathematical techniques
2  required to measure loss."[3] Indeed, another paper acknowledged: "As of yet, there is little guidance
3  on how to handle options in securities fraud suits. As shown below, the calculation of damages is
4  not as straight forward as one might think. This is true for both legal and economic reasons."[4]

5     15.    Options are significantly different than common stock. A stock option is essentially a contract that allows the purchaser to either buy or sell an underlying common stock at a fixed price (the strike price) during a finite time period (usually a few months). Unlike common stock, a call option (option to purchase common stock at a fixed price) has a limited downside. For example, an investor who bought Veritas common stock for $105 per share during the Class Period had a $105 downside as the stock price could have become worthless. Purchasing an option to buy Veritas common stocks at that same time would involve limited downside equal to the price of the option, which would generally be just a small fraction of the cost of the common stock. Because such stock options only have a fraction of the downside that outright ownership of the common stock carries, their economic losses per option generally are substantially less than losses per common stock. Consequently, stock options cannot simply be treated as common stock.

16.    Furthermore, during the Class Period there were a myriad of different options with different characteristics such as different strike prices and different expiration dates. Technically, each such option would be impacted differently by the alleged fraud and could arguably require its own allocation. In addition, the relationship between the underlying security and the option is complex, in part because the option generally only has a short life before it expires. For example, the value of a call option may decrease even if the price of the underlying security increases. Finally, given the lack of observable pricing information (as options often do not trade every day), a complete damage analysis would have to employ a valuation model, for example a Black-Scholes

---

[3] Usher, "Securities Act Violations: Derivatives in Securities Class Actions: Chapter 18," *Litigation Services Handbook: The Role of the Financial Expert*, Third Edition (2001).

[4] Tabak, Starykh and Shotland, "A proposed Methodology to Measure Damages for Option Traders Alleging Securities Fraud," Litigation Economic Review (2002).

DECLARATION OF BJORN I. STEINHOLT, CFA, IN SUPPORT OF THE PLAN OF
ALLOCATION - C-03-0283-MMC   - 6 -

1  model. This would require the claims administrator to conduct at least one valuation for each claim,
2  a daunting, time-consuming and expensive task.

3      17.    Based on my more than 15 years experience dealing with the complex issues relating
4  to options in securities class actions, I determined the best and most reasonable way of allocating
5  settlement proceeds to the option holders in this case was based on the market losses for options
6  owned at the end of November 14, 2002, i.e., those that experienced the impact of the November 15,
7  2002 revelation. Using market losses is overly generous to the option holders because they are
8  getting 100 percent of their losses. Common stock and Note purchasers are limited to the respective
9  November 15 price declines. For example, a common shareholder who purchased shares at $105 per
10 share and still owned these shares at the end of November 14, 2002, would have a claim of $1.32 per
11 share, or only 1.5 percent of the market losses. The option holder would be able to make a claim for
12 100% of her loss. In my view, it is unfair to the other security holders to allocate 100% of options
13 losses primarily because it would be too complex, time consuming and expensive to compute them
14 using a Black-Scholes model. Accordingly, to adjust for this inequity, the total recovery for the
15 option holders was limited to 2 percent of the total settlement proceeds.[5]

16     18.    No claim was awarded to option holders whose options exercised/expired prior to, or
17 purchased and exercised/expired after, November 15, 2002. First, to provide these options a claim
18 equal to roughly 7.5 percent of the price decline of the options on November 15, 2002 would be
19 virtually impossible. For one thing, many of the options did not even exist at that time. For another,
20 the options are all different requiring sophisticated individual analyses for each option. Further,
21 even if such a theoretical exercise was undertaken, it would in all cases result in a claim of
22 substantially less than 10 cents per options as options are significantly different than common stock,
23 as discussed above. In my opinion, the potential recoveries, if any, for such claims would not justify
24 the extra cost and effort.

---

[5] The 2 percent is roughly the same as the ratio of the total option volume used in the Hammerslough report divided by the total common stock volume (excluding the Notes). In my opinion, this is, if anything, very generous to the option holders.

DECLARATION OF BJORN I. STEINHOLT, CFA, IN SUPPORT OF THE PLAN OF ALLOCATION - C-03-0283-MMC - 7 -

19. Based on the above, I developed the Plan of Allocation, attached as Exhibit B.

**Hammerslough Report**

20. I have reviewed the report by John C. Hammerslough in this matter. Not surprisingly, Mr. Hammerslough does not address any of the complexities relating to allocating settlement proceeds to option holders, either generally or specifically. It is telling that Mr. Hammerslough provides a damage estimate for the common stock, but not for the options – the primary purpose of his report.

