**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| |
|---|
| IN RE VALEANT PHARMACEUTICALS INTERNATIONAL, INC. SECURITIES LITIGATION |

Case No.: 3:15-CV-07658-MAS-LHG

**REPORT & RECOMMENDATION**
**OF THE SPECIAL MASTER**

This matter comes before the Special Master upon motion by Lead Plaintiff TIAA for final approval of class certification, final approval of the proposed Settlement and for an award of attorneys' fees consistent with the provisions set forth in the Stipulation of Settlement. After considering the submissions of the parties, and based upon the fairness hearing conducted before the Special Master on May 27, 2020, it is the decision of the Special Master for the reasons herein expressed, that Plaintiff's motions for (1) Final Approval of Class Action Settlement and Plan of Allocation and (2) an Award of Attorney's Fees and Expenses and Awards to Plaintiffs Pursuant to 15 U.S.C. §78u-4(a)(4) are **granted.**

**I.      Background**

The Court has previously summarized many of the factual allegations at issue in this matter and the Special Master assumes the parties' familiarity with those allegations. *See e.g.*, *In re Valeant Pharm. Int'l, Inc. Sec. Litig. (In re Valeant)*, No. 15-7658, 2017 WL 1658822 (D.N.J. Apr. 28, 2017), *reconsideration denied*, No. 15-7658, 2017 WL 3880657 (D.N.J. Sept. 5, 2017); *Catalyst Dynamic Alpha Fund v. Valeant Pharm. Int'l, Inc.*, No. 18-12673, 2019 WL 2331631 at *2 (D.N.J. May 31, 2019).

On October 22, 2015, Laura Potter brought a putative class action on "behalf of all persons who purchased or otherwise acquired Valeant stock between February 23, 2015 and October 20, 2015, inclusive …, against Valeant and certain of its officers and/or directors for

violations of the Securities Exchange Act of 1934 …." (*In re Valeant Pharmaceuticals International, Inc. Securities Litigation (Valeant Class Action)*, No. 15-7658 (D.N.J.) Compl. ¶ 1, ECF No. 1). On May 31, 2016, the Court consolidated Ms. Potter's action with several other actions, and pursuant to the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, the Court appointed Lead Counsel and Lead Plaintiff in the consolidated action. (*Valeant Class Action*, Order 3, ECF No. 67).

On June 24, 2016, Lead Plaintiff and the other Named Plaintiffs filed a Consolidated Class Complaint (the "Class Complaint"). (*Valeant Class Action*, Class Compl., ECF No. 80). The Class Complaint was "brought on behalf of purchasers of Valeant equity securities and senior notes between January 4, 2013 and March 15, 2016, … to pursue remedies" under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), Securities Exchange Commission Rule 10b-5, and Sections 11, 12(a)(2), and 15 of the Securities Act of 1933. (*Id.* ¶ 1). On April 28, 2017, the Court decided six motions to dismiss filed by various groups of defendants in the *Valeant Class Action*. *See In re Valeant*, 2017 WL 1658822, at *1.

On September 9, 2018, Lead Plaintiff and Lead Counsel filed the First Amended Class Complaint naming additional defendants and bringing additional claims. (*Valeant Class Action*, First Am. Class Compl., ECF No. 352). Lead Plaintiff moved for class certification on September 28, 2018. Defendants' time to respond to Lead Plaintiff's motion for class certification has not yet elapsed, and the Court has not yet ruled on Lead Plaintiff's motion. The Litigation was referred to Special Master Judge Dennis M. Cavanaugh, U.S.D.J. (ret), on September 10, 2019.

During the course of this litigation the Settling Parties[1] engaged in two mediation sessions with Professor Eric D. Green, Esq. On November 20, 2019, Professor Green issued a mediator's proposal. On November 22, 2019, the Settling Parties agreed to settle the litigation with all Defendants and Former Defendants except PriceWaterhouseCoopers LLP ("PwC") in return for a cash payment of $1,210,000,000.00 for the benefit of the Class. A Stipulation of Settlement, dated December 15, 2019, was entered into by Lead Plaintiff, on behalf of itself and the Class, and the Settling Defendants.

On December 17, 2019, Lead Plaintiff moved before the Special Master for preliminary approval of the class action settlement pursuant to Federal Rule of Civil Procedure 23(e)(1). On January 24, 2020, the Special Master entered the Order Granting Preliminary Approval. (ECF No. 510). By Order dated February 5, 2020, the Hon. Lois H. Goodman, U.S.M.J., adopted the Special Master's Order Granting Preliminary Approval of Settlement. (ECF No. 515).

Notice to the proposed class was then performed in accordance with the Preliminary Approval Order. According to the Declaration of Ross D. Murray submitted by Lead Counsel, as of April 20, 2020, a total of 431,576 packages consisting of the Notice and Proof of Claim and Release form ("Notice Package") were mailed to potential Class Members and nominees. The Summary Notice was also transmitted over Business Wire and published in The Wall Street

---

[1] The Settling Parties are those who made and entered into the Stipulation of Settlement, dated December 15, 2019: Lead Plaintiff TIAA, on behalf of itself and the Class,; Valeant Pharmaceuticals International, Inc. ("Valeant") (n/k/a Bausch Health Companies Inc.); J. Michael Pearson; Howard B. Schiller; Robert L. Rosiello; Deborah Jorn; Ari S. Kellen; Tanya Carro; Jeffrey W. Ubben; Robert A. Ingram; Ronald H. Farmer; Colleen Goggins; Anders Lönner; Theo Melas-Kyriazi; Robert N. Power; Norma Provencio; Katharine B. Stevenson; Deutsche Bank Securities Inc.; HSBC Securities (USA) Inc.; MUFG Securities Americas Inc. f/k/a Mitsubishi UFJ Securities (USA) Inc.; DNB Markets, Inc.; Barclays Capital Inc.; Morgan Stanley & Co. LLC; RBC Capital Markets, LLC; Suntrust Robinson Humphrey, Inc.; ValueAct Capital Management, L.P. ("ValueAct Capital"); VA Partners I, LLC ("VA Partners"); ValueAct Holdings, L.P. ("ValueAct Holdings"); ValueAct Capital Master Fund, L.P. ("ValueAct Capital Master Fund"); ValueAct Co-Invest Master Fund, L.P. ("ValueAct Co-Invest Fund") (collectively, the "Defendants"); Goldman Sachs & Co. LLC f/k/a Goldman Sachs & Co.; J.P. Morgan Securities LLC; Merrill Lynch, Pierce, Fenner & Smith Inc.; CIBC World Markets Inc.; Citigroup Global Markets Inc.; DBS Bank Ltd.; TD Securities (USA) LLC; BMO Capital Markets Corp.; SMBC Nikko Securities America, Inc. (collectively, the "Former Defendants").

Journal.  The Notice, Proof of Claim and Release form, Stipulation of Settlement, Preliminary Approval Order, and other relevant documents were also posted to a website dedicated to the litigation and settlement. Four objections to settlement were received by the Court: two relating to the Attorneys' Fee Request, one to the amount of settlement, and one to the Plan of Allocation.

