## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: VALEANT PHARMACEUTICALS INTERNATIONAL, INC. SECURITIES LITIGATION | Master No. 3:15-cv-07658-MAS-LHG |
| | JUDGE MICHAEL A. SHIPP |
| | JUDGE LOIS H. GOODMAN |
| THIS DOCUMENT RELATES TO: | **REPORT & RECOMMENDATION** |
| | **OF THE SPECIAL MASTER** |
| ALL ACTIONS | **JUDGE DENNIS CAVANAUGH, RET.** |

The matter before the Special Master arises out of a motion filed by Direct Action Plaintiffs to overrule certain privilege and work product claims advanced by the Defendant, Valeant Pharmaceuticals International, Inc. ("Valeant"). The Motion concerns documents produced by FTI Consulting, a third party. The Class Plaintiff, City of Tucson and the Tucson Supplemental Retirement System, has joined the motion.

The Special Master has reviewed the following submissions: Direct Action Plaintiffs' Memorandum of Law and exhibits supporting the motion; Valeant's Memorandum of Law and exhibits in opposition; Class Plaintiff's Memorandum of Law joining the Motion with exhibits; and both Plaintiffs' Reply Memoranda.

Although Direct Action Plaintiffs and the Class Plaintiff have separately filed legal memoranda, the substance of their arguments is largely the same and seeks the same relief. Therefore, the Special Master will treat this application as a single, unified Motion. Except when necessary, the moving parties will be identified jointly as "Plaintiffs."

As will be set forth below, the resolution of this Motion requires that the Special Master determine whether or not Valeant's objections to the production of documents by FTI, a non-party, are valid and should be upheld.  After considering the submissions of all of the parties, based upon the following, it is of the opinion of the Special Master that Plaintiffs' Motion is **GRANTED**.

## I.    Factual and Procedural Background

The Special Master assumes the parties' familiarity with the factual background of this case and limits his discussion to facts directly relevant to the current motion.

This motion arises out of events dating to October 2015, when multiple public disclosures concerning Valeant's business practices came to light.  That is, information about Philidor and its impact on Valeant's financial reporting.  In particular, a report published by Citron Research, a stock commentary website, asserted that Valeant was using a secret network of mail order pharmacies to prop up sales and prevent patients and insurance companies from switching to less costly generics.  After this report and others were published, Valeant's stock shares dropped in price and trading of its shares was temporarily halted on the Stock Exchange.  [*See*, Defendant's Exhibits 3-6.]

Following these revelations, Valeant's Board of Directors established the Ad Hoc Committee ("AHC"), consisting of four individuals charged with reviewing allegations relating to Valeant's relationship with Philidor and recommending further action.  The full board also authorized the AHC to hire attorneys and other professionals needed to advise the AHC in connection with fulfilling its duties to the Board.  [*See*, Direct Action Plaintiffs' Exhibits 4, 5.]

As a consequence, among other things, the AHC hired consultant specialists for assistance in the investigation.  Then, approximately five months later, on March 21, 2016,

Valeant disclosed that "management of the company, the Audit and Risk Committee…and the Board" concluded that certain audited financial statements for 2014 and 2015 could no longer be relied upon due to misstatements contained in those documents.  Valeant disclosed that certain sales transactions for deliveries to Philidor were improperly categorized "on a sell-through basis instead of a sell-in basis."  Additionally, the company disclosed that its former CFO, Howard Schiller, and former controller, Tanya Carro, engaged in improper conduct which contributed to the misstatements, that there were "material weaknesses…in the company's internal control over financial reporting" and that the "tone at the top of the organization" contributed to improper revenue recognition.  [*See*, Direct Action Plaintiffs' Exhibit 5.]

Approximately one month before issuing the release, Valeant entered into an agreement with FTI Consulting, Inc. ("FTI"), a business advisory firm.  This related to "restatement assistance," meaning a restatement of the financial statements (then in the process of being created) to be included in Valeant's annual form 10-K for 2015.

That agreement, entered into on behalf of Valeant, and dated February 18, 2016, is a two-page document with an attachment entitled "FTI Standard Terms and Conditions."  The description of FTI's proposed work simply reads:

> FTI's work is to assist Client with consultation and analysis in the above-referenced matter and to perform such other tasks as may be identified during the case of this Engagement.

[*See*, Direct Action Plaintiffs' Exhibit 7.]

The attachment setting forth the terms and conditions (presumably employed routinely by FTI) memorializes the parties' agreement that any information exchanged was confidential and they would not disclose the other party's information to any third party without consent.  FTI understood that its product and files "may become subject to discovery; however, until such

3

materials are sought by subpoena or other process, they will be maintained by FTI as confidential." Further, those materials "will not be disclosed to any third party without Client's prior written consent." FTI agreed to notify the client promptly of any requests, subpoenas, etc. requiring production of documents and records. [*Id.*]

The attachment also provided in pertinent part:

> FTI is engaged by the Client to provide financial advisory and consulting services only…[W]hile we may from time to time suggest options…the ultimate decision as to which, if any, of these options to implement rests with the Client… FTI and its employees will not make any management decisions…and will not be responsible for communicating information concerning the Client to the public, the Client's shareholder or others… [*Id.*]

Nothing in the letter or the attachment made mention that the services were for the purpose of pending or anticipated litigation. Nor was the AHC referenced in any manner.

In December 2018, and in February 2019, in response to a subpoena by the Securities and Exchange Commission ("SEC"), FTI produced certain documents (some of which are in dispute here) to that agency. Then, on October 16, 2020, Direct Action Plaintiffs served on Valeant a notice of issuance of a subpoena to FTI along with a subpoena. On October 30, 2020, FTI served objections to the subpoena and on November 9, 2020, FTI produced responsive documents, all of which had been produced to the SEC. On November 11, 2020, Direct Action Plaintiffs provided copies to Valeant's counsel who, Defendant says, began review "shortly after" receiving the materials. [Defendant's Memorandum of Law, p. 9.]

