## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| IN RE: VALEANT PHARMACEUTICALS INTERNATIONAL, INC. SECURITIES LITIGATION | Civil Action No. 3:15-cv-07658 |
|  | JUDGE MICHAEL A. SHIPP |
|  | JUDGE LOIS H. GOODMAN |
| THIS DOCUMENT RELATES TO: | **REPORT & RECOMMENDATION OF THE SPECIAL MASTER JUDGE DENNIS CAVANAUGH, RET.** |
| 16-cv-07321 (MAS)(LHG) |  |
| 16-cv-07324 (MAS)(LHG) |  |
| 16-cv-07494 (MAS)(LHG) |  |
| 16-cv-07496 (MAS)(LHG) |  |
| 16-cv-07497 (MAS)(LHG) |  |
| 17-cv-06513 (MAS)(LHG) |  |
| 17-cv-07636 (MAS)(LHG) |  |
| 17-cv-12088 (MAS)(LHG) |  |
| 18-cv-00089 (MAS)(LHG) |  |
| 18-cv-00343 (MAS)(LHG) |  |
| 18-cv-00383 (MAS)(LHG) |  |
| 18-cv-00846 (MAS)(LHG) |  |
| 18-cv-00893 (MAS)(LHG) |  |
| 18-cv-01223 (MAS)(LHG) |  |
| 18-cv-08595 (MAS)(LHG) |  |
| 18-cv-08705 (MAS)(LHG) |  |
| 18-cv-15286 (MAS)(LHG) |  |
| 20-cv-07460 (MAS)(LHG) |  |
| 20-cv-07462 (MAS)(LHG) |  |

The matter before the Special Master is a motion filed by Defendant Valeant

Pharmaceuticals International Inc., n/k/a Bausch Health Companies, Inc.  ("Valeant" or the

"Company"), which seeks a protective order to preclude Direct Action Plaintiffs from taking the

deposition of Joseph C. Papa ("Papa"), the Company's current Chief Executive Officer. The

Special Master has reviewed Valeant's Memorandum of Law and exhibits in support of the

motion; Direct Action Plaintiffs' Memorandum of Law and exhibits in opposition; and Valeant's

Reply Brief.

After considering the submissions of the parties, based upon the following, it is the

opinion of the Special Master that Valeant's motion is DENIED for the reasons specified below.

## I.    Factual Background

The Special Master assumes the parties' familiarity with the factual background of this

case and limits his discussion to facts directly relevant to the current motion.

Direct Action Plaintiffs in these coordinated cases are sophisticated investment funds that

purchased Valeant securities. In general, Plaintiffs allege that:

> Unbeknownst to Plaintiffs and the rest of the market, between
> 2013 and 2015, Defendants Valeant, Pearson and Schiller made
> material misrepresentations and failed to disclose material facts in
> order to: (a) conceal the existence of a network of specialty
> pharmacies whose sole purpose was to steer patients toward
> Valeant products even when much cheaper generic alternatives
> were available; (b) artificially inflate Valeant's earnings by
> booking fictitious sales; and (c) mislead investors that Valeant's
> growth derived from organic volume increases when, in fact, such
> growth was driven primarily by Valeant's unsustainable practice of
> acquiring medications and drastically increasing their prices. As
> the truth was gradually revealed to the market, the price of Valeant
> securities plummeted from over $250 per share in mid-2015 to
> under $25 per share by the time the fraud was fully revealed in
> mid-2016.
>
> (*See GMO Tr., et al. v. Valeant Pharm. Int'l Inc., et als.*, No. 18-
> cv-00089, Dkt. 1, ¶ 1 (D.N.J. Jan 3, 2018))

Direct Action Plaintiffs' complaints allege that Valeant failed to maintain effective

internal controls in 2014 and 2015. *See e.g. GMO Tr., et al. v. Valeant Pharm. Int'l Inc.*, et al.

No. 18-cv-00089, Dkt. 1, ¶¶ 64, 107, 110. The complaints further assert that Valeant made

misrepresentations concerning the effectiveness of internal controls as the Company had

2

"certified that they had established effective internal controls over Valeant's financial reporting as well as effective disclosure controls and procedures for Valeant." *See e.g.*, *Id.* at ¶¶ 216-226. The complaints further allege that the "tone at the top" of Valeant, where challenging targets were set and achieving those targets was a key performance expectation, was a contributing factor resulting in the Company's improper revenue recognition. *See e.g.*, *Id.* at ¶¶ 108, 226, 248.

On March 21, 2016, Valeant reported that the Ad Hoc Committee had identified material misstatements in Valeant's previously-issued financial reporting and that CEO J. Michael Pearson ("Pearson") would be departing the Company. Valeant announced the appointment of Papa as CEO and Chairman of the Board on April 25, 2016.

On April 29, 2016, Valeant restated its historical financial statements (the "Restatement"). In the Form 10-K for the year ended December 31, 2015, the Explanatory note stated:

> Based on the results of the AHC Review[1], the Company's review of its financial records, and other work completed by management, the Company and the ARC[2] have concluded that material weaknesses in the Company's internal control over financial reporting existed that contributed to the material misstatements in the consolidated financial statements described above. These material weaknesses relate to the tone at the top of the organization and the accounting and disclosure for non-standard revenue transactions particularly at or near quarter ends. The improper conduct of the Company's former Chief Financial Officer and former Corporate Controller, which resulted in the provision of incorrect information to the ARC and the Company's independent registered public accounting firm, contributed to the misstatement of financial results. In addition, as part of this assessment of internal control over financial reporting, the Company has determined that the tone at the top of the organization, with its

---

[1] The Company's Board of Directors (the "Board") established an ad hoc committee of independent directors of the Board (the "Ad Hoc Committee") to review these allegations and related matters (the "AHC Review").

