# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: VALEANT PHARMACEUTICALS INTERNATIONAL, INC. SECURITIES LITIGATION | Master No. 3:15-cv-07658-MAS-LHG |
| | JUDGE MICHAEL A. SHIPP |
| | JUDGE LOIS H. GOODMAN |
| THIS DOCUMENT RELATES TO: | **REPORT & RECOMMENDATION** |
| | **OF THE SPECIAL MASTER** |
| ALL ACTIONS | **JUDGE DENNIS CAVANAUGH, RET.** |

The application before the Special Master is a Motion filed by Direct Action Plaintiffs ("Plaintiffs") arising out of an unresolved discovery dispute. Plaintiffs seek to overrule attorney-client privilege and work product protection claims advanced by Defendant Valeant Pharmaceuticals International Inc., n/k/a Bausch Health Companies, Inc. ("Valeant" or the "Company"). Similar motions have been previously filed. This time, the Motion concerns a subpoena served on a third party public relations consulting firm, Vianovo ("Vianovo" or "Firm"). Class Plaintiff, City of Tucson and the Tucson Supplemental Retirement System, has joined the Motion by way of a letter.

The litigants have provided and the Special Master has reviewed the following submissions: Plaintiffs' Memorandum of Law and exhibits in support of the Motion; Valeant's Opposition and exhibits; and Plaintiffs' Reply. Although Class Plaintiff has joined this Motion and relies on the arguments advanced by the Direct Action Plaintiffs, for brevity's sake, the moving parties will be collectively described as "Plaintiffs."

After considering all the submissions of the parties, based upon the following, it is the opinion of the Special Master that Plaintiffs' Motion is **GRANTED**.

## I.      Factual and Procedural Background.

The Special Master assumes the parties' familiarity with the factual background of this case and limits his discussion to facts directly relevant to the current motion.

As is the case with other motions filed in this litigation, the pertinent events date back to the fall of 2015.  At that time, public revelations emerged as to Valeant's business strategy, including what have been described as extreme price increases and questions about its relationship with a specialty pharmacy, Philidor.  The events included an incipient investigation by the House Oversight and Government Reform Committee, the fact of which was reported in the press; the issuance by Valeant of a press release on September 28, 2015, addressing these concerns; and additional media reports through October 2015, in publications such as the *New York Times, The Wall Street Journal* and by *Citron Research* which published an online report entitled, "*Valeant:  Could This Be the Pharmaceutical Enron?."*

The House Committee had authored an open letter which included a request to its chairman to issue a subpoena seeking documents related to price increases of Valeant drugs. Investigations into Valeant's business practices were ultimately commenced by both the House Committee and U.S. Senate Special Committee on Aging, leading to certain Valeant officials testifying before Congress.  Valeant was also notified in early October 2015, of an investigation by the U.S. Attorney's Office as a result of which subpoenas were served.  [See, Defendant's Opposition, pp. 2-3.]

Civil litigation also commenced against Valeant.  On October 22, 2015, Class Plaintiff filed the first class action lawsuit in this District.  More class actions followed.  By early

November 2015, Valeant had been excoriated in the press, the price of its shares had plummeted like a lead balloon, there were government investigations pending with Valeant as the target, and there were civil lawsuits revving up.

Valeant states that on November 5, 2015, it gave "express authority" to its outside counsel, Covington and Burling LLP ("Covington"), to hire Vianovo, a PR firm, "to assist Legal Counsel's representation of Valeant…in investigations being conducted by the Department of Justice and such other matters with respect to which Legal Counsel consults with Vianovo." This retention is memorialized in an engagement letter of the same date addressed to Matthew Miller of Vianovo and authored by Robert Kalner, a Covington partner.  Pertinent to this Motion are the following provisions:

1. Covington was given authority to retain Vianovo "to provide Legal Counsel with expert public relations and advice" so as to "formulate and provide to Valeant more informed and valuable legal advice as to the handling of legal issues presented by the above-described litigation and other similar matters."

3. Vianovo's services were to be undertaken "at the direction and under the supervision of Covington" including discussions with Covington and Valeant "to understand the issues" and to impart advice and recommendations "on matters within Vianovo's expertise."

4.- 5.  These provisions require Vianovo to regard all communications as privileged "and made solely for the purpose of assisting Covington in providing legal advice to Valeant."  The communications were to be subject to attorney-client and work product protection and Vianovo was prohibited from disclosing to anyone, without permission, those communications or to permit inspection of any papers or documents without approval.

7. This provision requires that Vianovo immediately notify Covington of any requests to examine, inspect or copy any documents.

8.  In the event served with legal process, Vianovo is required to
    immediately inform Covington, provide a copy of any process and
    to "assert the attorney-client privilege, the work-product privilege
    and any and all other applicable privileges and objections…"

The agreement does not specify *how* Vianovo's expertise would assist Covington in providing legal advice but merely states that Vianovo *will* provide such advice.

Plaintiffs have served a subpoena on Vianovo. In response, Valeant says, it "judicially assessed whether Vianovo's documents needed to be withheld to protect the Company's privileges." After review, Valeant states, Vianovo made a production of almost 3,000 documents "with about 500 documents produced with narrowly tailored redactions." Valeant also produced a 2,978 entry privilege log describing its attorney-client and/or work product claims. On the other hand, Plaintiffs describe this production as Valeant claiming privilege or protection "over 2,990 documents…withholding the vast majority of them in their entirety."

