**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE VALEANT PHARMACEUTICALS INTERNATIONAL, INC. SECURITIES LITIGATION | **Civil Action No. 15-7658 (MAS)**<br><br>**SEALED MEMORANDUM OPINION** |

**SHIPP, District Judge**

 This matter comes before the Court upon Defendants'[1] objections to the Report and Recommendations ("R&Rs"[2]) issued by Hon. Dennis M. Cavanaugh, U.S.D.J. (ret.) ("Special Master") which recommended denying Defendants' Motions for Summary Judgment on the element of reliance against Plaintiffs Grantham, Mayo, Van Otterloo & Co. LLC ("GMO"), Okumus Opportunistic Value Company Ltd. ("Okumus"), Hound Partners LLC ("Hound Partners"), and Brahman Capital Corporation ("Brahman") (collectively, "Plaintiffs"). Plaintiffs moved to adopt the R&Rs. (Pls.' Mot. to Adopt, ECF No. 1222.) Defendants filed objections (Defs.' Obj., ECF No. 1226), Plaintiffs responded to the objections (*see* Pls.' Opp'n to Defs.' Obj., ECF No. 1250), and Defendants replied (*see* Defs.' Reply, ECF No. 1266).

 The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth below, the Court adopts each of the R&Rs. Defendants' Motions for Summary Judgment (*see* Okumus Moving Br., ECF

---

[1] "Defendants" are referred to collectively to include Valeant Pharmaceuticals International, Inc. ("Valeant" or the "Company"), as well as certain officers and directors as identified in each of the subject complaints. *See* No. 17-6513 (Okumus), ECF No. 1; No. 18-89 (GMO), ECF No. 1; No. 18-8705 (Hound Partners), ECF No. 1; No. 18-893 (Brahman), ECF No. 1.

[2] The "R&Rs" are referred to collectively to include the GMO R&R (ECF No. 1185), Okumus R&R (ECF No. 1186), Hound Partners R&R (ECF No. 1187), and Brahman R&R (ECF No. 1189).

No. 996; GMO Moving Br., ECF No. 998; Hound Partners Moving Br., ECF No. 1014; and Brahman Moving Br., ECF No. 997) are denied.

## I.  BACKGROUND

The Court has previously summarized the factual background of this matter at length and therefore presumes the parties' familiarity with the procedural history and nature of the allegations presented. *See In re Valeant Pharm. Int'l, Inc. Sec. Litig.*, No. 15-7658, 2017 WL 1658822 (D.N.J. Apr. 28, 2017), *reconsideration denied*, 2017 WL 3880657 (D.N.J. Sept. 5, 2017). The Special Master also extensively outlined the facts in the R&Rs and they are incorporated by reference herein. (*See* GMO R&R 2-9; Okumus R&R 1-12; Hound Partners R&R 1-13; Brahman R&R 1-13.) To the extent that any of the facts overlap, the parties may also refer to the concurrently filed opinion addressing Defendants' Omnibus Motion for Summary Judgment and Motion to Exclude Chad Coffman. The Court therefore provides only those facts that are relevant to the instant objections.

### A.  Relevant Background

Valeant's business model deviated from the traditional approach used by other pharmaceutical companies. (Pls.' Opp'n to Defs.' Obj. 6 (citing Omnibus RSF[3] ¶¶ 78-80, ECF No. 1046-1).) Instead of investing capital into research and development to make new drugs, Valeant purchased drugs already on the market or bought pharmaceutical companies outright. (*Id.*) To convince investors that its model "could generate long-term value[,]" Plaintiffs allege that Valeant had to show that its revenue growth was sustainable and that there was an increase in demand for

---

[3] "Omnibus RSF" refers to the Direct Action Plaintiffs' Response to Defendants' Omnibus Local Rule 56.1 Statement of Material Facts Not In Dispute and Supplemental Statement of Disputed Material Facts.

its products—i.e., that the Company was not just driven by acquisitions or price increases on the products being sold. (Omnibus RSF ¶ 88.)

Valeant's acquisition-based model was initially successful. (*Id.* ¶ 20.) From 2013 to 2015, the Company reported increased revenues and strong organic growth. (*Id.* ¶ 81 (noting that Valeant grew "from a company with 3,000 employees and about $650 million in revenue, to a leading global pharmaceutical and consumer products company with about 22,000 employees and approximately $12 billion in revenue" (quoting Rolnick Ex. 16, at 1, ECF No. 1046-18); *see also* Defs.' Omnibus Statement of Undisputed Material Facts ("Omnibus SUMF") ¶ 20, ECF No. 994-1 (discussing Valeant's increase in revenues from 2013 to 2015).) Plaintiffs claim that, unbeknownst to investors, Valeant's success was largely due to aggressive price increases on its products, rather than volume-based growth. (Omnibus RSF ¶¶ 236-62; *see also id.* ¶ 239 (noting that "in 2014 and most of 2015, Valeant's internal analyses – distributed to senior management – [established that] Valeant's organic growth was driven primarily . . . by price, not volume"). Once the truth of Valeant's practices was gradually revealed to the market, the stock value declined from $262 per share in August 2015 "to less than $25 on June 7, 2016." (Second Am. Consolidated Compl. ("SACC"), ¶¶ 18-26, ECF No. 952.) In turn, investors' holdings in Valeant dropped precipitously in value, causing significant financial losses. (*Id.*) This litigation followed shortly after that decline.

