**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| IN RE VALEANT PHARMACEUTICALS INTERNATIONAL, INC. SECURITIES LITIGATION | Civil Action No. 15-7658 (MAS)<br><br>SEALED MEMORANDUM OPINION |

**SHIPP, District Judge**

    This matter comes before the Court upon the Report and Recommendations ("R&Rs") of Special Master Dennis M. Cavanaugh, U.S.D.J. (ret.) (the "Special Master") denying Defendants'[1] Motions to Exclude: (1) the Expert Testimony of Direct Action Plaintiffs' accounting expert, Andrew M. Mintzer, CPA/CFF, CFE ("Mintzer"); and (2) the Expert Testimony of Direct Action Plaintiffs' accounting and variance expert, Gregg A. Jarrell ("Jarrell"). (*See* Mintzer R&R, ECF No. 1195; Jarrell R&R, ECF No. 1196.) The Direct Action Plaintiffs moved to adopt the R&Rs on June 26, 2023 (Pls.' Mot. to Adopt, ECF No. 1222-1), and Defendants submitted objections thereto (Mintzer Obj., ECF No. 1221; Jarrell Obj., ECF No. 1220). The Direct Action Plaintiffs filed responses to the objections (*see* Pls.' Opp'n to Mintzer Obj., ECF No. 1251; Pls.' Opp'n to Jarrell Obj., ECF No. 1245), and Defendants replied (Mintzer Reply, ECF No. 1269; Jarrell Reply, ECF No. 1268).

    The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Local Civil Rule 78.1. For the following reasons, the Court adopts in

---

[1] Defendants are referred to collectively to include Valeant Pharmaceuticals International, Inc. ("Valeant" or the "Company"), Ari Kellen ("Kellen"), Robert Rosiello ("Rosiello"), J. Michael Pearson ("Pearson"), Howard Schiller ("Schiller"), Tanya Carro ("Carro"), and Deborah Jorn ("Jorn") (the "Individual Defendants," and together with Valeant, the "Defendants").

part, and rejects in part, the Mintzer R&R. The Court fully adopts the Jarrell R&R. Defendants'
Motion to Exclude the Expert Testimony of Mintzer is granted in part and denied in part.
Defendants' Motion to Exclude the Expert Testimony of Jarrell is denied.

## I.     **BACKGROUND**

The procedural history and the underlying facts of this case are well known to the parties.
The Court, therefore, recites only the facts that are necessary to resolve Defendants' Motions to
Exclude. The Court further incorporates the factual findings set forth by the Special Master in the
R&Rs denying the subject Motions to Exclude.[2] (*See* Mintzer R&R 2-10; Jarrell R&R 2-8.)

This action was initiated on October 22, 2015 through the filing of a putative class action
("Class Action") on "behalf of all persons who purchased or otherwise acquired Valeant stock
between February 23, 2015 and October 20, 2015 . . . against Valeant and certain of its officers
and/or directors for violations of the Securities Exchange Act of 1934 . . . ." (*See* Compl. ¶ 1, ECF
No. 1.) As the litigation progressed, the parties to the Class Action and the Direct Actions agreed
to the appointment of the Special Master to manage discovery and to oversee pretrial matters. (Pls.'
Mot. to Adopt 3; Appointment Order, ECF No. 484.) The parties each agreed that the Special
Master was eminently qualified to handle all pre-trial procedures in this matter, including deciding

---

[2] To the extent that any of the facts overlap, the parties may also refer to the concurrently filed
opinion addressing Defendants' Omnibus Motion for Summary Judgment and Motion to Exclude
Chad Coffman.

dispositive motions.[3] (*Id.*) Accordingly, on September 10, 2019,[4] the Court entered an Order appointing Judge Cavanaugh as the Special Master. (*Id.*)

In November 2019, the Class Action preemptively settled with respect to all Defendants except PwC. (Pls.' Mot. to Adopt 3.) Following the settlement, the Direct Action Plaintiffs remained as the only investors with securities fraud claims against Valeant and its former executives. (*Id.*) The Direct Action Plaintiffs thereafter continued with discovery against Valeant and the other Individual Defendants. (*Id.*) Fact discovery closed, and the parties conducted extensive expert discovery "during the first half of 2022—which included exchanging opening, rebuttal, and reply reports, and deposing sixteen testifying experts whose opinions are being proffered by the respective parties." (*Id.* at 4.)

On or about August 1, 2022, the parties filed a host of motions on the docket, including nine Motions for Summary Judgment and three Motions to Exclude. (*Id.* at 4-5.) Relevant here, Defendants moved to exclude three of the Direct Action Plaintiffs' experts, including their: (1) Causation and Damages Expert, Chad Coffman (Coffman Moving Br., ECF No. 995); (2) Price/Volume Expert, Greg Jarrell (Jarrell Moving Br., ECF No. 1032); and (3) Accounting Expert, Andrew Mintzer (Mintzer Moving Br., ECF No. 1038). These Motions were referred to the Special Master for findings of fact and issuance of R&Rs.[5]

---

[3] Pursuant to the Order of Appointment ("Appointment Order"), the Special Master shall "decide all discovery disputes and non-dispositive issues" and "issue appropriate written orders regarding the same." (Amended Appointment Order ¶ 9, ECF No. 871.) The Special Master shall also "issue proposed findings of fact and report and recommendations . . . on all dispositive issues." (*Id.* ¶ 10.)

[4] The initial Order was amended on October 15, 2021. (*See* Amended Appointment Order.) The Court refers to the Amended Appointment Order herein.

[5] The Special Master issued the subject R&Rs on May 22, 2023. (*See* R&Rs.) The Direct Action Plaintiffs' Motion to Adopt the R&Rs was filed on June 12, 2023. (Pls.' Mot. to Adopt.) The objections, responses, and replies thereto were fully briefed before this Court on August 21, 2023.

The Motions were heavily litigated before the Special Master, resulting in hundreds, if not thousands, of pages of briefing and exhibits, as well as oral arguments on November 21 and 22, 2022, respectively. (Mintzer R&R 2; Jarrell R&R 1-2.) After careful consideration of the parties' arguments, the Special Master recommended Defendants' Motions to Exclude be denied. (Mintzer R&R; Jarrell R&R.)[6]

## II.    LEGAL STANDARD

### A.    Standard of Review

Findings of fact and conclusions of law of a special master's reports and recommendations are reviewed *de novo*. (Amended Appointment Order ¶ 11); Fed. R. Civ. P. 53(f)(3)-(4); *Valeant Pharms. Int'l, Inc. v. AIG Ins. Co.*, No. 18-493, 2020 WL 7768405, at *4 (D.N.J. Dec. 30, 2020) (explaining that Federal Rule Civil Procedure 53's *de novo* standard governs all findings of fact and conclusions of law by the special master). The Court "may accept, reject, or modify, in whole or in part, those portions of an R&R to which an objection is made." (Amended Appointment Order ¶ 10); Fed. R. Civ. P. 53(f)(1). The Court reviews the findings and conclusions of the Special Master accordingly.

### B.    Daubert Principles

Rule 702 governs the admissibility of testimony by an expert witness. Fed. R. Evid. 702. Pursuant to Rule 702, a witness, who qualifies as an expert, may provide testimony if the expert's scientific, technical, or specialized knowledge will assist the trier of fact and "the testimony is based on sufficient facts or data . . . , [and] testimony is the product of reliable principles and

---

[6] For clarity, the Court has addressed Defendants' objections to the R&R that denied their Motion to Exclude Coffman in a concurrently filed opinion. The Court thus only addresses the Motions to Exclude Mintzer and Jarrell herein.

methods . . . , and the expert has reliably applied the principles and methods to the facts of the case." *Id.*

The Third Circuit has found "that Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability[,] and fit." *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (citation omitted). The qualification requirement is interpreted broadly and means that the witness possesses a specialized expertise. *Id.* To be reliable, "the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; [and] the expert must have 'good grounds' for his or her belief." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993)). Finally, the expert's opinion must "fit the issues in the case" and help the trier of fact. *Schneider*, 320 F.3d at 404. "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 591-92.

"[T]he district court acts as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability[,] and fit from reaching the jury." *Schneider*, 320 F.3d at 404 (citation omitted). The party offering the expert testimony bears the burden of establishing the existence of each factor by a preponderance of the evidence.[7] *See In re TMI Litig.*, 193 F.3d 613, 665 (3d Cir. 1999), *amended by* 199 F.3d 158 (3d Cir. 2000). Rule 702, however, "has a liberal policy of admissibility" which extends to substantive and formal qualifications of experts. *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997) (citation omitted).

---

[7] And recently, Rule 702 was amended to clarify the preponderance standard; that is, expert testimony may not be admitted unless the proponent demonstrates that it is more likely than not that the proffered testimony meets the admissibility requirements under Rule 702. *See* Fed. R. Evid. 702.

## III.   DISCUSSION

### A.   Motion to Exclude Expert Reports and Testimony of Andrew Mintzer

The Court turns first to Defendants' Motion to Exclude Mintzer. The Direct Action Plaintiffs retained Mintzer to offer testimony on whether Valeant "complied with applicable generally accepted accounting principles ['GAAP'] and/or SEC financial reporting-related-rules" and "the effectiveness of Valeant's internal control over financial reporting . . . ." (Expert Report of Andrew M. Mintzer ["Mintzer Rpt."] ¶¶ 1, 2(b), ECF No. 1038-6.) Mintzer authored a 150-page expert report dated February 2, 2022, as well as a reply report dated May 9, 2022. (*Id.*; *see also* Expert Reply Report of Andrew M. Mintzer ["Mintzer Reply Rpt."], ECF No. 1038-7.) He was deposed on June 14, 2022. (*See* Dep. Transcript of Andrew M. Mintzer ["Mintzer Dep."], ECF No. 1038-8.)

