# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: VALEANT PHARMACEUTICALS INTERNATIONAL, INC. SECURITIES LITIGATION | Master No. 3:15-cv-07658-MAS-RLS |
| | HON. MICHAEL A. SHIPP, U.S.D.J. |
| THIS DOCUMENT RELATES TO: | HON. RUKHSANAH L SINGH, U.S.M.J. |
| 18-cv-00089 (MAS) (RLS) | HON. DENNIS M. CAVANAUGH, U.S.D.J. (RET.) SPECIAL MASTER |

## FINAL PRETRIAL ORDER

*on June 12, 2024          RLS*

*✓*

This matter having come before the Court for a pretrial conference pursuant to Fed. R. Civ. P. 16; and Rolnick Kramer Sadighi LLP, 1251 Avenue of the Americas, New York, NY 10020 having appeared for Plaintiffs, and McCarter & English, LLP, Four Gateway Center, 100 Mulberry St., Newark, NJ 07102 and Simpson Thacher & Bartlett LLP, 425 Lexington Ave, New York, NY 10017 having appeared for Defendant Valeant Pharmaceuticals International, Inc., and Debevoise & Plimpton LLP, 66 Hudson Boulevard, New York, NY 10001 having appeared for Defendant J. Michael Pearson, and Winston & Strawn, 200 Park Avenue, New York, NY 10166 and Robinson Miller LLC, Ironside Newark, 110 Edison Place, Suite 302, Newark, NJ 07102 having appeared for Defendant Howard B. Schiller; the following Final Pretrial Order is hereby entered:

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

1.  JURISDICTION ............................................................................................................... 1

2.  PENDING/CONTEMPLATED MOTIONS ................................................................. 2

3.  STIPULATION OF FACTS ......................................................................................... 10

4.  PLAINTIFFS' CONTESTED FACTS ........................................................................ 13

5.  DEFENDANTS' CONTESTED FACTS ..................................................................... 23

6.  PLAINTIFFS' WITNESSES ....................................................................................... 27

7.  DEFENDANTS' WITNESSES .................................................................................... 43

8.  PLAINTIFFS' EXPERT WITNESSES ...................................................................... 54

9.  PLAINTIFFS' EXHIBITS ........................................................................................... 61

10. DEFENDANTS' EXHIBITS ........................................................................................ 63

11. PLAINTIFF'S LEGAL ISSUES ................................................................................. 65

12. DEFENDANTS' LEGAL ISSUES .............................................................................. 66

13. CHOICE OF LAW ....................................................................................................... 68

14. MISCELLANEOUS ..................................................................................................... 69

15. JURY TRIALS ............................................................................................................. 74

16. NON-JURY TRIALS ................................................................................................... 75

17. TRIAL COUNSEL ....................................................................................................... 76

18. BIFURCATION ............................................................................................................ 79

19. ESTIMATED LENGTH OF TRIAL ........................................................................... 80

**1.    JURISDICTION (set forth specifically).**

The Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa, and 28 U.S.C. § 1331. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391. For the purposes of trial in this action only, no party is contesting personal jurisdiction or venue.

2.   **PENDING/CONTEMPLATED MOTIONS (Set forth all pending or contemplated motions, whether dispositive or addressed to discovery or to the calendar.  Also, set forth the nature of the motion and the return date.  If the Court indicated that it would rule on any matter at pretrial, summarize that matter and each party's position).**

A.   **Pending Motions**

i.   None.

B.   **Plaintiffs' Contemplated Motions**

i.   Plaintiffs anticipate filing the following motions:

a.   Motion *in limine* to exclude reference to and evidence regarding *United States v. Gary Tanner and Andrew Davenport*, 17-cr-00061 (S.D.N.Y.), including the related criminal investigations, indictments, complaints, arrests, prosecutions, trial, convictions, sentences, and appeals, or the monies that Mr. Davenport paid Mr. Tanner in connection with the acquisition of Philidor by Valeant;

b.   Motion *in limine* to exclude reference to and evidence regarding GMO's assets under management, historical profits and/or losses, investments by GMO other than in Valeant common stock, and any other evidence concerning GMO unrelated to its investment in Valeant common stock;

c.   Motion *in limine* to exclude reference to and evidence regarding GMO's agreement to retain PricewaterhouseCoopers ("PwC") as auditor for GMO or any funds managed by GMO, including any audits or audit relationship;

2

d. Motion *in limine* to exclude reference to all deposition testimony and documents produced by the plaintiffs in any other Direct Action[1] and evidence regarding any investor in Valeant securities other than GMO (excluding any investors affiliated with Defendants), including other investors' communications with Defendants or their decisions to purchase or sell Valeant securities, the investment in Valeant by other current or former plaintiffs in the coordinated securities litigation, and any proposed testimony from Defendants' expert witnesses regarding other investors and their trading in Valeant securities;

e. Motion *in limine* to exclude any testimony that Valeant's financial statements and disclosures were prepared or approved by PwC, that Valeant's SEC filings, including on Forms 10-Q or 10-K, were prepared or approved by PwC, that PwC was otherwise responsible for, or delegated authority over, statements made by Defendants, or evidence regarding Defendants' purported reliance on PwC as a defense to liability;

f. Motion *in limine* to exclude reference to and evidence regarding pleadings, rulings, opinions, and motions in the coordinated securities litigation relating to the claims against PwC, and any discovery produced solely with respect to the claims against PwC;

---

[1] The other Direct Actions have the following individual docket nos.: 16-cv-07321; 16-cv-07324; 16-cv-07494; 16-cv-07496; 17-cv-06513; 17-cv-07636; 17-cv-12088; 18-cv-00343; 18-cv-00383; 18-cv-00846; 18-cv-00893; 18-cv-01223; 18-cv-08595; 18-cv-08705; 18-cv-15286; 18-cv-17393; 20-cv-02190; 20-cv-05478; 20-cv-07460; and 20-cv-07462.

3

g.  Motion *in limine* to exclude the proposed testimony of Matthew Magi and Gary Sardo;

h.  Motion *in limine* to exclude reference to or evidence regarding the investigation undertaken by, the findings of, or the conclusions of Valeant's Ad Hoc Committee that investigated Valeant's relationship with Philidor in 2015 and 2016, beyond statements that were publicly disclosed by Defendants;

i.  Motion *in limine* to preclude Defendants from asserting reliance on counsel or from testifying directly or indirectly about the advice of counsel, presence of counsel, or the involvement of counsel, including but not limited to as evidence of good faith or the absence of scienter;

j.  Motion *in limine* to exclude reference to expert opinions that were excluded by the Court in connection with Defendants' motions for summary judgment and *Daubert* motions;

k.  Motion *in limine* to exclude in whole or in part the proposed testimony from Albert Wertheimer under the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993);

l.  Motion *in limine* to exclude in whole or in part the proposed testimony from Amy Hutton under the Federal Rules of Evidence and *Daubert*, 509 U.S. 579;

m.  Motion *in limine* to exclude in whole or in part the proposed testimony from Brian Mittendorf under the Federal Rules of Evidence and *Daubert*, 509 U.S. 579;

4

n.  Motion *in limine* to exclude in whole or in part the proposed testimony from Carl Seiden under the Federal Rules of Evidence and *Daubert*, 509 U.S. 579;

o.  Motion *in limine* to exclude in whole or in part the proposed testimony from Charles K. Whitehead under the Federal Rules of Evidence and *Daubert*, 509 U.S. 579;

p.  Motion *in limine* to exclude in whole or in part the proposed testimony from Douglas F. Prawitt under the Federal Rules of Evidence and *Daubert*, 509 U.S. 579;

q.  Motion *in limine* to exclude in whole or in part the proposed testimony from Mark Garmaise under the Federal Rules of Evidence and *Daubert*, 509 U.S. 579; and

r.  Motion *in limine* to exclude in whole or in part the proposed testimony from Sean Nicholson under the Federal Rules of Evidence and *Daubert*, 509 U.S. 579.

ii.  Plaintiffs anticipate meeting and conferring with Defendants in advance of the July 12, 2024 deadline to file motions *in limine* to determine whether Plaintiffs' objections can be resolved without formal motion practice.

## C.  Defendants' Contemplated Motions

i.  Defendants anticipate filing the following motions:

a.  Motion *in limine* to exclude evidence of unpled misstatements;

b.  Motion *in limine* to exclude and/or limit evidence related to the roles of Gary Tanner and Andrew Davenport, including:

      i. Gary Tanner's state of mind cannot be attributed to Valeant for scienter purposes, because, among other things, he is not a senior executive and was working against Valeant's interests, as demonstrated by his criminal conviction;

      ii. Where Plaintiffs rely on evidence from Gary Tanner or Andrew Davenport, the Court should instruct the jury that they were both convicted of defrauding Valeant;

      iii. Evidence of the use of pseudonyms for Valeant employees at Philidor and chess-related names for Philidor entities should be excluded as evidence of scienter.

c. Motion *in limine* to exclude evidence of (1) stock-based compensation, salary, and benefits of Valeant executives; (2) Defendants' current financial condition, liability insurance, or ability to pay large judgments;

d. Motion *in limine* to exclude evidence of unrelated, potentially prejudicial behavior (*e.g.*, drug use);

e. Motion *in limine* to exclude evidence related to other proceedings, including the following:

      i. Evidence of the class action, third-party payor, or Canadian class action settlements;

      ii. Evidence of the SEC's Cease-and-Desist Orders;

iii. Evidence of any other litigations, proceedings, or government investigations (*i.e.*, Valeant-Pearson arbitration; *Kelk* class action; and investigations by the Senate Special Committee and U.S. Attorney's Offices);

f. Motion *in limine* to exclude argument concerning prior rulings (*e.g.*, fact that claims survived a motion to dismiss or summary judgment);

g. Motion *in limine* to exclude certain evidence related to the general pharmaceutical industry, including the following:

   i. Evidence of alleged harm to patients from drug price increases (no such evidence was actually obtained, but Plaintiffs should not be able to imply there is such evidence);

   ii. References to the "pharmaceutical" Enron and Turing or Martin Shkreli as a comparison to Valeant;

   iii. Evidence that Valeant's business model was unethical, contrary to medical best practices, etc.;

   iv. Argument that finding for Plaintiffs will "send a message" to the broader pharmaceutical industry about the impact of alleged price gouging or securities fraud;

h. Motion *in limine* to exclude evidence of remediation and/or executive departures, including the following:

7

    i. Evidence and arguments related to subsequent changes to corporate structure, including name change, spin-off, and "fraudulent conveyance" allegations, as evidence of liability, reputational issues, etc.;

    ii. Evidence of executive or director departures or requested departures;

    iii. Evidence of post-class period remediation initiatives;

i. Motion *in limine to* preclude Plaintiffs from relying upon news articles or short seller reports (*e.g.*, the Citron Report) for the truth of the matters asserted; use a limiting instruction when introduced for other non-hearsay purposes, such as materiality;

j. Motion *in limine* to exclude evidence or use limiting instruction when addressing PBM allegations of Philidor contract breaches, as there are no findings as to the truth of these allegations;

k. Motion *in limine* regarding the sufficiency of Plaintiffs' expert, Chad Coffman's, applying the "Alternative Method" for calculating damages;

l. Motion *in limine* directing Plaintiffs' expert, Andrew Mintzer, to reference only those facts which support specific opinions, not to give legal instructions or offer legal opinions;

m. Motion *in limine* to exclude Plaintiffs' expert, Gregg Jarrell's opinions on the "importance" of price-volume statements and "disclosures" of Valeant's Q3 2015 methodology;

n.  Motion *in limine* to exclude in whole or in part the proposed testimony from Jill E. Fisch under the Federal Rules of Evidence and *Daubert*, 509 U.S. 579;

o.  Motion *in limine* to exclude in whole or in part the proposed testimony from Allyson Wooten under the Federal Rules of Evidence and *Daubert*, 509 U.S. 579; and

p.  Motion *in limine* on behalf of Defendant, Howard Schiller, to exclude evidence or argument as to purported findings of engagement in "improper conduct" or provision of "incorrect information" by Mr. Schiller.

iii.  Defendants expect to meet and confer with Plaintiffs prior to the deadline to file motions *in limine* to determine whether the issues addressed by Defendants' contemplated motions can be resolved without Court intervention.  In accordance with the Court's April 22, 2024 Order, no reply briefs shall be permitted for motions *in limine* and such motions shall be fully briefed by July 19, 2024.

\* The parties shall meet and confer to attempt to further limit the Motions in limine.

RLS

9

3.    **STIPULATION OF FACTS (Set forth in narrative form a comprehensive listing of all uncontested facts, including all answers to interrogatories and admissions, to which there is agreement among the parties).**

1.    Plaintiffs are the following 19 investment funds managed by Grantham, Mayo, Van Otterloo & Co. ("GMO"):  (i) GMO Trust; (ii) GMO Alpha Only Fund; (iii) GMO Benchmark Free Fund; (iv) GMO Implementation Fund; (v) GMO Developed World Stock Fund; (vi) GMO International Large/Mid Cap Equity Fund; (vii) GMO International Equity Fund; (viii) GMO Tax-Managed International Equities Fund; (ix) GMO Funds PLC; (x) GMO Global Equity Allocation Investment Fund; (xi) GMO World Equity Allocation Investment Fund PLC; (xii) GMO Global Real Return (UCITS) Fund; (xiii) GMO Offshore Master Portfolios II Ltd.; (xiv) GMO Event-Driven Master Portfolio; (xv) GMO Global Equity Trust; (xvi) GMO Master Portfolios (Onshore), L.P.; (xvii) GMO Mean Reversion Fund (Onshore); (xviii) GMO Tax-Managed Global Balanced Portfolio; and (xix) GMO Mean Reversion Special Solution Fund, L.P.

2.    GMO is headquartered in Boston, Massachusetts.  It manages capital for its investment clients.

3.    Defendant Valeant Pharmaceuticals International, Inc. ("Valeant" or the "Company") is a Canadian pharmaceutical manufacturer with its chief executive offices in Bridgewater, New Jersey.