21. Mr. Hammerslough was asked to "make an estimate as to the number of options that might be eligible to claim and the amount of their claims assuming that the recognized loss was compatible with the recognized loss of shareholders." Not surprisingly, he fails do so. First, he fails to specify what the recognized loss would have to be for the option holders in order to "be compatible" with that given to the shareholders. The closest he gets is to suggest that a $1 price increase in the underlying common stock would on average result in a 50 cent increase in the call option. But even that was done without any consideration of how far the option is in or out of the money, or the length of time remaining until expiration, two of the many factors that would dramatically alter whether there was any impact from the fraud. Second, he does not even attempt to determine when the options were purchased or exercised/expired, or whether they were outstanding on November 15, 2002. This would be necessary in order to calculate the option damages. Third, he does not address any of the complex issues associated with option damages discussed above. Fourth, Mr. Hammerslough's only conclusion seems to be that after eliminating 92.5 percent of the volume for the common stock, and 70 percent of the volume for the options, the option volume is no longer about 2 percent of the total volume, rather, it is roughly 9.3 percent. Mr. Hammerslough provides no support for his ad-hoc volume reductions, and why volume he attributes to "noise" should not be eligible to file a claim. In any event, Mr. Hammerslough fails to provide any economic analysis that would assist in any way with the allocation of the settlement proceeds in this case. Consequently, the report by Mr. Hammerslough does not change my opinion that the proposed Plan of Allocation is fair and equitable to the Class member.

DECLARATION OF BJORN I. STEINHOLT, CFA, IN SUPPORT OF THE PLAN OF ALLOCATION - C-03-0283-MMC

- 8 -

## Conclusion

22. Based on the above, it is my opinion that the proposed Plan of Allocation provides a fair and equitable way to allocate the settlement proceeds in this case among the various Class members.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. This declaration was executed this 26th day of August, 2005 at San Diego, California.

BJORN I. STEINHOLT, CFA

T:\CasesSF\Veritas Software\DEC00023779.doc

DECLARATION OF BJORN I. STEINHOLT, CFA, IN SUPPORT OF THE PLAN OF ALLOCATION - C-03-0283-MMC

- 9 -

DECLARATION OF SERVICE BY FACSIMILE
PURSUANT TO NORTHERN DISTRICT LOCAL RULE 23-2(c)(2)

I, the undersigned, declare:

1. That declarant is and was, at all times herein mentioned, a citizen of the United States and employed in the City and County of San Francisco, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 100 Pine Street, Suite 2600, San Francisco, California 94111.

2. That on August 26, 2005, declarant served by facsimile the **DECLARATION OF BJORN I. STEINHOLT, CFA, IN SUPPORT OF THE PLAN OF ALLOCATION** to the parties listed on the attached Service List and this document was forwarded to the following designated Internet site at:

http://securities.lerachlaw.com/

3. That there is a regular communication by facsimile between the place of origin and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 26th day of August, 2005, at San Francisco, California.

/s/
_____
CAROLYN BURR

VERITAS SOFTWARE (LEAD)
Service List - 8/25/2005    (03-0029)
Page 1 of 1

### Counsel For Defendant(s)

Susan D. Resley
Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road
Menlo Park, CA 94025
   650/614-7400
   650/614-7401(Fax)

Peri B. Nielsen
Wilson Sonsini Goodrich & Rosati, P.C.
650 Page Mill Road
Palo Alto, CA 94304-1050
   650/493-9300
   650/493-6811(Fax)

### Counsel For Plaintiff(s)

John T. DeCarlo
Daniel M. Shanley
DeCarlo & Connor
533 South Fremont Avenue, 9th Floor
Los Angeles, CA 90071-1706
   213/488-4100
   213/488-4180(Fax)

William S. Lerach
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
401 B Street, Suite 1600
San Diego, CA 92101-4297
   619/231-1058
   619/231-7423(Fax)

Patrick J. Coughlin
Jeffrey W. Lawrence
Shawn A. Williams
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
100 Pine Street, Suite 2600
San Francisco, CA 94111-5238
   415/288-4545
   415/288-4534(Fax)

Andrew S. Brignone
Schreck Brignone
300 South Fourth Street, Suite 1200
Las Vegas, NV 89101
   702/382-2101
   702/382-8135(Fax)