## II.    Discussion

### A.  *Class Certification*

Class certification is subject to the requirements of Federal Rule of Civil Procedure 23, subsections (a) and (b). *See Amchem Prod., Inc. v. Windsor,* 521 U.S. 621–22 (1997). In determining whether certification is appropriate, this Court may take the Settlement Agreement into consideration. *See In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,* 148 F.3d 283, 308 (3d Cir.1998) *cert denied,* 525 U.S. 1114 (1999).

In accordance with Federal Rule of Civil Procedure 23(a), class certification is appropriate where a prospective class establishes: (1) numerosity (a "class [so large] that joinder of all members is impracticable"); (2) commonality ("questions of law or fact common to the class"); (3) typicality (named parties' claims or defenses "are typical ... of the class"); and (4) adequacy of representation (representatives "will fairly and adequately protect the interests of the class"). *Amchem,* 521 U.S. at 613. "To obtain class certification, plaintiffs must establish all four elements of Rule 23(a) along with one provision of Rule 23(b)." *Johnston v. HBO Film Mgmt.,* 265 F.3d 178, 183 (3d Cir. 2001); *see Georgine v. Amchem Prods., Inc.,* 83 F.3d 610 (3d Cir. 1996). "All four Rule 23(a) prerequisites for class certification serve as 'guideposts for determining whether maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members

will be fairly and adequately protected in their absence.'" *In re Schering Plough Corp. ERISA Litig.,* 589 F.3d 585, 597 (3d Cir. 2009).

Pursuant to Federal Rule of Civil Procedure 23(b), a class action may be maintained if Rule 23(a) is satisfied, and if:

> (1) prosecuting separate actions by or against individual class members would create a risk of:
>
>> (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
>>
>> (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;
>
> (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.
>
> [*In re Schering-Plough/Merck Merger Litig.*, No. CIVA09-CV-1099DMC, 2010 WL 1257722, at *4 (D.N.J. Mar. 26, 2010).]

Federal Rule of Civil Procedure 23(a) provides four prerequisites to maintaining a class action: numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P. 23(a). The Court addresses each Rule 23(a) requirement for class certification in turn.

The numerosity requirement is satisfied if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). A named plaintiff can generally demonstrate numerosity if "the potential number of plaintiffs exceeds 40." *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001) (citing Moore's Federal Practice ¶ 23.22 (3d ed. 1999)). Here, Lead Plaintiff claims that the class encompasses significantly more than forty members.

Lead Plaintiff has submitted the Declaration of Stephen P. Feinstein, Ph.D, CFA, which indicates that throughout the Class Period, Valeant stock was actively traded on the New York Stock Exchange, and had: (1) more than 300 million shares of common stock outstanding; (2) a market capitalization of between $11.5 billion and $90 billion and; (3) an average daily trading volume of 3.8 million shares. Lead Plaintiff further indicates that there were also at least 1,337 major institutions that reported ownership of Valeant common stock during the Class Period. Lead Plaintiff has also demonstrated that as of April 20, 2020, approximately 431,576 Claim Packages were mailed to potential Class Members and nominees. Rule 23(a)'s numerosity requirement is satisfied.

Rule 23(a)(2)'s commonality prerequisite requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The named plaintiff must "demonstrate that the class members 'have suffered the same injury'" and that their claims "depend upon a common contention ... capable of class wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (internal citation omitted). Here, Lead Plaintiff has demonstrated that questions of fact and law regarding Defendants' alleged misstatements and omissions concerning Valeant's financial results and the sustainability its business model are common to the class. The questions of law or fact common to Lead Plaintiff and the Class include: (1) whether Defendants' statements and omissions violated the federal securities laws; (2) whether Defendants acted with the requisite intent when making material misrepresentations or omissions; (3) whether Valeant's interim and year-end financial statements for 2014 and 2015 were materially false and/or misleading; and (4) whether investors suffered damages when the artificial inflation in the price of Valeant securities, created or

maintained by Defendants' false statements and/or omissions, was eliminated. The commonality requirement is satisfied.

Rule 23(a)(3)'s typicality requirement demands that the "claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality requirement is satisfied "where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct." *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 428 (3d Cir. 2016) ("*In re NFL Players Litig.*") (internal quotation omitted). Here, each of the proposed Class Representatives is alleged to have been damaged by the acquisition of Valeant Securities at prices that were artificially inflated. The claims are typical of the Settlement Class because the claims arise from the same course of conduct that gave rise to the claims of all other Class Members and are based on the same legal theory. Rule 23(a)(3)'s typicality requirement is satisfied.

Rule 23(a)(4) provides that "representative parties [must] fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "This requires a determination of (1) whether the representatives' interests conflict with those of the class and (2) whether the class attorney is capable of representing the class." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 185 (3d Cir. 2001).

First, as to the adequacy of class representatives, a "class representative must represent a class capably and diligently. [A] minimal degree of knowledge about the litigation is adequate." *In re NFL Players Litig.*, 821 F.3d at 430 (internal quotations and citations omitted). Here, Lead Plaintiff and Named Plaintiffs are large institutional investors that, like Class Members, purchased Valeant Securities at artificially inflated prices. Lead Plaintiff and Named Plaintiffs have demonstrated their competency and ability to serve as class representatives by

overseeing the litigation through the pleadings, motions to dismiss, discovery, and settlement phases, and participating in discussions with Lead Counsel concerning case developments, strategies, significant filings, and settlement.

Lead Plaintiff TIAA submitted the Declaration of Laurie A. Gomez in support of Lead Plaintiff's motion for final approval and an award pursuant to 15 USC §78u-4(a)(4). The sworn declaration details TIAA's involvement in this lawsuit and its efforts on behalf of the class. Named Plaintiff IBEW Local Union 481 Defined Contribution Plan and Trust ("IBEW") submitted the Declaration of David Ray in support of Lead Plaintiff's motion for final approval and an award pursuant to 15 USC §78u-4(a)(4). The sworn declaration details IBEW's involvement in this lawsuit and its efforts on behalf of the class. Named Plaintiff City of Tucson ("Tucson") submitted the Declaration of Roy Arthur Cuaron in support of Lead Plaintiff's motion for final approval and an award pursuant to 15 USC §78u-4(a)(4). The sworn declaration details Tucson's involvement in this lawsuit and its efforts on behalf of the class. The Special Maser finds that the Class Representatives capably represented the class and merit the proposed incentive awards. Pursuant to 15 USC §78u-4(a)(4), TIAA is awarded $66,495.00, IBEW is awarded $3,002.75, and Tucson is awarded $3,275.00.