After FTI's production, on December 5, 2020, attorneys for FTI informed Direct Action Plaintiffs "that Valeant had informed them that FTI's production…included documents over which Valeant claimed attorney-client privilege or work product protection." [Direct Action Plaintiffs' Memorandum of Law, p. 10.] Valeant thereafter contacted Direct Action Plaintiffs

directly and on December 6, 2020, provided a privilege log as to a 136 clawed back documents "some of which were produced with redactions and others entirely withheld." [Direct Action Plaintiffs' Memorandum of Law, p. 11; Defendant's Memorandum of Law, p. 9.] After a telephonic meet and confer, on December 15, 2020, Defendant identified 25 additional documents asserting attorney-client privilege or work product protection and provided a second privilege log, "once again, some of the documents were reproduced with redactions and others entirely withheld." [Direct Action Plaintiff's Memorandum of Law, p. 11.]

Following this series of events, the parties remained at an impasse and thereafter Direct Action Plaintiffs were given permission by the Special Master to file this motion.

Specific to the Class Plaintiff's joinder, the following facts should be noted. In its lawsuit, Class Plaintiff alleges that PricewaterhouseCoopers ("PwC"), a public auditor, violated Section 11 of the Securities Act and Section 10(b) of the Exchange Act by certifying false financial statements. Then, despite PwC presenting a "clean certification and audit opinion," Valeant admitted multiple deficiencies within its financial statements including a failure to comply with generally accepted accounting principles ("GAAP"), overstatement of income and that material weaknesses existed in the company's internal controls including an inappropriate "tone at the top." Class Plaintiff states that Valeant disclosed "some or all of the Withheld Documents to its external auditor PwC, who in turn produced an unredacted copy of a memo similar to several of the withheld documents to Class Plaintiff more than two years ago." Class Plaintiff asserts that this is an additional reason for the Special Master to overrule Valeant's objections. [*See*, Class Plaintiff's Memorandum of Law.]

In summary, the motion involves a subpoena served on a third party, FTI, acting as a consultant to Valeant. All of the documents at issue had been produced to the SEC and also

produced to Plaintiffs, only to be clawed back.    Defendant now asserts that these communications were protected by the attorney-client privilege and that materials concerning the AHC's investigation are subject to work product protection.

## II.    Plaintiffs' Arguments

Direct Action Plaintiffs make the following arguments in support of their motion.

While Direct Action Plaintiffs acknowledge that contemporary litigation involving Valeant had commenced, they argue that Defendant cannot demonstrate that the *primary* motivating purpose underlying the FTI documents was a response to pending or anticipated litigation.    That is, given that Valeant was obligated to prepare a restatement of its financial results following revelations of improperly accounted transactions, the documents would have been created had there been no litigation, negating work product protection.    Citing unredacted portions of documents produced by Valeant, Direct Action Plaintiffs take the position that the substance dealt with "a prototypical business matter" which would have necessitated this analysis even in the absence of existing or threatened lawsuits.    Hence, no work product protection.

As to FTI's engagement, Direct Action Plaintiffs maintain that this organization was not hired to perform work necessary to giving legal advice.    Instead, it was hired only to provide "financial advisory and consulting services" to Valeant.    This was not a case where lawyers hired a consultant to assist with complex topics to aid a legal strategy but instead the retention related to Valeant's improper accounting.    Direct Action Plaintiffs emphasize, in part, that the agreement indicates the non-legal nature of FTI's retention.    That is, the company, not its attorneys, entered into the agreement and the engagement letter makes no reference whatsoever to attorneys or

legal advice.  Therefore, by sharing information with FTI, in the form of comments to or by lawyers, Valeant waived its privilege.

Even assuming that the information is protected by the work product or attorney-client privilege, Direct Action Plaintiffs argue that Valeant waived those privileges by failing to timely assert them.  Direct Action Plaintiffs insist that Valeant failed in this respect first with the SEC subpoena when documents were produced two years before Valeant sought to claw them back.  Further, citing testimony given by Robert Rosiello, Valeant's CFO, in the SEC proceedings, Direct Action Plaintiffs maintain that Valeant did not consider information shared with FTI to be privileged.  In response to questions posed to Rosiello as to whether FTI provided legal advice, Defendants' attorney before the SEC interjected that "the Company [Valeant] has not instructed us to assert privilege on anything with FTI."  After Direct Action Plaintiffs' subpoena was sent to FTI, "Valeant nonetheless allowed FTI to produce the very same documents the Company now seeks to claw back."  Then, one month after the documents were produced, but only days before a scheduled deposition, Valeant requested a claw back.  In short, Direct Action Plaintiffs argue that if Valeant felt FTI was an agent of counsel, Defendant would have acted more swiftly to prevent production, but did not do so, waiving any applicable protection.

Direct Action Plaintiffs assert that by relying on the AHC's determination that "no fraud" occurred, Valeant waived any potential privilege or protection.  Applying the sword and shield analogy, and referencing Valeant's motion to dismiss Class Plaintiffs' claims, Direct Action Plaintiffs argue that despite Valeant's assertion that the AHC's review cleared the Company of accounting fraud, Valeant now seeks to improperly shield information describing the AHC's analysis and findings.

Finally, in the event that the Special Master cannot determine at this juncture whether the privilege or protection applies, Direct Action Plaintiffs ask for a review of a representative sample of the documents *in camera*.  That is, review of a "subset" of the FTI documents to resolve the parties' dispute as to all the documents.[1]

Class Plaintiff's argument is nearly identical to and supportive of Direct Action Plaintiffs. Class Plaintiff argues that Valeant's privilege logs are inadequate; that FTI was retained purely for business purposes, so the documents are not protected by attorney-client or work product privilege; that even if these documents are found to be privileged or protected, Class Plaintiff has demonstrated a substantial need for them; and, since Valeant disclosed "some or all" of the documents to PwC, "[i]t is now too late for Valeant to attempt to claw the documents back." [*See* Class Plaintiff's Memorandum of Law, pp. 2-3.]

Class Plaintiff emphasizes that FTI worked with Valeant's accounting personnel but also exchanged information with PwC, including draft documents.  Class Plaintiff asserts that the documents "likely contained facts not just relevant but critical to Class Plaintiff's claims against PwC."  PwC has claimed that certain facts were withheld by Valeant during the original audit. Accordingly, Class Plaintiff says it cannot rebut this defense by comparing what PwC learned during its audits with what it learned during the restatement process if the documents are withheld.