[2] Audit and Risk Committee (the "ARC")

> performance-based environment, in which challenging targets were set and achieving those targets was a key performance expectation, may have been a contributing factor resulting in the Company's improper revenue recognition and the conduct described above.

Papa officially became CEO of Valeant on May 3, 2016.  On May 23, 2016, Papa spoke at the UBS Global Healthcare Conference. At this conference, Papa made a thirty-minute presentation to investors and then met in-person with individual representatives of some of the Direct Action Plaintiffs. Plaintiffs assert that Papa spoke in detail about his diligence of Valeant before taking the job as CEO and his "off the record" discussions regarding the Company. Plaintiffs allege that while answering questions from investors and analysts, Papa described Valeant as "a great turnaround opportunity" and discussed a number of the challenges he inherited. *See, e.g.*, *Okumus Opportunistic Value Fund, Ltd. v. Valeant Pharm. Int'l Inc.*, et al., No. 3:17-cv-6513 (D.N.J.), Dkt. 1 at ¶ 112. Plaintiffs allege that Papa acknowledged that with Philidor "clearly we had some question marks" and that "there were some pricing mistakes that were made" and "some transparency things that [could be] improve[d] on at Valeant." *Id.* Regarding internal controls, Plaintiffs allege that Papa recognized "there are some functions that we need to put some additional . . . controls" and "there is some investment that needs to happen in areas," such as finance, "where [Valeant] just need[s] to bring some additional financial capabilities." *Id.* To that end, Papa disclosed that the Company "just recently hired a new Controller." *Id.*

On June 7, 2016, Valeant announced its results for the first quarter of 2016. *See e.g.*, *GMO Tr., et al. v. Valeant Pharm. Int'l Inc.*, et al. No. 18-cv-00089, Dkt. 1, at ¶ 185. Plaintiffs allege "the results were not good, primarily because of the hit the Company had taken in having to shut down its clandestine network of specialty pharmacies." *Id.* Plaintiffs allege that Papa

stated that "the 'vast majority' of Valeant's 'revenue shortfall in dermatology in our revised guidance relates to this average selling price shortfall.'" *See*, *e.g. Okumus Opportunistic Value Fund, Ltd. v. Valeant Pharm. Int'l Inc., et al.*, No. 3:17-cv-6513 (D.N.J.), Dkt. 1 ¶ 115. Plaintiffs allege that during the question and answer portion of the call, Papa further revealed how much the Company's drug pricing and profitability were suffering as a result of its cessation of price gouging and deceptive practices and the termination of its relationship with Philidor, and Valeant's new relationship with Walgreens. *Id.*

On August 9, 2016, Valeant issued a release and hosted a conference call regarding the Company's second quarter 2016 financial results. *Id.* at ¶ 118. In the release, Valeant disclosed a loss per share and a drop in revenue, which the Company blamed on the slow recovery in its dermatology division, which suffered greatly from Philidor's closing. *Id.* In the conference call that day, Plaintiffs allege that Papa stated: "I don't want to suggest for an instant that there [aren't] challenges" and that it "will take time to implement and execute our turnaround plan." *Id.*

In connection with these lawsuits, Plaintiffs requested to depose Papa on February 7, 2021. In response, Valeant requested that Plaintiffs withdraw their request as it maintained that Papa lacked unique and relevant knowledge of the subject matter of the case. Plaintiffs replied, and the parties were ultimately unable to reach agreement following a meet and confer. Valeant subsequently filed its motion for a protective order.

## II.    Valeant's Argument

Valeant argues that Plaintiffs have no basis to take the deposition of Papa as they cannot satisfy the high standard for authorizing depositions of apex witnesses. Valeant asserts that

courts in the Third Circuit consider two factors when assessing whether the deposition of a high-ranking corporate executive is appropriate: "(1) whether the executive or top-level employee has personal or unique knowledge on relevant subject matters; and (2) whether the information sought can be obtained from lower-level employees or through less burdensome means, such as interrogatories." *Younes v. 7-Eleven, Inc.*, 2015 WL 12844446, at *2 (D.N.J. Aug. 19, 2015).

Valeant argues that Papa possesses no personal or unique knowledge about the issues relevant to this litigation. It argues that Plaintiffs' complaints concern alleged conduct by Valeant on or before April 15, 2016. Papa did not join Valeant until May 3, 2016. Thus, Valeant argues that everything Papa learned about Valeant before he joined is information that can be readily obtained from other deponents who were actually associated with Valeant during the relevant time period. To the extent Plaintiffs seek to depose Papa because he instituted a "turnaround plan" between May and August 2016, Valeant argues that this period post-dates Plaintiffs' transactions in Valeant securities and all of the alleged misstatements.

Valeant further argues that to demonstrate unique knowledge, Plaintiffs must show a nexus between public statements by the executive and relevant issues in the case, including why the knowledge is unique to the executive. *Ciarrocchi v. Unum Grp.*, 2009 WL 10676631, at *3 (D.N.J. Aug. 27, 2009). Valeant argues that Plaintiffs must show that the information cannot be gathered from other Valeant personnel and must be knowledge that is unique to Papa. Valeant asserts that Plaintiffs do not show any connection between Papa's public statements and the allegations made in the Complaint. Valeant asserts that while Papa participated in first and second quarter 2016 earnings calls, these related to matters that took place before he joined Valeant. Thus, any information that he learned on the first quarter call was secondhand, and the

second quarter earnings call took place after the relevant time period for all of the complaints ends.