So here the litigants stand. Plaintiffs seek to overrule Valeant's objections which it says reflects, in whole or part, communications among the Company, its attorneys and Vianovo, which was hired shortly after Valeant's issues ignited a media firestorm and also on the heels of government investigations and civil lawsuits. Valeant asserts that the production effectively complied with the subpoena and that it has rightfully objected to the turnover of materials which are privileged or protected. The parties differ as to whether or not (assuming further scrutiny is needed) the Special Master should review these documents *in camera*.

## II.   Plaintiffs' Arguments

Generally, Plaintiffs argue that all documents exchanged between Vianovo and Valeant or its attorneys are unprotected by the attorney-client privilege or as work product. While Vianovo's agreement with Valeant's attorneys repeatedly injects the term "legal advice" (or

4

similar phrases), the substance of Valeant's work was actually ordinary PR services and help in a media campaign in the face of disastrous media exposure. The fact that investigations were pending did not transform the nature of Vianovo's work product and those materials should not be shielded from discovery.

Plaintiffs assert that any communications which might have been privileged absent Vianovo's involvement resulted in waiver of that privilege when the information was shared with the PR firm. Vianovo did not serve as a "translator" of abstruse information nor did it serve as a "functional equivalent" of a Valeant employee for a company with its own "robust in-house investor relations team."

Additionally, Plaintiffs maintain that the work product claim fails because the information was not generated due to pending or anticipated litigation *and for no other purpose*. Instead, the purposes were intertwined.

Plaintiffs also assert that Valeant's claims are far too broad, emphasizing the fact that the privilege log repeatedly lists objections to documents that "reflect strategy" or purportedly convey "legal advice."

Finally, if the Special Master determines further scrutiny is needed, Plaintiffs argue that *in camera* review of a sample is appropriate. However, given the volume of documents, Plaintiffs first seeks a ruling on legal principles, directing the parties to confer as to individual documents based upon those principles.

To support their specific arguments, Plaintiffs state the following.

As to Plaintiffs' position that the information exchanged was neither privileged nor protected, they rely principally on a district court case, *In re Riddell Concussion Reduction Litig.*, No. 13-7585, 2016 WL 7108455 (D.N.J. Dec. 5, 2016). Quoting *Riddell*, "if the primary purpose

was to assist counsel to render legal advice, the privilege applies.  If the purpose was to provide business or messaging advice, the privilege does not apply." *Id*. at *9.  Plaintiffs argue Vianovo performed ordinary PR work, i.e., the Firm responded to media inquiries, drafted press releases and analyzed news stories concerning Valeant.  Hence, the documents relate to PR strategy and Plaintiffs provide examples of redacted materials in which the description of the withheld documents seems to relate to media issues but the objections assert that the documents consisted of legal advice or litigation strategy.  Plaintiffs insist that simply because attorneys were involved in generating a "strategy," this does not constitute *legal* advice or *litigation* strategy and that the cited examples reflect the parties exchanging messaging advice unprotected as privileged or work product.  Moreover, Plaintiffs say, it is the party asserting the privilege which must demonstrate that the communication "would not have been made but for the client's need for legal advice or services," citing *La. Mun. Police Emps. Ret. Sys. v. Sealed Air Corp.*, 253 F.R.D. 300, 306 (D.N.J. 2008).

As to disclosure to a third party, Plaintiffs concede that an exception to waiver exists for certain agents of counsel, but only those "whose services are necessary for effective representation." *Sealed Air*, 253 F.R.D. at 311.  Valeant bears the burden of showing that the privilege has not been waived.  Plaintiffs maintain that neither the nature of the documents at issue nor testimony by Vianovo's Rule 30(b)(6) representative suggests that the Firm assisted by providing Valeant's attorneys with expertise to address legal matters but rather provided assistance to repair Valeant's image.  In short, Vianovo was not "translating" technical information to lawyers and there is no evidence that Vianovo's expertise was indispensable in facilitating attorney-client communications.

6

As to work product, Plaintiffs insist this claim also fails.  Citing *Sealed Air*, 253 F.R.D. 300, Plaintiffs state the doctrine does not apply to documents that would have been prepared independent of any litigation.  That is, "the party claiming the doctrine's protection must establish 'the material was prepared because of the prospect of litigation *and for no other purpose*.'"  *Riddell*, 2016 WL 7108455 at *6.  While Vianovo was hired after the inception of government investigations and civil litigation, Plaintiffs maintain the record demonstrates that the media strategy concocted by Vianovo was not specific to those proceedings.  Plaintiffs state it defies belief that Valeant would not have engaged in an intensive media campaign even absent the prospect of government proceedings or litigation.

As an alternative to a blanket ruling, Plaintiffs assert that even if the Special Master determines that some of the documents were properly redacted or withheld because they convey legal advice or a translation of esoteric information, the objections are still too broad.  Therefore, they ask that the Special Master direct Valeant to produce all documents that do not expressly reference legal advice or litigation.

Finally, as to additional scrutiny, (if needed), Plaintiffs ask for *in camera* review of a representative sample, consisting of some 300 documents.

## III.    Defendant's Argument

Valeant urges that Vianovo was retained to provide advice to its attorneys "to help them with their representation of Valeant in several investigations."  Hence, the withheld or redacted documents generated by the Firm or which were exchanged with Valeant and its attorneys are privileged.  Valeant maintains that as a result of government investigations and lawsuits, Vianovo was retained but not to perform "standard public relations work."

7

Valeant further argues that based on case law in this Circuit and elsewhere, information may be disclosed to a consultant, including a PR firm, for the purpose of obtaining or providing legal advice which is protected by work product and attorney-client privilege.

Finally, Valeant rejects Plaintiffs' alternative proposal of court review (of approximately 300 documents) simply based on the fact that the word "reflecting" was employed to describe them in the privilege log, a phrase which is proper and has even been employed by Plaintiffs.