To support their claims, Plaintiffs produce the testimony of Chad Coffman, CFA[4] ("Coffman"), an expert in loss causation and damages. (*See* Expert Report of Chad Coffman, CFA ("Coffman Rpt.") Ex. 13, ECF No. 995-15.) Coffman's expert report identified sixteen corrective

---

[4] The Court has addressed Defendants' Omnibus Motion for Summary Judgment and their Motion to Exclude Chad Coffman in a separate, but concurrently filed, opinion. The Court refers to the Coffman Report and the Omnibus record to the extent that such context is needed to resolve the pending Motions.

Case 3:15-cv-07658-MAS-LHG Document 1829-15 *SEALED* Filed 04/02/24 Page 142 of 152 PageID: 152211
Case 3:15-cv-07658-MAS-LHG Document 1829-15 *SEALED* Filed 04/02/24 Page 4 of 52
PageID: 152052

event windows ("Corrective Disclosure Events") that allegedly unveiled the "relevant truth" of Defendants' business practices and coincided with significant decreases in Valeant's common stock price. (*Id.* ¶ 12.) The Corrective Disclosure Events that Coffman identified spanned over the course of eight months, from October 5, 2015 to June 7, 2016. (*Id.* ¶ 13) During this period, Valeant's stock price fell from $182 per share to less than $25 per share. (*See* Pls.' Opp'n to Defs.' Obj. 14 (citing RSF ¶¶ 283-376).)

Relevant here, Plaintiffs are sophisticated investors who made significant investments in Valeant stock both before and after the Corrective Disclosure Events occurred. (*See* Defs.' Obj. 4.) As such, Defendants filed motions for summary judgment asserting that Plaintiffs cannot demonstrate the reliance element of their Section 10(b) claims "for all . . . purchases after October 4, 2015."[5] (Defs.' Obj. 17; *see generally* Okumus Moving Br.; GMO Moving Br.; Hound Partners Moving Br.; Brahman Moving Br.) The gravity of Plaintiffs' investments will be discussed in turn below.

   *i.*  GMO

GMO is a ▮▮▮▮▮▮▮ investment manager[6] that purchased Valeant securities between December 11, 2014 and February 12, 2016. (GMO R&R 2.) In December 2014, GMO took a "long" position in Valeant ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ (GMO Resp. to Defs.' SUMF ¶¶ 134-36, ECF No. 1049-1.) ▮▮▮▮▮▮▮▮▮▮▮▮

---

[5] In their objections to the R&Rs, Defendants only contest investments made after the first Corrective Disclosure Event on October 5, 2015. (Defs.' Obj. 18-27.) They do not object to Plaintiffs' claims of reliance for investments predating the first Corrective Disclosure Event.

[6] GMO's underlying complaint was filed on behalf of nineteen entities who were advised or affiliated with GMO. (*See* GMO Compl. ECF No. 1, ¶¶ 18-37, No. 18-89.)

███████████████████████████████████████████

(*Id.* ¶¶ 168-69.) GMO based its position, in part, on Valeant's statements that over 50% of organic growth in the third quarter of 2014 came from volume, ██████████████████████████

███████████████████████████████████████████

███████████████████ (*Id.* ¶¶ 187-90.)

To research and analyze Valeant, GMO ██████████████████████

███████████████████████████████████████████

██████████████ (*Id.* ¶¶ 18-25.) GMO also ████████████████████████

███████████████████████████████████████████

███████████ (*Id.* ¶ 342.) GMO, however, states that its financial models and investment materials "relied on Valeant's historical financial information, Defendants' representations about the sustainability of Valeant's business model and the drivers of its organic growth, and the market and market price of Valeant common stock functioning properly and efficiently." (GMO Resp. to Defs.' SUMF ¶ 18, ECF No. 1049-1.) GMO also used publicly available information, like news articles, press reports, Securities and Exchange Commission ("SEC") filings, and investor calls and presentations. (GMO R&R 4.) According to GMO, Valeant's filings with the SEC and statements during investor calls and presentations were among the most important sources of information available.[7] (GMO Resp. to Defs.' SUMF ¶ 37.)