Mintzer is a Certified Public Accountant ("CPA") with over forty years of experience. (Mintzer Rpt. ¶ 8, *see also* Ex. A.) He received a B.A. and a Master's degree in Accounting. (*Id.*, Ex. A at 1.) Among other positions, Mintzer worked for seventeen years with Ernst & Young—a national accounting firm—and spent four of those years as an Audit and Litigation Services Partner. (Mintzer Rpt. Ex. A at 1-2.) Mintzer previously served on the boards of several relevant organizations, including the California Society of CPAs, the Association of International Certified Professional Accountants ("AICPA"), and the International Ethics Standards Board of Accountants. (*Id.* ¶¶ 11-12.) Mintzer's resumé further reflects his experience as a member of the "Auditing Standards Board," where he supplemented and revised the Generally Accepted Auditing Standards ("GAAS"), as well as the AICPA Accounting Standards Committee, where he revised and added to the GAAP. (*Id.*, Ex. A.)

On September 28, 2022, Defendants moved to exclude Mintzer's testimony. (Mintzer Moving Br.)[8] On May 22, 2023, the Special Master issued a 38-page R&R recommending that Defendants' Motion to Exclude Mintzer be denied. (Mintzer R&R.) In their objections, Defendants present many of the same—if not identical—arguments that were raised before the Special Master. (*See* Mintzer Obj.) They argue that the Special Master erred:

> [1] 'in declining to exclude Mintzer's factual summaries and opinions about Valeant's supposed legal obligations'; [2] 'in declining to exclude all legal conclusions Mintzer offers, which are found throughout his report'; [3] 'in declining to find that many of Mintzer's substantive opinions are not the product of any expert analysis'; [4] 'in declining to find that Mintzer was not qualified to opine on whether Valeant's internal controls were adequate and whether Valeant made material misstatements in violation of Item 303'; and [5] 'in declining to find that several of Mintzer's opinions should be excluded for a lack of fit.'

(*id.* at 3) (internal citations omitted).)

Each objection will be addressed in turn.

      *i.*      *"Factual Summaries" and "Legal Instructions"*

In their first objection, Defendants argue that, under the "guise of [] 'background' information," Mintzer's report provides impermissible "legal instructions" and "factual narratives" or summaries. (Mintzer Obj. 7.) According to Defendants, the legal instructions "pervade" Mintzer's report, and include his opinions on laws, statutes, SEC rules, guidance, and regulations. (*Id.* at 7, 12.) They argue that Mintzer's factual narratives are "just as 'voluminous'" and have "no obvious connection" to his conclusions. (*Id.* at 7.)

---

[8] In their underlying Motion, Defendants argued Mintzer's opinions must be excluded because (1) his opinions concern factual issues for the jury to decide and include improper legal opinions; (2) he is not qualified to offer disclosure-related and ICFR-related opinions; and (3) his opinions regarding Item 303, Regulation G, and unpled disclosures lack the requisite "fit". (*See generally* Mintzer Moving Br.)

### a.    Factual Summaries

With respect to Mintzer's alleged factual summaries and/or narratives, Defendants primarily target Section V of the initial report. (*See* Mintzer Rpt. ¶¶ 6 n.13 and 14, 34-35; *see also* Defs.' Moving Br. App'x A.) In Section V of the report, Mintzer opines that Valeant—as a public company—was subject to predicate SEC reporting requirements, which mandated regular disclosure of "significant financial and other information so investors have the [sic] timely, accurate, and complete information they need to make confident and informed decisions about when or where to invest." (*Id.* ¶ 25.) This is codified in Item 303 of SEC Regulation S-K ("Item 303"), 17 C.F.R. § 229.303(b)(2)(i), requiring that companies provide the public and investors with the information necessary to understand the registrant's financial condition. (*Id.* ¶ 26.) This discussion can be found "in a single section" referred to as the "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"). (*Id.*)

Mintzer goes on to explain that—under the Sarbanes-Oxley Act of 2002 ("SOX")—Valeant executives were required to "establish[] and maintain[] internal control over financial reporting." (*Id.* ¶ 27.) Section 404 of SOX is "intended to bring information about material weaknesses in [internal controls] into public view" and aims to improve "the quality of financial reporting systems and processes." (*Id.* ¶ 29) (alteration in original).) According to Mintzer, Valeant did not maintain its internal controls, nor did the Company "consider the likelihood [of whether]

8

[a] deficiency, or combination of deficiencies, could result in . . . a 'material weakness.'" (*Id.* ¶ 30.)[9]

After providing this general backdrop, Mintzer provides a summary, albeit an exhaustive one, of Valeant's early relationship with Philidor and certain "key agreements" that Valeant and Philidor entered into beginning in 2013. (*Id.* ¶¶ 34-56.) This included a Master Service and Pharmacy Dispensing Agreement ("MSPDA") and Distribution Services Agreement ("DSA") effective July 27, 2013. (*Id.* ¶¶ 36, 39.) Moreover, Valeant and Philidor entered the "Purchase Option Agreement"[10] on December 15, 2014. (*Id.* ¶ 57.) Mintzer opines that the Purchase Option Agreement was a material event that should have been reflected in Valeant's 2014 and early 2015 financial statements. (*Id.* ¶ 58.)

Defendants seek to exclude Mintzer's above testimony asserting that it offers nothing more than gratuitous factual summaries and impermissible legal instructions. (*See* Defs.' Moving Br.) To be sure, expert testimony may not be used merely to repeat or summarize factual information and deposition testimony that the jury has an independent ability to understand. *Crowley v. Chait*, 322 F. Supp. 2d 530, 553 (D.N.J. 2004). Indeed, our courts have cautioned that such testimony comes "dangerously close to usurping the jury's function" and "implicates Rule 403 as a 'needless presentation of cumulative evidence' and 'a waste of time.'" *Id.* (quoting *United States v.*

---

[9] Mintzer cautions that his report should not be construed as "expressing any legal opinions" and to the extent that he has "interpreted contracts, court cases, or other evidence," his findings should be interpreted from an accounting standpoint. (Mintzer Rpt. ¶ 15.) Mintzer's report, however, muddles the law and accounting principles together. (*Id.* ¶¶ 18-33.) For the reasons stated, *infra*, Mintzer must amend his report to clarify that any references to the SOX or SEC regulations are *required* for a company to comply with GAAP. To the extent that Mintzer is merely providing the definition of laws and regulations, without any obvious connection to accounting-based principles, this testimony must be excluded. (Mintzer R&R 30.)

[10] Under the Purchase Option Agreement, Valeant acquired Philidor for 100% equity interest in exchange for $100 million upfront—with later milestone payments—totaling $133 million. (Mintzer Rpt. ¶ 57.)

*Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003)); *Terry v. McNeil-PPC, Inc. (In re Tylenol Acetaminophen Mktg.)*, No. 12-7263, 2016 WL 4538621, at *8 (E.D. Pa. Aug. 31, 2016) (finding that an expert should not be used "solely" for the purpose of constructing a factual narrative based upon record evidence, as such testimony invades the province of the jury).

Narrative testimony may be admissible, however, where an expert's explanation of complicated facts would help the jury understand them. *Id.* The Court has broad discretion in deciding whether to admit narrative testimony. *See In re Equip. Leasers of Pa., Inc.*, No. 96-544, 1996 WL 325105, at *8 (E.D. Pa. June 11, 1996) (citing *United States v. Young*, 745 F.2d 733, 761 (2d Cir. 1984) ("Generally speaking, a trial judge has broad discretion in deciding whether or not to allow narrative testimony."), *cert. denied*, 470 U.S. 1084 (1985); Fed. R. Evid. 611(a) (discussing that a trial court has broad discretion to control the mode of questioning witnesses and the presentation of evidence "so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, [and] (2) avoid needless consumption of time") (alteration in original); *In re Welding Fume Prod. Liab. Litig.*, No. 03-17000, 2005 WL 1868046, at *17 (N.D. Ohio Aug. 8, 2005) ("[A] 'narrative' by an expert is not automatically inadmissible; it is only when . . . the narrative is purely 'a repetition of the factual allegations in plaintiffs' complaint,' involving 'nothing technical or scientific,' that a court might find the expert testimony unhelpful, because the expert is providing only 'simple inferences drawn from uncomplicated facts.'").

Here, after citing to various cases within the Third Circuit and other persuasive authority, the Special Master deemed that narrative testimony is permissible so long as it summarizes facts that allow the expert to cogently express his opinions. (Mintzer R&R 31.) Narratives are particularly useful in complex cases, where an expert's explanation of complicated facts can aid the jury in understanding the basis of the expert's conclusions. (*Id.*) Hence, the Special Master

10

found that narrative testimony is not *per se* inadmissible; rather, factual narratives must only be excluded where an expert's factual testimony is "purely a repetition of the factual allegations in the plaintiff's complaint, involving nothing technical or scientific . . . [and represent] only simple inferences drawn from uncomplicated facts." (*Id.* at 31-32 (citing *In Re Welding*, 2005 WL 1868046, at *17).)