4.    From May 28, 2014, through March 9, 2016, Valeant's stock was traded on the New York Stock Exchange under the ticker symbol "VRX."

5.    Defendant J. Michael Pearson ("Pearson") was Chief Executive Officer ("CEO") of Valeant and Chairman of its Board of Directors from February 2008 through December 28, 2015, and was CEO from February 28, 2016, through May 2, 2016.

10

6.     Defendant Howard Schiller ("Schiller" and, collectively with Valeant and Pearson, "Defendants") was Chief Financial Officer ("CFO") of Valeant from December 2011 to June 2015. Schiller was a member of Valeant's Board of Directors from September 2012 through June 14, 2016. Schiller served as Valeant's Interim CEO from January 6, 2016 through February 29, 2016.

7.     In 2014 and 2015, Valeant issued Quarterly Reports on Form 10-Q, Annual Reports on Form 10-K, and accompanying disclosures which reported on the Company's financial results.

8.     In its 2015 Annual Report on Form 10-K filed April 29, 2016, the Company revised and restated certain financial results for past quarters in 2014 and 2015.

9.     Between 2014 and 2016, GMO conducted fundamental research into and analysis of Valeant, including of information Defendants provided to investors in Valeant's filings with the SEC and during investor calls and presentations.

10.    As part of its research into and analysis of Valeant, members of GMO's Fundamental Equity Team reviewed articles written about Valeant and press releases issued by Valeant.

11.    As part of its research into and analysis of Valeant, GMO personnel spoke to present and former Valeant employees.

12.    As part of its research into and analysis of Valeant, members of GMO's Fundamental Equity Team spoke with persons who purported to have experience in the pharmaceutical industry.

13.    As part of its research into and analysis of Valeant, members of GMO's Fundamental Equity Team spoke to Valeant management and sell-side analysts.

14.    On December 10, 2014, there was a scheduled meeting of GMO's investment committee to discuss Valeant as a potential investment for Plaintiffs.

11

*Intentionally Left Blank*

RLS

4.     **PLAINTIFFS' CONTESTED FACTS (State separately for each plaintiff. Proofs shall be limited at trial to the matters set forth below. Failure to set forth any matter shall be deemed a waiver thereof).**

A.     **Plaintiffs intend to prove the following contested facts with regard to liability:**

1.     GMO's clients include public and private pension funds, foundations, charities, retirement accounts, and individuals.

2.     As CEO and Chairman of Valeant, Pearson exercised control over Valeant's public disclosures and made public statements on behalf of Valeant.

3.     As CFO, a Director, and Interim CEO of Valeant, Schiller exercised control over Valeant's public disclosures and made public statements on behalf of Valeant.

4.     Between at least December 10, 2014, and March 10, 2016, Defendants materially misled GMO and Plaintiffs about the sustainability of Valeant's business model by, among other things:

      a.   concealing the existence, nature and extent of, and Valeant's relationship with Philidor Rx Services LLC ("Philidor"), a distribution channel controlled by Defendants and manipulated by them to create the false appearance of increased growth and to fraudulently inflate Valeant's financial results;

      b.   misrepresenting that an increase in demand for Valeant products, as opposed to increasing the price of those products, was predominantly driving Valeant's reported organic growth; and

      c.   falsely certifying under federal law that Defendants had adequate and effective internal controls to ensure that Valeant accurately reported its financial results and disclosed material information to investors.

13

5.      Defendants made the materially false or misleading statements attributed to them on **Exhibit A** attached hereto and omitted to state material facts necessary to make those statements not misleading.  The sources through which Defendants made these material misrepresentations, and from which Defendants omitted material facts, are listed on Exhibit A and include:  Valeant's Form 10-K filed with the SEC; Valeant's Form 10-Qs filed with the SEC; the CEO and CFO certifications pursuant to the Sarbanes-Oxley Act of 2002 attached to Valeant's Form 10-K and Form 10-Qs; Form 8-Ks and the attachments thereto that Valeant filed with the SEC; Valeant's year-end and quarterly earnings releases; Valeant's year-end and quarterly earnings presentations; Valeant's year-end and quarterly earnings calls; Valeant's guidance calls; Valeant's investor calls, Valeant's investor presentations; Valeant's business updates; Valeant's press releases; Valeant's public letters; and third-party conferences in which Valeant participated.

6.      In furtherance of their fraud, Defendants, among other things:

    a.  established a mail-order pharmacy – named Philidor – in Horsham, Pennsylvania, by providing a physical location and $2 million in capital;

    b.  placed Valeant employees at that location to develop Philidor's operational processes, hire Philidor employees, run the training programs for script adjudication, and adjudicate insurance coverage for Valeant prescriptions while using fake identities;

    c.  set up a sales team to persuade prescribers of Valeant drugs to fill their prescriptions through Philidor;

    d.  shipped pharmaceutical products to Philidor without requiring Philidor to incur the risks of ownership, including by not requiring Philidor to pay invoices when due and permitting Philidor to pay Valeant only if and when it received payment

14

for dispensed products, including payment from third-party payors or insurance companies;

e. provided Philidor with legal counsel to devise Philidor's strategy of shipping Valeant product into states where Philidor did not have a license by using other pharmacies' information;

f. had effective control over Philidor and was its primary beneficiary;

g. directed Philidor to place an unprecedented $75 million order so that Valeant could book the revenue upon delivery to Philidor before the end of the third quarter of 2014 in order for Valeant to meet stock analysts' consensus estimates for Valeant's revenue and earnings, and to rebut allegations publicly made by Allergan, Inc. about Valeant's business model;

h. booked the $75 million order as revenue even though collectability was not reasonably assured, the price was not fixed and determinable, the risk of ownership had not passed to Philidor, and the order was not made in the ordinary course of business;

i. failed to comply with Valeant's internal controls over financial reporting, including its Standard Operating Procedures ("SOPs") for revenue recognition and the extension of credit, so the $75 million order could be shipped to Philidor and booked as a sale;

j. made an offer to purchase Philidor in October 2014 for $100 million, which was ultimately structured to be a paid-in-full upfront purchase option in furtherance of the fraud;

k.  directed Philidor to place a series of orders in late-November and early-December 2014 – totaling approximately $131 million – so that Valeant could book the revenue upon delivery to Philidor before the acquisition closed, allowing Valeant ostensibly to meet analysts' consensus estimates for Valeant's Q4 2014 earnings;

l.  directed Philidor to fulfill unusually large orders that had extended payment terms, a one-time special price increase above the price that Philidor was contractually obligated to pay, and sought to fill a revenue gap by substituting products of an equivalent value that were not therapeutically equivalent to products that were unavailable;

m.  failed to comply with Valeant's internal controls over financial reporting, including SOPs for revenue recognition and the extension of credit, so the $131 million in orders could be shipped to Philidor and booked as sales;

n.  booked the $131 million in orders as revenue even though collectability was not reasonably assured, the price was not fixed and determinable, the risk of ownership had not passed to Philidor, and the orders were not made in the ordinary course of business;

o.  delayed the closing of the option to acquire Philidor until delivery of the orders could be made, including requiring Philidor to accept delivery of the orders on a Saturday so that they would be delivered before the acquisition closed;

p.  structured the formal acquisition of Philidor as a purchase option agreement to allow Valeant and Philidor to continue to further the fraud including by

16

concealing Philidor's connection to Valeant from third-party payors and other outsiders;

q.  raised Valeant's internal disclosure thresholds relating to acquisitions to prevent the disclosure of the Philidor purchase option agreement in Valeant's 2014 annual report filed with the SEC on Form 10-K in February 2015;

r.  provided false information to the Audit and Risk Committee ("ARC") and the Company's independent registered public accounting firm, PwC, related to the nature and intent of the $131 million in orders, including by misrepresenting to PwC that all sales with Philidor in the months leading up to the execution of the purchase option agreement were arm's-length transactions made in the ordinary course of business;

s.  when the existence of Philidor and its contractual relationship with Valeant was revealed, misrepresented to investors the nature, extent, and history of Valeant's relationship with Philidor and falsely stated, among other things, that Valeant (i) had not loaned or invested money in connection with the start-up of Philidor, (ii) did not control Philidor, and (iii) had not used Philidor to improperly recognize revenue;

t.  misrepresented that Valeant's organic growth was driven predominantly by volume rather than price notwithstanding internal calculations that showed Valeant's organic growth was being driven more by price than volume during every quarter between Q1 2014 and Q3 2015;

u. created an erroneous, new, and later-abandoned methodology for calculating the relative contributions of price and volume to Valeant's organic growth for the Q3 2015 earnings call and presentation;

v. improperly allocated price appreciation credits generated from price increases on Glumetza to more than 100 unrelated products, thus misrepresenting the extent to which price contributed to organic growth, misrepresenting the revenue and income of various products and business segments, and concealing from investors that a large amount of Valeant's revenue was driven by large price increases on a single drug;

w. imposed an improper "tone at the top" of the organization, with a performance-based environment in which challenging targets were set and achieving those targets was a key performance expectation, and where employees were encouraged to meet performance targets by any means necessary – including by improperly booking sales and directing employees to implement unconscionable price increases on life-saving drugs.

7. All of the information that Defendants concealed from or misrepresented to the market set forth above was either qualitatively material, quantitatively material, or both.

8. Defendants knew or recklessly disregarded that Valeant's business model was unsustainable, including but not limited to as set forth above in Paragraphs 4 and 6.

9. Defendants had the motive and/or opportunity to mislead GMO and Plaintiffs about the sustainability of Valeant's business model, including but not limited to as set forth above in Paragraphs 4 and 6.

18

10.     Plaintiffs purchased and sold Valeant common stock on the dates, at the prices, and in the quantities reflected on GMO00062715, which is attached hereto as **Exhibit B**.

11.     During the period January 4, 2013, through June 6, 2016, the market for Valeant common stock was efficient under the semi-strong version of the efficient capital markets hypothesis.

12.     In purchasing Valeant common stock as reflected on Exhibit B, Plaintiffs – through GMO – relied on the integrity of the market price of Valeant common stock.

13.     In purchasing Valeant common stock as reflected on Exhibit B, Plaintiffs – through GMO – actually relied on the statements listed on Exhibit A, to the extent such statements had been made prior to such purchases.

14.     Plaintiffs' reliance – through GMO – on the integrity of the market price of Valeant common stock and on the statements listed on Exhibit A was reasonable and justifiable.

15.     Plaintiffs and GMO were unaware of Defendants' fraud, as set forth above in Paragraphs 4 and 6, when making the purchases of Valeant common stock listed on Exhibit B.

16.     Defendants' materially false and misleading statements and omissions artificially inflated the market price of Valeant common stock.

17.     Defendants' materially false and misleading statements and omissions concerning the sustainability of Valeant's business model caused the losses for which Plaintiffs seek to recover damages.

18.     Between October 4, 2015, and February 29, 2016, a series of disclosures partially corrected Defendants' materially false and misleading statements and omissions, and the risks that Defendants concealed from the market partially materialized.

19.     New Valeant-specific information released to the market caused Valeant common stock to suffer a statistically significant abnormal price decline during the following corrective event windows:  October 5-6, 2015; October 15-16, 2015; October 19, 2015; October 21, 2015; October 26-28, 2015; October 29, 2015; October 30, 2015; November 4, 2015; November 5, 2015; November 11-12, 2015; February 19, 2016; and February 29, 2016.

20.     On March 21, 2016, Valeant filed a Form 8-K with the SEC, announcing a restatement of its financials for 2014 and 2015, admitting that its SEC filings from those periods contained "material misstatements," and declaring that its internal controls over financial reporting contained "material weaknesses."  On April 29, 2016, Valeant filed a Form 10-K with the SEC, revealing further details concerning the restatement.

21.     Valeant and Pearson admitted that the Company should not have recognized $58 million in revenue from orders delivered to Philidor at or near the end of 2014 because (i) those orders were not executed in the normal course of business, but rather to boost Valeant's revenue prior to execution of the purchase option agreement, and (ii) because collectability was not reasonably assured.  The improper revenue recognition in the second half of 2014 also had a material impact on the first quarter of 2015, reducing quarterly revenue by $21 million.

22.     Valeant and Pearson admitted that the "improper conduct" of Schiller and Corporate Controller Tanya Carro ("Carro") had "resulted in the provision of incorrect information" to the ARC and PwC and had contributed to the misstatement of results.

23.     Valeant and Pearson further admitted that "material weaknesses in the Company's internal control over financial reporting existed that contributed to the misstatements in the consolidated financial statements" associated with the 2014 sales to Philidor.  Valeant and Pearson stated that "these material weaknesses relate[] to the tone at the top of the organization and the

accounting and disclosure for non-standard revenue transactions particularly at or near quarter ends."

24.     Pearson, Schiller, and Carro were terminated from Valeant as a result of their misconduct. Several Valeant Directors and other senior executive officers were also forced out of the Company.

25.     In March 2016, Schiller was asked to resign as a member of Valeant's Board of Directors.

26.     In March 2016, Valeant announced that it had placed Carro on administrative leave.

27.     Pearson ceased being Valeant's CEO effective May 2, 2016, and did not stand for reelection as a Valeant Director.

28.     Several other senior Valeant executives – including Robert Rosiello, Ari Kellen, Robert Chai-Onn, and Laurie Little – left Valeant in the ensuing months.

29.     In April 2016, Valeant announced that Ronald Farmer, Colleen Goggins, Theo Melas-Kyriazi, G. Mason Morfit, and Norma Provencio would not stand for reelection as Directors of Valeant.

30.     Valeant implemented numerous changes to its internal controls and procedures following the departure of Pearson and Schiller.

31.     Valeant renamed itself Bausch Health Companies Inc. in July 2018 in an attempt to rebrand and disassociate itself from Defendants' fraud and the resulting scandal.