Second, as to the adequacy of class counsel, this Court must weigh three criteria: whether class counsel "(1) possessed adequate experience; (2) vigorously prosecuted the action; and (3) acted at arm's length from the defendant." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 801 (3d Cir. 1995). After reviewing the Declarations and submissions of Lead Counsel, the Special Master finds that Lead Counsel (i) have already done substantial work in investigating and prosecuting the claims in this litigation; (ii) are experienced in handling complex litigation and securities claims; (iii) have extensive knowledge of the

applicable laws; and (iv) have devoted considerable time and resources to this litigation. Accordingly, the Special Master finds that Rule 23(a)(4)'s adequacy in representation requirement is satisfied.

In addition to satisfying the four Rule 23(a) prerequisites, the parties must also demonstrate that the proposed class satisfies "at least one of the three requirements listed in Rule 23(b)." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011). Here, the parties turn to Rule 23(b)(3), which applies when (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) when "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The first inquiry—the "predominance inquiry"—tests "whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 298 (3d Cir. 2011). Here, the Class's claims depend on the same factual circumstances. Lead Plaintiff alleges that Defendants' course of conduct artificially inflated (or artificially maintained) the prices of Valeant Securities and that when the truth regarding Valeant's financial condition, deceptive business practices, and false accounting was revealed through a series of disclosures between September 28, 2015, and June 7, 2016, the price of Valeant Securities fell and Class Members were damaged. *See In re Linerboard Antitrust Litig.*, 305 F.3d 145, 163 (3d Cir. 2002) (discussing how common issues predominate where the "the inquiry necessarily focuses on defendants' conduct") (internal citation and quotation omitted). The Class's claims depend on proof of common legal issues because Valeant Securities traded in an efficient market during the Class Period.

The second inquiry—the superiority inquiry—"asks a district court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *In re Cmty. Bank of N. Va. Mortgage Lending Practices Litig.*, 795 F.3d 380, 409 (3d Cir. 2015) (interior citation omitted). The Special Master finds that the Settlement is superior to continued litigation after considering the costs of additional motion practice, the terms of the Settlement, and the size of the alleged loss. *See In re Gen. Motors Corp.*, 55 F.3d at 796 (discussing the superiority requirement in the settlement context). Thus, having found that Rule 23(a) and 23(b)(3) are satisfied, the Special Master will certify the class.

## B.   *Class Notice*

When the Court preliminarily certified the Class and approved the Settlement, it directed that notice be given to all potential class members. Notice "is designed to summarize the litigation and the settlement and to apprise class members of the right and opportunity to inspect the complete settlement documents, papers, and pleadings filed in the litigation." *Prudential,* 148 F.3d at 327 (internal quotation marks omitted). "Generally speaking, the notice should contain sufficient information to enable class members to make informed decisions on whether they should take steps to protect their rights, including objecting to the settlement or, when relevant, opting out of the class." *In re Baby Prods. Antitrust Litig.,* 708 F.3d 163, 180 (3d Cir. 2013).

For a class certified under Rule 23(b)(3), "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). In addition to the requirements of Rule 23, due process further requires that notice be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford

them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

Here, the Notice apprised Class Members of the nature of the litigation, definition of the class, claims and issues in the litigation, and the claims to be released. The Notice further advised that Class Members could enter an appearance through counsel, described the binding effect of judgment on the Class, outlined the procedures and deadlines for Class Members to exclude themselves and for objecting to Settlement, detailed the proposed Plan of Allocation and attorneys' fees sought, the procedure for submitting a Proof of Claim and Release, and the information related to the Final Approval Hearing. The claim administrator commenced mailing of the Notice Packages on February 6, 2020. As of April 20, 2020, approximately 431,576 Notice Packages were mailed to potential Class Members and nominees. The Summary Notice was also transmitted over Business Wire and published in The Wall Street Journal.  The Notice, Proof of Claim and Release, Stipulation, and Preliminary Approval Order were also posted on the website maintained for the Settlement. The Special Master finds that the content of the Notice and its distribution to the Class satisfied Rule 23 and due process.

### C.  Settlement Approval

Lead Plaintiff also moves the Court to grant final approval of the Settlement. Lead Plaintiff argues that the Settlement merits final approval because it is fair, reasonable, and adequate. Fed. R. Civ. P. 23(e)(2). The Special Master agrees and grants final approval of the Settlement for the reasons expressed herein.

Federal Rule of Civil Procedure 23(e) provides that "[a] class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such a manner as the court

directs." Fed.R.Civ.P. 23(e).  In determining whether to approve a class action settlement pursuant to Rule 23(e), "the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members" *In re GM Corp. Pick–Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F.3d 768, 785 (3d Cir.1995) (quoting *Grunin v. Int'l House of Pancakes,* 513 F.2d 114, 123 (8th Cir.1975), *cert. denied,* 423 U.S. 864 (1975) (citation omitted)).

Rule 23(e)(2) provides requirements that a court must ensure are satisfied prior to granting <u>final</u> approval. Obtaining final approval of a class action settlement under Rule 23(e) requires that, after a hearing, the district court find the settlement to be "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Specifically, Rule 23(e)(2) requires that the court consider whether

> (A) the class representatives and class counsel have adequately represented the class;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account:
>
>> (i)      the costs, risks, and delay of trial and appeal;
>>
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>>
>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>>
>> (iv) any agreement required to be identified under Rule 23(e)(3); and
>
> (D) the proposal treats class members equitably relative to each other.

Paragraphs (A) and (B) constitute the "procedural" aspects of the fairness analysis, and "look[ ] to the conduct of the litigation and of the negotiations leading up to the proposed

settlement." Fed. R. Civ. P. 23(e)(2) Advisory Committee Note ("Rule 23 Advisory Committee Note"). Paragraph (A) requires that the court conduct "a backward-looking assessment of the <u>actual</u> quality of representation afforded by class counsel." Paragraph (B) necessitates consideration of how the settlement was conducted; relevant to this question is whether a "neutral or court-affiliated mediator or facilitator" was involved in the negotiations. Rule 23 Advisory Committee Note.

Paragraphs (C) and (D) guide the "substantive" review of the proposed settlement, and require the court to analyze the "relief that the settlement is expected to provide." Rule 23 Advisory Committee Note. Paragraph (C)(i) invites analysis of the settlement as compared to "the likely range of possible classwide recoveries and the likelihood of success in obtaining such results;" Paragraph (C)(ii) queries whether the claims process for the proposed settlement is "unduly demanding;" Paragraph (C)(iii) examines the proposed attorneys' fee award as compared to the relief provided to the class; and Paragraph (C)(iv) requires the court to account for any side agreements that are made in connection with the proposed settlement. *Id.* Paragraph (D) considers whether "the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." *Id.*

The Third Circuit has held that a presumption of fairness attaches to a proposed settlement if "(1) the negotiations occurred at arm's-length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *In re NFL Players Litig*, 821 F.3d 410, 436 (3d Cir. 2016). In *Girsh v. Jepson,* the Third Circuit identified nine factors, so-called *"Girsh* factors," that a district court should consider when making this determination:

> (1) the complexity, expense and likely duration of the litigation;
> (2) the reaction of the class to the settlement; (3) the stage of the
> proceedings and the amount of discovery completed; (4) the risks
> of establishing liability; (5) the risks of establishing damages; (6)
> the risks of maintaining the class action through the trial; (7) the
> ability of the defendants to withstand a greater judgment; (8) the
> range of reasonableness of the settlement fund in light of the best
> possible recovery; and (9) the range of reasonableness of the
> settlement fund to a possible recovery in light of all the attendant
> risks of litigation.