As an example, Class Plaintiff cites the fact that Valeant clawed back drafts of its March 2016 "Philidor Revenue Recognition Memo" but the redacted version concludes that there were overstatements of revenue and pre-tax profit by Valeant.  Yet, the supporting facts have been

---

[1]  There are approximately 70 "sample" documents listed by Direct Action Plaintiffs.

removed serving to prevent Class Plaintiff from adequately pursuing its claims. As another example, Class Plaintiff states that PwC argued in its prior motion to dismiss that it was not negligent in issuing false audit opinions since, in part, Valeant officers had provided incorrect information to PwC. The *facts* underlying this assertion, says Class Plaintiff, "are neither privileged nor protected work product." [Class Plaintiff's Memorandum of Law, p. 12.]

As to waiver, Class Plaintiff emphasizes it is particularly significant that Valeant disclosed the documents to PwC, an independent external auditor. That is, due to an adversarial relationship between an independent auditor and a public company, courts have held that any disclosure waives privilege and protection. In this case, PwC not only acted as an external auditor, but worked with FTI for the express business purpose of assisting Valeant in the restatement. The fact that Valeant did not refrain from submitting the documents to PwC or FTI during the auditing process shows that Valeant did not believe the documents were privileged and demonstrates that both FTI and PwC were not working for Valeant's legal team.

Class Plaintiff also maintains that FTI was not hired and did not provide legal advice or report to Valeant's lawyers. Therefore, the Withheld Documents do not appear to contain legal advice but – at most – business or accounting advice. However, even if the facts underlying that advice are found to be subject to work product protection, Class Plaintiff asserts that the work product doctrine is not an absolute bar and there is a substantial need for the materials to prepare its case, i.e., the Withheld Documents provide information for Class Plaintiff to prove its claims against PwC and to rebut the auditors "purported defense that it only learned certain facts during the restatement process." [Class Plaintiff's Memorandum of Law, p. 24.] Class Plaintiff maintains that these documents are the "only source of the information" and dispute PwC's defenses and obtaining them otherwise "would cause undue hardship."

**III.     Defendant's Argument**

Defendant asserts that the communications at issue are those with Valeant's in-house and external counsel as well as drafts prepared or revised by counsel and documents reflecting preliminary findings of the AHC.  Accordingly, Defendant says, that these communications were properly objected to on the basis of the attorney-client privilege and work product doctrine.

Further, Valeant most strongly emphasizes that the company has not waived privilege or work product protection since disclosure to FTI amounted to the functional equivalent of disclosure to an employee who would be protected by corporate privilege.  FTI personnel were "retained and embedded" at Valeant to provide support and were functionally company employees. Valeant then asserts that once it became aware of the disclosure, it acted efficiently in seeking to retrieve and protect these communications.

Valeant also asserts that its privilege logs provide adequate information to support its privilege and work product assertions.

Finally, and premised upon the notion that there was no waiver, Valeant asserts that the Plaintiffs have failed to establish a substantial need for the documents at issue.

To support these arguments, Valeant provides its own chronology of the events leading up to the establishment of the AHC and later the retention of FTI.  To summarize, beginning in October 2015, investigations, lawsuits and allegations charging that Valeant had acted fraudulently through its relationship with Philidor came to the fore including Congressional and prosecutorial actions.  On October 22, 2015, the first of four class actions were filed in this District.  Three days later, on October 24, 2015, the AHC was established to "review allegations relating to [Valeant's] relationship with Philidor Rx Services and all related matters."  Valeant says the committee was created because of the class actions and also as a result of a subpoena

issued by the U.S. Attorney's Office.  Citing a declaration of Robert A. Ingram, the AHC's chair, Valeant states that the dominant purpose of the AHC investigation was to "examine claims that were the subject of litigation and investigations" as well as anticipated litigation arising from the same fraud claims.  The Committee's creation was announced on October 26, 2015.  Shortly thereafter the AHC retained attorneys (Kirkland & Ellis LLP) to advise the Committee.

On February 18, 2016, Valeant's CFO, Rosiello, engaged FTI "to assist with Valeant's anticipated restatement of its financial statements."  [Defendant's opposition to Direct Action Plaintiffs' Motion, p. 6.]  In SEC testimony, Rosiello said he engaged FTI after Valeant's controller, Tanya Carro, was placed on administrative leave.  In effect, Valeant states that FTI was filling in for Carro to assist Rosiello, particularly in preparing the Form 10-K and restatement.  Valeant says FTI reported to Rosiello, worked on site and that FTI's work for Valeant included consultation with the Company's lawyers.  "FTI was also included on emails with in-house and outside counsel regarding draft 10-K language and other accounting matters." [Defendant's opposition to Direct Action Plaintiffs' motion, p. 7.]

As to the production of documents by FTI to the SEC, Valeant states that it was not notified or copied with the documents, despite the confidentiality agreement.[2]  Similarly, on November 9, 2020, FTI provided the Direct Action Plaintiffs with copies of the same documents which were passed along to Valeant's counsel two days later.  At this point, Valeant began its review of the documents.  From December 5 through December 15, 2020, Valeant, first through FTI and then on its own, identified privileged documents and provided logs.

---

[2] This directly contradicts Plaintiffs' suggestion that Valeant had knowledge as to this disclosure to the SEC.

Valeant contends that a party is only required to produce documents containing attorney work product in rare circumstances and only if the adversary has substantial need for the documents and cannot without undue hardship obtain the equivalent by other means – and the burden is upon the moving party to demonstrate those points.