Valeant then argues that even if Papa possessed personal knowledge about matters at issue in this litigation, Plaintiffs have not demonstrated that they cannot obtain the information through less intrusive means. Valeant maintains that alternative sources for information relevant to this litigation exist. It argues that anything relevant that a CEO, who began after the relevant period, knows is equally known by the myriad of executives who handled the issues while they happened. Valeant argues that Plaintiffs have failed to identify anything that Papa learned during his diligence about these issues to which other deponents cannot speak.

Valeant points out that Plaintiffs have taken or are scheduled to take the depositions of a number of former Valeant executives. These depositions include: former Valeant Executive Vice President and member of the Office of the CEO, Robert L. Rosiello; former Valeant Executive Vice President, Company Group Chairman, and member of the Office of the CEO, Ari S. Kellen; Valeant's former CFO, Howard Schiller; Valeant's former Controller, Tanya Carro; the former Chairman of Valeant's Board of Directors, Robert Ingram; and Valeant's former CEO, J. Michael Pearson.

Valeant further argues that Papa's purported conversations with Direct Action Plaintiffs are irrelevant. Valeant asserts that Plaintiffs fail to explain how Papa's participation in meetings with investors as part of the May 23, 2016, UBS Healthcare Conference is relevant. Valeant argues that the mere fact that an executive spoke to investors as part of an industry conference cannot, without more, justify taking Papa's deposition under the apex doctrine.  Valeant points to the deposition testimony of Ari Herman, Brahman Capital Corp.'s corporate designee in

*Brahman v. Valeant Pharmaceuticals International, Inc.*, No. 3:18-cv-0893, in which Herman stated that during his meetings with Valeant management at investor days and other events Valeant management never conveyed anything to him that was not publicly available to the rest of the market. Herman also stated that while he could not recall his May 2016 meeting with Papa, he was sure he did not get any different information than what was disclosed to the public. Valeant goes on to argue that Plaintiffs offer nothing to suggest that Papa has unique knowledge about the alleged meetings with investors. Plaintiffs argue that mere speculation that unspecific statements made at this conference, which Plaintiffs themselves appear not to recall, are somehow uniquely probative, cannot suffice.

Finally, Valeant argues that Plaintiffs' counsel can acquire the information regarding any meetings between Papa and the Direct Action Plaintiffs themselves from their own clients at far less burden to all parties. Thus, Valeant argues that Plaintiffs fail to carry their burden of demonstrating that the discovery sought from Papa cannot be acquired through other means.

## III.    Direct Action Plaintiffs' Arguments

Direct Action Plaintiffs argue that their claims cover events that occurred from late 2012 through August 2016, and include public statements made by Papa on June 7, 2016, and August 9, 2016, in connection with Valeant earnings releases, which are alleged to have caused substantial decline in Valeant's stock price and harm to investors. Direct Action Plaintiffs argue that a centerpiece of their complaints is Valeant's Restatement. Plaintiffs explain that following Valeant's partial disclosure of its ties to Phildor in October 2015, the Company's Board established an Ad Hoc Committee to review the impact of the Philidor revelations. Plaintiffs allege that as a result of the review, Valeant restated certain of its previously issued financial

8

statements because of material improper revenue recognition. Plaintiffs argue that discovery concerning the Restatement, the Ad Hoc Committee investigation that caused it, and the changes to Valeant controls and policy as a result of both, is critically important for Plaintiffs to prove their allegations.

Plaintiffs argue that Papa's involvement with and knowledge of the relevant facts and circumstances was far more intimate and commenced far earlier than Valeant's motion suggests. Plaintiffs explain that on March 17, 2016, Papa was invited to a meeting of the Valeant Board of Directors that was being scheduled for June 14 and 15, 2016, to take place in Montreal, Canada. At that time, Papa was still the CEO of another publicly-traded pharmaceutical company. On March 21, 2016, Valeant announced that the Ad Hoc Committee had identified material misstatements in Valeant's previously-issued financial reporting and that Pearson was being terminated. On March 23, 2016, Papa emailed the then-current Board Chairman, Robert Ingram, and stated that he was "following the news regarding Valeant" and had "a couple thoughts regarding [Valeant's] current situation." Papa and Ingram spoke on March 28, 2016.

By April 18, 2016, Papa's employment agreement with Valeant was complete and ready for signatures, subject to a non-compete no litigation confirmation. Plaintiffs believe that after this point, Papa began managing Valeant and participating in Board meetings. Plaintiffs point out that on April 26, 2016, Papa was invited to a meeting with Valeant's Board to discuss the Restatement and Valeant's delayed 2015 annual report, which had not yet been finalized. Defendants Pearson and Schiller attended the meeting. That same day, Papa was forwarded non-public remarks that Pearson was scheduled to make in an appearance before the United States Senate Special Committee on Aging. On April 28, 2016, Papa was scheduled to have a

conversation with Pearson, which Plaintiffs presume was in connection with the Board meeting that he and Pearson were scheduled to attend that day.