In support of these arguments, Valeant emphasizes the following factual circumstances that gave rise to the retention of Vianovo.

As noted, beginning in September 2015, investigations into Valeant's practices commenced.  Simultaneously, media criticism erupted and by October 22, 2015, the first class action lawsuit was filed.  "Faced with this onslaught," says Valeant, its outside counsel hired Vianovo to assist the attorneys representing Valeant in the face of the existing investigations. Relying on the testimony of Matthew Miller, lead member of Vianovo's team, Valeant reiterates its position that the retention was for legal purposes and that Vianovo was not just another PR firm doing work for Valeant.

Valeant also points out that a "substantial majority" of the communications (approximately 2000 of 3000 documents) involve Valeant's in-house or outside counsel as senders or recipients, and Valeant did not assert privilege over approximately 3000 documents which were produced in full.  Moreover, when Miller was deposed, Valeant's counsel took a "narrow approach" to privilege, permitting Miller to answer a variety of questions and limiting objections only to those answers that involved communication with counsel.  Valeant points out that Plaintiffs did not challenge the substance of any privilege assertion prior to that deposition.

With this said, Valeant contends that the Vianovo documents contain privileged communications, i.e., communications with third parties are subject to the attorney-client privilege if the communication was for legal purposes, even if attorneys were *not* included as part of the exchange.  As Plaintiffs did, Valeant cites *Riddell* but in favor of its position that within this District, courts have recognized that PR consultants' communications [which] "are necessary for an attorney to provide legal advice" are privileged.  Valeant then distinguishes *Riddell* as well as *In Re Signet Jewelers Ltd. Sec. Litig.*, 332 F.R.D. 131 (S.D. NY 2019), also cited by Plaintiffs.  As to *Riddell*, Valeant points out that there was no anticipated or pending litigation, the court found that the consultant was hired for ordinary PR work and that the firm did not provide information to Riddell's attorneys necessary to provide legal advice.  Given this, the *Riddell* Court found many PR-related documents not privileged.  As to *Signet*, Valeant says, the court found that the PR firm was retained before any litigation was anticipated, performed only public relations activities and was not required to perform a specific litigation task.  Hence, the disputed materials were also found to be not privileged.

According to Valeant, contrary to *Riddell* and *Signet*, Vianovo was hired after investigations had begun and class actions filed.  Further, Vianovo was retained to provide Valeant's counsel with assistance and to provide them with services necessary for the provision of legal advice.

Under the work product doctrine, the communications to and from Vianovo were protected.  The key to the application of this doctrine, says Valeant, is whether a document has been prepared or obtained because of the prospect of litigation and, when prepared for multiple purposes, the "dominant purpose" must concern litigation.  To support this, Valeant states that at the time of Vianovo's retention, the Company was in the middle of multiple investigations and

9

class actions had been filed.  Hence, the *dominant purpose* in retaining the PR firm was litigation.  Citing *Sealed Air, 253 F.R.D. 300,*, a case referenced by Plaintiffs, Valeant states that this Circuit applies a two part test, the second part of which asks whether privileged documents were prepared *primarily* for the purpose of litigation and that the "no other purpose" language Plaintiffs rely on does not require that documents could have no possible use other than litigation.  Again, citing Miller's testimony, Valeant maintains that in this matter, it is impossible to separate the government investigations from the related media coverage.

As to any waiver, Valeant urges that this Circuit has long recognized that a client may allow disclosure to an agent assisting an attorney without waiving privilege.  Citing *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F. 2d 1414, 1424 (3d Cir. 1991).  Therefore, if a PR firm provides information needed by a party's attorney to render legal advice, that information is privileged.  Citing *Riddell,* 2016 WL 7108455 *at* *9.  Valeant maintains that courts have held that PR firms are necessary for lawyers to perform fundamental client functions, such as legal risks of speaking publicly, avoiding or narrowing charges against the client, "zealously seeking acquittal or vindication."  Where, as here, a PR consultant was hired to provide legal assistance in a high profile matter, communications are privileged.  In this case, Vianovo worked with Valeant's attorneys to prepare Valeant for hearings, assisted counsel by advising Valeant on public statements and in responding to media inquiries.  Given this, disclosure to Vianovo does not break work product protection and Valeant asserts that the burden is upon Plaintiffs to establish waiver of immunity.

Valeant argues that its privilege log is sufficient and the use of the term "reflecting" has been given court approval.  Finally, Valeant asserts that the Court has no duty to undertake a

"laborious *in camera* review," particularly in light of the fact that Plaintiffs did not attempt to resolve their complaints as to the log prior to filing this motion.

## IV.   Plaintiffs' Reply.

Briefly stated, Plaintiffs make the following points:

- Vianovo's work was not needed by Valeant's attorneys to render legal advice and Valeant fails to demonstrate *how* Vianovo's public relations services were critical to Covington's counsel or Valeant.  The documents produced (to the extent that they can be reviewed) and the testimony of Matthew Miller simply portray work that any PR firm would do for a client.

- While documents generated by Vianovo are not privileged, Valeant also waived any privilege to documents generated by their attorneys by sharing them with the Firm. They first argue that the third party's involvement must be necessary for the provision of legal advice, i.e., "the agent must evaluate information and in a sense 'translate' it into understandable terms for the non-expert attorney" and, secondly, communications between an attorney and third party are not protected simply because the communications later become beneficial to representing the client.  Nowhere does Valeant suggest that Vianovo "translated" esoteric information.