GMO ███████████████████████████████████████

█████████████████████████████ the first Corrective Disclosure Event—when "the New York Times reported that 'Valeant's revenue growth was highly dependent upon

---

[7] The Special Master's R&R carefully covers the extent of GMO's independent research processes and analyses. (*See* GMO R&R 3-5.) The parties do not dispute the Special Master's recitation of the facts. The Court, therefore, incorporates them by reference herein. (*Id.*)

price increases'" and inconsistent with "'a recently published letter to shareholders'" (GMO R&R 6); (2) ███████████████ the second Corrective Disclosure Event—the day that Valeant said it received subpoenas from federal prosecutors (*id.* at 7); (3) █████████████ third Corrective Disclosure Event—the day that Valeant disclosed its relationship with Philidor (*id.*); (4) ██████████████ the fourth Corrective Disclosure Event—when the New York Times reported Valeant used Philidor to "'keep the health system paying for high-priced drugs'" (*id.*); (5) ██████████████ the fifth Corrective Disclosure Event—when Citron Research published an article referring to Valeant as the "Pharmaceutical Enron" and disclosing common ownership in Valeant, Philidor, and R&O Pharmacy (*id.*); (6) ████████████████ the sixth Corrective Disclosure Event—a day after Philidor issued a press release disclosing relationships with affiliated pharmacies and detailing services Valeant received from Philidor (*id.*); (7) ██████████ ████████ the seventh Corrective Disclosure Event— when the Wall Street Journal reported "that Valeant employees secretly worked at Philidor under fictitious names" and when Valeant held a special investor call to discuss the nature of its relationship with Philidor (*id.* at 7-8); and (8) ████████████████ the eighth and ninth Corrective Disclosure Events—which involved reports that Philidor utilized "back door" approaches to receive payments from Valeant, that CVS terminated its relationship with Philidor, and that Express Scripts and UnitedHealth's Optum Rx cut ties with Valeant (*id.* at 8). In sum, GMO ████████████████████ ██████████ (GMO Resp. to Defs.' SUMF ¶ 110.) GMO stopped purchasing Valeant stock on February 2, 2016. (GMO R&R 10.)

    *ii.*    *Okumus*

    Okumus is a New York-based private investment fund that purchases stocks at a "deep discount to [what it believes is] the company's fundamental value[.]" (Okumus R&R 2.) In late

September 2015, Okumus began researching Valeant by "collecting SEC filings, news articles, earnings call transcripts, and sell-side research on Valeant." (Pls.' Opp'n to Defs.' Obj. 12.) Like other Plaintiffs, Okumus alleges that it "relied upon Valeant's past reported financial results and SEC filings," which its senior analysts believed were accurate and contained all material information. (Okumus Resp. to Defs.' SUMF 58 ¶ 17, ECF No. 1033; *see also* Pls.' Opp'n to Defs.' Obj. 13.) This included Valeant's September 28, 2015 Form 8-K, which rejected that Valeant's "business model and strategy [was] dependent upon large price increases in [its] U.S. pharmaceutical business" and instead purported that Valeant was "well positioned for strong organic growth, even assuming little to no price increases." (Okumus Resp. to Defs.' SUMF 86, ¶¶ 148-49.)

Okumus purchased Valeant stock the day of or directly after many of the Corrective Disclosure Events, though Okumus notes that some of these purchases resulted from put options.[8] (*See id.* at 31, ¶¶ 72-73; 36, ¶ 83; 39, ¶ 92; 42-43, ¶ 99; 44-45, ¶¶ 103-05.) Between October 12 and October 21, 2015, Okumus sold put options and purchased approximately 4.6 million Valeant shares. (*Id.* at 3, ¶ 6.) Thereafter, Okumus purchased an additional: (1) $31.8 million of Valeant stock after the Citron Research article's release (*id.* at 30, ¶ 69); (2) $7.985 million worth of stock the day that Philidor disclosed its relationship with Valeant, and $154.2 million the next day—which allegedly resulted from the put options (*id.* at 31, ¶¶ 72-73); (3) $72.56 million worth of Valeant stock the day that Express Scripts and United Health's Optum Rx ended their relationship with Philidor—which allegedly resulted from the put options (*id.* at 36, ¶ 83); (4) $536,500 worth of Valeant stock in February 2016 (*id.* at 40, ¶ 93); (5) $23.198 million on March 1, 2016, a day

---

[8] The put options required Okumus to purchase Valeant Stock from a purchaser at an agreed upon price when Valeant's stock's price fell below the agreed-on price and the purchaser exercised its option to sell Valeant stock to Okumus at that price. (*Id.* at 3, ¶ 8.)

after Valeant announced it would withdraw previous financial guidance (*id.* at 42, ¶ 98); (6) $28.3 million in Valeant Stock on March 4, 2016, after news reports revealed "Valeant's largest shareholder [paid] Valeant employees for information about [Philidor]" and highlighted "Philidor's questionable business practices"— allegedly resulting from the put options (*id.* at 42-43, ¶ 99); (7) $10.7 million of Valeant stock on March 15, 2016, and another $150,000 worth of Valeant shares on March 16, 2015 (*id.* at 44-45, ¶¶ 103-04); and (8) $4.36 million of Valeant stock on March 18, 2016 (*id.* at 44, ¶ 105).