The Special Master did not err in finding that, "[g]iven the complexity of this matter, it is hard to fathom how a jury could understand the issues and then decide the outcome without having been presented with an adequate factual background." (*Id.* at 35.) This notion holds especially true in securities cases—where expert testimony is needed to assist the jury in understanding securities industry practices and complicated terms and concepts. *SEC v. Johnson*, 525 F. Supp. 2d 70, 77 (D.D.C. 2007); *SEC v. U.S. Env't'l, Inc.*, No. 94-6608, 2002 WL 31323832, at *3 (S.D.N.Y. Oct. 16, 2002) (admitting expert's testimony that "certain trading patterns would raise 'red flags'" based on the expert's "knowledge of typical trading activity and the types of trading patterns that an experienced trader would recognize as irregular, and as such, are supported by his 30 years of experience in the securities industry"); *United States v. Bilzerian*, 926 F.2d 1285, 1295 (2d Cir. 1991) ("[T]estimony concerning the ordinary practices in the securities industry may be received to enable the jury to evaluate a defendant's conduct against the standards of accepted practice").

Further, Mintzer's explanation of general accounting principles such as "recognition of revenue, materiality, the conduct of audits, etc., are not the type of knowledge within the 'ken' of the average juror, and such testimony is unquestionably relevant to the various accounting issues at play in [a securities] case." *Johnson*, 525 F. Supp. 2d at 77; *see also Nappier v. PricewaterhouseCoopers LLP*, 227 F. Supp. 2d 263, 276 (D.N.J. 2002) (noting that "[t]he determination of 'what accounting practices comprise [generally accepted accounting principles]

is a question of fact best addressed through expert testimony . . . .'"); *Sec. & Exch. Comm'n v. BankAtlantic Bancorp, Inc.*, No. 12-60082, 2013 WL 12009694, at 10-11 (S.D. Fla. Nov. 14, 2013) (finding that "expert testimony on regulatory requirements and industry practices is permissible and does not, without more, constitute improper legal conclusions.") (citations omitted).

The Special Master correctly determined that *some* of the background and factual narratives set forth in Mintzer's report is useful for the jury to understand the complex nature of the claims presented in this case. (Mintzer R&R 35.) For example, the Special Master correctly concluded that an average juror is unlikely to be familiar with the technical accounting terms and principles referenced throughout Mintzer's report—such as GAAP, non-GAAP metrics, PACs', organic growth, non-organic growth, price-volume methodology, ICFR, MD&A and performance metrics. (*Id.* at 26.) Nor would an average juror understand "how these various factors work together to yield a conclusion regarding whether revenue should be recognized or 'booked' in one quarter or another." *Johnson*, 525 F. Supp. 2d at 78. As such, the Special Master correctly concluded that Mintzer may proffer testimony regarding these accounting-related subjects.

The Special Master also correctly concluded that Mintzer's factual account of Valeant's relationship with Philidor between 2013 and early 2014 is connected to Mintzer's opinions. (Mintzer Obj. 10-11.) Valeant's early agreements and participation in the development and operation of Philidor provide context for a jury to determine if Valeant should have consolidated Philidor in its financials sooner. (*See, e.g.*, Mintzer Rpt. 6(b) ("Philidor was required to be consolidated into Valeant's financial statements and disclosed as of and during the year ended December 31, 2014. Despite these requirements . . . Valeant's 2014 Financial Statements and quarterly financial statements as of and for the respective periods ended March 31, 2015 and June 30, 2015 failed to properly and adequately disclose its variable interest in, or consolidation of,

Philidor."). The degree of association between Valeant and Philidor also provides context as to whether Valeant should have disclosed Philidor as a variable interest entity ("VIE") under GAAP. (*Id.*) The information provided here is not purely extraneous; rather, the Philidor-related background was utilized in such a way that would support Mintzer's conclusions and opinions. The Court will allow such testimony to proceed.

The Court also agrees with the Special Master that any issues concerning the scope of Mintzer's testimony can be addressed at trial. (Mintzer R&R at 36 ("Should [Mintzer"] give opinions at trial, he can be directed by the Court to reference only those facts which support specific opinions such that he will not be allowed to 'become a vehicle for factual narrative.'") (quoting *SEC v. Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013).) In addition, any possible flaws in the testimony can certainly be mended by proper cross-examination or by way of Defendants' own experts. (Mintzer R&R at 33-34.)

**b.      Legal Instructions**

That is not, however, the end of the inquiry. Defendants also seek to exclude what they refer to as "legal instructions" in Mintzer's report—some of which have been described above. (Mintzer Obj. 17; *see infra* Mintzer Rpt. ¶¶ 25, 27, 29, and 30.) On this issue, the Special Master did not expressly rule out the possibility that there were legal instructions in Mintzer's report. Instead, while the Special Master cautioned that "an expert may not testify as to legal concepts, legal interpretation of case law and legal interpretation of statutes or whether specific conduct was fraudulent, intentional[,] or misleading in the legal sense," the Special Master, nevertheless, accepted that all of Mintzer's opinions were admissible because they were "*not replete* with statements which . . . tell the jury what to decide." (Mintzer R&R 31, 32-33 (emphasis added).) According to Defendants, the Special Master adopted an impermissible "wait-and-see" approach,

delaying judgment until trial to ascertain whether Mintzer would actually proffer improper legal testimony. (Mintzer Obj. 8.) The Court agrees that there are clear legal instructions in Mintzer's report that must be excluded now, rather than at trial.

It is well settled that the court has discretion to determine if expert testimony will help the trier of fact. (Mintzer R&R 30 (quoting *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006).) In applying this discretion, however,

> [T]he District Court must ensure that an expert does not testify as to the governing law of the case. Although Federal Rule of Evidence 704 permits an expert witness to give expert testimony that embraces an ultimate issue to be decided by the trier of fact, an expert witness is prohibited from rendering a legal opinion. Such testimony is prohibited because it would usurp the District Court's pivotal role in explaining the law to the jury.

(*Id.* (internal quotation marks and citations omitted).)

It follows that, "in general, testimony about a legal conclusion, or the legal implications of evidence is inadmissible." 4 J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE ¶ 704.04[1] (2d ed. 2010).

> An expert may testify as to his opinion on an ultimate issue of fact. *An expert may not, however, merely tell the jury what conclusion to reach. A witness also may not testify as to the legal implications of conduct; the court must be the jury's only source of law.*

*Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) (citations omitted) (emphasis added).

Accordingly, expert testimony must be circumscribed to ensure that an expert does not testify as to "what the law required" or "as to the governing law" of the case. *Holman Enters. v. Fid. & Guar. Ins. Co.*, 563 F. Supp. 2d 467, 472 (D.N.J. 2008) (quoting *United States v. Leo*, 941 F.2d 181, 196-97 (3d Cir. 1991)). A court must exclude "'legal terms of art' from expert testimony." *United States v. Xue*, 597 F. Supp. 3d 759, 772 (E.D. Pa. 2022). To illustrate this point,

for example, an expert may not offer testimony "in a products liability case that the machine at issue was 'defective,' 'unreasonably dangerous,' or was the 'proximate cause' of [the plaintiff's] injury, as this could lead the jury to be prejudiced against the defendant." *Id.* (quoting *Flickinger v. Toys R Us-Del., Inc.*, 492 F. App'x 217, 224 (3d Cir. 2012)); *Perez v. Townsend Eng'g Co.*, 562 F. Supp. 2d 647, 652 (M.D. Pa. 2007).

In the securities context, however, what may constitute impermissible legal testimony is not always clear. The Third Circuit in *Berckeley Investors Group, Ltd. v. Colkitt* explained that "the line between admissible and inadmissible expert testimony as to the customs and practices of a particular industry often becomes blurred when the testimony concerns a party's compliance with customs and practices that implicate legal duties." 455 F.3d at 218. *Berckeley* involved a former SEC lawyer who sought to offer testimony as to certain legal concepts; specifically, whether it was reasonable for the plaintiff to have believed that it was entitled to certain exemptions under Section 4(1) of the 1933 Securities Act. *Id.* at 217-19.

The *Berckeley* court explained that the SEC lawyer's "background testimony could be helpful to the jury" as he was "an experienced former counsel for the SEC with expertise in offshore securities transactions." *Id.* at 218. That is,

> [t]he customs and business practices in the securities industry at the time the parties entered into the Agreement provide[d] an important context which [could] aid the jury in determining whether [the defendant] had the requisite scienter at the time to evade the registration requirements.

*Id.* The expert lawyer in *Berckeley*, however, was barred from testifying as to whether the defendant "complied with legal duties that arose under federal securities laws—including whether certain sales were exempt from reporting requirements, and as to "the legal effect of the various SEC pronouncements regarding Rule 144 and Regulation S . . . ." *Id.* Key to the *Berckeley* court's

15

analysis was assessing whether the expert gave his opinion as to what was required under the law or whether the defendant complied with the law—neither of which, the *Berckeley* court noted, is permitted within the bounds of expert testimony. *Id.* (citing *United States v. Leo*, 941 F.2d 181, 196-67 (3d Cir. 1991)).

Since *Berckeley*, district courts have rejected testimony under Rule 702 where an expert seeks to introduce "legal instructions" through testimony or expert reports. *See United States ex rel. Silver v. Omnicare, Inc.*, No. 11-1326, 2023 WL 2808098, at *8 (D.N.J. Mar. 31. 2023) (finding that, on a *Daubert* motion, an expert's background paragraphs discussing the Anti-Kickback Statute, its safe harbor provision, and OIG opinions and guidance, must be excluded because these paragraphs "encroach[ed] on the [c]ourt's duty to explain the law to the jury") (citing *Wood v. Showers*, 822 F. App'x 122, 124 (3d Cir. 2020)); *Mastripolito v. Jefferson Health-N.J.*, 583 F. Supp. 3d 622, 627 (D.N.J. 2022) (finding that portions of an expert's report that "contain[ed] several pages detailing recitation of caselaw and the relevant legal standard" was "not admissible" under Rule 702).