**B.    Plaintiffs intend to prove the following contested facts with regard to damages:**

**(This must include each item of damages, the amount of each item, the factual basis for each item and, if punitive damages are claimed, the facts upon which plaintiff will rely to establish punitive damages).**

Plaintiffs collectively suffered damages in the range of $1,099,607,027 to $1,138,757,625 as a result of Defendants' fraud. The factual bases for these damages are set forth in detail in the February 2, 2022 expert report (as amended) of Plaintiffs' expert witness on damages, Chad Coffman, CFA. Mr. Coffman calculates each fund's damages as follows:

| Plaintiff | Security | Damages Using Assumptions Provided by Counsel | Damages Using Out-Of-Pocket Method | Accounting Method |
|---|---|---|---|---|
| GMO Alpha Only Fund | Common Stock | $3,028,827 | $2,673,872 | LIFO |
| GMO Benchmark Free Fund | Common Stock | $62,168,328 | $61,727,308 | LIFO |
| GMO Developed World Stock Fund | Common Stock | $14,584,200 | $14,536,298 | LIFO |
| GMO Event Driven Fund | Common Stock | $14,091,917 | $14,045,641 | LIFO |
| GMO Global Equity Allocation Investment Fund | Common Stock | $7,265,727 | $7,241,358 | LIFO |
| GMO Global Equity Trust | Common Stock | $2,529,077 | $2,508,497 | LIFO |
| GMO Implementation Fund | Common Stock | $460,447,349 | $458,940,928 | LIFO |
| GMO International Equity Fund | Common Stock | $347,996,556 | $346,748,136 | LIFO |
| GMO International Large/Mid Cap Equity Fund | Common Stock | $64,506,863 | $64,283,253 | LIFO |
| GMO Mean Reversion Fund | Common Stock | $44,840 | $34,128 | LIFO |
| GMO Mean Reversion Special Solutions Fund | Common Stock | $14,848 | $11,261 | LIFO |
| GMO Real Return UCITS Fund | Common Stock | $124,846,557 | $124,431,140 | LIFO |
| GMO Tax Managed Global Balanced Fund | Common Stock | $3,661,106 | $3,649,017 | LIFO |
| GMO Tax Managed International Equities Fund | Common Stock | $12,031,202 | $11,991,402 | LIFO |
| GMO World Equity Allocation Investment Fund | Common Stock | $21,540,228 | $21,468,227 | LIFO |

| Plaintiff | Security | Damages Using Assumptions Provided by Counsel | Damages Using Out-Of-Pocket Method | Accounting Method |
|---|---|---|---|---|
| GMO Alpha Only Fund | Common Stock | $3,119,915 | $2,981,345 | FIFO |
| GMO Benchmark Free Fund | Common Stock | $62,823,157 | $62,440,346 | FIFO |
| GMO Developed World Stock Fund | Common Stock | $14,324,892 | $14,021,898 | FIFO |
| GMO Event Driven Fund | Common Stock | $13,467,337 | $13,335,706 | FIFO |
| GMO Global Equity Allocation Investment Fund | Common Stock | $7,461,518 | $7,399,487 | FIFO |
| GMO Global Equity Trust | Common Stock | $2,694,717 | $2,596,295 | FIFO |
| GMO Implementation Fund | Common Stock | $440,263,803 | $435,761,659 | FIFO |
| GMO International Equity Fund | Common Stock | $355,141,079 | $344,592,770 | FIFO |
| GMO International Large/Mid Cap Equity Fund | Common Stock | $64,930,346 | $62,672,280 | FIFO |
| GMO Mean Reversion Fund | Common Stock | $45,588 | $45,588 | FIFO |
| GMO Mean Reversion Special Solutions Fund | Common Stock | $15,205 | $15,205 | FIFO |
| GMO Real Return UCITS Fund | Common Stock | $118,614,840 | $117,690,880 | FIFO |
| GMO Tax Managed Global Balanced Fund | Common Stock | $3,464,787 | $3,440,253 | FIFO |
| GMO Tax Managed International Equities Fund | Common Stock | $12,505,962 | $11,890,538 | FIFO |
| GMO World Equity Allocation Investment Fund | Common Stock | $21,267,268 | $20,722,774 | FIFO |

5.   **DEFENDANTS' CONTESTED FACTS (State separately for each defendant. See instructions above).**

   A.   **Defendants intend to prove the following contested facts with regard to liability.**

   1.   Between January 1, 2013 and March 9, 2016, Mr. Pearson did not sell any Valeant securities, with the exception of one occasion in 2015 when securities he pledged as collateral for a loan to make charitable donations were liquidated by the lender.

   2.   Between January 1, 2013 and March 9, 2016, Mr. Schiller did not sell any Valeant securities.

   3.   GMO had over $100 billion in assets under management in 2015 and 2016.

   4.   GMO describes itself as a "contrarian" investor.

   5.   By June 2014, GMO knew that price increases within the pharmaceutical industry had received political scrutiny.

   6.   During summer 2014, Allergan, Inc. publicly criticized as unsustainable Valeant's business model, including the Company's acquisition-based revenue growth and price increases.

   7.   As part of its research into and analysis of Valeant, GMO created a financial model of Valeant.

   8.   GMO created extensive investment materials on Valeant.

   9.   The investment materials GMO created included an 83-page investment thesis presentation on Valeant that was shared internally in December 2014.

   10.   By December 9, 2014, GMO believed that Valeant was aggressive on price for its prescription products.

   11.   By December 9, 2014, GMO had identified Valeant's practice of buying a mispriced product and implementing price increases.

23

12.   By December 9, 2014, GMO had identified limited competition and massive pricing power as reasons to invest in Valeant.

13.   By December 9, 2014, GMO was aware of assertions that Valeant's acquisitions had masked poor organic growth.

14.   By December 10, 2014, GMO believed that Valeant's price increases were a good thing.

15.   Between 2015 and 2016, GMO conducted its own due diligence in addition to reviewing representations from Valeant's management.

16.   By April 27, 2015, GMO was aware of an article in the *Wall Street Journal* titled, "Pharmaceutical Companies Buy Rivals' Drugs, Then Jack Up the Prices," dated April 26, 2015.

17.   By September 3, 2015, GMO was aware of a report by *AZ Value Investing* entitled "Valeant: A Detailed Look Inside a Dangerous Story Well Told – PART IV: The IRR Fallacy," dated August 27, 2015.

18.   By September 10, 2015, GMO believed that Valeant's organic growth in principle could be overstated because Valeant bought drugs and then increased their prices.

19.   By September 30, 2015, GMO was prepared to take unconventional positions within its portfolios and hold them longer than the pain threshold of most other market participants.

20.   By October 3, 2015, GMO was aware of a report by Citron Research titled, "Why a Congressional Subpoena to Valeant About Price Gouging on Drugs Should be Granted," dated September 28, 2015.

21.   By October 5, 2015, GMO was aware of an article in the *New York Times* titled, "Valeant's Drug Price Strategy Enriches It, but Infuriates Patients and Lawmakers," dated October 4, 2015.

22. By October 15, 2015, GMO was aware of a series of posts on the Cafepharma message board that discussed Valeant's relationship with Philidor.

23. On October 15, 2015, GMO reviewed Valeant's October 14, 2015 response to Senator Claire McCaskill regarding the Company's reliance on price increases and concluded that Valeant had exaggerated the extent to which volume was a driver of growth.

24. By October 16, 2015, GMO was aware that David Steinberg, an analyst at Jefferies, had mentioned Philidor on a Valeant earnings call.

25. On October 16, 2015, a junior analyst at GMO who covered Valeant reached out to David Steinberg to discuss Philidor.

26. By October 20, 2015, GMO was aware of an article by Roddy Boyd titled, "The King's Gambit: Valeant's Big Secret," dated October 19, 2015.

27. By October 21, 2015, GMO was aware of a report by Citron Research titled, "Valeant: Could This Be The Pharmaceutical Enron?" published on October 21, 2015.

28. By October 21, 2015, GMO was aware of an article in the *New York Times* titled, "Drug Makers Sidestep Barriers on Pricing," dated October 19, 2015.

29. By October 23, 2015, GMO believed that Valeant's stock was cheap because it was controversial.

30. In October 2015, GMO prepared a "bottoms up" build of Valeant's earnings.

31. By October 26, 2015, GMO was aware of an article in the *Wall Street Journal* titled, "Valeant and Pharmacy More Intertwined Than Thought," dated October 25, 2015.

32. In October 2015, GMO reached out to at least one Philidor employee.

33. In November 2015, GMO commissioned a survey of over 200 dermatologists.

34.     By April 6, 2016, GMO acknowledged that it had paid insufficient attention to Valeant's business practices.

35.     In addition, Defendants intend to prove that any presumed or actual reliance by Plaintiffs on any alleged misrepresentations by Defendants, to the extent established, is rebutted by facts demonstrating Plaintiffs' lack of reliance and/or that any reliance by Plaintiffs was unreasonable.

36.     Finally, Defendants intend to prove that Mr. Pearson and Mr. Schiller acted in good faith and did not directly or indirectly induce any act or acts constituting a primary violation of the securities laws, to the extent applicable.

37.     In 2015, GMO discussed Valeant with other investors and met directly with Valeant's management, including Mr. Pearson and Mr. Schiller to discuss, among other things, Valeant's price increases.

**B.      Defendants intend to prove the following contested facts with regard to damages.**

**(This statement must include the factual basis for each defense against plaintiffs' claims for damages).**

1.      Certain bases for Defendants' position with respect to damages are set forth in the April 4, 2022 Expert Reports of Defendants' expert witnesses on damages and loss causation, Amy Hutton, Ph.D. and Mark Garmaise, Ph.D.

6.   **PLAINTIFFS' WITNESSES (Aside from those called for impeachment purposes, only those witnesses whose names and addresses are listed below will be permitted to testify at trial).**

   A.   On liability, plaintiffs intend to call the following witnesses who will testify in accordance with the following summaries:[2]

| Witness Name | Testimony Live or Via Deposition Designation |
|---|---|
| **William Ackman**<br>New York, New York<br><br>Mr. Ackman is the Founder and Chief Executive Officer of Pershing Square Capital Management, L.P.  Mr. Ackman was a Valeant shareholder and a member of its Board of Directors.<br><br>Mr. Ackman is expected to testify about, among other things, the Valeant Defendants' material misrepresentations and omissions. | Deposition Designation |
| **Amy Bricker**<br>Chesterfield, Missouri<br><br>Ms. Bricker was the President of Express Scripts, a pharmacy benefit manager that contracted with Philidor.<br><br>Ms. Bricker is expected to testify about, among other things, Valeant's use of and reliance on Philidor. | Deposition Designation |

---

[2] Plaintiffs' expert witnesses are listed below in Section 8.A.

| Witness Name | Testimony Live or Via Deposition Designation |
|---|---|
| **Tanya Carro**<br>Branchburg, New Jersey<br><br>Ms. Carro was Valeant's Corporate Controller and Senior Vice President of Finance.<br><br>Ms. Carro is expected to testify about, among other things, the Valeant Defendants' material misrepresentations and omissions; the Valeant Defendants' knowledge of the fraud; Valeant's use of and reliance on Philidor; and the drivers of Valeant's organic growth. | Live |
| **Seana Carson**<br>Toronto, Canada<br><br>Ms. Carson was Valeant's Chief Compliance Officer.<br><br>Ms. Carson is expected to testify about, among other things, the Valeant Defendants' material misrepresentations and omissions; the Valeant Defendants' knowledge of the fraud; Valeant's use of and reliance on Philidor; Valeant's lack of effective internal controls; and Valeant's Standard of Business Conduct. | Live |
| **Robert Chai-Onn**<br>Newport Beach, California<br><br>Mr. Chai-Onn was, among other things, Valeant's General Counsel, Chief Legal Officer, and Head of Corporate Business Development.  Mr. Chai-Onn was also a member of the Interim Office of the Chief Executive Officer beginning in December 2015.<br><br>Mr. Chai-Onn is expected to testify about, among other things, the Valeant Defendants' material misrepresentations and omissions; the Valeant Defendants' knowledge of the fraud; Valeant's use of and reliance on Philidor; the drivers of Valeant's organic growth; and Valeant's lack of effective internal controls. | Deposition Designation |

| Witness Name | Testimony Live or Via Deposition Designation |
|---|---|
| **Andrew Davenport**<br>Haverford, Pennsylvania<br><br>Mr. Davenport was Philidor's Chief Executive Officer.<br><br>Mr. Davenport is expected to testify about, among other things, the Valeant Defendants' knowledge of the fraud; Valeant's use of and reliance on Philidor; and the drivers of Valeant's organic growth. | *De Bene Esse* Deposition |
| **Andrew Davis**<br>Summit, New Jersey<br><br>Mr. Davis was Valeant's Senior Vice President of Corporate Development.<br><br>Mr. Davis is expected to testify about, among other things, the Valeant Defendants' knowledge of the fraud; Valeant's use of and reliance on Philidor; and the drivers of Valeant's organic growth. | Live |
| **James Fleming**<br>Rutledge, Pennsylvania<br><br>Mr. Fleming was Philidor's Corporate Controller.<br><br>Mr. Fleming is expected to testify about, among other things, the Valeant Defendants' knowledge of the fraud; Valeant's use of and reliance on Philidor; and the drivers of Valeant's organic growth. | Deposition Designation |
| **Christopher Fortson**<br>Tampa, Florida<br><br>Mr. Fortson was a Portfolio Manager in Grantham, Mayo & Van Otterloo's Global Equity Team.<br><br>Mr. Fortson is expected to testify about, among other things, GMO's purchases and sales of Valeant securities; GMO's reliance on the market price of Valeant securities; and GMO's reliance on the Valeant Defendants' material misrepresentations and omissions about Valeant's business. | Live |