[521 F.2d 153, 157 (3d Cir.1975).]

"These factors are a guide and the absence of one or more does not automatically render the settlement unfair." *In re American Family Enterprises,* 256 B.R. 377, 418 (D.N.J. 2000). Rather, the court must look at all the circumstances of the case and determine whether the settlement is within the range of reasonableness under *Girsh. See In re Orthopedic Bone Screw Prod. Liab. Litig.,* 176 F.R.D. 158, 184 (E.D.Pa. 1997); *see also In re AT & T Corp. Sec. Litig.,* 455 F.3d 160 (3d Cir. 2006). In sum, the Court's assessment of whether the settlement is fair, adequate and reasonable is guided by the *Girsh* factors, but the Court is in no way limited to considering only those enumerated factors and is free to consider other relevant circumstances and facts involved in this settlement.

An initial presumption of fairness applies to the Special Master's review of this Settlement as "(1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *In re NFL Players Litig.*, 821 F.3d 410, 436 (3d Cir. 2016).

It is evident that the Settlement was conducted at arms-length. The Settling Parties engaged in two mediation sessions with Professor Green. On November 20, 2019, Professor Green issued a mediator's proposal, which the Settling Parties ultimately accepted, agreeing to

settle the claims of all the Defendants and Former Defendants, but not PwC, in the amount of $1.21 billion dollars. The Settlement was thus negotiated at arm's length.

As discussed in greater detail below, the parties conducted significant discovery. Lead Counsel produced over 1.5 million pages of documents and analyzed over 11.5 million pages of documents produced by Defendants and third parties. Lead Plaintiff and Named Plaintiffs are sophisticated institutional investors, while Lead Counsel are highly skilled attorneys with considerable experience in prosecuting complex securities actions. Finally, only two written objections to settlement approval and allocation were received. Thus, a presumption of fairness attaches to this proposed Settlement. See *In re NFL Players Litig.*, 821 F.3d 410, 436 (3d Cir. 2016).

The *Girsh* factors also favor settlement approval. The first *Girsh* factor "captures the probable costs, in both time and money, of continued litigation." *In re NFL Players Litig.*, 821 F.3d at 437 (internal citations and quotations omitted). Here, the costs, risks, and delay that continued litigation, trial and appeal would inevitably impose favor settlement. Should this case have proceeded to trial, recovery to the Class was in no way certain. As Lead Plaintiff points out, a number of factors would have contributed to the risk of trial and appeal, including  the difficulty of prevailing in securities cases generally, and due to the particular complexities of this case. These difficulties include the fact that: (i) Lead Plaintiff's claims are subject to the PSLRA, which has made it harder for investors to bring and successfully resolve securities class actions; (ii) this case had unique challenges, for example, relating to director liability, loss causation, and Defendants' arguments regarding the immateriality of the financial restatement to Valeant's overall revenues; and (iii) Defendants' assertion that Valeant was the victim of a rogue employee who has since been convicted of defrauding the Company by steering business to Philidor in

15

exchange for kickbacks.   The $1.21 billion-dollar settlement also weighs in favor of final approval in light of the risks of delay in recovery if the case were to be tried and appealed. *In re Merck & Co., Inc. Vytorin ERISA Litig.*, No. 08-CV-285, 2010 WL 547613, at *7 (D.N.J. Feb. 9, 2010) (observing that "there will necessarily be significant delay in recovery if this case is tried" and finding the "immediate recovery of more than $40 million" weighed in favor of final approval). Accordingly, the Special Master finds that the first *Girsh* factor favors approval of the Settlement.

The second *Girsh* factor is the reaction of the class to the settlement. As of April 20, 2020, a total of 431,576 Notice Packages were mailed to potential Class Members and nominees. The Summary Notice was also transmitted over Business Wire and published in The Wall Street Journal.  Despite this broad dissemination to potential Class Members, the Court received only four objections to Settlement: two relating to the attorneys' fee request, one to the amount of Settlement, and one to the Plan of Allocation. The reaction of the Class as a whole thus favors approval of the Settlement. *See In re NFL Players Litig.*, 821 F.3d at 438 (receiving objections and requests for exclusions from one-percent of class members favors settlement approval).

The third *Girsh* factor "captures the degree of case development that class counsel have accomplished prior to settlement. Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *In re Gen. Motors Corp.*, 55 F.3d at 813. Here, the parties engaged in significant discovery and motion practice prior to entering the Stipulation of Settlement. Lead Counsel drafted three complaints, opposed motions to dismiss and for reconsideration, produced over 1.5 million pages of documents, analyzed over 11.5 million pages of documents produced by Defendants and third parties, submitted Lead Plaintiff's motion for class certification, and engaged in two mediation sessions with Professor

Green. Accordingly, the Special Master finds that the third *Girsh* factor weighs in favor of granting settlement approval.

The fourth and fifth *Girsh* factors survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement. *In re NFL Players Litig.*, 821 F.3d at 439 (citations omitted). Here, a number of factors made continued litigation risky. As to liability, Defendants had asserted that investors were not misled as to the risky nature of Valeant's business because the pricing and business practices were publicly reported prior to the alleged corrective disclosures through various media articles; that they had no duty to disclose Valeant's relationship with Philidor prior to October 2015; and, to the extent there was any wrongdoing, they were the victims of a rogue employee who has since been convicted of defrauding the company by steering business to Philidor in exchange for personal kickbacks. As to damages, Defendants also vigorously challenged Lead Plaintiff's ability to prove loss causation and damages, maintaining that the sheer number of corrective disclosures alleged (22) and volume of reporting regarding Valeant rendered the Class particularly vulnerable on this element. For example, Defendants have argued that the truth regarding Valeant's pricing practices was disclosed during the Class Period in media articles and in a highly contentious acquisition battle with a competitor; that non-fraud-related confounding information caused the stock drops, including speculation of regulatory action regarding pricing that did not come to fruition; and that certain analysts were aware of Philidor prior to the alleged corrective disclosures. These contested issues of liability and damages would subject the Class to considerable risk through summary judgment, trial, and the inevitable appeals.

Valeant's uncertain financial condition and ability to withstand a larger judgment is an additional risk that weighs in favor of approving Settlement. Lead Plaintiff explains that at the time the Settling Parties accepted Professor Green's mediator proposal, Valeant had roughly $825 million in cash on hand and $23 billion in debt, its market capitalization was around $10 billion, and it was, and is, facing potential liability in more than 30 opt-out cases, a Canadian securities class action, a RICO class action, government investigations, and other pending litigation. *See* Bausch Health Companies Inc., Quarterly Report (Form 10-Q) at 1, 5, 29-38 (Nov. 4, 2019) (showing cash, debt, and pending litigation). The Settlement in this case is nearly 150% of Valeant's cash on hand, requiring Valeant to issue additional debt to fund the Settlement, which makes it a particularly good result in light of the risks of ongoing litigation. Accordingly, the Special Master finds that the fourth and fifth *Girsh* factors weigh in favor of approving settlement.