Valeant asserts that Direct Action Plaintiffs have wrongly charged that it placed the AHC's investigation at issue in their case. This argument seems to be premised on earlier events in the Class Plaintiff's lawsuit. Defendant states that assuming Valeant "could place any documents at issue in an Opt-Out Plaintiffs' case by moving to dismiss claims in a coordinated – but distinct action – Valeant did not do so by challenging the Class Plaintiffs' mischaracterization of Valeant's public statements as evidence of scienter." Valeant maintains that it has not asserted claims or defenses which must be proved on attorney-client communications or work product created to support the AHC investigation. Rather, Class Plaintiff placed Defendant's state of mind in issue "by mischaracterizing the findings of the Ad Hoc Committee as admissions of fraud in their complaint." Thus, Valeant argues that by responding to an allegation by Class Plaintiff to a charge of fraud, Valeant was forced to raise the AHC's conclusion that there was no fraud.

Finally, Valeant asserts that Plaintiffs have not established a substantial need for the FTI documents since it has produced "millions of pages of documents" which form the basis of the AHC's conclusions, so Direct Action Plaintiffs have a substantial equivalent of the information they now seek in the FTI documents.

In summary, Valeant asserts that it has sought protection only to the extent that the documents contained advice from or questions for counsel or reflect attorneys' mental impressions as to litigation. Once the inadvertent disclosure was discovered, Valeant acted

promptly to claw back those documents, a period of less than four weeks.  FTI produced 1,560 documents over which Valeant has asserted an attorney-client or work product protection to 91 documents in their entirety and 70 documents with partial redactions.

As to arguments specifically advanced by the Class Plaintiff, Valeant states as follows:

- As to disclosure of documents to PwC, Valeant maintains that protection under the attorney work product doctrine is waived only by disclosure to adversaries, not by disclosure to independent auditors.  Contrary to Class Plaintiff's assertion, PwC, an outside accountant, was not an adversary.  Accordingly, the protection was not waived and work product protection remains intact.

- As to Class Plaintiff's charge that the privilege logs are inadequate, Valeant insists that the information is more than adequate and that the majority of the entries are redacted, not withheld.  Valeant also notes that the Class Plaintiff had access to the logs for more than two months before filing its brief and made no inquiries about any missing information.

- Valeant states that Class Plaintiff has failed to demonstrate a substantial need for the FTI documents or that the equivalent information cannot be obtained through less intrusive methods.  Valeant maintains that a "better source of information" would be "contemporaneous, non-privileged documents and communications shared with PwC during its original audit."  Additionally, Class Plaintiff has the option of deposing PwC witnesses who can testify as to what the auditor knew at relevant times.

## IV. Plaintiffs' Replies.

Briefly stated, Plaintiffs collectively reply by stating the following:

Plaintiffs reiterate that the AHC was created as a result of an explosive report issued by Citron Research, not because of litigation.  Neither the Board meeting minutes nor the Board's resolution establishing the AHC mention litigation and while lawsuits existed, they were not the primary motivating factor for creating the Committee.  Plaintiffs minimize statements made well after the fact by AHC chair Robert Ingram and say, even taking the statements at face value, the Committee was created for multiple purposes, not *because* of the litigation."  [Direct Action Plaintiffs' Reply, p. 5.]  Plaintiffs maintain that Valeant misunderstands and misapplies the

proposition that FTI was the "functional equivalent" of an employee.  Citing District cases, Plaintiffs maintain that there is a narrower standard here which requires the demonstration that a consultant was brought in to perform a corporate function *necessary* in the context of actual or anticipated litigation.  Pointing to the engagement agreement, Plaintiffs emphasize that it clearly states that FTI would not make management decisions.  Further, Valeant, a large pharmaceutical company, was not dependent upon that entity and had employees fluent in financial accounting matters who could undertake these tasks.

As to failing to preserve privilege or work product protection, Plaintiffs question the validity of Valeant's ignorance of FTI's production to the SEC two years prior, although they do not specifically charge that the Defendant is untruthful.  However, Plaintiffs point out that Valeant does not dispute it had notice of the subpoena to FTI as of October 16, 2020 yet, failed to coordinate with FTI as to the subpoena in advance of production.  This, Plaintiffs say, wholly undermines Valeant's contention that it considered FTI to functionally be its employee.

## V.    Findings.

The Special Master finds that the resolution of this Motion is intimately connected to the circumstances surrounding the retention of FTI Consulting, a third party, whose communications with Valeant are the subject matter of this application.  So, context is required.

There is no doubt that at the time FTI was retained via an engagement letter dated February 18, 2016, litigation had not only been contemplated or anticipated, but was actively ongoing – both governmental and civil – a fact which the Plaintiffs obviously concede. Furthermore, the retention of FTI had also been preceded by a series of events which culminated in its engagement on behalf of Valeant.  Devastating media reports concerning Valeant, Philidor and its secret network of mail order pharmacies caused Valeant securities to plummet in value

and forced the Board to create the AHC to commence an investigation to examine the heart of Valeant's troubles.  In turn, damning revelations of mismanagement and improper accounting triggered further action including the dismissal of Valeant's CFO, Schiller, and controller, Carro, along with the need – indeed the obligation – to, in effect, re-do inaccurate financial statements to be encompassed in an annual Form 10K for 2015.

As a result of the last, FTI, a business advisory firm, was called in to assist Valeant's new CFO in preparing those statements, principally as a result of the absence of its former controller, Carro.

The guts of FTI's engagement letter with Valeant are quoted above.  However, as the Special Master sees it, significant to this Motion is what is missing from that document and its attachment.  There is no mention of legal assistance.  There is no mention of legal advice.  There is no mention of pending investigations, governmental or criminal.  There is no mention of pending civil suits, class actions or otherwise.  There is no mention of attorneys or legal counsel working for Valeant and working with FTI on behalf of Valeant.  There is no mention of the AHC or of an internal investigation.  The only hints of litigation are portions of the engagement letter which address the potential that materials might be sought by subpoena.  On the other hand, the letter is explicit that FTI was to provide "financial advisory and consultant services *only*…and that FTI would not make any management decisions."

While the engagement letter is not in and of itself dispositive to the outcome of this Motion[3], its contents strongly, if not exclusively, suggest that FTI was hired for business assistance, not legal purposes.  Indeed, everything about this contract points to the fact that FTI

---

[3]  Indeed, employing terms in an engagement letter such as "legal counsel" or "attorney assistance" would not by itself convert such an agreement into one in which the retention was for legal purposes.

was retained to assist in the creation of financial documents (the restatement) and not as a consequence of – either directly or indirectly – ongoing litigation against Valeant.