Plaintiffs assert that part of Papa's charge in taking over Valeant was to improve the "tone at the top" and implement measures to address the environment that allowed for Valeant's fraud. One of Papa's first actions was to establish the Patient Access and Pricing Committee to ensure that there was sufficient Board oversight, involvement, and management of pricing actions. Papa proposed the Committee on May 1, 2016. Plaintiffs argue that Papa was also involved in the Board's Conduct and Compliance Committee and was involved in the Company's remediation efforts following the Ad Hoc Committee investigation. Plaintiffs point out that Papa attended a June 14, 2016, meeting of the Board's Conduct and Compliance Committee, during which he was briefed on the work of the Ad Hoc Committee and the remediation plan and efforts undertaken under the Committee's plan to date.

Plaintiffs further argue that Papa had in-person meetings with investors, including Direct Action Plaintiffs. Papa made a thirty-minute presentation to investors at the May 23, 2016, UBS Healthcare Conference in New York. Papa then met with an analyst from Brahman Capital Corp, as part of a thirty-minute group meeting with other investors. He later met with employees of Blackrock, Inc. and an analyst from TIAA for a thirty minute two-on-one meeting. Papa then met with employees of Hound Partners as part of a thirty-minute three-on-one session. He also met with an analyst from Okumus Fund Management as part of a group meeting with eight different investors. The in-person meetings were not transcribed.  Plaintiffs maintain that during his opening remarks, Papa spoke in detail about his diligence of Valeant before taking the job as CEO and his "off the record" discussions regarding the Company. Papa also discussed what he

called "question marks" around Philidor and addressed drug pricing in detail, including "pricing mistakes that were made" and a return to pricing "normal" once he "clear[ed] up a couple of things that were in the past[.]" Plaintiffs assert that Papa also met in-person with two representatives of two Direct Action Plaintiffs, Okumus and Hound Partners, along with other investors, for dinner in Manhattan.

Plaintiffs also assert that on June 7, 2016, Papa made public statements during the Company's second quarter 2016 earnings call concerning Valeant's revenue shortfall and lowered 2016 revenue and Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") guidance. Papa's remarks concerned the reduction in Valeant's average selling price for prescriptions allegedly due to the Company abandoning price increases and terminating its relationship with Philidor. In response to this disclosure, the price of Valeant's stock declined $4.21, or more than 14.5%. Plaintiffs allege that Papa's statement caused uproar on Valeant's Board. Plaintiffs assert that there was tension on Valeant's Board regarding disclosures to the Company's investors during the time period relevant to the Direct Action Plaintiffs' claims.

Plaintiffs argue that while they are scheduled to take the depositions of numerous former Valeant employees, Papa is the only current high-ranking executive whose deposition has been noticed. Plaintiffs assert that Papa is a proper deponent under the rules. Plaintiffs contend that Valeant's position is absurd given that Papa was Board Chairman and CEO during part of the relevant time period. Plaintiffs assert that Papa's personal communications, his recollection of Board meetings, and the information he learned while remedying Valeant's deficient control environment are all discoverable. Plaintiffs further argue that Papa's unique personal knowledge

about his conversations with certain Direct Action Plaintiffs is relevant to the core facts of the case.

Plaintiffs assert that the apex doctrine only applies to those executives who have "no first-hand knowledge of the facts," *Lincoln Nat'l*, 2019 WL 7581176, at *2, in cases concerning the "company's 'day to day operations' or something manifestly immaterial in view of the total scope of the company's overall operations, such as slip-and-fall cases or a routine claim of trademark infringement…" *Id.* Plaintiffs argue that is not the case here. They assert that the alleged securities fraud is a seminal event in the Company's history. Plaintiffs argue it was the very reason that Papa first contacted Valeant's Board and was eventually hired to replace Pearson. Plaintiff's further point out that when Papa joined Valeant and became privy to non-public information about its operations, including through conversations with Valeant management and members of its Board, the Company was in the process of finalizing the Restatement and determining the depth and breadth of the toxic tone at the top created by Pearson and Schiller. Plaintiffs argue that Papa is a percipient witness to these events and can testify about his experience at the Company at that time, including information he learned about the Company's flawed control environment and the results of the Ad Hoc Committee investigation that he was being tasked to remedy. Plaintiffs assert that his perspective will be unique and highly probative because Papa was directly involved in deciding what measures were necessary to "right the ship" in light of past wrongdoing. Plaintiffs argue that Papa has quintessential firsthand knowledge of relevant events that is properly the subject of discovery.

Plaintiffs further argue that Valeant is incorrect in its position that there are no events after April 15, 2016, that are relevant to this case. Plaintiffs assert that Papa himself made

12

relevant statements about Philidor and drug price increases on at least June 7 and August 9, 2016. Plaintiffs argue that internal Valeant documents reveal that there was substantial disagreement at the Board over the content and veracity of the June 7 statement, which at least one Board member thought was misleading and omitted facts, and put Valeant at risk "again."

Plaintiffs also assert that in securities fraud actions, "courts allow discovery to extend to events before and after the period of actual liability so as to provide context." *See e.g.*, *In re New Century*, No. 07-cv-0931, 2009 WL 9568860, at *2 (C.D. Cal. July 8, 2009). Plaintiffs explain that such information is discoverable because it informs and "confirm[s] what a defendant should have known during the class period." *IBEW Local 90 Pension Fund v. Deutsch Bank AG*, No. 11-cv-4209, 2013 WL 1223844, at *12 (S.D.N.Y. Mar. 27, 2013) (quotation omitted). Plaintiffs argue that Papa is in a unique and special position to provide such information because it was his job to investigate Valeant's compromised control environment. Plaintiffs argue there is simply no other witness from whom this testimony is more properly developed.