- Distinguishing a case cited by Valeant, *In Re Grand Jury Subpoena Dated March 24, 2003*, 265 F. Supp. 2d 321 (S.D.N.Y. 2003), Plaintiffs argue Valeant's reliance on it is misplaced.  In that case, the court protected disclosures made with a PR firm hired by the attorneys of a target in a criminal (not civil) investigation.  Valeant argues that there is a distinction between civil and criminal liability and further argues that Valeant has failed to identify a specific legal strategy (unlike in *Grand Jury*) which required Vianovo's involvement.

- Citing *Claude P. Bamberger Int'l. Inc. v. Rohm and Haas Co.*, Plaintiffs assert that work product protection does not apply to documents that would have been prepared independent of litigation.  That is, Valeant would have conducted a PR campaign "independent of litigation or government investigations."

- Even if privilege or work product protection applies to some documents, Valeant has no justification withholding documents such as draft press releases and responses to media inquiries, which Valeant claims "reflect litigation strategy."  Those releases, including attorney edits, which do not expressly request or convey legal advice, are not privileged.

- As to *in camera* review, Plaintiffs insist that the challenge to such review is baseless, i.e., Valeant's expansive claims cast doubt on its interpretation of what actually reflects legal advice and such claims "raise a red flag that warrants further review."

## V.      Findings.

Whittled down to its basic form, the issue at the heart of this motion can be stated as follows:  When attorneys hire a public relations firm, what communications (if any) exchanged among that firm, the client and counsel are protected from disclosure during discovery?  As will be set forth in more detail below, this is not the first time that the courts in this Circuit and elsewhere have been called upon to answer this question in the case of a party battling both litigation and bad publicity.  But before addressing those decisions, the Special Master will address the basic tenets of discovery applicable here.

As the parties seem to agree, the outcome of this application revolves around two legal doctrines – attorney-client privilege and work product protection.  Although these are separate doctrines, aspects of each overlap with the other.

As our courts have stated, the purpose of the attorney-client privilege is to encourage "full and frank communications between attorneys and their clients."  *Upjohn C. v. United States*, 449 U.S. 383, 389 (1981).  While an ancient principle of our law, generally it is narrowly construed because it obstructs the truth finding process.  *Westinghouse Elec. Corp.,* 951 F. 2d at 1423.  Our courts are admonished to be cautious in their application of the privilege mindful that "it protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege".  *Fisher v. United States*, 425 U.S. 391, 403 (1976).  This privilege includes corporations; however, the administration of the privilege in the case of corporations presents "special problems."  *See In Re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 805 F. 2d 120, 124 (3d Cir. 1986).  Further, communications which relate to business rather than legal matters do not fall within the protection of the privilege and, therefore, the general rule is "while legal advice given to a client by an attorney is protected by the privilege,

12

business advice generally is not." *See*, *Leonen v. Johns-Manville*, 135 F.R.D. 94, 98 (D.N.J. 1990), cited in *Sealed Air Corp.*, 253 F.R.D. at 305.

Significant to a decision on whether the privilege applies, it is the party asserting the attorney-client privilege which bears the burden to show that it applies. *See*, *In Re Grand Jury Empanelled Feb. 14, 1978*, 603 F. 2d 469, 474 (3d Cir. 1979) and *Sealed Air Corp.*, 253 F.R.D. 300.

As Valeant correctly states, in the corporate setting, communications involving third party agents are entitled to attorney-client privilege as long as the communication in question was for legal purposes. *In Re: Flonase Antitrust Litig.*, 879 F. Supp. 2d 454, 460 (E.D.Pa. 2012).

As to the work-product doctrine, that "protection" arises out of Federal Rule of Civil Procedure 26(b)(3) which provides:

> Ordinarily, a party may not discover documents…that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney), consultant…or agent.

The purpose of the doctrine is to shelter the mental processes of the attorney representing a client, providing a privileged area within which an attorney can analyze and prepare a client's case. *See*, *In Re: Cendant Corp. Sec. Litig*., 343 F. 3d 658, 661-62 (3d Cir. 2003) (citation omitted).

The courts in this circuit have adopted a two-part test for ascertaining whether documents or things at issue should be protected under this doctrine. *See*, *In Re: Gabapentin Patent Litig.*, 214 F.R.D. 178, 183 (D.N.J. 2003). The first inquiry is the "reasonable anticipation test," which obligates the court to determine whether litigation could reasonably have been anticipated. *Id.* at 183. More important to the motion here is the second inquiry. That is, whether the documents were prepared "primarily for the purpose of litigation." *Sealed Air*, 253 F.R.D. at 306 (citing

*Paris v. R.P. Scherer Corp.*, No. CIV 02-1044, 2006 WL 1982876, at *2 (D.N.J. July 13, 2006)). As is the case with privileged attorney-client communications, a determination as to whether a document is protected work product also turns upon the nature and purpose of that communication, i.e., "whether the document comes within the purview of the work product [doctrine] still depends primarily on the reason or purpose for the documents' production." *In Re: Gabapentin*, 214 F.R.D. at 184. Accordingly, documents created in the ordinary course of business even if useful in subsequent litigation are not protected by the work product doctrine. *Sealed Air Corp.*, 253 F.R.D. at 307 (citing *United States v. Rockwell Int'l.*, 879 F. 2d 1255, 1265-66 (3d Cir. 1990)).

And, as is the case with attorney-client privilege, it is the party asserting work product protection that bears the burden of showing that the doctrine applies. *Konico, Inc. v. U.S. Dep't. of Justice*, 687 F. 2d 724, 730 (3d Cir. 1982).