Between late March and April 2016, Okumus bought Valeant stock four more times with purchases consisting of: $19.778 million, $2.65 million, $8.1 million, and $3.5 million. (*Id.* at 45-46, ¶¶ 106-09.) Okumus does not allege that any of the late March and April transactions resulted from put options. (*Id.*) Okumus ceased its purchases of Valeant stock after April 5, 2016, and "only fully exited its position in Valeant on March 6, 2017." (Okumus R&R 13.)

### iii. Hound Partners

Hound Partners is an investment manager based in New York that represents and manages "three Cayman Islands-based limited partnerships." (Hound Partners R&R 2.) Hound Partners bought Valeant ███████████████████████████████████████████ (*Id.*) After the first Corrective Disclosure Event, Hound Partners purchased ███████ shares for ██████████ (*Id.* at 6.) "[I]n total, Hound [Partners] purchased ███████████ of Valeant common shares between January 4, 2013 – the date of Defendants' first relevant misrepresentation – and March 7, 2016[.]" (Pls.' Opp'n to Defs.' Obj 11.)

Hound Partners was aware of the Corrective Disclosure Events, "but believed that the market was overreacting, and that Valeant remained a good investment." (Hound Partners R&R 6.) In essence, Hound Partners disputes that the corrective disclosures revealed the full truth and

8

extent of Defendants' fraud. (*Id.*) When investing, Hound Partners states that it relied on SEC filings, Valeant's annual Form 10-K, earnings reports, Company press releases, and conference presentations. (*See* Pls.' Opp'n to Defs.' Obj 12.) ████████████████████████████████ ████████████████████████████████████████████████ (Hound Partners R&R 2.)

        *iv.*   *Brahman*

Brahman is comprised of nine investment entities advised by Brahman Capital Corporation, a New York-based investment advisor. (Brahman R&R 2.) ██████████████████ ████████████████████████████████████████████████████ (*See* Brahman Resp. to Defs.' SUMF and Supp. Statement of Disp. Material Facts ("Brahman SSF") ¶ 117, ECF No. 1050-1.) Brahman alleges it made these purchases, and other purchases, based on "Valeant's disclosures in SEC filings, related presentations, and other public statements, including statements that Defendants made that Valeant's growth was driven by volume, not price." (Pls.' Opp'n to Defs.' Obj. 9 (citing Brahman SSF ¶¶ 123-26, 188-89, 196-204).)

Brahman invested in companies with ████████████████ . █████████████████ ████████████████████████████████████████████████████ ████████████████████████ (Brahman R&R 3-4.) Before investing, Brahman considered ████████████████████████████████████████████████████ █████████████████████████████████████████████ (*Id.* at 4.) Brahman also conducted extensive research, "read[ing] every document [and] earnings report that companies put out," as well as "meet[ing] with management teams regularly," and "maintain[ing] financial models." (*Id.*) Based on its research, Brahman valued ██████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████ (*Id.*)

Like GMO, Brahman placed Valeant in a "long" position because it believed that Valeant was positioned for long term growth. (Pls.' Opp'n to Defs.' Obj. 9 (citing Brahman SSF ¶¶ 280-81).) One of Brahman's investment managers, ███████████████ reviewed publicly available information and statements made from Valeant's management. (*Id.* (stating that Valeant's management's "statements about Valeant's business were critical to Brahman's understanding of the Company's prospects and for setting a target price for the Company's stock.").) Based on Defendants' representations, Brahman alleges that it continued to anticipate Valeant's long-term organic growth well into 2016 ██████████████████████████ ██████████████████████████████████████████ (*Id.* at 11.)

After the first Corrective Disclosure Event, ████████████████████████ ████████████████████ (Brahman R&R 9, 11.) Specifically, ██████████████ ██████████████████ the first Corrective Disclosure Event (*id.* at 6); (2) ████████ ████████████ the fourth Corrective Disclosure Event (*id.* at 7); (3) ████████████ █ the fifth Corrective Disclosure Event; and (4) ████████████████ the sixth Corrective Disclosure Event (*Id.*) Between two of the alleged Corrective Disclosure Events in February 2016, ██████████████████████████████ (*Id.* at 9.) ████████████████████ ████████████████████ (*Id.* at 10.)

B. **Procedural History**

Defendants filed a motion for summary judgment in each case contesting the element of reliance for Plaintiffs' § 10(b) claims. (*See generally* Okumus Moving Br.; GMO Moving Br.; Hound Partners Moving Br.; Brahman Moving Br.) Defendants argue that Plaintiffs cannot establish reliance because Plaintiffs: (1) bought Valeant stock following the first Corrective

Disclosure Event, and repeatedly did so following subsequent Corrective Disclosure Events;[9] (2) conducted their own extensive independent research prior to buying Valeant stock;[10] and (3) were aware of the business practices they claim that Defendants misrepresented.[11]

The Special Master recommended that the Court deny each of the summary judgment motions. (*See generally* R&Rs.) The Special Master determined that: (1) Plaintiffs' post-corrective disclosure purchases of Defendants' stock did not automatically rebut the presumption of reliance;[12] (2) Plaintiffs presented evidence that the first Corrective Disclosure Event did not reveal the full extent of Defendants' fraud;[13] (3) Plaintiffs' extensive research did not rebut reliance because Plaintiffs incorporated Defendants' misrepresentations into their research;[14] and (4) the record was disputed as to how much each Plaintiff knew about Defendants' business practices.[15] Defendants objected to the Special Master's findings only as to post-October 4, 2015 stock

---

[9] (*See* GMO R&R 10-11; Okumus R&R 13-14; Hound Partners R&R 14-15; Brahman R&R 10-11.)