As previously stated, the Court rejects Defendants' invitation to exclude Mintzer's testimony and his reports in its entirety. Mintzer is permitted to offer testimony as to the customs and business practices in the securities industry—which may be subject to certain necessary limitations at trial. *See Berckeley*, 455 F.3d at 218. Mintzer may not, however, testify whether Valeant complied with legal duties that arose under the federal securities laws or as to the legal effect of the various SEC pronouncements. *Id.*; *see also In re Twitter, Inc. Secs. Litig.*, No. 16-5314, 2020 WL 9073168, at *9 (N.D. Cal. Apr. 20, 2020) (discussing that an expert may not testify about "whether any SEC rule or regulation requires the disclosure of any metric at issue in this case, in SEC filings or otherwise. Any such testimony would amount to an impermissible legal

16

conclusion."); *see also SEC v. ITT Educ. Servs., Inc.*, 311 F. Supp. 3d 977, 985 (N.D. Ind. 2018) (excluding expert opinions about "what [d]efendants were legally obligated to disclose" under the federal securities laws and "whether [d]efendants complied with those legal obligations"); *United States v. Brooks*, No. 06-550, 2010 WL 291769, at *4 (E.D.N.Y. Jan. 11, 2010) (observing that, "overwhelmingly, courts specifically preclude" SOX experts "from offering either legal conclusions or opinions that apply corporate governance concepts to the case's specific facts"). Accordingly, Defendants' Motion to Exclude the legal instructions put forth in Mintzer's report will be granted.[11]

### ii.     Legal Conclusions

Defendants raise a similar argument that the Special Master erred by failing to exclude certain "legal conclusions" contained in Mintzer's report. (Mintzer Obj. 7-17.) These legal conclusions include Mintzer's opinions regarding: (1) materiality, (2) Valeant's state of mind, and (3) the interpretation of facts and how the jury should interpret evidence. (*Id.*)

### a.     Materiality

The term "materiality" is referenced throughout Mintzer's report. He concludes, for example, that: (1) certain improperly recognized revenue through transactions with Philidor was "material" to the Company's financial statements (Section VI.A); (2) Valeant's failure to timely disclose the nature of its relationship with Philidor was "material" to its SEC filings (Section

---

[11] It appears that references to SEC rules, regulations, and statutes permeate Mintzer's report. While the Court does not exclude the entire report, it finds that excluding many of the paragraphs outlined as "Legal Instructions" under Appendix A of the Mintzer objections to be warranted here. (*See* Mintzer Obj. A-1.) For brevity, the Court will not address each of the 50-plus paragraphs that Defendants seek to exclude from the report. The matter will instead be left to the Direct Action Plaintiffs to modify Mintzer's report in accordance with the reasons stated in this Memorandum Opinion. To the extent any lingering issues remain after the parties have conferred, Defendants can raise their concerns by way of a *motion in limine*.

VI.B); (3) certain disclosures in Valeant's MD&A were "materially misstated" from an accounting perspective (Section VI.C); and (4) Valeant failed to timely disclose "material" weaknesses in its ICFR (Section VI.D).

The parties do not dispute that Mintzer offers his opinions on "materiality" from both a legal and an accounting perspective. (Mintzer Obj. 15-16; Pls.' Opp'n to Mintzer Obj. 11-12.) In accounting terms, Mintzer defines materiality as an omission or misstatement on a financial report that, considering the surrounding circumstances, "it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item." (Mintzer Rpt. ¶ 92.) Mintzer goes on to say that materiality "in the accounting literature is in substance identical to the formulation used by the courts in interpreting the federal securities laws." (*Id.*) He cites two Supreme Court cases that have interpreted the concept of materiality from a legal perspective. (*Id.*)[12] At another point, his report cites directly to SEC Rule 12b-2 and provides the legal definition of materiality in its entirety. (*Id.* ¶ 167.)

While acknowledging that Mintzer offers testimony as to materiality in both legal and accounting terms, the Special Master deemed that any confusion from legal versus accounting "materiality" could be cured through careful jury instructions to ensure that the jury "will be able to distinguish between [the] two concepts of materiality." (Mintzer R&R at 34-35) (quotation omitted).) Defendants contend in their objections that Mintzer cannot, as a matter of law, testify as to "materiality" in legal terms. The Court agrees.

---

[12] Specifically, Mintzer refers to *TSC Industries v. Northway, Inc.*, 426 U.S. 438, 449 (1976), and *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988), to support the proposition that the "Supreme Court has held that a fact is material if there is – a substantial likelihood that the . . . fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." (Mintzer Rpt. ¶ 92.)

Undoubtedly, Mintzer's opinions go beyond explaining the concept of "materiality" from just an accounting perspective. (Mintzer Rpt. ¶ 92.) These portions of Mintzer's report must be excluded. *See United States ex rel. Penelow v. Janssen Prods., LP*, No. 12-7758, 2022 WL 94535, at *5 (D.N.J. Jan. 10, 2022) (granting a *Daubert* motion as to portions of the expert's report that set forth the "legal test for materiality and its application" as such portions of the report "risk usurping the Court's primary role in articulating the law to the jury"); *see also SEC v. Leslie*, No. 07-3444, 2010 WL 2991038, at *9 (N.D. Cal. July 29, 2010) (rejecting an expert's discussion of "legal materiality by providing actual citations to several judicial opinions on the subject[,] . . . [and] quot[ing] Securities Exchange Rule 13b2-2 in its entirety[.]"); *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, No. 07-61542, 2010 WL 6397500, at *12 (S.D. Fla. Aug. 18, 2010) (excluding opinion "as to the legal conclusion of 'materiality' and any other opinion which tracks the language of the legal standard for materiality"); *Hoefer & Arnett, Inc. v. Lehigh Press, Inc.*, No. 86-7016, 1988 WL 12505, at *12 (E.D. Pa. Feb. 16, 1988) (finding that while the plaintiffs' experts "may testify to the ordinary course of business and customary practices within the securities industry," the experts were nonetheless "precluded from testifying to legal conclusions of 'materiality', or what constitutes a fiduciary's duty . . . [since] [t]hose are questions of law, to be charged by the court."). The Court therefore excludes Mintzer's opinions as to

"materiality" in legal terms and any other opinion which tracks the language of the legal standard for materiality.[13]

Defendants go one step further and seek to exclude any reference to materiality—including Mintzer's opinions to materiality from an accounting perspective. (*See* Mintzer Obj. 16-17) (citing various out-of-district cases where other courts have excluded "similar attempts by experts to opine on materiality . . . from a non-legal perspective.") The Court will not go so far. Mintzer may offer opinions on "materiality"—but he may *only* do so in accounting terms. *See, e.g.*, *Leslie*, 2010 WL 2991038, at *9 (finding an expert's materiality opinions on whether the information was sufficiently important from an "accounting perspective" to be permissible but noting his "opinion with respect to legal concepts and conclusions of law are excludable."); *Baker v. SeaWorld Entm't, Inc.*, 423 F. Supp. 3d 878, 899 (S.D. Cal. 2019) (accepting an expert's testimony where his "materiality opinions do not rest on an erroneous legal standard," but rather discusses the concept of materiality from an "economic" viewpoint only "with support from economic authorities").

The Court finds that eliminating any reference to legal materiality in Mintzer's report and testimony will substantially minimize the risk that the jury will become confused. If additional mitigation is required, Defendants certainly can utilize, if needed, "[c]areful jury instructions" to ensure that the jury understands that Mintzer's references to materiality are only couched in accounting terms. (Mintzer R&R 35 (quoting *Leslie*, 2010 WL 2991038, at *26).) Accordingly,

---

[13] While the Special Master acknowledged that it is "important to distinguish between legal "materiality" and "materiality" for accounting purposes, the Special Master believed this issue could be reconciled on the jury instructions and believed the jury could distinguish between these two admittedly similar and highly complex concepts. (Mintzer R&R 34-35.) The Court does not hold the same confidence. By presenting the jury with the legal and accounting definitions of materiality—which, according to Mintzer, are identical—there is a substantial risk that the jury, even with the most meticulous of jury instructions, will become confused and otherwise will conflate the two concepts.

Defendants' Motion to Exclude Mintzer's references to "materiality" is granted in part and denied in part.

### b. State of Mind

Next, Defendants contend that Mintzer offers impermissible state of mind opinions. (Mintzer Obj. at 14.)[14] Among other statements, Defendants seek to exclude Mintzer's opinion that the "[e]vidence indicates Valeant management's intention to overstate [] Valeant's operating results through Philidor's sale transactions." (Mintzer Rpt. ¶ 98.)[15]

It is well settled that an expert may not testify to a party's state of mind. *Krys v. Aaron*, 112 F. Supp. 3d 181, 203 (D.N.J. 2015); *see also SEC v. Ambassador Advisors, LLC*, 576 F. Supp. 3d 250, 261 (E.D. Pa. 2021) ("Experts may not testify to a party's state of mind." (citing *Zimmer Surgical, Inc. v. Stryker Corp.*, 365 F. Supp. 3d 466, 497 (D. Del. 2019) ("Expert testimony as to intent, motive, or state of mind offers no more than the drawing of an inference from the facts of the case . . . and permitting expert testimony on this subject would be merely substituting the expert's judgment for the jury's and would not be helpful to the jury."))) (internal quotation marks omitted); *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469-70 (S.D.N.Y. 2005)

---

[14] As noted by Defendants, the Special Master did not address Defendants' arguments concerning Mintzer's alleged state of mind opinions. (Mintzer Obj. 19.) The Special Master appears to have determined that any shortcomings in Mintzer's testimony, including his statements regarding Valeant's state of mind, could be resolved at trial. (Mintzer R&R 34.)