29

| Witness Name | Testimony Live or Via Deposition Designation |
|---|---|
| **Paul Herendeen**<br>Longboat Key, Florida<br><br>Mr. Herendeen was Valeant's Executive Vice President and Chief Financial Officer and was designated as one of Valeant's corporate representatives pursuant to Federal Rule of Civil Procedure 30(b)(6).<br><br>Mr. Herendeen is expected to testify about, among other things, the Valeant Defendants' material misrepresentations and omissions; and the drivers of Valeant's organic growth. | Deposition Designation |
| **Jonathan Hirschfeld**<br>Randolph, New Jersey<br><br>Mr. Hirschfeld was PricewaterhouseCoopers' Lead Engagement Partner for its Valeant engagement.<br><br>Mr. Hirschfeld is expected to testify about, among other things, the Valeant Defendants' material misrepresentations and omissions; the Valeant Defendants' knowledge of the fraud; Valeant's use of and reliance on Philidor; the drivers of Valeant's organic growth; and Valeant's lack of effective internal controls. | Live |
| **Robert Ingram**<br>Deceased<br><br>Mr. Ingram was a member of Valeant's Board of Directors.<br><br>Mr. Ingram is expected to testify about, among other things, the Valeant Defendants' material misrepresentations and omissions; the Valeant Defendants' knowledge of the fraud; Valeant's use of and reliance on Philidor; the drivers of Valeant's organic growth; and Valeant's lack of effective internal controls. | Deposition Designation |

| Witness Name | Testimony Live or Via Deposition Designation |
|---|---|
| **Deborah Jorn**<br>Warren, New Jersey<br><br>Mr. Jorn was Valeant's Company Group Chairman and Executive Vice President of Dermatology.<br><br>Ms. Jorn is expected to testify about, among other things, the Valeant Defendants' knowledge of the fraud; Valeant's use of and reliance on Philidor; and the drivers of Valeant's organic growth. | Deposition Designation |
| **Ari Kellen**<br>Teaneck, New Jersey<br><br>Mr. Kellen was Valeant's Company Group Chairman and Executive Vice President.<br><br>Mr. Kellen is expected to testify about, among other things, the Valeant Defendants' material misrepresentations and omissions; the Valeant Defendants' knowledge of the fraud; Valeant's use of and reliance on Philidor; and the drivers of Valeant's organic growth. | Live |
| **Laizer Kornwasser**<br>Teaneck, New Jersey<br><br>Mr. Kornwasser was Valeant's Company Group Chairman and Executive Vice President.<br><br>Mr. Kornwasser is expected to testify about, among other things, the Valeant Defendants' knowledge of the fraud; Valeant's use of and reliance on Philidor; and the drivers of Valeant's organic growth. | Live |

| Witness Name | Testimony Live or Via Deposition Designation |
|---|---|
| **Laurie Little**<br>Las Vegas, Nevada<br><br>Ms. Little was Valeant's Head of Investor Relations.<br><br>Ms. Little is expected to testify about, among other things, the Valeant Defendants' material misrepresentations and omissions; the Valeant Defendants' knowledge of the fraud; Valeant's use of and reliance on Philidor; and the drivers of Valeant's organic growth. | Deposition Designation |
| **Steven McCall**<br>Mesa, Arizona<br><br>Mr. McCall was Vice President of Network Services for CVS Caremark, a pharmacy benefit manager that contracted with Philidor.<br><br>Mr. McCall is expected to testify about, among other things, Valeant's use of and reliance on Philidor. | Deposition Designation |
| **Steven McIlwraith**<br>Austin, Texas<br><br>Mr. McIlwraith was PricewaterhouseCoopers' Senior Manager for its Valeant engagement.<br><br>Mr. McIlwraith is expected to testify about, among other things, the Valeant Defendants' material misrepresentations and omissions; the Valeant Defendants' knowledge of the fraud; Valeant's use of and reliance on Philidor; the drivers of Valeant's organic growth; and Valeant's lack of effective internal controls. | Live |

| Witness Name | Testimony Live or Via Deposition Designation |
|---|---|
| **Theo Melas-Kyriazi**<br>Chestnut Hill, Massachusetts<br><br>Mr. Melas-Kyriazi was a member of Valeant's Board of Directors.<br><br>Mr. Melas-Kyriazi is expected to testify about, among other things, the Valeant Defendants' material misrepresentations and omissions; the Valeant Defendants' knowledge of the fraud; Valeant's use of and reliance on Philidor; the drivers of Valeant's organic growth; and Valeant's lack of effective internal controls. | Deposition Designation |
| **James Mendelson**<br>Boston, Massachusetts<br><br>Mr. Mendelson was an Equity Research Analyst in Grantham, Mayo & Van Otterloo's Global Equity Team.<br><br>Mr. Mendelson is expected to testify about, among other things, GMO's purchases and sales of Valeant securities; GMO's reliance on the market price of Valeant securities; and GMO's reliance on the Valeant Defendants' material misrepresentations and omissions about Valeant's business. | Live |
| **Jacquelyn Nascimento**<br>Port Saint Lucie, Florida<br><br>Ms. Nascimento was a Team Lead in Valeant's Customer Service Department.<br><br>Ms. Nascimento is expected to testify about, among other thigs, the Valeant Defendants' knowledge of the fraud; Valeant's use of and reliance on Philidor; and the drivers of Valeant's organic growth. | Deposition Designation |

33

| Witness Name | Testimony Live or Via Deposition Designation |
|---|---|
| **Craig Olson**<br>Warren, New Jersey<br><br>Mr. Olson was Valeant's Vice President of Finance and Head of Corporate and Commercial Financial Planning and Analysis.<br><br>Mr. Olson is expected to testify about, among other things, Valeant's use of and reliance on Philidor; the drivers of Valeant's organic growth; and Valeant's lack of effective internal controls. | Live |
| **Joseph Papa**<br>Far Hills, New Jersey<br><br>Mr. Papa succeeded J. Michael Pearson as Valeant's Chief Executive Officer in May 2016.<br><br>Mr. Papa is expected to testify about, among other things, Valeant's use of and reliance on Philidor; the drivers of Valeant's organic growth; and Valeant's lack of effective internal controls. | Deposition Designation |
| **Bijal Patel**<br>Scottsdale, Arizona<br><br>Mr. Patel was the Manager of Valeant's Access Solutions Team.<br><br>Mr. Patel is expected to testify about, among other things, the Valeant Defendants' knowledge of the fraud; Valeant's use of and reliance on Philidor; and the drivers of Valeant's organic growth. | Deposition Designation |

34

| Witness Name | Testimony Live or Via Deposition Designation |
|---|---|
| **J. Michael Pearson**<br>Fort Lauderdale, Florida<br><br>Mr. Pearson was Valeant's Chief Executive Officer and the Chairman of Valeant's Board of Directors.<br><br>Mr. Pearson is expected to testify about, among other things, the Valeant Defendants' material misrepresentations and omissions; the Valeant Defendants' knowledge of the fraud; Valeant's use of and reliance on Philidor; the drivers of Valeant's organic growth; and Valeant's lack of effective internal controls. | Live |
| **Alison Pritchett**<br>Chandler, Arizona<br><br>Ms. Pritchett was the Senior Product Manager of Valeant's Access Solutions Team and, later, Philidor's Vice President of Strategic Relationships.<br><br>Ms. Pritchett is expected to testify about, among other things, the Valeant Defendants' knowledge of the fraud; Valeant's use of and reliance on Philidor; and the drivers of Valeant's organic growth. | Deposition Designation |
| **Norma Provencio**<br>Hacienda Heights, California<br><br>Ms. Provencio was a member of Valeant's Board of Directors.<br><br>Ms. Provencio is expected to testify about, among other things, the Valeant Defendants' material misrepresentations and omissions; the Valeant Defendants' knowledge of the fraud; Valeant's use of and reliance on Philidor; the drivers of Valeant's organic growth; and Valeant's lack of effective internal controls. | Deposition Designation |

| Witness Name | Testimony Live or Via Deposition Designation |
|---|---|
| **Russel Reitz**<br>Sonora, California<br><br>Mr. Reitz is the Founder of R&O Pharmacy, which was acquired by Philidor.<br><br>Mr. Reitz is expected to testify about, among other things, the Valeant Defendants' knowledge of the fraud; and Valeant's use of and reliance on Philidor. | Live |
| **Robert Rosiello**<br>Boston, Massachusetts<br><br>Mr. Rosiello was Valeant's Executive Vice President and succeeded Mr. Schiller as Valeant's Chief Financial Officer.<br><br>Mr. Rosiello is expected to testify about, among other things, the Valeant Defendants' material misrepresentations and omissions; the Valeant Defendants' knowledge of the fraud; Valeant's use of and reliance on Philidor; and the drivers of Valeant's organic growth. | Live |
| **Natalie Rush**<br>Berkeley Heights, New Jersey<br><br>Ms. Rush was Valeant's Head of Trade Relations.<br><br>Ms. Rush is expected to testify about, among other things, the Valeant Defendants' knowledge of the fraud; Valeant's use of and reliance on Philidor; and the drivers of Valeant's organic growth. | Deposition Designation |
| **Katharine Rutkowski**<br>Bridgewater, New Jersey<br><br>Ms. Rutkowski was Valeant's Vice President of Finance.<br><br>Ms. Rutkowski is expected to testify about, among other things, the Valeant Defendants' knowledge of the fraud; Valeant's use of and reliance on Philidor; and the drivers of Valeant's organic growth. | Deposition Designation |

| Witness Name | Testimony Live or Via Deposition Designation |
|---|---|
| **Howard Schiller**<br>Telluride, Colorado<br><br>Mr. Schiller was Valeant's Chief Financial Officer and a member of Valeant's Board of Directors. Mr. Schiller also served as Valeant's interim Chief Executive Officer in late 2015 and early 2016.<br><br>Mr. Schiller is expected to testify about, among other things, the Valeant Defendants' material misrepresentations and omissions; the Valeant Defendants' knowledge of the fraud; Valeant's use of and reliance on Philidor; the drivers of Valeant's organic growth; and Valeant's lack of effective internal controls. | Live |
| **Steven Sembler**<br>Newtown, Pennsylvania<br><br>Mr. Sembler was Valeant's Senior Vice President of Neurology/Other Business Units.<br><br>Mr. Sembler is expected to testify about, among other things, Valeant's use of and reliance on Philidor; the drivers of Valeant's organic growth; and Valeant's lack of effective internal controls. | Live |
| **David Steinberg**<br>San Francisco, California<br><br>Mr. Steinberg was a Managing Director and Senior Equity Research Analyst at Jeffries, where he covered Valeant.<br><br>Mr. Steinberg is expected to testify about, among other things, the Valeant Defendants' material misrepresentations and omissions; and Valeant's use of and reliance on Philidor. | Deposition Designation |

| Witness Name | Testimony Live or Via Deposition Designation |
|---|---|
| **Katharine Stevenson**<br>Toronto, Canada<br><br>Ms. Stevenson was a member of Valeant's Board of Directors.<br><br>Ms. Stevenson is expected to testify about, among other things, the Valeant Defendants' material misrepresentations and omissions; the Valeant Defendants' knowledge of the fraud; Valeant's use of and reliance on Philidor; the drivers of Valeant's organic growth; and Valeant's lack of effective internal controls. | Deposition Designation |
| **Jeffrey Strauss**<br>Whippany, New Jersey<br><br>Mr. Strauss was Valeant's Director of Marketing for Dermatology, Neurology, and Aesthetics.<br><br>Mr. Strauss is expected to testify about, among other things, the Valeant Defendants' knowledge of the fraud; and the drivers of Valeant's organic growth. | Deposition Designation |
| **Gary Tanner**<br>Gilbert, Arizona<br><br>Mr. Tanner was Valeant's Executive Director of Commercial Analytics and, later, Vice President of Access Solutions.<br><br>Mr. Tanner is expected to testify about, among other things, the Valeant Defendants' knowledge of the fraud; Valeant's use of and reliance on Philidor; and the drivers of Valeant's organic growth. | Live |

| Witness Name | Testimony Live or Via Deposition Designation |
|---|---|
| **Barbara Teresak**<br>Whitehouse Station, New Jersey<br><br>Ms. Teresak was Valeant's Director of Corporate Financial Planning and Analysis in its Global Consolidations Group.<br><br>Ms. Teresak is expected to testify about, among other things, the Valeant Defendants' knowledge of the fraud; and the drivers of Valeant's organic growth. | Deposition Designation |
| **Kelly Webber**<br>Montvale, New Jersey<br><br>Ms. Webber was Valeant's Senior Vice President and Chief Human Resources Officer and was designated as one of Valeant's corporate representatives pursuant to Federal Rule of Civil Procedure 30(b)(6).<br><br>Ms. Webber is expected to testify about, among other things, the Valeant Defendants' material misrepresentations and omissions; the Valeant Defendants' knowledge of the fraud; Valeant's use of and reliance on Philidor; and Valeant's lack of effective internal controls. | Live |
| **Ryan Weldon**<br>Lake Oswego, Oregon<br><br>Mr. Weldon was Valeant's Executive Vice President and Head of Dermatology.<br><br>Mr. Weldon is expected to testify about, among other things, the Valeant Defendants' knowledge of the fraud; Valeant's use of and reliance on Philidor; and the drivers of Valeant's organic growth. | Deposition Designation |

*Subject to Defendants' objections, Plaintiffs may call a witness to authenticate the document identified in Exhibit B hereto, if the parties are unable to resolve the authentication objection in advance of trial.*

| Witness Name | Testimony Live or Via Deposition Designation |
|---|---|
| **Richard Wichansky**<br>Randolph, New Jersey<br><br>Mr. Wichansky was Valeant's Senior Director of SEC Reporting.<br><br>Mr. Wichansky is expected to testify about, among other things, the Valeant Defendants' material misrepresentations and omissions; the Valeant Defendants' knowledge of the fraud; and Valeant's use of and reliance on Philidor. | Live |

B. **On damages, plaintiffs intend to call the following witnesses who will testify in accordance with the following summaries:**

The calculation of damages for a claim brought pursuant to Section 10(b) or 20(a) of the Exchange Act is the province of expert testimony. *Sowell v. Butcher & Singer, Inc.*, 926 F.2d 289, 301 (3d Cir. 1991) ("As a general rule, plaintiffs alleging securities fraud rely on expert testimony to establish both the fact of damage and the appropriate method of calculation. *See, e.g., Behrens v. Wometco Enterprises, Inc.*, 118 F.R.D. 534, 542 (S.D.Fla.1988) (proof of damages in securities fraud case is always difficult and requires expert testimony), *aff'd*, 899 F.2d 21 (11th Cir.1990).").
Plaintiffs' expert witness on damages is Chad Coffman, CFA.