The sixth *Girsh* factor "measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 537 (3d Cir. 2004) (internal citation omitted). However, "this factor becomes essentially 'toothless' [in a class settlement] because a district court need not inquire whether the case, if tried, would present intractable management problems for the proposal is that there be no trial." *National Football League*, 821 F.3d at 440. Therefore, this factor deserves "only minimal consideration." *Id.* Accordingly, the Special Master finds that the sixth *Girsh* factor does not weigh in favor of or against approval of the Settlement.

The seventh *Girsh* factor "assesses the ability of defendants to withstand a greater judgment, and is 'most clearly relevant where a settlement in a given case is less than would ordinarily be awarded but the defendant's financial circumstances do not permit a greater

settlement.'" *In re NFL Players Litig.*, 307 F.R.D. 351, 394 (E.D. Pa. 2015) (quoting *Reibstein v. Rite Aid Corp.*, 761 F. Supp. 2d 241, 254 (E.D. Pa. 2011)). Here, Lead Plaintiff speculates that Defendants may be unable to pay a greater judgment. The Settlement provides for the payment of $1.21 billion dollars in cash to resolve this litigation. Currently, Valeant has roughly $25 billion in debt and its market capitalization was less than $10 billion at the time the Settling Parties accepted Professor Green's mediator proposal. As of September 30, 2019, Valeant had $825 million of cash on hand, substantially less than the Settlement. Therefore, the seventh *Girsh* factor weighs in favor of approval of the Settlement.

The eighth and ninth *Girsh* factors require the Court to "ask whether the settlement represents a good value for a weak case or a poor value for a strong case." *In re NFL Players Litig.*, 821 F.3d at 440 (internal citations and quotations omitted). In light of the aforementioned risks associated with successfully proving liability at trial and obtaining a recoverable judgment in light of Valeant's current financial condition, the Special Master finds that the all cash settlement of $1.21 billion dollars represents a good value for the Settlement Class. The eighth and ninth *Girsh* factors thus weigh in favor of approval of the Settlement.

Because the *Girsh* factors overwhelming weigh in favor of approving the Settlement, and the degree of direct benefit to the Class does not counsel against approving the Settlement, the Special Master will grant final approval of the Settlement pursuant to the terms outlined in the Stipulation of Settlement.

### D.  Objections to Settlement Approval

#### 1.  Mr. Lakhat's Objection

Jaskirat Lakhat filed an objection to the Settlement as he does not believe the Settlement is equitable as he lost over $100,000 due to the alleged fraudulent and negligible action of

Defendants. Mr. Lakhat objects and requests a variance or deviation of $45.00 per share as an equitable settlement. Mr. Lakhat's suggestion of an equitable settlement would equate to a classwide settlement of approximately $25 billion, which Defendants have not agreed to nor is it clear they could fund. Mr. Lakhat's objection is therefore overruled.

### 2. Timber Hill's Objection

On May 6, 2020, Timber Hill, LLC, filed an objection to the Settlement and Plan of Allocation. (ECF No. 557). Timber Hill objects to the Settlement and Plan of Allocation, arguing that it gives preferential treatment to Valeant Common Stock and specified Valeant Debt Investors at the expense of Valeant Option Investors, and it prevents Valeant Option Investors from sharing in the Net Settlement Fund based on their insider trading claims under Section 20A. Specifically, Timber Hill argues that the Plan of Allocation allows the Valeant Common Stock and Valeant Debt Investors to share in the Net Settlement Fund on a *pro rata* basis, while the recovery of Valeant Option Investors is limited to a separate, arbitrarily-allocated and capped fund. Under the proposed Plan of Allocation, 95% of the Net Settlement Fund will be allocated to Valeant common stock and specified Valeant debt securities, with no more than 5% of the Net Settlement Fund allocated to options on Valeant common stock. Timber Hill argues that the Valeant Options Investors should be permitted to share in the recovery on a *pro rata* basis, that the 5% allocation is arbitrary and represents only about half of the Valeant Options Investors' *pro rata* share of the overall recovery, and that the putative allocation has a "cap" and clawback feature that returns any unpaid portion of the 5% allocation back into the *pro rata* pool shared by Valeant Common Stock and Valeant Debt Investors. Timber Hill asks the Court to deny final approval of Settlement, or otherwise modify the Settlement to permit Valeant Option Investors to

share in the Net Settlement Fundo on a *pro rata* basis and to receive the same Section 20A "enhancement" as Valeant Common Stock Investors.

Lead Plaintiff responds that, initially, when the Settlement was publicly announced, counsel for Timber Hill contacted Lead Counsel proposing an allocation for the derivatives investors, based on its own expert analysis, in the "5.35% range[.]" (*See* ECF No. 559-15). Lead Counsel responded that the Plan of Allocation already provided for an allocation of up to 5% for option claimants. (*Id.*; ECF No. 522, at 6-7). Then, after the Special Master entered the Preliminary Approval Order, Timber Hill and its expert increased their proposed allocation to 9.5% and objected to the Preliminary Approval Order. Lead Plaintiff claims that Timber Hill's counsel and its expert have previously supported and agreed to allocations of less than 5%. Lead Plaintiff also cites to testimony of Timber Hill's expert, in which he identifies the economic bases for limits on the aggregate recovery of options class members, including: (1) option prices include a time premium that diminishes overtime, independent of the underlying common stock price, and (2) the additional volatility of derivative securities (such as common stock options) makes it more difficult to prove that all losses sustained on the purchase or sale of such securities are causally related to the alleged wrongdoing. Specifically, Lead Plaintiff notes that Timber Hill's expert has previously used an options cap of 10%, but first he started by reducing the recognized loss for options by 50%. Here, the Plan of Allocation allows options claimants to recognize 100% of their market losses and then applies the cap, which may not be reached. Lead Plaintiff argues that options investors do not require separate counsel, the use of an options cap is a common and fair practice, the Notice was adequate as the PSLRA only requires that the Notice include the average amount of damages per share, and that no other options investor has objected to the Plan of Allocation or Settlement. Lead Plaintiff also argues that Timber Hill's claim that

the Plan of Allocation is unfair because stock claimants get a §20A "insider-trading enhancement" but option claimants do not is unavailing because the "enhancement" only permits the stock claimants to submit market losses, as opposed to inflation adjusted-losses, for the specific transactions, whereas, option claimants are permitted to submit market losses for all transactions.