As noted, Valeant contends that the communications at issue are protected by attorney-client privilege and/or attorney work product protection and that Valeant has not waived privilege or protection over the challenged documents. A linchpin of this argument is that FTI personnel were acting as the "functional equivalent" of Valeant employees such that disclosure to FTI, a third party, did not constitute a waiver. For the reasons set forth below, the Special Master finds that FTI personnel were not the functional equivalent of Valeant employees and, as a result, by disclosing and exchanging the documents at issue with FTI's personnel, Valeant waived privilege over the challenged documents.

A review of the case law cited by the litigants demonstrates that there is no clear cut or bright line standard for determining "functional equivalency" and determining whether a particular consultant is or is not the equivalent of an employee of the retaining corporation. The courts' analysis of this issue has been strongly fact dependent and varied on a case by base basis. However, the Special Master does find that an opinion from this District upon which the Plaintiffs put a good deal of reliance is closely applicable to the facts and circumstances here and is instructive to the disposition of this motion. That opinion is *In re Bristol-Myers Squibb Sec. Litig.*, No. CIV 00-1990, 2003 WL 25962198 (D.N.J. June 25, 2003).

*Bristol-Myers Squibb* was a securities fraud class action where, like here, the court was faced with a discovery dispute centering on documents distributed to outside consultants. After a ruling by a special master, the court analyzed whether the consultants, as the defendant argued, were the functional equivalent of employees. The court noted that the attorney-client privilege in the case of a corporate client belongs to the corporation "and covers confidential

communications between a corporation's attorneys and its employee." *Id*. at *3.  However, the court went on, some courts have extended the privilege "where a third-party is acting as the functional equivalent of an employee." *Id*. (citing *In Re Copper Mkt. Antitrust Litig.*, 200 F.R.D. 213, 218-220 (S.D.N.Y. 2001).

The court then set forth a test for "functional equivalency," which required the consideration of multiple factors to reach an appropriate determination,

> [i]ncluding whether the consultants: (1) were incorporated in the staff to perform equivalent function, which is *necessary in the context of actual or anticipated litigation*; (2) possessed information needed by attorneys in rendering legal advice; (3) possessed authority to make decisions on behalf of the company; and (4) were hired because the company lacked sufficient internal resources and/or adequate prior experience with the consultant's field.
>
> [*Id*. at *4. (Italics in origina)].

The court emphasized that the key to deciding if a consultant should be protected under the "functional equivalent" exception is "if the consultant acts for the corporation and possesses the information needed by attorneys in rendering legal advice." *Id*. (citing *In Re Grand Jury Subpoena*, 995 F. Supp. 332, 340 (E.D.N.Y. 1198)).

The court concluded that the special master was correct in finding no functional equivalency since the consultant, a public relations firm, among other things, provided ordinary PR and marketing advice, the agreements were entered into well before the onset of that particular litigation, the contracts stated clearly that the consultants were not acting as agents or representatives, the consultants did not have authority to make decisions or issue statements on behalf of the defendant and finally, the ultimate goal was not legal advice, but business advice. *Id*. at *4.

Defendant argues that *Bristol-Myers Squibb* represents a "narrow" approach to the analysis of functional equivalency. For example, Valeant cites *In Re Copper Mkt. Antitrust Litig., 200 F.R.D. 213*, a case cited and recognized in *Bristol-Myers Squibb*, as one supporting a broader approach.

*In Re Copper Mkt. Antitrust Litig.* was an action against a Japanese company alleging it conspired to manipulate global copper prices. Prior to suit, the defendant hired a public relations firm, RLM, to handle "crisis management." Unlike this matter, and unlike the situation in *Bristol-Myers Squibb*, however, RLM acted as the company's spokesperson in dealing with the press, performed "damage control," helped the company make statements within the necessary legal framework, conferred frequently with the company's counsel, drafted public relations documents incorporating legal advice from counsel and had the authority to make decisions concerning public relations strategy. The court also pointed out that the defendant's internal resources were insufficient to handle significant PR responsibilities in the face of government investigations and anticipated private litigation. *Id*. at 16. Given this finding, the court ordered that 17 disputed documents which had been inadvertently released could be clawed back.

Valeant also cites *In Re: Flonase Antitrust Litig.*, 879 Fed. Supp. 2d 454 (E.D.Pa. 2012). This litigation involved a national pharmaceutical consulting firm, Swiftwater, which provided services to GlaxoSmithKline ("GSK") a multinational drug manufacturer. Again, after a discovery dispute was referred to a special master resulting in an adverse ruling to GSK, the defendant appealed to the district judge.

In analyzing whether Swiftwater was an employee equivalent, the court cited *In Re: Bieter Company*, 16 F. 3d 929 (8th Cir. 1994), "the first Appellate court to address whether communications between counsel and a corporation's independent counsel may fall within the

scope of the attorney-client privilege." *Id*. at 458.  While *Bieter* found that such communications *may* be entitled to privilege if the consultant was found to be the equivalent of an employee, "it did not adopt a generalized test for making this determination." *Id*.  The court went on to state that other courts had taken a more narrow view of when independent consultants qualified as employees, specifically citing *Bristol-Myers Squibb*.  *Id.*

Then, analyzing the facts specific to the litigation, the court found that the record demonstrated Swiftwater was an "integrated member" within the defendant's "brand maturation team" from its inception and preceding litigation, a team which included full time GSK employees and that Swiftwater assisted in administrative, managerial and analytic issues.  *Id*. at 460.  Further, the work touched on several legal and regulatory issues.  *Id*.  The court reasoned that given these factors, Swiftwater was the functional equivalent of an employee; yet, did not conclude that its functional equivalency provided blanket protection for the communications at issue, i.e., "without looking at individual documents it is impossible to know whether each…was created for the purpose of providing or obtaining legal advice."  The matter was then remanded for a further report and recommendation.  *Id*.