Plaintiffs assert that Valeant's attempts to downplay the significance of Papa's own statements and in-person meetings with Direct Action Plaintiffs are unavailing as discovery into the content of, and bases for, curative disclosures is routine in an Exchange Act case because loss causation is one of the elements for which the defrauded investor bears the burden of proof. Plaintiffs argue that it would be an unprecedented application of the apex doctrine to preclude the deposition of a corporate CEO in a stock fraud case who himself made public statements that are alleged to have revealed information about the alleged misstatements. Plaintiffs argue they are also entitled to explore what Papa knew during his in-person meetings with Direct Action Plaintiffs, what he did to educate himself for these meetings, and who he spoke to and what they

told him. Plaintiffs argue that the meetings themselves are relevant because Papa spoke about relevant issues, including Philidor and price increases, which means that he necessarily held discoverable information about those issues given his unique and special access to the Company. Plaintiffs assert that the fact that one Direct Action Plaintiff could not recall the specifics of the meeting is all the more reason to depose Papa, the other party to it.

Plaintiffs further argue that even if Papa's knowledge is entirely secondhand, there is no case in which a court invoked the apex doctrine solely because the executive deponent learned relevant information from other witnesses. Plaintiffs assert that if that were the case, no corporate executive could ever be deposed because a CEO's job largely entails receiving and synthesizing information from more junior employees.

Plaintiffs argue that Valeant's motion falls short of meeting the heavy burden necessary to obtain a protective order. Plaintiffs argue that Valeant does not articulate any specific examples of "prejudice or harm" to, or an "undue burden" on Papa because no such prejudice, harm, or burden exists. Plaintiffs argue that as the claims against Valeant are quite meaningful in financial terms and the would-be deponent is still employed by the Company, the mere fact of a deposition cannot constitute any undue burden. Plaintiffs assert that Valeant is facing billions of dollars of liability in connection with the remaining nineteen Direct Actions, and Papa is the only current Valeant executive whose deposition has been noticed.

## IV.   Valeant's Reply

Valeant argues that there is no relevant information that Plaintiffs could glean from Papa's deposition that they cannot get from the fifty-three other depositions they have taken or plan to take, as well as from the voluminous document productions made in these actions.

Valeant asserts that Plaintiff's five potential topics on which they seek to depose Papa have no substantial relevance to the allegations in the complaints. Valeant argues that Plaintiffs have failed to show a direct "nexus" between a topic and their allegations.

Valeant argues that Papa's pre-May 3, 2016, contact with the Board merely shows that Papa spoke with Valeant directors about the Company generally. Next, with respect to Papa's attendance at the April 26, 2016, Board meeting at which Valeant's forthcoming 2015 10-K was discussed, the meeting was presented by Rob Rosiello and Norma Provencio who have been or are scheduled to be deposed. Other individuals invited to the meeting have been or will be deposed, including: Mr. Ingram, Mr. Farmer, Ms. Goggins, Mr. Melas-Kyriazi, Mr. Pearson, Mr. Power, Mr. Schiller, Mr. Morfit, Mr. Ackerman, and Mr. Chai-Onn. Valeant argues that the fact that Papa may have attended this meeting does not mean that his deposition is also necessary.

Third, Valeant argues that discovery on Papa's responses to the Ad Hoc Committee's recommendations is not a justification for Papa's deposition since his leadership of the Company and remediation efforts are not relevant to the case. Valeant asserts that the fact that Papa was briefed on the work of the Ad Hoc Committee on June 14, 2016, and discussed the formation of a committee to oversee drug pricing with other Board members does not establish any need for his testimony.

As to Plaintiffs' arguments about Papa's meetings with certain representatives of Direct Action Plaintiffs, Valeant argues that Plaintiffs have offered no explanation for why these meetings are relevant, particularly as Brahman Capital Corp.'s corporate designee said his meeting with Papa was not memorable and that there was no discussion of material that

was not already publicly available. Finally, Valeant argues that purported Board tension following the June 7, 2016, earnings call does not relate to any issues in these actions. Valeant argues that Mr. Ackerman's concerns regarding disclosures around certain bond covenants—disclosures that Plaintiffs do not contend are at issue in these actions—do not say anything about what Papa did or said. To the extent Ackerman's concerns are relevant, Valeant argues that Plaintiffs can ask Ackerman about this when he is deposed.

Valeant argues that Plaintiffs' legal arguments also fail. Valeant argues that the deposition of a CEO is not governed under the normal liberal discovery standard but under the more specific standard of the apex deposition doctrine. Valeant asserts that none of Plaintiffs' arguments alter the fact that the relevant inquiry is (1) whether Papa possesses personal and unique knowledge on relevant subject matters and (2) whether any such information cannot be obtained from lower-level employees or through less burdensome means. Valeant argues that Papa joined Valeant after all of the alleged transactions and misstatements at issue, and that Plaintiffs fail to explain how any information that he possesses cannot be obtained from another source.

Valeant asserts that Papa does not have personal, unique knowledge of any relevant issues. Valeant argues that Papa's knowledge of the Company was derived from conversations with employees, news reports, and research and that such knowledge does not meet the standard for an apex deposition. Valeant asserts that even if Papa possessed relevant firsthand knowledge about any of these topics, Plaintiffs would still have to show that it is unique. Valeant maintains that Plaintiffs have made no showing that any information cannot be obtained from another witness. Valeant further asserts that there is no requirement under

the apex doctrine that Papa submit an affidavit detailing the topics or events he does not remember.