As noted previously, courts in this and other districts have tackled the issue of privileged or protected communications when PR firms are retained. The litigants have cited several opinions analyzing this issue, including opinions which each party insists supports their respective positions. While the circumstances of the cited cases bear similarities to this matter, the courts' analysis in each case were highly fact dependent. But one thing is clear: The crux of this issue turns upon whether the communications exchanged among the client, the attorneys and the firm hired to provide PR services principally involved and were directed at the provision of legal advice, not public relations services.

Both parties cite *In re Riddell Concussion Reduction Litig.*, No. 13-7585, 2016 WL 7108455 (D.N.J. Dec. 5, 2016), in support of their positions. The opinion centered on several series of communications, including those among Riddell's employees and an outside public

14

relations firm, MSL.   Riddell argued that the documents were protected by attorney-client
privilege and the work product doctrine.  *Id*. at *1.  According to the opinion, the majority of the
challenged documents involved communications amongst third party agents who were "mainly
hired for P.R. communications purposes."  *Id*. at *6.  Although MSL was an outside agency, the
court agreed with Riddell that when an attorney communicates with a third party, such as this PR
firm, that communication did not necessarily waive the attorney-client privilege when disclosure
was necessary to obtain informed legal advice.  But the court emphasized the limited context in
which this could occur:

> [I]t is unquestionably the case that communications between and
> amongst Riddell and MSL…[for] securing legal advice are
> privileged.  It is clear, however, that not all communications with
> an attorney's agent are protected…  If the communications would
> have been made in the normal course of business even if the
> attorney did not need the information to give legal advice, the
> communication is not privileged.  …*The agent's involvement must
> be necessary to the lawyer's provision of legal advice* [and]…*the
> party claiming the third-party as an agent…has the burden to show
> that a privilege exists and that the privilege has not been waived.*
>
> [*Id.* at *6 (emphasis added).]

The court emphasized that the key issue was the purpose of the work of Riddell's agents.
"If the primary purpose was to assist counsel to render legal advice, the privilege applies.  If the
purpose was to provide…messaging advice, the privilege does not apply."  *Id*. at *8.  The court
then specifically analyzed MSL's services:

> MSL is a public relations firm that consults with clients on
> communications strategies…Simply stated, even if an attorney was
> copied on an MSL email chain, the predominant purpose…was to
> provide business and communications advice, not legal advice.  In
> fact, MSL acknowledged it was 'hired to assist in public relations
> effort'. . .  This is evident by the subject matter of MSL's
> communications which concern, *inter alia*, how to respond to
> media inquiries, updates on relevant media coverage, preparing for

testimony before Congress, updates on congressional developments and general governmental affairs issues.

[*Id.*]

The court went on to note that a "media campaign is not a litigation strategy even if an attorney deems it advisable," nor is a campaign or strategy to bolster a party's public image and reputation privileged. *Id*. at *9 (citation omitted).

*Universal Standard Inc. v. Target Corporation*, 331 F.R.D. 80 (S.D.N.Y. 2019) implicated the same issue under similar circumstances. Target, a national retailer, was accused of infringing upon the plaintiff's trademark. A dispute arose out of the transmission of emails between the plaintiff, its attorneys and a public relations firm, BrandLink. Target argued that any privilege was waived when the documents were voluntarily disclosed to BrandLink and that the communications were unprotected as work product. *Id.* at 84. In assessing whether the privilege applied, the court, like others, emphasized that the party invoking the privilege had the burden to show that it had been waived but further that the party claiming protection was obligated to establish "those facts that are the essential elements of the privileged relationship…the burden not discharged by mere conclusory or *ipse dixit* assertions." *Id.* (citing *In Re Grand Jury Subpoena dated January 4, 1984*, 750 F. 2d 223, 224-25 (2d Cir. 1984)).

The court then generally traced the history of the legal standards guiding waiver under these circumstances. That is, notwithstanding the general rule that producing privileged communications to a third party constitutes waiver, there are instances where the privilege remains in effect. Those exceptions involved cases where a third party was deemed essential to transmit communications between an attorney and a client (such as an interpreter or an accountant); cases involving consultants acting as the "functional equivalent" of a corporate employee; and those cases involving consultants employed by attorneys in performing specific

16

tasks which went beyond advising the client as to the law. *Id*. at 87. But, as the court found, none of the exceptions applied. The court reasoned that the PR firm was not, in effect, translating nor transmitting communications between the attorney and the client, nor was this third party agent the equivalent of a corporate employee, distinguishing *In re Copper Mkt. Antitrust Litig.*, 200 F.R.D. 213 (S.D.N.Y. 2001), where the PR consultant was found to have been essentially incorporated into a foreign corporation's staff. *Id*. at 90.

Finally, the court examined the third line of cases which involved consultants employed by lawyers to aide in legal tasks, the element which seems most applicable here. In analyzing this exception, the court specifically addressed *In Re Grand Jury Subpoena dated March 24, 2003*, 265 F. Supp. 2d 321 (S.D.N.Y. 2003), a case relied upon by Valeant here, and another case from the same district. The court distinguished that matter, stating it was a "far cry from the situation here." *Id*. at 92. The court went on to state:

> The public relations consultant here was hired not by the attorney but by Universal Standard and was hired for business purposes…There is no evidence that the purpose of the communications…was to assist counsel in engaging in legal tasks as opposed to allowing Universal Standard to make a decision about the nature of the publicity that should be sought. The situation here is thus missing the critical element from *In Re Grand Jury Subpoena dated March 24, 2013*: attorneys using a public relations consultant to implement a specific strategy that requires the use of a public relations consultant.