[10] (*See* GMO R&R 11-12; Okumus R&R 14-15; Hound Partners R&R 15; Brahman R&R 11-12.)

[11] (*See* GMO R&R 12; Okumus R&R 15; Hound Partners R&R 17; Brahman R&R 12-13.)

[12] (*See* GMO R&R 19-20; Okumus R&R 23; Hound Partners R&R 33-34; Brahman R&R 21.)

[13] (*See* GMO R&R 20; Okumus R&R 23-24; Hound Partners R&R 34; Brahman R&R 21-22.)

[14] (*See* GMO R&R 20-21; Okumus R&R 24-25; Hound Partners R&R 34-36; Brahman R&R 22-23.)

[15] (*See* GMO R&R 21; Okumus R&R 25; Hound Partners R&R 36-37; Brahman R&R 23.)

purchases, i.e., after the first Corrective Disclosure Event.[16] (*See* Defs.' Obj. 6-8.) Plaintiffs opposed (*see* Pls.' Opp'n to Defs.' Obj.), and Defendants replied (*See* Defs.' Reply).

## II.     LEGAL STANDARD

The Court reviews *de novo* a Special Master's findings of fact and conclusions of law in their reports and recommendations. *See* Fed. R. Civ. P. 53(f)(3)-(4); (Appointment Order ¶ 11); *Valeant Pharms. Int'l, Inc. v. AIG Ins. Co.*, No. 18-493, 2020 WL 7768405, at *4 (D.N.J. Dec. 30, 2020) (stating that Fed. R. Civ. P. 53's *de novo* standard governs all findings of fact and conclusions of law by the Special Master). The Court "may accept, reject, or modify, in whole or in part, the R&R" or those portions of an R&R where a party objects. (Appointment Order ¶ 10); Fed. R. Civ. P. 53(f)(1). The Court reviews the Special Master's findings and conclusions accordingly.

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a summary judgment motion, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine dispute of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[W]ith respect

---

[16] Defendants do not object to any other conclusions in the R&Rs except for the issue of reliance. The Special Master, for example, granted summary judgment in favor of Pearson, Schiller, and the Underwriter Defendants on Plaintiffs' Section 12(a)(2) claims. (Hound Partners R&R 42.) The Special Master also denied summary judgment as to Defendants' Section 11(a) and 12(b) defenses. (*Id.* at 43-44.) The Court adopts the Special Master's findings as to the remaining issues that have not been objected to.

to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine dispute as to a material fact for trial. *Anderson*, 477 U.S. at 247-48; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which the nonmoving party must rely to support its assertion that genuine disputes of material fact exist). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,] . . . 'there can be no genuine [dispute] of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 n.5 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23).

In deciding a motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter but to determine whether there is a genuine dispute for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). The summary judgment standard, however, does not operate in a vacuum. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson*, 477 U.S. at 254.

## III. **DISCUSSION**

### A.  **Reliance Under Section 10b-5**

For purposes of the instant objections, the Court must determine whether Plaintiffs have come forth with sufficient evidence to establish the element of reliance for their claims under § 10(b) of the Securities Exchange Act and Rule 10b-5. To demonstrate a § 10(b) claim for securities fraud, Plaintiff must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) *reliance upon the misrepresentation or omission*; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (emphasis added) (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460-61 (2013)).

Reliance is "an essential element" of a § 10(b) cause of action. *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 159 (2008). The reliance element requires a proper connection between a defendant's misrepresentation and a plaintiff's injury before liability can arise. *Id.*; *see also Halliburton Co.*, 573 U.S. at 267 (quoting *Amgen Inc.*, 568 U.S. at 461). Traditionally, a plaintiff would prove reliance "by showing that he was aware of a company's statement and engaged in a relevant transaction—*e.g.*, purchasing common stock—based on that specific misrepresentation." *Amgen Inc.*, 568 U.S. at 461 (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011)).

The Supreme Court has recognized, however, that requiring direct proof of reliance in every case "would place an unnecessarily unrealistic evidentiary burden on the Rule 10b-5 plaintiff who has traded on an impersonal market." *Basic Inc. v. Levinson*, 485 U.S. 224, 245 (1988). Accordingly, the Supreme Court has held that reliance can be *presumed* in certain circumstances,

14

on the theory "that the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." *Id.* at 246. This is known as the "*Basic* presumption of reliance."[17] A plaintiff seeking to invoke the *Basic* presumption "must prove: (1) that the alleged misrepresentation was publicly known; (2) that it was material; (3) that the stock traded in an efficient market; and (4) that the plaintiff traded the stock between the time the misrepresentation was made and when the truth was revealed." *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1958 (2021).