[15] In addition, regarding certain revenues that Valeant derived from Glumetza, a drug that was acquired in April 2015, Mintzer states that Valeant's "management modified its accounting practices to achieve a desired disclosure outcome[.]" (Mintzer Rpt. ¶ 215.) There also appears to be several other instances where Mintzer gives his opinions as to Defendants' state of mind. (*See id.* ¶ 144 (presuming that "[Valeant] recognized that Philidor's financial position and operating results were material to its evaluation of internal control over financial reporting"); *id.* ¶ 148(b) (noting that Carro testified that Pearson and Schiller did not want to disclose Valeant's relationship with Philidor and that other evidence reflects "the Company did not want 'the managed care organizations being made aware that [Valeant] bought a distributor [i.e. Philidor] that offers alternative prescription fulfillment services.'").)

(excluding proposed expert's speculation concerning "the state of mind and motivations of certain parties who were involved in the relevant transaction, often without citation to any record evidence" on the ground that "[i]nferences about the intent or motive of parties or others lie outside the bounds of expert testimony").

Here, Mintzer offers improper speculations as to Defendants' state of mind and the motivations of certain executives involved in this case. Among the most obvious examples, Mintzer expressly states that Valeant and its management had an "apparent intention to overstate [its] operating results" through Philidor-related transactions. (Mintzer R&R ¶¶ 78-79.) While the Court agrees with the Special Master that certain close calls may be resolved at trial, a number of Mintzer's opinions pertaining to Defendants' state of mind must be excluded at this stage. *Primavera Familienstiftung v. Askin*, 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001) (noting that an expert cannot "supplant the role of counsel in making argument at trial, and the role of the jury [in] interpreting the evidence."); *see also Janssen Prods.*, 2022 WL 94535, at *5 (excluding expert testimony of the defendant's alleged "purposeful manipulation of Medical Information Requests"). Defendants' motion to exclude Mintzer's state of mind testimony is therefore granted.[16]

### c. Other Conclusions as to What the Facts Show

Third, Defendants contend that Mintzer offers improper legal conclusions as to "what the facts show." (Mintzer Obj. 14.) The testimony sought to be excluded in this part of Defendants'

---

[16] The Court excludes paragraphs 79 (last sentence), 98, 144 (last sentence), 148(b), 148(d), 179, 198, 215, and 216. (Mintzer Obj. 14.) Any other testimony as to Defendants' state of mind should be excluded as well. The Direct Action Plaintiffs must amend Mintzer's report for the reasons consistent with this Memorandum Opinion.

objections appears to substantially overlap with the testimony that the Court has already excluded above. (*Id.*) Defendants' motion to exclude on this basis is denied.[17]

      *iii.*    *ICFR and Item 303 Opinions*

Moving along, Defendants assert that the Special Master erred in declining to exclude Mintzer's Item 303 opinions (Section V.C of his report) and his ICFR opinions (Section VI.D of his report). (Mintzer Obj. 17-19.) As to his ICFR opinions, Defendants contend that Mintzer fails to apply a "specific framework that accountants follow to assess whether there are weaknesses in internal controls." (*Id.* at 17.) They argue Mintzer's Item 303 opinions are similarly "devoid" of any expert analysis or methodology. (*Id.* at 18.) According to Defendants, the "problem with both approaches is that they do not bring to bear any of Mintzer's purported accounting expertise on these subjects, and end up being a vehicle for Mintzer to improperly opine on the facts." (*Id.*)

The Court does not agree that Mintzer has failed to produce any expert analysis or methodologies in support of his Item 303 opinions. In Section VI.C, Mintzer details that Valeant materially misstated disclosures in its MD&A and earnings releases in violation of Item 303. (Mintzer Rpt. ¶¶ 151-163.) Mintzer opines that Valeant's "management [was required to] provide a narrative explanation in MD&A that extends beyond volume and price to include an analysis of the factors contributing to the changes in revenue." (*Id.* ¶ 158.) If there were any material changes in revenue, the MD&A should have reflected such "changes in price, volume, or other

---

[17] Defendants reference in a footnote that they seek to exclude dozens of other paragraphs in Mintzer's report on the same grounds. This includes "paragraphs 44 (all subparts), 47, 50, 79, 86, 87 (all subparts), 102, 110, 146, 148(b), 148(d), 149, 150, 179, 195, 251, 261, 272, 278, 288, 318, 322–23, 327, 330, 349, 359, 362, and 363 of Mintzer's Report." (Mintzer Obj. 14 n.12.) To the extent that any of the paragraphs do not fully overlap with what has been excluded herein, the Court finds that Defendants have not explained their reasoning to exclude this testimony outside of a single footnote in their objection. (*Id.* at 15 n.16.) That footnote does not present any substantive arguments aside from citing to two out-of-district cases—which do not appear to be directly on point. Defendants' requests are therefore denied.

considerations[,]" and/or "a discussion of significant changes or unusual events that materially affected profitability." (*Id.* ¶ 178.)

According to Mintzer, Valeant failed to provide proper disclosures about Philidor in the MD&A. (*Id.* ¶ 182.) For example, he explains that Valeant reported a $515 million increase (33%) in revenues during Q3 2014, which "significantly exceeded quantitative materiality thresholds" and required Valeant to "provide a narrative explanation on each measure" in the MD&A. (*Id.* ¶ 185.) Valeant also recorded $34.4 million in revenue during Q3 2014—an 8% change in revenue from the prior year quarter. (*Id.* ¶ 187.) The revenue generated from Philidor was approximately $141 million—constituting an "unusual and significant economic event" requiring MD&A disclosure. (*Id.* ¶¶ 188-89.) Valeant, nevertheless, did not "disclose any aspect of the Philidor transactions in the MD&A . . . from Q3 2014 through Q2 2015." (*Id.* ¶ 195.) These omissions "constitute[d] a failure to comply with the accounting related requirements of Item 303." (*Id.* ¶ 196.)[18]

Mintzer's above analysis was the product of a seemingly reliable and calculated accounting methodology. (*See* Mintzer R&R 22 (noting that, "under the rules, a trial judge 'must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" (citing *Daubert*, 509 U.S. at 589)).) As such, the Court rejects Defendants' contention that Mintzer failed to produce any expert analysis or methodologies in support of his Item 303 opinions.

---

[18] To this end, Mintzer concluded that Valeant also failed to (1) properly disclose the impact of price appreciation credits ("PACs") that were generated from significant price increases on its products (Mintzer Rpt. ¶¶ 205, 209-212); (2) made several inaccurate disclosures regarding the Company's position that its revenues were driven by volume increases, and not price increases. (*Id.* ¶¶ 226, 229, 232-51, 254-307); and (3) did not accurately portray the impact of price factors, relative to volume factors, on its "organic growth," and other factors that impacted measures of the Company's profitability. (*Id.* ¶¶ 315-63.)

Nor is the Court persuaded that Mintzer's ICFR opinions were "not the product of any expert analysis or methodology." (Mintzer Obj. 18.) In Section VI.D, Mintzer opines that Valeant's management should have adequately maintained the Company's ICFR. (Mintzer Rpt. ¶¶ 364, 380-89.) Mintzer cites to a PwC audit of Valeant's internal control over financial reporting as of December 31, 2015, which determined that ██████████████████████████████████ ████████████████████████████████ (*Id.* ¶ 380.) He concludes that "Valeant repeatedly failed to properly disclose evident material weaknesses in the Company's ICFR no later than as of September 30, 2014 through its financial reporting period end[ing on] December 31, 2015." (*Id.* ¶ 381.)

These opinions are within the proper scope of expert testimony. (Pls.' Opp'n to Mintzer Obj. 21 (citing *Houserman v. Comtech Telecommunications Corp.*, 509 F. Supp. 3d 1301, 1304 (W.D. Wash. 2020) (finding that an expert report was reliable where expert "la[id] the foundation for his analysis by delineating the COSO [and] framework[,] . . . describe[d] the components of effective internal control according to COSO, define[d] deficiencies in internal controls under [ICFR]").) If Mintzer's ICFR or Item 303 opinions present certain evidentiary weaknesses, the limits of his expertise "can be properly addressed during cross examination or though Defendants' own experts." (Mintzer R&R 34.)

### iv. Mintzer's Qualifications Regarding ICFR and Item 303 Disclosures

Although Defendants do not expressly challenge Mintzer's qualifications to present GAAP-related opinions, they assert that he is not qualified to offer ICFR or disclosure-related opinions. (Mintzer Obj. 20-23.) They say that Mintzer's lack of ICFR-related experience is "well documented" because Mintzer stopped practicing as an accountant "seven years before the ICFR regime came into existence . . . and has never performed a SOX audit under [a] relevant regime."

(*Id.* at 20.) They further cite to Mintzer's deposition testimony that—to audit a company for ICFR compliance—an accountant must be registered and certified with the Public Company Accounting Oversight Board. (*Id.*) Mintzer purportedly does not hold the requisite certifications. (*Id.*)

The Special Master declined to exclude Mintzer's ICFR-related opinions and instead determined that:

> [Defendants] [are] free to attack these aspects of Mintzer's qualifications at trial. Defendants will also be able to address the fact that Mintzer retired from the active practice of accountancy (as supposed to his ongoing engagements in forensic work), a line of attack which may prove effective in undermining his opinions. As has been stated often in the wake of *Daubert*, vigorous cross-examination, presentation of contrary evidence[,] and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.

(Mintzer R&R 37-38) (citation omitted).)

In making that determination, the Special Master referenced the *Houserman* decision, which he found to be an "instructive" case. (*Id.* at 37.) *Houserman* involved a CPA expert "with over 46 years of experience in accounting and auditing, risk management, and consulting and testifying as an expert in accounting standards, governance, and internal controls, among other related topics." 509 F. Supp. 3d at 1304. The *Houserman* expert also had experience working at a major accounting firm for 28 years, serving as a partner for 18 years, and working in various audit-related capacities. *Id.* The expert offered opinions "on whether [p]laintiff's conduct violated any internal controls or accounting standards, or whether it constituted a significant deficiency." *Id.* Based upon his experience, the court accepted that the expert's "knowledge and experience as an auditor and certified accountant render[ed] him qualified to opine on corporate governance as it relates to internal controls." *Id.* at 1305.