C. **Defendants object to Plaintiffs' witnesses for the reasons stated:**

Defendants generally object to Plaintiffs' witness list as overbroad and improperly cumulative. Plaintiffs' witness list identifies 47 witnesses: 21 witnesses they expect to call live, two witnesses whose depositions they expect to take *de bene esse*, and an additional 24 witnesses they expect to testify via deposition. The Direct Action Plaintiffs' April 2, 2024 trial plan for a single consolidated trial of all 21 Direct Actions – which they estimated could take place over two weeks – identified 23 witnesses that were relevant to the GMO action (19 common witnesses to

40

be called live,[1] 1 representative from GMO to be called live, and 3 additional common fact witnesses to testify by deposition). *See* ECF 1385 at 7-8. GMO has now ***more than doubled*** that number for its individual trial despite only having eight trial days. The GMO Plaintiffs cannot reasonably expect to call anywhere close to 47 witnesses in the eight days the Court has set aside. *See* April 22, 2024 Order (ECF 1400). Plaintiffs should be required to immediately identify a subset of those witnesses they actually expect to call at trial so as not to burden the parties and/or the Court with unnecessary pre-trial disputes and preparation.

Defendants also object to Plaintiffs' inclusion of Kelly Webber on their witness list to the extent Plaintiffs seek testimony outside of her personal knowledge. Ms. Webber was designated as a corporate representative of Valeant Pharmaceuticals International Inc., pursuant to Federal Rule of Civil Procedure 30(b)(6), and testified in that capacity, not in her personal capacity. *See* Section 6: Plaintiffs' Witnesses, (Ms. Webber "was designated as one of Valeant's corporate representatives pursuant to Federal Rule of Civil Procedure 30(b)(6)."). Rule 30(b)(6) "specifically applies to the deposition of a corporation" and "[t]here is no provision allowing the use of the 30(b)(6)-type designation . . . in order to compel a particular person, who may be a corporate employee outside the subpoena power of the court, to testify at trial." *Hill v. Nat'l RailRoad Passenger*, CIV. A. No. 88 5277, 1989 WL 87621, at *1 (E.D. La. July 28, 1989). In contrast to a 30(b)(6) deposition, "Federal Rule of Evidence 602 limits the scope of a witness's testimony to matters that are within his or her personal knowledge." *Union Pump Co. v. Centrifugal Tech. Inc.*, 404 F. Appx. 899, 907 (5th Cir. 2010) (emphasis added). Thus, courts have refused to "compel trial testimony through a Rule 30(b)(6)-type designation," *Dopson-Troutt v.*

---

[1] Two Underwriter Defendant witnesses Morgan Stanley and Deutsche Bank, who are relevant to the Hound action, but not relevant to the GMO case, were also identified as common witnesses.

*Novartis Pharm. Corp.*, 295 F.R.D. 536, 540 (M.D. Fla. 2013), and have limited the scope of testimony of corporate employees to matters within their personal knowledge, *see Ioengine, LLC v. Paypal Holdings, Inc.*, 2022 U.S. Dist. LEXIS 127876, at *16 (D. Del. June 15, 2022) (noting that "at trial, a non-party 30b)(6) witness must have personal knowledge of matters about which he testifies"). Defendants object to Ms. Webber testifying at trial as to matters that are outside of her personal knowledge.

In addition, Defendants object to Plaintiffs' taking a *de bene esse* deposition of Mr. Davenport via Zoom in August. Whether to permit a *de bene esse* deposition is at "the sound discretion of the court," and since Mr. Davenport has already provided two days of deposition testimony in this action, such additional examination is unnecessary and only serves to undermine the prior scheduling orders in this action. *See Indian Brand Farms v. Novartis Crop. Prot., Inc.*, 2011 U.S. Dist. LEXIS 167212, at *7-8 (D.N.J. Aug. 22, 2011). Given that Plaintiffs' request was made late in the JPTO process, Defendants intend to confer further with Plaintiffs regarding this proposal.

Plaintiffs' deposition designations, Defendants' objections and counter-designations to Plaintiffs' designations, and Plaintiffs' objections to Defendants' counter-designations are set forth on **Exhibit C**. Defendants' objections use the following key:

| Objection Key | |
|---|---|
| 105 | FRE 105 |
| 401/402 | FRE 401 and 402 |
| 403 | FRE 403 |
| 403 | FRE 403 |
| 407 | FRE 407 |

42

| 602 | FRE 602 |
|---|---|
| 611(a) | FRE 611(a) |
| 611(b) | FRE 611(b) |
| 701/702 | FRE 701 and 702 |
| 901 | FRE 901 |
| F | Lack of Foundation |
| H | Hearsay |
| MIL | Subject to Defendants' forthcoming motions *in limine* |

7.   **DEFENDANTS' WITNESSES (See instructions above).**

A.   **On liability, Defendants intend to call the following witnesses who will testify in accordance with the following summaries:**

| Witness | Will Call | May Call |
|---|---|---|
| **Andrew Davis, Vice President of Business Development, Valeant.**<br><br>Mr. Davis will testify regarding Valeant's business model and acquisition strategy, including but not limited to the December 15, 2014 option purchase agreement between Valeant and Philidor, and matters addressed during his deposition. | | Live |
| **Ari Kellen, Executive Vice President and Company Group Chairman, Valeant.**<br><br>Mr. Kellen will testify regarding Valeant's relationship with Philidor, including but not limited to Valeant's shipment of product to Philidor, and Valeant's general product delivery practices, and matters addressed during his deposition. | | Live |

| Witness | Will Call | May Call |
|---|---|---|
| **Deborah Jorn, Company Group Chairman and EVP, Valeant.**<br><br>Ms. Jorn will testify regarding Valeant's internal forecasting and processes in connection with potential price increases, and Valeant's distribution of dermatology products through Philidor. | | Deposition Designations |
| **Howard Schiller, CFO, Valeant.**<br><br>Mr. Schiller will testify regarding (i) Valeant's relationship with Philidor, (ii) Valeant's provision of information to and discussions with PwC and other Valeant personnel regarding Valeant's relationship with and sales to Philidor, the option purchase agreement, and associated accounting judgments, (iii) Valeant's business model, including but not limited to its acquisition strategy, (iv) the alleged misstatements attributed to Mr. Schiller, (v) his affirmative defenses, and (vi) matters addressed during his deposition. | Live | |
| **J. Michael Pearson, CEO, Valeant.**<br><br>Mr. Pearson will testify regarding (i) Valeant's relationship with and sales to Philidor, (ii) Valeant's provision of information to and discussions with PwC and other Valeant personnel regarding Valeant's disclosures, including Valeant's relationship with and sales to Philidor and the option purchase agreement, (iii) Valeant's business model, including but not limited to its acquisition strategy and pricing of pharmaceutical products, (iv) Valeant's disclosures regarding its organic growth and the internal review of and contributing factors thereto, (v) the alleged misstatements attributed to Mr. Pearson, (vi) his affirmative defenses, and (vii) matters addressed during his deposition. | Live | |
| **James R. Fleming, Controller, Philidor.**<br><br>Mr. Fleming will testify regarding Valeant's relationship with Philidor and Philidor's purchases of Valeant product. | | Deposition Designations |
| **Katharine Rutkowski, Vice President of Finance, Valeant.**<br><br>Ms. Rutkowski will testify regarding Valeant's provision of information to PwC in connection with PwC's audits of Valeant's reported financials. | | Deposition Designations |

| Witness | Will Call | May Call |
|---|---|---|
| **Mason Morfit, Valeant director and member of Ad Hoc Committee.**<br><br>Mr. Morfit will testify regarding the Ad Hoc Committee's conclusions regarding revising and restating certain of Valeant's reported financial information. | | Deposition Designations |
| **Norma A. Provencio, Valeant director and member of Ad Hoc Committee.**<br><br>Ms. Provencio will testify regarding the Ad Hoc Committee's conclusions regarding revising and restating certain of Valeant's reported financial information, Valeant's SEC disclosures during the relevant time period, and the Board processes followed in reviewing those disclosures. | | Deposition Designations |
| **Katharine Berghuis Stevenson, Valeant director and member of Audit and Risk Committee.**<br><br>Ms. Stevenson will testify concerning Valeant revising and restating certain of its reported financial information, Valeant's SEC disclosures during the relevant time period, and the Board processes followed in reviewing those disclosures. | | Deposition Designations |
| **Richard Wichansky, Senior Director of SEC Reporting, Valeant.**<br><br>Mr. Wichansky will testify regarding (i) Valeant's SEC disclosures during the relevant time period, (ii) Valeant's revision and restatement of certain financial information in connection with the Ad Hoc Committee's investigation, (iii) Valeant's accounting for sales to Philidor leading up to and following the December 15, 2014 option purchase agreement, and (iv) matters addressed during his deposition. | | Live |
| **Robert A. Ingram, Valeant director and member of Ad Hoc Committee.**<br><br>Mr. Ingram will testify regarding the Ad Hoc Committee's findings regarding the accounting for sales to Philidor leading up to the December 15, 2014 option purchase agreement. | | Deposition Designations |
| **Robert Rosiello, CFO, Valeant.** | | Live |

| Witness | Will Call | May Call |
|---|---|---|
| Mr. Rosiello will testify regarding Valeant management's work in connection with the Ad Hoc Committee investigation, and matters addressed during his deposition. | | |
| **Tanya Carro, Controller, Valeant.** Ms. Carro will testify regarding (i) Valeant's relationship with Philidor, (ii) Valeant's interactions with PwC leading up to and following the December 15, 2014 option purchase agreement between Valeant and Philidor, (iii) Valeant's calculations of organic growth and the various methods and assumptions used in preparing such calculations, and (iv) matters addressed during her deposition. | Live | |
| **Theo Melas-Kyriazi, Valeant director.** Mr. Melas-Kyriazi will testify the Audit and Risk Committee's review of certain disclosure thresholds and the Committee's discussions with PwC regarding Valeant's disclosure obligations related to the December 15, 2014 option purchase agreement between Valeant and Philidor. | | Deposition Designations |
| **Robert Chai-Onn, General Counsel, Valeant.** Mr. Chai-Onn will testify regarding (i) Valeant's provision of information to and discussions with PwC and other Valeant personnel regarding Valeant's relationship with and sales to Philidor, the option purchase agreement, and associated accounting judgments, (ii) Valeant's processes for the review and approval of public statements, and (iii) Valeant's SEC disclosures during the relevant time period. | | Deposition Designations |
| **David Michael Steinberg, Managing Director, Jefferies.** Mr. Steinberg will testify regarding Valeant's (i) disclosures to investors and analysts and general industry knowledge regarding Valeant's business practices, including but not limited to Valeant's pricing practices and relationship with Philidor, and (ii) Valeant's stock price performance in 2015-2016 and factors that contributed to Valeant's stock price decline during that period. | | Deposition Designations |

| Witness | Will Call | May Call |
|---|---|---|
| **Gary Francis Sardo, Analyst and Audit Manager, PwC.**<br><br>Mr. Sardo will testify regarding (i) PwC's 2014 audit of Valeant, (ii) PwC's knowledge and review of Valeant's relationship with Philidor and Valeant's Philidor-related disclosures, (iii) PwC's review and conclusions regarding the proper accounting for Valeant's sales to Philidor leading up to and following the execution of the option purchase agreement, and (iv) matters addressed during his deposition. | Live | |
| **Jonathan J. Hirschfeld, Valeant Engagement Partner, PwC.**<br><br>Mr. Hirschfeld will testify regarding (i) PwC's conclusions regarding Valeant's accounting for sales to Philidor, (ii) PwC's review and input on Valeant's public disclosures regarding Philidor, (iii) PwC's consultations with Valeant management regarding the December 15, 2014 option purchase agreement between Valeant and Philidor, and (iv) matters addressed during his deposition. | Live | |
| **Stephen John McIlwraith, Senior Engagement Manager, PwC.**<br><br>Mr. McIlwraith will testify regarding (i) PwC's 2014 audit of Valeant, (ii) PwC's internal consultations regarding the accounting for Valeant sales to Philidor, (iii) PwC's review and input on Valeant's public disclosures regarding Philidor, and matters addressed during his deposition. | Live | |
| **Matthew Magi, Associate Auditor, PwC.**<br><br>Mr. Magi will testify regarding PwC's receipt of audit documentation from Valeant. | Live | |
| **Christopher Joseph Fortson, Head of Global Equities Fundamental Team, GMO.**<br><br>Mr. Fortson will testify regarding (i) GMO's decision to invest in Valeant, (ii) GMO's analysis of Valeant's business operations, (iii) GMO's review and awareness of the information allegedly misrepresented by Defendants, and (iv) matters addressed during his deposition. | Live | |
| **James Mendelson, Analyst, GMO.** | Live | |

| Witness | Will Call | May Call |
|---|---|---|
| Mr. Mendelson will testify regarding (i) GMO's review and analysis of Valeant's business operations, (ii) factors considered in connection with GMO's investment in Valeant, (iii) GMO's review and awareness of the information allegedly misrepresented by Defendants, and (iv) matters addressed during his deposition. | | |
| **Matt Kadnar, Portfolio Manager, GMO.** Mr. Kadnar will testify regarding GMO's investments in Valeant and GMO's internal assessment of its decision-making processes and analyses in connection with its Valeant investment, and matters addressed during his deposition. | | Deposition Designations |

B.      **On damages, Defendants intend to call the following witnesses who will testify in accordance with the following summaries:**

Defendants intend to call expert witnesses with respect to issues of damages. Defendants' expert witnesses on damages are Dr. Amy Hutton and Dr. Mark Garmaise.