On May 26, 2020, the day before the Final Settlement Approval hearing, Timber Hill requested leave to file a sur-reply and expert declaration responding to Plaintiff's reply. (ECF No. 568). Timber Hill denies that its expert's 9.49% calculation of options losses is overstated because it takes into account artificial inflation. It claims that Lead Plaintiff's expert's arguments about the purported difficulty of calculating inflation-adjusted losses as a justification for an options cap are incredible. Timber Hill also claims that Lead Plaintiff's expert's argument about the price decay of options as a justification for reducing recoverable losses is unsupported because the only time that an option price degrades is if it is out of the money close to expiration. Timber Hill claims that Lead Plaintiff's expert analysis is devoid of any empirical or analytical analysis and contradicts the prior sworn statements of the expert at the class certification stage of this matter. Timber Hill argues that Options Investors do not get the same §20A enhancement as Common Stock Investors because Options Investors' recognized loss is equal to the market loss for the entire Class Period and subject to a cap.

Lead Plaintiff asks the Special Master to disregard Timber Hill's May 26 submission as untimely and unfairly submitted on the eve of the Settlement hearing, after normal business hours. Lead Plaintiff submitted a reply the following morning, before the 10:00 A.M. hearing. (ECF No. 569). Lead Plaintiff argues that Timber Hill never opposed the Court-approved Notice sent to over 450,000 potential class members and posted online as being deficient prior to this

submission, and thus, it is too late for Timber Hill to do so. Lead Plaintiff argues that it has suffered significant losses from options transactions and is not "conflicted."   Lead Plaintiff argues that Timber Hill fails to cite to any case law or controlling precedent in its sur-reply and that Timber Hill already advocated for a 5.35% options cap prior to the preliminary approval and should not be permitted to nearly double its proposed options cap after being advised that the Plan of Allocation already provided for a 5% cap.

Timber Hill's sur-reply is untimely and improper. Nevertheless, the Special Master's opinion remains the same, regardless of whether the sur-reply, and Lead Plaintiff's response thereto is considered. The Special Master is unpersuaded by Timber Hill's objections. For the reasons set forth herein, the proposed Settlement, Plan of Allocation, and attorney's fees are fair, reasonable, and adequate. Fed. R. Civ. P. 23(a). The Special Master finds that the treatment of options in the Plan of Allocation is a generally accepted and widely used methodology for equitably allocating a settlement fund in light of the differentiating factors affecting options damages. Timber Hill has failed to cite to any case law or controlling precedent to the contrary. According to Professor Steven P. Feinstein, Ph.D., who assisted Lead Counsel in developing the Plan of Allocation of the Net Settlement Fund, the Recognized Loss for Valeant Option Investors under the Plan of Allocation is computed equal to the investment loss, while the Recognized Loss for Valeant Common Stock and Valeant Note Investors is computed as the lesser of the investment loss and the inflation loss. (ECF 559-3, ¶ 26). Thus, Valeant Option Investors have larger computed Recognized Losses relative to Valeant common stock and note investors. *Id.* That, in conjunction with the economic bases for limits on the aggregate recovery of options class members, as recognized by Timber Hill's expert – such as option values naturally diminish overtime and the complex option price dynamics makes it difficult to differentiate between

fraud- and non-fraud-based factors – serves as the basis for the allocation and cap on the Valeant Option Investors' recovery under the Plan of Allocation. Finally, with respect to Timber Hill's argument that the Plan of Allocation improperly permits only the Common Stock Investors to recover for Section 20A claims, Dr. Feinstein notes that the Plan of Allocation only permits affected stock transactions to recognize a "market loss" instead of an "inflation-adjusted loss," and Valeant Option Investors are already permitted to recognize market loss under the Section 10(b) portion of the Plan of Allocation. (*Id.* at ¶ 33). Timber Hill claims that permitting Common Stock Investors to recognize a "market loss" is itself an "enhancement" that is not likewise extended to the Valeant Option Investors. Timber Hill cites no case law or binding authority to support this claim and the Special Master finds the argument unpersuasive.

### E. Attorneys' Fees & Litigation Expenses

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). *In re Comcast Corp. Set-Top Cable Television Box Antitrust Litig.*, 333 F.R.D. 364, 385 (E.D. Pa. 2019). Courts generally use one of two methods for assessing attorneys' fees requests: the lodestar method or the percentage-of-recovery method. *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005), *as amended* (Feb. 25, 2005). The lodestar method is more commonly the starting point in statutory fee-shifting cases. *Id.* The percentage-of-recovery method, on the other hand, is "generally favored in common fund cases." *Id.* This case involves a common fund, and therefore the percentage-of-recovery method is appropriate. Although not "necessarily determinative," the use of the lodestar method of fee approval also provides a cross-check of a court's initial fee calculation under the percentage-of-recovery method. *Baby Prods.*, 708 F.3d at 179-80; *see also In re Rite Aid*, 396 F.3d at 300.

In deciding what amount is a reasonable fee award under the percentage-of-recovery method, a district court must consider the following ten factors known as the *Gunter* and *Prudential* factors:

> the size of the fund created and the number of beneficiaries, (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel, (3) the skill and efficiency of the attorneys involved, (4) the complexity and duration of the litigation, (5) the risk of nonpayment, (6) the amount of time devoted to the case by plaintiffs' counsel, (7) the awards in similar cases, (8) the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations, (9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained, and (10) any innovative terms of settlement.

*In re Diet Drugs*, 582 F.3d 524, 541 (3d Cir. 2009) (citing *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190 (3d Cir. 2000); *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998)). These factors "need not be applied in a formulaic way . . . and in certain cases, one factor may outweigh the rest." *Gunter*, 223 F.3d at 195 n.1

Here, Lead Counsel seeks an award of attorneys' fees equal to 13% of the Settlement Amount and payment of litigation expenses of $1,673,016.13, plus the interest earned thereon at the same rate and for the same period of time as that earned on the Settlement Fund.

The Special Master notes that the fee was negotiated by Lead Plaintiff TIAA, an institutional investor, at the outset of the Litigation, and is therefore entitled to a presumption of reasonableness.  See *In re Cendant Corp. Litig.*, 264 F.3d 201, 282 (3d Cir. 2001)("under the PSLRA, courts should accord a presumption of reasonableness to any fee request submitted pursuant to a retainer agreement that was entered into between a properly-selected lead plaintiff and a properly-selected lead counsel").

In assessing the first factor courts "'consider the fee request in comparison to the size of the fund created and the number of class members to be benefitted.'" *Dartell v. Tibet Pharm., Inc.*, No. CV 14-3620, 2017 WL 2815073, at *9 (D.N.J. June 29, 2017). Here, Lead Counsel negotiated a Settlement that created a fund with a sizable value—a $1.21 billion cash recovery. This is an excellent result that provides an immediate recovery to the Class, particularly in light of the Defendants' uncertain financial condition. The Settlement is the ninth largest PSLRA class action settlement ever, the largest against a pharmaceutical manufacturer, and the largest in this District in almost two decades. Additionally, the Settlement exceeds many other top securities settlements as a percentage of the defendant corporation's reported cash balance. The number of class members to be benefitted is also large as the Class includes all persons who purchased or otherwise acquired Valeant Securities in the three years between January 4, 2013, and March 15, 2016. Thus, the first factor weighs in favor of approving the negotiated fee.