Another case favoring the broad approach urged by Defendant and cited in its submissions is Smith v. Unilife Corp., No. Civ-13-5101, 2015 WL 667432 (E.D. Pa. Feb. 13, 2015), a whistleblower case by a former employee in the context of alleged shareholder fraud. The documents consisted of communications with two non-lawyer consultants as to drafts of an SEC Form 10K but which the plaintiff whistleblower contended contained misrepresentations and omissions.  The court, taking a broader approach, concluded that the two consultants were the equivalent of employees since a review of the subject documents "demonstrated that the

communications were with counsel *and were made for the purpose of assisting the corporation in securing legal advice or making legal decisions.*"  *Id*. at \*3  (emphasis added).

Similarly, in *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, 2013 WL 4836752 (E.D.Pa., Sept. 11, 2013), the consultant, Clarion, had been engaged for years pre-suit to provide managerial support and strategic advice, worked hand-in-hand with Cephalon employees, regularly participated in making presentations to senior management regarding commercial and regulatory strategy, and were part of the company's Business Strategy Team.  Further, the Court found that all of the withheld communications were made for the purpose of obtaining or providing legal advice.  Given all of this, the court concluded that Clarion was performing a role substantially identical to that of Cephalon employees and, as such, the documents were covered by the attorney-client privilege.  *Id*. at \*7.

The Special Master finds this District Court's decision in *Bristol-Myers Squibb* to be a much more compelling and fitting analysis as to the test for "functional equivalency" of a consultant hired by a corporation under the circumstances here.  And under that test, Valeant's argument that FTI was the functional equivalent of a company employee fails.  In fact, even taking the broader approach, FTI does not qualify as a functional equivalent to a Valeant employee.

Defendant's use of FTI fails the test for several reasons.  While FTI was, it seems, to some degree integrated into Valeant's office, the Special Master finds that its incorporation was not necessary in the context of actual or anticipated litigation.  There is no doubt – and Valeant does not assert – that the company was obligated, and indeed was under the gun, to prepare a restatement to be incorporated in its 2015 Form 10K.  A Form 10K, of course, is a document that the SEC requires all public companies to file on an annual basis setting forth a comprehensive

20

summary of that entity's financial performance.  Having found the existence of serious issues with its prior financial statement, and with its 2015 Form 10K pending, Valeant had no choice but to create this document for filing with the SEC.  It was not an option.  More importantly, irrespective of pending litigation against the Company, and even irrespective of malfeasance at the top of the organization, Valeant, had it discovered financial irregularities (even in the absence of investigations or media scrutiny), would have taken – and was obligated to take – exactly the same steps.  In short, while FTI might have arguably been briefly integrated in Valeant to perform a corporate function, this was not a corporate function in the context of actual or anticipated litigation but a necessary step to take by any corporation whether litigation was anticipated or pending.  In short, it was a business function, not one associated with litigation.

Nor is there any showing here that FTI "possessed information needed by attorneys in rendering legal advice."  Defendant does not articulate what, if any, information was developed or discovered by FTI which in any way touched upon information required by Valeant's counsel to render necessary legal advice.  Presumably, all of the information upon which FTI rendered its assistance, or documents, including communications, existed in Valeant's possession pre-retention of FTI.

As to possessing authority to make decisions on behalf of the Company, there is no dispute, and again no assertion by Valeant, that FTI had such authority.  As memorialized, in fact, the engagement letter between the two entities explicitly *prohibited* FTI from making any decisions on Valeant's behalf while providing "financial advisory and consulting services only."

Finally, as to whether Valeant "lacks sufficient internal resources and/or adequate prior experience with the consultant's field," the Special Master is unable to discern from the submissions whether, in fact, this was the case.  Plaintiffs assert that Valeant employed staff

members fluent in financial accounting matters who could have assisted here, while Defendant states it required outside help to prepare the restatement and Form 10K given the loss of its controller.  While it stands to reason that a company such as Valeant should have adequate personnel versed in these financial issues, given that Defendant fails to meet the other prongs of this test, the Special Master finds that whether Valeant did or did not have substitute personnel does not tip the balance.

In terms of the cases cited by Defendant advocating a "broad" approach to determining functional equivalency, those opinions are generally inapposite or unsupportive of Valeant's position.  In each case, the retained consultants had long-standing or pre-existing relationships with the companies, were well integrated into the corporation, or had the authority to make significant decisions on behalf of the company or communicated with the corporation's attorneys for the purpose of securing legal advice or making legal decisions.  Such is not the case with FTI, a company retained by Valeant for what amounted to a temporary, specific task and one that the Special Master finds would have been performed irrespective of pending or anticipated litigation. Instead, the Special Master concludes that FTI was retained for limited business purposes.  *See IQVIA, Inc. v. Veeva Sys., Inc.*, No. 2:17-CV-00177, 2019 WL 2083305, at *1 (D.N.J. May 13, 2019), clarified on denial of reconsideration, No. 2:17-CV-00177, 2019 WL 3069186 (D.N.J. July 11, 2019).

In summary, the Special Master finds that courts in this District, articulated in *Bristol-Myers Squibb*, apply a narrower standard to test whether a consultant is acting as a functionally equivalent corporate employee.  Under that test, and even under a broader view, FTI was not a functional employee of Valeant.  Accordingly, Valeant waived any privilege applicable to comments to or from lawyers which may have been contained in the documents shared with FTI.

The Special Master also rejects Defendant's argument as to the work product doctrine.

The burden of proving that a document is protected rests with the party asserting the work-product doctrine. *Torres v. Kuzniaz*, 936 F. Supp. 1201, 1208 (D.N.J. 1996); *In re Riddell Concussion Reduction Litig.*, No. 13-7585, 2016 WL 7108455, at *6 (D.N.J. Dec. 5, 2016). As our courts have stated, in order for documents to be protected from discovery pursuant to the work product doctrine, it must be "reasonably clear based on the surrounding facts and the nature of the materials that they were in fact prepared or obtained because of pending or anticipated litigation." *Reich v. Hercules, Inc.*, 857 F. Supp. 367, 372 (D.N.J. 1994). The work product doctrine does not apply to documents that would have been prepared "independent of any anticipation of use in litigation (i.e., because some other purpose or obligation was sufficient to cause them to be prepared." *First Pac. Networks Inc. v. Atlantic Mut. Ins. Co.*, 163 F.R.D. 574, 582 (N.D.Cal. 1995). That is to say, documents prepared in the regular course of business are not protected. *United States v. Rockwell Int'l*, 897 F.2d 1255, 1265 (3d Cir. 1990).