## IV.    Governing Law

Federal Rule of Civil Procedure 26(b)(1)[3] establishes that, as a general proposition, a party's right to discovery is broad. As part of the discovery process, a party is generally permitted to depose any person without leave of court. Fed. R. Civ. P. 30(a)(1). Rule 26 permits a party or person from whom discovery is sought to "move for a protective order in the court where the action is pending—or as an alternative on matters relating to deposition, in the court for the district where the deposition will be taken." Fed. R. Civ. P. 26(c)(1). This Rule explains that district courts may, "for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense[.]" *Id.* Generally, under Rule 26(c)(1) the party seeking the protective order has a heavy burden of showing that good cause exists for issuance of that order. *In re Lincoln Nat'l COI Litig.*, No. 16-CV-6605, 2019 WL 7581176, at *1 (E.D. Pa. Dec. 5, 2019). However, where the discovery being opposed is the deposition of a high-ranking corporate official, some courts shift this burden to the non-moving party pursuant to the apex deposition rule, though the rule is not uniform. *In re Lincoln Nat'l COI Litig.*, 2019 WL 7581176, at *2. Thus, "[t]he 'apex' doctrine exists in tension with the otherwise broad allowance for discovery of party witnesses under the federal rules." *Apple Inc. v. Samsung Elec. Co., Ltd*, 282 F.R.D. 259, 263 (N.D. Cal. 2012).

---

[3] All subsequent references to a Rule are references to a Federal Rule of Civil Procedure.

The apex doctrine "addresses the potential limitations on a party seeking the deposition of high-ranking company executives." *In re Lincoln Nat'l COI Litig.*, 2019 WL 7581176 at *1. Although not yet addressed at the appellate level, district courts in the Third Circuit have recognized the apex doctrine as a "rebuttable presumption that a high-level official's deposition represents a significant burden upon the deponent and that this burden is undue absent the two factors set forth in the apex doctrine...." *United States ex rel. Galmines v. Novartis Pharm. Corp.*, Civ. A. No. 06-3213, 2015 WL 4973626, at *2 (E.D. Pa. Aug. 20, 2015) (internal citations omitted). Thus, the apex doctrine provides that the court must assess two factors when determining whether the deposition of a high-ranking or "apex" governmental official or corporate officer is appropriate: (1) whether the corporate officer possesses superior or unique information relevant to the issues being litigated; and (2) whether the information cannot be obtained by a less intrusive method, such as deposing lower-ranking employees or interrogatories. *See Ford Motor Co. v. Edgewood Properties, Inc.*, No. CIV. 06-1278, 2011 WL 2517133, at *3 (D.N.J. June 23, 2011).

Under the apex doctrine, courts have the ability to prohibit the deposition of a high-level executive where the executive has no firsthand personal knowledge of the events in dispute. *See Younes v. 7–Eleven, Inc.*, 2015 WL 12844446, at *2-3 (D.N.J. Aug. 19, 2015) (denying motion to depose 7–Eleven's President and CEO and its former Executive VP and COO who had no personal and unique knowledge that could not be obtained from other witnesses); *Ciarrocchi v. Unum Group*, 2009 WL 10676631, at *4 (D.N.J. Aug. 27, 2009) (denying motions for depositions of two current high level executives who had no unique knowledge regarding plaintiff's claim which could not be obtained from lower level

employees who plaintiff declined to depose). *But see, In re Tylenol (Acetaminophen) Mktg. Sales Practices & Prods. Liab. Litig.*, 2014 WL 3035791, at *3 (denying motion to quash the subpoenaed deposition of defendant's former President who "was actively involved in the decision making regarding...marketing and product development"); *Otsuka Pharm. Co. v. Apotex Corp.*, No. CIV.A.07-1000, 2008 WL 4424812, at *5 (D.N.J. Sept. 25, 2008) (denying defendant's motion for a protective order because the defendant's CEO had unique knowledge that other witnesses were unable to provide). The doctrine recognizes that depositions of high-level officers severely burdens those officers and the entities they represent, and that adversaries might use this severe burden to their unfair advantage. *Novartis Pharms. Corp.*, No. CV 06-3213, 2015 WL 4973626, at *1 (E.D. Pa. Aug. 20, 2015).

District courts in the Third Circuit have tried to harmonize the apex doctrine's principles with Rule 26. *See e.g.*, *United States ex rel. Galmines v. Novartis Pharms. Corp.*, No. CV 06-3213, 2015 WL 4973626, at *2 (E.D. Pa. Aug. 20, 2015) (holding that "[t]he apex doctrine does not represent an exception to the rule that a party seeking to quash a subpoena bears the 'heavy burden' of demonstrating that the subpoena represents an undue burden," but, rather, the doctrine should be used as a tool for guiding the court's analysis in determining whether to limit discovery). The Court in *United States ex rel. Galmines* explained:

> The apex doctrine does not represent an exception to the rule that a party seeking to quash a subpoena bears the "heavy burden" of demonstrating that the subpoena represents an undue burden. *See Frank Brunckhorst Co. v. Ihm*, No. MISC. 12–0217, 2012 WL 5250399, at *4 (E.D.Pa. Oct. 23, 2012). The apex doctrine is merely a tool for guiding the Court's analysis in determining whether to limit discovery under Rule 26(b)(2)(C) because the discovery can be obtained from some other source that is more