> [*Id*. at 92 (citations omitted).]

Similarly, in Pearlstein v. BlackBerry Ltd., No. 13-CV-07060, 2019 WL 1259382 (S.D.N.Y. Mar. 19, 2019), the court addressed again *In Re Grand Jury Subpoena dated March 24, 2003, 265 F. Supp. 2d 321 (S.D.N.Y. 2003)*, in another matter centering, in part, around the retention of a PR specialist. Two motions were before the court including one challenging

privilege and work product designations involving documents to and from a non-employee public relations consultant. *Id*. at *2.

In looking at the attorney-client privilege, the court stated that "the waiver rule does not apply if the disclosure…is made to a public relations consultant hired by the lawyer for the purpose of assisting the lawyer in rendering legal advice or to achieve a legal goal." *Id*. at *6. The court then addressed – and clearly distinguished – *In Re: Grand Jury Subpoena dated March 24, 2003*. The court emphasized that the public relations exception recognized in that essentially unique case was "narrowly construed." Further, citing other decisions in that district, the case was "limited by its context: the court couched its findings in a narrow scenario of public relations consultants in assisting lawyers during a high profile grand jury investigation" and was applicable "only in 'cases such as…high profile grand jury investigations.'" *Id*. at *6 (citations omitted). The court, then citing additional opinions, stated that when a public relations consultant has performed nothing other than standard PR. services, the normal rule applies in disclosure of privileged documents such as to result in waiver. *Id*.

Plaintiffs here also rely on *In Re Signet Jewelers Ltd. Sec. Litig.*, 332 F.R.D. 131 (S.D.N.Y. 2019), in support of their position. While Valeant attempts to nullify Plaintiffs' partial reliance on this opinion, it is instructional here and contains strong factual similarities.

*In Re Signet* was a class action securities fraud in which the lead plaintiff alleged that the defendant misrepresented the health of its credit portfolio and covered up an alleged "pervasive" culture of sexual harassment. *Id*. at 133. In late 2015, *Capitol Forum,* an online investigative news and analysis company, published a series of articles accusing the company of fraudulently misstating its financials to conceal the quality of its in-house consumer lending program. Suit

was filed in August of 2016.   Then in February of the following year, the *Washington Post* published a front page story regarding the sexual harassment allegations.   *Id*.

Signet's outside counsel retained two PR firms who, along with management and in-house counsel, formed a "strategic communications steering committee…to neutralize the climate of negative and often inaccurate media coverage in light of the legal and reputational risks facing the company."   *Id*. at 133.

In response to a discovery demand, the defendant withheld documents reflecting what was said to be privileged and/or protected communications among the company, its counsel, and the PR firms retained by counsel.   *Id*.   As is the case here, the defendant advocated for the court to apply the decision in *In Re Grand Jury Subpoenas dated March 24, 2003,* to the retention of and communications with the PR firms hired on behalf of *Signet*.   The court also distinguished that matter and found that it was not applicable to the facts before it.   The court noted that "[t]he PR firms here were not called upon to perform a specific litigation task that the attorneys needed to accomplish in order to advance their litigation goals.   Rather, the PR firms were involved in public relations activities aimed at burnishing *Signet's* image."   *Id*. at 136 (citations omitted).

In opposing this motion, Valeant places reliance upon *In Re Grand Jury Subpoenas dated March 24, 2003*.   As eluded to, that decision arose out of a grand jury investigation and the published opinion refrains from naming the target and the PR firm involved.   The target's attorneys hired the public relations firm out of a concern that "unbalanced and often inaccurate press reports," created a risk that the prosecutors conducting various investigations would feel public pressure to bring charges against the target.   *Id*. at 323.   Subpoenas were issued to the PR consultant.   *Id*.   Citing *United States v. Kovel*, 296 F. 2d 918 (2d Cir. 1961), the court found that the attorney-client privilege in appropriate circumstances extended to communications involving

persons assisting the lawyer in rendering legal services, such as secretaries and law clerks, but also had been applied "more broadly as well." *Id*. at 325.   The question then was weather the problems for which the target's attorneys needed outside help related to what *Kovel* spoke of as "legal advice."   *Id*.   Therefore, the "ultimate issue" was whether the attorney's efforts to influence public opinion in order to advance a client's legal position "or services, the rendition of which should be facilitated by applying the privilege to relevant communications which have this as their object."  *Id*.

The court focused on two cases involving PR services, *Calvin Klein Trademark Trust v. Wachner*, 198 F.R.D. 53 (S.D.N.Y. 2000) and *In re Copper Mkt. Antitrust Litig., 200 F.R.D. 213 (S.D.N.Y. 2001).   Calvin Klein*, however, rejected a privilege claim on the grounds that the documents at issue simply provided "ordinary public relations advice" so there was no justification for broadening the privilege to cover functions not "materially different from those that any ordinary public relations firm would have performed" if hired directly by the plaintiff instead of the plaintiff's counsel.  *Id*. at 328.   The court then analyzed *Copper Antitrust* which upheld a privilege claim reasoning "that the public relations firm, in the circumstances of this case, was the functional equivalent of an in-house department…and thus part of the 'client.'" *Id*. at 328-329.

Applying these principles, the court in *In Re Grand Jury Subpoenas dated March 24, 2003*, found that the communications were indeed protected.   However, a reading of this case emphasizes its fundamentally restricted nature.   That is, the court emphasized that in that particular matter, the target was "confronted with the broad power of government" and, without suggesting any impropriety, "the court [was] well aware that the media, prosecutors and law enforcement personnel in cases like this often engage in activities that color public opinion….to

the detriment of [the defendant's] ability to obtain a fair trial." *Id.* at 330.  The court then specifically held that "(1) confidential communications, (2) between lawyers and public relations consultants, (3) hired by the lawyers to assist them in dealing with the media in cases such as this ['high profile cases'], (4) that are made for the purpose of giving or receiving advice, (5) directed at handling the client's legal problems are protected by the attorney-client privilege." *Id.* at 331.