The *Basic* presumption, however, is rebuttable. 485 U.S. at 248. A defendant can rebut the presumption with "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff[.]" *Id.* If a defendant can "show that the alleged misrepresentation did not, for whatever reason, actually affect the market price, or that a plaintiff would have bought or sold the stock notwithstanding that it was aware the stock's price was tainted by fraud, then the presumption of reliance does not apply." *Halliburton*, 573 U.S. at 269 (citing *Basic*, 485 U.S. at 248-49).

In *In re DVI Securities Litigation*, the Third Circuit identified a list of non-exhaustive ways a defendant can rebut the presumption, such as showing that:

> (1) the market did not respond to the alleged misrepresentations; (2) the misrepresentations were immaterial; (3) a plaintiff did not actually rely on the misrepresentations; or (4) a plaintiff would have [purchased or] sold the securities without relying on the integrity of the market.

639 F.3d 623, 637 (3d Cir. 2011), *abrogated on other grounds by Amgen Inc.*, 568 U.S. at 455; *see also Semerenko v. Cendant Corp.*, 223 F.3d 165, 179 (3d Cir. 2000).

---

[17] This presumption has also been referred to as the "fraud on the market" doctrine. *See, e.g.*, *Basic*, 485 U.S. at 241-42. As is the case in the parties' briefs, the Court refers to both doctrines interchangeably.

## B.      Whether Plaintiffs' Post-Disclosure Purchases Defeat Reliance

First, Defendants argue that the Special Master erred by declining to follow precedent from this circuit and other jurisdictions, which finds that "purchasing additional stock in a company following alleged corrective disclosures revealing the 'truth' of the alleged misstatements and omissions rebuts the presumption of reliance." (Defs.' Obj. 20.) While Defendants cite a slew of cases to support their argument that post-disclosure purchases rebut the presumption of reliance, the Court finds those cases are distinguishable from the circumstances presented here.

To begin, Defendants rely on *In re Safeguard Scientifics*, 216 F.R.D. 577 (E.D. Pa. 2003), and *In re World Access, Inc. Securities Litigation*, 310 F. Supp. 2d 1281 (D. Ga. 2004). (*See* Defs.' Obj. 20-21.) The Court does not find that *Safeguard* and *In re World Access* govern, since the investors in those cases knew the magnitude of the fraud and continued to make purchases nonetheless. *See Safeguard*, 216 F.R.D. at 582 (finding that "[the lead plaintiff] would have made – and in fact did – purchase stock regardless of the fraudulent omission."); *World Access*, 310 F. Supp. 2d at 1300 (finding that the plaintiff "continued to purchase WAXS stock after he learned of the alleged misrepresentations" and that "[t]he only thing that [the plaintiff] appears to have relied upon is that WAXS stock would eventually go back up."). Here, there is evidence to support that, among other things, Plaintiffs valued Valeant's representations about its relationship with Philidor, and its statements regarding organic growth, and that these misstatements or omissions influenced their decision to continue purchasing securities despite the gradual release of negative information. (*See, e.g.*, GMO Resp. to Defs.' SUMF ¶¶ 189, 287, 290, 312, 327-29, 361, 363; Okumus Resp. to Defs.' SUMF ¶¶ 12, 14, 17, 18, 21, 45-47; Hound Partners Resp. to Defs.' SUMF ¶¶ 32, 36, 37-40, 61-64, 69, 76, 87, ECF No. 1053-1; Brahman SSF ¶¶ 125-26, 159-62, 198-202.) The cases referred to by Defendants do not fit this mold.

16

Nor is the Court persuaded by Defendants' reliance on the *Vivendi* line of cases. (*See* Defs.' Obj. 20, 22.) As the Special Master noted, *Vivendi* involved a liquidity crisis, where the court found that some "investors were aware of" and in fact "invested because of" and were "indifferent to" the crisis. (*See, e.g.*, GMO R&R 22 (citing *In re Vivendi Universal, S.A. Sec. Litig.*, 123 F. Supp. 3d 424, 428-29 (S.D.N.Y. 2015); *In re Vivendi Universal, S.A. Sec. Litig.*, 183 F. Supp. 3d 458 (S.D.N.Y. 2016)).) The *Vivendi* courts, therefore, found that the defendants severed the link between the market price and Vivendi common stock. (*Id.*) As discussed below, this case is inapposite because Plaintiffs allege that they continued to rely on Defendants' representations concerning the sustainability of Valeant's business model, whether or not Valeant's organic growth was attributed to volume or price increases, and whether or not Philidor was used to "stuff the channel." (*See* Pls.' Opp'n to Defs.' Obj. at 7-14.) Plaintiffs contend that they believed Valeant's representations and/or misstatements would, over the course of time, be reflected in the true value of the stock price. (*Id.*)