Like the *Houserman* expert, Mintzer has 40 years of experience as a CPA, with 17 of those years spent at Ernst & Young, in various audit-related roles. (Mintzer R&R 11.) In his capacity as a forensic accountant, Mintzer "had many engagements involved with ICFR," and was previously "retained by" the SEC as an expert in matters involving "adherence to standards of ICFR." (Pls.' Opp'n to Mintzer Obj. 24 (citing Mintzer Dep. 261:18-262:2, 262:9-11).) The Court finds that Mintzer's decades of experience as a CPA, as an auditor with a major national accounting firm, and as a forensic accountant, renders him qualified to make assessments in other accounting areas, such as ICFR.[19] Certainly, if Defendants believe that Mintzer's retirement from accountancy renders him unqualified to offer ICFR-related opinions, such alleged deficiencies may be addressed through proper "cross examination and by putting on contrary evidence" at trial. *SEC v. Ambassador Advisors, LLC*, 576 F. Supp. 3d 250, 256 (E.D. Pa. 2021) (citing *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

This same rationale applies to Mintzer's Item 303 opinions. Defendants suggest that because Mintzer has not practiced as an auditor since 1995 and could not specify having performed an Item 303 analysis as a practicing auditor, he lacks the requisite qualifications to render disclosure opinions. (Mintzer Obj. 22.) That argument is refuted by Mintzer's deposition testimony. Mintzer testified that he read financial statements as part of the process of approving audit opinions, which involved examining the MD&A sections of clients' annual reports, to

---

[19] Defendants cite to an Ontario Superior Court decision, *O'Brien v. Maxar Technologies Inc.*, which allegedly determined that Mintzer was not qualified to render ICFR-related opinions. (Mintzer Obj. 5.) This decision, however, must be juxtaposed against the Third Circuit's broader view of expert qualifications, which "extends to the substantive as well as the formal qualifications of experts." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008).

identify inconsistencies or misstatements of fact in the financial statements. (*See* Mintzer Dep. 35:7-16, 38:9-21.) He also participated in several forensic investigations pertaining to compliance with Item 303. (*Id.* at 35:17-23.)

The Special Master correctly determined that Mintzer's vast experience as an accountant and auditor renders him qualified to provide Item 303 opinions. (Mintzer R&R at 36-38 (agreeing with "Plaintiffs' assessment that accounting and disclosure issues are closely related" and that Mintzer need not have practiced in the specific area on which he gives opinions).) Defendants' motion to exclude Mintzer's ICFR or Item 303 opinions is denied.

     *v.*     *Lack of Fit*

Finally, Defendants contend that Mintzer's opinions regarding Item 303 and SEC Regulation G, as well as "unpled" disclosures, "are extraneous, lack fit, risk confusing and misleading the jury, and should be excluded." (Mintzer Obj. 24.)

Defendants raise that the Direct Action Plaintiffs did not plead Item 303 or Regulation G violations in their respective complaints. (*Id.* at 23.) The Direct Action Plaintiffs, however, note that this argument is refuted on the face of the opt-out complaints. (Pls.' Opp'n to Mintzer Obj. 28.) Indeed, these claims appear to have been raised in at least some of the complaints. (*See, e.g.*, BlackRock Am. Compl. ¶ 158 (noting that "Valeant's 10-Ks and 10-Qs . . . failed to disclose known trends, demands, commitments, events, and uncertainties . . . as required by Item 303), ¶ 196(1) (alleging Valeant's omissions in its 2013 10-K and 2014 10-Q violated Item 303), Docket No. 18-343, ECF No. 50.) The Court also rejects the hardline approach that a complaint must cite to each and every regulatory requirement that would support a plaintiff's claims. *Schlumberger Tech. Corp. v. First Mercury Ins. Co.*, No. 22-1465, 2023 WL 2738336, at *3 (M.D. Pa. Mar. 31,

2023) ("[A] plaintiff need not identify the statute giving rise to his or her lawsuit if the facts pled in the complaint clearly set out a possible avenue to relief.").

Next, citing to *Oran v. Stafford,* Defendants argue that violations of Item 303 and Regulation G do not fit the claims presented because they do not create liability under Section 10(b) of the Securities and Exchange Act of 1934. 226 F.3d 275, 286 n.6 (3d Cir. 2000). Not so. The Third Circuit in *Oran* explained that "a violation of [Item] 303's reporting requirements does not *automatically give rise to* a material omission under Rule 10b-5." 226 F.3d at 288 (emphasis added). The Second Circuit has since observed that "*Oran* is consistent . . . that failure to comply with Item 303 in a Form 10-Q can give rise to liability under Rule 10b-5 so long as the omission is material . . . and the other elements of Rule 10b-5 have been established." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 103-04 (2d Cir. 2015). This applies to claims under Regulation G as well. *Ironworkers Loc. 580-Joint Funds v. Linn Energy, LLC*, 29 F. Supp. 3d 400, 429 (S.D.N.Y. 2014) (noting that, like Item 303, "a violation of Regulation G does not constitute an independent basis for liability under the securities laws"). The fact that a violation of Regulation G or Item 303 may not, in and of itself, result in Section 10b-5 liability, does not automatically invalidate Mintzer's views on these disclosure requirements.[20]

**B.     Motion to Exclude Expert Reports and Testimony of Jarrell**

The Court turns next to Defendants' Motion to Exclude Jarrell—whom the Direct Action Plaintiffs proffer as an expert witness on managerial accounting and variance analysis. (*See* Jarrell

---

[20] Defendants also argue that Mintzer cannot provide Item 303 and Regulation G opinions because they are based on statements not pled in the complaints. (Mintzer Obj. 23.) The Court has addressed the unpled statements issue in its Memorandum Opinion as to Defendants' Omnibus Motion for Summary Judgment and their Motion to Exclude Chad Coffman. For the same reasons set forth therein, the alleged "unpled" statements Mintzer references are substantively similar to those expressly identified in Plaintiffs' complaints. The Court, therefore, does not exclude Mintzer's opinions on this basis.

R&R 2; *see also* Expert Report of Gregg A. Jarrell ["Jarrell Rpt."], ECF No. 1032-3.) Jarrell offers opinions on "Valeant's analysis of and disclosures about what is described as a 'non-GAAP financial metrics' – a contribution of price versus volume to the company's organic revenue growth." (Jarrell R&R 3.) He authored an initial report on February 2, 2022 (*Id.* at 3; *see also* Jarrell Rpt.), and a rebuttal report on May 9, 2022. (*Id.*; *see also* Rebuttal Report of Gregg A. Jarrell ["Jarrell Reb. Rpt."], ECF No. 1032-5.) He was deposed on June 28, 2022. (*Id.*)

In terms of his qualifications, Jarrell holds a Ph.D. in business economics, and an MBA from the University of Chicago. (Jarrell Rpt. ¶ 3.) He previously served as a Chief Economist for the SEC from 1984 to 1987, as an economist in the private sector, and as an expert witness in antitrust and securities litigation for nearly thirty years. (Jarrell Rpt. ¶¶ 3-4; Jarrell R&R 2-3.) Jarrell was also previously a tenured professor in finance and economics at the University of Rochester between 1988 and 2018. (Jarrell Rpt. ¶ 4.)

Defendants filed their Motion to Exclude Jarrell on September 28, 2022.[21] (Jarrell Moving Br., ECF. No. 1032-1.) In presenting many of the same reasons already discussed above, the Special Master recommended that the Motion be denied. (*See generally* Jarrell R&R.) On June 26, 2023, Defendants submitted objections arguing the Special Master erred in admitting Jarrell's testimony that: (1) certain price-volume statements Valeant made are not supported by the evidence; (2) investors and analysts considered Valeant's price-volume statements important;

---

[21] In their underlying motion, Defendants argue that: (1) Jarrell did not present expert opinions; rather, he made mere conclusions drawn from the evidence; (2) his opinions are irrelevant to the 21 direct action cases since he relies upon statements not presented in the complaints; (3) his price-volume methodology is unsound and represents his mere personal preference; and (4) he is not qualified to render opinions concerning Valeant's changes in methodology to calculating its volume growth and whether such should have been disclosed to investors. (Jarrell R&R 3.)

(3) Valeant did not disclose its Q3 2015 price-volume methodology; and (4) Valeant supposedly "abandoned" its Q3 2015 price-volume methodology after that quarter. (Jarrell Obj. 1-3.)

    *i.*     *Jarrell's Methodologies*

Defendants make a common themed argument that Jarrell voices opinions on topics and summarizes concepts and materials that a lay juror has an independent ability to understand. (Jarrell R&R 22.) The Special Master determined that this aspect of Defendants' argument lacked "substantial merit" and instead:

> The issues [in this case] are as complex, if not more complex, than lawsuits in which the facts and issues are of a scientific or medical nature. This is clearly a matter in which 'scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue' through expert testimony. Indeed, it could be strongly argued that expert testimony will not only assist a jury in this case, but expert testimony is *necessary* to provide the trier of fact with a clear understanding of what transpired in order to render a reliable, thoughtful verdict.

(*Id.* (emphasis in original).) The relevant inquiry, therefore, is whether Jarrell's Report is reliable and "based on the 'methods and procedures of science'" rather than on "subjective belief or unsupported speculation." *In re Paoli*, 35 F.3d at 742 (citations omitted).