C.      **Plaintiffs object to the following witnesses for the reasons stated:**

| Witness Name | Plaintiffs' Objection |
|---|---|
| **Tanya Carro** Live | Plaintiffs do not object to Ms. Carro testifying live but expressly do not waive any evidentiary objections to Ms. Carro's testimony. |
| **Robert Chai-Onn** Via Deposition Designation | Plaintiffs do not object to Mr. Chai-Onn testifying via deposition designation but object to Defendants' designations of Mr. Chai-Onn's deposition testimony for the reasons stated in their objections and counter-designations served on May 28, 2024. |
| **Andrew Davis** Live | Plaintiffs do not object to Mr. Davis testifying live but expressly do not waive any evidentiary objections to Mr. Davis's testimony. |
| **James Fleming** Via Deposition Designation | Plaintiffs do not object to Mr. Fleming testifying via deposition designation but object to Defendants' designations of Mr. Fleming's deposition testimony |

| Witness Name | Plaintiffs' Objection |
|---|---|
| | for the reasons stated in their objections and counter-designations served on May 28, 2024. |
| **Christopher Fortson**<br>**Live** | Plaintiffs do not object to Mr. Fortson testifying live but expressly do not waive any evidentiary objections to Mr. Fortson's testimony. |
| **Jonathan Hirschfeld**<br>**Live** | Plaintiffs do not object to Mr. Hirschfeld testifying live but expressly do not waive any evidentiary objections to Mr. Hirschfeld's testimony. |
| **Robert Ingram**<br>**Via Deposition Designation** | Plaintiffs do not object to Mr. Ingram testifying via deposition designation but object to Defendants' designations of Mr. Ingram's deposition testimony for the reasons stated in their objections and counter-designations served on May 28, 2024. |
| **Deborah Jorn**<br>**Deposition Designation** | Plaintiffs do not object to Ms. Jorn testifying via deposition designation but object to Defendants' designations of Ms. Jorn's deposition testimony for the reasons stated in their objections and counter-designations served on May 28, 2024. |
| **Matthew Kadnar**<br>**Deposition Designation** | Plaintiffs do not object to Mr. Kadnar testifying via deposition designation but object to Defendants' designations of Mr. Kadnar's deposition testimony for the reasons stated in their objections and counter-designations served on May 28, 2024. |
| **Ari Kellen**<br>**Live** | Plaintiffs do not object to Mr. Kellen testifying live but expressly do not waive any evidentiary objections to Mr. Kellen's testimony. |

| Witness Name | Plaintiffs' Objection |
|---|---|
| **Matthew Magi**<br>Live | Plaintiffs object to Mr. Magi's testimony. Mr. Magi was not disclosed in Defendants' Initial Disclosures or Supplemental Initial Disclosures. Nor did Defendants seek to depose Mr. Magi alongside PwC's other witnesses. Accordingly, Mr. Magi's live testimony at trial would be an unfair surprise to Plaintiffs and unduly prejudicial. *See Chiesi USA, Inc. v. Aurobindo Pharma USA, Inc.*, 2021 WL 6774676, at *5-6 (D.N.J. Dec. 17, 2021); *Toscano v. Case*, 2013 WL 5333206, at *5 (D.N.J. Sept. 20, 2013). Moreover, Plaintiffs object to Mr. Magi's testimony as unnecessarily cumulative given that Mr. Hirschfeld and Mr. McIlwraith currently are expected to testify live at trial regarding PwC's engagement with Valeant. *See Robert S. v. Stetson Sch., Inc.*, 256 F.3d 159, 169-70 (3d Cir. 2001); *Leja v. Schmidt Mfg., Inc.*, 2010 WL 2681975, at *7 (D.N.J. July 1, 2010). |
| **Steven McIlwraith**<br>Live | Plaintiffs do not object to Mr. McIlwraith testifying live but expressly do not waive any evidentiary objections to Mr. McIlwraith's testimony.<br><br>Additionally, Plaintiffs understand Mr. McIlwraith to reside in Austin, Texas and, accordingly, that Defendants have obtained his consent or expect to obtain his consent to testify live at trial, where Plaintiffs will have the opportunity to examine him in-person. |
| **Theo Melas-Kyriazi**<br>Via Deposition Designation | Plaintiffs do not object to Mr. Melas-Kyriazi testifying via deposition designation but object to Defendants' designations of Mr. Melas-Kyriazi's deposition testimony for the reasons stated in their objections and counter-designations served on May 28, 2024. |
| **James Mendelson**<br>Live | Plaintiffs do not object to Mr. Mendelson testifying live but expressly do not waive any evidentiary objections to Mr. Mendelson's testimony. |
| **Mason Morfit**<br>Deposition Designation | Plaintiffs do not object to Mr. Morfit testifying via deposition designation but object to Defendants' designations of Mr. Morfit's deposition testimony for |

| Witness Name | Plaintiffs' Objection |
|---|---|
| | the reasons stated in their objections and counter-designations served on May 28, 2024. |
| **J. Michael Pearson** Live | Plaintiffs do not object to Mr. Pearson testifying live but expressly do not waive any evidentiary objections to Mr. Pearson's testimony. |
| **Norma Provencio** **Deposition Designation** | Plaintiffs do not object to Ms. Provencio testifying via deposition designation but object to Defendants' designations of Ms. Provencio's deposition testimony for the reasons stated in their objections and counter-designations served on May 28, 2024. |
| **Robert Rosiello** Live | Plaintiffs do not object to Mr. Rosiello testifying live but expressly do not waive any evidentiary objections to Mr. Rosiello's testimony. Additionally, Plaintiffs understand Mr. Rosiello to reside in Boston, Massachusetts and, accordingly, that Defendants have obtained his consent or expect to obtain his consent to testify live at trial, where Plaintiffs will have the opportunity to examine him in-person. |
| **Katharine Rutkowski** **Via Deposition Designation** | Plaintiffs do not object to Ms. Rutkowski testifying via deposition designation but object to Defendants' designations of Ms. Rutkowski's deposition testimony for the reasons stated in their objections and counter-designations served on May 28, 2024. |
| **Gary Sardo** Live | Plaintiffs object to Mr. Sardo's testimony as unnecessarily cumulative given that Mr. Hirschfeld and Mr. McIlwraith currently are expected to testify live at trial regarding PwC's engagement with Valeant. *See Robert S. v. Stetson Sch., Inc.*, 256 F.3d 159, 169-70 (3d Cir. 2001); *Leja v. Schmidt Mfg., Inc.*, 2010 WL 2681975, at *7 (D.N.J. July 1, 2010). |
| **Howard Schiller** Live | Plaintiffs do not object to Mr. Schiller testifying live but expressly do not waive any evidentiary objections to Mr. Schiller's testimony. |

| Witness Name | Plaintiffs' Objection |
|---|---|
| David Steinberg<br>Via Deposition Designation | Plaintiffs do not object to Mr. Steinberg testifying via deposition designation but object to Defendants' designations of Mr. Steinberg's deposition testimony for the reasons stated in their objections and counter-designations served on May 28, 2024. |
| Katharine Stevenson<br>Via Deposition Designation | Plaintiffs do not object to Ms. Stevenson testifying via deposition designation but object to Defendants' designations of Ms. Stevenson's deposition testimony for the reasons stated in their objections and counter-designations served on May 28, 2024. |
| Richard Wichansky<br>Live | Plaintiffs do not object to Mr. Wichansky testifying live but expressly do not waive any evidentiary objections to Mr. Wichansky's testimony. |

Defendants' deposition designations, Plaintiffs' objections and counter-designations to Defendants' designations, and Defendants' objections to Plaintiffs' counter-designation are set forth on **Exhibit D** and **Exhibit E**. Plaintiffs' objections use the following key:

| Objection Key | |
|---|---|
| A | Authenticity – FRE 901 |
| F | Foundation |
| R | Relevance – FRE 401 |
| P | Unfair prejudice, confusion, potential to mislead the jury, undue delay, waste of time, or needless presentation of cumulative evidence – FRE 403 |
| C | Character Evidence – FRE 404 |
| K | Lack of Personal Knowledge – FRE 602 |
| H | Hearsay – FRE 801 and 802 |
| L | Improper Lay Opinion – FRE 701 |

| | |
|---|---|
| W | Waiver - By invoking privilege and refusing to produce documents or allow testimony on these topics, Defendants have waived their right to seek admission of evidence concerning: (1) their reliance on the advice of counsel or the involvement of counsel (a) in support of their defense of good faith or (b) to oppose evidence in support of a showing of scienter; or (2) the ad hoc committee's non-public investigation, communications, and findings. |
| 106 | Completeness – FRE 106 |

8.    **PLAINTIFFS' EXPERT WITNESSES**

A.    **Plaintiffs' expert witnesses are:**

    i.    <u>Chad Coffman, CFA</u>. Mr. Coffman is expected to testify about the opinions in his February 2, 2022 and May 9, 2022 expert reports, as modified by the Court's January 2, 2024 Order.

    ii.    <u>Jill Fisch</u>. Ms. Fisch is expected to testify about the opinions in her February 2, 2022 and May 9, 2022 expert reports.

    iii.    <u>Stanley Fortgang</u>. Mr. Fortgang is expected to testify about the opinions in his April 4, 2022 expert report as a rebuttal witness to Carl Seiden if Mr. Seiden testifies.

    iv.    <u>Gregg Jarrell</u>. Mr. Jarrell is expected to testify about the opinions in his February 2, 2022 and May 9, 2022 expert reports.

    v.    <u>Andrew Mintzer, CPA/CFF, CFE</u>. Mr. Mintzer is expected to testify about the opinions in his February 2, 2022 and May 9, 2022 expert reports, as modified by the Court's January 2, 2024 Order.

    vi.    <u>Dr. Alyson Wooten</u>. Dr. Wooten is expected to testify about the opinions in her February 2, 2022, April 4, 2022 and May 9, 2022 expert reports.

B.    **Defendants' objections to the qualifications of Plaintiffs' experts are:**

| Witness Name | Defendants' Objection to Qualifications |
|---|---|
| Chad Coffman | Defendants object to Mr. Coffman's qualifications, including because he has no meaningful pharmaceutical experience, lacks the requisite qualifications to opine on the degree of importance of statements made to investors, and does not have any legal training that would qualify him to opine on the damages stemming |

54

| Witness Name | Defendants' Objection to Qualifications |
|---|---|
|  | from the alleged violation(s) of specific provisions of federal securities law. Defendants further object to Mr. Coffman's qualifications to offer, as he presents it, expert testimony about: (i) whether the market for Valeant common stock was efficient during the period January 4, 2013 – June 6, 2016; (ii) whether the markets for certain specific Valeant Notes was efficient during that same period; (iii) whether the alleged misstatements and/or omissions purportedly made by Defendants during that period concerned information that was important to investors; (iv) loss causation; (v) the quantification of the artificial inflation per share for Valeant securities for the period January 4, 2013 – June 6, 2016; (vi) and the quantification of damages under SEC Rule 10b-5 for that period made under "specific legal assumptions." |
| Jill Fisch | Defendants object to Professor Fisch's qualifications, including because she has no professional investment or meaningful pharmaceutical experience. Defendants further object to Professor Fisch's qualifications to offer opinions regarding investors' reactions to Plaintiffs' version of the facts, scienter, and compliance with the law because Professor Fisch is a career academic and lacks significant experience in these areas. Defendants further object to Professor Fisch's qualifications to offer, as she presents it, expert testimony about: (i) factors Valeant should have considered as part of its materiality assessment; (ii) Valeant's purported decision not to disclose its relationship with Philidor; and (iii) Valeant's use of non-GAAP metrics. |
| Stanley Fortgang | Defendants object to Mr. Fortgang's qualifications, including because Mr. Fortgang lacks any meaningful pharmaceutical experience. Defendants further object to Mr. Fortgang's qualifications to offer, as he presents it, expert testimony about: (i) how institutional and professional investors typically analyze a company before deciding to invest; (ii) the information that is "first and foremost" in institutional investors' assessment in the same; (iii) the use of risk analysis by the Direct Action Plaintiffs and purportedly "faulty" data inputs into the same; (iv) the importance of corporate data inputs into risk analysis versus the process of risk analysis; (v) the ability of sophisticated investors to be |

| Witness Name | Defendants' Objection to Qualifications |
|---|---|
| | misled—despite their sophistication or research conducted—if alleged misstatements or omissions did in fact occur; (vi) institutional investors' longer-term analysis of newly disclosed information and its impact on a company they have invested in. |
| Gregg Jarrell | Defendants object to Professor Jarrell's qualifications, including because Professor Jarrell has no experience in disclosures or their "importance" and lacks meaningful pharmaceutical experience. Defendants further object to Professor Jarrell's qualifications to offer, as he presents it, expert testimony about: (i) inconsistencies between Valeant's public statements and internal documents; (ii) the alleged lack of disclosure of information; (iii) the importance and use of Valeant disclosures; and (iv) the abandonment of Valeant's price-volume methodology. |
| Andrew Mintzer | Defendants object to Mr. Mintzer's qualifications, including because Mr. Mintzer has no experience determining state of mind, has no experience performing internal controls audits, and lacks the relevant accounting credentials and experience and meaningful pharmaceutical experience. Defendants further object to Mr. Mintzer's qualifications to offer, as he presents it, expert testimony about: (i) Valeant's reporting responsibilities; (ii) Valeant's relationship with Philidor; (iii) improper revenue recognition; and (iv) disclosure compliance. |
| Alyson Wooten | Defendants object to Dr. Wooten's qualifications, including because she offers financial opinions that go beyond her experience as a patent lawyer and limited work as a pharmacist. Defendants further object to Dr. Wooten's qualifications to offer, as she presents it, expert testimony about: (i) Valeant's relationship with Philidor as compared to industry standards; (ii) Philidor's dispensing and reimbursement practices as compared to standard industry practices; (iii) the risks associated with Valeant's relationship with Philidor; (iv) how growth is achieved in the pharmaceutical industry; (v) drug pricing; and (vi) Valeant's use of patient assistance programs. |