The second factor assesses the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel. Notice of this Settlement and Lead Counsel's fee request was provided to over 430,000 potential Class Members. The Court received two objections relating to the Attorneys' Fee Request, one from Mr. and Mrs. Fromme and another from Cathy Lochridge. No institutional investor objected to the fee request.

The Fromme objection suggests that the fee should be limited to three to five times the expenses of litigation, which would equate to approximately $4.5 million to $7.5 million. The Fromme objection offers no support for the proposed method for awarding fees. As previously discussed, in the Third Circuit, "the percentage of common fund approach is the proper method of awarding attorneys' fees." *Rite Aid I*, 396 F.3d at 306. Therefore, the Special Master will overrule the Fromme objection.

The Lochridge objection argues for a lodestar-based approach to awarding fees as used in *American Realty Capital Properties, Inc. Litigation*. *See* Hearing Tr. at 178:13-17, *American Realty*, No. 1:15-mc-00040-AKH (S.D.N.Y. Jan. 23, 2020). The Special Master will not address Lead Plaintiff's assertion as to the motivation behind the Lochridge objection, but will overrule the objection on the basis that, in the Third Circuit, case law favors the percentage method of awarding fees and that the lodestar focused approach is neither required nor appropriate in this matter. Here, the Special Master will follow the percentage approach to awarding fees and finds that the fee sought by Lead Counsel is reasonable based on the *Gunter/Prudential* factors set forth herein. Ms. Lochridge's challenges to Lead Counsel's lodestar cross-check are likewise unpersuasive and do not refute that the 13% fee is reasonable in this case for the reasons set forth in greater detail below. Accordingly, the Lochridge objection is overruled.

Considering the size of the Class and the number of Notice Packages mailed out, it is apparent that the reaction from the Class supports the fee request. Accordingly, this factor supports the fee request.

The third factor, the skill and efficiency of the attorneys involved – is measured by the "'quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel.'" *In re Viropharma Inc. Sec. Litig.*, No. 12-2714, 2016 WL 312108, at *16 (E.D. Pa. Jan. 25, 2016). Here, Lead Counsel has a successful track record of prosecuting securities class actions. *See In re AT&T Corp. Sec. Litig.*, No. 00-5364 (GEB), 2005 WL 6716404, at *9 (D.N.J. Apr. 25, 2005) (stating that Robbins Geller is comprised of "highly skilled attorneys with great experience in prosecuting complex securities action[s], and their professionalism and diligence displayed

during [this] litigation substantiates this characterization"), *aff'd*, 455 F.3d 160 (3d Cir. 2006). The performance and quality of defense counsel is also high. The competence of opposing counsel favors a finding that Lead Counsel prosecuted this case with skill and efficiency. The $1.21 billion cash settlement is a further indicator of the quality of Lead Counsel's services to the Class. *See In re Lucent Techs., Inc., Sec. Litig.*, 327 F. Supp. 2d 426, 437 (D.N.J. 2004) (approving fee request where "the result itself evidences counsel's skill and efficiency"). Therefore, this factor supports the fee request.

The fourth factor evaluates the complexity and duration of the litigation. The factors that increase the complexity of a class action include: "complex and/or novel legal issues, extensive discovery, acrimonious litigation, and tens of thousands of hours spent on the case by class counsel." *In re Cendant Corp. PRIDES Litig.*, 243 F. 3d 722, 741 (3d Cir. 2001). This litigation involved sophisticated securities claims that required Lead Counsel to weave together complex facts regarding Valeant's accounting, internal controls, corporate governance, executive compensation practices, pricing, copay practices, patient assistance programs, research and development, product acquisition strategy, distribution practices, and payor contracts. As Plaintiffs have also noted, while securities cases commonly involve a single stock drop, this case had 22 alleged corrective disclosures, which Lead Counsel had to analyze carefully with its experts to rebut likely defense loss causation arguments.

Here, the Settlement was reached only after Lead Counsel (i) conducted an extensive investigation that developed the factual basis for the claims asserted in the Litigation; (ii) interviewed witnesses concerning the subject matter of the Litigation; (iii) researched applicable law governing the claims alleged and potential defenses thereto; (iv) prepared and filed the nearly 300-page complaint and then amended the complaint to successfully assert an insider

trading claim against additional parties; (v) successfully opposed Defendants' seven motions to dismiss as well as motions to reconsider and to appeal the denial of those motions; (vi) drafted, retained experts for, and submitted Plaintiffs' detailed motion for class certification; (vii) engaged in document and written discovery that included analysis of nearly 11.5 million pages of documents produced from approximately 25 Defendants and 150 third parties, as well as interrogatories and requests for admission; (viii) analyzed witness testimony from the review of deposition transcripts from related proceedings, Congressional testimony, trial and sentencing testimony from the criminal case against Philidor's former CEO and a former Valeant executive, and over 50 public videos consisting of media interviews, all of which provided the factual accounts of several defendants and key Valeant employees and directors regarding issues relevant to this case; (ix) retained five experts to opine on accounting, auditing, industry practices, corporate governance, and loss causation and damages; and (x) engaged in extensive arm's-length settlement negotiations, including preparing detailed mediation briefs with more than 125 exhibits, and participating in two in-person mediations. The Special Master therefore finds that this factor weighs in favor of approving Lead Counsel's fee request.

The fifth factor assesses the risk of nonpayment. In every class action in which class counsel bring a case on a contingency basis, there is some risk of nonpayment. Here, recovery was uncertain due to the difficulty of prevailing in securities cases generally and due to Valeant's uncertain financial condition. Lead Plaintiff had to face the legal obstacles of establishing scienter, damages, and causation under PSLRA and contend with Defendants' denial of liability and defenses, including its arguments that they were the victims of a rogue employee who has since been convicted of defrauding the company by steering business to Philidor in exchange for kickbacks. Moreover, Lead Plaintiff highlights that Valeant's financial condition was uncertain,

noting that Valeant has roughly $25 billion in debt and is still facing 30 opt-out cases, a securities class action in Canada, a RICO class action, and multiple government investigations. The Special Master thus finds that the risk of nonpayment was evident and that this factor weighs in favor of approving Lead Counsel's fee.

The sixth factor examines the amount of time devoted to the case by the plaintiff's counsel. For over four years Lead Counsel has devoted significant time to this case. Lead Counsel's efforts included drafting two detailed complaints; adding defendants and additional claims; substantially prevailing on seven motions to dismiss, a motion for reconsideration and a motion for certification to appeal all of which consisted of hundreds of pages of briefing; and pursuing discovery from over 150 third parties and Defendants resulting in the collection of over 11 million pages of documents, which were analyzed and used in multiple mediations to support the claims and negotiate the Settlement. Lead Counsel and their attorneys and paraprofessionals expended over 75,000 hours and incurred more than $1.6 million in expenses prosecuting the litigation for the benefits of the Class. Accordingly, the Special Master finds that this factor weighs in favor of approving Lead Counsel's fee.