The fact that documents may be useful for multiple purposes does not alter this concept. That is, "[d]ocuments created for other purposes that are useful in subsequent litigation are also not attorney work-product." *In Re Gabapentin Patent Litig.*, 214 F.R.D. 178, 184 (D.N.J. 2003); *Graco, Inc. v. PMC Glob., Inc.*, No. CIV.A. 08-1304, 2011 WL 666048, at *18 (D.N.J. Feb. 14, 2011). Therefore, a party seeking to invoke work product protection must prove at least two elements. First, that a document was prepared because of reasonably anticipated litigation. Second, that the material was prepared because of the prospect of litigation and for no other purpose. *Id.* at 183-184; *Riddell*, 2016 WL 7108455 at *6. More specific to this matter, as the court stated in *Martin v. Balley's Park Place Hotel & Casino*, 983 Fed. 2d 1252, 1260 (3d Cir. 1993):

23

> In limiting work product to materials prepared in 'anticipation of litigation', the drafters of *Rule* 26(b)(3) excluded from the Rule's protection '[m]aterials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other non-litigation purposes.'

*See also*, *Rockwell Int'l.*, 897 F.2d 1255 at 1265-1266.

As stated previously, FTI – an entity hired by Valeant, the company, not the Ad Hoc Committee or its attorneys – had been engaged primarily (if not exclusively) for the purpose of correcting Valeant's prior financial misstatements.  Nothing presented here supports the proposition that FTI's retention was necessitated by then pending or future litigation albeit governmental investigations or civil law suits.  The engagement agreement does not support this proposition, and as Plaintiffs point out, neither the Board meeting minutes nor the Board's official resolution establishing the AHC even mention litigation, although lawsuits existed at that time thus negating the notion that the primary purpose of creating the committee arose out of litigation.  Similarly, as Plaintiffs also argue, AHC chair Robert Ingram's after the fact equivocal comment, to the effect that the committee was created for multiple purposes, also undermines this proposition.  Then, at a later point in time, FTI was retained as a consequence of the discovery of significant financial and management irregularities, necessitating a restatement of inaccurate public financial reports – an action which Valeant was obligated to perform, no matter the circumstances which had led to the discovery of these damaging revelations.  At that point, for Valeant, the ordinary course of business included a requirement that it create a restatement to be incorporated into its 2015 Form 10K, an action which would have occurred with or without litigation.  Hence, the materials generated by FTI, the company retained to do this, were materials "assembled in the ordinary course of business [and] pursuant to public requirements unrelated to litigation or for other non-litigation purposes."  See, *Martin*, 983 Fed. 2d at 1260.

Given the Special Master's findings as to claims of attorney-client privilege and work product protection, it is unnecessary to determine whether Valeant, by sharing documents with its auditor, PwC, also waived privilege and protection.

In addition to the Special Master's findings set forth above, an analysis of this motion reveals a separate and independent reason to reject Valeant's assertion of privilege and work product protection as to the FTI documents.

Although Valeant insists otherwise, the Special Master finds that in Defendant's attempts to clawback the documents, it failed to take reasonable steps to prevent disclosure and to promptly rectify the error in accordance with Federal Rule of Evidence 502(b)(1) and 502(b)(3). This lack of reasonably prompt action, indeed seemingly inexplicable inaction and/or delay does, as Plaintiffs argue, constitute an alternative basis for waiver.

Although outlined previously in this Report and Recommendation, the Special Master will briefly review the chronology of events leading to the clawback of documents described by Valeant in its own submission. That is, as of February 2019, unbeknownst to Valeant, FTI had produced documents to the SEC which never came to the fore in that agency's investigation of Defendant. Then, on November 9, 2020, FTI, prompted by a subpoena, provided the documents to Direct Action Plaintiffs who, two days later, passed them along to Valeant's counsel. Counsel then "began its review…shortly after" and on December 4, 2020, the attorneys contacted FTI regarding what were felt to be privileged documents. FTI then notified Plaintiffs of Valeant's objections and on December 6, 2020, Valeant provided the litigants with a privilege log. No action was taken with regard to the SEC directly until January 20, 2021, when FTI requested that the documents be returned or destroyed. On February 16, 2021, FTI provided the agency with a

privilege log and on March 1, 2021, the SEC agreed to a clawback.  [Defendants' Memorandum of Law, pp. 8-10.]

As the fictional King of Siam once sang, it is a puzzlement.  Despite an engagement agreement between FTI and Valeant requiring that the consultant immediately notify the Company of any requests to produce confidential information, Valeant asserts that the company it hired to assist in producing financial statements, and whose employees interacted with Valeant employees and officers and who were physically located at Valeant's facilities, not only failed to notify Defendant of the SEC subpoena, but produced the documents without notice and then (apparently) remained silent for two years about its production.  This scenario, to say the least, strains credulity.  However, since there is nothing before the Special Master to demonstrate that Valeant's professed absence of knowledge as to the SEC production is untruthful, for the purpose of this motion, it is accepted as the fact.

Nevertheless, what transpired beginning in late Fall of 2020 is equally a puzzlement.

First, nothing in Valeant's submissions disputes that Defendant had notice of the subpoena to FTI as of October 16, 2020.  Certainly by November 11, 2020, when Direct Action Plaintiffs actually provided copies of the documents at issue to Valeant, Defendant was on further notice that Plaintiffs sought to obtain (and indeed had received) materials which Valeant now argues are either privileged or protected or both.  Not until December 6, 2020, when it provided a privilege log, did Valeant take any direct action asserting its objections to the document production.  Moreover, during this timeframe, there is nothing to suggest (and Valeant does not assert) that Defendant took any steps to coordinate with FTI as to the subpoena in advance of production.  A review of these actions or inactions strongly supports the proposition that Valeant did not consider its document exchange with FTI to constitute a privileged or

26

protected exchange.  It also undermines Valeant's argument that FTI was the "functional equivalent" of a Valeant employee.  But, most significantly, this arguably dilatory conduct does not meet the requirements set forth in Federal Rule of Evidence 502.