19

convenient, less burdensome, or less expensive. As such, the party seeking to quash the subpoena still bears the burden of persuasion. The apex doctrine does, however, apply a rebuttable presumption that a high-level official's deposition represents a significant burden upon the deponent and that this burden is undue absent the two factors set forth in the apex doctrine, which go to the lack of a more convenient, less burdensome, and less expensive alternative. *See Performance Sales & Mktg.*, 2012 WL 4061680, at *3-4 ("Put simply, the apex doctrine is the application of the rebuttable presumption that the deposition of a high-ranking corporate executive either violates Rule 26(b)(2)(C)'s proportionality standard or, on a party's motion for a protective order, constitutes 'good cause' for such an order as an 'annoyance' or 'undue burden' within the meaning of Rule 26(c)(1). Should the deposing party fail to overcome this presumption, the court must then limit or even prohibit the deposition.").

[*Id.*]

Therefore, although "[a] party seeking to preclude an 'apex' deposition in its entirety has a heavy burden of showing that such protection is warranted… Courts have also held that a party seeking to depose a high-level executive must demonstrate exceptional circumstances justifying the deposition." *Engage Healthcare Comm'ns, LLC v. Intellisphere, LLC*, Civ. A. No. 12-cv-787, 2017 WL 9481235, at *5 (D.N.J. Nov. 1, 2017) (internal citations omitted).

One of the most recent cases to come out of the Third Circuit dealing with the issue of the apex doctrine is *In re Lincoln Nat'l COI Litig.*, No. 16-CV-6605, 2019 WL 7581176, at *1 (E.D. Pa. Dec. 5, 2019). In that matter, the defendants requested a protective order to quash the plaintiffs' notice of deposition for the CEO of the defendant company. The court evaluated case law on the issue and noted that courts are not uniform on who bears the burden of persuasion. *Id.* at *2. However ultimately, "the question of whether the 'Apex Doctrine' should be applied to preclude a deposition is within the [c]ourt's sound discretion and is, axiomatically, an extremely fact-sensitive determination." *Id.*

The special master noted that "where the subject matter of the deposition would involve merely the company's 'day to day operations' or something manifestly immaterial in view of the total scope of the company's overall operations, such as slip-and-fall cases or a routine claim of trademark infringement, such facts might be said to tend to favor the application of the 'Apex Doctrine' to preclude the requested deposition." *Id.* (citing *In re Tylenol (Acetaminophen) Mktg., Sales Practices & Prod. Liab. Litig.*, Civ. A. No. 14-0072, 2014 WL 3035791 at *2 (E.D. Pa. July 1, 2014)). The special master noted that "the 'Apex Doctrine' largely applied to those instances 'where the executive has no first-hand knowledge of the facts' and that, as such, the 'Apex Doctrine' was merely derivative of the mandate implicit in Fed. R. Civ. P. 26 for courts to limit discovery that is 'unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive.'" *Id.*

The special master then determined that the plaintiffs made a meaningful prima facie case speaking to the involvement of the CEO in matters which, at least in the view of the plaintiffs, related to COI increases, which were at the core of the litigation. *Id.* at *3. The plaintiffs were also able to make a prima facie showing that some or all of the information they sought through the deposition of the CEO was information that they were not able to develop through the depositions of several other witnesses. *Id.* The special master was careful to note that the fact the defendants did not consider the information the plaintiffs sought to discover to be relevant or material or important, could not in and of itself be conclusive of the plaintiffs' right to conduct discovery under Rule 26(b)(1). *Id.* "[T]he fact that parties may disagree 'regarding the facts that will ultimately be proven and the inference to be drawn from them' is not a basis, under the

'Apex Doctrine' or otherwise, for precluding entirely a requested deposition. *Id.* at *3 (quoting *Hunt v. Cont'l Cas. Co.*, 2015 WL 1518067 (N.D. Cal. Apr. 3, 2015)).

The special master went on to note that this was manifestly not an instance in which the matters in dispute could "be said to be so obviously trivial or far off (or beneath) the radar-screen of a high-ranking executive" as to reasonably infer "that such a deposition is sought for purposes of harassment or is otherwise sought in bad faith, and may thus be disallowed on that basis." *Id.* The special master further found that it could not reasonably be inferred, as the claims against the defendants were quite meaningful in financial terms and the CEO was still employed by the defendants, "that it would without more constitute, the 'Apex Doctrine' aside, an undue burden on some other basis for [the CEO] to appear for a deposition." *Id.* The special master therefore denied the defendants' request for a protective order.

## V.    Findings

Turning to the matter at hand, the Special Master notes at the outset that Direct Action Plaintiffs' decision to notice the deposition of Papa does not appear to be motivated by a desire to harass or burden Papa or Valeant in order to gain an advantage in litigation.  While the apex doctrine may have been developed to curb the abusive practice of deposing officers in run-of-the-mill cases when adversaries used depositions to severely burden to their unfair advantage, case law does not suggest an alternative presumption should apply if there is no evidence of intended harassment. *See United States v. Medtronic, Inc.*, No. CV 15-6264, 2018 WL 11145992, at *1 (E.D. Pa. Oct. 26, 2018). Accordingly, the Special Master must apply the rebuttable presumption that Papa's deposition represents a significant burden upon Papa and Valeant and that this burden is undue absent a showing that: (1) Papa possesses superior or

22

unique information relevant to the issues being litigated; and (2) that the information cannot be obtained by a less intrusive method, such as deposing lower-ranking employees or interrogatories. *See Ford Motor Co. v. Edgewood Properties, Inc.*, No. CIV. 06-1278, 2011 WL 2517133, at \*3 (D.N.J. June 23, 2011).