Given this precedent, a determination of the outcome of this motion ultimately rests upon an analysis of the working relationship between Vianovo, a public relations firm, and Valeant and its attorneys.  What follows is a summary of that relationship derived exclusively from the facts asserted by Valeant in its opposition, including the supporting Declaration and the documents incorporated by the Declaration.

On November 5, 2015, the corporation expressly authorized its outside counsel, Covington, to hire the public relations firm and its attorneys did so by way of an engagement letter to Matthew Miller of Vianovo.  At that point in time, Valeant had already been subject to governmental investigations, prosecutorial investigations, civil suits (class actions) and a barrage of media reports which had eviscerated the Company's business practices and its corporate leadership.  Additionally, at that time, Valeant had a preexisting relationship with another PR firm (Sard Verbinnen) which, it seems, had been carrying out public relations duties for Valeant for some time.

That engagement letter to Vianovo, which has been both paraphrased and quoted previously in this Report and Recommendation, is replete with words and phrases describing the engagement in terms of assisting Valeant's legal counsel "with expert public relations services and advice" so as to provide "more informed and valuable legal advice" as to the "legal issues" presented by this litigation.   As also previously noted, the agreement goes on to provide that any

communications exchanged between the parties were regarded as confidential and privileged and subject to attorney-client privilege and work product protection.  The agreement does not, however, describe precisely how Vianovo was to assist Valeant's attorneys in terms of rendering legal advice.

The recipient of that letter, Miller, appears to have been Vianovo's principle conduit with Valeant and the individual most responsible for its public relations activities with its client.  He was subsequently deposed as Vianovo's Rule 30(b)(6) representative and questioned extensively as to Vianovo's relationship with Valeant.

When deposed, Miller confirmed that Vianovo was engaged in late October 2015, after being approached by the Covington firm.  [Miller Deposition Transcript, p. 18.]  He understood Vianovo's role as one to provide advice to Covington to help the attorneys "with their representation of Valeant in several investigations".  [Miller Deposition Transcript, p. 22.][1]  He testified that he was not a lawyer and that Vianovo would not be providing legal advice.  [Miller Deposition Transcript, p. 23.]

At page 26 of the transcript, the following testimony took place:

> Q.    In connection with your engagement with respect to Valeant, were there specific services that were to be provided by Vianovo?
>
> A.    Yes, general public relations services.

As Valeant argues, the single question and answer quoted above while striking in terms of the issue at the heart of this motion does not represent the full context of Miller's testimony as to the nature of Vianovo's services and the remainder of his testimony was slightly broader and a

---

[1]   Both parties have provided substantial portions of Miller's deposition testimony with their submissions. References here are to the page numbers of that deposition transcript.

bit more nuanced.  Miller understood Vianovo's role was to provide Covington with public relations advice on matters connected to government investigations of Valeant, meaning Congressional investigations and an investigation by the Department of Justice.  [Miller Deposition Transcript, pp. 23-25.]  The types of services to be provided were "a broad range of communication services, public relations services, public affairs services…how to deal with reporter inquiries, how government investigations might become public and what ramifications that could have on a company."  [Miller Deposition Transcript, pp. 25-26.]  Miller explained that at the time of these events, there was "a lot of media interest" in the Company and there were also "a number of government investigations and they needed help with those."  [Miller Deposition Transcript, p. 27.]   He also testified, for example, that in terms of certain communications as to a proposed "pricing plan" related to the government investigation as to which Vianovo made some recommendations, that those recommendations were made in response to that ongoing investigation "as well as associated media coverage" and that it was impossible to differentiate between the two.  [Miller Deposition Transcript, p. 70.]   Indeed, according to Miller, the investigations and media coverage were all part of a "general crisis the company was in" and were intimately connected, and sometimes indistinguishable, from each other.  [Miller Deposition Transcript, p. 71.]

Miller confirmed that another company, Sard Verbinnen, was Valeant's "lead" or "main" or "chief" PR firm and dealt with the "lion's share of media inquiries," although on other occasions Vianovo "dealt with some" of the inquiries.  [Miller Deposition Transcript, pp. 91-92.]  He stated that Vianovo was specifically retained to work with respect to the investigation and "things that flowed from that" since "Sard [Verbinnen] was the main PR firm" and "the main interlocutor with the reporters."  [Miller Deposition Transcript, pp. 92, 128.]

When deposed, Miller did not provide specific, concrete examples of Vianovo's day-to-day services to Valeant but, more generally, described typical tasks.  That is, the PR firm provided media analysis to Valeant in which key (and presumably negative) media reports concerning Defendant were highlighted and addressed.  [Miller Deposition Transcript, pp. 135-137.]  Valeant was provided assistance to defend itself against criticism by the press, short sellers and government investigators.  [Miller Deposition Transcript, p. 39.]   These were addressed by "largely preparing comments for reporters" often in connection with potential stories brought by reporters to Valeant or to Vianovo directly.   [Miller Deposition Transcript, pp. 39-40.]  Thereafter, Vianovo "will work with the company and with counsel to develop a response to give to the reporter."   [Miller Deposition Transcript, p. 40.]   In these situations, Miller testified, Vianovo would typically work with counsel to prepare a response.   [Miller Deposition Transcript, p. 41.]