Indeed, Defendants' cases reflect the minority view. Notably, the Eastern District of Pennsylvania later distinguished *Safeguard*'s approach and cautioned that "*Safeguard* is in the minority, as most courts have held that post-disclosure purchases are consistent with a buyer's reliance on the market." *Pelletier v. Endo Int'l PLC*, 338 F.R.D. 446, 476 (E.D. Pa. 2021). In other cases, courts have found that post-disclosure purchases do not necessarily rebut the fraud on the market presumption. *See Roofer's Pension Fund v. Papa*, 333 F.R.D. 66, 77 (D.N.J. 2019) (finding that defendants failed to demonstrate "post-disclosure purchases negate or even undermine [p]laintiff's allegations that its members relied on the relevant misrepresentations when they made stock-purchasing decisions during the [c]lass [p]eriod.").

Finally, the Special Master relied on *DVI*, a case the Eastern District of Pennsylvania decided and which the Third Circuit affirmed, to find that Plaintiffs' purchases of Valeant stock after the first Corrective Disclosure Event do not act as a "per se" bar to the fraud on the market doctrine. (*See, e.g.*, GMO R&R 19-20 (citing *DVI*, 249 F.R.D. at 204).) Defendants argue that the Special Master misconstrued *DVI* because that case only held that "post-disclosure purchases will not prevent an investor from relying on the integrity of the market *for pre-disclosure purchases*." (Defs.' Obj. 24 (emphasis in original) (citing *DVI*, 249 F.R.D. at 204).) Defendants emphasize that the court in *DVI* explained that there are certain "limited circumstances under which post-disclosure purchases may defeat an investor's attempt to utilize the fraud on the market presumption." (*Id.* at 24 (quoting *DVI*, 249 F.R.D. at 204 n.13).) This includes, for example, "when a disproportionately large percentage of the investor's purchases are made *after* a curative disclosure, or when a disclosure is so 'forceful' that it becomes 'unreasonable for an investor, or the market, to continue to be misled by the defendants' alleged misrepresentation.'" (*Id.* at 24-25 (emphasis added) (quoting *DVI*, 249 F.R.D. at 204 n.13).) Thus, Defendants contend that Plaintiffs' purchases in this matter fall squarely in the limited circumstances that defeat the fraud on the market presumption because Plaintiffs purchased most—and in one instance, all of their Valeant shares—after the first alleged Corrective Disclosure Event. (*Id.*)

The court in *DVI*, however, went on to explain that the plaintiffs' continued partial disclosures did not rebut the fraud on the market presumption because "the full scope of DVI's financial troubles were not revealed until well after [p]laintiffs' final purchase . . . ." *DVI*, 249 F.R.D. at 204 n.13 While Defendants argue that *DVI* does not appear to address the narrow circumstances presented here, they have not pointed to any case within this circuit that addresses the more narrowly tailored inquiry presented here. That is, whether the presumption of reliance is

rebutted with respect to Plaintiffs' post-corrective disclosure purchases where Plaintiffs consistently purchased Valeant stock during the period in which Defendants allege the repeated disclosures of the fraud became known to investors. (Defs.' Obj. 24.) Rather, Defendants appear to create their own standard and argue that *any and all* purchases made after October 4, 2015, *i.e.*, the first Corrective Disclosure Event, rebut the fraud on the market presumption and defeat the element of reliance for Plaintiffs' Rule 10b-5 claims. (*See* Defs.' Obj. 19-25.) The Court disagrees.

The Court agrees with the Special Master that the circumstances presented here create genuine disputes of material fact with respect to Plaintiffs' reliance that render summary judgment inappropriate. Put simply, Defendants have not shown that there is no dispute of material fact that the *full truth* concerning Valeant's fraud was revealed to the market on October 4, 2015. *See T. Rowe Price Growth Stock Fund, Inc. v. Valeant Pharms. Int'l, Inc.*, No. 16-5034, 2018 WL 395730, at *4 (D.N.J. Jan. 12, 2018) (where this Court determined, at the motion to dismiss stage, that "the [c]omplaints, when read in the light most favorable to [p]laintiffs, do not conclusively establish that the full 'truth was revealed' to the market by October 30, 2015."). The Court finds, as did the Special Master, that Plaintiffs have presented evidence that the first Corrective Disclosure Event did not reveal the full extent of the fraud.

The record shows that, as of October 4, 2015, many unknowns about Valeant's business practices had yet to be revealed to the market. To name a few, Plaintiffs learned, over the course of eight months, that: (1) Valeant received federal subpoenas from two U.S. attorney's offices regarding Valeant's pricing practices, the operation of its patient assistance programs, and the distribution of its products (*see* Coffman Report, ¶¶ 250-52); (2) Citron Research published an article referring to Valeant as the "Pharmaceutical Enron" (*see id.* ¶¶ 294-96); (3) Valeant set up and controlled Philidor to ship dermatology products to Philidor and report them as sales (*see id.*

¶ 310); and (4) Valeant's internal investigations revealed that shipments to Philidor at the end of the third quarter in 2014 and in the fourth quarter of 2014 had materially impacted its financial statements from 2014 to 2015, and these financial statements had to be restated (*id.* ¶¶ 442-46). Indeed, the public first learned about the details and nature of Valeant's relationship with Philidor on October 19, 2015, several weeks after the first Corrective Disclosure Event. (*See id.* ¶¶ 270-84; Omnibus SUMF ¶ 23.)