"The Rules of Evidence embody a strong preference for admitting any evidence that may assist the trier of fact." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (citing *Kannankeril*, 128 F.3d at 806); *see also* Fed. R. Evid. 401 (defining "relevant evidence," to mean evidence that "has any tendency to make a fact [of consequence] more or less probable than it would be without the evidence"). "[A]n expert's testimony is admissible so long as the *process or technique* [as opposed to the conclusion] the expert used in formulating the opinion is reliable." *In re TMI Litig.*, 193 F.3d at 664 (citation omitted) (alterations and emphasis in original). The Third Circuit has "cautioned that the standard for determining reliability is not that high." *Id.* at 665

(internal quotation and citation omitted). Indeed, "plaintiffs do not 'have to prove their case twice- they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable.'" *Id.*

The Court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Ebenhoech v. Koppers Indus., Inc.*, 239 F. Supp. 2d 455, 465-66 (D.N.J. 2002) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). "A court must examine the expert's conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used." *Crowley v. Six Flags Great Adventure*, No. 14-2433, 2017 WL 1836155, at *5 (D.N.J. May 8, 2017) (internal quotation and citation omitted). "*Daubert*[, however,] does not set up a test of which opinion has the best foundation, but rather whether any particular opinion is based on valid reasoning and reliable methodology." *Kannankeril*, 128 F.3d at 806. "Therefore, if the methodology and reasoning are sufficiently reliable to allow the fact finder to consider the expert's opinion, it is that trier of fact that must assess the expert's conclusions." *In re TMI Litig.*, 193 F.3d at 665.

a.        **Objections to Section V.B of Jarrell's Report (¶¶ 33-35)**

First, Defendants move to exclude paragraphs 33, 34, and 35 ("Section V.B") of Jarrell's report. (Jarrell Obj. 7-9.) This section describes that Valeant's price-volume disclosures were not supported by Valeant's internal price-volume analyses. (Jarrell Rpt. ¶¶ 33-35.) While the Special Master found that Jarrell reached this result through "an accounting and mathematical analysis," Defendants argue that this was in error.  (Jarrell Obj. 7; Jarrell R&R 26.)

In Section V.B, Jarrell states that in June 2014, Pearson expressed to investors that he would provide a breakdown on Valeant's "organic growth between price and volume," to be later

memorialized in a presentation on October 20, 2014. (Jarrell Rpt. ¶ 33.) In that presentation, on a slide titled "Q3 Organic Growth Drivers", Valeant stated that there was "[m]ore growth from volume than price" in the third quarter of 2014. (*Id.* ¶ 33.) Pearson apparently reaffirmed this stance in May 2015, stating to investors that "organic growth is more volume than price and [will] continue to be." (*Id.* ¶ 34.)

According to Jarrell, these statements were inconsistent with Valeant's internal calculations. (*Id.* ¶ 33.) Jarrell consolidates his findings in a table titled "Change in Pro Forma Organic Revenue Growth for Total Product Sales Attributable to Price and Volume" ("Table 1"), which exhibits that the growth in Q3 2014 was, in fact, driven by price, not volume. (*Id.* ¶ 33.) Jarrell opines that the findings in Table 1 are inconsistent with Valeant's and/or Pearson's statements to investors that Valeant's organic growth was the product of volume-based growth. (*Id.*)

Defendants argue that Jarrell's opinions are not the product of any "accounting or mathematical analysis." (Jarrell Obj. 7-8.) Instead, Defendants argue that Jarrell has merely provided a "straightforward comparison of the disclosures to Valeant's internal documents." (*Id.*) They assert that "the average juror is certainly capable of doing what Jarrell has done – looking at the organic growth, price[,] and volume figures in Valeant's documents and comparing them to what Valeant said." (*Id.*) (citations omitted).)

The jury's comprehension of Valeant's internal documents, including accounting spreadsheets, is not a straightforward task. Accepting Defendants' position, the jury would be required, on its own, to analyze internal spreadsheets, compare them with the testimony provided by Valeant's accounting employees, and ascertain whether the data in the spreadsheets aligns with the information presented by Valeant and Defendants in their 2014-2015 public statements

33

regarding price/volume. (Pls.' Opp'n to Jarrell Obj. 13-14.) Jarrell analyzed Valeant's internal documents, "including where the company was computing price/volume analysis over the quarters," and witness testimony, to ascertain if they aligned with Valeant's statements concerning its organic growth. (Jarrell Rpt. at 15-16; *see also* Jarrell Dep. at 125:20-24.) He then prepared his own analysis and chart, *i.e.*, Table 1, exhibiting Valeant's price/volume contribution to organic growth in every quarter of 2014 to 2015. (Jarrell Rpt. at 15.) Effectively communicating these concepts to a jury will be supported by Jarrell's analysis and his experience in managerial accounting. (*Id.*) Defendants' motion to exclude to Section V.B of the report is denied.

**b.      Objections to Section V.C of Jarrell's Report (¶¶ 36-50)**

Defendants move to exclude Section V.C of Jarrell's report on the same grounds; namely that Jarrell's opinions were not the result of expert analysis and merely compared information, which the jury is capable of doing independently. (Jarrell Obj. 10.)

In Section V.C, Jarrell suggests that Valeant failed to disclose its Q3 2015 price-volume methodology, which, in turn, distorted its price volume analysis. (Jarrell Rpt. ¶¶ 36-50.) This section details that in late September 2015, investors requested more specific information regarding how price and volume increases affected Valeant's organic growth. (*Id.* ¶ 36.) In response, Pearson sent a letter to Valeant employees on September 28, 2015—later filed with the SEC—that Valeant was positioned for "strong organic growth," and "the majority of [Valeant's] portfolio will continue to deliver strong volume-based organic growth and is not dependent on price increases." (*Id.* ¶ 37.)

Jarrell explains, however, that Valeant used a new and undisclosed calculation methodology to create the illusion of volume-based growth. (*Id.* ¶¶ 42-50.) The new methodology distorted Valeant's numbers in a way that: (1) deviated from its prior methodologies; and

(2) significantly distorted the results of the price/volume analysis. (*Id.* ¶¶ 36-50.) In the last paragraph of this section, Jarrell opines that:

> [F]or the U.S. Branded Pharmaceuticals Business, Valeant's traditional ███████████████ results in the price-only growth rate being nearly four times greater than its volume-only growth rate (32.4% vs. 8.4%), whereas its Q3 2015 methodology incorrectly suggests that for the U.S. Branded Pharmaceuticals Business, the price-only growth rate is only 41% greater than the volume-only growth rate (24% vs. 17%). . . . [The] undisclosed Q3 2015 methodology results in the price only and volume-only growth rates being identical, whereas Valeant's historic ████████ ███████ shows that the price-only growth rate was more than two and one-half times greater than its volume-only growth rate (11.1% vs. 4.3%).

(*Id.* ¶ 50.)

Defendants contend that "none of this analysis requires expertise" and that the analysis merely constitutes a "closing argument for [Plaintiffs] by summarizing evidence and drawing inferences therefrom." (Jarrell Obj. 10) (alteration in original).) The Court disagrees. Jarrell carefully analyzes the distortions created by Valeant's undisclosed switch to a new price/volume methodology in the third quarter of 2015. A lay juror would not simply comprehend or compute the impact of changes to Valeant's price/volume analysis in the absence of expert testimony. Accordingly, Defendants' motion to exclude Section V.C of Jarrell's report is denied.

  **c.**   **Objections to Section V.D of Jarrell's Report (¶¶ 51-57)**

In Section V.D of Jarrell's report, Jarrell cites to analysts' reports and commentary to show that professional analysts credited Valeant's new and undisclosed price/volume methodology. (Jarrell Rpt. ¶¶ 51-57.) Defendants argue, once again, that "Jarrell applied no accounting or mathematical expertise, analysis, or methodology[,]" and that his "'importance' opinions are not rooted in any expert analysis" and therefore must be excluded. (Jarrell Obj. 9.)

In this section, Jarrell cites to several reports from "professional analysts that followed Valeant" and other "financial press" that interpreted Valeant Q3 results. (Jarrell Rpt. ¶¶ 51-53.) These sources substantiate Jarrell's conclusions that investors were affected by the Q3 2015 outcomes and were swayed that Valeant's organic revenue growth was driven by volume rather than price. (*See id.* ¶ 52 (citing, among other sources, (1) Evercore's analyst report that Valeant's growth was 8% volume vs. 4.4% price; (2) J.P. Morgan's analyst report that Valeant and its management "addresse[d] pricing controversies, highlighting volume-driven growth . . . [of] (8.2%) rather than price (4.4%)"; (3) Barclay's analyst report that Valeant's "strong results were driven mostly by volume, up 8.2% y/y, compared to an increase in pricing of 4.4% y/y . . . ."; and (4) BMO Capital Markets' analyst report stating that "[i]mportantly, Valeant is increasing transparency to show that, despite recent concerns, its growth is not completely dependent on price increases.").) Because these reports make no mention of any changes to Valeant's procedures for calculating price/volume variances, Jarrell concludes that Valeant's price/volume modification was undisclosed and unknown to investors. (*Id.* ¶¶ 51-54.)

Here, Jarrell delineates Valeant's change in its price/volume methodology and how that change would "exaggerate the importance of . . . volume increases compared with price increases." (*Id.* ¶ 55.) The analyst reports and financial press reports cited to further support that investors were persuaded that Valeant's 3Q 2015 organic growth was driven more by volume than price. (*Id.* ¶¶ 52-53.) That belief, in turn, was a consequence of Valeant's undisclosed alteration in its approach to calculating price/volume variances. (*Id.* ¶ 54.) While Defendants argue that these concepts would be self-explanatory to the jury, the Court agrees with the Special Master and finds that these concepts are not self-evident and require a degree of expert clarification. (Jarrell R&R

26.) Jarrell's expertise, in holding a Ph.D. in Business Economics, would facilitate communicating these concepts to the jury. Defendants' Motion to Exclude Section V.D of Jarrell's report is denied.