**C.    Defendants' expert witnesses are:**

| Witness | Will Call | May Call | May, But Probably Will Not Call |
|---|---|---|---|
| **Albert Wertheimer, Ph.D., M.B.A.**<br><br>Dr. Wertheimer will testify consistent with his expert report, the Court's rulings, and any party agreements regarding the scope of his testimony. | | Live | |
| **Amy Hutton, Ph.D.**<br><br>Dr. Hutton will testify consistent with her expert report, the Court's rulings, and any party agreements regarding the scope of her testimony. | | Live | |
| **Brian Mittendorf, Ph.D.**<br><br>Dr. Mittendorf will testify consistent with his expert report, the Court's rulings, and any party agreements regarding the scope of his testimony. | | Live | |
| **Carl Seiden**<br><br>Mr. Seiden will testify consistent with his expert report(s), the Court's rulings, and any party agreements regarding the scope of his testimony. | Live | | |
| **Charles K. Whitehead**<br><br>Mr. Whitehead will testify consistent with his expert report, the Court's rulings, and any party agreements regarding the scope of his testimony. | | Live | |
| **Douglas F. Prawitt, Ph.D., CPA**<br><br>Dr. Prawitt will testify consistent with his expert report, the Court's rulings, and any party agreements regarding the scope of his testimony. | | Live | |

| Mark Garmaise, Ph.D. Dr. Garmaise will testify consistent with his expert report, the Court's rulings, and any party agreements regarding the scope of his testimony. | | Live | |
| Sean Nicholson Mr. Nicholson will testify consistent with his expert report(s), the Court's rulings, and any party agreements regarding the scope of his testimony. | Live | | |

**D.    Plaintiffs' objections to the qualifications of Defendants' experts are:**

| Witness Name | Plaintiffs' Objection to Qualifications |
| --- | --- |
| Albert Wertheimer, Ph.D., M.B.A. | Plaintiffs object to Mr. Wertheimer's qualifications to offer expert testimony in this case about (i) Philidor's central processing and fill arrangements and (ii) Philidor's dispensing of brand name drugs instead of generics. |
| Amy Hutton, Ph.D. | Plaintiffs object to Ms. Hutton's qualifications, including because she has a wholesale lack of experience in the pharmaceutical industry.  Plaintiffs further object to Ms. Hutton's qualifications to offer expert testimony in this case about (i) differences in Plaintiffs' allegations, (ii) evidence of Plaintiffs' reliance, (iii) the materiality or importance of Defendants' misrepresentations, (iv) the purported absence of a causal connection between Defendants' misrepresentations and the corrective events, and (v) the inflation in Valeant's stock price. |
| Brian Mittendorf, Ph.D. | Plaintiffs object to Mr. Mittendorf's qualifications, including because he has a wholesale lack of experience in the pharmaceutical industry.  Plaintiffs further object to Mr. Mittendorf's qualifications to offer expert testimony in this case as to the content of texts cited by Gregg A. Jarrell in his expert report. |
| Carl Seiden | Plaintiffs object to Mr. Seiden's qualifications, including because Mr. Seiden has no experience as a "sophisticated investor," nor working for one.  Plaintiffs further object |

| Witness Name | Plaintiffs' Objection to Qualifications |
|---|---|
| | to Mr. Seiden's qualifications to offer expert testimony in this case about (i) GMO as a sophisticated investor, (ii) GMO's research process and analysis, and (iii) GMO's consideration of supposed risks in investing in Valeant. |
| **Charles K. Whitehead** | Plaintiffs object to Mr. Whitehead's qualifications including because he has a wholesale lack of experience in the pharmaceutical and accounting industries. Plaintiffs further object to Mr. Whitehead's qualifications insofar as he has no experience in the past two decades preparing or reviewing disclosures on behalf of public companies. Plaintiffs further object to Mr. Whitehead's qualifications to offer expert testimony in this case about (i) Valeant's disclosure processes and practices, (ii) Defendants' knowledge, state of mind, and judgment in failing to disclose Philidor to investors, (iii) whether Defendants made material misstatements and omissions to investors, and (iv) Valeant's calculation of price vs. volume and disclosure of its organic growth. |
| **Douglas F. Prawitt, Ph.D., CPA** | Plaintiffs object to Mr. Prawitt's qualifications, including because he has a wholesale lack of experience in the pharmaceutical industry and in managing internal controls of a public corporation. Plaintiffs further object to Mr. Prawitt's qualifications to offer expert testimony in this case about (1) the sufficiency and/or misleading nature of Valeant's disclosures and (2) the sufficiency of Valeant's internal controls over financial reporting and its disclosures regarding the same. |
| **Mark Garmaise, Ph.D.** | Plaintiffs object to Mr. Garmaise's qualifications, including because he has a wholesale lack of experience in the pharmaceutical industry. Plaintiffs further object to Mr. Garmaise's qualifications to offer expert testimony in this case about whether Mr. Coffman considered supposed "key economic factors affecting Valeant's growth," including Valeant's (i) M&A growth model, (ii) known price increases, (iii) debt financing, and (iv) taxation model. |

| Witness Name | Plaintiffs' Objection to Qualifications |
|---|---|
| Sean Nicholson | Plaintiffs object to Mr. Nicholson's qualifications, including because he has never worked in the pharmaceutical industry.  Plaintiffs further object to Mr. Nicholson's qualifications to offer expert testimony in this case about (i) Valeant's supply chain, (ii) utilization management tools and manufacturers' responses, including Valeant's, (iii) drug pricing, including Valeant's (iv) Valeant's products and patient assistance programs, and (v) Philidor. |

9.     **PLAINTIFFS' EXHIBITS (Except for exhibits the need for which could not reasonably have been foreseen or which are used solely for impeachment purposes, only the exhibits set forth on the exhibit list attached hereto may be introduced at trial. Any objection to an exhibit, and the reason for said objection, must be set forth below or it shall be deemed waived. All parties hereby agree that it will not be necessary to bring in the custodian of any exhibit as to which no such objection is made).**

     A.     **Plaintiffs intend to introduce into evidence the exhibits listed on the attached exhibit list (list by number with a description of each):**

The exhibits Plaintiffs currently intend to introduce (other than those the need for which could not reasonably have been foreseen, or which will be used solely for impeachment or rebuttal purposes) are set forth on **Exhibit F**.

     B.     **Defendants object to the introduction of Plaintiffs' exhibits (set forth number of an exhibit and grounds for objection):**

Defendants' objections to the exhibits Plaintiffs intend to introduce are set forth in Exhibit F, using the following key:

| Objection Key | |
|---|---|
| 401/402 | FRE 401 and 402 |
| 403 | FRE 403 |
| 404 | FRE 404 |
| 407 | FRE 407 |
| 90 | FRE 901 |
| BE or 1002 | FRE 1002 |
| App. | Preserving objection for appeal |
| F | Lack of Foundation |
| H | Hearsay |
| HW | Objection to handwriting on document |

| Incomplete | Document is incomplete |
| Illeg. | Illegible document |
| MIL | Subject to Defendants' forthcoming motions *in limine* |

10.   **DEFENDANTS' EXHIBITS (See instructions above).**

    A.   **Defendants intend to introduce into evidence the exhibits listed on the attached exhibit list (list by number with a description of each):**

The exhibits Defendants intend to introduce are set forth in **Exhibit G** and **Exhibit H**.

    B.   **Plaintiffs object to the introduction of Defendants' exhibits (set forth number of exhibit and grounds for objection):**

Plaintiffs' objections to the exhibits Defendants intend to introduce are set forth on Exhibits

G and H, using the following key:

| Objection Key | |
|---|---|
| A | Authenticity – FRE 901 |
| F | Foundation |
| R | Relevance – FRE 401 |
| P | Unfair prejudice, confusion, potential to mislead the jury, undue delay, waste of time, or needless presentation of cumulative evidence – FRE 403 |
| C | Character Evidence – FRE 404 |
| K | Lack of Personal Knowledge – FRE 602 |
| H | Hearsay – FRE 801 and 802 |
| L | Improper Lay Opinion – FRE 701 |
| W | Waiver - By invoking privilege and refusing to produce documents or allow testimony on these topics, Defendants have waived their right to seek admission of evidence concerning: (1) their reliance on the advice of counsel or the involvement of counsel (a) in support of their defense of good faith or (b) to oppose evidence in support of a showing of scienter; or (2) the ad hoc committee's non-public investigation, communications, and findings. |

**(Copies of exhibits are to be made for opposing counsel, and a bench book of exhibits is to be delivered to the Judge at the start of trial. If counsel desires to display exhibits to the**

jury, sufficient copies should be available to provide each juror with a copy; alternatively, enlarged photographic or projected copies may be used).

11.   **PLAINTIFF'S LEGAL ISSUES**

A.      Whether Defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

     i.      To establish Valeant's, Pearson's, or Schiller's liability under section 10(b) and Rule 10b-5, Plaintiffs must prove: "(1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014).

B.      Whether Defendants Pearson and Schiller violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

     i.      To establish Pearson's or Schiller's liability as controlling persons under Section 20(a), Plaintiffs must prove that Valeant violated Section 10(b) and that Pearson or Schiller controlled Valeant and was a "'culpable participant' in the 'act or acts constituting the violation or cause of action.'" *SEC v. J.W. Barclay & Co., Inc.*, 442 F.3d 834, 841 n.8 (3d Cir. 2006).

**12.    DEFENDANTS' LEGAL ISSUES**

A.       Whether Plaintiffs can prove any element of a Section 10(b) of the Securities

Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and Rule 10b-5

promulgated thereunder, 17 C.F.R. § 240.10b-5.

      i.       To establish liability under section 10(b) and Rule 10b-5, Plaintiffs must

prove: (1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a

wrongful state of mind; (3) a connection with the purchase or sale of a

security; (4) reliance; (5) economic loss [*i.e.*, "damages"]; and (6) 'loss

causation,' *i.e.*, a causal connection between the material misrepresentations

and the loss. *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 424 (3d Cir.

2007) (citing *Dura Pharm. Inc. v. Broudo*, 544 U.S. 335, 341–42 (2005)).

A failure of proof as to any element requires dismissal as a matter of law.

B.       Whether Plaintiffs can prove that any Defendant violated Section 20(a) of the

Exchange Act, 15 U.S.C. § 78t(a).

      i.       To establish liability as controlling persons under Section 20(a), Plaintiffs

must prove that (1) "the defendant controlled another person or entity"; (2)

"the controlled person or entity committed a primary violation of the

securities laws"; and (3) "the defendant was a culpable participant in the

fraud." *Barbee v. Amira Nature Foods, Ltd.*, 2024 WL 626302, at *6

(D.N.J. Feb. 14, 2024) (Shipp, J.) (quoting *Institutional Investors Grp. v.

Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009)). No Section 20(a) liability

attaches if the alleged controller "acted in good faith and did not directly or

indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).

In addition, Defendants raised legal issues in their motions for summary judgment, *see* Docket Nos. 994 and 998, as well as motions to exclude the testimony of certain of Plaintiffs' experts, *see* Docket Nos. 995, 1032, and 1038, that remain relevant for trial, along with any legal issues that will be raised in Defendants' Contemplated Motions, *see supra* Section 2.C.

13.  **CHOICE OF LAW: (If there is any issue as to what state's law is applicable to any count of the complaint, set forth the choice of law question.  This issue shall be separately briefed in accordance with an order to be entered herewith).**

Not applicable.

14.   **MISCELLANEOUS (Set forth any other matters which require action by, or should be brought to the attention of the Court).**

1.      Defendant Pearson has indicated that he may be unable to attend trial due to health reasons. Accordingly, Plaintiffs intend to take a *de bene esse* deposition of Mr. Pearson prior to trial.

2.      Andrew Davenport has indicated that he will be out of the country during the trial but is available to provide his testimony remotely via video in August. Accordingly, Plaintiffs intend to take a *de bene esse* deposition of Mr. Davenport via Zoom in August.

3.      As set forth in Section 6c, Plaintiffs have indicated that they currently intend to call a staggering 47 witnesses at the trial: 21 witnesses live, two witnesses by *de bene esse* deposition, and 24 by deposition designations. With the exception of Defendants' experts and two fact witnesses, this list includes every deposed witness in the case. In stark contrast to Defendants' more narrow deposition designations, Plaintiffs have affirmatively designated more than 55 hours of deposition testimony alone. It is not remotely possible for Plaintiffs to play 55 hours of deposition testimony and call an additional 23 witnesses live in the time allocated by the Court— even ignoring the time necessary for Defendants to put on any evidence. Moreover, after weeks of promising a pared down list of alleged misstatements that could be tried in eight days, Plaintiffs recently provided Defendants with a "narrowed" list of alleged misstatements which contains 115 alleged misstatements (42 of which are not alleged in their Complaint). Defendants asked that Plaintiffs provide a more realistic plan for the eight trial days allocated by the Court. Plaintiffs have declined to do so. Instead Plaintiffs have repeatedly indicated that they will seek to narrow their witness list at some unspecified time closer to trial. Plaintiffs' refusal to provide Defendants with good faith disclosure about the case they intend to try in September has made meaningful trial preparation and productive meet and confers practically impossible. Plaintiffs' "kitchen sink"

approach, listing nearly every possible witness, designating near-wholesale deposition transcripts, and pursuing 115 separate statements—purportedly over 8 to 13 trial days—is also clearly unrealistic. As described herein, Plaintiffs should immediately identify a limited subset of misstatements as well as those witnesses they expect to call at trial so as not to burden the parties and/or the Court with unnecessary pre-trial disputes and preparation.