The seventh factor is a comparison to awards in similar cases. The Third Circuit has noted that the range of fees typically awarded within this District through the percentage-of-recovery method generally range from 19% to 45% of the settlement fund. *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 822 (3d Cir. 1995)(citing Feb. 2, 1994 Order, 1994 WL 30301 at *4.)) Lead Counsel's 13% fee request falls at or below fees awarded in similar class action settlements in this District and elsewhere. *See, e.g.*, *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, No. 05-1151 (SRC)(CLW), 2016 WL 11575090 (D.N.J. June 28, 2016) (awarding 20% fee on $1.062 billion recovery); *Lucent*, 327 F. Supp. 2d

at 430 (awarding 17% fee on $517 million recovery); *Kornell v. Haverhill Ret. Sys.*, 790 F. App'x 296 (2d Cir. 2019) (affirming 13% fee on $2.3 billion settlement); *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 266 (D.N.H. 2007) (approving 14.5% fee on $3.2 billion settlement). The requested fee in this matter is within the normal range.

The eighth factor looks at the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations. Here, while Defendants have faced multiple government investigations, the value of benefits attributed to Lead Counsel's efforts have not been displaced. Moreover, given that the government's theory in the criminal case, that Valeant was the victim of fraud by a rouge employee, was at odds with Lead Plaintiff's position, Lead Counsel was required to put more effort into disproving this theory.  Accordingly, the Special Master finds that Lead Counsel's efforts were not diminished due to the government's investigations.

The ninth factor evaluates the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained. "In individual cases, the customary contingent fee would likely range between 30 and 40 percent of the recovery." *Dartell v. Tibet Pharm., Inc.*, No. CV 14-3620, 2017 WL 2815073, at *11 (D.N.J. June 29, 2017) (internal citations omitted). Here, the 13% fee was negotiated by Lead Plaintiff TIAA, an institutional investor, at the outset of the Litigation and is far below the 30 and 40 percent of recovery range that could have been requested. Consequently, this factor also supports Lead Counsel's fee request.

The tenth factor evaluates any innovative terms of the settlement. "In the absence of any innovative terms, this factor neither weighs in favor nor against the proposed fee request." *In re Comcast Corp. Set-Top Cable Television Box Antitrust Litig.*, 333 F.R.D. 364, 389 (E.D. Pa.

2019). The Special Master finds that this factor neither weighs in favor nor against Lead Counsel's fee request.

After the court applies the percentage-of-recovery method to determine whether a fee request is reasonable, it is sensible to also apply "an abridged lodestar analysis serving as a cross-check." *In re Rite Aid*, 396 F.3d at 305. But the lodestar cross-check does not trump the primary reliance on the percentage of common fund method." *Id.* at 307. "The lodestar cross-check calculation need entail neither mathematical precision nor bean-counting. The district courts may rely on summaries submitted by the attorneys and need not review actual billing records." *Id.* at 306-07

"The lodestar award is calculated by multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys." *Id.* at 305. "The appropriate multiplier on counsel's lodestar varies based on the specifics of each case and it "'need not fall within any pre-defined range, provided that the [d]istrict [c]ourt's analysis justifies the award.'" *Schuler v. Medicines Co.*, No. 14-1149 (CCC), 2016 WL 3457218, at *10 (D.N.J. June 24, 2016) (quoting *Rite Aid*, 396 F.3d at 307). However, the Third Circuit has recognized that percentage awards that result in multipliers "'ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied.'" *See In re Veritas Software Corp. Sec. Litig.*, 396 F. App'x 815, 819 (3d Cir. 2010). While multipliers of one to four are a common baseline, courts in the Third Circuit recognize that larger settlements or earlier settlements can – and often do – produce higher multipliers. *See, e.g.*, *Stevens v. SEI Investments Co.*, No. 18-4205, 2020 WL 996418, at *13 (E.D. Pa. Feb. 28, 2020) (approving multiplier of 6.16 and stating "multiples ranging from 1 to 8 are often used in common fund

cases" to "compensate counsel for the risk of assuming the representation on a contingency fee basis"); *Bodnar v. Bank of Am., N.A.*, No. 14-3224, 2016 WL 4582084, at *5-*6 (E.D. Pa. Aug. 4, 2016) (approving 33% fee where counsel was able to negotiate the settlement "at the early stages" of the litigation and finding 4.69 multiplier was "appropriate and reasonable"); *In re Rite Aid Corp. Sec. Litig.*, 362 F. Supp. 2d 587, 589 (E.D. Pa. 2005) (approving fee award "with a 6.96 multiplier").

Here, Lead Counsel devoted 75,873.82 hours to this action, resulting in a lodestar award of $42,012,621.25, producing a multiplier of approximately 3.6. *See* Robbins Geller Decl., ¶ 5; Seeger Weiss Decl., ¶ 4; Trief & Olk Decl., ¶ 4; Johnson Fistel Decl., ¶ 5. In performing its lodestar crosscheck, the Special Master finds the rates submitted by Lead Counsel are reasonable and appropriate. Even assuming the 13% fee produced a lodestar multiplier of 4.4 as the Lochridge objection asserts, the Special Master still finds that the fee request is fair and reasonable under the particular circumstances of this case and application of the *Gunter/Prudential* factors discussed herein. The complexity of the Litigation and risks of non-payment due to the uncertain financial condition of Valeant present in this case are not typical of many securities cases. In addition, it is appropriate to reward counsel and incentivize counsel to pursue the best possible result for the Class and not punish counsel for negotiating an advantageous settlement on behalf of the Class at the early stages of the litigation. Therefore, the Special Master finds that the *Gunter/Prudential* factors and a lodestar crosscheck support awarding the requested fee.

In addition, the Special Master finds that Lead Counsel's request for expenses in the amount of $1,673,016.13 are adequately documented in the accompanying firm declarations and thus are also approved. Counsel in class actions "are entitled to reimbursement of expenses that

were 'adequately documented and reasonable and appropriately incurred in the prosecution of the class action." *In re Viropharma Inc. Sec. Litig.*, No. 12-2714, 2016 WL 312108, at *18 (E.D. Pa. Jan. 25, 2016) (quoting *Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1225 (3d Cir. 1995)); *Schering-Plough*, 2012 WL 1964451, at *8 (approving litigation expenses and noting that "[t]his type of reimbursement has been expressly approved by the Third Circuit"). There has been no objection to the requested expense award, and the Special Master finds that the expenses and charges set forth in the firm declarations were reasonably and appropriately incurred in the prosecution of this litigation.

Accordingly, the Special Master finds that that the awarded attorneys' fees and expenses, and interest earned thereon, shall be paid to Lead Counsel subject to the terms, conditions, and obligations of the Stipulation of Settlement, and in particular, ¶ 6.2 thereof, which terms, conditions, and obligations are incorporated herein.

Dated: June 15, 2020

DENNIS M. CAVANAUGH, U.S.D.J. (Ret.)

34