In effect, Valeant argues here that there was an inadvertent disclosure of protected documents caused by its agent, FTI.  It sought to rectify that disclosure by means of the clawback.  Federal Rule of Evidence 502, entitled, "Attorney-Client Privilege and Work Product; Limitations on Waiver" addresses this situation.  Specifically, Federal Rule of Evidence 502(b) reads, in pertinent part:

> (b)  **Inadvertent Disclosure.**  When made in a federal proceeding…the disclosure does not operate as a waiver in a federal or state proceeding if:
>
> (1)  the disclosure is inadvertent;
>
> (2)  the holder of the privilege or protection took reasonable steps to prevent disclosure; and
>
> (3)  the holder promptly took reasonable steps to rectify the error…

As our courts have stated, generally speaking, disclosure of privileged information (including attorney-client communications and work product) operates as a waiver of privilege. *Graco Inc.*, 2011 W.L. 666048 at *16.  That is, generally, when a party discloses privileged information to a third party, the privilege is extinguished and the documents at issue are discoverable.  See *In Re Teleglobe Commc'n Corp.*, 493 Fed. 345, 364 (3d Cir. 2007). Importantly, the party claiming a third party as its agent bears the burden of showing the privilege has been waived. *See Graco*, 2011 W.L. 666048 at *15 (citing *Cellco P'ship v. Certain Underwriters at Lloyd's London*, No. CIV.A. 05-3158, 2006 WL 1320067 (D.N.J. May 12, 2006)). However, in accordance with the Rule, inadvertent disclosure does not constitute a

waiver of the attorney-client privilege if: (1) the disclosure is inadvertent; (2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and (3) the holder promptly took reasonable steps to rectify the error in accordance with the rule. *Gloucester Twp. Hous. Auth. v. Franklin Square Assocs.*, 38 F. Supp. 3d 492, 496 (D.N.J. 2014). The disclosing party has the burden to prove that the elements of *Rule* 502(b) have been met. *See Smith v. Allstate Ins. Co.*, 912 F. Supp. 2d 242, 247 (W.D.Pa 2012), citing *Rhoades v. Young Women's Christian Ass'n of Greater Pittsburgh*, No. CIV. A. 09-261, 2009 WL 3319820, at *2 (W.D. Pa. Oct. 14, 2009).

In terms of this Circuit, courts also consider certain factors in determining whether a party's disclosure waived privilege. That is:

(1)   the "precautions taken to prevent inadvertent disclosure" given the extent of document production;

(2)   the quantity of inadvertent disclosures;

(3)   the "extent of the disclosure";

(4)   the extent of "any delay" and "measures taken to rectify the disclosure[;]" and

(5)   any "overriding interests of justice[.]"

[*See*, *Smith*, 912 F. Supp. 2d at 247, and *Gloucester*, 38 F. Supp. 3d  at 497.]

While Valeant says it has consistently treated FTI "as within the privileged relationship" such that shared attorney-client and work product communications were subject to those protections, Valeant's actions here appear otherwise. Nowhere in its submissions does Defendant lay out in any detail what steps it engaged in with FTI to prevent disclosure when it received a copy of the subpoena in late October 2020. Surely at that point, Valeant knew or should have known that the document demands could result in the production of the very same

28

materials which are now the subject of this motion – internal Valeant communications previously shared with FTI.  And yet FTI, an entity engaged by Valeant which had no evident reason to violate its contractual obligations to Valeant, shortly thereafter produced those documents despite a seemingly ironclad contract with Valeant which prohibited the consultant from doing so.  Moreover, as the privilege log attests, the production was no small collection of documents mistakenly included in a voluminous bundle, but rather substantial materials that certainly could not have been overlooked or ignored.

While Valeant also argues that its response (meaning the objection to disclosure) was "timely," the facts belie that as well.  Again, Valeant fails to describe what, if anything, it did upon being alerted to the subpoena and what steps were taken (other than review) when the documents were physically submitted to Valeant by Plaintiffs.  From the Special Master's perspective, this certainly appears to have been nearly a two month delay, and admittedly nearly a four week delay, by Valeant in raising objections to the production of documents which it now asserts are privileged and protected.  The Special Master agrees with Direct Action Plaintiffs assertion that the circumstances in *Gloucester* (a three month delay) and the rationale employed by the court in that opinion, bear strongly on this motion (a near two month delay) rather than Defendants' assertion that the circumstances in *Alers v. City of Philadelphia*, No. CIV.A. 08-4745, 2011 WL 6000602 (E.D. Pa. Nov. 29, 2011) (a four to six day delay) is more applicable here.[4]

---

[4] Indeed, the circumstances set forth in *Alers* are remarkably unlike those which underlie this motion.  Among other things, the inadvertent disclosure was transmitted directly to the Defendant's adversary, clearly marked privileged and confidential, and received approximately two years before the deposition.  Yet that attorney failed to alert opposing counsel of its receipt.  Additionally, the document was one of approximately 2000 pages produced and buried in a production response.  Further, as to timing and delay, defense counsel alerted the adversary to the privilege objection within four days of the deposition, the event which triggered the discovery of the disclosure.  The *Alers* court, in fact, cited – and contrasted – another matter, *Carbis Walker v. Hill* (citation omitted) where an 18-day period was found to be a significant delay in rectifying a disclosure.

In short, in terms of the steps taken by Valeant to prevent inadvertent disclosure and its response, the quantity and the extent of the disclosure, as well as the delay in attempts to rectify the disclosure demonstrates here that the holder of the privilege, Valeant, failed to take reasonable steps to rectify the error promptly.  Accordingly, the Special Master finds that these actions constituted waiver on Valeant's part.

**VI.    Conclusion.**

For the reasons previously set forth, Plaintiffs' motion is **GRANTED.**


Date:   June 24, 2021                            s/*Dennis M. Cavanaugh*
                                                 DENNIS M. CAVANAUGH
                                                 Special Master