A determination of these two factors involves a fact-sensitive analysis. Initially, the Special Master notes that the parties appear to disagree as to the relevant time period at issue. Direct Action Plaintiffs assert that the relevant time period extends to at least August 2016 when Papa made statements in connection with Valeant earnings releases. Meanwhile, Valeant asserts that all alleged transactions and misstatements at issue occurred before Papa joined the Company, pointing out that every pending claim relates to securities purchased prior to April 15, 2016.

"In general, courts allow discovery to extend to events before and after the period of actual liability so as to provide context." *In re New Century*, No. CV 07-0931 DDP (FMOx), 2009 WL 9568860, at \*2 (C.D. Cal. July 8, 2009) (citations omitted); *see, e.g.*, *Hatamian v. Advanced Micro Devices, Inc.*, No. 14-CV-00226, 2015 WL 7180662, at \*2 (N.D. Cal. Nov. 16, 2015) (finding that some discovery before and after the putative class period was relevant to give context to the misrepresentations alleged in the securities fraud putative class action); *IBEW Loc. 90 Pension Fund v. Deutsche Bank AG*, No. 11 CIV. 4209, 2013 WL 1223844, at \*12 (S.D.N.Y. Mar. 27, 2013) (noting that the Second Circuit has explicitly recognized that plaintiffs may rely on post-class period statements to confirm what a defendant should have known during the class period). Therefore, despite the fact that Plaintiffs may have liquidated their entire position in Valeant common stock prior to Papa's appointment as CEO, *see GMO Tr.*, No. 18-cv-00089,

Dkt. 1, ¶ 182, the Special Master finds that the relevant discovery period certainly extends past this date, at least until when Valeant made further revelations about its earnings. Moreover, the Special Master believes it is necessary to extend discovery past this date in order to give context to the misrepresentations alleged in the lawsuit, as well as the alleged lack of internal controls and "tone at the top" of the Company. Accordingly, the Special Master disagrees with Valeant's position that Papa does not possess relevant knowledge as he did not become CEO until after the alleged transactions and misstatements at issue occurred. What Papa learned about Valeant's alleged misdeeds and his steps to cure these issues is discoverable information Plaintiffs are entitled to probe. Whether such information need be obtained from deposing Papa requires application of the apex doctrine.

To that point, the Special Master finds *In re Lincoln Nat'l COI Litig.*, 2019 WL 7581176, instructive to this matter and holds that Plaintiffs have made a prima facie showing that Papa possesses superior or unique information relevant to the issues being litigated. In particular, the Special Master is persuaded that Papa has superior knowledge regarding the alleged deficient internal controls and "tone at the top" of the Company, which Papa was tasked with remedying upon his engagement as CEO and Board Chairman. The Special Master agrees with Plaintiffs that discovery concerning the Restatement, the Ad Hoc Committee investigation that caused it, and the changes to Valeant controls and policy as a result of both, may be necessary for Plaintiffs to prove their allegations. Moreover, the Special Master finds that Plaintiffs have made a prima facie showing that Papa possesses superior knowledge on these issues as he was intimately involved with them upon becoming CEO and Chairman.

Furthermore, while Valeant disputes the relevancy and importance of Papa's presentation and discussions with various opt-out Plaintiffs at the May 23, 2016, UBS Global Healthcare Conference, this in and of itself is not conclusive of relevancy or of Plaintiffs right to conduct discovery under Rule 26(b)(1). *See In re Lincoln Nat'l COI Litig.*, 2019 WL 7581176, at *3. Papa also has superior knowledge related to public statements he made in June and August 2016 during earning calls, related to the Company's financial decline in the wake of Phildor's closing. While these statements may have taken place after Plaintiffs sold their Valeant securities, the public statements revealed additional information about the alleged prior misstatements and are relevant to these cases.

 The Special Master also finds that Plaintiffs have made a prime facie showing that the information they seek cannot be obtained by a less intrusive method. As Papa was directly involved in deciding which measures were necessary to "right the ship" in light of Valeant's alleged past wrongdoing, specifically its lack of internal controls and "tone at the top," the Special Master is persuaded that there is no other witness from whom this testimony is more properly developed. With respect to statements made by Papa, there is no person better situated to provide information on these statements than Papa himself.

Having found that Papa possesses superior or unique information relevant to the issues being litigated and that the information cannot be obtained by a less intrusive method, the Special Master must next evaluate whether Valeant has otherwise met the heavy burden of showing that good cause exists for the issuance of a protective order under Rule 26(c)(1). The Special Master does not find that Valeant has met this burden. The Special Master points out that

the claims against Valeant are quite meaningful in financial terms and Papa is still employed by the Company.

## VI.    Conclusion.

For the reasons set forth in this Report and Recommendation, the Special Master denies Valeant's motion for a protective order to preclude the deposition of Joseph C. Papa. In light of the discovery schedule in this matter, Direct Action Plaintiffs shall be permitted to conduct the deposition of Papa within 45 days of the date of this order. The deposition shall be conducted pursuant to Rule 30 and any agreements made between the parties.

Date:   July 7, 2021

_____
DENNIS M. CAVANAUGH
Special Master