Valeant's privilege log [attached as Exhibit 1 to Plaintiff's submissions] is a 331 page listing of 2,990 documents dated from October 22, 2015 to July 20, 2016.  The log does clearly describe the sender and recipient of emails and other documents, their respective roles, the identity of those individuals copied, privilege designation, description and "status," meaning whether a document was redacted or withheld (the vast majority being the latter).  In the log, Valeant regularly and consistently describes the privilege designations as attorney-client, work product or both.  A typical description of a withheld or redacted item (and this is not inclusive of all of the descriptions) reads, "Email string requesting legal advice of in-house and outside counsel and reflecting legal advice of outside counsel and litigation strategy regarding government investigation and draft public statement."

24

The partially redacted emails and other documents attached to Plaintiffs' submissions as Exhibits 4 through 35 – documents which are difficult to fully appreciate in their redacted form – consist of communications concerning what would generally be described as public relations work. That is, emails attaching troublesome articles published by the press or appearing on-line, comments by the senders and recipients regarding those stories, questions posed and answers given as how to address or combat negative media reports, inquiries as to how to publicly explain the relationship between Valeant and Philidor, communications regarding Valeant's public perception and comments regarding appropriate messaging to the public, the media and investors. Again, this represents only a small, blurry snapshot of the communications exchanged among the Vianovo, Valeant and Valeant's counsel, but it does fully support Plaintiffs' argument that Vianovo, a pubic relations firm, was providing just that – public relations advice. Hence, Vianovo's role in providing its PR expertise to Valeant's attorneys so as to actually assist them in providing legal advice to Valeant remains a mystery.

With this said, the Special Master, following careful review of Valeant's Opposition to this motion, including documents and other attachments (such as the deposition transcript, privilege log and redactions), finds that Valeant has failed to present any facts or descriptions as to *how* Vianovo assisted Covington on Valeant's behalf in providing legal services or legal advice to the Company or *what* was done in that regard. The closest factual assertion provided is a sentence fragment in which it is stated that Vianovo worked with counsel "to prepare Valeant for Congressional hearings and assisted counsel in advising Valeant on its public statements and responses to media inquiries during the course of the Department of Justice investigation." [Valeant's Opposition, p. 19.]

25

Based on what has been presented before the Special Master, it would take a substantial leap of faith to conclude that Vianovo's work somehow differed from or exceeded general public relations services. Miller's sworn testimony combined with the limited descriptions in the log file and the redacted portions of the materials produced merely demonstrate the provision of public relations services and no more. That is, addressing reporters' inquiries, counseling on the effect of the ongoing investigations, culling damning stories from the press, providing media analysis of those reports, providing advice as to how to address criticisms directed at Valeant from different directions (the press, investors and the public generally), preparing comments for reporters and attempting to head off bad publicity. None of this in any substantial way differs from the public relations services described in the cases cited above including *Riddell, Signet* and *Calvin Klein*, i.e., "how to respond to media inquiries, updates on relevant media coverage, preparing testimony before Congress, updates on Congressional developments and general public affairs issues" *Riddell*, 2016 WL 7108455 at *8, and "[r]eviewing press coverage, making calls to various media to comment on developments in the litigation, and even 'finding friendly reporters.'" *Calvin Klein*, 198 F.R.D. at 54-55. Valent has wholly failed to demonstrate that Vianovo had been performing functions which were "materially different from those that any ordinary public relations firm would have performed" if hired directly by Valeant instead of Valeant's counsel. In short, the services provided by Vianovo consisted of advice on how to "spin" circumstances in the manner most favorable to Valeant on successive developments in the ongoing litigation. See, *Id.* at 54-55.

Reviewing Valeant's position and giving it the most favorable interpretation on the facts presented, leads the Special Master to the conclusion that Vianovo's services consisted of general public relations assistance, the primary purpose of which was to present a favorable

public image of Valeant, not to assist its attorneys in litigation.  Valeant has not demonstrated any of the criteria the courts have required of a party to establish that communications under these circumstances are protected by the attorney-client privilege.  Vianovo was not (nor does Defendant assert it was) the functional equivalent of a corporate employee; Vianovo was not a third party deemed essential to transmit or translate communications between an attorney and a client; and there is no evidence to support the notion that the purpose of the communications was to assist counsel in engaging in or implementing a specific legal strategy that required the use of a PR consultant.  Similarly, there has been no showing that the primary purpose of Vianovo's retention was to assist counsel in rendering legal advice, that is, engaging in "investigative or analytical tasks to aid counsel in preparing for litigation."  See, *Universal Standard, Inc.*, 331 F.R.D. at 93 (citing *Wultz v. Bank of China Ltd.*, 304 F.R.D. 384, 394 (S.D.N.Y. 2015)).  The purpose of the work product doctrine is to provide a zone of privacy for strategizing on the conduct of the litigation itself, not about the effects of the litigation on the client's customers, the media or the public generally.  See, *Id.* at 93; *Calvin Klein*, 198 F.R.D. at 55.  Simply put, the Special Master finds that Valeant has not demonstrated that Vianovo was retained for any purpose other than to act as an additional.PR arm at a troubled time for the Company.

In short, the Special Master finds that Valeant has failed to meet its burden to establish that the communications with Vianovo are protected by the attorney-client privilege or the work product doctrine.  Given this, the Special Master finds no need for *in camera* review.

## VI.    Conclusion.

For the reasons previously set forth, Plaintiffs' motion is **GRANTED**.

*s/Dennis M. Cavanaugh*

Dated:  July 22, 2021        DENNIS M. CAVANAUGH
Special Master