Moreover, through the fall of 2015, Plaintiffs contend that Valeant falsely assured investors that the sales through Philidor and its revenue recognitions were accurate. Okumus, for example, emphasizes that Defendants "repeatedly denied any impropriety and assured investors that Valeant's fundamentals were strong and that concerns about fraud were an overreaction." (Okumus R&R 24; *see, e.g.*, Okumus Resp. to Defs.' SUMF ¶¶ 148-59.) Okumus argues that many of the details concerning Defendants' fraud were not revealed until years later or were revealed through discovery in this action. Specifically, Okumus asserts that:

> [1] Pearson personally (and falsely) assured Okumus that Philidor was not material to Valeant's earnings and growth . . . [2] it was not until late February 2016 that Valeant warned investors not to rely upon the Company's prior reported financial statements, and that was limited to Valeant's channel stuffing through Philidor in 2014[;] [3] Defendants misrepresented the Company's organic growth, and even created a new methodology for calculating the price/volume breakdown in the third quarter of 2015. . . . [4] in an October 19, 2015, earnings presentation, Valeant represented that 66% of its same store growth was attributable to volume based on this new methodology, when in fact, only 42% of Valeant's same store growth was attributable to volume. . . . [5] Valeant concealed its reliance on price increases by shifting revenue from price increases on one drug to other drugs to create the false appearance of organic growth; [and 6] [on] September 28, 2015, [Pearson issued a] letter . . . represent[ing] that the thesis that the Company's growth was reliant on price increases was "incorrect[,]" and that Valeant was "well-positioned for strong organic growth, even assuming little to no price increases."

(Okumus R&R 23-24; *see* Okumus Resp. to Defs.' SUMF ¶¶ 148-59.)

The remaining Plaintiffs share the same contentions. (*See* GMO R&R 20; Hound Partners R&R 34; Brahman R&R 21-22.) These Plaintiffs note, for example, that on October 26, 2015 (weeks after the first Corrective Disclosure Event), Defendants gave a presentation where they assured investors that the accounting of shipments to Philidor had been re-examined by their Audit and Risk Committees and that such accounting was appropriate. (*See* GMO R&R 20 (noting that during a call with investors, weeks after the alleged Corrective Disclosure Event, Defendants represented "that Philidor could not be used to stuff the channel and that both its Audit and Risk Committee and its full Board of Directors had confirmed that its accounting with Philidor was appropriate."); GMO Resp. to Defs.' SUMF ¶¶ 370-72.) It was not until February 2016 that the *ad hoc* committee confirmed, after its extensive investigation, that: (1) Philidor's sales were not made in the ordinary course of business; (2) approximately $58 million in net revenues should not have been recognized on the 2014 to 2015 financial statements; and (3) Valeant's financial statements could no longer be relied upon. (*See* Defs.' Omnibus SUMF ¶¶ 27-33.) As such, Defendants fail to meet their burden of demonstrating that investors were fully aware of the fraud as of the first Corrective Disclosure Event and that subsequent purchases defeat the *Basic* presumption of reliance.

Based upon the evidence set forth above, and that presented in the summary judgment record, the Court concludes, as did the Special Master, that there are genuine disputes of material fact precluding summary judgment on the issue of Plaintiffs' reliance. *See* Fed. R. Civ. P. 56(c) (Summary judgment is appropriate where the moving party establishes that "there is no genuine [dispute] as to any material fact and that [it] is entitled to a judgment as a matter of law."). The

Court, therefore, agrees with the Special Master that the extent to which the fraud was revealed in the first Corrective Disclosure Event creates a genuine dispute of material fact.[18]

## IV.     CONCLUSION

For all the reasons stated above, the Court adopts the Special Master's R&Rs, and denies Defendants' Motions for Summary Judgment.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

---

[18] The Court acknowledges Defendants' position that Plaintiffs made substantial financial investments and engaged in repeated purchases of Valeant stock after many of the Corrective Disclosure Events. The Court does not foreclose that there *may* be a date within the Corrective Disclosure Events, between October 5, 2015, and June 7, 2016, where the entire fraud was fully revealed, and that Plaintiffs' purchases thereafter would not be entitled to the *Basic* presumption of reliance. In their objections, however, Defendants argue that the fraud was fully revealed on or after the first Corrective Disclosure Event. The Court finds that Defendants have failed to meet their burden with respect to their moving position that the nature of the fraud was fully revealed *on or after October 4, 2015*, and as to whether Plaintiff continued to rely on Defendants' misrepresentations after this date. *See Celotex*, 477 U.S. at 325 ("[T]he burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case.").