### d. Objections to Section V.F of Jarrell's Report (¶¶ 84-92)

Defendants argue that Section V.F of Jarrell's report, which opines that "'Valeant abandoned' [i]ts Q3 2015 [p]rice-[v]olume [m]ethodology as part of its restatement process, is nothing more than "an accounting- and mathematical-free factual summary that is irrelevant to [Jarrrell's] actual opinions." (Jarrell Obj. 11; *see also* Jarrell Rpt. ¶¶ 84-92.)

In Section V.F, Jarrell details that, only one week after reporting its Q3 results for 2015, Valeant announced that it had established an *ad hoc* committee to investigate Valeant's relationship with Philidor. (Jarrel Rpt. ¶ 84.) The *ad hoc* committee ultimately determined that Valeant's financial statements—specifically relating to transactions with Philidor—needed to be restated. (*Id.* ¶ 85.) The Company further identified "issues with the Q3 2015 methodology" and "a 'high risk impact' [associated with] distorting its price/volume analysis." (*Id.* ¶ 87.) After these deficiencies were revealed, Valeant abandoned the new methodology and returned to its ████ ███████████████. (*Id.* ¶ 88.)

The fact that Valeant abandoned its Q3 2015 methodology, and the fact that the investigation revealed risks of the Q3 2015 methodology distorting its price/volume analysis has some "tendency" to support Jarrell's opinion that "[t]he Q3 2015 methodology, unlike the ████ ████████████ Valeant previously utilized, was not consistent with sound accounting or mathematical principles." (*Id.* ¶¶ 2(b), 88.); *see also* Fed. R. Evid. 401. As such, Section V.F is not irrelevant and logically follows the opinions that precede it. Defendants' motion to exclude Section V.F of Jarrell's report is denied.

### ii. *Irrelevance and Lack of Fit*

Defendants next contend that Jarrell's opinions should be excluded because they are irrelevant and do not fit the theories presented in this litigation. (Jarrell Obj. 12-16.) Defendants primarily target two of Jarrell's conclusions: "[1] that certain Valeant price-volume disclosures are not consistent with Valeant's internal price-volume analyses[;]. . . and [2] everything concerning Valeant's Q3 2015 methodology, including the soundness of that methodology, that Valeant supposedly failed to disclose it, and that Valeant supposedly "'abandoned' it after Q3 2015." (*See* Jarrell Obj. 12.)

The Court disagrees and finds that Jarrell's opinions fit the theories of this case. Rather than restating the Special Master's findings, the Court finds that the Special Master accurately ascertained that:

> Jarrell's opinions indeed "fit" the *issues* in this case. The opinions are addressed [as] an aspect of Plaintiffs' theories of liability which form the basis of their collective causes of action against Valeant . . . . . . . Jarrell's opinions, in the Special Master's view, go to these issues and allegations. He does so by analyzing Valeant's accounting methodology "switch" in late 2015, a switch which Jarrell contends was improper and resulted in inaccurate highly misleading results as to the status of the company's organic growth, giving the impression that volume, not price, was the overwhelming contributing factor. Undoubtedly, this is an opinion which fits an *issue* in this case such that Jarrell's opinions are relevant and can assist the trier of fact.

(Jarrell R&R at 28-29 (emphasis in original).) As noted by the Special Master, the Direct Action Plaintiffs have consistently claimed that Valeant misrepresented the extent to which price or volume increases drove Valeant's organic growth. (*Id.* at 14, 28; *see also* Pls.' Opp'n to Jarrell Obj. 2-3.)

Defendants appear to acknowledge as much in other briefings before the Court. (*See*, *e.g.*, Defs.' Mem. in Supp. of Mot. Summ. J. 4, ECF No. 996 ("The [Okumus] Complaint alleges that Defendants violated the securities laws by misrepresenting specific aspects of Valeant's business model, including Valeant's (1) reliance on 'unsustainable price increases' to support growth for its products with 'undisclosed attendant risks'; [and] (2) representations that organic growth was attributable primarily to volume growth rather than price increases . . . ."). Defendants' motion to exclude Jarrell's report for irrelevance or lack of fit is denied.

      *iii.*    *Qualifications*

Defendants proceed to argue that the Special Master erred "in finding that Jarrell was qualified" to offer opinions "that [1] the market viewed Valeant's price-volume statements as important . . . and [2] Valeant should have but failed to disclose its Q3 2015 price-volume methodology." (Jarrell Obj. 15-16; *see also* Jarrell R&R 8, 10, 23.) Regarding the "'importance'" of Valeant's disclosures, Defendants aver that "Jarrell is not a professional investor or investment advisor." (Jarrell Obj. 15.) With respect to Valeant's alleged failure to disclose its Q3 2015 price/volume methodology, Defendants assert that this is not a topic that Jarrell "has studied, trained for, or has experience in." (*Id.*)

The first argument, concerning Jarrell's "importance" opinions, was not raised in Defendants' initial moving papers. (*See* Jarrell Moving Br. 20-22; *see also* Pls.' Opp'n to Jarrell Obj. 26 (noting that "Defendants never made this argument in their prior briefing to the Special Master" and that "Defendants previously only moved to exclude one sentence of [J]arrell's Report on the basis that [J]arrell has no expertise in disclosures or materiality.").) Because this argument was not raised before the Special Master, the Court declines to address it here. *In re Nat'l Collegiate Student Loan Trusts 2003-1, 2004-1, 2004-2, 2005-1, 2005-2, 2005-3*, 971 F.3d 433,

444 (3d Cir. 2020) ("Arguments not presented to a magistrate judge and raised for the first time in objections to the magistrate's recommendations are deemed waived." (citing *Marshall v. Chater*, 75 F.3d 1421, 1426 (10th Cir. 1996)).

Regarding Defendants' request to exclude Jarrell's opinions on "disclosures" of the Q3 2015 methodology, while Jarrell is not an expert on corporate disclosure obligations, the Court finds that his experience in managerial accounting and price/volume calculations provides him the baseline experience to assess how Valeant calculated its price/volume metrics. (Jarrell Rpt. ¶¶ 7-8.) The Court also agrees with the Special Master "that the admissibility [of such opinions would be more properly] addressed through a motion *in limine* or a directive at trial when it can be placed in context." (Jarrell R&R 31.) Defendants' objections to the same are denied.

iv.     *Jarrell's Alleged Legal Opinions*

Last, Defendants move to exclude portions of Jarrell's opinions on the basis that he offers improper "legal conclusions." (Jarrell Obj. 16-18.)[22] Defendants argue that Jarrell offers improper legal opinions that (1) Valeant's representations were important to the market (*id.* at 17 (citing Jarrell Rpt. ¶¶ 22-23, 53 (opining on the alleged "importance of" Valeant's Q2 2014 representations that "more of its organic revenue growth was driven by volume than price" and "Valeant's 2015 third quarter price/volume disclosures")); and (2) Valeant was required to, but did not, disclose, its switch in price-volume methodologies in Q3 2015 (*id.* (citing Jarrell Rpt. ¶ 42 ("Rather than report the results . . . that ███████████████████████████, Valeant created" a new methodology. "Valeant reported the results without disclosing that it was using a new methodology in its 3Q 2015 earnings presentation instead of the results of its ███████████████████

---

[22] This presents many of the same arguments that were raised to exclude Mintzer's testimony. (*See* Mintzer Obj. 12-17.)

████ . . .Valeant did not disclose the resulting impact from its change to a new and unsound methodology.").)

As to the first point, Jarrell's references to analyst reports and news articles do not create a legal opinion. (Jarrell Rpt. ¶¶ 52-53.) He merely cites the content of the analyst reports that interpreted Valeant's 3Q 2015 results. (*Id.*) In doing so, he opines that "professional analysts that followed Valeant" and the "financial press" believed Defendants' statements that Valeant's third quarter 2015 organic growth was driven more by volume than price. (*Id.*) In his capacity as "[a]n expert in calculating price/volume variances[,]" Jarrell is qualified to review analyst reports concerning Valeant's price/volume disclosures and "opine on whether Valeant disclosed that it had made a change to how it calculated price/volume." (Pls.' Opp'n to Jarrell Obj. 21; *see also* Jarrell Rpt. ¶¶ 4-9, 52-54.) These opinions do not warrant exclusion.

The Court similarly finds that Jarrell's testimony that Valeant should have disclosed its 3Q 2015 results does not amount to a legal opinion. While Jarrell states that Valeant did not disclose its change in accounting methodologies, he does not go so far as to say that Valeant was legally required to do so.[23] (Jarrell Rpt. ¶ 42.) Assessing whether Valeant disclosed a change in its price/volume methodology falls within Jarrell's area of expertise and is what he has been retained to testify on. (See Pls.' Opp'n to Jarrell Obj. 21.) Defendants' motion to exclude on this basis is denied.

## IV.    **CONCLUSION**

For the reasons set forth above, the Court adopts in part, and rejects in part, the Mintzer R&R. The Court fully adopts the Jarrell R&R. Defendants' Motion to Exclude the Expert

---

[23] Thus, these opinions do not present the same problems as that of Mintzer's testimony, discussed *supra*.

Testimony of Mintzer is granted in part and denied in part. Defendants' Motion to Exclude the Expert Testimony of Jarrell is denied. The Court will enter an order consistent with this Memorandum Opinion.

**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**