### Plaintiffs' Response to Defendants' Paragraph 14(c)

The immediately preceding paragraph was inserted by Defendants into the draft Final Pretrial Order on the evening of June 4, 2024, the night before it was to be submitted to the Court. Plaintiffs requested that Defendants remove this paragraph because, among other things, it is misleading and contrary to the position Defendants have taken during repeated meet-and-confers. Defendants refused to do so, so Plaintiffs regretfully feel compelled to include the following response to put to rest any concern that, after many years of litigation, Defendants are truly unaware of "the case [Plaintiffs] intend to try in September."

As a preliminary matter, both parties have necessarily identified more evidence in the Final Pretrial Order than they will actually move into evidence at trial. Defendants currently have over 1400 documents on their exhibit list and supplemental exhibit list, and they surely do not contend that they anticipate moving all of those documents into evidence in an eight-day trial or providing the Court with 1400 exhibits to review. They also have listed over 30 witnesses, some of whom they say they "will call" and some of whom they say they "may call." At this time, it is still uncertain which witnesses will attend and which will not. However, both parties agree that the lists they have prepared represent the total universe of potential evidence available for use at trial and have exchanged such information well in advance of trial so that each party can be prepared to address it. Both sides also agree that these witness lists and exhibit lists will have to be narrowed

before the joint exhibit list, bench books and witness list are submitted to the Court in August. The purpose of this initial exercise had been to prevent unfair surprise and to the extent that proofs are narrowed, there will be no undue prejudice.

Plaintiffs have engaged with Defendants in good faith and have not deployed anything close to a "kitchen sink" approach. On Tuesday, April 16, 2024, the parties informed the Court that the GMO action had been selected as the bellwether case to be tried in September 2024. Just two days later, on April 18, 2024, Plaintiffs sent Defendants a proposed pretrial schedule tailored off the September 4 trial date and the Court's June 5 deadline for submitting the Final Pretrial Order. Plaintiffs' version of the schedule proposed several mutual exchanges of Final Pretrial Order items to occur in April, as well as dates for additional submissions (such as motions in limine, proposed voir dire questions, a verdict sheet, and proposed jury instructions) not included in the Court's model Final Pretrial Order, which Plaintiffs proposed completing between June and August. The early exchanges were designed so that the parties would have as much time as possible to meet and confer to resolve their differences prior to June 5. A copy of Plaintiffs' April 18 proposed pretrial schedule is attached as **Exhibit I**.

In response, on April 23, 2024, and following a meet-and-confer earlier that day, Defendants sent Plaintiffs a proposed revised schedule, a redline copy of which is attached as **Exhibit J**. As the redline reflects, Defendants removed nearly all of the proposed joint exchanges in April and May, moved most of Defendants' deliverables back to May 24, 2024, imposed additional disclosure requirements on Plaintiffs in April and May, and struck any deadlines after June 12, 2024. Although Defendants' proposals reduced the time for the parties to meaningfully meet and confer, Plaintiffs agreed to accept most of them in the spirit of compromise and to move the case forward. The agreed-upon schedule is attached as **Exhibit K**.

As deliverables became due, Plaintiffs provided Defendants with the information necessary to prepare their case for trial. For example, the parties agreed to exchange their objections to each other's witnesses, including any objections to expert qualifications, on May 3, 2024. On that date, Plaintiffs provided Defendants with witness-by-witness objections, as well as objections to Defendants' experts' qualifications. Defendants, on the other hand, did not state whether they objected to any witnesses other than their corporate designees, and instead included a boilerplate objection to Plaintiffs' witness list, stating (contrary to their new position above) that "Plaintiffs should be required to identify *reasonably in advance of trial* a limited subset of those witnesses they actually expect to call at trial." (Emphasis added). Defendants did not provide any objections to the qualifications of Plaintiffs' expert witnesses, instead stating that they would conduct any necessary *voir dire* at trial.

In addition, Plaintiffs have taken the lead in moving the pretrial process forward. The three meet-and-confers that have occurred since the beginning of pretrial exchanges were all set at Plaintiffs' request (either by inclusion in Plaintiffs' proposed schedule or by Plaintiffs requesting a meet-and-confer in response to Defendants' exchanges). Plaintiffs have used those meet-and-confers to raise issues and seek information from Defendants. In between meet-and-confers, Plaintiffs have been contacting witnesses or their counsel to ascertain their availability for trial, and have provided updates to Defendants about those witnesses. Defendants, on the other hand, have not provided any information about their witnesses (except for the availability of Defendants Pearson and Schiller), even though Plaintiffs have asked for an update on every single meet-and-confer in which the parties have engaged.

Defendants' position on the narrowed list of misstatements is both surprising and perplexing. Plaintiffs voluntarily provided a narrowed list of misstatements to Defendants on May

10, 2024. That list, which is attached as Exhibit A, includes a significantly reduced number of misstatements than were before the Court on summary judgment. The narrowed list includes only statements that were pled in Plaintiffs' Complaint, which Defendants have had since January 2018, or disclosed in Plaintiffs' answers to interrogatories served more than three years ago in April 2021. Tellingly, since May 10, 2024, Defendants have never – *not once* – raised any issue with this narrowed list of misstatements during any of the parties' meet-and-confers.

Plaintiffs have devoted enormous resources to give Defendants notice of every single document, witness, or expert that they believe in good faith might be used at trial. Defendants have abundant resources and have had two months to prepare to address that evidence. That such body of evidence will perforce be narrowed (by both parties) as the trial approaches can cause no prejudice. Defendants' argument that they do not know what case Plaintiffs plan to put on strains credulity. Defendants have been litigating this case for almost a decade. Plaintiffs' theory of the fraud has remained remarkably consistent, and Defendants are well aware of the defenses they intend to advance. Plaintiffs submit that the best course forward is to continue to work in good faith toward trial rather than engage in needless disputation.

\* As instructed at the Final Pretrial Conference, the parties are directed to meet and confer as to these Miscellaneous items. Any further disputes as to these items following such meet and confers shall be promptly raised with the Court.

*RLS*

73

15.   **JURY TRIALS - Not later than August 12, 2024, and August 19, 2024, as set forth in the Court's April 22, 2024 Order Regarding Final Pretrial Conference (ECF No. 1400).**

   A.   <u>August 12, 2024</u>:  Each side shall submit to the Judge and to opposing counsel a trial brief or memorandum in accordance with Local Civil Rule 7.2B, with citations to authorities and arguments in support of its position on all disputed issues of law.  In the event a brief shall not be filed, the delinquent party's complaint or defense may be stricken.

   B.   <u>August 19, 2024</u>:  Counsel for each party shall submit to the Judge, with a copy to opposing counsel, written requests for instructions to the jury. Supplemental requests for instructions may be submitted at any time prior to argument to the jury.  All requests for instructions shall be plainly marked with the name and number of the case, shall contain citations of supporting authorities, if any, and shall designate the party submitting same.  In the case of multiple requests by a party, these shall be numbered in sequence and each request shall be on a separate sheet of paper.

   C.   <u>August 19, 2024</u>:  Joint proposed verdict form/special interrogatories are to be submitted to the trial judge.

   D.   <u>August 19, 2024</u>:  Proposed voir dire are to be submitted to the trial judge.

16.   **NON-JURY TRIALS**

Not applicable.

17. **TRIAL COUNSEL (List the names of trial counsel for all parties).**

Plaintiffs' trial counsel is:

ROLNICK KRAMER SADIGHI LLP

Lawrence M. Rolnick, Esq.
Michael J. Hampson, Esq.
Nicole T. Castiglione, Esq.

1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 597-2800
lrolnick@rksllp.com
mhampson@rksllp.com
ncastiglione@rksllp.com

Defendants' trial counsel is:

For Valeant Pharmaceuticals International, Inc.:

Matthew A. Sklar
Omar A. Bareentto
McCarter & English, LLP
Four Gateway Center
100 Mulberry St.
Newark, NJ 07102
T: 973.622.4444
F: 973.624.7070
msklar@mccarter.com
obareentto@mccarter.com

Jonathan Youngwood
Craig Waldman
Meredith Karp
Jonathan Kaplan
Jacob Lundqvist
Nora Hood
Simpson Thacher & Bartlett LLP
425 Lexington Ave
New York, NY 10017
T: 212.455.2000
jyoungwood@stblaw.com
cwaldman@stblaw.com

For J. Michael Pearson:

76

David Sarratt
Josh Cohen
Debevoise & Plimpton LLP
650 California St.
San Francisco, CA 94108
T: 415.738.5700
dsarratt@debevoise.com
jacohen@debevoise.com

Stephan Schlegelmilch
Mark Flinn
Debevoise & Plimpton LLP
801 Pennsylvania Avenue, NW
Washington, DC 20004
T: 202.383.8000
sjschlegelmilch@debevoise.com
mflinn@debevoise.com

Alessandra Masciandaro
Debevoise & Plimpton LLP
66 Hudson Boulevard
New York, NY 10001
T: 212.909.6000
amasciandaro@debevoise.com

For Howard B. Schiller:

Keith Miller
Robinson Miller
110 Edison Place, Suite 302
Newark, NJ 07102
T: 973.690.5400
kmiller@rwmlegal.com

Dan Webb
Joe Motto
Michael Stern
Winston & Strawn LLP
35 W Wacker Dr.
Chicago, IL 60601
T: 312.558.5600
dwebb@winston.com
jmotto@winston.com
mjstern@winston.com

Kerry Donovan

77

Winston & Strawn LLP
200 Park Ave.
New York, NY 10166
T: 212.294.6700
kcdonovan@winston.com

18.   **BIFURCATION (Where appropriate, the issues relating to liability shall be severed and tried to verdict. Thereafter, all issues relating to damages will be tried).**

The issues of liability and damages SHALL NOT be tried separately.

19.   **ESTIMATED LENGTH OF TRIAL**

7 DAYS FOR LIABILITY

and

1 DAY FOR DAMAGES.

The Court has currently set aside eight days for trial. Plaintiffs believe that it would be beneficial to increase the length of trial by an additional 4 or 5 trial days due to the amount of witnesses and exhibits that the parties currently contemplate introducing, but only to the extent that the trial will commence on September 3, 2024, as currently contemplated by the Court. If additional trial days cannot be added without disturbing the September 2024 trial date, Plaintiffs are prepared to complete trial within the eight trial days currently allotted by the Court.

Defendants are prepared to proceed with the eight trial days currently set aside by the Court.

* * * * *

AMENDMENTS TO THIS PRETRIAL ORDER WILL NOT BE PERMITTED UNLESS THE COURT DETERMINES THAT MANIFEST INJUSTICE WOULD RESULT IF THE AMENDMENT IS DISALLOWED.

\* The trial will commence on September 3, 2024 at 9:30 am. The Court has set aside nine (9) days for trial of this matter.

RLS

80

Dated: June 5, 2024

**MCCARTER & ENGLISH LLP**

*/s/ Matthew A. Sklar*
Matthew A. Sklar
Omar A. Bareentto
Four Gateway Center
100 Mulberry St.
Newark, NJ 07102
T: 973.622.4444
F: 973.624.7070
msklar@mccarter.com
obareentto@mccarter.com

**SIMPSON THACHER & BARTLETT LLP**

Jonathan K. Youngwood (*pro hac vice*)
Craig S. Waldman (*pro hac vice*)
Meredith D. Karp (*pro hac vice*)
Jonathan S. Kaplan (*pro hac vice*)
425 Lexington Ave
New York, NY 10017
T: 212.455.2000
jyoungwood@stblaw.com
cwaldman@stblaw.com
meredith.karp@stblaw.com

*Counsel for Defendant Valeant Pharmaceuticals International, Inc.*

**WINSTON & STRAWN LLP**

*/s/ Kerry C. Donovan*
Kerry C. Donovan
200 Park Ave.
New York, NY 10166
T: 212.294.6700
kcdonovan@winston.com

**ROLNICK KRAMER SADIGHI LLP**

*/s/ Lawrence M. Rolnick*
Lawrence M. Rolnick
Michael J. Hampson
Nicole T. Castiglione
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 597-2800
lrolnick@rksllp.com
mhampson@rksllp.com
ncastiglione@rksllp.com

*Counsel for Plaintiffs*

81

Dan K. Webb (*pro hac vice*)
Joseph L. Motto (*pro hac vice*)
Michael J Stern (*pro hac vice*)
35 W Wacker Dr.
Chicago, IL 60601
T: 312.558.5600
dwebb@winston.com
jmotto@winston.com
mjstern@winston.com

**ROBINSON MILLER LLC**

*/s/ Keith Miller*
Keith Miller
110 Edison Place, Suite 302
Newark, NJ 07102
T: 973.690.5400
kmiller@rwmlegal.com

*Counsel for Defendant Howard B. Schiller*

**DEBEVOISE & PLIMPTON LLP**

*/s/ Alessandra Masciandaro*
Alessandra Masciandaro
66 Hudson Boulevard
*New York, NY 10001*
T: 212.909.6000
amasciandaro@debevoise.com

David Sarratt (*pro hac vice*)
Josh Cohen (*pro hac vice*)
650 California Street
San Francisco, CA 94108
T: 415.738.5700
dsarratt@debevoise.com
jacohen@debevoise.com

82

Stephan Schlegelmilch (*pro hac vice*)
Mark Flinn (*pro hac vice*)
801 Pennsylvania Avenue, NW
Washington, DC 20004
T: 202.383.8000
sjschlegelmilch@debevoise.com
mflinn@debevoise.com

*Counsel for Defendant J. Michael Pearson*

\* Due to the volume of the Exhibits referenced    RLS
herein, the Court does not electronically file them
with this Final Pretrial Order. However, the Court
maintains such Exhibits, and the Court directs
Counsel to provide a complete copy of this
Final Pretrial Order, with Exhibits, to counsel
for the related parties.

So Ordered this 12th day
of June , 2024

Hon. Rukhsanah L. Singh, U.S.M.J.

83